**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DR. HOLLY ATKINSON,<br>DR. NATASHA ANUSHRI<br>    ANANDARAJA,<br>DR. STELLA SAFO,<br>MARY CALIENDO,<br>HUMALE KHAN,<br>GERALDINE LLAMES,<br>AMANDA MISITI,<br>EMILIE BRUZELIUS, and<br>DR. ANN MARIE BEDDOE | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No.:  1:19-cv-03779-VSB<br><br><br><br><br><br><br><br>**JURY TRIAL DEMANDED** |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | |
| DR. PRABHJOT SINGH,<br>DR. DENNIS S. CHARNEY,<br>BRUNO SILVA,<br>DAVID BERMAN, and<br>MOUNT SINAI HEALTH SYSTEM, INC., | )<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | | |

## PLAINTIFFS' [PROPOSED] SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs DR. HOLLY ATKINSON, DR. NATASHA ANUSHRI ANANDARAJA, DR. STELLA SAFO, MARY CALIENDO, HUMALE KHAN, GERALDINE LLAMES, AMANDA MISITI, EMILIE BRUZELIUS, and DR. ANN MARIE BEDDOE (collectively, "Plaintiffs"), by and through their undersigned attorneys, complain of Defendants DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA, DAVID BERMAN, and MOUNT SINAI HEALTH SYSTEM, INC., (collectively, "Defendants") and in support respectfully allege, upon information and belief, the following:

## NATURE OF THE ACTION

1.     This action is brought for unlawful sex discrimination in employment within a covered education program or activity pursuant to Title IX of the Education Amendments of 1972 20 U.S.C. § 1681, *et. seq.* ("Title IX") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), unlawful age discrimination in employment pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA"), unequal pay in violation of 29 U.S.C. § 206(d) (the "Equal Pay Act"), and related state-law claims for sex, age, race, religion and national origin discrimination and retaliation under the New York State Human Rights Law, Executive Law § 290, *et seq.* ("NYSHRL") and the New York City Human Rights Law, NYC Admin. Code § 8-107 ("NYCHRL"), unequal pay in violation of N.Y. Labor Law § 194, and breach of contract.

2.     Plaintiffs are former and current employees of the Icahn School of Medicine at Mount Sinai ("the Icahn School of Medicine"), run by Defendant Mount Sinai Health System, Inc. ("Mount Sinai"), their ultimate employer.

3.     This lawsuit centers on the Arnhold Institute for Global Health ("AIGH" or "the Institute") within the Icahn School of Medicine, and Defendant Dr. Prabhjot Singh's ("Singh") management of the Institute as its new Director.  Prior to his arrival, Mount Sinai Global Health ("MSGH"), as it was then known, was flourishing.  Its core staff included Plaintiffs Dr. Natasha Anushri Anandaraja ("Anandaraja") and Dr. Holly Atkinson ("Atkinson"), who helped build a pioneering and nationally recognized program in global health.

4.     Its success attracted the attention of the Arnholds, a prominent banking family in New York City who are widely known for their philanthropy, who in 2013 made a $12.5 million grant to expand the team's work.  Defendant Dr. Dennis S. Charney ("Charney"), Dean of the

Icahn School of Medicine, sought a "transformational" Director for this new era, and a distinguished search committee strongly recommended an accomplished scholar and academic leader, Dr. Steffanie Strathdee ("Strathdee"), Associate Dean of Global Health Sciences at the University of California-San Diego.  But Charney picked Singh, then a 32-year-old still completing his residency at Mount Sinai.

5.     Singh declared that he wanted to work only with young people.  He promptly set about denigrating and humiliating the Institute's existing employees who had been responsible for its success, most of them older women.  He was abusive, dismissive and hostile.  He showed no interest in anything he could not claim credit for starting, not even reading short briefing papers on complex programs in developing countries that had taken years to establish.  He denounced what he termed the female "legacy staff" for multiple, unpredictable reasons.  He would accuse them of failing to accomplish tasks he had not asked them to do, and when they did what he asked, he would deride them for not doing something else.

6.     Extremely charming when he wished to be, excellent at "managing up" and making stirring pitches to donors, Singh managed to cement his status as Charney's protégé as he turned AIGH into an unhappy and tumultuous workplace, particularly for women.  He was a brilliant "gaslighter," skilled at convincing people his abrupt shifts in direction were nothing of the kind, or that whatever he was angry about was their fault.  Employees began taking notes during conversations to reassure themselves they were not crazy when Singh tried to blame them later. His goal was apparently to demoralize the "legacy staff" so thoroughly that they would leave "voluntarily" or be set up to fail.  In this he was largely successful: by 2018, after they suffered increasing insomnia, depression and terror about going to work, 13 women were gone, many of them key legacy staff.  The people he liked to hire were overwhelmingly young men.

7.     Singh's oppression of those he perceived as inferior and weaker continued after the "legacy staff" were forced out, and women were his particular targets.  He skipped over them at meetings where men of equal importance got to talk freely.  When women did speak, he ignored their contributions in a way noticeably different from the way he treated men's contributions.  He told them to cut off long-standing professional contacts.  He even engaged in weird staring contests at meetings, evidently trying to intimidate his female subordinates.  And the culture he created enabled imitators.

8.     Defendant David Berman ("Berman"), his chief of staff, was known for violent screaming at women at AIGH, heard by everyone in the office, which Singh nonchalantly ignored. Defendant Bruno Silva ("Silva"), an employee of Mount Sinai, regularly called women "bitches" and "cunts"—fellow employees, donors, women from other parts of Mount Sinai—and made constant disparaging remarks about their appearance.  Singh did nothing to curb him.

9.     This "tough guy" management style was congruent with Dean Charney's, the ultimate boss whom Singh was always determined to please.   Charney is well-known for emphasizing his own strength and toughness under pressure, and for losing his temper with anyone who dares to cross him.  Charney's exchanges with Strathdee, the candidate to run AIGH strongly endorsed by the search committee, included screaming at her on the phone and an e-mail in which he called her "IDIOT" in red capital letters.  She said she had never been so rudely treated in her life and would never work for such a bully—and she was a job candidate with a distinguished background being recruited by Mount Sinai.

10.     Dishonesty pervaded Singh's management style.  Both with legacy employees and new ones, he proved himself untrustworthy.  He had inflated his CV to get the job to begin with and, as Director, lied to donors including USAID, falsely claiming that AIGH had deployed a

wonderful high-tech system for mapping health data in rural communities when the project was still a vague collection of specifications and unfinished code. Good employees responsible for the project who feared they were being used to deceive donors left AIGH. Singh allocated grant money to projects differently from what AIGH had agreed with donors. Employees knew they had to go along or get fired. The "cult of Singh" that brooked no dissent was equally conducive to the abuse of donors and female employees.

11.   To all of this, Mount Sinai's approach has been to "see no evil." A half-hearted and pre-judged 2018 investigation prompted by complaints from several "legacy staff" persuaded Mount Sinai that Singh rubbed people the wrong way but had done nothing fundamentally wrong. He received no punishment. Mount Sinai thought it unfair to discipline him because he allegedly had no idea he was discriminating or bullying. The fact that he picked overwhelmingly on older women was found not to be evidence of sex or age discrimination because he was also mean to a few men. An Oversight Committee was created to help him manage better, but until the original Complaint in this suit was filed, had met only a few times.

12.   In fact the culture that allowed Singh to thrive was set at the top, by the Dean of the Medical School for the last 12 years, Charney. He is intelligent and talented, but also has a widespread reputation at Mount Sinai as a bully. "I like it when people are afraid of me," he has said. The culture follows his lead: as Singh demonstrated, the main model for success is to "suck up and dump down." Charney's own HR staff were concerned at the "casual" way he installed Singh in a key position without following standard procedure, and they heard increasing complaints from AIGH staff about Singh's erratic, harsh and misogynistic behavior. But because Singh was Charney's rising star and no one wanted to provoke Charney's disfavor, the problems Singh created were allowed to multiply. The HR investigation into Singh made necessary by his

flagrant misconduct resulted in an Oversight Committee but no punishment for Singh and no redress for the complainants because Charney insisted upon that outcome. The only redress Plaintiffs could find was this lawsuit – an indicator that Mount Sinai's internal mechanisms are failing under the weight of Charney's management style.

13.     It turns out that his management style is oppressive to many people at Mount Sinai. In the wake of the original Complaint in this case, hundreds of Mount Sinai faculty alumni, students, and even current faculty who ultimately report to Charney, including some very senior ones, have signed public letters backing Plaintiffs for shining a spotlight on what the letters described as an "abusive culture." The student speaker at the Icahn School of Medicine's 2019 graduation, a few days after the original Complaint in this action was filed, spoke up against the systematic denigration and intimidation that the Plaintiffs experienced at Mount Sinai, telling the audience that "Time's Up!" to vigorous applause and cheers. Even staff members working regularly with Charney have been giving Plaintiffs encouragement and support.

14.     Perhaps in response to the public outcry, Charney sent an e-mail on July 3, 2019 praising Singh's "dedicated work" and "devotion to [the Icahn School's] mission and success," but also announcing that Singh had "chosen to step down" as Director of AIGH and Chair of the Department of Health System Design and Global Health. Singh remains on the faculty as an Associate Professor of Health System Design and Global Health, and of Medicine. Singh issued a statement saying he was able to "step aside . . . knowing that the attacks on [his] integrity and . . . . work have been investigated and proven false." In fact, the results of Mount Sinai's internal investigation into Singh (which had substantial shortcomings) have never been made public, but the fact that it resulted in the appointment of an Oversight Committee to supervise Singh cannot be construed as an unalloyed endorsement.

15.     This result exemplifies the double standards, sexism and ageism that pervade this case.  Singh's victims got no second chances: they were forced out or fired, their previously stellar careers in tatters, some needing to see counsellors and take antidepressants and anti-anxiety medications to deal with the stress and humiliation he heaped on them.  They did nothing wrong, continue to suffer, and have received no apology or redress; Singh, aided by Charney, Berman and Silva, left destruction in his wake, and yet he was permitted to step down on favorable terms from AIGH, still employed by Mount Sinai, with a warm, public endorsement from Charney.

## PARTIES

16.     Dr. Holly Atkinson is an individual and is domiciled in New York.  During the relevant period, and at all material times, Atkinson was employed by Mount Sinai Health System, Inc.

17.     Dr. Natasha Anushri Anandaraja is an individual and is domiciled in the State of New York.  During the relevant period, and at all material times, Anandaraja was employed by Mount Sinai Health System, Inc.

18.     Dr. Stella Safo ("Safo") is an individual and is domiciled in the State of New York. During the relevant period, and at all material times, Safo was employed by Mount Sinai Health System, Inc.

19.     Mary Caliendo ("Caliendo") is an individual and is domiciled in the State of New York.  During the relevant period, and at all material times, Caliendo was employed by Mount Sinai Health System, Inc.

20.     Humale Khan ("Khan") is an individual and is domiciled in the State of New York. During the relevant period, and at all material times, Khan was employed by Mount Sinai Health System, Inc.

21.     Geraldine Llames ("Llames") is an individual and currently domiciled in the Commonwealth of Virginia.  During the relevant period, and at all material times, Llames was domiciled in the State of New York and employed by Mount Sinai Health System, Inc.

22.     Amanda Misiti ("Misiti") is an individual and is domiciled in the State of New York.  During the relevant period, and at all material times, Misiti was employed by Mount Sinai Health System, Inc.

23.     Emilie Bruzelius ("Bruzelius") is an individual and is domiciled in the State of New York.  During the relevant period, and at all material times, Bruzelius was employed by Mount Sinai Health System, Inc.

24.     Dr. Ann Marie Beddoe ("Beddoe") is an individual and is domiciled in the State of New York.  During the relevant period, and at all material times, Beddoe was employed by Mount Sinai Health System, Inc.

25.     Mount Sinai Health System, Inc. is a domestic not-for-profit corporation, duly organized and existing under the laws of New York, with offices at One Gustave L. Levy Place, New York, New York, 10029.  It is the ultimate parent of an integrated health care system encompassing the Icahn School of Medicine and eight hospital campuses in the New York metropolitan area.

26.     Mount Sinai operates in an industry that affects commerce and employs twenty or more employees each working day in more than twenty calendar weeks per year, qualifying as an employer for purposes of Title VII, the ADEA, the NYSHRL and the NYCHRL.

27.     Dr. Prabhjot Singh is an individual and is domiciled in the State of New York.  At all relevant times, Singh was employed by Mount Sinai Health System, Inc.

28.     Dr. Dennis S. Charney is an individual and is domiciled in the State of New York. At all relevant times, Charney was employed by Mount Sinai Health System, Inc.

29.     Bruno Silva is an individual and was domiciled in the State of New York during the relevant period, and at all material times.  At all relevant times, Silva was employed by Mount Sinai Health System, Inc.

30.     David Berman is an individual and is domiciled in the State of New York.  At all relevant times, Berman was employed by Mount Sinai Health System, Inc.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. § 1331, Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*., Title VII, 42 U.S.C. § 2000e, *et seq*., the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq*., and the Equal Pay Act, 29 U.S.C. § 206(d).

32.     This Court has subject matter jurisdiction, pursuant to 28 U.S.C. § 1367(a), over all other claims in this case, as the claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

33.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because, *inter alia*, Mount Sinai Health System, Inc. has its headquarters in this District, and a substantial part of the unlawful employment practices alleged below occurred in this District.

## ADMINISTRATIVE PROCEDURES

34.    On April 26, 2019, Atkinson, Anandaraja, Safo, Caliendo, Khan, Llames, Misiti and Bruzelius filed duly notarized charges of employment discrimination based on sex, age, race, religion, national origin and retaliation with the Equal Employment Opportunity Commission ("EEOC") as required by federal law.

35.    On June 10, 2019, the EEOC issued Atkinson, Anandaraja, Safo, Caliendo, Khan, Llames, Misiti and Bruzelius with notices of right to sue in respect of their claims asserted herein. The First Amended Complaint was filed within 90 days of said notices on August 6, 2019.

36.    On September 14, 2020, Beddoe filed a charge of retaliation with the EEOC as required by federal law.  On September 21, 2020 the EEOC issued Beddoe with a notice of right to sue in respect of her claims asserted herein.

37.    Plaintiffs have fully exhausted all applicable administrative remedies, and all prerequisites and conditions precedent of the filing of this action have been satisfied.

## GENERAL ALLEGATIONS

### *Mount Sinai Health System, Inc.*

38.    Mount Sinai is the corporate parent of multiple entities providing health care, medical research and education in New York.  It was founded in September 2013 through the merger of Continuum Health Partners and the Mount Sinai Medical Center.  It includes eight hospital campuses along with the Icahn School of Medicine and employs 42,000 people, making it New York City's "largest integrated delivery system" for health care.  Its roots date to 1852, when the Mount Sinai Hospital was founded.  Icahn School of Medicine is one of the top medical schools in United States and is led by Defendant Charney, who is its Dean.

39.     Mount Sinai is or was the employer of all plaintiffs and individual defendants in this lawsuit.

## *Evolution of Global Health at Mount Sinai*

40.     In the mid-2000s, Dr. Ramon Murphy ("Murphy"), an eminent pediatrician, led a group of physicians to build a unique Global Health Training Program at Mount Sinai with two primary objectives: "to train, mentor, and equip U.S. medical students to pursue careers in global health, and to increase local health care capacity in medically under-resourced areas around the world."

41.     Murphy's core staff at the time included Anandaraja, who was in charge of developing the educational program.  In its first year, the group presented and received funding for a global health training Project Planning Grant from the Mulago Foundation, a fund administered by the Arnhold family.  An advisory board, which included many successful and influential philanthropists, academics and doctors, helped raise additional funds and advised the group on its mission and goals as it grew.

42.     Over time, the program became an integral part of Mount Sinai.  In 2010, Mount Sinai recognized this by creating a new position of Dean for Global Health, with Dr. Phil Landrigan ("Landrigan") being its inaugural appointee.  The program expanded from focusing on student education to additional research, patient care and human rights initiatives, under the name Mount Sinai Global Health.  MSGH expanded its staff to include Atkinson, who resurrected and developed a human rights program and later became Director of the Human Rights Program, and Elena Rahona ("Rahona"), who was Program Manager and later Administrative Director.  (A nascent human rights program had been introduced at Mount Sinai a few years before, but it had collapsed after the person overseeing it left Mount Sinai in 2012.)

43.     By 2014, MSGH had become one of the leading global health centers in the country and a crown jewel of Mount Sinai.  Its medical student training program, including a series of "InFocus courses" taught by Anandaraja and Atkinson for Mount Sinai's Department of Medical Education, reached 280 students per year receiving praise from students and lecturers, and high evaluation scores.  MSGH also created and implemented advanced global health training programs for Masters of Public Health students and resident doctors in various medical specialties.

44.     As a component of its comprehensive training program, MSGH also continued developing and strengthening its practical hands-on training opportunities at international partner sites, including Summer Global Health Projects which, between 2007 and 2015 accommodated 223 student and 94 faculty placements at up to 17 sites across the world, giving them valuable first-hand experience of global health principles in practice.

45.     Early evaluations showed that 64% of Mount Sinai Global Health Residents said that MSGH's educational programs influenced the way they had ranked Mount Sinai for residency and 71% of surveyed student alumni reported that their global health experience at Mount Sinai, run by MSGH, made them more competitive during their residency applications.  More importantly, in 2015, 91% of surveyed Mount Sinai Global Health Residency Track graduates reported they were working with underserved populations in the U.S., and 51% also continued to work with underserved populations internationally, a statistic that made Murphy, Anandaraja and Atkinson especially proud as producing a generation of healthcare workers competent and committed to work with underserved populations had long been MSGH's key mission.

46.     As successful as they were, Anandaraja and Atkinson found out early on in their employment at Mount Sinai that, as women, they would not receive due credit for their work.  In 2013, both applied for promotion from Assistant Professor to Associate Professor.

47.     Dr. David Muller ("Muller"), Dean for Medical Education, told Anandaraja that he had spoken to the Appointments and Promotions Committee about her application, that the application passed first muster, that he would support it, and that he was confident that it would succeed.  Muller also told Anandaraja that this was the right time in her career to submit the application.

48.     Atkinson had sought the advice of several colleagues before applying for the promotion.  She visited Dr. Andrew S. Jagoda, MD, Professor and Chair Emeritus of the Department of Emergency Medicine and then-Chair of the Appointments, Promotions and Tenure Committee ("Jagoda").   Jagoda reviewed Atkinson's *curriculum vitae* at this meeting and encouraged her to seek promotion, saying "You're going for full professor, right?" Atkinson replied that she was applying only for the role of Associate Professor, because she had come to academia relatively late in her career.  Jagoda said that "given all you've done, it should be a 'slam dunk.'"  He explained that Mount Sinai was interested in recruiting people from various backgrounds and different fields outside of medicine, including people with business experience, to help build innovative institutes to work horizontally across the institution.  Given this push to recognize diverse talents, backgrounds and contributions, Jagoda said that advancement at Mount Sinai was no longer predicated strictly on traditional academic measures like publication counts.

49.     Unbeknownst to Anandaraja and Atkinson, Drs. Jonathan Ripp ("Ripp") and Nils Hennig ("Hennig"), both Assistant Professors with whom they worked closely at MSGH, applied for academic promotions at around the same time.   While Anandaraja's and Atkinson's applications were rejected, both men's applications were approved.

50.     Anandaraja received no formal explanation for the decision to reject her application, but Muller told her that he was surprised at the outcome and that it must have been

"political."  He suggested that Anandaraja instead switch to a less-prestigious non-academic track to have better chances of success at Mount Sinai.  Anandaraja reluctantly agreed to focus on developing new educational programs and quickly proposed an executive course in global health, which Landrigan agreed to and funded.

51.     Landrigan told Atkinson almost a year after they started the process to promote her that it "wouldn't fly" because she did not have enough peer reviewed publications in "conventional biomedical journals."  This was contrary to the earlier assessment of Jagoda, who was then the Chair of the Appointments, Promotions and Tenure Committee.

52.     To add insult to injury, Ripp and Hennig had reported to Anandaraja in their MSGH roles and so were in fact junior to her, but did get promoted.  Anandaraja's and Atkinson's work experience, service, professional accomplishments and leadership experience undoubtedly matched, if not exceeded, that of Ripp and Hennig.

53.     Ripp's and Hennig's careers continued to flourish – the former is now the Senior Dean for Wellbeing and Resilience and Chief Wellness Officer for the Mount Sinai Health System (and Anandaraja's current supervisor), and the latter is Mount Sinai's Director of the Masters of Public Health program.  Meanwhile, Atkinson and Anandaraja were demoted, denigrated and cast aside.

### *Arnhold Foundation donates $12.5 million to MSGH*

54.     For most of MSGH's history, its finances relied mostly on informal fundraising by Murphy, Anandaraja and the advisory board.  Murphy was one of New York City's most prominent pediatricians and had a large network of influential friends and grateful patients.  Many of them supported MSGH when they could.  They trusted Murphy, his vision for global health and the work that he, Anandaraja, Atkinson and others were doing at Mount Sinai.

55.     By 2013, MSGH's work was so impressive and well-known that it attracted serious attention from two influential foundations in New York City, both run by the Arnhold family: the Arnhold Foundation and the Mulago Foundation (together, "the Foundations").   Murphy had known the Arnholds for decades, having been the family's pediatrician of choice.   He and other MSGH doctors had briefed the family on its work over the years and they had made periodic donations.   In 2013, the Arnhold family decided to sharply expand their support, making a major $12.5 million donation (split between the Foundations).   The Gift Agreement between the Foundations and Mount Sinai stipulated:

> Donor's gift will establish The Arnhold Global Health Institute, a multi-disciplinary institute dedicated to addressing the gap in global health, and will be used for the Institute's training and education mission. Of this gift, $8,000,000 will create a permanent endowment for support for the Institute's education and training mission. The remaining $4,500,000 will create a current-use education and training fund, enabling immediate growth and support of The Arnhold Global Health Institute.

56.     John Arnhold ("Arnhold"), a Trustee of the family's foundation, said that "[s]upport for high-quality, global health education has always been a priority for our philanthropy […].  We are delighted to have this opportunity to support the remarkable work that Mount Sinai is doing to create the next generation of global health leaders and workers."   Arnhold also stipulated that none of this donation was to fund the salary of MSGH's director, because he wanted Mount Sinai to at least partially match his commitment to the Institute and pay the Director's salary from Mount Sinai's operational budget.

57.     Anandaraja, Murphy and Atkinson were delighted by the gift.  They looked forward to taking MSGH to the next level.

58.     The Foundations supplemented their 2013 $12.5 million donation with an additional gift of $15 million in December 2015, after Dr. Singh had been formally in his role for

four months.  Charney sent John Arnhold a typed letter, on which he wrote a big handwritten "Thanks!" on the bottom, saying: "As you know, the Arnhold Institute for Global Health is poised to take a fresh approach to combat the health crises that affect global populations.  The appointment of Prabhjot Singh and your extraordinary commitment have galvanized the Institute and set us on a new course pinpointing and aligning our activities that show the highest potential; discerning where a population's problems run deepest; developing programs that will address these issues; and providing care – and building health care capacity – that offers new hope."  It is clear that Charney considered Singh a crucial asset to AIGH's major donor.

## *Name change and Director search*

59.    The terms of the 2013 donation dictated that Mount Sinai "upgrade" MSGH to a formal institute, initially named the Arnhold Global Health Institute, and later renamed the Arnhold Institute for Global Health.  Mount Sinai announced the name change on April 3, 2014.  Landrigan became AIGH's Interim Director to oversee the Institute as well as a competitive international search for a permanent director.  The Institute moved into new offices in summer 2015.

60.    Despite the changes, Mount Sinai was committed to continuing much of MSGH's work as part of the Institute:

> [AIGH] will continue to offer education and research into global health issues and further collaboration among physicians, scientists and trainees from Mount Sinai and like-minded organizations from around the world, particularly other academic medical centers in developing nations.

### *Charney forms a search committee*

61.    Upon receiving the gift, Charney, Dean of Mount Sinai and President of Academic Affairs for Mount Sinai, formed a search committee for the AIGH Director position.

62.     Charney has had a long association with Mount Sinai and has become virtually synonymous with it.  He was recruited to Mount Sinai in 2004 as Dean of Research and became Dean of the School and Executive Vice President for Academic Affairs of the Medical Center in 2007.  Mount Sinai contributed $500,000 towards the 2005 purchase of his $1.95 million home in Chappaqua, NY.  His discovery of Ketamine as a fast-acting antidepressant for treatment-resistant depression was named one of the top 10 medical innovations of 2017 by the Cleveland Clinic.  He was also named one of the world's most cited life science researchers in 2016 by Cybermetrics Lab and one of the world's most influential scientific minds by Thomson Reuters in 2015.  He has written or co-authored over 700 publications, including *Resilience: The Science of Mastering Life's Greatest Challenges* (2018), which examines why some people recover from trauma more easily than others.  Prior to joining Mount Sinai, Charney worked at the National Institute of Mental Health and taught at the Yale School of Medicine for 18 years as a professor of psychiatry, where he also completed his residency in 1981.  Charney obtained his M.D. from Penn State School of Medicine and his bachelor's from Rutgers University.

63.     Charney values toughness, emphasizing its importance in his work on resilience. A fan of Bruce Springsteen, he has adopted "tougher than the rest" as a personal mantra.  In his late 60s, he "pride[s] himself on his strength," kicking off Mount Sinai's annual push-up challenge for prostate cancer, which he won in 2015 after completing 106 push-ups, and continues to compete in every year.  In June 2020, Charney launched "Fit for the Front Line," asking alumni and others for $2 pledges for each of his 35 bench presses of 135 pounds to support frontline COVID workers.[1]

---

[1] https://time.com/3892044/the-science-of-bouncing-back/.

64.     Charney has a reputation for losing his temper and screaming expletives at colleagues and even students, and for treating the Icahn School of Medicine as his own personal fiefdom.  In the wake of this lawsuit, Dr. Andrew Goldstein, now Assistant Professor in the Department of Medicine at NYU Langone Health, publicly disclosed a disturbing incident involving Charney when he was a second-year student at the Icahn School of Medicine.  Goldstein had organized a panel discussion at the Medical School after Ken Davis ("Davis"), the CEO of Mount Sinai, published an advertorial in the New York Times endorsing the view of big drug companies that the exclusivity period for drug patents should be lengthened, a position Goldstein opposed on the grounds it would make drugs more expensive and keep them beyond the reach of patients who need them, especially in poorer countries.  At short notice, Charney insisted that an additional member in favor of the drug companies' position be added to the already crowded panel Goldstein had organized, and Goldstein had expressed concern to Charney's secretary and asked to speak to him.  While studying for an exam at home that evening, Goldstein received a call from Charney, who screamed at him down the phone:  "*Did you fucking tell my fucking secretary that I can't fucking add a fucking panelist to a fucking panel at my fucking medical school?*"

65.     Charney also caused controversy when he co-authored an article that favorably reviewed an experimental treatment for depression but initially failed to disclose that he and other co-authors had financial ties to the manufacturer of the device used to deliver the treatment.  The journal in which the article was published subsequently issued a "correction" disclosing the financial ties.

66.     Charney's direct oversight of the search process showed that the position of AIGH Director was a priority for Mount Sinai.  He appointed Landrigan as the chair of the search committee, and also appointed Muller, Murphy, Beddoe, System Director of Global Health and

Director of Global Women's Health, Michael Brodman, Chair of Obstetrics, Gynecology and Reproductive Science, Adolfo Garcia-Sastre, Director of Global Health and Emerging Pathogens Institute, and Jo Ivey Boufford, President of The New York Academy of Medicine and Clinical Professor of Global Public Health at New York University, as members.  Landrigan exchanged several e-mails with MSGH staff about an appropriate job description, ultimately approving the following:

> The Icahn School of Medicine at Mount Sinai seeks an experienced MD, PhD, Dr.P.H, or person with equivalent training to lead a newly endowed Institute for Global Health. Our ideal candidate is a person with well-recognized leadership skills, a scholarly portfolio that includes current grant funding and a strong publication record, and an approach to global health which fosters interdisciplinary collaboration, partnership and innovation[.] We are looking for an inspirational team leader with field experience in low and middle income countries, a grounding in public health and health education, and a demonstrated commitment to serving under-resourced and neglected populations.

67.     The message to candidates was clear: Mount Sinai wanted to hire an established, experienced and inspiring global health expert to lead the Institute.  The search committee agreed to limit candidates to those at Associate Professor level or above, with a "scholarly portfolio that includes current grant funding and a strong publication record" in global health.

68.     The committee narrowed the large application pool to a shortlist of ten scholars, each of whom met the criteria.  Some had more than 100 publications and ran their own departments and institutes elsewhere.  Having considered all the applicants and shortlisted candidates, the search committee eventually chose Strathdee to become AIGH's Director.

### Dr. Steffanie Strathdee's application

69.     Strathdee is a formidable expert in global health.  At the time of her application, she was the Harold Simon Professor at the University of California San Diego ("UCSD") School of Medicine, Associate Dean of UCSD's Global Health Sciences and Chief of the Division of

Global Public Health.  She also served as Director of the UCSD Global Health Initiative and the Co-Director of the GloCal Fellows Program.  Strathdee had written hundreds of peer-reviewed publications and was a leading researcher in HIV-risk behaviors among drug users and sex workers on the U.S.-Mexico border.  In 2018, she co-founded the Center for Innovative Phage Applications and Therapeutics, the first phage therapy center in North America.  She did so after conceiving of and overseeing the first use of phage therapy in the United States to treat antibiotic-resistant bacterial infection, an innovation that has attracted considerable media and scientific interest.

70.    Strathdee clearly exceeded the criteria the search committee had set for the Director position.  Landrigan, Murphy, Anandaraja, Beddoe and others were enthusiastic about her candidacy.

71.    After being picked by the search committee, Strathdee was due to meet with Charney to have her appointment confirmed.  However, before that, on September 29, 2014, Anandaraja, Landrigan and Murphy met with Charney to present a proposed budget for AIGH that they had worked out with Strathdee.  Murphy and Landrigan presented the budget to Charney, with Anandaraja providing context for a few aspects of the budget about which Charney had questions.  The meeting startled and confounded the members of the search committee.  Charney screamed at them, threw the budget down on the table, pounded it with his fist and exclaimed that the budget was unacceptable, because they were asking for too much.  He claimed that AIGH had not raised any money for Mount Sinai—which was not true—and that the budget they were seeking was ridiculous.

72.    The team went back to the drawing board with Strathdee to look for ways to make the budget more palatable to Charney, but none of their revisions changed his mind.  He sent a dismissive final budget offer to Strathdee on October 13, 2014.  He was similarly harsh to her in

other interactions, before ultimately writing Strathdee an e-mail calling her "AN IDIOT," in red font and all capitals.

73.     Strathdee decided to withdraw her application.  In an e-mail, she cited her disagreements with Charney over the budget.  On the phone, Strathdee told Anandaraja privately that the real reason was that Charney had been unbelievably rude to her, that she had never been spoken to like that in her life and that she could not and would not work for a bully like him.

74.     Anandaraja, Murphy and Landrigan were deeply concerned about this development.  Strathdee was a major scholar and leader in global health.  She had the experience, capacity and skill to realize the Foundations' gift into significant new programs at AIGH. Charney's rudeness and dismissiveness to her as she negotiated the details of her position, the same as any other senior figure would do, meant that Mount Sinai was throwing away a chance to hire one of the nation's top scholars in this field.  Since the Institute now had plenty of money, and Strathdee was accomplished and had many good ideas for the Institute, Charney's vituperative dismissal of her and her proposed budget seemed irrational.

**Charney blames Anandaraja for the failed Strathdee negotiations**

75.     Despite Murphy's and Landrigan's leading role in the meeting where Charney had screamed at them, Charney began referring to the budget as "Anu's [Anandaraja's] budget."  In a subsequent meeting with the Deans at Mount Sinai, he once more called it ridiculous and implied that the negotiations with Strathdee failed because of it.  After Strathdee withdrew her application, several people at Mount Sinai suggested that Anandaraja become AIGH's Interim Director while the search committee looked for a replacement.  However, when Anandaraja approached Muller about the idea, he told her that he did not think she should pursue it.  He said that although many would support her candidacy, she was too closely associated with the budget Charney had rejected.

Indeed, Charney was blaming Anandaraja for Strathdee's withdrawal, though Charney was the reason. The men on the selection committee, Murphy and Landrigan, were equally responsible for the budget Charney castigated as ridiculous, but he only blamed the women involved, Anandaraja and Strathdee.

76.     Anandaraja knew that Charney was making her a scapegoat for his own bullying and bull-headedness, but she wanted to be a team player, so she committed herself to finding another strong candidate for AIGH Director. In fact, Charney had already decided on a candidate, who would turn out to be adept at dismissing women too.

### Charney instructs the search committee to consider only Singh

77.     Charney's instruction to the search committee after Strathdee withdrew her application was to return to its pool of applicants, continue interviewing and pick another candidate. However, Charney quickly put forward his own candidate, Dr. Prabhjot Singh.

78.     Beddoe was astonished by this. Singh was still a resident and had not yet completed his medical training, and was vastly underqualified compared to the previous candidates the search committee had been considering. Nonetheless, at Charney's instruction, the search committee assessed him.

### Singh's background

79.     Singh had been a Visiting Assistant Professor of International and Public Affairs at Columbia University since 2011 and Director of System Design at the Earth Institute since 2006, where he worked with Professor Jeffrey Sachs ("Sachs") to co-found the One Million Community Health Workers Campaign in 2013. He obtained a bachelor's degree from the University of Rochester in 2003, a Ph.D. in Neural and Genetic Systems from Rockefeller University in 2009 and an M.D. from Cornell University in 2011. Singh was a 2012 Robert Wood Johnson

Foundation Young Leader, a 2005 Paul & Daisy Soros Fellow and a Fellow of the Committee on Global Thought at Columbia.  He came to Mount Sinai as a resident in 2011 but had not completed his medical training when Charney decided he should be AIGH Director.

80.     According to Singh's biography, he immigrated to the United States with his family from Nairobi, Kenya, where he grew up.  He is married to Manmeet Kaur ("Kaur"), CEO and Founder of City Health Works, a Harlem-based clinic that trains and manages locally hired health coaches to decrease costs and improve outcomes for high need patients.

### Singh's previous dealings with Landrigan and Anandaraja

81.     Landrigan and Anandaraja knew Singh because he was a Mount Sinai resident with an interest in public and global health and a promising academic background.  Anandaraja had also known Singh professionally because she was a Co-Chair of the Global Health Committee of the Associated Medical Schools of New York, of which Singh was a member.  In that role, Anandaraja had observed that Singh was often absent from committee meetings, and that even when he did attend (typically by phone), he rarely provided any meaningful assistance, and instead name-dropped and made vague promises to leverage his expansive network, none of which materialized.

82.     Singh was in touch with Landrigan and Anandaraja during the original search process that had resulted in Strathdee's selection.  He did not apply for the Director position, but arranged a meeting with Landrigan on February 24, 2014, to discuss his future at Mount Sinai. Prior to the meeting, Landrigan asked Anandaraja for her views about Singh.  Anandaraja, mindful of what she had observed about him during the Global Health Committee meetings, wrote:

> [W]e would like to have him involved in G[lobal] H[ealth]. I just passed him in the lobby actually. I guess just find out what his interests are and then lets [*sic*] discuss in our group whether his motivations and goals fit in within the GH

mission/vision. Maybe suggest that he meet with the rest of the team to find out more about what we are doing before we make any decisions - I'll reach out and see when he would like to meet with Sigrid and I....I am happy to work out a niche for him /with him if he is compatible and willing and we can work out funding - will he need an FTE?

And, you probably already know that his wife and he are working on a community health worker model for East Harlem - it is super interesting and I think in alignment with our dual training mission - there is a lot of overlap in what we do. I think he could be a valuable mentor for trainees too. Not sure if he is such a team player - which is important for us - but that remains to be seen.

83.     After Landrigan met with Singh, he and Anandaraja discussed how he might be someone to keep on their radar for a junior position at AIGH.  He was well-connected and clearly ambitious.  Once Singh finished his residency, Anandaraja and Landrigan thought, they could create a 10-20% role for him in MSGH to work as a clinical instructor, running a research project or a health site abroad.  They thought this kind of opportunity would excite him and would also be appropriate to his junior level of experience.

84.     Dr. Kevin Starr ("Starr"), Managing Director of the Mulago Foundation and the *de facto* Arnhold family representative for many of their philanthropic efforts, suggested that they ask Singh if he knew of any suitable candidates to be AIGH Director.  Anandaraja and Dr. Sigrid Hahn, who worked with Landrigan, agreed to meet with Singh, who provided them with three names who were too inexperienced or otherwise unsuitable.  Singh did not mention himself. Anandaraja sent Singh the job description for the search with a cover note:

> I know our goal is to explore candidates outside the traditional profile, but I think it likely that there are some immovable criteria - so it would probably save us time and energy to exclude candidates that are too young (less than 40???) and, if from an academic background, less than associate prof level…

85.     It was clear that the search committee was looking for somebody experienced, with leadership and management background and a strong academic track record.  Singh responded,

"tough crowd," apparently reconciled to the fact that the selection committee did not find any of his suggestions strong enough.

### Singh formally visits AIGH

86.     After Charney ordered the search committee to consider Singh, however, Landrigan had no choice but to comply.  Landrigan instructed his executive assistant to organize "a full day of interviews and a seminar [for Singh] as a candidate for the position of Director of [AIGH]."

87.     Anandaraja felt conflicted.  On the one hand, she knew that Charney would never change his mind.  She anticipated that the interview process would be window-dressing to make it look like Singh had gone through a serious selection process when the reality was that Charney had already picked him.  But at the same time, she was genuinely concerned that Singh lacked skills and qualifications for the job and did not have significant management experience.  He seemed a strange choice to run a sophisticated institute with accomplished staff and a track record that had just won it $12.5 million in new money.

