UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------:

DR. STELLA SAFO, et al.,      : Case No.: 19-cv-3779

            Plaintiffs,   :

    v.                        :

DR. PRABHJOT SINGH, et al., : New York, New York

          Defendants.  : January 3, 2024

----------------------------:

TRANSCRIPT AND STATUS CONFERENCE HEARING

BEFORE THE HONORABLE JENNIFER E. WILLIS

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:      GLENN AGRE BERGMAN & FUENTES LLP
                    BY:  Michael P. Bowen, Esq.
                    1185 Avenue of the Americas
                    22nd Floor
                    New York, NY 10036

For Defendants:     PROSKAUER ROSE LLP (NYC)
                    BY: Joseph Baumgarten, Esq.
                       Edna D. Guerrasio, Esq.
                    11 Times Square
                    New York, NY 10036

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

AMM TRANSCRIPTION SERVICE - 631.334.1445

THE DEPUTY CLERK:  Good morning, Your Honor.  We're here in Dr. Safo, et al. v. Dr. Singh; 19-cv-3779.

We ask that counsel for both parties please rise and state your name for the record, starting with plaintiffs.

MR. BOWEN:  Good morning, everyone.  I'm Mike Bowen, B-O-W-E-N, with the law firm of Glenn Agre Bergman & Fuentes on behalf of the plaintiffs.

THE COURT:  Good morning.

MR. BAUMGARTEN:  Good morning, Your Honor.  Joseph Baumgarten, Proskauer Rose, on behalf of defendants.

MS. GUERRASIO:  Good morning, Your Honor.  Edna Guerrasio of Proskauer Rose on behalf of defendants as well.

THE COURT:  And good morning to you-all as well.  So I know this case has been ongoing for quite some time since 2019, but I believe this is the first time that the parties have appeared before me.  I know there was a prior referral, and Judge Fox did some work on this case, but this is my first time meeting you-all.  I am in receipt of the letter dated December 27th, detailing the current dispute.

I'll turn to you first, plaintiff, for your

AMM TRANSCRIPTION SERVICE - 631.334.1445

position on why you think it's appropriate that you be provided with, essentially, everything in terms of documents and records dealing with this 2018 investigation.

MR. BOWEN:  Thank you, Your Honor.

The position really is that the facts as we know them to be and as have pretty much been conceded by the defendants, the investigation that was conducted in 2018 and the resulting report were not being done in anticipation of a legal dispute; but, in fact, were being done as part of their Title VII program to have antidiscrimination policies and procedures in place.

That's pretty much what happened.  That's what the defendants said initially in their answers when they asserted the defense.  I'm drawing a blank on the name.  I think it's Faragher and Ellerth's defense under the two Supreme Court decisions where they're saying that they had reasonable policies in place which would insulate the employer from responsibility for any discriminatory conduct undertaken by an executive employee.

So the fact of the matter is, not only did they originally assert that, now they've since tried to withdraw that.  But the underlying facts show

that in reality, that's, in fact, what they did.  It wasn't in anticipation of any litigation.  It was part of their procedure, responding to two complaints that were made about this particular defendant, Mr. Singh.  And then they disclosed the -- not just the conclusions or the outcome of that investigation, but also recommendations and methodology that was used as part of that investigation to a lot of people, including the plaintiffs, who eventually became --

THE COURT:  Before we get to your argument on waiver, Counselor, let me just push back a little on your assessment that defendant is essentially acknowledging or admitting that this investigation, essentially, was only about, sort of, an internal, you know, follow-up about what happened when there was this discussion about donations and the like.

My read, at least of the joint letter, and I'm probably anticipating a bit of defense's argument here, but I'd like to hear your response, is that the two things are intertwined, that there was this meeting that had nothing to do with potential litigation, but in the course of that, things were said about Dr. Singh.  And that immediately on the tails of that, I don't know, the

next day, a couple days later, you have these complaints that are being made such that the investigation is about both, right, and the idea that if they're intertwined, they can still claim privilege and work products.

So what is your response to that?

MR. BOWEN:  Well, there's two things.  One is, I don't think the facts, as the defendants have conceded them to be, support that interpretation.  I know that that's what they're arguing, and it may very well be that that's something that we're going to need more discovery on, which kind of bleeds into the second point of the letter, which is the issue of whether a categorized privilege log on this topic is sufficient.

But the other response, and I think the more important one, is if it's a mixed purpose, if there is both a business purpose and a legal purpose, then we're entitled to take discovery on that.  And to the extent that the purpose was serving a business purpose as opposed to a legal purpose that could be potentially privileged, the privilege doesn't attach.  When you have these kind of mixed situations, the privilege is going to be limited by the extent to which it was being used for

a business purpose.

THE COURT:  All right.  You wanted to speak to waiver.

MR. BOWEN:  Well, the issue with waiver is, and I don't think this is really in dispute either, although the parties probably take different approaches to describing what happened, but the report itself was disclosed to the complainants who eventually became plaintiffs in this action.  And the defense has taken the position that they only disclosed the conclusion, and the conclusion being that there was no discriminatory behavior here.

But the reality is, is that there's a lot more that was disclosed.  Methodology was disclosed.  The fact that certain witnesses had given statements as part of the effort by the employer to investigate the allegations were disclosed.  The content of what some of the witnesses was disclosed, the fact that recommendations were being made and what those recommendations were, were also disclosed.

And we got some discovery just last week from the defendants from Mount Sinai that showed that they were also being disclosed to Mr. Singh and his lawyer, because he had a lawyer at the time, and this was sometime in 2018, just shortly after the

report was concluded.  So those e-mails show that they were discussing with Mr. Singh the contents of the report and what recommendations were being made. And then Mr. Singh and his attorney were discussing that with third parties.  Again, not just the conclusion that there was no discriminatory conduct, but the substance of what the report was, what the recommendations were.

