# EXHIBIT 3

# AFFIDAVIT OF ANN OLIVARIUS

STATE OF NEW YORK         )
                                          ) ss.:
COUNTY OF NEW YORK    )

I, Dr. Ann Olivarius, the undersigned, being first duly sworn, do hereby state under oath and under penalty of perjury that the following facts are true:

1. I am over the age of 18, of sound mind and otherwise competent to make this Affidavit. The evidence set out here is based on my personal knowledge.

2. I am the Senior Partner and Chair of McAllister Olivarius, an international law firm specializing in litigation, with offices in the United Kingdom and United States. I have been practicing law for almost three decades.

### A. Meeting Jonathan Taylor

3. In April 2017, I went to New Haven because I had been selected as a Donaldson Fellow by the Yale School of Management, an award recognizing alumni "whose personal and professional accomplishments embody the school's mission to educate leaders for business and society."

4. At a dinner organized to honor Donaldson Fellows on April 20, I was seated next to Jonathan Taylor ("Taylor"), who was at that time employed by Yale School of Management's Development Office. In the course of the dinner, Taylor noted that Yale had estimated that I had made $400 million for my clients as plaintiff's counsel, and that Yale appreciated I had funded the education of many students who came from disadvantaged backgrounds (as is true of me also) and consistently employed many Yale graduates. Taylor knew my record extremely well and congratulated me on awards and international recognition that I had received for my work. He knew I had been a board member of Women Moving Millions, a group of women and men who have each committed $1 million in philanthropy to advance women and girls. Taylor was friendly, kind and engaged about my legal work and record at Yale.

5. Several months later, Taylor contacted me again. I was not aware that he had left Yale's Development Office to join the Development Office of Mount Sinai Health System, Inc. ("Mount Sinai"), but this time he was soliciting funds for Mount Sinai. This surprised me because I had no connections with Mount Sinai, and my donor information is in Yale's proprietary database.

### B. Introduction to Dr. Prabhjot Singh

6. On March 19, 2018, I received an email from Taylor informing me he would soon be visiting London with Dr. Prabhjot Singh ("Dr. Singh"), Director of Mount Sinai's

Page **1** of **6**

Arnhold Institute for Global Health ("AIGH"), and asking whether I would meet with them. He was clearly pursuing me to make a donation to Mount Sinai. I had not heard of Dr. Singh before, but Taylor's warm persistence and Sinai's reputation as a leader in medicine prompted me to accept the invitation.

7. On April 10, 2019, I hosted Taylor and Dr. Singh for brunch at Cliveden House (the "Cliveden Meeting"). During the Cliveden Meeting, Dr. Singh delivered an impassioned and eloquent presentation seeking my help in raising funds for AIGH, claiming that he was developing path-breaking technologies, including the use of cell phones, that with the right philanthropic support would enable poverty and hunger in Africa to be cured. He emphasized that these ideas would particularly benefit women in Africa. Dr. Singh stated that he was uniquely poised to do this, that he had originated these technological advances, and that he was a "genius" (said with convincing humility). He showed that he was well acquainted with my own work including the praise that Nelson Mandela had given to it. He went so far as to say he wanted to emulate my record. He was convincing and engaging, and I was impressed.

8. Near the end of our meeting, I asked if he had met Dr. Holly Atkinson ("Dr. Atkinson"), a doctor I knew in New York, because during the meeting it occurred to me that they were in broadly the same field. Dr. Singh's face briefly clouded, and he indicated in a few words that he might know her, but moved the conversation back to his work and how through mobile phones and various technology platforms, he would be curing poverty.

9. The Cliveden Meeting ended on a high note. Dr. Singh gave me a copy of his book. I later read it, thought well of it and wrote him to tell him so. Dr. Singh invited further discussions between us. I took some informal soundings with my London and New York networks and concluded that if due diligence confirmed Dr. Singh's representations, I would be able to raise from members of Women Moving Millions (where I had served on the board for six years), from others and from my own funds something in the range of £80 million (approximately $100 million) to support Dr. Singh's work.

### C. Meeting with Dr. Holly Atkinson in New York

10. Approximately a week after the Cliveden Meeting, I learned that I would be in New York City from April 25-27, 2018 on unrelated matters. I wrote to Dr. Singh on April 23 to arrange to visit him at Mount Sinai while I was in town. My plan was to meet some of his team as part of doing due diligence for the donation I was contemplating. Taylor and Helen Caldwell of my office scheduled the meeting for the morning of Thursday, April 26 at AIGH's offices in New York (the "Sinai Meeting").

