```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF NEW YORK
----------------------------:

DR. STELLA SAFO, et al.,    : Docket No.: 19-cv-3779

                Plaintiff,   :

        v.                   :

DR. PRABHJOT SINGH, et al., : New York, New York

                             : May 6, 2025

                Defendant.    :

----------------------------:
```

TRANSCRIPT AND STATUS CONFERENCE HEARING

BEFORE THE HONORABLE JENNIFER E. WILLIS

UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:      GLENN AGRE BERGMAN & FUENTES LLP
                    BY:  Michael P. Bowen, Esq.
                    1185 Avenue of the Americas
                    New York, New York 10036

                    McALLISTER OLIVARIUS
                    By:  Jan Cervenka, Esq.
                    641 Lexington Avenue - 13th Floor
                    New York, New York 10022

For Defendant:      PROSKAUER ROSE LLP
                    BY:  Edna D. Guerrasio, Esq.
                         Adam Lupion, Esq.
                    Eleven Times Square - Suite 2106
                    New York, New York 10036

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1                THE COURT:  You may be seated.

 2                THE DEPUTY CLERK:  Good morning, your

 3    Honor.  We're here for a discovery conference in

 4    Safo, et al. v. Singh, et al.; Case Number:

 5    19-cv-3779.

 6                Could the parties both stand and state

 7    their name for the record, starting with plaintiff.

 8                MR. BOWEN:  Good morning, your Honor.

 9                It's Michael Bowen, B-O-W-E-N, with the law

10    firm Glenn Agre Bergman & Fuentes, on behalf of

11    plaintiffs.

12                THE COURT:  Good morning.

13                MR. CERVENKA:  Good morning, your Honor.

14    Jan Cervenka -- C-E-R-V-E-N-K-A -- from the law firm

15    McAllister Olivarius, on behalf of plaintiffs.

16                THE COURT:  Good morning.

17                MS. GUERRASIO:  Good morning, your Honor.

18                Edna Guerrasio, from Proskauer Rose, on

19    behalf of the defendants.

20                MR. LUPION:  Good morning, your Honor.

21                Adam Lupion -- L-U-P-I-O-N -- also from

22    Proskauer, on behalf of the defendants.

23                (Inaudible)

24                THE COURT:  All right.  Good morning to

25    you, all.
```

```
 1              So we are here for a number of discovery
 2    disputes.  First thing I wanted to address is that I
 3    had received three separate motions to compel -- I
 4    guess one is really a motion to reargue -- by
 5    plaintiffs which were filed on April 30th, and then
 6    a letter, I believe, yesterday from defendants
 7    asking for more time to respond to those April 30th
 8    filings.
 9              First of all, when we have a conference
10    that is scheduled, filing something at, you know,
11    the 11th hour at 4-30, which technically would have
12    left enough time for defendants to have filed
13    something responsive yesterday, still really puts
14    the Court in not an ideal position to resolve those
15    disputes because it would have left zero time for
16    myself and my chambers to, sort of, fully absorb
17    both the moving party's arguments and the responsive
18    arguments and to, sort of, do our own research.
19              And in terms of defendants', sort of,
20    letters saying, we need more time, understandable,
21    but it appears from my review of the letter that you
22    would have known that you needed more time at the
23    moment that those letters were filed on 4-30, so I'm
24    also not really sure why you didn't immediately say,
25    we need more time, and we don't want that to, sort
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    of, be on the agenda for today.

2         With all that being said, I will grant some

3    additional time to defendants to respond.

4    Regardless, that was never going to be on the agenda

5    for today because it did not put the late -- won't

6    call it late, but the "late in the life of the

7    schedule that we set to have a hearing today" filing

8    never put me in a position that I would have really

9    been able to grapple with those today.  So we will

10   not be addressing the plaintiffs' three letters.

11   Instead, we'll focus on the three letters that had

12   been filed by defendants.

13        What I'd like to do is, sort of, take not

14   only each letter in turn, but some of them obviously

15   have some subparts to them, and I want to make sure

16   that everyone has a chance to be heard and that I'm

17   able to hear the response to each point.  And so

18   rather than having, you know, sort of, defendants go

19   and say, oh, well, in our January 28th letter, we

20   raised, you know, seven different issues, here they

21   all are, and then having plaintiffs try to keep

22   track of all that and respond to each, I'd like to,

23   sort of, break everything down into chunks so I can

24   hear the one argument, hear the response, hear

25   anything else that there is before we move on to the

1    next topic.

2          With that being said, there's obviously a

3    lot of topics, and I -- you know, I do not have,

4    sort of, you know, five, six hours in my schedule to

5    be able to devote to these discovery disputes.  So

6    while I want to ensure everybody has a chance to be

7    heard, I just want to be mindful of, sort of, the

8    time constraints and, you know, if there are places

9    where you think your papers are sufficient or where

10   people are willing to agree and make concessions,

11   please do let me know so that we don't waste our

12   time talking about things that perhaps we don't need

13   to talk about.

14         So, defendants, these are your motions.

15   You can, sort of, decide where you want to start.

16   To me, the January 7th letter is, sort of, the first

17   letter and really a discrete issue, so it seems to

18   me that that might be a good place to start, but,

19   again, your motions, your request for a hearing, so

20   I will let you choose whether we start with the

21   request to depose Dr. Olivarius or with something

22   else.

23         MS. GUERRASIO:  Thank you, your Honor.

24         That's fine.  We can start with our motion

25   with respect to Dr. Olivarius.

AMM TRANSCRIPTION SERVICE - 631.334.1445

1           Is it okay if I use the podium, or do you
2    want me to --
3           THE COURT:  Either.
4           MS. GUERRASIO:  Okay.  Thank you.
5           Can I proceed?
6           THE COURT:  You may.
7           MS. GUERRASIO:  Thank you, your Honor.
8           The first application that defendants would
9    like to address with the Court is the deposition of
10   Dr. Ann Olivarius.  Before I get into the substance
11   of defendants' application, I'd like to briefly make
12   the point that plaintiffs' actions in refusing to
13   produce Dr. Olivarius for her deposition are
14   improper.
15          So Dr. Olivarius was personally served with
16   both a deposition and a document subpoena.  They
17   have not contested service.  Dr. Olivarius, in fact,
18   tendered written responses to the document subpoena,
19   and McAllister Olivarius notified defense counsel
20   that Dr. Olivarius was not available on the date
21   noticed for her deposition when they received the
22   notice.  They didn't provide us with any other
23   issues or information.
24          It was when our office tried to reschedule
25   that date and looked for Dr. Olivarius' availability

1    that we were told that McAllister Olivarius was

2    going to unilaterally limit the topics on which

3    Dr. Olivarius could be questioned to two

4    conversations she had with Dr. Singh, and that if

5    defendants refused to comply with that instruction,

6    that she would not appear.

7         That's not how the discovery process works.

8    It was incumbent upon Dr. Olivarius to move for a

9    protective order.  Under Second Circuit case law, a

10   party who moves for a protective order then has the

11   burden to show that good cause exists for that

12   order.  That didn't happen.  So defendants were

13   compelled to then make this motion, and that's why

14   we're here before the Court.

15        To address the substantive arguments, I

16   want to first lay out the fact that plaintiffs have

17   not objected to Dr. Olivarius' deposition outright.

18   Instead, they just seek to limit her testimony to

19   those two discussions I mentioned she had with

20   Dr. Singh, but that limitation is far too narrow.

21        Here's why:  Dr. Olivarius is a fact

22   witness in this litigation.  She came onto the scene

23   as a philanthropist potentially interested in making

24   a large donation to AIGH, which Dr. Singh was the

25   director of.  Dr. Olivarius had two meetings with

1    Dr. Singh in April of 2018.  During the time frame

2    in between those two meetings, Dr. Olivarius'

3    position on a donation to support Dr. Singh changed.

4    But even more significant, immediately thereafter,

5    an internal complaint is filed at Mount Sinai

6    regarding Dr. Singh.

7         But here's the linchpin between those two

8    events:  The morning on which Dr. Olivarius notified

9    Dr. Singh that she would not support him or AIGH,

10   she said, and I put in quotes, that he had no direct

11   support -- or no support -- excuse me -- from Mount

12   Sinai's leadership and, in quotes, "needed to resign

13   immediately."  That's the same morning that Polly

14   Atkinson met with Dr. Olivarius, and she then filed

15   the gender discrimination complaint the very next

16   day.

17        Plaintiffs would like the Court to believe

18   that this is all coincidence.  In fact, I think the

19   word "serendipitous" was used to describe it, but

20   that's not how the testimony from depositions

21   describes the events.  In fact, Dr. Atkinson, who

22   was a former plaintiff in this litigation, said that

23   Dr. Olivarius' withdrawal of funding and her

24   internal complaint was a double punch that they made

25   against Dr. Singh.

```
 1              Another witness, Elena Rahona, also a
 2    former AIGH employee, testified that -- excuse me --
 3    the internal investigation was the start of a
 4    cascade of events that Dr. Olivarius helped usher
 5    in.
 6              That doesn't sound serendipitous to me.  It
 7    sounds intentional.  It sounds like an orchestrated
 8    plan to have Dr. Singh removed from his post.  And
 9    Dr. Olivarius played a part in that plan, not as
10    counsel, but as an individual.
11              We should be able to ask Dr. Olivarius
12    about her discussions with Holly Atkinson and Anu
13    Anandaraja, which she also stated that she spoke to
14    that morning.  We should also have the opportunity
15    to ask anyone else she spoke with about Dr. Singh,
16    which led to this cascade of events, endless
17    litigation that followed thereafter.
18              The discussions Dr. Olivarius had with
19    Dr. Atkinson, Dr. Anandaraja and others goes to the
20    credibility of the plaintiffs' claims.  Is this
21    really gender discrimination or the takedown of a
22    man that they did not like and wanted to see removed
23    from his position of power?
24              That's our theory.  And Dr. Olivarius
25    helped propel that plan into action.  We should be
```

1    entitled to ask her when she uncovered allegations

2    about mistreatment of women at AIGH -- and that's a

3    direct quote from her own affidavit that she

4    submitted to the Court -- what allegations did she

5    uncover?  Who did she uncover them from?  Who did

6    she speak to?  What did she do with that thereafter?

7         This is all prior to her being counsel to

8    plaintiffs.  And we're entitled to understand what

9    she learned, who she learned it from, and how it

10   relates to then the investigation and the complaint

11   that followed thereafter at Mount Sinai.

12        In her own affidavit that she filed with

13   this Court in October of 2019, Dr. Olivarius said

14   she took some informal soundings with her London and

15   New York networks about Dr. Singh -- again, we

16   should be able to ask her about those informal

17   soundings -- and that she did due diligence.  What

18   due diligence did she do?  And what did it lead to?

19        Plaintiffs object to our deposition of

20   Dr. Olivarius on the grounds that she is counsel for

21   the plaintiffs in this litigation, but it is clear

22   that Dr. Olivarius did not serve as counsel for

23   anyone in connection with this litigation or the

24   underlying claims until March of 2019.

25        Dr. Olivarius and every single plaintiff

1  who was deposed, which is all four, as well as the

2  two former plaintiffs, have testified that their

3  attorney-client relationship did not begin until

4  March of 2019.

5          It is also clear that during that April

6  2018 breakfast that Dr. Atkinson had with

7  Dr. Olivarius, she said she was not seeking legal

8  advice nor did she think of Dr. Olivarius as her

9  counsel.  There's an affidavit on the docket that

10  says that.

11          Even in August of 2018, Dr. Olivarius and

12  Dr. Atkinson are in agreement that the discussions

13  they have over e-mail about a potential lawsuit,

14  about a newspaper letter, all were not in the

15  context of an attorney-client relationship.  In

16  fact, Dr. Olivarius says, I am not your counsel.  I

17  cannot provide you with legal advice, but here are

18  some thoughts I have.

19          We should be able to depose Dr. Olivarius

20  about that.  That started a campaign of sending

21  letters to newspapers and other ways of gaining

22  attention for what would eventually become a

23  litigation.

24          I also will note for the Court that the

25  plaintiffs took the depositions of Marina Lowy, who

1    is in-house counsel for Mount Sinai, and Rosalind

2    Fink -- excuse me -- who was individual counsel for

3    Dr. Singh in both this litigation and during the

4    investigation at Mount Sinai.  Defendants did not

5    object to either of those depositions and did not

6    place limitations as to the subject matter of those

7    depositions.  Dr. Olivarius is in no different

8    position than Ms. Fink, and the same breadth of

9    deposition should apply here.

10         I'm happy to answer any questions that the

11   Court has.

12         THE COURT:  Sure.  Let me ask you about the

13   Second Circuit's -- the standard set in the Second

14   Circuit case, the In Re Subpoena of whatever,

15   whatever, Friedman, sort of, laying out four factors

16   to consider when we've got this question about

17   whether or not a deposition of an attorney should be

18   allowed.

19         And Factor Number 1, there is, sort of, the

20   need to actually depose the person, right?  And I

21   want to, sort of, tease out a little more from you

22   about that.  You know, you spoke about the idea that

23   there's a lot of -- there's a huge cast of

24   characters, and there's just no way I'm going to get

25   everybody's name --

```
 1              MS. GUERRASIO:  Sure.

 2              THE COURT:  -- right, but the idea that

 3     Olivarius was speaking to, you know, some of the

 4     plaintiffs, some of the former plaintiffs and the

 5     like.

 6              But would not a deposition of those

 7     folks -- in fact, those have already been taken --

 8     be it another avenue to, sort of, getting the same

 9     information, right?

10              So one of the factors the Court is looking

11     at is not just, you know, privilege and these other

12     things, but this question of is there some way that

13     the party seeking information could get the

14     information through another route?

15              And, you know, as you've laid out the, sort

16     of, central role that you think Olivarius has played

17     in all this, your examples of that are drawn from

18     Olivarius spoke to, you know, Plaintiff, you know, A

19     and Plaintiff B and former Plaintiff C.

20              So how does that play into the factors laid

21     out by the Second Circuit, the idea that there's

22     another source for this information?

23              MS. GUERRASIO:  Sure, your Honor.

24              So, first, I will say it's our position

25     that Dr. Olivarius is not being deposed in her
```

1   capacity as counsel.  I understand she's an

2   attorney, but being an attorney does not absolve you

3   from being called as a fact witness.  So I think,

4   actually, it's a completely different analysis.

