UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------:

DR. STELLA SAFO, et al.,      : Docket No.: 19-cv-03779

              Plaintiffs,   :

        v.                    :

DR. PRABHJOT SINGH, et al.  : New York, New York

                            : October 6, 2025

              Defendants.   :

----------------------------:

                PROCEEDINGS BEFORE
        THE HONORABLE JENNIFER E. WILLIS
         UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:      HERSCHMANN BENSON BOWEN, LLP
                    BY:  MICHAEL P. BOWEN, ESQ.
                    305 Broadway, 7th Floor
                    New York, New York 10007

For Defendant:      PROSKAUER ROSE, LLP
                    BY:  ADAM M. LUPION, ESQ.
                    11 Times Square
                    New York, New York 10036


Transcription Service: Marissa Lewandowski
                       Phone:  (631) 813-9335
                       E-mail:marissamignano@gmail.com

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

THE DEPUTY CLERK: Judge Jennifer E. Willis is now presiding. Court is now in session.

THE COURT: You may be seated.

THE DEPUTY CLERK: Good afternoon, everyone. We are here in the matter of Safo, et al. V. Singh, et al., Case Number 19-cv-03779.

Can the parties please rise and state their names for the record, starting with plaintiffs.

MR. BOWEN: For plaintiffs, it's Michael Bowen, B-O-W-E-N, with the law firm Herschmann Benson Bowen.

THE COURT: Good afternoon.

And defendant.

MR. LUPION: Good afternoon, your Honor. On behalf of the defendants, Adam Lupion, L-U-P-I-O-N, from Proskauer Rose.

MS. GUERRASIO: Good afternoon, your Honor. Edna Guerrasio, also from Proskauer Rose, on behalf of the defendants.

THE COURT: Good afternoon. Oh, no. Just one second. Okay.

All right. So we had a fairly lengthy discovery conference some months ago, and I issued a fairly lengthy order shortly thereafter. And directly, just a few days before the last

conference, plaintiff had filed, I believe, three letters, which we wound up not having argument about at the last conference because, obviously, neither the Court nor defendant was prepared to discuss those issues. And so the conference on those issues, the three motions that plaintiff filed -- I think this is maybe our third date, our third attempt to have a hearing on those issues.

And I had asked you all for a joint letter, which I am in receipt of, which I believe was filed September 2nd, just trying to sort of see if anything had been resolved, to just distill everything down into one more-easily-referred-to document, as opposed to all of the various letters.

So what I want to do is sort of take it in turn, so one issue at a time, so I have an opportunity to hear the response. And I know, per the joint letter, that there was some dispute amongst the parties about whether or not the timeliness of any of these motions to compel is something that we will be discussing. But, frankly, from the Court's perspective, it very much is something that I see as being part of the agenda.

So with respect to each of the requests, I'll start with plaintiff first. But I do want to

hear, as part of plaintiffs' remarks, why these motions to compel should not just be denied outright for not being filed in a timely way. But I'll turn to plaintiff first for whichever particular issue you'd like to start with, sir.

MR. BOWEN: Thank you, Judge. Again, this is Mike Bowen, B-O-W-E-N, for the plaintiffs.

I guess I'll start with the timeliness issue. I really don't see that as much of an issue because this is not unlike every case where there has been a lot of discovery, and some discovery disputes persist past the fact discovery deadline. And there's a buffer zone in the court's schedule. The fact discovery deadline was February 28th, but all discovery was to be concluded, including any lingering issues, I believe by -- yeah, by May 2025, this past year, this past May.

THE COURT: I don't believe that contemplated lingering issues. I believe that contemplated expert. So, I mean --

MR. BOWEN: Well, that makes sense, Judge. But lingering issues happen all the time, I mean, when issues come up, and --

THE COURT: But why then wait two months, right? Fact discovery ended on -- was set to close

on February 28th, and the motions to compel were not filed until April 30th. And, if I recall correctly, that was maybe two or three days before we were set to appear for hearing on the issues that had already been identified and teed up by defendant, which does -- you know, that's a two-month delay. And it also seems -- often folks like to be in a posture when we're having a conference of, well, they want some things, we want some things. There's stuff outstanding on either side. And so the timing of the filing, you know, essentially on the eve of when we were scheduled to be here to hear the issues being raised by defendant, also to me seems suspect, but ...

MR. BOWEN: Well, there were efforts to resolve these issues and some efforts to digest whatever else was coming from the defendants in order to crystallize the issues for the Court. That's the only explanation for a delay. Nor did we understand that there was some kind of deadline, that after the February 28th deadline that we had, you know, some clock was ticking and we had to get the rest of the outstanding discovery issues before your Honor.

I know there was some order or directive

from the Court that said, you know, we're going to have one last conference on this, everybody bring their last remaining discovery issues to that conference. And that's what we did. So those motions were filed before that conference, albeit not leaving enough time for the defendants to respond, but at least it put it on the Court's radar that these were still outstanding issues.

Now, the other general point I would make is that all parties under the federal rules have an ongoing duty to provide updated discovery when they find out that there are problems with their prior production. And that's really what this boils down to, that from the depositions that were held towards the end of the fact discovery period into February of 2025, there were new facts that were coming out, including, most saliently, the deposition of Mr. Starr, Kevin Starr, which was delayed for reasons it is not worth getting into.

But that deposition occurred, I think, on the close of fact discovery. So it occurred on February -- if I'm not mistaken, February 28th, 2025. And out of that deposition -- or days before that deposition, Mr. Starr's lawyer turned over documents, including communications with Dr. Singh,

who is one of the principal defendants, that were never produced before. And these documents had to exist in Dr. Singh's files because he was the correspondent with Mr. Starr.

And these are very important documents for the case. They are really documents where Mr. Starr is talking to Dr. Singh about the fact that the Arnholds, this major donor to the institute at issue in this case, were talking to the people who were in charge of the investigation and were very blatantly talking about influencing that investigation, such that additional donations or even introductions to other potential donors, none of that would happen unless certain, quote-unquote, protections were afforded to Dr. Singh that had nothing to do with the truth of the allegations against him. And that kind of influence over an investigation is obviously directly relevant. So we had a glimmer of that from what Mr. Starr produced. But Dr. Singh didn't produce his side of that conversation, so there's a clear deficiency in his production.

There's also references in those -- both Mr. Starr's testimony, as well as the few emails that he provided to us -- that there was some letter of reproach that the defendant institute put into

whatever file they were maintaining, either concerning the investigation or concerning Dr. Singh. And the Arnholds, these donors, made it a condition of future donations or continuing the relationship that that, quote-unquote, letter of reproach be removed from whatever file the institute was maintaining it in.

We've never seen that letter. We've never heard about it before. This was the first time. So we had follow-up demands that followed that deposition. And I thought that there was some agreement that Dr. Singh would undertake a review with his attorneys and make sure that everything was up to date. I think even the most latest joint submission says that they are doing that and they will produce anything that they have, but they haven't. Nothing has been produced. We don't know if they've undertaken that review or not.

They put some kind of condition on it, saying that they think it is overly burdensome and they won't do a full review but they'll do some kind of stopgap review. Whatever they're doing, we don't know when. We think the Court should know and order them to do a comprehensive review so that this missing discovery is provided.

And they -- again, Judge, they have an obligation to do it whether there's a court order or not. And we know that they didn't do it, or at least they haven't given us any indication that they've done it and have certainly not produced anything. So that is one of the core issues.

And related to that is we want to take the depositions of the Arnholds now, because the Arnholds -- Mr. Starr testified that the Arnholds -- or at least one of the Arnholds -- had direct communications with Dr. Charney, who was the dean, who oversaw the entire investigation. The investigation was reported to him.

