**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DR. HOLLY ATKINSON, DR. NATASHA ANUSHRI ANANDARAJA, DR. STELLA SAFO, MARY CALIENDO, HUMALE KHAN, GERALDINE LLAMES, AMANDA MISITI, and EMILIE BRUZELIUS, <br><br> Plaintiffs, <br><br> v. <br><br> DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA, DAVID BERMAN, and ICAHN SCHOOL of MEDICINE at MOUNT SINAI, <br><br> Defendants. | **ORAL ARGUMENT REQUESTED** <br><br> No. 19-cv-3779 (VSB) (JW) |

**DEFENDANTS DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA, AND ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 3

I.      THE FORMATION OF AIGH. ................................................................................. 3

II.     DR. STELLA SAFO. ............................................................................................... 4

III.    GERALDINE LLAMES. ......................................................................................... 7

IV.     AMANDA MISITI. ................................................................................................. 9

V.      EMILIE BRUZELIUS. ........................................................................................... 11

ARGUMENT ........................................................................................................................ 14

I.      THE STANDARD FOR SUMMARY JUDGMENT. .............................................. 14

II.     SAFO'S DISCRIMINATION CLAIMS SHOULD BE DISMISSED. ....................... 14

        A.      Safo Fails To Raise A Triable Issue On Her Hostile Work Environment Claims
                (Count Six). ................................................................................................. 14

        B.      Safo Fails to Raise a Triable Issue of Disparate Treatment (Count Five). ........... 19

                1.      Safo's Program Manager Title And Salary Negotiation Allegations Are
                        Untimely. .......................................................................................... 20

                2.      Safo Did Not Suffer an Adverse Employment Action. ........................... 21

                3.      Safo Cannot Show an Inference of Discrimination. ............................... 22

                4.      Safo Cannot Show Defendants' Legitimate Business Reasons Are Pretext.
                        ........................................................................................................ 23

III.    LLAMES'S DISCRIMINATION CLAIMS SHOULD BE DISMISSED. ..................... 25

        A.      Llames Fails to Raise A Triable Issue On Her Hostile Work Environment Claims
                (Count Ten). ................................................................................................ 25

        B.      Llames Fails To Raise A Triable Issue Of Disparate Treatment (Count Nine).... 28

IV.     NEITHER SAFO'S NOR LLAMES'S CONSTRUCTIVE DISCHARGE THEORY
        SURVIVES SUMMARY JUDGMENT. ................................................................... 29

V.      MISITI'S DISCRIMINATION CLAIMS SHOULD BE DISMISSED. ........................ 30

        A.      Misiti Fails To Raise A Triable Issue On Her Hostile Work Environment Claims
                (Count Twelve). ........................................................................................... 30

        B.      Misiti Fails To Raise A Triable Issue of Disparate Treatment (Count Eleven).... 32

VI.     BRUZELIUS'S DISCRIMINATION, EQUAL PAY AND RETALIATION CLAIMS
        SHOULD BE DISMISSED. ..................................................................................... 34

        A.      Bruzelius Fails To Raise A Triable Issue On Her Hostile Work Environment
                Claims (Count Fifteen). ................................................................................ 34

        B.      Bruzelius Fails To Raise A Triable Issue of Disparate Treatment (Count
                Fourteen). ................................................................................................... 35

C.     Bruzelius Fails To Raise A Triable Issue of Fact On Her Unequal Pay Claims (Counts Twenty-Four and Twenty-Five). ............................................................... 35

D.     Bruzelius Fails To Raise A Triable Issue Of Fact On Her Retaliation Claims (Count 16). ....................................................................................................................... 38

VII.   IF ANY OF PLAINTIFFS' CLAIMS SURVIVE, THEIR CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS MUST BE DISMISSED. ............................................. 40

A.     There Is No Individual Liability Under Title VII Or Title IX. ............................. 40

B.     Plaintiffs' New York State and City Law Claims Against Charney Must Be Dismissed. ....................................................................................................................... 40

CONCLUSION ....................................................................................................................... 41

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adams v. N.Y. State Educ. Dep't*,
2010 WL 624020 (S.D.N.Y. Feb. 23, 2010), *R. & R. adopted in part*,
705 F. Supp. 2d 298 (S.D.N.Y. 2010)...................................................................................20

*Agosto v. N.Y.C. Dep't of Educ.*,
982 F.3d 86 (2d Cir. 2020)...................................................................................14, 17

*Alvarado v. Nordstrom, Inc.*,
685 F. App'x 4 (2d Cir. 2017) ...................................................................................14, 38

*Atkinson v. Singh*,
2022 WL 137634 (S.D.N.Y. Jan. 14, 2022) ................................................................15, 18, 26

*Bailey v. Reg'l Radio Grp. LLC*,
2017 WL 1025948 (N.D.N.Y. Mar. 15, 2017) .........................................................................16

*Bart v. Golub Corp.*,
96 F.4th 566 (2d Cir. 2024) ...................................................................................24

*Batiste v. City Univ. of N.Y.*,
2017 WL 2912525 (S.D.N.Y. July 7, 2017) .............................................................................16

*Bautista v. PR Gramercy Square Condo.*,
642 F. Supp. 3d 411 (S.D.N.Y. 2022)...................................................................................17

*Beale v. Mount Vernon Police Dep't*,
895 F. Supp. 2d 576 (S.D.N.Y. 2012)...................................................................................26

*Benzinger v. Lukoil Pan Ams., LLC*,
447 F. Supp. 3d 99 (S.D.N.Y. 2020)...................................................................................26

*Blake v. Bronx Lebanon Hosp. Ctr.*,
2007 WL 2981465 (S.D.N.Y. Oct. 10, 2007)........................................................................32

*Blutreich v. N. Shore-Long Island Jewish Health Sys., Inc.*,
844 F. App'x 417 (2d Cir. 2021) ...................................................................................39

*Boatright v. U.S. Bancorp*,
2020 WL 7388661 (S.D.N.Y. Dec. 16, 2020), *aff'd*, 2022 WL 351059
(2d Cir. Feb. 7, 2022)...................................................................................37

*Braunstein v. Sahara Plaza, LLC*,
2021 WL 2650369 (S.D.N.Y. June 28, 2021), *aff'd*, 2022 WL 17480962 (2d Cir. 2022) ...............................................................................................................16, 27

*Brennan v. Metro. Opera Ass'n*,
192 F.3d 310 (2d Cir. 1999) ...............................................................................................19

*Brown v. Henderson*,
257 F.3d 246 (2d Cir. 2001) ...............................................................................................23

*Carter-Marks v. Alstom Transp. USA Inc.*,
800 F. Supp. 3d 423 (E.D.N.Y. 2025) ................................................................................18

*Casalino v. N.Y. State Cath. Health Plan, Inc.*,
2012 WL 1079943 (S.D.N.Y. Mar. 30, 2012) ..............................................................19, 25

*Chepak v. N.Y.C. Health & Hosps. Corp.*,
2015 WL 509279 (S.D.N.Y. Feb. 5, 2015), *aff'd*, 643 F. App'x 62 (2d Cir. 2016) ...............................................................................................................................37

*Costello v. N.Y. State Nurses Ass'n*,
783 F. Supp. 2d 656 (S.D.N.Y. 2011) ...........................................................................15, 17

*Crowther v. Board of Regents of University System of Georgia*,
No. 25-183 ...........................................................................................................................14

*Dall v. St. Catherine of Siena Med. Ctr.*,
966 F. Supp. 2d 167 (E.D.N.Y. 2013) ................................................................................28

*Desimone v. JP Morgan/Chase Bank*,
2004 WL 2978011 (S.D.N.Y. Dec. 22, 2004) ....................................................................35

*Dinkins v. Mayorkas*,
2024 WL 1806174 (S.D.N.Y. Apr. 25, 2024) .....................................................................21

*Donahue v. Asia TV USA Ltd.*,
208 F. Supp. 3d 505 (S.D.N.Y. 2016) .................................................................................17

*Drouillard v. Sprint/United Mgmt. Co.*,
375 F. Supp. 3d 245 (E.D.N.Y. 2019) ................................................................................16

*Eisenhauer v. Culinary Inst. of Am.*,
2021 WL 5112625 (S.D.N.Y. Nov. 3, 2021), *aff'd in part, vacated in part on other grounds*, 84 F.4th 507 (2d Cir. 2023) ....................................................................36, 37

*Estevez v. Berkeley Coll.*,
2021 WL 3115452 (S.D.N.Y. July 19, 2021), *aff'd*, 2022 WL 16843460 (2d Cir. Nov. 10, 2022) ................................................................................................................32

*Figueroa v. City of N.Y.*,
 2002 WL 31163880 (S.D.N.Y. Sept. 27, 2002), *aff'd*, 118 F. App'x 524 (2d
 Cir. 2004) ..............................................................................................................31

*Figueroa v. N.Y.C. Health & Hosps. Corp.*,
 500 F. Supp. 2d 224 (S.D.N.Y. 2007)....................................................................22

*Fincher v. Depository Tr. & Clearing Corp.*,
 604 F.3d 712 (2d Cir. 2010)...................................................................................29

*Fitzgerald v. Barnstable Sch. Comm.*,
 555 U.S. 246 (2009)................................................................................................40

*Fleming v. MaxMara USA, Inc.*,
 371 F. App'x 115 (2d Cir. 2010) ............................................................................31

*Garcia v. Barclays Cap., Inc.*,
 281 F. Supp. 3d 365 (S.D.N.Y. 2017) (Broderick, J.) .....................................34, 37

*Garrison v. Am. Sugar Refining, Inc.*,
 789 F. Supp. 3d 291 (S.D.N.Y. 2025), *appeal withdrawn*, 2025 WL 4065857
 (2d Cir. Dec. 17, 2025) .....................................................................................21, 22

*Goodwine v. City of N.Y.*,
 2016 WL 3017398 (S.D.N.Y. May 23, 2016) .........................................................17

*Green v. Mount Sinai Health Sys. Inc.*,
 826 F. App'x 124 (2d. Cir. 2020) ...........................................................................38

*Husser v. N.Y.C. Dep't of Educ.*,
 137 F. Supp. 3d 253 (E.D.N.Y. 2015) ....................................................................16

*Ikedilo v. Statter*,
 2025 WL 1011346 (2d Cir. Apr. 2, 2025) ...............................................................21

*Kemp v. Regeneron Pharms., Inc.*,
 117 F.4th 63 (2d Cir. 2024) ....................................................................................30

*Kops v. PPM Am., Inc.*,
 2016 WL 7188793 (S.D.N.Y. Dec. 5, 2016) ..........................................................15

*Kunik v. N.Y.C. Dep't of Educ.*,
 436 F. Supp. 3d 684 (S.D.N.Y. 2020) (Broderick, J.), *aff'd*, 842 F. App'x 668
 (2d Cir. 2021)..........................................................................................................33

*Lambert v. Trump Int'l Hotel & Tower*,
 304 F. Supp. 3d 405 (S.D.N.Y. 2018) (Broderick, J.) ............................................30

*Lee v. City of Syracuse*,
    603 F. Supp. 2d 417 (N.D.N.Y. 2009) .......................................................................16

*Liburd v. Bronx Lebanon Hosp. Ctr.*,
    2009 WL 900739 (S.D.N.Y. Apr. 3, 2009) ................................................................26

*Littlejohn v. City of N.Y.*,
    795 F.3d 297 (2d Cir. 2015) ......................................................................................14

*Livingston v. City of N.Y.*,
    563 F. Supp. 3d 201 (S.D.N.Y. 2021) .......................................................................18

*Maron v. Legal Aid Soc'y*,
    605 F. Supp. 3d 547 (S.D.N.Y. 2022) .......................................................................18

*Marseille v. Mount Sinai Health Sys., Inc.*,
    2021 WL 3475620 (S.D.N.Y. Aug. 5, 2021), *aff'd*, 2022 WL 14700981 (2d
    Cir. Oct. 26, 2022) .....................................................................................................18

*Mazzone-Trani v. Donohue Cecere Funeral Home*,
    2010 WL 3282616 (E.D.N.Y. Aug. 13, 2010) .....................................................15, 32

