# EXHIBIT 2

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 1:19-CV-03779-VSB-JW

----------------------------------------x

DR. STELLA SAFO, GERALDINE LLAMES, AMANDA

MISITI, and EMILIE BRUZELIUS,

       Plaintiffs,


   - against -


DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY,

BRUNO SILVA, and ICAHN SCHOOL OF MEDICINE AT

MOUNT SINAI,

       Defendants.

----------------------------------------x

      April 24, 2024

      9:44 a.m.


   EXAMINATION BEFORE TRIAL of a Defendant,

DR. PRABHJOT SINGH, pursuant to Notice, held at

Glenn Agre Bergman & Fuentes, 1185 Avenue of the

Americas, New York, New York 10036 before Mandy

Fein, a Notary Public of the State of New York.

SINGH

McAllister Olivarius.

MS. BRUZELIUS:  Emilie Bruzelius.

MS. GUERRASIO:  Edna Guerrasio, Proskauer Rose on behalf of the witness and the Defendants.

MS. MADONNA:  Theresa Madonna, Proskauer Rose on behalf of Defendants.

MR. McLEON:  Austin McLeod, Proskauer Rose on behalf of Defendants.

MR. BAUMGARTEN:  Joseph Baumgarten, Proskauer Rose for the Defendants.

THE VIDEOGRAPHER:  Can the court reporter please swear in or affirm the witness.

P R A B H J O T   S I N G H, called as a witness, having been first duly sworn, was examined and testified as follows:

EXAMINATION BY

MR. BOWEN:

Q      Dr. Singh, when did your position as the Director for the Arnhold Institute For Global Health come to an end?

A      In July of 2019.

Q      How did it come to an end?

A      I stepped down from the position.

SINGH

Q      You resigned?

A      From those positions, yeah.

Q      From what positions?

A      From the Director of the Arnhold Institute and chair of The Department Of Health System Design And Global Health.

Q      Was that a voluntary resignation or were you asked to resign?

A      It was voluntary.

Q      It was your decision?

MS. GUERRASIO:  Objection.

You can answer.

A      I wanted to not be in those roles and there was agreement on that.

Q      Agreement with whom?

A      I discussed it with Annetine Gelijns.

Q      Spell that name, please.

A      And others.  Annetine, A-N-N-E-T-I-N-E.

Q      Last name?

A      I don't know how to spell her last name.

Q      Gelijns?

A      Yeah.

SINGH

institute, is that what caused you the emotional distress?

A     It's part of it.

Q     What's the other part?

A     There were many factors.

Q     What are they?

A     I don't think I could list them.

Q     Can you list any of them?

A     It's difficult too.  That was a period of time where I felt like things were imploding, and so, there were any number of things that made me feel pretty distressed, depressed.  I don't think I could really pick them apart one by one.

Q     Was part of the reason why you felt emotionally distressed a feeling that you had done something wrong?

        MS. GUERRASIO:  Objection to form.

A     I think any time you have people that are upset at you and there are serious problems in your -- in your ability to do your work, and there's no question that I would have -- I spent a lot of time reflecting upon what happened, and what my contribution to

SINGH

A       No.  I had known about it.

Q       How did you know about it?

A       I had been in Mount Sinai and I had heard that the Global Health program had received funding.

Q       When you took the position as a director with the Arnhold Institute, who did you -- let me ask it this way.  Who was the person that you learned from -- start over.

Who told you that you had been selected to be the director?

A       I can't recall if it was either Phil Andergan or Dennis Charney, one of the two.

Q       Before you were selected, you had a discussion with Dean Charney about what the position is and what the expectations for the job would be?

A       Yes.

Q       What did Dean Charney tell you about those two items?

A       He knew that I had come in through my relationship with Barbara Murphy in the department of medicine and that my interest was in domestic community health, and he said

SINGH

that, you know, you should build a vision that combines both -- we had discussed it, rather, you know, follow your vision of combining both, which is what I had expressed, and that it would be an opportunity to build something from the ground up that could happen gradually.

Q     Did he talk about what kind of work was already being done by the people who would be employed by the institute?

A     There wasn't yet an institute established.  So, there weren't people at it, but he did make me aware of the broad range of global health offerings across the institution, which were pretty extensive.

Q     You had nothing to do with the fact that the Arnhold Family donated either 12.5 million or however much they donated to set up the institute, did you?

A     No.

Q     Do you know who did?

A     There were multiple people involved.

Q     Who?

A     I know that Ramone Murphy was part of

SINGH

that.  I know there were others.  I don't know who specifically.

Q    Dr. Aranda Raja?

A    I believe so.

Q    Did Dr. Charney express any views about work that Dr. Aranda Raja was doing?

A    No.

Q    How about Dr. Atkinson?

A    No.

Q    Did you have any discussions with Dean Charney about how much leeway you would have in terms of making hiring decisions for the institute?

A    Not in great detail.

Q    Well, what did he say?

A    That we would discuss them along with other relevant people to get to the best answer.

Q    Was there a discussion about following Mount Sinai policies in terms of posting for positions and following some kind of hiring process?

MS. GUERRASIO:  Objection to form. You can answer.

SINGH

the work.

Q      You said she had a lot of experience in healthcare policy?

A      In both healthcare policy and care delivery.

Q      Who else did you recruit?

A      For what?  Sorry.

Q      For the institute.

A      Sorry, do you want me to list all the people I recruited to the institute?

Q      Yes.

A      Rachel Breeman, Duncan Maru, Sheila Maru, Erin Baum, Natalie Privith, David Heller, Stella Safo, James Faghmous, Sunde Kashur.

Q      Cindy Kashur?

A      Sunde.  Madeline Bollard.  That's what I can recall at the moment.

Q      How about Bruno Silva?

A      Yes.

Q      You recruited him, right?

A      Yeah.  My list -- yes.  My list was focused more on faculty recruitment.

Q      Other than faculty recruitment, that

SINGH

would include Bruno Silva, correct?

A       Yes.

Q       And Abdul Elsayed?

A       He never started at the institute.

Q       But you had asked him to take a position, correct?

        MS. GUERRASIO:  Objection to form.

A       I did.

Q       And he ended up taking a different position in Detroit or something?

A       Yes.

