# EXHIBIT 5

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
DR. STELLA SAFO, GERALDINE LLAMES, AMANDA
MISITI, and EMILIE BRUZELIUS,

                    Plaintiffs,
                              Civil Action No.
        -versus-            1:19-cv-03779-VSB-JW

DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY,
BRUNO SILVA, and ICAHN SCHOOL OF MEDICINE AT
MOUNT SINAI,

                    Defendants.

------------------------------------------------X

                    February 22, 2024
                    9:39 a.m.



        VIDEOTAPED DEPOSITION of GERALDINE
LLAMES, taken pursuant to Notice, held at the
offices of Proskauer Rose, 11 Times Square, New
York, before Fran Insley, a Notary Public of
the States of New York and New Jersey.

Llames

A.    Yes.

Q.    Where did you work prior to Red Hat?

A.    Montefiore Medical System.

Q.    Is that in New York?

A.    Yes.

Q.    What location?

A.    In the Bronx.

Q.    How long did you work at Montefiore for?

A.    A year and a half about.

Q.    When did you leave Montefiore?

A.    November 2019.

Q.    What was your job at Montefiore?

A.    Senior project manager.

Q.    What were your job responsibilities?

A.    I was managing the DSRIP program.  I was creating project plans and conducting status meetings and checking on status.

Q.    What was the district program?

A.    DSRIP.

Q.    Oh, DSRIP.  How do you spell that?

A.    D-S-R-I-P.

Q.    Can you tell us what the DSRIP program was?

Page 21

Llames

A.    It is a New York State funded program that was meant to -- they had several different projects that had different streams of funding to better the different health incentives in the Bronx.

Q.    Did you have anyone reporting to you as a project manager?

A.    Yes.

Q.    How many individuals?

A.    One.

Q.    Why did you leave Montefiore?

A.    I was looking to get out of project management.

Q.    Did you quit or were you terminated?

A.    Oh, I quit.

Q.    How did you come to -- strike that.

Your position at Red Hat, did you leave that position voluntarily or were you fired?

A.    Yes.

Q.    Just let me finish my question.

A.    Oh, sorry.

Q.    That's okay.  You said yes?

A.    Yes, I left voluntarily.

                        Llames

projects and more.

Q.    Is this the last job you had prior to going to Mount Sinai?

A.    Yes.

Q.    Did you leave that position voluntarily?

A.    Yes.

Q.    How did you come to learn about a position at Mount Sinai?

A.    Through Mike Escosia.

Q.    Who is Mike Escosia?

A.    A friend.

Q.    Can you spell his last name?

A.    E-S-C-O-S-I-A.

Q.    Was Mike Escosia at Mount Sinai when he spoke to you about an opportunity there?

A.    Yes.

Q.    What did he tell you?

A.    He said this is a great place to work.  You should come check this out.  We are looking for a project manager.  You are a project manager.  You're great.  So you want to move to New York and this could be a good way for you to move.

Page 55

Llames

Q.   Can you provide any details about conversations you had with Dr. Safo about being skipped over in meetings?

A.   Yes.

Q.   What details can you recall?

A.   That I would tell her when I was skipped over in meetings or ignored in meetings.

Q.   Who would those meetings be with?

A.   With Dr. Singh.

Q.   Anyone else?

A.   The ATLAS team, some external stakeholder meetings.

Q.   Was Dr. Safo in any of those meetings?

A.   I don't recall.

Ma'am, do you mind if we take a break?

Q.   That's fine.  We can take a break.

THE VIDEOGRAPHER:  The time is approximately 10:56 a.m.  We are going off the record.

(Brief recess taken.)

THE VIDEOGRAPHER:  The time is

Llames

you start your role at Mount Sinai?

A.    January 2017.

Q.    Do you recall when you left Mount Sinai?

A.    Not exactly.

Q.    Why don't you turn to page 94 of the document you've been handed.  Do you see paragraph 337?

A.    Yes.

Q.    Do you see it says, "By summer 2018, Singh had made Llames so unhappy and uneasy at work that she decided to leave?"

A.    Yes.

Q.    At the end of that paragraph it says "August 9, 2018?"

A.    Yes.

Q.    Does that sound accurate for when you left Mount Sinai?

A.    Yes.

Q.    Let's look at the sentence immediately or two sentences immediately preceding paragraph 337.  It says "Solely because of Singh, she found the environment hostile and oppressive.  She cried at least

Page 60

Llames

it to be a hostile environment?

A.    Yes.

Q.    So this paragraph is not accurate?

A.    That is not accurate.

Q.    Even though you just testified that everything in here as pertaining to you is accurate?

A.    It was an oversight on my part.

Q.    So since -- if we don't know everything in this Complaint to be true and accurate, why don't we put it aside for a moment and I will just ask you.

So, Ms. Llames, tell me then what acts by Dr. Prabhjot Singh and David Berman created a hostile environment for you at Mount Sinai?

A.    It was being skipped over in meetings. It was being treated differently from my peers, being yelled at, being called stupid, being told one thing and then another, being gas lit and yeah, generally mistreated.

Q.    So, let's talk about being skipped over in meetings. What meetings were you skipped over in?

Llames

A.    Multiple ATLAS team meetings.

Q.    Who was on the ATLAS team?

A.    Emily, Matt, Humale, Bruno, some other guys whose names I don't remember.

Q.    Anyone else you can remember?

A.    No.

Q.    Was Dr. Safo on the ATLAS team meetings?

A.    No.

Q.    Was Emily skipped over in team meetings?

A.    I don't recall.

Q.    Was Matt Escosia skipped over in team meetings?

A.    Mike.

Q.    I'm sorry, I thought you said Matt.

A.    Mike was in meetings.

Q.    So who is Matt?

A.    Matt Le was one of the guys on the team.  He was not skipped over in meetings.

Q.    And Humale Khan, was he skipped over in meetings?

A.    No.

Q.    Bruno Silva, was he skipped over in

Page 62

Llames

meetings?

A.    No.

Q.    So you specifically remember that Matt Le, Humale Khan and Bruno Silvo were not skipped over in meetings but you can't recall whether Emily Bruzelius was?

