# EXHIBIT 6

**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------- x

DR. STELLA SAFO, GERALDINE LLAMES,

AMANDA MISITI, and EMILIE BRUZELIUS,

                          Plaintiffs,

          -versus-

DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY,

BRUNO SILVA, and ICAHN SCHOOL OF MEDICINE

AT MOUNT SINAI,

                          Defendants.

Civil Action No. 1:19-cv-03779-VSB-JW

--------------------------------------------- x

                          April 17, 2024

                          9:43 a.m.


     VIDEOTAPED DEPOSITION of the Plaintiff,

AMANDA MISITI, taken by the Defendants,

pursuant to Notice, held at the offices of

Proskauer Rose LLP, Eleven Times Square, New

York, before Fran Insley, a Notary Public of

the States of New York and New Jersey.

Page 25

Misiti

think he gave me the option... before the investigation I recall Prabhjot suggesting I might report to different people.  However, after the investigation and prior to filing the lawsuit, so in that period after the investigation and before filing the lawsuit, I do not recall being asked by Prabhjot saying if I wanted to report to anyone, or anyone else, actually, during that period.  I don't recall that.

Q.    Ms. Misiti, have you ever spoken with Dennis Charney?

A.    After we filed the lawsuit Dennis Charney organized a meeting and came to the New York Academy of Medicine and addressed the staff of the institute and asked us all to go around in a circle and state our name.

Q.    When was that meeting?

A.    We filed the lawsuit in April 2019. It was sometime shortly thereafter.

Q.    Is that the only time that you ever had a conversation with Dennis Charney?

A.    Yes, I believe so.

Q.    What was the purpose of that

Page 26

Misiti

meeting?

A.    The purpose of that meeting, from Dennis Charney's perspective, or what he communicated, was to express -- actually, I'm not sure what his purpose was.  However, I felt that it was an intimidation tactic, to make everyone go around and make me say my name.

MR. BOWEN:  Can we just introduce Joe so the witness knows who he is?  He just walked in.

MS. GUERRASIO:  No problem.  Who has come in the last five to ten minutes is Marina Lowy, who is counsel at Mount Sinai, and Joe Baumgarten, who is a partner at Proskauer on behalf of the defendants.

MR. BOWEN:  Thank you.

Q.    Ms. Misiti, you testified that shortly after you filed the lawsuit, Dr. Charney invited you and others from AIGH into a meeting; is that correct?

A.    I don't know that he invited us, but he came for a meeting and we were all gathered from AIGH, yes.

Page 27

                        Misiti

Q.    Was the gathering for a different purpose or was the gathering specifically to meet with Dennis Charney?

A.    My recollection is that it was in connection with the lawsuit.

Q.    Where was this gathering?

A.    It was in the large conference room at the New York Academy of Medicine.

Q.    Can you tell me who else was present?

A.    I can't say specifically everyone who was there.

Q.    Who do you recall generally?

A.    Prabhjot was there.  I was there, of course.  I think Erica Levine was there.  And I don't recall the other specific individuals.

Q.    How big was the meeting?  How many people would you estimate were there?

A.    I wouldn't be able to estimate the number of people.

Q.    So you remember four individuals, yourself, Erica Levine, Dr. Singh and Dr. Charney?

A.    Yes, that's correct.

Page 28

Misiti

Q.    Were there others present?

A.    Yes.

Q.    Do you recall how you were invited to this meeting?

A.    No.

Q.    What did Dr. Charney say during the meeting?

A.    I don't recall his exact words except asking everyone to go around and say their name.

Q.    Did everyone go around the room and say their name?

A.    Yes.

Q.    And you provided your name; is that correct?

A.    That's correct.

Q.    Did you provide any other information during the meeting?

A.    No.

Q.    What did you understand the purpose of the meeting to be?

A.    I think Dennis was trying to show his support perhaps.

Q.    Support for what?

Page 29

Misiti

A.    Prabhjot, the institute, I'm not sure.

Q.    Other than asking you and others at the meeting to state your name, can you remember anything else Dr. Charney said at the meeting?

A.    Yes.  I do recall him saying to an assistant dean or an associate dean, a woman that joined him, that she was a woman who came to take his notes.

Q.    Who was that?

A.    I don't remember her exact name.

Q.    Anything else you can remember about this meeting?

A.    No.

Q.    Did anyone else speak other than Dr. Charney and the individuals who provided the names?

A.    I don't recall.

Q.    Ms. Misiti, you testified earlier that Dr. Charney called this meeting or that attended this meeting with Dr. Charney, excuse me, and you believed it was an intimidation tactic; is that correct?

Page 30

Misiti

A.    That's how I felt, that that was part of the meeting.

Q.    But the only thing you can recall about the meeting is the fact that you were asked to provide your name and that Dr. Charney, Prabhjot Singh, yourself, Erica Levine were present, as well as a dean that he asked to take notes?

A.    Yes, that's correct.

Q.    Why would a meeting in which you were only asked to provide your name would you feel that that was intimidating?

A.    As a plaintiff, suing my then boss and employer and the dean of the school of medicine, I felt that that was an intimidation tactic.

Q.    But there were people in this meeting other than the plaintiffs, correct?

A.    Yes, I was the only plaintiff.

Q.    And you have no recollection as to what the message at the meeting was?

A.    No.

Q.    So other than the fact that Dr. Charney did not fire Dr. Singh after the

Misiti

investigation and this meeting that you've described which you just testified about, any other basis upon which you would identify that Dr. Dennis Charney engaged in discriminatory or harassing behavior towards you?

A.    Not that I recall in this moment.

Q.    Are there any other instances in which you ever spoke with Dr. Charney?

A.    No, not directly.

Q.    Did you interact with him on a regular basis when you worked at AIGH?

A.    No.

Q.    Did you interact with him even infrequently when you worked at AIGH?

A.    No, not directly.

Q.    So you didn't have any direct contact with Dr. Charney other than this one meeting?

A.    No, not that I recall.

Q.    Just to confirm, no, you did not have contact with him, correct?

A.    Not direct contact.

Q.    That's accurate?

A.    Yes.

Page 40

Misiti

Q.   So you spent seven hours preparing for your deposition, roughly?

A.   I didn't add the hours, but --

Q.   Does that sound about accurate?

A.   Yes.

Q.   And you said you reviewed the complaint prior to today in anticipation of the deposition, correct?

A.   Yes, that's correct.

Q.   Did you review any other documents?

A.   Yes, I did.

Q.   Did you review any deposition transcripts?

A.   No, I did not.

Q.   Ms. Misiti, where are you currently employed?

A.   I'm currently employed by a company called Premier, Inc.

Q.   What is Premier, Inc.?

A.   Premier, Inc. is a large healthcare organization.

Q.   Where are they located?

A.   The headquarters is in Charlotte, North Carolina.

Page 41

Misiti

Q.   Do you work in New York City?

A.   I work remotely, yes, in New York.

Q.   Are you 100 percent remote?

A.   Technically, yes, although I have some work travel.

Q.   What role do you have at Premier, Inc.?

A.   My title is Director of Strategic Collaborations.

Q.   How long have you been in that role?

A.   I began at the end of September of last year.

Q.   Do you hold any other positions at Premier?

A.   No.

Q.   When you say September of last year, you mean 2023?

A.   Yes, that's correct.

Q.   Is this the only position you've held since you left Mount Sinai?

A.   Yes, that's correct.

Q.   When did you leave Mount Sinai?

A.   In September of 2023.

Q.   Did you resign or were you

Page 42

Misiti

terminated?

A.    I resigned.

Q.    Did you resign for this position at Premier, Inc.?

A.    Yes.

Q.    What is your current salary?

A.    I believe it is 150, 155.  I think it's 155 with a 15 percent bonus which is dependent on revenue.

Q.    Did you receive any type of signing bonus?

A.    Yes, I did receive a $10,000 signing bonus.

Q.    Did you receive any benefits in connection with your employment, healthcare, 401(K), pension?

A.    I have healthcare benefits, yes, and some retirement.

Q.    Other than the $10,000 signing bonus, any other stipend or payment you received in connection with starting employment at Premier?

A.    No, not that I recall.

Q.    So you have been at Premier for six

Page 52

Misiti

Q.    Did you know who Ann Olivarius was at the time she came to meet with Dr. Singh?

A.    Before the meeting I -- Prabhjot mentioned the meeting to me and I think I Googled her as a result.

Q.    But you didn't have any known affiliation... you didn't have any knowledge of who she was other than Googling her?

A.    No, Prabhjot mentioned her and then I Googled her.

Q.    And then since that time until, you're saying, you met with Honza and a paralegal from the firm, did you have any communications, correspondence with anyone from McAllister and Olivarius?

