# EXHIBIT 10

Case 1:19-cv-03779-VSB-JW   Document 212-10   Filed 06/18/26   Page 2 of 29

1/14/2026        Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.     Rachel Vreeman 30(b)(6)

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DR. STELLA SAFO, GERALDINE     )
LLAMES, AMANDA MISITI and      )
EMILIE BRUZELIUS,              )
                              )
              Plaintiffs,      ) Case No.
                              ) 1:19-cv-03779-VSB-JW
        vs.                   )
                              )
DR. PRABHJOT SINGH,           )
DR. DENNIS S. CHARNEY, BRUNO  )
SILVA and ICAHN SCHOOL OF      )
MEDICINE AT MOUNT SINAI,      )
                              )
              Defendants.      )
----------------------------)

VIDEOTAPED DEPOSITION OF RACHEL VREEMAN
ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI 30(b)(6)
New York, New York
Wednesday, January 14, 2026

Stenographically Reported by:
KRISTIN KOCH, RPR, RMR, CRR

1/14/2026          Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.     Rachel Vreeman 30(b)(6)

Page 25

trigger -- I can't remember that it like specifies precisely for these -- I don't think it says specific positions for which one is mandatory reporting.  It more describes what -- what the various entities to which reporting happens and the policies around the specific rules of conduct and particularly the lack of tolerance for discrimination and harassment.

Q.    So taking discrimination and harassment as an example, between 2014 and 2019, if an institute director at ISMMS became aware of concerns surrounding discrimination, would that person have a duty to report those concerns to anybody else within Mount Sinai?

MS. GUERRASIO:  Objection to form.

You can answer.

A.    For what's laid out in the policy handbook and Code of Conduct is that Mount Sinai broadly, health system and medical school, does not tolerate discrimination or harassment based on any characteristics of the individuals involved, and as such, it -- I can't remember the language that it says beyond that in terms of how the reporting is to take place, but it doesn't, to my recollection, distinguish in terms of what one's

Page 64

Q.    Would it be helpful to take it one by one.

A.    That would be fine with me.

Q.    Great.  All right.  Remote work, did the Icahn School of Medicine at Mount Sinai in the relevant time period have a policy on remote work?

A.    So there was not -- so I am going to answer again separately for staff and for faculty. There was not a formal policy in place for remote work during that initial time period, for most of that time period, for staff or for faculty.  At the very end of that time period there began to be more specifics put in place for the procedures for how remote work would be instituted in the absence of the formal policy.

Q.    You said that was towards the end of the relevant time period.  When was that?

A.    So in the first half of 2019.

Q.    So your testimony on behalf of Mount Sinai is that in the first half of 2019, it instituted procedures for remote work but not a formal policy?

A.    Correct, that -- that is my testimony.

Q.    What were those procedures?

A.    So up until that point and continuing

Page 65

through remote work for staff, and I should note for this for remote work particularly in the context of global health, this was particularly designated as working from home or outside of the office but not working -- not -- not working in the context of one of our global partners or global activities in that way, there are differences that way specific to global health, but particularly for working from home, it had been considered very much the exception to the rule, working from home, and but the procedures that started to get outlined in early 2019 were formalizing the practices whereby you needed permission from your supervisor to be able to work remotely, you needed to -- the person doing so needed to get that permission in advance of when they would be working from home, and that they needed to specify what it was that they would be doing during that time in terms of their job duties.

Q.    And that was an Icahn School of Medicine at Mount Sinai procedure for remote work that applied to faculty and staff alike?

MS. GUERRASIO:  Objection to form.

You can answer.

Page 66

A.    This was a procedure being outlined that would apply to the Arnhold Institute For Global Health specifically, as there was not a formal school or policy for how remote work would be applied for staff.  That procedure, again, was specific for staff, for faculty, it was not specified what the -- the remote work procedures would look like.

