# EXHIBIT 12

Case 1:19-cv-03779-VSB-JW    Document 212-12    Filed 06/18/26    Page 2 of 11

11/26/2024          Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.          Kirsten Knaup
Confidential - Includes Attorneys' Eyes Only Portions

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

DR. STELLA SAFO,                    )
GERALDINE LLAMES,                   )
AMANDA MISITI and                   )
EMILIE BRUZELIUS,                   )   CASE NO.
                                    )   1:19-cv-03779-VSB-JW
                    Plaintiffs, )
          -against-                 )
DR. PRABHJOT SINGH,                 )
DR. DENNIS S. CHARNEY,              )
BRUNO SILVA and                     )
ICAHN SCHOOL OF MEDICINE AT   )
MOUNT SINAI,                        )
                    Defendants. )
_____)

*** CONFIDENTIAL ***
INCLUDES ATTORNEYS' EYES ONLY PORTIONS
VIDEO-RECORDED DEPOSITION OF
KIRSTEN KNAUP
Glenn, Agre, Bergman & Fuentes, LLP
1185 Avenue of the Americas
22nd Floor
New York, New York  10036


11/26/2024
9:37 a.m. (EDT)


REPORTED BY:  MONIQUE CABRERA

_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

11/26/2024          Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.          Kirsten Knaup
Confidential - Includes Attorneys' Eyes Only Portions

Page 12

Does that make sense?

A.    Yes.

Q.    Wonderful.

So, Ms. Knaup, was there a time that you worked at the Arnhold Institute for Global Health?

A.    Yes.

Q.    When did you work there?

A.    From June 2015 until November 2018.

Q.    And what was your role at the Arnhold Institute at the time?

A.    I was the administrative director and COO.

Q.    And how did you apply for the positions?

A.    A friend of mine referred me to Abdul El-Sayed.

Q.    And what's the name of the friend?

A.    Maryann Crowell (phonetic).

Q.    Is Maryann affiliated with Mount Sinai at all?

A.    No longer.

Page 30

Q.    For Icahn.

Is it true that at times staff at AIGH had an internal title, internal to AIGH, and then a Icahn School of Medicine title that were perhaps different at times?

MS. GUERRASIO:  Objection to form.

A.    Yes, sometimes.

BY MR. CERVENKA:

Q.    Do you know what your title within the Icahn School of Medicine was?

A.    Administrative director.

Q.    And your title within AIGH, I believe you testified was chief operating officer, right?

A.    Yes, that was outward facing.

Q.    And do you know why your Icahn School of Medicine title wasn't chief operating officer?

A.    At that time for my salary grade, that didn't exist as a COO yet.  And I also felt it was just natural progression the way, for example, things started out with girl Friday and

Page 31

it became secretary, then administrative assistant and now business analyst. So I felt from the past start-ups that I worked at, profit and non-profit, it made sense, you know, to have that title.

Q. Did you ask to have the title of chief operating officer?

A. No, that was...

Q. Did somebody offer it to you?

A. It was just legal that adds COO.

Q. Do you know who decided that that was going to be the label?

A. No.

Q. And you mentioned something about the title not being available in the salary range at Icahn School of Medicine. I misunderstood so I may be mischaracterizing, but can you explain that to me a bit more?

A. Again, position control has all the available job titles, and associated with that is the salary range. So to the best of my knowledge, Icahn didn't have it, but the Mount

Page 50

was about finance, purchase orders, accounts payable, allowable expenses under grants.  For example, you couldn't charge alcohol, so.

Q.    Any other policies that you recall being present on the Icahn School of Medicine website?

A.    Basically policies for every area that I was involved in were on there.  So there was -- I mentioned purchase orders.  I-9 verifications when there was a new hire.  I took training and Renee did too so that we were allowed to do I-9 certifications.  So that was specific training that we went to, and then once we passed, we were okayed to certify I-9.

