# EXHIBIT 13

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 1:19-cv-03779-VSB-JW
- - - - - - - - - - - - - - - - - - - x
DR. STELLA SAFO, et al.,

                    Plaintiff,

        - against -

DR. PRABHJOT SINGH, et al.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - x
                    August 13, 2024
                    9:38 a.m.

        VIDEO RECORDED DEPOSITION of MICHAEL
ESCOSIA, a Witness for the Plaintiffs herein,
taken by the Defendants, held at the offices of
Proskauer Rose LLP, 11 Times Square, New York,
New York, before Sara K. Killian, a Registered
Professional Reporter, Realtime Certified
Reporter and Notary Public.

Page 26

M. ESCOSIA

the process was, but I do know that I typically do.

Q.    What do you mean, you typically do?

A.    In all the jobs that I've taken, before the actual hiring, I would negotiate.  So I don't remember what the process I took for AIGH was, but I wouldn't doubt that I did try to negotiate.

Q.    That's based on your personal practice?

A.    Personal practice, yes.

Q.    Do you recall if you were ever told you could not negotiate the salary at AIGH?

A.    No, I don't remember being told that.

Q.    Do you recall discussing your salary with Dr. Safo?

A.    I don't recall, but I would if she were my supervisor.

Q.    Was she your only supervisor?

A.    If I could recall, she was mostly my supervisor and I don't quite

Page 27

M. ESCOSIA

remember towards the end when she had left who I reported to.  I believe it was Dr. Singh that I ended up reporting to.

Q.      Do you recall when she left?

A.      Probably sometime in Q1 of 2018.

Q.      Around February of 2018?

A.      Sometime in the middle.  Let's say the beginning of 2018.

Q.      Okay.

What was your role when you were hired?

A.      I was a project manager.

Q.      Was that within a specific team?

A.      Within the Health System Design team.

Q.      Is that referred to as HSD for short?

A.      That's right.

Q.      Did anyone report to you?

A.      No.

Q.      What were your duties and responsibilities as project manager?

Page 28

M. ESCOSIA

A.      I would take our projects --
most of them were very complex -- put them
into timelines, deliverables, organize any
documentations, organize our meetings.

Q.      To organize meetings, would you
consider that administrative?

A.      Yeah, I would.

Q.      Would you consider any other
aspects of your role at administrative?

A.      I would say so.

Q.      What other aspects would you
consider were administrative?

A.      Liaising with our finance
group, managing the logistics of the team,
including meetings.  Yeah, that was a few
examples.

Q.      Who else was on the Health
Systems Design Team?

A.      At the beginning, it was
Dr. Privett, who was the lead systems
engineer.  Dr. Safo was our main physician.
Bruno Silva was the head of design and then
eventually Shanice Guerrier was our junior
systems engineer.

Page 31

M. ESCOSIA

A.      No.  He was the director of Arnhold.

Q.      Other than Natalie, who you said you believed reported to Dr. Singh, did anyone else on the Health Systems Design Team report directly to Dr. Singh?

A.      I believe Bruno did.

Q.      What about Stella?

A.      Stella did.

Q.      She did?

A.      She did report to Dr. Singh.

Q.      Did HSD have team meetings?

A.      We did.

Q.      How often?

A.      Once a week and I would be in charge of putting our notes together as the project manager.

Q.      Were those post-meeting notes?

A.      Post-meeting notes, yes.

Q.      Did you also put together agendas?

A.      I did not.  Sorry.  Hold on.  I can't remember.  But if I were to be putting agendas together, it would be with Dr. Safo.

Page 35

M. ESCOSIA

Dr. Safo left.

Q.      Is that because you began reporting to Dr. Singh?

A.      I can't remember if I did.  But yes, if that were the case, yes.

Q.      When did you leave AIGH?

A.      April 2018.

Q.      What was the frequency of those one-on-one meetings?

A.      Oh, goodness.  I can't remember.  Let's say every other week.

Q.      Besides these one-on-one meetings and the HSD meetings with Dr. Singh, did you meet with him?

A.      I'm sorry.  Say that one more time.

Q.      Besides the one-on-one meetings that you had at the end of your tenure and the HSD meetings you said were in his office, did you meet with --

A.      Like additional meetings with him?

Q.      Yes.

A.      No.

Page 69

M. ESCOSIA

I would characterize.

