# EXHIBIT 14

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

DR. STELLA SAFO, GERALDINE    )
LLAMES, AMANDA MISITI and     )
EMILIE BRUZELIUS,             )
                 Plaintiffs, )  CASE NO.
        -against-            )  1:19-cv-03779-VSB-JW
DR. PRABHJOT SINGH, DR. DENNIS)
S. CHARNEY, BRUNO SILVA and   )
ICAHN SCHOOL OF MEDICINE AT   )
MOUNT SINAI,                  )
                 Defendants. )
_____)


          ***  CONFIDENTIAL  ***
     INCLUDES ATTORNEYS' EYES ONLY PORTIONS


        VIDEO-RECORDED DEPOSITION OF
                DAVID BERMAN
    Glenn, Agre, Bergman & Fuentes, LLP
        1185 Avenue of the Americas
                22nd Floor
        New York, New York  10036


              08/15/2024
             9:37 a.m. (EDT)


        REPORTED BY:  MONIQUE CABRERA


_____
          DIGITAL EVIDENCE GROUP
        1730 M Street, NW, Suite 812
          Washington, D.C. 20036
              (202) 232-0646

8/15/2024          Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.          David Berman
Confidential - Includes Attorneys' Eyes Only Portions

Page 50

He is both our bosses.

Q.    Did she express any views about Dr. Singh?

A.    Sure.

Q.    What did she say?

A.    I mean, it's hard to summarize in a single sentence, Michael.  I guess, like, surmise is, you know, really smart but in person had some management challenges, you know, overall like him.

Q.    Did you share that view?

A.    I do.

Q.    What were his management challenges?

A.    That's a big question.  I am trying to think of the best way to answer that.

I think in some respects, it helps to understand, like, how a academic medical center runs and the goals of an academic medical center.  I think his management challenges were, like, he struggled with what the operating model actually is and how do you align your resources to support that operating model, then ultimately

Page 51

grow that operating model.

And so it's like this idea of, like, how do you take ideas and turn them into action, that was a challenge for him.

Q.   Was it your sense that he didn't have a lot of experience in that type of management?

A.   That is my sense.

Q.   He was inexperienced in that regard?

A.   Correct.

Q.   When was the first time you met Dr. Singh?

A.   I can almost tell you precisely.  It was either the day of, the day before, or the day after my 40th birthday before I went to a Knicks game.  So I would have to go back and figure out when it was, but I was turning 40 and my family had come out from California, which is where I am from.  And before I went to the game, I met with him, and that was the first time we met.

Q.   Was the purpose of that meeting concerning you taking a position with the Arnhold

Page 58

her writings on peak pettiness?

A.   The writings after the lawsuit was filed, her views during our employment together.

Q.   So you've talked to her directly about peak pettiness?

A.   On one occasion, yes.

Q.   When you were both working together?

A.   Yes.

Q.   So Mr. -- in this call with Mr. Silva, he said something along the lines of that her views on peak pettiness are probably what's driving the lawsuit, something like that?

A.   Something to that effect.  I don't know if I would use the word "driving" but framing, informing.

Q.   Did you agree with that?

MR. GREENHAUS:  Objection.

A.   I don't know.

BY MR. BOWEN:

Q.   Well, do you agree with it today?

A.   I don't know.  I don't know if I agree with it or not.

Page 77

California.  That's so weird.  Like, all these years.

A.    Then NYU started to run out of funding a little bit, and so there was, like, some -- the viability of the center was starting to become questioned, so it felt like a good time to make a move.

BY MR. BOWEN:

Q.    So when you went back to CHF, did you immediately take a position as a chief-of-staff-type role?

A.    Yes.

Q.    Was that chief of staff to Dr. Redlener?

A.    Correct.

Q.    Was that the actual title used?

A.    No.  It was special assistant to the president.

Q.    If I remember correctly, you were in that role for about four years?

A.    Yeah, something like that.

Q.    Why did you leave?

Page 97

what?  Just personalities?

A.    Yeah, professional disagreements, work styles.  Go ahead.  Sorry.

Q.    But you were never disciplined in the sense that the employer sat you down and said if you do this again, we're going to have to let you go or something like that?

A.    No, I never had that.

Q.    And other than the investigation -- or other than the incident at Columbia that you mentioned, you are not aware if there was any kind of formal investigation that involved you in any way either as a witness or as a subject?

MR. GREENHAUS:  Objection.

