# EXHIBIT 17

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

DR. STELLA SAFO,                        )
GERALDINE LLAMES,                       )
AMANDA MISITI and                       )
EMILIE BRUZELIUS,                       ) CASE NO.
                                        ) 1:19-cv-03779-VSB-JW
                    Plaintiffs,   )
          -against-                     )
DR. PRABHJOT SINGH,                     )
DR. DENNIS S. CHARNEY,                  )
BRUNO SILVA and                         )
ICAHN SCHOOL OF MEDICINE AT      )
MOUNT SINAI,                            )
                    Defendants.   )
_____)

*** CONFIDENTIAL TRANSCRIPT ***
INCLUDES ATTORNEYS' EYES ONLY PORTIONS
VIDEO-RECORDED DEPOSITION OF
JEB WEISMAN, Ph.D.
Glenn, Agre, Bergman & Fuentes, LLP
1185 Avenue of the Americas
22nd Floor
New York, New York  10036
06/21/2024
9:42 a.m. (EDT)


REPORTED BY:  MONIQUE CABRERA


_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 10

Q.    You weren't a party to that lawsuit?

A.    No.

Q.    What was the subject matter of that lawsuit, if you know?

A.    A software company and one of its customers were involved in a litigation.  And since my company had licensed the software, we were asked to -- I was asked to represent our experience working with the company.

Q.    Are you currently employed, Dr. Weisman?

A.    Yes, I am.

Q.    Who's your employer?

A.    Icahn School of Medicine at Mount Sinai.

Q.    And when did you begin to be employed by the Icahn School of Medicine at Mount Sinai?

A.    April of 2018.

Q.    What was your title at the time of hire?

A.    Director of ATLAS.

Page 47

ATLAS project?

A.   He and his colleagues were designing the front-end interfaces and I think had done some user experience testing, though that was before my time.

Q.   Was he working on other projects within the institute at well?

A.   I believe so, yes.

Q.   And you weren't his supervisor, correct?

A.   Bruno's?  No.

Q.   But you supervised the work that he was doing on the ATLAS project?

A.   He did work for my team.

Q.   Did you have weekly team meetings?

A.   Our team?  The ATLAS team?

Q.   For the ATLAS team.

A.   Yes.  As well as a lot of ad hoc because we were just in a big open room.  And my office was basically adjacent to it without a floor-to-ceiling partition, so it was -- and I had to walk through the room to do anything.

Page 48

Q.   Was the room called the design room?

A.   No.  That was across the hall.  That was Bruno Silva's room.

Q.   All right.  And so in the big open room that the ATLAS team sat in, who were the people who sat in that room?

A.   Humale Khan, Craig Helfgott, Kyle Landell, Mihir Mongia.  Emilie Bruzelius sat in there.  And in my area, Dr. Aaron Baum.

And the interns who I remember in the late summer or fall, they may have been there beforehand; but I just don't remember.  And Matt Le, during his short period there, Matt Le.

Q.   And you said that the design room was on the other side the hall?

A.   Correct.

Q.   How far was it from the ATLAS room?

A.   Catty-corner.  The doorway from ours to theirs probably was from here to that partition.

Q.   So 10 feet?

A.   10, 20 feet.

Page 83

about 2018.

Moving on to 2019, did any institute staff bring concerns to you about gender discrimination or a hostile work environment for women at the institute?

A.    In 2019, not that I recall.

Q.    And since then?

A.    No.

Q.    Did staff bring any concerns to you regarding Dr. Singh?

A.    Regarding Dr. Singh, no.

Q.    What about Mr. Berman?

A.    Yes.

Q.    Who brought you concerns about Mr. Berman?

A.    Geraldine Llames.

Q.    What did she say?

A.    She said that he had yelled at her and made another faculty member, Dr. Baum, cry.

Q.    Do you recall when she reported -- reported this to you?

A.    It was early in my time there.

Page 175

underutilized?

A.    It's a little hard -- I would say Craig Helfgott was not fully utilized.  He had an extraordinary pedigree in developing very complex data algorithms, really, to be honest, above my head kind of stuff.  And we really weren't taking great advantage of his -- that skill set.

We were using him within the limits of ATLAS, but here's a guy that was predicting stock market stuff for years and things like that.  So yeah, I felt he was underutilized.

