# EXHIBIT 25



EXHIBIT
ME 10
8|13|24

| | |
|---|---|
| **From:** | Mike Escosia |
| **Sent:** | Wednesday, May 16, 2018 3:36 PM EDT |
| **To:** | Jones-Winter, Clarissa |
| **BCC:** | stellasafo@gmail.com |
| **Subject:** | Re: Confidential: Mount Sinai investigatory meeting |
| **Attachments:** | 2018-05-16 Escosia Statement_Arnhold.pdf |

Hi Clarissa,

In preparation for my meeting with you, Ms. Lowy, and Ms. Tiger, I've written a statement for the investigation. Please excuse the major grammatical errors, in my rush to coherently organize my thoughts into the document, I spent less time on the proof reading than I should have. Additionally, as I was writing it, I noticed that it may contain more subjective information than I had anticipated so please feel free to follow up if you need clarification or if you want me to think through more concrete examples.

See you soon.

Best,
Mike


---

Michael J Escosia, MPA
http://www.linkedin.com/in/mescosia

On Wed, May 16, 2018 at 11:29 AM, Jones-Winter, Clarissa <clarissa.jones-winter@mssm.edu> wrote:

Thanks Mike, have a good day and see you soon :-)


**From:** Mike Escosia [mailto:michael.escosia@gmail.com]
**Sent:** Wednesday, May 16, 2018 11:22 AM

**To:** Jones-Winter, Clarissa
**Subject:** Re: Confidential: Mount Sinai investigatory meeting


Hi Clarissa,


Thank you so much for the follow up. I will see you at 5:15p at the lobby of the Icahn building.

Safo_006931

I'm looking forward to meeting.

Best,

Mike

---

Michael J Escosia, MPA

http://www.linkedin.com/in/mescosia

On Wed, May 16, 2018 at 9:54 AM, Jones-Winter, Clarissa <clarissa.jones-winter@mssm.edu> wrote:

Hi Mike,

I hope you are well. The location for today's 5:15pm meeting will be a swing space the Legal department uses in the Icahn Building - MC level, Room 60 (inside the Recanati Miller Transplant Office, which is Room 65, right of the reception desk). The room is a bit difficult to find, so I will wait for you in the lobby to escort you. I will be wearing a green dress.

See you soon.

Best,

Clarissa

**From:** Mike Escosia [mailto:michael.escosia@gmail.com]
**Sent:** Monday, May 14, 2018 4:41 PM

Safo_006932

**To:** Jones-Winter, Clarissa
**Subject:** Re: Confidential: Mount Sinai investigatory meeting

Hahah, I really appreciate that. Thank you for being so flexible with my availability! I really look forward to speaking with you all.

Thanks

Mike

---

Michael J Escosia, MPA

http://www.linkedin.com/in/mescosia

On Mon, May 14, 2018 at 4:38 PM, Jones-Winter, Clarissa <clarissa.jones-winter@mssm.edu> wrote:

My dear, we never leave before 5, no worries! We are happy to accommodate you. I will send you the location when I receive it from Legal.

Thanks again for your flexibility.

Best,

Clarissa

Sent from my iPhone

On May 14, 2018, at 4:33 PM, Mike Escosia <michael.escosia@gmail.com> wrote:

Oh that would perfectly, are you sure you don't mind staying past 5?

Safo_006933

---

Michael J Escosia, MPA

http://www.linkedin.com/in/mescosia

On Mon, May 14, 2018 at 4:30 PM, Jones-Winter, Clarissa <clarissa.jones-winter@mssm.edu> wrote:

We already have a 4pm, but but would 5:15 work?

Sent from my iPhone

On May 14, 2018, at 4:18 PM, Mike Escosia <michael.escosia@gmail.com> wrote:

Hi Clarissa,


Darn, 3:30 might be a *little* too early for me considering I'll have to leave likely around 2:50 to get to you. Can you squeeze me in at 4 pm by chance?


