**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DR. HOLLY ATKINSON, DR. NATASHA ANUSHRI ANANDARAJA, DR. STELLA SAFO, MARY CALIENDO, HUMALE KHAN, GERALDINE LLAMES, AMANDA MISITI, and EMILIE BRUZELIUS,<br><br>        Plaintiffs,<br><br>             v.<br><br>DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA, DAVID BERMAN, and ICAHN SCHOOL of MEDICINE at MOUNT SINAI,<br><br>        Defendants. | No. 19-cv-3779 (VSB) (JW)<br><br><br>**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the

Southern District of New York, Defendants Dr. Prabhjot Singh ("Singh"), Dr. Dennis S. Charney

("Charney"), Bruno Silva ("Silva"), and the Icahn School of Medicine at Mount Sinai

("ISMMS") (collectively referred to as "Defendants"), submit the following statement of

materials facts as to which they contend there are no genuine issues to be tried.

**I.      DEFENDANTS**

1.      ISMMS is the medical school and academic partner to The Mount Sinai Hospital,

which, along with other member hospitals, comprises the Mount Sinai Health System.  ISMMS

maintains a network of clinical, research, and educational partners that contribute to the

furtherance of the school's mission.  (Lupion Decl. Ex. 19 (ISMMS 3268-69).)

2.      Charney became the Dean of ISMMS in 2007 and remained in that position during

all times relevant to this litigation.  (Lupion Decl. Ex. 1 (Charney Tr. 9).)

3.    Singh was named the Director of the Arnold Institute for Global Health ("AIGH") at ISMMS on February 24, 2015.  He remained in that role until he stepped down on July 3, 2019. (Roben Decl. Ex. 1 (ISMMS 5516-17); Lupion Decl. Ex. 2 (Singh Tr. 7-8).)

4.    Silva was hired to work at AIGH in January 2016 as a Designer and Senior Management Analyst.  (Lupion Decl. Ex. 3 (Silva Tr. 28, 67, 287).)  In this role, Silva was responsible for the design aspect of the Health System Design team and reported to Singh.  (Lupion Decl. Ex. 3 (Silva Tr. 74-75, 116-17).)  Silva resigned from AIGH in October 2019.  (Lupion Decl. Ex. 3 (Silva Tr. 9).)

## II.    PLAINTIFFS

5.    Dr. Stella Safo ("Safo") joined ISMMS in September 2015 as an Assistant Professor in the Department of Medicine.  She reported to Dr. Michael Mullen for her HIV clinical work and to Singh for her research and population health work at AIGH.  In February 2018, Safo transferred from AIGH to Mount Sinai Health Partners as Senior Medical Director, Clinical Transformation.  She resigned from her full-time position in the spring of 2019.  (Lupion Decl. Ex. 4 (Safo Tr. 16, 20, 35-36, 68, 85, 239); Lupion Decl. Ex. 20 (ISMMS 165).)

6.    Geraldine Llames ("Llames") started at ISMMS on January 23, 2017 as a Project Manager in AIGH.  She initially reported to Dr. Sandeep Kishore ("Kishore"), Associate Director, then to Singh beginning in November 2017, and to Dr. Jeb Weisman ("Weisman"), Director of ATLAS[1], beginning in April 2018.  Llames left Mount Sinai on August 9, 2018.  (Lupion Decl. Ex. 5 (Llames Tr. 31, 58, 65, 122, 168, 204); Lupion Decl. Ex. 2 (Singh Tr. 247-48); Singh Decl. Ex. 3 (WEISMAN 49); Roben Decl. Ex. 3 (ISMMS 265-66).)

---

[1] ATLAS was a project within AIGH that sought "to develop methods for using satellite imagery and other data sources," including "community health worker data," "to address public health and epidemiologic issues in global health."  (Lupion Decl. Ex. 7 (Bruzelius Tr. 37-38, 43); Lupion Decl. Ex. 3 (Silva Tr. 105).)

2

7.        Amanda Misiti ("Misiti") joined AIGH on May 1, 2017 as a Program and Policy Research Manager.  She reported to Singh.  Misiti resigned from Mount Sinai in September 2023 to take a position at Premier, Inc.  (Lupion Decl. Ex. 6 (Misiti Tr. 40-42, 52, 61).)

8.        Emilie Bruzelius ("Bruzelius") joined AIGH on April 4, 2016 as a Data Analyst II. She initially reported to Dr. James Faghmous ("Faghmous") on the Data Science team, then directly to Singh following Faghmous's departure in fall 2017, and then to Weisman beginning in June 2018.  Bruzelius resigned effective March 4, 2019.  (Lupion Decl. Ex. 7 (Bruzelius Tr. 18, 51, 55-56, 125, 169, 234); Roben Decl. Ex. 4 (ISMMS 208-09); Lupion Decl. Ex. 21 (WEISMAN 33-34).)

9.        On April 26, 2019, Plaintiffs and four then-plaintiffs filed an original complaint in the United States District Court for the Southern District of New York as well as an Equal Opportunity Commission charge.  (Dkt. 1; Dkt. 30 ¶29.)  Plaintiffs amended their complaint on August 6, 2019, in a 190-page, 889-paragraph filing.  (Dkt. 30) ("Amended Complaint").

## III.    CREATION OF AIGH AND SINGH'S TENURE

### A.    AIGH

10.       In or around 2006, a group of physicians who were employed at ISMMS and/or had hospital privileges to work at Mount Sinai Hospital began "discussing plans" to create a global health program at ISMMS.  (Lupion Decl. Ex. 8 (Landrigan Tr. 16-17); Lupion Decl. Ex. 22 (ISMMS 5098).)

11.       From 2006 to 2015, that group, comprised primarily of Dr. Philip Landrigan ("Landrigan"), the then-Chair of Preventative Medicine and Dean of Global Health at ISMMS; Dr. Jagat Narula, Associate Dean for Global Health and Director of Research; Dr. Ramon Murphy ("Ramon Murphy"), Director of Patient Care and Professor of Clinical Pediatrics; Dr. Natasha

Anandaraja, Director of Training and Assistant Professor of Pediatrics and Medical Education; Dr. Holly Atkinson, Director, Human Rights Program, and Assistant Professor of Preventive Medicine and Medicine; and Associate Directors Drs. Sigrid Hahn, Nils Hennig, Jonathan Ripp, and Annie Sparrow, began to create "the skeleton" of "Mount Sinai Global Health" (MSGH), a program focused on global health education at ISMMS, direct delivery of care overseas, and research. (Lupion Decl. Ex. 8 (Landrigan Tr. 35, 31, 38-39); Lupion Decl. Ex. 22 (ISMMS 5098, 5112).)

12.    In 2014, benefactors John and Jody Arnhold donated a $12.5 million grant to ISMMS to establish the "Arnhold Global Health Institute" (later renamed AIGH). (Lupion Decl. Ex. 1 (Charney Tr. 71-72); Lupion Decl. Ex. 8 (Landrigan Tr. 51).)

13.    The Arnholds wanted to create "a multi-disciplinary institute dedicated to addressing the gap in global health." (Lupion Decl. Ex. 1 (Charney Tr. 80).)  The Arnhold gift was an "enormous increase in resources" for the global health program at ISMMS, and provided a chance to "substantially grow the program and lift it up to a new level."  (Lupion Decl. Ex. 8 (Landrigan Tr. 233).)

14.    One condition of the gift was that ISMMS had to create an "institute" with a director.  (Lupion Decl. Ex. 1 (Charney Tr. 70-72).)

15.    In early 2014, a search committee was formed to vet potential candidates and make a recommendation to Charney for the inaugural AIGH director.  Landrigan was the chairman of the search committee, which was tasked with finding someone with a vision who could "put their imprint on the program" and build something "different than the other institutes and departments in New York City." (Lupion Decl. Ex. 8 (Landrigan Tr. 15-16, 80, 233, 243); Lupion Decl. Ex.  9 (Gelijns Tr. 13-14).)  The search committee did not have hiring authority. Its role was to interview

4

candidates, make a recommendation and "express appropriate caveats as necessary." (Lupion Decl. Ex. 8 (Landrigan Tr. 243).)

16.     In November 2014, Dr. Barbara Murphy ("Barbara Murphy"), Chair of the Department of Medicine at ISMMS, recommended Singh for consideration for the AIGH Director role. (Lupion Decl. Ex. 8 (Landrigan Tr. 173); Lupion Decl. Ex. 22 (ISMMS 5065-66).)

17.     Singh went through the search committee's evaluation process. (Lupion Decl. Ex. 8 (Landrigan Tr. 199, 207-10).)

18.     Search committee members noted both the strengths and weaknesses of Singh's candidacy. On January 4, 2015, Dr. David Muller ("Muller"), Dean for Medical Education, wrote that he thought Singh was "quite capable and might turn out to be great," but noted his inexperience in leadership. (Lupion Decl. Ex. 23 (ISMMS 5161).) Dr. Annetine Gelijns, Chair of the Department of Population Health, Science, and Policy, noted that "Singh had a very interesting background," was an "out of the box thinker," and had a strong commitment to "community health workers[] and health equity" in New York City and internationally, but lacked an extensive portfolio of funding or "long term management experience." (Lupion Decl. Ex. 9 (Gelijns Tr. 6, 37-39, 42).) Landrigan similarly considered Singh's CV "very impressive" but noted he was young and inexperienced as a leader. (Lupion Decl. Ex. 8 (Landrigan Tr. 210, 290); Lupion Decl. Ex. 23 (ISMMS 5161).)

19.     On January 4, 2015, Landrigan informed Charney in writing of the search committee's "qualified endorsement" of Singh for the AIGH director role, noting that it was a "bit of a high-risk/high-reward situation," but concluding that "[w]ith proper guidance, we feel that Prabhjot is ready to lead the Institute." (Lupion Decl. Ex. 8 (Landrigan Tr. 220-21); Roben Decl. Ex. 5 (ISMMS 5147).)

20.    Charney selected Singh as the inaugural director of AIGH. Singh's hire was announced on February 24, 2015, though he did not officially start until September 1, 2015. (Roben Ex. 1 (ISMMS 5516-17); Lupion Decl. Ex. 8 (Landrigan Tr. 247-48).)

**B.    AIGH Under Singh.**

### 1.    AIGH Personnel and Institute Titles.

21.    Singh's understanding of his role as AIGH Director "would be an opportunity to build something from the ground up." Singh wanted to execute on his vision of creating a global health institute that combined domestic community health initiatives with global health initiatives. (Lupion Decl. Ex. 2 (Singh Tr. 113-15).)

22.    Singh recruited the following individuals to AIGH: Safo, Dr. Madeleine Ballard, Dr. Aaron Baum ("Baum"), David Berman ("Berman"), Faghmous, Dr. David Heller ("Heller"), Kishore, Kirsten Knaup ("Knaup"), Dr. Duncan Maru ("Duncan Maru"), Dr. Sheila Maru ("Sheila Maru"), Dr. Natalie Privett ("Privett"), Silva, and Dr. Rachel Vreeman ("Vreeman").  (Lupion Decl. Ex. 2 (Singh Tr. 124-27).)

23.    In addition, Singh interviewed and approved the hiring of Misiti, Bruzelius, and Llames.  (Singh Decl. ¶11; Lupion Decl. Ex. 2 (Singh Tr. 146, 182-83).)

