# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO: 1:19-cv-3779-VSB-JW

DR. STELLA SAFO, et al.,
Plaintiffs,

-against-

DR. PRABHJOT SINGH, et al.,
Defendants.

---------------------------------------------------

DEPOSITION OF DR. NATASHA ANUSHRI ANANDARAJA
TUESDAY, NOVEMBER 19, 2024

Deposition of DR. NATASHA ANANDARAJA in the above-mentioned matter before Jomanna DeRosa, a Certified Court Reporter (License No. 30XI00188500), and Notary Public of the State of New Jersey, taken at Proskauer Rose LLP, 11 Times Square, New York, New York 10036 on Tuesday, November 19, 2024, commencing at 9:50 a.m.

topics that are discussed in this document. I'm just going to ask you a few questions. In the document, you stated under subheading B, preparing to file a Human Resources complaint, I believe it's Paragraph 8 -- 7, excuse me. That you: "Heard from Renee Bischoff, with whom you had worked at AIGH, that 13 women had left AIGH because of the hostile environment created by Dr. Singh."

Do you see that?

A. Yes.

Q. What did Renee Bischoff tell you?

A. She told me that she had observed that 13 women, since the time that I had left or including myself, had left AIGH because they couldn't tolerate the work environment at AIGH and Dr. Singh.

Q. Did she tell you who those 13 women were?

A. She showed me a list of names.

Q. Is that prior to you drafting this affidavit?

A. Yes.

Q. Do you know who compiled that list of names?

A. I'm not certain.

Q. Do you recall any of the names on the

complaint would be adjudicated by Dr. Dennis Charney - the Dean of Mount Sinai - who had long enabled Dr. Singh's behavior."

Do you see that?

A. I do.

Q. How did Dr. Charney enable Dr. Singh's alleged discriminatory behavior?

A. Dr. Charney was aware that there had been complaints about Dr. Singh's behavior. I believe he was aware that there had been resignations of women, predominantly, maybe solely of women at that point, I'm not certain, from the Institute. And we had been told by Dr. Charney himself that he would be closely overseeing and supervising Dr. Singh's behavior or his -- his position at the Institute. So it was reasonable for me to expect that Dr. Charney was aware of what was happening and had not responded to mitigate the damage that Dr. Singh was doing at the Institute.

Q. You just testified that it was reasonable for you to expect that Dr. Charney was aware. Do you have actual knowledge that Dr. Charney was aware of complaints filed against Dr. Singh?

A. I was told by leadership at Mount Sinai, including Dean Muller, that Dr. Charney had been made

aware of the problems with Dr. Singh's behavior at the Institute that had caused women to resign.

Q. When did Dr. Muller tell you that?

A. I can't give you exact dates. I spoke several times to Dr. Muller about this during the time when I was at the Institute and after Dr. Prabhjot Singh arrived, so that would have been from early 2015 until the time that I left in mid-2016.

Q. So when you were -- strike that.

Is it your testimony that Dr. Muller told you that he had raised these concerns to Dr. Charney while you were still employed at the Institute?

A. Yes.

Q. So by 2016?

A. As early as 2015.

Q. Okay. But at least by 2016, did you -- just so I'm understanding, you left the Institute when?

A. My last day was June 30th, 2016.

Q. So prior to June 30th, 2016, Dr. Muller told you that he had relayed concerns directly to Dr. Charney?

A. Yes.

Q. When did you have -- strike that.
You testified that you raised concerns to Dr. Muller on multiple occasions. Is that correct? How many times?
A. Yes. I don't know the exact number of times. I spoke to Dr. Muller several times a month.
Q. And the concerns you raised to Dr. Muller, were they about gender discrimination?
A. They were about Prabhjot Singh's behavior towards women and the management or the way that things were being managed within the Institute that affected women, impacted women within the Institute.
Q. And you specifically pointed out to Dr. Muller, in raising your concerns, women?
A. All the -- all the examples that we were speaking about with Dr. Muller were to do with women.
Q. Did you say to Dr. Muller: "I have concerns that Prabhjot Singh's behavior towards women is discriminatory?"
A. I can't recall whether I used the word "discriminatory".
Q. Did you -- can you recall that you used the word "women"?
A. Yes.

