# Exhibit 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- x
DR. STELLA SAFO, GERALDINE LLAMES,
AMANDA MISITI and EMILIE BRUZELIUS,
Plaintiffs,
- against -
DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY,
BRUNO SILVA, and ICAHN SCHOOL OF MEDICINE
AT MOUNT SINAI,
Defendants.
Civil Action No. 1:19-cv-03779-VSB-JW
---------------------------------------- x

October 10, 2024
9:38 a.m.

VIDEO-RECORDED DEPOSITION of DR. HOLLY ATKINSON, taken pursuant to Notice, held at the offices of Proskauer Rose, 11 Times Square, New York, before Fran Insley, a Notary Public of the States of New York and New Jersey.

Atkinson

present?

A. Anu Anandaraja, Renee Bischoff and myself.

Q. Do you recall when in was?

A. This, I believe, was in March of 2016. Because what we were talking about was the strategic planning process. And that is something that Dean Charney had asked the entire institute to go through. And AIGH, the Arnhold Institute of Global Health, was conducting its own strategic planning at the time, and that was part of the discussion of the meeting. So I think it would have been in March of 2016.

Q. And what was your role in March of 2016 within the Arnhold Institute?

A. I was -- I had been demoted to the Program Manager of the Human Rights Program. Program Director.

Q. Your title was Program Manager or Program Director?

A. Program Director. I had been director and he changed my title.

Q. You had been Director of the Human

Atkinson

Rights Program, correct?

A. Yes.

Q. And now you were Program Director of Human Rights, correct?

A. Program, yes.

Q. Alright, so we talked about this March 2016 meeting. You said that your voices were silenced. Did I hear that correctly in your testimony?

A. Yes.

Q. What do you mean by that?

A. When we went to speak, we were spoken over. So --

Q. I'm sorry, I thought you were done. Go ahead.

A. So we were drowned out when we went to speak.

Q. So someone spoke over you?

A. Yes.

Q. Someone didn't say to you don't speak at this meeting?

A. No.

Q. And you said also that your work had not been recognized; is that correct?

Atkinson

question?

Q. Prior to Dr. Singh becoming the institute director, you had an administrative role with Global Health?

A. Correct. I also had a faculty position.

Q. I'm not asking about the faculty position right now. I'm just asking about the administrative role. What was the source of funding for your administrative role?

A. Initially it was a one-time gift by the Gogel Family. And it was clear when that gift was given to me, that it was a one-time gift.

Q. What was the gift amount?

A. Two hundred thousand.

Q. What was your salary when the gift was made?

A. A hundred fifty thousand, which is in my letter of agreement.

Q. So the Gogel's gift, what year was that made?

A. They made the gift in October of 2012, and I started in the full-time position

Atkinson

program managers engaged in a federal lawsuit against the Mount Sinai Health System for gender, age and race discrimination." Do you see that?

A. Yes.

Q. Do you see this GoFundMe is seeking to raise $45,000?

A. Yes.

Q. And you previously testified that your counsel in this case is being paid on a contingency basis, correct?

A. Yes.

Q. What is this GoFundMe for?

A. Expenses.

Q. I believe you testified earlier, Dr. Atkinson, that your salary at Mount Sinai was $150,000, correct?

A. Yes.

Q. And the other plaintiffs, Dr. Anandaraja is a doctor, correct?

A. Yes.

Q. Dr. Safo is a doctor, correct?

A. Yes.

Q. And the other women and/or

Atkinson

harassment or discrimination?

MR. CERVENKA: Same instruction.

A. I was very distressed by an interaction between Dr. Landrigan and me. In the Department of Preventive Medicine there was something called grand rounds. This is something that occurs in academic medicine, but we particularly had grand rounds for Preventive Medicine. Dr. Landrigan had invited an admiral friend of his, Admiral Baker, to give a grand rounds to the Preventive Medicine group. I attended. It was a room on the fifth floor of the building on 102nd Street. The admiral gave a fantastic grand rounds. It was really a compelling talk. He's a trauma surgeon. He had been a trauma surgeon in the military for 30 years. And he gave a talk on how trauma surgery had progressed over the years and what they were able to do. It really was a tour de force presentation. As a matter of fact, I remember texting my stepdaughter at the time, because she was at Bethesda Naval Hospital, and I asked her if she had kind of seen any of this new surgery going on at the naval hospital.

