# Exhibit 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 1:22-cv-03080

-----------------------------------------x

DR. ANN MARIE BEDDOE,

Plaintiff,

- against -

MOUNT SINAI HEALTH SYSTEM, INC., ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI AND DR. DENNIS CHARNEY,

Defendants.

-----------------------------------------x

March 15, 2023
9:30 a.m.

DEPOSITION of DR. ANN MARIE BEDDOE, taken by the Defendants, pursuant to Notice, held at the offices of Proskauer, LLP, 11 Times Square, New York, New York, before Debbie Zaromatidis, a Shorthand Reporter and Notary Public of the State of New York.

BEDDOE

Q. Before Ms. Lowy called you, were you aware that a complaint had been made or complaints had been made about Dr. Singh?

A. Yes.

Q. How were you aware?

A. I don't know exactly. It was the best kept secret at Mount Sinai.

Q. What do you mean?

A. Everyone knew that there was -- there was some complaints about harassment at the Arnhold Institute of Global Health.

Q. Was it your understanding that Mr. Lowy was investigating a complaint as counsel for Mount Sinai?

A. That is what she told me.

Q. And what did she say to you and what did you say to her?

MS. EDWARDS: Objection form.

Go ahead.

A. Specific questions. I mean she -- she said many things. Is there anything specific that you want me to say?

BEDDOE

Q. What you remember about the conversation.

A. She told me that she was investigating Dr. Singh, some complaints about Dr. Singh, harassment of employees at the Arnhold Institute of Global Health. She asked what I knew about the complaints. I told her what I had heard, and she offered some assessment of what was going on, what she felt was going on. She was very puzzled why the women were bringing a complaint when she had suffered the same kind of treatment during her years as a lawyer in Israel. She asked if I ever witnessed any harassment. I said I didn't. Whether I had spoken to colleagues. And she said that she was going to make a decision about, you know, the outcome of this investigation, but that most people would not be very happy with what she -- you know, what decision she came to.

Q. Is it your testimony that Ms. Lowy told you she had been a lawyer in

MS. EDWARDS: Objection form. Go ahead.

MR. BAUMGARTEN: I'm sorry. What was the basis of the objection?

MS. EDWARDS: The form of the question.

MR. BAUMGARTEN: What was wrong with the form?

MS. EDWARDS: It was compound. It was an or.

Q. What did he say to you and what did you say to him?

A. Well, I asked him if he was aware of the complaints that were filed with HR, which he said he did. He said he didn't know about it before they filed the complaint. He said that he wanted the women to know that he was very supportive of them because he had daughters, and he would not want anything like that to happen to them.

He asked me what I thought about Dr. Singh. I told him that I thought he was incompetent, that he was not qualified

BEDDOE

to be an institute director, that he was very rash, that he often exaggerated his credentials and also name dropped a lot. Dr. Charney asked me if I thought he could be rehabilitated, and I said no. I don't think he can rehabilitated. He expressed concerns that he didn't want to stifle his potential, and at my remark but what about the women who are complaining he didn't respond to that.

We talked about some of the things that I was told he would do to denigrate the women, and he kept stressing that he was -- he wanted the women to know that he really empathized with them. I know I said maybe you should meet with them and talk to them.

Sort of that was the gist of the conversation. You know, there were many things said, and I can't tell you exactly everything, but the gist of the conversation is I left thinking Dr. Charney recognized that there was a problem with Dr. Singh. He wouldn't ask

BEDDOE

me if he could be rehabilitated if he didn't think there was a problem, and he may not have been happy that I said things about a faculty member that he really put on a pedestal really, and he was sort of Dr. Charney's -- Dr. Singh was like Dr. Charney's golden boy, and I don't know that he received that well, but he didn't express that to me at the time.

Q. I was going to ask you whether he expressed any hostility or anger about what you were telling him?

A. No.

Q. Did you ever have any other conversations with Dr. Charney in person or by telephone concerning Dr. Singh?

A. No, but I would like to go back for one -- when you said if he expressed hostility, when I went to meet with Dr. Charney I prefaced my meeting by telling him that I heard he was a bully, that he screamed at people, and I really didn't want to have a confrontation with him. I wanted to have a conversation with him.

