# Exhibit 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. STELLA SAFO, GERALDINE LLAMES, AMANDA MISITI and EMILIE BRUZELIUS, Plaintiffs, | CASE NO. 1:19-cv-03779-VSB-JW |
| -against- | |
| DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA and ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI, Defendants. | |

*** CONFIDENTIAL ***
INCLUDES ATTORNEYS' EYES ONLY PORTIONS

VIDEO-RECORDED DEPOSITION OF
DAVID BERMAN
Glenn, Agre, Bergman & Fuentes, LLP
1185 Avenue of the Americas
22nd Floor
New York, New York 10036

08/15/2024
9:37 a.m. (EDT)

REPORTED BY: MONIQUE CABRERA

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

So we hadn't spoke in a while, and she called just, first of all, to catch up, say hi, how are you doing, what's new in your life, what's new in my life.

And she said that she was at Mount Sinai working for Prabhjot. Prabhjot was looking to hire like a special assistant, chief-of-staff-type person.

And she was, like, "Would you be interested in a role like that?" I had filled a previous -- I had filled that capacity in a previous job where she and I had worked together, and she said that she had always admired the way I did that work, handled that job, so that -- that was the context in which she started to talk about Dr. Singh.

(Reporter clarification.)

THE WITNESS: Sorry.

A. That was the context under which she started to talk about Dr. Singh was, like, you know, "If you had that role with him, this is kind of what he might be like to work with."

description.

Q. You mentioned earlier in your testimony that you had worked in that kind of capacity in the past before Mount Sinai, right?

A. Correct.

Q. What was that job?

A. I was a special assistant to the president, was the title.

Q. What president?

A. President of the Children's Health Fund.

Q. At Columbia University?

A. Children's Health Fund. No. It's a separate organization.

Q. It's a non-profit?

A. Correct.

Q. Other than that job and the position you had with Mount Sinai, have -- had you been in a role either called chief of staff or similar to that before?

A. No.

Q. Or since?

A. No.
Q. Okay. So let's talk a little bit about your background.
What's your educational background?
A. High school degree, college degree, master's degree.
Q. Where did you grow up?
A. Southern California.
Q. Did you go to high school out there?
A. Yeah.
Q. Is it public school? Private school?
A. Public.
Q. Is it LA or?
A. It's Riverside County.
Q. Okay. And college?
A. I went to Cal Poly in San Luis Obispo.
(Reporter clarification.)
A. California Polytechnic in San Luis Obispo. San Luis Obispo. I know it's a lot.

have felt like they heard someone's voice raise. I don't know how people's ears work. What might be a raised voice to one person may not be to another.

I can tell you that I did not raise my voice to Mary Caliendo.

Q. And you certainly didn't yell at her?

A. No.

Q. Didn't you have an encounter with Mary Caliendo in the office outside of Dr. Singh's office where you yelled at her?

A. I did not. I did have a -- I know the characterization that you are describing in the complaint. I am very familiar with it.

It's silly -- a silly thing to read. I think the exact words that you use in the complaint are "he was yelling, his arms were gesticulating, he was spitting."

Like, that sounds like Yosemite Sam to me. Like, that's not something that happens in a workplace. And if I did that or anybody

Q. So I want to talk about the investigation that Mount Sinai conducted. I am going to start at the end.

A. Okay.

Q. So you were asked to leave, right, by Mount Sinai?

A. I was not asked to leave.

Q. You weren't fired?

A. No.

Q. How did it come about that you resigned or left the job?

A. Well, I will allow that -- that I may have been on a list of people to fire. Like, that could have absolutely be the case, and I probably believe that I was.

But the way that it came about was just before the 4th of July, I had a conversation with Dr. Singh and expressed to him I was pretty unhappy with where things were going. It felt to me like it was going to be hard to keep doing good work moving forward. And, you know, I thought we probably talk about what a mutual

right?

MR. GREENHAUS: Objection.

BY MR. BOWEN:

Q. Yes? Yes?

A. Yeah.

Q. You have to answer verbally which is why I keep saying yes. I see you nod your head.

A. Sorry.

Q. And then lastly, you had a discussion, you and Dr. Singh, about what that could mean and neither one of you brought up the fact that she's made her career doing gender discrimination cases?

MR. GREENHAUS: Objection.

BY MR. BOWEN:

Q. Is that right?

A. I wasn't familiar enough with her profile. I didn't see gender discrimination happening at the Arnhold Institute or frankly anywhere. So no, I didn't. I didn't know what she meant by it.

Q. Did Dr. Singh mention to you that

not why he agreed, but why was cohesion elusive?

A. I think just, like, it was hard to get everybody aligned on, like, what are the primary workloads that we're -- we're addressing. Like, what is everybody working on? What are the outcomes that we are seeking?

It was difficult to have a meeting and say what are we talking today? Like, and then to have that same meeting again and have that same meeting again, like, that's cohesion.

Q. Did anybody ever report to you that women were being treated differently in the meetings at the institute, than men?

A. I never heard that.

Q. Did you observe that or --

A. No, I never observed that.

Q. -- men called upon to -- to report or speak and women were skipped over?

A. I never saw that.

Q. That would affect cohesion, yes?

A. Oh, absolutely.

Q. There's a bullet point second from

it was my point of view that it's helpful to have a department title if you are working in the department as well as an institute title working in the institute. Like, that's just kind of appropriate.

So, like, think about it like this, like, Dr. Singh is the director of the Arnhold Institute and he is the chair of the department, two titles, because there's two different areas, two different areas of work.