88.     Trying to do a thorough vetting process despite the high likelihood that Charney's mind was already set, Anandaraja reached out to Starr on December 3, 2014, to learn more about Singh:

> I wanted to reach out to hear your thoughts regarding Prabhjot as a candidate for Institute Director.  I know you have met several times and think highly of him. We also know of his work and see the potential for creating a defining brand for AGHI.  Do you have any specific ideas regarding his potential as Director of the Institute?  We look forward to discussing his vision for AGHI with him, but also keen to hear your perspective.

89.     Starr believed that AIGH needed a brand, a "special sauce" to truly develop and become successful.  He told Anandaraja that Singh was a visionary, somebody who could use his *je ne sais quoi* to change the world.  Anandaraja was not entirely convinced.  But Starr told her

that he would be able to convince the Arnholds to donate another $15 million if Singh became AIGH's Director.

90.     Singh's official interview, lecture and visit to AIGH was on December 16, 2014. Many of those present were unimpressed, including Beddoe and other members of the search committee.  After his lecture, the audience asked him several questions that he seemed unable to answer, including one from Beddoe: "What do you see as the most important problem in global health that we will face in the upcoming years?"  Singh was unable to answer.  He came across as unprepared and underqualified, a clearly charismatic young man who had not had enough time or experience to qualify him to run the Institute.

91.      Some were struck by how much name-dropping he did.  After the lecture, Singh boasted to Beddoe that he had extensive contacts in Liberia, including the President, and said he could put her in touch with some of them if it would be helpful.  Beddoe had her own contacts there from her prior work, and when they began to discuss specific names, Singh suddenly fell silent, leaving her with the impression that in fact he did not have the contacts he had claimed to, and was worried that this might be exposed if the conversation continued.

92.     Members of the search committee submitted evaluations to Landrigan after Singh's visit.  Several of them made it clear that they regarded him as clearly unsuitable.  Beddoe gave him a score of zero on virtually all of the search committee's metrics.  When she submitted her scores to Landrigan, he asked if she really wanted to score Singh in this manner.  Beddoe replied that it was an appropriate assessment for someone who was clearly not qualified for the position.

93.     The committee had identified a number of other promising applicants, including Dr. Francesca Gany of Memorial Sloan Kettering Cancer Center, but put them on hold knowing

that the final call was up to Charney, who had already chosen Singh. Landrigan wrote Anandaraja saying that "if he [Charney] is completely smitten by [Singh], end of story."

## *Singh was underqualified and inflated his CV*

94.    Singh certainly demonstrated promise for a young man, but all zeros was not an unreasonable score for him on the committee's metrics. High-level positions, such as the Director of a major global health institute, normally require candidates to have dozens of peer-reviewed, original research articles. His CV at the time showed very few publications, and none contained original global health research; he wrote mostly opinion pieces.

95.    Singh also had no federal grants, usually a given for reputed researchers and a requirement for high-level positions overseeing research. Singh's funding came primarily from private foundation grants regarded as less prestigious than the standard R01 grants from the National Institutes of Health.

96.    He had published only a fraction of the number of articles published by Strathdee. Indeed, the comparison between Singh's CV and Strathdee's is even more striking if basic due diligence is applied. In the CV he submitted to the search committee, Singh repeatedly overstated his credentials. For example, he stated that he was an Assistant Professor at Columbia University when, on information and belief, he was in fact a Visiting Assistant Professor, but this was not apparent from his CV.

97.    Singh also misrepresented his publication record by using non-standard formatting and exaggerated his funding by implying others' grants were his own.

*Misleading list of publications*

98.    In medicine, CVs usually list publications by type, separating peer-reviewed articles, which carry the most weight, from other works.   Though other kinds of publications contribute to authors' reputations, peer-reviewed articles are critical for proving the quality and influence of scholarly work.   Mount Sinai's own guidelines instruct all faculty members to isolate their "peer reviewed original contributions" from other types of publication—such as "books and book chapters" or "non-peer reviewed publications."   Singh's CV, however, amalgamated all publications together regardless of their type, thus obscuring their import, or lack thereof.

99.    Singh's undifferentiated list of publications worked to his benefit by allowing him to list his peer-reviewed publications in the same group as his less-esteemed work, which included:

> (a) A book chapter:  Singh P. Closing the Health Gap: Lessons from Africa, in Learning from the World: New Ideas to Redevelop America. London: Palgrave Macmillan; p. 185–97.

> (b) A working group paper: Singh P, et al. One Million Community Health Workers: Technical Task Force Report. Earth Institute at Columbia University, 2011.

100.   Singh's CV also avoided standard procedure for formatting citations, in a way that resulted in inflating the appearance of his contributions to the cited publications.   Authors' contributions to academic articles in medicine are typically denoted by the order in which their names are listed.   The first author receives the greatest amount of credit, as he or she is most responsible for conceiving and writing the piece.   In medicine, promotions to senior faculty appointments often require that candidates be the first authors of numerous high-quality peer-reviewed articles.   The last author of an article is often the senior person who received funding for a project and is responsible for its overall direction.   Though he or she may not be involved in the

intimate details of the research, the last author can be critical to its completion and may also receive significant credit.  Middle authors usually contribute less and accordingly receive less credit.

101.   Mount Sinai recognizes that middle authors may make substantial contributions to an article and allows middle authors to include a publication on their CV if they explain the extent of their work on it.  "For publications in which [applicants] made major contributions but appear as a middle author," Mount Sinai requires that they "annotate [their] contribution directly under the journal citation."  CVs must describe middle authors' "substantial contributions in: conception and design of study; data acquisition; data analysis and interpretation [and] drafting or revising critically important intellectual content."

102.   Mount Sinai requires that CVs use the National Library of Medicine ("NLM") format, the most widely accepted format for medical publications.  It lists publications by their primary author and displays co-authors in proper order.  Singh's CV did not use the NLM format or any other standard method.  Instead, he created his own system, listing his publications by title rather than name and placing authors at the end of each citation.

103.   Though Singh included a roster of authors for each entry, he excluded his own name in all of them, with the result that his own contribution was impossible to determine and his junior status in most of them could be elided.  For example, he listed a 2012 study published in *The Lancet* as "with Pronyk P et al."  He did not list any of the other authors besides Pronyk.  He did not make clear that he was in fact the thirteenth of fifteen authors.  He did not explain whether or how he substantially contributed to the publication.  The implication was that he had a much bigger role in the article than would have been conveyed had he complied with Mount Sinai's required CV format.

104.   Of the eight peer-reviewed publications on Singh's CV, he was the first author for three and the last author for three.  In proper NLM citation format, the two other articles which Singh listed on his CV for which he was a middle author are:

(a) Pronyk PM, Muniz M, Nemser B, Somers M-A, McClellan L, Palm CA, Huynh UK, Amor YB, Begashaw B, McArthur J, et al. The Effect of an Integrated Multisector Model for Achieving the Millennium Development Goals and Improving Child Survival in Rural Sub-Saharan Africa: A Non-Randomised Controlled Assessment. The Lancet. 2012May8;379(9832):2179–88.

(b) Carlson KB, Dhadialla PS,[2] Feaster MM, Ramnarain A, Pavlides C, Chen Z-L, Yu W-M, Feltri ML, Strickland S. Mesenchymal Stem Cells Facilitate Axon Sorting, Myelination, and Functional Recovery in Paralyzed Mice Deficient in Schwann Cell-Derived Laminin. Glia. 2010;59(2):267–77.

105.   Singh's CV did not provide Mount Sinai with the required annotation of his "major contributions" to the two peer-reviewed articles for which he was a middle author.  Among the peer-reviewed publications for which Singh was the first or last author, the majority were not original research.  Instead, Singh mostly wrote perspective articles that did not create new data and were essentially opinion pieces.  Singh's CV included only one peer-reviewed, original research study for which he was the first or last author, and the study was unrelated to global health:

(a) Dhadialla PS, Ohiorhenuan IE, Cohen A, Strickland S. *Maximum-Entropy Network Analysis Reveals a Role for Tumor Necrosis Factor in Peripheral Nerve Development and Function*. Proceedings of the National Academy of Sciences [Internet]. 2009;106(30):12494–9.  Available from: https://www.pnas.org/content/pnas/106/30/12494.full.pdf

---

[2] Early in his career, Singh published under the name "Prabhjot S. Dhadialla."

106.   At the time Singh was hired, the only peer-reviewed research article in global health that Singh had ever published—as the thirteenth author—was an evaluation of the Millennium Villages Project (see ¶ 104(a)).  After publication, the article was heavily criticized for its statistical methods and unsubstantiated claims, leading to a forced correction by the journal of the article's "unwarranted and misleading" assertions.  The controversy over errors in the article and its retraction was widely covered in the popular and scientific press.  The article's infamy resulted in the resignation of Dr. Paul Pronyk, the lead author and a colleague of Singh's at the Earth Institute, from Columbia University.

107.   For the Director of a major academic global health institute to have so few peer-reviewed articles—with only one original research study for which he was the first author and only one (highly controversial) original research study in global health—would be extremely peculiar. It is reasonable to infer that Singh, well aware of his shortcomings as he applied to Mount Sinai, attempted to bolster his publication record by obscuring some details of his work.

### *Singh misrepresents his sources of funding*

108.   Singh's CV also deviated from the standard medical CV format, and Mount Sinai requirements, in the way it covered grants and omitted certain usual information, with the result that he appeared to be the recipient of funding that other academics had secured.

109.   Mount Sinai policy requires prospective faculty members to detail their funding source, the project being funded, the grant number, the applicant's role in the project, the start and end dates of funding and the direct costs received individually by the applicant.  Mount Sinai does not allow CVs to stray from the template, stating that applicants must "use exact grid format and include all required information."  Singh, however, failed to follow these requirements in his CV

and did not include grant numbers, his role in the funded projects, specific start or end dates or his direct costs.

110.   Singh's omission of his role in the grants listed on his CV is particularly suspect, as different roles carry significantly different weight.  The Principal Investigator is the person primarily responsible for the preparation, conduct and administration of a grant and is ultimately answerable for any misconduct.  As a result, the role of Principal Investigator carries the greatest weight.  Co-Investigators are less crucial and their role less prestigious due to their lower level of responsibility.

111.   Singh included grants on his CV without disclosing his actual role; it would have looked less impressive had he directly admitted he was not their Principal Investigator.  There were other unusual aspects of the grants he listed.[3]  On the CV he submitted as a candidate for Director, Singh included a 2008-2012 grant for $1.2 million from the Merck Foundation to the Millennium Villages Project without specifying his role.  One year later, only after becoming Director of AIGH, Singh changed his CV to specify that he was the Co-Investigator on the grant, making clear at that stage that he had not been Principal Investigator.

112.   Singh listed on his CV a 2013-2015 grant for $725,000 from the Robert Wood Johnson Foundation ("RWJF") to City Health Works, a non-profit organization founded by his wife, Kaur.  In the RWJF's online grant database, however, Singh's name does not appear in any capacity in relation to the grant.  Instead, the RWJF indicates that Kaur was the sole responsible party as its Project Director.

---

[3] Because none of Singh's grants were federally funded, detailed information about them must be sought from the individual donors rather than through the government's widely used grants database.

113.   Singh's CV also included a 2013-2014 grant for $250,000 from the Gates Foundation to the Earth Institute's One Million Community Health Workers Campaign.   While the Gates Foundation's online grant database displays other grants to the Earth Institute, no grant is listed for the amount or time period indicated by Singh.

114.   Other weaknesses as a candidate were obscured by Singh's choice not to use Mount Sinai's required CV format and omission of several required sections.   Mount Sinai requires that applicants must "not exclude sections or leave sections blank," and "if a particular section does not apply to [them]," should "enter 'not applicable' under the section heading."   Disregarding these explicit instructions, Singh failed to include the required sections on his research profile, clinical profile, impact, clinical trials participation and trainees, further obscuring his actual credentials to become Director.

115.   Charney apparently did not care that his protégé failed to follow Mount Sinai's CV guidelines designed to protect against resume inflation.   Ignoring this made it easier for Charney to appoint him Director of AIGH.

## *Despite lack of qualifications, Charney hires Singh*

116.   Charney evidently thought Singh was a remarkable find and that choosing him was a coup.  On February 2, 2015, he met with the Institute's Advisory Board to tell them Singh was his choice, as shown in the meeting minutes:

> He is close to finalizing the recruitment of a "founding leader" for the Arnhold Global Health Institute. If all goes through the new Director will be Dr. Prabhjot Singh, who is Director of Systems Design at the Earth Institute, Assistant Professor of International and Public Affairs at Columbia University, as well as a current resident at Mount Sinai.  […]
>
> Advisory Board members will receive the official announcement, but are asked not to share the information until it has been made official.

During the board's ensuing question and answer session, Dean Charney shared that Dr. Singh has already presented him with a vision statement for the Institute and brings creativity and ambition to his new position. Dr. Singh also brings strong relationships with key foundation funders including Robert Wood Johnson and Gates Foundations. The Dean is very excited about this candidate and will be working with Dr. Singh on setting up a five year plan (with metrics) and recruiting faculty. In addition, Dr. Charney will be personally mentoring Dr. Singh and meeting with him weekly.

117.  Many members of the Advisory Board were concerned by Charney's approach. They noted Singh's lack of experience and asked how and by whom he would be supervised. Charney seemed annoyed by their comments and offered only curt replies; he said he would supervise Singh personally and meet with him weekly. Charney's main focus seemed to be on quieting the Advisory Board so that he could get his way.

### Elizabeth Stern's due diligence on Singh

118.  Elizabeth Stern ("Stern"), who was appointed Chair of the Advisory Board in 2015, shared its members' concerns. Stern first met Singh in May or June 2015 at the offices of Peter Peterson of the Peterson Institute, where Singh worked as a consultant. Singh initially gave her the wrong address for the meeting, and when she could not find the location, he told her that she should have been able to find the entrance on her own. Stern was surprised by this comment, which seemed unusually rude. As she was the Chair of AIGH's Advisory Board, the normal thing for a new employee would be to try to make a good impression. Then, Singh opened their meeting by saying he was not sure there was much to talk about, which again seemed oddly dismissive.

119.  Singh spent the rest of their hour-long session boasting about himself and his connections. Despite her ten years of experience on the Advisory Board, and her experience as a fundraiser and a philanthropist in public health, Singh often interrupted her and dismissed her opinions. He gave the impression of having no interest in her views. She left believing that he did not respect women in leadership roles and would be arrogant as Director. He spoke so poorly of

the existing global health program that Stern thought he might fire the entire team despite its numerous awards and achievements.  Afterwards, she told Murphy, "We have our hands full."

120.   Stern had never heard of Singh before; if he had been well-known and highly regarded at the Earth Institute, she expected she would have heard of him through her network.  It surprised her that Charney would choose someone so egotistical and inexperienced over Strathdee, a woman with stellar credentials whom everyone at MSGH had been enthusiastic about.  This, coupled with the negative first impression he went out of his way to make, prompted Stern to seek more information about him from her network of contacts in global health.  Her first inquiry was with friends at the Earth Institute at Columbia University, where Singh had worked with Dr. Jeffrey Sachs.

121.   Her contacts told her that Singh was "trouble."  They told her that any woman subordinate to him needed to have her wits about her, advising her to hold her ground and not give him an inch.  They said his wife, Kaur, acted very differently around him than when she was alone; while she was usually quite independent and confident, in Singh's presence she deferred to him in a striking way.  These comments confirmed Stern's initial fears that Singh did not respect women.  She met Singh and his wife subsequently and watched them interact, finding her friends' and colleagues' comments justified.

### Singh secured a highly-paid fellowship at Mount Sinai for Sachs

122.   Additionally, Stern's Earth Institute contacts told her that Sachs had helped Singh obtain the Director position by talking him up to Charney.  Sachs and Singh were clearly close.  Singh told people that he had written large parts of Sachs' books and that Sachs sometimes took Singh's ideas, in particular that one of Sachs' 2017 articles was largely Singh's product.

123.   Later, after Singh started at AIGH, Stern's contacts told her that Sachs' contract

with the Earth Institute ended the same year that Singh joined AIGH, and that Singh arranged for

Sachs to serve as an AIGH fellow and as member of the new Executive Board of AIGH.  AIGH

agreed to pay Sachs $121,100 per year for two years in exchange for just eight hours of work per

week (equivalent to $2,523 per eight-hour workday assuming a 48-week working year).  While

Sachs had a substantial reputation, Stern took this to be payback for helping Singh get the job in

the first place, which augmented her concerns about Charney's hiring process.

### Charney announces Singh's arrival

124.   Charney hired Singh within a few weeks of the Advisory Board's February 2015

meeting, but did not tell the Advisory Board or the AIGH staff he had done so.   Instead,

Anandaraja, Atkinson and the other senior staffers learned that they had a new boss from their

colleague, Nils Hennig, who happened to attend an unrelated meeting where Charney spoke:

> I am just coming out of the Student Council Steering Committee meeting where
> Dennis Charney announced that Prabhjot Singh signed the contract to be the new
> GH Institute Director. He will start in September.

125.   Charney did not even inform Landrigan, his own Dean for Global Health, who also

first found out from Hennig.  The official notice to everyone else at AIGH took another week, via

an "All Staff, Faculty and Students" e-mail from Charney:

> We are delighted to announce the appointment of Prabhjot Singh, PhD, MD, as
> Director of the Arnhold Global Health Institute at Icahn School of Medicine at
> Mount Sinai, and Vice Chair of Population Health in the Department of
> Medicine, effective September 1, 2015.
>
> The Arnhold Global Health Institute, a new interdisciplinary institute, is
> dedicated to improving the health of people worldwide by building global
> partnerships in research, education, and clinical care. As Institute Director, Dr.
> Singh will align high-potential global and domestic health activities across the
> Icahn School of Medicine and the Mount Sinai Health System.

> As Vice Chair, Dr. Singh will lead the development of educational and research goals for population health within the Department of Medicine, in collaboration with the Department of Population Health Science and Policy.

> These dual responsibilities will enable Dr. Singh to blend advances in domestic population health—including economic principles, biomedical advances, and systems science—with principles that have historically driven global health activity, such as social impact, inequity, and human rights.

126.   Charney's infatuation with Singh was so total that this 32-year-old junior scholar was not only given the reins at AIGH but also a position as Vice Chair in the Department of Medicine.

127.   In a later meeting, Beddoe reiterated to Landrigan her deep concerns about Singh's appointment.  Landrigan told her that he and Dr. Barbara Murphy would mentor Singh during his first year, and that she "shouldn't worry about it."

### Singh's recruitment is consistent with Charney's broader hiring practices

128.   Charney's track record of hiring underqualified young people, especially men, for very senior positions extends well beyond Singh.

129.   Upon information and belief, Charney has hired numerous inexperienced and under-qualified young doctors to lead Mount Sinai departments over the last five years.  His obsession with young protégés, or "golden boys," who are inevitably indebted to him for their over-promotion and excessively subservient to his wishes, is widely regarded within Mount Sinai as both discriminatory and reckless—as demoralizing to colleagues, dangerous for patients and harmful to valuable scientific research.

130.   Charney is also nepotistic.  On information and belief, his son Alex was rapidly promoted to Assistant Professor in no less than four separate departments at Mount Sinai directly out of his residency, skipping several steps in the normal path to advancement, and vaulting over numerous other, better-qualified candidates.

131.   On information and belief, Alex continues to receive preferential treatment over better-qualified colleagues, and is widely regarded within Mount Sinai as having been promoted out of his depth.  Most recently, he was installed Co-Director of the COVID Informatics Center and effectively made the gatekeeper for COVID-19 biospecimen samples, a responsibility considered far beyond his experience level and expertise.  Researchers working on urgent projects relating to COVID-19 report that he has failed to respond to requests for access to biospecimens necessary for their work.  Recently, Alex was listed as first and corresponding author on a paper describing the results of a study in which Mount Sinai's Institutional Review Board authorized the collection of samples from patients without the need to obtain their informed consent; an extraordinary departure from normal scientific protocols.[4]

132.   On August 4, 2020, Charney's daughter Allison was appointed the Executive Director of Mount Sinai Medical Legal Partnership, after serving on its Board of Directors since 2014.

### *Singh hires allies and undermines "legacy staff"*

#### *Singh's arrival is delayed until September 2015 because he is still a resident*

133.   Although Charney hired Singh in February 2015, Singh's official start date at AIGH was postponed until September because he had to finish his residency at Mount Sinai first.  Landrigan was expected to handle all business until Singh was ready to take over, but Singh started intervening as soon as his appointment was announced, making the interregnum uncomfortable and confusing to AIGH's staff.

---

[4] *Sampling the host response to SARS-CoV-2 in hospitals under siege* (https://www.nature.com/articles/s41591-020-1004-3).

134.   Singh sought to take control very early on.  He started pushing his own agenda and projects before he could learn about AIGH's existing projects and commitments.  His first official visit as Director-designate took place on April 7, 2015.  He met with AIGH's key staff, including Murphy, Anandaraja and Atkinson, but said that his schedule was too busy to meet with anybody for more than 20 minutes.

135.   Anandaraja realized this was hardly enough time to learn about the Institute's substantial array of programs or ideas for future growth but tried to organize the meetings as well as she could to let Singh know what exactly he would have responsibility for.  She asked everybody to prepare clear reports so that Singh could read them in advance.  This took Anandaraja and her staff many hours and several all-nighters to produce.

136.   When Singh met Anandaraja, Atkinson and their colleagues, however, he made it clear that he disdained AIGH's current projects and did not care to learn about them or understand their impact and benefits.  He appeared not even to have read the reports.  He simply did not want to hear about what they had been doing or what they wanted to do next.

137.   In fact, the die had already been cast: out with the old, even if it was superb and had taken years to build; in with the new, as long as Singh could take credit for it.  On April 5, two days before his scheduled visit, he wrote one of the consultants he hired to do an overview of AIGH, instructing her to review "legacy activity in education and global health sites," to streamline the department and "bring down the number of global health sites to 2-3 and education processes down to one coherent flagship program."  This was the first step of many to dismantle the existing work of the Institute, erase its legacy and start *de novo* so that anything AIGH now did would be seen as his brainchild.

138.   Singh promptly set to work on this plan.  In August 2015, he ordered Anandaraja to cut short her important work trip to Mozambique, Malawi and South Africa and return to New York.  Anandaraja was in Africa to mentor one of the Global Health fellows at an AIGH site in Mozambique and to visit organizations in Malawi and South Africa as part of her vetting process for a new executive course she had been developing with Landrigan.  Singh said that he did not support these efforts, did not understand them and wished her to attend a three-hour retreat that he organized instead.  Anandaraja had no choice but to comply.  Soon after her return, work on the executive course was cancelled, and Anandaraja's Program Coordinator fired.  Singh also cut funding for the executive course Anandaraja had established.

### Singh undermines "legacy initiatives"

139.   Singh used the terms "legacy staff" and "legacy initiatives" as shorthand to refer to Murphy, Anandaraja, and Atkinson—in short, existing MSGH staff who were older than Singh.

140.   Singh immediately took over the Institute's finances and required every major expenditure to be cleared by him, including for active projects that had ongoing commitments. When Anandaraja or Atkinson approached him about a "legacy" project, or a decision that needed to be taken to continue "legacy" work, Singh stonewalled, saying that he needed to do a full review of AIGH first before committing to any further expenditures or initiatives.  Long-term projects with proven benefits for thousands of people in developing countries were suddenly in limbo.

### Singh dismantles Advisory Board

141.   Soon after Singh was hired, Tal Recanati ("Recanati"), who was then Chair of the AIGH Advisory Board, hosted a welcome event for him at her home.  Many of AIGH's staff and advisory board members attended.  They asked Singh about his plans for the future so they could help deliver them, but Singh was unable or unwilling to articulate any vision.  When they tried to

probe deeper, he responded evasively.  Singh told staff at AIGH afterwards that he did not value the Advisory Board's role.  He frequently referred to them as "ladies who lunch," a clearly sexist remark.  In fact, the Advisory Board included highly successful people, both men and women.

142.    Singh preferred to assemble a board of his own.  He explained his plan to Murphy, who then wrote Stern:

> Not clear what Prabhjot wants to do with advisory Board, since he has assembled his own with heavy hitters in Med/GH Chair of Dept of Med Barbara Murphy, Head of Earth Institute, Jeffrey Sachs, Dean of Global Health, Phil Landrigan and 1 or 2 more ....interesting...

143.    It then came as little surprise that Singh dismantled the Advisory Board after two meetings.  Stern was disappointed—they were all volunteers, dedicated to AIGH's work.  They had supported it from its humble beginnings and donated their own money to keep it afloat.  Based on what they had seen of Singh and Charney's February presentation, they concluded that Singh dismantled the Advisory Board to free himself of outside oversight or criticism.  He clearly wanted to be in complete control.

***Singh hires contacts from his network***

144.    Singh was bedazzled by the world of technology start-up companies and frequently spoke of running AIGH as a start-up.  At the same time as he was rescinding funding to "legacy projects," citing new budgetary constraints and other obstacles, Singh made numerous six-figure commitments and hired new staff and consultants.  These were his friends and professional connections, mostly his age or younger, hired without any normal process.

### Dr. Abdulrahman M. El-Sayed

145.    Singh's first hire was one of his colleagues from Columbia University, Dr. Abdulrahman M. El-Sayed ("El-Sayed").  Singh hired him in spring 2015 to become his right

hand, AIGH's Associate Director and an Associate Professor of Population Health Science and Policy at Mount Sinai.  Upon information and belief, Singh did not open the position to others within Mount Sinai or to the public—he recruited El-Sayed directly.  El-Sayed, a former Rhodes Scholar, was thirty years old, and had recently been appointed Assistant Professor of Epidemiology at Columbia University.

146.   Although Singh did not officially announce El-Sayed's hiring to the staff at the Institute for a while, El-Sayed knew he had the job.  In or before April 2015, without having worked a day at the Institute, El-Sayed listed himself as AIGH's Associate Director in materials for an upcoming New York conference, C3 U.S.-Arab Healthcare Summit.

147.   Rahona found out about this through her professional network.  On April 9, 2015, she sent an e-mail to Anandaraja pointing out that El-Sayed listed himself at a conference as affiliated with the Arnhold Institute.  Anandaraja was as surprised as Rahona—she knew nothing about it, a complete departure from the way people were normally hired at Mount Sinai, which was after consultation and normal vetting.

148.   El-Sayed then started visiting the Institute and various events associated with Singh's hire.  He was included in Singh's strategy meetings and e-mail chains, and was introduced to AIGH's Board of Advisors.  El-Sayed boasted to Anandaraja that he was furnishing his AIGH office with very high-end furniture, using leftover grant money from grants he transferred from Columbia University to Mount Sinai.  However, at some point in the summer of 2015, El-Sayed decided not to join AIGH after choosing to take a job in Michigan.

149.   Singh's hiring of El-Sayed is significant, because it demonstrates that AIGH was not struggling financially or unwilling to spend from the Arnhold donation.  Singh just did not

want to spend on "legacy staff," who were mostly older women.  He was happy to offer jobs to young people who would be beholden to him.

### Other new staff

150.   Singh made a number of other high-profile hires of his friends and professional contacts.  These included Dr. Sandeep Kishore ("Kishore") and Berman, whom Singh hired without publicly recruiting other candidates or opening the positions to internal applicants within Mount Sinai.

151.   Singh originally offered Kishore the position of Global Health Fellow at AIGH, which would have been an appropriate post for him.  However, a few months later, Singh named Kishore Associate Director to oversee education and training—essentially replacing Anandaraja, despite the fact that Kishore had recently dropped out of a medical residency program, had no relevant experience for this management role and lacked leadership qualifications.

152.   Berman was hired to become AIGH's Chief of Staff, a new title little known at Mount Sinai and unusual in academia.

153.   Singh also hired Kirsten Knaup ("Knaup") to become AIGH's Chief Operating Officer, essentially replacing Rahona.

154.   All of these new hires were friends or professional contacts of Singh.  One day, El-Sayed came into the office to meet with Singh.  On observing them through the glass window of Singh's office, Knaup said, "Look at that bromance; isn't that so beautiful that the men have this bromance where things get done?  It would not be the same if a woman was involved."  Rahona, who was in the room, understood Knaup's comment to mean that it was obvious Singh respected and trusted male colleagues more than female ones.

**PopTech and other consulting firms**

155.   Singh spent lavishly on several rounds of consultants.  In May 2015, he hired PopTech, a firm Singh called "enterprise design experts."  He explained to Landrigan that they would help "us move forward on our inclusive, strategic planning process, which allows [us] to bring in a wide set of perspectives and allows us to amplify core principles and values of the Institute."  By Singh's own estimate, PopTech would send the Institute a six-figure bill, which Charney approved.

156.   On information and belief, Singh did not conduct an open search to find consultants at a competitive price—he hired PopTech directly after they had named him as a PopTech Science Fellow for 2013 and promoted him at one of their past conferences.

157.   Much of the work for which Dr. Singh hired consultants could have been done internally.  Singh required Anandaraja, Rahona, Atkinson and others at AIGH to work closely with PopTech and other consultants, spending many hours talking with them.  They were required to hand over work and institutional knowledge that they had gathered over many years at AIGH, only for the consultants to repackage and present it to Singh as profound new insights.

## Singh demotes "legacy staff" and discriminates against them

158.   Singh's choice of new staff was not rooted in his rolodex alone.  It was also sexist and ageist.

159.   He treated the "legacy staff" as if they were inconvenient barnacles, soon to be cleared away.  He quickly dismissed their work, which had gathered significant renown and prestige, as subpar and unworthy of his attention.  He did not even try to understand it.  Most of the people Singh called "legacy staff," including Murphy, Anandaraja, Atkinson, and Rahona, were much older than he was.  It quickly became clear that being "old" and especially "old and

female" were sufficient reasons to be ignored, and then forced out.  Charney's "rising star," with his comparatively thin credentials, apparently felt resentful towards those whose CVs already had luster, and whom he could not so easily dominate.

160.   And so Singh overwhelmingly hired people his age or younger, who were even more junior and beholden to him for their jobs, and therefore unlikely to challenge him.  Both Singh and El-Sayed made numerous statements about how they only wanted to work with young people.  They wanted to run AIGH like a Silicon Valley start-up and believed, as is common in that world, that effective enterprises should be run by young men.  In El-Sayed's first meeting with Anandaraja, he told her that he was excited to develop a "young" team at AIGH and not to have to work with "anyone over 40."  El-Sayed also attended the cocktail party organized by Recanati and told everybody that he was excited for the opportunity to "start a global health program from scratch."  This sent an uncomfortable wave through the audience—AIGH was already a global health program, and a successful one.

161.   Singh made a similar statement during a presentation to AIGH's Board of Advisors on June 17, 2015, which Murphy, Anandaraja, Atkinson and Rahona also attended.  Singh presented his strategic plan for AIGH, stating that it was his intention to populate AIGH with a team of investigators who were "ideally young, in their twenties and thirties."  The clear implication to the "legacy staff" was that Singh planned to get rid of them, regardless of their contributions.  Rahona and Anandaraja were in their 40s, and Atkinson was in her 60s.

162.   Charney knew and approved of Singh's plan to rid AIGH of all the old staff and replace them with young graduates.  In fact, Murphy told Stern that it was Charney who authorized Singh to move out all the "legacy staff" and start afresh shortly after he hired Singh.  However, Mount Sinai's HR policies prevented Singh from firing employees at will, which in Murphy's

view annoyed Singh tremendously, so his only option to get rid of the "legacy staff" was to make them leave "voluntarily."

163.   Singh did not delay that project.  His work with external consultants, intended to provide him a fig leaf so he could restructure AIGH to his liking, culminated in a presentation to AIGH staff.  The slides outlined several imperatives for the remainder of 2015.  One of them was to "manage legacy staff and initiatives that are unfocused and below the standards required to help realize the new vision."  While facially unobjectionable, those words were code for dumping the work that had brought AIGH to prominence and the older women who had been responsible for it.

164.   Murphy was very disturbed by Singh's presentation.  He wrote him an e-mail to push back and defend the quality of AIGH's team, his colleagues for many years:

> Dear Prabhjot,
>
> Greetings! (that by the way is how one's letter from the Armed Forces begins when you are drafted (it happened 1 week after our wedding!)
>
> […] You may want to rethink the phrasing of ["Manage Legacy staff and initiatives that are unfocused and BELOW the standards required to help realize the new vision"] to recognize that we are not "legacy staff", we are the founders and builders of the program and the ones that brought it into this next phase through our efforts and our fundraising and that the term "legacy staff" could be read as insulting......
>
> Also we acknowledge that our programs have room for improvement and alignment with new vision, but seeing them described as "below standard" will yield nothing positive.
>
> The advisory Board is aware of all of this, so the question is.....what's next? Looking forward to our Advisory Board meeting this coming Wednesday.
>
> Take care,
>
> Ramon

165.   To realize his vision of a leadership team "in their twenties and thirties," Singh picked young men for prominent positions and did not consult with other AIGH staff beforehand.

These picks included Berman, Kishore and El-Sayed.  He also demoted AIGH's existing leadership, comprising primarily of women older than him—the "legacy staff."  Though their official job description did not change, Singh downgraded their titles.  Atkinson and Anandaraja, formerly Directors, became Program Directors.

166.   This was a significant demotion.  Directors at Mount Sinai are considered to have a high level of experience and responsibility, overseeing programs, trainees, staff and faculty.  Program Directors are a step down and suggest a much lower amount of responsibility and experience.  As a result, Anandaraja's and Atkinson's career prospects were knocked down, and their reputations suffered.

167.   Singh later told a job applicant at AIGH that his gradual ousting of most of AIGH's employees when he started in 2015 was an "important part" of AIGH's progress.  When Singh interviewed Misiti, he told her he had to "get rid of these women."  He also bragged to Misiti and others that he had driven legacy staff out of AIGH because he needed a "clean house."  When he brought this up again, Misiti asked him, "well, how did you do it?  Did you fire them?" and Singh responded "No, there's a way that you do it that's not firing."

### Legacy staff: Singh discriminates against Rahona

168.   As soon as Singh arrived, Rahona saw him exclude "legacy staff" from the Institute's plans and his decision making.  He often did not respond to her e-mails and generally ignored her.  As AIGH's Administrative Director, she should have been involved in his transition period and liaised with him on budgets, office space leases, new hires and other important decisions, but Singh froze her out.

### Singh hires Knaup to replace Rahona

169.   In March 2015, Rahona was asked to provide a fund number for a new job posting for AIGH on Mount Sinai's website.  She had no idea what the posting was for and asked to see the job description.  The job description was nearly identical to her own.  She was initially AIGH's Program Manager and then Administrative Director and had performed in those roles to everybody's satisfaction and high praise for years.  Yet, having only met her for a few minutes, Singh had evidently decided to replace her without notice or explanation.

170.   Rahona contacted Vivian Reccoppa ("Reccoppa"), an administrator at Mount Sinai who was expert in its hiring procedures.  Reccoppa was confused by the language of the job posting, noting that it did not follow Mount Sinai's template and that the proposed title, Chief Operating Officer, did not comply with Mount Sinai's guidelines.

171.   Rahona met with Caryn Tiger-Paillex ("Tiger-Paillex"), Mount Sinai's Director of Human Resources, for approximately an hour and a half, and expressed her concerns about AIGH and her position.  Tiger-Paillex appeared uninterested in getting involved, and dismissed Rahona's concerns about being forced out by saying that Rahona could apply for the open position if she wanted to.  So Rahona turned to Anandaraja, who said she would try to discuss the issue with Singh directly.  A few weeks later, Singh agreed to talk to Rahona by phone.

172.   Singh opened the call brusquely, telling Rahona, "I don't have a lot of time," followed by "Is this about the position?  I'm not supposed to have to deal with this."  Before Rahona had a chance to say anything, he added, "I need someone intellectually capable and whom I can trust."  His implication was that Rahona was stupid and untrustworthy, for which he had no evidence and which is false.

173.   Singh continued by berating Rahona for not being a "team player."  He criticized her for not directing mail to his new office properly.  Rahona replied that this was not due to her, but to the lack of administrative infrastructure for the new Institute in the wake of its separation from the Department of Preventive Medicine, and Singh's failure to properly assign and delegate responsibilities.  Singh said he expected her to take on all administrative tasks, before ending the call abruptly by saying, "I don't have any more time to discuss this."

174.   As Administrative Director, Rahona provided high-level administrative support in budget planning and fundraising, working closely with AIGH's leaders such as Murphy, Anandaraja and Atkinson.  Singh treated her as if she were a filing clerk.

175.   A few weeks later, Knaup, Singh's contact, was hired through the job posting and became AIGH's Chief Operating Officer.

**Rahona leaves AIGH**

176.   After the call with Rahona, Singh continued to ignore her and assign her low-level administrative tasks.  Rahona decided to complain.  She met with Clarissa Jones-Winter ("Jones-Winter"), Director of Employee Relations, on July 1, 2015.  Rahona was candid, telling her about the irregular way Singh was hired, how Charney appeared to give him a *carte blanche* to dismantle AIGH, how Singh was excluding the older women (her, Atkinson and Anandaraja) and had hired external consultants to give him a fig leaf for taking total control.  Rahona told Jones-Winter that Singh was forcing her out by reducing her duties as Administrative Director to basic secretarial work.  Jones-Winter did not offer Rahona any assistance.  She said she was not surprised, and that new managers sometimes deliberately set up staff to fail in such a way that they either resign or are let go because they are unable to perform their job as newly defined.

177.   Subsequently, Singh asked Rahona out of the blue to design a fellowship program. Without information on AIGH's mission, faculty, budget and programs, Rahona knew she could not possibly succeed at this task.  Anticipating that Singh was setting her up to fail, Rahona told him she was going to take a two-week vacation and would start on her return.  During the vacation she reflected about her prospects under Singh, and when she returned, announced she was resigning.