And we know from those e-mails, which we just got last week and I saw this morning, that among other people who were in on the substance of the report, were the benefactor of the institute that's at issue here, and other people that Mr. Singh shared the report with.

THE COURT:  I guess I want to sort of pull this apart a bit, because, obviously, as you've already said, defendants are going to argue that their argument is that the results are not what they're saying is privilege, that it is the, sort of, inner workings, the decision-making, the strategy, if you will.

So to the extent that the results, the recommendations, the people who were interviewed in order to generate this report has been disclosed, it sounds like what hasn't been disclosed would be the,

sort of, discussions and the strategy and the things that do seem more like work product and privilege, right.  The idea of a lawyer and the team having some conversation about what should we do, what should be our strategy, how should we approach this?  But the fact of an investigation, the conclusions of the investigation, that's information that they're saying is not privileged.

So this other piece that you don't have that hasn't been disclosed, what is your response that -- I mean, look, when we talk about privilege, it's not something that covers all, often, of something.  As you just said, if there's a mix of business and litigation, you can, sort of, disentangle those and get the business piece but not the other piece.

So to the extent that your request, essentially, I'm not quoting it, but was for everything.  We've already talked about parts that have been disclosed, right, so presumably, you have access to that.

Explain to me why the pieces that you do not have, which, without hearing from defendant, sound maybe like it's strategic.  I, obviously, don't have the report myself to review it.  But why

would that not be, you know, privileged within a larger bucket of information that is not privileged?

MR. BOWEN:  Well, I have two responses again to that.

The first is that we haven't gotten anything from the defendants about their internal communications that led up to the report or any portions of the report at all, including portions of that report that were clearly disclosed and discussed with, not only our clients but also the people who were accused of wrongdoing in the case. And then they also disseminated that onward to others.

So in order for us to really see what has been disclosed and not disclosed, we need from them, at the very least, their internal communications and the portions of the report that even they concede were disclosed to third parties.  That's number one.

Number two, it really just shows that they were using the report, not for legal advice in anticipation of litigation, but they were using the report in exactly the way that the Faragher-Ellerth line of cases suggest is not privileged.  Because if you're using the report to show and to tell people that you have adequate anti-discrimination policies

and procedures in place, that they were acted upon, and that the plaintiffs, to the extent that they didn't get the protection they were entitled to, that was their fault, because this procedure, this mechanism was in place.

And as soon as it was known to the employer, they acted on it in accordance with their procedures, and came to the conclusion that nothing had violated the discrimination laws. And they were telling everybody that. And that's how they were using the report. Well, that means it's not privileged. That means you're not using it in anticipation of litigation. You're using it for a business purpose. There was another e-mail that I just saw this morning that, again, I think, was produced last week or over the holiday, that they were using it to have a press strategy. They were worried that the media would get wind of this, and they were coordinating with Mr. Singh's lawyer about what to say based on the fact that they had this report had been done and that they were exonerated -- or Mr. Singh, in any event, would take the position he was exonerated. And apparently, the employer, Mount Sinai, is taking that position.

So if you're using the report for that kind

of a business purpose, that's not consistent with in anticipation of litigation.  It's not consistent with the level of confidentiality that would have to be accorded very carefully, not just to the methods and methodologies, but to the entire report. Because once you start releasing pieces of it, there's the issue of subject matter waiver, where you're going to end up having no privilege over any part of it.

And that's more critical in this area of the law, where you have a defendant that's saying, we had the policies and procedures in place, we acted on them.  There was nothing here.  So it's the plaintiffs that are out to lunch on this.  The employer didn't do anything wrong, and we can prove it because we have a report exonerating everybody. Well, then we need to see that.  We need to see that in order to determine whether this is a whitewash, or whether they really were armed with and taking in earnest and in good faith the information that was being provided by the complainants at the time.

THE COURT:  What is your response to defendant's argument that you, sort of, haven't demonstrated substantial need for this information, that there's other ways for you to get this

information, specifically depositions of the various people who were interviewed in order to generate the report, plus, I'm sure, other people at the hospital who would know about the results and the like?

MR. BOWEN:  Well --

THE COURT:  And to that let me also add, just so that your response can, sort of, address this as well, their argument that it would be, sort of, time consuming and burdensome and costly to go through, I don't know, what did they say, there was 1000 documents included in this, to sort of parse out, this is business, this is litigation, this is privilege, this is not.  That, sort of, the more proportionate way for you to get this information would be through depositions versus document production.

MR. BOWEN:  Well, to take your second question first, the idea of burden, they haven't made a burden demonstration at all.  I mean, in order to show burden for discovery purposes, they would have to have some kind of statistical analysis, some kind of numbers of the volume of documents that we're talking about here.

I mean, on their own account, they started the investigation in April of 2018, and it was

concluded by June, by the end of June of 2018.  So we're only talking three months, right, April, May, June; three months of time.  And in modern discovery, that can't possibly amount to an undue burden.  And 1000 documents is nothing.  I mean, we deal with that, and computers deal with that in the blink of an eye.  Literally computers do it in a blink of an eye, and human beings can do it in a morning.

So I don't see any burden here.  And I don't think they've met their burden of showing that it's unduly burdened because they haven't provided any statistics, any metrics at all in order to make that determination, because I just don't think that's the case.  I mean, we're all commercial litigators.  We deal with this -- you know, this volume is paltry compared to the normal volume of e-mails and documents that we deal with on a regular basis in commercial matters.