11. I was already planning to see Dr. Atkinson and her husband during this trip. But as I left for New York, it occurred to me I should see her before meeting Dr. Singh as part of my due diligence, despite Dr. Singh's noncommittal response at Cliveden about whether he knew her. Dr. Atkinson and I had worked together on other women's issues, she was in the global health field, and I trusted her judgment. We met for a 7 AM breakfast, two and a half hours before my scheduled meeting with Dr. Singh. She did not know why I wanted to see her.

12. At the start of the meeting, after asking after her husband, I asked her whether she had worked at Sloan Kettering or Mount Sinai. She said the latter. I told her that I had a memory that she had had a terrible experience at some previous employer and asked her if that was Mount Sinai. She said yes, and I asked her to tell me about it. She then described her experiences at AIGH, in particular Dr. Singh's long record of mistreating her and other women.

13. I was shocked to learn this, and when she finished, I gave her my printed itinerary that showed my next appointment was with Dr. Singh. We were both startled at this coincidence. I then told her about my own experience of being solicited for funds by him. I asked Dr. Atkinson if there was anyone else who could shed light on Dr. Singh's conduct at AIGH, and she told me that Dr. Natasha Anandaraja could do so, as well as others. I then spoke by phone to Dr. Anandaraja, whom I had never met, who confirmed Dr. Atkinson's account of Dr. Singh's systematic mistreatment of women at AIGH. She also described his lack of management skills. She said that at the time she left AIGH there had been no substantial work done in Africa or on women's empowerment issues, nor to her knowledge, did AIGH have the capacity or experience to take on such a project. She also described Singh's habit of inflating his past achievements and his abilities to donors and potential partners.

14. Dr. Atkinson expressed continuing loyalty to Mount Sinai and did not want me to drop the idea of funding AIGH, but urged me to continue doing due diligence on Dr. Singh and his Institute to see if it could demonstrate actual successes that would interest my network of potential donors. However, I concluded that I could not in good conscience go back to that network to fund an institute that could not pass even cursory due diligence, and which I could not support myself.

15. Other than my conversations with Drs. Atkinson and Anandaraja, I did not have any discussions about Dr. Singh with anyone else associated with Mount Sinai (including donors to Mount Sinai) prior to my meeting with Dr. Singh.

16. At the end of my breakfast meeting with Dr. Atkinson, I called Taylor to say that I wanted to meet with him in advance of my scheduled meeting with Dr. Singh. In the park outside the AIGH offices, I told him that I would no longer continue organizing the potential donation based on what I had learned about AIGH, but told him I would still like to meet with Dr. Singh as scheduled so I could deliver the news personally. I wanted Taylor to realize that Dr. Singh's conduct had scotched a potential donation of £80 million. I also wanted to make sure that that Dr. Singh could not blame Taylor for the loss of the potential donation and that the development office at Mount Sinai would understand that Dr. Singh had liabilities they should know about. I also thought it was right and proper to face Dr. Singh directly to tell him why I would no longer organize any donation to AIGH.

**D. Meeting with Dr. Singh at Mount Sinai**

17. Taylor escorted me to Dr. Singh's office. An extensive program of briefings had been arranged for me, but I asked Dr. Singh if I could have a private word with him. He looked

nervous but was friendly and invited me into his private office. I did not sit down. I told him that I had come originally to progress an £80 million gift to AIGH, but from my initial due diligence I had learned that his track record with women was deeply troubling and that his claims to me at Cliveden about curing poverty with exciting new technologies appeared to be inflated to the point of untruthfulness. I told him he was a liar and a con man. He looked stunned. He did not try to rebut anything I said; it appeared to me he felt that I had exposed him and his misrepresentations and could find nothing to say. He began to cry. He put his arms on my shoulders and asked me what he should do, which I took to be a genuine request under very fraught circumstances for him. I told him that I was not his lawyer, nor his friend, but that if I were in his shoes, I would try to clean up the harm I had inflicted on so many; I would resign stating truthfully my reasons why and apologize; and I would not pitch up at Harvard (meaning that he should not try to get another prestigious job). We shook hands, I wished him better days and left. The meeting was short, just a few minutes.

18. Taylor met me outside of Dr. Singh's office and accompanied me out of the building. I relayed to him my conversation with Dr. Singh in full. I told him that if anyone in development at Mount Sinai had any questions, they were welcome to call me.

19. After the meeting, I called Dr. Atkinson to debrief her on my encounter with Dr. Singh and Taylor.

**E. Subsequent Contact with Dr. Atkinson and Retainment as Plaintiffs' Attorney**

20. The following day, Dr. Atkinson e-mailed me to thank me for breakfast and to inform me that she and Dr. Anandaraja were intending to meet with Mount Sinai HR that afternoon to discuss the procedure for filing an internal complaint. I understand from Dr. Atkinson that they ultimately filed a formal complaint with Mount Sinai HR, and that they had been contemplating doing so for some time. Their decision to file a complaint was made independently, and I neither advised them to do so nor commented on its substance.