5          But to answer your question, Dr. Olivarius

6   has put in an affidavit and has put in

7   correspondence to her clients that were produced

8   that she had discussions with individuals -- we

9   don't know the identity of who -- to do her own due

10  diligence of Dr. Singh, and that's what led her to

11  learn of mistreatment of women.

12         We need to ask Dr. Olivarius about those

13  conversations, who those individuals were and what

14  she learned because there's no other way for us to

15  get that information.

16         THE COURT:  All right.  Thank you.

17         I'm sorry.  Is there more you want to say?

18         MS. GUERRASIO:  No.

19         THE COURT:  Plaintiffs?

20         MR. BOWEN:  Mike Bowen, on behalf of the

21  plaintiffs.

22         The issue here is opposing counsel, meaning

23  the litigation counsel in this action for the

24  plaintiffs, and the lead counsel is Ann Olivarius,

25  so those factors that the Second Circuit laid out

1    all apply.  And I think the Court, by focusing on
2    the specific need, is the one argument that -- or
3    the one factor that we also think is dispositive of
4    this entire analysis because the people who the
5    defendants are relying on as the need for deposing
6    Ms. Olivarius are people they know about.  Those are
7    the people who are actually bringing these claims or
8    are known witnesses against the defendants in this
9    case, and they've already deposed those witnesses.
10   And the fact that they know about these
11   conversations between Miss or Dr. Olivarius at a
12   time with this group of people before they had
13   engaged her is from discovery in this case, both
14   from documents that have been produced and the
15   questioning of these other parties, some of whom are
16   plaintiffs, some of whom are former plaintiffs or,
17   for various different reasons, couldn't become
18   plaintiffs, or decided not to become plaintiffs.

19          So that information has already been teased
20   out.  And this actually ties into the final factor
21   that the Second Circuit laid out, which is the stage
22   of discovery.  We're late in the day here, and they
23   have had plenty of time and plenty of opportunities
24   to get all this information about Dr. Olivarius'
25   role prior to the time that she became engaged as

```
 1    counsel through that discovery process, which
 2    eliminates the four factors.
 3         THE COURT:  What is your response to
 4    defendants' counsel's answer to my question about
 5    this issue of need, that while they may know some of
 6    the people that Olivarius spoke to during her
 7    investigation, that that doesn't mean they know
 8    everybody that she spoke to, right?
 9         So they may know she spoke to Plaintiff A,
10    but if Olivarius has provided information and has
11    said to folks, you know, I conducted my own
12    investigation, I spoke to who knows who, that the
13    only way for them to find out, you know, the full
14    gamut of everybody that she spoke to, interviewed
15    and discussed this with is by asking her.
16         So what is your response to that issue when
17    it comes to the necessity of deposing Olivarius?
18         MR. BOWEN:  It's irrelevant.
19         THE COURT:  Why would not -- if she is
20    speaking to people who would have firsthand
21    knowledge, presumably -- I know who she spoke to,
22    other than some of the plaintiffs and some of the
23    former plaintiffs.
24         Why would what those folks are saying about
25    what's, kind of, happening on the ground with
```

1    Dr. Singh not be relevant?

2          MR. BOWEN:  Because they're not -- they

3    haven't been identified as potential witnesses in

4    this case.  And to the extent that she had

5    conversations with anybody and learned information,

6    either from firsthand witnesses or secondhand

7    witnesses, that information is totally inadmissible.

8    It's all hearsay.

9          The only way she would have relevant

10   information -- so let's keep this clear.  She's not

11   a percipient witness of anything that's relevant to

12   this case.  Any information she learned would be

13   secondhand.

14         THE COURT:  Sure.

15         MR. BOWEN:  So if it's a firsthand witness

16   who's going to be testifying in this case, those

17   people have been identified.  They've already been

18   disclosed in discovery.

19         THE COURT:  Except that there could be

20   other firsthand witnesses who you all have not

21   identified, who exist, who Olivarius somehow

22   stumbled onto.

23         And I understand you're saying, these

24   aren't people that we've listed already, but that

25   the universe of who might have relevant information

```
 1   is not everybody that the plaintiff has identified.
 2   It's everybody who, in fact, might have information.
 3        I take your point that Olivarius isn't --
 4   it's not as if Olivarius was there and seeing things
 5   firsthand, right?  This would have been a Olivarius
 6   spoke to people who presumably had firsthand
 7   information.  It's just the question of have you all
 8   found and identified every person who has firsthand
 9   information?
10        You know, we're not at trial at this point.
11   This is a -- would asking Olivarius these questions
12   about who Olivarius spoke to during her
13   investigation lead to relevant information is --
14   it's a low standard.  It's not a -- it's not a trial
15   standard.
16        I don't understand how the "we've
17   identified people" you think it's the end all, be
18   all question of who has relevant information.
19        MR. BOWEN:  Well, the point is that she
20   hasn't identified anybody who would be a witness in
21   this case, other than what we've already disclosed.
22   I mean, that information has been disclosed through
23   the discovery process.
24        If they're saying, we want to know who you
25   were talking to about Dr. Singh in your capacity as
```

1   a potential philanthropist donating money to this

2   institution, and we want to know who those people

3   are, that question is irrelevant unless the people

4   she learned information from have been identified as

5   potential witnesses in this case; in which case,

6   they already know those people, and they've already

7   had the opportunity to depose those people and, in

8   fact, have deposed those people.

9           So that, kind of, eliminates that idea that

10  there's some specific need to find out who she spoke

11  to because those people could be potential witnesses

12  in this case.

13          THE COURT:  What is your response to

14  defendants' argument that, sort of, the Friedman,

15  the In Re subpoena, isn't really the right standard

16  because the time period in which they want to

17  question Olivarius about is a time period in which,

18  clearly, by your own admission several years ago

19  when there was a disqualification request before

20  Judge Fox, Olivarius was not retained, was not --

21  you know, just was simply not a lawyer at all -- was

22  a lawyer -- was not a lawyer with respect to any of

23  the parties in this case at that time?

24          So what is your response to their argument

25  that, therefore, the, sort of, Friedman analysis

1    isn't really the one that this Court should be

2    applying?

3            MR. BOWEN:  Well, first of all, there's no

4    case law that distinguishes that.  The point is

5    that, no matter when she learned the information or

6    had the relevant interactions, she is the lead

7    litigation counsel in this case.  And it raises all

8    of the issues that the Second Circuit identified,

9    including potentially infringing upon privilege.

10           So to the extent that they want to ask her

11   about conversations that she had with current

12   plaintiffs or former plaintiffs or potential

13   plaintiffs, all of that's going to implicate her

14   mental impressions, her legal opinions and her

15   evaluation of the facts that lead up to her being

16   engaged.  And it would put her in the position of

17   trying to differentiate when she learned certain

18   information from -- whether it was before being

19   engaged or before even evaluating being engaged and

20   then after being engaged, and that's an impossible

21   position for an attorney to be in.

22           So, most of the time, there's going to be

23   an assertion of privilege to any questions of her

24   about any effort that she was making either to

25   evaluate the case from a legal point of view because

1    that eventually informs her legal advice to the

2    plaintiffs who did retain her.

3         THE COURT:  But if she's being asked

4    questions, again, as a fact witness about what she

5    saw, what she heard, what people said, that is

6    distinct from what did you conclude about what, you

7    know, person X told you.  What would -- I mean --

8         MR. BOWEN:  That's --

9         THE COURT:  Is there not a way to, sort of,

10   parse that out, that there's, here's what I saw,

11   here's what I heard, and then there's the, here's

12   the conclusions I reached because of that and advice

13   I gave people because of that, right?

14        One is involving your analysis.  And I take

15   your point that, now, as lead counsel, that there's

16   going to be, sort of, a -- I don't want to call it a

17   slippery slope, but that, you know, there's going to

18   be -- it's going to be hard to, sort of, draw the

19   line of when was I thinking about this case from the

20   perspective of someone who's actually representing

21   somebody, and when was I thinking about it in a

22   different way.

23        But if we're not asking questions about

24   what she is thinking about what she learns and

25   merely, you know, on whatever day -- I don't know

1    these dates -- but on, you know, January, whatever

2    year, you spoke to Sally Sue, what did Sally Sue

3    tell you, that's different, is it not?  I mean, why

4    could that line not be drawn?

5           We're not getting into her impressions and

6    her thoughts about the case, merely what she heard,

7    what she said, what people told her.

8           MR. BOWEN:  It's too fine a line because

9    that proves too much.  In which case, every

10   litigator could be deposed about fact information

11   that that litigator heard from a witness who may end

12   up not being a plaintiff or may even not end up

13   being identified as a potential witness in the case

14   because you're asking that litigator to give

15   information, only what that person heard, as opposed

16   to what the litigator thought about it.

17          The very fact that the litigator remembered

18   it, made a mental note of it, is an indicator that

19   the litigator thought that that was important

20   information, that it matched up with some other

21   piece of information that that litigator had, or

22   that it had some legal significance in one way or

23   another.

24          The human brain is not a machine.  She's

25   not going to be able to say, these are the words

1    that I heard from some unidentified witness or some

2    witness that I can remember the name of or maybe not

3    even remember the name of, but it's devoid of any of

4    my own evaluation of the significance of what was

5    said.

6              Just the fact that she remembers it could

7    be some evidence that she thought it was important.

8    And what I mean by "it proves too much," Judge, is

9    what's the -- if that's the standard to be applied

10   here, then why can't they depose me or depose other

11   litigators in the case and say, who else have you

12   talked to about the case, whether they're identified

13   or not as potential witnesses, because we want to

14   know who else you talked to?

15             THE COURT:  Because, by definition, that's

16   work product because you, in fact, have been

17   retained in this case.  I think what opens the door

18   to this discussion at all, Counsel, is the idea

19   that, as you all have said and declared to

20   Judge Fox, she was not the attorney in the case.

21             If she had been, you know, retained, had

22   been consulted with, was thinking about being

23   retained, and then did an investigation to see is

24   this a case I want to be involved in, that's a

25   different type of analysis than --

```
 1              MR. BOWEN:  I --

 2              THE COURT:  -- I happen to be a lawyer, and

 3     I happen to speak to some people, and then a year

 4     later, I decide to get involved in a case.  That's

 5     why they can't depose you.

 6              MR. BOWEN:  I had conversations before I

 7     was retained about this case.  All lawyers do.  You

 8     don't get retained and then learn about the case.

 9     You're learning about the case when the client

10     brings it to you as a potential retainer.

11              THE COURT:  What you all also told

12     Judge Fox is that this was not a people came to me;

13     I was thinking about, maybe; I'm investigating for

14     the purpose of figuring out is this a valid claim or

15     something that I want to, in fact, accept.

16              The idea was this was totally disconnected.

17     That's why the request to have her disqualified was

18     denied because the representation that she just was

19     simply not an attorney connected to the dispute at

20     that time, that her involvement was based on she

21     debating if she wanted to make a donation and, in

22     that context, spoke to these people and did these

23     things.

24              I mean, I don't think you can, sort of,

25     have it as a sword and a shield.  She's not our
```

1    attorney.  She had nothing to do with it back then;

2    therefore, she can't be disqualified.  But she was

3    enough of our attorney that she can't be deposed.  I

4    don't think that you can have both of those.

5         MR. BOWEN:  Well, I don't think the

6    disqualification motion was made solely on the fact

7    that she was an attorney.  The point is that she's

8    not a witness to any of the underlying events in

9    this case, with the sole exception of the two

10   conversations that she had with Dr. Singh, which we

11   agreed she could testify on those topics because

12   that is an issue in the sense that Dr. Singh has

13   testified -- there's only two people who can testify

14   about those meetings, and that's Dr. Singh and Dr.

15   Ann, Dr. Olivarius.

16        And then the whole question is whether or

17   not Dr. Singh is being truthful about what happened

18   at that -- in those conversations.  To the extent

19   that becomes an issue in the case -- and it very

20   well might -- then Dr. Olivarius is a necessary

21   witness to that.

22        But on your earlier point, Judge, the fact

23   that she wasn't engaged at the time doesn't mean

24   that she's not evaluating the information that she's

25   learning as a lawyer.  And that's the whole issue.

1            So the point is that she was eventually

2    involved in preliminary discussions that happened

3    sometime around -- shortly after these conversations

4    that she had with Dr. Singh that led up to her being

5    engaged.  And those preliminary discussions prior to

6    being engaged are protected by attorney-client

7    privilege as well as work-product privilege.  That's

8    information that ordinarily, without exceptional

9    circumstances, an adversary is not entitled to have.