Mr. Starr says that he's aware that Mr. Arnhold had said to Dean Charney things like, "You have to protect Dr. Singh," or "If Dr. Singh goes, we go," something like that. I'm paraphrasing. But it was a clear indication that they wanted to know what was going on, and they wanted to know that Dr. Singh -- no adverse consequences would befall Dr. Singh.

THE COURT: But talk to me about why this whole business about the investigation, whether there were, sort of, outside influences, whether it was fairly conducted or not, why is any of that

relevant to your actual claims, which are that in the first instance there was discrimination, right? The investigation after the fact, how is that actually relevant to what decisions, you know, Singh was making, whether people were appropriately promoted or not, whether gender played a role? Why does the after-the-fact investigation and whether that was fairly done have anything to do with your claims?

MR. BOWEN: Well, because the investigation itself is being relied on by the defendants as some step that they undertook, and it affected Dr. Singh's relationship with the institute. He wasn't forced to resign. He wasn't terminated or anything like that. They reached the conclusion that there was no gender discrimination or any other kind of unlawful discrimination.

THE COURT: Wait. And you think that the investigation is being relied on by defendants in which way? Because --

MR. BOWEN: Well, I don't think they can rely on it because they haven't produced the outcome of the investigation.

THE COURT: Right. So if they are not relying on it, then why is it relevant?

MR. BOWEN: Because the investigation itself is relevant. It's coming out through the testimony of all the witnesses who were interviewed by these investigators and what they said to the investigators. That kind of leads into another -- what we view as an open element, an open issue for discovery.

But the fact of the matter is that if the Arnhold Institute -- if the donors who hold the purse were telling the dean, "whatever you need to do, whitewash your investigation, I don't want any findings" -- and, again, I'm putting this in stark terms. This is not something that we have evidence of. We do have evidence that Mr. Arnhold said to Dean Charney that they don't want anything to happen to Dr. Singh -- and that does -- that would have a ramification on their continued relationship with the institute.

So that just shows complete and clear interference with -- or pressure on the, quote-unquote, investigators to reach a conclusion that's not true. Now, that may be relevant because if, as we show at trial, there was clear evidence of gender discrimination, then the jury, no matter how much they are instructed not to speculate, are going

to wonder why there was no adverse consequences to Dr. Singh other than this Oversight Committee that they set up.

THE COURT: But, again, that is not the centerpiece of your case at all. I mean, in life, clearly, one thing leads to another, leads to another, and there's thousands of ways in which things are interconnected. But your claim is these particular plaintiffs, you know, should have been promoted, were not but for gender. The idea that afterwards there either were -- there was an investigation, there wasn't; it was fairly conducted or it wasn't; Dr. Singh had consequences or not, that -- your case isn't about any of that.

I mean, this is -- it's not just sort of ancillary, we're sort of tertiary at this point. I'm still not getting why any of that after-the-fact work is relevant to your claims.

MR. BOWEN: Well, at the very least, it all goes to credibility. I mean, Dr. Singh testified that he didn't undertake any of these wrongful acts. It's a question of credibility. It's a question of credibility whether Dean Charney knew about some of these acts and when did he know about it, at least the allegations, if not the fact of what happened,

including other executives to whom Dr. Singh reported because --

THE COURT: But an investigation after the fact that may or may not have pointed to wrongdoing, how does that go to what people knew at the time that decisions were happening that would have been relevant to your clients and their promotions or lack thereof?

MR. BOWEN: Because one of the defenses in this case is that nobody complained. And our counter to that is that --

THE COURT: Look, wait, I'm sorry, nobody --

MR. BOWEN: -- they did complain.

THE COURT: Nobody complained when?

MR. BOWEN: During the time of the unlawful discrimination. So that --

THE COURT: Right. But if the investigation is taking place after the fact, that's because now there are complaints, right? I'm still not seeing how --

MR. BOWEN: It goes to credibility. So if you have a defendant who is denying that they ever heard a complaint, or they're giving a different timeline of when they understood that there was any

concern about unlawful discrimination, and we don't have any records that are, you know, pinpointing down this timeline other than the witnesses say-so, and then the witness omits mentioning at all that he had these discussions with one of the major donors to the institute that was telling him or directing him, we don't want anything to happen to Dr. Singh, that clearly goes to his credibility and whether or not he's being frank and open in saying when he did or did not know about these underlying claims of discrimination.

So they're saying, during the time -- the relevant time period, nobody was complaining and if it was true, people would have complained. We're saying people were complaining.

THE COURT: And when you're saying you have information that after the relevant time period there's an investigation and some donors find out about it and there's some discussion with some donors about, you know, protect Singh or don't protect Singh or whatever it is, I'm still not --

MR. BOWEN: No. What --

THE COURT: -- I certainly take your point that during the relevant time period, right, that there are people there, they are seeking to be

promoted. Did they complain about it? Did they not? Who knew that maybe there was gender discrimination? But this seems like it's another time period. It's that we're done now, and now we're talking about investigation after the fact.

MR. BOWEN: Well, it's after the fact only because the defense witnesses are denying it. They are denying that they got these complaints. They are denying that they knew that there were these, at least, issues of wrongful conduct during the time in question. And the question of whether that denial is credible depends on what they were being told by the donor or by the person who holds the purse and is funding the whole operation. Because -- you know, there are famous quotes, like -- I think it was Sinclair Lewis that says, you know, you can't get a man or a person to say something they are being paid not to say. It's that kind of a situation. It goes directly to credibility.

And, you know, certainly the broadest sense of discovery, which underlies the whole structure of the federal court system, or at least modern civil justice, is supposed to be broad. We're entitled to see what happened after the fact, because that may reflect, and be evidence of, prior states of mind or

prior knowledge. And that's really primarily what we're relying on in saying that this stuff is relevant.

I don't really think that there's a credible argument that's not relevant, which is why they rely so much on the timing issue in just saying, well, it's just too late. But that's not a response either.

And just one last point, Judge, on the timing issue. I think we cited this in one of our letters. There is even an exception for allowing discovery after a cutoff. And there are six factors. We outlined the six factors, and we showed that those factors weigh in favor, out of an interest of justice, to let the discovery at least conclude, because we know specific things are missing. We're not asking, go back and give us everything related to Dr. Singh. We're saying, give us the letter of reproach, give us the communications with Dr. Starr, some of which we already have, you know, his version of -- Mr. Starr.

And we want to take the depositions of the Arnholds. They would be limited depositions because it's mostly just going to be about this conversation that Mr. Arnhold had with Dean Charney. When we

deposed Dean Charney during the discovery period, he said he didn't remember conversations with Arnhold about this issue.

So there's information out there that can help get to the truth. And there's really no reason to cut it off, certainly not on some kind of timeliness notion. We certainly were raising these issues with the defendants at the time, and we've sent them emails. They say, well, that's an informal demand. It should have been a formal demand.

In my view and in my experience, practicing, you know, in federal and state court, that's usually not a good excuse. I mean, you know that these documents were not produced. You know what they are. You have an obligation, whether we demanded them or not, to go get them. So I don't think the timeliness issue is well taken at all.

THE COURT: All right. I'm going to pause you there and then hear -- unless there's more you wanted to say on --

MR. BOWEN: Well, I do, but on the discrete motions to compel. So I'm getting more into the substance and away from the timing, so I'll yield on the timing.

THE COURT: Yes. Thank you.

MR. BOWEN: Okay.

MR. LUPION: Good afternoon, your Honor. I'll try to limit my remarks to the timeliness issue. I know there was some substance interwoven there. I'd like to start, if I can, with the Court's December 23rd, 2024 scheduling order. On December 23rd, 2024, this Court entered the seventh -- the seventh and, presumably, last extension of the fact discovery deadline to February 28th, 2025. That's Docket No. 154.