*Meder v. City of N.Y.*,
    2007 WL 1231626 (E.D.N.Y. Apr. 27, 2007) .....................................................30, 31

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
    715 F.3d 102 (2d Cir. 2013) ............................................................................. passim

*Milord-Francois v. N.Y. State Off. of Medicaid Inspector Gen.*,
    635 F. Supp. 3d 308 (S.D.N.Y. 2022) .......................................................................19

*Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*,
    2007 WL 1149979 (S.D.N.Y. Apr. 18, 2007), *aff'd*, 303 F. App'x 943 (2d Cir.
    2008) ..........................................................................................................................19

*Olin v. Rochester City Sch. Dist.*,
    596 F. Supp. 3d 475 (W.D.N.Y. 2022) ......................................................................19

*Pa. State Police v. Suders*,
    542 U.S. 129 (2004) ...................................................................................................29

*Pacheco v. Comprehensive Pharmacy Servs.*,
    2013 WL 6087382 (S.D.N.Y. Nov. 19, 2013) ...........................................................40

*Palomo v. Trs. of Columbia Univ. in City of N.Y.*,
    2005 WL 1683586 (S.D.N.Y. July 20, 2005), *aff'd*, 170 F. App'x 194 (2d Cir.
    2006) .....................................................................................................................27, 28

*Palomo v. Trustees of Columbia University in City of New York*,
  170 F. App'x 194 (2d Cir. 2006) .......................................................................27

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*,
  633 F.3d 81 (2d Cir. 2011)................................................................................14

*Paterakos v. City of Chicago*,
  147 F.4th 787 (7th Cir. 2025) ..........................................................................22

*Payano v. Fordham Tremont CMHC*,
  287 F. Supp. 2d 470 (S.D.N.Y. 2003)...............................................................27

*Perry v. Slensby*,
  815 F. App'x 608 (2d Cir. 2020) ......................................................................28

*Pollock v. Shea*,
  568 F. Supp. 3d 500 (S.D.N.Y. 2021)...............................................................29

*Richards v. Dep't of Educ.*,
  2022 WL 329226 (S.D.N.Y. Feb. 2, 2022).......................................................39

*Richardson v. Bronx Lebanon Hosp.*,
  2014 WL 4386731 (S.D.N.Y. Sept. 5, 2014).....................................................38

*Robinson v. Concentra Health Servs., Inc.*,
  781 F.3d 42 (2d Cir. 2015)................................................................................14

*Rodriguez v. Cnty. of Nassau*,
  830 F. App'x 335 (2d Cir. 2020) ......................................................................39

*Rodriguez v. Coca Cola Refreshments USA, Inc.*,
  2013 WL 5230037 (E.D.N.Y. Sept. 16, 2013) ..................................................17

*Rolle v. Educ. Bus Transp., Inc.*,
  2013 WL 783026 (E.D.N.Y. Feb. 12, 2013), *R. & R. adopted*, 2013 WL
  783011 (E.D.N.Y. Feb. 27, 2013)......................................................................34

*Romanello v. Shiseido Cosmetics Amer. Ltd.*,
  2002 WL 31190169 (S.D.N.Y. Sep. 30, 2002)..................................................33

*Royall v. City of Beacon*,
  2024 WL 4266546 (S.D.N.Y. Sept. 23, 2024)...................................................32

*Shalom v. Hunter Coll. of City Univ. of N.Y.*,
  2014 WL 3955167 (S.D.N.Y. Aug. 13, 2014), *aff'd*, 645 F. App'x 60 (2d Cir.
  2016) .................................................................................................................18

*Smalls v. Allstate Ins. Co.*,
  396 F. Supp. 2d 364 (S.D.N.Y. 2005)..................................................................................23

*Smith v. City of N.Y.*,
  2025 WL 1983047 (S.D.N.Y. June 3, 2025), *R. & R. adopted*, 2025 WL
  2022534 (S.D.N.Y. July 18, 2025) .......................................................................................21

*Spence v. Md. Cas. Co.*,
  995 F.2d 1147 (2d Cir. 1993)................................................................................................29

*Spina v. Our Lady of Mercy Med. Ctr.*,
  2003 WL 22434143 (S.D.N.Y. Oct. 23, 2003), *aff'd*, 120 F. App'x 408 (2d
  Cir. 2005) ..............................................................................................................................26

*Stidhum v. 161-10 Hillside Auto Ave, LLC*,
  2026 WL 761394 (2d Cir. Mar. 18, 2026)............................................................................22

*Talwar v. Staten Island Univ. Hosp.*,
  610 F. App'x 28 (2d Cir. 2015) ...........................................................................................35

*Thompson v. Shutterstock, Inc.*,
  2024 WL 2943813 (S.D.N.Y. June 10, 2024) ......................................................................28

*Tulino v. City of N.Y.*,
  813 F. App'x 725 (2d Cir. 2020) ..........................................................................................30

*Turner v. MTA Metro-N. R.R.*,
  2024 WL 1177227 (S.D.N.Y. Mar. 19, 2024) (Broderick, J.)...............................................34

*Uttarwar v. Lazard Asset Mgmt.*,
  2024 WL 1251177 (S.D.N.Y. Mar. 22, 2024), *aff'd*, 2025 WL 704278 (2d Cir.
  Mar. 5, 2025)...........................................................................................................15, 20, 25

*Villar v. City of N.Y.*,
  135 F. Supp. 3d 105 (S.D.N.Y. 2015)..................................................................................40

*Virgona v. Tufenkian Imp.-Exp. Ventures, Inc.*,
  2008 WL 4356219 (S.D.N.Y. Sept. 23, 2008)......................................................................37

*Vito v. Bausch & Lomb Inc.*,
  403 F. App'x 593 (2d Cir. 2010) ..........................................................................................17

*Walsh v. N.Y.C. Hous. Auth.*,
  828 F.3d 70 (2d Cir. 2016)....................................................................................................20

*Weaver v. Bloomberg L.P.*,
  717 F. Supp. 3d 372 (S.D.N.Y. 2024)...................................................................................23

*Williams v. N.Y.C. Hous. Auth.*,
  61 A.D.3d 62 (1st Dep't 2009) ..........................................................................15

*Woolfolk v. N.Y.C. Dep't of Educ.*,
  2020 WL 1285835 (S.D.N.Y. Mar. 18, 2020) ......................................................33

*Wrighten v. Glowski*,
  232 F.3d 119 (2d Cir. 2000)................................................................................40

*Ya-Chen Chen v. City Univ. of N.Y.*,
  805 F.3d 59 (2d Cir. 2015)............................................................................25, 38

*Zhengfang Liang v. Cafe Spice SB, Inc.*,
  911 F. Supp. 2d 184 (E.D.N.Y. 2012) ...............................................................36

**STATUTES**

29 U.S.C. § 206(d)(1) ...............................................................................................35, 36

N.Y. Lab. Law § 194(1)(b) ...........................................................................................35

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ...................................................................................................14

Local Civil Rule 56.1......................................................................................................3

Defendants Prabhjot Singh, M.D., Ph.D. ("Singh"), Dennis Charney, M.D. ("Charney"), Bruno Silva ("Silva"), and Icahn School of Medicine at Mount Sinai ("ISMMS") (collectively, "Defendants") submit this memorandum of law in support of their summary judgment motion.

## PRELIMINARY STATEMENT

This case began with a sprawling 190-page, 889-paragraph complaint. (Dkt. 30.) Four of the eight original Plaintiffs were dismissed from the case at the pleading stage. (Dkt. 81.) Now, following extensive discovery, Plaintiffs' discrimination claims remain a patchwork of speculation, innuendo, and rhetoric—*i.e.*, "sound and fury, signifying nothing." All remaining claims must be dismissed because there is no triable issue of material fact from which a reasonable jury could find unlawful discrimination.

The four Plaintiffs—Stella Safo, M.D. ("Safo"), Geraldine Llames ("Llames"), Amanda Misiti ("Misiti"), and Emilie Bruzelius ("Bruzelius")—allege that they were the victims of gender discrimination and retaliation under federal, state, and city law. While Plaintiffs claim that they perceived their workplace—the Arnhold Institute for Global Health ("AIGH") at ISMMS—to be unpleasant, the undisputed record evidence belies a hostile work environment based on gender. Plaintiffs "believed" that Singh, the Director of AIGH, was hostile to them because they are women—a belief based on little more than how he supposedly looked at them and how he conducted certain meetings. None of the Plaintiffs have adduced any facts whatsoever, much less a disputed issue of material fact, to substantiate that belief. The handful of episodic incidents on which Plaintiffs rely were, indisputably, gender neutral, neither severe nor pervasive, and certainly did not alter the terms and conditions of their employment on the basis of sex. Indeed, Plaintiffs admitted that they were either unaware of, or not offended by, the supposedly offensive language underlying their hostile work environment claims; moreover, Plaintiffs' feigned outrage at purportedly sexist comments is belied by their own crude sexual comments to colleagues and

others. Simply put, the record is devoid of any facts to support Plaintiffs' hostile work environment claims.

Plaintiffs' disparate treatment claims suffer from the same infirmity. No Plaintiff experienced an adverse action—there was no termination, demotion, transfer, or reduction in compensation. Moreover, there is no evidence that any of the trivial inconveniences on which Plaintiffs rely give rise to an inference of discrimination, especially because men and women had the same shared experiences. Even if Plaintiffs could establish a *prima facie* case of disparate treatment—which they cannot—there is not a scintilla of evidence that Defendants' explanations for their actions were false, and that discrimination was the real reason. Plaintiffs' complete and abject failure to raise a genuine dispute of material fact with respect to pretext dooms their disparate treatment claims.

Bruzelius's Equal Pay Act claims fail because her alleged comparators had vastly different credentials and performed fundamentally different work. Indeed, all her alleged comparators had either a Ph.D. or a computer science or engineering background—Bruzelius had neither. Her retaliation claim fails because she did not experience a materially adverse change in her employment and the alleged retaliator, Singh, could not have acted with a retaliatory animus because it is undisputed that he had no knowledge of Bruzelius's alleged protected activity.

Lastly, if any of Plaintiffs' claims survive—which they should not—all claims against Charney should be dismissed because there is no evidence that he actually participated in ***any*** conduct giving rise to Plaintiffs' claims.

In sum, none of the four Plaintiffs has raised a genuine dispute of material fact on any of their claims. Plaintiffs' attempt to cobble together their respective individual allegations in this

multi-plaintiff case cannot mask that fatal defect and does not render the whole greater than the sum of its parts. Accordingly, Defendants are entitled to summary judgment.

## STATEMENT OF FACTS[1]

### I.    THE FORMATION OF AIGH.

In 2014, ISMMS, the medical school of The Mount Sinai Hospital (56.1 ¶1), received a $12.5 million grant to create "a multi-disciplinary institute dedicated to addressing the gap in global health," which would become known as AIGH. (56.1 ¶¶11-12.) Charney, the Dean of ISMMS, convened a search committee to vet potential candidates and make a recommendation for AIGH's inaugural director. The committee was tasked with finding someone who could build something "different than the other institutes and departments in New York City." (56.1 ¶¶2, 14.) After a lengthy search process, the committee recommended Singh. (56.1 ¶18.) While some committee members had concerns about Singh's relative youth and lack of extensive management experience, others believed him to be an "out of the box thinker" with a strong commitment to "community health workers[] and health equity." (56.1 ¶17.) Charney adopted the committee's recommendation and announced Singh's hire on February 24, 2015. (56.1 ¶19.) Singh officially assumed the role on September 1, 2015. (*Id.*)

Singh began planning the framework of the new institute before his official start. He recruited and hired a slate of individuals, including David Berman ("Berman"), Kirsten Knaup ("Knaup"), Sandeep Kishore, M.D., Ph.D. ("Kishore"), James Faghmous, Ph.D. ("Faghmous"), Natalie Privett, Ph.D. ("Privett"), Rachel Vreeman, M.D. ("Vreeman"), Silva, and Safo. (56.1 ¶21.)

---

[1] Citations to the record are set forth in Defendants' Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 In Support Of Defendants' Motion For Summary Judgment as ("56.1").