Q       Did he tell you why he wanted a different position rather than the one you had discussed with him?

A       My recollection is that he had a opportunity to pursue a political career in Michigan, and so, he wanted to take it.

Q       He didn't have any concerns with the way the institute was being run?

A       Not that I know of, it hadn't begun.

Q       You also recruited David Burman, right?

A       I did.

Q       And you wanted him to be your chief

SINGH

of staff?

A        Yes.

Q        Was that also the position you were asking Elsayed to take?

A        No.

Q        What was the position that you had originally offered to Mr. or Dr. Elsayed, it is mister, right?

A        Doctor.

Q        Dr. Elsayed.

A        If I recall correctly, it was -- it was focused on building the research capacity in the institute and I think it was as an associate director.

Q        Was James Faghmous recruited to fill that position when Mr. or Dr. Elsayed went elsewhere?

A        No.

Q        Who did you get to replace Dr. Elsayed?

A        Ultimately, that research leader was only fully replaced when Rachel Breeman joined.

Q        Anyone else that comes to mind in

SINGH

terms of who you recruited to join the institute?

A     Kirsten Knaup.

Q     Anyone else?

A     No.

Q     How about Jeff Sachs?

A     At some point, sometime after I had joined, he had an advisory role.

Q     That was a compensated role?

A     Yes.

Q     And you arranged for that compensation for him?

MS. GUERRASIO:  Objection to form.

Q     Is that right?

A     I had discussed it with the Dean as well as the Phil Andergan, the Dean Of Global Health because it had more to do with the school than the department.

Q     Well, were you involved in determining what that compensation should be for Mr. Sachs?

A     I don't recall.

Q     Is it Dr. Sachs?

A     Yeah.

SINGH

Q    How do you know Dr. Sachs?

A    He was a mentor.

Q    Did he have any role in promoting you as the director of the institute?

A    No.

Q    No?

A    With regards to what?  He was at a different institution.

Q    Well, did he have any role in recommending you or giving a recommendation for you to take the position as the director of the institute at Mount Sinai?

A    I discussed it with him and I think he was a reference.

MS. GUERRASIO:  If we could just place on the record that one of the Plaintiffs, Dr. Stella Safo, has entered the room.

Q    In terms of the Health Systems Design, who were the heads of that unit or that division of the institute?

A    I worked on it with Stella Safo.  We really worked on building that program.  So, we worked on it together.

Q    But you saw her as heading that up?

SINGH

A        Yes.

Q        When you recruited Dr. Safo, you told her that's the position you wanted her in; is that right?

MS. GUERRASIO:  Objection to form.

A        I think at the time of recruitment, we were more focused on the faculty rank.

Q        What does that mean?

A        The focus was on her title at the school.  I'm not sure if we had resolved the title at the institute at that time.

Q        So, you wanted her to do something with the institute, you just weren't sure what and you were more focused on her title would be, or what her rank would be with the -- with medical school?

MS. GUERRASIO:  Objection to form.

A        The institute hadn't yet started and these discussions took place prior to myself even joining.

Q        I am sorry, who joining?

A        Took place prior to myself formally joining.  And so, what I had really wanted to do is identify how she would fit into her home

SINGH

department, which is, was the department of medicine, and making sure that she got the best possible rank there that she could. Initially, she was proposed to have a title of instructor, but I advocated for that to be assistant professor, something we had discussed, and there was a discussion about compensation, which was standard in the department, and I was able to push that up to a supplement on the institute side.

So, we were more focused on getting her administratively set up in the system and meeting her goals for that part of it.

Q    So, you just made a decision you wanted her to somehow work at the institute, but you hadn't decided what that role would be before ironing out the other administrative aspect of her work for the school of medicine; is that right?

A    I was in pretty close dialogue with Stella about what was important to her in terms of being able to feel comfortable taking a role and feeling like she was landing well. And so, that's where the priorities were, yes.

SINGH

Q      Why is it that you recruited her, what was it about Dr. Safo in terms of her professional work and her professional background that you decided, I want Dr. Safo working with me at the institute?

A      Stella had -- I knew her through my wife.  That's how I initially got to know her. She had a great academic background.  She had a clear interest in community health because of where she went to -- to school, and she had a really unusual interest in both domestic and global work through her work on HIV.  And so, even though she hadn't had program experience managing people and so on, I felt she had a really unique contribution that she could make, and I thought it would also be helpful in terms of female, and minority recruitment. And so, it seemed like a great person to bring on and build something with.

Q      How well did you know her at the time that you recruited her?

A      On a personal level, not very well, but I knew about her professional background, her interests.  And so, on maybe at a similar

Page 132

SINGH

level that I would maybe another faculty recruit, like Natalie Privith.  So, I felt like I knew her professionally enough and that she was enthusiastic to do this.  Seemed like a good fit.

Q      You respected her work?

A      I respected her.

Q      You respected her professionally, as well as, personally?

A      Yeah.

Q      You thought she had good judgment?

A      Yeah.

Q      Good person?

A      Yeah.

Q      Competent in her field?

A      She was in a fellowship program, and so, she really had kind of clinical competency which was, you know, clearly good.  Beyond that, it was un -- unclear, but I felt like she had a talented background, and so, she could start building a new area of work that she was interested in doing, and she would probably be good at getting off the ground, and doing it.

SINGH

appropriate level of communication or

documentation is.

Q    Do you know if she contacted anybody

at Human Resources for Mount Sinai?

A    I don't.

Q    Did you talk to Ms. Caliendo about

it?

A    I did.

Q    That was just you and her?

A    Yes.  When I saw that David and Mary

were having a heated conversation, I asked

David to leave immediately and go to his

office, and I'd speak to him later, and I

asked Mary if she was okay, and if she wanted

to go home.  She said she was fine and that

she didn't like, you know, she was heated as

well.  She said that she wanted some time to

cool down.  I said okay.

Q    Did you ask her anything else about

the dynamic that she had with Mr. Burman?

A    I had gone to my office to actually

just hear a little bit about the dynamic

myself before I stepped in, and I heard that

it was a heated by directional discussion.  It

SINGH

felt inappropriate to me, and so, I stepped in.

Q        You don't know what it was about?

A        I don't recall the details.