A.    I don't recall.

Q.    But you don't recall an instance in which she was; is that accurate?

A.    Correct.

Q.    Are we talking about one ATLAS meeting or are we talking about multiple meetings?

A.    Multiple.

Q.    Just let me finish my sentence.

A.    Sorry.

Q.    In which you are claiming you were skipped over?

A.    Multiple.

Q.    How often were ATLAS meetings held?

A.    Weekly.

Q.    How many times do you recall that you were skipped over?

A.    I don't recall.

Page 63

Llames

Q.    More than once?

A.    Yes.

Q.    More than twice?

A.    Yes.

Q.    More than ten times?

A.    I don't recall the exact number.

Q.    So your testimony is that more than twice you were skipped over, but you don't recall how many times beyond that?

A.    Correct.

Q.    Any other meetings other than the ATLAS meetings that you allege you were skipped over?

A.    Robert Wood Johnson, RWJ meetings.

Q.    Who attended those meetings?

A.    James, Prabhjot, other people.  I can't recall who else.

Q.    What do you recall about being skipped over during the Robert Wood Johnson Foundation meeting?

A.    Having done a good amount of the work leading up to it and then having, you know, questions asked about oh, what did we think about this and that and not being

Llames

acknowledged or, you know, putting -- being able to put my input on how things went.

Q.    So was it that you were skipped over or others -- or just that others spoke at the meeting and you did not?

A.    Skipped over.

Q.    So did someone ask your opinion at a meeting and you were told you couldn't speak?

A.    No.

Q.    Did someone ask your opinion and someone answered on your behalf?

A.    I don't recall.

Q.    Did you speak at all at the Robert Wood Johnson Foundation meetings?

A.    The -- in the specific meetings that I'm referring to or the external ones?

Q.    Let's focus on the meetings you're referring to.

A.    Yes.

Q.    And these were then internal meetings I take it?

A.    Yes.

Q.    You identified James Faghmous and Prabhjot Singh.  Anyone else at those meetings

Page 65

Llames

that you can recall?

A.     Not that I can remember clearly.

Q.     Any other women in the meetings?

A.     Not that I remember clearly.  I feel
as though there were other women there, but I
don't recall clearly.

Q.     What was James Faghmous' title?

A.     I don't recall.

Q.     Was he your superior?

A.     Yes.

Q.     What about Dr. Singh; what was his
title?

A.     I don't recall.

Q.     Was he your superior?

A.     Yes.

Q.     You mentioned internal meetings, but
you also made a reference to external meetings.
Were there external meetings in which you
allege that you were skipped over?

A.     No.

Q.     We talked about Robert Wood Johnson
Foundation meetings and ATLAS team meetings.
How many times did you have Robert Wood Johnson
Foundation meetings internal to the

Page 66

Llames

organization?

A.   I don't recall.

Q.   Were they weekly?

A.   No.  I don't recall.

Q.   How many times do you allege that you were skipped over in those meetings and I'm using your language in skipped over?

A.   Once or twice.

Q.   Is it the same that -- strike that.

Any other meetings, other than ATLAS and Robert Wood Johnson Foundation, that you can remember in which you would allege that you were skipped over?

A.   Not that I can recall.

Q.   Ms. Llames, you've testified that one of the other examples of experiencing a hostile behavior at Mount Sinai was being yelled at.  Would you please provide me with the details concerning that allegation?

A.   I was in a meeting with David Berman and someone else, I can't recall clearly, and had put together a document or a plan or something and he was reviewing something that I had put together and he was like, "What is

Llames

this?  This is stupid.  Are you fucking stupid?" and was just yelling about my work.

Q.    And you can't recall who else was present?

A.    No.

Q.    Where did this meeting take place?

A.    In one of the offices.

Q.    Was this early on in your career at Mount Sinai, in the middle, towards the end? Do you have any point in time you can place this meeting at?

A.    I don't recall clearly.

Q.    Other than saying, "Are you fucking stupid?  What is this?" is there anything else you can recall that David Berman said to you?

A.    Not that I recall clearly.

Q.    Were you offended by him cursing in the meeting?

A.    I was offended by -- could you please clarify your question?

Q.    You said he swore during the meeting, correct?

A.    Yes.

Q.    Did that offend you?

Page 70

Llames

Q.    I'm not sure --

A.    I'm sorry, say that again.

Q.    So you recounted one meeting to me that we just discussed at length, correct?

A.    Correct.

Q.    I believe your testimony is that other than this one meeting, there is no other time in which you were yelled at or someone raised their voice to you as you would identify creating a hostile environment at Mt. Sinai?

A.    Correct.  There was no other time where someone raised their voice or yelled at me.

Q.    When we started this line of questioning you identified someone calling something stupid.  Is this part of that same meeting or was there another instance?

A.    The same meeting.

Q.    The next behavior you identified, Ms. Llames, was being told one thing and then another.  Can you tell me about what instance were you told one thing and then another which you believe created a hostile environment at Mount Sinai?

Llames

A.    There were instances where I was told you need to do, put this plan together and then I would do that or put together a Gantt chart, G-A-N-T-T chart or proposal together and then come back and then I was told no, this isn't what we wanted.

And then there were times where the one that stands out was when I, being from the northern Virginia area, we had a meeting in DC and Dr. Singh had said I could work from home, work from Virginia like one day so I didn't have to go back to New York before going for the holiday.  And then he later recounted that and declined that.  Just, yeah, just instances where I was told one thing and then another.

Q.    Let's unpack what you just testified to.  The first thing you said was I was told to put this plan together and then I was told something different.  What plan are you referring to?

A.    Different project plans.

Q.    Do you have a specific example?

A.    Not that I can recall clearly.

Q.    So what recollection do you have

Page 72

Llames

that makes you identify being told to put a plan together and then that being changed?

A.    Sorry, what recollection was I?

Q.    I asked you to identify for me the instances in which you were told one thing and then another and that you said it is something you would identify as creating a hostile environment at Mount Sinai by either Dr. Singh or David Berman.

Then in your testimony said you were told to put this plan together and then told something different.  I'm asking for what plan and if you can't remember the plan, what can you remember specifically that makes you identify that as an example?

A.    Because my job was to put together project plans and see them through and I remember putting them together and I remember having to turn around and redo the whole thing after sitting in meetings where I had done what was asked initially and --

Q.    What meetings are we talking about?

A.    I can't recall.

Q.    What plans are we talking about?

Page 73

Llames

A.     I can't recall.

Q.     So you have a vague recollection of being told to put one plan in place and then being told to do something different, but you can't recall any details about it?