A.    Not that I recall.  I don't know how the communication occurred for when I first met Honza and the paralegal, I don't remember that specific communication, but.

Q.    Ms. Misiti, what was the first role you held at AIGH?

A.    It was a program manager and my title was something like Program and Policy Research Manager, something along those lines.

Page 59

Misiti

for purposes of this deposition.  Have you had a chance to review it?

A.     Yes, I have.

Q.     Can you tell me what this document is?

A.     This appears to be a text exchange that I had with Ngiste Abede in 2017.

Q.     And do you see in here where you say to Ms. Abede, "Did you get the sense Prabhjot was kind of an asshole?"

A.     Yes, I do read this.

Q.     And do you see she responds, "No opinion"?

A.     Yes, I do.

Q.     Do you also see that in this text exchange you say that you were irrationally offended by him interviewing you on a Saturday afternoon with no set time?

A.     Yes.

Q.     What was offensive to you about the fact that he asked you to interview on a Saturday with no set time?

A.     To me, it's highly unusual to have someone set up an interview and have no time

Page 60

Misiti

set for that, and in particular for that to be on a weekend.  So I couldn't really enjoy the day.  I was on high alert waiting to give an interview at any moment.

Q.    And you note here your level of offense was irrational to your former boss; is that correct?

A.    Yes.  I think I was questioning my own response to that, that I found that, you know, offensive, but I was also questioning myself as people are apt to do.

(Whereupon Misiti Exhibit 3 was marked for identification.)

A.    (Witness reviewing document).

Q.    Ms. Misiti, you have been handed a document that was marked as Misiti Exhibit 3 for purposes of this deposition.  Do you recognize this document?

A.    I did familiarize myself with it.

Q.    Can you tell me what it is?

A.    It appears to be a text exchange between myself and Ngiste Abede.

Q.    The date of this text exchange is March 22nd, 2017, correct?

Page 61

Misiti

A.    Yes.

Q.    And that is more than a month after you had your... at least had your last text exchange with Ms. Abede about interviewing with Dr. Singh, correct?

A.    I don't have the whole text exchange in front of me.

Q.    Your counsel has redacted large portions of it.

A.    Okay.

Q.    But do you see that date is March 22nd?

A.    Yes, I do.

Q.    At this point had you accepted the job at Mount Sinai?

A.    I'm not sure exactly what day I accepted the job at Mount Sinai.

Q.    Do you recall what your start date was?

A.    My start date was May 1st, 2017, I believe.

Q.    So in March of 2017 you write to Ms. Abede, "I think Mount Sinai might have terrible culture."  Do you see that?

Page 68

Misiti

Q.     So you weren't made an offer to start until April.  Does that sound right?

A.     Yes.  I may have had a verbal offer, I'm not sure, or something to suggest that a verbal offer was forthcoming, but yes.

Q.     And your starting salary was $92,000; is that correct?

A.     That's what the document says, yes.

Q.     Does that sound accurate?

A.     Yes, more or less.

Q.     It says here you reported to Kirstin Knaup.  Is that correct?

A.     No, that is not correct.  I believe once I received this I sent an e-mail to clarify.  It was clarified to me that it would be Prabhjot Singh.

Q.     So you never reported to Kirstin?

A.     No.

Q.     Ms. Misiti, can you tell me what your job duties were as Program Manager II?

A.     Can you specify what time frame you're referring to?

Q.     When you started at Mount Sinai.

A.     When I first started I was reporting

Misiti

directly to Prabhjot and helping him to manage the Robert Wood Johnson Foundation Grant.

Q. What was entailed in managing the grant?

A. When I started on May 1st there was an event by the end of the month for that grant and there was a task force that was some parts... I think many of the people are even identified, maybe all, I'm not sure. So it was kicking off the various aspects of that grant. Some of it had predated my employment start a little bit.

Q. So actually I'm looking to get more granular. What did you do on a day-to-day basis as the Program Manager II?

A. At the beginning of my employment?

Q. Yes.

A. In that first month a lot of those activities were focused on the event, organizing the content of that event, working with Prabhjot Singh and Ana Stapleton, who to some degree I was -- she was leaving at the time I was coming. And it was developing the content for that. I remember a lot of

Misiti

discussions with Prabhjot around the presentations and the goals of the event as well as, you know, how everything would sort of run for the event, and then after the event. The event was meant to inform, if I remember correctly, it has been some time, the development of the Task Force on Global Advantage Report.

Q.    So in your capacity as the program manager were you involved in scheduling aspects of the Robert Wood Johnson Foundation Grant, this task force that you testified about?

A.    What types of things?

Q.    Scheduling meetings, working with calendars, was that one of your responsibilities?

A.    I don't believe it was explicitly so, but I'm sure I did scheduling as part of that.

Q.    What about sitting in on meetings? Did you sit in on meetings related to this Robert Wood Johnson Foundation Grant and the task force?

A.    Yes, I joined meetings.

Misiti

Q.    Did you take notes during these meetings?

A.    Yes.

Q.    Did you make presentations regarding this Robert Wood Johnson Foundation Grant?

A.    Yes, I believe I made presentations or made presentations with others on the team.

Q.    What about, I think you said development of a report.  Were you involved in the development of a report?

A.    Yes, I was.

Q.    Did you find all of these tasks to be within your role as program manager?

A.    In what period?  Initially?

Q.    Yes.

A.    Yes, I think initially.  Very initially I considered that to be within my role.

Q.    At some point did that change, that you no longer considered these tasks to be within your role?

A.    I think the -- I was surprised. It's hard to remember exactly what I thought during that specific period.  Which period are

Page 80

Misiti

Q.    Was it a good trip?

A.    It was a difficult trip for me.

Q.    Why was it difficult?

A.    It was large spots of time just Prabhjot and I traveling together and then large spots of time with Raj Punjabi and some of the other Last Mile Health colleagues.

Q.    And what was the issue with there being large spots of time with you and Prabhjot together?

A.    I found it stressful at times to be just with Prabhjot, and it was sort of an extreme -- was an extreme environment.  We were in the capital and then we went out to a very remote area where we didn't have running water or electricity.

Q.    Other than the extreme environment, no running water, no electricity, is there anything else that made it stressful?

A.    It was sort of a boundary-less period where I was -- like I said, I was with -- you know, working from the time we woke up until late at night taking notes of his conversations with Raj Punjabi and others.  I

Misiti

felt that when I spoke up I was often -- you know, what I said was often criticized and at various times... I remember an incident, too, where we were -- you know, Prabhjot was sort of dictating to me and made a drawing of something related to the Task Force on Global Advantage Report and then he became very frustrated afterwards with me that I didn't have better notes or hadn't been able to capture it to his liking.

Q.    What did Prabhjot say to you that made you feel he criticized when you spoke up?

A.    I don't remember the details, but I remember feeling like he was being very critical.

Q.    You don't remember what he said to you?

A.    No, I don't.

Q.    What did he say to you that was critical of your notes?

A.    I don't remember verbatim, but I remember that he was frustrated with me that I hadn't better captured whatever his idea was.

Q.    Do you recall the language he used?

Page 85

Misiti

made weren't true?

A.    I don't know that all of them were untrue.

Q.    How do you know that any of them were?

A.    Sometimes there were specific examples.  Like this example of whether he had been to Liberia or not, where he directly contradicted himself, so one of them must be untrue.

Q.    When he was making these statements about whether he had been to Liberia or not, who was he making the statements to, you or others?

A.    Initially it was to me and throughout the trip to a number of people and then to the entire institute.

Q.    Ms. Misiti, you testified that you felt that when you spoke up during the Liberia trip, where you said you were criticized, and I may have asked you before, if I did, I apologize.  Do you have any specific examples of when you spoke up and you were criticized by Dr. Singh?

Misiti

A.    No, I don't remember the specific examples.  That was my pervasive feeling.

Q.    Even if you can't remember what the words Dr. Singh said, do you remember what the criticism was about or anything in general about instances where you would give feedback and were criticized or speak up and be given criticism?

A.    No, I don't remember the details.

Q.    Do you believe that when you spoke up and were criticized by Dr. Singh, that that was a result of your gender?

A.    Yes.

Q.    Why?

A.    Because we were with two men, Raj Punjabi and another gentleman from Last Mile Health, whose name I don't recall, and they were not addressed in a similar manner.