Q.    So it only applied to those working at AIGH, but not people working in other parts of Mount Sinai; is that right?

MS. GUERRASIO:  Objection to form.

You can answer.

A.    What was laid out was to -- was laid out by the administrator within the Arnhold Institute, so it would only apply to those staff members.  I don't know what was being laid out for other departments at that time.  There was not a formal school broader policy at that time period yet.

Q.    Did AIGH from time to time institute its own policies and practices?

A.    The AIGH would defer to any applicable policies that the school or health system had, but often it's the case where there is a lack of a

1/14/2026          Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.    Rachel Vreeman 30(b)(6)

Page 72

of those it would be the case that there are the applicable Mount Sinai policies and then each department has practices that operate within those policies and procedures but where they have to operationalize what -- what is going to happen. So they wouldn't necessarily look any different than any other department's procedures, but each department does have, you know, specific people doing that. They may or may not have -- for example, depending on the size of the department or institute, you know, they may -- they may have a designated HR person or finance person or, you know, person who is dealing with decision making around it, whereas in if it's smaller, you know, some of that might be handled more directly. So the practices themselves may -- may vary a bit for -- for the department, but again, the overall policies and procedures of Mount Sinai would apply. I can't remember -- you might need to -- did you ask if they whether published, like written, was that the -- or -- at every level? Because certainly there was not something written for every single like practice related to these, but we can -- we can go through specifics if you -- if you want.

Page 75

available or not and then what the parameters are around how that can be applied.  Each department has some ability then to -- within the parameters of what the school has set to indicate who -- or the level of bonus there, but it has to be within what the school has set as eligible.  So they get to make some decisions about it, in contrast, say, to promotions where it's determined by the appointment and promotion committee of the school, entirely out of the hands of the department chair, for example.  So there is some decision making that the department chair gets to do around that, but within the -- within the parameters of what's set by the school in terms of eligibility for bonuses, what amount of money is available, if the system is allowing any bonuses for anybody that year and so on.

Q.    Thank you for the clarification.

A.    Okay.

Q.    (g), anti-discrimination and anti-harassment policies, same question?

A.    Entirely the school health system's policies.

Q.    What about retaliation?

A.    Also entirely the school health

Page 76

system's policies.

Q.    And same question again, as long as you still understand that you are testifying about whether or not AIGH --

A.    Understood.

Q.    -- or the department --

A.    Yes.

Q.    -- had its own policies --

A.    Yeah.  For (g) and anti -- (g), which is anti-discrimination, anti-harassment, (h), retaliation policies, the institute and department did not have their own policies.

Q.    What about performance evaluations?

A.    So for performance evaluations, they -- they followed the policies and procedures of the school more broadly.  Each department -- and this was true also of AIGH -- has practices of their own by which they gather the information needed for those performance evaluations and, again, there are separate procedures laid out for -- this is -- the school has laid out separate procedures for staff and for faculty members, but within how those evaluations are completed that -- that comes down to the department, within that broader framework.  For example, what I mean by that is a

Case 1:19-cv-03779-VSB-JW    Document 212-10    Filed 06/18/26    Page 10 of 29

1/14/2026          Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.    Rachel Vreeman 30(b)(6)

Page 84

titles as opposed to institutional positions.  So there is a category for each position that is established by the institution, specifically by position control and compensation and a procedure which I am happy to talk about, but that the school has laid out and which AIGH followed and went through as well in terms of how formal positions, which are sometimes called titles or the -- the title, within the -- within the institution are determined.  Each institute, though, does have the ability to create and structure what we would colloquially again call functional titles, which are the internal titles that are used most often to describe more actively the -- the specific role or work that one does.  So AIGH did have their own ability to and did create their own titles internally, those functional titles, and they also followed and had the same procedure really as the rest of Mount Sinai related to the institutional titles or institutional positions that are determined by the central entities of position control and compensation.