Q.    You testified that you had experience setting up new centers within universities prior to joining the AIGH; is that right?

A.    Yes.

Q.    Where did you gain that experience?

A.    Oh, over like 20 years, I -- I guess starting in '92, I joined a division that had

Page 51

been created a year prior, so still -- things were still being figured out.  They had another faculty recruit, and I helped onboarding him because he had wet labs so there were a lot of purchase orders that had to be done.

Then I worked for profit start-ups. One was based around cardiology.  The other one was about Alzheimer medication, and that one was really interesting because I was employee number 2.  We had no space yet.  So I worked from home the first month, but I organized -- I secured the space.  I set up the bank account.  You know, got the accounts payable.  Back then, we were a small outfit so we did payroll through ADP.

From there, I worked at Columbia at Inquire which also had just been -- not founded but they had a major clinical trial called REMATCH.  And so I was involved in supporting the efforts to keep it running.

And then I went to the National Center for Disaster Preparedness.  That was a center within Columbia.

Page 225

the amendment, she would have gotten retro pay, I think, for about -- retro pay of the increase of probably three months.  And I would have to guess exactly what that amount was or would have been. And then moving forward, she would have had the regular increase with each pay cycle.

Q.    Did you think it unreasonable of her to not have signed the paper that you prepared?

MS. GUERRASIO:  Objection to form.

A.    I was completely surprised because I really worked hard to get done in an expeditious manner, and she just said no and didn't elaborate.

BY MR. CERVENKA:

Q.    Did central Sinai HR get involved in this process?

A.    That actually is a different office because it was a faculty appointment so it went through a different office, and HR wasn't -- Sinai HR wasn't part of that process.

Q.    What is the name of the office?

A.    I don't recall.  I know -- I

Page 226

remember their location.  It was grouped together with Mount Sinai Hospital System because a lot of the contracts involved clinical personnel, for example, Dr. Safo.

Q.   So per your recollection, you expeditiously did everything that was necessary to effect this increase, correct?

A.   Yes.

Q.   Did there ever come a time that somebody from the Icahn School of Medicine expressed concerns how long it took to get the pay increase formalized?

A.   No.

Q.   We spoke previously about Dr. Faghmous who was the chief technology officer at AIGH; is that right?

A.   Yes.

Q.   Was there a time that he left Mount Sinai?

A.   Yes.

Q.   Was he eventually replaced by somebody else?

Page 232

recollection as to Matt Le and Bruno Silva

assuming additional responsibilities once

Dr. Faghmous left?

A.    Again, I wasn't privy to the

day-to-day functions so I wouldn't be able to say

how much they took on or -- so I do know that

Matt Le had another offer and we were trying to

retain him.

Q.    So would it be fair to say, though,

that the two of them received a salary increase

in recognition of the additional responsibilities

that they took on once Dr. Faghmous left?

MS. GUERRASIO:  Objection to form.

A.    Again, I can't speak to what Matt Le

did day in and day out.  In terms of Bruno, by

then, he had transitioned out of the health

system design group under Stella and had

developed his own team.  I think at that point,

he had three direct reports.  So that's what I'm

aware of in terms of his expansion of scope of

work, but I don't know any details in terms of if

he took over responsibilities that previously

Page 238

responsibilities after he left?

A.    No.

Q.    Did you assume any of Dr. Faghmous' responsibilities after he left?

A.    No.

Q.    I want to talk to you about working from home at AIGH.  Is it true that each supervisor set their own expectations of how work from home requests were going to be handled?

MS. GUERRASIO:  Objection to form.

A.    That was the common practice.

BY MR. CERVENKA:

Q.    What was common practice?

A.    That the supervisors would basically determine whether work from home was acceptable or not.

Q.    Were there some supervisors who found work from home acceptable and others didn't?

A.    I don't know if there was a pattern because I wasn't sitting with any of the individual groups so I wouldn't have noticed if