Q.      Who is we?  You said we would throw around.

A.      I think certainly within the HSD team, but I think it was a widespread thing throughout the entire institute.

Q.      How would you describe it as toxic?

A.      Let's see.  Not being able to get the work done because of changing directives.  A lot of -- we're constantly second guessing ourselves because of the change in directors or second guessing ourselves because of what was said, what was not said, what was true, what was not true.

Q.      Is that all?

A.      Mm-hmm.

Q.      Did you experience not being able to get work done?

A.      I did.

Q.      This attempt to streamline the process is one of those examples?

A.      Just one example, but I think this was -- there were other situations.

Page 70

M. ESCOSIA

Q.    Can you recall situations in which Dr. Singh prevented you from getting work done?

A.    Yeah.  I mean, I can just recall from just in general.  It got to a point where every two weeks we would have to check in with each other to see if we were in the right direction or following the same timeline because directives would change so often.  We would be -- we would put in considerable work within HSD because of let's say X priority, but then in the next two weeks, X priority is no longer a priority, so the amount of work we'd done, the amount of hours we put in was no longer valid.  It happened many times.

Q.    Who were those check ins with?

A.    With Dr. Singh.

Q.    You and Dr. Singh?

A.    Yes.

Q.    So you're saying you would meet and then in two weeks' time, you'd have another meeting and the directives had since changed?

M. ESCOSIA

A.      I would say the every other week meetings were internal and we would get the directives every other month from Dr. Singh that would change.

Q.      Did you feel like you had wasted your time once those directives had changed?

A.      Of course.

Q.      Was that frustrating?

A.      Yes.

Q.      Was that frustrating for anyone else?

A.      I'm not sure how everyone else felt, but I felt it was frustrating and I feel like we shared the same frustration.

Q.      You also indicated it was toxic in the sense that people were second guessing because of the change in directions.

Did you experience second guessing yourself?

A.      I did.

Q.      Do you have any other examples besides the change in directives situation?

M. ESCOSIA

Q.    Do you remember when this happened?

A.    No.

Q.    Early in your time at AIGH?

A.    Later in my time.

Q.    Do you remember whether she specifically referenced David Berman?

A.    No.  In this conversation, this scenario, I think it was implied that it was Dr. Singh that was the problem.

Q.    What makes you say it was implied it was Dr. Singh?

A.    One -- I can't give you examples, but when we -- when she and I would talk, we would have conversations about our projects within HSD and that's managed by Dr. Singh's oversight.

Q.    But HSD was also managed by Dr. Safo?

A.    That's right.  If you recall, there was the shifting directions that were given to us from Dr. Singh and so that's why we were unable to do the work within the Sinai system.

M. ESCOSIA

Q.      When you were listing out reasons of how you found the environment toxic, you mentioned you all would be unsure of things that you heard, whether they were true or untrue.

A.      Mm-hmm.

Q.      Who would be saying things that you weren't sure whether they were true or not?

A.      Dr. Singh.  So it got to a point where -- like I mentioned, it got to a point where we had to meticulously take notes, send it to Dr. Singh so we had record of what was said, so if things were to change, we could reference the records.

Q.      So you took notes and sent them to Dr. Singh?

A.      I did.  Mm-hmm.

Q.      Did anyone else?

A.      For my team?  No, just me.

Q.      What about from outside of HSD?

A.      I'm not quite sure.

Q.      Did you think he was gaslighting?

Page 80

M. ESCOSIA

A.      It started to sound like that, started to appear like that.  Yes.

Q.      Because of him saying things that you weren't sure were true or for another reason?

A.      For that reason where we would come -- we would leave meetings thinking one way for him to reverse track or deny or whatnot.

Q.      Did anyone else think that he was gaslighting them?

A.      I'm sure a lot of other people from other teams felt that way.  I don't know what their specific scenarios are, but it certainly was known.

Q.      You said the actions of senior management had an effect negatively impacting your reputation.

Was there anyone else in senior management that you attributed to this negative impact of your reputation?

MR. CERVENKA:  I think that actually misstates the testimony.

He didn't say it was his

Page 124

M. ESCOSIA

Q.      At the bottom of the previous page, Safo_3799, after you say you're right, it's not all that bad, you say:  But sometimes the non -- I believe that's supposed to be stimulation -- really puts a drain on you.