BY MR. BOWEN:

Q.    And, again, leaving Mount Sinai out of it.

A.    I don't think so.

Q.    Now, I want to talk about Mount Sinai.  When Ms. Knaup mentioned to you -- you've already testified about this, and I don't want to go over it again, but you said earlier that

8/15/2024         Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.         David Berman
Confidential - Includes Attorneys' Eyes Only Portions

Page 98

Ms. Knaup mentioned to you Dr. Singh and that there might be an opportunity with this institute that he was now director of, correct?

A.    Yes.

Q.    How did it go from there?  Did you -- did you have further discussions with Ms. Knaup about what the idea was behind the institute or did you set up a meeting or did somebody help arrange a meeting with Dr. Singh or what?

A.    Both.  Yeah, I was curious.  She told me, you know, what she could.  You know, I did Googling.  Like, what's going on here, what's this place about.

She set up the meeting.

Q.    Did she tell you about her relationship with Dr. Singh, how she knew him and things like that?

A.    Not -- not in the way that you're -- I think in the way that you're asking.

I think I asked her how -- how did she get this job.  She had been at Mount Sinai

8/15/2024       Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.       David Berman
Confidential - Includes Attorneys' Eyes Only Portions

Page 99

for awhile and this position opened up and she

applied for it.

Q.    Did she say that she knew Dr. Singh

from some other context?

A.    I don't recall.

Q.    Did you ask her what her views of

Dr. Singh were?

A.    Sure.

Q.    What did she say?

A.    The same as I told you before.

Like, a smart guy.  Needs some help, you know.

Q.    Some management --

A.    Yeah.

Q.    -- issues?

A.    Yeah.

Q.    Was it Ms. Knaup who arranged the

meeting between you and Dr. Singh?

A.    Yes.

Q.    Did you meet with him in person?

A.    Yes.

Q.    Before you talked to him -- or the

first time you talked to him was in person?

Page 100

A.    Correct.

Q.    At Mount Sinai?

A.    Correct.

Q.    And was that a formal interview or was that just a let's talk informally first?

A.    I would characterize it as a formal interview.

Q.    Formal?

A.    Yes.  I wore a suit.  I was being told it was a job so whether -- I don't know whether anyone else considered it formal.  I considered it formal.

Q.    When you had this meeting with Dr. Singh, was it just you and him, or was anybody else in the meeting?

A.    It was just us.

Q.    At that time, did you -- did you have an understanding of what the open position was, what the title would be or anything like that?

A.    Yes.

Q.    And your understanding of the title

Page 101

was what?

A.    Chief of staff.

Q.    And did you talk with Ms. Knaup about what that meant, what was the expectation for chief of staff to Dr. Singh?

A.    Yes.

Q.    What did she say?

A.    Similar to what I described, sort of my function at Children's Health Fund.  Like, helping him prioritize, strategy, helping prepare things.  The single biggest issue was strategy and, like, that was sort of like, you know, helping him with the strategic plan.

Q.    Now, you -- you had been in touch with Ms. Knaup during the whole time that you were working as a special assistant to the president at CHF, right?

A.    No.

Q.    No?

A.    Because she left.  I don't remember when she left, but she wasn't there the whole time.

Page 133

Q.    At any time before there was a formal investigation at Mount Sinai that involved Dr. Singh, had you had any discussions with him or where you heard directly from him where he was criticizing the work that anybody was doing at the institute?

A.    I mean, I think that's pretty normal for a director to have feedback on people's work, including my own, so yeah.

Q.    Did he criticize your work?

A.    Sure.

Q.    Did he --

A.    I wouldn't -- criticism's not a word that I would use.  I think that, you know, providing feedback and, you know, expressing whether, like, you know, the work met the quality or the expectations or hit the mark.  Like, pretty normative conversations, yeah.

Q.    Well, I mean to ask about discussions where he expressed concerns that the work was not adequate.

Did he ever express that to you

Page 134

about your work?

MR. GREENHAUS:  Objection.

You can answer.

A.    I mean, no, not like -- not like that.  Like, he was generally pretty satisfied with my work.  Yeah, he certainly had moments where, yeah, you can do better than that, like, or, like, come on, is this your best work?  You know, like, yeah, like, normal boss stuff, you know.

BY MR. BOWEN:

Q.    Well, can you give me an example of that, where he said this is not -- you need to do better than this?

A.    Nothing specific comes to mind.

Q.    Did you ever hear him say that he had the view that anybody who was at the Arnhold Institute was not doing satisfactory work?