Q.    Is there a reason why Geraldine Llames wasn't on the list of your supervisees we --

A.    Yeah.  She had left by then.

Q.    Okay.  So prior to her leaving, she was your supervisee, correct?

A.    Yes.

Q.    You never had the occasion of doing a performance review with her, though, did you?

A.    That's correct.

Q.    Because that's a fall cycle?

Page 182

descriptions from earlier in the ATLAS program,
and then I'd have to compare them to these to
know for sure.

Q.    And do you have an independent
memory of whether you were asked to send
Rachel Posner current job descriptions or
original job descriptions?

Do you have any memory?

A.    Yeah, it would have been the
current -- the job descriptions in force at that
time.

Q.    If you look at the -- on the cover
page, the attachments begin with initials, right?
CH, software engineering; EB, data analyst,
epidemiologist and so on and so forth.

Do you see that?

A.    Yes, I do.

Q.    CH, that would be Craig Helfgott,
right?

A.    Correct.

Q.    EB, Emilie Bruzelius?

A.    Correct.

Page 186

Q.    And then four or more years of experience in software engineering?

A.    I see that.

Q.    Do you agree that those are the minimum qualifications for the role of a software engineer at the ATLAS team in the fall of 2018?

A.    I think that's reasonable.

Q.    Did Mr. Helfgott have these minimal qualifications?

A.    Yes, and probably exceeded them significantly.

Q.    Turning over then to Kyle Landell. Again, again are you able to determine whether this is the original job description as you found it or the stage 1 of it?

A.    I am not, without further study.

Q.    And for Mr. Landell's position, the minimum education requirement is a bachelor degree in computer science or a related discipline.

Do you see that?

A.    Yes, I do.

Page 195

Craig Helfgott on some of his algorithmic work.

And he was develop -- trying to develop new algorithm-based software modules. Emilie was not doing that work.  Just different.

Q.     Different but comparable?

A.     I cannot say that.

Q.     Was he doing more advanced work?

A.     I would say it was more sophisticated, yes.

Q.     More sophisticated than the work that Dr. Bruzelius did once you engaged your role definition and restructuring?

A.     I think that it would have been had she stayed, but she left and we didn't have a chance to develop that.

Q.     Did you consider Mr. Mongia to meet the criteria for being a senior data analyst?

A.     I hadn't gotten that far in my analysis of what he did.

Q.     You overlapped for a few months, right?

A.     That is correct.

Page 203

was fulfilling both roles.  I can't remember what his official title was.

Q.    Is it common for employee to have multiple titles at AIGH?

A.    I can't say it is.  I can -- I can say -- yeah, I can't say it is one way or the other.

Q.    Do you know what the job requirements to be a data science analyst 3 are?

A.    Off the top of my head, I do not.

Q.    Was Mr. Helfgott and Dr. Bruzelius, were they doing similar work?

A.    No.

Q.    How was it different?

A.    Craig Helfgott was developing, quite frankly, innovative new algorithms and writing them into software around high resolution weather data to overlay on visualizations, realtime visualizations and mapping.

It was incredibly sophisticated and in many ways, defining work.  It was very innovative.  It was very new and experimental.

Page 204

He was also looking to integrate that into machine learning models.  So it was pretty heavy stuff.

Q.   Was he paid more than Dr. Bruzelius at the end of 2018?

A.   Yes, that's my memory.

Q.   Do you know what his salary was?

A.   Well, I -- I don't know what it was at the end of 2018.  I do see the offer here. That's all I knew.

Q.   Do you think it right that he was paid more than Dr. Bruzelius?

MR. MCLEOD:  Objection to form.

(Reporter clarification.)

BY MR. CERVENKA:

Q.   Do you think it's right that he was paid more than Dr. Bruzelius?

MR. MCLEOD:  Objection to form.

A.   Given the complexity and sophistication of the task, absolutely.  Today, it would be worth a great deal.

BY MR. CERVENKA:

Page 205

Q.    Dr. Weisman, we marked document
Bates stamped ISMMS 019383 as Exhibit JWE 10.

(Whereupon, Exhibit JWE 10, Salary
review DEPT 091 Global Bates Number ISMMS
019383, was marked for identification.)

BY MR. CERVENKA:

Q.    Have you seen this document before?

A.    I'm looking at it.

I'm not sure I have.  I don't -- I
don't immediately recognize it.

Q.    The title of the document says
"Salary review DEPT" --  that stands for
department, I believe --

A.    Yes.

Q.    -- "091 Global."

Do you see that?

A.    Yes, I do.

Q.    And it's a spreadsheet with various
staff member names, titles, job grades, salaries,
et cetera.

Do you see that?

A.    I do.