---

Michael J Escosia, MPA

http://www.linkedin.com/in/mescosia


##

On Mon, May 14, 2018 at 3:29 PM, Jones-Winter, Clarissa <clarissa.jones-winter@mssm.edu> wrote:

Hi Mike,

Safo_006934

Thanks so much for your response. We prefer an in-person meeting as well, so appreciate your willingness to adjust your work schedule to do so! We expect to need at least an hour, not much more. We were asking for statements from people who weren't comfortable being interviewed, so you are welcome to submit a written statement in support of your verbal statement but it's isn't required.

Right now we are flexible to meet between 11:30 and 3:30pm, so please let me know what time frame works best for you.

Thanks,

Clarissa

**From:** Mike Escosia [mailto:michael.escosia@gmail.com]
**Sent:** Monday, May 14, 2018 3:17 PM
**To:** Jones-Winter, Clarissa
**Subject:** Re: Confidential: Mount Sinai investigatory meeting

Hi Clarissa,

Thank you so much for reaching out. Yes, Dr. Safo had reached out to me to let me know that I might be contacted regarding the Arnhold Institute. I'd be HAPPY to speak with you, Caryn, and Marina and anyone for that matter. I'd absolutely prefer to meet in person and can possibly try and take off the latter half of the afternoon. I've since left the Arnhold Institute and so I'd have to account for travel time. Do you anticipate an hour or half hour meeting? Additionally, Stella had suggested I also write a written statement. Do you prefer I come in with one to use as as a base, perhaps? Let me know how I can be the most useful!

I'm looking forward to speaking with the three of you.

Best,

Mike

Safo_006935

---

Michael J Escosia, MPA

http://www.linkedin.com/in/mescosia

##On Mon, May 14, 2018 at 1:57 PM, Jones-Winter, Clarissa <clarissa.jones-winter@mssm.edu> wrote:

Hi Michael,

I hope you are well. I believe Stella Safo spoke with you about the investigation my office is conducting regarding the Arnhold Institute. I would very much like to speak with you in relation to this inquiry. The meeting would be conducted by me, the Associate Dean for Faculty and Staff Relations (Caryn Tiger), and the head of our Legal department (Marina Lowy). We are the only three who will be meeting witnesses for the investigation, as we are keeping this very narrow.

Would you perhaps be available for an in-person or telephone discussion today after 4pm, or sometime Wednesday?

Please let me know what you can do.

Best regards,

Clarissa

Clarissa Jones-Winter

Director of Employee Relations

Icahn School of Medicine at Mount Sinai

Safo_006936

One Gustave L. Levy Place, Box 1217

Annenberg 21-81

New York, NY  10029

Phone: 212-241-7021

Fax: 212-241-7146

clarissa.jones-winter@mssm.edu

Safo_006937

| To: | Clarissa Jones-Winter, Marina Lowy, Caryn Tiger |
| From: | Michael Escosia |
| Date: | May 16, 2018 |
| Re: | Arnhold Institute for Global Health at Mount Sinai |

The purpose of this statement is to provide reasonably objective[1] information for the ongoing investigation into the Arnhold Institute for Global Health at the Mount Sinai Health System. I was informed by Ms. Clarissa Jones-Winter of Mount Sinai that a written statement accompanying my in-person interview may be useful for the overall gathering of data. However, it should be noted that as of this writing, I openly admit that I'm not fully aware of the exact context of the investigation. Rather, I have suspicion and can only provide context based on my own assumptions.

I'd like to preface by stating that, overall, the Arnhold Institute employs some of the best and brightest individuals who are mission-driven and care deeply about the work. Despite the challenges that a few individuals bring, the staff persevere often in resource-constraint environments. My hope is that this investigation sheds light into the inefficiencies and mismanagement of the Institute so that the original intention of the Institute is reclaimed.

### Personal Background

I joined the Arnhold Institute in May 2016 as the Project Manager of the Health System Design (HSD), reporting directly to Dr. Stella Safo. As the Arnhold Institute started to grow and the [prospective] portfolio of work in HSD started to form its shape, I was tasked with leading the forecasting, managing, and executing of the complex system design projects. I received my MPA in 2013 from NYU in Public and Non-Profit Management and Policy, with a focus in organizational and managerial development.

I left the Institute April of 2018 for a non-competing higher education institution.