24.    During the relevant time period, each AIGH employee held a Mount Sinai "institutional title" that was created and assigned by ISMMS's Compensation and Position Control review process based on the job description, duties, necessary expertise and credentials.  (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 75, 84-86).)  Neither Singh nor any other AIGH employee played a role in the decision-making process concerning an employee's institutional title.  (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 84-86).)

25.      Employees at AIGH also held "functional titles," which were outward facing titles that describe the specific role or work that a person performed within AIGH.  (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 84).)  Functional titles had no significance with regard to compensation, promotions, or other terms and conditions of employment. ISMMS did not maintain any policies regarding functional titles and a change in a functional title alone did not equate to a change in compensation.  (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 107, 96).)  Functional titles could vary from institutional titles and were typically created in dialogue between the individual and their supervisor, with ultimate approval from the AIGH Director.  (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 87-89, 92).)  There was no written procedure or protocol associated with the creation of functional titles.  (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 93; 105-06, 108).)

### 2.      Policies and Procedures.

26.      AIGH's policies, procedures, and practices largely matched those of ISMMS and/or the Mount Sinai Health System, including policies with respect to recruitment, hiring, compensation, promotions, anti-discrimination and anti-harassment.   (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 72).)

27.      AIGH was subject to ISMMS's anti-discrimination, anti-harassment, and retaliation policies, which provided, among other things, that harassment, discrimination, intimidation and retaliation would not be tolerated.  (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 25, 75-76, 220-21).)

28.      Decisions affecting faculty compensation, including base salary, administrative supplements, clinical supplements, and bonuses, had to be approved by the Dean's Office. (Lupion Decl. Ex. 19 (ISMMS 3297).)  Department chairs and institute directors were not authorized to

7

adjust the compensation of current faculty members without the approval of the Dean's Office. (*Id.* at ISMMS 3296.)

29.     Position Control was responsible for decisions that concerned compensation for non-faculty staff, including new positions, replacement positions, salary adjustments, and year-end bonuses.  (Lupion Decl. Ex. 11 (Tiger-Paillex Tr. 11-13, 182-83; Errata of Tiger-Paillex at 311:9); Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 96).)   Position Control reviewed the job description of each role to make sure the title was consistent with the titles of those performing the same roles in other departments and to ensure the compensation was appropriate given the job responsibilities.  (Lupion Decl. Ex. 11 (Tiger-Paillex Tr. 185-89).)

30.     ISMMS's promotion policy applied to institutional titles. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 250).)   Faculty promotions went through the Committee on Faculty Appointments, Promotions, and Tenure.  (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 249); Lupion Decl. Ex. 19 (ISMMS 3287-88).)  For non-faculty promotions, the individual needed to be out of their probationary period, which typically lasted six months, but by position, could be extended, and would restart when an employee changed roles.  (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 249).)

31.     Prior to 2019, there was no formal policy on remote work at AIGH, nor was there an ISMMS remote work policy applicable to staff.  The practice was specific to each supervisor. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 64-66); Lupion Decl. Ex. 12 (Knaup Tr. 238).) Safo allowed her staff to work remotely on Wednesday, which was her clinic day.  (Lupion Decl. Ex. 3 (Silva Tr. 182).)   Singh, on the other hand, considered remote work an "exception" to the expectation that work was performed in the office and required pre-approval for planned remote work based on what he deemed to be a "compelling reason" and submission of a job plan that

specified the tasks that would be completed while working remotely.  In or around May 2019, AIGH memorialized the practice of requiring a written plan to request approval to work remotely. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 64-65); Lupion Decl. Ex. 55 (ISMMS 20090-91); Lupion Decl. Ex. 31 (ISMMS 22303).)

## IV.    PLAINTIFF STELLA SAFO

### A.    Safo's Recruitment and Hiring.

32.    Safo joined ISMMS in September 2015 as an Assistant Professor in the Department of Medicine.  (Lupion Decl. Ex. 4 (Safo Tr. 16); Lupion Decl. Ex. 20 (ISMMS 161).)

33.    Safo's hire at ISMMS was negotiated in conjunction with Singh's AIGH director package.  (Lupion Decl. Ex. 2 (Singh Tr. 129-31); Lupion Decl. Ex. 4 (Safo Tr. 38, 195); Singh Decl. ¶¶3-5.)  Specifically, Singh, who was family friends with Safo, advocated for Safo to be offered a faculty contract at ISMMS and a position at AIGH.  (Lupion Decl. Ex. 2 (Singh Tr. 129-30); Lupion Decl. Ex. 4 (Safo Tr. 38, 195); Singh Decl. Ex. 2 (SINGH 1658); Singh Decl. ¶4.)

34.    Even though Safo was only a fellow at Montefiore and had no program experience managing people, Singh felt her academic background, clinical competency, and interest in domestic and global health work would make meaningful contributions to the Institute.  He vouched for her hire and had her role as a "junior faculty" expressly referenced in his contract with ISMMS. (Lupion Decl. Ex. 2 (Singh Tr. 131-32); Lupion Decl. Ex. 4 (Safo Tr. 64); Singh Decl. ¶¶4-5.)

35.    Singh advocated for Safo to come to ISMMS as an Assistant Professor as opposed to Instructor, a lesser title and the position traditionally offered to candidates who are only one year post fellowship, which Safo was at the time.  (Lupion Decl. Ex. 2 (Singh Tr. 130, 264); Lupion Decl. Ex. 4 (Safo Tr. 64).)

9

36.     ISMMS offered Safo a full-time faculty position in the Department of Medicine. (Lupion Decl. Ex. 4 (Safo Tr. 32-33, 51-52); Lupion Decl. Ex. 20 (ISMMS 161-68).)  Safo would receive a salary supplement for her work at AIGH. (Lupion Decl. Ex. 2 (Singh Tr. 261-62).)

37.     Since Safo's primary appointment would be in the Department of Medicine, Singh suggested that Safo contact Barbara Murphy directly to discuss the terms of her contract.  (Lupion Decl. Ex. 2 (Singh Tr. 260); Singh Decl. Ex. 4 (SINGH 1547).)  The two women discussed Safo's contract on multiple occasions. (Singh Decl. Ex. 4 (SINGH 1612); Lupion Decl. Ex. 4 (Safo Tr. 44).)

38.     On April 30, 2015, Safo executed a contract with ISMMS that reflected the following terms of employment: (1) institutional job title of Assistant Professor; work allocation of forty percent clinical (HIV) and sixty percent population health research; (2) compensation of $175,000, which was comprised of a $152,000 base salary and clinical supplement from the Department of Medicine, and a $23,000 research supplement from AIGH.  (Lupion Decl. Ex. 20 (ISMMS 161-67).)

### B.      Safo's Title, Job Responsibilities and Promotion Opportunities

39.     Safo's functional title within AIGH was Program Manager, which she testified was beneath her because another colleague, Anna Stapleton, who she noted was only a college-level graduate, was offered the same functional title. (Lupion Decl. Ex. 4 (Safo. Tr. 72).)

40.     On June 10, 2015, prior to starting at AIGH, Safo wrote to Singh that she believed titles such as "clinical director," "clinical supervisor," or "researcher in global health" would be appropriate for her functional title.  (Singh Decl. Ex. 7 (Safo 6824).)  Safo admitted that when she started at AIGH, she and Singh spoke a lot about her future career trajectory, including what her title could be as the work and team materialized. (Lupion Decl. Ex. 4 (Safo Tr. 74, 90).)

10

41.    Safo also admitted that at the time Singh identified her functional title as Program Manager, she did not suggest a different title for her role, nor did she have one in mind that she believed would be more fitting to her responsibilities. (Lupion Decl. Ex. 4 (Safo Tr. 73-74).)

42.    Within AIGH, Safo led the Health System Design team. (Lupion Decl. Ex. 4 (Safo Tr. 77-79); Lupion Decl. Ex. 2 (Singh Tr. 128-29).)  Mike Escosia, Project Manager, reported to her, and she also supervised Privett and Silva. (Lupion Decl. Ex. 4 (Safo Tr. 78-79, 82); Lupion Decl. Ex. 13 (Escosia Tr. 26-28); Lupion Decl. Ex. 3 (Silva Tr. 74).)

43.    At the time of Safo's hire, Singh did not believe she possessed the skills or experience commensurate with a "chief" titled role, such as Chief Medical Officer.  Within the first year of her employment, Singh asked Safo about her goals with respect to her professional rank and title and she indicated she wanted to work towards a Chief Medical Officer role.  (Singh Decl. ¶¶ 6-7.)

44.    As team lead, Safo attended senior management meetings, and supervised and organized the Health System Design team's work.  (Lupion Decl. Ex. 4 (Safo Tr. 77, 79); Lupion Decl. Ex. 2 (Singh Tr. 258).)

45.    Over time, Safo's AIGH workload expanded to include work with the Mount Sinai Health Partners ("MSHP") team, as well as providing clinical input into the work of other AIGH teams.  (Lupion Decl. Ex. 4 (Safo Tr. 78-79).)  By 2017, Safo felt her job responsibilities had increased to the point where she should be considered for a more elevated functional title, such as Chief Medical Officer.  (Lupion Decl. Ex. 4 (Safo Tr. 80, 82-84).)  She had not been a Chief Medical Officer prior to working at ISMMS.  (Roben Decl. Ex. 6 (ISMMS 141).)

46.    In early 2017, Singh suggested to Safo that she consider the Chief Medical Officer role, but she declined because she felt she was not ready. Safo testified that she did not recall this conversation. (Lupion Decl. Ex. 4 (Safo Tr. 84, 90-91); Singh Decl. ¶8.)

47.    Both male and female employees received functional "chief" titles within AIGH. Berman applied for and received the "Chief of Staff" role, and Kirsten Knaup was hired as Chief Operating Officer, although she did not ask for a chief-level title.  Prior to joining AIGH, Knaup had worked in for-profit and non-profit start-up organizations and spent over twenty years setting up new or recently created organizations.  (Lupion Decl. Ex. 14 (Berman Tr. 97-101); Lupion Decl. Ex. 12 (Knaup Tr. 12, 30-31, 50-51)).)  At the time of his hire, Berman had been in a Chief of Staff-type role for four years.  (Lupion Decl. Ex. 14 (Berman Tr. 77).)  At the time of his hire, Faghmous had been a Chief Technology Officer since 2012.  (Singh Decl. Ex. 8 (SINGH 86); Singh Decl. Ex. 9 (SINGH 156-57); Singh Decl. Ex. 10 (SINGH 309).)

48.    Safo testified that she saw male colleagues receive promotions that she believed were not necessarily tied to the amount of work they were doing but because they "ask[ed] for it." (Lupion Decl. Ex. 4 (Safo Tr. 81).)   When asked if she knew Faghmous's or Berman's qualifications to be Chief Technology Officer and Chief of Staff, respectively, Safo responded "no."  (Lupion Decl. Ex. 4 (Safo Tr. 75-76).)

49.    On August 11, 2017, Safo submitted a formal request to Singh for promotion to Chief Medical Officer.  (Singh Decl. Ex. 11 (BERMAN at 6.)  Singh approved the request and Safo was promoted effective October 1, 2017, with a $20,000 increase to her annual supplement. (Lupion Decl. Ex. 4 (Safo Tr. 85, 90-91, 153); Singh Decl. Ex. 13 (ISMMS 18926).)