Q. So you specifically said to Dr. Muller: I have concerns that Dr. Singh's behavior towards women are -- and I'm not going to use "discriminatory", because you don't recall that word, but that you specifically said Dr. Singh and women in the same -- in the same sentence of your concern?

A. Yes.

MR. CERVENKA: Objection. Form. Just give me time to object. Thank you.

THE WITNESS: Okay, sorry.

BY MS. GUERRASIO:

Q. What did Dr. Muller say in response?

A. I mean, there were several instances -- there were times when Dr. Muller responded that he would take those concerns to Dr. Charney. There were times when Dr. Muller responded that he acknowledged that he was seeing what was happening. There were times when Dr. Muller told me that I should keep my head down and keep working.

Can I respond to your question at the beginning of this, which is why I thought that it was reasonable for Dr. Charney to know?

Q. We'll get back there and I will certainly give you a chance -- I just want to finish

around "we're going to build this from the ground up as a startup." So there was a lot of rhetoric around, you know, it's, like, all hands on deck, we're starting this thing from scratch, which we weren't actually. We had been there for almost a decade. It was just those -- that narrative around startup was what -- emphasis on design, on, like, end users. That was kind of a vision that was put forward that we were going to be a Global Health startup.

Q. Do you think Dr. Singh's focus on being a Global Health startup was discriminatory towards women?

A. There was a very bro-ey feeling around it.

Q. What is a bro-ey feeling?

A. Like, a very -- it discriminatory in that it was, like, it's going to be this young -- this kind of young setting. Youth was valued in that setting and, you know, in the popular culture. At that time, there was this kind of narrative around tech bros. And so, you know, the word "bromance" was used in the office. And as Dr. Singh sequentially brought on young men to be part of his team and demoted women, there was this growing sense of he's

building, like, a startup culture, which, in the culture at that time, was young men.

Q. You were part of Dr. Singh's team when he started at the Institute. Correct?

A. He and -- yes.

Q. And Dr. Stella Sofa was part of his team?

A. Uh-huh.

Q. And Kirsten Knaup was part of his team?

A. Yes.

Q. And are any of them young men?

A. No. But the men -- the people that he brought into leadership working directly with him in his inner circle of leadership were men. Dr. Stella was not part of that. Kirsten Knaup was not part of that. I was not part of that.

Q. What was Kirsten Knaup's role?

A. I believe she was COO.

Q. And that's not leadership role?

A. She -- I don't know where you define that, in a leadership role, but she was not included in the circle of men. Her office was not in the same space as them. She was not even given an office. She was not in the strategy meetings. She was not included in some of the leadership meetings. There

were still employed at AIGH?

A. At the point that I was still employed at AIGH, I had reached out to a number of my superiors and have received no help from them and had no confidence at that point that my complaints about Dr. Singh were being taken seriously or that Dennis Charney would act on any complaints about Dr. Singh. Because what I was told was that Dr. Singh was Dr. Dennis Charney's golden boy and that any complaints about him would fall on deaf ears.

Q. Who were your -- and I know you testified earlier about Dr. Muller. Is there any other superior who you allege that you brought these concerns to?

A. Dr. Landrigan was aware, Dr. Ramon Murphy.

Q. Anyone else?

A. There were other people in that realm who I didn't speak to directly, but Ramon Murphy told me that he had spoken to Dr. Ian Holzman, Dr. Michael Brodman.

Q. And in your conversations with Dr. Landrigan, did you specifically tell him that women were not being treated fairly by Prabhjot Singh?

one that was a one-on-one with him, did you feel that you could work at Mount Sinai, despite your testimony that you didn't feel safe there?

A. I felt, as I felt when I entered, that I probably wasn't safe there, even though I'd chosen to work there again. I felt that I was threatened in that meeting with Dr. Charney. So -- but that sense of being in an unsafe environment at Mount Sinai wasn't one that was foreign to me.