Atkinson

And most of the people in the room were women, medical students, MPH students. There was some faculty there.

And at the end, during the Q&A, one of the young woman in the room asked him about rape in the military. And Dr. Baker's response was very lacking. He made a comment that was, "Well, what do women expect if they come into the military. Boys will be boys." And this was -- this basically ended the presentation. I mean, the room was -- you could hear the gasp in the room. And a lot of the women were very upset.

The presentation ended. And this was a room near the stairwell on the fifth floor. So for people to go back to their offices, they had to go down this stairwell. And people are pouring out of the room. And like I said, the vast majority of people who happened to attend that day, it wasn't always that way, but it just happened to be women. And as the women were going down the stairwell, there was an uproar about his answer to the question. And as I was in the stairwell, some

Atkinson

of the medical students turned to me and, you know, I was one of the older, senior people on the team, and some of the women said, "Can't you do something about that? It's really an inappropriate comment for rape in the military." I thought, yeah, he should get some feedback on how to improve his presentation. It's a really just phenomenally insensitive way to approach rape in the military.

So I went back in my office on the second floor. And Phil passed my office as I was sitting there. And I said, "Phil, can I have you for a moment?" I said, "Would you mind giving me Dr. Baker's e-mail address or contact information? I'd like to reach out to him and give some feedback." Well, I'm sure I said something about, you know, the presentation was fantastic. Phil had left the room by this time. He was not in the room when this happened. And I said, "You know, I think the presentation was just amazing." There's a medical paper that goes along with his presentation that he published in the medical journal. And I said, "You know, it was a great

Atkinson

presentation, but if he's going around the country giving this presentation, he should really think of a better way to answer this question about rape in the military and I'd like to give him some feedback on that."

I mean, I cannot tell you how distressed the voices were in the stairwell. It was an uproar of women upset and aghast coming up the echoing in the stairwell. And he said to me, "Well, yeah, I can give you his contact information." And I said, "Thanks a lot."

So he walked away, and about, I don't know, 20 minutes later he came back and he said to me, "Holly, you know, can you just like not give him the feedback?" And I'm like, "Why, Phil? I mean, I'm trying to make his presentation better and for him to have some sensitivity about this." And he said, "Well..." and I thought this was a rather bizarre reason not to give him feedback. He said, "Well, you know, his wife recently died and he's been having a tough time." I'm thinking that's an excuse for making an

Atkinson

inappropriate answer to rape in the military in front of a bunch of women? And I said, "Well, let me think about it." So I felt pressured not to reach out to Phil's friend to address this issue.

He came back to me a third time. I don't remember how long that interval was, maybe a day later, and he said, "You know, I don't know if you sent him anything, but I really don't want you to send him anything about this." I never did.

I feel badly about that. I think he did need feedback. But I felt pressured by Phil not to kind of, you know, critique his friend, and I thought it was very inappropriate of Phil to put that pressure on me.

And I think it is sexist on his part. First of all, to join us in being a little aghast at Admiral Baker's response and to not support me in actually helping his friend improve his grand rounds presentation. And I felt it was sexist and it was inappropriate pressure on me.

Q. Dr. Landrigan didn't actually hear

Atkinson

13:25. We are off the record.

(Lunch recess)

AFTERNOON SESSION

THE VIDEOGRAPHER: The time is 14:39. We are on the record.

CONTINUED EXAMINATION

BY MS. GUERRASIO:

Q. Dr. Atkinson, can you describe for me the ways in which Dr. Singh treated you differently based on your gender?

A. Yes. First of all, I think there were pay discrepancies. I was being paid $90,000 a year for full-time work, which I think is scandalous that I was paid that little. Upon his arrival at the institute, there was another layer of middle management put above me that was mostly men; so David Berman, Sunny Kishore, James Faghmous. And I'm sure all of them were making substantially more money than I was. Which indicates that he was willing to spend money on bringing new people in. I would also like to add that I did not know nor was I offered the opportunity to apply

for any of those jobs. So I think there was a disparity there in the way the men were recruited. They weren't openly recruited positions.