BEDDOE

global oncology program that I was trying to do for Liberia.

Q. When was that?

A. That was -- my timelines are not clear. It would have about in -- somewhere in 20 I believe 18, but I don't have the exact time.

Q. And I don't want to get too far into the specifics of it, but was he a bully at that meeting?

A. No, that was at a presentation. I went to give a presentation, so he was receptive of the presentation.

Q. I think you said when he asked you who considered him a bully you said everyone?

A. Yes, around campus.

Q. Women?

A. Everybody. Men, women.

Q. Men?

A. Yes.

Q. Okay. Did you ever witness him bullying anybody?

A. No.

BEDDOE

told me that she was going to make the decision, and that she was sure that most people would not be happy with it, and then I had heard that they were ready to make an announcement. I believe I sent this e-mail it was in middle of the week or near the end of the week, and I had heard that on the Monday -- no. Sorry. I met with him around the middle of the week or late in the week, and then I had heard that they were going to make an announcement on Monday. So I thought I would write him because I -- what Ms. Lowy told me stood with me. You know, it stayed with me that people wouldn't be happy with her announcement, and I was concerned that she was going to let Dr. Singh off the hook. So I thought I would write him to reiterate my concerns.

Q. You wrote here in the second paragraph, and I will quote, "Sadly there have been numerous rumors heralding your announcement this week that range from appoint an oversight committee to monitor

BEDDOE

the person alleged to have committed these offenses while leaving his position intact to removing him from his current role but protecting his career within the confines of our great institution."

Where did you hear those rumors?

A. Around campus.

Q. Can you be any more specific?

A. This was not an isolated event that was occurring at Mount Sinai, so many people talked about it. I couldn't tell you who. Many people talked about it, and among those conversations I heard that they were going to make an announcement that Monday. So I felt there was some urgency to reach out to him.

Q. When you say this was not an isolated incident, what do you mean?

A. It was not just confined to Marina Lowy and the dean. The entire campus knew what was going on.

Q. You mean -- are you referring to the investigation of Dr. Singh?

A. Yes.

BEDDOE

Q. Okay. Did you confer with anybody about writing this e-mail before you sent it to Dr. Charney?

A. No. I thought long and hard before I wrote it.

Q. Did you talk to anybody else about whether it was a good idea to write it?

A. No.

Q. Were you and Dr. Singh in the same department?

A. No.

Q. Did he manage you in any way?

A. No.

Q. Did you manage him in any way?

A. No.

Q. So there was no reporting relationship between the two of you?

A. We were colleagues.

Q. Okay. Did you ever talk to Dr. Singh about the allegations that had been made about him?

A. No.

Q. Did you ever talk to Dr. Singh

BEDDOE

before you wrote to Dr. Charney about the allegations that were made about him?

A. No.

Q. Did you ever think that it would be good to hear his side of the story?

A. No.

Q. Did Dr. Charney respond to this e-mail?

A. No.

Q. Did he ever respond to the e-mail?

A. No.

Q. Did he ever acknowledge the e-mail?

A. No.

Q. Did you provide a copy of the e-mail --

MR. BAUMGARTEN: Withdrawn.

Q. Was anybody CC'd or BCC'd when you sent the e-mail?

A. No.

Q. Did you ever provide a copy to anybody else?

A. To my legal counsel.

BEDDOE

Q. Okay. Did you provide a copy of this to anybody else including your legal counsel at the time it was sent?

A. I didn't provide this to legal counsel when this was sent to Dr. Charney. No one got this letter but Dr. Charney.

Q. Did anybody at Mount Sinai ever indicate to you that they saw the letter?

A. No.

Q. Do you have any reason to believe that Dr. Charney provided the letter to Dr. Brodman?

A. I don't know.

Q. Do you have any reason to believe that he provided it to Ms. Berdebes?

A. I don't know.

Q. Do you have any reason to believe that he provided it to anybody in -- any physician or any administrator at Mount Sinai?