Q. So did you get a department title?

A. Yes. I forget what it was. I forget. Like, director of special initiatives or something like that.

Q. Did you ever criticize Llames' work?

A. Who?

Q. Geraldine Llames.

A. Did I ever criticize it? I mean, apart from that -- what we discussed earlier, the missing the deadline on the application, I don't think so. I didn't really work with her.

Q. But did you ever say to her, looking

at some work product that she did, by calling the work product stupid and saying something along the lines of are you stupid or are you fucking stupid, something like that?

A. No, no. And I think you're conflating still the Robert Wood Johnson project which -- application which was a timeline issue, not a -- not a --

Q. Content?

A. Content issue. I don't think there was much content. I think that was part of the issue.

Q. You don't think there was much content?

A. Yes, like, missing the deadline because there wasn't enough there, yeah.

Q. But did you -- did you respond to that by saying this is stupid, this is not up to our standards?

A. No, I don't think so.

Q. Did you use the word "stupid" in referring to her?

A. Referring to a person, no.
Q. Or her work?
A. No, no.
Q. Did you ever tell Renee Bischoff that she is not to speak with Dr. Muller?
A. No.
Q. You never told her that?
A. No.
Q. And you never yelled at her, right?
A. I never yelled at anybody.
Q. Did you raise your voice to Renee Bischoff?
A. On one occasion.
Q. Only once?
A. Yeah.
Q. What -- what was the context of that?
A. She had -- so the -- the background is that her and Dr. Singh were -- were not working well together, in part because she kept going around Dr. Singh and talking to his peers or superiors without notifying him or aligning

Anyway, can pick this up at ops next week, Prabhjot.

Does this refresh your recollection that there was some question about how to respond to Dr. Safo's request for promotion?

A. Yeah, I mean, this was not an area I was super involved in. I don't really have much recollection on this. I am sorry.

Q. Okay. Did you work from home once a week as part of your regular work conditions?

A. No. From time to time, I worked from home on Fridays.

Q. But that wasn't a set?

A. It was really based on did I need to be in the office or not. If I did, then of course, I was in the office or elsewhere, traveling. But if the flexibility allowed for it, I tried to work from home on Fridays.

Q. Is that -- did you have to follow a procedure to request working from home on Fridays, or was that something you could do at your discretion?

A. I mean, I would need to let my boss know, and I couldn't just not show up for work. But, yeah, my discretion, like, if I had nothing that needed pressing to be in the office or I wasn't travelling, I could say to him, I'm going to work from home tomorrow.

Q. Were there -- was there a policy that others had to follow in the Arnhold Institute to request work from home privileges?

A. I don't know. I mean, I dealt with my boss directly. I don't know what other people did.

Q. Were you ever asked to handle logistics on a trip where you were traveling for a group of people from Arnhold Institute?

A. Yes, many.

Q. So you would -- did what? You would handle all of the hotel reservations, booking tickets, that kind of stuff?

A. Not really because everyone does that on their own. You know, as I am sure your firm does. They use Concur or whatever. People

more work. That's brutal, you know.
Q. You would use it in a more commiserating way?
A. I would say, like, more of like a, like -- yeah, I guess commiserating, silly. Like, ugh, that was brutal, like overexaggerating the fact that it's really not actually as bad as, you know.
Q. Did you say it to her after she had been interviewed as part of this investigation in 2018? Did you say to Ms. Misiti or remind her of the fact that you had told her the meeting was brutal after she had been interviewed?
MR. GREENHAUS: Objection.
BY MR. BOWEN:
Q. Do you understand my question?
A. I don't.
Q. Did you know when Ms. Misiti had been interviewed as part of the investigation in 2018?
A. I didn't know she had been.
Q. Even until to this day, you don't

CERTIFICATE OF SHORTHAND REPORTER

NOTARY PUBLIC

I, Monique Cabrera, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 15th day of August, 2024.



MONIQUE CABRERA

Notary Public in and for the State of New York

County of Suffolk

My Commission No.

Expires: 06/12/2026

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE
Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.
Witness Name: David Berman
Deposition Date: August 15, 2024

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):
( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.
(X) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

10/01/24 [signature]
DATE WITNESS SIGNATURE

10/01/24 [signature]
DATE NOTARY

RYAN DANLEY
Notary Public - State of New York
NO. 01DA0027217
Qualified in Suffolk County
My Commission Expires Jul 29, 2028

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202)232-0646

ERRATA SHEET

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: David Berman

Deposition Date: August 15, 2024

| Page No. | Line No. | Change |
|---|---|---|
| 4 | 1 | "ON BEHALF OF DEFENDANTS" instead of "ON BEHALF OF DEFENDANTS AND WITNESS" |
| 50 | 9 | "overall we like" instead of "overall like" |
| 110 | 1 | "System" instead of "system" |
| 159 | 9, 10, 11, 12 | "Sunny" instead of "Sonny" |
| 325 | 13 | "Sunny" instead of "Sonny" |
| 325 | 14 | "Sunny's" instead of "Sonny's" |
| 222 | 6, 13 | "Skoll" instead of "school" |
| 232 | 5-6 | "Women Giving Millions" instead of "women giving millions" |
| 313 | 20 | "exaggerated" instead of "aggravated" |
| 345 | 21 | "really was open" instead of "really opened open" |
| 346 | 4, 5 | "Bare" instead of "Bear" |

[signature] 10/01/24
Signature Date