178.   Several weeks later, Singh and Knaup reached out to Rahona asking if she wanted to remain at AIGH but without offering a clear job description.  Rahona believed they were worried that her resignation, coming so soon after Singh's official start date as Director, would tarnish the optics of his arrival.

179.   Rahona declined.  Although she did not have another job lined up, she had no confidence in Mount Sinai's leadership and did not want to continue being associated with it. Rahona's last day was October 2, 2015.

### Legacy staff: Singh discriminates against Atkinson

180.   When Singh took over, Dr. Holly Atkinson was Director of the Human Rights Program at AIGH.  She holds a M.D. from the University of Rochester and a M.S. from the Columbia University Graduate School of Journalism.  Prior to joining Mount Sinai, Atkinson had wide-ranging business experience both nationally and internationally.  For nine years, she served as Senior Vice President of programming for Lifetime Medical Television, where she worked closely with senior leaders of numerous national medical organizations, such the American Academy of Family Practice, the American Academy of Pediatrics, the American Association of Orthopedic Surgeons, the American College of Obstetricians and Gynecologists and the American College of Physicians (of which she is a fellow), among others.

181.   When Reuters acquired GeoMedica, the successor of Lifetime Medical Television, Atkinson served first as Executive Vice President and then President and CEO of Reuters Health for five years.  She worked with Reuters' London headquarters to acquire a Paris-based health news company and assisted in its management until new leadership was put in place.

182.   Atkinson's tenure at Reuters Health also included significant innovative start-up responsibilities, such as the development of daily health news services for both the medical business community and consumer health websites.  Working with Harvard's Dr. Anthony Komaroff, Atkinson also helped launch *Journal Watch*, which is now a highly successful series of physician newsletters.  Atkinson served as one of its Associate Editors*,* which led the Massachusetts Medical Society to hire her as Editor-in-Chief for a new and prestigious health newsletter, *Health News*; Atkinson served in that role for 12 years.  She was also President of iVillage Health, one of the leading global websites for women at that time, and revamped its health offerings.

183.   Atkinson was an on-air medical correspondent with the *CBS Morning News* with Bill Curtis and Diane Sawyer, and with NBC's *Today* show with Katie Couric, and co-hosted the PBS show *Bodywatch* with Dr. James "Red" Duke.  She also authored the book *Women and Fatigue* and has for several decades been an in-demand public speaker about health and wellness, represented by the Washington Speaker's Bureau.

184.   Atkinson has extensive non-profit experience, having served on numerous boards, including the National Organization for Women's Legal Defense and Education Fund (now Legal Momentum), where she served for 12 years; the 1997 Nobel Peace Prize-winning Physicians for Human Rights, where she served for 16 years, including four years as President; and the American Heart Association, where she served for seven years, including as chair of the National

Communications Working Group.  At the American Medical Women's Association, she co-founded the Task Force Against Human Trafficking.  She is a member of the Council on Foreign Relations.  Most recently, she is a founding member of Time's Up Healthcare, a new nonprofit organization dedicated to raising awareness about sexual assault, harassment and inequality in healthcare.

185.  Atkinson's primary research interest is on the intersection of health and human rights.  In particular, she focuses on how human rights violations affect the health and well-being of women and girls.  Her most recent work has been on human trafficking and female genital mutilation/cutting.  She has been recognized for her anti-trafficking work by the American Medical Women's Association with the Esther Pohl Lovejoy Award and Lifeway Network with its Freedom Award.  In 2013, she was acclaimed as one of New York's "New Abolitionists."  Atkinson is currently involved in a groundbreaking study investigating the health outcomes of Kenyan women with female genital mutilation/cutting who have undergone clitoral reconstructive surgery.

### Atkinson's employment at Mount Sinai

186.  In 2006, Dr. Paul Klotman, then-Chair of the Department of Internal Medicine at Mount Sinai, asked Atkinson to sit on an advisory board to guide the new Advancing Idealism in Medicine (AIM) program, which aimed to support and advance idealism among Mount Sinai's residents.  Within a few months, on October 1, 2006, Mount Sinai asked Atkinson to join Dr. Ripp and co-direct AIM with him, in addition to becoming an Assistant Clinical Professor in the Department of Internal Medicine.

187.  Over the next several years, Atkinson became increasingly involved in teaching at Mount Sinai, mentoring students and working with them to develop the new Human Rights and

Social Justice Scholar Program.  In January 2012, when Atkinson approached Murphy to join MSGH full-time to build a strong human rights program, Murphy agreed.  Despite growing responsibilities, Atkinson did not ask for any additional pay because she believed in MSGH's mission and respected Murphy and his work greatly.  She wanted to help him and work with him and his colleagues, particularly Anandaraja.

188.   In October 2012, Atkinson presented her vision for MSGH's human rights program at a fundraising event.  Following the event, Don and Georgia Gogel (the "Gogels"), who attended, announced that they would commit a one-time gift of $200,000 to help MSGH cover Atkinson's salary so she could realize the plans she described.

189.   As a result, on March 13, 2013, Mount Sinai offered Atkinson a new five-year contract at a base salary of $150,000, effective April 1, 2013.  Atkinson had dual faculty appointments as Assistant Professor in the Department of Medicine and the Department of Preventive Medicine, and an administrative appointment as the Director of Human Rights.

190.   Atkinson made remarkable contributions to Mount Sinai.  She helped build out the Advancing Idealism in Medicine program, served as faculty mentor to students as they established the Human Rights and Social Justice Scholars Program ("HRSJ") for first-year medical students, and relaunched the Human Rights Clinic, which she expanded to include other faculty and students to insure its long-term viability, as the initial phase of building a robust human rights program. She developed and taught innovative curricula for two new mandatory courses for medical students at Mount Sinai, "InFocus 3: Health and Human Rights" and "InFocus 4: Physician Advocacy," and  co-developed  a  curriculum  for  addressing  patients'  spirituality  needs  in  the surgery/anesthesiology clerkship for third-year medical students.

191.    In her teaching role at Mount Sinai, Atkinson quickly became a highly regarded presence in the classroom.  She taught Health, Human Rights and Advocacy as part of the Human Rights and Social Justice program, served as regular guest lecturer in the Master of Public Health Human Rights course, and taught in the Ambulatory Care Clerkship courses.

192.    Also during her time at Mount Sinai, Atkinson continued her high-profile international work investigating major human rights violations, including the oppression of Shias in Bahrain and the massacre of Muslims in Myanmar.  As a result of the investigation in Myanmar, she and her co-investigator presented their findings to the State Department, the House Foreign Affairs Committee, the Tom Lantos Human Rights Commission, the National Security Council, the U.S. Holocaust Memorial Museum, the Center for the Prevention of Genocide, the UN's Office on Genocide Prevention and the UN Security Council working group on the Responsibility to Protect.

193.    As part of her work in fighting human trafficking, Atkinson conceived a mobile app to assist clinicians in identifying and intervening on behalf of trafficking victims.  Atkinson developed a prototype and Mount Sinai Innovation Partners, a business unit within Mount Sinai, became interested in her work and began to help her develop the prototype further.  The app attracted the attention of several external organizations, including Microsoft Corporation's Digital Crime Unit.  Singh showed no interest in the app after he joined AIGH and the project stalled as a result.

194.    Atkinson has also published numerous peer reviewed articles.  Since she began her full-time faculty appointment at Mount Sinai, she has published twelve peer reviewed academic papers, with an additional five currently in preparation.  Of these twelve papers, she is first author on seven of them, senior author on three of them and second author on two.  Atkinson has also

authored invited chapters in *Hurst's the Heart* (a leading cardiology textbook) and in the American Medical Association's book, *The Master Adaptive Learner Fieldbook*.  Atkinson also served as guest editor for a special issue of the *Annals of Global Health*, where she is an Associate Editor. She was pivotal in incorporating human rights into Mount Sinai's curriculum and established the current Mount Sinai Human Rights Program, which assists individuals, both in the community and in immigration detention centers, who are seeking asylum in the United States and experienced human rights abuses or torture in their countries of origin.  The Program conducts expedited psychological, physical and/or gynecological evaluations to support the asylees' claims and offers a safe haven for survivors to receive medical support and share their experiences.

195.   On January 28, 2015, Atkinson received a strong annual performance evaluation from Landrigan, saying that she "exceed[ed] expectations."  She was a significant figure at AIGH and beyond.  In recognition of her many achievements Atkinson received the University of Rochester Medical Center's 2020 Alumnus Humanitarian Award in March 2020.  It recognized her as a physician who, "by way of direct doctor/patient care and/or administrative oversight, has dedicated an uncommonly large portion of his/her career providing unique, compassionate care, in the United States or abroad, to patients with difficult to manage afflictions, or to patients with special needs because of living conditions lacking modern health care resources."

196.   To Singh, however, Atkinson was an older woman who might outshine him.  After he systematically degraded her for many months, described below, Atkinson felt she had no choice but to leave an institution and program she had loved, and is now Clinical Professor in the Department of Medical Education and Medical Student Advisor at the City University of New York (CUNY) School of Medicine.

**Singh cuts Atkinson's pay and demotes her**

197.   The Gogels' gift provided Mount Sinai with two years of funding to cover Atkinson's salary.  Atkinson was not required or expected to find funding to cover the remaining three years of her renewed five-year contract, which was expected to come from other MSGH sources.

198.   Yet 26 months into this five-year contract, Atkinson learned that her position was in jeopardy.  Landrigan, who was stepping down as the Chair of the Department of Preventive Medicine, told her it was up to Singh to decide if she were to remain at AIGH.  Singh made his views on Atkinson's term at AIGH clear in an e-mail on June 17, 2015 (on which Atkinson was not copied):

> Per my records, Holly has no financial support for 2015-2016. I spoke directly with the board of trustee member [Gogel] who has not renewed the gift that supports her work, and who, unprompted, stated that he does not expect global health to provide bridge/future support.
>
> I am not making new commitments on the core global health budget until we have completed our collaborative strategic planning process. As a result, I am not offering bridge funding for her position after her dedicated account ends (not sure exact date, but should be easily calculated based upon gift and payout rate).
>
> I spoke with Holly briefly this evening at an event, where she stated that she would be with Med[ical] Ed[ucation]. She did not seem aware of the financial requirements to make that transition, which is what David e-mailed me about to clarify yesterday. It was not the right setting to clarify.
>
> My understanding is that even though her funding is being routed through Prev[entive] Med, it is a global health budget responsibility. It seems like there has been a lack of planning for her funding post the ending of her gift, neither initiated by her nor prior stewards of global health personnel. Unfortunately, this means that there may not be runway for a phased reduction if her account is being imminently drawn down.

199.   Singh was wrong on many counts.  His implication that the Gogels' decision to not renew their gift reflected poorly on Atkinson's work was misleading.  Their $200,000 was a one-time gift and known to be so from the outset.  More importantly, Atkinson was not expected or

required to continue funding her salary.  In fact, she was directly instructed by Murphy <u>not</u> to fundraise for her role.  Instead, her salary was integrated into the AIGH budget, and after the Gogels' gift had been used, the Institute's general fundraising was supposed to cover it.

200.   Singh had never discussed Atkinson's credentials, achievements or skills with her. He had spoken to her for less than 20 minutes during a meeting in April 2015.  Atkinson prepared a summary of her initiatives and responsibilities for that meeting, but Singh did not appear to have read them and did not show any interest in her work.  Instead, he lectured her condescendingly about how one of her fields of expertise—human rights—had no relevance to global health. Atkinson was shocked by Singh's arrogance and ignorance; human rights are widely considered to be integral to global health.

201.   Singh's disdain for Atkinson's work did not change with time.  He wanted her to leave like the other "legacies."  Accordingly, he called Atkinson on June 19, 2015, to tell her that she could still have a job at AIGH, as long as she immediately agreed to work full-time rather than her current part-time (*i.e.*, 0.6 FTE) basis, but for no additional money.  Singh also indicated that there might be further adjustments, including possible termination, after he finished his full review of AIGH later that year.  This in effect amounted to an immediate 40% reduction in Atkinson's salary.

202.   Atkinson was blindsided by Singh's demands.  Even though his proposal clearly expressed contempt for her, she felt she had to accept it then and there or lose her job, and she began working on a full-time basis in July.  She had signed a five-year contract in 2013, yet in 2015 was suddenly told that her appointment was not being renewed and her salary was effectively being reduced and might soon be eliminated.  Singh's unilateral decision to abrogate her contract

was based primarily on Atkinson's age and gender, as she did not fit the profile of the young, cool, Silicon Valley-type "band of brothers" he sought to have around him.

203.   Singh also demoted Atkinson by changing her title of "Director, Human Rights Program" to "Program Director of Human Rights."  Although the change may appear small, in the academy's intricate hierarchy of titles, this was a significant step down.  It was another prod to go. Otherwise, he would have had no reason to bother.

204.   In addition to the multiple academic degrees she already held, Atkinson was also in the process of completing a Masters in Public Health ("MPH") degree to gain a formal qualification in this area.  Atkinson's tuition was paid for by Mount Sinai, as had been the case with other MSGH faculty including Anandaraja and Hahn.  However, following Atkinson's June 19 meeting with Singh, her funding was removed, forcing her to abandon working on her degree.

### Singh demeans Atkinson's teaching

205.   One of Atkinson's duties was to organize, develop and teach the Medical School's two mandatory intensive week-long courses, InFocus 3 and InFocus 4.  Singh downplayed their importance and her contribution, claiming she took way too long to prepare them; he told her he had organized larger conferences as a medical student in a fraction of the time.  His implication was that she was an "old lady" unable to move fast and decisively.  In fact, Atkinson developed groundbreaking curricula for the courses involving nearly 150 students and some 20 guest instructors and speakers.  They were very highly regarded.

206.   After the June 19, 2015 call, Singh excluded Atkinson from his projects at AIGH and mostly ignored her.  When he did engage with her, Singh often assigned her work that was far below her capabilities and level, such as maintaining a MailChimp list and asking her to add

hundreds of new e-mail addresses to it, which he misappropriated from a United Nations Foundation mailing list—an intentionally menial task even for the newly demoted "Program Director of Human Rights."

### Atkinson's strategic plan

207.   Singh's efforts to belittle Atkinson culminated in early 2016, during Atkinson's presentation of her strategic plan for the Human Rights Program.   Minutes after she began, he interrupted her and viciously snapped that she was "not capable of doing this"—that there was no way she could deliver what she was proposing.   Singh insisted that Atkinson would not be able to execute the strategic plan.   As he was talking, it became apparent that he had not read the documents she had prepared for him, so she asked him if he had done so.   Singh responded with withering contempt, "I didn't have to," since he supposedly already knew that she could not succeed.

208.   As Singh insulted her capabilities, Atkinson's anxiety and stress from the many months of being isolated, demeaned and discriminated against by Singh became unbearable.   She burst out crying—she could not take his humiliation any longer.   She apologized, blaming her tears on the fact that she was concerned about her 95-year-old father, who was dying.   This was true, he was very sick at the time, but it was in fact Singh who made her cry, although Atkinson did not want to admit that to him.   Singh touched Atkinson's upper thigh and said, "Let's do this with empathy."   She recoiled at his touch, which made her very uncomfortable, and left.

### Atkinson decides to leave AIGH

209.   This was the last straw, no doubt as Singh had intended.   When Atkinson secured a new job in April 2016, she handed in her two-week notice.

210.   Unbeknownst to her, Anandaraja was planning to leave at the same time, so their resignations were announced together in an e-mail to all staff on May 11, 2016, in which Dean Muller, Dean of Medical Education, praised Atkinson's work:

> Since her arrival [Atkinson] has been an integral part of building our Human Rights and Social Justice Scholars Program, established and staffed the Human Rights Clinic for individuals seeking asylum, designed and implemented required core curricula on physician advocacy and human rights, and most recently has been a faculty mentor working with students to enhance our teaching related to spirituality and religion. Through all these endeavors, Dr. Atkinson has been a role model and always demonstrated a deep passion and commitment to those most vulnerable.

211.   Atkinson joined the faculty of the CUNY School of Medicine as Medical Student Advisor and Distinguished Lecturer and has since been promoted to Clinical Professor.  Her final paycheck from AIGH, still reduced at Singh's direction, was paid on May 6, 2016.

212.   Despite her departure from AIGH, Atkinson remained associated with Mount Sinai. On May 24, 2016, she received an e-mail notifying her that, effective on January 1, 2016, she had been reappointed an Adjunct Professor in the Department of Medical Education within the Icahn School of Medicine.  On October 19, 2016, she was promoted from Adjunct Professor to Assistant Clinical Professor.

213.   As part of her ongoing duties, Atkinson remained Course Director for InFocus 3 and 4 at Mount Sinai.  She also collaborated with other Mount Sinai academics on various peer-reviewed articles, including:

(a) Atkinson HG, Ottenheimer D. Involuntary sterilization among HIV-positive Garifuna women from Honduras seeking asylum in the United States: two case reports.  J Forensic Leg Med. 2018 May;56:94-98. doi: 10.1016/j.jflm.2018.03.018. Epub 2018 Apr 3. PMID: 29635207;

(b) Atkinson HG, Fleenor D, Lerner SM, Poliandro E, Truglio J. Teaching third-year medical students to address patients' spiritual needs in the surgery/anesthesiology clerkship. MedEdPORTAL. 2018 Dec 14;14:10784. doi: 10.15766/mep_2374-8265.10784. PMID: 30800984; PMCID: PMC6354800; and.

(c) Lever H, Ottenheimer D, Teysir J, Singer E, Atkinson HG. Depression, anxiety, post-traumatic stress disorder and a history of pervasive gender-based violence among women asylum seekers who have undergone female genital mutilation/cutting: a retrospective case review. J Immigr Minor Health. 2019 Jun;21(3):483-489. doi: 10.1007/s10903-018-0782-x. PMID: 29968003.

214.   In addition, Mount Sinai invited Atkinson to give lectures in various courses, such as for "Health and Human Rights: Human Rights Abuses, Torture and its Consequences" and for "Global Environmental Change" in the Masters of Public Health Program and for the International Exchange Program for Minority Students.

215.   Atkinson remained Course Director for InFocus 3 and 4 at Mount Sinai until February 2019, allowing her to keep her ties with her old colleagues without dealing with Singh, and to continue her mission of bringing human rights into the curriculum of Mount Sinai medical students.

### *Legacy staff: Singh discriminates against Anandaraja*

#### History of Anandaraja's employment at Mount Sinai

216.   Dr. Natasha Anushri "Anu" Anandaraja served as the Director of Global Health Education at MSGH/AIGH between January 2008 and June 2016 but has been involved with Mount Sinai in other capacities since July 2002.

217.   Anandaraja received her bachelor's and medical degrees from the University of Auckland School of Medicine, New Zealand, before coming to Mount Sinai for a pediatric residency from 2002 to 2005.  She then completed a year-long Fellowship in Global Health through the Mount Sinai Department of Community Medicine, and her master's in Public Health with a concentration in Global Health at Mount Sinai in 2009.  She also completed the Gorgas Course in Clinical Tropical Medicine in 2007 and earned Certification in Tropical Medicine and Travel Medicine through the American Society of Tropical Medicine and Hygiene.  Anandaraja came to

Mount Sinai with extensive experience in global health, having worked with non-governmental organizations in rural health and development in India since 1995, and in disaster relief efforts in both India and Sri Lanka between 2001 and 2005.

218.   Based on her extensive experience in global health, Muller and Murphy recruited her in 2005 to be one of the founding faculty of Mount Sinai's Global Health program, MSGH. Together with her colleagues, Anandaraja was instrumental in building MSGH's educational program, known as the Global Health Center ("GHC").  With support from Muller, Murphy and Landrigan, Anandaraja built a highly successful multidisciplinary, multi-level global health training program.  That made MSGH a nationally recognized global health medical education program—a model that many other medical schools have since emulated.

219.   After MSGH's formation, Anandaraja's efforts to fundraise for the program were critical to its growth and continued success.  She contributed to the first Project Planning Grant that was ultimately funded by the Mulago Foundation, a fund administered by the Arnhold family. Anandaraja subsequently developed a strong relationship with the Arnhold family and procured several further grants totaling approximately $3,000,000 between 2005 and 2013.

220.   In recognition of her successes and dedication to MSGH, in 2008, Mount Sinai offered Anandaraja to take on the role and functional title of Director of the Global Health Training Program within MSGH.  When MSGH evolved into AIGH, her title changed to Director of Global Health Education.

221.   While at MSGH/AIGH, Anandaraja designed and implemented a nationally recognized global health training and educational program that spanned the Medical School, the Public Health program and six clinical residency programs, including a dedicated Global Health Teaching Fellowship.  She designed the program to encourage experimental learning and worked

with her colleagues to establish multiple international partner sites for training and collaborative research in India, the Dominican Republic, Kenya, Uganda, Ethiopia, Vietnam, Tanzania, Mozambique, and the U.S.  The program became widely known, receiving national recognition from other medical schools, including Yale, Harvard, and Duke.

222.   Over time, Anandaraja expanded the mission of the GHC to encompass not only the training of U.S. health care workers, but capacity-building at partner sites through educating their local health care workforce.  She worked with international non-governmental organizations and national Ministries of Health to develop, implement and support the training of traditional birth attendants and community health workers in Mozambique, pediatric and family medicine residents in the Dominican Republic, and pediatricians and nursing staff in neonatology in Colombia.

223.   From 2005, Anandaraja coordinated the first ever Annual Global Health Conferences at Mount Sinai.  These conferences attracted internationally recognized experts and health professionals from the tri-state region.  In 2011, the Global Health Conference also provided a forum for an inter-institutional poster session to allow trainees from across New York State the opportunity to present global health-related research.  Anandaraja took a leadership role in coordinating and teaching in New York's first Global Health Forums in 2009, 2010 and 2011 which, for the first time, brought together NY-area global health educators from medicine, public health, dentistry and nursing.  In 2014, in collaboration with Weill-Cornell Medical College and the Associated Medical Schools of New York, Anandaraja, with help from Atkinson, organized a TEDx-style conference which drew attendees and renowned speakers from institutions across the U.S.

224.   In 2012, Anandaraja and colleagues created and recruited for Mount Sinai's first formal Global Health fellowship.  The first of its kind nationally, the Global Health Teaching Fellowship drew national recognition because it focused on medical education rather than clinical care, accepted physicians from all specialties, and provided for a full year immersion experience without requiring doctors to look after patients in U.S. hospitals.  She also created a five-year specialty track in Global Health that included courses, summer work, a year of scholarly work, and a funded two-year master's in Public Health.  This was the first of its kind in the U.S.

225.   In 2014, after many years of advocating for inclusion of Global Health in the mandatory medical school curriculum, Anandaraja and Atkinson launched the Global Health, Human Rights, and Advocacy InFocus weeks as part of the Department of Medical Education's larger Infocus initiative, making Mount Sinai one of the few American medical schools to include global health, human rights and advocacy in its core curriculum.

*Global Health Education at Mount Sinai*

226.   Anandaraja was also active in fundraising, working with the Development Office and Advisory Board to identify and approach major sources of private foundation and donor funding.  Her significant success in this area allowed continuous growth of the program from 2007.  In 2012, Anandaraja hosted two Advisory Board members at the MSGH project site in Mozambique, increasing donor commitment through direct experience with the programs.

227.   During her time as Director of Global Health, Anandaraja also served at various times as an Attending Pediatrician in Mount Sinai's Pediatric Associates practice, was an Assistant Professor in the Department of Pediatrics and Department of Education and directed the Pediatric Travel Medicine Clinic.  In May 2012, Anandaraja received the Dean's Award for Excellence in

Teaching, one of many recognitions she received from Mount Sinai for her research, global service, teaching and program development.

228.   In 2007, Anandaraja led an initiative to convene the first Consortium of New York Global Health Educators at the New York Academy of Medicine.  In 2009, she was invited to join a working group convened by the Associated Medical Schools of New York (AMSNY) to form a Global Health Committee, and in 2010 became its co-chair.

229.   Outside Mount Sinai, Anandaraja founded and directed two organizations: Women Together Inc, which supports grassroots women's organizations through regional and global learning exchanges, and Te Karanga LLC, which provided experiential service learning exchanges in Malawi.  She recently founded a third organization in March 2020, COVID Courage, which raises funds and mobilizes communities to distribute PPE to frontline healthcare workers.

230.   By all accounts, Anandaraja's work to build the MSGH Training Program was critical to the success of the global health program and its support by the Arnhold family. Anandaraja led the work on the first Project Planning Grant for MSGH and every subsequent funding report and proposal to the Arnholds.  She met with them and with Kevin Starr several times a year for this purpose, and her work was instrumental in maintaining this funding stream. Along with Murphy, Anandaraja met with the Arnholds to solicit the $12.5 million gift that transformed MSGH into the Arnhold Institute for Global Health and allowed Singh's hiring as Director.

231.   Today, Anandaraja is the Program Director for the Office of Well-Being and Resilience at Mount Sinai.

**Singh denigrates Anandaraja's work and abilities**

232.   Despite her accomplishments, Singh considered Anandaraja too old for *his* Institute—she was one of the "legacy staff."  Her fruitful record of building the Institute's educational programs did not matter.

233.   Singh regularly denigrated Anandaraja's work with harsh and cutting critiques.  He denounced the training initiatives she had built as worthless, outdated and beyond repair.  Singh's insults were always given verbally, and he was careful not to leave a paper trail demonstrating his frequent cruelty.  When he made particularly harsh or sarcastic comments, he would sometimes send kind follow-up e-mails that allowed him to appear less demeaning.

234.   Like others outside Singh's charmed circle, Anandaraja was blamed for setbacks to his plans and self-regard whether she was responsible for them or not.  Anandaraja attended a meeting with Singh and Muller, the Dean for Medical Education, at which Singh delivered a presentation about a prospective partnership between AIGH and Gerson Lerman Group ("GLG").  After the presentation, Muller called Anandaraja to tell her that he had only understood about 40% of Singh's presentation (in fact, it was widely remarked in AIGH and across Mount Sinai that Singh often did not make sense as he strung together big words and concepts over which he did not have total command, a "word salad" apparently intended to impress).  Anandaraja explained Singh's proposal in a way that Singh could not, after which Muller said he would be willing to move forward after speaking to other Deans.  However, when Muller subsequently presented the GLG partnership to the team of Associate Deans responsible for medical education, they voiced concerns that Singh had approached GLG too quickly and without their approval.  Though their concerns were reasonable, Singh was furious.  He took no responsibility and instead blamed

Anandaraja, accusing her of ruining the project.  In fact, she had salvaged his presentation, and the Deans' disapproval was solely due to Singh's actions.

235.   Afterwards, Singh instructed Anandaraja to no longer speak with anyone at Mount Sinai's senior leadership without him being present.  He specifically forbade Anandaraja to meet with Muller, her long-time mentor.  Singh told Anandaraja that it was clear to him that she could not handle herself or represent AIGH in high-level meetings.  This was ridiculous and obviously intended to insult, given her track record at AIGH and the large number of successful partnerships she had forged both inside and outside Mt. Sinai.  As an additional gibe, Singh told Anandaraja to hire an executive coach to help her through her "communications issues."

236.   Singh used the same playbook toward Anandaraja as he did towards other older women, dismissing everything they did as useless.  In his beginning days, Singh asked her to create organizational charts to illustrate the structure of AIGH educational programs and staffing.  She produced several iterations; he called them all useless.  He said her failure to have this basic skill was shocking, a sign of incompetence.  At all of his previous institutions, he said, the staff never had any trouble producing clear charts.  When Anandaraja asked him to send her an example chart he liked, Singh said he should not have to.  He later sent the entire AIGH staff an e-mail referring them to the Wikipedia page on organizational charts, which was clearly intended to condescend and was not useful.

237.   At a private meeting in Singh's office on May 18, 2015—before he had officially started as Director—Anandaraja presented him with a budget for her programs following Mount Sinai's standard formatting and structure.  Moments after he began reviewing it, Singh threw the document down on the table and yelled at Anandaraja that her work was impossible to understand and useless.  Singh declared that he had been frustrated with all the "legacy staff" and doubted

their competence.  He said it was obvious that Anandaraja did not know what she was doing and lamented that no one at AIGH could provide what he needed.  When Anandaraja asked what Singh wanted if he found the standard budget format unsatisfactory, Singh scoffed that he needed to work with people who did not require explanations.

### Singh cuts Anandaraja's initiatives

238.    Despite AIGH's receipt of $12.5 million from the Arnhold Foundation to expand its educational work, which Anandaraja directed, Singh immediately sought to cut it.  He refused to recognize the worth of these programs or their importance to AIGH's reputation as a leading global health center.  He treated Anandaraja's decade of work as a colossal waste of money to be eliminated as fast as possible.

239.    On September 17, 2015, Singh told Anandaraja over the phone that he would reduce the budget for her global health educational programs by 60 percent for the current academic year. The year had already begun, so Anandaraja had already committed to paying staff and programs. Singh did not care and charged her with terminating or reducing the salaries of her longtime colleagues.

240.    Singh instructed Anandaraja to cease work and expenditure on existing AIGH international programs, despite her warnings that this would tangibly endanger the health and well-being of communities and patients across the globe.  He even forced Anandaraja to suspend training programs in which students and resident doctors had already enrolled and for which they had chosen Mount Sinai.  Singh did not explain where the money would be redirected.

241.    When Anandaraja sought Singh's assistance in speaking to terminated staff, as she did not understand the reasons for their termination, he refused.  He said that he had hired and fired more than 70 people in his previous positions, and was disappointed Anandaraja was not prepared

to do so herself.  Rather than explain the terminations, Singh condescendingly offered Anandaraja books on leadership and advised her to improve her management skills.

242.   Singh also threatened to terminate Anandaraja's field projects.  Anandaraja had developed a strong partnership between AIGH and the Gorongosa Restoration Project in Mozambique that hosted students, residents and fellows for training, and with whom the Institute had built a community health worker system.  She was the supervisor for the site, requiring her to visit two or three times a year to work with the staff and Mount Sinai trainees at the Project and to explore future partnerships in other African countries.  In August 2015, Singh forced Anandaraja to return early from Africa to attend a three-hour staff retreat.  On another occasion, Singh advised her that her work on the continent was misguided and insignificant, referring to a high-level meeting on this subject with the U.S. Agency for International Development—a major backer of one of AIGH's projects in Mozambique—as just a "meet and greet."  He also claimed Anandaraja had failed to prove she could handle her responsibilities at Mount Sinai, let alone international partner sites, and threatened to cancel an upcoming trip to Mozambique.  Anandaraja's many years of experience successfully managing field sites and international partnerships, which had won her international acclaim, meant nothing to him.

**Singh demotes Anandaraja and makes her report to new hires**

243.   Singh changed Anandaraja's title from "Director of the Global Health Educational Program" to "Program Director for Global Health Education," effectively demoting her without changing her responsibilities.  The step down from "Director" to "Program Director" reflected poorly on Anandaraja within institutional and academic circles.  Her functional title of "Director" reflected the high level of experience and responsibility she had held at MSGH and AIGH since 2008, overseeing the management of multiple educational programs, trainees, staff and faculty in

several countries.  Being demoted to "Program Director," listed publicly on the AIGH website and necessarily reflected on her CV and business cards, reduced the importance of her role and belittled her responsibilities and experience.

244.   Knaup strongly advised Anandaraja not to object, as Singh had clearly stated the need for team members' "flexibility."

245.   While demoting Anandaraja, Singh hired El-Sayed—who had little or no experience implementing global health education programs—to serve above Anandaraja as Associate Director for Education.  During the brief period in which El-Sayed was involved in AIGH, Anandaraja reported to him on her education portfolio, despite her greater knowledge and experience.  El-Sayed told Anandaraja that he liked AIGH because he would not have to work with anyone older than 40.

246.   Singh instructed Anandaraja to have her work checked by unqualified new hires. He suggested that she "review [documents] with Abdul [El-Sayed] or Kirsten [Knaup]," both new to AIGH and with far less experience than Anandaraja, "to ensure that the information [was] easy to understand" before sending it to Singh.  Singh's clear implication was that Anandaraja's work was inadequate and incomprehensible and that she should defer to younger employees.

**Anandaraja leaves AIGH**

247.   By January 2016, only four months after he officially became AIGH Director, the hostile work environment Singh created drove Anandaraja to resign.  Though she did not have another position lined up, she could no longer stand going to work.  She sought to tell this to Singh, but he repeatedly rescheduled their meetings so that it took a month before she was able to see him, while he was walking between meetings.  She told him she was leaving.  He asked her to continue working for AIGH through June and requested that she not tell anyone she was leaving.

With Atkinson's and Anandaraja's resignations so close together, Singh had reason to worry about the "bad optics" that these two departures would create for AIGH among members of the Mount Sinai community and donor agencies that had high regard for them. Singh knew he had driven out two pillars of AIGH and feared their departures would reflect poorly on his leadership.

248. On one of Anandaraja's final days at AIGH, she attended a meeting with Atkinson, Berman and Kishore to discuss the future of AIGH's education program. Anandaraja and Atkinson had spent years developing the program while Berman and Kishore were new to AIGH—in fact, Kishore was still in the process of being onboarded. Despite Atkinson's and Anandaraja's first-hand experience of running the program, Berman and Kishore barely let them speak during the meeting. Berman and Kishore dominated the discussion for the first twenty minutes without giving Atkinson or Anandaraja any opportunity to speak. Only after they interjected to suggest that their experience mattered to the discussion did Berman and Kishore start listening to them.

249. After Anandaraja told Singh she was leaving, he did not let up on his bullying. He demanded that she train replacement staff and complete a thorough handover of her projects, but then disinvited her from meetings needed to do so. Singh stopped speaking to Anandaraja and ignored her requests for meetings necessary to an efficient transition. Though Anandaraja cared deeply about AIGH and did not want her departure to interrupt its work, Singh's disdain for her made a smooth exit impossible.

250. Singh had agreed with Anandaraja not to talk about her leaving AIGH, but she learned he had been doing so anyway. To prevent him misrepresenting the reasons for her departure, she told him that she wanted a public announcement. Muller subsequently announced Anandaraja's resignation to all staff on May 11, 2016, praising her work:

> Anandaraja has been part of the Mount Sinai family for over a decade and was
> one of the core group of faculty who launched our global health programs when

she first arrived. She built a comprehensive infrastructure that has provided countless students, residents, and faculty the opportunity to participate in structured scholarly global health experiences in the United States and abroad. Over the past three years, with an outstanding team that included Renee Bischoff and others, she developed and implemented a global health curriculum for all medical students that has been enormously successful. In addition, [Anandaraja] mentored countless trainees across the continuum of education. Going forward, [Anandaraja] will focus her work on field-based maternal and child health programming with partners in Africa and India.

251.   Murphy was devastated by Anandaraja's resignation.  For years, she had been his right hand and a real co-architect of MSGH and AIGH.  Now he was seeing what they had built dismantled as Singh deliberately drove people out and others left because they did not want to work with him, and he was dismayed.  Speaking of Anandaraja and Atkinson, Murphy replied to Muller:

> I feel as if there is a hole in my heart. These are 2 remarkable human beings, colleagues and friends. They each made us better people, and doctors=, and Mount Sinai a changed and better place.   Ramon

252.   Murphy was even more forceful in an e-mail about Anandaraja's departure to a fellow pediatrician at Mount Sinai, Dr. Ian Holzman:

> [Anandaraja] quit, her boss assigned by [Charney],who did not follow our search committee suggestions, is a travail....and she was a large part of the reason we got the $ which he is now spending in an unusual fashion....a real source of difficulty.

**Singh badmouths Anandaraja to her colleagues**

253.   Anandaraja subsequently learned that Singh had told at least two of her close colleagues—Murphy and Renee Bischoff ("Bischoff"), Program Director of Global Health Education—that she had not performed adequately and had actively undermined their work.  Singh implied that Anandaraja's departure was not a loss, but rather a necessary step for AIGH's success.  Singh's misrepresentations undermined friendships they had built over many years and caused a particularly significant rift between Anandaraja and Murphy, a close mentor.

254.   Anandaraja left AIGH on June 30, 2016, though she continued to consult on a project basis for the Department of Medical Education.  She returned to Mount Sinai part-time in September 2018 as the Program Director for the Office of Well-being and Resilience in the Office of Dean Charney, a position that does not require any direct work with Singh (see ¶¶ 514 – 518 for more detail).

*Beddoe's experiences with Singh*

255.   Beddoe is an expert in global health.  She has worked at Mount Sinai on and off for the last 25 years, and assumed a full time position in 2013 as an Assistant Professor in the Department of Obstetrics, Gynecology and Reproductive Science, Division of Gynecological Oncology.

256.   In 2019, she was promoted to Associate Professor and continues to hold that position. She applied for promotion in 2017, at the same time as two male peers, both of whom received promotions within a year.  In Beddoe's case, however, the process took two years, purportedly because Mount Sinai "lost" her application.  She also serves as the Director of Global Women's Health and as the Director of the Global Women's Health Fellowship Program at the Icahn School of Medicine.

257.   Beddoe received her MD from State University of New York, Downstate Medical Center College of Medicine and completed her residency at State University of New York, Health Science Center at Brooklyn in Obstetrics and Gynecology.  After her residency, she undertook a fellowship in Gynecologic Oncology at State University of New York, during which she received specialized training in women's cancers, surgery, chemotherapy and medical care. She additionally completed a fellowship in Clinical Nutrition from Memorial Sloan Kettering.

258.   Beddoe is an accomplished researcher with dozens of publications related to obstetrics, gynecology and oncology with a global health focus.   Her research centers on developing countries, specifically Liberia, South Africa, Colombia and the Dominican Republic, where she has spent a significant amount of time researching and raising awareness of cervical and other gynecologic cancers, as well as providing reproductive health care to sexual and religious minorities, including LGBTQ and sex-worker communities in Liberia and South Africa.