And then on your second question, the question of whether we can't get to the same information, that there's undue hardship, and, therefore, work product materials should be made available to us, I mean, we haven't really made that argument because we don't think the first prong has

been met that it's work product.  But to the extent that the Court entertains the idea that it is, or at least some portion of it is work product, then we would have to make a showing that we can't get to that same information through, basically, repeating the processes that they used in conducting their report.  Whatever 20 people they talked to, we're going to have to go take their depositions.

That would involve some leeway from the Court, given the limitation on depositions and things like that, which we haven't explored.  But if we needed to do that, I don't necessarily disagree with the defendants that we can't replicate their methodology.  At least going around and reinterviewing all of the people who were interviewed in the past and asking them, in addition to the substantive questions we want to ask, what were they asked by the defendants when they were conducting their investigation?  And then that way, we might have the same information that they claim to have at the end of June 2018.

But part of what we're facing in this case, just as a practical matter, is we have an institution, a very well-respected institution in this city, that has said publicly and has said to

its employees, including the complainants, my clients, and including the people who are accused of discriminatory conduct, that they didn't do anything wrong, that they had a procedure in place that worked the way it was supposed to work. And when things came to their attention, they did what they needed to do to determine that nothing had gone wayward here.

And that creates a problem for the plaintiffs because we're faced with rebutting that argument. Even if they're saying they're not going to bring up the 2018 report at trial and they have tried to retract that, they also say that they're going to make the same Faragher-Ellerth defense in part based on things that they claim don't have anything to do with their report.

So, for example, they're going to bring in the evidence that they have policies in place, and they publish those policies to their employees, and they have a method in place. And it's going to leave the impression to the jury, if we don't have that report, that they did have these safeguards in place and that they followed them here, and they came to the conclusion that there was no discrimination.

The only way for us to really defend against that is to have the information that underlies that report and the report itself in order for us to show, from our point of view, that it was a whitewash.

THE COURT:  Thank you.

MR. BOWEN:  Thank you.

THE COURT:  Defendant?

MR. BAUMGARTEN:  Thank you, Your Honor. I'll address these points in turn and, obviously, take your questions as you have them.

There are two principles involved here. One is the attorney-client privilege and the other is the work-product doctrine and protection.  And, obviously, they're distinct.  The report that was made by in-house counsel, Ms. Lowy, whose declaration the Court has was provided to Dr. Charney, who's the Dean of the medical school.  That is subject to both attorney-client privilege and work-product protection.  The report has not been disclosed publicly.  The report has not been shared with others.

THE COURT:  Let me just ask for a clarifying point here.  I take it that the entirety of the report certainly hasn't been shared, but in

the arguments I just heard from plaintiff's counsel, it sounded as if portions of the report may have been shared.  So I just want to know, is that the case or nothing from the report has been shared?

MR. BAUMGARTEN:  The outcome of the report, hardly a surprise, that the result was shared.  It would be shared with Dr. Singh.  It would be shared with the complainants.  I don't see how you could conduct an investigation without sharing the conclusion of the report and the fact that there were recommendations made and what those recommendations were.

But Mr. Bowen, I think, referred to the substance of the report having been shared.  That's not the case that this report was handed over.  The recommendations are out there.  And they know what the recommendations are already, and those were shared.

Sharing the outcome of an investigation does not waive privilege as to the underlying communications that were conducted in connection with the investigation.  We've cited case law to that effect, and I think that case law is applicable here.  So the attorney-client privilege applies. This was not a typical investigation of an HR

complaint.

And if there was a single case that I would refer the Court to, to, sort of, glean some guidance from, it would be the O'Gorman case that was decided, I think, a year or two ago by Judge Liman, who dealt with this in a very common-sense fashion. And Judge Liman noted that, "the immunity covers material produced when apprehension of litigation was reasonable under the circumstances." And then he went on to say, "Even where a business has a policy of conducting investigations of complaints, the circumstances of a particular investigation may indicate that it had a unique purpose related to impending litigation through doing work product protection."

Now, there were particular circumstances there that led Judge Liman to conclude that work product protection applied. And among the things that he noted in his decision was the fact that the complaint there, and there were two investigations, but the latter investigation involved a complaint that had been made by the plaintiff in the case. And Judge Liman noted, well, this isn't a typical HR investigation because the complainant had already been terminated. So it's not as though there was an

HR department that was conducting an investigation in order to remedy an ongoing situation with an existing employee. That's what HR does. When there's a terminated employee who makes a complaint, again, depending on all of the circumstances, there's a reasonable apprehension that there's going to be litigation to follow. And that was true in that case, and that was true in this case as well. And the initial people who made the complaint were Dr. Atkinson, Dr. Anandaraja, and a former employee named Elena Rajona. They were all former employees.

Now, this complaint was made on October -- I'm sorry, on April 27th of 2018, and there's an antecedent to it. Earlier in April, Dr. Singh had met with Dr. Olivarius, who's lead counsel of record in this case. She indicated that she was amenable to considering a fundraising effort in support of his activities at the Arnhold Institute. And then she came to New York ostensibly to discuss what could have been an 80-million euro gift. And by the way, this is laid out in Dr. Olivarius's own affidavit that was submitted in this case.

And in the initial meeting, she had asked Dr. Singh, do you know Holly Atkinson? Because she knew Dr. Atkinson, and Dr. Singh had referred to Dr.

Atkinson, but it had not been a focus of the conversation. And then Dr. Olivarius appears on April 26, and instead of meeting to discuss or to continue discussions about the donation, she drops a bombshell that says there's no donation.