21. On April 28, Dr. Atkinson e-mailed me to update me on an "off the record" conversation she had had with Clarissa Jones-Winter, the Mount Sinai HR official with whom she and Dr. Anandaraja had been speaking.

22. On May 2 and 3, 2019, Dr. Atkinson called to update me on developments since she and Dr. Anandaraja filed their complaint. She explained that she was scheduled to be interviewed by Mount Sinai HR on May 3. On May 4, 2019, I wrote to her to find out how the interview went. She responded that it had been "difficult" for her, that she "didn't realize how tough it would be to go back to that time," and that she had been "moved to tears several times." She called me with a further update on May 17, 2018.

23. On May 18, 2018, I received an email from Taylor thanking me for my "candor and insight" during my trip to New York. It said he was "truly hope[ful]" that it would "lead to positive change here." He then invited me to attend a "special dinner" to be attended by "Mount Sinai leadership." Though I admired his chutzpah in asking, I declined the invitation.

Page 4 of 6

24. In June 2018, Dr. Atkinson called me with an update regarding the investigation that was underway at Mount Sinai as a result of her complaint. Later that month, I recommended some lawyers she might consider if she wished to take a case forward against Mount Sinai. Dr. Atkinson provided me with a further update by phone in early August 2018.

25. On August 13, 2018, I received an email from Dr. Atkinson asking if I could review a draft of a public letter from her and other former employees of Mount Sinai regarding their experiences working with Dr. Singh. I responded by telling her that I was not her lawyer and thus could not offer any opinion about the wisdom or efficacy of the draft letter. She had not asked me to be her lawyer, but I wanted to be clear that I was not intending to be. Her husband, Rev. Galen Guengerich, was our firm's client. Dr. Atkinson and her husband also had connections with a board member at Mount Sinai and Dr. Guengerich's church who might be angered by a case against Mount Sinai, and who was also relevant to a board position I intended to vie for. I told her that at that moment we had a structural conflict in representing her.

26. The weekend of August 24, 2018, Dr. Atkinson and her husband stayed with my family at our house in England on their way to their daughter's wedding in Scotland. We talked about the possibility of McAllister Olivarius representing women from AIGH against Mount Sinai, but I preferred that they find other counsel and suggested some names.

27. On December 4, 2018, I received an email from Dr. Atkinson asking if I could meet with her and Dr. Anandaraja to discuss ideas for "women's empowerment and women's global health initiatives." I offered to meet them during a planned trip to Cold Springs Harbor, New York where I was addressing a group of scientists, and we had dinner on December 10, 2018. During the dinner, Dr. Atkinson and Dr. Anandaraja told me that they were actively searching for counsel to represent them in a suit against Dr. Singh and Mount Sinai and perhaps others. I discussed the merits of a potential case with them in detail, and gave them legal advice about it, but still advised them to obtain another lawyer to take the matter forward.

28. On March 1, 2019, I talked with Dr. Atkinson, Dr. Anandaraja, Dr. Safo and Elena Rahona at the launch party for TimesUp Healthcare at Dr. Atkinson's apartment. They told me about their continuing frustrations with Dr. Singh and with the Mount Sinai HR investigation about him that they considered a whitewash. Nevertheless, they had not found another attorney; few New York lawyers wanted to take on Mount Sinai. I knew that statutes of limitations were arguably approaching on several of their potential claims, which I thought were strong, and felt it would be very unjust if they lost their opportunity to advance them. The various reasons I had been reluctant to be their lawyer in 2018 were no longer operative. My firm did thorough legal research that confirmed my view that my meeting with Dr. Singh was not relevant to their case and could not provide a basis for disqualifying our firm, despite a high likelihood that Mount Sinai would seek this result to throw sand in our gears. Accordingly, I agreed to take the matter forward. Dr. Atkinson, Dr. Anandaraja, and Dr. Safo formally retained McAllister Olivarius to represent them in March 2019. The other plaintiffs engaged us on other dates in March and April 2019.

29. Prior to March 2019, my firm and I had no communications with any of the Plaintiffs in this matter other than Drs. Anandaraja and Atkinson. Moreover, neither my firm nor I was retained by Dr. Atkinson or any other Plaintiff on any matter prior to March 2019.

Dr. Ann Olivarius
Dr. Ann Olivarius

Sworn to before me this 6th day of August, 2019.

Ivette Wulff
Notary Public

WULFF IVETTE
NOTARY PUBLIC, STATE OF NEW YORK
NO.: 01WU4973060
QUALIFIED IN STATE OF NEW YORK
COMMISSION EXPIRES 12/23/2022

New York, N.Y.