10           And the shoe goes the other way.  There

11   were conversations by lawyers on their side before

12   there was a litigation where those lawyers were

13   learning information.  Now, granted, they

14   represented Mount Sinai as an institution, but they

15   didn't represent these individuals.  They're

16   representing them now, but at the time they were

17   conducting investigations, they didn't represent

18   Mr. Silva or Mr. Singh or anything like that.

19           So why wouldn't we be able to get

20   information from them about this internal

21   investigation that they conducted where we're asking

22   them, prior to the time that they were engaged by

23   these individuals, only for the fact information

24   devoid of any of their own mental impressions and

25   legal opinions?

```
1              That's an impossible standard to police.
2    And that's why the courts are especially solicitous
3    of deposing an opposing counsel, a litigator.  That
4    just almost never happens.  And there's a reason for
5    that:  Because it infringes or threatens to infringe
6    too much on the privilege, and it would just -- if
7    the rule is so lax, litigators would be deposing
8    each other all the time, and that's something that's
9    intolerable in our situation, in our court system.
10             Thank you, Judge.
11             MS. GUERRASIO:  Thank you, your Honor.  I
12   just have a couple points to make.
13             I think we, all, need to just remember the
14   perspective that we have crossed the threshold of
15   whether Dr. Olivarius can be deposed.  Plaintiffs'
16   counsel has agreed that she will sit for a
17   deposition.  It's a matter of the scope of those
18   topics.
19             And we're talking about witnesses or
20   individuals -- I'm going to not use the word
21   "witnesses" because my adversary seems to take issue
22   with that -- but individuals who had conversations
23   with Dr. Olivarius.
24             She has put in an affidavit she had
25   conversations with individuals in London and New
```

1    York about Dr. Singh to do part of her own
2    due-diligence investigation.  We have no way of
3    knowing who those individuals are.  Somehow, my
4    adversary believes that we have those names
5    available to us.  We do not.  They are not anywhere
6    in the record.  We have to depose Dr. Olivarius to
7    find out who they are, what they said, when they
8    said it.  That information is available through her.
9    That's the need.
10        I'll also make the point that her
11   investigation and due diligence, which she directly
12   says in her affidavit, was in connection with her
13   philanthropic donation, not as counsel.
14        My adversary seems to blur this line, that
15   when she was speaking to these individuals we don't
16   know, and when she was even speaking with Holly
17   Atkinson and Anu Anandaraja in April of 2018, she
18   was doing so as a lawyer.  We know that to not be
19   true because --
20        THE COURT:  Let me, sort of, tease out what
21   I'm thinking about that because I want to hear your
22   response to it.
23        MS. GUERRASIO:  Yes.  Sure.
24        THE COURT:  I understood that argument to
25   be not that she was speaking and -- you know,

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    speaking to and investigating and doing whatever she

2    was doing back when in her capacity as an attorney

3    connected to this case.

4         But what I understood that argument from

5    plaintiff to be is that she is a lawyer, right?

6    Everywhere she goes, everything she does, that's who

7    she is because that's the training that she has, and

8    that if asking questions of her now, where she

9    clearly is connected to and retained in connection

10   with this case, about, you know, who she may have

11   spoken to however many years ago, that -- to me, I

12   think she was a lawyer back then.  I'm interpreting

13   that to mean that her memory of these conversations

14   of what was important, of what stood out, will be

15   filtered through the legal lens, which obviously,

16   now, is being applied and utilized for the benefit

17   of the plaintiffs.

18        I took that to, sort of, go to the -- I'll

19   call it Factor 3 in, sort of, the Friedman test,

20   right?  The, sort of, risk of encountering

21   privileged information; that asking her now to think

22   back on a conversation multiple years ago, that the

23   pieces of the conversation that would stand out to

24   her are the ones that stand out because she thinks

25   there's significance to the dispute.

```
 1              That's where I thought the lawyer piece
 2    was, sort of, coming in on their argument that you
 3    can't, sort of, divorce that training and her now
 4    connection to the case from the recollection that
 5    she might have about conversations, which, I agree
 6    with you, happened at a time that they represented
 7    she had no legal connection to the case.
 8              So what is your response to that, sort of,
 9    piece of it?
10              MS. GUERRASIO:  Sure.  Your Honor, I think
11    that could be said for any profession and any
12    individual.  I mean, if you ask a doctor about a
13    conversation they had as part of, you know, a
14    friendly conversation with someone, and then --
15              THE COURT:  Except work-product and
16    attorney-client privilege doesn't apply to doctors.
17    So the issue is that what we're teeing up is
18    something that is protected.
19              So you're certainly right.  If I'm a
20    carpenter and I'm talking to somebody about -- I'm
21    not going to be able to do this analogy.  This was
22    bad.  I shouldn't have gone this route.
23              But the point is, a place where I have an
24    area of expertise, right, I'm going to notice the
25    carpenter sort of aspects of it.  That's fine
```

1  because I have no privilege there.  Attorney-client

2  privilege and work product is something that is

3  protected and something that the Friedman factors,

4  you know, sort of, acknowledge as one of the things

5  to, sort of, think about.

6            MS. GUERRASIO:  Sure, but the Friedman

7  factors don't -- the Second Circuit hasn't said

8  lawyers can never be deposed.  And lawyers do -- are

9  deposed.  And, quite frankly, they have been deposed

10  in this case by my adversary -- in fact, litigation

11  counsel -- on their representation of individuals.

12            THE COURT:  I just don't know that the

13  "good for the goose, good for the gander" argument

14  is serving either one of you, right?

15            Plaintiffs' counsel did the exact same

16  thing.  That wasn't in dispute.  You all didn't

17  object.  You didn't try to get a protective order to

18  say, let's not do that, so really -- okay.  Maybe

19  you should have.  I don't know.

20            MS. GUERRASIO:  Sure.

21            THE COURT:  Maybe it was perfectly fine.

22  Either way, it's of no moment to the decision about

23  whether or not Olivarius will be able to be deposed

24  beyond, clearly, as they've conceded, those two

25  conversations with Dr. Singh.

```
 1              MS. GUERRASIO:  Sure.

 2              THE COURT:  But please carry on.

 3              MS. GUERRASIO:  So, as I believe I

 4    represented when I was standing at the podium

 5    earlier, our -- and I believe your Honor actually

 6    made this point -- the questions for Dr. Olivarius,

 7    in terms of who she spoke with, what they said, when

 8    she had those conversations, who has knowledge,

 9    those are facts.  No matter which way you slice

10    them, they are facts.  They are not her mental

11    impressions.  They are not her work product.

12              There's information that was provided to

13    her from someone else.  That's what we want to know.

14    I don't have an intention of asking Dr. Olivarius

15    about her attorney work product or mental

16    impressions she had, or conclusions or strategies

17    she reached as a result of that information she

18    learned.  But the information she learned from

19    others, those are facts.  That's not work product.

20    That's the distinction I would say.

21              THE COURT:  All right.  Thank you.

22              So, again, I don't know where you would

23    like to go next.  The next letter was the January

24    28th requesting a protective order to narrow the

25    30(b)(6) topics, and then it's obviously subtopics
```

1    to -- you know, there's sub-issues, rather, to that
2    question.
3         So we could go there next.  Or, obviously,
4    you have the February 25th letter seeking to compel
5    the production of certain categories of
6    communication, so ...
7         MS. GUERRASIO:  Sure.  I'm happy to go to
8    the next letter, which was the January 28th, that
9    concerns the corporate representative deposition
10   notice.
11        Your Honor, defendants' application for
12   protective order in connection with the corporate
13   representative deposition notice really stems from a
14   disagreement amongst the parties as to the purpose
15   of a 30(b)(6) deposition.
16        A corporate representative deposition is to
17   provide answers on behalf of the company, concerning
18   policies, practices, procedures, corporate decisions
19   that are central to the facts of the litigation.
20        It's not supposed to be a memory test.
21   It's not supposed to be an individualized assessment
22   of every employee who worked in a department over a
23   ten-plus-year period, or a substitute for questions
24   that should have been -- or in this case, already
25   were -- asked of individual deponents, including the

1    individual managers relevant to this case.

2          But that's what the plaintiffs are seeking

3    in this 30(b)(6) notice.  So we're asking the Court

4    to provide limitations either because the scope of

5    inquiry the plaintiffs are asking for is overbroad

6    or is akin to an information dump, too

7    particularized as to individual employees or

8    irrelevant, seeking irrelevant information.

9          By our count, there are six issues in

10   dispute with respect to the 30(b)(6) deposition

11   notice.  I believe those to be the relevant time

12   frame for the notice; AIGH's policies and practices

13   regarding changes to titles, positions,

14   descriptions, job duties under faculty ranks; then

15   AIGH's policies and practices regarding office

16   seating arrangements; then the personnel who worked

17   at Mount Sinai Global Health from 2012 to 2015; the

18   personnel who worked at AIGH from 2014 to 2024; and

19   then Emilie Bruzelius' comparators.

20         So let's talk about the relevant time frame

21   first.

22         This case concerns one alleged principal

23   discriminator, Dr. Prabhjot Singh.  Discovery before

24   and after Dr. Singh was in the role of director at

25   AIGH is simply not relevant to the litigation.

```
1              Dr. Singh became AIGH's director in 2015
2    and stepped down July 2019.  As a compromise, prior
3    to coming to the Court, defendants agreed to go back
4    as early as April 3, 2014, which is the date when
5    AIGH was first announced as an institute.  At that
6    point, it really was a shell of an -- a shell within
7    Mount Sinai.  There was no director.  There was --
8    they were building up what would become the
9    institute.  But plaintiffs insisted that 2015 was
10   not the right time to start.
11             We then learn that, in fact, plaintiffs
12   want to go back to 2013 because they want to include
13   within this relevant time frame promotion decisions
14   made as to Dr. Anandaraja and Dr. Atkinson.
15             Dr. Anandaraja and Dr. Atkinson are not
16   plaintiffs in this litigation.  And, in fact, none
17   of the current plaintiffs worked at AIGH in 2013.
18   Dr. Singh did not work at AIGH in 2013.  In fact,
19   AIGH did not exist in 2013.  So the idea that we
20   should go back to promotion decisions regarding two
21   individuals who are not plaintiffs at a time when
22   the principal alleged discriminator did not work at
23   the institute and the institute didn't exist, it
24   does not have any nexus to what this case is about
25   today.
```

```
 1              Plaintiffs make the argument that, in
 2    certain circumstances, experiences of other
 3    employees can be presented as evidence of a hostile
 4    work environment, but there must be some nexus to
 5    the claims that currently exist.  For all the
 6    reasons I just went through, that nexus does not
 7    exist.  So we would submit that the proper time
 8    frame is what we have presented to plaintiffs.  And
 9    we have conceded already to even go back earlier, to
10    April of 2014, and concluding July of 2019.
11              Excuse me.  The next, I guess I'll say
12    topic --
13              THE COURT:  I think --
14              MS. GUERRASIO:  Sure.  Please.
15              THE COURT:  -- I'm to pause you and hear
16    the response on the time frame --
17              MS. GUERRASIO:  Okay.
18              THE COURT:  Just so that we can, sort of,
19    drill down on that --
20              MS. GUERRASIO:  That makes sense.
21              THE COURT:  -- and then move on to the
22    other sort of requests to narrow the 30(b)(6)s.
23              Counsel?
24              MR. CERVENKA:  Good morning, your Honor.
25    Jan Cervenka, from McAllister Olivarius, on behalf
```

1    of the plaintiffs.

2             Your Honor, Counsel is incorrect that the

3    only discriminator in this case is Dr. Singh.

4    Plaintiffs pled allegations of discrimination

5    against the institution, against another defendant,

6    Bruno Silva, and are alleging that not just

7    Dr. Singh, but Bruno Silva and the institution at

8    large discriminated against women and created and

9    perpetuated a hostile work environment based on

10   their sex.

11            As to the time frame, Counsel for

12   defendants is correct that the only dispute on this

13   issue is whether or not the time frame should be

14   extended to 2013 regarding promotions of

15   Dr. Atkinson and Dr. Anandaraja.

16            Those two women, in 2013, were employed by

17   defendant, Icahn School of Medicine in Mount Sinai.

18   They were put forward for promotion, an academic

19   promotion, at the same time as two men were in the

20   same department.  The two men got the promotions.

21   Dr. Atkinson and Dr. Anandaraja didn't get those

22   promotions.  And they testified that they believed

23   that was for discriminatory reasons.

24            They continued working at AIGH until 2016,

25   under Dr. Singh's tenure, where the discriminatory

1   environment, they claim, worsened and involved some

2   new actors, such as Dr. Singh and Bruno Silva.

3          THE COURT: Let me ask you, Counsel, how is

4   a court to determine what an appropriate time frame

5   should be?

6          You know, you could -- what if you -- what

7   I mean is this: We obviously know the time frame in

8   which Dr. Singh was there. I hear you on the

9   argument that, look, we're not just saying that

10   Dr. Singh is the only problem, that it's the

11   institution, broadly, that there's other folks we've

12   identified as discriminators. But how far back,

13   then, should a court allow someone to go?

14          You could say, oh, well, you know, the

15   Southern District of New York is an institution that

16   has stood since, you know, 18-whatever, and let's go

17   back until, you know, the very beginning and, sort

18   of, see if there's a pattern. And here, the two

19   folks that you've just identified, Atkinson and

20   Anandaraja, their claims themselves were dismissed

21   because they were time-barred.

22          And so does that not, sort of, give some

23   guidance to the Court that there has to be, you

24   know, sort of, some limiting factors, even in a

25   situation where, obviously, you are going to be

1    alleging and attempting to prove that there is a,

2    you know, sort of, pattern and a culture of

3    discrimination against women that sweeps more

4    broadly than Dr. Singh?

5            But should I not take some -- you know, I

6    don't want to call it guidance, but some

7    persuasiveness from the fact that those claims were

8    time-barred, right?  And so, clearly, a court has

9    already said, this is too old.  We can't bring this

10   in.

11           Why, now, should we be able to have

12   discovery into a time frame that couldn't be, sort

13   of, substantively part of the case?

14           MR. CERVENKA:  Yes, I appreciate the

15   difficulty of the exercise in front of the Court.