Indeed, the Court noted that no further extension would be granted absent extraordinary circumstances. Your Honor, I'd like to note that this order was a carefully negotiated document between the parties, principally because defendants wanted to put guardrails around discovery, given the disputes or the discovery that necessitated the six prior extensions. So rather than open-ended discovery, the parties agreed and this Court so ordered that the extension would be limited to certain enumerated discovery items. Your Honor, these are the lingering disputes that Mr. Bowen referred to that were covered by this order.

Now, insofar as is relevant here, the order

provided that discovery shall be extended until February 28th, 2025, so that the parties can raise any unresolved discovery disputes to the Court. That's subparagraph 5 of the order. This so-called conspiracy theory that the investigation was a whitewash that was orchestrated by the Arnholds and Dr. Starr was a theory that was pled in the Complaint.

THE COURT: Sorry, my computer is not working. You know what, I'm just going to slide to the side. I think we can keep going and I'll let him -- I don't know, if it's some obvious thing where I pressed the wrong button and I'll be really humiliated in front of you all. Hopefully it is a more serious problem, but please carry on. Sorry.

MR. LUPION: This was a so-called theory that was pled in the Complaint. It's a theory that they have been pursuing throughout discovery.

THE COURT: But to the extent that the -- what we're now calling the letter of reproach and that perhaps some of these things they did not know about until the deposition of Starr -- which was, in fact, on the very last day -- so certainly the idea that this is an overarching theory has been part of what they've been talking about all along. But, you

know, what is your response to plaintiffs' counsel's argument that, well, this is -- you know, it's the particular items that they're asking for now, in terms of the Arnhold deposition, in terms of the letter of reproach, and the -- I think there's one or two other things -- that those are not -- you know, those were new because they did not know about them until that deposition --

MR. LUPION: Sure.

THE COURT: -- of Starr?

MR. LUPION: Fair enough, your Honor. Let me take that in turn. Mr. Bowen is right. There was, for example, the letter of reproach. That was something that was discussed during Dr. Starr's deposition on February 28th. What's notable is that we offered to meet and confer that day to discuss these outstanding issues, and if they had responded on March 1st or March 2nd, would we be making a timeliness argument? No. No, they didn't respond until April 30th, when they said, now we're prepared to meet and confer -- on the same day, by the way, that we're going to file the motion to compel, okay?

So that's -- with regard to the letter of reproach, in an effort to resolve this dispute, we've conducted a diligent, good faith search.

There is no letter of reproach that we have been able to locate.

Okay. So they ignored our efforts to meet and confer for two months. So when Mr. Bowen stood up before you and said, from the close of fact discovery to the filing of their letters on April 30th that the parties have made efforts to resolve issues, that was not a true statement, okay. They did nothing after February 28th.

With regard to the deposition of the Arnholds, I'll note that the Arnholds were identified in -- or at least John Arnhold was identified in plaintiffs' initial disclosures in 2022, okay? So his involvement certainly was not a secret. And, again, I'd also like to refer back to that carefully negotiated discovery order, where the parties expressly agreed that any additional third-party depositions would be limited where service of a subpoena has already been effectuated.

THE COURT: Again, and I think I already know your answer to this, which will be -- you know, we could have talked about this in the two months, but to the extent that what I'm hearing today is that they are looking to do a narrowly tailored deposition of the Arnholds solely on this question

of the Arnholds' conversations with whoever the dean is about, you know, sort of, exerting influence over this investigation, as framed by plaintiffs' counsel, that, too, would be sort of a -- they may have known that the Arnholds were somehow involved, you know, in the background with everything, but that it was the deposition of Starr that teed up for them this particular conversation that they want to explore.

So again, maybe your response there will be this is something we should have talked about in the two months between when the deposition happened and when the letter was filed. But on the timing, that's how they framed it, that it's not so much we've known about the Arnholds since the dawn of time and just waited. It's that this narrowly tailored issue about the Arnholds, for them, they are saying, you know, materialized on April 20th.

THE DEPUTY CLERK: The computer is dead.

THE COURT: It's dead. Okay. It's not me. The computer is, in fact, dead. I've done nothing wrong here. There's really nothing worse than when the tech people come and they press one button and it all works. Thank you. I guess you'll bring a new one, then.

All right. Please carry on, sir.

MR. LUPION: So, your Honor, this theory, and I think you aptly predicted, was not a new one that was discovered during Dr. Starr's deposition. Indeed, they pursued this theory vigorously with Dean Charney in June of 2024.

THE COURT: And you asked Charney at that time in June whether Charney had spoken to the Arnholds --

MR. LUPION: Yes. Yes, your Honor.

THE COURT: All right, keep going, please.

MR. LUPION: So I would note that, you know, there were no new facts adduced during the Dr. Starr deposition. To the extent that Dr. Starr produced emails that Dr. Singh didn't produce, we offered to do another search for those documents. I think it is worth noting that at the outset of discovery, plaintiffs refused to agree to an ESI search protocol. So we had to do what we believe was a diligent, good faith search for electronic records.

Dr. Singh is prepared to re-review his personal email account because the communications that Dr. Starr located that Dr. Singh did not were from his Gmail account. We have offered to do a

re-review of Dr. Singh's personal email to find relevant communications with Dr. Starr pursuant to their discovery request.

But, again, your Honor, I think that their -- the plaintiffs' inaction here, right -- and it can best be characterized as inaction -- in pursuing the discovery between February 28th -- actually, before February 28th -- from December 20th -- 23rd, 2024, when the Court entered the order, it is the absence of diligent conduct such that they are now entitled, that it constitutes extraordinary circumstances within the meaning of this Court's order.

THE COURT: Let me ask you -- and I hear you on the Arnhold, the Charney conversation, that that can't be sort of a new revelation in February because it was something that was being asked of Charney back the previous year.

But let me ask you, on the -- you know, Dr. Starr produces documents and emails, some of which don't match the production that Singh made -- whether they were diligent, whether they were sort of, you know, constantly contacting you or not -- clearly, in the first instance, you had an obligation to produce from Singh relevant

communications. And perhaps because there's multiple accounts that are involved, you know, and we don't maybe have the best protocol in terms of what we'll be searching for, but once it was clear that the Starr production didn't marry, didn't mimic, mirror, the Singh production, even if they had not followed up, was not the onus on you all, once it was clear that things were missing, to go back and have Singh do that additional review of the personal email account regardless?

So I hear your argument in terms of there are some other aspects of what they are asking for that it may be on them that they did not get the information sooner or ask about it sooner, but when it became clear there was a shortfall in your production, isn't the burden now on you to just have Dr. Singh go back and look for that stuff anyway because you were obligated all along to produce relevant documents from Singh's communications?

MR. LUPION: Your Honor, I agree 100 percent with that, and we are not disavowing that obligation at all. But because what we're talking about here is an electronic search, it's not talking about going into a hard copy personnel file and retrieving a document, we wanted to make sure

that we had -- that there was agreement between the parties and the Court before we commenced that electronic review. But we absolutely agree that there is an independent obligation to produce those responsive communications with Dr. Starr that are responsive to a discovery request. And, as we said in the joint letter, that's what we are prepared to do.

THE COURT: All right. Anything more on the timing before I turn back to plaintiff for more particularized arguments on some of these individual categories?

MR. LUPION: Not insofar as it would otherwise intrude on the substance. So I will -- and reserve. There are different timing considerations with respect to their motion to reargue our motion for reconsideration. So there are similar arguments with respect to the terms of this Court's discovery order, as well as independent arguments that I can discuss at the appropriate time.

THE COURT: All right. Thank you very much.

All right, turning back to you, plaintiffs' counsel, for the particularized arguments with

respect to, sort of, the individual categories of what you're asking for.