## II.    DR. STELLA SAFO.

Safo was a longtime family friend of Singh's, and someone he knew had an interest in domestic and global health work.  (56.1 ¶¶32-33.)  As Singh was developing his senior leadership team, he thought that Safo could make meaningful contributions to AIGH, even though she had no prior experience in global health and had never worked in a management role.  (*Id.*)

Singh both advocated and negotiated (as part of his own package) for Safo's hire at ISMMS. (*Id.*) As a result of Singh's efforts, Safo was offered the position of Assistant Professor in the Department of Medicine at ISMMS (as opposed to Instructor, a lesser title and the position traditionally offered to candidates who are only one year post fellowship, which Safo was at the time), with a supplemental role in AIGH. (56.1 ¶¶34-35.) Safo discussed her contract terms on multiple occasions with Dr. Barbara Murphy, M.D., Chair of the Department of Medicine, before she signed it on April 30, 2015. (56.1 ¶¶36-37.)

Safo began working at AIGH in September 2015.  (56.1 ¶31.) Her functional AIGH title was Program Manager and her primary task at AIGH was to lead the Health System Design team. (56.1 ¶¶38, 41.) While she and Singh had multiple discussions regarding her career trajectory at AIGH, including the possibility of one day becoming AIGH's Chief Medical Officer, Singh believed her lack of management experience at the time of her hire made the title of Program Manager a more appropriate starting point. (56.1 ¶¶39, 42.)

As the leader of the Health System Design team, Safo attended senior management meetings with Singh and other AIGH leaders, and supervised three employees, Mike Escosia ("Escosia"), Privett, and Silva. (56.1 ¶¶4, 41.) After one-and-a-half years at AIGH, Singh thought Safo was ready to be Chief Medical Officer and suggested she consider the role. (56.1 ¶45.) Safo declined because she felt she was not yet ready. (*Id.*) Six months later, after Safo continued to take on increasing responsibility, she submitted a formal request for promotion to Chief Medical

4

Officer, which Singh approved.  (56.1 ¶48.) Her new functional title and a salary increase of $20,000 (to account for her expanding job responsibilities), went into effect October 1, 2017.  (*Id.*)

Notwithstanding Safo's ascension, she became increasingly dissatisfied with her role and Singh's leadership.  In particular, Safo objected to being asked to perform tasks that she felt were beneath her position, including organizing senior meetings and the structure of a retreat. (56.1 ¶51.) She objected to Singh's management style and the way he interacted with her. She described Singh as having a "constant desire" "to control," including his "constant telling [her] of what [she] need[ed] to be focused on." (56.1 ¶¶55-56.)  Safo was "put off" by the "lack of clarity" in Singh's directions. (*Id.* ¶56.) Safo also felt that Singh's communication style was "degrading" and "diminishing" toward her, though the only examples she could provide was that he passed over her in meetings, engaged in "staring contests," said she was acting like a "mother hen" and told her she was "talking to[o] much." (56.1 ¶¶54, 56-58.)

Other AIGH employees—men and women alike—had difficulties with Singh's management and communication style. Dr. Natasha Anushri Anandaraja (a former Plaintiff) described him as a "poor communicator" and Berman indicated Singh "had management challenges in aligning resources to support and grow" AIGH's operating model. (56.1 ¶¶70, 173.) After one meeting, Dr. David Muller, M.D., Chair of the Department of Medical Education, told Anandaraja that "he hadn't understood 60 percent of what Dr. Singh had said" and that Singh would shift direction unexpectedly. (56.1 ¶¶71, 173.) Silva referred to Singh's communication style as "word salad." (56.1 ¶173.)  Misiti testified that "many people" felt as though Singh "constantly changed his mind." (56.1 ¶171.) Escosia, a male Project Manager at AIGH, testified that Singh's "constant shifting of priorities" caused him to question his own abilities, and ultimately to leave AIGH. (56.1 ¶68.)

Safo also had issues with Berman, AIGH's Chief of Staff. From Safo's perspective, Berman was "not collegiate [*sic*]" and "had a manner of disregarding those he didn't think were important," including commenting "this person isn't capable or this person isn't that good." (56.1 ¶77.) Safo testified that Berman made statements that called into question her "professionalism and seemed to suggest a lack of competence." (56.1 ¶79.) For example, she said that after a meeting had to be rescheduled, Berman told her, "if you could do your job, you would be able to organize your meetings." (*Id.*) Safo was also bothered by a heated e-mail exchange she had with Berman regarding her not inviting everyone in AIGH to a birthday celebration she planned in the office. (56.1 ¶81.) Berman, who was aware of prior staff complaints that Safo was not inclusive, informed Safo that her "celebration effort [was] selective" and that her "tone and replies" were "combative," reflecting "non-inclusion and a lack of respect for basic administration protocols." (56.1 ¶83.) Safo responded to Berman in kind and with an intentionally angry tone. (56.1 ¶84.) She forwarded her response to another colleague, stating, "Girl he is bothered!" and adding, "I can't wait to be a thorn in the side of these mofos for the next year I'm here. Muahahahaha." (*Id.*)

Safo also now raises concerns about her interactions with Silva, who, at the time, was one of her direct reports on the Health System Design team and someone with whom she vacationed and shared a personal friendship. (56.1 ¶86.) In particular, Safo alleges that Silva's language in the workplace, and in particular his use of the term "bitch," was inappropriate. Yet, Safo admitted that the only times she heard Silva use "bitch" were in a "very clearly friendly" context, and that she, herself, used the term "bitch" or "B" when referring to Silva, who is a gay man. (56.1 ¶¶90-91.) Neither Safo nor Silva ever reported such comments as inappropriate. (56.1 ¶¶92-93.) In fact, on multiple occasions, Safo used the term "bitch" and other vulgar language in communications

6

with her colleagues, including Singh, making statements such as: "[t]hese mofos can kiss my ass," "haters can suck a million dicks," and "millennials suck huge balls." (56.1 ¶¶94-96.)

On or about February 28, 2018, within four months of being named Chief Medical Officer, Safo requested a transfer from AIGH to Mount Sinai Health Partners ("MSHP") to work as a Senior Medical Director, Clinical Transformation. (56.1 ¶97.) Singh supported Safo's request and helped facilitate her transition to MSHP, where she remained until 2019. (56.1 ¶98.)

### III.   GERALDINE LLAMES.

Llames started at AIGH on January 23, 2017, as a Program Manager I with a functional title of Project Manager. (56.1 ¶¶103-04.) Llames worked with the ATLAS team as well as on the Robert Wood Johnson ("RWJ") Foundation grant. (56.1 ¶106.)

Within three months of starting at AIGH, Llames was dissatisfied with her role. She described herself as "struggling with motivation" and asked a colleague "how bad will it look if i leave so soon?" (56.1 ¶¶141, 143.) She took extended lunches, overslept through morning meetings, and characterized her role at AIGH as "just paying for [her] drinking habits." (56.1 ¶142.)

Llames's lack of motivation manifested in her work. Llames missed an important grant application deadline for the RWJ Foundation. When Berman learned of the missed deadline he raised his voice to Llames and said, "[t]his is stupid. Are you fucking stupid?" (56.1 ¶122.) While Llames could not recall any details of the meeting, Berman explained that Llames "didn't do a great job" and did not take responsibility for the missed deadline, which angered him. (56.1 ¶123.) Notably, Berman also raised his voice with male employees whom he believed underperformed, including Aaron Baum, Ph.D., Assistant Professor of Global Health, which Berman admitted was a "heated exchange." In fact, Berman once made Baum cry. (56.1 ¶80.)

Llames disliked Singh's management style. She testified that Singh would skip over her in meetings and give her conflicting instructions about her work product—neither of which she believed Singh did to men. When asked, however, Llames could not describe these meetings with any particularity, nor identify who provided the conflicting information. (56.1 ¶¶115-16.) To the extent these allegations are attributed to Singh, several men described similar issues with his shifting priorities or changes in direction. (56.1 ¶¶65-68, 171-72.)

In November 2017, Llames asked Singh to work remotely from Virginia in the days leading up to a USAID meeting. (56.1 ¶110.) At the time, there was no formal remote work policy for AIGH or ISMMS; instead, individual managers had discretion to approve requests to work remotely. (56.1 ¶30.) Singh considered remote work an "exception" to the general expectation that work be performed in the office, and required his direct reports—male and female—to submit a work plan for any remote work request. (*Id.*) Singh denied Llames's request because they were "preparing for a pretty intensive meeting" with USAID and he believed her work plan lacked sufficient detail. (56.1 ¶111.) While Llames thought Singh's denial was unfair, she testified that she had no knowledge of any other employees who had remote work requests approved or denied by Singh. (56.1 ¶¶112-13.)

Llames also claims Silva offended her with certain language and their topics of in-office conversation. Silva and Llames had a close personal friendship in which they spoke freely and "very openly" with one another. (56.1 ¶127.) Llames admitted that she and Silva discussed intimate topics, including men she was dating, men she slept with, men that appeared in her dating apps, her struggles with weight, drinking, partying, gay bars, and her menstrual cycle. (56.1 ¶¶128-33.) Within the context of their friendship, Silva made comments about Llames's appearance. (56.1 ¶¶128-29.) Llames admitted that these conversations were part of their friendly banter, that she

8

was not offended by Silva's use of the word "bitch," and that she "couldn't take [Silva] seriously." (56.1 ¶¶127, 136.) Llames likewise poked fun at Silva by, for example, making comments about his "belly showing" when he wore a tight shirt. (56.1 ¶129.) At a personal gathering outside of work, Silva once commented that Llames looked "like a dyke," and they both laughed. (56.1 ¶130.)

Llames said that, at times, she found Silva's comments inappropriate because he was "in a position of leadership" (albeit not her supervisor) and would make comments in front of others, including Escosia and David Rojas Leon, two other men who were also friends with Llames and Silva. (56.1 ¶¶137-38.) Llames admitted that, in general, she did not find Silva's cursing offensive. (56.1 ¶137.)

Llames left AIGH on August 9, 2018 for a new role at Montefiore Medical System. (56.1 ¶144.) Five months later, on January 18, 2019, Llames texted Silva, "I miss you too," asking him, "How are you?," and continuing the dialogue into the next day. (56.1 ¶140.)

## IV.    AMANDA MISITI.

Amanda Misiti joined AIGH on May 1, 2017 as a Program Manager. (56.1 ¶146.) Her job duties included managing the RWJ grant, developing content and presentations related to the grant, scheduling meetings, and taking notes. (56.1 ¶149.)  Singh hired Misiti and was her supervisor. (56.1 ¶148.) In her first annual performance review, Singh gave Misiti an "Excellent" rating and requested that she receive a salary increase. (56.1 ¶151.) Singh thought highly of Misiti, saw her as a "rising leader," gave her autonomy, and praised her work on multiple occasions, including by giving her "shout-outs" and describing her work as "perfect." (56.1 ¶¶185-87.)

Notwithstanding the foregoing, Misiti disliked Singh's management style. (56.1 ¶168.) She alleges that Singh failed to acknowledge her in meetings, publicly criticized her, used "esoteric terms" during arguments or debates, "engage[d] in staring contests" with her, and made her feel as though she had to adopt his opinion on work matters. (56.1 ¶169.)

Misiti recounted a handful of interactions with Singh that she believes exemplifies his hostility toward women.  On one occasion, Misiti claims that Singh commented that she looked "stressed" and suggested she act more like Helfgott and "not have emotional reactions"—though Misiti admitted Singh's observation was a fair assessment because she was stressed at the time. (56.1 ¶169.) On another occasion, Misiti said that Singh criticized her for speaking up during a 2017 trip to Liberia, but did not criticize the male attendees. However, Misiti acknowledged that the male attendees were not AIGH employees, nor under Singh's supervision, and that Singh later spoke negatively about their contributions, referring to one man as "just a pretty face," which Misiti understood to be an insult to him. (56.1 ¶174.)

Misiti also testified about an e-mail Singh asked her to send on October 1, 2018 to two AIGH faculty members, Drs. Duncan and Sheela Maru. (56.1 ¶177.) The e-mail requested their in-person attendance at a meeting with external consultants. (*Id.*) Misiti said she was uncomfortable with the request because the Marus would perceive her as "being the bad guy" for requesting their in-person attendance. (56.1 ¶179.) Singh reassured Misiti that he explained to the Marus that the request was his and told her the Marus had no issue with her e-mail and they "appreciated [her] clarity in particular." (*Id.*) Nonetheless, Misiti remained angry at Singh, texting a colleague that Singh was "playing with the wrong bitch." (56.1 ¶180.)