Q        Did you -- did you observe that Mr. Burman treated women differently than men in his interactions at the Institute?

A        No.

Q        You had -- you had no direct perception that he was more dismissive of women than men?

A        No.

Q        Had you ever heard that that was a complaint by others at the Institute?

A        No.

Q        Did you become aware that there were complaints about Mr. Silva?

A        Not until the litigation was filed.

Q        Well, didn't you hear from others at the Institute that Mr. Silva was making derogatory remarks about people, co-workers?

        MS. GUERRASIO:  Objection to form.

    You can answer.

A        Not that I can recall.

SINGH

Q      You don't recall that Dr. Safo told you that Mr. Silva was making inappropriate comments about co-workers?

A      No.

Q      And you didn't hear that from anyone else while you were the director of the Institute?

A      I had discussions with people about management questions or issues with Bruno's team, but not about comments that were derogatory in nature.

Q      Well, did you have discussions about his behavior, Mr. Silva's behavior, of any nature?

          MS. GUERRASIO:  Objection to form.

A      Could you be more specific?

Q      Leaving aside questions about work related conduct, whether something was being administered properly or not, did you, while you were the director, did you hear any comments from anyone that Mr. Silva was acting inappropriate or behaving inappropriately?

A      No.

Q      Did you hear Mr. Silva use profanity

Page 146

SINGH

getting late.  Why don't we break here and go off the record.

THE VIDEOGRAPHER:  The time 1:26 p.m. and this marks the end of Media Unit Number 2.

(RECESS)

The time is 2:23 p.m. and this begins Media Unit Number 3.

MR. BOWEN:  I will note for the record that Geraldine Llames is on the Zoom call.

MS. GUERRASIO:  In addition to the other individuals?

MR. BOWEN:  Yes.

MS. GUERRASIO:  Thank you.

Q    Dr. Singh, how did you first meet Amanda Misiti?

A    She was referred to the Institute for a position that we were looking to fill.

Q    So, you hired her?

A    I ultimately hired her, but she went through interview process.

Q    But it was your decision whether to hire or not?

A    Yes.

SINGH

privately to the women who were working at the Institute and then contradicting what you had told them privately in public settings?

MS. GUERRASIO:  Objection to form.

You can answer.

A    No.

Q    Did you have a practice of making written records about private conversations that you had with women at the Institute that were different than what was actually said during the meeting?

MS. GUERRASIO:  Objection to form.

A    No.

Q    Do you recall having a conversation with Ms. Misiti in October 2017 where you were going over her performance review?

A    Not specifically.

Q    Did you ever tell her that she would make an excellent Director Of Global Sites at AIGH?

A    We discussed whether that was a fruitful direction for her to work on global sites.

Q    In one of those meetings, you

SINGH

suggested to her it was -- that she would make an excellent director, right?

MS. GUERRASIO: Objection to form.

You can answer.

A       I don't -- we weren't speaking about a specific role, but it would be a good place for her to go in her work.

Q       You encouraged her in that respect, correct?

A       We had a discussion about whether that would be something she was interested in.

Q       Well, you -- you suggested to her that would be an excellent position for her to be in.

MS. GUERRASIO: Objection to form.

A       I don't recall that being the conversation.

Q       It would be -- it would have been a promotion from her position that she was in at that time, right?

A       There was no position for the director role until Rachel Breeman came in and filled it.

Q       Well, when did Rachel Breeman come in

SINGH

in relationship to when Amanda Misiti was working for the Institute?

MS. GUERRASIO:  Objection to form.

A       I'm not sure of the timing.

Q       Was Rachel Breeman hired after Amanda Misiti?

A       Yes.

Q       So, prior to the time that Ms. Breeman or is it Dr. Breeman?

A       Doctor.

Q       Before the time that Dr. Breeman came in, had you had a discussion where Misiti, Ms. Misiti, could fill that position or that role?

A       We had a lot of discussions since the beginning of the Institute all the way until Rachel took the position about how we would manage or work on building global sites, and along the way, I wanted to gauge interest of people at the Institute, and actually doing that type of work, and it was exploratory because the actual description of that role, and what it would entail only became more clear and crystallized later on.  And so, at that juncture, it was not a concrete role, and

Page 154

SINGH

so, it was an exploratory discussion.

Q      The exploratory discussion was with Ms. Misiti?

A      Yes.

Q      But you raised the possibility that would be a position that she could fill, no?

A      I raised the question if she would even be interested in doing that type of work, which would require travel abroad, which would require a different set of -- potentially a different set of interests than she might have.

Q      She was interested, right?

MS. GUERRASIO:  Objection.

Q      Didn't she tell you she was interested?

A      I recall her saying that she'd think about it.

Q      Well, you had a later meeting, about a week later, where you then told Ms. Misiti that it wouldn't be good for her because it required someone with good project management capabilities; is that right?

MS. GUERRASIO:  Objection to form.

Page 161

SINGH

that I said that.

Q    So, you directed her to send an email, but to say that the message was coming from you?

MS. GUERRASIO:  Objection to form. You can answer.

A    She was in charge of sending those emails, and so, I wouldn't want to send a message that would undermine her if I was doing it separately, and so, I asked her to communicate this message and say that it was coming from me.

MR. BOWEN:  Let's mark that document. Please mark this PS1.

(Email Chain marked as PS Exhibit 1 for Identification, as of this date.)

Q    What we marked as Exhibit PS1 to your deposition, Dr. Singh, is an email string.  It starts with Bates number Safo4220 and the top email on the first page is an email that purports to be from you, dated October 1, 2018 to Amanda Misiti.

Do you remember this email?

(Exhibit handed to witness.)

SINGH

A      I have to take a look at it.  Okay.

Q      If you start on the second page, these are front and back copies.  At the top there is an email from Sheela Maru which reads, "Amanda, On Tuesday we'll be working from the Possible office.  Can we call in for the Panorama meeting?  Thanks, Sheela and Duncan," and then the email on the bottom of the first page is from Amanda Misiti and she writes, "Hi Sheela, I discussed with Prabhjot, and he has requested that you both please join the senior management meeting at 3 PM Tuesday in person."

Do you recall this discussion that you had with Ms. Misiti before this email was sent?

A      To some degree.