MR. BOWEN:  I object to your characterization of her recollection.  It misstates her testimony, but you can answer.

A.     Could you please repeat?

MS. GUERRASIO:  Can you read back the question, please.

(Whereupon the record was read back by the reporter.)

MR. BOWEN:  Same objection.  You can answer.

A.     I don't remember details.

Q.     Are we talking one instance in which you were told to put a plan together and then it was changed?

A.     No.

Q.     How many times?

A.     I couldn't give you an exact number.

Q.     And you can't give me any details

Page 79

Llames

strike that.

So the -- I'm going to call it bucket of behavior where you described as being told my experiences weren't what they were, you've just testified about people making excuses for bad behavior.  Any other example that you can provide to me?

A.    Not that I remember clearly.

Q.    So Sunny Kishore telling you that David Berman was just passionate about his work is the only thing you can identify as being an example of someone telling you your experiences weren't what they were, if that was your testimony?

MR. BOWEN:  Object to the form.  You can answer if you understand the question.

A.    If you're asking that is the only thing that I'm remembering, then yes, that's the only thing I recall clearly.

Q.    Is there anything you recall vaguely?

A.    No.

Q.    You also testified about a work trip that you were told that you would be going on

Page 80

                              Llames

and that at one point were told you were not.

Can you tell me about that work trip?

A.    It was for a project in, I believe,

somewhere in Africa.

Q.    What was the project?

A.    I can't remember clearly.

Q.    Do you know where in Africa?

A.    No.

Q.    Do you know who the project was

with?

A.    I can't remember clearly.

Q.    Do you recall who told you

originally that you would be going on this

trip?

A.    Dr. Singh.

Q.    Do you recall who told you you would

not be going?

A.    Dr. Singh.

Q.    Do you recall, did he give you any

reason why?

A.    I don't recall clearly.

Q.    Do you have any recollection?

A.    I remember him telling me and being

very upset that I had three shots already and

Llames

had gone through all the steps and planning of it.

Q.   What do you mean by was upset that you had gotten shots and had gone through planning?

A.   I had gotten the vaccinations to go to the country and I had put together the plan and the purpose and what we were going to be doing and then they do this right before.

Q.   Did the trip actually happen?

A.   Yes.

Q.   Do you know who went on the trip?

A.   Dr. Singh and some other folks.  I don't recall.

Q.   Do you know if any women went on the trip?

A.   I don't recall.

Q.   Did Dr. Singh provide you with a reason why you would not be accompanying the team on the trip?

A.   I don't recall clearly.

Q.   Could it have been for a business reason?

A.   I don't recall clearly.

Page 82

Llames

Q.    Ms. Llames, in the list you provided to me earlier, you testified about a remote work request that you made and was at one point not followed through with.  Can you tell me about that?

A.    Yes, there was a USAID meeting in DC around Thanksgiving and I'm being from the DC/Virginia area, I had said oh, why don't I work -- can I work from Virginia so I don't have to travel between DC to New York back to DC again then back to New York again and Dr. Singh was like yeah, of course, that makes sense.

And then I -- as we were approaching, somebody had said to me oh, you know, you better get that in writing because you know how he'll find a way to go back on it and you know say that you didn't have permission.  So I was like okay, per our conversation you had said I could do this so I'm just giving you this.  So he said I need a work plan.  I said okay here is the work plan. And then he said no, I still couldn't.

Q.    Ms. Llames, when you were at Mount

Page 83

Llames

Sinai, was there a policy concerning work from home?

A.    Not that was clear.

Q.    Was there any policy?

A.    I don't know what the formal policy was.

Q.    Was it a policy that you had to make work from home requests in writing?

A.    I don't know what the policy was.

Q.    You testified that you approached Dr. Singh about working from home in advance. Was that approach verbal?

A.    Yes.

Q.    You testified that someone told you you better get that in writing.  Who was that?

A.    I don't recall clearly.

Q.    So you recall someone telling you to get the request or to make the request in writing, but you don't recall who said that to you?

A.    I don't remember if it was one of a number of people.

Q.    Can you give me the names of who you think it could have been?

Page 84

Llames

A.    I feel like it could have been either Amanda, Mike or Andrew.

Q.    Could the recommendation that you get it in writing be because there was a policy that it needed to be in writing?

A.    That was not the insinuation from that conversation.

Q.    Was working from home an exception to the general requirement that you work in the office?

A.    It wasn't clear because some people worked from home sporadically and some people worked -- it was all very unclear what the policy was.

Q.    At the time you made this request to Dr. Singh, was he your direct supervisor?

A.    Yes.

Q.    Who else reported to him at that same time?

A.    I don't remember.

Q.    Are you aware of anyone else who had a remote work request denied?

A.    No.

Q.    Are you aware of anyone who had a

Page 85

Llames

remote work request approved?

A.    Explicitly approved or that they worked from home?

Q.    I'll rephrase the question.  Are you aware of anyone who had a remote work request approved by Dr. Singh?

A.    I'm not aware.

Q.    Ms. Llames, I think you testified that your request to work from home was around Thanksgiving; is that correct?

A.    I think so.

Q.    And this was in 2017?

A.    Yes, I think.

Q.    You can take a minute to think if you need to.

A.    I just can't recall dates clearly.

Q.    Well, I think we established earlier that your employment at Mount Sinai was from January 2017 to August of 2018.  So if it was Thanksgiving, the only November that falls in there is 2017.

A.    Yes, correct.

Q.    So November 2017 is when you made this request you believe?

Page 86

Llames

A.    Yes, I believe.

Q.    I believe you testified, Ms. Llames, that there was a USAID meeting in DC; is that correct?

A.    Yes.

Q.    What was that meeting related to?

A.    I feel as though it might have been related to some grant.

Q.    Was it related to ATLAS?

A.    Yes, I believe.  I don't recall entirely clearly.

Q.    What is USAID?

A.    It's the US -- it is the department for foreign aid essentially.

Q.    USAID is external to Mount Sinai, correct?

A.    Correct.

Q.    Ms. Llames, do you remember what your -- the details of your work from home request, how many days you were asking to work from home?