Q.    What was their role on the trip?

A.    Raj Punjabi was showing us this rural area and co-writing the book with Prabhjot, and the other person also worked for Last Mile Health.

Q.    So neither of them worked for AIGH?

                    Misiti

A.    Yes, that's correct.

Q.    And neither of them reported to Dr. Singh?

A.    Yes, that's correct.

Q.    So in a sense he would never be giving them feedback as an employee; is that correct?

            MR. BOWEN:  Object to the form of the question.  You can answer it.

A.    My feeling is something that since it was such a long period to be together, it was, of course, I was still his employee, but it wasn't a traditional work setting and we were together for much longer hours and, you know, it transcended a normal -- it was beyond the confines of a normal working relationship at that time.

Q.    Well, that was your perspective, but this was a work trip, correct?

A.    Yes.

Q.    So no one else on the trip was a Mount Sinai employee except you and Dr. Prabhjot?

A.    On this trip, yes, that's correct.

Page 88

Misiti

Q. You said that Dr. Singh also criticized the notes that you took during the trip?

A. Yes.

Q. Did you find that criticism to be connected to your gender?

A. No, I guess I can't say that that was necessarily related to my gender.

Q. Ms. Misiti, I want you to identify for me every way in which you believed you were treated negatively or poorly as a result of your gender by Dr. Singh.

A. So in the period after many staff left, so Sasha Walek left, David Berman left, my role significantly expanded and I was now responsible for managing the Panorama contract with branding, as well as helping to establish global sites in Nepal and in Queens, New York, and running the Commonwealth Grant. And so my role had significantly expanded and I asked for an increase in my pay, in my title, and that was not granted to me during that time period. So that's one example where I think that was specific to my gender, because I saw -- you

Misiti

know, while Prabhjot was telling me that it was not possible to get a promotion without having been there for a specific period of time, or without having first done the role for a year, Duncan Maru was put into that role, and there was a lot of false promotion promises as well at that time, so.  That's one example where I feel it was very gendered.  I also would say that the hostile work environment and the environment in which he was regularly criticizing women and characterizing me specifically as being stressed and emphasizing my emotional state to others around the office, I did not hear him do that with men, I only heard him do that about women, and that created a very gender-focused environment.  I didn't see men having to take on such expansive roles. Those are some of the first examples that come to my mind.

    Q.    Anything else?

    A.    There was an incident after the Marus joined, Duncan and Sheela Maru as well, where Prabhjot asked me to -- you know, I was managing this Panorama contract and he asked me

Misiti

to -- or I think, actually, maybe I mentioned it to him first, and said, you know, we would have to have certain days in which -- to have the consultants were going to be there and have meetings on certain days and we can do it two different options, and the Marus reached out and wanted to join by phone.  So Prabhjot and I had an exchange and he said that I should tell them that it was mandatory and that they had to come in at that time.  I don't know that he used that word but that was the gist.  And I said I really didn't feel comfortable in my role communicating something to people who were senior to me and faculty.  But he insisted that I do so.  And right after I sent that communication, Prabhjot came in after me and said that they could -- you know, they could join it the other day, basically what my suggestion had been.  And this spoke to a broader, you know, pattern of behavior that I had experienced with him.  I was frustrated and felt that he was undermining my relationship with them.  And I said to him, you know, you're making me look -- "Prabhjot, you're making me

Misiti

look like the bad guy."  At which point Prabhjot came in to my office and we had an exchange, and he basically then tried more to characterize himself -- so somewhere in that exchange Natalie Privett entered the room and she thought there had been another meeting that was starting, 'cause we had a meeting, and I said no, we were just finishing up another conversation.  She left, went to the bathroom. And Prabhjot accused me of admonishing him in front of someone on his staff.  I highlight this just to say this is an example in my mind of gaslighting me and undermining me and I never saw him do this behavior to men.  I would also say there was -- you know, in that period that I worked very closely with him, when I was in one-to-one meetings with him and others, they were very intense, and he would not let me leave those meetings oftentimes until I agreed with him about something, and, you know, there were times when I would be upset in those meetings and he would ask if I was upset and I would ask to resume the conversation at a later date, and he would not let me do so.  And I'm

Page 93

Misiti

A.    Those were the examples that come to my mind.  There was a broader pattern of being dismissive of myself and other women of either interrupting or not acknowledging comments that were made.  There were staring contests that were very intensive.  And at one point I even said are we engaged in a staring contest that he would use as an intimidation factor.  There was a time he approached me and just said, "Hand me your phone."  It was my personal phone, and I did.  So, you know, there was another time he took my phone and typed out an e-mail.  There were a lot of techniques that he used to exert coercive control over me and I was very afraid of him.  And I had nightmares and I did not see men experiencing that same level of intense behavior.

Q.    Anything else?

A.    I'm sure there's other examples, but that's what's front of mind, so to speak.

Q.    Ms. Misiti, I want to ask you about some of the items you just identified for me.  So you said that Dr. Singh would regularly criticize women and call them stressed?

Page 94

Misiti

A.    He called me specifically.

Q.    He called you stressed?

A.    Stressed to other people and suggested that I should act more like Craig Helfgott, who's a man, a former colleague, and not have emotional reactions.  And then he would also often inquire and elicit, you know, a question as to what my emotional feeling was.

Q.    Were you stressed?

A.    Yes, I was stressed.

Q.    Were you emotional?

A.    I wouldn't say I was overly emotional.

Q.    Is it a fair assessment that you were stressed at your job?

A.    It is a fair assessment, but the way in which he characterized that to other people, I felt was meant to undermine my competency.

Q.    Did your being stressed at work affect your competency in your job?

A.    No, I would not say that it did.

Q.    Do you know if he thought it did?

A.    I'm not sure what Prabhjot thought.

Q.    Has any other supervisors or bosses

Page 98

Misiti

A.    Characterizing me as being stressed.

Q.    What was the project that this was related to?

A.    I believe it was either the Task Force on Global Advantage or the Commonwealth Fund.

Q.    And how was he communicating to other individuals that you were stressed?  Was it verbal, written?

A.    I believe it was verbal.

(Whereupon Misiti Exhibit 5 was marked for identification.)

A.    (Witness reviewing document).

Q.    Ms. Misiti, you have been handed a document that has been marked as Misiti Exhibit 5 for purposes of the deposition.  Can you tell me what this document is?

A.    This appears to be a directors' e-mail from Prabhjot in 2018, January of 2018.

Q.    And are the recipients on this e-mail members of AIGH, employees that work within AIGH?

A.    Yes, it appears to be a combination of employees and students.

Page 99

Misiti

Q.    And do you see in here it says, "Dear Arnholds Institute -- Happy New Years! Just a quick note to say welcome back, and I'm looking forward to 2018 with all of you."  Do you see that?

A.    Yes, I do.

Q.    And do you see the last paragraph says, "Shout out: To Amanda Misiti, who, within the course of the last month, has driven the first phase Global Advantage Taskforce to a successful conclusion, and is now playing a lead role, along with Stella Safo, in building the next phase with new funding"?

A.    Yes, I see that.

Q.    And that was from Prabhjot Singh?

A.    Yes, that's correct.

Q.    Is there any mention in here of you having overcoming any emotions or questioning your competency based on your emotional state?

MR. BOWEN:  I object to the form of the question.  You're asking her how she interprets that document?

MS. GUERRASIO:  Yeah.

MR. BOWEN:  Okay, you can answer

Misiti

A.    There was a specific incident that comes to mind, I'm sure there were others, where we were engaged in a discussion about a potential promotion and then shortly thereafter Prabhjot reversed course.  You know, we had one conversation, and he was telling me all the reasons why I would be excellent as being a Director of Global Sites.  And then there was a subsequent conversation shortly thereafter where he told me all the reasons why I would not be good at that, and he correctly read that I was upset and said, "Are you upset"?  To which I believe I acknowledged that I was and asked to postpone the conversation.  And he said, "You need to fight for this position," and would not let me end the conversation when I felt that I needed to.

Q.    And do you believe that his response to you in that meeting, that you needed to fight for the position, was discriminatory?

A.    I believe that his dangling a promotion and then quickly reversing course not long afterwards was discriminatory.

Q.    Why?

Misiti

A.    I'm not familiar with him doing that to men but I am familiar with him doing that with other women.

Q.    Are you not familiar with him doing it to other men because you're unaware of whether he had promotion conversations with men or because you know he did not?

MR. BOWEN:  I object to the form of that question, but you can answer it.