Q.    Okay.  Thank you.  So let's just -- let's just talk about titles.

Page 85

A.     Okay.

Q.     Am I understanding your testimony correctly that each employee of AIGH had a title within the larger Mount Sinai system?

A.     Correct.  Each -- each AIGH employee had a Mount Sinai institutional title or position label that -- that's given by the system, yes.

Q.     And the award of that title, this ISMMS title, is governed by ISMMS policies and procedures; correct?

MS. GUERRASIO:  Objection to form.

You can answer.

A.     The -- the ISMMS Mount Sinai title is governed by Mount Sinai policies and procedures determined based on things like job duties, that person's expertise and credentials and so on, but that is determined centrally ultimately.

Q.     And did AIGH or the department have its own policy, procedure, practice about what ISMMS titles an employee would have?

A.     No, related to the -- the Mount Sinai institutional titles, AIGH did not have their own practices, procedures, policies, determining those.

Q.     All right.  And perhaps just for ease

Page 86

of distinguishing these different titles --

A.    Yeah.

Q.    -- you used the firm -- you used the term "functional title" for the more AIGH specific titles.

A.    Uh-huh.

Q.    Is there a term that you colloquially use to refer to the ISMMS titles?

A.    We would usually call it your institutional title or position or position category, something like that, so we could say like the institutional title, I guess.

Q.    Okay.  That works.

A.    Yeah.  So functional title and institutional title.

Q.    Great.  Thank you.

And AIGH or the department did not have a policy on institutional titles, that's essentially your testimony; correct?

MS. GUERRASIO:  Objection to form.

You can answer.

A.    AIGH followed the school health system policy and procedures for institutional titles.

Q.    All right.  Did AIGH have policy, procedures, practices or codes of conduct

Page 87

regarding the functional titles of its staff and faculty?

A.    Let me take staff first, because that is somewhat different.  For staff, AIGH did not have their own policies, procedures or codes of conduct for functional titles beyond those of the school that were applicable.  They have the ability to -- for their own practice, as each of the institution -- each of the institutes, I meant to say, as each of the institutes at Mount Sinai does, to create functional titles that would reflect the activities, programs, teams within the institute.

Q.    And what was the procedure for determining a functional title of a staff member?

A.    From what Dr. Singh reported to me, the -- the practice around determining the functional internal titles was based around the -- the teams that were developing within the institute, so largely -- because this was a new institute forming, he described that as people, both staff and faculty, joined the institute and, therefore, as teams and activities evolved along with those people coming together, that their functional titles were typically created often in

Page 88

dialogue with that individual as to what their functional title would be, yeah.

Q.   So this dialogue, who was the dialogue between, the individual in question on the one hand and on the other?

MS. GUERRASIO:  Objection to form.

You can answer.

A.   Okay.  The -- the practice, generally speaking, was that there was dialogue between the person who would have that title and their supervisor, which, you know, may -- may have been Dr. Singh directly or may have -- or may have gone through their supervisor to Dr. Singh, depending on if there was another layer of manager or supervisor in between them.

Q.   And whose decision was it ultimately as to what functional title to give to a AIGH employee?

A.   It was largely Dr. Singh's title -- Dr. Singh's decision in the end as to the functional title, though, again, he wouldn't have that ability over the institutional title.  He -- he also described in initial procedures related to setting up the institute often consulting with other department chairs like Dr. Murphy at the

Page 89

time, as well as with the dean or other leadership around potential titles or how other institutes were -- were doing this, but the decision seems largely to have been -- the decision seems to have been his ultimately.

Q.    And what procedure did he follow in making the decisions about what functional title staff would have?

MS. GUERRASIO:  Objection to form.

You can answer.

Q.    If any.

A.    Dr. Singh described practices around trying to match the evolving organizational chart for the institute with titles that would fit the specific individual in question.  So again, because at first there were no people and then the people were coming in, it -- he described an evolving process whereby they were figuring out what people's titles would be as they figured out what programs and teams were -- were growing.