Are you referring to the non-stimulation for yourself?

A.      I don't know what that's referring to.

Q.      Were you busy at work?

A.      I was busy at work.

Q.      But you didn't have -- you said you didn't have the same portfolio she had?

A.      That's right.

Q.      Afterwards, in the next grouping from Ms. Llames, she says or asks:  How bad would it look if I leave so soon?

Do you know what she's referencing when she says leave in that instance?

A.      To resign so soon.  It sounded like she was very unhappy from the start. She says I'm not even three months in, so

M. ESCOSIA

attend these sites?

A.     My supervisor was Dr. Safo.

Q.     Looking down further to your response, 11:37, part of your messaging: This is getting too messy.  Let 'em burn.

Again, I want to ask you who are you referring to with let 'em burn.  I take that as them, short for them?

A.     That's right.

Q.     Who is the them?

A.     Probably AIGH in general.

Q.     Then Ms. Llames replies:  Ugh, Berbitch and Sunny.  Dream team.

Who is Berbitch?

A.     Mr. Berman.

Q.     How do you know that to be a reference to Mr. Berman?

A.     Ber.

Q.     That's a play on his name, Berman, and the word "bitch"?

A.     That's right.

Q.     Who came up with that nickname?

A.     I don't know.  I don't remember.  I don't remember.

M. ESCOSIA

Q.      But you used it also, correct?

A.      I did.

Q.      Do you know if anyone else besides you and Ms. Llames referred to Mr. Berman as that?

A.      Just me and Ms. Llames.

Q.      Did your cursing with Ms. Llames concern you?

A.      No.

Q.      Why not?

A.      I think there's a difference between a playful cursing and a cursing that's intentional to hurt someone.

Our cursing, while is cursing admittedly, was contained between myself and Ms. Llames.  With other people cursing -- like I'll reference Mr. Silva again -- it was out in the open and was intentionally to hurt someone.

Q.      How do you know Mr. Silva's cursing was intended to hurt someone?

A.      You can just tell from the tone.  There's a playful tone and there's a tone in which it's more aggressive.

Page 243

M. ESCOSIA

A.      Not that I can recall.

Q.      Now, I want to focus to the last section of your statement.

Drawing your attention to the first paragraph of that last section, you can read to yourself, please --

MR. CERVENKA:  Why don't you read the whole last section?

BY MR. McLEOD:

Q.      Focusing on the first paragraph of that last section, you say here that Dr. Singh caused you to question your own abilities?

A.      Mm-hmm.

Q.      And you also say that he directly -- his causing of you to question your own abilities directly impacted your overall self-confidence?

A.      Yes.

Q.      And your self-esteem?

A.      Yes.  I also believe he did that for a lot of people.

Q.      Do you list anyone in here who he made feel that way?

Page 244

M. ESCOSIA

A.    Not in this statement, no.

Q.    Is there a reason why you didn't indicate anyone else here?

A.    It was just my closing paragraph, so I probably didn't give it a thought.

Q.    You didn't like how he treated you, correct?

MR. CERVENKA:  Objection. Form.

You can answer.

A.    Like I mentioned before, Dr. Singh and I never -- we didn't have a bad relationship.  I didn't like his style. I don't think he was able to manage properly and that's what ultimately affected me.

So -- yeah.  Let's go with that.  I'll also add to that his constant shifting of priorities and constant, I guess, retelling a story or saying one thing and not the other, that really affected the way I performed my work.  I'm sure it was the same way with other people and I just really thought that his constant -- either

Page 245

M. ESCOSIA

intentionally or not -- lying where we had to respond by taking notes and sending him our notes just to make sure we have everything on record, that was exhausting.

I think that's what contributed to my overall feeling towards the end at Arnhold and I'm sure this is shared amongst other people there.

Q.    Is this statement you provided investigators a complete accounting of facts that you knew regarding the investigation?

MR. CERVENKA:  Objection. Form.

You can answer if you understand the question.

MR. McLEOD:  I'll rephrase it.

BY MR. McLEOD:

Q.    Was this statement that you provided the investigators complete?

MR. CERVENKA:  Objection. Form.

A.    That's a difficult question to answer, mainly because it's all based off of memory.  I couldn't have thought to, again,