A.    Yes.

Q.    Who?  Who was he talking about?

A.    I can think of a couple people.  Probably most acutely James Faghmous,

Page 159

or we need to think about replacing her or something like that?

A.   I don't recall.  I don't recall ever having a conversation about replacing her. Standards, I don't recall.

Q.   So when you say that she might have been "a bit of an underperformer," you are basing that on what Mr. -- is it Sandeep?

A.   Sonny, yeah.  He goes by Sonny.

Q.   Sonny?

A.   Sonny.

Q.   What -- what Sonny had told you, not your own observations?

A.   My own observations as well.  Like, she only really did one project with me.  She didn't do a great job.  She missed the deadline. And she didn't really own that.  Like, that's just one -- that's just one data point in a person's career.  I don't want to judge on that alone.

Q.   What project was that?

A.   It was -- it was a grant application

Page 160

to a Robert Wood Johnson Foundation.

Q.   What do you mean she didn't really own it?

A.   When it was due, it wasn't done. And she was project managing it.

Q.   When you say "she didn't own it," do you mean she -- she didn't accept responsibility for missing the deadline?

A.   Correct.

Q.   Did you have a talk with her about that?

A.   I did.

Q.   How did that go?

A.   Poorly.  She didn't accept the feedback.

Q.   She did not?

A.   No.

Q.   Were you yelling at her?

A.   No.

Q.   Did you ever yell at her?

A.   How do you define yelling?

Q.   You tell me.

Page 162

A.    It's normal.

Q.    So you do raise your voice to have an effect?

A.    From time to time, sure.

Q.    In the workplace?

A.    Sure.

Q.    Have you always done that throughout your work history?

A.    I would say throughout my life history, yeah.

Q.    Have you had complaints in the past, not at Mount Sinai, but before Mount Sinai that you were either yelling or raising your voice to other co-workers?

A.    Not that I'm aware of.

Q.    So you -- you would describe some of the conversations you had with Ms. Llames as you raising your voice?

A.    No, I said conversation.  You asked about a conversation.  I said, yes, I raised my voice.  But no conversations plural.

Q.    So the one conversation you had with

Page 163

her where you had the impression that she was not accepting responsibility for missing the deadline, you raised your voice in that conversation; is that right?

A.    I believe I did, yes.

Q.    But you didn't yell?

A.    No.

Q.    And then you said it went badly because she -- she didn't accept the criticism; is that right?

A.    I wouldn't say the criticism.  As I told you earlier, like, criticism is -- in some respects is an opinion, but there's also a fact pattern.  And, like, the nice thing about, like, a deadline is a deadline is a bit of a fact pattern.  Like, are we making the deadline, or are we not making the deadline?

She did not make the deadline.  And she didn't really take responsibility.  She was, "I was focusing on other things.  I was doing other things."

Like, is this a real deadline?

Page 164

Yeah, it is a real deadline.

Like, "I am glad that you are focusing on other things.  But you also have to deliver this, too."

Q.    You said to her in that tone of voice?

A.    Yeah, probably the first time.

Q.    And then the second time in a louder volume?

A.    Yeah, perhaps.

Q.    Did you ever yell at Ms. Bischoff?

A.    I have never yelled at anybody in a workplace in my life.  I have raised my voice.

Q.    You raised your voice to Ms. Bischoff?

A.    Yes.

Q.    And to Ms. Caliendo?

A.    I don't think I ever raised my voice to Ms. Caliendo.

Q.    You never raised your voice to Ms. Caliendo?

A.    I would always allow for somebody to

Page 166

else did that, I would imagine security would be called. That never happened.

I had a -- a very difficult discussion with Mary Caliendo where she frankly spoke inappropriately and raised inappropriate issues in a workplace. I absolutely raised my voice to her and said, like, "Hey, this has to stop. You can't keep having this conversation."

But the characterization in the complaint is false.

Q. I am not asking about the complaint. You are saying there was an encounter between you and Ms. Caliendo outside of Dr. Singh's office, right? That much is true?

A. As -- as described in the complaint, there is a confrontation outside -- whatever you want to call it, outside of Dr. Singh's office. Yes, there was.

Q. Do you consider it a confrontation?

A. She was confrontational toward me, yes.

Q. Well, you said that she responded

Page 196

much.  And I was really focused not only on remembering the details of the assault but redirecting the conversation to business matters at hand.