### Statement

During my time at the Arnhold Institute, I've experienced and witnessed a multitude of scenarios that were very questionable. Some produced immediate emotional reactions, while others, didn't yield an emotion until much later. Nonetheless, for the purpose of this statement, I will highlight examples that can be easily grouped together and note that the most egregious and obvious examples are of unprofessionalism, sexism, and mismanagement of the leadership (mainly, three individuals[2] Dr. Prabhjot Singh, Mr. David Berman, and Ms. Kirsten Knaup).

**Leadership are very unprofessional people.**

In particular, **Mr. Berman** had demonstrated irrational and verbally abusive behavior towards many of the staff throughout my tenure.[3] Admittedly, however, not towards me. In one instance, (1) he had

---

[1] It is in my interest to provide objective testimony with evidence (i.e., examples of incidents, etc), however, some cited situations may lean more towards subjective (e.g., non-first person witness, hearsay through colleagues) and I will do my best to call these out when cited

[2] It should be noted that I don't view these three individuals on equal footing in their contribution to the overall culture at Arnhold – they have each contributed, but some more than others.

[3] Note: I was not a direct eyewitness

Safo_006938

made a female colleague cry while berating her in his office, showing no restraint and no awareness of his being audible to the entire office. It wasn't until a male colleague (who later ended up in a similar situation with Mr. Berman) interrupted the altercation. (2) Outside of the office, his short temper had strained relations with potential partners outside of Mount Sinai. For example, in a trip to Ghana to meet with the Ministry of Health and other officials, it was reported back from a team member that his shouting at governmental officials (due to their tardiness) was resulted in their unwillingness to work with the Arnhold Institute after months of preparation and rapport building. Many of our subsequent subprojects faced many challenges as a direct result of the confrontation. Lastly, in one final instance (3), Dr. Prabhjot Singh had not intervened despite being witness (separated only by a closed door) to one of Mr. Berman's berating of another female colleague.

Both female colleagues are no longer with the Arnhold Institute.

I find it highly unprofessional to exhibit this behavior, but I also find this disrespectful to everyone at the Arnhold Institute and more egregious for allowing the behavior to continue, despite having knowledge. In a personal conversation I had with Dr. Singh around my one-year anniversary at the Institute, Dr. Singh had asked if I was willing to work with Mr. Berman. I had candidly said that I didn't feel comfortable only because I didn't want to work with someone with his temperament. He had acknowledged my response and had said he understood, eluding to the fact that he was well aware of his behavior but had not intervened – neither as his direct supervisor, nor as the Director of Institute.

It's also important to note that **Ms. Knaup** had also demonstrated unprofessional behavior throughout my time at Arnhold that should question her role as the HR designee. For example, it wasn't surprising to learn that she had discussed email correspondences with a colleague despite having only directed emails only to her. In one instance, she had made comments to the same colleague about how bothered she was with the tone I had used in an email (the email was written in a direct tone versus a more common passive voice). This had resulted in my censoring subsequent communications with her for fear of my email being shared. Additionally, Ms. Knaup had been known to hold grudges against individuals who disagreed or brought up questions. While I understand that disagreeing or questioning policies may develop emotions, she had not been able to separate one incident from another and thus, the lack of separation had affected decisions completely unrelated. Such as a workshop that my colleague and I had been approved to go on that had subsequently been rescinded, presumably due to an incident when I and a colleague, under her supervision, proposed what we thought was a more efficient process for something that existed (see section on professional development and persona interaction/collaboration below).[4]

In the same meeting with **Dr. Singh** around my one-year anniversary, I had brought up the incident that had caused a severe ripple effect throughout the entire Institute.[5] Despite my having expressed discontent and feeling of an unbalanced power dynamic after he had asked, Dr. Singh told me that he wasn't able to address the issue because the confrontation would have forced him to single someone out, thus again, inadvertently encouraging unprofessional behavior.

---

[4] Note that his is purely speculative as there is no direct evidence other than the timing (colleague and I proposed this new process a couple weeks prior to the rescinding of the workshop.
[5] See section "discourages professional development and personal interaction/collaboration" section.