50.    For administrative reasons within ISMMS, rather than AIGH, there was a delay in effectuating Safo's salary increase. The pay increase required approval by the Department of

12

Medicine and because Safo later transferred to MSHP, the change required her contract to be amended. (Lupion Decl. Ex. 4 (Safo Tr. 191-92); Lupion Decl. Ex. 12 (Knaup Tr. 225-26); Singh Decl. Ex. 12 (ISMMS 9843); Singh Decl. Ex. 13 (ISMMS 18923-27).) Safo ultimately received backpay to account for her increase in pay. (Lupion Decl. Ex. 4 (Safo Tr. 191-92); Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 110-12); Roben Decl. Ex. 7 (ISMMS 19386).)

### C.    Administrative Tasks Were Distributed Among Male and Female Employees.

51.    In her role as Program Manager, Safo's responsibilities included developing a population health learning and dissemination platform, developing evidence-based standards for clinical and social service partner accountability, and conducting research on care delivery approaches. (Lupion Decl. Ex. 20 (ISMMS 165).)

52.    Safo testified that she was also asked to do "a lot of the organizing" and set the structure of one retreat, as well as certain senior meetings. (Lupion Decl. Ex. 4 (Safo Tr. 72, 207-08).) She felt that these tasks were beneath her position at AIGH. (*Id.*)

53.    Male employees performed similar administrative-type tasks. Singh described the early AIGH environment as "akin to a start-up organization," where administrative aspects of the work had to be handled by the available team member, regardless of seniority. (Singh Decl. ¶10.)

54.    Kishore, a member of the leadership team, organized topics for AIGH employees to present in all-hands meetings. (Lupion Decl. Ex. 15 (Kishore Tr. 24-25, 30).) Berman worked on trip agendas, coordinated logistics, prepared briefcases of folders, and on at least one trip, handled logistics and managed drivers at Singh's direction. (Lupion Decl. Ex. 14 (Berman Tr. 372-73); Lupion Decl. Ex. 2 (Singh Tr. 176-77).)

13

**D.    Singh's Interactions with Safo and other AIGH Staff Members.**

55.    Safo testified that Singh would stare at her "without blinking" to "intimidate" her. (Lupion Decl. Ex. 4 (Safo Tr. 261).)

56.    Safo testified that Singh had a "constant desire" "to control," a "lack of clarity," and would cause "multiple changes to the direction of the work," which Safo described as a "continuous shifting of the ground underneath us."  (Lupion Decl. Ex. 4 (Safo Tr. 159-60).)

57.    Safo testified that she was "put off" by Singh's e-mail communications, which she described as "degrading" and "diminishing," including his "constant telling [her] of what [she] need[ed] to be focused on."  (Lupion Decl. Ex. 4 (Safo Tr. 160, 199).)

58.    Safo testified Singh referred to her as a "mother hen" regarding how she ran a meeting.  (Lupion Decl. Ex. 4 (Safo Tr. 199).)

59.    Safo testified she was "more or less directed not to speak" in calls with funders and in meetings with MSHP leadership.  (Lupion Decl. Ex. 4 (Safo Tr. 210, 286).)  During one such call, on October 4, 2016, Singh emailed Safo with the subject line "you are talking to[o] much." (Singh Decl. Ex. 5 (SINGH 4063).)

60.    Safo testified that she believed Singh's "desire to control" her "professional relationships" "felt gendered" or she "didn't feel like [the experiences] w[ere] happening for other colleagues." (Lupion Decl. Ex. 4 (Safo Tr. 209).)

61.    Singh testified: "I think if anybody was -- if we were running a program or we had a meeting, and we weren't getting through material, I would certainly communicate that to the person that was taking too long, if I could." (Lupion Decl. Ex. 2 (Singh Tr. 279).)

14

62.    Singh also testified that he similarly told a male employee—either Baum or Heller—that his presentation was "going too long about their research."  (Lupion Decl. Ex. 2 (Singh Tr. 279-80).)

63.    Safo testified that people "told [her] about things [Singh] had said" about her that she characterized as "disparaging." When asked to identify the meetings where this occurred, Safo testified that during a meeting with the Peterson Institute, Singh "had me there kind of in a titular fashion but essentially didn't really allow me to speak or engage with them."  Safo claimed that Baum was "brought in to work with" Peterson and "was engaging with them freely."  However, Safo admitted she did not actually know whether Baum was engaging with Peterson or with MSHP, an internal group.  (Lupion Decl. Ex. 4 (Safo Tr. 285-86).)  According to Singh, Safo and Baum interacted with the Peterson Institute under his guidance and they were subject to the same communication limitations.  (Singh Decl. ¶9.)

64.    In March 2015, Singh emailed Safo not to respond to Barbara Murphy about the number of Safo's clinical sessions because, as the Director of the Institute and her supervisor, he first wanted to discuss Safo's allocation of time with Barbara Murphy.  (Lupion Decl. Ex. 2 (Singh Tr. 269-70).)

65.    On October 24, 2017, when Singh learned Safo was meeting with someone from Cityblock Health, Singh requested that she keep him in the loop since he had a longstanding relationship and had personally advised the organization. (Lupion Decl. Ex. 24 (Safo 2307-08).)

66.    With regard to Safo's allegation that she was passed-over in meetings, neither Safo nor Singh was able to identify a specific meeting or instance when this happened. (Lupion Decl. Ex. 4 (Safo Tr. 285-86); Lupion Decl. Ex. 2 (Singh Tr. 238-40).)

67.     Singh noted that "there were meetings in which either men or women felt like they didn't get a chance to speak up," including himself.  Singh explained that he "often felt like [he] had something left to say and there just wasn't time for it."  (Lupion Decl. Ex. 2 (Singh Tr. 238-40).)

68.     Safo admitted the Health System Design Team, as a whole, received directed critiques from Singh and that he was critical of male employees at AIGH, including Faghmous and Charney.  (Lupion Decl. Ex. 4 (Safo Tr. 203; 237; 271).)

69.     Male employees described the same behavior with regard to Singh's management style.  Escosia testified he did not like Singh's management "style," stating Singh was not "able to manage properly" and Singh's "constant shifting of priorities" and "saying one thing and not the other" caused Escosia to question his own abilities.  (Lupion Decl. Ex. 13 (Escosia Tr. 244); Lupion Decl. Ex. 25 (Safo 6942).)

70.     Escosia left AIGH in April 2018 because he "found it impossible to work under the conditions of uncertainty."  (Lupion Decl. Ex. 13 (Escosia Tr. 35); Lupion Decl. Ex. 25 (Safo 6942).)

71.     Berman testified that Singh "struggled" to determine AIGH's "operating model" and that he had management challenges in aligning resources to support and grow that model. (Lupion Decl. Ex. 14 (Berman Tr. 50-51).)

72.     Muller also testified that he experienced Singh's shifting priorities.  According to Muller, Singh initially was very supportive and enthusiastic about work being done by Muller, Ramon Murphy, and Landrigan, but then shifted his position and made clear that the work "was not among his highest priorities for the institute."  (Lupion Decl. Ex. 16 (Muller Tr. 119-21).)

16

73.    Muller also testified that once, Singh was initially very supportive of a project he was working on with Google, but then "completely torpedoed it" in a group meeting, speaking about it "in…almost disparaging terms."  (Lupion Decl. Ex. 16 (Muller Tr. 150-51).)

74.    Silva testified that Singh "yelled" at him when Silva changed a flight without informing Singh.  (Lupion Decl. Ex. 3 (Silva Tr. 322-23).)

75.    Berman testified that Singh was critical of his work and at times pushed Berman to do better. (Lupion Decl. Ex. 14 (Berman Tr. 133-34).)

76.    On one occasion, when Misiti and Berman pushed back with Singh on the timing of writing a report, Singh "became enraged" at both employees.  (Lupion Decl. Ex. 26 (Safo 5372).)

77.    Safo testified that Singh never threatened her or acted in a way she found menacing. (Lupion Decl. Ex. 4 (Safo Tr. 261-63).)

### E.    Safo's Interactions with David Berman.

78.    Safo testified that Berman was "not collegiate *[sic]*" "openly hostile and verbally abusive towards staff."  According to Safo, Berman "had a manner of disregarding those he didn't think were important." (Lupion Decl. Ex. 4 (Safo Tr. 94-95, 108-09).)  Safo testified that Berman would make comments such as "this person isn't capable or this person isn't that good." (Lupion Decl. Ex. 4 (Safo Tr. 101).)

79.    Safo identified two women whom Berman yelled at (Mary Caliendo and Renee Bischoff) but admitted that she did not witness either interaction. (Lupion Decl. Ex. 4 (Safo Tr. 96-101).)

80.    Safo testified that Berman made statements that called into question her "professionalism and seemed to suggest a lack of competence." (Lupion Decl. Ex. 4 (Safo Tr. 106-

17

10).)  She said that after a meeting was rescheduled, Berman told her, "if you could do your job, you would be able to organize your meetings."  Safo testified that Berman would disregard people who were not important. (Lupion Decl. Ex. 4 (Safo Tr. 107, 109).)

81.    While Safo believed that these types of comments "didn't seem to happen nearly as much [to] James[] [Faghmous's] work, or Aaron[] [Baum's] work" (Lupion Decl. Ex. 4 (Safo Tr. 106-10)), Berman made similarly critical comments of men. For example, Berman chastised Faghmous for not finding time to take senior management calls while out of the office, telling him "[g]reat senior managers don't find reasons not to attend senior level meetings, they find ways to[]." (*See* Roben Decl. Ex. 2 (ISMMS 8193-95 at 94).)  Berman once made Baum cry.  (Lupion Decl. Ex. 17 (Weisman Tr. 83).)

82.    On September 19, 2017, Berman and Safo got into a heated email exchange over Safo's failure to invite everyone in the Institute to a birthday celebration she planned in the office. (Lupion Decl. Ex. 14 (Berman Tr. 351-54); Lupion Decl. Ex. 27 (ISMMS 93-96).)

83.    Berman, who was previously aware of complaints that Safo was not inclusive of others in the Institute, raised his concern directly with Safo. (Lupion Decl. Ex. 14 (Berman Tr. 351-53); Lupion Decl. Ex. 27 (ISMMS 95-96).)  He also spoke with Safo about what he perceived as her pettiness.  (Lupion Decl. Ex. 14 (Berman Tr. 58).)

84.    In the email exchange, Berman informed Safo that her "celebration effort is selective" and that her "tone and replies" were "combative," reflecting "non-inclusion and a lack of respect for basic administration protocols."  (Lupion Decl. Ex. 14 (Berman Tr. 353-54); Lupion Decl. Ex. 27 (ISMMS 93-95).)

85.    Safo responded to Berman, stating, "[a]s feedback to you, I'd say you should find ways to encourage staff to celebrate each other. I could read this email, and other efforts to

18

contribute or help institute culture which have been rejected/cautioned against, as an indication to do less." (Lupion Decl. Ex. 27 (ISMMS 95).)  Safo admitted that her email responding to Berman was written in an intentionally angry tone and separately forwarded her response to Privett stating, "Girl he is bothered!" and adding "I can't wait to be a thorn in the side of these mofos for the next year I'm here. Muahahahaha."  (Lupion Decl Ex. 56 (ISMMS at 26691).)

86.     At that point, Singh directed both to take the conversation "offline," communicating that "the exchange was getting heated and extended, and everybody should cool it."  (Lupion Decl. Ex. 14 (Berman Tr. 355); Lupion Decl. Ex. 2 (Singh Tr. 283).)