Q. And in what way did you believe you were being threatened by Dr. Charney at that meeting?

A. At one point during the meeting, I wanted to address what I felt was the elephant in the room and the real reason that Dr. Charney had wanted to meet with me. And I expressed that, although we had disagreed on what should have been the result of the investigation, which he obviously knew about, that I was dedicated to improving well-being at Mount Sinai and that that was something that we could agree on and I hoped that we could work forward together on that. At that point, Dr. Charney started to become visibly agitated and said that -- had an angry tone in his voice and said that he had recently received an e-mail from an employee at Mount Sinai stating that how he approached the investigation of Prabhjot

Singh was a crossroads of his career and urging him to make the right decision. And he said -- and by this time he was definitely agitated and kind of blustery and aggressive and he said it made him very angry when people questioned that he was a champion for women. And that, to me, was threatening because he obviously knew that I had been involved in that investigation.

Q. He didn't raise the investigation, you did. Correct?

A. I -- in that meeting, yes.

Q. You raised it, not him?

A. Yes.

Q. And the comments that you just testified to that you attributed to Dr. Charney in that meeting, that was the subject of your retaliation claim in the state court case. Is that correct?

MR. CERVENKA: Objection to form. You can answer if you understand.

THE WITNESS: I don't understand, I'm sorry. Can you clarify?

BY MS. GUERRASIO:

Q. You raised -- sure. You raised the allegations about Dr. Charney's conduct to you in

break?

THE WITNESS: Sure.

THE VIDEOGRAPHER: Time is 1549. We're going off the record.

(Whereupon, a brief recess was taken off the record.)

THE VIDEOGRAPHER: The time is 1611. We are on the record.

BY MS. GUERRASIO:

Q. Dr. Anandaraja, in the court complaint, there is an allegation that Dennis Charney sent an e-mail to Steffanie Strathdee calling her an idiot in red font, in all caps. Are you familiar with that allegation?

A. Yes, I am.

Q. Did you ever see that e-mail?

A. I did not.

Q. Do you know where -- do you know anyone who has seen that e-mail?

A. Ramon Murphy and Elena Rahona are the two that I know about.

Q. Did they tell you that they saw that

e-mail or you found that information out some other way?

A. They told me.

Q. And did they see it together or they each individually told you they saw it?

A. Ramon saw it and then he showed it to Elena.

Q. Have you seen that e-mail in connection with any of the preparation that you've done for your deposition today?

A. I have not.

Q. Dr. Anandaraja, at some point, Dr. Prabhjot Singh is identified as the Institute director for AIGH. Is that correct?

A. Yes, at some point, he was.

Q. Do you know when that was?

A. There was a board meeting in early 2015 where Dennis Charney -- he came to one of our advisory board meetings, the advisory board that we were speaking about earlier, he was at that meeting to speak to our advisory board members about -- and he, at one point, mentioned that he thought we were close to appointing Prabhjot Singh or that we had, you know, found a candidate that he thought favorably of. And then, I'm not sure how much longer later,

workplace at Mount Sinai use any gendered terms?
A. Yes, I did, many times.
Q. What terms were those?
A. I heard, at various times, reference to women as having big ovaries. I heard reference to us using our pay to buy handbags. I heard Phil Landrigan talking about masturbating in a bathroom at Mount Sinai. I heard comments about -- to the tone of she should just get laid and then she wouldn't be so uptight or she needs to get laid. I experienced gendered behavior in the responsibilities and the work that I was meant to take on as compared to my male colleagues. I had -- I experienced gender discrimination being left out of key meetings that I should have been part of. Gender discrimination was not something that was foreign to me at Mount Sinai.
Q. We can talk about the other things in a second. My question was as to language.
A. I believe I've provided some examples of gendered language.
Q. Who used the term "big ovaries"?
A. I can't recall. I think it was either Phil Landrigan or Ramon Murphy.
Q. In fact, isn't it true that Steffanie Strathdee used that term in communications with you

A. Yes, I heard the comment.
Q. And did you say anything to Dr. Landrigan about it?
A. I can't recall.
Q. What about, you made a comment about Dr. Landrigan masturbating in a bathroom?
A. Yes.
Q. Can you tell me about that?
A. Yes. I was sitting in my office with Ramon Murphy and Ramon Murphy had called Dr. Landrigan and had him on speakerphone. And I presume that Dr. Landrigan was unaware that I was there or that he was on speakerphone, or either of those things, and Ramon asked Phil how he was doing and Dr. Landrigan said that he had gotten out of bed on the wrong side and he was grumpy, but he had just gone to the bathroom and masturbated and now he felt better.
Q. Anything else you recall about that conversation?
A. Only that I was shocked, that Ramon saw that I was shocked and took Phil Landrigan off speaker.
Q. Did Ramon call Phil Landrigan from your office?