Also, in the case of seating arrangements, the offices were primarily given to the men. Anu was the only exception. She was eventually given an office. Marina Lowy told us, when she gave us the results of the investigation in the summer of 2018, in July of 2018, that indeed they had found a discrepancy in that and asked him to fix it, and he did. So that perception is quite accurate.

I also feel that I was substantially excluded, purposefully so. He told me in June of 2015 that I had to essentially prove myself, and if I proved myself over the next six months, again I would add that he was promoted on promise and I had to take a pay cut and prove myself over six months, but in order to do so, in order to prove myself, I would have had to have been included. And he specifically included me -- excluded me from major projects, such as ATLAS, although -- so there was

Atkinson

telling people at AIGH, the new people who came in over the summer, that I was incompetent. And I sensed that because people wouldn't react to me. I would invite people out to lunch, like Stella Safo. When she first came in, I invited her out to lunch. She basically ghosted my e-mails, not interested. I invited Kirstin Knaup out to lunch. She ghosted me. I asked for meetings with... sorry.

THE WITNESS: Can I have a tissue? Can someone get me a tissue.

MR. CERVENKA: We can take a break if you like.

THE WITNESS: No, that's okay. We have to move on.

A. I asked for meetings with James Faghmous because I had some ideas on how to incorporate some human rights initiatives. He had said to me that you have to show us that you can incorporate human rights across the work of the institute. So I tried to meet with James. I was brushed off several times. I finally was able to meet with James. I pitched an idea, and James actually at one point said,

Atkinson

"Well, this could be pretty good."

And this, by the way, started very early on. This started in April, when he first met with us as the Mount Sinai Global Health Group. And this is April of 2015. In the one-on-ones he had with us very briefly, they were supposed to be 20 minute meetings, they were essentially 10 minutes. They were cut down. He showed very little interest in my work. He was insulting, openly insulting towards human rights work. And very early on, this is April, this was basically the first time he sat with me, I felt that he just disrespected me as a woman, and especially an older woman, and that he had no room for me. And that he created a hostile environment to make me so miserable on the job, which he did, that I had to leave.

I also want to say that he defamed me. He was saying that I was doing sex exams, I have no idea what he means by that, at the institute, which was putting the institute at risk. That is a total falsehood. And if he believed that, he never spoke to me about it,

Atkinson

and I would have disabused him of whatever he thought sex exams were. This came back to me two years later, that he was still saying that about me in 2018. And I had a sense, like I said early on, that he was gaslighting me to my colleagues such that they didn't even think it was worth working with me. So I was set up to fail over the course of the six months -- well, five months from when he came in, from September to December. I was given menial tasks. For example, as an MD I was asked to put in 1,000 e-mail addresses that he basically ripped off from the UN. It would have been inappropriate to do it. I did not do it because I thought it was inappropriate to take a thousand e-mails on a UN distribution list and type them into our Constant Contact, but I was asked to do that menial kind of work. Emily told me, we overlapped for about two months, I was taking photos of the new employees of the institute trying to make my way there. He had an MD taking photos of new people coming on. It was so insulting and so degrading and so demeaning, I have never been

Atkinson

treated this way in my life.

And to summarize it all, he told Amanda Misiti, when she was interviewing for the job, that one of the first things he had to do when he came to the institute was to get rid of the Legacy Group.

By the way, I want to say that Legacy Group is his term. Not mine, not anybody else's. That was Prabhjot's term for us. He is the one who introduced that into the parlance. He did it in an e-mail and he did it in an insulting way by saying the Legacy Group was doing basically incompetent work, subpar work. He bragged to Amanda that his first -- one of the first things he had to do was get rid of the Legacy Group, and she said to him, "What, you fired them all?" And he said, "No, I had my ways." So he set me up to fail by the exclusions, not mentoring me, the hostile workplace, and try as I might, I had no option but to leave. Can we have a moment? I just need a moment.