A. I have no idea.

Q. Did anybody at Mount Sinai ever make reference to this e-mail in any

BEDDOE

referenced the e-mail?

A. No.

Q. Who is David Muller?

A. He was the dean of students I believe.

Q. At Mount Sinai?

A. At Mount Sinai.

Q. Was he a colleague of years?

A. Yes.

Q. Aside from being the dean of students, did he have any other faculty appointment?

A. I don't know.

Q. Was he part of OB/GYN?

A. No.

Q. What communications did you have with Dr. Muller concerning complaints to Mount Sinai about Dr. Singh?

A. I met Dr. Muller on the street one day. It was sometime after the complaint had been filed, and I suggested to him that he talk to Dr. Charney about -- in support of the women, and he didn't seem to be -- he didn't seem to

BEDDOE

want to engage with Dr. Charney about that.

Q. Do you recall anything else about your conversation with Dr. Muller?

A. He mentioned he had met with him before, but he didn't give me any details about what was said. So I don't know exactly what he spoke -- you know, what he had said to Dr. Charney about this.

Q. Okay. Did you have any other communications with Dr. Muller about complaints concerning Dr. Singh?

A. Complaints, no.

Q. What communications did you have with Dr. Brodman about complaints regarding Dr. Singh?

A. Just in casual conversation. I couldn't recall any specific times or what we said.

Q. Do you remember anything at all?

A. I don't have any specific details of my conversation. I spoke to Dr. Brodman a lot, so I really -- on this particular topic. It was one of many

BEDDOE

topics that we talked about. I don't have specific details of a conversation about Dr. Singh.

Q. Did you tell Dr. Brodman about the meeting you had with Dr. Charney?

A. I called him as I was walking across campus after I left doctor -- immediately after I left Dr. Charney's office, and he said Dr. Charney already called me about the meeting, and he said we will talk about it later, but we never really got to talk about it later.

Q. Did he say anything else about what Dr. Charney had called him about?

A. No.

Q. Were there any other -- I'm sorry. You were about to add something?

A. He did say that Dr. Charney called me and said that you were in his office. That is -- that's the extent of what he told me, and we will talk about it later.

Q. Okay. Did you discuss anything else with Dr. Charney in the meeting where

BEDDOE

emotional abuse and harassment of women by men in leadership positions in our medical sector."

Why were you -- let me ask first were you in fact encouraged by conversation that you had with Dr. Charney?

A. A little.

Q. Why?

A. He talked about his daughters. He talked about he empathized with the women. He talked about he didn't know about it before they filed a complaint, and as soon as he found out about the complaint he organized this internal investigation.

Q. Okay. So you came away feeling that he was sincere about taking the complaints seriously and doing the right thing?

A. Well, I hoped that he was being -- that he would be sincere about it. I don't know if he was sincere.

Q. I am not asking how you feel

BEDDOE

sufficient funds. Although everybody in the hospital -- in the campus knew about the case that was going on with -- against Dr. Singh, there was -- there were no senior members as far as I knew who approached Dr. Charney about it. My conversation with Dr. Charney when I brought up Dr. Singh, like I said, I was a little encouraged, but I am not sure how he took it, and I -- I mean I did put down somebody that he really held on a pedestal. So that I feel was probably a little annoying to him. This e-mail that I sent him, he never responded to it. There was no communication after that e-mail, but he brought it up six months later. So obviously it was something that was on his mind, and when I met with him and I left his office after talking to him about Dr. Singh and his -- and complaints that were filed against him, he immediately called my chairman. I don't know what the conversation was, but I don't think he calls everybody's chairman