**Beddoe approaches Singh about funding a global oncology program in Liberia, which he rejects**

259.   After he assumed his position at AIGH, Beddoe approached Singh about obtaining funding for a global oncology program she was developing in Liberia.   Beddoe had already worked extensively in Liberia, but was hoping to form a new partnership between Mount Sinai, AIGH and Liberian hospitals to further local oncology research and care.

260.   The partnership fit perfectly with the goals and mission of AIGH, and Beddoe was optimistic about securing funding.   But when she approached Singh, he displayed no interest in her proposal or how it could benefit AIGH, and refused to fund it.

**Singh later wants to be involved in Liberia efforts**

261.   Shortly after this meeting, upon information and belief, Charney informed Singh that AIGH should be involved in more global health sites.   Singh then reconnected with Beddoe and asked her to introduce him to people she knew in Liberia and to join him on a networking trip. Misiti also participated in the trip.

262.   During the trip, it became increasingly clear that, despite his boasting at his job interview, Beddoe's connections in Liberia were in fact far more extensive and impressive than

Singh's.  Misiti was uncomfortable with how Singh behaved towards Beddoe on the trip; she found him unprofessional and rude.

263.   As the trip progressed, Singh's demeanor changed.  Having initially insisted on being present for every item on the agenda, he made clear that he wanted to skip many of them. Notably, during a dinner with AIGH's workforce grant partners, almost all of whom were women, Singh announced loudly: "We should have sat this one out."

264.   Nonetheless, when they met again after returning to New York, Beddoe was again hopeful that Singh might support the global oncology program in Liberia having just seen how impactful it could be.  Once again he declined, and began to tell everyone within AIGH that "Liberia was off."

265.   Singh and Misiti later discussed his interactions with Beddoe.  Singh asked her, "Do you know what splitting is?", which Misiti understood to be an (inflammatory and unfounded) insinuation about Beddoe's mental health.  Misiti was offended by the remark, and inferred that Singh was twisting things to avoid accepting that it was he, not Beddoe, who had made their relationship difficult.

### Beddoe flags concerns about Singh's leadership during a meeting with Charney

266.   Over time, Beddoe noticed that key female faculty members and staff were leaving AIGH, including Rahona, Atkinson and Anandaraja.  Having previously had concerns about Singh's leadership, and having watched him operate firsthand and been unimpressed, Beddoe decided to raise her concerns directly with Charney during an upcoming meeting they had scheduled.

267.   During the meeting, Beddoe pitched her Liberian oncology program to Charney, hoping he might agree to fund it.  Charney said he could not, but perhaps Singh could through AIGH.  Beddoe explained that Singh had already rejected the idea.  Charney told Beddoe to ask Singh again, and if she encountered any issues, to come back to him.

268.   Beddoe also told Charney that she had concerns with Singh and his leadership of the Institute.  She said that Singh had no real knowledge of global health, that he often name-dropped, that he was in over his head, and that most of what he said was a lie.

### *Singh launches ATLAS, a signature program, but covers up its shortcomings*

269.   At the same time that Singh was cutting AIGH's core programs and forcing Rahona, Atkinson and Anandaraja out of the Institute, he also started developing his own projects. The most significant was ATLAS, a system intended to combine satellite imagery and demographic data using artificial intelligence in a way that would help rural communities improve health care.  Even though ATLAS was Singh's baby, with no "legacy" staff to hold him back, he made multiple promises about it he could not deliver and ended up lying to donors about it to cover up his failures.  Meanwhile, even for the new, younger women brought in to work on his glamorous new program, he made AIGH a miserable place to work.

#### *Beginnings of the ATLAS project*

270.   In the early summer of 2015, El-Sayed, then still slated to be Singh's deputy, recruited Dr. James Faghmous ("Faghmous") to join AIGH as its Chief Technology Officer. Faghmous came from a tech background—his Ph.D. research focused on applying artificial intelligence methods to better understand global climate change.  Faghmous accepted the position.

He and El-Sayed were friends; Faghmous knew and respected El-Sayed and thought AIGH showed promise to become a leading global health institute.

271.   Faghmous started working at AIGH in July 2015, working directly under Singh as El-Sayed had left in the interim.

272.   Singh was very enthusiastic about the prospect of AIGH developing a digital atlas of health care information that would help rural health care workers direct resources more accurately, which he called ATLAS.  Faghmous was confused by Singh's strong backing for ATLAS, because there was no source of funds and it was still vague what precisely this digital atlas would accomplish and how it could be made to work.  After discussing it with Singh more, Faghmous concluded that Singh was excited mostly at the prospect of riding the wave of "tech" and artificial intelligence that was getting a lot of attention.

273.   At first Faghmous kept away from ATLAS.  He was not interested in building up Singh's political profile using cool-sounding buzzwords; he wanted to develop real projects with clear parameters and deliverables.  Faghmous thought Singh had committed to ATLAS without thinking about the work and staff it would need to produce results.  So, for the time being, Faghmous focused on developing AIGH's technology infrastructure, creating concrete projects that integrated social, economic and health data, hiring new staff and creating a strong Data Science team.

274.   Singh was still focused on creating a "cool" tech product as a marker of his leadership and was put in touch with Dr. Trevor Mundel ("Mundel"), president of the Global Health Program at the Gates Foundation in Seattle.  In June 2016, Singh requested that Faghmous fly to Seattle with him and Berman to pitch ATLAS to Mundel to gain funding.  The meeting also intended to connect AIGH with other partner organizations who were interested in collaborating

on ATLAS, including Deb Roy from Massachusetts Institute of Technology, James Kondo from Twitter and Gus Ruchman from the United Nations Special Envoy Office.

275.   From Faghmous' viewpoint, the meeting was excruciating.  Singh made ATLAS seem to be a finished product, though it was really just an unpolished idea.  He told the Gates Foundation that ATLAS had active users, which was a lie—there were no users.  He told them ATLAS had prototypes out with customers, which was also a lie; at the time, AIGH did not even have staff working on ATLAS.  To make matters worse, Singh could not even answer basic questions, and had a verbal disagreement with Saara Romu, a program officer at the Gates Foundation, who asked probing questions.

276.   After that meeting, Faghmous decided to take over ATLAS.  He was disturbed by Singh's calculated misrepresentation and felt ethically bound to take control and protect AIGH's reputation from Singh's hype.  A few months later, in the fall of 2016, Faghmous presented ATLAS at a USAID innovation competition, where organizations pitch ideas hoping to find a funding partner.  ATLAS ended up partnering with Dimagi, a mobile data collection software company, and received a $300,000 grant for a one-year pilot program to develop proof-of-concept in Guatemala.

277.   Singh continued to market ATLAS to various organizations and donors including USAID and the Arnhold Foundation.  He regularly claimed it had active users (it still did not) and had built infrastructure in AIGH partner countries (it still had not).

278.   By summer 2017, Faghmous could not justify staying at AIGH as Singh continually misrepresented ATLAS to get more funding.  When Faghmous left in early fall 2017, ATLAS was still very much in infancy and essentially useless despite his best efforts to make it work.  It did not yet have any useful functionality or output.  That was not unusual, as big data projects often

take years to build, but Faghmous did not want to be responsible for or legitimize vaporware Singh was selling as real.

### Emilie Bruzelius

279.   Emilie Bruzelius ("Bruzelius") received her bachelor's degree from Brandeis University and holds a master's degree in Public Health from Columbia University.  She completed a course in advanced training in Data Science at Columbia University in 2016 and pursued a Ph.D. in Epidemiology at Columbia University at the same time that she worked at AIGH.  Bruzelius has worked in health research for over ten years.  She managed several large National Institutes of Health research projects and has expertise in research, data management and statistical analysis. In 2015, Bruzelius started a doctoral degree in Epidemiology at Columbia University to deepen her skills in advanced biostatical and epidemiological methodology.

280.   Bruzelius was first approached about AIGH by El-Sayed in 2015.  El-Sayed taught a summer workshop at Columbia University in systems science that Bruzelius attended.  El-Sayed told her that he was impressed with her background and said that she would be an excellent fit for AIGH.  When Bruzelius met with El-Sayed to discuss the opportunity further, El-Sayed said that one of the most exciting aspects about the Institute was the young average age of its faculty and staff.  But El-Sayed left AIGH later that summer, after having introduced her to Singh, who contacted her eight months later and hired her to do research, write scholarly analyses and essays, and to work on AIGH's research grant applications.

281.   At first, Bruzelius worked almost exclusively with Faghmous, then AIGH's Chief Technology Officer.  During this time, her experience at AIGH was positive; she was happy for the opportunity to conduct global health research with a focus on data science methods. Bruzelius was one of the most productive researchers in the institute despite her title as staff rather than

faculty, and Faghmous rewarded that by negotiating a $5,000 pay raise for her early in her employment.  Bruzelius regularly presented at high-profile conferences and was asked to give academic lectures and presentations around the school.  She also enjoyed working with Faghmous and the Data Science team, which gradually grew to have approximately ten members, all of whom were men except Bruzelius.

282.   Initially, Bruzelius had minimal contact with Singh as most of her work was supervised by Faghmous.  But she quickly noticed he treated women as inferior to men.  He frequently disparaged them, criticizing them for being "too emotional" while also seeming to enjoy provoking them to see if he could get an emotional reaction.  Once he approached Bruzelius after one of her papers was declined by a journal, a common situation for an academic.  She was unfazed, knowing that she could rework the article and submit it elsewhere.  But Singh asked her, in a sympathetic tone that did not appear genuine: "I heard your paper did not get accepted, are you upset?"  It felt to her like he was trying to prod her to see if she would show weakness, and rub her nose a little in her failure, while feigning concern.  She thought it was consistent with the way he liked to exert control over women.

**Faghmous leaves and Bruzelius takes over his duties without extra pay**

283.   In Fall 2017, after Faghmous left AIGH, Singh asked Bruzelius to take over Faghmous' research and management of the Data Science Research team.  She started reporting directly to Singh.  Right after his abrupt exit, Faghmous warned Bruzelius about working with Singh and suggested she try to limit her interactions with him.  Later, Faghmous apologized via e-mail for "failing to protect her" from Singh and for not doing more to "create a better work environment for everyone."

284.    Bruzelius did not receive a promotion or any extra pay for her vastly expanded job. She did not mind initially because she enjoyed the work and wanted to see her projects through. However, this changed once she learned that she, a woman, was in fact earning significantly less than many of the men on the ATLAS team whom she supervised.

285.    Bruzelius had long suspected that she made less money than her colleagues on the Data Science team.   Before Faghmous left, Bruzelius had worked with him on several grant submissions where she had access to some salary information for budgeting purposes.  She learned, for example, that Patrick Doupe ("Doupe"), Data Scientist, and Matt Le ("Le"), Software Engineer, made significantly more money than she did even though Faghmous always treated Bruzelius as an equal to them—from the projected budgets it appeared that Le earned $105,000 and Doupe earned $86,000, while Bruzelius earned $75,000.

286.    Sometime later, Bruzelius noticed that a new male hire, Mihir Mongia ("Mongia"), was listed on AIGH's website as Senior Data Analyst, while Bruzelius was only listed as Data Analyst even though she had significantly more experience than Mongia, who had just graduated from a master's program and did not have full-time job experience.  When Bruzelius checked other entries on the website, she found that other members of her team, e.g., Doupe, Le, Khan and Craig Helfgott ("Helfgott"), had "Senior" or "Manager" in their titles while Bruzelius did not.

287.    Bruzelius brought these concerns to Knaup, who commiserated and told Bruzelius that she would be "shocked" by how much money the men on her team made compared to Bruzelius.  Knaup then said that she had already in fact brought this up to Singh, who was aware of the inequality but decided to not address it because he did not think that Bruzelius would "push it."

288.   Knaup also informed Bruzelius that Singh had decided not to offer her any pay raise because he thought her "weak," "too collaborative" and "did not like" her.   To try to make Bruzelius feel better about Singh's unreasonable and sexist criticisms, Knaup suggested that Singh clearly did not know Bruzelius very well, otherwise he would not have made those comments. Knaup suggested that Singh might change his view in the future and that Bruzelius could push for salary parity then.

289.   Bruzelius was taken aback by this feedback.   She worked hard and was good enough that Singh had promoted her to run the data science research team.   How could it then make sense to pay her less than her male subordinates?   Bruzelius also disliked that Knaup was willing to perpetuate Singh's clearly sexist views of her being "weak."   Nevertheless, she decided she had no choice but to keep her job and try to get a raise later.

290.   Bruzelius observed a troubling pattern of disparate treatment of women within the Institute.   The lion's share of AIGH's work was conceptualized and implemented by women, but Singh gave credit for it to the men.   Bruzelius saw herself as part of that pattern—she worked extremely hard and productively, over long hours.   She was often the last member of the Institute to go home, yet Singh appeared not to notice or care.

291.   Eventually, Singh seemed to come around and started appreciating Bruzelius more, commending her on being able to "fix everything" and making him "look good."   He welcomed her advanced research and statistical skills.   He began to praise her work publicly and introduced her to external collaborators as a "rising star."

292.   When Bruzelius suggested that Singh hire somebody to oversee the ATLAS project after Faghmous left, Singh agreed and hired Dr. Jeb Weisman ("Weisman") for the role.   Singh then rearranged the Data Science team to report to Weisman, while insisting that Silva and

Bruzelius continue reporting to him (Singh) directly, as they were more senior than the rest of the group.

293.   Singh then verbally offered Bruzelius a promotion, suggesting that she become a Director with an appropriate raise.  Knaup told Bruzelius separately that she should receive a pay raise between $20,000 and $30,000.  Bruzelius thought it was overdue but was still glad.  Neither the promotion nor the raise ever materialized.

### Bruzelius raises ethical and HIPAA issues

294.   Over the course of her employment, Bruzelius learned of disturbing research and scientific practices at AIGH.

### *Institutional Review Board authorization*

295.   Before a site visit to Guatemala to conduct fieldwork for a USAID grant, Bruzelius pointed out that AIGH did not have the necessary Institutional Review Board ("IRB") clearance to conduct interviews with staff members at Tula Salud, the Institute's partner organization there. Bruzelius told Singh that the Design Team, headed by Silva, had to obtain the necessary paperwork before going to Guatemala.  Singh agreed and asked Bruzelius to make the necessary IRB application.

296.   When she told Singh that she would need access to certain documents, such as the original grant proposal and AIGH's data use agreements with Tula Salud, Singh referred Bruzelius to Knaup, who refused to give her access.  Bruzelius surmised that her requests were denied because the documents did not exist.  Bruzelius then told Singh that AIGH should postpone the trip because it was then too late to get the required authorizations.  Singh immediately changed tack and said that they did not need IRB approval because they were doing "quality improvement," not research.

297.   Bruzelius told him that under federal guidelines and Mount Sinai's own policies, AIGH's planned activities in Guatemala constituted research and not quality improvement, but Singh told her that she was wrong and that he wanted her to drop the issue.

298.   Bruzelius subsequently learned that the Design Team gathered data in a similarly haphazard manner without IRB clearance on other trips and projects.  Because she was not involved in those projects directly, and having seen how her suggestion to get clearance for the IRB trip was rejected, Bruzelius did not push this issue further.

299.   Khan was similarly instructed to conduct interviews with healthcare workers in Guatemala without written and signed consent forms or IRB approval.  On information and belief, the recordings of interviews conducted by various AIGH staff in Guatemala were stored, and continue to be stored, in personal Dropbox accounts belonging to AIGH staff, without encryption or other appropriate security measures.

300.   At some point later, Bruzelius also became aware that Silva had never completed the Collaborative Institutional Training Initiative Program, a mandatory requirement for any Mount Sinai employee engaged in research.

*HIPAA breaches*

301.   Separately, Bruzelius learned from her colleague, Aaron Baum ("Baum"), that AIGH was holding patient data about millions of patients on computer servers that did not comply with the Health Insurance Portability and Accountability Act ("HIPAA").  AIGH used a regular cloud subscription to Amazon Web Services ("AWS"), instead of paying for a more secure AWS "GovCloud" subscription that is specifically designed to host sensitive data.

302.   Baum told Bruzelius that he had reported the issue to Singh and Knaup, but instead of dealing with it properly, Singh simply instructed Baum to delete the patient data.  Baum felt

uneasy about this directive and tried to discuss it with Singh further, but Singh insisted.  Bruzelius thought this to be in direct contravention of the rules and illegal.

303.   While Bruzelius only found out about that HIPAA breach after Singh already ordered the deletion, she found separate HIPAA issues with the way the ATLAS team handled data.

304.   Singh and Weisman told Bruzelius repeatedly that ATLAS did not collect any patient identifiers and therefore did not need to undergo data security compliance or IRB review. Bruzelius told them that she had seen some patient identifiers in the system, but Singh and Weisman told her that since they were not cached or held in computer memory, this was not an issue.  Bruzelius suggested that they seek independent verification from Mount Sinai, but Singh and Weisman told her that they did not intend to.

305.   Soon after, on October 3, 2018, Weisman showed Bruzelius a specific component of the ATLAS project that analyzed Lyme disease data.  Matteo Danieletto, an AIGH affiliate, had presented that workflow in draft form at a public conference organized by LymeMIND the day before.  Halfway through the demonstration, Bruzelius pointed out to Weisman that the data being displayed included Zip-code identifiers, which, under federal guidelines, constituted Protected Health Information and were therefore HIPAA-protected.  Weisman agreed and told Bruzelius that he would make sure the system was password-protected.  Bruzelius told him that proper procedure dictated AIGH should temporarily disable this feature and get official guidance from the office responsible for HIPAA compliance and security at Mount Sinai on how to proceed.  Weisman told Bruzelius he thought this was unnecessary but that he would discuss the issue with Singh.

306.   Bruzelius felt extremely uncomfortable every time she had to bring up a compliance issue to Singh.  She knew that it was not up to Singh to decide whether AIGH was in breach of

HIPAA or research ethics rules.  Protocol required that any breaches or suspected breaches be reported to the appropriate offices at Mount Sinai so they could determine how to react.  She made sure to apply for specific IRB authorizations on AIGH projects where she was directly involved and active, but she remained concerned that this was not something that Singh enforced or even encouraged elsewhere at AIGH.  Singh, and later Weisman, further began to make offhand jokes about how Bruzelius was "obsessed" with AIGH's lack of compliance, downplaying and discrediting her concerns.

### Bruzelius' complaint against Singh

307.   On several occasions, Bruzelius considered whether she should report her concerns to Mount Sinai or the IRB.  While anonymous complaints were allowed, she expected that Singh would trace any complaint to her since she seemed to be the only one at AIGH raising these concerns.  This scared her: she had seen Singh lash out against those who he thought were "against him" and thought he would retaliate against her by either forcing her out, sidelining her or blocking her from projects.  She also felt she did not have enough proof to bring an official complaint, as Singh and Weisman had control of ATLAS, its computer code and data.

308.   Bruzelius did, however, participate in a HR complaint against Singh in summer of 2018 and reported her concerns to Jones-Winter.

### *Humale Khan*

309.   Humale Khan received his bachelor's degree in Computer Science from Cornell University, where he spent his summers interning at Microsoft, SpaceX and other tech companies.  His first foray into global health was as a member and then project lead of Engineering World Health, a student-run organization of engineers who design and build medical devices for resource-poor communities.  After graduating from Cornell, Khan worked at Microsoft as a Program

Manager for the Operating Systems Group. Khan helped design a feature for an innovative screen-reading tool called "Narrator," which used artificial intelligence to read out and describe images for visually impaired users.

310.   In 2017, Faghmous hired Khan to become a Product Manager at AIGH. He joined the Institute even though it meant a pay cut, $95,000 compared to $130,000 at Microsoft. Khan was willing to earn less because he believed in AIGH's mission and wanted to make a difference in the world—something he thought he could do at AIGH.

311.   Khan's main role at the Institute was developing ATLAS, the tool that was intended to combine satellite imagery, machine learning and epidemiological methods to identify at-risk patients in rural communities and plan effective interventions. Khan was first tasked to oversee the development of a prototype that would coordinate the data available to ATLAS and display it in a user-friendly application upon which further programs could be built.

312.   When Khan arrived, ATLAS had very little written computer code for it and its GitHub account, used to track and show progress of computer programs, was largely empty. Khan and his colleagues essentially had to build ATLAS's code up from scratch, which was particularly distressing since ATLAS had to report to USAID on its progress in October 2017, just a month later. Without developed computer code, there was very little, if anything, that ATLAS could honestly report as an accomplishment.

313.   Faghmous left AIGH within Khan's first month there, which left ATLAS without any direction or clear leadership. Khan started his work on the prototype but became aware that ATLAS's data—mostly based on Zika data from Guatemala and some user insight reports—were grossly incomplete, rendering the prototype's impact flat from the onset.

### Khan sees Singh making misrepresentations to donors

314.   Khan soon became concerned about Singh's conduct for the same reasons that drove Faghmous to leave AIGH.   Khan saw Singh give inconsistent and false presentations on ATLAS to donors, asserting it had features and uses that it simply did not.   Singh regularly said that ATLAS was deployed in the field and was improving health care services, when in reality ATLAS was still in its infancy and a long distance from being able to do anything.

### Fraudulent USAID report

315.   Although Khan did not work for AIGH when it secured a $300,000 grant from USAID to develop ATLAS, he was part of the team who reported to USAID on the grant's progress in 2017.   Early on in his employment, Khan was on a call with Llames and Jennifer Fluder ("Fluder"), AIGH's program manager and advisor at USAID.   In that call, Fluder listed all the targets to which Singh had committed at the beginning of the grant, namely getting ATLAS to the point where it could develop and test machine learning algorithms, be tested in the field, and use rainfall/health data to predict the spread of the Zika virus, among others.

316.   Khan was concerned.   It was clear to him that Singh could not possibly deliver on any of those targets by the time AIGH had to submit ATLAS's final report to USAID.   None of them had been achieved.   With only a few weeks remaining before the final report was due, Khan recommended that AIGH own up to its lack of progress on ATLAS and clearly outline the constraints that had impeded them.

317.   That did not happen.   The ATLAS team, including Singh, Silva, Llames and Khan, traveled to Washington D.C. to meet with Fluder.   During this meeting, Fluder asked Singh directly: "How many users does ATLAS have?"   Singh was flustered at first, because he knew ATLAS had no users—it was not finished.   Rather than admit this, he made up an answer and said

something like "ATLAS is covering 20% of Guatemala" and "ATLAS has hundreds of users." Fluder said that she did not see those numbers anywhere in the draft report and asked Singh to include that statistic in the final version.

318.    After the meeting, Singh instructed the ATLAS team to revise the USAID report as she had asked.   Khan was astonished to see how unabashedly Singh was willing to submit fabricated data to a government body.

319.    Berman and Singh appeared highly determined, even enthusiastic, about falsifying the USAID report despite the efforts of Bruzelius, Llames and Khan to explain how disastrous this could be to AIGH's reputation.   Bruzelius even highlighted many portions of the report that used scientific terminology in fundamentally incorrect and almost laughable ways.   But Silva, Berman and Singh, during a group discussion in the design room, disregarded these concerns and made fun of them.   Berman told Khan and Bruzelius they worried too much.   Singh laughed it off as well, adding that "these reports would be given out to people who would not understand the text or even read it anyway."   Berman then said that Singh had "particular expertise in presenting work like this to older white people at foundations" to get funding.   Singh and Silva laughed in agreement with Berman and left the room.

320.    Despite the efforts of Khan, Llames and Bruzelius, the final and printed version of the report (the "Final USAID Report") contained a number of false statements, most notably, on page 16, where it said that ATLAS had a "coverage of 16% of secondary health coverage services. Each health district has a Nurse and a Health Supervisor, while each health area has an Epidemiologist, providing a total of 224 ATLAS core users."   This was completely false—ATLAS did not have <u>any</u> users, core or otherwise.

**Presentations to Gates Foundation, Vulcan Inc. and Commonwealth Fund**

321.   Also in fall 2017, Singh, Berman, Khan and their colleagues made presentations about ATLAS to representatives of the Gates Foundation and Vulcan Inc.  As with USAID, Singh again exaggerated ATLAS's capabilities, stating that it was heavily tested with health care workers—which it was not—and that its machine-learning algorithms were being tested on the ground—which they were not.

322.   The thinness of Singh's lies became apparent when the representatives probed deeper.  He was unable to answer their questions.  When Singh decided to showcase the prototype that Khan had helped build in the first few months of his employment, it was clear that Singh did not really know how it worked, clicking on parts of it and appearing surprised or confused at the result, as if he had just opened the prototype for the first time.

323.   Another AIGH staffer with concerns about Singh's honesty with donors was Amanda Misiti.  In January 2018, in response to questions from Melinda Abrams, Vice-President of the Commonwealth Fund, about certain methods employed in aspects of AIGH's Task Force on Global Advantage report, Singh sent Misiti a draft e-mail response and copied Safo.  He asked Misiti to review and improve it.  She thought it was riddled with misrepresentations and in her reply to Singh highlighted everything she thought he should redact.

324.   In January 2019, Singh and Misiti's team were preparing for an important meeting with the Commonwealth Fund, and she sent him the draft slide deck and report for the meeting to review.  Two days later, Singh responded with his thoughts on how to address questions he anticipated the Commonwealth Fund might ask.  His suggested answers exaggerated AIGH's progress on the project.  He wanted to tell the donors something different than what the stakeholders had agreed upon.  Misiti felt very uncomfortable about Singh's planned approach and

responded to him the same day, saying: "I think it is ill-advised for us to indicate that there is a greater degree of specificity committed to beyond what was written on and signed in the commitment document." She did not want to be involved in misleading the Fund's representatives.

### Khan's whistleblowing and departure from AIGH

325.   Khan left AIGH on February 4, 2019, but before he left, he felt it was his ethical duty to report Singh.

#### Report to the Mulago Foundation

326.   On January 30, 2019, Khan wrote an e-mail to the Mulago Foundation through their website contact form to offer his anonymous feedback on projects at AIGH. Alex Hughes-Smith, Starr's Executive Assistant, responded, asking to schedule a call between Khan and Starr. During the call, after Khan elaborated on his report, Starr said that he cared about the success of AIGH as well as Singh's success, and said he would try to find a solution to this problem.

#### Report to USAID

327.   Khan also contacted Fluder via LinkedIn to report Singh to her directly. He learned that she had left USAID, but she connected him to David Milestone ("Milestone"), Acting Director for the Center for Innovation and Impact at USAID. Khan spoke to Milestone by phone on February 25, 2019. Milestone promised Khan anonymity and encouraged him to participate in an investigation into Singh's conduct.

328.   On July 27, 2020, Khan contacted USAID for an update on the investigation; however, it was unable to comment.

*Report to Mount Sinai*

329.   Khan did not know that Anandaraja, Atkinson, Rahona and others approached Mount Sinai to file a complaint against Singh in 2018.  He was not informed of the existence of that complaint, the resulting investigation or any of its outcomes.

330.   As he was leaving AIGH in early 2019, Khan was surprised that Jones-Winter did not schedule an exit interview, so he wrote her on February 1, 2019, asking for a meeting to air his concerns about the Institute and make his own complaint.  They exchanged several e-mails, in which Khan made clear that:

> (a) Singh's claim that ATLAS was being used by community health care workers or their managers was completely false.  ATLAS was not deployed in the field by AIGH or any of its partners;
>
> (b) the Final USAID Report contained false statements;
>
> (c) Singh regularly oversold ATLAS to potential funders; and
>
> (d) ATLAS's servers likely contained unprotected patient health information.

331.   Khan and Jones-Winter spoke over the phone to discuss Khan's allegations in more detail.  Khan also offered to send Jones-Winter some evidence substantiating his complaint. Jones-Winter sounded excited about the prospect, telling him that she has been working on investigating Singh for a long time but had little hard evidence to really go after him.

332.   Khan provided Jones-Winter with the evidence that he thought relevant, but never heard anything more from her about any investigation.

333.   On February 12, 2019, Khan made a separate report directly to Charney, which he concluded by saying:

> I'd be happy to get on a call with you to discuss other serious violations, but I hope this is good to start. I'd like to note that this has been reported to HR and

the people that coordinated my exit interview. My hope is that the large quantity of funds used for this project is instead used for projects that truly help vulnerable communities in a measurable way. What is clear is that the organization and staff have spent an extremely long time on this project, with no impact to date. Any potential impact is also clearly impossible from how the organization is structured and run under Dr. Prabhjot Singh's leadership to allow such an ineffective project to continue this long. Also, I'd like to note that I'm coming forward now because there are many who work at Arnhold who are afraid to come forward and share what they've experienced; I'd like my account to help change the culture at Arnhold to ensure that only work that has real impact is being done. I am also concerned for how liable Arnhold may make Sinai at large, given the various elements I've mentioned about the exaggerations and lies around Atlas, especially to federal funders.

334.   Singh had obvious reasons of self-interest for not admitting problems in ATLAS or other programs to donors and his own managers, but his disregard for basic standards of honesty and his insistence that employees back him up was another way he intimidated them and made them nervous about whether they could ever stand on firm ground with him.  In this way, his handling of ATLAS illustrates the management techniques he used to turn AIGH into a hostile environment.

### *Other reports*

335.   Khan and Smaldino also reported Singh's conduct to Medic Mobile, a software company.  Singh wanted to partner with it and had exaggerated AIGH's successes to accomplish this.  Khan and Smaldino wanted Medic Mobile to know the true nature of AIGH's work—not just Singh's fraudulent account of it—so that they could make an informed decision about collaborating with AIGH.  Khan also made a similar report to Ray Brunsting, the Chief Technology Officer of the Tula Foundation, which was one of AIGH's partner organizations for the USAID grant.  Brunsting told Khan that the Foundation would likely slow down or freeze its cooperation with AIGH as a result.

**Singh and Weisman retaliate against Khan**

336.   After Khan left AIGH, on February 12, 2019, Weisman e-mailed him suggesting they have an "informal exit interview" to catch up.  Khan agreed, and Weisman called him on February 15, 2019.  Khan knew that Weisman and the rest of the team, likely including Singh, recently had a meeting with Starr, so Khan asked Weisman how it went.  Weisman said it went well.  Khan then told Weisman that he had reported Singh and ATLAS to Starr, suspecting that Starr had told Weisman in their meeting anyway.

337.   After the call, Khan learned from several staff members at the Institute that Weisman had told them that he was concerned for Khan's mental well-being, calling Khan "manic."

338.   Khan also learned that Singh made several similar comments, including to the Oversight Committee created in response to the HR complaint about Singh.  Jones-Winter told Misiti that Singh had told her, "It's not my medical focus, but he seemed manic."

## Singh and Silva use Mount Sinai for personal gain

339.   Singh (and to a degree, Berman and Silva) regularly used his position at Mount Sinai for personal gain.  On several occasions, Singh told Khan that for him, a big benefit of working at Mount Sinai was the amount of time he could spend working on other projects benefiting other organizations during usual business hours.  On one occasion, Singh told Khan that he regularly used his connections from Mount Sinai to get paid advisor roles at companies and foundations, taking advantage of his prestigious job to "get money from side gigs."

340.   Singh also asked Mount Sinai staff to devote large amounts of time and effort to other institutions' projects in which he was involved, especially projects for the Peterson Center for Healthcare.  He often told them to stop their work on Mount Sinai projects for the day to handle

some immediate requirement of his other jobs, from which Mount Sinai did not get any benefit, but Singh did.

341.   On one occasion, Silva received multiple phone calls and an e-mail from Singh instructing Silva to help him that same day with a personal project involving the Sikh community. Silva complained to Khan about always having to drop everything to prioritize Singh's personal projects or create presentations for Singh matters not related to Mount Sinai during work hours.

### Silva submits personal receipts for reimbursement

342.   Khan often saw Silva at his desk in the design room, agonizing over his expense reports and how he could best get reimbursed by Mount Sinai for his lavish trips.  One of Silva's tactics to get alcohol expenses reimbursed — which he spoke about openly — was to ask restaurants and bars to print non-itemized receipts that showed the overall cost without drinks being itemized.

343.   Silva made similar statements to Bruzelius and Llames when they were all on a business trip to Guatemala.  He told them that drinking in hotel bars and expensing the bills to Mount Sinai was easy because the bar charges appeared under the hotel's name and he had a practice of telling Mount Sinai that he lost the original receipt.

344.   Silva also bragged to Khan and other AIGH employees that he often booked himself into lavish suites and hotels on his work trips, paid for them on his own credit card, and succeeded in getting reimbursed by Mount Sinai.  He also gave tips on how to book hotels and flights for business purposes, cancel them, and use the flight credits that were sent back to his account directly for personal trips.  Silva would apparently still seek reimbursement through AIGH for these cancelled (and in some cases, refunded) trips in part of a convoluted scheme to profit from Mount Sinai's reimbursement policies.

345.   Silva also spoke about having used Mount Sinai funds to sponsor trips to Mexico City and California for one of his side businesses or for personal reasons, such as to see friends or people that he was dating at the time.  He said that he, Singh, and Berman had done this countless times.  Silva then emphasized that Singh approved anything Silva asked for and nobody (including Caroll Hayek, who processed AIGH's reimbursement requests) could stand in the way of Silva getting his excessive and personal receipts reimbursed by Mount Sinai.  This is of note because Mount Sinai has clear *per diem* policies on how much a staff member can spend and on what, which Silva, with Singh's help, was able to flout.

## *Singh continues to discriminate against women*

346.   Singh's attitude towards women did not improve after he drove Anandaraja and Atkinson out of AIGH.  He continued undermining, berating and silencing them.  The only way a woman could avoid this was through total subservience.  Like Atkinson, Anandaraja and Rahona before them, however, Safo, Misiti and Caliendo would not abase themselves and Singh sought systematically to make their lives miserable.

### *Stella Safo*

347.   Safo received her bachelor's degree *magna cum laude* in History of Science and African American Studies from Harvard College, her master's degree in Public Health with a specialization in Global Health from Harvard School of Public Health, and M.D. from Harvard Medical School and School of Public Health.  She completed a year-long HIV clinical fellowship with HIV Medicine Associates (HIVMA) and has conducted extensive research in Hepatitis C and HIV-positive patient populations with Montefiore's Department of General Internal Medicine.

348.   Safo joined AIGH on September 1, 2015, as Program Manager.  She led the Health Systems Design team, which combined user experience designers, researchers, clinicians, engineers and project managers to design and implement innovative ways to improve medical practice in complex health systems around the world.

349.   Safo developed the team's strategic plan, collaborating closely with high-level stakeholders on the academic and medical sides of Mount Sinai.  The three-fold strategy sought to develop (1) Care Solutions (products) that would help improve individual health care practices, (2) Care Delivery models for larger systems, and (3) ways of spreading knowledge at scale via Learning Networks.  She also helped design Mount Sinai's Primary Care strategy to oversee the improvement and reorganization of its 50+ primary care practices.  Safo implemented five different programs at AIGH to advance these goals, including a real-time patient feedback tool that can help practices redesign their operations, and created a three-year population health curriculum for trainees to equip the next generation of physicians to adapt to the changing health care landscape.

350.   In the last two years, Safo received an Award for Community Advocacy in HIV medicine from the New York Department of Health and was a New York Academy of Medicine Fellow.  She is one of 30 minority professionals chosen as a Fellow by the Council for Urban Professionals in 2017.  She was also selected as a 2017 Honoree by the Amazing Grace Children's Foundation, an organization building a hospital in Ghana.

351.   Singh hired Safo without any selection committee, telling her she would be his "second in command."  He told her she would work with him on health systems design.  Safo told him that this was not her field of training, but Singh responded, "I will mentor you; we will learn

this together.  This is an opportunity to dig into new space." Safo trusted Singh.  She had known

his wife, Kaur, for most of her life so felt she could believe Singh too.

### Singh's preferential treatment of men

352.    Singh offered Safo a salary of $175,000 to join AIGH.  Safo wanted to see if there

was any space for negotiation about her salary or benefits.  When Singh did not budge, she reached

out to Mount Sinai directly to ask questions about her contract and pay.  Singh became very angry

at Safo for doing this and told her to be grateful for what he was offering.   She wanted to stay in

Singh's good books, so she decided not to press further.

353.    However, once she joined AIGH, Singh started treating her condescendingly, and

denigrated her in public.  A group from the Peterson Institute, where Singh had worked, once met

with Singh and Safo during a visit to AIGH's offices, and group members said afterwards that they

had never seen Singh be so disparaging as he was towards Safo.  This was not unusual.  Safo sat

in many meetings with Singh where he ignored or talked over her.

354.    While Singh discussed his projects primarily with his male staff, he assigned tasks

and deliverables primarily to women.  Singh also frequently assigned menial tasks like logistics

planning or note-taking to women only.

355.    Safo's title of Program Manager did not match her qualifications.   When Safo

pointed this out to Singh, he told her not to worry and to trust the process.  Safo did, but with time,

the inappropriateness of the title only grew.  She was routinely asked to do more and higher-level

work than fit the Program Manager label.  She attended senior management meetings, hired and

managed multiple staff and helped design the Institute's programming.  Singh should have given

her a more senior title, but he did not.  Meanwhile, the men Singh hired were all given senior titles,

such as Chief Technology Officer, Associate Program Director, and Head of Research, even if their qualifications did not merit this.

356.   Singh also issued pay raises more often and more automatically to men than women.  Singh regularly rewarded the primarily male staff working in data science to prevent them from leaving for other jobs.  For example, Safo noticed that while Matt Le received a raise after Faghmous left AIGH, his female colleagues, such as Misiti and Bruzelius, did not.  Similarly, Silva told Safo in his first year at AIGH that Singh gave him an unexpected raise for which Silva had not asked.

357.   This was a common trend—Singh gave men promotions automatically; women had to ask.  In fall 2017, Safo asked Singh to promote her to Chief Medical Officer to better reflect her seniority and level of responsibility.  Singh said he was surprised Safo had not asked earlier, and that if he had been mentoring her, he would have told her to ask much sooner.  Safo felt betrayed.  Singh recruited her precisely by promising to mentor her.  Although he did end up promoting her, she saw he was not trustworthy.  Safo was owed back pay after her promotion, but it took nine months to get it despite repeated requests to Singh, and finally required her to appeal directly to Jones-Winter.