And according to her own affidavit, what she said to Dr. Singh was, I told -- quote -- and I'm quoting from paragraph 17 -- "I told him that I had come originally to progress an 80-million euro gift to AIGH. But from my initial due diligence, I had learned that his track record with women was deeply troubling and that his claims about curing poverty appeared to be inflated to the point of untruthfulness."

So she drops that bombshell on him. He communicates this back to Dr. Charney because he's obviously concerned about this. And Dr. Olivarius is a well-known plaintiff's counsel who handles sex discrimination cases. And the following day, Dr. Atkinson is one of the three employees who meets to advance this complaint.

THE COURT: But doesn't the -- look, the timing certainly, you know, speaks to the idea that these complaints were already, sort of, in the groundwater and sort of percolating up at the point

where Olivarius met with Dr. Singh.  But I guess I'd like to hear you speak more pointedly about this concept of when there is sort of an enmeshment, an intertwining of potential imminent, you know, a reasonable person would have thought litigation was coming, but that there's also sort of a business purpose here.

So imagine a world in which there had been no official complaint that was filed on the 27th.  There's no doubt in my mind, and I'm sure everybody's mind here, that that conversation with Olivarius on the 26th would have prompted some kind of internal something with a business focus, with the idea that there's something happening here that reputationally is harming us.  We need to investigate and figure out what's going on.

And I would ask in your response to also talk about what plaintiff's counsel spoke about, which is the idea that the investigation and ultimately the results of the investigation were also being thought of and used in a, sort of, public relations press strategy idea, right.  This is not something that is totally behind closed doors that no one knows anything about.  Again, it was in the groundwater.  It's already percolating up.  And so

to the extent that defendant was conducting this investigation, using the investigation, talking about the investigation, its results, not just anticipating this lawsuit, but there's already bad blood out there, there's bad press.  We need to, sort of, get ahead of that and we can use this for that.  That's not attorney-client privilege.  I mean, I certainly take the point that there must be something in there that probably is, but the idea that the whole investigation is solely under the bucket of attorney-client privilege when there's this clear business concern, and this press concern I'm hearing about as well.

So can you respond to that?

MR. BAUMGARTEN:  Sure.

First of all, I'm not sure what would have happened if there had been only the Olivarius meeting without the complaint that followed.  But I do know this:  The investigation was about the complaint.  It was not about Olivarius.  It was about the complaint that had been raised by Drs. Atkinson and Anandaraja and Ms. Rajona.  That was what the investigation was about.

THE COURT:  But Olivarius says, I'm hearing that Dr. Singh has a bad -- whatever the language

was -- bad reputation or whatever it is, dealing with women.  So the question isn't is the investigation about Olivarius; it's is there a business component to that?

And the fact that this bad reputation -- whatever language this is -- cost them 80-million euro.  But that's business versus what potentially they'd be facing in terms of a lawsuit.

MR. BAUMGARTEN:  You know, it may be a little bit difficult to segregate things out that can't be easily segregated out.  But when the three employees or former employees, because they were all former employees again, come in and complain about what they said was a hostile work environment, and you know that there's a plaintiff's attorney who has been in the background who knows at least one of them.  You're talking about anticipating litigation. That's the advice I would give any client who came to me in that instance.  And I think any experienced employment lawyer would tell you you're going to get sued, and this is the first step to getting sued, and that everything that follows has to take account of what you need to do in order, at least in the first instance, to ensure that you're going to be able to invoke work product protection and

attorney-client privilege.

By the way, none of this has to do with the report itself. The report itself is a legally-privileged communication about -- it's a privileged communication that conveys legal advice and the analysis behind that legal advice. So I should distinguish the privilege issue from the work product issue because they're conceptually distinct, although there is a lot of overlap in a case like this because of that.

As far as the press is concerned, Your Honor's second question, I'm not quite sure what Mr. Bowen was referring to. There was a lot of press associated with this lawsuit after it was filed. All of that press was initiated by plaintiff's counsel. And I'm not sure, and it wasn't addressed in plaintiff's correspondence, so I'm not sure what is being referred to here. Certainly Sinai has taken the position that it takes complaints seriously, and it took this one seriously. That's not a waiver of privilege, and it's not a waiver of work product protection either.

If there's any doubt about it, I would refer the Court to the Second Circuit decision in the Von Bulow case, which dealt with extrajudicial

AMM TRANSCRIPTION SERVICE - 631.334.1445

disclosures. And that was the case in which Professor Dershowitz had written a book about the Von Bulow case. And he had -- with his client's acquiescence, he had disclosed certain aspects of certain conversations. And the Second Circuit said, whatever you've disclosed publicly, you waive privilege as to that disclosure.

THE COURT: Let me ask you, in keeping with that logic, there had been some discussion by plaintiff's counsel about e-mail communications, back and forth about press strategy, about -- I don't want to say report, but at the very least, you acknowledge the results and the recommendations, sort of, being discussed with third parties and the like.

Has anything that was said to third parties about this report -- I heard plaintiff's counsel talking about methodology was also, perhaps, discussed with third parties. Certainly the results we've already talked about, the recommendations we've already talked about. Has all of that been given to plaintiff's counsel? Because plaintiff's counsel earlier said, I think the language was that they'd been given -- received nothing from defendant about the report.

Now, again, I didn't sort of drill down on exactly what does that mean.  Certainly we know the full report hasn't been provided.  But to the extent that if not the full report, something about it was certainly discussed with third parties, which if any of that would have had privilege, it's obviously no longer there because it's being discussed and provided.  I say provided, whatever it is, whatever snippets, summary, whatever, hot takes are being shared with third parties, has that been provided by you to plaintiff's counsel?

MR. BAUMGARTEN:  Yes, I think that's exactly what Mr. Bowen was referring to.  There was correspondence with Dr. Singh's counsel about what the recommendations were, and we have disclosed that correspondence.  So he has what was provided to Dr. Singh's counsel because we've produced that in discovery.