16           In response, I would say, first, defendants

17   conceded that the time period prior to Dr. Singh

18   being employed, even under their --

19           THE COURT:  Did they concede, or did they

20   offer a compromise, which you all then rejected?

21           Like, I mean, I hear what you're saying.

22   And, obviously, Counsel herself just said we were,

23   you know, willing to, sort of, go back a little

24   further.

25           I did not hear that as an argument being

1    that they thought that that was in any way relevant,

2    but that when we have a dispute about discovery, you

3    know, the first step is to have a meet and confer

4    and see if the parties can, sort of, work it out.

5         So I'm not sure that concede with respect

6    to relevance is really the proper use of their offer

7    to expand the time frame beyond when Singh took

8    over, was appointed, entered the picture.

9         MR. CERVENKA:  I appreciate that.  And a

10   better phrasing would be that they offered to go

11   prior to when he was employed.

12        And we are not -- plaintiffs are not asking

13   to move the time period to 2013 across all matters.

14   The only inquiry in 2013 that they're asking the

15   Court to consider to be falling within the scope of

16   the 30(b)(6) deposition notice is the limited issue

17   of Dr. Atkinson's and Dr. Anandaraja's promotions.

18        It's not a wholesale attempt to start

19   talking about 2013.  The only topic prior to the

20   otherwise agreed time period is the limited topic of

21   their promotions.

22        THE COURT:  And you think the fact that

23   those very promotions were time-barred in terms of

24   the actual complaint is not something that factors

25   in; is that --

AMM TRANSCRIPTION SERVICE - 631.334.1445

1          MR. CERVENKA:  You know, your Honor, I

2    believe it's a factor, but it's a limited inquiry.

3    The scope for discovery in employment hostile work

4    environment cases is relatively broad and

5    challenging, challenging to define.

6          We are not asking for a wholesale expansion

7    of the time period, but only to one or two cojoined

8    events which were pled in the complaint remain part

9    of the complaint that is live before this Court and,

10   again, are limited in scope.

11         THE COURT:  All right.  Thank you.

12         MS. GUERRASIO:  I'll move on to the next

13   topic unless your Honor has any other questions.

14         THE COURT:  I do not.

15         MS. GUERRASIO:  Okay.  The next part of the

16   30(b)(6) notice that I want to -- that was presented

17   in our application concerns Topic 1.  And it appears

18   with respect to Topic 1 there are two subtopics that

19   the parties are in dispute now.

20         The first is Subtopic G, and that subtopic

21   is about policies and practices regarding changes to

22   titles, position descriptions, job duties and/or

23   faculty ranks.

24         Plaintiffs argue that subtopic G is

25   relevant because plaintiffs have a claim that women

1    at AIGH received inferior titles and job

2    descriptions to men, but this is a red herring.

3         Topic G seeks testimony on changes to

4    titles, changes to job descriptions.  The only

5    plaintiffs, again, who have allegations that their

6    job descriptions or their job titles were changed

7    are Holly Atkinson and Anu Anandaraja.  Those two

8    plaintiffs' claims have been dismissed as

9    time-barred.

10         I'll also say that our -- it is our

11   obligation to prepare our witness to testify about

12   the topics that the parties agree upon or upon which

13   your Honor orders.  Those topics need to be

14   proportional to the needs of the case as it stands

15   today.  Topics that relate to plaintiffs that have

16   been dismissed and/or actions that happened before

17   the relevant time period, it's our position, that

18   would not be proportional, and it would be outside

19   the scope of what a 30(b)(6) witness should be --

20   have to be prepared and testify about.

21         In their submission to the Court, the

22   plaintiffs point to the investigation outcome.  They

23   quote from the investigation outcome as the nexus

24   that exists between Topic G and the facts of the

25   case.  Again, I'm going to say that that's a red

1    herring.

2              Pay parity was one of the concerns raised

3    as part of the investigation.  The investigation

4    result that they are citing to is about pay parity.

5    It's not about job titles or job descriptions or

6    changes to jobs.  It is about pay parity and an

7    analysis.

8              So the plaintiffs are using that language,

9    and there's been testimony on this -- on the record

10   as to what that language referred to.  And, in fact,

11   they asked witnesses about it multiple times.  That

12   did not have anything to do with job descriptions or

13   job titles, and that's in the record in multiple

14   instances.

15             I will also note that plaintiffs have

16   already taken the deposition testimony of Dr. Singh

17   as AIGH's director and their chief operating

18   officer, Kirsten Knaup.  And Dr. Singh and Ms. Knaup

19   both testified about the policies and procedures for

20   job descriptions, job titles.

21             These questions have been asked of

22   witnesses.  This is duplicative of that testimony.

23   And we would say, again, we should not have the

24   burden of having to educate a 30(b)(6) witness when

25   this testimony has already been taken, and it would

1    be outside what's proportional to the needs of the

2    case.

3              That's -- do you want me to go to office

4    seating arrangements or to stop there?

5              THE COURT:  I think we can add in the

6    office seating arrangements.

7              MS. GUERRASIO:  Okay.

8              THE COURT:  I think it's narrow enough that

9    plaintiff will be able to respond in kind.  Thank

10   you.

11             MS. GUERRASIO:  So with respect to office

12   seating arrangements, plaintiffs assert that office

13   seating arrangements are relevant because women sat

14   in cubicles while men had offices.

15             Again, this is testimony that has already

16   been elicited from Ms. Knaup as the chief operating

17   officer of AIGH.  She testified about how --

18             THE COURT:  So this issue, the argument is

19   duplicative as opposed to relevance?

20             MS. GUERRASIO:  Yes.

21             THE COURT:  Okay.

22             MS. GUERRASIO:  So I will say that in the

23   meet and confer discussions, it was not made clear

24   to us what office seating arrangements specifically

25   referred to.  We've since also had deposition

1    testimony.  In their submission, they say "cubicles"
2    versus "office."

3          So, yes, Ms. Knaup has already testified
4    that offices were allocated based on rank.  She's
5    testified that Dr. Anandaraja and Dr. Safo both had
6    offices, that she had an office, that Dr. Singh had
7    an office, and David Berman had an office.  And all
8    of that was based on their position and the rank of
9    their position within the organization.

10          Ms. Knaup also testified that, once a
11    concern was raised to ISMMS, AIGH, about women are
12    seemed to be placed in cubicles more often than men,
13    the issue was dealt with.  And, in fact, plaintiffs
14    have testified that, yes, there was a change made
15    once that issue was raised.  So any testimony from a
16    30(b)(6) witness would be duplicative and, again,
17    not necessary given the testimony that's already
18    come.

19          THE COURT:  Okay.  Thank you.

20          MR. CERVENKA:  Your Honor, Defense Counsel
21    is incorrect by representing that the only people
22    who plaintiffs alleged had changes to their titles
23    were the dismissed plaintiffs, Atkinson and
24    Anandaraja.  Plaintiffs have alleged that the
25    current plaintiffs were given inferior titles to men

```
 1    where --
 2            THE COURT:  I don't think the issue is
 3    inferior titles.  I think what she was highlighting
 4    is it was the change in titles that it -- because
 5    that's what Topic 1, that piece of it -- what is
 6    it -- G is asking for.
 7            So I hear you on the idea that there might
 8    be some broad issue about, you know, men have a
 9    fancy-sounding title and women have some title that
10    sounds inferior and that that is part of the claims
11    for the remaining plaintiffs, but what they have
12    teed up, and I'd like your response on, is this idea
13    that what's being asked for here in G is changes in
14    titles.  And they're making the representation that
15    it is only Atkinson and Anandaraja who complained
16    about a change in title.
17            So are you saying current plaintiffs also
18    complained about changes in title versus, you know,
19    sort of, some inferior title to what their male
20    counterparts would have had?
21            MR. CERVENKA:  Yes, your Honor, that's
22    correct.  Plaintiff Safo's title changed during her
23    employment at ISMMS.  And other plaintiffs were also
24    offered title changes of promotions that didn't
25    materialize for various reasons.  So it is a
```

 1    current, live issue in this, in this dispute.

 2           THE COURT:  Then what is your response --

 3    and this, I guess, would go to the seating

 4    arrangement piece as well -- that, regardless of the

 5    relevance -- and they're saying it is relevant

 6    because, at the very least, Dr. Safo, and perhaps

 7    others, also complained about these issues of change

 8    in title -- what is your response to her argument

 9    that this is duplicative because it has already been

10    asked of -- she said Dr. Singh and somebody else.  I

11    don't recall who, but that there was already

12    testimony about policies with respect to titles and

13    changes of titles and the like, and that, therefore,

14    the need to, sort of, prep and get a 30(b)(6) person

15    ready to testify would be not proportionate to the

16    needs of the case because it's burdensome without

17    giving any new value to you all.

18           MR. CERVENKA:  I have two responses to that

19    question, your Honor.

20           First, Dr. Singh and Ms. Knaup didn't have

21    complete or satisfactory recollection of the events

22    during their deposition.  And also, the defendant

23    institution has already found their approach to

24    these issues to be insufficient.

25           As an outcome of the investigation, the

```
 1   institution concluded that its policies were not
 2   transparently and consistently used by the lower
 3   administrative unit, which was the Arnhold Institute
 4   for Global Health.  The institution decided to
 5   remove Ms. Knaup from her position.
 6           THE COURT:  When you say the institution
 7   decided, you know, as a result of their
 8   investigation, you're speaking now to the title
 9   change?  Because the representation that was made by
10   Defendants' Counsel was that the investigative
11   outcome actually spoke to a pay parity issue and did
12   not, in fact, reflect on, sort of, this question of
13   title changes.
14           MR. CERVENKA:  Yes, it did, your Honor, and
15   we included an exhibit in support to this point.
16   It's exhibit -- in Docket Number 1632 -- I believe
17   it was filed under seal -- 1643.  My apologies.
18           It was filed under seal.  It's labeled as
19   confidential.  But I think a reading of Number 5 and
20   Number 7, in particular, in the exhibit clearly
21   shows that the institution looked at much more than
22   just pay parity, but also the very topics that
23   plaintiffs seek to include.
24           THE COURT:  All right.
25           Did you have a response on the argument the
```

1    defendant made about the seating arrangement

2    questions, also, they say has been testified to and,

3    therefore, would be duplicative to have a 30(b)(6)

4    person prepped to testify to that?

5        MR. CERVENKA:  Yes.  And so, again, perhaps

6    center discussion on the fact that we're asking for

7    knowledge of policies on the various institutional

8    levels.  We are not asking the 30(b)(6) corporate

9    representative to provide factual testimony about

10   the specific circumstances, but whether or not there

11   was a policy on the --

12       THE COURT:  But they specifically said that

13   somebody -- I'm not going to try to get who it

14   was -- that somebody, and maybe two somebodies,

15   testified specifically about the fact that there

16   were policies, and the policy was, you know, X, Y

17   and Z, based on rank or something like that.