MR. BOWEN: Just -- just on that point about Dean Charney, we did ask Dean Charney about conversations with the Arnholds concerning this topic, the subject matter of this litigation. His answer was he didn't remember. He literally said, I don't recall.

THE COURT: Right. But I think the argument here is, therefore, you knew that there was the potential, at least, that this conversation existed.

MR. BOWEN: We had no idea whether he was having direct communications with the Arnholds or not. But we do now because on the last day, when Mr. Starr or Dr. Starr was deposed, he said -- and he also had an email of his conversations with the Arnholds, where the Arnholds were saying, I'm going to tell Dean Charney X.

So, and Mr. Starr -- I'm sorry, I guess he goes by Dr. -- Dr. Starr also specifically said that, yes, the Arnholds specifically talked to Dean Charney about this particular topic. So that's -- now we know that there is at least one eyewitness out there who says this conversation occurred,

although he couldn't attest to what was said because he wasn't part of that phone call. Only two people were, Dean Charney and the Arnholds. So we want to depose the Arnholds. It's as simple as that.

Just quickly, on the other substantive stuff, Judge, I'll just, I guess, go through by numerical order. We have a motion to compel Ms. Knaup's documents. That's at docket number 176. This, again, is just follow-up from her deposition testimony, which, again, we sent an email right away after the deposition -- or it might have not been right after, but it was in December. It was long before the February cutoff. And the response we got back was nothing.

The defendants just didn't respond to that email at all. And when they later did, they said -- months later, they said, well, that was an informal request. You should have given us a formal request. So that's not really in the spirit of trying to move things along.

But on the substance, she testified -- well, they produced a redacted Separation Agreement. Ms. Knaup is one of the key witnesses in this case about what was going wrong at the institute. And she was paid some kind of severance fee. We don't

know how much. She was instructed not to answer, and they didn't produce it. So we want that and the separation -- just an unredacted Separation Agreement.

There was also a To Whom It May Concern letter where she listed her own grievances. They asserted privilege over that, but they basically said it was on privacy grounds because the position of the defendants was it was just her point of view about what was going on, and she mentioned private matters.

But regardless of how it's characterized, we don't have to accept the defendants' characterization of it. We know she was complaining about the conditions -- the work conditions at the institute. That's directly relevant to our claim. We're entitled to see that document. And if there are privacy concerns, well, you mark it Confidential or Highly Confidential. That's what the confidentiality order is for. You can never just withhold something on privacy grounds.

There's also this issue about what she told the institute about Doug Berman, who had had allegations of gender discrimination at his previous job, and she knew about that. She discussed it with

Mr. Berman's prior supervisor at his previous job. The question is, what did she say to the institute about it -- to Mount Sinai?

And so we're just looking for the relevant communications about that, which should be easy to find. It's a cleanup point. And then they didn't produce any text messages between Ms. Knaup and defendants Mike Silva and Dr. Singh. Everybody -- we know those text messages exist because there was -- well, Knaup didn't deny that they existed. Apparently they objected on burden grounds.

But we do have some texts from some of the other defendants that suggest all of these people were texting with each other. So if there are relevant texts, we're asking that they produce those. Again, that's a matter of cleanup.

And then also, as part of that motion, we asked for the draft report of the Oversight Committee. They assert a privilege over that. We don't think they meet their privilege grounds. Those arguments are in the letter, Judge. I don't really see a need to go over it unless you're interested in discussing it. But that's our position as to motion number 176. And I'll pause there for a response.

THE COURT: Yes. Thank you.

MS. GUERRASIO: Good afternoon, your Honor.

THE COURT: Good afternoon.

MS. GUERRASIO: I'm going to address the branch of the plaintiffs' application that concerns document production requests directed to Ms. Knaup, as well as the draft Oversight Committee report that my adversary just touched upon. I'm going to put aside the arguments with regard to timeliness because I know my colleague just addressed that, but, obviously, we have the same position here that was just reiterated.

So, first, I'm going to address the requests that concern Ms. Knaup, who is a third-party witness. She is not an employee of the Icahn School of Medicine at Mount Sinai currently and has not been for -- since 2018, and she is not a named defendant in this litigation.

So to just briefly address plaintiffs' arguments regarding waiver, as I said, Ms. Knaup is a third-party witness. And to obtain documents from a third-party witness, they must be requested through a properly served subpoena. They did not do that here, the plaintiffs.

The documents were requested through an

email from plaintiffs' counsel's paralegal after Ms. Knaup had already fulfilled all of her obligations with respect to the subpoenas that were properly served. She was served a document subpoena. She was served a deposition testimony subpoena.

She retained us at that point, after those subpoenas were served upon her, to represent her in terms of the testimony and responding to that document subpoena. We did that timely. The plaintiffs made no objections with respect to the document subpoena responses that were served on behalf of Ms. Knaup. They took her deposition. After her deposition, weeks later, they then sent an email saying, we'd like to request the following documents.

I believe I did have a conversation with Mr. Cervenka about the email in the context of numerous discovery issues that were happening. In any event, we did ultimately respond because we wanted to move discovery forward and let the plaintiffs know what documents our client would object to, as well as what documents she was willing to produce. We provided that information. But when the subpoena requirements were not adhered to, it

was not a waiver of our client's right. It was actually that the requests were never propounded properly.

With respect to the actual document categories that they are seeking from Ms. Knaup, one is documents concerning her separation from the Icahn School of Medicine. So that would include both an unredacted copy of her Separation Agreement and then the letter that Dr. Singh wrote on her behalf as a recommendation.

With regard to the Separation Agreement, we did produce the agreement, but we redacted the amount of severance. We produced the agreement because the plaintiffs already have another agreement from another individual in this litigation. It's a standard agreement. But the amount that Ms. Knaup received from Mount Sinai is confidential, personal information of her own that has no relevance to the claims at issue in this case.

Ms. Knaup's termination occurred after the investigation. During her deposition, Ms. Knaup testified multiple times she never witnessed any gender discrimination, she never experienced it herself.

There's no nexus between Ms. Knaup's separation and the underlying claims. The plaintiffs want to create this nexus between the fact that after the investigation she was terminated that somehow makes her termination relevant to the underlying claims of discrimination, but that just doesn't exist.

So, for her privacy, yes, she has asked -- and it's her position that this is confidential, private information -- that that not be disclosed. To try and come to a compromise, we produced the rest of the agreement, but we don't see any reason or any relevant connection for the amount of severance she got, which was after she was terminated.

The same argument exists as to the recommendation letter that Dr. Singh wrote for her to help her try and get another job. Ms. Knaup testified about it. She said she had a recommendation letter from Dr. Singh, she never actually had an even opportunity to use it, but that she received one. They then sent that email seeking production of it.

Again, Ms. Knaup testified repeatedly at her deposition she never witnessed, never

experienced gender discrimination or any conduct that she would classify as being hostile or based on her gender while she was at Mount Sinai. Whatever recommendation Dr. Singh would write for her to help her get a job after the fact has nothing to do with their claims.

Just to also address Mr. Bowen's argument that if confidentiality or privacy is really the concern here, we can just sort of stamp it confidential and that should solve all the problems, but a confidential stamp is not a substitute for relevance. The document and the information therein has to be relevant first. It has to be material or necessary to their claims or our defenses.

THE COURT: Can you talk to me about why the -- I took the To Whom It May Concern letter not to be referencing a letter of recommendation that Ms. Knaup would have received, but, instead, it sounded like this was a kind of a generalized "let me explain what's happening" --

MS. GUERRASIO: Sure.

THE COURT: -- letter from Ms. Knaup sort of to the wider office, saying, you know, here's my side of the story about whatever is going on here.