Finally, Misiti recounted that Singh once drew a diagram and commented, "I'm no Georgia O'Keefe," which she interpreted as him implying that the diagram looked like a vagina.  Misiti acknowledged that neither Singh nor anyone else commented on the diagram in a sexual or gendered manner. (56.1 ¶182.) In fact, Misiti engaged in explicit conversations with colleagues about female genitalia, including comments such as: "omg he didn't' eat your pussy?!," "[i]t's like he saw my dirty hoo ha," and "[t]hey've got me by the clit." (56.1 ¶183.)

10

Misiti also claims Berman insulted her.  She was supposedly offended when Berman told her that it would take her a least nine months to get "up to date" when she joined AIGH, and that she should "not have opinions" about a grant on which they were working.  Misiti also felt that Berman encouraged women not to say more than a few words during meetings, though she could not provide any details. (56.1 ¶176.)

After Berman left AIGH in 2018, Misiti asked for an increase in pay and a new title because she had assumed some of his responsibilities. (56.1 ¶¶152-53.) According to Misiti, Singh denied her request because she had not been in her role long enough to be considered for promotion. (56.1 ¶153.) However, Misiti admitted that she never applied for Berman's job, and that the position was eliminated following his departure. (56.1 ¶159.) With respect to the Director of Global Sites role, a position newly created by Singh for which he initially indicated that Misiti would be a good fit, Misiti never applied for the role, and the woman Singh hired, Vreeman, had an M.D., which Misiti admittedly did not have. (56.1 ¶¶164, 167.)

Misiti resigned from AIGH in September 2023. (56.1 ¶190.)

## V.    EMILIE BRUZELIUS.

Emilie Bruzelius joined AIGH on April 4, 2016 as a Data Analyst II with a starting salary of $70,000. (56.1 ¶192.) Faghmous, recruited and hired her, with Singh interviewing her and approving the hiring decision. (*Id.*) At the time, Bruzelius held a Bachelor of Arts Degree in sociology, a Masters Degree in Public Health, and was a doctoral student in epidemiology. At no point during her employment at AIGH did Bruzelius have her Ph.D. (56.1 ¶194.)

Bruzelius's work "fundamentally concentrated on research," including grant applications, papers, and ATLAS' epidemiologic features. (56.1 ¶196.) When Faghmous left AIGH in fall 2017, Bruzelius began reporting to Singh, who asked her to take lead of "the research side of the Data Science team." (56.1 ¶198.) Bruzelius was unable to take over Faghmous's role as Chief

11

Technology Officer because she was not a data scientist and, according to Singh, the role required a "very technical" "computer science" background. (56.1 ¶199.) Further, she could not have grants assigned to her because she did not have a Ph.D. (*Id.*) Bruzelius encouraged Singh to find someone to replace Faghmous—and in April 2018, Jeb Weisman was hired for the role and in June, became Bruzelius's supervisor. (56.1 ¶¶199-200.)

Although Bruzelius alleges she was paid less than her male colleagues, her alleged comparators had different qualifications and performed different work. (56.1 ¶¶218-24.)

- Craig Helfgott was a Data Science Analyst III with a salary of $120,000; his role required an undergraduate degree in computer science or engineering and at least four years of software engineering experience. Helfgott had a Ph.D., a Master of Science in physics, and nine years of prior experience as a software engineer, senior quantitative specialist, and quantitative analyst. (56.1 ¶221.) Helfgott had a computer science background and performed work Weisman described as "incredibly sophisticated." (56.1 ¶¶221-22.)

- Patrick Doupe, Mihir Mongia, and Matthew Le worked as Senior Data Analysts with yearly salaries between $75,000 and $85,000. Senior Data Analysts performed "more sophisticated" work than Data Analysts, including developing new algorithm-based software modules and focusing on technical algorithm creation and software development, which Bruzelius did not have the training to perform. (56.1 ¶¶223-25.)

- Doupe had a Ph.D. in economics and completed the Insight Health Data Science Fellows Program, a full-time postdoctoral data science training fellowship. (56.1 ¶223.)

- Mongia had a Bachelor of Science in electrical engineering, a Master of Science in computational and mathematical engineering, and prior software engineering experience. (56.1 ¶224.)

- Le had a Bachelor of Science and Master of Science in computer science and a machine-learning background that Bruzelius lacked. (56.1 ¶225.)

- Humale Khan was a Product Manager with a yearly salary of $95,000, had a degree in computer science, and worked as a Program Manager at Microsoft before joining AIGH. Khan managed the ATLAS product lifecycle, oversaw product strategy roadmaps, conducted usability testing, and coordinated cross-functional teams— duties Bruzelius never performed. (56.1 ¶227.)

12

Singh publicly praised Bruzelius as a "rising leader" and a "phenomenal explainer" with a "sharp analytical mind." (56.1 ¶¶213-14.) Singh supported Bruzelius's work and suggested that she be listed as the first author on a paper over Le. (56.1 ¶208.)

Bruzelius believed that AIGH applied different rules to men and women regarding vacation requests, in-office attendance, office space, and receiving credit for work. (56.1 ¶¶202, 206-08.) Bruzelius identified a handful of comments and interactions to which she took exception, including that Berman once "spoke rudely" to her, Silva commented on her weight on a few occasions, and Singh called her "weak," said she "cared too much about" collaboration, and had a habit of reversing course with his instructions. Bruzelius was told that Singh "did not particularly like [her]." (56.1 ¶¶212, 217-18.)

In spring 2018, Mount Sinai commenced an internal investigation of discrimination complaints alleged by two then-former AIGH employees. (56.1 ¶228.) Bruzelius alleges that Singh retaliated against her for participating in that investigation. (56.1 ¶229.) Bruzelius testified that after the investigation Singh's demeanor changed, that he was "cold and aggressive," that he stared her down, and that on one occasion he made fun of her for being "obsessed" with data privacy concerns. She also said that he stopped asking her to attend meetings and present to external donors. (56.1 ¶¶231-32, 238.) At one point, Bruzelius believed Singh was questioning the future of her role at AIGH, but Singh testified that any discussions regarding Bruzelius's role were intended to keep her at AIGH, particularly in light of Faghmous's departure. (56.1 ¶235.) Although Bruzelius stated she could not "help but wonder" whether Singh knew she spoke to investigators, Singh's unrebutted testimony is that he did not know who complained about discrimination or who participated in Mount Sinai's internal investigation. (56.1 ¶¶230, 235.)

13

Bruzelius resigned from AIGH effective March 4, 2019. (56.1 ¶¶8, 241.)

## ARGUMENT

### I.    THE STANDARD FOR SUMMARY JUDGMENT.

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The nonmoving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" and may not rely on "conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted).

### II.    SAFO'S DISCRIMINATION CLAIMS SHOULD BE DISMISSED.

#### A.    Safo Fails To Raise A Triable Issue On Her Hostile Work Environment Claims (Count Six).

To establish a hostile work environment claim under Title VII, Title IX[2], and the NYSHRL, a plaintiff must show that the workplace is "so severely permeated with discriminatory intimidation, ridicule, and insult, that the terms and conditions of his or her employment were thereby altered." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 101 (2d Cir. 2020) (misconduct shown must be "severe or pervasive") (citation omitted); *see also Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) (Title IX claims); *Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 6 (2d Cir. 2017) (NYSHRL) (summary order). This standard has both objective and subjective components, requiring conduct that is "more than episodic" and "sufficiently continuous and concerted." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 321 (2d Cir.

---

[2] Plaintiffs' Title IX claims are duplicative of their rights under Title VII, an issue currently pending before the Supreme Court in *Crowther v. Board of Regents of University System of Georgia*, No. 25-183. If the Supreme Court rules Title IX does not provide a private right of action for employees, Plaintiffs' Title IX claims would have to be dismissed for this reason alone.

2015). The conduct must be based on the plaintiff's membership in a protected class. *Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 672 (S.D.N.Y. 2011). Courts consider the totality of the circumstances, including frequency, severity, whether the conduct is physically threatening or humiliating, and whether it unreasonably interferes with plaintiff's work. *Id*. at 672-73.

NYCHRL claims are analyzed separately, but still require proof that plaintiff was treated "less well" because of discriminatory intent. *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013); *Uttarwar v. Lazard Asset Mgmt.*, 2024 WL 1251177, at *7 (S.D.N.Y. Mar. 22, 2024), *aff'd*, 2025 WL 704278 (2d Cir. Mar. 5, 2025).  A NYCHRL claim fails when it raises a "truly insubstantial case"; there is no discrimination where the "conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and trivial inconveniences." *Kops v. PPM Am., Inc.*, 2016 WL 7188793, at *5 (S.D.N.Y. Dec. 5, 2016) (citation omitted). The NYCHRL does not operate as a "general civility code." *Atkinson v. Singh*, 2022 WL 137634, at *15–16 (S.D.N.Y. Jan. 14, 2022) (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 79 (1st Dep't 2009)).[3]

Safo's hostile work environment claims fail under each standard because she identifies only sporadic comments and actions that were, at most, petty slights, experienced by both men and women alike, not connected to gender, made without her knowledge (if ever made), and/or were not offensive to her.

The supposedly offensive comments on which Safo relies do not create a triable issue of fact. Her claim that Singh referred to her as "mother hen" is insufficient. Indeed, courts have dismissed Title VII, NYSHRL and NYCHRL hostile work environment claims based on this very conduct. *See Mazzone-Trani v. Donohue Cecere Funeral Home*, 2010 WL 3282616, at *5

---

[3] This same standard applies to each Plaintiffs' hostile work environment claims.

(E.D.N.Y. Aug. 13, 2010) (calling the plaintiff "mother hen" and stating "women get more emotional" insufficient to survive summary judgment); *see also Husser v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 253, 276 (E.D.N.Y. 2015) ("twelve cited remarks and events over the course of a three-year period" insufficient under NYCHRL).

Safo's reliance on Silva's supposedly offensive language also fails to raise a triable issue of fact. First, sporadic use of the term "bitch" is insufficient to establish an inference of gender-based hostility. *See Braunstein v. Sahara Plaza, LLC*, 2021 WL 2650369, at *18 (S.D.N.Y. June 28, 2021), *aff'd*, 2022 WL 17480962 (2d Cir. 2022); *Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 265–66 (E.D.N.Y. 2019).

Second, Safo admitted she was not offended when Silva called her a bitch, and that she also used the word bitch to refer to Silva. (56.1 ¶¶91, 93.) Where the plaintiff does not perceive the challenged language to be offensive and is a willing participant, the conduct has not actually altered the conditions of employment. *Husser*, 137 F. Supp. 3d at 276-77 (dismissing Title VII, NYSHRL, and NYCHRL hostile work environment claims when "the record [was] clear that [plaintiff] participated in the sexual banter"); *Bailey v. Reg'l Radio Grp. LLC*, 2017 WL 1025948, at *6 (N.D.N.Y. Mar. 15, 2017) (plaintiff's admission that she considered the comment lighthearted undermined her hostile work environment claim); *Lee v. City of Syracuse*, 603 F. Supp. 2d 417, 439 (N.D.N.Y. 2009) (plaintiff's admitted use of derogatory language weighs against hostile work environment claim).

Additional comments alleged in the Amended Complaint attributed to Silva, including allegations that Silva told Llames that Safo was a "cunt," "uptight," a "control freak" and "needs to get laid," cannot support her hostile work environment claim because Safo admitted she was unaware of them. (56.1 ¶89.) *See Batiste v. City Univ. of N.Y.*, 2017 WL 2912525, at *10 (S.D.N.Y.

16

July 7, 2017) (finding no hostile work environment where the remark was not heard by the plaintiff); *Donahue v. Asia TV USA Ltd.*, 208 F. Supp. 3d 505, 516 (S.D.N.Y. 2016) (dismissing Title VII and NYSHRL hostile work environments claims based in part on comments Plaintiff had no knowledge of until after his employment); *Rodriguez v. Coca Cola Refreshments USA, Inc.*, 2013 WL 5230037, at *5 (E.D.N.Y. Sept. 16, 2013) ("A plaintiff cannot assert a hostile work environment based on co-workers telling [her] things; [she] has to experience it [herself].").