Q      And your testimony is that you specifically directed Ms. Misiti to send the email requesting that the meeting happen in-person, right?

A      I requested that Ms. Misiti let them know that I -- I was asking for them to come in-person.

Q      And Ms. Misiti had already told you

SINGH

that she and others thought it would be better to do it by phone, correct?

MS. GUERRASIO:  Objection to form.

A      I don't recall if she said it would be better.

Q      Well, it would be more considerate to the Maru's, no?

MS. GUERRASIO:  Objection to form.

A      Possibly.

Q      But do you remember that she specifically said, I don't think we should insist on an in-person meeting, it should be okay to do it by phone?

A      Seems possible.

Q      Why didn't you just send the email yourself to the Maru's saying you specifically felt strongly that it needed to be in-person?

A      Well, as you can see, Amanda was in charge of the communications and I felt that I shouldn't jump into that role that she was doing in communicating with them.  And so, I thought that it was fine to just have them have Amanda continue her role and not disrupt it, and that it was for it to be attributed to

Page 164

SINGH

me in my request because I did want them to be

in the office.  It was the very close to when

they had just joined or were going to join,

and I felt that it would be good to have them

in-person, if possible, and I wanted that to

be -- my preference to be communicated.

Q        Well, four minutes after Ms. Misiti

sent that email, you did jump in, correct?

A        Yes.

Q        And you sent another email saying --

well, on the same email string to both Marus,

to Amanda Misiti and you say, "Hi Both please

let me know if this is logistically

unworkable."

And you go on from there, correct?

A        Yeah.

Q        So, Ms. Misiti then responds to you

one-on-one, if you look on this exhibit, one

email from the top on the first page, and she

writes, "Hi Prabhjot, I hope that they will

not perceive your response as me being the bad

guy on this one, since it was me who suggested

to you to try to accommodate them by offering

a time slot on Wednesday."

SINGH

Q    So, you called them right after you sent them the email?

A    I spoke to them at some point between sending the response and must have.

Q    Well, was it right after you sent the email, you just picked up the phone and called them anyway?

A    I don't know the timeline.

Q    So, sometime before you responded to Ms. Misiti at 11:24 a.m. where you said, "I spoke with them," and the time at 11:00 a.m. 28 minutes or 24 minutes earlier when you jumped in on the email conversation, you picked up the phone and called them, right?

A    Yeah.  At that point, I felt that the -- I really wanted them to be in-person and I knew that I was comfortable with that being attributed to me, and my request, and that's clear in Amanda's email.  I also wanted to know if it was impossible, but I wanted to reiterate that I would really like them to be there.  And so, at that juncture, instead of sending a lot of emails back and forth, I picked up the phone at some point and said

SINGH

hey, can you come, and -- and then clearly they appreciated that you -- that Amanda was being clear in her communication, and in each of these points, I was expressing my preference.

So, I think it really had more to do with what they thought about me, not so much about Amanda and I think that's communicated here.

Q     Well, did you ask Amanda to do things like this before where you asked her or directed her to send an email expressing your view that was contrary to what she suggested should happen?

A     If I felt it was appropriate and I had a view on something, as written here, it's fine for her to have attributed it to me.

Q     So, your testimony is that you directed her to specifically say in the email, you asked her to send to attribute it to you?

A     I am sure I said to her that it was fine if she could just attribute it to me.

Q     Are you aware that Ms. Misiti had talked with Clarissa Jones-Winter about

SINGH

100 percent sure.  One at the end of the summer and one closer to the winter.

Q      Closer to the end of the year?

A      I think so.

Q      Both of those trips, there were multiple people, not just you and Ms. Misiti, right?

A      That's right.

Q      Had you been to Liberia prior to those two trips?

A      I had been in West Africa, but not Liberia.

Q      When you were on these trips, were the other people that were with you employees of the Institute?

A      There was a mix of people.

Q      So, some were employees of the Institute and some were not?

A      Yeah.

Q      They would be from other positions in Mount Sinai?

A      Mount Sinai and external organizations.

Q      Did you ask Ms. Misiti to handle

SINGH

logistics and manage drivers, and things like that?

A       It depends on the trip.  I think on one trip David Burman handled it and I think on another trip, I may have asked her to help on that basis.

Q       Did you tell Ms. Misiti that --

MR. BOWEN:  Withdraw the question.

Q       Did you -- did you ask Ms. Misiti whether she minded managing the drivers and doing logistics?

A       I don't recall conversations about it.

Q       Was there one trip where it was just you and her, do you remember that, the first trip?

A       I thought that there were other people from Mount Sinai or other organizations, but my recollection of who was on the trip is not clear.

Q       Did you ever comment on the clothes that she was wearing on -- during the trip to Liberia?

A       No.

SINGH

Q      Did you ever tell her that you thought she was emotional?

A      No.

Q      Do you recall any conversation with her where you used that -- that adjective to describe her?

A      No.  I would check in with people, men and women, about their -- how they're managing their workload, if they were under stress or not, and that would help me gauge whether or not there should be more work for -- that would be appropriate.  So, that's the context in which something like that would come up.

Q      Do you have a memory of a specific incident where something like that came up?

A      No.  Not at this time.

Q      When did Emilie Bruzelius join the Institute?

A      She was hired relatively earlier on, I believe, by James.

Q      Dr. Faghmous?

A      Dr. Faghmous.

Q      Were you involved in the decision to

SINGH

hire her?

A       I think it was his decision, but I supported it.

Q       When did he leave?

A       I think in late summer 2017, but I might have gotten the year off.

Q       Why did he leave?

A       James had -- we had a -- a search for a new center on big data and global health, which I had stopped because we didn't have enough diverse candidates and James wanted to run that entity, and told me that he had counter offers from other universities, he had told me that he had immediate offers from Cornell, and from Stanford, and I communicated with Dean about what I should do in the situation, if I should counter it, and I ended up in the meantime asking folks at Cornell, and Stanford if they made offers, and people I would know said that there were no offers out there.  And so, I felt like he wasn't communicating honestly about it.  And so, he told me if he didn't get what he needed by a certain date, he would resign.  And so, we let

SINGH

him resign.

Q        Did you tell Dr. Faghmous that you had contacted people at the other institute -- institutions he mentioned to you?