A.    I don't remember the details.

Q.    This can be marked.

Llames

organization about PTO, but I don't remember the details of it.

Q.    So there was an e-mail that you received that concerned procedures or policy on if you were going to be out of the office.  Did it also concern work from home?

A.    No, not that I can recall.

Q.    If you see in this e-mail, you can really only tell from the top chain the way the e-mails are truncated, I guess the second e-mail too.  The subject line is "Re:  Work from Home 11/27-11/30."  Do you see that?

A.    Yes.

Q.    And if you look in that bottom e-mail we were just looking at it says, "We have the USAID meeting on 11/30 in DC."  Is that the meeting you just testified about?

A.    Yes.

Q.    So I can tell you and represent to you and you can look it up if you like, Thanksgiving that year fell on November 23. That was a Thursday.

A.    Okay.

Q.    I presume Friday the 24, do you

Page 89

Llames

recall whether you had off because the day after the holiday?

A.    I don't recall.

Q.    The 25th and the 26th were Saturday and Sunday so that would mean the 27th is the Monday.

A.    Okay.

Q.    And I can give you a calendar if you want to take a look.

A.    I trust you.

Q.    So you were requesting to not be in the office the three days before the USAID meeting; is that correct?

A.    Yes.

Q.    And you were making this request ten days before you wanted to be out of the office before this meeting?

A.    No, I had made the request prior.

Q.    Let me clarify.  Thank you.  You're making this request in writing to Dr. Singh ten days before?

A.    Yes.

Q.    And this meeting was with the USAID which you said was external to the

Llames organization.  Do you remember who attended the meeting?

A.    Not clearly.

Q.    Was the plan for you to attend with Dr. Singh?

A.    Yes.

Q.    You don't recall anyone else who attended?

A.    I have a vague recollection of people who might have been there.

Q.    Who do you recollect?

A.    I feel as though maybe Bruno, maybe Humale, but it's not entirely clear.

Q.    If you look at your work plan, which was attached to the e-mail, you had four meetings that you were supposed to attend in those three days leading up to the USAID meeting.  Do you see that?

A.    Yes.

Q.    And you -- and that was in preparation for the USAID meeting?

A.    Some of them I don't believe are connected.

Q.    In the days leading up to the

Page 93

Llames

A.    Yes.

Q.    Is this the response that Dr. Singh provided to you on your work from home request?

A.    Yes.

Q.    Does this refresh your recollection as to why the request was denied?

A.    This refreshes my recollection to his reasoning or his -- what he told me.

Q.    What do you understand the reasoning to be from this document?

A.    He says they need a deeper dive.

Q.    The "they" being what?

A.    The documents need a deeper dive to make them enough to -- to allow enough to work remotely.

Q.    Do you see that the last line in the third paragraph says, "Happy to discuss what is expected in order to achieve signoff on something like this in the future, recognizing that it's always an exception?"

A.    Yes, I see that.

Q.    Does that refresh your memory that working from home was an exception?

A.    It refreshes my memory that it was

Page 94

Llames

an exception to certain people.

Q.   What is the basis for your testimony on that?

A.   Again, it was -- there were people who worked from home regularly and even ad hoc and so, as far as I know, did not have to put together work plans and so, it makes me recall that it was an exception to certain people.

Q.   Ms. Llames, did you ever ask any other employees that reported to Dr. Singh whether they had to put together work plans to work from home?

A.   No.

Q.   And, Ms. Llames, I believe you testified earlier that you're not aware of anyone else who either had a work from home request granted or denied by Dr. Singh; is that correct?

A.   Correct.

Q.   Ms. Llames, when Dr. Singh denied your request to work from home in advance of this external USAID meeting, were you angry?

A.   Yes.

Q.   Did you tell anyone at Mount Sinai

Page 95

Llames

about it?

A.   Yes.

Q.   Who?

A.   Probably the same folks I vented to.

Q.   Did you take Dr. Singh up on his offer to discuss in the future ways to put together a plan that would be accepted?

A.   No.

Q.   Ms. Llames, who is Hunter Loving?

A.   He's a friend of mine.

Q.   How do you know him?

A.   Former colleague.

Q.   From Mount Sinai?

A.   No.

Q.   From where?

A.   FedBid.

Q.   Are you still in contact with Mr. Loving today?

A.   Yes.

Q.   Have you ever discussed this litigation with him?

A.   No.

Q.   Did you ever discuss your Mount Sinai employment with him?

Llames

in 2017.

Q.    Mr. Randall responds to you, "Damn that screwed up everything for you."  Do you see that?

A.    Yes.

Q.    Is Mr. Randall referring to your plan to be able to stay in Virginia with your family over the Thanksgiving holiday and few days after that?

A.    Yes.

Q.    Is that why you were angry that Dr. Singh denied your request from home, request to work from home, excuse me?

A.    I was angry that the request was denied, but also that the -- that I was being treated unfairly compared to other folks at the institute.

Q.    How can you say that you were being treated unfairly compared to other folks at the institute when you don't know anyone else who made a request to work from home to Dr. Singh and which was either approved or denied?

MR. BOWEN:  I object that it's argumentative, but you can answer it.

Page 101

Llames

A.    Because I knew of other people who were working from home.

Q.    Did they report to Dr. Singh?

A.    I don't remember.

Q.    But you don't know of any other person who made a request that was denied or approved; is that accurate?

A.    That is correct.  I don't ask folks about.

Q.    Ms. Llames, I will represent to you that you forwarded this e-mail on to numerous other people including Stella Safo, Fara Khan and Amanda Misiti.  Why did you forward this e-mail exchange on to five different people?

A.    I was venting and trying to see if, you know, what do you think.

Q.    Ms. Llames, you have recounted to me the meetings in which you believed you were skipped over, again using your language from your testimony, the one meeting in which you believed you were yelled at and David Berman called the work, some of that fucking stupid, the instance in which you were told one thing and then another with a work plan, being told

Llames - Attorneys Eyes Only

A.      Project management professional class.

Q.      What is that?

A.      It's a certification.

Q.      Where did you watch those classes?

A.      It's -- it was an online course.

Q.      And you did this during you're workday at Mount Sinai?

A.      That is what I had said I was going to do.

Q.      Was that part of your Mount Sinai work?

A.      Not directly.

Q.      Were you paid by Mount Sinai to watch PMP classes?

A.      No.

Q.      Then you say, "I mean, really, it's a pros and cons thing.  I walk in after 9:00 a.m.  I can generally leave when I feel like it.  There's stupid office politics, but that's gonna be everywhere."  Do you see that?