A.    I can't unequivocally say what conversations he had with men, but I'm not aware of those conversations.

Q.    But you don't know one way or the other whether he did?

A.    I don't believe that he did.

Q.    Do you know that he did?

A.    I can't say unequivocally.

Q.    I'm not asking unequivocally.  I'm saying do you know if did Dr. Singh had conversations with male employees about promotion at AIGH?

A.    And then reversed course afterwards?

Q.    Do you know if he had conversations with men about promotions at AIGH?

Page 103

Misiti

A.   I would assume he had conversations.

Q.   I'm not asking assumptions.  I'm saying do you know?

A.   No examples come to my mind.

Q.   So you don't know?

A.   If he had conversations with men about being promoted?

Q.   Correct.

A.   I would assume that he did, but yes, I do not know.

Q.   So then obviously if you don't know he had those conversations you wouldn't know the content of those conversations either?

A.   No, I don't.

Q.   Ms. Misiti, you testified earlier that you had asked for an increase in pay and title from Dr. Singh, who said it was not possible to get a promotion unless you had been in the role for two years.

A.   A year or two years.

Q.   I'm just trying to understand your testimony so if you could tell me.

A.   I believe he said something along the lines of you had to have been there for a

Page 104

Misiti

certain amount of time and you actually had to have done that role for a year or so before you were put into that role.

Q. I understand your testimony to be that you questioned the accuracy of that statement given that someone named Duncan Maru was put into a role that you had been asking for?

A. Around that same time Prabhjot had offered or mentioned to me the role of Director of Global Sites. I believe that initially came from Prabhjot, not myself. And then Duncan was -- I believe he was hired for that role and then he was later promoted into a assistant or associate director position when Sunny Kishore left.

Q. So was the Director of Global Sites role offered to you or mentioned to you by Prabhjot?

A. It's hard to say whether -- he suggested that I would be a good fit for that, I believe. That's my recollection of the conversation. And then he quickly changed course.

Misiti

Q.    So the statement to you that you would be a good fit, did you understand that to be an offer for the role?

A.    First of all, I want to say I don't know that good fit is not verbatim, but yes, that was the general framing, and I considered that to be something that he was suggesting to me would be a path forward in my career.

Q.    Are you aware that Duncan Maru was a MD and had a Ph.D.?

A.    Yes.

Q.    Do you have a MD?

A.    No, I do not.

Q.    Do you have your Ph.D.?

A.    No, I do not.

Q.    Do you understand that he was recruited to Mount Sinai for a specific role?

A.    Yes, he was recruited to be an assistant professor.

Q.    And how do you know he was recruited to be an assistant professor?

A.    I remember his recruitment process.

Q.    Were you involved in it?

A.    I was there for his talk, his grand

Misiti

rounds talk.  I don't think that I interviewed him specifically but I remember that period.

Q.    Were you involved in negotiating the terms of the position he was offered?

A.    No, I was not.

Q.    Ms. Misiti, one of the other examples you provided to me of ways in which you felt Dr. Singh acted in a discriminatory manner towards you was that you had to take on an expanded role but men did not.  Is that accurate?

A.    If men took on an expanded role, so, for example, when James Faghmous left, Matt Le or Le, I'm not sure how to pronounce his last name, he, for example, was given a promotion. I took on an expanded role when Sasha Walek and David Berman left and that was never acknowledged with a title or pay increase.

Q.    What was Matt Le's role prior to getting a promotion?

A.    He was an engineer.

Q.    Do you know what his job title was?

A.    No, I do not.

Q.    Do you know what his job title was

Misiti

after he received the promotion that you believe he got?

A.    No, I do not.

Q.    Do you know what James Faghmous's title was?

A.    No, I don't know his specific title.

Q.    Do you know how Matt Le's job responsibilities expanded once he took on the new role after James Faghmous left?

A.    Well, he didn't take on James's role specifically.  But, no, I don't know how his roam expanded.

Q.    Who did Matt Le report to?

A.    I don't know.  That was such an ever-evolving period of reporting structures. I'm not sure if it was Prabhjot at that time or if it was Jeb Weisman or Emily.  I'm not sure.

Q.    Do you know if he received an increase in his compensation?

A.    I believe that he did.

Q.    Do you know or do you believe?

A.    I believe.

Q.    So you don't have knowledge?

A.    Can you clarify your question

Misiti

further?

Q.    Do you have actual knowledge that Matt Le received increased pay?

A.    I never saw his paystub, so I guess not, but it was my understanding that he received an increase.

Q.    Did you ask him?

A.    No, I did not.

Q.    What role did Sasha Walek have at the institute?

A.    Sasha Walek, I believe her title was something along the lines of Director of Communications.

Q.    Do you remember when she left?

A.    I think it was -- I remember when she first told me she was interviewing elsewhere, which I want to say was like December of 2018, perhaps, but I'm not positive about that.  So that would have been -- you know, she may have left a little after that or somewhere in that time frame.

Q.    Do you recall when David Berman left?

A.    Yes.  I believe David Berman left in

Page 109

Misiti

July of 2018.

Q.    What role did David Berman have at the institute?

A.    David Berman's title was Chief of Staff, but for all intents and purposes he was operating as Prabhjot's right hand.

Q.    David Berman, was his role filled after he left the institute?

A.    To my knowledge, no.

Q.    Was Sasha Walek's role as Director of Communications filled after she left?

A.    No, I took on some of her responsibilities.

Q.    But she wasn't replaced?

A.    No.

Q.    What happened to the responsibilities that Sasha had that you didn't take on?

A.    I think she managed social media, which I later took on but not in that same period.  I don't believe that was when I was still reporting to Prabhjot.  So probably her social media, that aspect of her role, I don't think was -- there was a period when no one was

Misiti

doing that.

Q.    When David Berman left the institute, what responsibilities of his did you take over?

A.    I took over Panorama, managing the contract.  When Sasha left I first started working with David Berman on it and then when David Berman left I took that over.  David Berman was also supposed to be working on Global Sites, and before he left I was working on it and then my role in Global Sites continued to expand.

Q.    What were your responsibilities with respect to Panorama?

A.    Panorama?  Managing the contract, working closely with the consultants.

Q.    What was Panorama?

A.    Panorama was a large contract.  I was not very involved in the first part of the contract, but my understanding is that part of that was paid for by the development office and part of it was paid for by the institute.  And they conducted a series of external interviews... external and internal interviews

Page 112

Misiti

it your testimony that they fell outside the scope of the program manager role?

A.    Yes, that is my testimony.

Q.    Are you familiar with the job description for the program manager?

A.    Fairly familiar.

(Whereupon Misiti Exhibit 6 was marked for identification.)

Q.    Ms. Misiti, you have been handed a document that has been marked as Misiti Exhibit 6 for purposes of the deposition.  Can you take a look at it and let me know when you're done?

A.    Sure.  (Witness reviewing document). Okay.

Q.    Ms. Misiti, do you see that within this job description it says the primary job duties for a Program Manager II role is to "Oversee and manage the activities of consultants"?

A.    Yes, I see that.

Q.    And was Panorama a consultant?

A.    Yes, Panorama was a consultant, as there were other consultants that I managed as well.

Misiti

Q.    And what were the other consultants?

A.    The other consultant was Stislow - John Stislow, perhaps - a design consultant that I managed for the development of the Task Force on Global Advantage Report and then, subsequently, the Commonwealth.

Q.    Ms. Misiti, did you see it as a negative development that you were asked to take on expanded responsibilities when individuals left the institute?

A.    No, I did not.  I saw it as an opportunity that I hoped would later be compensated and acknowledged with a title change.

Q.    When were those discussions with Dr. Singh about a title change?

A.    Well, at some point there was the initial discussion that I believe he initiated about the Director of Global Sites' role.  I'm not sure exactly when that occurred.  And then there was later on the discussion towards the end of the year, my performance appraisal time period in 2018.  So at that point David Berman was gone, Sasha was gone, the investigation had

Misiti

honor that given that we had just had these very intensive discussions that were emotionally difficult for me and did not lead to an expanded role or title change.

Q.    When you say these other discussions that were emotionally difficult for me, those were about your job title?

A.    I think it was about more than just the job title.  I think it was, you know, sort of the intensity of meeting so regularly and flip-flopping between offering me things and then telling me all the reasons why I wouldn't be good for something.

Q.    So you testified earlier that Dr. Singh approached you about the Director of Global Sites position and then ultimately hired Duncan Maru for that role; is that correct?

A.    Yes.  I don't remember the exact timeline of how much time passed between those two things, but he initially mentioned the Director of Global Sites role to me and then shortly thereafter told me all the reasons -- he said I'd be great for it and then shortly thereafter told me all of the reasons why I

Page 116

Misiti

would most likely not be a good fit for it and that I should fight for it.