Q.    What did that process constitute?

MS. GUERRASIO:  Objection to form.

A.    I mean, again, I -- it -- Dr. Singh described having discussions with the individuals that were being recruited or hired about what

Page 92

the discretion of Dr. Singh.

Q.    I appreciate that, but if you could answer the specific question that I asked.

Did the -- was the process different for faculty member or non-faculty members?

A.    Not really.  Again, for some of them their functional titles, as I said, would -- would be -- for faculty members would be the same as their -- as their institutional title in that there is more overlap, whereas the functional titles for staff tend to be a lot more different than the -- the institutional titles, but the internal processes for functional titles used within the institute would have -- seems to have been the same for staff and faculty.

MS. GUERRASIO:  Honza, whenever you are ready, if we could take a five-minute break.

MR. CERVENKA:  Yeah, just a few more minutes.

Q.    You mentioned the process by which Dr. Singh determined a functional title including -- included him considering the org chart of the institute; is that correct?

A.    He described considering the organizational structure.  I did not see, you

Page 93

know, any like visual drawn-out document reflecting that, in that sense an org chart, but he -- he said that it -- it was related to the organizational structure.

Q.   Anything else that Dr. Singh considered in the process of determining a person's functional title?

MS. GUERRASIO:  Objection.  Asked and answered.

You can answer again.

A.   He -- he described considering both individual factors related to their expertise and what they would specifically be working on in terms of their job duties, as well as in terms of the organizational structure thinking about emerging teams or groups of people so the -- you know, so that the functional title would potentially reflect, you know, domains of work as well as, you know, is there a team of people or is there just one person in this particular area, for example.

Q.   But whatever the process that Dr. Singh followed was not reduced to writing, that is your testimony; correct?

A.   That is correct.

Page 96

department or institute is not using a central description typically exclusively.

Q.    I understand.  Thank you.

Now, when it comes to functional titles, does a change in functional title mean a change in compensation?

A.    Not necessarily.  It would really depend on the -- on the change and it would -- changes in compensation need to be ultimately passed through other levels of approval along the lines of what I was just saying in terms of how the -- the salary bands are tied to the position titles, so it's -- it's possible that it could go along with it if the individual involved -- if -- essentially if position control and compensation agreed that there was in addition to the functional title a shift in the institutional title, that that matched that.  Sometimes there might be not a shift in the institutional title, but you could potentially get approval, again, by compensation for the duties that went along with that functional title change to be tied to something like a supplement or I guess it would just be a supplement typically, but again, that -- that has to go through compensation and they don't

Page 105

A.    Does that make sense?  Like to the dean of the medical school, because those are different -- the office of the president and the dean of the -- so they both would be going up through the system, but somewhat different --

Q.    I understand.  The dean of ISMMS versus president of Mount Sinai Health System, I believe is the entity, so different kind of higher-ups?

A.    Right.

Q.    But higher-ups nonetheless; correct?

A.    Yes.

Q.    Is it your testimony that any functional title within AIGH that was a chief of something had to go beyond just Dr. Singh to be approved?

A.    No, I don't think that they all needed to or -- it's not -- there is not -- in the sense of need to, there is not a set procedure for the functional titles, you know, in terms of how they are supposed to go, that -- some of them did go to higher discussion and it's my testimony and understanding that some of them did not, I think. For example, I never saw any documentation that the chief operating officer title went anywhere else.

Page 106

Q.    That the chief operating officer title --

A.    Yeah, the COO or --

Q.    Okay.

A.    I think there was a COO title.  I never saw that one going else -- or heard about in preparation for this that one going elsewhere. But again, there wasn't -- there wasn't a set policy or procedure spelled out as to what types of functional titles would go in what route.

Q.    How was it then that they took different -- different routes?

MS. GUERRASIO:  Objection to form.

You can answer.