BY MR. BOWEN:

Q.    But the concern you had was that she was saying that kind of stuff out loud where other people could hear it if they come into the room?

A.    That is not a singular concern. That is a concern.  There were other concerns which are she's not redirecting and focusing on the matter at hand.  She's allowing extracurricular activity to be an excuse.  She is raising her voice at me.  So, you know, it was one of them, among others.

Q.    And you're -- you're saying that the only thing you said to her in a raised voice was just "stop," the word "stop"?

A.    I must have said the word "stop" a dozen times.

Q.    In a raised voice a dozen times?

Page 249

Q.   And in no time in that discussion, did Dr. Singh say to you the Arnhold Institute's going to terminate you anyway?

A.   Not that I recall.

Q.   So did you tender your resignation that date?

A.   I guess, yeah, orally, sure.  I didn't like write, like, I resign today.  But my understanding -- and this is what came to be -- was the next week after the 4th of July break that, you know, it was time to go.

Q.   You didn't go back to work?

A.   I did.  I went back for a couple of days.  I went back for that week, whatever that week was after 4th of July.  My last official day was July 13th.

Q.   July 13th?

A.   Yeah, 2018.

Q.   Are those notes you made just for remembering dates today?

A.   Yes.

Q.   You made them before you came in to

8/15/2024          Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.          David Berman
Confidential - Includes Attorneys' Eyes Only Portions

Page 348

I guess this was the only time where he ever really, like, said, you know, you are not really doing a good job.  This was, like, very explicit.  He's --

Q.    He said that to you about you?

A.    Yeah, he's like, "You are not doing a good job.  Like, if, like -- like, you can't control those situations or, like, help make it better or get me involved, like, you know, this sucks, you know."

And so I went to talk to Renee about it.  I was, like, "Renee, did this just happen?"

She's, like, "Yes."

"Renee, didn't we just talk about this?"

And she's, like, "Yes."

"Then why did you do it?"

She's, like, "Well, the meeting was already on the calendar."

I was, like, "Well, then just tell Prabhjot or cancel it or include him or whatever but just don't go do it."

Page 349

And she's, like, "Well, Ramon was there."

I'm, like, "That's part of the problem too."  I'm, like, "This is not good."

And she was, like, really obstinate. "I don't agree with you."  And she's like, "You're wrong."

I am right.  Like, my boss just -- like, got -- like, told me, like, he is not happy.  Angela's not happy.  You are wrong.

And she just kept, like, digging in. And I raised my voice.  I was, like, "Come on, Renee, this is enough.  Like, I am not asking to, like, die on a sword here, but you got to admit that this isn't good."

And she didn't really, and I was just, like, whatever, this meeting -- like, we're not -- we are this not going solve something here today so let's just go separate.

Q.   So she didn't respond positively to what you were saying?

A.   She was very defensive.

Page 350

Q.   But did she cry or tear up or anything?

A.   No, no.

Q.   Was Aaron Baum in that meeting?

A.   No.

Q.   Was there some other occasion where Baum was present and you were having a heated conversation with Ms. Bischoff?

A.   Not that I can recall, no.

Q.   Do you -- did you ever have a heated exchange with Baum, Aaron Baum?

A.   Couple of conversations.  Aaron is a man by the way, not a woman.  But yeah, a couple times.

Q.   Did he cry on some of those encounters?

A.   No, no.

Q.   But you never yelled at him either, right?  You just -- you might have had raised voices?

A.   Yeah.

Q.   And his voice was raised talking to

Page 351

you?

    A.    Yeah.

    Q.    Did you have a discussion with Dr. Singh where he -- he issued you a, quote/unquote, second warning or a first warning because of the way you had interacted with Mr. Baum?

    A.    I don't recall that.

    Q.    What was this -- this whole -- you know this term "cake gate"?

    A.    Yes.

    Q.    What -- what was that from your point of view?

    A.    This was one of the few times like I really had a disagreement with -- with Stella. So just before that incident, she and I had a conversation that kind of stemmed from a couple things.

    One was this whole pettiness thing of hers which I just didn't think reflected well on her. Like, she's a leader, like, in the institute. I was, like, I don't think you want

Page 352

to do that.

Q.   You knew about that back when you were still employed at Mount Sinai?

A.   Yes.  And, like, I didn't really, like, talk to her.  I didn't use these words with her.  Like, I didn't want to be, like, so direct.  But I just wanted to talk to her a little bit about, like her leadership.