Safo_006939

Lastly, there had been an unspoken double standard between the leadership and staff on several issues. Though I only list some examples below, they are contributing factors to the overall health of morale at Arnhold:

1. *Work from home policies were inconsistent* throughout the entire Institute, where some were allowed and some weren't (i.e., male vs. female). One egregious example was an instance when a female colleague had asked to work from home on some days after her maternity leave. Despite many male individuals having had already openly worked from home on a consistent basis (on a particular day of the week), my female colleague's decision had to go through extensive policy-based permissioning.
2. While very trivial, *purchasing a birthday cake and celebrating was very controversial*. For example, there had been times when people purchased cakes and celebrated (on their own or through the Institute), however, when one had purchased a cake for a team member and subsequently had emailed the team leads to invite everyone to the celebration, *she* was severely reprimanded for reasons citing exclusivity.
3. *Reimbursable expenses were approved for some, while questioned for others*. There were inconsistency in how employee reimbursements were evaluated and subsequently reimbursed. While some were able to take taxis to and from approved business-related events/meetings, others second-guessed themselves because of inconsistency and instead had decided to only take public transportation.

**Inconsistency and the constant shift in priorities prevent teams from delivering.**

One of the most detrimental results of working at the Arnhold Institute was the constant shifting of priorities that caused an unintentional ripple effect that damaged the professional reputations of the faculty and staff. This had resulted in the difficulty of delivering on promises to outside stakeholders. The Health System Design team had developed a procedure internally to address the challenge of shifting priorities, where after every meeting, summaries and action items were sent to Dr. Singh, to no avail. Even with written documentation and email chains, items always seemed to have shifted.

- Around Q1-Q3 2016, Dr. Singh framed all of the work of the Institute to be under the guise of Health System Design
- In an abrupt shift around Q4 16 and Q1 17 (likely to ATLAS gaining some ground under the guidance of Dr. James Faghmous), all work – existing work included – were to be (re)structured under an ATLAS lens
- Around the time of the off-campus retreat (August 2017), all work – again, existing work included – were to be (re)structured under the lens of Liberia, after Dr. Singh's trip to Liberia.
- Lastly, around the time I left in Q2 2018, the work of the Institute reshifted back to Health System Design (likely as a result of the successful implementation of the Primary Care Council led by Dr. Stella Safo).

Early on in the growth of Health System Design, the team had campaigned heavily in building social capital around MSHS to set the groundwork to enable the team to do the work necessary to achieve our mission. These constant shifts had not only prevented us from delivering (ever or in a timely fashion), but also resulted in losing the social capital we had worked so hard to build. For example, I had once met with my counterpart in the Mount Sinai Health Partners Commercialization team, whom I met with monthly to bridge the gap between our respective work. She told me explicitly that she was instructed not to work with HSD (and all subsequent project proposals to go through her leadership) because Dr.

Safo_006940

Singh was known to be inconsistent and unreliable. It was a very unfortunate realization, especially since we were willing to share resources and actively work together.

**Leadership openly discourages professional development and personal interaction/collaboration.**

I'm in the personal opinion that leadership, especially senior leadership should encourage professional development (in various means) and encourage cross-functional interaction, and in fact, view it as an investment in the human capital that they've so willingly spent in the hiring process. Obviously, I was not in the position to challenge policies or question the values of an organization, so I readily admit that this is purely a personal opinion. However, I do feel there is value in allowing staff to participate in these types of activities or at least encourage multi-disciplinary teams to collaborate and innovate.

My supervisor, Dr. Safo had been met with consistent denial to allow me to attend conferences for professional development and learning purposes (one conference was directly related to the work that HSD was doing at the time), citing that there was no value in these development activities.[6] Additionally, colleagues under Ms. Knaup had been explicitly forbidden to attend workshops, talks, events (even hosted by Arnhold colleagues) or meet with individuals that were not pre-approved. These types of activities were one of the key ways to learn about a colleague's work and it was unfortunate to learn that they were absolutely forbidden to participate.