**F.      Safo's Interactions with Silva.**

87.     Prior to the lawsuit, Silva considered Safo a friend.  (Lupion Decl. Ex. 3 (Silva Tr. 226, 232-33).)  While working at AIGH, Safo and Silva took a personal vacation together to Mexico City.  (Lupion Decl. Ex. 3 (Silva Tr. 186-88).)

88.     Safo and Silva worked together on the Health System Design team.  While Silva believed Safo was a qualified physician, he did not "think that she was experienced enough" from a management perspective to lead the design team.  (Lupion Decl. Ex. 3 (Silva Tr. 227-28).)

89.     Safo testified that, at one point, Silva was not "following through on some of the health system design work" because "he was upset" with her or "something that the team had done." (Lupion Decl. Ex. 4 (Safo Tr. 276).)  Safo admitted, however, that Silva's actions were not motivated by gender.  (Lupion Decl. Ex. 4 (Safo Tr. 242-44, 250-51).)

90.     On one occasion, Silva complained to Llames (with whom he had a personal friendship) that Safo was rude and described her as "being a bitch."  (Lupion Decl. Ex. 3 (Silva Tr. 228, 298).)  Llames testified that in a conversation she had with Silva, Silva called Safo a "cunt," but could not recall any other details and did not report it to anyone.  (Lupion Decl. Ex. 5

19

(Llames Tr. 147-48).) Safo testified that she did not hear Silva say these things while she was at AIGH. (Lupion Decl. Ex. 4 (Safo Tr. 245).)

91.    Safo testified that the only times she heard Silva use the term "bitch," was in a "very clearly friendly" context.  (Lupion Decl. Ex. 4 (Safo Tr. 249-51).)

92.    Silva testified that Safo used the term bitch or "B" "multiple times" to refer to him. (Lupion Decl. Ex. 3 (Silva Tr. 236-37).)  Silva, who reported to Safo, is a gay man. (Lupion Decl. Ex. 3 (Silva Tr. 294).)

93.    Safo did not inform Singh, or any other supervisor, of Silva's comments at the time they were made.  (Lupion Decl. Ex. 4 (Safo Tr. 241-42); *see also* Lupion Decl. Ex. 2 (Singh Tr. 141-43).)

94.    Silva also was not offended by Safo's use of the term bitch or "B" because he interpreted their conversations as amongst friends. (Lupion Decl. Ex. 3 (Silva Tr. 236-37).)

95.    Safo testified that she "could imagine" using curse words, including "bitch" in a friendly way.  (Lupion Decl. Ex. 4 (Safo Tr. 102-03).)  She used the word "bitch" in communications with coworkers, including Misiti and Llames.  (Lupion Decl. Ex. 28 (Safo 10772); Lupion Decl. Ex. 29 (Safo 18530); Lupion Decl. Ex. 30 (Safo 20654).)

96.    In communications with other AIGH employees, including Singh, Safo made statements such as: "[t]hese mofos can kiss my ass," "haters can suck a million dicks," and "millennials suck huge balls."  (Singh Decl. Ex. 14 (SINGH 3508); Singh Decl. Ex. 15 (SINGH 1071); Lupion Decl. Ex. 56 (ISMMS 26691).)

97.    In an email to Privett, on September 19, 2017, Safo referred to Singh, Knaup, and Berman as "mofos," which she testified meant, "motherfucker[s]." (Lupion Decl. Ex. 4 (Safo Tr. 123-25).)

### G.    Safo's Transition and Departure.

98.    On or about February 28, 2018, within five months of being named Chief Medical Officer, Safo transferred from AIGH to MSHP. (Lupion Decl. Ex. 4 (Safo Tr. 20).) Safo informed Singh of her intention to join MSHP during a meeting she surreptitiously recorded. (Singh Decl. Ex. 24 (Safo 7159); Singh Decl. ¶40.)[2]

99.    Singh supported Safo's decision, and helped facilitate her transition by meeting with her future supervisor. (Singh Decl. Ex. 16 (ISMMS 9901); Singh Decl. Ex. 17 (Safo 2347); Lupion Decl. Ex. 4 (Safo Tr. 70-71).)

### H.    Safo's Single Interaction With Charney.

100.    At the time of her transition, Safo met with Charney. It was her one and only interaction with him during her employment at AIGH. She surreptitiously recorded the interaction. (Lupion Decl. Ex. 4 (Safo Tr. 138-40); Lupion Decl. Ex. 1 (Charney Tr. 258-59); Lupion Decl. Ex. 58 (Safo 7260).)[3]

101.    Safo wanted to understand her future at ISMMS since she was moving to MSHP. (Lupion Decl. Ex. 4 (Safo Tr. 138-39).)

102.    Charney did not say anything during the meeting that Safo considered offensive. (Lupion Decl. Ex. 4 (Safo Tr. 138-40).)

103.    Safo continued at MSHP for "a little over a year" before resigning from her full-time position in the spring of 2019. She testified that at the time of her deposition on April 8, 2024, she was still employed by ISMMS doing clinical work. (Lupion Decl. Ex. 4 (Safo Tr. 13-18, 20).)

---

[2] Defendants will provide the Court with a copy of the audio file of Safo's recording.

[3] Defendants will provide the Court with a copy of the audio file of Safo's recording.

## V.    PLAINTIFF GERALDINE LLAMES

### A.    Llames's Hiring and Role at AIGH.

104.    Llames started at ISMMS on January 23, 2017 as Program Manager I. (Lupion Decl. Ex. 5 (Llames Tr. 31); Roben Decl. Ex. 3 (ISMMS 265-66).)

105.    Llames' functional title within AIGH was Project Manager. (Lupion Decl. Ex. 5 (Llames Tr. 31).)

106.    At the time of her hire, Llames reported to Kishore. (Lupion Decl. Ex. 5 (Llames Tr. 122).) Over time, however, Llames's reporting structure changed. Starting in November 2017, Llames reported to Singh until approximately early 2018, at which time Llames reported to Weisman until she resigned in August 2018. (Lupion Decl. Ex. 5 (Llames Tr. 65, 122, 168); Lupion Decl. Ex. 2 (Singh Tr. 247-48); Lupion Decl. Ex. 17 (Weisman Tr. 175); Singh Decl. Ex. 3 (WEISMAN 49).)

107.    Llames worked with the ATLAS team and attended weekly ATLAS meetings, as well as meetings with the Robert Wood Johnson ("RWJ") Foundation.  (Lupion Decl. Ex. 5 (Llames Tr. 62-63).)  She prepared ATLAS workplans, coordinated meetings with external partners and global health organizations, and was involved in the preparation for a USAID meeting in Washington, D.C.  (Lupion Decl. Ex. 5 (Llames Tr. 89-90); Lupion Decl. Ex. 31 (ISMMS 22303-04).)

108.    As a Program Manager I, her role included providing "administrative, operational and programmatic oversight;" "setting an effective agenda to ensure that performance goals are met;" developing and scheduling program work plans, overseeing daily operations, coordinating program activities and administering program procedures and systems.  (Roben Decl. Ex. 3 (ISMMS 265).)

22

109.    Escosia, a male Project Manager, testified he would consider certain project manager duties to be administrative, such as organizing meetings, managing logistics, and putting together post-meeting notes.  (Lupion Decl. Ex. 13 (Escosia Tr. 27-28, 31).)  Escosia testified he was the only person on the Health System Design team who had to "meticulously take notes" and send them to Singh.  (Lupion Decl. Ex. 13 (Escosia Tr. 78, 124).)

**B.        Remote Work Requests.**

110.    Llames testified that Singh discriminated against her by denying her request to work remotely.  (Lupion Decl. Ex. 5 (Llames Tr. 70-71).)

111.    In November 2017, Llames wanted to work remotely as part of a pre-planned trip to Virginia for the Thanksgiving holiday.  (Lupion Decl. Ex. 5 (Llames Tr. 82, 85-86).) There was an upcoming USAID meeting in Washington, D.C. around that same time.  Llames asked Singh to work remotely from Virginia in the days leading up to the meeting.  (Lupion Decl. Ex. 5 (Llames Tr. 82).)

112.    Llames and Singh had spoken about the possibility of her working remotely. However, when Singh received Llames's remote work plan ten days before the requested time, he denied the request because he believed it lacked sufficient detail to ensure that all of the work would be done in light of Faghmous's recent departure and the fact they were "preparing for a pretty intensive meeting."  (Lupion Decl. Ex. 2 (Singh Tr. 247); Lupion Decl. Ex. 5 (Llames Tr. 88-89).)

113.    Llames admitted that she did not know the policy regarding remote work, nor did she take Singh up on his offer to "discuss in the future ways to put together a plan that would be accepted." (Lupion Decl. Ex. 5 (Llames Tr. 82-83, 95); Lupion Decl. Ex. 31 (ISMMS 22303).)

114. Llames also did not know whether anyone else who reported to Singh had a remote work request denied. (Lupion Decl. Ex. 5 (Llames Tr. 84-85, 100-01).)

115. Around January 2016, Singh had rejected a request from Silva to work remotely from Mexico in order to extend his holiday break. (Lupion Decl. Ex. 2 (Singh Tr. 249); Lupion Decl. Ex. 3 (Silva Tr. 185-86).) Silva testified Singh "didn't like people working from home" and that Silva had to cancel his ticket and pay to rebook. (Lupion Decl. Ex. 3 (Silva Tr. 185).)

**C.      Llames's Concerns Regarding Singh and Berman.**

116. Llames testified Singh discriminated against her because he skipped over her in meetings, while, according to Llames, none of the men on the team—Matt Le ("Le"), Humale Khan ("Khan"), or Silva—received the same treatment. (Lupion Decl. Ex. 5 (Llames Tr. 55, 60-64, 66).)

117. Llames confirmed there were no external RWJ meetings where she was skipped over and could not recall whether any other women were skipped over. (Lupion Decl. Ex. 5 (Llames Tr. 61-66).)

118. Singh testified he would call on Llames to speak in meetings if "that's what the agenda that was prepared called for," explaining, "if there was a project management related discussion, then she would be part of that discussion." Singh also testified that Llames was important to meetings, as she was the "backbone" and the one who decided who would speak. (Lupion Decl. Ex. 2 (Singh Tr. 242-43).)

119. Llames put together project plans or Gantt charts. Llames alleges that it was discriminatory to receive requests for such work, only to later be told that was not what was wanted. (Lupion Decl. Ex. 5 (Llames Tr. 71-73).)

120.    Llames could not specify who made the requests, who rejected the work, the meetings where these events occurred, any specific project plans at issue, or how many times this occurred.  (Lupion Decl. Ex. 5 (Llames Tr. 70-73).)

121.    Llames testified Singh originally told her she would attend a work trip in Africa, only to later tell her she was not going.  (Lupion Decl. Ex. 5 (Llames Tr. 79-81).)  She could not recall details about the project, Singh's reasoning for why she would no longer attend, or who actually attended. (Lupion Decl. Ex. 5 (Llames Tr. 81).)

122.    Llames did attend a work trip to Guatemala related to the ATLAS project with Silva, Bruzelius, Berman, and members of the Data Science team.  (Lupion Decl. Ex. 5 (Llames Tr. 80-81, 123-25).)

123.    On one occasion, during a meeting with Berman (and another unidentified employee), Berman [yelled at Llames] and said, "[t]his is stupid. Are you fucking stupid?"  Llames testified that Berman's comment was about her work product, but could not recall any other details about the meeting.  (Lupion Decl. Ex. 5 (Llames Tr. 66-67).)