A. He did.
Q. Using your phone?
A. Using his cell phone.
Q. So Dr. Landrigan thought he was having a personal conversation with Dr. Ramon on his cell phone. Is that correct?
MR. CERVENKA: Objection. Objection. Form. You can answer.
THE WITNESS: No. It was well into office hours. Ramon and Phil had a professional relationship. There was no reason to assume that it was a personal call. That was a call from a colleague.

BY MS. GUERRASIO:
Q. But it was a colleague on his cell phone that he didn't know you were present for. Correct?
MR. CERVENKA: Objection. Form. You can answer.
THE WITNESS: Dr. Landrigan was talking to Ramon Murphy, who was his colleague, who was calling him on the phone that he always used to call him on for work conversations.

BY MS. GUERRASIO:

Q. Do you know whether Dr. Landrigan thought he was having a personal conversation with a personal friend?
A. I'm not aware.
Q. And you also testified that someone made a comment "she needs to get laid"?
A. Yes.
Q. Is that a comment that you, personally, heard?
A. I heard it a number of times.
Q. By who?
A. By various men.
Q. Please identify them.
A. I heard it once said by Nils Hennig. I heard it once said by -- there was a group of people and I can't identify who it was. I can't recall, I'm sorry, among that group, who it was.
Q. All of the comments that you just testified about, were you working at AIGH at the time you heard them?
A. I can't recall the exact time period. Some of them --
Q. Were they --
A. Some of them were not. The masturbation comment was before AIGH was formed. The big ovaries

approval for that trip?
A. I did.
Q. And did he provide it?
A. He did, ultimately. He made me jump through a number of hoops and go through a very micromanaged process of providing details of what I was going to be doing and budget items matched to details of what I was going to be doing. He referred to that trip in a derogatory terms as a meet and greet. And, I believe, Kirsten was actually concerned that he was micromanaging me and advised me that he doesn't do that for the men in this Institute and he shouldn't be doing that to you.
Q. Well, Dr. Singh expressed concerns that it was a meet and greet because he was concerned that the goals of the trip were not going to be met and it was just a visit abroad. Is that correct?
A. Dr. Singh characterized it as that. I believe, if you read further, you may see that it was a very strong proposal of what was going to happen on that trip that did not warrant a response characterizing it as a meet and greet. It was a long-term relationship in place with some major funders for a program that had been very successful. It was in no way a meet and greet.

because Holly Atkinson was resigning around the same time. I was unaware that she had already resigned and set a date. So he told me it would be bad optics for AIGH for me to leave. He tried to insinuate that it would be irresponsible of me, that I would be leaving my colleagues in a bad position because I had been doing so much of the work and who was now going to do the work. He told me that I would be leaving my program, he had been then demoted to assistant director -- from assistant director to -- he told me that I was leaving Renee Bischoff, who had been my assistant director and was demoted to program manager, I believe, or program coordinator, that I would be leaving her in a bad position. He tried to tell me that it was my responsibility to find my replacement and train my replacement before I could leave and that he felt that it was bad form of me to leave before the end of the academic year.

And so, I, because I had seen the environment at Sinai, I was worried that I would be faced with retaliation and that he would make my life even more difficult than it already was if I didn't come to this compromise about waiting until I left -- waiting a few months before I left.

Q. Once you left Mount Sinai -- strike

that.

Dr. Anandaraja, is it your belief that, as a legacy member of Mount Sinai Global Health, that you were being driven out of AIGH?

A. I'm sorry, can you repeat that? Was it my belief, sorry?

(Whereupon, the requested portion of the record was read by the reporter.)