Q. Sure.

MR. CERVENKA: Let's go off the

Atkinson

Q. And I believe that you then referenced a comment that you were doing sex exams.

A. Yes.

Q. Where did you hear that from?

A. A number of people. Again, Stella Safo, James Faghmous, Jonathan Taylor. Jonathan Taylor was in the Development Department at Mount Sinai.

Q. Tell me about your conversation with Stella Safo when she told you that Prabhjot Singh said you were doing text exams.

A. She corroborated that he was saying that around the office.

Q. Where did you first learn that he was telling people you were doing sex exams?

A. Where did I first learn it?

MR. CERVENKA: And again, just reminding you of the instruction to not reveal the contents of communications where your counsel was present.

A. I learned this after we filed the federal complaint --

Q. From who?

around the time that Ann Olivarius had met with Prabhjot Singh at the Arnhold Institute, and Prabhjot spoke to Jonathan Taylor afterwards, because Jonathan Taylor was part and parcel of setting up that meeting between Prabhjot and Ann. And he was upset after that meeting and was on the phone with Jonathan. And Jonathan recalls that he thinks it's that conversation, that Prabhjot said to him, "Well, you know, she was doing sex exams." And Jonathan told me that it was said in a way that it was like, this is so creepy, this is so solacious, that he said I understood it was an insult to you, but it was like so creepy I didn't want to go there. And this is two years after I had left the institute that Singh was still saying that about me. And Jonathan took it as basically an insult and an attack on what I was doing. It was suggesting I was doing something terribly wrong and that I was putting the institution at risk. And there is absolutely no truth to that statement whatsoever.

Q. You weren't employed at Mount Sinai in 2018, correct?

Atkinson

Q. When you were at AIGH, who was working on ATLAS?

A. Primarily Dr. Singh.

Q. Who was working with him?

A. It was a very small group. Kirstin was in some of the meetings. I was initially in perhaps one or two of them. This is early, early. This is actually before he started full-time September 1. I would say this probably was in August of 2015, when it was a concept, and I had indicated to him I was very interested in working on it.

I at the time was working on my MPH, and I was -- I was early in my MPH at Sinai. My tuition was being covered and I was interested in particularly majoring, if you will. There were different areas you could concentrate on in an MPH in biostatistics, and I was interested in the quantitative side of things. And I was in the midst of this MPH and I indicated to him that I was very interested in working on the ATLAS project. Not only because I was interested in biostatistics, but I was interested in big data, which is what he

Atkinson

A. No, I didn't testify about this.

MR. CERVENKA: Why don't you just answer the question.

Q. So in March 2015, is that the time period you're talking about?

A. No.

Q. Okay, then go ahead.

A. This is March of 2016.

Q. Okay.

A. During the process of developing a strategic plan for the Arnhold Institute at the behest of Dean Charney, because the entire institution, Mount Sinai, every department was supposed to be doing a strategic planning. So this was part of an institution-wide initiative.

I went in to talk to Dr. Singh about my plan. I had prepared a document as requested. I had prepared a PowerPoint. And I had just started presenting the PowerPoint, and he basically, very brutally yelled at me, "You're not capable of this" in a very loud voice. Essentially made me jump. I was in the middle of a PowerPoint presentation. And he

Atkinson

said, "You're not capable of this." And I said, "Excuse me?" I looked at him and, you know, "What?" He said, "You're not capable of this. There is no way one person can do all this themselves." And I looked at him and I said, "You didn't read what I submitted to you, did you?" I knew he hadn't read it because when he said you can't do this all yourself, he obviously had not looked that I had a phased approach for the plan and it was predicated by milestones and ramp-ups if the milestones were met. And he said, "I don't have to read it, you're not capable of it." At which point I burst into tears. And I was overwhelmed just by the accumulation of the months of his treatment of me. And I was embarrassed that I broke down into tears. And I said to him, "I'm so sorry, my father dying," which my father was dying, but that's not why I broke into tears. I felt so humiliated.