BEDDOE

A. During 2016, yes.

Q. Your complaint to Dr. Charney was in June of 2018, correct?

A. Correct.

Q. And you had followed up April '18 with Dr. Freedeman, correct?

A. Yes.

Q. Okay. And within a couple of weeks of your follow-up, Dr. Brodman had corrected the problem, correct?

A. He didn't correct the problem. He found out why my application wasn't processed.

Q. Okay. And the application was put back on course, correct?

A. Yes.

Q. And you were informed before the end of the year that you would in fact be promoted, correct?

A. Yes.

Q. And you were promoted, correct?

A. Yes.

Q. Your complaint alleges, and it is in paragraph 12, if you want to take a

BEDDOE
A F T E R N O O N   S E S S I O N
1:45 p.m.
A N N   M A R I E   B E D D O E,
having been previously duly sworn,
testified further as follows:
CONTINUED EXAMINATION
BY MR. BAUMGARDEN:
Q. We are going on the record. The time is 1:37.
Q. Dr. Beddoe, your e-mail to Dr. Charney, Exhibit 8, was sent on June 23, 2018, and that was Saturday. You can look at a calendar if you would like to confirm that, but I did, and it was a Saturday.
Does that sound right?
A. Yes.
Q. Okay. And you wrote in the e-mail that you were thanking him for meeting with you last week. So I am guessing that was the week -- the work week proceeding the Saturday?
A. Correct. Yes.
Q. Okay. And did you meet with

BEDDOE

him on Wednesday, the 20th of June?

A. That sounds right. It was Wednesday or Thursday. Yes.

Q. And you testified that when you left the meeting you communicated with Dr. Brodman?

A. Yes.

Q. Okay. And Dr. Brodman told you that Dr. Charney had already called him?

A. Yes.

Q. Okay. Was that -- did you speak with Dr. Brodman or did you communicate with him by text?

A. I believe it was by text.

Q. Okay.

(Beddoe Exhibit 17 marked for identification.)

(Document handed to witness.)

Q. We have marked as Exhibit 17 a document that was produced by your counsel this morning actually bearing Bates stamp 0770 through 773.

What is this?

A. These are some text messages

BEDDOE

between myself and Dr. Brodman.

Q. And if you look at the text messages on page 770, it says June 20, 2018 at 10:07 you text Dr. Brodman "I have a meeting with Charney this a.m. to follow-up on Liberia funding. Will need to speak to you about it. If not today I kept our Friday GH meeting, so I could meet with you then to discuss."

Did I read that correctly?

A. That is correct.

Q. Okay. And he wrote good luck, right? The good luck is from -- is Dr. Brodman's response?

A. Yes.

Q. Was this the meeting -- was a meeting to discuss the Liberia funding with Dr. Charney?

A. This was my second meeting with Dr. Charney when we discussed -- I followed up on the Liberia meeting and spoke about Dr. Singh.

Q. That is what I wanted -- that was going to be my next question. Was

BEDDOE

this the meeting where you told him about your concerns with Dr. Singh?

A. Yes.

Q. Okay. Just so we are clear, when you wrote in your e-mail to Dr. Charney "Thanks for meeting with me last week," this is the meeting that you were referring to there, correct?

A. This --

Q. The meeting on June 20 that you texted Dr. Brodman about?

A. Yes.

Q. And then the next text in the chain says "Just finished. It went well. He will be in touch with you." That is a text that you sent to Dr. Brodman?

A. Yep.

Q. And you sent that text after you finished the meeting with Dr. Charney?

A. Yes.

Q. And how long was it that you sent that text after the meeting ended?

A. Two minutes.

Q. And what was Dr. Brodman's

BEDDOE

Q. How many times did you speak with Marina Lowy?

A. About this case?

Q. About the complaints made that are in the Atkinson litigation.

A. Once.

Q. And that was in June of 2018?

A. Right.

Q. So that wasn't March of 2019.

A. So then that was my error. I apologize.

Q. Well, is that sentence wrong?

MS. EDWARDS: Objection to form. You can answer.

A. Testimony to the plaintiffs -- let me understand what you are asking here. Is that -- are you asking me if I spoke to legal counsel in March of 2019?

Q. No. I am asking you whether you provided testimony --

A. To the plaintiffs?

Q. Yes.

A. Testimony to the plaintiffs. I

C E R T I F I C A T I O N

I, DEBBIE ZAROMATIDIS, a Shorthand Reporter and a Notary Public, do hereby certify that the foregoing witness, ANN MARIE BEDDOE, was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes.

I further certify that I am not employed by nor related to any party to this action.

Debbie Zaromatidis

DEBBIE ZAROMATIDIS