**Singh and Berman control and silence Safo**

358.   Singh frequently made Safo invisible.  In meetings where he introduced projects to outside partners, Singh would allow male heads of departments to introduce their work, but, when it was Safo's turn to present on Health System Design, Singh did it himself, allowing Safo only brief interjections between his long remarks.  Safo frequently observed Singh, Berman and Silva listen attentively to men's opinions in meetings while ignoring the women.  Safo sat in many

meetings where her comments were simply ignored or talked over, so much so that others told her afterwards that this was noticeable.

359.   Singh also controlled Safo's written communications with external partners.  He barred Safo from responding to external e-mails.  When she once responded to an outside partner after they asked her a direct question about her work, Singh was furious.  He e-mailed Safo privately to reprimand her, telling her that he wanted to handle all external relationships himself.

360.   It was clear to Safo that Singh tried to control her, both physically—by restricting when and to whom she could speak—and intellectually, by calling her unintelligent and useless without him.  He told Caliendo, his Executive Assistant at the time, that Safo was not smart and did not know how to think until he "made her."

361.   Safo came to dread meetings with Singh.  Whenever he was involved in her Health System Design team meetings, he confused her team by speaking in a very convoluted and obfuscating manner.  When the staff said they did not understand him, Singh got frustrated and ended the meeting early, then criticized Safo for how she ran her meetings.  Once, he told her she should cancel team meetings altogether rather than running them like a "mother hen."  This was an offensive and sexist remark.  All she wanted was to make sure her team understood what tasks he wanted them to accomplish, which sometimes took a little patience because he was confusing.

362.   Mike Escosia ("Escosia"), Project Manager of Health System Design and one of Safo's male colleagues and subordinates, heard Singh regularly focus all criticism of Safo's team on her even though it would have been properly directed to other team members present.  Singh called Safo a "bad leader" and her department, Health Systems Design, a bad role model for AIGH in front of her subordinates.  Escosia believed Safo had to work five times as hard as her male counterparts to get any respect from Singh.

### Singh and Berman reprimand Safo for buying a cake

363.    On September 19, 2017, Safo sent e-mail inviting AIGH staffers to gather for a brief birthday celebration and cake for Dr. Natalie Privett ("Privett") and Misiti.  Berman criticized her e-mail for omitting some AIGH staffers as addressees, though the body of the e-mail made clear everyone was invited.  Berman wrote Singh a heated e-mail saying Safo was "exclusive" and bad for AIGH culture.  Safo then went to a meeting with potential donors.  Singh pulled her out in the middle of it, telling her angrily in the hallway that he "100% agreed" with everything that Berman had said, calling her unprofessional, divisive and insubordinate—all because she did not happen to circulate her birthday cake e-mail to everybody at AIGH.  Safo found Singh's and Berman's reaction startling, disproportionate and hurtful, one more gust of unwarranted hostility.  It was the straw that broke the camel's back, and she began to cry.  Singh told her she was getting too emotional and that they should end the discussion then.  He left, but Safo had to compose herself and return to her meeting with donors.

364.    Serving cake on staff birthdays became commonplace afterwards at AIGH, and no one was criticized like Safo had been for organizing them.  In or around December 2017, when Silva bought cake for a colleague who was leaving AIGH, Singh even told him to submit his receipt to Knaup for reimbursement.

### Singh continues to gaslight and emotionally manipulate Safo

365.    After Singh told Safo she was "too emotional," Safo made a point never to show him emotion.  But then Singh criticized her for not showing enough emotion, allegedly because she did not grasp the severity of a particular situation they were discussing.  Safo concluded that she was being gaslit.  Singh was trying to make her doubt herself, to provoke her into a reaction he could use against her, and to show his dominance.

366.   Before the birthday cake incident, Safo had always spoken up freely in senior management meetings.  Afterwards, Singh and Berman both told Safo in separate conversations that she was speaking up too much.  Singh even said, "You have a lot of opinions and maybe need to be more contained," so Safo decided to try speaking less.  Then Singh told Safo angrily that if she did not speak up more in these meetings, she was not fit to be Chief Medical Officer.  This "heads I win, tails you lose" approach, so common in Singh's treatment of women subordinates, felt designed to make her lose confidence and bring her under his total control.

367.   Singh would frequently change his mind about the direction of projects, throwing weeks' or months' worth of work into question.  He would have Safo rewrite draft after draft of documents because none was any good, then decide at the last minute that the first draft was fine.  He was charming, then instantly furious.  There was never any firm ground to stand on.  He always kept her and other women off-balance.  The hostile, even weird environment meant Safo began to doubt herself, and started taking copious notes at every meeting with Singh to provide proof when he would later deny the things he had said.

368.   Singh deliberately pitted people and teams against each other.  For example, Singh and Berman told Safo that Faghmous had called Safo's work "unimportant," which led to a falling out between Faghmous and Safo.  Months later, after they both resigned, Safo and Faghmous spoke about this.  Faghmous was startled to hear what Singh had attributed to him and said he had never said or thought any such thing.  Singh evidently wanted to create a rift between Safo and her colleagues so he could keep her off guard and dominate her further.

**Singh's money manipulations**

369.   Safo developed concerns about Singh's handling of donor and grant funds.  Every project had its own detailed budget, which was submitted to and ultimately approved by Mount

Sinai.  However, once AIGH was receiving grant money, Singh allocated it contrary to the agreed budgets.  For example, Singh used funds provided by Mount Sinai Health Partners intended to pay for Safo's team to cover salaries for other AIGH staff.

370.   When Safo raised this with Singh and Knaup, Singh said that if questioned, he would come up with a way to justify his allocation.  Singh further directed Safo to lie and confirm that everyone at AIGH paid using Mount Sinai Health Partners money was indeed working on her project.

371.   Safo also heard from her colleagues, including Caliendo, about Singh's lavish spending, which included booking cabs to all his meetings, upgrading economy tickets to business class on Sinai's account (which was against hospital policy but when Caliendo contacted Charney's office for sign off, it was always authorized), and organizing personal trips to include one or two supposed business meetings so he could get all his expenses reimbursed, even those not incurred on business.  On information and belief, Singh also spent lavishly on renovating his office at AIGH and ordered custom-fitted furniture.

372.   Another example of possible misallocation was raised by Murphy shortly after Singh became Director.  It appeared to Murphy that contrary to AIGH's agreement with the Foundations, Singh was using some of their grant to pay his own salary.  Murphy wrote about this in an e-mail to Singh:

> John Arnhold specifically stated the $ was not for the new Director of AIGH and that should come from the School. We both know now that the school does not have the money and Dr Charney then gave you a significant portion of that designated money. That suggests that designated funds may have been diverted.  The money stream has not been discussed with John Arnhold.

373.   On information and belief, at least a portion of Landrigan's salary was also paid from the grant at Charney's direction.

*Safo's resignation*

374.    The pervasive hostile environment resulting from Singh's efforts to gaslight and demean her and other women, and his instructions to lie about how he was allocating Mount Sinai Health Partners funds, convinced Safo she had to go.  She found a new position with Mount Sinai Health Partners, still under Mount Sinai's umbrella but not within AIGH.

375.    Although Singh had given Safo excellent performance appraisals in the past, scoring her largely 4s and 5s on a scale of 1 to 5, after Safo left AIGH on February 28, 2018, Singh submitted a final appraisal, scoring her almost all 3s.

376.    Safo remained employed by Mount Sinai to introduce systematic improvements in its delivery of primary care.  In the wake of this lawsuit, however, Safo concluded that she could no longer be effective in her new role as Senior Medical Director of Population Health and resigned in June 2019.  She continues working at Mount Sinai in a limited capacity, seeing patients one day a week.  Since June 2019, Safo has worked at Premier Applied Sciences, most recently as its Chief Clinical Transformation Officer.  In 2020, Safo was recognized as a top minority leader on Modern Healthcare's "Minority Leaders to Watch" list.

*Geraldine Llames*

377.    Geraldine Llames ("Llames") joined AIGH on January 23, 2017.  She received her undergraduate degree from the University of Virginia in 2008 where she studied Sociology and Spanish.  She has previously worked at Accenture Federal, Java Productions Inc. and FedBid, Inc., supporting the Departments of State, Homeland Security and Defense.

378.    At AIGH, she joined Chronic Disease Action Center team and reported to Kishore.  She was hired to be a Project Manager, but Kishore used her as his personal assistant, to take notes in meetings and book flights for him.  Llames was willing to pitch in despite many of those tasks

being below her pay grade.  But she was happy when Faghmous asked her to join his Data Science team too, where he put her skills to appropriate use.  The team included Bruzelius, Doupe, Le, and Silva.

379.    In her new role at the Data Science team, Llames developed and monitored project plans, contributed to strategy planning and otherwise helped manage the team.  She liked her work until Faghmous left AIGH in the fall 2017 and she began reporting directly to Singh.

### Singh ignores Llames and other women during meetings

380.    Singh often treated Llames and other women as if they were invisible and inferior to men.

381.    In May 2017, Singh held a debrief meeting on the progress of a grant AIGH received from RWJF.  Four men were present (Singh, Faghmous, Kishore and Berman) and four women (Misiti, Sasha Walek ("Walek"), Associate Director of Media and PR, Anna Stapleton ("Stapleton"), Policy Analyst, and Llames).  Although the women did most of the work on the grant, Singh ignored them and talked only to Faghmous, Kishore and Berman.  Only after Faghmous told Singh that he should ask the women for their feedback, since they actually did the work being discussed, did Singh do so.

382.    At weekly status meetings Singh behaved in equally denigrating fashion.  Everyone sat in a circle and took turns reporting to Singh about their major activities for a few minutes.  But at least half a dozen times, when it was Llames' turn to report, Singh skipped over her as if she did not exist, making others as well as Llames feel deeply uncomfortable.  Sometimes others pointed out to Singh that he had skipped her, and he would reluctantly let her speak, but usually she just left the meeting without having said anything.

383.    Singh continued his pattern of inviting Llames to meetings but then ignoring her with external partners too.  Singh often introduced his entire team except for Llames, who then had to sit quietly and awkwardly among them.  In one meeting, Dr. Jeb Weisman, Director of ATLAS, undercut Singh's silent treatment by highlighting Llames' contributions on the project to the rest of the attendees.

384.    Singh never ignored male subordinates in meetings, no matter how junior.  For example, Llames' position was comparable to Escosia's, who was also a Project Manager, and they produced work of similar quality and amount, yet Singh never ignored Escosia.  Although Escosia and Llames were equals, Singh always treated Llames like she was subordinate to Escosia.

### Singh approves men's Paid Time Off requests, rejects Llames'

385.    While Singh ignored Llames in meetings, he did occasionally speak to her in person.  One day he might be friendly, and even compliment her work, but the next day he would deride it—even if he had liked the same document the day before.  After agreeing well in advance that she could work from home on a particular day, he would change his mind at the last minute, in a way he did not do with any men at Llames' level of seniority.  Singh's erratic about-faces made Llames feel constantly on edge and anxious, the same way he made other women feel.  She felt he was being capricious on purpose, to lord his power over her, and that he enjoyed it.  Solely because of Singh, she found the environment hostile and oppressive.  She cried at least biweekly while she worked at AIGH.

### Llames leaves AIGH

386.    By summer 2018, Singh had made Llames so unhappy and uneasy at work that she decided to leave.  She then learned that Mount Sinai was investigating Singh after Anandaraja, Atkinson and others had filed a complaint against him.  Llames met with the investigation

committee and relayed all her concerns about working at AIGH.  Llames never heard back from the committee.  She found a new job as a Senior Project Manager at the Montefiore Health System and resigned from AIGH on August 9, 2018.

### Amanda Misiti

387.   Misiti joined AIGH in May 2017 as a Program and Policy Research Manager.  She is the only plaintiff in this matter who remains employed at AIGH.

388.   Misiti received her bachelor's degree in International Development from McGill University and a master's degree in Public Administration jointly from the New York University Wagner Graduate School of Public Service and University College London.

389.   After graduating from her undergraduate program, Misiti worked for the U.S. Peace Corps as a Health Education Specialist in Mali.  In that position, she worked to improve health awareness in a rural community, designed and implemented a strategy to address malnutrition in partnership with local organizations, secured funding for a well and initiated the community's first HIV/AIDS Awareness Day.  She then worked at the U.S. Department of Health and Human Services as a Program Officer in Washington, D.C, developing strategies to achieve quality, cost and population health goals for five different communities across the United States, which totaled more than $60 million in cooperative agreements.

390.   Misiti also has experience outside health care.  She worked as a Knowledge Management and Communications Officer at the BRAC Social Innovation Lab in Bangladesh, where she managed multiple funds, including ones supported by the Bill & Melinda Gates Foundation and the Rockefeller Foundation.  Misiti also worked as an independent consultant for several organizations, primarily developing their knowledge products and writing grants.

391.   At AIGH, Misiti managed two grants on which Singh was Principal Investigator or Co-Investigator, as well as strategic initiatives.   Prior to his resignation, she reported directly to Singh.   Part of her role involves managing the Commonwealth Fund grant, which provides AIGH $299,000 a year and covers 80% of her salary.

**Misiti's interview and onboarding process**

392.   The interview process showed her how Singh operated in a way her employment confirmed.   He scheduled her initial interview for an unspecified time on a Saturday, saying simply he would simply "call" her.   She waited around all day to hear from him, finally deciding to e-mail him after hours of silence.   Singh replied saying that he was sick and would call her the next day, also at an unspecified time.   He seemed to be emphasizing that he could do what he wanted and that she should get used to it.   Eventually he did call, organized further interviews with other AIGH staff and ultimately agreed to hire her.

393.   Misiti's onboarding process was almost entirely focused on "how to best work with Singh," a topic that clearly preoccupied everyone at AIGH at least as much as their actual work. Numerous colleagues told Misiti that Singh was erratic and inconsistent and would regularly march off in a new direction while refusing to acknowledge he was doing so.   She quickly observed that Singh used esoteric words in bizarre sentences and frequently jumped between topics in ways that were hard to follow.   She also noticed that Singh had a haphazard attitude to research and grant reports, often overstating what he had done or making large claims for which he had no evidence.

394.   Within her first month, Misiti told Singh that she had connections at both the Rockefeller Foundation and the Bill & Melinda Gates Foundation from her previous work, hoping to capitalize on them to further AIGH's initiatives.   Singh said he already knew all the "top people" at these foundations and felt that funding conversations should be the exclusive province of those

at the top, like him, rather than mid-level employees like her–although most research groups are glad for connections with funders at all levels.

395.   Berman told her he thought it would take her nine to 12 months to get up to speed. Misiti had ample relevant experience and had managed much larger grants previously, so his expectations seemed surprisingly low, with an implication that she was not very competent. Berman also told Misiti to "not have opinions" about an event that was being organized for the project she managed—she was apparently to have opinions only when invited.

### Singh's unfavorable treatment of women

396.   Misiti observed that Singh treated men at AIGH better than women.

397.   During meetings, Singh regularly interrupted female colleagues or acted as though their comments were insignificant or irrelevant, often ignoring that they had even spoken.  Misiti started making a point of circling back to comments women had made, trying to ensure their voices were actually heard by the men in the room.

398.   Misiti also started to notice how Singh frequently dumped menial tasks on female staff, like taking notes, event logistics and stuffing over 200 envelopes with Task Force reports. On a trip to Liberia, Singh even made Misiti responsible for managing drivers and logistics, carrying the satellite phone and writing up a trip report.  None of the men on the trip was asked to share in these relatively menial duties, though some were at her level or lower.

399.   On another work trip to Liberia, Misiti and Singh had a meeting at the U.S. embassy.  Misiti wore a suit dress for that meeting, but then changed into more conservative clothing for the rest of the day, which she thought more culturally appropriate for field work.  Singh noticed that she changed her clothes and told her, "I prefer the modest look," which struck Misiti as inappropriate.

400.   During this trip, Singh also purposely provoked Misiti and another female colleague by starting pointless debates with them, appearing to take pleasure in throwing them off guard and exploiting the power dynamic between them as their supervisor.  Misiti attempted to diffuse the situation multiple times, but found it stressful and unpleasant.  She noticed that Singh never treated his male reports in the same manner.

401.   Singh frequently described women at AIGH as "stressed" and "overwhelmed," implying they could not really cut it.  He criticized Misiti for being overly emotional and said he preferred to work with people whose emotions did not affect their work, such as Helfgott, a man. He also developed an odd practice to intimidate Misiti–staring at her intensely without blinking for long periods during meetings.  It was bizarre.  Misiti asked him if there was a reason why he was holding a "staring contest" with her, which made him stop, only to resume in other meetings.

402.   On one occasion, Singh bragged to Misiti that he had made a female subordinate at Columbia University cry on a regular basis, and that he had taken credit for her accomplishments. He then listed the accomplishments of a number of his female subordinates and said that Misiti might one day find herself among their number.  This comment frustrated Misiti, who felt that everything that she had accomplished at AIGH had been accomplished despite Singh and not because of him.  Misiti also heard that a number of women at Columbia had found Singh to be emotionally taxing and frustrating.  Separately, Anandaraja heard from friends that their colleagues at Columbia had found Singh arrogant.

403.   On another occasion, Singh lied to Misiti about his academic accomplishments, telling Misiti that he had minored in women's studies.  On information and belief, this was untrue: Singh graduated with a major in biomedical engineering and a minor in biology, not women's studies.

**Singh's continued discrimination based on age**

404.   Singh continued to discriminate against AIGH staff based on their age even after he successfully drove Anandaraja and Atkinson out of the Institute.  In or around March 2018, Walek, who was in her 40s, left AIGH.  Singh discussed hiring of a replacement with Misiti and said that he preferred to hire someone "younger" than Walek to take over as the Director of Communications.  Misiti looked at him horrified that he would make such a statement, and Singh tried to take it back.

405.   However, a few weeks later, during a trip to Guatemala, Misiti heard Singh repeat the same comment about wanting to hire somebody younger than Walek to take over Walek's role to Silva, who readily agreed.

406.   Singh repeated that statement to Berman, who also agreed.  This time, Singh added that his ideal replacement for Walek was not only "younger" but also somebody who "preferably lives in Brooklyn … has pink or blue hair … is a hipster."

**Singh publicly shames Misiti**

407.   In early July 2017, Misiti met with Singh for a one-on-one meeting before a broader Global Advantage team meeting.  The meeting went well—Singh seemed to be happy with her work and the progress of the team.  Right afterwards, Singh and Misiti met with the rest of the team, which included Berman, Walek and Llames.

408.   Once everyone gathered in the room, Singh raised his voice and started chastising Misiti in front of everyone.  He said he was angry about a document she had drafted, and also because she had not given him a summary of a task force meeting on May 31 or a list of innovations that were discussed in the meeting.

409.   Misiti was nonplussed.   Singh had never requested these deliverables. Additionally, not five minutes before, he had confirmed Misiti was doing well and was pleased with her work.  Now he was very deliberately shaming her in front of her team, plucking out of the air what appeared to be random reasons to criticize her.  His goal seemed to be to make her insecure and parade his power over her.  Even Berman, in a rare moment of empathy, told Misiti afterwards that he thought Singh was "brutal" to her.

410.   When Misiti later confronted Singh about this incident and told him that he had never asked for those documents, he responded that others would have "created them without being asked," blaming Misiti for not reading his mind.

**Singh continues to berate Misiti**

411.   Subsequent one-on-one meetings between Singh and Misiti became increasingly hostile and stressful for her.  Singh frequently criticized her work using language so vague it was impossible to know how to fix it and assigned new tasks in a similarly confusing manner.  Misiti began taking detailed notes and sharing them with Singh afterwards to make sure they agreed about her next steps, prompting him to chastise her for not understanding him properly and taking bad notes.

412.   After Misiti sent Singh the work he requested, he usually gave unusable criticism, for example saying she had "missed the mark" but not indicating how to hit the mark.  Singh also assigned Misiti complex tasks with unrealistic and arbitrary deadlines, only to later berate her for "wasting a day's work" trying to complete them.  Misiti never witnessed a senior male employee of AIGH being treated this way.

413.   He once said he had taught Safo "how to think" and that he was going to have to do the same with Misiti.

414.   He also forbade Misiti from exhibiting emotions at work, and said they were "just two machines working together."

**Singh makes false promotion promises**

415.   On October 31, 2017, Singh conducted a performance review with Misiti. Suddenly and uncharacteristically expansive, he said Misiti was an "absolute joy" to work with and that she would make an excellent Director of Global Sites at AIGH.

416.   One week later, on November 8, 2017, Singh requested a second performance review meeting.  He did not say why a second meeting was needed; Misiti thought he wanted to continue their discussion about her potential promotion.  But this time Singh said she would "not be a good fit for the position," because it required someone with good project management capabilities and a strong sense of "process."  He directly contradicted what he had said a week earlier, his trademark method for putting female subordinates on the defensive and on edge.

417.   Knowing he had played with Misiti's expectations and feelings, Singh asked if she was upset, and she said that she was.  Misiti asked to adjourn the meeting to consider what he had said before discussing it further, but Singh said that if she wanted the position she had to "fight for it."

418.   After this meeting, for a significant period of time, Singh insisted on having one-to-one meetings with Misiti daily, in which he continued being very critical of her for no apparent reason and called her "snippy."

**Misiti reports Singh to Mount Sinai**

419.   Misiti had considered reporting Singh for a long time, but feared retaliation and further emotional abuse.  On May 16, 2018, Misiti submitted an anonymous statement about her concerns with Singh to Mount Sinai as part of its larger investigation.  Misiti met with Mount

Sinai's investigators for over three hours but never heard back. As far as she could tell, nothing happened for months and Singh remained in post.

### Retaliation

420.   In early July 2018, Berman left AIGH. Singh announced Berman's departure to AIGH staff but did not give any clear indication as to why he was leaving. However, shortly before he left, Berman asked Misiti to go for a walk with him. She agreed. Berman told her that he left on his own accord because Singh was "an asshole."

421.   Berman then brought up the investigation against Singh. She tried to pretend that she did not know anything about it, but Berman asked her a direct question: "Did you ever hear me use the term 'brutal'?" Misiti quickly said no, but then realized that Berman was in fact referencing his earlier statement to her (see ¶ 409 above), which she had mentioned to Mount Sinai's investigators. Misiti understood that Berman was signaling he knew all about her conversations with Mount Sinai investigators. She had been assured those conversations would be protected and anonymous, but clearly, they were not.

422.   At the end of the walk, Berman told Misiti that she would likely be given much of his work, without a pay increase or title change. He was right. Misiti was given Berman's job of managing AIGH's contract with Panorama, a global health communications firm. Singh was supposed to help Misiti handle the contract, but he never paid it any serious attention.

423.   Nevertheless, a small incident involving Panorama was characteristic of Singh's seemingly perpetual campaign to put Misiti at a disadvantage. In October 2018, Panorama representatives were booked to come to AIGH for a two-day visit. One of the scheduled events was a session with AIGH's senior management team, including Singh, but because of scheduling difficulties some AIGH staff suggested that the meeting be held by phone instead of in person.

Singh told Misiti to write the staff to insist the meeting be in person.  Misiti told him this stern message would probably be better received if it came from him as Director, but he told her to send it from her e-mail.  As soon as she did, Singh wrote the other staffers reversing what Misiti had just written and saying he agreed the meeting should be arranged to suit them.  It appeared he had deliberately undercut her, setting her up to look like the "bad guy" in front of her colleagues.  When she complained, he appeared to take pleasure in her discomfort.

### Singh downplays Misiti's role at AIGH, lies about bonus and pay raise

424.   By November 2018, more AIGH employees left, and Misiti's role had expanded considerably to include many new responsibilities.   Singh asked Misiti to rewrite her job description in line with her current duties, but then edited it to downplay her role by changing "leads" to "prepares" or "develops" on several entries; he also specifically excluded her work on the Panorama contract as it allegedly fell under the "service to the Institute" category.

425.   Misiti was frustrated that Singh decided not to acknowledge in her job description what had become a significant portion of her work.  Instead of battling him, however, she asked him for additional compensation at the end of 2018.  He was negative, saying he did not know if there was enough money for extra compensation in the "bonus pool," and claimed that pay raises and bonuses were totally out of his control.  He told her that she could not be promoted until after she had been at AIGH for two years and in any event would have to do the job she wanted for a year before the promotion would be confirmed.  Misiti found Singh's statement difficult to believe and checked it with Jones-Winter, Director of Employee Relations.  As she expected, Singh had been lying.  He did have the power to promote people and give raises.  There was neither a two-year tenure requirement nor a one-year requirement to perform in a new role without getting the

title.  In fact, Jones-Winter told Misiti that Singh had been advised to increase compensation and offer promotions to his best staff.

426.    Misiti continued to correspond with Jones-Winter, but the pay raise, promotion and bonus never materialized.  When Misiti contacted Jones-Winter in January 2019, concerned after Singh had been suggesting a blizzard of new roles for Misiti that either her colleagues or she were already performing, Jones-Winter suggested that Singh might be trying to tie Misiti into a new probationary period so he could fire her at its end.

### Mary Caliendo

427.    Caliendo started at Mount Sinai in November 2015, first working in the President's Office for the Senior Vice President of Cardiology.  In January 2017, Singh hired her to be his Executive Assistant.  Caliendo gladly took the job.  She was inspired by AIGH's mission and also got a $6,000 raise.

428.    Prior to joining Mount Sinai, Caliendo had spent her entire working life as a successful Executive Assistant at large firms, including *The Economist*, Credit Suisse, Avon Products and the Memorial Sloan Kettering Cancer Center.  Caliendo has also worked and volunteered at charities that focus on women.

### Singh accuses Caliendo of "talking too much"

429.    Caliendo found Singh unpredictable.  He often changed his hours and left the office without telling anyone.  He regularly canceled meetings and ignored e-mails, especially from women.  He seemed to only care about pleasing and impressing his boss, Charney.

430.    In spring 2017, at the end of Caliendo's standard probation period, Singh met with her to conduct a formal review of her role.  He was at first professional and kind.  He said he was happy with the way Caliendo ran the office and had only one piece of feedback—he wanted her to

print out Google Maps directions for him whenever he had a meeting outside Mount Sinai. Caliendo happily agreed to do that.

431.   At that point, Singh's attitude changed for no obvious reason, and he became hostile.  He accused Caliendo of "talking too much."  He forbade her from talking to anyone else at the Institute.  Caliendo was taken aback by the criticism; much of any Executive Assistant's job is to be friendly and develop working relationships with people around her.  She left the meeting feeling belittled and demoralized.  To please Singh, she kept her interactions with her colleagues to a minimum, and usually only via e-mail.  One of her colleagues noticed how withdrawn and unhappy she was; she told Caliendo that she seemed like someone had "turned off the light" in her.

## *Berman, Singh's Chief of Staff, yells at women*

432.   Singh hired Berman to serve as AIGH Chief of Staff in 2016.  Berman obtained his master's degree in Sociology from Columbia University in 2002 and his bachelor's degree in Business Administration-Finance from California Polytechnic State University – San Luis Obispo in 1998.

433.   Before joining Mount Sinai, Berman had been a consultant for six years.  Before that, he worked in many different positions: a Managing Associate for Next Street Financial for one year, Special Assistant to the President at the Children's Health Fund for four years, Associate Director for the Center for Catastrophe Preparedness and Response at New York University for two years, a Senior Policy Analyst for Children's Health Fund for two years, a Senior Policy Analyst at Columbia's National Center for Disaster Preparedness for two years and in financial roles for several other employers for no more than a year each.

434.   Singh gave Berman a free rein to manage AIGH as he saw fit.  Berman's handling of staff quickly fit right into the culture created by Charney and Singh where women were second class citizens.  Berman was a terrifying boss, prone to sudden eruptions of anger.  It was not uncommon to walk the halls of the Institute and hear Berman shout at female employees at the top of his lungs.

435.   Singh, Berman's supervisor, was aware of Berman's outbursts and often present or nearby when he shouted at women.  As far as can be determined, Singh never intervened.

### Berman yells at Bischoff

436.   Early in his employment, Berman snapped and yelled at Renee Bischoff, who was Anandaraja's right hand at AIGH.  Bischoff had been at Mount Sinai since 2009 and knew a lot of people across various departments and was widely liked and respected.  Berman appeared to be jealous of her excellent connections—as the AIGH Chief of Staff, he felt forming partnerships with other departments at Mount Sinai was exclusively his role.

437.   Bischoff was AIGH's lead on one of its global health sites in Kenya, having worked with the team on the ground there for many years.  Berman tried to push her out of that role to assume it himself.  Once, just as Bischoff returned from one of her trips to Kenya, Berman sat her down in an office and starting yelling at her about the trip and for daring to hold further internal meetings about the Kenyan site after she returned.  Berman yelled at Bischoff for over five minutes, his voice and language escalating higher and higher, bellowing through the Institute.

438.   Bischoff's colleagues saw Berman shouting at her.  Bruzelius distinctly remembers how Berman was gesticulating so wildly and threateningly at Bischoff that she worried about Bischoff's well-being.  Another colleague, Baum, actually went into the meeting room to defuse Berman.  This had the desired effect.  Berman apologized to Bischoff a few days later, but in the

same breath added that she had probably told everybody in the office about his outburst anyway, so he did not sound very apologetic.  She gathered his true concern was that his screaming might get him in trouble with HR, not that he felt he had done anything wrong.

***Berman yells at Caliendo, making her fear he will hit her***

439.   Although Caliendo was Singh's Executive Assistant, Berman started to manage her too.  He instructed her to start providing him with detailed timesheets.  He wanted every minute of her time to be accounted for.  While this is standard for lawyers, it certainly is not for executive assistants, and Caliendo had never encountered it.  It felt like she was being tested, or intimidated.  She did not see Singh or Berman similarly monitor anybody else.

440.   Singh and Berman travelled to Aspen in July 2017, and Berman tasked Caliendo to work with AIGH's Communications Director to finalize and send out the Institute's Annual Report while they were gone.   Unfortunately, the Communications Director had a serious medical emergency and was out of the office, so the project came to a halt; Caliendo could not finalize it without her.

441.   When he returned from Aspen, Berman ran up to Caliendo's office and started screaming at her about the delay at the top of his lungs.  He fully erupted: his face was bright red, he was fuming, spitting and clenching his fists.  Caliendo's body froze.  She was scared but did not know what to do.  Berman was so out of control and yelling at her so violently that she feared he would hit her.  She started crying profusely.

442.   Singh was in a meeting across the hall with Misiti and an intern, Pranay Nadella.  A few minutes into Berman's tirade, Singh left his meeting and walked by Caliendo's office into his own, allowing Berman to continue abusing Caliendo.  Moments later, he walked back to

continue his meeting with Misiti and Nadella, as if nothing unusual was happening. Berman's loud voice continued booming through AIGH, but Singh ignored it.

443.   Once Berman finally left Caliendo's office, leaving her shell-shocked and in tears, Singh left Misiti's meeting again and went to talk to Berman. Misiti, recognizing that Caliendo was likely in need of some support, went to tend to her. She found Caliendo bawling and still shaking from Berman's torrent of abuse.

444.   A few moments later, seeing Misiti talking to Caliendo, Singh stopped talking to Berman and walked in too. Not only had he allowed Berman's abuse to happen by not intervening, he did not join Misiti in trying to console her but instead began criticizing Caliendo. He told her that Berman was right and that Caliendo should "slow down" so she would not make "so many mistakes." Misiti was shocked that Singh chose to side with Berman. She had not caused the problem with the annual report. Caliendo wiped her tears and told Singh that she needed to go home and be alone.

**Singh and Berman try to change the narrative and fire Caliendo**

445.   Later that day, Berman approached Misiti and asked whether she had heard his "interaction" with Caliendo. She told him that she had. He then asked her whether it sounded like he raised his voice. Misiti said that it sounded like he had been yelling.

446.   Following the incident, both Singh and Berman separately asked Misiti if she had any issues working with Caliendo. Misiti made it clear to both that she had absolutely no issues with Caliendo and that she thought Caliendo was a good employee. Misiti suspected that they were trying to build up a sham case to fire Caliendo even though she did nothing wrong—she was the victim here.

447.   For the following week, Caliendo continued recovering from Berman's attack.  She cried every day before going to work and found it difficult to hold herself together once she arrived.  She was overwhelmed by anxiety, afraid to be anywhere near Berman.  She felt hurt by Singh too, who had done nothing to restrain Berman.

448.   Misiti was right to worry about Caliendo's job security.  Singh extended Caliendo's probation and, in August 2017, told her that things "were not working" and fired her.  When Caliendo said that she was worried about losing her job and her health insurance, Singh told her not to worry; she could always rely on Medicaid.

449.   Singh's firing of Caliendo came the day before a summer retreat that she had planned for AIGH staff.  Singh did not inform others that he had fired Caliendo, creating an uncomfortable confusion when she was absent.

### Berman yells at Llames

450.   Llames, like others at AIGH, knew of Berman's short temper with female subordinates.  She heard him yell at Bischoff and, while she did not witness Berman yelling at Caliendo, she saw Caliendo shaking and crying shortly afterwards.

451.   Llames was also a target of Berman's anger.  On February 28, 2017, Llames, Stapleton and Walek were working together on AIGH's grant application to RWJF, under Berman's supervision.  In one of their meetings, Berman suddenly started yelling at them about a slide deck that they put together.  He did not like some of the text.  But instead of working together to improve it, he yelled at them, "this verbiage is stupid!  Why'd you say that??  What IS this?"  Berman's face turned bright red and he was gesticulating violently.  Llames was taken aback by this outburst and unsure of what to do, but luckily it did not last long.

452.   Escosia, who was sitting in his office, wrote a message to Llames once her meeting finished, asking her: "[I] heard someone yelling.  what the hell was going on?"  Llames told him what happened, and said she was glad that she was not alone in the room when Berman exploded. Llames also discussed the incident with Kishore, but he tried to normalize and downplay Berman's behavior, saying: "That's just how he is—he is just passionate about his work.  Don't take it personally."

453.   Berman left AIGH in summer 2018 but before he did, he came up to Llames and said, "Do you know how many times I had to hear about the one time I raised my voice at you?" Llames felt accosted—that Berman was trying to intimidate her and somehow make her feel bad for *his* outburst at her.

### Berman berates Safo

454.   About a year after Safo started at AIGH, Berman asked her for a one-on-one meeting.  After agreeing to a day and time, Berman then changed the meeting time twice; Safo, responding to the rescheduling, in turn reworked her schedule to be able to attend.  When Berman changed the meeting a third time, Safo told him that she would not be able to cancel a third series of meetings.  In response, Berman told Safo that she was bad at managing her time.  This comment was out of line and wrong; she had lots of responsibilities as both a clinician and a manager and was good at juggling them.  Berman then continued to berate her, first by e-mail and then in person, in a highly aggressive way.  Safo became upset and tearful and stopped the conversation with him.

455.   When Safo told Singh about the conversation that night, Singh instructed her to placate Berman and learn to work around him.  He did nothing to control Berman.

456.   Berman also denounced Safo vituperatively for being exclusive, "insubordinate" and "the problem with the workplace culture" when she attempted to hold a birthday celebration

for Privett and Misiti in September 2017 (see ¶ 363).  Singh then pulled Safo out of a meeting to tell her that he "100% agreed" with everything that Berman had said.  In fact, both Singh and Berman were routinely abusive towards women, and encouraged rather than policed each other's excesses.

### *Silva's sexist, sexual and racist comments about women at AIGH*

457.   Bruno Silva joined AIGH in January 2016 as the Director of Design and Product Development.

458.   Prior to joining Mount Sinai, he worked as the Lead Experience and Product Designer for Amplify Education.  He has also worked as a designer for B&B Productions, Radical Media and Trollbäck & Company.  His design work has been displayed at the Museum of Modern Art and the Cooper Hewitt Museum, and he has spoken at the Healthcare Refactored 2017 conference and the Mayo Clinic Transform Conference 2016.

459.   Silva received his MFA in Design for Social Innovation in 2016 and his BFA in Graphic Design and Advertising in 2007 from the School of Visual Arts.  He obtained his Bachelor of Applied Science in Medicine in 2001 from the Universidade do Grande Rio in Rio de Janeiro. This year, he began studying for his PhD in Inclusive Design and Creative Technologies at University College Dublin.

460.   Silva quickly built a reputation for making inappropriate, sexist and sexual comments about women at AIGH.  For about a year, Khan sat in the "design room" together with Silva and the rest of his design team, witnessing Silva's daily verbal attacks.  Silva demeaned women constantly, commenting on their physical appearance, sexual activity, use or non-use of makeup, and general attitude.

461.   If a woman said something in opposition to Silva or even displayed slight skepticism with Silva's ideas, his immediate reaction was to ignore her for the rest of the meeting, and ridicule her behind her back.

462.   Silva particularly enjoyed commenting on women "being wet."  Once, Silva even licked his fingers and touched his crotch area in reference to "getting wet" in a conversation that included Llames.

463.   Llames was also frequent witness to and target of this abuse—her office (shared with a colleague) was next door to Silva's.  They were interconnected by an interior door, but each also had an individual entrance from the hallway.  Silva often walked through Llames' office to get into his, as if it were part of his territory.  As he barged through multiple times a day, he often began long conversations, lamenting various aspects of his personal life.  If he felt Llames was not listening to him intently, he would get upset.  He seemed to expect her to entertain him at all times, no matter how busy she was.

**Silva's comments to and about Llames**

464.   On multiple occasions, Silva made intrusive and derogatory comments about Llames' appearance, saying, for example, "you look rough today."  Once, he took an unflattering photo of Llames and posted it on Instagram, ridiculing her.  He often said that Llames should wear makeup to look better.  Another time, he said, "You look slutty today, what are you doing after work?  Do you have a date tonight or something?"  He often suggested that when Llames looked pretty (in his opinion), she was going to have sex that day.  Silva made lewd comments about Llames' genitals and alluded to her having her period, such as "Why is Geraldine so upset?  She's probably on her period."  Silva told Llames, who is Filipina, presuming she also had a Filipino boyfriend or partner: "Asian men have small dicks."