THE COURT:  I'm seeing a bit of a -- a bit of a shake of the head there.  I'm just going to pause briefly because I want to make sure we're all talking about the same thing.  I don't want to get your response, and it turns out you're not responding to what I think I heard from him.  So let me just pause you for a moment just to hear what it

is that you think you don't have, at least in terms of these communications with third parties about report adjacent stuff.

MR. BOWEN:  We certainly don't have e-mails about the report itself and the recommendations that were disclosed to Dr. Singh.  All I have is one e-mail where it's obliquely referred to because he's talking about, or his lawyer is talking about --

THE COURT:  Well, I'm talking about -- you discussed the idea that either pieces of, sections of or report-adjacent things were discussed with third parties, which would not be Dr. Singh, right; so what in that bucket do you think you don't have?

MR. BOWEN:  Well, for example, we don't have the report itself, unredacted sections of the report that were disclosed to third parties.  So if we got a redacted report that had the conclusions unredacted and the recommendations unredacted, then by their own admission, they're saying that that kind of stuff was widely circulated.

THE COURT:  And I'm going to go back, obviously, to defense counsel in a moment, but what I heard defense counsel saying was that the report or pieces of it had not, in fact, been disclosed. The only thing that I heard him say that was

AMM TRANSCRIPTION SERVICE - 631.334.1445

disclosed was the results and the conclusions, if you will, and the recommendations, as opposed to in our initial discussion, I was sort of imagining, as you're saying, that there might have been, here's half of page ten, here's a redacted version or something.

I'll certainly clarify with defense counsel, but when I asked him that in the first instance, the response that I think I got from him was, no, we had not disclosed the report, i.e., portions of, redacted versions of, that it was only results.  Report says that we've done no wrong, nothing to see here, move along.  And recommendations.

MR. BOWEN:  That's my understanding, too, that they didn't actually hand a piece of paper to anybody, but they described orally what purportedly is in the report.  And that means, from my point of view, in my experience as a practicing lawyer, is I get at least the unredacted sections of the report that you verbally described, both to my clients.  And, from what I can understand or gleaned from the little bits of communication we have that have been produced by the defendants, they were discussed, for example, with Dr. Singh's lawyer.  And then Dr.

Singh's lawyer reports that that was discussed with other people outside of this circle.

So if that was all done verbally, and apparently it was. And I know from my own clients that they were given oral descriptions, verbal descriptions, not just of the conclusions and the recommendations, but also methodology, who was talked to, who said what. So all of that was verbally presented to them.

And so that, at the very least, suggests that the report itself should be produced in some kind of redacted form, at the very least. Now, if the defense counsel was saying -- and I'm sorry, I forget your name.

MR. BAUMGARTEN: It's okay.

MR. BOWEN: What's your last name?

MR. BAUMGARTEN: Sorry.

MR. BOWEN: You don't want to tell me your last name?

MR. BAUMGARTEN: I told you twice.

MR. BOWEN: Okay. My esteemed, learned colleague said that the report itself is just attorney-client communication, and they're not really -- from what I heard him say, they're not really saying that's work product. It has a greater

protection, attorney-client privilege protection. But attorney-client privilege is waived if any part of that communication is provided to any third party outside of the privilege, because that's subject matter waiver.

So once you say, I have a report, I know more than you do and I'm going to tell you that we did nothing wrong, and here are the recommendations, which have nothing to do with fixing discriminatory practices, then they've waived that attorney-client privilege in its entirety, and the entire report should be turned over.

THE COURT:  All right.  So let me turn back to defendant there.

We had been discussing this idea about -- to the extent that -- I'll say portions, sections, something report-adjacent was shared with third parties, I'm now hearing plaintiffs sort of clarify that, yes, it's also his understanding that it's not as if some redacted, printed, electronic version of this was given to anyone.

But if there were a verbal summary, we have a report and the report concludes X.  I don't know what the report looks like, but it's 20 pages, and on page 19 to 20 it says, here's the recommendations

or the conclusions.  To the extent that that is then summarized verbally, does that not at least waive privilege with respect to page 19 and 20, where it has the conclusions and the recommendations?

MR. BAUMGARTEN:  First, let me address something that Mr. Bowen said a moment ago about subject matter waiver.  Subject matter waiver -- and I'm quoting from a case called *Freedman v. Weatherford*, a 2014 decision in the Southern District.  "Subject matter waiver is reserved for the rare case where a party either places privileged information affirmatively at issue or attempts to use the privileged information as both a sword and a shield in litigation."

And then the Court referred to selective, manipulative and strategic use of evidentiary privileges in litigation -- in the litigation, which is not what we're doing or attempting to do here. So subject matter waiver, it's a fallacy to say that it applies to anything here.

Second, my colleague handed me the e-mail that I was thinking of, that perhaps Mr. Bowen was thinking of as well, which has been produced, which is from Ms. Lowy to the lawyer who was representing Mr. Singh.  And it says, "The investigation led to

the recommendations listed below, which were made to and accepted by Dean Chardy. Dean discussed them with Dr. Singh," and then asked that they keep them confidential. And it's a list of the recommendations. So that has been disclosed. Those recommendations have been disclosed.

As far as statements otherwise, that have been made again, I won't belabor the point, but I think the Von Bulow case is instructive about the extent to which extrajudicial disclosures, they simply don't waive a privilege except with respect to what actually was said, which can then be used in the litigation. There were even parts in that Second Circuit opinion where the Court said if there were undisclosed parts of the conversation that were described in the book, privilege is not waived as to those undisclosed parts of the conversation. And again, it's because it's extrajudicial. It's not being used in the litigation itself.