18       So I hear you on the, we're not asking the

19   30(b)(6) person to talk about, you know, factually

20   who was sitting where.  But, again, their argument

21   was someone already testified, has already been

22   deposed specifically about the policies with respect

23   to the seating arrangements, and that, therefore, it

24   would be burdensome because it wouldn't be necessary

25   because it would be duplicative.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              MR. CERVENKA:  Yes.
 2              THE COURT:  So are you saying there wasn't
 3   adequate testimony about the policies with respect
 4   to the seating arrangements?
 5              MR. CERVENKA:  That's right.  It wasn't
 6   adequate testimony, in our view.  And the witness,
 7   Ms. Knaup, was already previously found to have not
 8   maintained and enforced the institutional policies
 9   correctly and, therefore, she was removed from post.
10              So we are asking for the umbrella defendant
11   organization's view as to the existence of any
12   policies regarding this topic.  If there are no
13   policies, then that's going to make for a short
14   deposition on this topic, but we have not received
15   adequate testimony to date on what the policies were
16   at the level of the organization as a whole or the
17   smaller administrative unit that the Arnhold
18   Institute was.
19              THE COURT:  All right.  Anything else?
20              MR. CERVENKA:  Nothing on these points,
21   your Honor.
22              THE COURT:  Thank you.
23              MS. GUERRASIO:  Your Honor, if I could just
24   respond quickly on that before I go to the last
25   topic -- or the next topic -- I apologize.
```

1          In that exhibit that Mr. Cervenka directed
2     the Court to, Exhibit 3, the two items that he
3     highlighted, paragraphs 5 and 7 -- paragraph 5
4     concerns practices and policies regarding promotions
5     and hiring.  We have already agreed to produce a
6     witness to testify as to those exact two topics.
7          And number 7 absolutely concerns
8     appropriate classification and pay parity between
9     men and women and to ensure transparency, nothing
10    more.  So I'm not sure what Mr. Cervenka is
11    referring to that I'm somehow misrepresenting what
12    those two items refer to, but we have already agreed
13    to produce someone to testify about promotions and
14    hiring.  And the second bullet absolutely concerns
15    pay parity.
16         Two other, just, notes quickly.
17         Mr. Cervenka says that he is not looking
18    for testimony about how the office seating
19    arrangement policy was applied to individuals.
20    That's exactly what Topic 2 is seeking.
21         If you look at the Schedule A that's
22    attached to their notice, in fact, Number 2 reads:
23    Knowledge of how all such policies, procedures and
24    practices that fall under Topic 1 were applied or
25    not applied to, and then lists 12 different

               AMM TRANSCRIPTION SERVICE - 631.334.1445

1    individuals.  So I'm not sure how that

2    representation can be made.

3          The last thing I will say, I'm not sure

4    what Mr. Cervenka is referring to when he says that

5    Ms. Knaup was found to not have enforced the

6    policies and was dismissed from Mount Sinai.  That's

7    not what the testimony revealed, that she was found

8    to have lost confidence in the people who reported

9    to her.  That's what's been on the record.

10         I'm happy to move on to the next topic if

11   your Honor does not have any questions.

12         THE COURT:  I do not have any more

13   questions on this particular topic.  Thank you.

14         MS. GUERRASIO:  So as I just touched upon,

15   Topic 2 actually seeks testimony as to how all of

16   these policies -- and we're talking about, now, an

17   agreement amongst the parties of already 11 topics,

18   and there are two in dispute -- how they apply to 12

19   different individuals.

20         The plaintiffs have conceded that they're

21   willing to withdraw Humale Khan from that list, but

22   that still leaves 11 individuals that plaintiffs

23   would like 30(b)(6) testimony as to how each

24   individual policy was applied to that person.  That

25   type of individualized testimony is not what a

1    30(b)(6) is intended to provide.

2            The answers to questions about how Mount

3    Sinai's policy with respect to hiring, a promotion,

4    a retaliation, or harassment was applied to each

5    individual will depend on context.  The purpose for

6    which the policy was being relied upon, that type of

7    particularized inquiry is not appropriate for a

8    30(b)(6) deponent.  That's the type of inquiry you

9    ask of an HR individual or of that person's manager,

10   which, by the way, plaintiffs have deposed.

11           They've deposed 17 individuals in this

12   litigation, many of whom are plaintiff supervisors.

13   They have seven supervisors that they've deposed.

14   They've deposed also Kirsten Knaup, the chief

15   operating officer, and two HR professionals.

16           Plaintiffs have had multiple opportunities

17   to collect the information about how policies and

18   procedures were applied to specific individuals on

19   numerous instances.  To the extent that they haven't

20   asked those questions or they're unhappy with the

21   answers does not give them the ability to now create

22   a 30(b)(6) deposition that would require very

23   fact-specific, individualized inquiry that no

24   institution retains that type of knowledge that

25   could be given to one individual.

1            Do you want me to move on or stop there for

2    a second?

3            THE COURT:  Was that all that you had to

4    say on this topic of Topic 2 applying to these

5    various folks?

6            You've spoken broadly about, sort of, all

7    12 -- or I guess we'll call 11 since Khan is being

8    withdrawn.  I didn't know if you wanted beyond just

9    the concept that this is not, sort of, an

10   appropriate area of inquiry for 30(b)(6), if you had

11   any other arguments with respect to this, Topic 2.

12           MS. GUERRASIO:  Sure.  So, you know, we did

13   agree that if they would like to have individualized

14   testimony as to the four plaintiffs and Dr. Singh,

15   that we could educate a witness as to whether there

16   were any policies or practices that applied to those

17   individuals.

18           But their list also includes individuals

19   who never worked at Mount Sinai.  It also includes

20   individuals who have been dismissed from this

21   litigation, again, Dr. Atkinson and Dr. Anandaraja.

22   It also includes high-level supervisors that the

23   plaintiffs were not on the same -- you know,

24   reported to, not in the -- not comparators, for

25   example.

```
 1            Again, the burden of having to educate a
 2    30(b)(6) witness falls on the defendants, and when
 3    that burden becomes so disproportionate to what the
 4    case is actually about, it's not a practical, you
 5    know, vehicle for having the testimony.
 6            THE COURT:  All right.  Thank you.  I'm
 7    going to pause there so I can hear the response.
 8            MS. GUERRASIO:  Yes.
 9            MR. CERVENKA:  Your Honor, the offer of
10    compromise that the defendants extended to
11    plaintiffs was to limit the individuals in Topic 2
12    to plaintiffs and one of the remaining defendants,
13    Dr. Singh.
14            Defendants particularly criticized
15    plaintiffs for including Dr. Abdulrahman El-Sayed
16    and Dr. Sandeep Kishore in that list.  Dr. El-Sayed
17    testified that he never worked at the school.  He
18    was nonetheless hired to work at the school, hired
19    under extraordinary circumstances.  He also was
20    present at the premises prior to his official start
21    date, engaged in strategy discussions and building
22    of the institute, and so has been active in the
23    workplace prior to his official start date, which is
24    similar to how Dr. Singh came on board.  He started
25    getting involved in the leadership position prior to
```

1    his official start date.

2        Dr. Sandeep Kishore was one of the senior

3    leaders at the institute, and defendants are

4    incorrect to claim that that makes him unsuitable as

5    a comparator to any of the plaintiffs.  One of the

6    plaintiffs, Dr. Stella Safo, was also a member of

7    the senior leadership team, was the same rung of the

8    hierarchy at the institute as Dr. Sandeep Kishore.

9    And so, again, plaintiffs maintain that Dr. Sandeep

10   Kishore is also a relevant person for the purpose of

11   this exercise.

12        THE COURT:  Thank you.

13        MS. GUERRASIO:  Topic 5, your Honor, seeks

14   detailed information about the terms and conditions

15   of employment for all employees who worked at Mount

16   Sinai Global Health, which was the predecessor to

17   the Arnhold Institute of Global Health.  Mount Sinai

18   Global Health ceased to exist once AIGH was created.

19        To be clear, Dr. Singh never worked at

20   Mount Sinai Global Health.  None of the named

21   defendants ever worked at Mount Sinai Global Health.

22   None of the current plaintiffs ever worked at Mount

23   Sinai Global Health.  There are no allegations of

24   gender discrimination or harassment concerning Mount

25   Sinai Global Health.  There are absolutely no nexus

1    between the current plaintiffs and their claims and

2    Mount Sinai Global Health.

3            Again, in talking about proportionality to

4    the claims that exist and what a 30(b)(6) witness

5    should be prepared to testify, this is outside the

6    scope of what's relevant to the case and what would

7    be proportional.

8            THE COURT:  Would not the, sort of, I'll

9    call it, transition of those folks from being under

10   the Mount Sinai umbrella to being under AIGH, if

11   there were -- and I don't know how in the world a

12   business, you know, goes from one to the other

13   because that's not, you know, the job that I'm in,

14   but presumably there's, you know, some process of,

15   sort of, well, now they were here, and now we need

16   to do whatever so that they're under this umbrella.

17           Wouldn't, sort of, the steps, if there

18   were -- I don't know -- onboarding, whatever that's

19   happening during that transition period -- is your

20   argument that that is irrelevant as well?

21           MS. GUERRASIO:  My --

22           THE COURT:  I hear you on the, like, nobody

23   from -- like, the plaintiffs didn't work at Mount

24   Sinai.  But, again, Mount Sinai, clearly, this

25   section, has transitioned into AIGH, so ...

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              MS. GUERRASIO:  Sure, your Honor.

 2         The -- I just lost my train of thought.  I

 3    apologize.

 4         The Mount Sinai Global Health -- oh, that's

 5    what I was saying.  The topic as framed in their

 6    notice is not about the transition.  The topic is

 7    actually defined into two different topics:  Topic 5

 8    and Topic 6.

 9         We want to know everything about all the

10    employees who worked at Mount Sinai Global Health.

11    And then, separately, we want to know everything

12    about all the employees that worked at AIGH.  We're

13    not asking you about how the transition happened,

14    how one person's job changed or how they got placed

15    in a different role.  That would be a different

16    topic, and that would be a different discussion.

17         The information they're seeking is

18    particular job duties, responsibilities, for

19    positions that did not exist then under AIGH.

20    They're asking for compensation numbers for

21    employees that did not work at AIGH.  Faculty rank.

22    A whole litany of items for individuals who, you

23    know, it's defendants' position, have no relevance

24    to this case.

25         One of the -- also, the things that is in
```

1    this list of items they want is discussions of any

2    negotiations that individuals at Mount Sinai Global

3    Health had regarding their pay, their promotions,

4    their hiring, any term and condition of their

5    employment, essentially.

6            THE COURT:  And let me just, so I have it

7    right --

8            MS. GUERRASIO:  Yes.

9            THE COURT:  Ever?  Or within the context of

10   the transfer?

11           MS. GUERRASIO:  Within Mount Sinai Global

12   Health.  At any time when they worked at Mount Sinai

13   Global Health.

14           We're talking about, now, having to go

15   through every person who worked in Mount Sinai

16   Global Health and do an inquiry to find out the

17   negotiations they had about every facet of their

18   employment.  This is getting to be too broad.  This

19   is not relevant to the claims that are currently

20   pending in this case.  And it's our position that

21   this is too burdensome and not proportionate to the

22   needs of the case.

23           I can go to Topic 6, which is, sort of, a

24   mirror, or I can stand.

25           THE COURT:  I think it might make sense to

 1    loop in Topic 6 since it does have some similar

 2    aspects to it.

 3         And then, obviously, your response.

 4         MS. GUERRASIO:  Sure.  Okay.

 5         So Topic 6 is a mirror image of Topic 5 but

 6    with respect to AIGH and, again, for what we would

 7    submit is an overextension of the relevant time

 8    period.

 9         So first, Topic 6 asks for all of the same

10    types of specific employee information for a

11    ten-year period, which we, for all the reasons I

12    identified earlier, say is too broad.

13         Dr. Singh worked at AIGH from 2015 to 2019.

14    In fact, many of the plaintiffs left before he had

15    left, or around the same time period.  To now ask

16    for data going up to 2024 for employees who were

17    still at the institute in 2024 is outside the scope

18    of this litigation.

19         For the same reasons I articulated as to

20    why Topic 5 is not suitable for corporate

21    representative testimony, those same arguments apply

22    to Topic 6.  So testimony that identifies AIGH

23    employee job duties, compensation, their faculty

24    rank, negotiations of their hiring, their

25    onboarding, who they supervised, who supervised

1   them -- as to each employee who worked in AIGH -- I

2   mean, that is so expansive and a particularized set

3   of data that someone would have to know as a

4   30(b)(6) representative.  It's not the purpose of

5   this, a corporate deposition.

6            This type of testimony should have been

7   sought from the managers and the HR individuals that

8   they deposed already and have asked numerous of

9   these questions about negotiations:  Did you

10  negotiate for your position?  Did you negotiate your

11  salary?

12           They've already asked a number of witnesses

13  those types of questions.  They're seeking this now

14  for the entire workforce of AIGH, which we say is

15  too broad.

16           As a compromise -- again, in the spirit of

17  a meet and confer -- defendants offered to provide a

18  list of the AIGH employees that worked at Mount

19  Sinai in AIGH for the time period that we have

20  identified as relevant to the litigation and to

21  include in that their title, their faculty rank, and

22  who their supervisor was.  That's defendants' offer

23  because we believe that would be the relevant

24  information that plaintiffs could have if there were

25  some other witness that they wanted to identify;

1    though, I will now submit, obviously, fact discovery

2    has closed, and this type of inquiry should have

3    been done long before.

4         We received the 30(b)(6) deposition notice

5    two weeks before the close of fact discovery at the

6    time.  So the idea that this has been -- this was,

7    sort of, put to the end also, I think, plays into

8    where we are.

9         That's all I have on this.

10        THE COURT:  Thank you.

11        MR. CERVENKA:  Your Honor, I have a few

12   matters to bring in response.

13        It is true that Topics 5 and 6 are

14   essentially mirrored.  It is also true that

15   plaintiffs and defendants have agreed on a time

16   period for these requests, absent the issue of 2013

17   promotions.

18        The reason why we are asking for

19   information regarding Mount Sinai Global Health, the

20   preceding institutional variation of AIGH, is

21   because we have received testimony from Dr. Singh

22   and others that even on his first day, months after

23   the commencement of the otherwise agreed time

24   period, AIGH wasn't really fully instituted, and

25   that, in fact, a lot of effort had to be put to

1     properly institute it and complete, if not start,

2     the transition from MSGH to AIGH.

3              So we're constrained by the relevant time

4     period.  For a portion of it, AIGH wasn't really a

5     functioning unit, MSGH was.  And so we're really

6     asking the same types of documents, the same types

7     of questions.  It just so happens that, for a good

8     few months, the relevant institution was MSGH rather

9     than AIGH.

10             So we're not asking the defendants to go

11    back decades prior.  MSGH was started at some point

12    in the early 2000s.  We're not looking that far

13    back, but we are looking --

14             THE COURT:  So you believe -- so your

15    representation is that the time frame on what you're

16    asking for Topic 5 is what?  Because I've heard this

17    2013.  We've got the, well, even once AIGH, sort of,

18    came in, it was still -- existed as an entity, that

19    it really wasn't, sort of, up and running.

20             So exactly what is it that you all are

21    asking for in terms of a start date on the Mount

22    Sinai information?

23             MR. CERVENKA:  Yes.  So the agreed time

24    period, your Honor, for the most part, is April 3,

25    2014, when the formation of the Arnhold Institute

1    was announced, to July 3, 2019 when Dr. Singh, the

2    inaugural director, stepped down from his leadership

3    role at that institute.

4           But again, he testified, and others

5    testified, too, that from an administrative

6    perspective, many of the AIGH processes were not

7    fully prepared come even September or October of

8    2014, so a few months into the otherwise agreed time

9    period.

10          THE COURT:  So that was your argument with

11    respect to Mount Sinai.

12          What is your argument with respect to, you

13    know, sort of, every employee at AIGH for this

14    ten-year period from 2014?  My understanding was you

15    were going all the way up to 2024.

16          And what is your response to defendants'

17    argument that this is simply too broad and simply

18    too much in terms of the proportionality to the

19    needs of the case?

20          MR. CERVENKA:  Yes, your Honor, and we note

21    defendants' offer to produce documents in lieu of

22    30(b)(6) deposition.  We haven't received those

23    documents yet.  We're open to receiving documents in

24    lieu of deposition testimony on these topics.  It's

25    our position that the topics are proportionate.