And I hear you saying that when she

testified, she disavowed having ever witnessed any gender discrimination, that -- and I don't know why the woman was terminated, but if she was terminated and wrote some letter, you know, in her own defense that she disseminated to who knows who saying here's what really happened, I don't know what's in there, but potentially there could be contemporaneous sort of observations, right? Because this is all -- when in the world -- this is a 2019 case. So we're talking 2018, and it's now -- you know, I don't know when she was deposed, but obviously years later.

So, you know, I've heard you talk about the letter of recommendation, but what is your response on relevance to any letter that she would have written contemporaneous with her being terminated telling her side of the story about whatever underpinned her termination?

MS. GUERRASIO: Absolutely, your Honor. So let me make this clear, and if I wasn't clear, I apologize. So there is a -- there are two separate letters we're talking about. There's a letter of recommendation that Dr. Singh drafted or wrote for Ms. Knaup to help her, one would assume, get another position. There is also a letter that Ms. Knaup wrote that she did submit to Mount Sinai after the

investigation, after she learned that her employment was going to be terminated. So I was previously addressing the Singh letter. Now I will address the To Whom It May Concern letter.

So the letter titled "To Whom It May Concern" was a letter from Ms. Knaup to Mount Sinai that gave her view of the outcome of the investigation. It does not concern any events, facts, anything that happened while she was employed by Mount Sinai. It's purely her view of the investigation outcome.

For all the reasons that I just said -- and, quite frankly, that I think your Honor underscored earlier in this proceeding -- that the investigation is not being relied upon here. We are not relying upon it as our defense. We are not relying upon the outcome. We are -- it's an investigation that happened. All of the plaintiffs' claims concern conduct prior to the investigation. All of their claims concern allegations about Dr. Singh and how he treated individuals prior to that.

Ms. Knaup's opinion about the outcome of the investigation is not relevant. I don't know -- Mr. Bowen mentioned that we had asserted a privilege

over it. We did not assert a privilege over that email. The only privilege that was asserted in objections was with regard to Ms. Knaup's communications with her own counsel. She had communications with her counsel. So I just wanted to clarify that.

To try and create some form of relevance, I think, the plaintiffs have argued in their letter that the investigation was conducted in a discriminatory manner, and so it therefore makes the investigation relevant to this case. That is not their claim. That is not the claim that's pled in the Complaint.

And, quite frankly, there is case law out there -- and we've cited it in our letter; it's the *Williams* case that was affirmed by the Second Circuit -- that an argument that an investigation was conducted in a discriminatory manner is not relevant to a claim of a hostile work environment or discrimination as the basis of what -- like a Title VII or a --

THE COURT: Well, today, in the main, the argument I've heard from plaintiffs' counsel in terms of why anything to do with this investigation -- was it fair or not, what was the

outcome, you know, did people pressure it -- was primarily that it was relevant because it goes to credibility.

So what is your response on that, the idea that if, you know, folks now are being deposed and providing communication that says, here's when we learned about things and here's what we knew and when we knew it, and if -- and I don't know what's in the investigation -- if during the course of the investigation they are providing a different timeline, they are providing a different set of facts, that therein lies the impeachment, I suppose?

So what is your argument with response to that?

MS. GUERRASIO: Plaintiffs' counsel asked all of the individuals they deposed about when they learned about complaints of discrimination, when they first got that information. That's where the impeachment would come from. If they would say, oh, yeah, we knew about this from 2015 or we knew about this from 2016, that's not what the testimony was.

The contents of the investigation -- they can ask the very same questions they want to at a deposition. Whether they did or not was how they want to litigate their case. But that doesn't go to

credibility in terms of looking at documents post the relevant time period.

I mean, that's really what we're talking about now. We're talking about an investigation to look backward at Dr. Singh's conduct in terms of how he treated women, whether he promoted them, how they were paid, what the investigation found. We are not relying on it as our defense. And then the aftermath of that, including the letter of -- To Whom It May Concern letter, including Ms. Knaup's recommendation letter, the terms of her termination, that is not relevant to their claims, which all predate the investigation.

Another topic that Mr. Bowen raised was communications with both Mr. Silva and Dr. Singh from Ms. Knaup, text communications. We have already represented to plaintiffs' counsel that Ms. Knaup is not in possession of those communications. So I'm not quite sure what the ask is here today, but we have already made that representation to them after we spoke with Ms. Knaup and she did her own search.

THE COURT: All right. And I think there was also this discussion about Berman and what --

MS. GUERRASIO: Oh, yes.

THE COURT: -- Knaup -- Knaup knew that Berman, you know, had some allegations at Berman's other job and to what extent did Knaup tell folks at Mount Sinai what she knew about Berman.

MS. GUERRASIO: Sure.

So Ms. Knaup testified at her deposition that while she was working at Columbia University in 2006, she learned from someone named Dr. Redlener, who was her supervisor, that a graduate student had filed a complaint against David Berman. David Berman is a former defendant who was dismissed from this litigation because there was insufficient pleadings to state a claim against him.

Ms. Knaup testified that all she knew about that complaint was that it was from a student and that it concerned Mr. Berman asking her for a date. She does not know the outcome, whether it was a substantiated complaint. She does not know whether it impacted in any way the fact that he left Columbia University. But she did testify that she knew at the time he left he had already accepted a position at NYU. So she was like, I don't even know -- I don't know where this went if it ever went anywhere. All I know is that someone had mentioned it to me.

The plaintiffs argue that a communication ten years prior to her even coming to Mount Sinai, that she had an obligation to disclose that to Dr. Singh because it somehow created knowledge that Mr. Berman was -- had the propensity to act in a harassing manner towards women. And they cite the *Ferris v. Delta Air Lines* case.

That case is not even remotely close to the facts at issue here. In the *Ferris* case, there were repeated reports that a flight attendant -- a male flight attendant was raping female flight attendants when they would land at various cities and that those reports were made to supervisors multiple times and that Delta did nothing about it.

That is completely not the facts here. We're talking about a different employer, we're talking about events ten years prior, and we're talking about a complaint that was not substantiated and that we don't even know if it was ever even looked into by Columbia, let alone the facts or whether it was relevant here.

On that request, we did also assert a burdensome objection. I mean, we're talking about something ten years ago. Our client, quite frankly, wouldn't even know -- she was like, "I don't even

know where I would go to look. I have multiple phones. I did keep an old phone." She said, "I -- maybe there are communications that exist. I don't know." But I just wanted to put it out there given the time frame we're talking about.

I will also note for the Court that Mr. Berman was deposed for seven hours in this case by the plaintiffs. They had every opportunity to ask him about that if they wanted to.

THE COURT: Well, I take your point on the other arguments, but I don't know that deposing Berman -- if it was information that Mount Sinai should have been on sort of notice about, I don't know that deposing Berman answers that question. But, again, I take your other argument. So you can certainly continue if there's more you want to say about the Knaup post-deposition bundle of potential additional documents.

MS. GUERRASIO: The only other document I was going to address is the Oversight Committee report. It's a bit removed from Ms. Knaup, but it's, I think, part of that letter. So is it okay for me to proceed?

THE COURT: Yes.

MS. GUERRASIO: Great.

So just to also frame, in terms of timeliness here, the plaintiffs first requested documents from the Oversight Committee over three years ago. I mean, we're talking about 2022. And we've timely responded to those and we timely produced a privilege log which identified the draft Oversight Committee report. So, again, this is something the plaintiffs have been on notice existed for quite some time but never, ever pursued it.

I will say that defendants have never taken the position that all of the work of the Oversight Committee was privileged or cloaked in privilege. Marina Lowy, who is the in-house counsel, she provided guidance, legal counsel, to the Oversight Committee. She concluded that in an affirmation that was submitted to the Court. And Dr. Gelijns, who was the chair of the Oversight Committee, testified during her deposition that Marina Lowy was counsel to the committee.