Moreover, even if Safo had been aware that Silva called her a "cunt"—and there is no evidence that she was—courts in this district have held that use of the term "cunt," even when combined with "bitch," is insufficient to survive summary judgment. *See Goodwine v. City of N.Y.*, 2016 WL 3017398, at *8-9 (S.D.N.Y. May 23, 2016) (dismissing NYCHRL claim where plaintiff alleged she was referred to as a "cunt" and a "bitch" by a manager, the court noting while the "language may be uncivil," plaintiff failed to show conduct was caused by discriminatory motive).

Safo's allegations that Singh's and Berman's management and communication styles created a hostile work environment fare no better. "[I]t is axiomatic that in order to establish a…hostile work environment…a plaintiff must demonstrate that the conduct occurred because of her [membership in a protected class]." *Vito v. Bausch & Lomb Inc.*, 403 F. App'x 593, 595–96 (2d Cir. 2010) (citation omitted). A supervisor's management style that is "overzealous, overbearing, or even oppressive" is insufficient if it is not tied to the individual's membership in a protected class. In other words, "[h]aving an overbearing boss is simply not enough." *Costello*, 783 F. Supp. 2d at 680.

Thus, Safo's allegations that Singh stared at her and ignored her in meetings are insufficient. *See Bautista v. PR Gramercy Square Condo.*, 642 F. Supp. 3d 411, 426-27 (S.D.N.Y. 2022); *Agosto*, 982 F.3d at 102 (staring, sneering, and yelling incidents insufficient to create an

17

objectively hostile workplace); *Carter-Marks v. Alstom Transp. USA Inc.*, 800 F. Supp. 3d 423, 463 (E.D.N.Y. 2025) (supervisor glaring, staring, scowling, along with micromanaging and excluding plaintiff from work meetings insufficient to establish a hostile work environment).

Moreover, any criticism of Safo's work—such as Singh telling her she talked too much in meetings—is equally insufficient because there is not a shred of evidence that it was related to gender.[4]  *See Maron v. Legal Aid Soc'y*, 605 F. Supp. 3d 547, 565-66 (S.D.N.Y. 2022) ("[C]riticism, even if unwarranted, does not suffice to create a hostile work environment . . . ."); *Livingston v. City of N.Y.*, 563 F. Supp. 3d 201, 252-53 (S.D.N.Y. 2021) (finding plaintiff's allegations that he was "subjected to 'belittling comments and constant questioning'" was "the sort of facially neutral conduct that does not support a hostile work environment claim.").

Safo's allegations that the tone in Singh's e-mails was degrading and he was dismissive of her work are far too vague and conclusory to survive summary judgment. *See Marseille v. Mount Sinai Health Sys., Inc.*, 2021 WL 3475620, at *10–11 (S.D.N.Y. Aug. 5, 2021) (granting summary judgment on NYCHRL hostile work environment claim where plaintiff failed to adduce evidence, beyond self-serving and conclusory assertions, that the alleged workplace hostility was connected to her protected characteristic), *aff'd*, 2022 WL 14700981 (2d Cir. Oct. 26, 2022); *Shalom v. Hunter Coll. of City Univ. of N.Y.*, 2014 WL 3955167, at *6 (S.D.N.Y. Aug. 13, 2014) (plaintiff's subjective feelings regarding a manager's comments or e-mails are insufficient to show sex neutral statements had a discriminatory motive), *aff'd*, 645 F. App'x 60 (2d Cir. 2016). Moreover, Safo admitted that Singh also spoke critically about high-ranking men at AIGH and ISMMS, such as

---

[4] This Court already held that allegations that Berman reprimanded Safo for seemingly trivial matters—including the allegation that Berman criticized her as "exclusive" and "bad for AIGH culture" after the birthday celebration e-mail—did not state a NYCHRL or NYSHRL claim because Plaintiffs pled no facts suggesting "discriminatory intent." *Atkinson*, 2022 WL 137634, at *15–16.

18

Faghmous and Charney. (56.1 ¶67.) The record is simply devoid of evidence that any criticism she experienced was gender based.  *See Milord-Francois v. N.Y. State Off. of Medicaid Inspector Gen.*, 635 F. Supp. 3d 308, 329 (S.D.N.Y. 2022) (granting summary judgment on NYCHRL hostile work environment claim where supervisor's comments about plaintiff's "fucking scowl face" and demeanor, while "intemperate and potentially hostile," did not show discriminatory treatment); *Olin v. Rochester City Sch. Dist.*, 596 F. Supp. 3d 475, 488 (W.D.N.Y. 2022) (alleged "mean" boss who subjected plaintiff to unfair scrutiny and criticism did not plausibly create hostile work environment absent "sexist or disparaging remarks, threats, physical interactions, or other egregious conduct").

Further, the undisputed record shows that men experienced the same frustrations with Singh, and that Berman yelled at men and women alike, which further precludes any inference of discrimination.[5] *See Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999) ("[A]n environment which is equally harsh for both men and women…does not constitute a hostile working environment under the civil rights statutes."). *See also Casalino v. N.Y. State Cath. Health Plan, Inc.*, 2012 WL 1079943, at *7 (S.D.N.Y. Mar. 30, 2012); *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, 2007 WL 1149979, at *18 (S.D.N.Y. Apr. 18, 2007), *aff'd*, 303 F. App'x 943 (2d Cir. 2008).

As such, Safo's hostile work environment claims cannot survive summary judgment.

**B.      Safo Fails to Raise a Triable Issue of Disparate Treatment (Count Five).**

To establish a claim for disparate treatment under the *McDonnell Douglas* framework, Safo must show "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under

---

[5] (*See, e.g.*, 56.1 ¶¶124,176-77.)

circumstances giving rise to an inference of discrimination." *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016) (citation omitted). If she does, the burden shifts to Defendants to articulate a legitimate, nondiscriminatory reason, at which point Safo must prove the reason was pretextual. *Id.*

Under the NYCHRL, "[t]o prevail on liability, the plaintiff need only show differential treatment—that she is treated 'less well'—because of a discriminatory intent." *Mihalik*, 715 F.3d at 110. However, Plaintiffs must still prove the treatment was "more than trivial, insubstantial, or petty" and that Defendants' actions were pretextual or motivated at least in part by discrimination. *Uttarwar*, 2024 WL 1251177, at *7.

It is not entirely clear where Safo's hostile work environment claim ends and her disparate treatment claim begins, but her disparate treatment claim appears to be based on, (a) her initial title of Program Manager and "the delay" in being named Chief Medical Officer and corresponding salary increase, and (b) her belief that men were treated more favorably than women in terms of salary negotiations and job assignments. As discussed below, Safo's disparate treatment claim fails.

> 1.      *Safo's Program Manager Title And Salary Negotiation Allegations Are Untimely.*

To the extent Safo's disparate treatment claim is based on her title of Program Manager when she joined AIGH in 2015, or her belief that she was not permitted to negotiate her starting salary, her claim is untimely. Title VII requires a plaintiff to file a charge with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged discriminatory act. *Adams v. N.Y. State Educ. Dep't*, 2010 WL 624020, at *32 (S.D.N.Y. Feb. 23, 2010), *R. & R. adopted in part*, 705 F. Supp. 2d 298 (S.D.N.Y. 2010). Safo's Title IX, NYSHRL and NYCHRL claims are likewise time-barred because claims under all three statutes are subject to a three-year

statute of limitations. *Ikedilo v. Statter*, 2025 WL 1011346, at *1 (2d Cir. Apr. 2, 2025). The original complaint and EEOC charge were filed on April 26, 2019 (Dkt. 1; Dkt. 30 ¶29), meaning Safo's allegations based on her initial title and supposed inability to negotiate her salary in 2015 fall well outside of the limitations period. *Ikedilo*, 2025 WL 1011346, at *1.

### 2. *Safo Did Not Suffer an Adverse Employment Action.*

Safo's disparate treatment claim rests on her initial functional title, the timing of her promotion to Chief Medical Officer in 2017, and the delay in the accompanying pay raise. She also claims that she was assigned menial work responsibilities, including planning for a retreat and senior meetings.[6] Safo's disparate treatment claim fails because she did not suffer an adverse employment action in connection with her title, pay raise, or salary negotiations. And while Safo may have believed that organizing and setting the structure of a work retreat and senior meetings were "administrative corralling tasks" beneath her, it was not an adverse employment action.

To survive summary judgment, a plaintiff must show that the challenged action was "more than [] 'trifling'" and that it is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Garrison v. Am. Sugar Refining, Inc.*, 789 F. Supp. 3d 291, 306 (S.D.N.Y. 2025) (citations omitted), *appeal withdrawn*, 2025 WL 4065857 (2d Cir. Dec. 17, 2025); *see also Smith v. City of N.Y.*, 2025 WL 1983047, at *9 (S.D.N.Y. June 3, 2025) ("[N]ot every change in working conditions, by itself, can be an adverse employment action…because every plaintiff who brings a discrimination case believes that he is worse off as a result of something that happened to him at work.") (citation omitted), *R. & R. adopted*, 2025 WL 2022534 (S.D.N.Y. July 18, 2025).

---

[6] Safo alleges that she also experienced disparate treatment in the form of "public disparagement" by Singh. (Dkt. 30 ¶620; 56.1 ¶62.) Safo testified that during meetings between ISMMS and members of the Peterson Institute, Singh "essentially didn't really allow [her] to speak or engage with them." This portion of Safo's disparate treatment claim fails because she has not identified any specific comments or actions by Singh that altered the terms and conditions of her employment. *See Dinkins v. Mayorkas*, 2024 WL 1806174, at *5, *8 (S.D.N.Y. Apr. 25, 2024) (exclusion from meetings does not qualify as an adverse employment action).

Safo's Program Manager title was not an adverse employment action because the undisputed record evidence is that functional titles had no impact on the terms and conditions of her employment. (56.1 ¶¶38-40.) *See Garrison*, 789 F. Supp. 3d at 307 ("plaintiff cannot identify a material deterioration in his working conditions beyond his frustration at not being promoted."). Similarly, the alleged "delay" in receiving the Chief Medical Officer title and the corresponding $20,000 raise was not an adverse action. Safo acknowledged that when she asked for the chief title, Singh approved it, and she received her salary increase retroactively to the date of her promotion. (56.1 ¶¶48-49.) *See Stidhum v. 161-10 Hillside Auto Ave, LLC*, 2026 WL 761394, at *3 (2d Cir. Mar. 18, 2026) (summary order) (no adverse employment action where plaintiff admitted she was never denied the promotion).

Likewise, the fact that Safo helped plan a retreat and senior meetings are not adverse employment actions. *Garrison*, 789 F. Supp. 3d at 306-07 ("[a] plaintiff's subjective dissatisfaction with the work assigned, absent some evidence that the assignment materially worsened [her] working conditions, is insufficient to make out an adverse action claim") (citation omitted); *see also Paterakos v. City of Chicago,* 147 F.4th 787, 796 (7th Cir. 2025) (one week reassignment was not an adverse employment action absent "some quantitative or qualitative change in the terms or conditions of [the plaintiff's] employment that is more than a mere subjective preference") (citation omitted).

### 3.    *Safo Cannot Show an Inference of Discrimination.*

Assuming, *arguendo*, Safo experienced an adverse action, she cannot show that it raises an inference of discrimination.

Safo's conclusory allegation that men received raises and promotions just by asking while women did not is wholly unsupported with any facts, and in any event cannot be reconciled with the fact that Singh not only hired Safo, but also promoted her. *See Figueroa v. N.Y.C. Health &*

22

*Hosps. Corp.*, 500 F. Supp. 2d 224, 236 (S.D.N.Y. 2007) (when same actor hires a plaintiff already within a protected class and later engages in an adverse action, courts may draw an inference of no discriminatory intent).