A        No.

Q        And is whomever you contacted, you were confident that they would know whether or not offers have been extended to Dr. Faghmous?

A        I felt that those individuals would.

Q        Why would they tell you, to your understanding?

A        It would be a collegial thing to do. I would share the same if I made an offer to a faculty member at another department.

Q        At a different university?

A        Yes.

Q        Has that ever happened where somebody contacted you and said did you make an offer to this candidate?

A        This was the only time I was in the position to be able to do that.

Q        Were you concerned that it would interfere with whatever negotiations Dr. Faghmous had with those institutions?

SINGH

A      No.

Q      Did you know that Dr. Faghmous was critical the way you were running the institute?

MS. GUERRASIO:  Objection to form. You can answer.

A      I knew that James had issues with the direction of the Institute.

Q      And you knew that he had concerns that women were being treated differently and worse than men at the Institute?

A      That wasn't my understanding of what he was concerned about.

Q      When Dr. Faghmous left --

MR. BOWEN:  Let me withdraw that.

Q      I take it, the gist of what you're saying is that Dr. Faghmous gave you an ultimatum and you called his bluff, and he left, is that right, is that how you see it?

MS. GUERRASIO:  Objection to form. You can answer.

A      He said he'd resign on a certain date until -- unless we did something and he resigned.

SINGH

Q      What was he asking you to do?

A      He was asking for a very large amount of money to be committed to him and new position, and promotion.

Q      When he left, did you ask to have an exit interview?

A      No.

Q      Did anybody at Mount Sinai give him an exit interview?

A      Not that I know of.

Q      Was some of the work that Dr. Faghmous -- I will start over.

MR. BOWEN:  Withdraw that.

Q      After Dr. Faghmous left, did the work that Ms. Bruzelius -- the workload of Ms. Bruzelius increase?

A      Everybody's workload probably increased a little bit.

Q      Was Ms. Bruzelius basically asked to take over whatever work Dr. Faghmous had been doing before he left?

A      No.

Q      Who did?

A      When Dr. Faghmous left, he had a very

SINGH

technical background, a computer science background, and so, filling that would have been really difficult.  And so, I asked for -- to borrow somebody with a similar background or more of a technical background from another department, and his name is Mateo Donatello. And so, he came in to help handle all of the technical work and support management of the people with data science backgrounds.

Emilie's work was really different.  She had more of a focus on research.  She was, you know, facilitating grants related work, and so, it took a long time for us to actually identify a person to replace what James was doing, which was, ultimately, Jeb Wiseman, Dr. Jeb Wiseman.

So, during that interim period, it was really a bit of a patch work of me working with Mateo to support just keeping, you know, treading water until we could get a replacement.

Q    During that period, was Ms. Bruzelius doing more work to support Mr. Donatello, and as you say, treading water until a more permanent solution was reached?

A    Ms. Bruzelius had a lot of latitude

Page 188

SINGH

in her role.  Part of it was to support research and program work.  Part of it was pretty independent, she could come up with the project and work on them.  She ended up doing her own independent work pursuing her own topics that she was interested in.

During that time, I did ask her to support our -- some of the research work, like getting a paper published, which she ultimately did, and supporting that process to get it done.

Q    That was research work she wanted to do?

A    It was research work that was important to all of us and she was the -- ultimately became the lead author of it, and it was published.

Q    Did you talk to her about her getting a raise?

A    At what point?

Q    At any point.

A    At some point early on in her tenure, there was an opportunity to give both her and Amanda Misiti a bonus.  And so, they were identified as a couple people who we wanted to

SINGH

Q      You don't have any reason to doubt that you received it, right?

A      No.

Q      And as far as you can recall, you approved the 2 percent increase for Ms. Bruzelius?

A      I think the way it works is that you receive a slate of people who are even eligible in the first place.  I think that's what's in Excel, I am not 100 percent sure.  Out of them, you have to identify who the department actually wants to give that to.

So, I don't think, but I'm not 100 percent sure, I don't think everybody gets this increase.  I think this is just generated by the system and it probably has some limits based upon it seems like the performance appraisal.

My role would have been to say I think these three people, who are in the next page, Emilie, Bruno and Amanda, out of that full list should receive raises.  How that is executed and what happens exactly related to it, and how it's calculated was not something I looked into, but I did look into who got it.

SINGH

increase then the three people listed here, Matt Le, Bruno Silva and Kirsten Knaup, right?

MS. GUERRASIO:  Objection to form.

You can answer.

A       Matt Le was actually a data scientist and he had a machine learning background, which was pretty distinctive from anybody else on the team.  There were other computer science people.  He was being recruited for roles that paid multiples of what we could pay him and if he left, we wouldn't be able to continue the work at all.  And so, we aimed to give him that retention offer, which ultimately, wasn't enough because he then did leave and receive a job with, you know, very high compensation.

Q       Before we get to that, my question was simply that Matt Le, Bruno Silva and Kirsten Knaup received an increase in salary and bonuses that were greater than any increase in salary and bonus that Emilie Bruzelius got for 2018, right?

MS. GUERRASIO:  Objection to form.

A       I'm not sure if these were comparable

SINGH

issues.  I don't think that they were.

Q     What do you mean comparable issues?

A     The -- they're distinct pools from which you can draw bonuses or any salary raises.  The NBU pool was one and, for example, that one Matt Le or Kirsten were not identified in that one.

Q     They're not eligible for the NBU?

A     I'm not sure, but it was distinct, it was a separate issue and this was another issue related to retention.  So, they're not comparable in my mind.

Q     Well, are you saying that you would -- you would have been unable to recommend Emilie Bruzelius or Amanda Misiti for the types of bonus and increase in salary that you were recommending for Matt Le and Bruno Silva in December 2017?

A     I think on the basis of what I wrote in the email, which was really retention incentives, I don't think I would have been able to for either.

Q     So, if you had a retention concern for Emilie Bruzelius or Amanda Misiti then you

Page 219

SINGH

email, I asked him a series of questions which he denied.

Q    Let's go back to the document, Dr. Singh.

Did you realize when you were looking at this document before your lawyer said anything, that you're not addressed in this email chain anywhere?

A    Yes.

Q    So, you didn't need your Counsel to point that out to you, right?