A.      Yes.

Q.      So is it true that you could come and go at the office as you please?

Llames - Attorneys Eyes Only

A.    Within reason.

Q.    You weren't being micromanaged in your time; is that accurate?

A.    At this time, no.

Q.    And you described stupid office politics but that's going to be everywhere; do you see that?

A.    Yes.

Q.    What are you referring to there?

A.    In April it was still early tenure and it was clear that there was a lot of conflict between, you know, David Berman and other women and it was like, you know, things -- I don't recall exactly, but just different instances where like -- where I had realized that it was not as put together as I had previously thought.

Q.    You described all of that as stupid office politics?

A.    Yes.

Q.    You'll see then after that Mr. Escosia says, "You're right.  It's not all that bad, but sometimes the nonstimulation really puts a drain on you, ya hear?"  Do you

Page 121

Llames - Attorneys Eyes Only

project manager and at -- in my previous role at JPI, I loved being a project manager.  And I have awards from the chief of staff for the CRSO department, the Department of Homeland Security.  I was frequently recognized for my collaboration and my input and like, leadership in different branches of the government have recognized me.  And then to come here and to -- not here, to get to Arnholds and my project management skills were not being used to the degree that they had been at JPI.  It was under stimulating.

Q.    So from very early on in your time at Mount Sinai you found the job to be, I don't know your word, under stimulating?

A.    Yes.

Q.    So you were dissatisfied from a very early time frame in project management role at Mount Sinai; is that accurate?

A.    Yes.

Q.    From that time April 2017 you already are considering leaving; is that correct?

A.    I had bounced the idea around, but

Page 122

Llames - Attorneys Eyes Only

it was not a serious conversation.

Q.    At this point you are not reporting to Dr. Singh; is that correct?

A.    Correct.

Q.    You're reporting to Sunny Kishore?

A.    Yes.

Q.    Ms. Llames, in this chat you say to Mr. Escosia, "This is just paying for my drinking habits.  Bet your ass I'm not staying late for SK."  Who is SK?

A.    Sunny Kishore.

Q.    So this job at Mount Sinai was just a job to fund your recreational activities; is that what you are saying here?

A.    I'm saying it was a job.

Q.    That was my question.

A.    Yes, to live life outside of work.

Q.    I think we can take a break now.

MR. BOWEN:  Thank you.

THE VIDEOGRAPHER:  The time is approximately 1:02 p.m.  We are going off the record.

(Lunch recess.)

Page 123

Llames - Attorneys Eyes Only

AFTERNOON SESSION

THE VIDEOGRAPHER:  The time is approximately 2:08 p.m.  We are back on the record.

BY MS. GUERRASIO:

Q.    Ms. Llames, you previously testified that there was a trip to Guatemala that you were -- excuse me.  Strike that.

That there was a trip that you were -- I thought you said to Africa?

A.    Yes.

Q.    That you were told you were going to go on and that decision was changed at some point.  Do you have any details as to who was going on that trip?

A.    I don't remember the details aside from Dr. Singh.

Q.    And you don't have any recollection as to when, during your time at Mount Sinai, that trip occurred?

A.    I would have to go through and see when I got the vaccinations.

Q.    Do you have any recollection as to the reasons that were told you would not be

Page 124

Llames - Attorneys Eyes Only

going on the trip?

A.    I don't remember being given an exact reason.

Q.    Were you given any reason?

A.    I don't recall.

Q.    Ms. Llames, was there a time when you went on a work trip to Guatemala?

A.    Yes.

Q.    Do you recall when that was?

A.    I don't recall.

Q.    Do you recall whether you were accompanied by anyone else from Mount Sinai on the trip?

A.    Yes.

Q.    Who were you with?

A.    Bruno, Emily, David, and the data science guys whose names I cannot recall right now.

Q.    What project was that trip related to?

A.    ATLAS.

Q.    Is there any other trips that you took while you worked at Mount Sinai in connection with your job?

Page 125

Llames - Attorneys Eyes Only

A.    Not that I can recall right now.

Q.    Ms. Llames, are you aware of whether any of the trips, the trip that was canceled, excuse me, had to do with the lack of funding?

A.    No.

Q.    You're not aware or you don't know, I'm sorry, I just want to make sure I understand your response.

A.    My understanding at the time was not -- was that the reason was not due to lack of funding.  I wouldn't remember that.

Q.    But you don't remember the reason you were given?

A.    No.  I don't remember clearly if it was like oh, you're not needed or --

            (Whereupon document was marked Exhibit 8 for identification as of this date.)

A.    (Witness reviewing document).

Q.    Ms. Llames, you have been handed a document that has been marked as Llames Exhibit 8 for purposes of this deposition.

            Can you take a look at it and let me know if you recognize it?

Llames - Attorneys Eyes Only

which I assume is a reference to you?

A.    Yes.

Q.    And you say, "But my boss has no spine, so he has to see if it's okay with you." Do you -- what are you referencing there?  Who are you referencing there, excuse me?

A.    Sunny.

Q.    So Sunny Kishore?

A.    Yes.

Q.    You say my boss has no spine referencing Sunny Kishore.  So he has to see if it's okay with you.  Who are you referencing there?

A.    You being David Berman.

Q.    So Sunny Kishore had said that David Berman needs to approve whether or not you go on the Guatemala trip; is that correct?

A.    Yes.

Q.    A little bit down in the conversation you say, "Ugh, Berbitch and Sunny dream team."  Who is Berbitch?

A.    David Berman.

Q.    So you're referring to David Berman as Berbitch?

Llames - Attorneys Eyes Only

A.    Yes.

Q.    Did you respect David Berman when you worked at Icahn?

A.    Initially.

Q.    Did it change at some point?

A.    Yes.

Q.    When did it change?

A.    After I had seen him yelling at multiple women and myself included.

Q.    Did you respect Prabhjot Singh when you worked at Icahn?

A.    Initially.

Q.    Did it change at one point?

A.    Yes.

Q.    What prompted it to change?

A.    After seeing and experiencing his behaviors towards my female peers.

Q.    What about Sunny Kishore; did you respect him?

A.    Yes.

Q.    And what about James Faghmous?

A.    Yes.

Q.    What about Bruno Silva?

A.    Sometimes.

Llames - Attorneys Eyes Only

Q.    What is the qualifier for sometimes?

A.    I respected the work that he did and then there were times he was just wildly inappropriate and in those times I would say I couldn't take him seriously.