Q.   What were the reasons he told you you wouldn't be a good fit?

A.   There was something about my process, I believe was the word that used.

Q.   Can you expand on that?

A.   Unfortunately, no.

Q.   Did you ask him what he meant by your process?

A.   I'm sure I probably did at the time, but I don't recall what he said.

Q.   When Dr. Singh told you to fight for the role that he and you were discussing, what did you understand him to be telling you?

A.   I don't fully remember.

Q.   Did you think that that comment was discriminatory?

A.   He often encouraged a sort of alpha-like behavior, but I think that at that point I was already -- since the week before he had encouraged and said he thought I'd be good and now he was contradicting it, I was starting to realize that it was unlikely that he was

Misiti

going to really give me the role.

Q.    That wasn't my question.  My question was did you find his encouragement to you to fight for the position to be gender discrimination?

MR. BOWEN:  Object to the form.  You can answer.

A.    I would say that it represented a general attitude that he shared about a gender perspective that you should be very aggressive and then when I was aggressive that was often not well-received.

Q.    Do you have any examples of when you were aggressive and it wasn't well-received?

A.    No, I can't think of specific examples at this time.  But I know that there were instances in which he encouraged me to give more feedback and pushback, and then when I did, that was actually ultimately not well-received.

Q.    You can't think of any time to identify?

A.    I can't think of a specific example at this time, no.

Misiti

Q.    Can you think of a general example?

A.    No.

(Whereupon Misiti Exhibit 7 was marked for identification.)

Q.    Ms. Misiti, you have been handed a document that's been marked as Misiti Exhibit 7 for purposes of the deposition.  Can you take a look at it and let me know when you're done reviewing it?

A.    Yes.  (Witness reviewing document).  Okay.

Q.    Ms. Misiti, you testified earlier an example of Dr. Singh's discriminatory treatment toward you was when he asked you to schedule a meeting with the Marus and then came in and changed the original request which undermined your relationship with them, is this e-mail regarding that meeting that you testified about?

MR. BOWEN:  Object to the form.  You can answer it.

A.    Yes, there was a verbal conversation between Prabhjot and I in the midst of this as well and then another one afterwards, but yes,

Page 144

Misiti

April 17, 2024.  We are back on the record and you may proceed.

CONTINUED EXAMINATION

BY MS. GUERRASIO:

Q.    Good afternoon, Ms. Misiti.  Before we had a break for lunch, you testified as to the ways in which Dr. Prabhjot Singh discriminated against you or acted in a manner that you found to be discriminatory.  One of the things you identified for me was him being dismissive of you.  Is that accurate?

A.    Yes, that's accurate.

Q.    Can you give me an example?

A.    I can't give a specific date and time or meeting, but a general phenomenon would be, I might say something in a meeting and some of the other women as well, instead of acknowledging it, he would just move on or would quickly sort of dismiss it instead of fully addressing it.

Q.    Could it be that Dr. Singh didn't agree with the point you were making?

MR. BOWEN:  I object to the form of that question.

Misiti

Q.    You can answer.

A.    Yes, of course, but it was more the manner in which it was done.

Q.    Can you describe the manner for me?

A.    Beyond saying that it was disrespectful, no, I can't.

Q.    How was it disrespectful?

A.    I think generally when someone speaks, if you're not acknowledging the statement or if you're quickly dismissive, that that is disrespectful.

Q.    So his failure to verbally acknowledge your statement, you felt, was disrespectful and discriminatory to you because of your gender?

A.    Yes.  And I observed a broader pattern of this happening with women at the institute.

Q.    Did you observe him treat other women in this way?

A.    Yes.

Q.    Who?

A.    Geraldine Llames and Stella Safo.

Q.    Who would be at the meetings in

Misiti

which Dr. Singh would be dismissive of comments you made?

A.    So, one example that's coming to me now was after the first Task Force on Global Advantage meeting, we'd this large event, and Ana Stapleton was still there at this time, I was there.  I think Sasha Walek was there, I'm not sure.  I think Geraldine was probably there, I'm not sure.  I know James Faghmous was there, and I believe David Heller.  And Prabhjot thanked the women for their work and then asked the men what they thought, and the feedback, and engaged them robustly in that discussion, to the point which James Faghmous commented on the fact that the women had done most of the work but weren't being asked their opinion.

Q.    So, Dr. Singh acknowledged that the women had done the work, thanked them for the work, but you found it inappropriate that then he asked for the opinion of the men that were sitting there?

A.    Yes, and not the opinion of the women.

Misiti

Q.    How did he isolate just the men as being the individuals he asked for their opinions of?

A.    I don't remember specifically now, but it was clear that that was his intention.

Q.    Did he ask individuals?  Did he say "James Faghmous, what's your opinion on what the women have presented?"

A.    I don't remember, no.

Q.    Any other examples of times in which you felt that Dr. Singh was dismissive of your opinion or other women?

A.    I recall a instance at a Task Force on Global Advantage meeting where Dr. Safo had the mic and Prabhjot asked me -- texted me, I believe, although I couldn't find this text afterwards, so I'm not sure if that's what he deleted on my phone or not, but he asked me to take the microphone away from her and have her stop speaking.

Q.    You just made a reference to Dr. Singh deleting something on your phone.  What are you referring to there?

A.    I don't know if he did, I'm just

Misiti

Q.    Did he take your phone out of your office?

A.    Yes.

Q.    How long did he have it for?

A.    I think it was just a few minutes.

Q.    And did he return it and tell you why he had your phone?

A.    No, I don't recall him offering an explanation.

Q.    You didn't ask for a reason why?

A.    I don't recall asking.

Q.    Ms. Misiti, you also testified that Dr. Singh would engage in staring contests. Can you tell me about that?

A.    Yes.  This was an occurrence I remember happening in particular after the investigation.  I don't know if it happened before.  But I do remember at some point after the investigation, so sometime post the spring of 2018, spring/summer of 2018, and before Prabhjot resigned in July I remember him engaging in intense staring -- intensely staring at me to the point where, as I've said, "Are we in a staring contest?"

Page 151

Misiti

Q.    And when you asked him that, what was his response?

A.    I don't remember.

Q.    Did he stop staring at you?

A.    At least briefly in that moment, I believe so.

Q.    Was this in a meeting?

A.    Yes, I believe this was in a meeting.  And there were other people in that meeting where I remember addressing it.

Q.    Did you address it verbally to him in front of other people?

A.    Yes, I believe I did at that time.

Q.    Who else was at that meeting?

A.    I'm not sure, but I think probably Roxanne Martin.

Q.    Who's Roxanne Martin?

A.    She's someone that I hired to work underneath me on the Commonwealth Grant.

Q.    She reported to you?

A.    Yes.

Q.    Ms. Misiti, do you believe that Dr. Singh staring at you or engaging in these staring contests was the result of your gender?

Misiti

A.    I believe that or I do not recall him doing this to men.

Q.    You were not in all of Dr. Singh's meetings, is that a fair statement to make?

A.    I was in many but certainly not all.

Q.    You would not be aware of the conduct or behavior Dr. Singh engaged in in meetings in which you didn't participate; is that a fair statement?

A.    I would have to only rely on what was told to me, so yes, that's correct.

Q.    So if Dr. Singh was dismissive of male opinions in meetings you were not in or engaged in staring contests with men in meetings you were not in, you don't have any knowledge of that?

A.    It's possible that it happened and that I'm not aware of that, yes.

Q.    Ms. Misiti, you testified earlier that you went on a trip to Liberia in August of 2017 with Dr. Singh, correct?

A.    Yes, that's my understanding of the timeline, the first trip.

Q.    And you testified that there were

Misiti

two individuals on this trip who were not Mount Sinai employees.  I believe one of their names was Raj?

A.    Yes, that's correct.

Q.    And where did Raj work?

A.    For Last Mile Health.

Q.    I believe you testified earlier that you found parts of the trip to be stressful, and that in two instances, one you identified taking notes of conversations and that when you spoke up Dr. Singh criticized you and he also criticized your notes of your conversations. Do you recall that testimony?

A.    Yes, I do.

Q.    I believe you also testified that he was not critical of Raj and the other male on the trip in the same way.  What was the other male's name?

A.    I don't remember the other male's name.

Q.    Did you ever witness Dr. Singh treat Raj or the other male in a negative way?

A.    On that trip?

Q.    On that trip or in any of your other

Misiti

interactions with Last Mile Health.