A.    I mean, I -- the -- again, the institution -- the institution has policies related -- and procedures related to the institutional titles.  For these functional titles, a lot of discretion is given to the department chair or institute director related to titling that makes sense as well as, you know, the roles and responsibilities that go along with those.

Q.    Does Mount Sinai have a policy on needing to be informed of changes to functional

Page 107

titles?

A.   No, there is no policy on needing to be informed about changes to functional titles.

Q.   Does Mount Sinai have a policy that sets out the degree of discretion that an institute director can properly exercise in determining faculty -- functional titles?

A.   No.

MS. GUERRASIO:  Objection to form.

You can answer.

A.   No, Mount Sinai doesn't have a policy about the degree of discretion they can apply.

Q.   What mechanisms or what policies does Mount Sinai have in place to ensure that the discretion that the institute directors have in this matter of determining functional titles is not abused?

MS. GUERRASIO:  Objection to form.

You can answer.

A.   Mount Sinai does not have policies related to the functional titles.  They have the centralized procedures laid out related to institutional titles, positions, and the -- with that, the independent reviews by compensation and position control, which are -- among the reasons

Page 108

for those centralized procedures is the attempt to ensure that compensation and titles reflect people's expertise, duties, and that they are consistent across different parts of the institution.

Q.    Does Mount Sinai have a policy that would prevent an institute director from awarding senior functional titles to his or her friends?

A.    Mount Sinai's policies, as laid out in particular in the Faculty Handbook, would potentially influence a scenario along those lines in that there are policies whereby individuals are not supposed to have supervisory relationships in particular with those with whom they have intimate relationships, that would potentially -- one -- you know, there could be applications along those lines.  There is also, of course, as we talked about, the policies related to anti-discrimination, which could be applicable. Again, it's not specific to, you know, an institute director or department chair.  It's -- it's -- those are applied to all employees.

Q.    So it's your testimony on behalf of Mount Sinai that the policies within the Faculty Handbook, as amended from time to time, were

Page 110

limit the exercise of that discretion?

A.    I mean, again, there is -- there is nothing specifically about functional titles, so this is applying other policies with that, but I guess there would potentially be -- the other scenario I could think of from the handbook is related to like if there is kind of a teacher student or evaluator, like a trainee relationship in that way as specified in terms of a range of things as to, you know, where complaints can go or how positioning works, but again, there is nothing about functional titles applied or mentioned with that.

Q.    Have Mount Sinai's and AIGH's policies been fully followed in the process of Dr. Safo's title change to chief medical officer?

A.    Yes, as far as I'm aware, they -- they were fully followed for Dr. Safo.

Q.    Where there is a compensation change that results from a change to a person's functional title, does Mount Sinai have a policy as to when that change needs to be effected?  Let me rephrase that.  If -- I guess let me just break it down even more.

In Dr. Safo's case when she -- when her

Page 111

title changed to chief medical officer, did that come with a salary change?

A.   My understanding is that there -- there -- there was the intention that that would come with a salary change, but effectuating that in terms of having like the actual money released or moved to her took some time, I believe.  So like I can't -- I think there was in that sense a gap between like the date that her title was likely announced versus when the -- the money came, but I believe it was intended that they would go together.

Q.   Intended by whom?

A.   By Dr. Singh.

Q.   Was the gap between the promotion and the money arriving in the account, as you said, was that gap in violation of Mount Sinai's policies?

A.   No, I mean, it -- my -- from my understanding, the gap, from what I saw in preparation, was related to the logistics of trying to get the -- the funds moved from one account to where they needed to be to some extent. As I recall, there was an email chain about that. I would have to refer to the specific emails as to

Page 112

what was happening on the finance side from the office of the president to the department of global health.  Or actually -- and maybe it was even to a different department, to the department of medicine or wherever the department needed -- wherever it needed to be transferred to in that way.  On the finance side I mean.

Q.    But whatever the policies, your testimony on behalf of Mount Sinai is that all of them were followed in this instance?

MS. GUERRASIO:  Objection to form.