And she wanted to be more of a leader.  I mean, I think she had the most people reporting to her so she had, like, a big people responsibility.

Q.   She was the chief medical officer, right?

A.   Yeah, I don't know what her title was at the time.  But yeah, so that was, like, part of it.

And there had been a couple of complaints by staff about her.  Just like -- just like she wouldn't -- that she wasn't including people and that, like, she kind of formed, like, cliques.  And, like, she had so much potential.

Page 353

I didn't want her to get hung up on things like that, you know.

And so I had this conversation which basically I just told you about that.  It was like a super casual.  I think it like a walk and talk in the hallway kind of thing.

And she was like, "Yeah, I hear you.  Thanks -- thanks for the heads-up."

You know, then a couple of days later, she, like, sent this e-mail out inviting people -- or two people -- inviting two people -- to celebrate two people's birthdays.

And the e-mail didn't include, like, the institute full distribution.  There are two people that she was seen as being cliquey with.  So yeah, I basically told her, like, "Hey, come on.  Like, we just talked about this.  Like, make sure you have the whole distribution.  If you don't have it, you can get it from Kirsten who by the way is not even on the e-mail.  And, like, she is one of the people that feels excluded by you, you know."

Page 354

I was just like -- it was, like, there was no plan for it.  We had just talked in management meetings about, like, trying to celebrate people more.  But, like, we need budget for those things.  We need a plan for it.  It has to be organized, you know.  Like, this just looks sloppy and episodic.

And not that a cake is a big budgetary issue, but, you know, like, we're trying to figure out how to do this.  We're trying to build something, you know.

So yeah, that was what, like, underpinned it.  I was just basically just, like, "Come on, let's demand more of each other.  Let's do better here.  I am not saying don't do the cake.  I'm just saying let's be more purposeful. Like, be a manager, you know."

It was on, like, a Jewish holiday too at a Jewish hospital.  It's, like, there's people that aren't going to be there.  Like, just pick a day where it can happen when everyone can be there.

Page 355

And she was just, like, very defensive about it.  I was just, like, whatever, you know.  Like, I guess I was defensive about it too, you know.

Q.    At some point, Dr. Singh got involved in it, right?  Do you remember how that happened?

A.    Yeah.  One of us copied him in. Could have been me.  Could have been her.  I don't recall.  He was basically just, like, both of you, knock it off, you know, like.  And that was it.

Q.    Do you remember sending it to him after the investigation started in the summer of 2018?

MR. GREENHAUS:  Objection.  Sending what?

BY MR. BOWEN:

Q.    Sending him some portion of that exchange about -- these e-mails about cake?

A.    Yes, I think he'd asked to see it, and I forwarded it to him.  I'm sure he had it.

Page 372

take care of their -- but I would, like,

coordinate and say hey, like, we're all going to

roughly leave at this time.  We are all planning

to arrive here.

For, like, international trips or

like a big trip to DC or something, I would,

like, work on the agenda.  Like, hey, we are

going to meet here.  This is who we are -- like,

this is who we are meeting with.  Like, I was

responsible for, like, you know, coordinating,

making content, moving pieces around.

Q.    Were you responsible for making sure

equipment was -- personally carrying equipment

yourself that needed to be carried by the group?

A.    I guess I carried things, yeah,

sure.  Like, I would carry, like, you know, a

briefcase full of folders we're going to hand out

in a meeting, yeah, yeah, totally.

Q.    What about other types of equipment,

camera equipment, or I don't know, whatever kind

of medical equipment you guys would need?

A.    We didn't use medical equipment.

Page 373

We're not a clinical institute.  No, there was not really any equipment like --

Q.    Projectors or something?

A.    No, you use the --

Q.    Laptops?

A.    Everyone carries their own laptop.

Q.    Were you aware of anybody complaining that the -- the work of handling logistics on trips was not being fairly allocated to people who were travelling?

A.    Not until I read the complaint.

Q.    Do you recall saying to Amanda Misiti that the way Dr. Singh had talked to her during a meeting that had just ended was brutal, quote/unquote?

A.    I use the term "brutal" all the time.  Like, that pitch was too far outside, that was brutal.  Like, this weather is brutal.  I don't use it in a pejorative.  So could I have said to her that something was brutal, sure, but I wouldn't have meant it in like a pejorative way.  It might have been like, ugh, got assigned