Earlier in my statement, I had mentioned an incident that had a negative ripple effect because of a collaboration between me and a colleague, under Ms. Knaup. For the purposes of highlighting the discouraging of collaboration and innovation and its contribution to the low morale, I include in this statement. My colleague and I had identified a need for improving the travel request process due to my recent experience in requesting and providing information for a workshop I mentioned earlier in this statement, which was later rescinded. He, being part of the Operations team, and my role as a Project Manager had met to identify the inefficiencies and had created a new process that would have aggregated the necessary data for travel requests and automated the submission to the Operations team.[7] My colleague had proposed the change to Ms. Knaup with the example, which had resulted very negative feedback. There were comments that he and I had deliberately went around leadership's backs to develop the process – "very vindictive," as it had been described. Personally, this immediately discouraged my willingness to innovate and collaborate, and even had affected my motivation to go beyond what was listed in my own job description. My colleague was essentially put on probation and my trip the following week was rescinded.

**Sexism and favoritism was very prevalent at Arnhold.**

While there is no direct evidence to these accusations, there were scenarios that warranted the suspicion. As I had eluded earlier in the statement to some double standards practiced, these double standards oftentimes involved male and female colleagues. It was no secret at the Institute that there were individuals who were favored more than others. For example, there are individuals who are able to consistently ask to attend relevant conferences and workshops, while others were not (in one case, the one permissioned to go was male and the other female). While highly speculative, there was no reasoning as to why the former versus the latter was permitted.

---

[6] Some colleagues were allowed to attend workshops (see Sexism and Favoritism section)
[7] This process was done using Qualtrics form that was automatically emailed to the "owner" in the Operations department to process. This process was to improve the original process of a difficult and paper-heavy process using excel and email.

Safo_006941

In this team's investigation, you might also find that those with the worst experiences (that are tangible) are likely to be my female colleagues. For example, I was one of two project managers in the Institute. My female colleague was often criticized and driven to tears (picked on, if you will), while I, in my two years of working at Arnhold was never, directly to my face, criticized of my work, despite my and my colleague's work style being very similar.[8] Lastly, though subjective, it was plainly just known that there was obvious sexism (my sincerest apologies that I can't pinpoint more concrete examples – it was just known).

**Despite all of the above, I truly believe Dr. Singh is the root of all the challenges Arnhold had and is facing.**

Overall, I think Dr. Singh was/is the root of the issues at the Arnhold Institute. I believe that his mismanagement of priorities and human capital has led the Institute into its current state. He refuses to acknowledge and address unprofessional and immoral behavior, his constant re-shifting of priorities prevented teams from getting from concept to realization (and thus, preventing deliverables), and his choosing of treating individuals differently based on his own judgments had made it very difficult to work at the Arnhold Institute. Whether or not he was/is purposeful in his behavior, he had caused me to question my own abilities and had directly impacted my overall self-confidence and self-esteem. Working under his direction made me feel that I had been set back professionally, as I had started to refer to textbooks and materials I once had been proficient in from earlier positions. He lacks the discipline of directing effectively, oftentimes "chasing the shiny new object." Towards the end, I found it impossible to work under the conditions of uncertainty and thus, I had decided to pursue other interests.

While I feel lucky myself for moving onto a better position, there currently are individuals at the Arnhold Institute who are not being given the proper training and support they need to succeed professionally. In the current model, they are not being set up to succeed on account of the lack of clarity and vision of the leadership.

Although this statement leans towards the negative spectrum of evaluation, I have general hope that Arnhold will eventually fulfill its mission, but not without a significant change in either leadership structure, culture, or staff turnover[9] and I hope this investigation discovers similar findings. There are individuals who have the background, capability, and motivation to lead the Institute into a new phase of growth and prosperity. These individuals are caring, motivated, and able to overcome this turbulent period of mismanagement and I hope this investigation brings to light the great people who make the Arnhold Institute thrive – I also hope that the investigation finds the people who can lead the Arnhold Institute into its true intentions.

---

[8] My female colleague and I would oftentimes share documents as templates and review each other's work.
[9] Staff turnover in the sense that if leadership doesn't change, staff will need to change to address a poisoned staff culture

Safo_006942