124.    Berman admitted to raising his voice with Llames, but explained that his reaction was in response to learning that Llames had missed a grant application deadline for RWJ. (Lupion Decl. Ex. 14 (Berman Tr. 162-64).)  He said, she "didn't do a great job," and did not take responsibility for missing the deadline. (Lupion Decl. Ex. 14 (Berman Tr. 159-60).)

125.    Berman raised his voice with other employees, including men. (Lupion Decl. Ex. 14 (Berman Tr. 164).)  Safo was aware Berman had heated conversations with Kishore, and recalled one incident where Berman spoke to him "harshly." (Lupion Decl. Ex. 4 (Safo Tr. 104).) Berman recounted a "[c]ouple of conversations" with Baum that he characterized as "heated

exchanges." (Lupion Decl. Ex. 14 (Berman Tr. 166, 196, 348-51).) Silva also testified that he witnessed Berman yell at Baum. (Lupion Decl. Ex. 3 (Silva Tr. 242-43).)

**D.      Llames's Personal Relationship with Silva.**

126.    Llames discussed aspects of her personal life with colleagues at AIGH, including Escosia, Andrew Randall, and Silva. (Lupion Decl. Ex. 5 (Llames Tr. 155-57).) The topics she discussed included her romantic relationships and dating experiences, the men she slept with, her weight struggles, and drinking alcohol. (Lupion Decl. Ex. 5 (Llames Tr. 142-43, 155-57).)

127.    Llames shared information with Silva about the men who appeared in her dating applications to solicit his opinion. (Lupion Decl. Ex. 5 (Llames Tr. 145-46).) Llames once sent Silva a photograph of a man in her bathroom. (Lupion Decl. Ex. 3 (Silva Tr. 293).)

128.    Both Llames and Silva characterized their relationship as a personal friendship. (Lupion Decl. Ex. 5 (Llames Tr. 143-44, 223); Lupion Decl. Ex. 3 (Silva Tr. 127-28).) Silva testified that the two spoke freely and "very openly" with one another. (Lupion Decl. Ex. 3 (Silva Tr. 293).)

129.    Silva made comments about Llames's appearance, including "you look slutty today," "do you have a date," or "you better be careful eating those snacks, you're going to get fat." Llames admitted these conversations were part of their friendly banter. (Lupion Decl. Ex. 5 (Llames Tr. 148-49).)

130.    Silva testified that Llames likewise made fun of him, including comments about his "belly showing" when he wore a tight, short shirt. (Lupion Decl. Ex. 3 (Silva Tr. 295-96).)

131.    At a personal gathering outside of work, Llames showed Silva a photo of herself in biker clothes and he commented, "Oh, you know, you look like a dyke," and Silva testified that they both laughed. (Lupion Decl. Ex. 3 (Silva Tr. 294-96).) Silva testified that his use of the word

26

"dyke" had no intended "offensive connotation" and Llames never told him the comment was inappropriate. (*Id.*)

132. Silva considered Llames to be someone who was "pretty much part of the gay community." (Lupion Decl. Ex. 3 (Silva Tr. 294-96).)

133. Llames would talk to Silva about going to gay bars in New York City. (Lupion Decl. Ex. 5 (Llames Tr. 146-47).)

134. Llames had conversations with Silva about her menstrual cycle. (Lupion Decl. Ex. 5 (Llames Tr. 142-43, 148).) On December 18, 2017, Llames texted Silva that she was "having really bad cramps" (Lupion Decl. Ex. 32 (Safo 20939)), and Llames would "openly" "volunteer" to Silva that she was "PMS-ing." (Lupion Decl. Ex. 3 (Silva Tr. 294, 301).)

135. According to Escosia, Llames used the term "dick" in conversation with him. (Lupion Decl. Ex. 33 (Escosia 29).)

136. The term "bitch" and was used by Llames, Escosia, Safo, Misiti and others, for example: "Beach bitch!" (Lupion Decl. Ex. 32 (Safo 20935)); "I feel like I always bitch to you about boys" (Lupion Decl. Ex. 34 (Safo 7380).) Llames and Escosia would refer to Berman as "Berbitch" in Gchat communications and describe Singh as "a little bitch" stating, "and he wonders why people are leaving." (Lupion Decl. Ex. 35 (Safo 7399-401); Lupion Decl. Ex. 36 (Safo 7402-03); Lupion Decl. Ex. 5 (Llames Tr. 130-31); Lupion Decl. Ex. 13 (Escosia Tr. 129-30); Lupion Decl. Ex. 37 (Safo 20880).)

137. Llames could not identify specific instances of when Silva used the term "bitch" except one instance when he referred to Safo as "being a bitch," and "vague remembrances of him just calling women bitches." (Lupion Decl. Ex. 5 (Llames Tr. 141).) Llames testified she was not

offended by the word "bitch" and she "couldn't take [Silva] seriously."  (Lupion Decl. Ex. 5 (Llames Tr. 132, 140).)

138.    Llames testified that on one occasion, Silva called Safo a cunt, but she could not provide any details about the comment except that he said the word (Lupion Decl. Ex. 5 (Llames Tr. 147).)  Llames admitted that, in general, she did not find Silva's language offensive, but felt that because he was "in a position of leadership" he should not have used certain language. (Lupion Decl. Ex. 5 (Llames Tr. 139-40).)  Silva was not Llames's supervisor.  (Lupion Decl. Ex. 5 (Llames Tr. 137).)

139.    Llames testified Silva would make comments in the design room in front of other employees, including Escosia and David Rojas Leon, who were also friends with Llames and Silva. (Lupion Decl. Ex. 5 (Llames Tr. 137, 149); Lupion Decl. Ex. 3 (Silva Tr. 61-62).)

140.    Llames did not report Silva's comments to anyone at Mount Sinai.  (Lupion Decl. Ex. 5 (Llames Tr. 139, 148).)

141.    On January 18, 2019, after Llames had left AIGH and four months before this litigation was filed, she texted Silva, "I miss you too!!! How are you??"  The dialogue continued the next day.  (Lupion Decl. Ex. 57 (ISMMS 7422-23).)

E.    **Llames's Early Dissatisfaction and Performance Issues.**

142.    Llames testified that as early as April 2017—less than three months after she started working at AIGH and prior to the period during which she reported to Singh—she was dissatisfied with her role and had discussed leaving AIGH with Escosia, asking, "how bad will it look if i leave so soon?"  (Lupion Decl. Ex. 35 (Safo 7400); Lupion Decl. Ex. 5 (Llames Tr. 121-22).)

143.    In April 2017, Llames characterized her job at AIGH as "just paying for [her] drinking habits."  (Lupion Decl. Ex. 5 (Llames Tr. 118-19, 122).)  In another correspondence with

28

colleagues she wrote, "I walk in after 9:00 a.m. I can generally leave when I feel like it. … Bet your ass I'm not staying late for SK," referring to Kishore, her boss at the time.  (Lupion Decl. Ex. 35 (Safo 7399-400).) One month prior, Llames admitted to a friend that she took a "2.5 hour lunch" (Lupion Decl. Ex. 38 (Safo 7412)) and had overslept through her morning meetings.  (Lupion Decl. Ex. 34 (Safo 7385).)

144.    In a text exchange with Escosia, Llames described herself as "struggling with motivation" (Lupion Decl. Ex. 39 (Safo 7445).)

### F.    Llames's Departure from AIGH.

145.    Llames left Mount Sinai on August 9, 2018 to take a new job at Montefiore Medical System.  (Lupion Decl. Ex. 5 (Llames Tr. 20-21).)

### G.    Llames Had No Interactions With Charney.

146.    Llames testified she did not have any direct interactions with Charney and did not witness him engage in harassing or discriminatory behavior.  (Lupion Decl. Ex. 5 (Llames Tr. 226-27, 229-31).)   Llames testified her claims against Charney were solely due to the "larger organization and part of the environment that he fostered at AIGH."  (Lupion Decl. Ex. 5 (Llames Tr. 230).)

## VI.    PLAINTIFF AMANDA MISITI

### A.    Misiti's Hiring and Role at AIGH.

147.    Misiti joined AIGH on May 1, 2017 as a Program and Policy Research Manager, with an institutional job title of Program Manager II.  (Lupion Decl. Ex. 6 (Misiti Tr. 52, 61, 68).)

148.    Misiti characterized herself as "midlevel staff;" her highest level of education was an executive master's degree. (Lupion Decl. Ex. 6 (Misiti Tr. 256); Lupion Decl. Ex. 40 (Safo 1054).)  She was not eligible for a faculty position.  (Lupion Decl. Ex. 6 (Misiti Tr. 161).)

149.    Misiti interviewed with Singh, who made the decision to hire her and became her supervisor.  Singh scheduled her phone interview on a weekend and then did not call her until the next day, due to being sick that weekend.[4] (Lupion Decl. Ex. 2 (Singh Tr. 146); Lupion Decl. Ex. 6 (Misiti Tr. 55-56, 68).)

150.    Misiti's responsibilities included helping Singh manage the RWJ grant, organizing and developing content related to the grant, contributing to the Task Force on Global Advantage Report, scheduling meetings, sitting in on and taking notes during meetings, and making presentations regarding the grant.  (Lupion Decl. Ex. 6 (Misiti Tr. 68-71).)

151.    According to Escosia, he sent the notes he took for the entire Health System Design team to Singh  "just to make sure we [had] everything on record."  (Lupion Decl. Ex. 13 (Escosia Tr. 79, 244-45).)

152.    On her first annual performance review, Misiti received a performance rating of "Excellent" from Singh.  As a result, and at Singh's request, Knaup asked ISMMS's Compensation Department to award Misiti a salary increase, even though she had only been at AIGH for less than seven months.  (Roben Decl. Ex. 8 (ISMMS 9513-14); Lupion Decl. Ex. 2 (Singh Tr. 201).)

**B.    Misiti's Salary, Title, and Requested Promotion.**

153.    After Berman left AIGH in 2018, Misiti assumed some of his responsibilities, a few of which overlapped with the work she was already doing. (Lupion Decl. Ex. 6 (Misiti Tr. 110); Lupion Decl. Ex. 41 (ISMMS 267).)  Misiti started managing the Panorama contract, working more with consultants, and had an expanded role in Global Sites, which included helping establish

---

[4] In the Amended Complaint, Misiti pleads that Singh's decision to hold her job interview call on a Saturday as a forecast of his discriminatory nature. (Dkt. 30, ¶ 343.)  At her deposition, Misiti admitted that her reaction, finding it objectionable that Singh scheduled an interview on a Saturday, was irrational.  (Lupion Decl. Ex. 6 (Misiti Tr. 59-60).)

global sites in Nepal and in Queens, New York.  (Lupion Decl. Ex. 6 (Misiti Tr. 88, 106, 108-10); Lupion Decl. Ex. 14 (Berman Tr. 249).)  Misiti did not view her expanded responsibilities as a negative development.  (Lupion Decl. Ex. 6 (Misiti Tr. 112-13).)

154.    In light of Berman's departure, Misiti asked for an increase in pay and a new title. According to Misiti, Singh denied her request because she had not been in the role long enough to be considered for promotion.  (Lupion Decl. Ex. 6 (Misiti Tr. 104-05).)  Singh testified that he does not recall the conversation but that Misiti had already received a pay increase and bonus within her first year at AIGH.  (Lupion Decl. Ex. 2 (Singh Tr. 268-69).) Berman's Chief of Staff role was not filled following his departure.  (Lupion Decl. Ex. 6 (Misiti Tr. 109).)