THE WITNESS: My experience was that Prabhjot created an environment that was incredibly hostile to who I regard as the legacy members, which was -- and whom he referred to as the legacy members, which was the female employees that he had inherited from the Mount Sinai Global Health program or initiative or center or office.

MS. GUERRASIO: Can I see my question? I just want to make sure.

BY MS. GUERRASIO:

Q. Dr. Anandaraja, did you contact The New York Times about an article concerning Mount Sinai?

A. I think The New York Times was contacted. I can't recall whether it was me who

remember exactly what is in the complaint, so I might be repeating myself.

MS. GUERRASIO: I'm not talking about the complaint. I'm talking about your testimony today.

THE WITNESS: Oh, okay.

MR. CERVENKA: Sorry to back you up, what's the question again? Can you read it back? Thank you.

(Whereupon, the requested portion of the record was read by the reporter.)

MR. CERVENKA: Thank you. Objection as to form. Go ahead and answer.

THE WITNESS: I was demoted from my position. I was demoted. I received a demotion, as did other female members of my team. And when I was demoted, men who were less experienced and less qualified than me became my superiors over work streams that I had much more experience and had previously owned, and were brought in place, I believe, at higher salaries than I was at and with titles that were senior to mine, even though they had no qualifications to -- to warrant that. I was

excluded from workflows that were under my purview and I was aware that the men in AIGH were invited into those workflows, were attending meetings about strategy and education that I was not invited to or excluded from, even though they were areas that I had the background in and the experience in and some responsibility for. I was -- it was made clear to me that by referring to me and my colleagues as legacy that -- and by being demoted and other ways that we were treated, that we were on thin ice, that we were being criticized, our work was being disparaged, we were being disrespected. I'm sorry, I'll slow down. And so it was obvious to us from the way we were treated and the structural changes that we were not valued. We felt we were on thin ice. We felt that we had to constantly prove ourselves, but we weren't given clear direction about how to do our work. And so we felt that we were endangered within that environment at all times and had to continuously prove ourselves. Whereas men who were brought into positions above us were brought in with nothing really to recommend them and no past experience, but just on their promise or their potential, whereas we had to continuously prove ourselves. I was exposed to disparaging, overly critical, and hostile

commentary on my work in one-on-one conversations and disparaging comments about my work in group meetings, which I didn't see occurring to men and didn't hear from men that they had experienced with Prabhjot. I was micromanaged and forced to give unduly detailed and tortuous details about my expenditures and my plans and that was not something that men were subjected to at AIGH. I was not given the resources that I needed to do my job. In fact, my budget for education was cut by 60 percent within a few weeks of Prabhjot assuming directorship, even though the Arnhold gift was specifically for Global Health education. Whereas my male colleagues seemed to have no problem accessing resources, asking for raises and being granted them, getting the money, the funds, the resources that they needed for their projects. I was -- my reputation in the institution was -- Prabhjot set about destroying my reputation in the institution while I was there and after I left. I heard from several colleagues that he had been disparaging my work claiming that it was a good thing I left because I was holding the Institute back. Claiming that I hadn't done the work that I had been doing. Claiming, apparently, that I had had inappropriate sexual relations with people during

Global Health field trips and that I had misspent Global Health funds, all of which were grossly untrue, and cutting off my relationships. Basically, destroying my relationships within the institution, relationships that I had held for a long time with leadership in the Department of Medical Education. He, at one point, forbid me from speaking to David Muller, who was a long time mentor of mine and was a professional relationship that was key to me being able to do my work in Global Health education. Destroying my relationship with the Arnhold family by excluding me from meetings with them, even though I had been the main contact, myself and Ramon, with the Arnhold family for many years. As soon as he came in, he asked that I be excluded from those meetings, so cutting off my relationships within the institution and my ability to do my work through those relationships. Those are some of the ways that come to mind right now. And by the way, when he cut those relationships, men in the organization retained those relationships, and I was not permitted to do that.

BY MS. GUERRASIO:

Q. You testified, first, about you being

demoted from your position and I believe you testified that you went from director to program director. Is that correct?