You know, once again, I've never been treated this way in my entire career, and it's been a long one. And then he reached out and he took his left hand and he put it on my

Atkinson

left upper thigh, and he looked at me and said, "Let's do this with empathy." I have no idea what he meant by that. I was very upset that he had touched me. We were sitting kitty-corner. It was a very small table and we were sitting like this. So when he reached his left hand out, he put his hand out on my upper left thigh. And I got up and walked out. And at that point I realized that, you know, I just had to preserve my dignity and leave the institute. And because we were in this strategic planning process, I needed to buy myself some time to get out. And I sent him an e-mail, I don't know how long after this was with this incident, and I said to him, "You're right, human rights doesn't fit with you." Doesn't belong in the Arnhold Institute. Certainly not under the environment that he created for me; no one could succeed in the environment he had created for me. And that was the day that he basically won and he got me out. And, thankfully, I was able to get the job at CUNY. I almost didn't because they said I was overqualified. And I -- as soon as I got

Atkinson

the offer from CUNY, I gave him two weeks notice.

Q. This presentation of the strategic plan that you had put together and you talked with Dr. Singh about, where was this meeting?

A. In his office. At his little conference table. He had a little round conference table.

Q. And this was in the glass office he sat in?

A. Yes, yes.

Q. Did anyone else see you when you were in the office with him?

MR. CERVENKA: Objection, form.

A. My back was pretty much to the door. But I got up and I walked out and I walked out of the building. I left the building. And there is a -- in the Hess Building, which is on the corner of Madison and 102nd Street, there's a cafeteria and, you know, we used to meet a lot of people in there, students and whatnot. And it was relatively -- you know, it's a few blocks away from the NYAM, the NYAM building, and I went there and I called Anu and I asked

Atkinson

her to come. And she came. And I was sitting there sobbing. And she sat with me. And that's actually when I learned she was thinking of leaving. I didn't realize that she was thinking of leaving either. It was just kind of happenstance that we both got to the point where we couldn't stand his treatment of us anymore. And she loaned me $20. I went across the street and bought some Visine 'cause and I had to go back to the office and I didn't want to go back in a state. It was the morning. And so I just, you know, caught my breath and went back to the office. So, yes, Anu saw me and gave me some support.

Q. My question is a little different. In the office, did anyone see you sitting with Dr. Singh?

MR. CERVENKA: Objection, form. You can answer.

A. I don't know.

Q. So you didn't see anyone, you didn't happen to notice anyone when you were in the meeting with Dr. Singh?

A. No, I was pretty distraught and I

Atkinson

we've talked about earlier, about the way that Dr. Singh was selected. When his name was originally put forth, he wasn't considered a high enough candidate. His CV was not considered -- you know, that had the criteria to be the director. And the fact that the search committee -- first of all, that Stephanie Strathdee, the recommended director, was not brought in, and I was told by Elena Rahona that she had seen an e-mail that Charney had sent to Strathdee that called her an idiot. I don't know what the idiot referred to. But I believe Elena was shown that by Landrigan. We knew that. We knew that before these events. We knew that in late 2014, and then we saw the search committee be circumvented, and Charney picked a man on promise, and it's the culmination of that that you see here. It's both the selection process, Stephanie Strathdee's deal falling apart, the idiot e-mail, and the way the announcement was made, it's the culmination of that that we're reacting to here, and that yes, I put in the category of gender discrimination.

Atkinson

large, as I said, the word dysfunction does not apply to all the people at the place or all the departments or all the hospitals. This is specifically in regards to Dean Charney, the way he picked Prabhjot and the way it was announced, and we do think that there was -- I think that there was gender bias in his rejection of Stephanie Strathdee. I do not believe he would have put a woman with the same thin CV that Dr. Singh had in the position of directorship. And so I don't think these situations are black or white and I feel in your question you're trying to make this black and white at a very large institution. All institutions can improve. All institutions may have levels of dysfunction. So, and this was a moment of distress that I might have said yeah, we may have to leave.