465.   Silva also commented on Llames' weight.  When Llames bought snacks and Silva noticed, he criticized her weight and body, making comments such as, "What's your mother gonna say if you eat this?," "Girl, you are putting on some weight," "You better watch out, you don't want to gain any more weight," "You shouldn't be eating that" and "You're eating quite a lot today, are you sure you want to do that?"

466.   Silva further called Llames a "lazy bitch" and "crazy" to her colleagues.

467.   Once, Silva and Llames went to Washington, D.C., and Llames said she might ride her motorcycle from her family's home in Virginia if the weather was nice.  Silva seemed surprised that Llames had a motorcycle, so Llames showed him a picture of herself on her motorcycle.  Silva quickly said, condescendingly, "You look like a dyke."  Llames told him that he could not say that; it was inappropriate.  Silva said he was just kidding but did not apologize.

468.   Singh treated Llames noticeably worse than Silva.  Silva could work whenever and wherever he wanted; Singh kept Llames on a tight leash.  Silva often teased her, "We're leaving early, but you can't!" while pointing at Singh's office.  He took pleasure in her hostile work environment and seemed to delight in pointing out how much better Singh treated him than her.

469.   Silva's waterfall of derogatory comments made Llames uncomfortable and self-conscious about her appearance.  She tried to write them off as juvenile, but sometimes Silva got to her.

### Silva's comments targeting Safo

470.   Silva had a deep disdain for Safo and made numerous nasty, sexist comments about her to her colleagues.  He told Llames that "Stella [Safo] is a cunt.  She just needs to get laid." Silva told others that Safo was a "bitch," a "cunt," "uptight," and a "control freak."

471.   He also said, "that bitch [Safo] is stealing my work," called her "unqualified for her job," "too inexperienced" and "generally incompetent."  Silva said that he wanted her to fail, and intentionally delayed or ignored projects she assigned to him, hoping that the delay would reflect poorly on her as his supervisor on the Health Systems Design team.

### Silva's comments targeting Khan and other AIGH staff

472.   Silva once told Llames: "Alyssa [Smaldino] is being a bitch.  Maybe she's on her period."  He also frequently called Caliendo "crazy."

473.   Another time, Silva said to Llames, "I said hi to Shanice, but she probably didn't hear me because her hair is too big."  Shanice Guerrier ("Guerrier"), Process Engineer, is a black woman, and she often changed her hairstyle, sometimes leaving it natural.  Silva made similar comments about Safo.  He also commented on Misiti's hair, saying "she looks messy," and once told her that one of her skirts made her "look like a Hasidic Jewish woman."

474.   Silva called Privett, who was pregnant at the time, lazy—he said she was using her baby as an excuse not to work.  He also said he did not think she would come back from maternity leave.

475.   Although Silva's abuse mostly targeted women, he also went after Khan, who is Pakistani and a Muslim.  Silva criticized Khan for not drinking and for going to pray.  When Khan was out of his office for religious reasons, Silva would say, "Humale said he's out praying, but he's probably out interviewing," and roll his eyes.  He also frequently said that Khan smelled bad, saying "it smells like shit in here," or "it smells like curry" in Khan's office.  These comments made Khan deeply self-conscious.  He became anxious about smelling bad and started buying and applying multiple deodorants and chewing gum excessively.

476.   Silva also made derogatory comments about Eid, a Muslim tradition that involves adherents visiting a slaughterhouse to select and humanely slaughter a goat.  When Silva found out that Khan participated in this tradition, he made numerous comments calling him and his family "backwards" and "weird."  On Khan's return from the Eid holiday, Silva repeatedly asked him, in the design room at AIGH, "how was the goat?"

### *Targeting visitors to AIGH*

477.   Silva also made comments about employees of various Mount Sinai departments and external organizations that partnered with AIGH.  For example, after a woman from another Mount Sinai department came in for a meeting, Silva told the rest of the AIGH team, including Khan, "if I wasn't gay, I'd have sex with her."  After one of AIGH's meetings with Dimagi, a partner organization, Silva said about one of the women attending: "She's so dirty… she smells… no man would want her," "she looks like she hasn't gotten laid."  He further called her a "dumb, crazy bitch," and said that she "smells, needs to learn how to wear deodorant," and "girl needs to wear makeup."  When he met with male visitors to AIGH (Silva is gay), he often commented "that guy was so hot!"

478.   Singh and Berman knew about Silva's statements and heard them directly, but never interfered.  Singh set the tone for AIGH by abusing women himself, and letting Berman do the same; this created an environment where Silva felt he could get away with a torrent of abusive comments.  Safo frequently told Singh that Silva made acid remarks about people behind their backs and fueled a culture of nasty gossiping, but Singh did not chastise Silva.  Instead, Singh protected him and told Safo not to antagonize him.

*Khan reports Silva to Singh, to no avail*

479.   In or around October 2017, Khan decided to report Silva and his abusive comments to Singh.  Singh thanked Khan for his complaint, told him he would keep his involvement confidential, and work towards finding a solution.

480.   In November 2017, after ATLAS's meeting with USAID in Washington D.C., which both Khan and Silva attended, Silva came up to Khan in the airport on their way back to New York.  Silva told Khan in a threatening tone that he (Silva) and Singh were very close and talked about everything openly.  Silva emphasized that he and Singh did not keep secrets.  Silva then said that this gave him the ability to protect Khan or get him fired.

481.   Silva said that he had been protecting Khan so far and that he would continue to do so for as long as the whole team worked together and told each other everything.  He told Khan that he would not want there to be any problems in the team, because then both Silva and Singh would have to tackle them.  Silva's demeanor made it clear that Singh told him that Khan had complained about Silva.

482.   Khan was not frightened or deterred.  In a later meeting with Singh, Khan said that Silva's behavior had not improved at all, and that if anything Silva was treating Khan worse than before, both personally and professionally.  Silva was delaying his contributions to Khan's projects so as to derail them.  Singh listened to Khan and then told him, "I'm here to help you figure out how to work with him. We all know how he is. Let's try to find a solution on how to work with him."  But Khan told him that even when he tried to work around Silva, he would insert himself to sabotage Khan's projects.

### HR complaint against Singh

483.   Although Safo was one of Singh's hires, and so not a natural ally of Atkinson, Anandaraja, and Rahona, after Safo's resignation from AIGH on February 28, 2018, the four reconnected and began to discuss their shared experiences of mistreatment by Singh.  They decided to jointly file a complaint against him at Mount Sinai.

484.   On April 27, 2018, Anandaraja and Atkinson met with Jones-Winter, to ask her about the procedures for filing a complaint.  They were worried that Singh would retaliate against anyone still at Mount Sinai.  Jones-Winter assured them that they could submit an anonymous complaint, which would be investigated by Mount Sinai's Human Resources and Legal offices.  Anandaraja and Atkinson submitted a verbal complaint.

485.   Jones-Winter told Atkinson and Anandaraja that she had been hearing about problems with Singh for some time, knew that AIGH had experienced a fair amount of staff turnover since his arrival and that their complaints corroborated what Jones-Winter had heard from other employees about Singh.  Nevertheless, Jones-Winter said that the final outcome of any investigation would depend on what Mount Sinai stood to gain or lose as an institution, and Charney would be the one to decide.  Jones-Winter also told them that the *New York Times* would love their story, which they agreed to consider if Sinai did not respond appropriately.

486.   Four days later, Jones-Winter called Atkinson to give her an update.  She told Atkinson that the problematic situation with Singh "started at the top," meaning with Charney.  "We spoke to Legal about it too, how Prabhjot got in the door in the first place, and how his structure has been maintained, his lack of output, and the amount of turnover at the Institute," Jones-Winter said.  She went on to say that "When Caryn [Tiger-Paillex, Associate Dean for Staff and Faculty Relations] was in seeing Charney yesterday, Charney admitted to her that he picked

Prabhjot, and it was casually done.  He thought [Prabhjot] was a rising star."  But, according to Jones-Winter, Tiger-Paillex viewed Charney's chagrin over the bad fallout caused by Singh as a basis to persuade him to pay more heed to normal hiring procedures.  Tiger-Paillex told him— gently—that the bad results from Charney's picking Singh without due diligence proved that "process is an issue" that Charney should pay more attention to.  Jones-Winter said to Atkinson that "we have a good team looking at this, but we have to be careful not to threaten Charney, we've got to approach it gently, as, see—'this is what can go wrong when process isn't followed.'"

487.   Charney might have been less protective about Singh if he had heard how Singh routinely described Charney to colleagues at AIGH: as "dumb" and "stupid."  Singh described himself as "almost always the smartest person in the room," which accounted for his success.  He also said that he could get things over on Charney and Davis, because he was so much smarter than they were.

***Mount Sinai's investigation of Singh***

488.   Mount Sinai then undertook an investigation of Singh and AIGH, led by Jones-Winter, Senior Associate General Counsel Marina Lowy ("Lowy"), and Tiger-Paillex.  In May 2018, the investigative committee conducted interviews with at least 13 current and former employees of AIGH.

489.   Those who gave evidence included all the plaintiffs in this lawsuit except Khan who was not informed of its existence, plus Smaldino, Faghmous, Bischoff and many others.  They each described their issues with Singh, Berman, Knaup, and Silva.  Some supplied written statements first, but they were all intensely interviewed by the committee.

490.   Beddoe was interviewed by Lowy for 20-30 minutes.  During the interview, Beddoe described her concerns about Singh and the incompetencies she saw from day one, and emphasized

the importance of listening to and supporting the complainants.  Beddoe said she had been hearing their accounts of his misconduct since his arrival at AIGH.

490. Rather than replying neutrally to these comments, as Beddoe would have expected of an independent investigator, Lowy explained to Beddoe that when she was a young lawyer in Israel, she herself had experienced treatment similar to what the complainants were bringing forward and did not understand why they were doing it; the clear implication was that they should simply tolerate it.  That the "independent" investigator made this comment troubled and offended Beddoe.   On information and belief, Lowy made comments of a similar nature to another interviewee, claiming "that's just how Israelis engage with each other."

491.   Lowy contended that some of the allegations were not true simply because Singh had denied them.  She concluded by saying that Beddoe and the complainants "may not be happy" with the outcome of the investigation.  Beddoe was confused as to how Lowy could know the outcome when it was not over, and inferred either that Lowy had prejudged the outcome or that someone more senior (specifically, Charney) had already decreed it.  Beddoe was so concerned by Lowy's comments that she decided to speak to Charney directly.

492.   Beddoe pitched the meeting to discuss her global oncology program, but opened it by explaining to Charney that she had done this rather than explain she wanted to talk about Singh because of Charney's widespread reputation for losing his temper and screaming at people.  She explained that she was coming from a good place and wanted to discuss her deep concerns about the internal investigation.

493.   Charney appeared stunned and told Beddoe that he did not understand why anyone would claim that he yells and screams at people.  Beddoe then frankly relayed her concerns about the investigation.  She said that Singh had consistently demonstrated he was not fit to run the

Institute, just as she had predicted when she interviewed him, that he was in over his head, that he had mistreated multiple women at the Institute, and that she was worried that the investigation would not hold him properly to account.

494.   Beddoe explained that Singh had verbally and emotionally abused his female colleagues, and that the methods by which he did so were often subtle rather than overt, and that he purposely walked the line between the two.   She said that Charney, as a psychiatrist, would recognize this kind of pathology.   She also said that if the investigation cleared him of any misconduct, she worried he would feel emboldened and become more overt in his abusive behavior.

495.   Charney replied that he knew of no concerns about Singh's conduct until they were raised by Atkinson, Anandaraja, Rahona and Safo, which had prompted him to order the internal investigation.   Charney claimed that he was a champion for women and women's rights, that he himself had daughters, and that he had supported the women who complained about Singh.

496.   Charney asked Beddoe if she believed that Singh could be rehabilitated.   She said she did not think so.   Charney said he believed that Singh "had potential" and should be given a chance to develop it.   Beddoe strongly disagreed, and asked "what about the potential of the women Singh mistreated?"   Charney had no response.   Charney ended by stating that he would follow whatever recommendations resulted from the internal investigation (an investigation that Lowy had just hinted that Charney had predetermined).

497.   The following week, Beddoe heard rumors that the investigation was done and that Charney would reveal the outcome (in favor of Singh) within days.   Still concerned, Beddoe wrote Charney on June 23, 2018:

Dear Dean Charney,

I want to once again thank you, now personally, for meeting with me last week. I was encouraged by our conversation and left with the profound feeling that Mount Sinai would go down in history as an academic institution that would show "zero tolerance" for emotional abuse and harassment of women by men in leadership positions at our medical center.

Sadly there have been numerous rumors heralding your announcement this week that range from appointing an oversight committee that would monitor the person alleged to have committed these offenses, while leaving his position intact to removing him from his current leadership role but protecting his career within the confines of our great institution. None of the rumors however hinted of his complete removal from the institution with assurances that Sinai would never condone even the perception of abuse to women.

This has consumed my thoughts and has given me sleepless nights: that you may be even entertaining putting one man's career over multiple women who have been mentally and emotionally scarred. I believed you when as we discussed you said that you did not know this was taking place at our institution. But now you do know and you will be judged by this very important decision. It will be the true test of Mount Sinai's values in the field of diversity and tolerance of bullying.

I have conveyed to some of the women the sentiment that you expressed in full support and value of women; but any action by our leadership that serves to protect men in power would undermine those sentiments and would send a profound message not just to these women but to all women on campus that Sinai does not have the "backs" of women but that the careers of men in power are of utmost importance to the institution and that their careers must be protected.

From deep in my heart I pray that you make the right decision. This is our institution's "Rubicon."

Respectfully,
Ann Marie Beddoe

498.   Charney never replied to Beddoe's e-mail.

499.   Earlier that month, at a meeting among Jones-Winter, Anandaraja, Rahona and Atkinson, Jones-Winter said that donors and other financial and political considerations would influence Mount Sinai's deliberations.  She described another Mount Sinai HR investigation involving Dr. David Newman, a Mount Sinai doctor who ejaculated on one of his patients in the emergency room and was sentenced to two years in prison because of it.  She said that Charney had wondered whether the narrative about the case could be spun to revolve around a drug problem—investigations often had a political context.

500.   She also told them that Singh had engaged a labor attorney to fight the complaint. Jones-Winter stated that, at a meeting with Singh and his attorney, Singh had played a "trump card," which she did not describe except to say that it concerned Charney.  On information and

belief, this trump card was either that Charney had directed Singh to create a hostile working environment for the legacy staff to drive them out and so was just as responsible as Singh, and/or that Charney had paid Singh's salary with Arnhold money after committing by contract not to.

501.   Further, at a birthday celebration for Safo in June 2018, Jones-Winter told Caliendo and others that Singh had successfully gotten away with "harming over twenty women" by "hiding behind his ethnicity and religion."

502.   None of the complainants received a written statement of the investigation's findings.   Singh remains employed by Mount Sinai even though the majority of his department complained against him.   Berman, Silva and Knaup have now left the Institute, but under unclear circumstances, and Berman told Misiti that he had in fact left on his own accord.

### Follow-up meeting on July 17, 2018 with HR and Counsel

503.   The only insight into the results of the HR investigation into Singh came for some of the complainants on July 17, 2018, when Anandaraja, Atkinson, and Rahona met Jones-Winter and Lowy.   Jones-Winter and Lowy at first tried to meet individually with Anandaraja, Atkinson and Rahona.   When they declined, Jones-Winter and Lowy agreed to meet with them as a group, but had a separate conversation with Anandaraja afterwards.

504.   At the group meeting, Lowy told them that she and the rest of the investigative committee had made recommendations to Charney, which he had accepted in full.   She said that Mount Sinai did not find gender discrimination in Singh's actions because both women and men had complained about him, nor did they find age discrimination, because there were complaints about him both from "legacy people" who were older and from younger hires too.   She acknowledged that "clearly there's something about [Singh's] demeanor that rubs people the wrong way, and that makes people feel that there is a gender bias issue going on," and that "people

across the board did not like working for him," but she claimed that there had not necessarily been more women who felt mistreated at the Institute than men.

505.   When Atkinson pushed back, asking why Mount Sinai would recommend keeping Singh given the overwhelming evidence that he created a hostile work environment, Lowy responded, "Because no one ever told him what he was doing was wrong," and he was not given the opportunity to correct his behavior.  Atkinson challenged her on this point since many people had told Singh his conduct was out of line.  Lowy said that even if Singh's peers had confronted him, those confrontations were insufficient to inform him that he needed to change his behavior; the directive needed to come from Charney, Singh's boss.  She said that Charney had now made clear to Singh that he needed to address the issues raised in the investigation and had established an Oversight Committee to monitor Singh.

506.   When asked if it was not a failure of the institution at large that Singh had not been reprimanded sooner, Lowy responded that Charney had not known about the problems people experienced with Singh until the recent complaint.  She said it was unfortunate that people had not come forward sooner, to which Atkinson responded that many people had indeed complained to their superiors.

507.   Lowy emphasized that Charney was dismayed to hear that people felt so miserable working at AIGH, saying that "he reacted…like a father of daughters would react."

508.   In justifying her decision, Lowy said she thought it would be unfair to "just say out of the blue, 'So far, we thought you were doing great, but we just realized you're not, and you're fired'"—despite the fact that some of the complainants in the investigation had undergone this very experience themselves when Singh became Director.  They were tossed out even though they never did anything wrong or discriminated, lied or misrepresented to people as Singh

systematically did.  When asked what price Singh would pay for mistreating employees and discriminating against them, bullying them, insulting and demeaning them, Lowy responded that the investigation had been personally damaging to him, and he was under "professional duress." When Atkinson pointed out that at least he still had a job, Lowy agreed, "He is very lucky for sure."

509.   Lowy also said that it was important to AIGH and Mount Sinai that Singh be given an opportunity to realize his "potential."  Atkinson asked, "What about my potential?"  which did not appear to be any concern of Mount Sinai's when Singh pushed her out.  Lowy replied, "I'm sorry, we can't do anything about that now."  Of course, Mount Sinai could have done whatever it wanted to clean up the mess made by Singh, such as giving his victims their old jobs back or new ones, apologies or compensation.

510.   At the end of the meeting, Jones-Winter and Lowy asked Anandaraja to stay behind and meet with them without her co-complainants.  After Atkinson and Rahona left, Jones-Winter and Lowy told Anandaraja that they were concerned about Anandaraja's comments regarding a "from the top" culture of bullying at Mount Sinai and asked her to clarify her statements. Anandaraja asked them, "Have you never been screamed at by Dennis Charney?" Jones-Winter replied that she and Lowy were likely protected from that kind of behavior due to their position as in-house counsel.

511.   Anandaraja pressed further and asked: "Are you telling me that you have never heard Dennis Charney screaming at other people?"  Lowy agreed that Charney tended to shout at people but insisted that he was usually very pleasant afterwards and they felt that even though his reaction was to yell it didn't mean that he wasn't listening to what he was being told.

512.   Lowy and Jones-Winter then said that Charney would like to meet with Anandaraja in person to discuss how she perceived him.  Anandaraja declined.  She was under the impression that her participation in the HR investigation was anonymous and she preferred it remained that way.

513.   In December 2018 and January 2019, Anandaraja and Atkinson wrote to  Jones-Winter, Lowy and Tiger-Paillex to request a meeting to discuss the progress of the Oversight Committee.  Their first e-mail requesting a meeting was ignored.  When they wrote a second time almost a month later, their request for a meeting was ignored, and they were simply told that the Oversight Committee had "started its work," without being provided any details regarding its approach or its findings.

### Charney is anxious about Anandaraja's return to Mount Sinai

514.   As Anandaraja was about to return to Mount Sinai in 2018 (see ¶ 254 above), Ripp, who negotiated her contract on behalf of Mount Sinai, told her several times that Charney was anxious and confused as to why she would consider returning and working in an office that reports directly to him.  Charney was concerned that she would not be able to be "happy" in the Dean's office given that he had not disciplined Singh in response to the complaints.

515.   Anandaraja replied that if Charney was asking whether she was willing and able to do a good job as the Director of the Office of Wellbeing and Resilience, then the answer was "yes."

516.   After Anandaraja rejoined Mount Sinai, Ripp mentioned that her name came up several times during his bi-weekly meetings with Charney.  According to Ripp, Charney consistently expressed curiosity about what and how Anandaraja was doing and offered to meet with her.  Eventually, Anandaraja felt she could not avoid talking to Charney, as he was her superior, and made an appointment to see him on December 13, 2018.

517.   At the meeting, Anandaraja told Charney that they clearly had not seen eye-to-eye on how to handle the concerns regarding Singh's behavior as Director of AIGH.   Anandaraja however said that both she and Charney shared the goal of seeing Mount Sinai improve and thrive, and she wanted to focus on that in her new role.

518.   Charney appeared uncomfortable and agitated in the meeting, saying he had recently received an e-mail from a female employee who had implied that his handling of the complaint against Singh was the "crossroads" of his career, presumably a reference to Beddoe's June 23 e-mail.   Charney became irritated and said: "It makes me very angry when people suggest that I am not a champion of women" before elaborating on how many female leaders had been appointed since he joined Mount Sinai and that he had four daughters.   Anandaraja read this as a threat to not make Charney angry even if she had legitimate concerns about the way his leadership had devalued women.

### *Mount Sinai's failure to act decisively demoralized Atkinson, who resigns in 2019*

519.   Mount Sinai's attitude towards the complaint against Singh deeply demoralized Atkinson and her co-complainants.   While Atkinson initially enjoyed her post-AIGH relationship with Mount Sinai as Adjunct Professor and then Assistant Clinical Professor in the Department of Medical Education at the Icahn School of Medicine, her disappointment with Mount Sinai's leadership deepened in January 2019 in light of Jones-Winter's and Tiger-Paillex's poor handling of the complaint against Singh.

520.   Atkinson decided that she could no longer ethically maintain any connection with Mount Sinai.   On January 5, 2019, she sent an e-mail to Dr. Reena Karani, Senior Associate Dean for Undergraduate Medical Education & Curricular Affairs, stating that she wished to resign after the completion of the upcoming InFocus course, in February 2019.   Atkinson wrote:

> [T]he failure of Mount Sinai leadership to act on behalf of protecting employees from outright abuse and from more subtle forms of discrimination and co-optation of one's work is, well, breathtaking and profoundly demoralizing.

***Despite HR's representations to the contrary, Charney was on notice of Singh's actions***

521.   Lowy and Jones-Winter were wrong to assert that Charney had not known about the problems at AIGH under Singh's leadership.   On information and belief, Charney in fact intervened forcefully in the investigation, directing Lowy and the rest of the investigative committee to change their more severe initial recommendation and endorse the milder outcome demanded by Charney.   As a result, Singh remained Director of AIGH, supervised by an ongoing Oversight Committee that would report directly to Charney and review progress after six months.

522.   On information and belief, Charney intervened in the investigation at least in part because he had been fully informed of and endorsed Singh's key actions as Director of AIGH, including his efforts to drive Atkinson, Anandaraja and other "legacy staff" out of AIGH, and Singh had written proof thereof.

523.   On information and belief, the outcome of the investigation was also motivated by political considerations, just as Jones-Winter had predicted.   Specifically, Anandaraja learned that Starr had intervened in the investigation on Singh's behalf, tying the Arnholds' future funding to Singh's continued leadership of AIGH.   This was later evidenced at a regular Arnhold Foundations dinner in Fall 2018, when Starr found Murphy and screamed at him, exclaiming, "I thought you were a friend!" and "How can you do this?"   Starr was clearly referencing the investigation against Singh and suggesting that Murphy orchestrated it, which Murphy did not.   Starr also accused Murphy of bringing shame on Mount Sinai by causing trouble for a "fine man" like Singh and implied that Murphy had "incited his women" against Singh.

524.   Charney told Murphy that he had spoken to Starr to tell him about the seriousness of the allegations against Singh, and that Starr had refused to believe them and had backed Singh, "his friend," implying that Mount Sinai had mismanaged the complaint.  Starr also clearly tied a proposed future $50 million donation to AIGH to Singh's continued employment as Director of AIGH.

525.   Separately, Stern, Murphy and Anandaraja regularly spoke to Muller, Dean for Medical Education, and told him about the hostile environment Singh was creating.  Muller reports directly to Charney and passed those concerns on and added some of his own.

526.   For example, in January 2016, nearly a year after Singh was hired, but before he drove Atkinson and Anandaraja out of the Institute, Murphy and Muller exchanged several e-mails with a subject line stating: "He whose name can not be mentioned," a reference to Lord Voldemort in the *Harry Potter* series, following up on a conversation about Singh:

> **Murphy:**   I tried I don't think he gets it and I don't think you're [*sic*] talking to him will work I think we just have to wait and see when he implodes
>
> **Muller:**   He and I had a long conversation about a month ago and Anu tells me that there has been a noticeable positive difference since then. We also had a great meeting between Medical Education and the G[lobal] H[ealth] team, including Prabhjot. The meeting was excellent, so I'm hopeful.
>
>    Do you want to chat about it before you go to P[uerto] R[ico]?
>
> **Murphy:**   I believe he is brilliant and scheming. He will please those who are of service and dis those who no longer are. He obviously sensed that he needed to adapt in his conversation with you. Be cautious.  Ramon

527.   In October 2016, Muller exchanged e-mails with Stern about Singh.  Stern wrote, "I had a very good and poignant meeting with Ramon tonight.  He gave me a play by play of [Singh], much of which I found stunningly bad."  Muller replied, in pertinent part:

> I also had a meeting with Dean Charney last week. it was our standing meeting but [Singh] and global health came up because of the impact on our budget. We ended up having a pretty intense conversation about the current state of global health, [Singh]'s approach to education, and in particular his approach to Ramon. Dennis was not pleased with the way [Singh]'s handled things and asked me if I would meet with him and [Singh] to get him on the right track. In the setting

> of that discussion I shared with [Charney] that you and I have met, and what our intentions are.
> He was enormously grateful that you and the Board would even consider doing this, and wants
> to add that to the agenda when he and I meet with [Singh].

528.   In February 2018, Atkinson went to see Muller to discuss an issue involving the history webpage of the Human Rights Program at Mount Sinai.  Part of their discussions included a controversy about another male physician who had abruptly left Mount Sinai, about whom Muller said: "he reminds me of someone else we know." Atkinson said, "You mean PS [Prabhjot Singh]?"  Muller replied "Yes, he's an evil person."

529.   At that time, Muller was overseeing the drafting of a webpage describing the history of Mount Sinai's Human Rights Program.  Muller refused to publish a full narrative of the program's history, which would entail acknowledging Atkinson's lead role in re-establishing the program after it had collapsed when the male physician (see ¶ 528 above) left Mount Sinai, choosing instead to not have a history webpage at all.  When Atkinson questioned this, Muller shut her down in an e-mail on March 7, 2018; yet another example of Mount Sinai's culture of minimizing and "disappearing" the contributions of women.

530.   The Arnhold family, through Starr, was also aware of Singh's failures as AIGH Director.  In a meeting among Starr, Murphy, Landrigan and others on November 1, 2016, Starr admitted that he knew staff at AIGH were unhappy with their work environment and with Singh specifically.  Starr also stated that Singh's performance was poor and that he was not meeting any metrics.

531.   After she resigned from AIGH, Anandaraja received a call from Starr.  He said he had recently visited AIGH and had been alarmed to learn that Singh had not developed a vision or mission statement for the organization, and that no one on the staff had been able to explain what goals they were working towards.  Starr also told her he had heard serious criticism of Berman's conduct, and that he had advised Singh to fire Berman.

*Singh's retaliation against Bruzelius*

532.    On June 5, 2018, after Bruzelius had filed her complaint against Singh, she had her next regular meeting with him.  Immediately as she entered the room, she noticed that his behavior towards her was markedly different.  He threatened he would "take [her] off all projects" that interested her, that he "didn't want [her] working on academic research" or on anything that could "lead to [her] publishing a paper," except for a single paper already completed that he had co-authored.  Singh also told Bruzelius he was "unsure if there would be a role for [her] at AIGH" in the future.  He was trying to pressure her to quit, or at the very least, reduce her to an inconsequential pen pusher.  His unstated message was that because she had complained about him, his gloves were off.

533.    Bruzelius reported these threats to Tiger-Paillex, Lowy and Jones-Winter, and met them the following day.  Bruzelius told them Singh's comments made her uncomfortable and she was worried about the damage that he could inflict on her career.  Bruzelius reminded them that she had only spoken to them on anonymous basis, which they confirmed, but provided no further assurances or help.

534.    The responsible parties at Mount Sinai thus left Bruzelius in "retaliation limbo."  She continued to work at AIGH and have one-on-one meetings with Singh, but he either cancelled them to ignore her or, when they did take place, he was hostile, constantly questioned her work, called it subpar and gaslighted her.  He played his customary cat and mouse games with her, such as assigning her a task only to later deny it.

535.    Singh's hostility was starting to affect Bruzelius so much that she began avoiding him.  For this reason, she suggested that they did not need to continue having one-on-one meetings.  He agreed and told her to report to Weisman instead.  Previously, Weisman had been her equal.

*Anandaraja's meetings with Muller and Landrigan*

536.   Anandaraja had one-on-one meetings with Muller every month, in which she freely discussed Singh's personality, leadership and management issues.   Initially, Muller told Anandaraja that telling Charney about all the problems Singh was creating would be futile.   Since Charney favored him so strongly, any criticism would cause Charney to disfavor the critic.

537.   However, as Singh's conduct worsened, Muller told Anandaraja that he had after all relayed her concerns to Charney.   Another time, Muller told Anandaraja that he had asked for a meeting with Singh and Charney together to discuss the problems at AIGH, but he arrived in Charney's office to find that Charney and Singh were already in the middle of a pre-meeting and were looking very chummy.   Muller felt that his criticism of Singh was without effect given Singh's dynamic with Charney.

## Developments Since the Original Complaint was Filed

538.   Since the Complaint was filed on April 26, 2019, there have been a number of developments relevant to the allegations it advances.

*Silva edits relevant documents; Misiti's calendar entries disappear*

539.   While Khan was employed at AIGH, it was common practice for members of the ATLAS team to store documents in Google Drive, a cloud computing platform.  Khan's access to the platform was not revoked despite his departure from AIGH.  As a result, Khan continues to have access to AIGH-related files in Google Drive, including the Final USAID Report.  It is likely that other former employees also continue to have access to such files.

540.   At 2:36 pm on May 28, 2019—more than a month after the original Complaint in this lawsuit was filed and served on all the Defendants—Silva edited the Google Doc document

that AIGH's staff used to collaborate on the Final USAID Report, which had been completed and published in or around Fall 2017. Specifically, Silva "resolved" (that is, made disappear) a comment he had originally inserted in the document on December 19, 2017 when it was "live."

541. The comment itself read "This is the new block of text I have added to the report. Can you please take a look at it?" That block of text showed him to be the author of some of the false statements in the Final USAID Report, namely that ATLAS had a "16% of secondary health coverage services in the country. Each health district has a Nurse and a Health Supervisor, while each health area has an Epidemiologist, providing a total of 224 ATLAS core users" (¶ 320). Making the comment disappear meant that the document no longer showed that Silva had authored the false statement. However, Khan was able to see the resolved comment in the document's editing history. It thus appears that Silva resolved the comment in order to cover his tracks in the wake of the Complaint and its allegations of AIGH making false statements to USAID.

542. Earlier in the same week, Silva "shared" the Final USAID Report with Singh within Google Drive, with edit rights—*i.e.*, Singh was given the permissions needed to edit the document. Plaintiffs do not know whether Singh made any edits to the document subsequent to the filing of the Complaint, nor whether he or Silva made any edits to any other documents relevant to this lawsuit.

543. In a similar vein, shortly after the Complaint was filed, almost all of the entries on Misiti's work calendar from the date she started at AIGH through November 2018 disappeared without warning. Misiti has been unable to access them since that date, and does not know whether they can be restored. She has since been told that they were auto-archived.

*Current and former faculty, staff and students sign letters of support*

544.   In the wake of the Complaint, a large number of current and former faculty, staff and students at the Icahn School of Medicine published open letters to Mount Sinai's Board of Trustees (the "Board") in which they lamented what the Complaint described about Mount Sinai and demanded immediate action.

545.   The letter from current students (some of whom have since graduated), which now has over 300 signatures, states that they feel "compelled to speak out" in light of the "shocking acts of discrimination" described in the Complaint, and calls on Mount Sinai's leadership to "prevent further perpetuation of an abusive culture."

546.   The letter on behalf of former faculty, staff and students, now with over 200 signatures, praises the plaintiffs for "empowering medical students, residents and fellows through direct, mentorship and building [Mount Sinai's] curriculum on human rights and health justice," and similarly demands action.

547.   The letter from current faculty and staff at Mount Sinai now has over 400 signatories.  All of these people ultimately report to Defendant Charney.  Yet they are willing to put their names on a statement declaring that they are "saddened and profoundly disturbed" by the allegations in the Complaint, asking the Board to take "decisive action," and calling for a "culture shift."  Some of the signatories are only two levels down from Charney in the Mount Sinai hierarchy, an indication of how much they are willing to stick their necks out to help Mount Sinai become a fair place to work.

548.   These letters went unanswered for many weeks, prompting a chaser from student organizers to the Board.  On May 22, 2019, the co-chairs of the Board responded that they were appointing an internal committee to investigate the allegations but provided no details of the

committee's composition, goals or timelines.  No further announcements were made by the Board in 2019.

549.    In early January 2020, a group of the original letter writers sent another e-mail to the Board, copying the Co-Chairs and Davis, asking for updates and inviting them to discuss how to address ongoing concerns in person.  While Davis acknowledged receipt of this e-mail, neither he nor the Board responded to it, or the three original letters, in any substance.

### Charney remains in his post; Singh remains at Mount Sinai

550.    In the wake of the Complaint, Mount Sinai has learned to trumpet the ideals of gender equity.  Whereas in October 2018 the school declined to be a founding signatory of Time's Up Healthcare ("TUHC"), a blizzard of more recent emails from senior figures including Dean Charney have endorsed improving opportunities for women.  On August 27, 2019, Mount Sinai finally announced that it became a member of TUHC, ten months after TUHC had begun asking schools to endorse its core principles and only after many other major hospitals and medical schools had joined.

551.    The day before the First Amended Complaint was filed as agreed with Defendants, perhaps in anticipation of it, Mount Sinai leaders sent a school-wide email announcing several reforms aimed at improving the treatment of women and minorities.  These included not permitting any panels to speak at Medical School meetings that contain no women or minorities; a "recently expanded and significantly updated Diversity Statement"; a new Dean for Gender Equity, Dr. Carol Horowitz ("Horowitz") (who was appointed by Charney without a national or external search and whose other responsibilities mean these duties occupy only 20% of her time); a new Gender Steering Committee with no clearly communicated agenda or mandate; student listening sessions led by a senior dean; and revamped complaint processes. "These steps are important, but

we know we have more to do," says the statement.  One of these steps included hiring public relations firms to promote Mount Sinai's new pro-female image.

552.   Plaintiffs are gratified that their lawsuit has apparently been a catalyst for getting Mount Sinai's leaders to acknowledge what hundreds of its students, alumni and current employees describe as a culture that needs fixing.  The changes Mount Sinai has introduced in the wake of the Complaint, in particular Singh's stepping down as a Director of AIGH, essentially confirm that the Plaintiffs' claims have merit.

553.   But it is not clear how far Mount Sinai's ostensible change of direction goes beyond cheery e-mails.  Charney, Singh's protector and enabler, remains in his job.  Mount Sinai's lawyers are defending Singh, Silva and Charney in this lawsuit.  The Plaintiffs have received no apology.  There is nothing wrong in Mount Sinai agreeing to fine principles, but gauzy new initiatives do not address the real casualties of its past behavior.  "Mistakes were made" – but apparently not by anyone now willing to take responsibility for them and make amends.

### Singh's continued employment at Mount Sinai

554.   Singh's story is particularly instructive.  On July 3, 2019, Charney informed the Medical School that Singh had "chosen to step down" as Director of AIGH and Chair of the Department of Health System Design and Global Health.  Singh nonetheless remains an Associate Professor at Mount Sinai, and his Mount Sinai web profile continues to describe him as Director of AIGH.  In his notice, Charney thanked Singh for his "dedicated work as Chair and Director," and praised his "devotion to [the school's] mission and success."  In a separate statement issued through a public relations consultant, not contradicted by Mount Sinai, Singh proclaimed that he was able to "step aside . . . knowing that the attacks on [his] integrity and . . . work have been investigated and proven false."

555.   The contrast with Mount Sinai's treatment of the Plaintiffs is stark.  They were bullied, retaliated against, and in most cases pushed out of the institution.  They continue to suffer consequences both to their mental health and their professional reputations.  Singh, meanwhile, was allowed to control both the timing of and the messaging around his own resignation as AIGH's Director, and remains a senior employee of Mount Sinai in good standing, generously compensated.

556.   It is instructive that other institutions have not been so tolerant.  In the wake of the Original Complaint, Singh was deselected as an Associate Editor of Annals of Global Health, a peer-reviewed journal supported by the Boston College Global Health Program.  He has also recused himself as Co-Investigator for the Commonwealth Fund grant, at the Fund's request.

557.   Since July 3, 2019, Singh has had no clear responsibilities or funding for his role as Associate Professor at Mount Sinai despite Charney's usual requirement for faculty to secure a significant percentage, at least 60%, of their salary from grants.  Singh continues requesting assistance from AIGH designers and drains AIGH's budget.  On information and belief, Singh was granted access to a portion of AIGH's budget despite the fact that he brought no new grants and produced no tangible work for AIGH's benefit.