As far as what was said here, Ms. Lowy did meet with the complainants at the conclusion of the investigation, and she did report to them on the outcome of the investigation. And I guess if there were any remaining doubt about whether litigation was contemplated, although Ms. Lowy didn't know this

at the time, they recorded the conversation.  So they have that conversation.  There's nothing that needs to be disclosed about what Ms. Lowy said.  They already have that.

THE COURT:  Let me hear from you, defense counsel, before I turn back to plaintiff's counsel on this question of whether or not there's -- let's say that there is privilege, whether or not there is demonstrated substantial need for this information in your assertion that plaintiff would have another avenue to obtain the same information, i.e., depositions.

And I guess what immediately sprung to mind when I saw this section of the letter was, are you saying then that -- because you've just heard plaintiff's counsel say, yes, they could interview, whatever it is, 20 people, and ask them whatever questions, and then also would want to ask them, what were you asked by defendants as part of this investigation back in 2018?

Are you saying that you would not object based on some kind of work product or something in the same vein, such that we'd be right back here now saying, well, these witnesses weren't able to testify fulsomely about this because there were

objections either to privilege or to work product?

MR. BAUMGARTEN:  This comes up in depositions quite a bit.  You know, we have a very lawyered world, and people seek legal advice and get it, and sometimes there are questions asked during a deposition, who did you talk to?  What was said?  And that's when -- we know the rules, so it's pretty much the only time you can direct a witness not to answer and seek a ruling from the Court.

I don't think that there is an issue about substantial need here.  There are hardly any cases where a Court finds there is substantial need, and I believe all the witnesses would be available.  Plaintiff knows who they are.  They know who was interviewed as well, and they have told us, separate and apart from the immediate dispute, that they intend to depose 20 witnesses in this case.

The issue at the end of the day is not about the investigation.  The issue at the end of the day is about whether the plaintiffs experienced discrimination or not.  And we've provided buckets and buckets and buckets of discovery on the underlying claims.

THE COURT:  All right.  Thank you.

Plaintiff, I'll turn back to you.

MR. BOWEN:  Well, I would just say that given the repeated admissions that portions of the report and the outcome of the report or recommendations of the report were disclosed, that's the whole point.  The fact of the matter is they're making selective disclosures, and they're saying that it's based on this report that they did -- or this investigation that they did.  And the implication is that they have superior knowledge because they did this exhaustive report that was required under their own policies and procedures, antidiscrimination policies and procedures.

And then they're saying to certain people, not for legal reasons, by the way, but for business reasons, that they exonerated themselves, and this is the outcome of the report.  So at least to that extent, we're entitled to see the report itself and any other communications that are relaying any portion of their findings, so to speak, or that relate to or refer to their report in any way.

And now, I would also argue further than that, that it does amount to subject matter waiver, because when you disclose any portion of a privileged communication, the normal rule is you lose privilege because you now are not zealously

guarding the confidentiality of the communication. So if you're describing some part of it for some purpose, whether it's legal purpose or business purpose or any other reason, you're no longer maintaining confidentiality about that communication. You've now disclosed a portion of it, so all of it gets disclosed.

Now, the Von Bulow case is an old case, and I'm not really sure about the ins and outs of that case. I haven't read it in a long time. But the basic rule in this Circuit, which I think is true throughout the country, is that if you selectively disclose any portion of attorney-client communication, you waive the entirety of the subject matter of the attorney-client communications on that topic because you can't use it. This is the whole sword and shield thing. You can't say, look, these are the only recommendations that we got. We didn't do anything wrong, and then say, well, I'm not going to show you the rest of the discussion because maybe in that discussion, there is a discussion of things that were wrong.

THE COURT: But let me just -- and I want to hear a response from defendant on this. I'm glad we brought this up that, this sort of sword and

shield concept.

My understanding of what the current position is of defendant in terms of an affirmative defense, if you will, is that they don't intend to say, as a defense, if this were to go to trial or summary judgment, we did this investigation and the investigation said that we've done nothing wrong, and so, therefore, we've done nothing wrong.  That instead, they are, sort of, to the extent that they were saying that was going to be a defense or if we misunderstood that that was going to be a defense, that they're not using that, instead that they will use the idea that, yes, we have internal policies and procedures broadly that we followed, and, therefore, we did nothing wrong, but that they would not be saying --

Because certainly, you're right, they couldn't possibly go to trial and say, we did an internal investigation and said we did nothing wrong, but we won't let you see what that is, take our word for it.  That is the classic sword and shield.  They are not allowed to do that.

But they have said, apparently in writing to you.  Certainly they have said both in the letter and here in Court, they don't intend to use, as an

affirmative defense, 2018 investigation said we did nothing wrong. Instead, they would be speaking to the idea that we are an organization that has policies and procedures, no doubt drafted with the assistance of attorneys, that says you're supposed to do this, and if there's a complaint, you do this. And here's the whatever, the chain of command here, we followed those procedures, and, therefore, we did nothing wrong. But that they would not be specifically referring to this 2018 report. Because you're certainly right, if they plan to, I think they'd have to give it to you because it now has made it a subject of the litigation.

So they have said that is not what they intend to do. So how does that not affect your argument that you somehow are entitled to this report?

MR. BOWEN: Well, again, it's the fact that they already did that. They've already told witnesses and the public at large that they have a report, and this is the outcome of the report.

So my main argument is that they've already, through their conduct, have shown that this was not in anticipation of litigation. It was, at best, a mixed business purpose/legal purpose. And

in those kinds of situations, the business purpose can't outweigh the legal purpose, and you don't have privilege anymore.  So that's number one.