 1          I look at, for example, Subtopic B,
 2    compensation.  It is, I think, generally accepted
 3    that part of this lawsuit concerns compensation,
 4    whether there was pay parity between genders or not.
 5    Yet, in the document that defendants offer to
 6    produce to plaintiffs in lieu of deposition
 7    testimony, compensation isn't one of the datasets
 8    that they're willing to share.
 9          It may well be that there aren't any --
10    that there isn't any institutional knowledge on
11    negotiations that people have been allowed to
12    undertake regarding the terms and conditions of
13    their employment, but plaintiffs have no way of --
14    we have no way of knowing that.  It is a live issue.
15          It is a live issue in the case.  And,
16    again, we believe it's proportionate to the needs of
17    the case to ask a corporate representative whether
18    men or women were allowed to negotiate terms of
19    their employment because testimony we've unearthed
20    so far suggests that there was a disparity along
21    gender lines.
22          I don't have anything else to add about
23    Topics 5 and 6, unless your Honor has any questions.
24          THE COURT:  I do not.
25          MS. GUERRASIO:  Your Honor, if I can, just

1     two quick points there.

2            So defendants didn't concede that 2014 was

3     the relevant time period.  That was a compromise

4     that was offered.  And while, yes, defendants did

5     offer to provide a list of employee names, that was,

6     again, a compromise as part of a meet and confer.

7     And plaintiffs would not agree to, then, strike the

8     topic for deposition testimony.  They wanted the

9     list and to also be able to depose someone then on.

10    So it wasn't actually an agreement at all that

11    plaintiffs represented, it would be a compromise.

12           I will also say with respect to the

13    compensation data that plaintiffs are requesting,

14    one plaintiff has a pay parity claim, Dr. Bruzelius,

15    or Emilie Bruzelius.  None of the other plaintiffs

16    do.  And plaintiffs' comparators or compensation

17    information with regard to Dr. Bruzelius, that is a

18    specific request and, in fact, is a different

19    deposition topic we're about to talk about.  That

20    doesn't require or necessitate compensation for

21    every person who worked at AIGH for a ten-year or

22    nine-year -- whatever the period we're going to

23    agree upon is.

24           Quite frankly, the list of categories they

25    have identified in their notice very much appears to

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    be a fishing expedition for them to look for

2    information that is not relevant to what is before

3    the Court in the time frame.

4           Okay.  The last topic, I believe, on this

5    for us to address is Topic 7, and that seeks

6    deposition testimony of all employees performing

7    equal work, requiring equal skill, effort and

8    responsibility as Emilie Bruzelius.

9           As we have represented to the plaintiffs in

10   the meet and confer discussions -- and we had

11   numerous of them -- this request seeks a legal

12   conclusion from Mount Sinai -- from a Mount Sinai

13   witness and tries to shift the burden that

14   plaintiffs must carry to identify who Ms. Bruzelius'

15   comparators are.  That's not defendants'

16   responsibility.

17          Questions about employees performing work

18   similar to Plaintiff Bruzelius is a question that is

19   most appropriately directed to her and to her

20   supervisors.  That question has already, in fact,

21   been asked and responded to.

22          Plaintiffs asked that very question of

23   Dr. Weissman and of Dr. Singh.  Both said that

24   Ms. Bruzelius did not have a comparator of someone

25   who performed the same work, the same job duties,

1    the same responsibilities.

2         Plaintiffs have now tried -- there's no

3    need for corporate testimony on this point.  There

4    has already been testimony as to who performed

5    similar work to Dr. Bruzelius.

6         Plaintiffs now seem to try and reframe

7    Topic 7 in their response to the Court to knowledge

8    of ISMMS's review of Dr. Bruzelius' job duties,

9    titles and compensation to ensure appropriate

10   classification and pay parity.

11        First, I will submit to the Court this is

12   not the topic that the parties met and conferred on

13   or that was included in the notice.  It is an

14   entirely different topic.  And, again, this would go

15   to the fact that there has already been testimony

16   provided as to who Ms. Bruzelius' comparators are,

17   and that the individuals who conducted that review

18   of Ms. Bruzelius' pay have already testified.

19        Plaintiffs have had the documents as to who

20   reviewed Ms. Bruzelius' pay and her job duties.

21   They've had those documents now for two years --

22   three years, actually.  It's 2025.  And they deposed

23   those individuals.  The fact that they didn't ask

24   those individuals those questions at the deposition,

25   now they want to use a 30(b)(6) for that

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1    information.  That is a fact witness deposition.  We
 2    think that it is, again, a burden they're trying to
 3    shift to defendants that the plaintiffs must carry.
 4            MR. CERVENKA:  Your Honor, before
 5    addressing Counsel's arguments on Topic 7, if I may
 6    just come back to some of the earlier arguments,
 7    plaintiffs did offer to retract Topics 5 and 6 upon
 8    receipt of the documents, if the documents indeed
 9    contain the data to a satisfactory extent.
10            Defendants offered to disclose documents.
11    And plaintiffs said in the meet and confer
12    discussions that if the documents do indeed contain
13    that information, then they will withdraw Topics 5
14    and 6.  Defendants have not produced any documents
15    in lieu of deposition testimony.
16            But it is incorrect to state that the
17    plaintiffs insisted on conducting a 30(b)(6)
18    deposition into Topics 5 and 6, even after
19    defendants produced some further documents.
20            Defendants are also incorrect -- well, let
21    me rephrase that.
22            Defendants are correct that the only
23    plaintiff bringing an unequal pay claim is
24    Dr. Bruzelius; however, the other remaining
25    plaintiffs are claiming that their pay was lower
```

1    than their -- that of men, and so their

2    compensation, promises of pay raises that never

3    materialized, whereas men received pay increases for

4    similar jobs at the same time is a relevant issue to

5    other plaintiffs as well.

6         And Defendants' Counsel made a quick

7    reference to the 30(b)(6) notice only being shared

8    with them a few weeks prior to the close of

9    discovery.  I may have misunderstood that, but I

10   just want to say it on the record that that is not

11   correct.  The 30(b)(6) deposition notice was served

12   on defendants in October of 2024, many months prior

13   to the end of fact discovery.

14        Regarding Topic 7, the parties, on the last

15   meet and confer call that they had prior to the

16   defendants filing this motion, agreed to step back

17   and think of an alternative for Request Number 7 to

18   not end up using the 30(b)(6) vehicle as a vehicle

19   to get legal conclusions out of corporate witnesses.

20        Defendants raised this as an issue.

21   Plaintiffs accepted the issue and agreed to seek a

22   different way of reframing it.  We stated the

23   different way of framing it at the bottom of our

24   motion.  As phrased, we believe that's an

25   appropriate request.

```
 1              The institution, as a result of the 2018
 2    investigation, decided to conduct a thorough review
 3    of everybody's titles, pay, et cetera, to make sure
 4    that they are not just harmonious within AIGH, but
 5    at the institution at large.
 6              Dr. Bruzelius was one of the employees that
 7    the institution looked at, compared her to somebody,
 8    I presume.  We have no way of knowing because we
 9    don't have that information.  And so what we're
10    asking for is ISMMS's own exercise of looking at
11    comparators for Dr. Bruzelius in 2018, after the
12    conclusion of the investigation.
13              THE COURT:  What is your response to
14    defendants' argument that the very -- the question,
15    I think, the exploration of this topic is really
16    just an attempt by plaintiffs to get defendants to
17    identify for you who the comparators are, and to
18    defendants' argument that, you know, one, obviously,
19    it's plaintiffs' burden to, sort of, identify
20    comparators, but that question of, sort of, who's
21    doing similar work to Dr. Bruzelius -- I'm getting
22    this wrong.
23              Bruzelius?
24              MR. CERVENKA:  Bruzelius, your Honor.
25              THE COURT:  Bruzelius.
```

```
 1              -- was more properly asked of her and of
 2    her supervisor, and it, in fact, was asked of her
 3    and of her supervisor, and that if there were other,
 4    sort of, questions to explore on this question, that
 5    those should have been directed some time ago to
 6    both her and her supervisor.
 7              So what is your response to their broad
 8    argument that this whole, sort of, area -- attempted
 9    area of inquiry is really just an attempt to, sort
10    of, shift the burden for who should be identifying
11    comparators?
12              MR. CERVENKA:  Yes, your Honor.  The
13    supervisors that we deposed were supervisors within
14    AIGH.  They weren't supervisors at the larger
15    institution.  And --
16              THE COURT:  Okay.  Why does that matter?
17              MR. CERVENKA:  Well, AIGH had -- I forget
18    the exact number -- 20, 30, 40 employees.  It may
19    well be that only one of them did the work that
20    Dr. Bruzelius did, but I assume --
21              THE COURT:  But when we're looking at
22    comparators, isn't it, sort of, same work, same
23    whatever, you know, same supervisor, same -- I mean,
24    you could have, you know, some institution that
25    sweeps across the whole country, the whole globe,
```

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    and it doesn't matter what somebody's doing in
2    Paris.  It matters what somebody's doing, you know,
3    in the location where I'm -- if I'm the one alleging
4    discrimination, where I'm assigned.
5            So why does it -- if there are other people
6    at the larger institution who are doing something
7    similar to Dr. Bruzelius, how is that relevant?
8            How would that make them comparators?
9            MR. CERVENKA:  Because it's the larger
10   institution, your Honor, that was her employer.  And
11   the larger institution has a number of institutes, a
12   number of departments, many thousands of people
13   working for them.  And the institution has,
14   independently of this lawsuit, independently of any
15   claim of privilege, as a regular business function,
16   decided to undertake an exercise of making sure that
17   Dr. Bruzelius' terms and conditions of her
18   employment are harmonious with her -- with other
19   people performing a similar role at the whole
20   organization.  So that's the only information we're
21   after.
22           And, again, to the degree that there is a
23   document that provides the information in lieu of
24   the deposition testimony, we are, of course, happy
25   to accept that as a compromise, too.

1        I have nothing further, your Honor.

2        MS. GUERRASIO:  I think those are all

3   the -- oh, that's all for the 30(b)(6).

4        THE COURT:  There's more.

5        MS. GUERRASIO:  There's more.

6        Okay.  Your Honor, I'm happy to say I

7   believe the last outstanding application for the

8   Court concerns some outstanding discovery documents.

9        Defendants submitted a motion to the Court

10  that concerns documents defendants believe are being

11  improperly withheld as either attorney-client

12  communications or attorney work product or under a

13  common-interest privilege.

14       I'm going to divide the documents into

15  three buckets.  I think that's the easiest way for

16  us to address them.

17       So first, I want to address within

18  defendants' application documents that concern a

19  third-party witness named Elena Rahona.  Ms. Rahona

20  is a former ISMMS employee.  She worked at AIG for a

21  short period of time, and she left in 2015.

22       As part of her departure, she signed a

23  separation agreement.  She received severance.  As

24  part of that separation agreement, she got a sum of

25  money and signed a release.

1          Ms. Rahona testified in her deposition that

2     she understood that upon signing her release

3     agreement that she could not bring a legal claim

4     against Mount Sinai, yet we have pages and pages of

5     communications that plaintiffs' counsel has withheld

6     on the basis that she had a common interest with the

7     plaintiffs in this litigation.  That is simply

8     wrong.

9          The common interest only applies when

10    parties or individuals have an identical legal

11    interest, and we set that analysis out in our

12    letter.  Ms. Rahona never had an identical legal

13    interest with the plaintiffs because she knew and,

14    in fact, in either way, could not bring a legal

15    claim against Mount Sinai.

16         In addition, the redacted messages which

17    are withheld under the common-interest privilege

18    include Renee Bischoff.  Renee Bischoff is not a

19    plaintiff, has never been a plaintiff; in fact, is

20    still a Mount Sinai employee.

21         THE COURT:  Not being a plaintiff, I

22    don't -- I certainly take your point on the argument

23    with respect to Rahona and will certainly be

24    interested to hear plaintiffs' response to that, but

25    the idea of "is not a plaintiff," I don't really

1    think is the legal framework, right?

2         The idea is, is there an identical legal

3    interest?  And if -- you know, the fact that

4    somebody might have had the identical interest and,

5    at the end of the day, decided not to bring a

6    lawsuit, I don't think would vitiate the common

7    legal interest, sort of, protection.  But on Rahona,

8    I certainly take your point, but ...

9         MS. GUERRASIO:  Understood, your Honor.

10        If we look at the messages that have been

11   redacted under this common-interest privilege -- and

12   that would be Exhibit 8 in the submission -- the box

13   is marked attorney-client, first of all.

14        I will note for the record, we never

15   received a privilege log, which includes any of the

16   markings of redaction for attorney-client

17   communications.  And, in fact, no attorney is listed

18   in this document anywhere, so this is not an

19   attorney-client communication.  And we have no

20   indication on any privilege log as to why it was

21   withheld.

22        At the time of this communication, August

23   of 2018, we know that Dr. Olivarius was not serving

24   as counsel for plaintiffs.  And, in fact, this

25   communication concerns the letter that the

1    plaintiffs were planning to send to the newspaper.

2    If you just read the few parts that you can see

3    right above the big redaction box, it concerns what

4    Ann Olivarius thought of the letter.  And we've seen

5    Ann Olivarius' communications with Holly Atkinson,

6    which she says, I am not your counsel.  I can't

7    provide you with legal advice.

8         But here are my thoughts on the letter:

9    Plaintiffs have redacted this as an attorney-client

10   communication.  There's no attorney-client

11   privilege.  And, in fact, it's our position there's

12   also no common-interest privilege because

13   Ms. Rahona, who's on these communications, could not

14   have the same legal interest as the plaintiffs.

15        The next black box, which is on the next

16   page, is dated March 1, 2019.  Again, the same women

17   are part of the communication, including Elena

18   Rahona, and who could not become a plaintiff, knew

19   she couldn't become a plaintiff, and had no common

20   interest with the other women.  Again, this is also

21   not marked on a privilege log, but was identified as

22   a privileged communication.

23        There are page -- you see just in what we

24   produced, but there was an 89-page document, the

25   majority of which had redactions like this.  And our

1    application to the Court is that those redactions be

2    removed.

3              The second bucket of communications I want

4    to discuss -- actually, I'm going to step back for

5    one second.

6              You know what?  No.  I think it will be

7    easier if we just talk about the -- there are three

8    statements.  One was on behalf of -- or produced --

9    excuse me -- was written by Elena Rahona, the

10   witness that I just told you about.  And then two

11   other witnesses.

12             McAllister Olivarius has withheld those

13   three statements as attorney work product.  Once

14   again, none of these statements have been included

15   on a privilege log that we've received to date,

16   which raises the question of whether other

17   statements exist that we don't know about.  And

18   the --

19             THE COURT:  You know what?  I'm going to

20   pause you because I think --

21             MS. GUERRASIO:  Sure.  Do you want to --

22             THE COURT:  -- you know, text versus

23   statements which, you know, may or may not have been

24   prepared with the direction of attorney are really,

25   sort of, two different issues.

AMM TRANSCRIPTION SERVICE - 631.334.1445

```
 1              MS. GUERRASIO:  Yes.