The report that Dr. Gelijns started to prepare in anticipation of the committee concluding its work was at -- was with Marina Lowy as counsel. Marina Lowy commented on the draft. It was prepared for Marina Lowy's review, and Marina Lowy gave direction as to what should be or should not be

included in the draft.

It was a privileged report in terms of the fact that it was done under the advice of counsel and for counsel's use, and it was never finalized. The draft that we have, just to give your Honor some indication, has Marina Lowy's comments all over it. Her side comments in line edits, thoughts, ideas are throughout the document and clearly identified by -- being from Ms. Lowy.

Also, to put this in the context of relevance, the Oversight Committee was formed after the investigation. It was formed for Mount Sinai to move forward and make sure that things like HR policies, concerns about pay, women being paid certain amounts versus men, that all of that -- that was the Oversight Committee's work. Dr. Gelijns testified as to the scope of all that. But, again, this is not -- this is work that happened after the investigation, which we're not relying on as our defense, and postdates the allegations in the Complaint in terms of the harassment, the discrimination that is the basis of their claims.

I'm happy to answer any other questions the Court has.

THE COURT: I do not have any at this

point.

MR. BOWEN: Just briefly on Dr. Gelijns' draft report, it's -- again, the timing issue, I think, is a red herring, but she -- we didn't know the extent of legal counsel's involvement until her deposition. So these requests were made after her deposition.

And the report itself -- she testified that she saw things that were potentially discriminatory and she ordered them to be corrected. For example, all the women had cubicles and all the men had offices, and that was something that persisted during the relevant time period. That was part of her draft report. We want to know what else was in her draft report. If in-house counsel was commenting on it, and it's also segregated, is the way counsel just put it, that could just be redacted. I mean, that's a compromise that, if they're willing to do that, you know, we would take that compromise. But I do think the relevance is kind of self-evident.

Unless your Honor wanted to talk about anything else on Ms. Knaup's documents, I'll move on to the next motion, which was number 179.

I don't know --

THE COURT: I'm sorry, I'm going to pause you just for a second. There's some activity at the back table, I think just on that point about the attorney saying she saw evidence of discrimination and --

MR. LUPION: Just one brief sentence, your Honor. Dr. Gelijns was deposed in June of 2024, or '25.

MS. GUERRASIO: 2024.

MR. LUPION: June 2024.

MS. GUERRASIO: Your Honor, the reaction was that -- I'm just looking for it in the transcript. Dr. Gelijns was asked if the report contained anything about cubicles and women being treated differently in terms of where they were placed, and she said, no, that was not within the scope of the committee's review. She was like, none of that was presented to us.

THE COURT: Thank you.

MR. BOWEN: That's not what I have.

MR. LUPION: Well, we have the transcript.

MR. BOWEN: Yeah, I do, too. At pages 121 and 123, she testified about reporting her concerns at a time men had offices and women sat in cubicles. It's at Page 121.

MR. LUPION: Mr. Bowen, you can tell the Court that you're reading from your own work product, not the actual transcript.

MR. BOWEN: Yeah, I'm reading from my notes.

MR. LUPION: You're reading from your notes. We're reading from the transcript.

MR. BOWEN: Okay. Do you want to read Page 121?

I mean, do we want to spend time on this, Judge, or should I move on?

THE COURT: I don't believe we need to drill all the way down on what's in the deposition.

MR. BOWEN: It's submitted with the paperwork, Judge. You have the excerpts.

On the next motion, number 179. I don't have much to add to that because that's really the motion to compel Dr. Singh's version of the -- his communications with Dr. Starr and our request for the Arnhold deposition, which we've already covered.

The only wrinkle in that is in that motion, we mentioned another subpoenaed deposition of a Dr. Kishore, and I think there's a separate motion that's not on the calendar for today because we made a motion to compel where Dr. Kishore is in

California, in federal court out there, and it got transferred here. So counsel for Dr. Kishore is not here.

But I think it's worth just pointing out that, again, all these issues about whether we were diligent in pursuing Dr. Kishore's deposition I think is, again, a red herring. The fact of the matter is that we did make efforts. We documented them in our submissions to the Court. There is a good indication that Dr. Kishore and his counsel were just avoiding being served with the deposition subpoena because they had accepted service of the documents subpoena.

But when it came time to ask him for deposition dates, all of which was pursued before the end of fact discovery, we just couldn't find it, and counsel didn't respond. And then there was kind of a, you know, Mutt and Jeff routine where they said, oh, I'm not representing him for the deposition. You have to talk to somebody else. We contacted somebody else. They didn't represent him. We had to -- and it was kind of a runaround.

But, again, it shouldn't matter. The fact is that we tried to get his deposition before the cutoff. He does have relevant testimony. And my

understanding, Judge -- and I'm sure counsel will correct me if I'm wrong -- is that Dr. Kishore's attorney said that he'll sit for the deposition as long as there's an order from the Court saying that that's allowed as part of a cleanup effort here to -- after the official close date or deadline for fact discovery. So he hasn't offered his dates, but he's waiting on this Court's outcome. And if it's not decided in connection with this motion, we'll have to decide it in connection with the transferred California motion to compel on the subpoena that was actually eventually served on Dr. Kishore. So that's all I have to say on Motion 179.

The last motion is a motion to reargue about producing the investigation file, which your Honor had previously held to be privileged. And this kind of has intersected a little bit some of the other issues we've raised here.

But one of the concerns we've had, your Honor, in your ruling, said that there's no necessary -- or there's no need for the plaintiffs to have this internal investigation report because we can talk to all the witnesses who were interviewed by these investigators. And we did set about doing that, and we did question these

witnesses, some of whom were not represented by the same counsel as Mount Sinai. And so they spoke openly about what they did and did not say to the investigators.

But others, when we asked them, what is it that you said to the investigators? They were instructed not to answer as privileged. So we weren't able to figure out if their story of what they observed or what they knew when, if it was different from what they were testifying to under oath when we questioned them and what they had said previously to investigators closer to the date and time -- to the date and time at issue.

So that's one problem that we ran into, and this got crystallized at the deposition of Mike Escosia, who is no longer an employee with Mount Sinai. He was a male executive in the same institute where the plaintiffs had worked during the same period of time. And he himself witnessed the disparate treatment and the prejudicial treatment towards women on the basis of gender. And he testified about that, and he testified, actually, about specific instances where vulgar, demeaning terms were used about the women, referring to their gender.

And when the defendants cross examined him, they said, well, you didn't say that to the investigators. So they then themselves then opened that door by saying -- because Mr. Escosia had sent both a written submission to the investigators and then he was interviewed. And they said, well, you didn't say that in your written submission to the investigators, which everybody had a copy of at the deposition. But then they went on to say, well, you didn't say it when you were being interviewed.

So they themselves are now using information that they claim are privileged that we're not privy to, to cross examine a witness in our favor to suggest that he is making something up, you know, past -- what is it -- past -- it's inconsistent prior statement. So they're saying, you have an inconsistent prior statement by omission. Well, that puts us at a serious disadvantage.

And it's really based on those two elements, your Honor, that we're asking you to reconsider that ruling. And we understand your Honor's ruling. By no means are we challenging the reasoning behind that ruling, which we fully understood at the time. We just think circumstances

have changed. It warrants a second look.

Thank you, Judge.

THE COURT: Thank you.

MR. LUPION: Your Honor, if I may respond first to the motion to compel the additional depositions. I've hit on the discovery order in my earlier remarks where parties agreed and this Court so ordered that any additional third-party depositions would be limited to where service of a subpoena had already been effectuated. In that very same order, the parties also agreed for a third-party deposition where service had not been effectuated, and they identified that person specifically.