Furthermore, Safo's belief that Faghmous and Berman, the men she identified as comparators, were unqualified for the titles they received is based on pure speculation. When Safo was asked whether she knew about Faghmous's qualifications to be Chief Technology Officer, or Berman's to be Chief of Staff, she responded "no." (56.1 ¶47.) "[A] Plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow an inference of discrimination to be drawn." *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (citations omitted).  However, both men had been in those roles prior to joining AIGH.  (56.1 ¶46.)

Safo's unsupported allegation that only women were assigned menial tasks likewise fails to establish an inference of discrimination. As set forth above, Safo testified to only two examples of tasks that she perceived to be beneath her level of responsibility. The undisputed record evidence confirms that senior men, including Berman and Kishore, were also assigned similar administrative tasks. (56.1 ¶52.) *Brown v. Henderson*, 257 F.3d 246, 254 (2d Cir. 2001) ("[I]n the absence of evidence suggesting that a plaintiff's sex was relevant, the fact that both male and female employees are treated similarly, if badly, does give rise to the inference that their mistreatment shared a common cause that was unrelated to their sex.")

### 4. Safo Cannot Show Defendants' Legitimate Business Reasons Are Pretext.

If a plaintiff meets her burden to establish a *prima facie* case of discrimination, the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse action. *Weaver v. Bloomberg L.P.*, 717 F. Supp. 3d 372, 384 (S.D.N.Y. 2024). The burden then shifts back to the plaintiff who bears the burden of persuasion to demonstrate "(1) that the

23

employer's stated reason is false and merely a pretext for discrimination, or (2) that the employer's stated reason, although factually accurate, is not the only reason, because the employer's decision was also attributable to an impermissible consideration." *Bart v. Golub Corp.,* 96 F.4th 566, 577 (2d Cir. 2024).

Safo's initial Program Manager title was a function of her lack of experience in a chief-level position or in global health work. (56.1 ¶¶33, 42.) Singh believed it was appropriate for Safo to develop into the role before attaining the Chief Medical Officer title—a conversation Singh testified he had with Safo when she started, but that Safo could not recall. (56.1 ¶39.) The record is devoid of any evidence that suggests Singh's belief was false, and that discrimination was the real reason.

With respect to the delay in receiving her pay increase, Defendants provided a legitimate justification, which was an administrative lag at ISMMS that was out of Singh's control. (56.1 ¶49.) Safo received backpay when the increase was successfully processed. (56.1 ¶49.) There is no evidence whatsoever that this administrative delay was pretext for discrimination.

Finally, with respect to Safo's allegations regarding her so-called administrative tasks, Defendants have articulated a legitimate, nondiscriminatory explanation for these assignments, namely that AIGH was a new institute whose operational needs required employees at all levels of the organization to assist with retreats, events, and other administrative functions as needed. Because the record reflects that administrative responsibilities were not assigned exclusively to women, there can be no showing of pretext. (56.1 ¶52.)

Even under the NYCHRL's more liberal standard, Safo's allegations do not support a discrimination claim because she fails to show that she was treated "less well" **because of** a protected characteristic or that the challenged conduct amounts to more than "petty slights and

24

trivial inconveniences." *Mihalik*, 715 F.3d at 110–11 (citation omitted); *see also Uttarwar*, 2024 WL 1251177, at \*7. Safo's complaints regarding her functional title, an alleged administrative delay in receiving a retroactive pay increase, and completing administrative tasks are, at most, the type of workplace inconveniences or subjective dissatisfactions that do not satisfy the NYCHRL's standard. In any event, as explained in Section II.A. above, Safo has not adduced evidence tying any of these alleged acts to her gender, a failure that is fatal to her NYCHRL claim. *See Mihalik*, 715 F.3d at 110.

In sum, Safo's discrimination claims are based on her belief that interactions with Singh "felt gendered" or she "didn't feel like [the experiences] w[ere] happening for other colleagues." (56.1 ¶59.) That is not evidence of discrimination. *See Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 73–76 (2d Cir. 2015) (affirming summary judgment on Title VII, NYSHRL, and NYCHRL claims, explaining that plaintiff's "feelings and perceptions of being discriminated against" were not evidence of discrimination) (citation omitted).

## III. LLAMES'S DISCRIMINATION CLAIMS SHOULD BE DISMISSED.

### A. Llames Fails to Raise A Triable Issue On Her Hostile Work Environment Claims (Count Ten).

Llames's hostile work environment claims rest on three allegations: (1) Berman yelled at her on one occasion and described her work product as "stupid"; (2) Singh gave conflicting directions and passed her over in meetings; and (3) Silva made workplace comments that Llames felt were inappropriate given his position but that she did not find offensive. For the reasons set forth below, Llames fails to raise a triable issue of fact on her hostile work environment claims.

Berman yelling at Llames once and calling her work product stupid is not unlawful. "Incidents, however abusive, that are not gender-related are not relevant to establish a claim against [Defendant] that can survive its motion for summary judgment." *Casalino*, 2012 WL 1079943, at

25

\*7. Llames's encounter with Berman fails to establish a hostile work environment claim because it was a one-time, isolated encounter, completely unrelated to her gender.[7] *See Spina v. Our Lady of Mercy Med. Ctr.*, 2003 WL 22434143, at \*3–4 (S.D.N.Y. Oct. 23, 2003) (holding that while the plaintiff's supervisor "was a difficult person to work with," Title VII "was not meant as a general civility code and may not be used for turning otherwise ordinary disputes with a superior into a claim for sexual harassment"), *aff'd*, 120 F. App'x 408 (2d Cir. 2005); *see also Benzinger v. Lukoil Pan Ams., LLC.*, 447 F. Supp. 3d 99, 123 & n.16 (S.D.N.Y. 2020).

Moreover, the undisputed record evidence establishes that Berman also yelled at and was rude to male employees. (56.1 ¶124.) In these circumstances, Llames's hostile work environment claims fail. *See Beale v. Mount Vernon Police Dep't*, 895 F. Supp. 2d 576, 587–88 (S.D.N.Y. 2012) (finding repeated incidents of yelling by male supervisor, while "rude and/or inappropriate," were unrelated to the plaintiff's sex where supervisor "often would yell at male subordinates in similar circumstances.")

Llames cannot establish a hostile work environment claim based on Singh's management style and being passed-over in meetings because it is undisputed that both men and women experienced Singh's changing directives and not being able to speak in meetings. (56.1 ¶¶55, 178-79.) *See Liburd v. Bronx Lebanon Hosp. Ctr.*, 2009 WL 900739, at \*1, \*8-9 (S.D.N.Y. Apr. 3, 2009) (no hostile work environment where supervisor ignored and spoke to plaintiff harshly at meetings). Even if there were evidence that Llames was passed over in meetings because of her

---

[7] This Court dismissed Llames's NYCHRL and NYSHRL claims against Berman on the pleadings because allegations that Berman had a "short temper with female subordinates" and yelled at Llames and others did not show that "gender factored into Berman's alleged unpleasantness towards her" or that he treated similarly situated male employees better. *Atkinson*, 2022 WL 137634, at \*15-16 (citing *Mihalik*, 715 F.3d at 114-15). The undisputed record now confirms the same defect: Llames cannot identify any evidence tying Berman's criticism or yelling to gender.

26

gender—and, to be clear, there is none—this is precisely the type of "truly insubstantial" conduct that does not alter the conditions of employment. *See supra*, *II.A.*

In an attempt to bolster her lifeless discrimination claim, Llames tries to portray the playful, friendly banter she exchanged with Silva as offensive comments about her appearance, dating habits, sex life and menstrual cycle. Her allegations, however, cannot be reconciled with the undisputed record evidence of their personal friendship in which they both shared intimate information and sought advice about work and sexual partners, among other things.

Courts look to the parties' relationship and whether the alleged conduct reflects discriminatory hostility rather than interpersonal dynamics or workplace friction. *See Payano v. Fordham Tremont CMHC*, 287 F. Supp. 2d 470, 476 (S.D.N.Y. 2003) ("A plaintiff who is the victim of a feigned workplace friendship…does not have a remedy under Title VII unless [the] treatment relates to unlawful discrimination."). Furthermore, to establish a claim, the alleged comments must be offensive to the person asserting the claim. *See Braunstein*, 2021 WL 2650369, at *18.

The Second Circuit's decision in *Palomo v. Trustees of Columbia University in City of New York*, 170 F. App'x 194, 196–97 (2d Cir. 2006) is instructive. In that case, the plaintiffs, two women, alleged that they were subjected to a hostile work environment because their co-worker, Hanabury, talked to them at work about his dating life in graphic detail (including asking them to help him scan photographs of himself in his underwear for his profile on a dating website), and "commenting on male employees he thought were 'cute' or 'good looking,' that someone was thin or 'looked good in his clothing,' that someone had gained some weight, or that someone was losing his hair." *Palomo v. Trs. of Columbia Univ. in City of N.Y.*, 2005 WL 1683586, at *7 (S.D.N.Y. July 20, 2005), *aff'd*, 170 F. App'x 194 (2d Cir. 2006). In granting summary judgment for the

27

defendants, the district court held, and the Second Circuit affirmed, that "no reasonable fact-finder could conclude that Hanabury engaged in this behavior toward [plaintiffs] because they were women, rather than because he considered them his friends." *Id.* at 196–97. The court emphasized that the plaintiffs never told Hanabury that they did not consider him their friend or that his comments made them feel uncomfortable, and that they socialized with him outside of work. *Id.*

The undisputed facts of this case are even more convincing than *Palomo* and compel the conclusion there was no hostile work environment because the interactions between Silva and Llames, including her own repeated comments discussing the men she dated, her sex life, her struggles with weight, and her menstrual cycle, were a product of their personal friendship. (56.1 ¶¶125-26, 133.)

Finally, Llames's belief that Silva's conduct was inappropriate because he was a supervisor also cannot salvage her claim because it does not change the basic undisputed fact that Llames did not find anything he said to be offensive based on ***her gender*** – if at all. *Perry v. Slensby*, 815 F. App'x 608, 611 (2d Cir. 2020); *Palomo*, 170 F. App'x at 196–97; *Dall v. St. Catherine of Siena Med. Ctr.*, 966 F. Supp. 2d 167, 190 (E.D.N.Y. 2013).

## B.    Llames Fails To Raise A Triable Issue Of Disparate Treatment (Count Nine).

Llames testified that the entire basis of her disparate treatment claim is that she was unable to attend a work trip to Africa and that Singh denied a single work-from-home request in November 2017. The former is not actionable for the simple reason that Llames could not recall any details about the trip, including why she was unable to attend, or who did attend. (56.1 ¶120.) The latter (denial of a remote work request) is precisely the type of "trifling" or "petty inconvenience" that does not constitute an adverse employment action. *See Thompson v. Shutterstock, Inc.*, 2024 WL 2943813, at *8 (S.D.N.Y. June 10, 2024) (denial of remote work request not an adverse employment action). Furthermore, Llames cannot show that Singh's denial of her request raises

28

an inference of discrimination or that she was treated "less well" because of her gender. Llames testified that she has no knowledge of any other employees who had remote work requests approved or denied by Singh. (56.1 ¶113.) In any case, the undisputed record evidence shows that Singh also denied a similar request from Silva—a male employee who reported to him. (56.1 ¶114.)

Finally, even if Llames could establish a *prima facie* case of disparate treatment—which she cannot—Defendants have set forth a legitimate business reason for Singh's denial, namely his sincerely held belief that there was an important business meeting that week for which Llames had to prepare and his determination the remote work plan she submitted was insufficient. (56.1 ¶111.) There is no evidence whatsoever that Singh's reason was false, much less that gender discrimination was the real reason for his denial.  Indeed, Llames admitted she was unaware of Singh's requirement for a sufficient work plan. (56.1 ¶112.)

## IV.    NEITHER SAFO'S NOR LLAMES'S CONSTRUCTIVE DISCHARGE THEORY SURVIVES SUMMARY JUDGMENT.

Although the Court previously held that Safo and Llames had adequately pled the adverse action element of constructive discharge at the motion to dismiss stage, discovery has not borne out allegations of working conditions "so intolerable that a reasonable person would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004); *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 725 (2d Cir. 2010); *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156–57 (2d Cir. 1993) ("[C]onstructive discharge cannot be proven merely by evidence that an employee. . .preferred not to continue working for that employer. Nor is the test merely whether the employee's working conditions were difficult or unpleasant."); *Pollock v. Shea*, 568 F. Supp. 3d 500, 513 (S.D.N.Y. 2021) (the demanding standard also applies to NYCHRL).