MS. GUERRASIO:  Objection to the characterization.

MR. BOWEN:  I will withdraw the question.

Q    Did you say to Ms. Bruzelius something along the lines that you didn't see a data science research agenda moving forward?

A    I'm trying to remember when James left.  I don't quite recall the dates, if that was before or after this.

Q    Well, it was before the meeting you had with Dr. Olivarius, right?

A    Right.  So, if it was -- if it was

Page 220

SINGH

after James left, I can imagine a conversation, which I don't fully recall, I don't recall this conversation, but I am -- I know that Emilie and I spoke about how the data science work could take place without a data scientist, and she wasn't a data scientist, and she did other types of work. And so, the question that I wanted to work out with her is how would she -- what is the work that she wanted to do, given that we didn't have a principal investigator, she didn't have a PHD, we couldn't assign grants to her in the same way.

And so, it was -- it was -- I having a dialogue with her about well, what kind of work could we do if we don't have a lead data scientist and that's the context of the conversations I recall during that time, and none of it, in my view, contemplated her going anywhere.

Q    Meaning, having to leave the Institute?

A    Absolutely not.

Q    But you did say something to her to

Page 221

SINGH

the effect that you weren't, "sure whether there was a place for the work that she was doing"?

MS. GUERRASIO:  Objection.

Q      Right?

MS. GUERRASIO:  Objection again.

A      I don't recall any conversation of that nature.  There was definitely a place for her work.  The question was, how would it be done given that we didn't have a data scientist, a lead data scientist.  So, it was more a question of how, not if.

Q      Skipping down two sentences, she writes, now in the middle of the paragraph towards the right-hand side, the sentence starts, I then asked him point blank, if you want to follow along, "I then asked him point blank if that was the case, to which he verbally responded no -- let me back up.

The sentence above that, starting on the left-hand side with the word however reads, "However, the implication as I understood it, was that he was telling me that there wasn't necessarily going to be a job for me in the

SINGH

even after I left, I stepped down.

Q     The paper came out after you left?

A     Yeah.

Q     It's important for a scientist to have published articles, right?

MS. GUERRASIO:  Objection.

You can answer.

A     That's a one of the goals of a concrete output of scientific work and research.

Q     You supported Ms. Bruzelius in accomplishing that for her own purposes of her own career advancement, right?

A     I did and, in fact, that paper was going to be lead authored by Matt Le and we had a discussion where she -- you know, I said to her that she should be first author, and that's ultimately how the paper was published. I think that was the right thing.

Q     You had that discussion with Matt Le?

A     With both Emilie and Matt Le and they agreed.

Q     Whose idea was it that she should be the lead author?

SINGH

A        It was my idea.

Q        That wasn't Ms. Bruzelius' idea?

A        No.  I felt like it reflected the work.  Authorship is usually something that reflects contribution and she drafted it, so she should have been first, and she was.

Q        Did you talk to her about the fact that her paper had been rejected by other publications?

A        I recall telling her that it was rejected at some point and that's a normal part of the process.  I can't imagine, you know, getting papers in on the first try.  It's just part of the process.

Q        She understood that it was part of the process, right?

                MS. GUERRASIO:  Objection.

A        I don't know what she understood, but anybody in a research environment knows that you have to often get feedback and try multiple times until it works.

Q        But somebody at her level of work, you would expect they understand the paper rejection is something that happens more often

Page 238

SINGH

was the main way that we transitioned the work after James left.

Q       Do you recall a meeting in May 2017 about progress of work on RWJF report?

A       Not particular.

Q       Do you know what that, is the RWJF report?

A       I think so.

Q       The Robertwood Johnson Foundation report?

A       Yes, I know that.  I think it was -- I can't remember if we had one or two projects with them, but I do recall we had, you know, one project with them, at least.

Q       There was a meeting in May in which you, Dr. Faghmous, Dr. Kashur and David Burman were present, as well as, Ms. Misiti, Ms. Wallik, Ms. Stapleton and Ms. Llames.

Do you remember that meeting?

MS. GUERRASIO:  Objection to the characterization.

You can answer.

A       I don't remember the meeting.

Q       Well, in meetings like that where you

SINGH

had multiple people, more than two or three people, did you consciously just talk to the men in the room and not address yourself to the women?

A    No.

Q    Do you remember any meeting where that happened, whether you were consciously doing it or not, or intending that to be the case or not?

A    I'm sure there were meetings in which either men or women felt like they didn't get a chance to speak up and I would certainly try to make sure that folks voices were heard when I could.

Q    Why couldn't you do it?

A    For example, if there was a 20 person meeting that lasted half an hour, we have a focused agenda, and so, really trying to get through certain work in a short amount of time with a lot of people, so you simply can't hear from every single person in 20, 30 minutes or an hour.

Q    You think that happened sometimes where there were women who wanted to speak and

SINGH

there simply wasn't enough time?

A    I'm sure there were times where there were both men and women who felt like they couldn't speak when -- or that they had something left to say.  I often felt like I had something left to say and there just wasn't time for it.

Q    You had weekly status meetings that included Ms. Llames?

A    I'm not sure what you're referring to.

Q    Well, did you have something called a Weekly Status Meeting?

A    During what time period?

Q    In that same time period, in the 2017, summer of 2017.

A    After James had left?

Q    Well, before he left.

A    I don't recall the specific meetings.

Q    Were there status meetings after he left?

A    There were.

Q    And that was to reallocate work that Dr. Faghmous had been doing?

SINGH

didn't happen?

A       No.  In part, because again, she was interictal to the meeting.  She often set up who would be speaking or who needed to get things done and if there was a clarification or we were off agenda, I would certainly ask her if we were getting everything done that we needed to get done.

So, she was kind of a backbone and then other people did need to pipe in and communicate what they needed to get done.  So, she had a role in those meetings.

Q       But your testimony is that you never intentionally just skipped over her during the meeting?

A       No.

Q       Did she speak at all in the meetings?

A       I don't know if she spoke at all the meetings.  I'm sure she spoke at some of them.

Q       Did you call on her to speak in those meetings?

A       If that's what the agenda that was prepared called for.  So, for example, if there was a project management related

SINGH

discussion, then she would be part of that discussion for sure.

Q      Were these agendas written?