Q.    I'm going to put a pin in that for a moment.  In this chat you say after you say Berbitch and Sunny dream team, Mike Escosia says, "Berbitch God, we are going to get fired" and your response is "Laugh out loud if anyone ever found our Gchats."  What is in your Gchats that would get you fired from Mount Sinai?

A.    Me calling David Berman Berbitch.

Q.    Anything else?

A.    Maybe Mike calling them Satan.

Q.    Is that it?

A.    Most, yeah.

Q.    So did you search all of your Gchats with Mike Escosia as part of your discovery obligations?

A.    Yes.

Q.    You selected which chats to provide to your counsel?

A.    Yes.

Llames

peers about things that are going on versus somebody who is in a leadership position who's talking badly about other women around you.

Q.    Was Mr. Silva your manager or your supervisor?

A.    No.

Q.    Ms. Llames, I believe you testified earlier that you considered Mr. Silva to be a friend who you did vent to at times; is that correct?

A.    Yes.

Q.    But you found it inappropriate when he would use the word in your presence he -- strike that.

Why would it then be inappropriate to use that word in your presence if it is otherwise you've testified that it would be okay amongst colleagues to vent?

A.    Could you repeat the question, please?

Q.    Sure.  You and Mr. Silva had a friendship; is that accurate?

A.    Yes.

Q.    Mr. Silva you've testified at times

Page 139

Llames

Q.   What about Mr. Silva using the term with someone that you have described that you are his friend made this inappropriate?

A.   He's in a position of leadership and I am not.

Q.   I'm sorry, go ahead if you're not done.

A.   He's saying this in the whole design team room and that's different from me having a private conversation on Gchat.

Q.   Was Stella Safo in a position of leadership?

A.   Yes.

Q.   Did she use the term bitch?

A.   Maybe.  I don't recall.

Q.   Would that be inappropriate if she did?

A.   It would --

MR. BOWEN:  I object to that question.  You can answer if you have an answer.

A.   It would depend on the context.

Q.   Why; because she is an individual in leadership?

Llames

MR. BOWEN:  Again, object to that question.  You can answer that question if you have one.

A.    Because it would still depend on the context.

Q.    So is it your testimony that in some context using the word bitch is not offensive?

A.    I would say that I have -- I am not offended by the word and/or cursing, but there are -- I believe there are instances where I do find it offensive and inappropriate to be using it to talk about people in the workplace.

Q.    So, Ms. Llames, if Bruno Silva ever used the word bitch in the workplace in a conversation, is that conduct you found to be offensive such that it created a hostile environment?

A.    I am not offended by the word bitch, but I do and I did say that it was inappropriate.  I would say Bruno, you can't say that, stop.

Q.    What was his response when you would say that?

A.    Maybe a laugh.

Page 141

Llames

Q.    Do you have any specific recollection of you telling him you can't say that?

A.    Not a specific time like on April 4 I said this, but --

Q.    You testified you don't have any specific recollection of Bruno Silva using the word bitch in connection with any one individual; am I'm correct about that?

A.    I'm sorry, say that again, please.

Q.    Sure.  You testified that while you believe the word bitch was used by Mr. Silva in the workplace, you couldn't identify any one specific individual or comment that he said?

A.    Not clearly.

Q.    What about vaguely?

A.    Yes.

Q.    And what is the comment that you vaguely recall?

A.    He would talk about Stella being a bitch and her work and I think that was the gist of it.  Just vague remembrances of him just calling women bitches.

Q.    And your testimony is that you

Page 142

                    Llames

didn't find that offensive, but other

individuals did?

        A.    I can't speak for other individuals.

        Q.    So I'm just trying to understand

what is offensive about it if you are

personally not offended by the word bitch?

        A.    I think that context matters and I

think that me not being offended by it and

using it when speaking with a friend is

different from somebody in a leadership

position talking about other women in -- openly

in a team, an open space room.

        Q.    But you were friends with Mr. Silva

when you and he were having these

conversations?

        A.    Yes.

        Q.    You also cited comments that it were

made about women being on their period.  Can

you tell me what specifically you recall?

        A.    I don't remember who it was

specifically but he would say oh, maybe you

know, per somebody, like she gave me attitude.

She must be on her period.

        Q.    Who is the she?

Page 143

Llames

A.    I don't know if it was Alyssa or Amanda.  I can't recall clearly.

Q.    Was anyone else present when he made the comment?

A.    I don't recall.

Q.    Do you recall where you were?

A.    Either at my desk or in the design room.

Q.    Was this just a conversation between you and he or were their other people present?

A.    I don't recall.

Q.    Did you and Bruno Silva talk about your personal lives at work?

A.    Yes.

Q.    Would you talk about men you were dating?

A.    Yes.

Q.    Would you talk about struggles with your weight?

A.    Yes.

Q.    Would you talk about going out and drinking and partying?

A.    Yes.

Q.    And those were conversations you had

Page 144

Llames

with Mr. Silva as friends?

A.    Yes.

Q.    Were those appropriate conversations for the workplace?

A.    No.

Q.    So talking to him about your dating life was not appropriate?

A.    No.

Q.    So why did you talk to him about it?

A.    Because we were friends.

Q.    Is there anyone else that made comments about women and being on their period or cramps, going to a gynecologist, anything else in that -- related to that?  Is there anyone who made comments in the workplace?

A.    Not that I can recall.

Q.    Did you ever talk about it?

A.    About cramps?

Q.    Yes.

A.    Not that I recall clearly.

Q.    Do you have any vague recollection?

A.    Not that I can place.

Q.    What about with Mike Escosia?

A.    Not that I can recall.

Llames

Q.    Did you ever talk to anyone at work about being on your period?

A.    Not that I can recall clearly.  I might --

Q.    I thought you were done?

A.    I've might have asked if somebody had products.

Q.    So is it that you can't recall it didn't happen or you just can't recall either way, the conversations may have happened?