A.    On that first trip I don't remember that.  On the second trip I don't think that we interacted with Raj, but I do recall at a later date Prabhjot making a negative comment in my presence but not directly to Raj about him.

Q.    What was the negative comment?

A.    It was something along the lines of 'He's just a pretty face.'

Q.    What did you understand that to mean?

A.    I understood it to mean that he was being dismissive of his accomplishments.

Q.    So Dr. Singh was being critical of Raj's capabilities?

A.    Yes.

Q.    Do you recall any other critical feedback that Dr. Singh has given about male employees or male consultants or AIGH employees that you worked with?

A.    I recall him saying something about Heller needing to be baby-sat or something by Carol Horowitz.

Q.    Anything else?

Page 155

Misiti

A.    No, not at the moment.

Q.    Ms. Misiti, we have taken now quite some time to go through all of the examples you could provide of behavior that you felt was discriminatory by Dr. Singh.  Is there anything else that you have not identified?

A.    Yes.  I also would like to mention there was an incident shortly after I started. So I began work in May of 2017.  Around July of 2017 I had a one-to-one with Prabhjot, and he was positive.  And then we entered from his office into the room behind where my office was which was also a conference room.  And we had a meeting.  David Berman was there, others were there.  I don't remember exactly who else.  And he proceeded to be then very critical and to be -- to publicly shame me for not having produced a deliverable that he did not explicitly ask for.  And after this meeting David Berman described Prabhjot's behavior towards me as brutal.  There was also -- you, know, I think just speaking to the larger environment that I was operating in, it was a very bizarre environment and one that was

Misiti

hostile to women.  Prabhjot drew a diagram and then said, "I'm no Georgia O'Keefe," basically implying that it was a vagina.  This is an environment where, as I said before, you know, there was differential treatment.  For me to get PTO it was extremely difficult to have that approved, whereas Bruno Silva, for example, could go to Ireland or other places and be on PTO and come and go as they pleased.  This -- you know, in this environment, as I mentioned, my role expanded very significantly.  It included a -- an ever-growing range or tasks that I did not see the men carrying similar burdens and many of those men had higher pay and higher titles.

Q.   What men had higher pay and higher titles?

A.   James Faghmous had higher pay and higher title.  David Heller, Aaron Baum.

Q.   What was James's title?

A.   James was a faculty member, presumably an assistant professor.  I'm not sure if it was assistant or associate professor.

Page 157

Misiti

Q.    Do you know what credentials he had?

A.    He had a Ph.D.

MR. BOWEN:  Apologies.  I'm not sure he was done.

A.    He had a Ph.D.

MR. BOWEN:  I'm also not sure she finished the first question when you started asking about the men's names.

Q.    You identified James Faghmous, David Heller and Aaron Baum.  Was there anyone else you can add to that list?

A.    Can you read me the question again?

Q.    You said that there were men who had higher titles and paid more than you.

A.    Yes.  So yeah, we were talking about the higher titles, Aaron Baum, David Heller, James Faghmous.

Q.    So that was your list?

A.    Hmm-hmm.

Q.    So now, for James Faghmous, he had a Ph.D.?

A.    Yes, that's correct.

Q.    And he came to AIGH and was hired into a specific role, correct?

Page 158

Misiti

A.    Yes.

Q.    Do you know what role that was?

A.    I believe it was -- he was there before I joined, but something to do with ATLAS, running ATLAS.

Q.    Would you be qualified for that role?

A.    No, I would not be qualified for that role.

Q.    And what about David Heller?

A.    David Heller, he was also recruited before I joined and I'm not sure exactly what his role was within there, but something related to research.

Q.    What credentials did David Heller have?

A.    He has an MD and an MPH.  Oh, I did forget to add Bruno Silva to the list.  And there was someone else I just thought of too. Anyway, I'll keep going through these.  Of course, David Berman was also in a position senior to me as well.

Q.    Your testimony about all these men, is it that you believe you were qualified to

Page 159

Misiti

fulfill the roles that they had?

A.   No.  It's not to say that I was more qualified than most of those men.  It's to say that I had a much larger portfolio of work than many of them.

Q.   You had a different role than they did?

A.   Yes.

Q.   So you're comparing different roles to the role that you had?

A.   I am comparing different roles, but also I think that I had a much more expansive -- for less money and less title I had more immediate responsibilities.

Q.   And what is that opinion based on?

A.   My observations.

Q.   Do you know what all of David Heller's roles and responsibilities were?

A.   No, I do not have a comprehensive.

Q.   Do you even know what title he had?

A.   I believe it was Assistant Professor.

Q.   Do you know what duties he had?

A.   At that time, no.

Page 160

Misiti

Q.    At any time?  I mean you've identified him as someone you believe had a higher title, that was compensated more in a way that compared to you would signify unfair treatment.  Do you know what David Heller's responsibilities were?

A.    I don't believe he had -- if he did have grants, I don't recall that.  I don't recall him managing grants or writing reports or building global sites at that time.

Q.    Were those responsibilities within his role?

A.    The roles were very fluid under Prabhjot's leadership.

Q.    You don't know what role he had?

A.    I don't remember the exact specifics of what he was supposed to be doing at that time.

Q.    Aaron Baum, what role did Aaron Baum have?

A.    Aaron Baum was a health economist.

Q.    What were his responsibilities?

A.    It was unclear what those responsibilities were.

Page 161

Misiti

Q.   You don't know what they were?

A.   I think he had some funding.  He was working on something related to Fonkoze, but there didn't seem to be an immediate set of items that he had to deliver on.

Q.   Do you know that because he told you that?

A.   No, that was my impression.

Q.   Do you know what he made?  What his salary was?

A.   No, but given that he was faculty, I have a sense that it was higher than mine.

Q.   You were not hired for a faculty role, correct?

A.   That is correct.

Q.   You didn't apply for a faculty role?

A.   No, I wouldn't be eligible for a faculty role.

Q.   And what about Bruno Silva?

A.   However, I would add that those faculty they were not being -- they were not expected to deliver what faculty are normally expected to deliver under those circumstances.  And what was the question about Bruno?

Misiti

Q.    You identified Bruno Silva in the list of men that you provided to me.  What roles and responsibilities did Bruno Silva have?

A.    Bruno was running the design team, but he had -- to my knowledge, he was working on ATLAS but he did not seem to have as many pressing responsibilities as I had.

Q.    Did you work on ATLAS?

A.    No, I did not.

Q.    Other than the general qualification that Bruno was working on ATLAS, do you know what his job responsibilities were?

A.    It seemed to be making Prabhjot's documents look pretty.

Q.    Do you know what Bruno Silva's salary was?

A.    No, I do not, but I believe that it was higher than mine as his title was higher than mine.

Q.    With is that belief based on?

A.    My understanding of Mount Sinai's pay structures associated with their titles.

Q.    You don't know what Bruno Silva made

Misiti

one way or the other, though?

A.    No, but I feel strongly that it was more than what I made.

Q.    You didn't apply for Bruno Silva's job, correct?

A.    No, I did not.

Q.    Do you have a design background?

A.    No, I do not.

Q.    So you wouldn't be qualified for a design job?

A.    No, I would not.

Q.    You just testified that PTO was something you found to be an issue in terms of there being a discriminatory environment?

A.    Working remotely.

Q.    Working remotely, sorry.  Can you describe for me what you mean by that?

A.    There was -- for the men in the department it seemed they could work remotely with fairly great freedom when they wanted and come and go as they pleased, but I recall a specific incident, I don't know when it was, when there was inclement weather, and I asked Prabhjot to work remotely, and I don't remember

Misiti

the final conclusion.  He may have eventually

relented, but he gave me a very difficult time,

whereas in contrast Bruno was in other

countries working remotely.

Q.    Who is Bruno's supervisor?

A.    My understanding is that it was

Prabhjot.

Q.    Are you sure of that?

A.    I'm not positive but that's my

understanding.

Q.    And if his supervisor was someone

else who had a different remote work philosophy

than Dr. Singh, would that impact your belief

that working remote was an issue in the culture

at AIGH?

A.    Can you rephrase that?

Q.    Sure.  Is your belief that remote

work policies were part of the discriminatory

environment because you believed that Bruno

Silva reported to Prabhjot Singh and so did you

and the two of you had different accommodations

afforded with remote work?

A.    I believe that there was a

generally -- general different attitude in

Page 165

Misiti

which men were able to work remotely and have a lot more freedom than the women.