You can answer.

A.    My testimony is that the policies and procedures were followed in the instance of Dr. Safo.

Q.    Did Dr. Safo complain that the delay was retaliatory?

MS. GUERRASIO:  Objection.  Can you tell me what topic that this is related to that you think your questioning pertains?

MR. CERVENKA:  1(d), 1(h), 1(l), 2 --

MS. GUERRASIO:  I'm sorry.  Say that --

1(d)?

MR. CERVENKA:  1(h).

MS. GUERRASIO:  (h), okay.

Page 220

Sinai hospitals that are listed, the ambulatory care entities, the physician practices, and across the range of individuals from the board of trustees, employees, faculty, staff, residents, students, volunteers and consultants.

Q.    Did it apply to Ms. Misiti?

A.    Yes.

Q.    Did it apply to Dr. Singh?

A.    Yes.

Q.    Did it apply to all people working in AIGH?

A.    Yes.

Q.    If you could turn to page ISMMS 325, you will see in the section that's headed Harassment/Workplace Violence there is a sentence that reads, quote:  "Degrading or humiliating jokes, slurs, intimidation or other harassing conduct is not acceptable," end of quote.  Do you see that?

A.    I do see that.

Q.    At the top of the following paragraph, quote:  "Mount Sinai does not tolerate workplace violence, which includes threatening, aggressive or abusive behavior."  Do you see?

A.    Yes.

Page 221

Q.    On the other side of the page in the section headed Equal Employment Opportunity and Diversity, at the end of that paragraph it reads: "Retaliation against individuals for raising claims of discrimination or harassment is prohibited."  Do you see that?

A.    Yes.

Q.    That was Mount Sinai's policy as of August 2017; correct?

A.    That has been the policy not only for that time period, but yes, it is also reiterated here in this 2017 document.  We have looked at it in other earlier documents as well that predate that, such as the 2006 Faculty Handbook -- not 2006 -- 2016 Faculty Handbook that had -- originally 2013, I believe, was the date we had on that as well.

Q.    Unlike the Faculty Handbook, though, this Code of Conduct applies to non-faculty as well; correct?

A.    That is --

MS. GUERRASIO:  Objection to form.

You can answer.

A.    This applies both to faculty and to staff, yes.  We did not review the Employee

Page 249

MS. GUERRASIO:  Objection to form, but you can answer.

THE WITNESS:  Okay.  Sorry.

Q.    Is it Mount Sinai's policy that a non-faculty member cannot be promoted within the first two years of their employment?

A.    No.

Q.    Is it Mount Sinai's policy that an employee could not be promoted until after they have performed the duties for a year?

MS. GUERRASIO:  Objection to form.

You can answer.

A.    The -- the policy related to promotion requires the non-faculty employee to be out of their probationary period.  The length of that probationary period could vary.  It most often starts at six months, but it can be longer and restarts with moves in position, so it's -- yeah, that's what's specified.

Q.    But it is not Mount Sinai's policy that, for example, Ms. Misiti could only become a director of global sites at AIGH after she demonstrated for a year that she could carry out those duties?

A.    The title you are using in that example

Page 250

would be a functional title, so it wouldn't apply to a change or promotion within the Mount Sinai institutional policies.  Mount Sinai's policies are related to the institutional title.

Q.   Mount Sinai does not have any policies about functional titles?

A.   Correct.

Q.   Functional titles are entirely at the discretion of in this case the institute's director?

MS. GUERRASIO:  Objection.

You have asked and answered this.  You can testify again.

A.   They -- they are not entirely at the discretion in that they are often included in things like negotiate an offer letter, which, as we described, all the terms of that would be -- have to be approved by the dean's office, and then depending on funding sources or some of the specific functional titles, there would be other departments or entities that -- that might need to approve that as well, so -- yeah, so it's not entirely within the discretion of the -- the director or chair.

Q.   But there are -- okay.