155.    Misiti testified that men, such as Faghmous, Baum, Heller, Silva, and Berman were offered "higher pay and higher titles" than her. However, she acknowledged she had a "different role" than them and did not have the same credentials.  She testified, "[i]t's not to say that I was more qualified than most of those men." (Lupion Decl. Ex. 6 (Misiti Tr. 156-63).)

156.    Faghmous was a faculty member with a Ph.D. who was in charge of ATLAS; Misiti admitted she was not qualified for his role.  (Lupion Decl. Ex. 6 (Misiti Tr. 156-58, 161, 256).)

157.    Heller was a faculty member with a M.D. and a Master of Public Health degree; Misiti did not know his responsibilities or role at AIGH.  (Lupion Decl. Ex. 6 (Misiti Tr. 158-60).)

158.    Baum was a faculty member and Health Economist; Misiti did not know his responsibilities or salary and had only a "sense" his salary was higher.  (Lupion Decl. Ex. 6 (Misiti Tr. 160-61).)

159.    Silva was on the design team and worked on ATLAS; Misiti acknowledged she did not have a design background and was not qualified for a design role.  (Lupion Decl. Ex. 6 (Misiti Tr. 163).)

160.    Misiti admitted she did not apply for the Chief of Staff position.  (Lupion Decl. Ex. 6 (Misiti Tr. 166-67).)

161.    Misiti identified Le as a male who she believes received a promotion following the departure of his supervisor, Faghmous.  (Lupion Decl. Ex. 6 (Misiti Tr. 106).)  Misiti testified that she does not know if Le's job title or responsibilities changed, or whether he received increased compensation.  (Lupion Decl. Ex. 6 (Misiti Tr. 106-08).)

162.    After Faghmous left, Singh tried to retain Le with an offer of a retention bonus and promotion, but Le left for a higher-paying job.  (Lupion Decl. Ex. 2 (Singh Tr. 205); Lupion Decl. Ex. 12 (Knaup Tr. 232).)  Singh explained that Le "had a machine learning background, which was pretty distinctive from anybody else on the team" and was "being recruited for roles that paid multiples of what [AIGH] could pay him." There was a concern that if Le left AIGH, the work he was doing would not continue.  (Lupion Decl. Ex. 2 (Singh Tr. 205).)

163.    During this same time period, Singh also requested a retention bonus of $10,000 for Knaup for providing "inexhaustible resources to manage the continued growth of the Department and Institute." (Singh Decl. Ex. 18 (ISMMS 9518).)

C.    **Director of Global Sites Role.**

164.    Singh wanted to create a new role at AIGH: Director of Global Sites.  This role would be responsible for AIGH's efforts to manage and build-out additional global sites for the Institute's work.  (Lupion Decl. Ex. 2 (Singh Tr. 151-54).)

165.    Misiti alleges that Singh told her she would be "great" for the Director of Global Sites role, but then "shortly" thereafter reversed course and "told me all the reasons why I would most likely not be a good fit." Misiti testified Singh told her that she "should fight for it."  (Lupion Decl. Ex. 6 (Misiti Tr. 103, 115-17).)

32

166. Misiti said that Singh's suggestion that she fight for the role "represented a general attitude that he shared about a gender perspective that you should be very aggressive and then when I was aggressive that was often not well-received." (Lupion Decl. Ex. 6 (Misiti Tr. 117).) When asked if she had examples of times she was "aggressive and it wasn't well-received" Misiti could not identify any. (Lupion Decl. Ex. 6 (Misiti Tr. 117-18).)

167. Misiti admitted she did not know whether Singh made similar suggestions to men in conversations about promotion. (Lupion Decl. Ex. 6 (Misiti Tr. 102-03).)

168. Singh hired Vreeman as the Director of Global Sites at AIGH. She held an M.D. Misiti did not have a doctorate degree. (Singh Decl. ¶12; Lupion Decl. Ex. 40 (Safo 1054).)

**D.      Singh's Communication Style.**

169. Misiti alleges that during arguments or debates, Singh "would employ obfuscating language to fluster" her, use "esoteric terms" during discussions, create a different narrative than what occurred in person, engage in "staring contests," and make her feel as though she could not leave a meeting until she adopted his opinion. (Lupion Decl. Ex. 26 (Safo 5370); Lupion Decl. Ex. 6 (Misiti Tr. 91, 93, 101, 150-52, 203-04, 279).)

170. Misiti testified that Singh once commented that she looked "stressed," suggested she act more like Craig Helfgott ("Helfgott"), another AIGH employee, and "not have emotional reactions." Misiti acknowledged that she was stressed and Singh's observation that she appeared stressed was a "fair assessment." (Lupion Decl. Ex. 6 (Misiti Tr. 94).)

171. According to Misiti, Singh would act positively toward her in a one-on-one meeting but then, in a meeting with Berman and others, criticize her for not producing a deliverable that he thought others would have known to create on their own. (Lupion Decl. Ex. 6 (Misiti Tr. 155).)

33

172.    These experiences were not unique to Misiti, or to women.  According to Misiti, "[m]any people" found that Singh "constantly changed his mind."  (Lupion Decl. Ex. 26 (Safo 5370); Lupion Decl. Ex. 13 (Escosia Tr. 69-70, 79-80).)

173.    Escosia reported being frustrated that Singh changed directives "every other month," causing Escosia to second-guess himself, and said he thought Singh was gaslighting him because Singh would "reverse track" or deny what was said after meetings.  (Lupion Decl. Ex. 13 (Escosia Tr. 70-71, 79-80, 243-45).)

174.    Anandaraja described Singh as "a poor communicator across the board."  (Lupion Decl. Ex. 18 (Anandaraja Tr.  34).)  Muller reported to Anandaraja after a meeting with Singh, "he hadn't understood 60 percent of what Dr. Singh had said."  (Lupion Decl. Ex. 18 (Anandaraja Tr. 25).)  Safo testified that Silva described Singh's "way of communicating" as "word salad" and at one point, told Safo that he "didn't understand anything [Singh] said."  (Lupion Decl. Ex. 4 (Safo Tr. 247).)  Misiti described Singh as critical and disrespectful of men and women during team meetings.  (Lupion Decl. Ex. 42 (Safo 16702); Lupion Decl. Ex. 6 (Misiti Tr. 144-46); Lupion Decl. Ex. 26 (Safo 5376).)  When asked for examples, Misiti could describe it only as "a general phenomenon."  (Lupion Decl. Ex. 6 (Misiti Tr. 144-46).)

### E.    Misiti's Trip to Liberia.

175.    Misiti testified that during a work trip to Liberia, Singh criticized her for speaking up, which she attributed to her gender because Singh did not make a similar comment to the two other men in their group.  (Lupion Decl. Ex. 6 (Misiti Tr. 80-81, 85-88, 152-54).)  Misiti could not recall the specifics of Singh's alleged comment.  Misiti acknowledged that the two men she referenced were not AIGH employees and that at a later point, Singh referred to one man as "just a pretty face, which Misiti understood it to be dismissive of his accomplishments.  (Lupion Decl.

34

Ex. 6 (Misiti Tr. 154).) Misiti testified that Singh was critical of her note-taking skills on the trip, but admitted that she did not believe his comments were related to her gender. (Lupion Decl. Ex. 6 (Misiti Tr. 88).)

176. After the first Task Force on Global Advantage meeting, Misiti testified Singh "thanked the women for their work and then asked the men what they thought . . . to the point which Faghmous commented on the fact that the women had done most of the work but weren't being asked their opinion." Misiti could not recall what Singh said to solicit opinions and whether he sought feedback from participants as a group or individually. Misiti admitted that she spoke during the meeting and shared her feedback. (Lupion Decl. Ex. 6 (Misiti Tr. 146-47); Lupion Decl. Ex. 26 (Safo 5372).)

F.    **Misiti's Workplace Complaints.**

177. Misiti testified that Berman told her when she joined AIGH that it would take her a least nine months to get "up to date," that she should "not have opinions" about a grant on which they were working, and he once encouraged women not to say more than a few words during meetings. (Lupion Decl. Ex. 6 (Misiti Tr. 205-06).) Misiti admitted that Berman interviewed her and had a basis to evaluate her professional skill-level. (Lupion Decl. Ex. 6 (Misiti Tr. 207).)

178. On October 1, 2018, Singh asked Misiti to email Drs. Duncan and Sheela Maru to request their in-person attendance at a meeting with Panorama consultants. Misiti said she was uncomfortable making an in-person attendance request of them, but that she ultimately did it because Singh asked her to. (Lupion Decl. Ex. 6 (Misiti Tr. 89-90).) Singh testified it was part of her responsibilities to send such correspondence. (Lupion Decl. Ex. 2 (Singh Tr. 161-64).)

179. Singh replied to the email stating, "[w]e won't be doing another session like this in the future, and so I would like to take advantage of our consultants while we have them on board."

35

(Singh Decl. Ex. 19 (Safo 4220).)  Singh testified that he subsequently spoke with the Marus by phone and reiterated his request for their in-person attendance.  (Lupion Decl. Ex. 2 (Singh Tr. 161-64, 166-67).)

180.    Misiti emailed Singh afterward, expressing concern that the Marus would perceive her as "being the bad guy" because she requested they join the meeting in person, when Singh's correspondence showed more flexibility.  Singh replied, "[t]hey did not; I spoke [with] them. They appreciated your clarity in particular."  (Singh Decl. Ex. 19 (Safo 4220).)

181.    Misiti, on the other hand, texted AIGH colleague Erica Levine ("Levine") about the exchange, saying of Singh, "[h]e's playing with the wrong bitch."  (Lupion Decl. Ex. 43 (Safo 18101-02).)

182.    On October 23, 2018, Misiti texted Levine that she had lunch with Sheela Maru "to clarify with her what happened with that whole panorama scheduling thing," adding, "I feel like I always come off as this crazy angry paranoid person . . . (Because I am)."  (Lupion Decl. Ex. 44 (Safo 18124).)

183.    Misiti testified that Singh once drew a diagram and stated, "I'm no Georgia O'Keefe." Misiti interpreted the statement to mean the diagram looked like a vagina, but admitted no one in the room said what the drawing looked like.  (Lupion Decl. Ex. 6 (Misiti Tr. 156, 168-69).)

184.    In communications with Levine, Misiti made numerous references to female genitalia, including writing to Levine, "I use that combination of punctuation for sentences like 'omg he didn't eat your pussy?!'" (Lupion Decl. Ex. 45 (Safo 18024)) and texting Levine, "[i]t's like he saw my dirty hoo ha . . . ." (Lupion Decl. Ex. 6 (Misiti Tr. 241-45); Lupion Decl. Ex. 46

(Safo 7900)) and "I just spent $9 at deli They've got me by the clit." (Lupion Decl. Ex. 47 (Safo 18067).)