A. Yes.

Q. Did your salary change when you went from director to program director?

A. It did not.

Q. Did your responsibilities change?

A. They did not.

Q. You said that men who --

A. Actually, I'm sorry, do you mind if I clarify that answer? My responsibilities, I was not given a formal change in my job description saying that now your job description is this. So my assumption is that my responsibilities stayed the same. However, I was not able to do the work that I had been doing because of the environment at AIGH.

Q. Okay. So your responsibilities didn't change, but your testimony is that the environment prevented you from doing the work?

A. Yes.

MR. CERVENKA: Objection. Form. You can answer.

THE WITNESS: Yes, I had -- sorry if you're waiting for my answer. Yes, I had difficulty

people who would know. I'm presuming Prabhjot knew. I'm presuming Kirsten knew. I'm presuming some other people at the institution knew.

BY MS. GUERRASIO:

Q. Do you know anyone that had that information, is my question?

MR. CERVENKA: Objection. Form. You can answer.

THE WITNESS: Kirsten would have had that information and Prabhjot would have had that information.

BY MS. GUERRASIO:

Q. And to the extent you have that information, it was secondhand from someone else?

A. Yes, it was.

Q. You testified that another way was that you were excluded from workflows that were under your purview that men were invited into?

A. Yes.

Q. Specifically, what men?

A. At that point, there's one example -- so Abdul El-Sayeed and Prabhjot would have conversations, that I would hear about afterwards,

about education that I was not invited into, although I held all the institutional knowledge about education at Mount Sinai up to that point, and had as one of my responsibilities to lead some of those educational programs. There was a meeting between David Berman and Sandeep Kishore that was set up around the time that he was going to be coming in around education that, basically, myself, Holly Atkinson, and Renee had to invite ourselves to, to say, hey, we might know something about that given that we've been running it for the last five to eight years. There were numerous examples like that where I could see that there were meetings being had about topics that I should have been involved in that I was either excluded from or disinvited from.

Q. How were you disinvited?

A. There's one example where I was involved in a workflow to redesign Global Health residency tracks. And when I showed up for that meeting, Prabhjot's executive assistant, Andrew Randall, at that time, told me that Prabhjot had asked that I be removed from that invitation, that I be disinvited from that meeting. And that workflow was directly under my responsibility as the director of education. Prabhjot had previously asked me specifically to work

on that with the other people who would be in that meeting. Then I had turned up and I was told I had been disinvited and that Prabhjot had been asked -- had asked that I be disinvited from all meetings to do with that.

Q. Did you ask Prabhjot why you were disinvited?

A. At that point, I did not.

Q. And one of the items that you said was that your budget was cut 60 percent, but that male colleagues had no problem accessing resources or getting funds raised. Is that correct?

A. Yes.

Q. What male colleagues are you referring to when you say they had -- male colleagues had no problem accessing resources?

A. When I spoke to James Faghmous, he told me that he didn't find that a problem. David Heller said, similarly, he didn't find that a problem.

Q. What area did David Heller work in?

A. David Heller, I can't remember exactly what his title was. Again, we crossed paths, but he was managing a field site, I believe, and was doing, I think, doing research at that field site.

Q. Did either of them work on the programs

that you were working on?
A. Tangentially, they were linked.
Q. You testified that one of the ways in which Dr. Singh discriminated against you was that he destroyed your relationships with people in leadership and, in particular, you identified David Muller?
A. Uh-huh, yes.
Q. You testified that he forbid you from talking to David Muller. Can you tell me when Prabhjot told you, you were not allowed to speak to David Muller?
A. I believe it was in November 2015, after the GLG incident, when he blamed the downfall of that program or the problems that we were having with that program on me and instructed me that I should not have conversations with David Muller without him or other of his leadership present.
Q. You testified another example was that he provided overly hostile and disparaging comments about your work. Can you give me any specific examples?
A. Yes. For instance, for certain parts of the year, a significant amount of my time would be taken up with designing and implementing what was

CERTIFICATE

I, JOMANNA DEROSA, a Certified Court Reporter and Notary Public of the State of New Jersey, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically and digitally at the time, place and on the date hereinbefore set forth, to the best of my ability.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor Counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or Counsel, and that I am not financially interested in the action.

JOMANNA DEROSA, C.C.R.
License No. 30XI00188500
Notary Public of the
State of New Jersey