I want to add, he gave a presentation in December as part of the selection process and his vetting, and he came and get a presentation to our group. And the presentation was a lot of people were disappointed by it. Parts of it were fairly

Atkinson

Q. Mount Sinai Global Health.

A. Arnhold Institute of Global Health. Well, no -- yes, the Director was when I was at MSGH and then Program Director was at AIGH.

Q. So just so the record is clear, when you were worked at AIGH your title was changed to Program Director of Human Rights AIGH, and prior to that when you worked for Mount Sinai Global Health your title was Director of Human Rights Mount Sinai Global Health?

MR. CERVENKA: Objection, form.

A. Yes.

MR. CERVENKA: But you can answer.

A. Yes.

Q. And I misstated. It's Director of Human Rights Program Mount Sinai Global Health?

A. Yes.

Q. What's the difference between those two titles?

A. A director title implies more responsibility, is a higher level on the organization, and to go from a director to a program director is essentially demotion, and it would certainly read that way on a CV.

Atkinson

A. Correct.

Q. At that point had you decided that you wanted to sue Mount Sinai?

A. No.

Q. And prior to that you had made an internal complaint to Mount Sinai, correct?

A. Yes.

Q. And when was that?

A. On Friday, April 27th.

Q. And who did you make that complaint to?

A. Clarissa Jones-Winter.

Q. Was it an in-person complaint?

A. Yes.

Q. Was it just you and Ms. Winter?

A. No.

Q. Who else was present?

A. Anu Anandaraja.

Q. Just the three of you?

A. Yes.

Q. And what was the purpose of you meeting with Ms. Jones-Winter?

A. It started by us wanting to understand the process at Mount Sinai of

Atkinson

lodging such a complaint.

Q. Did you talk with Dr. Olivarius about making a complaint at Mount Sinai before you did on, I think you said, was April 27?

A. Very briefly.

Q. What did you tell Dr. Olivarius?

A. That a number of us women who had been and still are at the Arnhold Institute was contemplating making a complaint, but up until that point we had not because we were fearful of retaliation, especially for the women who were still working there.

Q. Did you specifically mention Dr. Singh to Dr. Olivarius?

A. Yes.

Q. Did you mention anyone else?

A. I'm sorry?

Q. Did you mention anyone else as being someone that you felt had discriminated against you?

A. No.

Q. This conversation you had with Dr. Olivarius was at a breakfast at the Yale Club, correct?

Atkinson

A. There are typos.

Q. And Comment 3 now, your testimony is that is not accurate?

A. It's accurate regarding the group. It is not accurate in the absolute.

Q. Are you part of the group?

A. Yes.

Q. If you look at the fourth bullet down, it says, "During the investigation, at least 19 people came forward to give testimonials about their negative experiences, including 15 women. More women were ready to give testimonials and were not called on to do this." What women were ready to give testimonials but were not called on?

A. I don't recall.

Q. You don't have any names that you can't provide?

A. No, I do not recall.

Q. But you when you were fact checking this, you knew that to be accurate?

MR. CERVENKA: Objection, form. You can answer.

A. I don't know who drafted this, and

this is a working copy, so to say that... we tried to be as accurate as possible.

Q. On the second page, Dr. Atkinson, there's a line here that says, "Instances of..." it's halfway down the page, under the far left bullet. It's the second bullet down. It's a clear bullet, not a filled-in bullet. It says, "Instances of leadership hiring and firing without due process are common, and contribute to the environment of fear and instability." What due process are people owed in decisions of hiring and firing?

MR. CERVENKA: I'm sorry, Edna, can you point on the page where it is? I can't find it.

MS. GUERRASIO: If you look at the far left bullet, the black bullet, if you go two down from that.

MR. CERVENKA: That begins "the abuse spanned"?

MS. GUERRASIO: I'm on the second page.

MR. CERVENKA: Thank you.

Q. What due process is owed to

Atkinson

A. Yes. I specifically recall that she said when Dr. Singh had his first meeting with HR.

MS. GUERRASIO: I'm going to put an objection on the record for a privilege that Mount Sinai holds and Dr. Atkinson does not, but I'm obviously not stopping her from testifying, but I would just like it on the record.