558.   On information and belief, Singh spends the majority of his time working for other organizations, such as City Health Works and the Peterson Foundation, while collecting his Mount Sinai salary.  Singh behaved similarly in the past, clearing most of his schedule to write a book and secure a marketing campaign for it, and pressuring his staff to restructure their work for AIGH to help him on his personal projects or tasks benefiting other organizations he was affiliated with.

**Faculty Wellbeing Survey summary is edited to remove key and troubling statistics**

559.   Mount Sinai's Office of Wellbeing and Resilience conducted a wellbeing survey from December 2018 to February 2019, gathering responses from nearly 1,900 Mount Sinai faculty members.   Ripp and his colleagues condensed the survey's findings into a draft report to share with faculty, which included data illustrating every key aspect of the survey, including troubling statistics showing that 25% of Mount Sinai's female faculty members reported having been victims of sex discrimination within the last twelve months, and 13% of female faculty reporting sexual assault in that time period.   6.8% of respondents (of any gender) reported being treated unfairly because of race, ethnicity or religion.   Finally, 29% of Mount Sinai's faculty aged 29-30 indicated a desire for backup childcare services while they work.

560.   On information and belief, Charney sanitized the report, releasing instead a purely narrative text which excluded all of the actual data about sex discrimination, sexual assault or racial discrimination.   When Anandaraja expressed concern to her colleagues that the final text did not fairly represent the survey, she was told that those decisions were made "above [their] pay grade."

**Mount Sinai's student body challenges Charney and his leadership**

561.   Mount Sinai's students continue to question its policies.   During an InFocus 8 course in 2019, students received a training session on Mount Sinai's updated student mistreatment policy.   Muller and Dr. Peter Gliatto, Mount Sinai's Dean of Student Affairs at the time, were present.   At the end of the session, two female students queried how they could possibly trust Mount Sinai's management if its top tier continued to say that the Plaintiffs, who had followed Mount Sinai complaints policies to the letter in reporting Singh, were liars.   Muller simply acknowledged the paradox and moved on in the discussion.

562.    On January 17 and January 24, 2020, medical students organized a protest outside Mount Sinai's main hospital, demanding "Answers, Action and Accountability" from Mount Sinai's leadership.  They cited recent incidents, including the handling of this lawsuit and some Defendants' continued presence at Mount Sinai as causes for concern.  Their flyer stated that the protest was also "a response to the recent NY Post and NY Magazine articles highlighting unacceptable conditions and behaviors in the Mount Sinai Emergency Department and evidence of links between Mount Sinai Board of Trustees and Jeffrey Epstein's illegal activities."

563.    Mount Sinai's Student Council hosted a public meeting that included students, Horowitz, Muller and Charney on January 27, 2020.  Students were invited to submit questions on an online platform and then vote for the ones they thought were most important to discuss at the forum.  Some of the most popular questions included why Singh remained a faculty member given the serious allegations against him, and why the Dubin family had been allowed to remain on Mount Sinai's board given their close connection with Jeffrey Epstein.  They were not answered.

564.    Instead, Charney, Horowitz and Muller had a general discussion about how the institution would address its systemic problems, with Horowitz vaguely stating that there was "room for improvement" and she was open to suggestions.  At the end of the meeting, students were told that they would receive answers to any unanswered questions via e-mail.  No such e-mail was ever sent.

***Anandaraja is separated from her colleagues and excluded from work streams***

565.    Anandaraja's first day back at work after the Complaint was filed was May 13, 2019.  She met with Ripp, her supervisor, who said that he realized she may be in a sensitive situation, but that he wanted her to be comfortable, and as far as he was concerned, it's all "business as usual."  Ripp then asked whether Anandaraja felt uncomfortable in her current office location

as she was currently seated together with some of Mount Sinai's legal team, and offered to find her an alternative office space.  Anandaraja replied she was happy with her current working arrangements and did not see a reason to change them.  A few weeks later, when Anandaraja returned from a period of leave, she noticed that all of the members of Mount Sinai's legal team who used to sit near her had been moved.  Hennig later confirmed to Anandaraja that he had heard that the legal team members were moved because Anandaraja had "refused" to move.

566.   One of Anandaraja's projects in her new role at Mount Sinai was the introduction of lactation rooms, for which she advocated and worked towards in partnership with numerous Mount Sinai leaders, including Horowitz.  This initiative was eventually formalized and became a Lactation Room Taskforce led by Horowitz's office.  On Tuesday, May 14, Anandaraja learned the taskforce's inaugural monthly meeting was scheduled for the following day, Wednesday, May 15, 2019.

567.   Despite Anandaraja's involvement in this project, she was excluded from the calendar invite and related e-mails.  Anandaraja was understandably concerned about this development and asked Ripp about it, who said he would look into it.  In the meantime, Anandaraja told him that she planned to attend the meeting regardless of the missing invitation, and Ripp allowed this.

568.   Having not heard from Ripp before the meeting's scheduled start, Anandaraja entered the meeting room at the scheduled time and participated in the discussion.  After the meeting, Anandaraja asked Horowitz's assistant why she was not included on the attendee list. The assistant appeared surprised, unable to explain how Anandaraja was overlooked.

### *Silva plagiarizes Safo's work at Stanford's Medicine X Conference*

569.  In late September 2019, Safo learned that Silva had plagiarized her work during a presentation at Stanford's Medicine X Conference.  It shocked but did not surprise Safo to learn that Silva, having degraded and discriminated against Safo and her colleagues, was now exploiting her work for his benefit.

570.  Safo wrote to the conference organizers to express concern about Silva's conduct. In January 2020, they informed that they had undertaken an investigation and Silva would not be invited to any further Stanford conferences and that his videos and materials plagiarizing Safo's work would not be included in the conference.

### *Charney retaliates against Beddoe*

571.  From the start of Singh's recruitment and hiring, Beddoe expressed concerns to Charney, Lowy and other senior Mount Sinai administrators, that he was underqualified, that he dismissed and targeted the women who worked for him, and that the internal investigation into his misconduct was one-sided and predetermined (see ¶ 491).  In March 2019, she provided testimony in support of the original Complaint in this action.  Mount Sinai and Charney have retaliated against Beddoe and continue to retaliate against her for her willingness to oppose discrimination at Mount Sinai.

> **Beddoe is told she would be considered for a new role within Global Health, yet never hears back after her interview**

572.  After Mount Sinai announced Singh's resignation, Beddoe heard rumors that Rachel Vreeman ("Vreeman"), the newly appointed Interim Chair of the Department of Health System Design and Global Health and Director of AIGH, was being considered as Singh's

permanent replacement.  Beddoe was thrilled; she thought Vreeman was a very good choice and was certainly qualified to lead AIGH.

573.  However, in around September 2019 she and several others were contacted by Leslie Schneider on behalf Dr. Annetine Gelijns ("Gelijns").  Schneider said that Gelijns was chairing new the search committee responsible for finding Singh's replacement as Director of the Institute and Chair of the Department of Health System Design and Global Health.  She scheduled a call for the following week.

574.  On the call, Gelijns and Schneider sought the group's advice about what the roles entailed and what she thought Mount Sinai should do differently this time around.  Beddoe asked if the roles had been advertised because she had heard rumors that Vreeman would be offered them.  Gelijns replied that they had not been advertised.

575.  Beddoe said this was the same approach that had failed during Singh's hiring, when Charney had picked a candidate without normal vetting. She recommended that Mount Sinai learn from that mistake, and she suggested a couple of candidates from the previous recruitment process so Gelijns could reconnect.

576. On October 25, Gelijns e-mailed Beddoe and asked whether, in light of her "experience and stature in the field of global health," she might be interested in applying for the roles herself.  In response, Beddoe said that her global health commitments and ongoing clinical research would prevent her from taking on the Chair role, but she would be delighted to be considered for the role of Director of the Institute.  Gelijns then asked to have a face-to-face meeting to discuss this idea.

577.  During that meeting, Gelijns asked Beddoe for her thoughts about the position and how the current leadership and management team could be improved.  The following week,

Gelijns e-mailed Beddoe to say that she had "learned a lot from [their] conversation," and that she had "conveyed [Beddoe's] views to … Charney."

578.  In a subsequent phone call, Gelijns stated that she would be meeting with Charney to discuss the possibility of splitting the position between two individuals and appointing Beddoe to the Director role.  Gelijns said she would get back to her shortly.

579.  Beddoe never heard from Gelijns about the role again, despite following up with her several times.  Nor did she hear from Charney.

580.  On March 11, 2020, Vreeman was appointed Chair of the Department of Health System Design and Global Health and Director of the Arnhold Institute for Global Health.

**Beddoe's pay is cut**

581.  On February 1, 2017, Charney appointed Beddoe to a three-year position at Mount Sinai as Assistant Professor in the Department of Obstetrics, Gynecology and Reproductive Sciences, Member of the Medical Staff, and Director of Gynecologic Oncology Chemotherapy Infusion Service and System Director of Global Health.  The contract provided that Beddoe would receive an annual base salary, clinical supplement, and administrative supplement.  The three-year contract was due for renewal in February 2020.

582.  On February 12, 2020, Beddoe received an offer letter from Charney and her Department Chair, Brodman, to remain at Mount Sinai, but her 2020 compensation was $50,000 less than her annual compensation under the 2017 contract.  The offer letter further reduced her 2021 by an additional $50,000, and her 2022 compensation was reduced yet another $50,000, so that her total compensation would decrease $300,000 over the three-year term.

583.  Beddoe was initially told by her administrator that her compensation was being cut because her Director of Chemotherapy title was being removed; Beddoe replied that she had never

been compensated for this role, so its removal should not affect her compensation. Her administrator referred her to Brodman.

584. Brodman told her a different story, that her salary was being cut because she had not brought in sufficient revenue. Beddoe asked for her billing records to verify this. Brodman asked for a list of her patients, which she provided for a 14-month period. Brodman noted that his hands were tied regardless because Charney controlled her salary. He also asked Beddoe about the status of her application for the role of Director of the Institute, and said that if she got that role, she would not feel the impact of the pay cut.

585. During a follow-up meeting in March 2020, Brodman failed to provide Beddoe with her billing records for the patients she had identified, and asked her to resubmit the list.

586. In June and July 2020 Mount Sinai finally provided some data about her patient billings, but it was obviously inaccurate and incomplete. For example, it excluded bills that Mount Sinai submitted to insurance companies as well as the companies' usual Explanation of Benefits, which would readily show Beddoe's professional fees. The data provided were clearly not a serious effort to record the income Beddoe had earned for Mount Sinai. The explanation given for her reduction in pay thus appeared to be pretextual.

587. Compelled by the pressure of an expired contract, Beddoe reluctantly acceded to a $50,000 reduction on a one-year agreement, although Brodman and Charney had still not justified the pay cut.

588. Additionally, since her salary dispute, Beddoe has been approached by patients who are concerned about a recent new charge added to their bill for a "physician fee." Beddoe deduces from this that her patients had not previously been billed for her services.

589. Colleagues have told Beddoe that they believe her pay was cut in retaliation for expressing concerns about Singh and the internal investigation.

### Anandaraja resigns from Mount Sinai

590. On September 15, 2020, Anandaraja formally resigned from Mount Sinai. During her resignation meeting with Ripp, she told him that she could "no longer take the moral injury of working for Mount Sinai." She explained that she felt like she was no longer able to have an impact at Mount Sinai due to both what happened at AIGH, and the reactions of her colleagues to this lawsuit.

## <u>Harm to Plaintiffs</u>

591. AIGH was a hostile environment for women, at first focused on the older "legacy staff," but continuing after their departure. Between Singh's gaslighting and denigration, Berman's angry outbursts and Silva's abusive name-calling, the Plaintiffs each suffered damage to their well-being and mental health.

### Atkinson

592. Singh's pattern of insulting and ignoring Atkinson made her feel inadequate and incompetent. He berated her until she had an emotional breakdown in front of him. Atkinson started to feel despondent and depressed, questioning her own capabilities despite decades of accomplishments. Singh's belittling caused her significant anxiety; she experienced severe stress and developed insomnia. Atkinson saw her primary care physician in December 2015 with a chief complaint of insomnia and was prescribed anti-anxiety medication. Atkinson felt that she had nowhere official to turn for help, as Mount Sinai Human Resources had previously failed to help Rahona deal with Singh's onslaught.

593.   The harm Singh inflicted on Atkinson's well-being continues to this day.  Early in the morning of March 1, 2019, Atkinson viewed the launch video prepared by Time's Up Healthcare, which was to be shown at the new organization's launch event to be held at the New York Academy of Medicine later that day.  To her shock and horror, Singh was in the video endorsing the group's mission of promoting women in medicine.  The experience of watching Singh claim to be an ally for women in healthcare, when Atkinson knew him in fact to be precisely the opposite, left her sobbing and shaking.

594.   Atkinson contacted the leadership team at Time's Up Healthcare, telling them that Singh had been the subject of an internal complaint by women at Mount Sinai.  By the time of the launch later that evening, the clip of Singh had been removed.  Atkinson learned that Time's Up Healthcare had asked him to participate because he had been tweeting pro-women items, and he did not inform them of the complaint pending against him; when asked by Time's Up Healthcare officials after Atkinson's intervention why he hadn't, Singh said he had been "ambivalent" about participating and admitted he thought he might be removed before it was released – the only (if still muted) indication of remorse Plaintiffs have ever heard from Singh about his conduct towards them.

595.   Atkinson's professional reputation suffered due to Singh's denigration of her performance.  He made misleading remarks about Atkinson's funding, falsely implying that a donor had chosen not to renew his gift due to dissatisfaction with her work.  He maligned her significant contributions in front of her colleagues.

596.   While Atkinson was fortunate to find employment after she left AIGH, she is no longer working in her chosen field of human rights, to which she had devoted much of her career.

*Anandaraja*

597.   Anandaraja was unemployed for two years after her departure from AIGH and has incurred financial losses as a result.  At AIGH, Anandaraja earned $150,000 annually and received health benefits and retirement contributions; while unemployed, she had to live off her savings and pay out-of-pocket for marketplace health insurance or use Medicaid.  When she finally returned to Mount Sinai in a different job, she received the same base salary as she had at AIGH. Her period of unemployment therefore cost her not only two years' salary and benefits, but also customary salary increases and her retirement savings.

598.   The deterioration in her financial position also meant that she was unable to continue to make mortgage payments on her apartment, and she was forced to sell it in a compressed timeframe.  She had lived in the apartment for eleven years, made a significant investment in it and had hoped to make a significant profit on it at some point in the future.  She now shares a rental apartment with a friend.  The stress and other health repercussions associated with selling her apartment under value and finding alternative accommodation under pressure of time was significant.

599.   Singh significantly damaged Anandaraja's professional reputation by misrepresenting the reasons for her departure.  Singh's lies that Anandaraja had been terminated due to poor job performance impugned her work and her contributions to AIGH.  Now that she has returned to Mount Sinai, Anandaraja has found it more difficult to build relationships within leadership circles than she did previously.

600.   Anandaraja's career trajectory in global health was completely disrupted by Singh. Before Singh's arrival at AIGH, Anandaraja's career was on an upward curve.  She organized

conferences, co-chaired city-wide committees and directed a major academic global health program at Mount Sinai.

601.   Singh cut Anandaraja off from New York City's global health scene, demoted her from Director to Program Director during her time at AIGH and sidelined her internally as well as externally on the larger funding and academic scene within global health.  As a result, Anandaraja is no longer able to pursue a career in Global Health; Singh derailed her from any advancement opportunities in the field.

602.   The damage to Anandaraja's relationships and reputation was made substantially worse by her involvement, at Singh's direction, in terminating or reducing the salaries of longtime colleagues at AIGH without a clear rationale or guidance for the future.  Those colleagues rightly felt aggrieved at the way they were treated, and Anandaraja's reputation and relationships have suffered as a result, despite the fact that she had objected to treating them this way, and did so only because she was directed to by Singh.

603.   Anandaraja's physical health deteriorated noticeably while employed under Singh. She worked overtime at night and on weekends to carry out the meaningless tasks he assigned.  In her attempts to buffer Singh's negative effect on her staff, Anandaraja took the stress on her own body.  She lost significant amounts of weight, and her hair greyed.

604.   Singh's constant denigration caused Anandaraja to doubt her competence, judgment and value.  He derided her abilities and pressured her to cut programs and to terminate her projects, causing her extreme anxiety.   Her experience terminating or reducing the salaries of longstanding colleagues and staff without proper justification or guidance caused her further significant anxiety and distress.

605.   During her time at AIGH and for many months afterwards, Anandaraja suffered from nightmares, difficulty sleeping and concentrating, depression, persistent feelings of anger and an inability to trust others.   She continued to fear Singh, sweating and feeling her heart rate increasing when she saw people who looked like him.   Even today, Anandaraja avoids places Singh frequents at Mount Sinai and in her neighborhood, where Singh previously lived.   She has had to undergo intense counseling and professional coaching in order to pick up the pieces of her career and move forward.

### *Safo*

606.   Safo suffered a major career setback from working at AIGH.   Lured by Singh's false promises that she would be his "second-in-command" and that he would mentor her, she left a two-year general internal medicine fellowship to join AIGH.   When she started work, however, unlike similarly situated men, she was given a title well below her professional standing.   When she finally received a promotion, it took over a year to receive her back pay.   Singh's need to diminish others, especially the women who worked for him, meant Safo effectively lost two years of productive work as she responded to irrational and changing demands and was kept from producing scholarship or programming that had value.   This has set back her career and promotion prospects.

607.   Singh's abusive mismanagement also affected her health.   In December 2017, Safo had a flareup of a chronic medical condition that is aggravated by stress.   Within a month, she lost 30 pounds and suffered severe arthritic damage that caused her to walk with a cane.   As a result, Safo now needs a more intensive drug regimen than previously and has damage in her joints, impacting her mobility.

608.   Safo's experiences at AIGH have caused her tremendous psychological distress.  In January 2018, she started seeing a therapist to help her cope with the resulting anxiety and depression.  Safo sees her therapist weekly or biweekly at $160 per session, not covered by insurance.

609.   Safo's time at AIGH created a deep sense of distrust in her own abilities.  Despite her three Harvard degrees and success in all other aspects of her professional life, Singh's gaslighting and denigration have left her doubting her competence, intellect and emotional intelligence to a crippling degree.  Sometimes it now takes her an entire day to send a simple e-mail.  She fears lasting professional damage from Singh, as the health system design and global health worlds are small.

### Caliendo

610.   The workplace toxicity Caliendo experienced at AIGH has affected all parts of her life.  After Berman yelled at her and made her fear he would hit her, she cried every day before work for a week.  She felt traumatized and scared to go to work.  Caliendo suffers from Crohn's disease, which was common knowledge at AIGH.  Her symptoms had been under control before she started at AIGH, but they returned and worsened due to stress and now affect her daily life.

611.   In or around July 2017, after Berman yelled at her upon his return from Aspen, Caliendo's Crohn's disease, which had been in remission, returned and became so severe she could not eat solid food without pain and had to go on a liquid diet for two months.  Caliendo also began to experience recurring Crohn's-related infections, which she had not suffered before.

612.   Working for Singh and Berman made Caliendo feel incompetent and inadequate.  They ruined her self-esteem and confidence.  She has suffered from anxiety due to her experiences with them and has been unable to hold down stable employment after she left AIGH, as she fears

that other employers will also mistreat her.  While her salary was $74,000 at AIGH, her income dropped to around $40,000 last year.

## Khan

613.   Before joining AIGH, Khan enjoyed a successful career as a Product Manager and was confident in his abilities.  But Silva's constant undermining made him feel self-conscious, and he came to doubt his skills and abilities.  This, coupled with Singh's misrepresentations about ATLAS – the core of Khan's work – demoralized him and made him hate going to work.

614.   Even in his new role outside AIGH, Khan now constantly doubts and second-guesses himself.  He feels very self-conscious around his co-workers and friends and has become more private.  He also has trouble focusing on his work and has developed unhealthy eating habits.  Khan gained approximately 20 pounds while he worked at AIGH and is now the heaviest he has ever been.  He now also suffers from frequent stomach pains and diarrhea.

## Llames

615.   Prior to joining AIGH, Llames felt confident in her professional abilities, but Singh's campaign of treating her as if she were invisible undermined her confidence.  Her self-esteem plummeted, and she cried at least twice a week due to Singh's treatment.  She dreaded going into work every day, feeling that she just had to survive until she could leave the office.  She sought therapy while at AIGH to cope with her work-induced stress, but she gave up after an initial inquiry when she discovered she could not afford the therapist's costs.

616.   Because Singh assigned her low-level administrative tasks rather than using her capabilities, she not only failed to gain new skills, but her existing ones got rusty.  Her professional development went backward.  Furthermore, because she was kept from trips and meetings with

external stakeholders, external partners did not recognize her as a project lead, and she was unable to form important networking connections that could further her career.

### Misiti

617.   Misiti continues being employed at AIGH and experiences work-related stress due to her maltreatment by Singh and the rest of AIGH's leadership.  Misiti persistently feels powerless and voiceless, fearing further retribution if she speaks up.  Her regular meetings with Singh were intense and overwhelming—over time, they made her become anxious and paranoid, often to a debilitating extent.  Singh made her feel useless and stupid.  She suffers from regular nightmares about Singh and wakes up with a high heart rate and intense feelings of shame.  She now has to see a therapist and must take prescription anti-depression and anti-anxiety medications.

618.   Misiti's physical health has also deteriorated as a result of the hostile work environment at AIGH.  She struggles to sleep through the night, has severe stomach problems and grinds her teeth.  Misiti gained 15 pounds since working at AIGH and is now the heaviest she has ever been.  Work-related stress has also affected Misiti's menstrual cycle and caused her to spot in between her periods.

619.   Misiti wants to leave AIGH, but her anxiety and depression make job applications and interviews extremely difficult—her sense of professional confidence has left her.  She fears going to work at the Institute and, due to her worsening mental health, will likely have to leave AIGH to begin healing.

### Bruzelius

620.   After Bruzelius participated in an interview for Mount Sinai's investigation of Singh, he actively impeded her career prospects and caused her significant emotional distress.

Though Mount Sinai investigators had assured Bruzelius that she would remain anonymous, Singh became aware of her participation and retaliated against her without consequence. Singh berated Bruzelius and treated her in a hostile manner. He also demoted her, reducing her responsibilities and forcing Bruzelius to report to her former equal, Dr. Jeb Weisman.

621. Bruzelius' experience of the culture of fear, manipulation and emotional abuse perpetrated by Singh at AIGH took a significant toll on her mental health. She has difficulty sleeping and eating due to stress. She saw a therapist to help cope with emotional distress directly resulting from the hostile work environment at AIGH.

*Beddoe*

622. Mount Sinai's decision to cut Beddoe's salary has directly harmed her significantly. Its refusal to consider her for internal promotions has also hurt her financially, including by depriving her of opportunities to secure external appointments. Mount Sinai's actions have also caused Beddoe emotional distress. In particular, Charney's retaliation has inflicted an immense toll on her sense of self-worth and depleted the energy and enthusiasm she once brought to her work at Mount Sinai.

## *Conclusion*

623. Mount Sinai told several of the women who had filed a complaint about Singh in 2018 that they had determined he had not discriminated against them as women, because it was clear he was an unpleasant, erratic boss to men too. But that misrepresents both the applicable legal standard for discrimination, and the facts of what actually happened at AIGH.

624. Legal precedent clearly establishes that behavior affecting women particularly harshly because they are women, even if that same behavior is also hostile to men, states a claim for sexual harassment. "The mere fact that men and women are both exposed to the same offensive

circumstances on the job site . . . does not mean that, as a matter of law, their work conditions are necessarily equally harsh." *Petrosino v. Bell Atl.*, 385 F.3d 210, 221 (2d Cir. 2004). For example, a workplace inundated with pornographic images of women and sexual vulgarities is no less a hostile work environment for women because men also see them. *Patane v. Clark*, 508 F.3d 106, 114-15 (2d Cir. 2007). Likewise, Singh's strange staring contests with a female subordinate (¶ 401), his describing women but not men at AIGH as "stressed" and "overworked" and "emotional" with the implication they were inferior workers (¶¶ 282, 401), permitting his deputy to scream at his female assistant and other staff at the top of his lungs but ignoring it (¶¶ 437, 441, 451), and other aggressive behaviors directed at both men and women were rightly received differently by women than men.

625. In fact, the idea that Singh was an "equal opportunity jerk" may be attractive to Mount Sinai, but in addition to being scant consolation to those who worked there, is not true. Singh's behavior overflowed with examples of targeting older people and women in particular for abuse. He stated directly and repeatedly that he wanted to work with people "ideally in their twenties and thirties" (¶ 161) and "younger people" (¶ 406). He demeaned highly accomplished "legacy staff," mostly women over 40, in public and private (¶¶ 197-208, 232-246, 353), promoted less qualified men over them (¶ 245), pointedly ignored them in meetings and elsewhere (¶¶ 168, 206, 358, 381-384, 429), gave menial work to them but not to similarly situated men (¶¶ 206, 354, 398), gave credit to men for women's accomplishments (¶ 290), ordered women to cut off contact with long-standing professional contacts (¶¶ 359, 394), demoted them (¶¶ 201-202, 243-246) and created such a hostile environment that they were driven from the Institute. He clearly preferred working with men, such that even his female allies noticed it (¶ 154). He bragged about making a female subordinate at Columbia University cry regularly (¶ 402) He gave promotions and bonuses

to men without their asking, but made women beg and "fight" for them, and paid them less than male counterparts (¶¶ 288, 356, 357, 425).   Men got better titles than women (¶¶ 286, 355).   He allowed Silva to keep targeting women with outrageously demeaning and sexual comments (¶478), even after he was told they were offensive and problematic (¶ 479).

626.   Indeed, Singh's flagrant abuse of his female and older subordinates did not come in a vacuum.   Charney apparently hired Singh casually (¶ 486), agreed that Singh should get rid of the older women (¶ 162) and gave him cover as he did so.   He too screamed at women and made them scapegoats when men were equally responsible for outcomes he disliked (¶ 75).   He likes being feared (¶ 12), and he cursed and yelled at a student (¶ 64).   Charney bullied Strathdee, the distinguished professor chosen by the search committee to run AIGH, and wrote her an e-mail calling her an IDIOT in red capital letters (¶¶ 72, 73).   He directed that Beddoe's salary be cut after she complained about Singh and the lenient treatment Singh received at Charney's direction, for shifting reasons that did not add up (¶¶ 581-588).   In this environment, it is perhaps not surprising that AIGH staff could not get Mount Sinai to take seriously the deeply dysfunctional, abusive, sexist and ageist environment Charney's protégé, Singh, was creating, to say nothing of his lies about ATLAS to funders including the federal government.   Complaints poured into HR (¶¶ 176, 357, 426, 485, 488), even to Charney himself (¶¶ 521-537), but nothing happened despite HR believing that Singh had harmed over twenty women (¶ 501).   Charney intervened in the investigation (¶ 521) and as a result, Singh remains in an enviable job today, publicly praised by Charney even as internal and external pressure finally overwhelmed Charney's desire to keep Singh as AIGH Director.

## <u>CLAIMS FOR RELIEF</u>

### <u>FIRST CAUSE OF ACTION</u>

**UNLAWFUL SEX DISCRIMINATION–DISPARATE TREATMENT**
**TITLE IX, TITLE VII, NYSHRL and NYCHRL**
**(By Atkinson Against Singh, Charney, and Mount Sinai)**

627.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

628.    At all relevant times, Atkinson was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

629.    At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

630.    At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Atkinson's employment and had the power to do more than carry out personnel decisions made by others.

631.    At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Atkinson.

632.    Through AIGH and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

633.     On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

634.     By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Atkinson to discrimination on the basis of sex while she was employed by Mount Sinai.

635.     Mount Sinai was placed on actual notice of the discriminatory and hostile environment created and endorsed by Singh and Charney.

636.     Despite this actual notice, Mount Sinai failed to take reasonable corrective measures to stop Singh and Charney from discriminating against Atkinson on the basis of sex.

637.     Mount Sinai's actions and inaction constitute deliberate indifference to Atkinson's federal rights, causing her to suffer economic and non-economic damages.

638.     By their discriminatory and hostile treatment, Defendants treated Atkinson less well than other employees because of her gender.

639.     As a result of Defendants' unlawful actions, Atkinson suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to reduction in compensation, demotion, and constructive discharge.

640.     Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Atkinson's rights.

641.     As a result of Defendants' discriminatory actions, Atkinson has and/or will continue to suffer irreparable injury including but not limited to: lost earnings, humiliation, mental anguish, insomnia, emotional distress and damage to reputation.

642.     As a result of those actions and consequent harms, Atkinson has suffered such damages in an amount to be proved at trial.

643.    Atkinson requests relief as described in the Prayer for Relief below.

## SECOND CAUSE OF ACTION

**UNLAWFUL SEX DISCRIMINATION–HOSTILE WORK ENVIRONMENT
TITLE IX, TITLE VII, NYSHRL and NYCHRL
(By Atkinson Against Singh, Charney and Mount Sinai)**

644.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

645.    At all relevant times, Atkinson was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

646.    At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

647.    At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Atkinson's employment and had the power to do more than carry out personnel decisions made by others.

648.    At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Atkinson.

649.    Through AIGH and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

650.    On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

651.    By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Atkinson to a hostile work environment on the basis of sex while she was employed by Mount Sinai.

652.    Mount Sinai was placed on actual notice of the discriminatory and hostile environment created and endorsed by Singh and Charney.

653.    Despite this actual notice, Mount Sinai failed to take reasonable corrective measures to stop Singh and Charney from creating and fostering a hostile work environment in AIGH on the basis of sex.

654.    Mount Sinai's actions and inaction constitute deliberate indifference to Atkinson's federal rights, causing her to suffer economic and non-economic damages.

655.    Defendants' hostile and abusive conduct was sufficiently severe and pervasive to alter the terms and conditions of Atkinson's employment with Mount Sinai.

656.    Defendants' hostile and abusive conduct created an environment that a reasonable person would find hostile or abusive, and Atkinson subjectively perceived the workplace environment as hostile and abusive because of her gender.

657.    By their discriminatory and hostile treatment, Defendants treated Atkinson less well than other employees because of her gender.

658.    As a result of Defendants' unlawful actions, Atkinson suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to reduction in compensation, demotion, and constructive discharge.

659.     Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Atkinson's rights.

660.     As a result of Defendants' discriminatory actions, Atkinson has and/or will continue to suffer irreparable injury including, but not limited to: lost earnings, humiliation, mental anguish, insomnia, emotional distress and damage to reputation.

661.     Atkinson requests relief as described in the Prayer for Relief below.

### THIRD CAUSE OF ACTION

**UNLAWFUL SEX DISCRIMINATION–DISPARATE TREATMENT**
**TITLE IX, TITLE VII, NYSHRL and NYCHRL**
**(By Anandaraja Against Singh, Charney, and Mount Sinai)**

662.     Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

663.     At all relevant times, Anandaraja was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

664.     At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

665.     At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Anandaraja's employment and had the power to do more than carry out personnel decisions made by others.

666.     At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions

made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Anandaraja.

667.    Through AIGH and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

668.    On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

669.    By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Anandaraja to discrimination on the basis of sex while she was employed by Mount Sinai.

670.    Mount Sinai was placed on actual notice of the discriminatory and hostile environment created and endorsed by Singh and Charney.

671.    Despite this actual notice, Mount Sinai failed to take reasonable corrective measures to stop Singh and Charney from discriminating against Anandaraja on the basis of sex.

672.    Mount Sinai's actions and inaction constitute deliberate indifference to Anandaraja's federal rights, causing her to suffer economic and non-economic damages.

673.    By their discriminatory and hostile treatment, Defendants treated Anandaraja less well than other employees because of her gender.

674.    As a result of Defendants' unlawful actions, Anandaraja suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to demotion and constructive discharge.

675.    Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Anandaraja's rights.

676.    As a result of Defendants' discriminatory actions, Anandaraja has and/or will continue to suffer irreparable injury including, but not limited to: lost earnings, humiliation, mental anguish, stress, anxiety, depression, insomnia, emotional distress and damage to reputation. As a result of those actions and consequent harms, Anandaraja has suffered such damages in an amount to be proved at trial.

677.    Anandaraja requests relief as described in the Prayer for Relief below.

## FOURTH CAUSE OF ACTION

**UNLAWFUL SEX DISCRIMINATION–HOSTILE WORK ENVIRONMENT**
**TITLE IX, TITLE VII, NYSHRL and NYCHRL**
**(By Anandaraja Against Singh, Charney and Mount Sinai)**

678.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

679.    At all relevant times, Anandaraja was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

680.    At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

681.    At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Anandaraja's employment and had the power to do more than carry out personnel decisions made by others.

682.    At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions

made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Anandaraja.

683.    Through AIGH and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

684.    On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

685.    By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Anandaraja to a hostile work environment on the basis of sex while she was employed by Mount Sinai.

686.    Mount Sinai was placed on actual notice of the discriminatory and hostile environment created and endorsed by Singh and Charney.

687.    Despite this actual notice, Mount Sinai failed to take reasonable corrective measures to stop Singh and Charney from creating and fostering a hostile work environment in AIGH on the basis of sex.

688.    Mount Sinai's actions and inaction constitute deliberate indifference to Anandaraja's federal rights, causing her to suffer economic and non-economic damages.

689.    Defendants' hostile and abusive conduct was sufficiently severe and pervasive to alter the terms and conditions of Anandaraja's employment with Mount Sinai.

690.    Defendants' hostile and abusive conduct created an environment that a reasonable person would find hostile or abusive, and Anandaraja subjectively perceived the workplace environment as hostile and abusive because of her gender.

691.    By their discriminatory and hostile treatment, Defendants treated Anandaraja less well than other employees because of her gender.

692.    As a result of Defendants' unlawful actions, Anandaraja suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to demotion and constructive discharge.

693.    Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Anandaraja's rights.

694.    As a result of Defendants' discriminatory actions, Anandaraja has and/or will continue to suffer irreparable injury including, but not limited to: lost earnings, humiliation, mental anguish, stress, anxiety, depression, insomnia, emotional distress and damage to reputation.  As a result of those actions and consequent harms, Anandaraja has suffered such damages in an amount to be proved at trial.

695.    Anandaraja requests relief as described in the Prayer for Relief below.

### FIFTH CAUSE OF ACTION

**UNLAWFUL SEX DISCRIMINATION–DISPARATE TREATMENT**
**TITLE IX, TITLE VII, NYSHRL and NYCHRL**
**(By Safo Against All Defendants)**

696.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

697.    At all relevant times, Safo was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

698.     At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

699.     At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Safo's employment and had the power to do more than carry out personnel decisions made by others.

700.     At all relevant times, Berman was an employee or agent of Mount Sinai who aided, abetted, incited, compelled, or coerced discriminatory acts against Safo.

701.     At all relevant times, Silva was an employee or agent of Mount Sinai who aided, abetted, incited, compelled, or coerced discriminatory acts against Safo.

702.     At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Safo.

703.     Through AIGH and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

704.     On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

705.     By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Safo to discrimination on the basis of sex while she was employed by Mount Sinai.

706.     Mount Sinai was placed on actual notice of the discriminatory and hostile environment created and endorsed by Singh, Berman, Silva, and Charney.

707.    Despite this actual notice, Mount Sinai failed to take reasonable corrective measures to stop Singh and Charney from discriminating against Safo on the basis of sex.

708.    Mount Sinai's actions and inaction constitute deliberate indifference to Safo's federal rights, causing her to suffer economic and non-economic damages.

709.    By their discriminatory and hostile treatment, Defendants treated Safo less well than other employees because of her gender.

710.    As a result of Defendants' unlawful actions, Safo suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to public disparagement, discriminatory job assignments, discrepancies in compensation, and constructive discharge.

711.    Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Safo's rights.

712.    As a result of Defendants' discriminatory actions, Safo has and/or will continue to suffer irreparable injury including: lost earning capacity, out-of-pocket medical expenses, humiliation, mental anguish, physical injuries, stress, anxiety, depression, emotional distress and damage to reputation.  As a result of those actions and consequent harms, Safo has suffered such damages in an amount to be proved at trial.

713.    Safo requests relief as described in the Prayer for Relief below.

## SIXTH CAUSE OF ACTION

**UNLAWFUL SEX DISCRIMINATION–HOSTILE WORK ENVIRONMENT**
**TITLE IX, TITLE VII, NYSHRL and NYCHRL**
**(By Safo Against All Defendants)**

714.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

715.    At all relevant times, Safo was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

716.    At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

717.    At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Safo's employment and had the power to do more than carry out personnel decisions made by others.

718.    At all relevant times, Berman was an employee or agent of Mount Sinai who aided, abetted, incited, compelled, or coerced discriminatory acts against Safo.

719.    At all relevant times, Silva was an employee or agent of Mount Sinai who aided, abetted, incited, compelled, or coerced discriminatory acts against Safo.

720.    At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Safo.

721.    Through AIGH and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

722.    On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

723.    By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Safo to a hostile work environment on the basis of sex while she was employed by Mount Sinai.

724.    Mount Sinai was placed on actual notice of the discriminatory and hostile environment created and endorsed by Singh, Berman, Silva, and Charney.

725.    Despite this actual notice, Mount Sinai failed to take reasonable corrective measures to stop Singh, Berman, Silva, and Charney from creating and fostering a hostile work environment in AIGH on the basis of sex.

726.    Mount Sinai's actions and inaction constitute deliberate indifference to Safo's federal rights, causing her to suffer economic and non-economic damages.

727.    Defendants' hostile and abusive conduct was sufficiently severe and pervasive to alter the terms and conditions of Safo's employment with Mount Sinai.

728.    Defendants' hostile and abusive conduct created an environment that a reasonable person would find hostile or abusive, and Safo subjectively perceived the workplace environment as hostile and abusive because of her gender.

729.    By their discriminatory and hostile treatment, Defendants treated Safo less well than other employees because of her gender.

730.     As a result of Defendants' unlawful actions, Safo suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to public disparagement, discriminatory job assignments, discrepancies in compensation and constructive discharge.