And then secondly, they have made a point, including in this submission to Your Honor, this joint letter, in one of their footnotes -- I think it's footnote five, where they say on page eight, they say, we don't withdraw the defense altogether. We're going to be making allegations that fall under this Faragher-Ellerth doctrine.

THE COURT:  But I think that's the point that I was just articulating --

MR. BOWEN:  Yes.

THE COURT:  -- is the idea that -- forget the report.  Let's say there'd never been an investigation, there had never been a report, we're an organization that has policies and procedures to deal with discrimination and allegations and whatnot, here's what our policies and procedures are.

I would trust that that information has been long since turned over.  We followed that. Whatever.  In the past, somebody complained, and we did this, that and the other.  That that's what they mean by this footnote number five, but that they

AMM TRANSCRIPTION SERVICE - 631.334.1445

don't intend to say the 2018 investigation, that's what shows that we did nothing wrong, that it's going to be whatever long-standing policies and procedures they have internally.

MR. BOWEN:  But I don't see how they can do that because the policies and procedures themselves say that you can report any instance that you think is potentially in violation of these antidiscrimination policies and rules, and it will be investigated.  And it will be kept confidential. And a full investigation -- you will be responded to.  There will be a response.  We will take care of you.  And part of that generated this report.

So on the one hand, they're saying we're not going to mention the fact that we actually did this in this particular case that generated a report, but we're going to refer the jury or the decision-maker to these general policies and procedures which talk about the fact that a report would be generated, that an investigation would be undertaken, that the report, a confidential complaint would be taken seriously and would be investigated.

So I don't see how they can have it both ways.  And the fact that they're still trying to

have it both ways, again, just goes back to my main point, which is, that's what this always was about. This always was about a business purpose of, you have policies like this in place when things like this are raised, regardless of whether or not you think there's potential litigation coming, as a business reason, as a business purpose, you market yourself.

Mount Sinai tells the world, we are an equal-opportunity employer, and we have these kinds of policies in place, and we protect people from this kind of discriminatory behavior.  So that's really what was going on here.

Now, for some reason, at the end of the day, they looked at that report and they said they don't want everybody to know what's in it.  So now it's in anticipation of litigation, and they're going to completely protect the whole thing and withdraw it after they've used it for business purposes by telling people, we didn't do anything wrong.

THE COURT:  Let me turn back to you briefly, defendant's counsel, just on this, sort of, footnote five.

To the extent that you still intend to rely

on as part of the defense the idea that we have whatever policies and procedures, we followed them, to the extent that those policies and procedures dictate that when there is some kind of complaint, there should be an investigation and a report generated.

I guess it is a bit -- what would that look like, right, where there's now direct, and there's cross-examination about, here's our policies, and the policies say these are the 15 steps to follow if somebody makes a complaint.  And we follow them all the time, and we followed them this time, and they dictate that there be a report, and then everybody pretends like there was not, in fact, a report.

Just to the extent that you still intend to have this sort of Faragher-Ellerth defense, how do you disentangle the general policies and procedures from the report, when the general policies and procedures, I take it -- and, again, I don't have those policies and procedures -- but I take it from what plaintiff's counsel is saying, one of the steps in the list of policies and procedures would be, and you do an investigation and generate some type of a report.

MR. BAUMGARTEN:  First of all, Your Honor,

AMM TRANSCRIPTION SERVICE - 631.334.1445

there were several plaintiffs.  There are two plaintiffs in this case who continued to work after the investigation was completed, and some of their allegations relate to subsequent events.

To the extent they did not make a complaint about those subsequent events, there is potential room for a Faragher-Ellerth defense based on their failure to have complained as to those later events. That's got nothing to do with the report.  I don't know that there is any other way to make a Faragher-Ellerth defense here, and I would anticipate plaintiffs would object to it if we tried to advance evidence at trial that would be inconsistent with both the assertion of privilege here, and what we've said in our correspondence, and what we're seeing in Court here today.  That's just the reality of it.  And I'm fine with acknowledging that.

I think Mr. Bowen is just plain wrong about selective waiver.  So I've already addressed that, and I won't belabor the point.  And the case law is clear that disclosing the outcome of an investigation is not a waiver as to the content.  So again, that's been addressed as well.

THE COURT:  Thank you.  Plaintiff, I didn't

mean to not give you the last word, but I did want to hear his response on this footnote five, because it wasn't really something we discussed before. So I don't know if you were done or if I cut you off when I turned back to defendant. If there was, it's your request here, I'll give you the last word if there's anything more that you'd like to say.

MR. BOWEN: There's nothing else, Judge. I think we've covered it.

THE COURT: All right. Thank you very much. I'm going to take a short recess. I'll be right back.

(Recess taken.)

THE COURT: You may be seated.

So, first of all, thank you all very much for a useful letter and a useful oral argument from both sides. Sometimes, particularly when I am coming in midstream to a case that has been ongoing for some time, it can be hard to, sort of, get my arms around everything that's relevant and important. And I thought that the joint letter in this case, you know, really honed in and teased out the issues that were important. And I thought that the oral arguments were helpful as well. That's not always the case. So thank you to both sides for

that.

In terms of my ruling, I'm going to make an oral ruling and then follow up with just a short written ruling as well.

I think that the report and the conversations connected to it and surrounding it and supporting it are both partially attorney-client privilege, but certainly covered by work product.

In this situation, I think there's no question that there is some enmeshment, that there is a business purpose and perhaps a, sort of, press, public-relations purpose to this investigation, but it is also clearly and centrally connected to impending litigation.