 2              THE COURT:  So let me hear from plaintiffs

 3    on this question about whether the presence of

 4    Rahona in these text group communications, you know,

 5    initiates any potential privilege that might have

 6    existed.

 7              MS. GUERRASIO:  Sure.

 8              MR. BOWEN:  This is Mike Bowen.  I'll

 9    address that issue on this motion, which is at

10    Document Number 166.

11              So on these -- this argument that

12    Ms. Rahona could not be seeking legal advice or

13    didn't have a similar interest only because she had

14    signed a release is just illegitimate on its face.

15    I mean, anybody -- we're all lawyers in this room,

16    and we all know that people sign documents and then

17    go to a lawyer to try and figure out what it means

18    and whether they are, in fact, barred from bringing

19    a certain type of claim, which would involve

20    defining what that claim would be.

21              So these communications by these women were

22    discussing their communications with a lawyer about

23    their rights and legal -- potential legal claims and

24    evaluation of these legal claims against this

25    defendant.
```

```
 1              So it's a common interest because all of
 2    them were in the same environment.  They all had
 3    questions about whether that environment, which
 4    pertained to all of them, would give rise to a claim
 5    that all of them shared against this defendant.
 6              THE COURT:  Except the whole argument here
 7    that is being made by defendant is that Rahona did
 8    not have that legal interest because she had
 9    already, you know, sort of, waived it, given it
10    away.  I mean, what --
11              MR. BOWEN:  Who's to say that?
12              I mean, is Ms. Rahona herself a lawyer?
13    No.
14              Did she have her own layperson
15    understanding equivalent to a lawyer evaluation of
16    how that release would be enforced in this kind of
17    situation?
18              THE COURT:  Well, I guess, two issues,
19    then.
20              MR. BOWEN:  Simply because she has a
21    legal --
22              THE COURT:  Two issues, then.  One, I've
23    heard defendants say -- and I obviously don't know
24    because I'm not privy to all the depositions --
25    that, one, when Rahona was deposed, she testified
```

1    that her understanding was that she had, in fact,

2    you know, sort of, given away the right to sue.

3         So that's one thing.  So I'd like to hear

4    your response on that.

5         But the second, does it matter?  Meaning if

6    I wrongfully believe that I have, you know, some

7    kind of legal issue, right, legal interest, and it

8    turns out I'm wrong about that or I -- and does my,

9    you know, subjective belief about whether I have a

10   legal issue matter, or is the question, do I, in

11   truth, have a legal interest?

12        So two points.  One, I'd like to hear your

13   response to this question, this issue that Rahona,

14   when deposed, said, I signed it, and I understood it

15   to mean I'd given up my right to sue.  So that would

16   be her understanding.

17        But number two, does her understanding

18   actually matter, or is the Court looking at

19   something else?

20        MR. BOWEN:  Well, it's an objective

21   evaluation whether there's a common interest or not.

22   And that common interest may be mistaken in

23   retrospect, but certainly at the time that the

24   parties are discussing the legal advice that they're

25   seeking of the group, as long as they all had a

1    plausible or articulable common interest, that's

2    enough to protect the privilege in that

3    circumstance.

4         THE COURT:  Again, what I'm drilling down

5    on here is, is common interest defined by whether

6    the person believes that they have the interest or

7    whether they, in truth, have the legal interest,

8    right?

9         Those are -- those can be two separate

10   things.

11        MR. BOWEN:  Yes, I understand, Judge, and I

12   think it's an interesting question, but I think my

13   answer to that question is it really doesn't matter.

14   It may be that --

15        THE COURT:  And do you have some case law

16   that you can direct me to that says, you know,

17   whether the person's subjective knowledge of the

18   interest matters or doesn't matter or anything like

19   that?

20        MR. BOWEN:  Well, I think it's the

21   solicitude that the courts provide for the privilege

22   itself.  The whole concept of the privilege is to

23   protect people when they seek legal advice from

24   counsel so that they're able to speak freely without

25   any worry that there's going to be a divulgence of

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    what kind of advice they were seeking or what kind
2    of advice they got.
3         THE COURT:  But here we're already one
4    removed from that, right?  There's one thing if
5    we're talking about Rahona goes to an attorney and
6    has a conversation with an attorney about, can I do
7    this?  Can I do that?  You know, this thing that I
8    signed, what does it forestall me from doing, and
9    what does it not?
10         Here, we're talking about a group of people
11    who are not lawyers, right?  I mean, unless I'm
12    getting this wrong, my understanding is that this
13    group chat didn't contain lawyers, but that the
14    people in the chat were discussing, I spoke to a
15    lawyer.  Maybe I, you know, with Person B, spoke to
16    a different lawyer about the same issues, and here's
17    what the lawyers are advising us, collectively.
18         So already this is not the same as the
19    scenario you're talking about, which is, sort of --
20    it's providing a type of protection, I'll grant you,
21    but it's not -- I don't think the issue here is we
22    want people to be able to go out and consult with
23    lawyers about whether they have an interest or not.
24         Because you're certainly right, I could be
25    wrong about my assessment of the law.  I could go to

1    a lawyer.  The lawyer could tell me, actually, you

2    don't have a claim.  That's still protected.

3              MR. BOWEN:  Right.

4              THE COURT:  I mean, I don't think anybody

5    anywhere is arguing differently.

6              MR. BOWEN:  Right.

7              THE COURT:  But here we're already a step

8    removed, right?  We're having a conversation between

9    nonlawyers about what lawyers told them, which,

10   whether protected or not, is just, sort of, a bad

11   idea.  And I'm sure we would all counsel people not

12   to, sort of, do this because it opens the door to

13   these kind of inquiries.

14             So I don't know that your response is

15   really getting at what the issues are here.

16             MR. BOWEN:  Well, I want to get at your

17   concern.

18             THE COURT:  Go ahead.

19             MR. BOWEN:  So your observation that this

20   is a conversation among a group of people who are

21   reporting to each other what they learn from lawyers

22   is correct.  That's my understanding of this

23   document as well.

24             My point is that, to the extent that that

25   group of people had assessed that they all have a

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    common interest -- and what that common interest is

2    based on, objective fact, they all work for the same

3    employer at the same period of time and had similar

4    complaints about the working conditions for that

5    employer.  So they were talking as a group about

6    moving as a group, both in seeking legal counsel and

7    then making decisions about proceeding with claims,

8    legal claims, based on what that legal counsel told

9    them.

10         And, Judge, this is not just one legal

11   counsel we're talking about.  They could be seeking

12   legal advice from various different people and

13   reporting back to each other.  And that's no

14   different than any other type of organization where

15   you have a group of people who are self-identifying

16   as seeking legal advice that it may end up, at the

17   end of the day, doesn't apply to all of them, but

18   that's based on the legal advice that they're

19   getting as a group.  And that's simply what was

20   happening here.

21         So just as a, you know, nonprofit

22   organization or a company can go as an entity and

23   seek legal advice, and then their employees, their

24   agents within that organization, can discuss it

25   amongst themselves, that's one situation.  Another

1   situation could be a class-action type of situation

2   where the people are self-identifying as a relevant

3   class, but it turns out they're wrong.  The class is

4   smaller than what they thought.  But all of that is

5   protected by privilege.  And that's just blackletter

6   law.

7           So I don't think this situation is anything

8   extraordinary.  And the idea that Ms. Rahona,

9   because she had signed a release, that's it; any

10  conversation she goes and seeks advice from the

11  lawyers can't be protected by privilege, or if she's

12  talking to somebody else who's already obtained that

13  advice, to see if she falls under that umbrella as

14  well, that's ruled out because she signed a release,

15  and she testified she understood what that release

16  meant, but that's a layperson understanding.

17          The idea that she signed a document and,

18  therefore, has no attorney-client privilege if she's

19  looking for legal advice about what that document

20  means, which, frankly, is an obvious thing to do and

21  something that our society would encourage her to

22  do --

23          THE COURT:  But, again, nobody here is

24  saying that she wouldn't have attorney-client

25  privilege.  Since this is a conversation with an

AMM TRANSCRIPTION SERVICE - 631.334.1445

1    attorney, that's covered.

2              MR. BOWEN:  I heard --

3              THE COURT:  Whether she's right about the

4    claim, wrong about the claim, it's now part of this

5    group.  Because here's what's going on, right,

6    attorney-client privilege, that's, sort of, bedrock,

7    right?  Hopefully, nobody ever comes for the

8    privilege.

9              It's important what we're talking about is,

10   these are communications which would otherwise be

11   discoverable.  And we've created this sort of

12   exception that says, well, wait a minute, if there's

13   a situation where people have the same legal

14   interest and those folks are having a conversation,

15   we're going to now, sort of, extend this extra

16   protection to it.

17             So we're not talking about attorney-client

18   privilege.  You keep wanting to go there.

19             MR. BOWEN:  I'm responding --

20             THE COURT:  This is the satellite

21   conversation.

22             MR. BOWEN:  I'm responding to something the

23   Defense Counsel said.  She said, because she signed

24   the release -- and your Honor mentioned you wanted

25   to hear our position on this.

1          THE COURT:  Right.

2          MR. BOWEN:  Because she signed a release

3   and testified she understood she couldn't bring a

4   claim, that's it.  She no longer has a common

5   interest with people who haven't signed the release

6   and may have a claim.

7          THE COURT:  Sure.

8          MR. BOWEN:  And what my point is, is that's

9   wrong.  That's just simply wrong.  Of course,

10  somebody who signed a release still has the ability

11  to consult with counsel or to self-identify with a

12  group of people that shares a common interest who

13  are all consulting with counsel and sharing with

14  each other what they learn.

15          Simply because she signed the release and

16  testified that she had a layperson understanding of

17  what that meant doesn't mean she's outside of that

18  common group.  That's my only point because that's

19  what defendants' counsel was arguing, and your Honor

20  said you wanted to hear our position on it.

21          And I would challenge them to find any case

22  law that says because somebody signed a release and

23  understood what it meant, that they cannot then

24  seek -- be protected by attorney-client privilege or

25  common-interest privilege with a group of people who

1    otherwise have a common factual circumstance that

2    may lead to a common set of legal claims.

3              THE COURT:  Okay.

4              MR. BOWEN:  And the other thing I would

5    point out is, they're making -- they make arguments

6    about Dr. Olivarius and when she became engaged and

7    things like that and things that Ms. Rahona

8    testified to about her relationship with

9    Dr. Olivarius, but Dr. Olivarius isn't the only

10   lawyer.  They're assuming that she is, but it's

11   easy -- as easy to assume that this group of people

12   were talking to other lawyers, which one would

13   expect probably happened.  So that's part of the

14   factual circumstances here.

15             And, your Honor, we have with us an

16   unredacted copy of these excerpts.  I don't think

17   it's that many pages, but we can --

18             THE COURT:  They said there was something

19   that was 80 or 90 pages, maybe.  Are we talking

20   about two different --

21             MR. BOWEN:  That's not what I'm saying.

22   It's redacted.

23             MR. CERVENKA:  The full exchange is the

24   exhibit that was --

25             THE COURT:  Oh, in terms of the unredacted

```
 1    copy of the exhibit.
 2              MR. BOWEN:  It was blacked out.  Just the
 3    redactions.
 4              THE COURT:  Sure.
 5              MR. BOWEN:  It's only a few pages.  And we
 6    can submit that for in camera review.
 7              THE COURT:  Yes.  Please hand that up to my
 8    law clerk, and then we will --
 9              MR. BOWEN:  Do we yellow highlight what's
10    been redacted so the Court can see?
11              MR. CERVENKA:  I got it.
12              MR. BOWEN:  Okay.
13              It's indicated with blue ink, what's
14    redacted, your Honor.  And we should staple that.
15              Do you have a stapler?
16              THE COURT:  I do.
17              Did you -- can we just put a sticky on
18    that, marking that that's the redacted -- the
19    unredacted as well as the redacted?
20              MR. BOWEN:  That corresponds with which
21    exhibit?
22              MR. CERVENKA:  So that's the unredacted
23    version of Exhibit --
24              MR. BOWEN:  5.
25              MR. CERVENKA:  -- 8.  Thank you.
```