So there can be no reasonable dispute that service was not effectuated on Dr. Kishore at the time the parties entered into this agreement and this Court so ordered. Indeed, plaintiffs' counsel admitted as much on October 14th, 2024. They told us, in response to our inquiry, that Dr. Kishore was not among the third-party witnesses whom plaintiffs had served, and they certainly did not cure that defect by the time the parties agreed to the order on December 20th.

Now, I'm not surprised that Mr. Bowen

didn't want to discuss the circumstances -- the other facts of Dr. Kishore, because they really don't paint plaintiffs in the most favorable light here. And let me just get a little more granular, if I can.

On October 2nd, the plaintiffs asked Dr. Kishore's lawyer if he was authorized to accept service and they would serve him personally if he was not. Dr. Kishore's lawyer advised that he needed to check with Dr. Kishore regarding accepting service. And because Dr. Kishore and his lawyer were located in different cities, he asked if any deposition could be via Zoom. Plaintiff said, no Zoom, any deposition would be in person.

That exchange took place on October 2nd and 3rd. And on October 9th, plaintiffs proceeded to send Dr. Kishore a subpoena via U.S. Mail, not personal service as required under Rule 45. And, again, I'd like to reference plaintiffs' communication to us the very following week when they admitted they had not effectuated service on Dr. Kishore. They took no further steps between then and the time of this Court's discovery extension order in December of 2024.

Now, it's also worth noting that plaintiffs

told the California Federal District Court the following, and I quote: "Plaintiffs in good faith believe that Dr. Kishore was properly served via U.S. Mail on October 9th, 2024." That's from plaintiffs' reply memo at page 3, footnote 1.

That was not a true statement because they told us on October 14th that service had not been effectuated. So what changed? Absolutely nothing. So the bottom line is that the plaintiffs' window has now closed. In fact, they also told the California Court that "The discovery window in the Southern District of New York litigation has now closed," also in their reply at page 3. And they waited until April 30th, 2025, to seek relief from this Court to open fact discovery for the purpose of deposing Dr. Kishore and the Arnholds.

Plaintiffs did not exercise any diligence in trying to secure Dr. Kishore's deposition. So that type of inaction, coupled with their delay until April 30th, doesn't justify reopening fact discovery, and it certainly doesn't constitute extraordinary circumstances. And we'll cite the *Sabre Health v. Day* case, as cited in our papers. So that's the motion to compel the deposition of Dr. Kishore and the Arnholds.

Let me just discuss briefly the motion for reconsideration to reargue this Court's decision holding Mount Sinai's internal investigation to be attorney-client privileged and attorney work product. That is both procedurally improper and it fails on the merits. Let me just discuss the procedural first. I'm not going to belabor the Court's discovery order yet again, but that required the Court to -- the parties to present any unresolved discovery disputes by February 28th, 2025. And I think it's worth noting --

THE COURT: Can I ask, when was the deposition of -- I'm not going to get this name -- Visage, Visoge, Visige?

MR. LUPION: Escosia?

THE COURT: Yes. That was not -- a horrible thing happened there. I heard something, I wrote something, and whatever I repeated back is not it. Yes, that's the --

MR. LUPION: It was so far ago, I don't remember. It was, I believe, the spring of 2024, maybe May of 2024.

THE COURT: All right. Thank you. You can keep going.

MR. LUPION: So, again, just leave aside

the terms of the discovery order and the absence of extraordinary circumstances. Plaintiffs' application is procedurally improper for failure to comply with Local Rule 6.3. So plaintiffs have styled their application as a motion to reargue. And as we noted in our papers, a motion for reargument is also regarded as a motion for reconsideration.

Your Honor, I believe your July 29th order in this case also characterized plaintiffs' instant application as a motion for reconsideration of the Court's prior order. That rule requires motions for reconsideration to be brought within 14 days of the order being challenged. Here, obviously, that order was January 3rd, 2024, so we're more than 15 months after the order.

So even if the Court were to incline to overlook that delay, plaintiffs certainly cannot satisfy the very exacting standard for reconsideration. They don't even argue that there's been an intervening change in controlling law. Nor do they claim reconsideration is warranted to correct a clear error of law. Instead, they suggest that there is new evidence that they supposedly unearthed during discovery that supports a different

ruling from the one that this Court entered.

Your Honor, their application cited a number of facts that they claimed were new. I take it from counsel's argument today that they are abandoning those arguments, and rightfully so, because it --

MR. BOWEN: I am not abandoning. Anything in the papers --

MR. LUPION: Well -- okay, well, Mr. Bowen wasn't -- didn't discuss any of that so --

THE COURT: You could all address your comments to me, and I'll let you, obviously, plaintiffs' counsel, have an opportunity to respond. And, certainly, anything that anyone has not disavowed that is in the papers, I am assuming they are still relying on and that folks are choosing to highlight in oral argument the things that they want to highlight. But if there's something in the papers that you would like to respond to, Counsel, you certainly can do that.

MR. LUPION: Sure. I would just note, while I have the opportunity, that everything on which they rely was known to them at the time of the prior -- this Court's prior decision in January of 2024. And I want to be -- I want to be very clear

about this. So they rely on the disclosure of the investigative report to the Oversight Committee. They say in their papers that this was new information. That fact, your Honor, was in the affidavit of Marina Lowy, the in-house lawyer who oversaw the investigation that was submitted to this Court in connection with the prior motion in December of 2023. That's Docket 133-1 at paragraph 14.

Text messages. They claim that there were text messages between one of the investigators and the plaintiffs, that this too was discovered during the discovery process. Your Honor, plaintiffs had those at the time as well, because one of the plaintiffs was a party to the text messages. And defendants actually produced those text messages in August of 2023, months before plaintiffs' motion to compel in December of 2023.

They also rely on testimony during Ms. Lowy's deposition that she disclosed the investigation to the plaintiffs. That's not new either. Plaintiffs recorded Ms. Lowy's conversations with them. They had the recording, which they produced in June 2023. And, indeed, this very claim, this very issue, was discussed

extensively during the time the parties were here on plaintiffs' motion. And I can quote Mr. Bowen on page 6 of the January 2024 conference, where he said, "The reality is that there's a lot more that was disclosed. Methodology was disclosed. The fact that certain witnesses had given statements as part of the effort by the employer to investigate the allegations were disclosed. The content of what some of the witnesses -- was disclosed. The fact that recommendations were being made and what those recommendations were also was disclosed." So, your Honor, this is not new ground in any respect.

And with regard to the statement produced by Mr. Escosia, this deposition didn't involve the use of his witness statement as a sword and a shield. Mr. Escosa -- excuse me, Mr. Escosia sent an unsolicited letter to Mount Sinai in advance of his investigatory interview, a letter that plaintiffs' counsel produced in this litigation, okay. They produced that letter to us.

Now, at deposition, he testified concerning certain comments allegedly made at work, and defendants asked him why he didn't include those statements in the letter that he sent to Mount Sinai. To be clear, he was not asked what was said

during his investigatory interview. And plaintiffs have not and cannot cite any such testimony.

The investigation has not been put at issue here by the defendants in any respect. We've withdrawn that portion of the Faragher-Ellerth defense that is -- that would have applied had we were relying on the investigation. And as your Honor observed at the outset of these hearings, the underlying claims and defenses in this case have nothing to do with the investigation or its outcome, which is both subject to the attorney-client privilege and the attorney work product doctrine, even if plaintiffs could cross all of the procedural obstacles and the motion was proper at this time, which it is not. I'm happy to answer any questions.

THE COURT: I do not have any, thank you.

All right. Plaintiff, you had obviously taken issue with some of the things that defendant was saying. And so, first of all, it is your motion. So I'll certainly give you the last word. But, second, if there were things that you wanted to be heard on, in terms of the arguments that the defendants made, I'll certainly hear you as well.