29

Whether asserted as a stand-alone hostile work environment constructive discharge or the adverse action element of disparate treatment, Safo's and Llames's constructive discharge theory fails based on the undisputed record.  First, as discussed above, both failed to establish a hostile work environment, so their constructive discharge claim on that basis necessarily fails. *Lambert v. Trump Int'l Hotel & Tower*, 304 F. Supp. 3d 405, 427 (S.D.N.Y. 2018) (Broderick, J.) (explaining the standard is higher than that for hostile work environment). Second, neither Llames nor Safo suffered a humiliating reduction of responsibilities, reduction in pay or adverse action that would have compelled them to resign. *See Kemp v. Regeneron Pharms., Inc.*, 117 F.4th 63, 72 (2d Cir. 2024) (reassignment to position with fewer direct reports did not constitute constructive discharge where plaintiff retained same salary and pay grade). Finally, Safo did not actually cease employment with ISMMS—she left AIGH in February 2018 and voluntarily transferred to another unit within ISMMS (MSHP) and continued working part-time at ISMMS even after her leaving MSHP. (56.1 ¶104.) *See Tulino v. City of N.Y.*, 813 F. App'x 725, 728 (2d Cir. 2020) (summary order) (affirming dismissal of constructive-discharge claim where plaintiff transferred to another position); *Meder v. City of N.Y.*, 2007 WL 1231626, at *5 (E.D.N.Y. Apr. 27, 2007) (same).

## V.    MISITI'S DISCRIMINATION CLAIMS SHOULD BE DISMISSED.

### A.    Misiti Fails To Raise A Triable Issue On Her Hostile Work Environment Claims (Count Twelve).

Misiti's hostile work environment claims should be dismissed because they are based on a handful of episodic interactions that have no nexus to gender, and there is no evidence, much less a triable issue of fact, that Misiti was treated less well than men because of her gender.

Misiti's claims that Singh stared at her, ignored her in meetings and used language intended to confuse her do not create a hostile work environment because they do not rise beyond

30

insignificant slights and have no nexus to gender. As discussed above, these are the types of unremarkable acts that are insufficient to establish a hostile work environment. *See supra*, *II.A*.

Moreover, not only did multiple men testify that they found it difficult to understand Singh, (56.1 ¶173), Misiti herself described Singh's behavior and conduct as a "general phenomenon," *i.e.*, one experienced by men and women alike. (*Id.*)

Misiti's allegations as to Berman's purported comments suffer the same fate. There is no evidence that Berman's alleged comments about how long it would take Misiti to "get up to speed," or instructions regarding whether she should have opinions or speak in meetings, were related to her gender or negatively altered her work environment. *See Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) (finding allegations that "defendants wrongly excluded [plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her" insufficient).

Misiti's allegations that Singh said she looked "stressed" and suggested she "not have emotional reactions" at work also are insufficient. (56.1 ¶169.) An isolated comment unrelated to gender cannot establish a hostile work environment, particularly where Misiti admitted that she was indeed stressed at the time. *Figueroa v. City of N.Y.*, 2002 WL 31163880, at *3 (S.D.N.Y. Sept. 27, 2002) (granting summary judgment for defendant when plaintiff relied on gender neutral conduct), *aff'd*, 118 F. App'x 524 (2d Cir. 2004). In any event, a single comment that a plaintiff is "emotional" without regard to her gender is insufficient to establish a hostile work environment.[8]

---

[8] Misiti had interpersonal issues with Singh before she was even hired at AIGH. Singh scheduled her phone interview on a weekend and then did not call her until the next day. Misiti believed Singh's behavior "emphasiz[ed] that he could do what he wanted and that she should get used to it." (Dkt. 30 ¶343; 56.1 _.) Given Singh was sick on the original day of the interview, Misiti admitted that her reaction at the time was irrational. (56.1 ¶148 n.4.)

*Cf. Mazzone-Trani*, 2010 WL 3282616, at *5 (suggestion that "women get more emotional" did not preclude summary judgment).

Misiti's interpretation of a diagram Singh had drawn as resembling a vagina also does not create a triable issue of fact. There is no record evidence that Singh intended to communicate a sexual or gendered meaning, or that anyone else in the meeting interpreted the diagram that way. Even if Singh had intended to reference or depict a vagina, *and* Misiti was offended, the incident would still be insufficient to survive summary judgment. *See Royall v. City of Beacon*, 2024 WL 4266546, at *20 (S.D.N.Y. Sept. 23, 2024) (court has "little trouble rejecting" the contention that a sexual reference on "one occasion" establishes a hostile work environment, particularly where plaintiff does not allege that he complained about, or even took offense.); *Estevez v. Berkeley Coll.*, 2021 WL 3115452, at *16 (S.D.N.Y. July 19, 2021) (co-worker's comment "too much estrogen," repeated more than thirty times in a year, was "too mild and innocuous to create a hostile work environment."), *aff'd*, 2022 WL 16843460 (2d Cir. Nov. 10, 2022). Moreover, any suggestion that Misiti was offended by a drawing she perceived to resemble a vagina cannot possibly be reconciled with the undisputed record evidence showing Misiti engaged in explicit conversations with colleagues about female genitalia, including writing text messages to her AIGH colleagues "omg he didn't eat your pussy?!," "[i]t's like he saw my dirty hoo ha," and "[t]hey've got me by the clit." (56.1 ¶183.)

### B.    Misiti Fails To Raise A Triable Issue of Disparate Treatment (Count Eleven).

Misiti's disparate treatment claims are equally meritless.  Misiti's claim that she was denied a promotion following Berman's departure cannot survive summary judgment.  Putting aside that Misiti never applied for *any* promotion, the Chief of Staff role was eliminated after Berman left. (56.1 ¶¶153, 159.) *See Blake v. Bronx Lebanon Hosp. Ctr.*, 2007 WL 2981465, at *8 (S.D.N.Y. Oct. 10, 2007) (granting summary judgment on failure to promote claim when the position was

32

eliminated, noting that when "no applicants are sought, no failure to promote claim exists"); *Woolfolk v. N.Y.C. Dep't of Educ.*, 2020 WL 1285835, at *7 (S.D.N.Y. Mar. 18, 2020) (allegation of a potential promotion role is too speculative). These undisputed facts doom her claim.

Misiti's reliance on Le as a male who received a promotion following his supervisor's departure is misplaced because Berman was never Misiti's supervisor (56.1 ¶148.) Nor can Misiti establish a triable issue with respect to the Director of Global Sites role. There is no evidence that Misiti actually applied for the role, and the woman Singh hired, Vreeman, had far superior qualifications, including an M.D. (56.1 ¶167.)  *See Romanello v. Shiseido Cosmetics Amer. Ltd.*, 2002 WL 31190169, at *6 (S.D.N.Y. Sep. 30, 2002) (granting summary judgment on NYSHRL and NYCHRL claims where plaintiff failed to offer evidence of gender-based discrimination and plaintiff was replaced by another woman).

Misiti's conclusory allegation that men were placed in higher paying positions with higher titles is wholly unsupported because the supposed comparators she identified—faculty members Faghmous, Baum, and Heller, and members of senior management Silva and Berman—are indisputably not similarly situated. (56.1 ¶¶154-61.) Indeed, Misiti, who described herself as "midlevel staff," admitted she did not apply for Silva's or Berman's role, had a different role than them, and would not have been qualified for a faculty position. (56.1 ¶147.) *See Kunik v. N.Y.C. Dep't of Educ.*, 436 F. Supp. 3d 684, 697-98 (S.D.N.Y. 2020) (Broderick, J.) (comparator must "be similarly situated in all material respects"), *aff'd*, 842 F. App'x 668 (2d Cir. 2021).[9]

Furthermore, in addition to the absence of any adverse action, there can be no inference that Singh discriminated against Misiti because Singh hired her in 2017, a mere one year before

---

[9] Misiti's claim that Singh discriminated against her by criticizing her contributions during a trip to Liberia has no factual support. A critique, standing alone, is not an adverse action, and Misiti confirmed that Singh was critical of men on the trip. (56.1 ¶174.)

she claims he failed to promote her. *See Garcia v. Barclays Cap., Inc.*, 281 F. Supp. 3d 365, 384-85 (S.D.N.Y. 2017) (Broderick, J.).

Finally, Misiti's allegation regarding the e-mail Singh asked her to send to two faculty members to request their in-person attendance at a meeting does not establish disparate treatment. The Second Circuit has held that "purportedly degrading work assignments" that are "within [a plaintiff's] job description," and which cannot be characterized as more than "trivial harms," cannot be deemed materially adverse." *Turner v. MTA Metro-N. R.R.*, 2024 WL 1177227, at *7 (S.D.N.Y. Mar. 19, 2024) (Broderick, J.) ("It is true that a 'subjectively undesirable' work assignment will not constitute an adverse employment action so long as it is within a plaintiff's 'job description.'") (citations omitted). There is no record evidence that Singh asking her to send the meeting attendance e-mail was outside of her job responsibilities and based on her gender.

## VI.    BRUZELIUS'S DISCRIMINATION, EQUAL PAY AND RETALIATION CLAIMS SHOULD BE DISMISSED.

### A.    Bruzelius Fails To Raise A Triable Issue On Her Hostile Work Environment Claims (Count Fifteen).

The sum and substance of Bruzelius's hostile work environment claims is that Berman once "spoke rudely" to her, Silva commented about her weight, and Knaup told her Singh called her "weak," said she "cared too much about" collaboration and frequently reversed course in his instructions. (56.1 ¶212.) These allegations echo the same petty slights and trivial inconveniences put forth by the other Plaintiffs—none of which concern Bruzelius's gender and therefore cannot establish a hostile work environment.

Moreover, Bruzelius's understanding that Singh "did not particularly like [her]" (56.1 ¶212) belies any suggestion of a discriminatory animus. *See Rolle v. Educ. Bus Transp., Inc.*, 2013 WL 783026, at *13 (E.D.N.Y. Feb. 12, 2013) (plaintiff's belief that her supervisor had "something

34

personal against [her]" suggests a motivation of personal dislike, rather than unlawful bias), *R. & R. adopted*, 2013 WL 783011 (E.D.N.Y. Feb. 27, 2013).

**B.    Bruzelius Fails To Raise A Triable Issue of Disparate Treatment (Count Fourteen).**

Bruzelius's disparate treatment claims are based on her belief that AIGH applied different rules for men and women regarding vacation requests, in-office attendance, office space, and receiving credit for work. There is no triable issue because Bruzelius offers no evidence to suggest that differences actually existed, or even if they did, that they were based on gender.

Bruzelius could neither identify a single denied vacation request, nor articulate a basis for her allegation that women had different in-office attendance requirements. (56.1 ¶203.) Moreover, she admitted that she sat in the same open workspace with men on her team, and could not identify an example of a man receiving credit for her work. (56.1 ¶¶209-10, 211-16.) In other words, Bruzelius's claim is based on mere speculation unsupported by any facts.  Bruzelius's claims should be dismissed. *See Desimone v. JP Morgan/Chase Bank*, 2004 WL 2978011, at *4 (S.D.N.Y. Dec. 22, 2004) ("purely conclusory allegations of discrimination, absent any concrete particulars, are insufficient to defeat a summary judgment motion") (internal quotes and citations omitted).

**C.    Bruzelius Fails To Raise A Triable Issue of Fact On Her Unequal Pay Claims (Counts Twenty-Four and Twenty-Five).**

To establish a *prima facie* case under the federal Equal Pay Act and New York State Equal Pay Law ("NYSEPL") a plaintiff must demonstrate that: (1) their employer pays different wages to employees of the opposite sex; (2) for equal work on jobs requiring equal skill, effort, and responsibility; and (3) which are performed under similar working conditions.[10] *See Talwar v.*

---

[10] The NYSEPL also prohibits a wage differential for "substantially similar work, when viewed as a composite of skill, effort, and responsibility, and performed under similar working conditions…." *See* N.Y. Lab. Law § 194(1)(b) (as compared to 29 U.S.C. § 206(d)(1)).