A      We tried to have clear meeting goals for each status meeting, yeah.

Q      But they were in writing?

A      I don't recall how the status meetings were run.  They had been preexisting, and so, I think we probably followed the custom of how they were until Jeb took them over.

Q      What do you mean preexisting?

A      There were status meetings that I think James had held and I can't recall if I attended them regularly or not, but we continued those status meetings.

Q      And he had a set format?

A      I don't recall.

Q      Well, I thought you testified a minute ago that Ms. Llames would prepare the agenda for these meetings?

A      She would prepare the priorities.  I am not sure if that was put into an agenda or not.  I don't know if it was circulated or

SINGH

home, do you remember that happening?

A     I recall her mentioning that she may want to have the option to work from home and I asked her to, you know, it seemed -- it might have been okay at that time, I am not sure, but ask for it in writing what the plan was.

Q     And then when you saw the plan in writing, you rejected it, right?

MS. GUERRASIO:  Objection, form.

You can answer.

A     We were preparing for a pretty intensive meeting and there was a lot of work to get done, particularly, without James being there, and when I saw the plan, I didn't think it was detailed enough to be able to get all that work done from home.

Q     Well, whose decision was it whether somebody could work from home or not, was it yours?

A     I think it was usually the manager of that person.

Q     And in this case, you were the manager of Ms. Llames?

SINGH

A       Of record.

Q       What does that mean?

A       It means that yes, administratively, as I mentioned before, there were a lot of people after James left who didn't have James, and so, all of those people became reporting to me administratively.  And so, this was an administrative issue.  And so, it would come to me.

Q       Did you more liberally grant requests by men to work from home verses women?

A       No.

Q       Are you aware that men worked from home more frequently then men did at the Institute?  I am sorry, that men worked from home more frequently than women did at the Institute?

MS. GUERRASIO:  Objection to form.

A       No.

Q       Have you seen a calendar that indicates whose working from home when?

A       I wouldn't know, I didn't look at the calendar of where people were working at various points.

SINGH

Q      But there was some kind of shared calendar where people were working from home had to indicate that they were working from home that day, are you aware of that?

A      Not really.  I didn't look at that calendar, if it exists.

Q      And to your mind, you treated men the same way you treated women when you asked for a work plan and advance requests for permission to work from home, correct?

A      Yeah.  You know, for example, once Bruno wanted to be able to work from Mexico and extend his break there, and I wanted him back in the office, and said that he couldn't do that, so ...

Q      When was that?

A      I don't recall.

Q      Was it after the internal investigation?

A      I don't think so.

Q      So, it was sometime before the summer of 2018?

A      I don't recall.

Q      You don't recall the date?

Page 258

SINGH

A       I don't recall.

MR. BOWEN:  Let's go off the record. We will take a quick break.

THE VIDEOGRAPHER:  The time is 5:20 p.m.  We will go off the record.

(RECESS)

The time is 5:44 p.m. and we are back on the record.

Q       Dr. Singh, this morning I was asking about Dr. Safo and you said something to the effect that she was one of the most important leads in the, was it, the Health Design Unit?

MS. GUERRASIO:  Objection to --

Q       Is that right?

MS. GUERRASIO:  Objection to form.

You can answer.

A       She really organized the work of the Health System Design with team, yeah.

Q       Did you view her as one of the most important leaders of that division or that team?

A       It was a new group and I worked with her to develop it, and she was important to it.

SINGH

to read the email, go ahead, you can take the time to do that.

A       Okay, what was the question?

Q       Do you recall this exchange that you had with Dr. Safo by email around this time in 2015?

A       I recognize it now.

Q       Do you recall this was about negotiating Dr. Safo's salary when she joined the Institute?

A       It was about a number of -- of items and as -- as is written in the first email, which I hadn't seen, between Barbara and Stella, I recommended that Stella be in touch with Dr. Barbara Murphy directly as she writes to work out the terms of her contract.

Q       And that included establishing a salary, right?

A       It included her -- where she would be working and salary was part of that.

Q       Did you tell her in connection with these discussions that she should not negotiate the salary figure that was being offered to her?

Page 261

SINGH

A    Are you pointing to something?

Q    Well, I am -- I'm looking at the -- towards the bottom of the page, so the last email on the first page is an email from Dr. Safo, and then the one above that is from you, and it reads, "He has no authority over IMA. Let's just move forward and we can adjust."

Was that your way of saying to her don't try and negotiate the salary, we'll --

A    I don't think this discussion had anything to do with salary. It had to do with where her clinical time would be.

Q    Were you telling her not to negotiate those terms, just move forward and "We can adjust"?

MS. GUERRASIO:  Objection to form.

A    I don't think it had anything to do with terms. It was about who would be able to -- it wasn't part of -- I don't recall this discussion exactly, but this was really about where she would be working clinically.

Q    Well, did you at one point tell her that you had obtained for her a base salary

Page 262

SINGH

from Sinai of 150,000 and that you can top it up by 20,000?

A    I recall that after she was in touch with the medicine department, they let me know that her base would be 150. And so, I discussed it with her and she -- and I believe that her title would have been instructor, and I believe that in our discussions, she said that she both wanted a higher title and asked if there was more salary, and I went and had those discussions, and was able to bring it up by 20K, I think that sounds right.

Q    But you told her you would take care of it and she didn't need to engage in any negotiations over her salary, correct?

MS. GUERRASIO:  Objection to form.

A    I said that I would do my part to advocate for her salary and title, and that I also put her in touch with everybody that would be relevant to that discussion directly, as it is stated.

Q    You invited her to have her own discussions about salary with those people?

A    I wanted her to be in direct contact

SINGH

Q       And in your email to her, the second paragraph, you wrote, "We also spoke about salary, and the base at Sinai for your position is 150K.  I will top it up by 20K.  I advocated for you to be titled as assistant professor rather than instructor, which is standard for 1 year post fellowship.  Happy to discuss further."

Do you recall this exchange?

A       I do now.

Q       In connection with telling her about the 150 plus a top "top of 20K," were you telling her don't continue to try and negotiate your salary?

A       I think I write there, I say, happy to discuss further.

Q       Did you discuss it further with Dr. Safo?

A       I don't recall.