A.    Which conversations?

Q.    About you being on your period or having cramps?

A.    I can't recall.

Q.    That didn't answer my question.  It's okay.

Is it possible that you had conversations at work with your colleagues about being on your period or having cramps?

A.    Yes.

Q.    Ms. Llames, you would be on -- strike that.

When you were working at Mount Sinai, were you using dating apps?

Page 146

Llames

A.   Yes.

Q.   What dating apps were you using?

A.   Tinder, Bumble.

Q.   Would you share with Mr. Silva the individuals who would show up on your dating apps?

A.   Yes.

Q.   Would you ask for his opinion?

A.   Yes.

Q.   Would you do that during meetings?

A.   Not that I can remember.

Q.   Would you do it in the -- I'm going to call it the design room -- I'm not sure if that's a correct word -- but where you sat?

A.   Yes.

Q.   Did you talk to Mr. Silva about men that you slept with?

A.   Yes.

Q.   Would you talk to Mr. Silva about going to gay bars?

A.   Yes.

Q.   What bars?

A.   Like the specific names?

Q.   Yes.

Page 147

Llames

A.    Rise, Industry, Vodka Soda, Bottoms Up, Free Bar, any number of bars in the city.

Q.    Ms. Llames, you said earlier that one of the comments that Mr. Silva made involved the word cunt.  Can you tell me what the comment was?

A.    I can't remember the phrase clearly.

Q.    It's a pretty memorable word.  What do you remember about the comment?

A.    I remember that he had called someone a cunt.

Q.    Who?

A.    Stella.

Q.    Who was present when that statement was made?

A.    I don't remember.

Q.    Do you remember the context in which he made the comment?

A.    I can't recall.

Q.    So you have a specific recollection that Mr. Silva used the word cunt in reference to Stella Safo, but you don't have any other recollection of the details?

A.    Correct.

Page 148

Llames

Q.    Did you report that to anyone?

A.    No.

Q.    Did you report him saying something about women being on their period to anyone?

A.    No.

Q.    Did you report him using the word bitch in the workplace to anyone?

A.    No.

Q.    You also testified that Mr. Silva made comments about your appearance?

A.    Yes.

Q.    Were there comments to you directly?

A.    Yes.

Q.    Can you tell me what they were?

A.    He would say oh, you look slutty today or do you have a date or you better be careful eating those snacks, you're going to get fat.  Comments like that.

Q.    You testified earlier that you spoke with Mr. Silva about your dating -- dating men, correct?

A.    Yes.

Q.    So was it in discussions about going out on dates that he would make comments about

Llames

your appearance?

A.    Sometimes if I recall kind of vaguely.

Q.    Was anyone else present when he would make these comments?

A.    Sometimes.

Q.    Who?

A.    Sometimes Mike.  Maybe sometimes David.  It kind of varied based on who was in the room at the time.

Q.    Did you ever tell Mr. Silva that you didn't want him to make those comments?

A.    I would say sometimes, "Bruno, stop. You can't say those things."

Q.    When you and Mr. Silva would have discussions about your dating life, the way you looked, your weight, were those conversations you were having with him as part of your friendship?

A.    Yes.

Q.    You testified that Mr. Silva also made comments about other individuals' appearance.  Who did he make those comments about?

Page 155

Llames - Attorneys Eyes Only

with your friends at work?

A.    Andrew.

Q.    Anyone else?

A.    That I can recall clearly.

Q.    Would you speak to Mr. Silva about your eating habits?

A.    Yes.

Q.    Then you go on and you say, "Sorry Hurricane Bruno came by" and he responds "Laugh out loud.  Totally get it" and you say, "I feel bad.  I feel like I always bitch about boys to you, haha."  Do you know what you are referencing there?

A.    I would talk to Andrew about dating sometimes.

Q.    About your relationships?

A.    Yes.

Q.    Would you talk to Mr. Randall about your boyfriends?

A.    About guys I dated, yes.

Q.    Would you talk to him about men you slept with?

A.    Yes.

Q.    Would you talk to him about other

Page 156

Llames - Attorneys Eyes Only

personal things like going out on the weekends, the type of men you were interested in?

A.    Yes.

Q.    If you go to the next page, you talk about a guy, "Have I told you about this guy in Flushing?  The one who slightly remembers the guy I live in Baltimore."  Do you see that?

A.    Yes.

Q.    This is a chat that is happening during work, correct?

A.    Correct.

Q.    And it starts at 11:29 a.m. and goes until 4:57 p.m., correct?

A.    Yes.

Q.    Was talking about your relationships and dating and men you slept with something you regularly did with colleagues?

A.    It's something I did with friends.

Q.    Mr. Randall was one of those individuals?

A.    Yes.

Q.    And was Mike Escosia one of those individuals?

A.    Yes.

Llames - Attorneys Eyes Only

Q.    Was Bruno Silva one of those individuals?

A.    Yes.

Q.    In this chain you say, "Well, first of all, I have a type... Elijah" and then you have "bmore".  What is bmore?

A.    Baltimore.

Q.    "6'2, half black, half Korean, plays a ton of soccer, even overseas in Korea for a bit.  Joe," and then in parentheses "flushing is 6'5 half black, half Taiwanese, plays a lot of bball, played in Taiwan for a few years.  I swiped right on Joe's profile honestly because he kinda reminded me of Elijah.  We've pretty much been talking since late October."  Do you see that?

A.    Yes.

Q.    Is this the type of conversation you would have with Mr. Randall or Mr. Escosia or Bruno Silva at work regarding your dating life?

A.    Yes.

Q.    If you turn, Ms. Llames, to, I guess, it's the fourth page of the chat.

A.    Is it 7383 at the bottom?

                    Llames

disrespected, that I was -- that I wanted to be
taken -- like -- to -- that I was upset with
how things were.