Q.     And that's based on your belief, knowledge, that Bruno Silva was allowed to work remotely?

A.     Yes.

Q.     Is it --

A.     And there were other men as well who seemed to have the freedom to work remotely.

Q.     Who?

A.     Well, Aaron Baum moved to another state at one point and was in Nashville.  David Berman was allowed to work remotely every Friday.  I recall Humale coming in fairly late in the day.  I don't know if that was approved or not.  And if women had similar allowances that were made, I don't recall that.

Q.     You don't know if there were women who had allowances made for themselves?

A.     I don't remember women having such freedom to come and go as they pleased.

Q.     Who did Humale Khan report to?

A.     Humale, I guess it would matter what time period.  I think he had different

Page 166

Misiti

managers.

Q.    Did he ever report to Prabhjot Singh?

A.    I'm not sure.  David Berman was a direct report to Prabhjot.

Q.    I don't think I've asked that question yet.  Thank you.  Who did Aaron Baum report to?

A.    I believe he reported to Prabhjot.

Q.    Do you know when he moved to Nashville?

A.    No, I do not recall.

Q.    Do you know the circumstances under which he was allowed to continue to work from Nashville?

A.    No.

Q.    And you mentioned David Berman.

A.    Uh-huh.

Q.    What was David Berman's title?

A.    Chief of Staff, I believe.

Q.    Was that a higher title than you came into this institute with?

A.    Yes.

Q.    That was a yes?

Page 167

Misiti

A.   Yes.

Q.   So your responsibilities were not similar to those of David Berman?

A.   I would say my responsibilities were fairly similar to David Berman although he was senior to me.

Q.   Did you apply for the Chief of Staff position?

A.   No, I did not.

Q.   You stated that David Berman made a comment to you that criticism Dr. Singh had given to you was brutal and that was in relation to a July 27 meeting?

A.   Yes.

Q.   Where were you when David Berman made that comment?

A.   I don't remember the exact location, but I remember that it was immediately following that meeting.

Q.   Can you picture you with David Berman in a certain location?

A.   No, I cannot.

Q.   Was it a verbal comment?

A.   Yes, it was.

Page 168

Misiti

Q.    Was anyone else present?

A.    I don't believe so.

Q.    Do you think that David Berman was making a comment to you about Dr. Singh acting in a discriminatory manner?

A.    I think that David Berman was acknowledging the fact that it was a unfair and harsh approach that Prabhjot had taken.

Q.    Unfair because he was being critical of your work?

A.    Unfair because of the tone and that he had not explicitly asked me to do this before.

Q.    How did David Berman know that Prabhjot hadn't asked you to prepare the document that he asked for?

A.    I don't know.

Q.    But that's your understanding?

A.    That's my interpretation.

Q.    You also testified that Dr. Singh drew a diagram that looked like a vagina.  When was that?

A.    And made the comment that he was no Georgia O'Keefe.  I don't remember that exact

Misiti

time period.

Q.    Did Dr. Singh say that the diagram looked like a vagina?

A.    No, it was implied by his statement that he was no Georgia O'Keefe.

Q.    So that was your interpretation of what that statement meant?

A.    Yes, that was my interpretation.

Q.    But no one in the room said that looks like a vagina or the diagram I made looks like a vagina?

A.    I believe others shared the same interpretation, but yes, I don't think anyone explicitly said that.

(Whereupon Misiti Exhibit 11 was marked for identification.)

Q.    Ms. Misiti, you have been handed a document that has been marked as Misiti Exhibit 11 for purposes of this deposition.  Do you recognize what this is?

A.    Yes, I believe this is the interrogatories but I'll need a few minutes to read it over.

Q.    You can read it over now or I can

Misiti

I tried to get it to end because I found it to be a very intense experience. And I remember at one point in this Prabhjot said that he had a minor in women's studies, and then he also began saying things about white women's role in the women's... I think it was the women's movement or something else, but it was -- this is the thing about a pattern of behavior that I've often experienced with Prabhjot and, as I said, this is the first time I observed it, where it's a hard set of behaviors to characterize, but Mary later told me that she reported in the investigation that it felt like an attack. And it felt like a very gendered form of attack and an abuse of that power dynamic that he had.

Q.    I'm going to try and unpack some of what you said. When you worked with Dr. Singh, did he use esoteric terms at times?

A.    Yes, very frequently.

Q.    And you found that to be discriminatory?

A.    I found that in the course of an argument or a heated debate he would employ

Misiti

obfuscating language to fluster the -- what I observe -- what I experienced myself and what I observed the woman that was part of that discussion.

Q.    Could there have been a man just as easy on the other end of the discussion?

A.    There could have been.  It's not what I observed but there could have been.

Q.    Could it have been Dr. Singh's style to speak with esoteric terms?

A.    Yes, it's certainly Dr. Singh's style to speak with esoteric terms.  However, this style of engaging was done in a very intimidating way.

Q.    You interpreted it to be intimidating?

A.    Yes, I interpreted it to be intimidating and I know that others experienced it that way as well.

Q.    Do you know of any men experienced it as intimidating?

A.    I don't recall any saying that to me.

Q.    Did you ask them?

Page 205

Misiti

A.    Probably.

Q.    Who did you ask?

A.    I don't recall.

Q.    So do you recall whether you did or did not ask them or you just can't recall who you asked?

A.    Can you repeat the question?

Q.    Did you ask any men if they found Dr. Singh's use of esoteric terms to be intimidating?

A.    I don't recall a specific instance of framing the question that way, no.

Q.    Did you ask any men whether they found Dr. Singh's communication style in general to be intimidating?

A.    I don't recall asking that question in that way.

Q.    Ms. Misiti, is it your intention that David Berman ever discriminated against you?

A.    Yes, I would say that David Berman discriminated against me.  When I first began he said that it would take me nine months at least, I believe, to get up to date in my

Page 206

Misiti

position.  He also encouraged me to not have opinions about the grant that I was working on. There was another instance before we were prepping for a Commonwealth meeting that he encouraged the women who were preparing for that meeting to not say more than a few words in the meeting.

Q.    And do you believe that he told you it would take you nine months to get up to speed in your position because you're a woman?

A.    I think that could likely have contributed to the comment.

Q.    Well, my question isn't it could have.  Do you believe he said that to you because you are a woman?  Framed differently, do you believe David Berman would have said that to any woman who had the job?

A.    My job?

Q.    Yes.

A.    Yes.

Q.    So no matter the qualification?

A.    Yes, probably.

Q.    What makes you say that?

A.    That was his general attitude.  I

Misiti

don't think that that comment was a statement on me.

Q.    Did he know you?

A.    He participated in some of my interviewing.

Q.    So he had some level of knowledge of your background, where you came from, who your prior employer was?

MR. BOWEN:  Object to the form.  You can answer.

A.    Yes.

Q.    So he had some basis to know what your skills were?

A.    Yes.

Q.    Anything else that you would identify for David Berman?

A.    Those are the comments that come to mind.

Q.    Did you ever tell Dr. Singh that David Berman told you not to have an opinion?

A.    No, I did not.

Q.    Why not?

A.    At the time I don't think it occurred to me to share that with Prabhjot.

Page 241

Misiti

Q.    And she responds "Oh God."  Then you say, "I feel like since I lifted the kimono over my head he wants to avoid me.  It's like he saw my dirty hoo ha and is afraid the truth is catching."  What are you referring to when you say "I lifted the kimono over my head"?

A.    I do not remember making this specific statement.  However, I suspect that this is in relation to a conversation that I had with Sunny Kishore where I shared with him what I was experiencing at the institute and I was visibly very upset, and I said to him, "Does this sound crazy to you?"  And he said, "It doesn't because other women have told me similar things."

Q.    And you are describing then the experience you shared with Sunny as your "dirty hoo ha"?

A.    I don't remember making that statement, but yes, it appears that that is the case.

Q.    And what is a dirty hoo ha?

A.    I think I was trying to be funny.

Q.    What is it?

Page 242

Misiti

A.   A dirty hoo ha?  Well, I suppose it's what's underneath the kimono.

Q.   Which is?

A.   Underwear.

Q.   You're describing to your friend that the conversation you had with Sunny about your experiences at Sinai were like your dirty underwear?

A.   I'm saying I lifted the kimono, which means I'm suggesting I shared with him -- I'm using a figure of speech that I shared with him how terrible what I was going through was.

Q.   And you were trying to be funny?

A.   I suppose I was trying to infuse humor in a very dark time in my life.

Q.   Further down here it says, "besides my crucial role in the resistance I am enthusiastically plotting global advantage 2.0."  What's your crucial role in the resistance?

A.   I'm not sure what I was referring to there.

Q.   And what's global advantage 2.0.

A.   That would probably be the

                          Misiti

Commonwealth Fund.