### G.    Remote Work Approvals.

185.    Misiti testified that men in the department "seemed they could work remotely with fairly great freedom" but women could not.  Misiti could recall only one instance when she asked Singh to work remotely, and could not recall the outcome of the request.  She also testified that she had no knowledge of any male AIGH employee's remote work request and/or approval experience.  (Lupion Decl. Ex. 6 (Misiti Tr. 163-66).)[5]

### H.    Singh's Positive Comments About Misiti and Acknowledgment of Her Contributions to AIGH.

186.    Misiti received positive feedback from Singh, including public "shout-out[s]" and describing her work as "perfect."  (Lupion Decl. Ex. 6 (Misiti Tr. 98-99, 261); Lupion Decl. Ex. 26 (Safo 5374).)

187.    On June 6, 2017, Singh wrote to Misiti regarding the task force, stating that he trusted her approach, and she responded, "I appreciate you clarifying and giving me the autonomy."  (Lupion Decl. Ex. 6 (Misiti Tr. 268-69).)

188.    On February 7, 2018, Singh emailed Misiti, Bruzelius, and others, calling them "rising leaders and talented professionals" who "play a vital role in developing, managing and implementing key areas of programming."  (Lupion Decl. Ex. 48 (ISMMS 9887-88); Lupion Decl. Ex. 6 (Misiti Tr. 254-56).)

---

[5] Misiti testified it was "extremely difficult" for her to get PTO approved, whereas Silva "could go to Ireland or other places and be on PTO." (Lupion Decl. Ex. 6 (Misiti Tr. 156, 163-64).)  However, Misiti clarified she was referring to working remotely, not PTO.  (*Id*. at 163.)

189.    On September 4, 2018, Singh emailed Misiti and Privett about talking points they prepared, saying, "[j]ust to reiterate prep was amazing and I thank you both."  (Singh Decl. Ex. 20 (ISMMS 19184).)

190.    After a Panorama site visit on October 5, 2018, Misiti emailed Singh with her reflections.  Singh responded, "[t]hese are great reflections," indicating he was going to share them with senior management and asking if she was comfortable with him attributing them to her with his "strong endorsement."  Singh later added, "[y]our list below is exceedingly helpful, and the SMM felt so as well."  (Singh Decl. Ex. 21 (ISMMS 19236-37).)

**I.        Misiti's Resignation.**

191.    Misiti resigned from Mount Sinai in September 2023 to take a position at Premier, Inc.  (Lupion Decl. Ex. 6 (Misiti Tr. 40-42).)

**J.        Misiti's Sole Interaction With Charney Occurred After Filing the Lawsuit.**

192.    Misiti never met Charney prior to filing this lawsuit.  Misiti testified that she did not have any direct interaction or contact with Charney, could not identify a single act by Charney that she viewed as discriminatory, denied experiencing any instances of discrimination by Charney, and could not identify any way in which he harassed her.  Misiti's interaction with Charney was limited to one meeting after this lawsuit had been filed, where he asked all meeting attendees—male and female—to introduce themselves.  Misiti testified she "felt" intimidated because of the event.  (Lupion Decl. Ex. 6 (Misiti Tr. 25-31).)

**VII.    PLAINTIFF EMELIE BRUZELIUS**

**A.        Bruzelius's Hiring.**

193.    Bruzelius joined AIGH on April 4, 2016 as a Data Analyst II with a starting salary of $70,000.  (Lupion Decl. Ex. 7 (Bruzelius Tr. 75, 121); Lupion Decl. Ex. 49 (ISMMS 3931).)

Faghmous recruited and hired her; Singh interviewed her and approved her hire. (Lupion Decl. Ex. 2 (Singh Tr. 182-83); Singh Decl. ¶11.)

194.    Prior to her hire, Faghmous worked with Knaup to create a position for Bruzelius within AIGH. On January 13, 2016, he informed Knaup that Bruzelius would be a "full-time data analyst" and attached a job description indicating a salary range of "$35-$50k." (Roben Decl. Ex. 9 (ISMMS 6033; ISMMS 6038).)

195.    At the time of her hire, Bruzelius had a Bachelor of Arts degree in sociology, a Masters of Public Health, and was a doctoral student in epidemiology. She did not have a Ph.D. (Lupion Decl. Ex. 50 (ISMMS 57); Lupion Decl. Ex. 7 (Bruzelius Tr. 20-21, 35).) During her employment at AIGH, she was also employed as a teaching assistant at Columbia University. (Lupion Decl. Ex. 7 (Bruzelius Tr. 12).)

### B. Bruzelius's Role and the Departure of Faghmous.

196.    When Bruzelius started at ISMMS, she reported to Faghmous, who led the Data Science team. Faghmous reported to Singh. (Lupion Decl. Ex. 7 (Bruzelius Tr. 51, 55-56).)

197.    Bruzelius's work "fundamentally concentrated on research," working primarily on grant applications, papers, and researching the epidemiologic features underlying issues related to the ATLAS project. Bruzelius's work was initially primarily with Faghmous, but as time progressed, she also worked with Le, Patrick Doupe ("Doupe"), and Baum. (Lupion Decl. Ex. 7 (Bruzelius Tr. 51-52, 62).)

198.    Singh testified Faghmous left AIGH in fall 2017 after Singh did not agree to his demands for more money and a higher title. (Lupion Decl. Ex. 2 (Singh Tr. 183-86); Lupion Decl. Ex. 7 (Bruzelius Tr. 106).)

199.    At that point, Bruzelius began reporting directly to Singh.  (Lupion Decl. Ex. 7 (Bruzelius Tr. 125).)  Singh asked Bruzelius to "lead the research side of the Data Science team," which included directing the research activities of projects that Mihir Mongia ("Mongia") and Helfgott worked on, both of whom reported to Singh.  (Lupion Decl. Ex. 7 (Bruzelius Tr. 125-27).)

200.    Bruzelius supported research and program work, and had the ability to pursue other topics she was interested in, but she did not do data science work because, according to Singh, "she wasn't a data scientist." (Lupion Decl. Ex. 2 (Singh Tr. 187-88, 220).)  For this reason, Singh believed she could not take over Faghmous's job when he left, which Singh felt required a "very technical" and "computer science background."  (Lupion Decl. Ex. 2 (Singh Tr. 186-87).) Bruzelius also could not have grants assigned to her as a principal investigator because she did not have a Ph.D.  (Lupion Decl. Ex. 2 (Singh Tr. 187-88, 220).)  Bruzelius admitted she did not oversee the ATLAS project, and, in fact suggested to Singh that someone be hired to fill the role when Faghmous left.  (Lupion Decl. Ex. 7 (Bruzelius Tr. 207).)

201.    In April 2018, Weisman replaced Faghmous as Director of ATLAS.  By June 2018, after a transition period, Weisman became Bruzelius's supervisor. (Lupion Decl. Ex. 17 (Weisman Tr. 10); Lupion Decl. Ex. 7 (Bruzelius Tr. 60-61, 234).)

**C.    Bruzelius's Performance Appraisals.**

202.    In 2016 and 2017, Singh gave Bruzelius performance appraisal ratings of "[e]xceeds expectations" and "[m]eets expectations," respectively.  In 2018, Weisman gave Bruzelius a rating of "[m]eets expectations." (Roben Decl. Ex. 4 (ISMMS 208).)

40

### D.    Bruzelius's Observations of AIGH's Environment.

203.    Bruzelius testified that she "observed different sets of rules being applied differentially to female and male employees in terms of who could take vacation [and] how much notice they had to give" and "when different people had to be in the office," indicating Kishore, Silva, and "maybe" Baum had more flexibility.  (Lupion Decl. Ex. 7 (Bruzelius Tr. 87, 104).)

204.    Bruzelius testified that she never had a vacation request denied and could not provide an example of a request that was denied for any man or woman at AIGH.  (Lupion Decl. Ex. 7 (Bruzelius Tr. 90).)

205.    Bruzelius similarly admitted that she did not know why she had the impression that Kishore and Silva had more flexibility with their schedules, and that no one at AIGH ever told her she had to stay at work until a certain hour.  (Lupion Decl. Ex. 7 (Bruzelius Tr. 104-05).)

206.    Bruzelius recounted one instance when she was told she needed to be in the office following an international trip while "other men from the trip" did not.  Bruzelius could not remember who told her she had to be in the office, nor identify the "other men" on the trip. Bruzelius also did not know whether these unidentified men had the same supervisor as her. (Lupion Decl. Ex. 7 (Bruzelius Tr. 91).)

207.    Bruzelius testified she observed different rules between men and women regarding who had offices.  (Lupion Decl. Ex. 7 (Bruzelius Tr. 87).)  Neither Bruzelius, nor any of her team members, were assigned offices, including Khan, Helfgott, Kyle Landell, Mongia, and Le, all of whom were on the data science team and sat with Bruzelius in an "open room."  (Lupion Decl. Ex. 17 (Weisman Tr. 47-48).)

208. Bruzelius testified she observed different rules between female and male employees regarding "who had different titles that seemed commensurate with what they were doing." (Lupion Decl. Ex. 7 (Bruzelius Tr. 87, 113).)

209. Bruzelius testified she observed different rules regarding "who received credit for their work," but had no specific (or general) examples to offer. (Lupion Decl. Ex. 7 (Bruzelius Tr. 87).) Singh testified that when a paper was proposed to be authored by Le, he suggested that Bruzelius be first author, given she had drafted the work; the paper was published with her as first author. (Lupion Decl. Ex. 2 (Singh Tr. 229-30).)

210. Bruzelius testified that while at AIGH she was "getting the opinion" that Singh did not value women's contributions. However, when asked what he said or about any conversations leading her to that conclusion, she was unable to provide any specifics. (Lupion Decl. Ex. 7 (Bruzelius Tr. 148-49).)

211. Although Bruzelius testified that there were staff meetings where women's "contributions were ignored or talked over," she could not provide any details or identify who ignored or talked over them. (Lupion Decl. Ex. 7 (Bruzelius Tr. 84-85).)

**E.     Bruzelius's Interactions With Singh.**

212. Bruzelius testified that Singh "would tell you one thing to your face and say something different behind your back or he would say one thing in an e-mail and then say something different when you were alone with him." (Lupion Decl. Ex. 7 (Bruzelius Tr. 142-43).) However, she admitted that Singh did not yell or "deeply criticize[]" her work. (Lupion Decl. Ex. 7 (Bruzelius Tr. 142).)

213. Bruzelius testified that Knaup told her Singh "did not particularly like [her]" and he thought she "cared too much about cooperation and collaboration" and was "weak." (Lupion Decl. Ex. 7 (Bruzelius Tr. 137).)

214. On February 7, 2018, Singh publicly praised Bruzelius as a "rising leader." Lupion Decl. Ex. 48 ISMMS 9887-88).)

215. That same day, in Singh's "Director's Email" to AIGH, Singh wrote:

> Shout Out. Huge shout out to Emilie Bruzelius for her amazing presentation at the Center for Global Development. She is a phenomenal explainer, has a sharp analytical mind, and identifies points of collaboration in real time. We'll have her present to us all at some point soon!

(Singh Decl. Ex. 22 (ISMMS 9902).)

216. On May 28, 2018, Singh forwarded Bruzelius an email indicating a manuscript she submitted for publication had been rejected. Singh included a note that read, "sorry Emilie. You did a great job." (Singh Decl. Ex. 23 (ISMMS 18517).) Singh explained that the rejection was a "normal part of the process" and should not bother her. (Lupion Decl. Ex. 2 (Singh Tr. 230); Lupion Decl. Ex. 7 (Bruzelius Tr. 178).)