MR. CERVENKA: What's the privilege?

MS. GUERRASIO: This is part of a privilege investigation that Mount Sinai holds a privilege to. I don't know if this conversation was part of the investigation, that wasn't clear from her testimony, but she can testify as to what Clarissa said and we can have a dispute about it if we need to with the court if the testimony is used.

Q. Why don't you go on and finish your answer, Dr. Atkinson?

A. She said when Dr. Singh first met with HR that he was accompanied by a labor lawyer, and Charney had told him to get a

lawyer, and that during the meeting Prabhjot threw on the table a trump card. And she said they looked at the trump card and said, "You're not going to use that, are you?" And he said, "Yes, I am. And she said, "I can't tell you what it is." And later on in the conversation I circled back to it specifically. I said, "Clarissa, I know you can't tell us what the trump card is, but that is about us or Dean Charney? And she said, very quickly, "Dean Charney."

MR. CERVENKA: Thank you. I've got no further questions.

MS. GUERRASIO: I have two follow-up questions at least.

CONTINUED EXAMINATION

BY MS. GUERRASIO:

Q. This conversation with Clarissa Jones-Winter that you just testified about, did you tape record that?

A. No.

Q. Did you tape record any of your conversations with Clarissa Jones-Winter?

A. No.

C E R T I F I C A T E

I, FRAN INSLEY, hereby certify that the Deposition of HOLLY ATKINSON was held before me on the 10th day of October, 2024; that said witness was duly sworn before the commencement of testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein;

That the within transcript is a true record of the Deposition of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 23rd day of October, 2024.

FRAN INSLEY

ERRATA SHEET

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

HOLLY ATKINSON, being duly sworn, deposes and says:

I have reviewed the transcript of my deposition taken on October 10, 2024. The following changes are necessary to correct my testimony:

| **Page/Line** | **Corrected Testimony** | **Reason for Correction** |
|---|---|---|
| 15,19 | "and" not "a d" | Typo |
| 37, 15 | "seen," not "seen." | Typo |
| 39,23 | "administrative" not "ministrative” | Typo |
| 87,07 | "Medicine" not "Science" | Misspoke |
| 102, 06 | "Berman" not "Roman" | Typo |
| 110, 15 | "Commensurate" not Commiserate | Typo |
| 132, 10 | "Star" not "Starr" | Typo |
| 135, 20 | “Discrimination” not “consideration” | Misspoke |
| 138, 14 | "know" not "month" | Typo |
| 151, 24 | "excluded" not "included” | Misspoke |
| 159, 10 | "take" not "tell" | Typo |
| 159, 11 | "your" not "you're" | Typo |
| 162, 16 | "than an" not "an" | Typo |
| 181, 13 | "salacious" not "solacious" | Typo |
| 197, 18 | "will—" not "will." | Punctuation |
| 197, 19 | "MPH — in" not "MPH in" | Punctuation |
| 219, 23 | "gave" not "get" | Typo |
| 219, 24 | "was," not "was | Punctuation |

| | | |
|---|---|---|
| 234, 12 | "we" not "she" | Typo |
| 275, 10 | "my" not "his" | Misspoke |
| 284, 14 | "McO" not "MCH" | Typo |
| 308, 11 | "I do not think it is a typo. The four MDs were Anandaraja, Safo, Dandekar, myself, and the paralegal was Anna Stapleton." not "I think it was a typo. I think I was listing examples of professional. I don't know, did it make it into the – I don't know if it made it into the final one, but the "4" is a typo, and I may have someone's credentials wrong. That's a typo. | Refreshed recollection upon reviewing the transcript |
| 308, 20 | "unwanted" not "unwaving"\| | Typo |
| 311, 08 | "for" not "or" | Typo |
| 318, 16 | "Jones-Winter" not "Winter-Jones | Misspoke |

Holly Atkinson

Sworn to before me this 21 st of November, 2024

Notary Public

Notarized online using audio-video communication

melissa mendez
Online Notary Public
State of New York
Orange County
Commission #: 01ME0012476
Commission Expires: 08/22/2027