731.     Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Safo's rights.

732.     As a result of Defendants' discriminatory actions, Safo has and/or will continue to suffer irreparable injury including: lost earning capacity, out-of-pocket medical expenses, humiliation, mental anguish, physical injuries, stress, anxiety and depression.  As a result of those actions and consequent harms, Safo has suffered such damages in an amount to be proved at trial.

733.     Safo requests relief as described in the Prayer for Relief below.

### SEVENTH CAUSE OF ACTION

**UNLAWFUL SEX DISCRIMINATION–DISPARATE TREATMENT
TITLE IX, TITLE VII, NYSHRL and NYCHRL
(By Caliendo Against Singh, Charney, Berman and Mount Sinai)**

734.     Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

735.     At all relevant times, Caliendo was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

736.     At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

737.   At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Caliendo's employment and had the power to do more than carry out personnel decisions made by others.

738.   At all relevant times, Berman was an employee or agent of Mount Sinai who aided, abetted, incited, compelled, or coerced discriminatory acts against Caliendo.

739.   At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Caliendo.

740.   Through AIGH and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

741.   On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

742.   By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Caliendo to discrimination on the basis of sex while she was employed by Mount Sinai.

743.   Mount Sinai was placed on actual notice of the discriminatory and hostile environment created and endorsed by Singh, Berman, and Charney.

744.   Despite this actual notice, Mount Sinai failed to take reasonable corrective measures to stop Singh and Charney from discriminating against Caliendo on the basis of sex.

745.   Mount Sinai's actions and inaction constitute deliberate indifference to Caliendo's federal rights, causing her to suffer economic and non-economic damages.

746.    By their discriminatory and hostile treatment, Defendants treated Caliendo less well than other employees because of her gender.

747.    As a result of Defendants' unlawful actions, Caliendo suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to unlawful termination.

748.    Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Caliendo's rights.

749.    As a result of Defendants' discriminatory actions, Caliendo has and/or will continue to suffer irreparable injury including: lost earnings, humiliation, mental anguish, stress, anxiety, emotional distress and physical injuries.   As a result of those actions and consequent harms, Caliendo has suffered such damages in an amount to be proved at trial.

750.    Caliendo requests relief as described in the Prayer for Relief below.


## EIGHTH CAUSE OF ACTION

**UNLAWFUL SEX DISCRIMINATION–HOSTILE WORK ENVIRONMENT
TITLE IX, TITLE VII, NYSHRL and NYCHRL
(By Caliendo Against Singh, Charney, Berman and Mount Sinai)**


751.   Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

752.    At all relevant times, Caliendo was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

753.    At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

754.    At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Caliendo's employment and had the power to do more than carry out personnel decisions made by others.

755.    At all relevant times, Berman was an employee or agent of Mount Sinai who aided, abetted, incited, compelled, or coerced discriminatory acts against Caliendo.

756.    At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Caliendo.

757.    Through AIGH and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

758.    On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

759.    By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Caliendo to a hostile work environment on the basis of sex while she was employed by Mount Sinai.

760.    Mount Sinai was placed on actual notice of the discriminatory and hostile environment created and endorsed by Singh, Berman, and Charney.

761.    Despite this actual notice, Mount Sinai failed to take reasonable corrective measures to stop Singh, Berman, and Charney from creating and fostering a hostile work environment in AIGH on the basis of sex.

762.    Mount Sinai's actions and inaction constitute deliberate indifference to Caliendo's federal rights, causing her to suffer economic and non-economic damages.

763.    Defendants' hostile and abusive conduct was sufficiently severe and pervasive to alter the terms and conditions of Caliendo's employment with Mount Sinai.

764.    Defendants' hostile and abusive conduct created an environment that a reasonable person would find hostile or abusive, and Caliendo subjectively perceived the workplace environment as hostile and abusive because of her gender;

765.    By their discriminatory and hostile treatment, Defendants treated Caliendo less well than other employees because of her gender.

766.    As a result of Defendants' unlawful actions, Caliendo suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to unlawful termination.

767.    Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Caliendo's rights.

768.    As a result of Defendants' discriminatory actions, Caliendo has and/or will continue to suffer irreparable injury including: lost earnings, humiliation, mental anguish, stress, anxiety, emotional distress and physical injuries.  As a result of those actions and consequent harms, Caliendo has suffered such damages in an amount to be proved at trial.

769.    Caliendo requests relief as described in the Prayer for Relief below.

## NINTH CAUSE OF ACTION

### UNLAWFUL SEX DISCRIMINATION–DISPARATE TREATMENT
### TITLE IX, TITLE VII, NYSHRL and NYCHRL
### (By Llames Against All Defendants)

770.   Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

771.   At all relevant times, Llames was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

772.   At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

773.   At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Llames' employment and had the power to do more than carry out personnel decisions made by others.

774.   At all relevant times, Berman was an employee or agent of Mount Sinai who aided, abetted, incited, compelled, or coerced discriminatory acts against Llames.

775.   At all relevant times, Silva was an employee or agent of Mount Sinai who aided, abetted, incited, compelled, or coerced discriminatory acts against Llames.

776.   At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Llames.

777.     Through AIGH and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

778.     On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

779.     By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Llames to discrimination on the basis of sex while she was employed by Mount Sinai.

780.     Mount Sinai was placed on actual notice of the discriminatory and hostile environment created and endorsed by Singh, Berman, Silva and Charney.

781.     Despite this actual notice, Mount Sinai failed to take reasonable corrective measures to stop Singh, Berman, Silva and Charney from discriminating against Llames on the basis of sex.

782.     Mount Sinai's actions and inaction constitute deliberate indifference to Llames' federal rights, causing her to suffer economic and non-economic damages.

783.     By their discriminatory and hostile treatment, Defendants treated Llames less well than other employees because of her gender.

784.     As a result of Defendants' unlawful actions, Llames suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to constructive discharge.

785.     Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Llames' rights.

786.    As a result of Defendants' discriminatory actions, Llames has and/or will continue to suffer irreparable injury including: humiliation, mental anguish, stress, emotional distress and damage to reputation.  As a result of those actions and consequent harms, Llames has suffered such damages in an amount to be proved at trial.

787.    Llames requests relief as described in the Prayer for Relief below.

## TENTH CAUSE OF ACTION

### UNLAWFUL SEX DISCRIMINATION–HOSTILE WORK ENVIRONMENT
### TITLE IX, TITLE VII, NYSHRL and NYCHRL
### (By Llames Against All Defendants)

788.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

789.    At all relevant times, Llames was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

790.    At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

791.    At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Llames' employment and had the power to do more than carry out personnel decisions made by others.

792.    At all relevant times, Berman was an employee or agent of Mount Sinai who aided, abetted, incited, compelled, or coerced discriminatory acts against Llames.

793.   At all relevant times, Silva was an employee or agent of Mount Sinai who aided, abetted, incited, compelled, or coerced discriminatory acts against Llames.

794.   At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Llames.

795.   Through AIGH and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

796.   On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

797.   By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Llames to a hostile work environment on the basis of sex while she was employed by Mount Sinai.

798.   Mount Sinai was placed on actual notice of the discriminatory and hostile environment created and endorsed by Singh, Berman, Silva and Charney.

799.   Despite this actual notice, Mount Sinai failed to take reasonable corrective measures to stop Singh, Berman, Silva and Charney from creating and fostering a hostile work environment in AIGH on the basis of sex.

800.   Mount Sinai's actions and inaction constitute deliberate indifference to Llames' federal rights, causing her to suffer economic and non-economic damages.

801.   Defendants' hostile and abusive conduct was sufficiently severe and pervasive to alter the terms and conditions of Llames' employment with Mount Sinai.

802.    Defendants' hostile and abusive conduct created an environment that a reasonable person would find hostile or abusive, and Llames subjectively perceived the workplace environment as hostile and abusive because of her gender.

803.    By their discriminatory and hostile treatment, Defendants treated Llames less well than other employees because of her gender.

804.    As a result of Defendants' unlawful actions, Llames suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to constructive discharge.

805.    Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Llames' rights.

806.    As a result of Defendants' discriminatory actions, Llames has and/or will continue to suffer irreparable injury including: humiliation, mental anguish, stress, emotional distress and damage to reputation.  As a result of those actions and consequent harms, Llames has suffered such damages in an amount to be proved at trial.

807.    Llames requests relief as described in the Prayer for Relief below.

### ELEVENTH CAUSE OF ACTION

**UNLAWFUL SEX DISCRIMINATION–DISPARATE TREATMENT**
**TITLE IX, TITLE VII, NYSHRL and NYCHRL**
**(By Misiti Against Singh, Charney and Mount Sinai)**

808.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

809.    At all relevant times, Misiti was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

810.    At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

811.    At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Misiti's employment and had the power to do more than carry out personnel decisions made by others.

812.    At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Misiti.

813.    Through AIGH and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

814.    On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

815.    By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Misiti to discrimination on the basis of sex while she was employed by Mount Sinai.

816.    Mount Sinai was placed on actual notice of the discriminatory and hostile environment created and endorsed by Singh and Charney.

817.    Despite this actual notice, Mount Sinai failed to take reasonable corrective measures to stop Singh and Charney from discriminating against Misiti on the basis of sex.

818.    Mount Sinai's actions and inaction constitute deliberate indifference to Misiti's federal rights, causing her to suffer economic and non-economic damages.

819.    By their discriminatory and hostile treatment, Defendants treated Misiti less well than other employees because of her gender.

820.    As a result of Defendants' unlawful actions, Misiti suffered one or more adverse employment actions that materially changed the terms and conditions of her employment, including but not limited to disparate job assignments, public disparagement, and denial of compensation.

821.    Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Misiti's rights.

822.    As a result of Defendants' discriminatory actions, Misiti has and/or will continue to suffer irreparable injury including: losses in past and future compensation and earning capacity, out-of-pocket medical expenses, humiliation, mental anguish, stress, anxiety, depression, insomnia, stomach and other physical injuries, emotional distress and damage to reputation.  As a result of those actions and consequent harms, Misiti has suffered such damages in an amount to be proved at trial.

823.    Misiti requests relief as described in the Prayer for Relief below.

## TWELFTH CAUSE OF ACTION

**UNLAWFUL SEX DISCRIMINATION–HOSTILE WORK ENVIRONMENT**
**TITLE IX, TITLE VII, NYSHRL and NYCHRL**
**(By Misiti Against Singh, Charney and Mount Sinai)**

824.   Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

825.   At all relevant times, Misiti was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

826.   At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

827.   At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Misiti's employment and had the power to do more than carry out personnel decisions made by others.

828.   At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Misiti.

829.   Through AIGH and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

830.   On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

831.   By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Misiti to a hostile work environment on the basis of sex while she was employed by Mount Sinai.

832.   Mount Sinai was placed on actual notice of the discriminatory and hostile environment created and endorsed by Singh and Charney.

833.   Despite this actual notice, Mount Sinai failed to take reasonable corrective measures to stop Singh and Charney from creating and fostering a hostile work environment in AIGH on the basis of sex.

834.   Mount Sinai's actions and inaction constitute deliberate indifference to Misiti's federal rights, causing her to suffer economic and non-economic damages.

835.   Defendants' hostile and abusive conduct was sufficiently severe and pervasive to alter the terms and conditions of Misiti's employment with Mount Sinai.

836.   Defendants' hostile and abusive conduct created an environment that a reasonable person would find hostile or abusive, and Misiti subjectively perceived the workplace environment as hostile and abusive because of her gender.

837.   By their discriminatory and hostile treatment, Defendants treated Misiti less well than other employees because of her gender.

838.   As a result of Defendants' unlawful actions, Misiti suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to disparate job assignments, public disparagement, and denial of compensation.

839.   Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Misiti's rights.

840.    As a result of Defendants' discriminatory actions, Misiti has and/or will continue to suffer irreparable injury including: losses in past and future compensation and earning capacity, out-of-pocket medical expenses, humiliation, mental anguish, stress, anxiety, depression, insomnia, stomach and other physical injuries, emotional distress and damage to reputation.  As a result of those actions and consequent harms, Misiti has suffered such damages in an amount to be proved at trial.

841.    Misiti requests relief as described in the Prayer for Relief below.

## THIRTEENTH CAUSE OF ACTION

### RETALIATION–TITLE IX, TITLE VII, NYSHRL and NYCHRL
### (By Misiti Against Singh, Charney and Mount Sinai)

842.   Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

843.   At all relevant times, Misiti was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

844.   At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

845.   Through the Arnhold Institute of Global Health ("AIGH") and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

846.   On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

847.   At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Misiti's employment and had the power to do more than carry out personnel decisions made by others.

848.   At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others.

849.    On May 16, 2018, Misiti submitted an anonymous statement about her concerns with Singh to Mount Sinai as part of its larger investigation and subsequently met with Mount Sinai's investigators for over three hours.  Misiti's complaint and participation in Mount Sinai's investigation constitutes a protected activity under Title IX, Title VII, the NYSHRL, and the NYCHRL.

850.    As a direct result of and in retaliation for her protected activities, Singh increased Misiti's workload without increasing her compensation while downgrading her job description. When Misiti asked Singh for a pay raise, Singh fabricated reasons to deny her request.  Singh's actions, among others, constitute adverse actions in retaliation for Misiti's participation in the Mount Sinai investigation.

851.    Defendants' adverse actions against Misiti could well dissuade a reasonable employee from making or supporting a charge of discrimination.

852.    As a result of Defendants' discriminatory actions, Misiti has and/or will continue to suffer irreparable injury including: losses in past and future compensation and earning capacity, out-of-pocket medical expenses, humiliation, mental anguish, stress, anxiety, depression, insomnia, stomach and other physical injuries, emotional distress and damage to reputation.  As a result of those actions and consequent harms, Misiti has suffered such damages in an amount to be proved at trial.

853.    Misiti requests relief as described in the Prayer for Relief below.

### FOURTEENTH CAUSE OF ACTION

**UNLAWFUL SEX DISCRIMINATION–DISPARATE TREATMENT**
**TITLE IX, TITLE VII, NYSHRL and NYCHRL**
**(By Bruzelius Against Singh, Charney and Mount Sinai)**

854.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

855.    At all relevant times, Bruzelius was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

856.    At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

857.    At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Bruzelius' employment and had the power to do more than carry out personnel decisions made by others.

858.    At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Bruzelius.

859.    Through AIGH and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

860.    On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

861.    By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Bruzelius to discrimination on the basis of sex while she was employed by Mount Sinai.

862.    Mount Sinai was placed on actual notice of the discriminatory and hostile environment created and endorsed by Singh and Charney.

863.    Despite this actual notice, Mount Sinai failed to take reasonable corrective measures to stop Singh and Charney from discriminating against Bruzelius on the basis of sex.

864.    Mount Sinai's actions and inaction constitute deliberate indifference to Bruzelius' federal rights, causing her to suffer economic and non-economic damages.

865.    By their discriminatory and hostile treatment, Defendants treated Bruzelius less well than other employees because of her gender.

866.    As a result of Defendants' unlawful actions, Bruzelius suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to disparate pay and demotion.

867.    Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Bruzelius' rights.

868.    As a result of Defendants' discriminatory actions, Bruzelius has and/or will continue to suffer irreparable injury including: humiliation, mental anguish, stress, insomnia, and emotional distress.  As a result of those actions and consequent harms, Bruzelius has suffered such damages in an amount to be proved at trial.

869.    Bruzelius requests relief as described in the Prayer for Relief below.

**FIFTEENTH CAUSE OF ACTION**

**UNLAWFUL SEX DISCRIMINATION–HOSTILE WORK ENVIRONMENT**
**TITLE IX, TITLE VII, NYSHRL and NYCHRL**
**(By Bruzelius Against Singh, Charney and Mount Sinai)**

870.   Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

871.   At all relevant times, Bruzelius was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

872.   At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

873.   At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Bruzelius' employment and had the power to do more than carry out personnel decisions made by others.

874.   At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Bruzelius.

875.   Through AIGH and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

876.   On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

877.    By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Bruzelius to a hostile work environment on the basis of sex while she was employed by Mount Sinai.

878.    Mount Sinai was placed on actual notice of the discriminatory and hostile environment created and endorsed by Singh and Charney.

879.    Despite this actual notice, Mount Sinai failed to take reasonable corrective measures to stop Singh and Charney from creating and fostering a hostile work environment in AIGH on the basis of sex.

880.    Mount Sinai's actions and inaction constitute deliberate indifference to Bruzelius' federal rights, causing her to suffer economic and non-economic damages.

881.    Defendants' hostile and abusive conduct was sufficiently severe and pervasive to alter the terms and conditions of Bruzelius' employment with Mount Sinai.

882.    Defendants' hostile and abusive conduct created an environment that a reasonable person would find hostile or abusive, and Bruzelius subjectively perceived the workplace environment as hostile and abusive because of her gender.

883.    By their discriminatory and hostile treatment, Defendants treated Bruzelius less well than other employees because of her gender.

884.    As a result of Defendants' unlawful actions, Bruzelius suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to disparate pay and demotion.

885.    Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Bruzelius' rights.

886.     As a result of Defendants' discriminatory actions, Bruzelius has and/or will continue to suffer irreparable injury including: humiliation, mental anguish, stress, insomnia, and emotional distress.  As a result of those actions and consequent harms, Bruzelius has suffered such damages in an amount to be proved at trial.

887.     Bruzelius requests relief as described in the Prayer for Relief below.

## SIXTEENTH CAUSE OF ACTION

### RETALIATION–TITLE IX, TITLE VII, NYSHRL and NYCHRL
### (By Bruzelius Against Singh, Charney and Mount Sinai)

888.     Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

889.     At all relevant times, Bruzelius was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

890.     At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

891.     Through the Arnhold Institute of Global Health ("AIGH") and the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

892.     On information and belief, Mount Sinai receives Federal financial assistance from the United States government for educational purposes.

893.   At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Bruzelius' employment and had the power to do more than carry out personnel decisions made by others.

894.   At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others.

895.   In 2018, Bruzelius filed a formal complaint against Singh and participated in Mount Sinai's investigation into the discriminatory environment he created and fostered in AIGH. Bruzelius' complaint and participation in the investigation constitute protected activities under Title IX, Title VII, the NYSHRL, and the NYCHRL.

896.   As a direct result of and in retaliation for her protected activities, Singh increased his hostility toward Bruzelius, treating her more harshly than he had prior to her complaint and, ultimately, demoting her by directing her to report to Weisman, formerly an equal.

897.   Defendants' adverse actions against Bruzelius could well dissuade a reasonable employee from making or supporting a charge of discrimination.

898.   As a result of Defendants' discriminatory actions, Bruzelius has and/or will continue to suffer irreparable injury including: humiliation, mental anguish, stress, insomnia, and emotional distress.  As a result of those actions and consequent harms, Bruzelius has suffered such damages in an amount to be proved at trial.

899.   Bruzelius requests relief as described in the Prayer for Relief below.

## SEVENTEENTH CAUSE OF ACTION

**UNLAWFUL AGE DISCRIMINATION–DISPARATE TREATMENT**
**ADEA, NYSHRL and NYCHRL**
**(By Atkinson Against Singh, Charney and Mount Sinai)**

900.   Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

901.   At all relevant times, Atkinson was an employee of Mount Sinai over the age of 40 whose education, background, experience, and established employment history made her exceptionally qualified for her position.

902.   At all relevant times, Mount Sinai was an employer within the meaning of the ADEA, 29 U.S.C. § 630(b), NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

903.   At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Atkinson's employment and had the power to do more than carry out personnel decisions made by others.

904.   At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Atkinson.

905.   By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Atkinson to discrimination on the basis of age while she was employed by Mount Sinai.

906.   By their discriminatory and hostile treatment, Defendants treated Atkinson less well than other employees because of her age.

907.     Mount Sinai knew or should have known of Atkinson's discriminatory treatment in comparison to younger employees but failed to take reasonable remedial actions to end the discriminatory treatment.

908.     As a result of Defendants' unlawful actions, Atkinson suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to reduction in compensation, demotion, and constructive discharge.

909.     Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Atkinson's rights.

910.     As a result of Defendants' discriminatory actions, Atkinson has and/or will continue to suffer irreparable injury including, but not limited to: lost earnings, humiliation, mental anguish, insomnia, emotional distress and damage to reputation.

911.     Atkinson requests relief as described in the Prayer for Relief below.


## EIGHTEENTH CAUSE OF ACTION

**UNLAWFUL AGE DISCRIMINATION–HOSTILE WORK ENVIRONMENT
ADEA, NYSHRL and NYCHRL
(By Atkinson Against Singh, Charney and Mount Sinai)**


912.     Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

913.     At all relevant times, Atkinson was an employee of Mount Sinai over the age of 40 whose education, background, experience, and established employment history made her exceptionally qualified for her position.

914.    At all relevant times, Mount Sinai was an employer within the meaning of the ADEA, 29 U.S.C. § 630(b), NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

915.    At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Atkinson's employment and had the power to do more than carry out personnel decisions made by others.

916.    At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Atkinson.

917.    By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Atkinson to a hostile work environment on the basis of age while she was employed by Mount Sinai.

918.    Defendants' hostile and abusive conduct was sufficiently severe and pervasive to alter the terms and conditions of Atkinson's employment with Mount Sinai.

919.    Defendants' hostile and abusive conduct created an environment that a reasonable person would find hostile or abusive, and Atkinson subjectively perceived the workplace environment as hostile and abusive because of her age.

920.    By their discriminatory and hostile treatment, Defendants treated Atkinson less well than other employees because of her age.

921.    As a result of Defendants' unlawful actions, Atkinson suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to reduction in compensation, demotion, and constructive discharge.

922.    Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Atkinson's rights.

923.    As a result of Defendants' discriminatory actions, Atkinson has and/or will continue to suffer irreparable injury including, but not limited to: lost earnings, humiliation, mental anguish, insomnia, emotional distress and damage to reputation.

924.    Atkinson requests relief as described in the Prayer for Relief below.


### NINETEENTH CAUSE OF ACTION

**UNLAWFUL AGE DISCRIMINATION–DISPARATE TREATMENT**
**ADEA, NYSHRL and NYCHRL**
**(By Anandaraja Against Singh, Charney and Mount Sinai)**

925.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

926.    At all relevant times, Anandaraja was an employee over the age of 40 of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

927.    At all relevant times, Mount Sinai was an employer within the meaning of the ADEA, 29 U.S.C. § 630(b), NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

928.    At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Anandaraja's employment and had the power to do more than carry out personnel decisions made by others.

929.    At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions

made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Anandaraja.

930.    By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Anandaraja to discrimination on the basis of age while she was employed by Mount Sinai.

931.    By their discriminatory and hostile treatment, Defendants treated Anandaraja less well than other employees because of her age.

932.    Mount Sinai knew or should have known of Anandaraja's discriminatory treatment in comparison to younger employees but failed to take reasonable remedial actions to end the discriminatory treatment.

933.    As a result of Defendants' unlawful actions, Anandaraja suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to demotion and constructive discharge.

934.    Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Anandaraja's rights.

935.    As a result of Defendants' discriminatory actions, Anandaraja has and/or will continue to suffer irreparable injury including, but not limited to: lost earnings, humiliation, mental anguish, stress, anxiety, depression, insomnia, emotional distress and damage to reputation. As a result of those actions and consequent harms, Anandaraja has suffered such damages in an amount to be proved at trial.

936.    Anandaraja requests relief as described in the Prayer for Relief below.

## TWENTIETH CAUSE OF ACTION

**UNLAWFUL AGE DISCRIMINATION–HOSTILE WORK ENVIRONMENT
ADEA, NYSHRL and NYCHRL
(By Anandaraja Against Singh, Charney and Mount Sinai)**

937.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

938.    At all relevant times, Anandaraja was an employee of Mount Sinai over the age of 40 whose education, background, experience, and established employment history made her exceptionally qualified for her position.

939.    At all relevant times, Mount Sinai was an employer within the meaning of the ADEA, 29 U.S.C. § 630(b), NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

940.    At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Anandaraja's employment and had the power to do more than carry out personnel decisions made by others.

941.    At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Anandaraja.

942.    By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Anandaraja to a hostile work environment on the basis of age while she was employed by Mount Sinai.

943.    Defendants' hostile and abusive conduct was sufficiently severe and pervasive to alter the terms and conditions of Anandaraja's employment with Mount Sinai.

944.     Defendants' hostile and abusive conduct created an environment that a reasonable person would find hostile or abusive, and Anandaraja subjectively perceived the workplace environment as hostile and abusive because of her age.

945.     By their discriminatory and hostile treatment, Defendants treated Anandaraja less well than other employees because of her age.

946.     As a result of Defendants' unlawful actions, Anandaraja suffered one or more adverse employment action that materially changed the terms and conditions of her employment, including but not limited to demotion and constructive discharge.

947.     Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Anandaraja's rights.

948.     As a result of Defendants' discriminatory actions, Anandaraja has and/or will continue to suffer irreparable injury including, but not limited to: lost earnings, humiliation, mental anguish, stress, anxiety, depression, insomnia, emotional distress and damage to reputation.  As a result of those actions and consequent harms, Anandaraja has suffered such damages in an amount to be proved at trial.

949.     Anandaraja requests relief as described in the Prayer for Relief below.


**TWENTY-FIRST CAUSE OF ACTION**

**UNLAWFUL RACE, RELIGIOUS, AND NATIONAL ORIGIN DISCRIMINATION–
HOSTILE WORK ENVIRONMENT
TITLE VII, NYSHRL and NYCHRL
(By Khan Against Singh, Silva, Charney and Mount Sinai)**


950.     Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

951.    Khan is from Pakistan, a South Asian and a Muslim.  At all relevant times, he was an employee of Mount Sinai whose education, background, experience, and established employment history made him well qualified for his position.

952.    At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

953.    At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Khan's employment and had the power to do more than carry out personnel decisions made by others.

954.    At all relevant times, Silva was an employee or agent of Mount Sinai who aided, abetted, incited, compelled, or coerced discriminatory acts against Khan.

955.    At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced discriminatory acts against Khan.

956.    By the acts and practices described above and herein, Defendants, individually and collectively, unlawfully subjected Khan to a hostile work environment on the basis of race, religion, and national origin while he was employed by Mount Sinai.

957.    Defendants' hostile and abusive conduct was sufficiently severe and pervasive to alter the terms and conditions of Khan's employment with Mount Sinai.

958.    Defendants' hostile and abusive conduct created an environment that a reasonable person would find hostile or abusive, and Khan subjectively perceived the workplace environment as hostile and abusive because of his race, religion, and national origin.

959. By their discriminatory and hostile treatment, Defendants treated Khan less well than other employees because of his race, religion, and national origin.

960. Defendants' unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Khan's rights.

961. As a result of Defendants' discriminatory actions, Khan has and/or will continue to suffer irreparable injury including: substantial weight gain, stomach pains, and other physical injuries, humiliation, mental anguish, stress, and emotional distress.  As a result of those actions and consequent harms, Khan has suffered such damages in an amount to be proved at trial.

962. Khan requests relief as described in the Prayer for Relief below.

## TWENTY-SECOND CAUSE OF ACTION

### RETALIATION–TITLE VII, NYSHRL and NYCHRL
### (By Khan Against Singh and Mount Sinai)

963. Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

964. At all relevant times, Khan was an employee of Mount Sinai whose education, background, experience, and established employment history made him exceptionally qualified for her position.

965. At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

966. At all relevant times, Singh was an employee or agent of Mount Sinai who, as Director of AIGH, controlled the terms and conditions of Khan's employment and had the power to do more than carry out personnel decisions made by others.

967.   In or around October 2017, Khan engaged in a protected activity by reporting Silva's racial, religious, and national origin discrimination and harassment to Singh.

968.   As a direct result of and in retaliation for Khan's protected activities, Singh took adverse action against him by intentionally breaching his promise of anonymity in order to intimidate Khan and instill in him a fear of reprisal.

969.   Defendants' adverse actions against Khan could well dissuade a reasonable employee from making or supporting a charge of discrimination.

970.   As a result of Defendants' retaliatory actions, Khan has and/or will continue to suffer irreparable injury including: substantial weight gain, stomach pains, and other physical injuries, humiliation, mental anguish, stress and emotional distress.  As a result of those actions and consequent harms, Khan has suffered such damages in an amount to be proved at trial.

971.   Khan requests relief as described in the Prayer for Relief below.

## TWENTY-THIRD CAUSE OF ACTION

### BREACH OF CONTRACT
### (By Atkinson Against Mount Sinai)

972.   Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

973.   Atkinson was employed by Mount Sinai pursuant to a written employment agreement dated March 27, 2013 (the "Employment Agreement").

974.   The Employment Agreement provided that Atkinson was being appointed for "five years."

975.   The Employment Agreement further provided that, after March 31, 2014, the "terms and conditions" of Atkinson's employment "will be governed by [the Icahn School of

Medicine at Mount Sinai's] policies and procedures, including its Faculty Handbook from time to time in effect," and that her "compensation" "will be determined in accordance with the Faculty Compensation Policy in effect from time to time."

976.    The Faculty Compensation Policy provides that "[t]otal compensation [for faculty members] must be fair market value for the services rendered and must be commercially reasonable."

977.    On June 19, 2015, Singh informed Atkinson that she could remain employed with Mount Sinai only if she accepted a 40% reduction of her salary (from $150,000 per annum to $90,000 per annum) as well as further adjustments, including possible termination after Singh finished his full review of AIGH later that year.

978.    $90,000 per annum was not a "fair market value" for the services Atkinson provided, nor "commercially reasonable" given her skills and expertise.

979.    By requiring Atkinson to accept a salary that did not reflect "fair market value" for the services she provided and that was not "commercially reasonable," Mount Sinai breached the Employment Agreement.

980.    As a result of Mount Sinai's breach, Atkinson was deprived of her full salary of $150,000 from September 2015 onwards.

981.    Further or in the alternative, the Employment Agreement contained an implied covenant of good faith and fair dealing, which prohibited Mount Sinai from engaging in conduct which, although not expressly forbidden by any contractual provision, deprived Atkinson of her right to receive the benefits of the Employment Agreement.

982.    Mount Sinai breached the covenant of good faith and fair dealing by requiring that Atkinson accept radically less attractive terms or else face termination.

983.    As a result of Mount Sinai's breach, Atkinson was deprived of her full salary of $150,000 from September 2015 onwards.

984.    Further or in the alternative, Singh and Mount Sinai made Atkinson's working conditions so intolerable that she was constructively discharged in May 2016, in breach of her Employment Agreement, which provided that her appointment was for five years.

985.    As a result of Mount Sinai's breach, Atkinson was deprived of her salary from May 2016 (when she resigned) to March 2018 (when her initial five-year appointment would have ended).

986.    Atkinson requests relief as described in the Prayer for Relief below.

## TWENTY-FOURTH CAUSE OF ACTION

### UNEQUAL PAY (EQUAL PAY ACT)
### (By Bruzelius Against Mount Sinai)

987.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

988.    29 U.S.C. § 206(d) (the "Equal Pay Act") makes it unlawful for an employer to discriminate against an employee by paying her wages at a rate less than the rate at which it pays wages to employees of the opposite sex for equal work on jobs the performance of which require equal skill, effort, and responsibility, and which are performed under similar working conditions.

989.    Bruzelius, Doupe and Le performed equal work requiring equal skill, effort and responsibility under similar working conditions.

990.    Despite this, Mount Sinai paid Bruzelius significantly less than it paid Doupe and Le, in violation of the Equal Pay Act.

991.    Mount Sinai's violation of the Equal Pay Act was willful.

992.    Bruzelius requests relief as described in the Prayer for Relief below.

## TWENTY-FIFTH CAUSE OF ACTION

### UNEQUAL PAY (N.Y. LABOR LAW § 194)
### (By Bruzelius Against Mount Sinai)

993.    Bruzelius incorporates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

994.    N.Y. Labor Law § 194 makes it unlawful for an employer to discriminate against an employee by paying her wages at a rate less than the rate at which it pays wages to employees of the opposite sex for equal work on jobs the performance of which require equal skill, effort, and responsibility, and which are performed under similar working conditions.

995.    Bruzelius, Doupe and Le performed equal work requiring equal skill, effort and responsibility under similar working conditions.

996.    Despite this, Mount Sinai paid Bruzelius significantly less than it paid Doupe and Le, in violation of N.Y. Labor Law § 194.

997.    Mount Sinai's violation of N.Y. Labor Law § 194 was willful.

998.    Bruzelius requests relief as described in the Prayer for Relief below.

## TWENTY-SIXTH CAUSE OF ACTION

### RETALIATION–NYCHRL
### (By Anandaraja Against Mount Sinai)

999.    Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

1000.   At all relevant times, Anandaraja was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

1001.   At all relevant times, Mount Sinai was an employer within the meaning of the NYCHRL, N.Y.C. Admin. Code § 8-102.

1002.   On April 26, 2019, Anandaraja filed a duly notarized charge of employment discrimination based on sex, age, and retaliation with the EEOC as required by federal law.

1003.   On April 26, 2019, Anandaraja asserted claims in this Court for disparate treatment and hostile work environment on the basis of sex and age in violation of Title IX, the NYSHRL, and the NYCHRL.

1004.   Anandaraja's administrative EEOC charge and federal complaint constitute protected activities under the NYCHRL.

1005.   Shortly after Anandaraja filed her complaints, Defendants took adverse actions against her by ostracizing her and excluding her from continuing involvement in the Lactation Room Taskforce, which Anandaraja had previously championed.

1006.   Defendants' adverse actions against Anandaraja are related to and grow out of the subject matter of her discrimination complaints and could well dissuade a reasonable employee from making or supporting a charge of discrimination.

1007.   But for her participation in these protected activities, Defendants would not have taken adverse action against Anandaraja.

1008.   As a result of Defendants' retaliatory actions, Anandaraja has and/or will continue to suffer irreparable injury including, but not limited to:  humiliation, stress, and anxiety.  As a

result of those actions and consequent harms, Anandaraja has suffered such damages in an amount to be proved at trial.

1009.   Anandaraja requests relief as described in the Prayer for Relief below.

## TWENTY-SEVENTH CAUSE OF ACTION

### RETALIATION–TITLE IX, TITLE VII, NYSHRL and NYCHRL
(By Beddoe Against Charney and Mount Sinai)

1010. Plaintiffs incorporate and reallege each and every allegation set forth in the preceding paragraphs as if set forth here in full.

1011.   At all relevant times, Beddoe was a female employee of Mount Sinai whose education, background, experience, and established employment history made her exceptionally qualified for her position.

1012.   At all relevant times, Mount Sinai was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b), the NYSHRL, N.Y. Exec. Law § 292(5), and the NYCHRL, N.Y.C. Admin. Code § 8-102.

1013.   Through the Icahn School of Medicine, Mount Sinai provides graduate-level medical education and training under an education program or activity within the meaning of 20 U.S.C. §§ 1681 and 1687.

1014.   On information and belief, Mount Sinai receives financial assistance from the United States government for educational purposes.

1015.   At all relevant times, Charney was an employee or agent of Mount Sinai who, as Dean of the Icahn School of Medicine, had the power to do more than carry out personnel decisions made by others and aided, abetted, incited, compelled, or coerced retaliatory acts against Beddoe.

1016.   On numerous occasions during her employment at Mount Sinai, Beddoe voiced opposition to workplace discrimination, most prominently in June 2018 when she confronted Charney about Singh's discrimination against women at AIGH.  The following week, on June 23, Beddoe sent an email to Charney calling for him to take responsibility for the discriminatory environment in AIGH by relieving Singh of his duties as Director.

1017.   Beddoe actively contributed to the investigation leading up to the original Complaint in this matter, served on Defendants on April 26, 2019.  Beddoe's contributions to the allegations set forth in the original Complaint are clear in its language and were repeated in the First Amended Complaint filed on August 6, 2019.

1018.   On or about February 12, 2020, at their first opportunity to do so, Defendants took adverse actions against Beddoe by progressively reducing her annual compensation.

1019.   Beddoe's call for Charney to take remedial action and her contributions to the investigation of the discrimination claims asserted in this matter constitute protected activities under Title IX, Title VII, the NYSHRL, and the NYCHRL.

1020.   Defendants' adverse actions against Beddoe could well dissuade a reasonable employee from making or supporting a charge of discrimination.

1021.   But for her participation in these protected activities, Defendants would not have taken adverse action against Beddoe.

1022.   As a result of Defendants' retaliatory actions, Beddoe has and/or will continue to suffer irreparable injury including, but not limited to: lost earnings, mental anguish, stress, and emotional distress.  As a result of those actions and consequent harms, Beddoe has suffered such damages in an amount to be proved at trial.

1023.   Beddoe requests relief as described in the Prayer for Relief below.

## **DEMAND FOR JURY TRIAL**

1024.   Plaintiffs respectfully demand a trial by jury as to all matters so triable pursuant to Fed. R. Civ. P. 38.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully demand judgment against Defendants Singh, Charney, Silva, Berman and Mount Sinai Health Systems, Inc., awarding:

(a)   Damages in amounts to be established at trial, including without limitation, damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish and physical injuries, compensation for harm to reputation, loss of past, present and future enjoyment of life, and past and future lost earnings and earning capacity, and out-of-pocket expenses, punitive damages and liquidated damages;

(b)   Attorney's fees, costs and expenses authorized by 42 U.S.C. § 1988, 29 U.S.C. § 216, the Equal Pay Act, N.Y. Labor Law § 198.1.1a, the NYSHRL and the NYCHRL;

(c)   Pre- and post-judgment interest; and

(d)   Such other and further relief as the Court may deem just and proper.

\*   \*   \*

Dated: [DRAFT]

                                                    Respectfully submitted,

                                                    BY: [DRAFT]

                                                    John F.O. McAllister
Paul Peter Hughes
McALLISTER OLIVARIUS
MetLife Building
200 Park Avenue, Suite 1700
New York, New York 10166
(212) 433-3456
jmcallister@mcolaw.com
phughes@mcolaw.com
*Attorneys for Plaintiffs*