The fact that the communication with Olivarius on the 26th specifically referenced one of the people who, the next day, made these complaints shows that, from its inception, the business piece of this, the fact that there's reputational harm and the loss of this potential investment is directly connected to the allegations and the investigation flows from that. I think it'd be a different situation if this Olivarius conversation happened, and there'd been some weeks of investigation and the like before these complaints were made, or if one of

the plaintiffs wasn't directly -- one of the people who makes a complaint was not directly referenced. But it is clear here that they are intertwined. And intertwined to a degree that I don't think it's possible to separate out. This is purely business and, therefore, disclosable. And this is clearly in anticipation of litigation, and, therefore, work product. The entire thing, I think, is protected.

Providing the results of an internal investigation does not waive the work product and attorney-client privilege as to what is in the report and in those internal conversations. We've obviously -- it is our most standard that organizations, when somebody's suing them, when there's the potential of being sued, they will do their own, sort of, preparation. And just to say we have results does not mean that you get access to everything that supported those results.

Now, what would have been sort of the strongest argument in plaintiff's favor was this idea that if defendant wanted to use this information as a sword and a shield, they've already acknowledged that they certainly can't use the report itself in the first instance. And frankly, to the extent that the general argument about

policies and procedures seems like that would bleed over into the fact that there is an investigation, it seems to me unlikely that they would be able to use that defense at all, but obviously we're not at that stage at this point.  But I certainly trust that if they did attempt to bring up an affirmative defense that touched at all on this report, plaintiff would be at the ready to make the appropriate objections.

In terms of whether or not there had been no showing of substantial need, and, in fact, plaintiff's counsel acknowledged that they can, in fact, get this information another way; they know what the recommendations are; they know what the results are; and most crucially, they know who the people are who were interviewed as part of this investigative process, and would be able to depose those folks to ask them whatever about what was going on during this time frame at this organization.

So those are my findings.  And as I said, I will follow up with a brief written order probably later on today.

Was there anything else we need to discuss from plaintiff's perspective?

MR. BOWEN:  Well, we also asked, Your Honor, that we get a ruling on their categorical log that addresses this material.  They just give a one-paragraph general description of what they claim is 1000 documents.  But we want a document-by-document privilege log so that we can tease out if there is some of this material anyway that doesn't fall within that privilege, as Your Honor just outlined it.

THE COURT:  So we didn't really have any argument about that before I took a brief recess.

Is there anything more that you'd like to say with respect to that request?

MR. BOWEN:  I would just reiterate that I don't think they've made a burden showing that this is -- 1000 documents is not that many.  I mean, I've seen privilege logs with tens of thousands of documents on it.  And given the nature of this assertion of privilege and Your Honor's findings just now that there is some component of this that has, at least -- at very least, a mixed business purpose, and maybe some portions of this have solely a business purpose, we would like to see the documents -- the privilege log itemize these document by document so that we can make the

determination whether or not there should be a challenge to any portion of their assertion of privilege as to specific documents.

THE COURT:  Defendant?

MR. BAUMGARTEN:  Yeah, I think we're really talking about category one of the privilege log, which I think is over 1000 documents.  I think that falls well within what I would normally consider to be appropriate for a categorical privilege log.  And there's a variety of documents that are covered by that category.  But they all relate to the investigation as indicated by, I think, the time frame that's associated with that category.

So I'm not sure that there's really -- what else there is to do with respect to fleshing that out further.

THE COURT:  All right.  Thank you.

Anything further you want to say?

MR. BOWEN:  No.

THE COURT:  I do think that under these circumstances that -- I don't really know what a sort of parsed-out log would look like, other than to essentially make the same -- to list out, oh, here's 1000 documents, and we're not giving them names.  We'll call them one through 1000, and

they're all attorney-client privilege or they're all work product.

I certainly trust that -- what I hear plaintiff's counsel saying is this idea that there may be some entanglement.  I acknowledge that.  I don't see how there isn't some business purpose behind what is going on here given the way in which everything that happened leading to this investigation.  But I also don't see how any investigation that springs from the conversation with Olivarius and the lodging of these complaints the next day is not an anticipation of litigation.

So any discussion about that, any strategy about, we should ask these questions, we should talk to these people, here's an internal thing, it is going to be attorney-client privilege.  It is going to be work product because it is clear litigation is springing from this.  And so the blanket assertion of privilege for category one, for these thousand documents, it just seems, sort of, an exercise in futility to say they now have to list out one through 1000 and make the same objection to all of them.

MR. BOWEN:  Well, the only thing I would add, Judge, is that when we have the documents

listed out separately, we'd see who the recipients are, and we would have more information about who was getting information about the report and the investigation, and what kinds of information were they getting?  At least from gleaning the categories of information that have to be provided on a traditional log, you have to have the sender, the recipients, subject matter and the date.

So with that information we may be able to see around the edges that there was a wider dissemination of this report or the details of the report than what we know already.

THE COURT:  I think that their blanket assertion of purpose for category one is sufficient, counsel.

Anything else we need to discuss from defense?

MR. BAUMGARTEN:  No, Your Honor.

THE COURT:  All right.  In that case, we'll be adjourned.  And everyone have a good rest of your day.

MR. BOWEN:  Thank you, Judge.

MR. BAUMGARTEN:  Thank you, Judge.

MS. GUERRASIO:  Thank you, Your Honor.

0o0

C E R T I F I C A T E


I, Adrienne M. Mignano, certify that the foregoing transcript of proceedings in the case of Safo, et al v. Icahn School of Medicine at Mount Sinai, et al.; Docket Number: 19CV3779 was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature *Adrienne M. Mignano* _____

ADRIENNE M. MIGNANO, RPR


Date:        January 5, 2024

AMM TRANSCRIPTION SERVICE - 631.334.1445