```
 1                THE COURT:  8.  Yes.  Thank you.
 2                MR. BOWEN:  Yes, Exhibit 8 --
 3                THE COURT:  Okay.
 4                MR. BOWEN:  -- which is at Doc Number
 5       168-2.
 6                THE COURT:  All right.
 7                MS. GUERRASIO:  Your Honor, just two points
 8       to respond there.  It has to be an identical legal
 9       interest, and that is a legal question.
10                Even if the plaintiffs mistakenly thought
11       there was some common interest, if they did not have
12       an identical legal interest, that does not qualify
13       them for the common-interest privilege.
14                THE COURT:  And is there some case law that
15       you can point me to about that?  Because that was,
16       sort of, what I was trying to tease out from
17       plaintiffs' counsel, this question of is it, you
18       know, the person or the group's objective
19       understanding of what the interest may be, or is it,
20       you know, objectively an actual legal interest?
21                And so if there's some case that you can
22       point me to --
23                MS. GUERRASIO:  Yes.
24                THE COURT:  -- and if you don't have it --
25                MS. GUERRASIO:  Your Honor, it's in our
```

1    submission to the Court.  And, in fact, we have

2    multiple cases cited there which say that disclosure

3    to a non-client or agent of a third party has waived

4    that privilege, thinking that there was a common

5    interest.  And when the court determines there is

6    not, it's waived.

7            Yeah.  And you'll see in our submission --

8    it's the *In Re* -- I'm going to mispronounce this --

9    *Rivastigmine Patent Litigation*, where the Court

10   says, "Merely sharing a desire to succeed in various

11   civil litigations does not support that there's a

12   common-interest privilege."

13           So it can't be your desire to want there to

14   be a common interest.  There actually has to be a

15   legal identical --

16           THE COURT:  Well -- all right.  I'll look

17   at it.

18           MS. GUERRASIO:  Sure.

19           THE COURT:  I don't -- sure.  All right.

20           MS. GUERRASIO:  Okay.

21           THE COURT:  All right.  So the three

22   statements?

23           MS. GUERRASIO:  Yes, your Honor.

24           There are three witness statements, that

25   defendants know of, at least, that McAllister

1    Olivarius has withheld from production as attorney

2    work product.

3         Again, I think I started to say before,

4    your Honor, that none of these statements have been

5    included on a privilege log, which raises the

6    questions of whether there are more statements out

7    there that we are just unaware of because these

8    statements came to our awareness through deposition

9    testimony.

10        So we'll start with Ms. Rahona.  She

11   testified that she had communications with

12   McAllister Olivarius prior to the litigation and

13   provided the firm with a statement that she had

14   written, and I quote, "to tell her story."

15        This was all prior to her retention of

16   McAllister Olivarius to represent her and after she

17   had signed a release against -- a release waiving

18   all claims against Mount Sinai.  The statement that

19   Ms. Rahona wrote on her own to tell her story is not

20   attorney work product.

21        THE COURT:  So I just want to be clear

22   about exactly -- I understand it's a -- you know,

23   she testified and says, I spoke to Olivarius.  I

24   provided Olivarius with the statement, and it's the

25   statement I had written.

1          I just want to be clear, sort of, on the --
2     on whatever temporal language was used in this
3     deposition, if any.
4          Did she say, I prepared this statement
5     before I -- because you can have a, I met with
6     Olivarius, and Olivarius asked me to prepare a
7     statement, and then I wrote a statement, and then I
8     gave it to Olivarius, versus, you know, I've got a
9     diary where I'm keeping notes, and then I meet with
10    the lawyer, and the lawyer says, can I see these
11    things.
12         So is there any temporal language in the
13    deposition that makes clear when and how and under
14    what circumstances this -- whatever it is --
15    statement was prepared?
16         MS. GUERRASIO:  Yes.  So, your Honor, I'll
17    be honest.  Ms. Rahona's recollection of the time
18    period was not good.  She, in fact, thought we were
19    talking about 2016, which doesn't really comport
20    with any of the other dates in this case.  So the
21    precision of the time frame is a little bit
22    difficult to point down -- to pin down.  Excuse me.
23         So what I did ask her is, I said:
24         "Q:  "Ms. Rahona, did you prepare a written
25    statement concerning your experience at Mount

1   Sinai?"

2                   "A:  Yes.

3                   "Q:  When did you prepare that?

4                   "A:  I don't recall.

5                   "Q:  What was the purpose of your preparing

6   the statement?

7                   "A:  To tell my story.  To tell my story.

8                   "Q:  Did anyone ask you to write it?

9                   "A:  Yes.  I wrote a statement for

10  McAllister, for Honza.

11                  "Q:  When was that request made?

12                  "A:  I don't recall."

13          So she wrote the statement presumably after

14  she had a conversation with McAllister Olivarius,

15  though I don't know the time frame.  She said,

16  "2016."

17          THE COURT:  But regardless of, you know,

18  where it is in the timeline of the universe is

19  really the point.  If the question that you just

20  said was asked, did you prepare that statement for

21  anyone or at the direction of anyone, or whatever

22  that language is, isn't that the relevant piece,

23  right, that I was asked to prepare this in the

24  context of discussions with an attorney?

25          MS. GUERRASIO:  Well, your Honor, I think

1    that it's attorney work product if the -- let me

2    step back for a second.

3        Ms. Rahona, at the time that she prepared

4    this statement, was not a client of McAllister

5    Olivarius.  She testified to that.  Whether she was

6    seeking legal advice, she's now submitted a --

7    during her deposition, she said she was not.  She

8    said she did not seek legal advice.  She has since

9    produced an affidavit to retract that testimony and

10   say she doesn't understand what "legal advice"

11   means, and she's retracting that.

12       Either way, a statement that is prepared by

13   a witness about her telling her story doesn't just

14   become attorney work product because counsel has

15   asked her to write down her factual recitation,

16   which is what she told us it is.  I wanted to tell

17   my story.  This is my story.

18       She attempted to testify about it, but

19   counsel prohibited her from doing so, and so

20   that's -- we're going to direct her not to answer

21   any questions about the statement.

22       The same encounter happened with

23   Mr. Escotia (phonetic) under almost the same exact

24   facts.  Mr. Escotia testified at his deposition that

25   he had prepared a statement, and counsel objected to

1    him testifying about it.  He did testify that he was

2    not -- he had not retained McAllister Olivarius at

3    the time.  This was many, many years ago that he had

4    written it.  And, again, he was prohibited from

5    testifying about it.

6            There's a third statement written by James

7    Fagnes (phonetic), who was someone who worked at

8    AIGH.  He was not a -- he has not been a witness in

9    this case, but Dr. Holly Atkinson, at her

10   deposition, testified that she saw a statement

11   written by James.  And then when I went to go ask

12   her what that statement was, again, plaintiffs'

13   counsel said, no, no, no.  She's -- we're going to

14   preclude her from testifying about that and assert a

15   privilege.

16           We've not seen these documents.  It appears

17   that this claim of privilege is being used as a

18   shield here to shield these documents from

19   production, which would have been for us to have

20   prior to the deposition of Mr. Escotia, prior to

21   Ms. Rahona's deposition, but we didn't even know

22   they existed.

23           We would submit that they are not covered

24   by the attorney-work-product privilege because,

25   again, they were written, it appears, from other

1    testimony we have -- we don't know about Mr. Fagnes.

2    But, again, Holly Atkinson testified she saw a

3    statement.  But it's specifically with respect to

4    Ms. Rahona.  She wrote it to tell her story.  Work

5    product doesn't necessarily apply just because an

6    attorney has a conversation with someone and they

7    write their story down.

8           But I will say that if the Court agrees

9    that these documents are properly classified as

10   privileged, they cannot be used as a sword against

11   defendants down the road, which is where we're

12   anticipating that this issue is going to come to a

13   head.

14          They have been withheld from us in

15   discovery.  If they are properly being withheld as

16   privileged, they should be logged on a privilege

17   log, and we should understand when they were

18   created, who created them, the normal information

19   that's on a privilege log.  And then later down the

20   road, whether it's at summary judgment or at trial,

21   they should not be permitted to be, then, thrown at

22   us as a sword as here's information you didn't know

23   about.  And we would like, then, an order from the

24   Court prohibiting that.

25          THE COURT:  Plaintiff?

```
 1              MR. BOWEN:  Well, it sounds to me like
 2     defendants' counsel is, in fact, conceding that this
 3     is subject to the work-product privilege.  An
 4     attorney who asked a witness to write down the
 5     events that the attorney has discussed with that
 6     witness in order to send that information to the
 7     attorney is quintessential work property, and I
 8     don't think there's any real doubt about that.
 9              Now, Defense Counsel misread the testimony
10     about this by Ms. Rahona because at page 198 of her
11     deposition, as Defense Counsel read, the witness
12     made clear that she wrote the statement for
13     plaintiffs' counsel at the direction, at the
14     request, of plaintiffs' counsel because she says, "I
15     wrote a statement for MCO," meaning McAllister
16     Olivarius Law Firm, "for Honza," meaning
17     Mr. Cervenka.
18              The next question was not when that request
19     was made, as the Defense Counsel misread, but the
20     question was:
21              "Q:  Was that request made in a
22     conversation, a verbal conversation?
23              "A:  I don't recall."
24              But later -- I think Defense Counsel
25     overlooked this -- at page 204 of that same
```

 1    deposition transcript, which is attached as

 2    Exhibit 10 to the motion, the witness then comes

 3    back to it because the question is:

 4             "Q:  Do you recall when you may have

 5    answered this?  And if you did, I apologize.  Do you

 6    recall when you drafted it?

 7             "A:  I don't know the exact date.

 8             "Q:  Time frame, roughly?

 9             "A:  Late spring, early summer.  I don't

10    know.  I do not know.

11             "Q:  Of what year?

12             "A:  2019."

13             So it's clear that this was after the

14    McAllister Olivarius firm had been retained.  It's

15    clear it was after this litigation started.  It's

16    clear that this was attorney work product coming --

17    you know, request of a witness, and the witness

18    submitted the written document at the request of

19    counsel.  Quintessential work-product privilege,

20    which, I take it, defense counsel has conceded.

21             And then they argue, well, it may be an

22    issue down the road because it may be that the

23    plaintiffs' counsel are going to try and use it now

24    as a sword, and they can't do both the sword and the

25    shield.  But that issue is not ripe for adjudication

1    because I can say we're not going to do that, but if

2    that ever becomes an issue, it becomes an issue, but

3    we can't have an advisory opinion from the Court on

4    something that doesn't exist.

5           Lastly, Defense Counsel has repeatedly said

6    that these documents should have been logged.  They

7    should have known of them before the depositions.

8    But, again, the principle here is that the log

9    pertains to evidence that predated the start of the

10   litigation and that are not documents that the

11   lawyers either made or collected from either

12   witnesses or from their clients.  And that's the

13   principle that the plaintiffs correctly followed

14   here.

15          And I'll note that the defendants followed

16   that same principle, too, because we became aware,

17   through counsel exchange of letters on a completely

18   separate matter, that the defendants have written

19   affirmations from witnesses; one from Mr. Taylor,

20   who was one of the fundraisers for the institute,

21   and also one from Clarissa Jones-Winter, who was one

22   of the defendants' main witnesses in this case and

23   who we deposed.

24          And those sworn statements, or written

25   statements, or written stories that those witnesses

1    provided to the defendants were also not logged on

2    their privilege log.  Again, they're just following

3    the same principle that all attorneys understand and

4    that the plaintiffs follow, too.  So there was no

5    misconduct or no, you know, failure to disclose the

6    fact that these written documents existed.

7            Thank you, Judge.

8            THE COURT:  All right.  It is now one

9    minute after one o'clock, which means I am a minute

10   late to a Board of Judges' meeting.

11           On the last topic in that February 25th

12   letter, I believe the cases that are, sort of,

13   relied upon contemplate the idea of having an

14   in camera review of the e-mails to, sort of, see if,

15   you know, whether it is appropriate to, sort of,

16   withhold those or not, and so I am going to direct

17   plaintiffs' counsel to provide those just as you did

18   with the unredacted version of -- what was it --

19   Exhibit 8, which are the text communications, so

20   that I may review that.

21           I am also going to direct the parties to

22   order a copy of the transcript of today's proceeding

23   and send that to me.

24           There may be one or two topics on which I

25   might want some very limited additional briefing

1    from you all.  I'm not sure, but just as I was

2    hearing argument for a couple things, I was thinking

3    about, I want to go back through my notes, refer,

4    obviously, back to the documents that you've already

5    provided.

6              But if that is the case, I will try to get

7    out the request for whatever additional I want

8    sooner rather than -- what are we?  Tuesday?  Is

9    this Wednesday?  I have no idea.  Time has lost all

10   meaning.

11             Certainly, before the end of the week, if I

12   want something additional, I'll put that word out to

13   you.  Other than that, my hope is to have a written

14   decision on these issues sooner rather than later.

15   We have a draft, but as is the case last time I

16   recall having an oral argument with respect to this

17   particular case, there have been useful things that

18   each side has, sort of, highlighted in the oral

19   argument.  So, you know, what our, sort of, rough

20   draft was coming in, I'm confident will change in a

21   couple of respects.  But I mention that there's a

22   draft so that you know we are -- you know, we're

23   trying to turn this around as quickly as possible.

24             So with that, we'll be adjourned.

25

AMM TRANSCRIPTION SERVICE - 631.334.1445

1

2                           C E R T I F I C A T E

3

4       I, Adrienne M. Mignano, certify that the

5   foregoing transcript of proceedings in the case of

6   Dr. Stella Safo, et al v. Dr. Prabhjot Singh, et al;

7   Docket #19-cv-3779 was prepared using digital

8   transcription software and is a true and accurate

9   record of the proceedings.

10

11

12  Signature  _____
                    *Adrienne M. Mignano*

13             ADRIENNE M. MIGNANO, RPR

14

15  Date:       May 14, 2025

16

17

18

19

20

21

22

23

24

25