MR. BOWEN: Thank you, Judge. I'll be very brief. The Escosia deposition, your Honor asked

when that took place. It was August 13, 2024. So it was last summer. Not this past summer, the one before.

THE COURT: Wait, I'm sorry, I heard you say 2024. You mean --

MR. BOWEN: Yes. Not this past summer but --

THE COURT: Right. This past summer is 2025. I understood --

MR. BOWEN: Right.

THE COURT: The time is running away. I'm like, sir, we're still in August. Okay.

MR. BOWEN: That's how -- that's how I feel too, Judge.

THE COURT: Wow. Sorry. August of last year, got it. Thank you.

MR. BOWEN: Defendants' view that -- where he's discretely taking the timing apart and saying, well, you knew this then and you knew this then, I mean, it misses the point. That's why these are kind of arguments about timing, because what they're really saying is we should have reasonably known earlier on that they were going to be using this -- their privileged knowledge about this investigation report in a way --

THE COURT: Well, they dispute that that occurred. So I obviously don't --

MR. BOWEN: Well --

THE COURT: I mean, they say they only asked him about the letter that he had generated and sent to Mount Sinai and why certain things were or were not included in that letter, which apparently you all had produced in your discovery. And defendants' counsel avers that they did not, in fact, ask him about, you know, what did he or did he not say in the interview as part of the internal investigation after the fact.

MR. BOWEN: Here's two questions, Judge. The cite for the first one is Escosia's deposition, page 255, line 10, to page 256, line 2. The question from the defendants' counsel was, "Did you make a conscious decision not to inform the investigators that Mr. Silva used the word 'cunt'?" That's not about his written submission.

The next question, at page 191, line 5, "Did you inform the investigators that you included Dr. Safo on the communication to them?" So, again, they're talking about what he did and did not say to the investigators apart from his written submission. They're just wrong when they say it had nothing to

do with it.

But, again, the point is that we -- and this is -- the idea that we should have followed a 15-day rule, it's just ignoring the practicalities of a difficult case like this. The Court made a ruling. We abided by that ruling. We took multiple -- I think more than two dozen depositions trying to recreate the investigation.

That took time. It took time for us to connect all the dots to understand what was being said and what the witnesses were allowed to answer and not allowed to answer, what we knew from our own independent investigation and what we needed from this investigation report.

We don't make this request to reconsider it lightly, Judge. We did it only after reassessing everything that had gone on throughout the entirety of discovery. And we were most concerned by the two facts that I mentioned earlier.

One is, they didn't allow people to answer the question, what did you say to the investigators, for us to determine whether they have changed their testimony between that earlier point in time when they were recounting these facts to the date that they were giving testimony in this case. That was

one set of facts, and that was consistent by the defendants over the course of many, many depositions over the course of many years.

And then the second one was the Mike Escosia questioning, where they were using to their advantage their privileged knowledge about what was in that report that we didn't know. But I'll leave it at that.

Lastly, Judge, I just want to say I feel compelled to respond to this allegation that my colleague Honza Cervenka, who is an associate in the co-counsel's law firm, the McAllister Olivarius firm, had made a false statement to the California courts. It's just -- it really is -- it really shouldn't happen that lawyers attack each other like this.

It is true that Mr. Cervenka said to defense counsel that, as far as he knew, there had been no personal service on Mr. Kishore. It's also true that, prior to that statement, they had emailed the testimonial *ad testificandum* subpoena under Rule 45 to the lawyer for Mr. Kishore. And I'm not sure about this, but it might have also been to an email that they had for Mr. Kishore. I don't know about that. I do know about the lawyer.

By the time we were litigating this in California, we have authority that says that may be okay. In some circumstances, it is okay to serve a Rule 45 subpoena by email because the rule requires communicating it to the defendant -- or, excuse me, the third-party witness. It doesn't require personal service.

Now, I am not fully up to speed on that research, Judge. I don't know if there's a split in authority about it or what the situation was, but that's what was relied on in the California court, when they said, well, in fact, for purposes of this argument, we think we can use this authority to argue that he was, in fact, served before the close of discovery.

The reality, though, going back away from the abstract formalities and just get back to the reality, the reality is the lawyers weren't talking to us. The fact that he was served, even if he was personally served, and then he disappeared for two months and he doesn't talk to us, we can't just fly people out there and scour the ground looking for him somewhere in California.

If we can't coordinate with him and his lawyer and the defense lawyers, then this deposition

couldn't occur. And that effort to communicate with us only happened after the close of discovery and right before we brought this to the attention of your Honor and before we made the motion to compel out in California. So I'll leave it at that. But the suggestion that there was any intentionally false statement to a Federal Court is, frankly, outrageous and false.

THE COURT: Yes, sir.

MR. LUPION: Just briefly, very briefly, your Honor, with regard to the investigation, I just want to make two quick points. The first is, as your Honor observed in January of 2024, "The plaintiffs know who the people are who were interviewed as part of this investigative process and would be able to depose those folks to ask them whatever about what was going on during this time frame at this organization." And that's from page 47 of the January 2nd, 2024 transcript. Plaintiffs had every opportunity to do so.

The second point I want to make is a practical one, right? If we're going to reconsider the privilege ruling and reopen up discovery and require all the deponents to re-sit for their depositions to discuss what they told the

investigators and what they didn't tell the investigators, this case is never going to end. Plaintiffs have already taken 18 or so depositions. We invoked attorney-client privilege and attorney work product based on this Court's ruling. So we don't think it's appropriate to reopen discovery for that.

With regard to the Kishore deposition, I didn't accuse anybody of anything. I just pointed out what statements were true or not. There were no *ad hominem* or personal attacks, and I'm sorry if Mr. Bowen construed it that way.

I do think, your Honor, our motion to transfer that proceeding was predicated on giving this Court the ability to interpret its own discovery order and manage its own docket. We think that the motion should be denied on that basis alone.

Now, if the Court disagrees with us, we do think that Dr. Kishore should have notice and an opportunity to be heard. You know, whether or not there are compromises, such as a Zoom deposition that plaintiffs' counsel refused when they had discussed this issue several months ago in October, that's not our fight to have. We're simply relying

on the terms of the confidentiality -- the discovery scheduling order, the parties' mutual understanding at the time that the discovery order had been entered, and plaintiffs' conduct since that time.

THE COURT: All right.

Was there anything more, sir? Because it is your motion. I did promise you the last word.

MR. BOWEN: Not from plaintiffs, thank you.

THE COURT: All right.

There are enough, sort of, i's to dot and t's to cross that I'm not even going to attempt to take a brief recess and come out and orally rule. I think there are some issues on which I could, but rather than forcing it and giving you partial rulings, my intention is to get something out as soon as I can. Again, there were clearly many issues and technical problems on my end, so hopefully those in no way affected the transcript, which their computers do, not mine. So I'm assuming we're green lights for the transcript.

So the only thing I'm going to say is I'm going to direct you all to please order a copy of the transcript post haste. I do have fairly detailed notes, and my law clerks were taking them as well. But to the extent that there's something

where I really want to see exactly what was said, I'd rather have the transcript.

So my hope is to start working on the order before I get the transcript and then, sort of, use the transcript to backfill just in case my notes are either inaccurate or, as often is the case, illegible.

So, other than that, thank you all for your very helpful arguments. We are adjourned. Have a good rest of your day.

C E R T I F I C A T E

     I, Marissa Lewandowski, certify that the foregoing transcript of proceedings in the case of DR. STELLA SAFO, et al. v. DR. PRABHJOT SINGH, et al., Docket #1:19-cv-03779-VSB-JW, was prepared using digital transcription software and is a true and accurate record of the proceedings.


Signature  *Marissa Lewandowski*
           _____
                Marissa Lewandowski


Date:      October 15, 2025