*Staten Island Univ. Hosp.*, 610 F. App'x 28, 30 (2d Cir. 2015); *see also Eisenhauer v. Culinary Inst. of Am.*, 2021 WL 5112625, at *3 (S.D.N.Y. Nov. 3, 2021), *aff'd in part, vacated in part on other grounds*, 84 F.4th 507 (2d Cir. 2023). If a plaintiff makes this showing, the burden shifts to the employer to demonstrate that the wage differential is justified under one of the EPA's four exceptions, including "a differential based on any other factor other than sex." *Zhengfang Liang v. Cafe Spice SB, Inc.*, 911 F. Supp. 2d 184, 202 (E.D.N.Y. 2012) (citing 29 U.S.C. § 206(d)(1)). To survive summary judgment, the plaintiff must ultimately prove that the employer's reasons are pretext for sex discrimination. *See id.* Bruzelius cannot succeed at any step of this analysis.

Bruzelius cannot meet her *prima facie* burden because the male comparators she identifies—Le, Doupe, Mongia, Helfgott, and Khan (56.1 ¶¶221-27; Dkt. 30 ¶247)—indisputably did not perform equal work in jobs requiring equal skill, effort, and responsibility. Each alleged comparator performed materially different work requiring skills, credentials, and/or experience that Bruzelius did not possess.

Bruzelius worked in a research-focused Data Analyst role, did not oversee ATLAS, did not perform data-science work, and could not serve as a principal investigator on grants because she lacked a Ph.D. By sharp contrast, all of Bruzelius's alleged comparators had either a Ph.D. or backgrounds in computer science or engineering.

For example, Helfgott, a Data Science Analyst, is not a valid comparator because his role, credentials, technical background, and responsibilities were materially different than Bruzelius's. Weisman's unrebutted testimony was that Helfgott and Bruzelius were not doing similar work and that, given the "complexity and sophistication" of Helfgott's contributions, his higher compensation was appropriate. (56.1 ¶222.) Doupe, Mongia, and Le are also not valid comparators for the same reason: they had superior, more specialized credentials and performed more

36

technically sophisticated work than Bruzelius. (56.1 ¶¶223-25.) Bruzelius did not have a Ph.D. or a "machine-learning" background, did not develop new algorithm-based software modules or perform the type of engineering, machine learning, or algorithm creation work that was central to the work of her comparators. (56.1 ¶¶223-225.) Khan likewise is not a valid comparator because he performed an operational product-management function materially different than Bruzelius's research-focused role. (56.1 ¶227.)

In short, the undisputed record forecloses any finding that Bruzelius's work was substantially equal to the work of her identified comparators. *See Garcia*, 281 F. Supp. 3d at 386; *Chepak v. N.Y.C. Health & Hosps. Corp.*, 2015 WL 509279, at *11 (S.D.N.Y. Feb. 5, 2015), *aff'd*, 643 F. App'x 62 (2d Cir. 2016).

Even if Bruzelius could establish a *prima facie* case—which she cannot—as discussed above, ISMMS had legitimate business reasons for any pay differential, including comparators' prior work experience, superior educational credentials, technical specialization in computer science and/or engineering, differing job responsibilities, and market-based retention needs. *See Eisenhauer*, 2021 WL 5112625, at *7 ("an employer is entitled to pay employees more when they have greater work experience, better professional credentials, and more advanced educational degrees than other employees"); *Virgona v. Tufenkian Imp.-Exp. Ventures, Inc.*, 2008 WL 4356219, at *10 (S.D.N.Y. Sept. 23, 2008) (same).

To survive summary judgment, a plaintiff cannot merely speculate that the stated reason was pretextual, nor rely on the mere fact that a comparator's compensation is higher. *See Boatright v. U.S. Bancorp*, 2020 WL 7388661, at *13 (S.D.N.Y. Dec. 16, 2020), *aff'd*, 2022 WL 351059 (2d Cir. Feb. 7, 2022). Here, Bruzelius failed to adduce any evidence that the salary differential based

37

on her comparators' wildly different credentials, skills, experience, and market demand were not the real reasons, and that gender discrimination was.

### D.   Bruzelius Fails To Raise A Triable Issue Of Fact On Her Retaliation Claims (Count 16).

To establish a *prima facie* case of retaliation under Title VII, Title IX, and the pre-amendment NYSHRL, the plaintiff must show: (1) participation in protected activity; (2) the defendant's knowledge of that activity; (3) a materially adverse employment action; and (4) a nexus between the two. *Green v. Mount Sinai Health Sys. Inc.*, 826 F. App'x 124, 125-26 (2d. Cir. 2020) (summary order). If the plaintiff establishes a *prima facie* case, the defendant must articulate a legitimate, non-retaliatory reason, at which point the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action." *Ya-Chen Chen*, 805 F.3d at 70 (citation omitted).

Under the NYCHRL a plaintiff need only show she opposed discrimination and the employer engaged in conduct "reasonably likely to deter a person from engaging in such action." *Mihalik*, 715 F.3d at 112. If the employer proffers a legitimate reason, the plaintiff must show retaliation played *some* role in the action. *Alvarado v. Nordstrom, Inc.*, 685 F. App'x 4, 9 (2d Cir. 2017).

Bruzelius cannot establish a *prima facie* case on her claim that Singh retaliated against her for participating in ISMMS's internal investigation of discrimination. Bruzelius's retaliation claim rests only on her speculation that she could not "help but wonder" whether Singh received information from the investigator. (56.1 ¶235.) Singh's unrebutted testimony that he had no knowledge of who participated in the investigation is fatal to her retaliation claim. (56.1 ¶230.) *See, e.g.*, *Richardson v. Bronx Lebanon Hosp.*, 2014 WL 4386731, at *13 (S.D.N.Y. Sept. 5, 2014)

38

(retaliation claims dismissed where no evidence that decisionmaker had knowledge of protected activity).

Even if Bruzelius could overcome that fundamental defect, she also fails to identify an adverse employment action. The challenged conduct—including Singh questioning the viability of her role,[11] changing her reporting structure and stopping one-on-one meetings—does not constitute an adverse act.[12] *See Blutreich v. N. Shore-Long Island Jewish Health Sys., Inc.*, 844 F. App'x 417, 419 (2d Cir. 2021). To the extent Bruzelius's retaliation claim is based on Singh staring at her and acting "curt" in meetings, these actions fall into the category of "petty slights or minor annoyances" courts have found insufficient. *See Richards v. Dep't of Educ.*, 2022 WL 329226, at *21 (S.D.N.Y. Feb. 2, 2022).

Even if Bruzelius could establish a *prima facie* case, Defendants have articulated legitimate reasons for why her meetings with Singh stopped and her reporting structure changed. After Faghmous left AIGH, there was a leadership void on the ATLAS team that Singh temporarily filled until Weisman transitioned into the ATLAS Director role, at which point he became Bruzelius's supervisor. (56.1 ¶200.) Furthermore, it was *Bruzelius* who asked to stop her one-on-one meetings with Singh, which he granted. (56.1 ¶239.) There is no record evidence to suggest that the reasons for these de minimis changes were false and that retaliatory animus was the real reason.

---

[11] While Bruzelius portrays Singh's questioning the viability of her role as a threat to her position, Singh's unrebutted testimony is that he had a concern regarding how Bruzelius would continue her work without a lead data scientist or principal investigator. (56.1 ¶¶199, 234.) Singh's discussions regarding Bruzelius's role were an attempt to work with her to keep her at AIGH. (*Id.*)

[12] Bruzelius's vague allegation regarding an intention on Singh's part to raise her title fails to identify any actual adverse employment action since Bruzelius did not testify that Singh actually promised a promotion prior to the investigation or that she applied for one. *See Rodriguez v. Cnty. of Nassau*, 830 F. App'x 335, 340 (2d Cir. 2020) ("vague and conclusory allegations" and "generalized statements" about alleged adverse actions insufficient).

## VII.    IF ANY OF PLAINTIFFS' CLAIMS SURVIVE, THEIR CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS MUST BE DISMISSED.

Even if Plaintiffs could raise a triable issue as to any of their claims against ISMMS—which they cannot—the federal claims asserted against the individual Defendants, as well as all claims asserted against Charney, fail as a matter of law and should be dismissed.

### A.    There Is No Individual Liability Under Title VII Or Title IX.

Plaintiffs' federal discrimination claims against Singh, Charney, and Silva must be dismissed as a matter of law because there is no individual liability for claims brought under Title VII or Title IX. *See Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000); *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009). Accordingly, if any federal claim survives summary judgment, the Title VII and Title IX claims asserted against Singh, Charney, and Silva must be dismissed, a point which Plaintiffs have already conceded.[13] (Dkt. 53, at 23 n.8).

### B.    Plaintiffs' New York State and City Law Claims Against Charney Must Be Dismissed.

Plaintiffs' remaining New York State and City law claims against Charney also fail.  Under both the NYSHRL and NYCHRL, an individual defendant may be held liable only "if he or she 'actually participate[d] in the conduct giving rise to the discrimination.'" *Pacheco v. Comprehensive Pharmacy Servs.*, 2013 WL 6087382, at *17 (S.D.N.Y. Nov. 19, 2013) (citation omitted); *see also Villar v. City of N.Y.*, 135 F. Supp. 3d 105, 143 (S.D.N.Y. 2015) (dismissing NYSHRL and NYCHRL claims against an individual defendant when the record contained insufficient evidence of participation in the alleged discrimination). There is no evidence that

---

[13] This includes Counts Five, Six, Nine, Ten, Eleven, Twelve, Fourteen, Fifteen and Sixteen of the Amended Complaint.

40

Charney participated in any decision regarding Plaintiffs' employment at ISMMS or was involved in conduct giving rise to Plaintiffs' claims.

Bruzelius fails to offer *any* evidence against Charney and admitted that she had never met with him one-on-one. (56.1 ¶243.) Llames testified that the sole basis for her claims against Charney was that he was "part of the larger organization and part of the environment that he fostered at AIGH." (56.1 ¶127.) Llames, however, failed to provide a shred of evidence to support such a conclusory allegation and conceded she did not interact with Charney or witness him engage in harassment or discrimination. (56.1 ¶145.) Safo admitted that, in the one meeting she had with Charney—one that she surreptitiously recorded—Charney did not say anything she considered offensive. (56.1 ¶¶99-101.) Misiti claims only that she "felt" intimidated when Charney asked all meeting attendees—male and female—to introduce themselves. (56.1 ¶191.)

Because the record is devoid of any evidence that Charney took any action that could be considered adverse, altered the conditions of Plaintiffs' employment, caused Plaintiffs to be treated "less well" because of their gender, or otherwise actually participated in any alleged discrimination, all New York State and City law claims against him should be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion for summary judgment and dismiss this action with prejudice.

Dated:  June 18, 2026                              PROSKAUER ROSE LLP

                                                   By: */s/ Adam M. Lupion*

                                                   Adam M. Lupion
                                                   Joseph Baumgarten
                                                   Edna D. Guerrasio
                                                   Austin D. McLeod

41

Eleven Times Square
New York, NY 10036
T: 212-969-3000
F: 212-969-2900
alupion@proskauer.com
jbaumgarten@proskauer.com
eguerrasio@proskauer.com
amcleod@proskauer.com

*Attorneys for Defendants Dr.
Prabhjot Singh, Dr. Dennis S.
Charney, Bruno Silva, and ISMMS*

43

## CERTIFICATE OF COMPLIANCE

On June 12, 2026, this Court ordered that Defendants are permitted to submit summary judgment moving brief of up to 13,250 total words. (ECF No. 206.)

The undersigned hereby certifies, pursuant to Local Civil Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, and this Court's June 12, 2026 Order (ECF No. 206) that the foregoing brief contains no more than 13,250 words.

Specifically, the Microsoft Word "Word Count" tool indicates that the brief contains 13,113 words. That word count excludes the "caption, any index, table of contents, table of authorities, signature blocks, or any required certificates," but does include "material contained in footnote or endnotes." Local Civil Rule 7.1.

Dated: June 18, 2026
       New York, New York

/s/ Adam M. Lupion
Adam M. Lupion