Q       Are you aware that Dr. Faghmous negotiated his salary with Mount Sinai?

A       I am not sure of the details.

Q       Do you recall what his starting salary was?

SINGH

before February 2016?

A       As I had said earlier, Dr. Elsayed
was supposed to be doing that work and he did
not come, and so, we had a gap there, and I
think I had asked James to focus on some of
that work as well.

Q       And then eventually it was
Dr. Breeman that took that over?

A       It's not the same role, but,
ultimately, Dr. Breeman came in as vice chair
of research, which was the intent of having
somebody to have a research leader there.

Q       In connection with pay increases, did
you tell Ms. Misiti that she wasn't eligible
for any kind of pay increase unless she had
been doing -- unless she had been at the
Institute for two years?

A       I don't recall that conversation.

Q       Was that some kind of unwritten
policy at the Institute?

            MS. GUERRASIO:  Objection to form.
      You can answer.

A       I think it makes sense.  I mean, she
received a bonus or a pay increase within her

Page 269

SINGH

first year.

Q    Did you ever tell her that bonuses and pay raises were totally out of your control?

A    I don't recall that conversation.

Q    Did you try and manage Dr. Safo's interactions with others outside of the Institute?

A    Quite the contrary.  I introduced her to a lot of people.  I brought her into executive meetings, I facilitated her relationship with department chairs.  She had independent relationships that she built extensively across the campus as one would have hoped and I facilitated a lot of them.

Q    Did you tell Dr. Safo not to reply to Barbara Murphy in March of 2015 while there were discussions about her salary?

A    I don't recall.

Q    I will show you the next exhibit.

(Email Chain marked as PS Exhibit 11 for Identification, as of this date.)

What have marked as Exhibit Number PS11 is an email string, one page in length.  The

Page 270

SINGH

Bates number is SINGH1612. The top email on the page is from you, dated March 9th, 2015 and the email is addressed to Dr. Safo, and you just say, "Don't respond to this yet."

Do you recall having this exchange with Dr. Safo?

(Exhibit handed to witness.)

A     I see it now. I don't recall it.

Q     Do you remember why you told her not to respond?

A     We were looking at the apportionment of clinical sessions and I think, at that time, we were trying to have one of her sessions be an administrative session so she didn't have to do clinical work for them, but that's something that I would have had to probably straighten out with Barbara, and so, I it seems like I asked for a pause.

Q     Did you -- did you have conversations with Dr. Murphy about that?

A     We did. We worked on getting more flexibility in her clinical schedule over time.

Q     Did you ask Dr. Safo to run her -- to

SINGH

it in terms of institutional organizational relationship, and so, I didn't want to have her feel like she was a middle person just communicating things back and forth until it was more clear whether or not we would, in fact, have a relationship or interaction with that group.

Q    Did that go forward?

A    No.

Q    Were there occasions where you told Dr. Safo that she talked too much?

A    Not that I recall.

MR. BOWEN:  Next exhibit.

(Email marked as PS Exhibit 13 for Identification, as of this date.)

Q    What we marked as Exhibit Number PS13 is a very short, one page email, Bates number SINGH4063.  It's from you, your Gmail account, to Dr. Safo at her Mount Sinai email account, dated October 4, 2016, and the subject says, "You are talking too much," and there is no message.

Do you remember this?

(Exhibit handed to witness.)

SINGH

A       I don't.

Q       Was this during a meeting that you wanted to get a message to her to "stop talking"?

A       I don't know the context for that email.

Q       You don't have any memory about it at all?

A       No.

Q       There was another occasion where you asked Ms. Misiti to take a microphone away from a Dr. Safo during a presentation and Ms. Misiti did so.

Do you remember that?

MS. GUERRASIO:  Objection to form.

You can answer.

A       Could you give more detail?

Q       Well, there has been testimony in this case that you asked Ms. Misiti through a text to Ms. Misiti to take the microphone away from Dr. Safo during a presentation.

Do you remember texting that to Ms. Misiti?

A       I don't recall the context for it.

SINGH

Q    Were there other occasions where you moved the mic while Dr. Safo was still speaking?

A    I don't think so.

Q    Did you do that to anyone other than Dr. Safo?

MS. GUERRASIO:  Objection to form. You can answer.

A    I think if anybody was -- if we were running a program or we had a meeting, and we weren't getting through material, I would certainly communicate that to the person that was taking too long, if I could.

Q    Do you know a specific memory doing that to anyone in particular other than Dr. Safo?

MS. GUERRASIO:  Objection to form. You can answer.

A    I recall in a, you know, staff or faculty meeting, if somebody's presentation like Erin or David Heller's presentations were going too long about their research because it would have meant that somebody wouldn't have been able to present during that time period,

Page 280

SINGH

I certainly had said so at those times.

Q      So, you remember doing it to Mr. Heller and who else?

A      I recall a faculty meeting where I had asked for folks to kind of hurry or finish up, or wrap up, at some point at Dr. Baum and at some point to Dr. Heller.

Q      Did you go and move the mic or ask somebody to move the mic away from them?

A      It was it more direct.  I think I communicated directly.

Q      You just stood up in the middle of the meeting and said let's move on?

A      I don't recall the details, but I probably nudged that we should move on.  I think there's a number of ways to do that.

Q      Did you tell anyone else other than Dr. Safo that he or she was talking too much?

A      I don't know.

Q      You don't have a specific memory of that?

A      No.

Q      Do you recall that both you and David Burman both said to Dr. Safo that she was

Page 283

SINGH

Q    Do you remember that Dr. Safo was upset?

A    I recall that Dr. Safo was upset about the exchange.

Q    Well, do you recall that she was upset about your criticism of her in that -- in that episode?

A    I recall her being upset about the exchange.

Q    You recall that she cried?

A    No.

Q    Didn't you say to Dr. Safo in that context that she was "too emotional"?

MS. GUERRASIO:  Objection.

A    That's not what I recall.  I recall communicating to both Mr. Burman and Dr. Safo that the exchange was getting heated and extended, and everybody should cool it.

Q    What did you understand the genesis of that exchange was, was it Mr. Burman or was it Dr. Safo who was kind of extending it?

A    I think that they both were extending it and it was about a invitation related to a birthday cake, and I felt like it was just, in