Q.    Did you bring those -- that
information to Mr. Weisman's attention?

A.    Yes.

Q.    Did you have a conversation with
him?

A.    Yes.

Q.    Was it one or multiple
conversations?

A.    Multiple.

Q.    When did Mr. Weisman join AIGH?

A.    I don't recall.

Q.    Did he become your supervisor at one
point?

A.    Yes.

Q.    Were you bringing these concerns to
Mr. Weisman to make a complaint?

A.    I was complaining to him.

Q.    Were you intending him to convey
these concerns to someone else, to raise them
to someone else?

A.    No.

Llames

you believe paid more than you were making at Mount Sinai and was comparable at the time?

A.    There was not a specific job posting that I recall that had the salary posted.

Q.    So there was no specific job you can identify that paid a higher salary range than you were making?  There was a posting on Glassdoor that you believe had a higher salary range?  I'm just trying to understand where this information is coming from.

A.    Yes.

Q.    Did you ever pursue that job, the posting?

A.    It wasn't a specific job posting.

Q.    Am I correct that when you left Mount Sinai and started to work for Montefiore, you made a higher salary?

A.    Yes.

Q.    I believe you testified $110,000?

A.    Yes.

Q.    So your claim for lost wages is limited from January 2017 until August 2018 for the five to $20,000 that was within the range of what you felt other project manager

Llames

A.   Yes.

Q.   It is a text message to you from Mr. Silva and it says, "I miss you" exclamation, exclamation, exclamation, exclamation.  Do you see that?

A.   Nineteen?

Q.   Yes.

A.   My understanding is that it was sent to me.

Q.   That's what I just said.

A.   Yes, yes, sorry.

Q.   That's okay.  So Mr. Silva sent you this message "I miss you" exclamation, exclamation on January 18, 2019, correct?

A.   Correct.

Q.   And you responded to him with three hearts?

A.   Yes.

Q.   And you said "I miss you too.  How are you;" is that correct?

A.   Yes.

Q.   And you and he then engage in a dialogue that continued for the rest of the report.  It looks like until the next day,

Page 223

Llames

1/19 -- 2019.  Do you see that?

A.    Yes.

Q.    Three months after this text message exchange in which you tell Mr. Silva you miss him and send him hearts, you filed a litigation accusing him of sexual harassment.  Why?

A.    While I do agree that Bruno and I were friends and I did miss him and I did care for him, I recognize that it was part of a larger issue with a lot of other things going on at the institute and it's his comments were still inappropriate as much as I cared for him and were also part of the problem and it's more than -- it's more than, you know what, as a whole like -- it's more than what our friendship was.

Q.    Did you think to pick up the phone and tell him about your -- this problem that you had with your communications with him while you were at Sinai?

A.    I -- when he would say certain things, I would say, "Bruno, stop.  You can't say that."

Q.    Ms. Llames, there is a difference

Page 226

Llames

experienced while you were at AIGH.

Is there anything that you have not, any incident or recollection you have that you have not already testified to?

MR. BOWEN:  I object to that question.  It's an improper question. Nonetheless, you can answer it if you have an answer.

A.     Not that I can recall.

Q.     Ms. Llames, we've been here for roughly six hours today and you haven't mentioned Dennis Charney's name once.  Do you have a claim against him?

A.     I did not interact with him.

Q.     Is there any harassing or discriminatory behavior that you witnessed Dennis Charney engage in?

A.     Not that I can recall.

Q.     If you just testified you didn't interact with him what would be -- what would there be a recollection of?

MR. BOWEN:  I object to the form, but if you understand the question, you can answer it.

Llames

A.    Could you please repeat the question?

Q.    I asked if you had a claim against Dennis Charney and you responded, "I did not interact with him," correct?

A.    Correct.

Q.    Do you have a claim against Dennis Charney?

MR. BOWEN:  I'm going to object to the extent you're trying to ask her for a legal view or legal opinion, but subject to that objection, you can answer.

A.    I didn't have any interactions with him, direct interactions with him.

Q.    It doesn't respond to my question. Have you asserted a claim against Dennis Charney in this litigation?

MR. BOWEN:  Object to your statement that it doesn't respond to your question. It does.  And then I'm objecting again to the extent that you're asking her for legal advice or her legal opinion.  She is not a lawyer obviously.

MS. GUERRASIO:  I'm not asking her

Page 229

Llames

instruction.

MR. BOWEN:  I'll repeat it word for you.  My objection is to the extent that you're trying to get legal views from a lay witness, it's improper.  So subject to that objection, she can answer the question.

BY MS. GUERRASIO:

Q.    Ms. Llames, what is your claim against Dennis Charney?

MR. BOWEN:  Again, same objection. You can answer.

A.    I didn't have any direct interactions with him.

Q.    That's not my question, Ms. Llames. What is your claim against Dennis Charney?

MR. BOWEN:  She's answered your question.  This is now the third time.

MS. GUERRASIO:  She hasn't, Mike.

MR. BOWEN:  She is entitled to answer the question as best as she understands it as a layperson.

MS. GUERRASIO:  She has to actually answer it.

Page 230

Llames

MR. BOWEN:  She is not a lawyer.

MS. GUERRASIO:  I'm not asking for a legal question.

MR. BOWEN:  Then maybe you need to refine your question because it sure sounds like a legal question.

When you say do you have a legal claim against somebody, that's a legal question.  A layperson may not even have a concept of what that means.

BY MS. GUERRASIO:

Q.    Ms. Llames, why are you suing Dennis Charney?  Do you understand what the word sue means?

A.    Yes.

Q.    Okay, why are you suing him?

MR. BOWEN:  Same objection, but you can answer subject to that objection.

A.    As part of the larger organization and part of the environment that he fostered at AIGH.

Q.    You just testified you didn't interact with him at all, correct?

A.    I did not have direct interactions

Page 231

Llames

with him.

Q.    What did Dennis Charney do to foster an environment at AIGH that you know of?

A.    He enabled the behaviors of the folks underneath him.

Q.    How did he enable them?

A.    In that bad behavior went unpunished in that he -- he fostered this environment that was -- was toxic.

Q.    Do you have any reason to believe that Dennis Charney knew of the behavior that was occurring?

A.    I had assumed so.

Q.    Other than an assumption, do you have any knowledge that he was informed or that anyone notified him of the behavior that you've complained about today?

A.    I don't have direct knowledge.

Q.    Do you have any knowledge?

A.    I'm not sure.

Q.    Ms. Llames, can you go to your interrogatory responses?

A.    Which document number is that?

Q.    Eleven.