          (Whereupon Misiti Exhibit 16 was

     marked for identification.)

          MS. GUERRASIO:  Let's mark Exhibit

     16

     A.    (Witness reviewing document).

     Q.    Are you ready?

     A.    Yes.

     Q.    So, before we actually turn to this

document, Ms. Misiti, am I right that a hoo ha

is your vagina?

     A.    It's not a term that I recall using,

but yes, it could mean vagina.

     Q.    I'm just trying to understand what

you're describing the mistreatment you allege

you experienced at AIGH as your dirty vagina?

          MR. BOWEN:  I object to the form of

     the question.  That's not what the witness

     said, but you can answer it.

     A.    Can you rephrase that as a question?

     Q.    I'm trying to understand what you're

communicating to your friend in terms of... you

said you had a conversation with Sunny Kishore

in which you told him about the ways you felt

Misiti

you had been mistreated at AIGH, and in describing that conversation to your friend you describe it as your dirty hoo ha, which you said could be your dirty underwear or your dirty vagina.

MR. BOWEN:  I object to the form of the question.  You can answer it.

A.    Can you repeat that one more time.

MS. GUERRASIO:  Can you read it back.

(Whereupon the record was read back by the reporter.)

A.    I don't remember making those statements.  I believe what I was getting at was the expression "lifting the kimono," revealing a vulnerable part of myself to Sunny Kishore.  I think was even choked up in that conversation with him describing what I was experiencing at the institute.

Q.    I'm just trying to understand, in discussing what you are now saying was a vulnerable experience with Sunny Kishore, why you would use the phrase "dirty hoo ha" to describe it?

Page 245

Misiti

A.    Well, I don't remember saying that phrase, so.

Q.    But it's here, I mean.  Are you disputing it?

A.    No, I'm not disputing that it's here, but I'm offering my best explanation of what I was sharing with her that I had shared with Sunny during a period of great vulnerability.

Q.    If you turn to what I think is now marked as Misiti Exhibit 17, can you tell me what this is?

THE COURT REPORTER:  16.

Q.    I'm sorry, 16.

A.    This appears to be a text exchange between myself and Ariella Rojhani.

Q.    And the date of this is April 4th, 2018?

A.    Yes, that's what it appears to be.

Q.    You write to your friend Ariella, "I'm livid.  Sunny sent email which I can tell was written by Prabhjot.  I wish these fucking clowns would fire me."  Do you see that?

A.    Yes, I do.

Page 254

Misiti

A.   Yes, I guess I did say that. However, I think it was a coping mechanism for the time period in the environment I was in.

(Whereupon Misiti Exhibit 18 was marked for identification.)

A.   (Witness reviewing document).

Q.   Ms. Misiti, have you reviewed what has been marked as Misiti Exhibit 18 for purposes of the deposition?

A.   Yes, I have.

Q.   Can you tell me what this document is?

A.   This appears to be a document announcing the development of lunches supported by the institute in engaging those of us addressed in working with Panorama for providing feedback on Panorama.

Q.   Who is this e-mail directed to or addressed to?

A.   Myself, Erica Levine, Alyssa Smaldino, Mike Escosia and Emily Bruzelius.

Q.   Four women who worked at the institute and one man, correct?

A.   Yes, that's correct.

Page 255

Misiti

Q.    And this is from Prabhjot Singh?

A.    Yes.

Q.    And this e-mail starts out by saying, "You've all been identified by the senior management team as people at the institute who play a vital role in developing, managing and implementing key areas of programming at the Arnhold Institute."  Do you see that?

A.    Yes.

Q.    It goes on to say, "Each of you works with external stakeholders and play a vital role in speaking about our work."  Do you see that.

A.    Yes.

Q.    And this e-mail also talks about you being a rising leader and talented professional at the institute, correct?

A.    Yes, that's correct.

Q.    Would you consider this e-mail to be praise for your work performance at Icahn or AIGH?

A.    I don't know that I would characterize it as praise.

Page 256

Misiti

Q.   So someone describing you as having a vital role at the institute and a rising leader is not praise?

A.   Well, it was more or less to almost all of the midlevel staff.

Q.   How many individuals were at the institute when you worked there?

A.   I don't remember the specific period.

Q.   More than these five that are identified on this e-mail?

A.   Yes.

Q.   Did you attend a lunch with Dr. Singh as is stated in this e-mail?

A.   I don't remember that lunch.  I don't remember if it was with him or if it was him paying for lunch for the group.  Him paying for meaning supported by the institute.

Q.   Ms. Misiti, do you believe that Erica, Alyssa, Mike and Emily deserved recognition for their contributions at AIGH?

A.   Under what time period?

Q.   The time period this e-mail comes out.

Page 260

Misiti

workshop.  Is that how you read this document?

A.    Yes.  It looks like Natalie -- that the substantive part of it is the goal of the grant and how we can make this valuable, but yes.

Q.    So you assign the substantive part to Natalie, introductions, questions, updates to Prabhjot, and then some portion of the workshop to yourself?

A.    Yes, it appears that way.

Q.    Do you see that you received feedback from both Natalie and then Prabhjot on the talking points and the prep?

A.    Yes.

Q.    And do you see that Prabhjot in particular says, "Just to reiterate prep was amazing and I thank you both."  Do you see that?

A.    Yes.

Q.    Is that positive feedback you received from Dr. Singh?

A.    It appears to be positive feedback in writing.

Q.    Ms. Misiti, do you have any reason

Page 261

Misiti

to believe that the feedback you received from Dr. Singh in this e-mail was intended to gaslight you?

A.    I don't recall when he made this or the context around it.

Q.    Do you have any reason to believe this feedback was not genuine?

A.    I don't remember what the verbal conversations were that occurred around this.

Q.    Did you receive positive feedback from Prabhjot Singh over the course of your employment when you worked under him?

A.    Over the course of the roughly two years that I worked with him?

Q.    Yes.

A.    Yes, at times I did.  There was often a pattern of lots of negativity and then, you know, adding a little bit of positivity, and there was often a pattern of one thing said verbally and the opposite documented in writing.

Q.    Just to return to Exhibit 18 for a second, this invitation to the director's lunch for you and Erica and Alyssa and Mike and

Page 268

Misiti

A.    Yes, that's what I read here.

Q.    If you look at the second page of this exchange, you'll see that on June 6 of 2017 there is a message from Dr. Singh which says, "Amanda if it wasn't clear you're in process/strategic control on task force.  I'll make suggestions and you're 100% free to ignore them or put them in the parking lot.  I trust your approach!"  Do you see that?

A.    Yes, I do.

Q.    And your response is "okay, thank you -- I appreciate you clarifying and giving me the autonomy."  And then Dr. Singh wrote back, "I'll also be clear in front of Pranay as well, just so there isn't ambiguity that I look to you for next steps despite whatever dialogue ensues."  Do you see that?

A.    Yes, I do.

Q.    So does this refresh your recollection that Dr. Singh gave you autonomy on the task force... strategic control on the task force and that you were to drive that project?

MR. BOWEN:  I object to form.  You

Page 269

Misiti

can answer.

A.    Could you rephrase the question?

Q.    Earlier today you testified about some interactions that involved I believe you said his name was Pranay and he was your intern?

A.    Yes.

Q.    And this's who this is referring to, presumably?

A.    Yes.

Q.    And it seems here that Dr. Singh is confirming that you are 100 percent in control of the task force project and that he was going to communicate that to Pranay.  Is that what your understanding this communication to be?

A.    Yes.  But I interpret this as, as I testified earlier, that this is creating a written record that is different than what was communicated verbally.

Q.    Did you ever say that to Dr. Singh?

A.    No, I don't believe I did.

Q.    Did you say that here, that this is not what you said to me verbally?

A.    No, I would have been intimidated to

Page 279

Misiti

others to have calls with him in the evening.

Q.    So is that a you don't know or you do not believe he did?

A.    I do not know.  And last but not least, on October 1st, 2018 Prabhjot says, "Upon reflection - you are completely right. Thank you for your candor and feedback."  And I did not respond.  And as we know, we had a very heated exchange on October 1st, 2018.

Q.    What was the heated exchange?

A.    Wasn't that the day of the exchange with the Marus?

Q.    The e-mail exchange?

A.    Yes.

Q.    Do you have any context for this statement other than the date that this was related?

A.    This to me, my recollection is this is another example of Prabhjot creating a different written version of what happened versus what actually happened.

Q.    Well, it looks to me that if this in fact is related to the Maru exchange, that he is acknowledging your position.