217. On November 29, 2018, Singh sent Bruzelius an email, copying Weisman, thanking her for developing a presentation he gave, stating, "[i]t was clear, compelling, and generated a good discussion. I appreciate it." (Lupion Decl. Ex. 7 (Bruzelius Tr. 177-78).)

**F.      Bruzelius Offers No Details Regarding Comments by Berman and Silva.**

218. Bruzelius testified Berman "spoke rudely" to her during a disagreement regarding him wanting her to present at a time where she was supposed to be out of the office. (Lupion Decl. Ex. 7 (Bruzelius Tr. 145.) Bruzelius could not recall any details of the comment.

219. Bruzelius testified Silva commented on her weight on several occasions, but she could not identify any specific comments. (Lupion Decl. Ex. 7 (Bruzelius Tr. 150-51, 200).)

43

220.    Bruzelius admitted that she did not complain about Silva's comments or ask Silva to stop, acknowledging "we were all friendly with him at various points."  (Lupion Decl. Ex. 7 (Bruzelius Tr. 152-53).)

### G.    Bruzelius's Compensation.

221.    Within her first year at AIGH, Bruzelius received two salary increases.  By the end of her employment at ISMMS in March 2019, her salary had increased to $82,500. (Lupion Decl. Ex. 7 (Bruzelius Tr. 121); Roben Decl. Ex. 8 (ISMMS 9513-14); Roben Decl. Ex. 4 (ISMMS 208-09).)

### H.    Bruzelius's Purported Comparators.

222.    Helfgott held the title of Data Science Analyst III and was hired at a salary of $120,000.  (Roben Decl. Ex 10 (ISMMS 21370-71).)  Helfgott's role required an undergraduate degree in computer science, engineering, or a related field, and four or more years of software engineering experience.  (Lupion Decl. Ex. 51 (ISMMS 19303); Lupion Decl. Ex. 17 (Weisman Tr. 182).)  Helfgott had a Ph.D., a Master of Science in physics, and nine years of prior experience as a software engineer, senior quantitative specialist, and quantitative analyst. (Roben Decl. Ex. 11 (ISMMS 21355).)  Weisman testified that Helfgott exceeded the minimum qualifications "significantly."  (Lupion Decl. Ex. 17 (Weisman Tr. 186).)

223.    Helfgott developed "innovative new algorithms and writing them into software around high resolution weather data to overlay on visualizations" and mapping, which Weisman described as "incredibly sophisticated" and "defining work."  Weisman testified that Helfgott and Bruzelius were not doing similar work.  Weisman stated that given the "complexity and sophistication" of Helfgott's work, his position commanded a higher salary.  (Lupion Decl. Ex. 17 (Weisman Tr. 203-05).)

44

224.    Doupe was hired as a Senior Data Analyst at a salary of approximately $85,000. (Lupion Decl. Ex. 52 (ISMMS 21363-64).)  Doupe held a Ph.D. in economics and completed additional training through the Insight Data Science Program.  (Lupion Decl. Ex. 7 (Bruzelius Tr. 69-71).)  In his role, Doupe developed algorithms pertaining to data science and machine learning, and he worked on technical algorithm creation and software development.  According to Singh, he and Doupe discussed the fact that Doupe had multiple offers of employment from non-academic organizations. (Singh Decl. ¶13.)

225.    Mongia was hired as a Senior Data Analyst at a salary of approximately $80,000. (Roben Decl. Ex. 12 (ISMMS 21372-73).)   Mongia had a Bachelor of Science in electrical engineering and a Master of Science in computational and mathematical engineering and worked as a software engineer, with experience in deep learning research, neural network modeling, and computational engineering.   (Lupion Decl. Ex. 53 (ISMMS 26197-98); Roben Decl. Ex. 13 (ISMMS 21361-62).)   Weisman testified that Mongia did high-level, "sophisticated" work, including developing new algorithm-based software modules.  His role was also focused on technical algorithm creation and software development.  (Lupion Decl. Ex. 17 (Weisman Tr. 195); Singh Decl. ¶14.)

226.    Le was hired as a Senior Data Analyst earning approximately $75,000 per year. (Roben Decl. Ex. 14 (ISMMS 21359-60).)  Le had a Bachelor of Science and a Master of Science in computer science and "a machine learning background."  Bruzelius did not have a machine-learning background.  (Roben Decl. Ex. 15 (ISMMS 21401-02); Lupion Decl. Ex. 2 (Singh Tr. 205); Lupion Decl. Ex. 50 (ISMMS 57.)  Le's role was focused on technical algorithm creation and software development. (Singh Decl. ¶15.) Singh believed Le was "particularly strong at machine learning." (*Id*.)

45

227.    Singh testified that Le "was being recruited for roles that paid multiples of what we could pay him." (Lupion Decl. Ex. 2 (Singh Tr. 205).) In November 2017, Singh recommended Le receive a year-end bonus of $8,000 and a promotion to Data Science Analyst I with a salary of $95,000, effective January 1, 2018, "to ensure retention of this highly technically skilled employee." (Singh Decl. Ex. 18 (ISMMS 9517-18).) Singh did not have the same retention concerns about Bruzelius, who never indicated to Singh she had a competing offer of employment. (Lupion Decl. Ex. 2 (Singh Tr. 206); Singh Decl. ¶16.)

228.    Khan was a Product Manager with a salary of $95,000. (Roben Decl. Ex. 16 (ISMMS 21385-86).) Khan had a bachelor's degree in computer science and had prior product management experience. (Roben Decl. Ex. 17 (ISMMS 21393).) Khan managed the ATLAS product lifecycle from requirements gathering to product release, and managed product strategy roadmaps, usability testing, and cross-functional team coordination, for ATLAS. (Lupion Decl. Ex. 51 (ISMMS 19308).)

## I.    Bruzelius's Retaliation Allegations.

229.    On April 27, 2018, two former AIGH employees made a complaint against Singh alleging, among other things, that female employees had been subjected to a hostile work environment based on their gender. (Dkt. 133-1 ¶¶ 3-5.)

230.    Bruzelius participated in the investigation of that complaint. (Lupion Decl. Ex. 7 (Bruzelius Tr. 139-40).)

231.    Singh did not know the identity of the individuals who had complained, or the identity of any individual who participated in the investigation. (Singh Decl. ¶17.)

232.    Bruzelius testified that prior to the investigation, Singh "wanted to raise my position, give me a new title, potentially all the things that go along with that," but that after her

investigatory interview Singh's demeanor changed, describing him as staring her down and being curt.  (Lupion Decl. Ex. 7 (Bruzelius Tr. 153-55).)

233.    Bruzelius testified that Singh's overall tone shifted to being "cold and aggressive," and said it was "clear to me that I wasn't in the same position that I had been before."  When asked for an example, Bruzelius stated that at one meeting where they were discussing her concerns about data, Singh "made fun of" her for being "obsessed" with those concerns.  (Lupion Decl. Ex. 7 (Bruzelius Tr. 161, 163).)

234.    Bruzelius testified that Singh told her, "I really want to make sure that you have a future [here]," which she interpreted as him expressing concern as to whether Bruzelius would "fit in here in the future."  (Lupion Decl. Ex. 7 (Bruzelius Tr. 153-55).)

235.    Singh testified that because AIGH was without a lead data scientist at the time (in light of Faghmous's departure), there was a question of "how" Bruzelius's work would be done, not "if" it would be done.  (Lupion Decl. Ex. 2 (Singh Tr. 219-21).)  His conversation with Bruzelius regarding her role was an effort to "work out with her" the work that she wanted to do, given the limitations of AIGH not having a principal investigator and Bruzelius not yet having a Ph.D., which prevented assigning grants to her.  (Lupion Decl. Ex. 2 (Singh Tr. 220-21).)

236.    On June 5, 2018, Bruzelius emailed Jones-Winter in ISMMS's labor relations department regarding her meeting with Singh, indicating Singh explained to her that "without grant funding, he couldn't be sure whether there was a place for the work I was doing."  (Lupion Decl. Ex. 54 (Safo 895-96); Lupion Decl. Ex. 7 (Bruzelius Tr. 154).)  Bruzelius wrote in an email to Jones-Winter that she could not "help but wonder" whether some information from the investigation was attributed to her, writing "I believe" Singh would connect gender pay issues to her.  (Lupion Decl. Ex. 54 (Safo 895-96).)  Bruzelius admitted, however, that when asked if he

was firing her, Singh said "no" and expressed hope she would remain at AIGH.  (*Id.*; Lupion Decl. Ex. 7 (Bruzelius Tr. 154).)

237.    On June 13, 2018, Bruzelius emailed Singh and Weisman, recapping their conversation about formalizing "a plan for [Bruzelius]'s role in the Institute moving forward." (Lupion Decl. Ex. 21 (WEISMAN 33).)  The document indicated, among other things, AIGH was going through a strategy and alignment period, and that because Baum did not have "sufficient funding to cover methodological work," "Emilie should begin to focus more of her time on Atlas." (*Id.*)

238.    At this point, Weisman had been at AIGH for two months, and Singh believed "it is a good time to consolidate [Bruzelius]'s reporting directly under [Weisman]."  (Lupion Decl. Ex. 21 (WEISMAN 33-34).)

239.    Bruzelius testified Singh stopped asking her to attend meetings with him and present to external donors, but did not identify any specific meeting or conference from which she was excluded.  (Lupion Decl. Ex. 7 (Bruzelius Tr. 165-66).)

240.    Bruzelius admitted that she suggested to Singh that they discontinue their one-on-one meetings. Singh agreed and directed her to report to Weisman instead.  (Lupion Decl. Ex. 7 (Bruzelius Tr. 169).)

241.    At her deposition, Bruzelius also admitted:

- Singh never referenced the investigation in conversations with her (Lupion Decl. Ex. 7 (Bruzelius Tr. 153, 155-56));

- Singh never asked her to resign (Lupion Decl. Ex. 7 (Bruzelius Tr. 156));

- Singh never used an "aggressive word" with her and did not "come at [her] in an aggressive way" (Lupion Decl. Ex. 7 (Bruzelius Tr. 161));

48

- Her work was not reassigned to anyone else (Lupion Decl. Ex. 7 (Bruzelius Tr. 165-66)); and

- Her complaint about alleged retaliation to Jones-Winter "didn't make a huge difference in [her] day-to-day experience." (Lupion Decl. Ex. 7 (Bruzelius Tr. 247).)

## J.    Departure from ISMMS.

242.   Bruzelius resigned from ISMMS, effective March 4, 2019. (Roben Decl. Ex. 4 (ISMMS 208-09).)

243.   Bruzelius became a graduate research assistant at Columbia University in the Department of Epidemiology. (Lupion Decl. Ex. 7 (Bruzelius Tr. 18-19).)

## K.    Bruzelius Had No Interactions With Charney.

244.   Bruzelius testified she never met Charney one-on-one and did not have any evidence of actions by Charney regarding harassment or discrimination against her. (Lupion Decl. Ex. 7 (Bruzelius Tr. 198).)


Dated:  June 18, 2026

PROSKAUER ROSE LLP

By: /s/ Adam M. Lupion

Adam M. Lupion
Edna D. Guerrasio
Austin D. McLeod
Eleven Times Square
New York, NY 10036
T: 212-969-3000
F: 212-969-2900
alupion@proskauer.com
eguerrasio@proskauer.com
amcleod@proskauer.com

*Attorneys for Defendants Dr. Prabhjot Singh, Dr. Dennis S. Charney, Bruno Silva, and ISMMS*

49