# Exhibit 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DR. STELLA SAFO, GERALDINE LLAMES, AMANDA MISITI and EMILIE BRUZELIUS,
Plaintiffs,
-against-
DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA and ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI,
Defendants.

CASE NO. 1:19-cv-03779-VSB-JW

*** CONFIDENTIAL ***
INCLUDES ATTORNEYS' EYES ONLY PORTIONS
VIDEO-RECORDED DEPOSITION OF
RENEE BISCHOFF
Glenn, Agre, Bergman & Fuentes, LLP
1185 Avenue of the Americas
22nd Floor
New York, New York 10036

06/24/2024
9:36 a.m. (EDT)

REPORTED BY: MONIQUE CABRERA

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

BY MR. CERVENKA:
Q. You reverted back to your original title of program manager 2, correct?
A. I don't remember exactly. When I took on Anu's role, I did get a promotion; and my title changed within the Mount Sinai HR system.
Q. Do you recall what your title changed to?
A. I don't remember.
Q. Did you get a salary increase?
A. Yes, I believe so.
Q. Do you remember how much?
A. I don't remember.
Q. There was a time, wasn't there, when only men had offices and women at the institute were in cubicles or in the open space?
A. There was a short period of time, with the exception of Kirsten and I, who shared an office, a private office.
Q. But there was no woman at the institute had an office to herself, correct?
A. For a short period of time.

health programs and --
Q. How did you come to learn of this?
A. Ann Marie Beddoe called me, and separately Ramon called me.
Q. What do you recall Dr. Beddoe telling you when she called you?
A. Just that he had been very rude and dismissive of the programs and people were offended.
Q. Dr. Beddoe was offended?
A. And other people who were present.
Q. And that's Beddoe, B-E-D-D-O-E.
Do you know who else was present?
A. I don't know.
Q. And you said that Dr. Murphy called you as well?
A. Yes. I don't believe he was present. I believe Ann Marie had called him.
Q. What did Dr. Murphy say?
A. I don't remember exactly, but that he heard from Ann Marie that it was an unpleasant meeting and that David had come off as being

rude.
Q. And do you recall when this happened?
A. No, I don't remember the exact time line.
Q. Were you reporting to Dr. Singh at the time?
A. No.
Q. Were you reporting to Dr. Kishore?
A. Yes.
Q. Did Dr. Beddoe and Dr. Murphy call you about Dr. Berman being rude on the same day?
A. Yes.
Q. Was it the same day that -- this meeting where Dr. Berman was dismissive?
A. No.
Q. Do you recall how long of a time lag was there between this meeting and Dr. Murphy and Dr. Beddoe calling you about it?
A. I'm sorry. Can you repeat that?
Q. Just how many days elapsed, to the degree that you can remember it, between the

meeting where Dr. -- where Mr. Berman was rude to Dr. Beddoe and others and Dr. Beddoe picking phone and calling you about it?

A. I think it was the same day or the next day.

Q. And you then went and talked about this with Dr. Singh, right?

A. No, I didn't initiate the conversation.

Q. So how did that conversation with Dr. Singh come about?

A. He approached me one day at my desk and asked me if I wanted to see the new renovations of the office and asked me if there was -- I don't know the exact phrasing, but it came up in the course of that walk-around, that I mentioned to him this meeting had happened and it didn't come across well.

Q. Do you recall why you did that?

A. I recall Dr. Singh asked me for my advice, if there were any things that he -- you know, that I thought he could improve about the

way things were running.

Q. And you said, well, there's this one thing that I just heard about and described what you had learned from Dr. Beddoe and Dr. Murphy?

A. Yes. There were three things. One was I told him I thought David Berman was coming off as rude and people were feeling insulted by things that he said. And I also mentioned to him people were upset about the optics of the space, with the women having -- not being in their own space, and that was something that he took very seriously and actually made a change afterwards.

And the third thing was just regarding the global health advisory board, that I thought they were feeling left out and upset. And so that was another area.

Q. And do you recall when you had this discussion with Dr. Singh, was it still the same day as the phone call from Dr. Beddoe?

A. No. It was maybe a week or so later, maybe two weeks.

Q. Was it the first time that you

raised what you perceived to be issues of the department to Dr. Singh?
A. Yes. It's the first time I recall.
Q. Did Dr. Beddoe ask you to report David Berman being rude to Dr. Singh?
A. No.
Q. Did Dr. Murphy ask you to do that?
A. No.
Q. But you still reported it to Dr. Singh, right?
A. Yes. In answer to his question about my advice.
Q. And how soon after your conversation with Dr. Singh did Dr. Berman come and talk to you and raised his voice at you?
A. A few days later.
Q. Did he come into your office?
A. No. I had a regular meeting with him, and I was in his office.
Q. How often did you meet with him?
A. I think every two weeks.
Q. 30 minutes, one hour?

A. 30 minutes.
Q. What did he say?
A. I don't remember his exact words. But he said, you know, why did you tell my boss about this meeting where I was supposedly rude?
Q. And that's when he was raising his voice?
A. He raised his voice, but he wasn't yelling.
Q. How loud was he?
A. Loud enough that the two people who were sitting outside heard the conversation.
Q. Who were these two people?
A. If I recall, it was Mary Caliendo.
Q. Who else?
A. I believe Anna Stapleton, but I could be wrong.
Q. They told you afterwards that they heard that conversation?
A. Yes.
Q. How long was he speaking to you in a raised voice?

A. Not very long, just a few minutes or less. A minute.
Q. Did you find it threatening?
A. No.
Q. Intimidating?
A. A bit.
Q. It was inappropriate, right?
A. Yes.
Q. Do you recall more about how you felt at the time other than a little bit intimidated?
A. No. Just that my relationship with him was fraying quickly.
Q. What did you tell him after he began to raise his voice at you?
A. I don't remember exactly, but I think I tried to explain to him that it was perceived -- his -- the way he spoke was perceived negatively and that it wasn't making him look very good to other faculty and staff; that he was, you know, making people feel devalued.

A. I believe it was February 2017.
Q. And this time he actually yelled at you, right?
A. Yes.
Q. Where were you?
A. Sorry?
Q. Sorry. Where were you?
A. In his office.
Q. Same office as before?
A. Yes.
Q. And was it just the two of you?
A. No. Sandeep Kishore was sitting to the left of me.
Q. The first time when he raised his voice at you, you two were the only ones in the office, correct?
A. Correct.
Q. Was Ms. Caliendo still seated outside of David Berman's office at that time?
A. I don't remember.
Q. Or Anna Stapleton?
A. I don't remember.

Q. Did anybody come to you after Dr. Berman yelled at you in February of 2017, saying that they heard --

A. That the -- sorry. Are you talking about the second incident?

Q. Yes.

A. And what was your question again?

Q. Did anybody come to you, again, saying that they had heard him yell at you?

A. Yes. Aaron Baum came into the office.

Q. So what was Mr. Berman yelling at you?

A. He was angry that I had gone to a meeting that he didn't want me to go to.

Q. What meeting was it?

A. It was a meeting regarding a site that we had in Kenya.

Q. So he knew of this meeting taking place, and he specifically told you not to go?

A. He didn't want me to go because there was a person there who I think he was --

thought was in competition for funding.
Q. What's the name of this person?
A. Angela Diaz.
Q. And he told you specifically not to go to that meeting?
A. Yes.
Q. Just to get a sense of time here, so you said that at some point in February, he yelled at you.
Do you recall in relation to the meeting taking place how far apart are the two events, the meeting and Berman yelling at you afterwards?
A. I don't remember. I think it was more than a month.
Q. And do you recall when or how much in advance of the meeting did Mr. Berman tell you not to go to that meeting?
A. I think it was -- I think it was a weekend between the two events.
Q. I'm sorry. A weekend between the two events?

A. No, sorry. Between him not wanting me to go and him yelling at me. And I think the yelling incident happened at the end of a long weekend.

Q. I see. So you -- you mentioned that the yelling happened about a month after the meeting took place; is that right?

You -- I believe you testified that you thought it was more than a month.

A. Between the first time he raised his voice to me and the second time, that's what I meant.

Q. I see, okay. Thank you. That's -- that's helpful. I wanted to know -- let's -- let's just take it from the beginning.

So number one, he's raising your voice at you; and number two, he's yelling you, correct?

A. Correct.

Q. And those two were spaced more than a month apart?

A. I believe so, but I can't say for

sure.
Q. All right. So both happened in early 2017?
A. I believe so.
Q. And then specifically about the yelling incident, if I understand you correctly, there was three events leading up to it. First, he told you not to go to the meeting regarding Kenya. Then the meeting regarding Kenya happened and you attended. And then he yelled at you about your attendance at this meeting in the presence of Dr. Kishore, right?
A. Correct, in part.
Q. And I'm just trying to understand within those three elements of this second incident where he yelled at you, how far apart, how far spaced were those.
Did everything happen on the same day? He tells you at 9:00 a.m., don't go to a 2:00 p.m. meeting, and then he's yelling at you at 4:00 p.m. --
A. No.

Q. -- or how -- where are those of events spaced out?

A. I think he told me during a meeting early one week. I met with my colleagues who I had been working with for many years on the Kenya issue maybe that Friday. And then I had a meeting with David Berman. I think it was a Tuesday because it was a long weekend. And that's when he screamed.

Q. All right. And when he told you not to go to that meeting, did he say why?

A. I don't recall.

Q. Why did you go regardless of his instruction not to go?

A. I don't recall exactly, but this particular subject of the site in Kenya was something I had been working on for many years. I had been working with the faculty member who was the point person for that site. I had visited the site.

And so it seemed I was the main face for all of the students who were -- and residents

going to that site, so it seemed important that I go.

Q. So you have Dr. Singh telling you not to talk to Dr. Muller. You have Mr. Berman telling you not to attend a meeting that is concerning a work stream that you had been working on closely for a long time.

Were you concerned that these two men were silencing you, stifling you?

MS. GUERRASIO: Objection to form.

You can answer.

A. I don't know if it was that, so much as I was concerned -- I was -- it was getting harder to do my job effectively.

BY MR. CERVENKA:

Q. And you felt sidelined, didn't you?

A. Yes.

Q. So he is yelling at you, Dr. Berman is. For how long, would you say?

A. I don't remember exactly. It was something of an out-of-body experience. I would say it was at least five minutes, maybe ten

minutes.
Q. Of just yelling?
A. Yes.
Q. Did he curse at you?
A. I don't remember -- I -- I don't think so.
Q. Do you recall any words or sentences of him yelling at you?
A. No, I don't recall the -- the content.
Q. Did -- have you, prior to that, had an out-of-body experience like that?
A. No.
Q. Since then?
A. No.
Q. Did you feel intimidated?
A. Yes.
Q. Threatened?
A. I felt intimidated and, I think, shocked.
Q. It was a horrible experience, right?
A. Yes. It was a pretty difficult

experience.
Q. Yeah. And Dr. Kishore didn't say anything?
A. Not at that time.
Q. For the five, ten minutes of -- of Mr. Berman yelling at you, he didn't say anything?
A. No.
Q. Was that disappointing?
A. At the time, yes.
Q. What was Mr. Berman's body language like?
A. He was sitting across the table, Sandeep was next to me. I just remember his face was very red and he was animated.
Q. Gesticulating a lot?
A. I don't remember exactly.
Q. Did he pound the table?
A. I don't remember.
Q. Did he stand up in anger?
A. I don't remember.
Q. And you mentioned that Dr. Baum

entered the room at some point, correct?
A. Correct, yes.
Q. Did he just walk in?
A. Yes.
Q. Did he knock?
A. I don't remember. I think he just walked in.
Q. What did he say?
A. He said, "Is everything okay? Can I help you? Do you need help?"
Q. Talking to you?
A. Yes.
Q. What did you say?
A. I said, "No, we're okay here."
Q. Did you mean that?
A. I think I was just in shock.
Q. Yeah. You weren't okay, right?
MS. GUERRASIO: Objection to form.
A. I mean, no, I wasn't feeling great about it.
BY MR. CERVENKA:
Q. Well, what did Dr. Baum say

afterwards?
A. I don't recall talking to him immediately afterwards.
Q. He walks in, turns to you, asks you, "Is everything okay? Do you need help?"
You say no. What happened after?
A. I recall it toned down, the yelling, and it was more of a conversation. And I think pretty soon after I just -- that the meeting ended, and I went back to my office.
Q. Did Dr. Baum leave, or did he stay for the remainder of the meeting?
A. No, he left.
Q. So he was only there for a few short moments?
A. Yes.
Q. Were you distraught afterwards when the meeting ended?
A. No.
Q. Were you pretty calm?
A. Yes.
Q. Did you discuss the incident with

anybody other than Ms. Jones-Winter?
A. I discussed it with Sandeep Kishore later that day over coffee.
Q. Over coffee?
A. Yes.
Q. What did he say?
A. I don't recall his exact words; but he said that he didn't think it was okay, what had happened.
Q. Did you agree?
A. Yes.
Q. Did he offer to do anything to help?
A. Not that I recall.
Q. Did you ask him to do anything?
A. No.
Q. Did you and Dr. Baum discuss it afterwards?
A. At some point, yes.
Q. Do you recall how many days or weeks after?
A. I don't recall.
Q. Were you still at the Arnhold

Institute when you discussed it?
A. Yes.
Q. What did he say at that time?
A. I e-mailed him to thank him for intervening.
Q. Do you recall e-mailing him the same day as the yelling happened?
A. I don't recall. Either the same day or the next day.
Q. Did he respond?
A. Yes.
Q. What did he say?
A. He told me I had handled it a lot better than he had.
Q. That you handled it a lot better than Dr. Baum?
A. Handled it when he had yelled at by Dr. -- by David Berman several months earlier.
Q. David Berman had also yelled at Dr. Baum?
A. Yes.
Q. Did you witness that?

A. No.
Q. Did you e-mail Dr. Baum on your Sinai e-mail address?
A. Yes.
Q. How loud was Mr. Berman when he raised his voice at you compared to when he yelled at you?
A. When he yelled at me, it was much louder.
Q. Did you get the sense that he was yelling at you at the top of his lungs?
A. I don't know if it was at the top of his lungs, but it was loud.
Q. Well, I'm sorry you had to go through that. But I think why don't we take a break now?
THE VIDEOGRAPHER: Time right now is 1:05 p.m. We're off the record.
(Whereupon, a luncheon recess was taken.)
THE VIDEOGRAPHER: The time right now is 1:55 p.m. We're back on record.

MS. GUERRASIO: I want to put on the record that the witness reserves -- wants to reserve her right to make to review the transcript and make any corrections. I'm sorry. I didn't mean to cut you off.

(Whereupon, a request for Read and sign was made.)

BY MR. CERVENKA:

Q. Ms. Bischoff, did there come a time that Dr. Berman apologized to you for having yelled at you?

A. Yes.

Q. When was that?

A. I believe it was less than a week after it happened.

Q. After the yelling or the raising his voice?

A. After the yelling.

Q. What did he say?

A. I don't recall all of the details. He said he was sorry. But I remember distinctly he said something the effect about how

important it is to say to stay discreet when you're -- he was kind trying to give me a life lesson, it felt like.

Q. Oh, did he?

A. He said something to the effect, you know, that was one of the lessons he had learned in the workplace about being discreet and so --

Q. What did you understand that to mean?

A. I didn't know at the time, but I took it as a veiled warning.

Q. Warning against what?

A. Well, I didn't know for sure; but I thought he was talking about, you know, making a report.

Q. That you would make a report to HR?

A. Perhaps.

Q. Dr. Singh?

A. I didn't get the feeling it was about Dr. Singh. I think he was referring to HR, but I don't know.

Q. Do you recall the words that he

used?
A. No, I don't recall exactly the words he used. I just remember him using the word "discreet."
Q. And you said it was one of his life's lessons?
A. He referred to something that he had learned through his experiences in the world of work and that, you know, he made some reference to how important it's been, you know, to be discreet in the office environment and how that had been, you know, an important thing he had learned, something to that effect.
Q. Well, it was clear to you, wasn't it, that he didn't want you to make an official report of the incident?
MS. GUERRASIO: Objection to form.
A. I don't know what he was thinking.
BY MR. CERVENKA:
Q. But what were you thinking?
A. I was thinking he likely did not want me to make a report.

raised his voice to you on a prior occasion?
A. I don't remember telling her about that.
Q. Did you tell her that Mr. Berman had also yelled at Dr. Baum?
A. I believe I did mention that because it was an important part of the -- my own story.
Q. What did you tell her about that?
A. I remember telling her that Aaron had knocked on the door and intervened to try to stop the yelling. And I believed he was the one who stepped up and did that because he had been yelled at by the same person months prior.
Q. Did you hear Dr. -- I'm sorry about that -- Mr. Berman yell at anybody else?
A. No.
Q. Did Mr. Berman also accuse you of telling everybody in the office about his outburst at you?
A. I don't recall him saying that to me.
Q. Did you tell Ms. Jones-Winter that

you had an out-of-body experience while he was yelling at you?

A. I don't remember if I used those words.

Q. You said that you didn't mention how loud he was to Ms. Jones-Winter.

Can you tell me now how loud he was when he yelled at you?

MS. GUERRASIO: Objection to form. It's been asked and answered multiple times.

You can answer.

A. I don't know. I can't really give you a precise decimal point or, you know, whatever you want to call it. It was loud enough that everybody in the outside office and -- heard it, heard the whole thing.

BY MR. CERVENKA:

Q. The door was closed?

A. The door was closed, yeah.

Q. Had anybody yelled at you in that manner before?

A. No.

Q. Since?
A. No. Aside from my 14-year-old daughter?
Q. Is she louder than Mr. Berman?
A. She might be.
Q. Did you and Ms. Jones-Winter have regular discussions about the goings-on at the Arnhold Institute after you left the Arnhold Institute?
MS. GUERRASIO: Objection to form.
You can answer.
A. We didn't have regular meetings about it, but I certainly told her it was a place that, yes, people were unhappy.
BY MR. CERVENKA:
Q. So your counsel is advising not to testify about anything to with the investigation, so let's just put it to the side.
How many times did you talk to Ms. Jones-Winter about the Arnhold Institute?
A. I don't remember.
Q. Can you estimate?

was commenced?
A. No, not before.
Q. Now, you also testified before we had lunch that you spoke to David Muller, that you reported unhappiness --
A. Yes.
Q. -- to David Muller; is that accurate?
A. Yes.
Q. Did you report Dr. Berman yelling at you -- Mr. Berman?
A. Yes, I did.
Q. You did.
What did you tell Dr. Muller about Mr. Berman yelling at you?
A. I happed to have a regularly meeting scheduled with Dr. Muller the day after the yelling incident. And when I went to meet with him, I told him that I had been screamed at by David Berman the day before.
Q. Did you downplay the yelling when you spoke to Dr. Muller?

A. I think so.

Q. Similarly to how you downplayed it to --

A. Similarly. I felt embarrassed by the incident, and I think I was still in shock.

Q. How long were you in shock for afterwards? Do you know?

A. Maybe just a few days.

Q. Did you also tell David Muller that Dr. Berman gave you the veiled warning to be discreet?

MS. GUERRASIO: Objection to form.

You can answer.

A. I don't think I told him that.

BY MR. CERVENKA:

Q. Did you tell anybody?

A. I don't remember that I told anybody that right away. It was something that I told people later on. It kind of came back to me.

Q. How often did you meet with David Muller? You said there was a regularly scheduled meeting between the two?

A. I can't remember exactly, but I think it was every two weeks.

Q. Do you still meet with him every two weeks now?

A. No.

Q. When did you stop meeting with him?

A. I think when the pandemic started.

Q. And when did you start meeting with him on this basis?

A. When Anu left in the spring of 2018.

Q. 2016?

A. 2016. I'm sorry.

Q. So for about four years or so, you met with David Muller on a -- every two weeks?

A. Sometimes it was every month, but regularly.

Q. Did you report any other incidents that you witnessed at AIGH to Dr. Muller?

A. I don't recall if there were, yeah, any other incidents I spoke to him about.

Q. What did he say when you told him about Mr. Berman yelling at you?

A. I remember he got up and got me a cup of tea and then he -- I don't remember exactly what he said; but, you know, it was very empathetic.

Q. Did he say that it was inappropriate for you to be treated this way?

A. Yes. He was -- thought it was inappropriate, for sure.

Q. Unacceptable?

A. Yes.

Q. Did he say he would do something about it?

A. I don't remember exactly what he said, but I remember I didn't want it reported.

Q. Did you say that?

A. I don't remember what I said, but I think it was clear that I wasn't planning to report it.

Q. Why not?

A. Because I was afraid of David Berman retaliating.

Q. That the warning would become less

veiled if you did, in fact, report?

MS. GUERRASIO: Objection to form.

A. I don't know what would have happened, but I was afraid there would be another yelling incident or things would become even more tense in my work environment.

BY MR. CERVENKA:

Q. Did you specifically ask Dr. Muller to not to tell anybody about it?

A. No, I don't recall using those words.

Q. Dr. Muller had his own issues with Dr. Singh, right?

MS. GUERRASIO: Objection to form.

A. Dr. Muller and Dr. Singh had a tension over the future of the programs. So yes, there was issues.

BY MR. CERVENKA:

Q. Was there also tension about how Dr. Anandaraja's and Dr. Atkinson's employment at Mount Sinai came to an end?

A. I don't know exact -- I don't know

female leaving the Arnhold Institute and Mount Sinai. Sasha will be starting a new job at NYU next week. Please don't forward.

Q. This isn't the first time that you notified Ms. Tiger of a talented female leaving the Arnhold Institute, correct?

A. Correct.

Q. Who else did you notify Ms. Tiger of leaving the Arnhold Institute?

A. I provided her with a list of all of the people who had left the Arnhold Institute for Global Health.

Q. Do you recall when you provided her with that list?

A. I don't remember the exact month, but I think it was in 2018. And I just went next door into her office and showed it to her.

Q. Do you recall when in relationship to this e-mail you would have done that?

A. I don't know exactly, but this e-mail would have come after that.

Q. Do you know how long after that?

A. No, because I can't remember when I showed her the list, but -- yes, I don't know.
Q. Could be days? Could be weeks?
A. Yes.
Q. So you put together a list of people who left Sinai?
A. Yes.
Q. In early 2019?
A. Yes.
Q. Was it a typed up list or handwritten list?
A. I remember it being a handwritten list on a little piece of yellow legal paper.
Q. What do you mean by a "little yellow" -- like a full page?
A. No. Like one of those smaller notepads that looks like a legal pad but it's like half of size.
Q. Okay. So take a regular letter size paper and fold it in half --
A. And maybe fold it again. It was one of those little ones.

Q. How many names were on that list? Do you recall?

A. I don't recall how many names were on that yellow piece of paper. At some point I typed it up.

Q. Do you recall any of the individuals who were on the first iteration of this list?

A. I remember the individuals who were on the typed list. I don't remember if those were identical or not.

Q. So who do you recall being on the typed list?

A. I believe it was chronological order. I remember Elena Rahona, Jessica Batista, Anu, Holly. I think it included people who were leaving the Arnhold Institute but not the institution. So, like, Stella's name was on there. She left Arnhold but not Mount Sinai at that point. Darinka Gadikota and then were also -- I believe James Faghmous, Matthew Le.

Q. Matthew Le you said?

A. Matthew Le. I'm forgetting some of

the names right but it was a -- yeah.
Q. Did you put your name down as well?
A. Yes, I believe so.
Q. Anybody else who you recall being on the typed up list?
A. I don't remember exactly when that was typed up, so I'm trying to think. Patrick Dupey (phonetic) or something was one of the names. I believe there were 13 female names and 5 male names on that list, the one that was typed up. And I don't recall the number on the little yellow piece of paper.
Q. But you don't know which of those people were included on the handwritten list, right?
A. I think a number of them were the same because I believe it was, you know, in my head kind of chronological in terms of when, starting in 2015, I think Elena being the first to leave.
Q. When you typed up the list, do you recall having the handwritten one on the side of

your keyboard and typing it from the handwritten list?

A. No. I don't remember if I had that one at that point or if it was from memory.

Q. Did you leave the handwritten list with Ms. Tiger?

A. I don't recall if I left it then or if it was collected during the investigation, but I don't have it.

Q. But is it your testimony that it one way or another ended up with the investigatory team?

MS. GUERRASIO: Objection to form. Don't answer that.

MR. CERVENKA: On the basis of --

MS. GUERRASIO: The investigation is privileged. She has testified that she gave it -- she gave the list to Caryn Tiger either at that moment or as part of the investigation. She does not have it. So the question asking her that it ended up with the investigatory team, she just testified she

doesn't know whether she gave it to Caryn during the meeting or later to the investigators.

BY MR. CERVENKA:

Q. Was Ms. Tiger one the investigators?

A. Yes.

Q. Did you give the list to anybody else?

A. I had shown that same list to David Muller prior to giving it to Caryn Tiger.

Q. Was David Muller the first person you showed that list to?

A. I believe so.

Q. Do you remember how long after showing that list to David Muller you showed it to Caryn Tiger?

A. I don't remember.

Q. The same day?

A. No.

Q. Week?

A. Maybe. I don't remember.

Q. Do you recall giving the list to

anybody other than David Muller or Caryn Tiger?
A. I recall discussing it with Stella.
Q. And just so I understand, you recall leaving the list with Caryn Tiger, but just are not sure when you did that?
A. I recall giving it to the investigators, and I don't have it --
MS. GUERRASIO: Don't testify to anything further.
THE WITNESS: Sorry.
BY MR. CERVENKA:
Q. Did Ms. Tiger respond to this e-mail?
A. No.
Q. Did she come and talk to you about it in person?
A. I don't recall.
Q. It didn't go anywhere?
A. I don't know what she did with any of the information I provided.
Q. Why did you ask her to not forward your e-mail to anybody?

A. Because I think, as I stated before, I was feeling a lot of anxiety and paranoia at that point, in general.

Q. Still in March of 2018?

A. Yes.

Q. Having left the Arnhold Institute in August 2017, you still felt a sense of anxiety about that place?

A. Yes.

Q. Did you ever seek therapy about what happened at AIGH?

MS. GUERRASIO: Objection to form.

You can answer.

Actually, I'm going to object to that. She is not a plaintiff in this matter, nor does she have any claims. Whether she seeks therapy is a personal and confidential matter for herself. She does not have to answer the question.

MR. CERVENKA: Are you instructing her not to answer?

MS. GUERRASIO: I am. If she's not

comfortable with testifying to that, I'm not -- I'm going to instruct her that it's not relevant.

(Whereupon, a request for Instruction not to answer was made.)

BY MR. CERVENKA:

Q. Are you going to follow your counsel's instruction, Ms. Bischoff?

A. Yes.

Q. Why did you write up this list?

A. Because I was very concerned about, you know, the atmosphere over the Arnhold Institute and I know how miserable I myself felt. And I saw that even after I left, people were continuing to be unhappy, continuing to leave and I didn't see any end in sight.

And there is something, I think, inside me that made me feel like since I sat next to Caryn Tiger, who's the head of HR, that I should at least, you know, try to do something, try to bring attention to it.

MR. CERVENKA: I think she said

unhappy as opposed happy on the transcript.

THE WITNESS: Yes.

MR. CERVENKA: I just noticed that.

BY MR. CERVENKA:

Q. You wanted to do something about it, right?

A. Yes.

Q. You were disappointed that other people didn't do anything about it, right?

MS. GUERRASIO: Objection.

You can answer.

A. I was frustrated that it was continuing, and there didn't seem to be any end in sight.

BY MR. CERVENKA:

Q. And when you say that "it was continuing," what's "it"?

A. I think just people feeling very unhappy, that it was people were still very miserable and were continuing to leave in, you know, in large numbers.

Q. And you were concerned that gender

was a particularly important factor, right?

A. Yeah. It was definitely something I thought about. I didn't know what it was, but I knew there was something wrong. And I -- you know, I wanted to bring this situation, you know, to HR's attention.

Q. You've wondered about gender or you were concerned that gender played a role for years at this point, correct?

MS. GUERRASIO: Objection to form.

You can answer.

A. It was something I considered for years, yes.

BY MR. CERVENKA:

Q. And even this list, what stands out to you some six years after is the fact that it listed 13 women leaving compared to five men leaving, right?

MS. GUERRASIO: Objection to form.

You can answer.

A. I think there were more women who were working at the Arnhold Institute, but I

think part of it is -- that stood out to me, but I think part of it was just the wide range of people who were leaving, that it was not just people who had been part of the original global health team, but it was also a lot of the new people that Prabhjot had hired. I thought that's frankly what really stood out, that even the new people were miserable.

BY MR. CERVENKA:

Q. And that women are more miserable than men, right?

MS. GUERRASIO: Objection to form.

A. I don't know if I would agree with that.

BY MR. CERVENKA:

Q. No?

A. In retrospect or after the fact, I've had many conversations with the men who worked there and they were just as miserable, so.

Q. Did you tally up the women and men who left on the list?

A. I believe on the original list, I

may have had two columns. One was female, and one was male. And then on the subsequent typed list, it was in chronological order and distinguished whether the person had been part of the original global health team or had been new and where they currently were still at Mount Sinai or left Mount Sinai.

Q. The impetus was around gender, wasn't it, Ms. Bischoff?

MS. GUERRASIO: Objection to form.

A. I think the impetus was around what I saw a very miserable environment and that I had an opportunity to bring it to somebody's attention who could do something about it. And I was, you know, in an office right, you know, next to HR. And so, you know, I felt like I should -- I should do that.

BY MR. CERVENKA:

Q. Why did you organize the people on this list by gender?

A. Because as I said, at that time, it was a -- you know, something I considered. I was

wondering, you know, is this gender? Is this, you know, something else? Is it a hostile work environment? Like, what do we name this? What is it?

And not to mention that the atmosphere we were all living at that time was "me Too." You couldn't open a newspaper, a magazine, look at the TV without there being stories every single day about, you know, these -- these very issues.

Q. And you thought this might be another one of those stories, right?

A. Yeah, I considered it.

Q. And that's the spirit in which you shared that list with Dr. Muller correct?

MS. GUERRASIO: Objection to form.

A. No. I think the original reason I shared it with him was to say, there are a lot of people leaving, a lot of talented people leaving. And, you know, you could see who was female, who was male. But I think the point was, there's a lot of people leaving. There's something wrong

here.

BY MR. CERVENKA:

Q. Why did you write: Another talented female leaving the Arnhold Institute at Mount Sinai when you sent this e-mail to Ms. Tiger?

A. Because as I said, at that time, it was, you know, something I thought about. You know, was this -- was this gender? Here goes --

Q. Who -- I'm sorry. Go ahead. I didn't mean to jump in.

A. And I, you know, said here goes another, you know, talented female. These were people who I enjoyed working with who I found to be, you know, smart and fun and, you know, just really committed to their work. And I was frankly disappointed that so many of them were leaving.

Q. What did David Muller do after you shared that list with him?

A. I don't know what he did afterwards.

Q. Did he say anything to you?

A. I remember him saying, "Wow, this is

not just, you know, people who had been on the original global health team. These are a lot of the people who Prabhjot hired and they're, you know, the -- the new team."

And I think that was what really stood out.

Q. Did he mention anything about the gender split of the people included on the list?

A. I don't recall him mentioning that.

Q. Did you ask him to do anything?

A. No.

Q. Did he say he would do anything?

A. I don't recall him saying he was going to do anything.

Q. What about Ms. Tiger, did she -- did you ask her to do anything when you shared the list with her?

A. I think I said something to the effect of can you look into this or can this be looked into.

Q. What did she say?

A. I don't recall what she said at that

point.

Q. How did you feel during the conversation with Ms. Tiger?

A. I think at that point, I felt a sense of relief that somehow, you know, this was off of just my hands and that, you know, hopefully there was going to be some kind of more formal, I don't want to say investigation, but looking into this matter.

Q. It was a scary thing to do, right, to -- to type up this list and share it with Ms. Tiger?

MS. GUERRASIO: Objection to form.

A. I think at the time, I didn't realize how scary it probably was, and in retrospect, yes.

BY MR. CERVENKA:

Q. Were you afraid of retaliation?

A. No.

Q. Is that something that is a thought that went through your mind and you dismissed it, or did it just not occur to you at all that this

CERTIFICATE OF SHORTHAND REPORTER

NOTARY PUBLIC

I, Monique Cabrera, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of June, 2024.



MONIQUE CABRERA

Notary Public in and for the State of New York

County of Suffolk

My Commission No.

Expires: 06/12/2026

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: Renee Bischoff

Deposition Date: June 24, 2024

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):

( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

( X ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

NEIL F. AGYIRI
Notary Public - State of New York
NO. 01AG6324731
Qualified in Rockland County
My Commission Expires May 11, 2027

8/7/2024 — Renee V. Bischoff

DATE — WITNESS SIGNATURE

08/07/2024 — [signature]

DATE — NOTARY

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202)232-0646

ERRATA SHEET

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: Renee Bischoff

Deposition Date: June 24, 2024

| Page No. | Line No. | Change |
|---|---|---|
| 7 | 10 | "June 24, 2024" not "January 24, 2004" |
| 8 | 8-9 | "And, today, here representing Ms. Bischoff" not "And Jay, you're representing Ms. Bischoff" |
| 15 | 18 | "department of medical education" not "department medical education." |
| 22 | 7-8 | "years in West Africa" not "years in Asia and West Africa." |
| 32 | 5-6 | "...the projects and went often to the sites" not "the projects and went off into the sites" |
| 32 | 18 | "I believe had some USAID money" not "...I believe had some U.S.A. -- U.S. aid money" |
| 34 | 14-15 | "candidates who were coming in" not "candidates were coming in |
| 104 | 9 | "Jon Ripp" not "Don Ripp" |
| 162 | 17 | "he had been yelled at" not "when he had yelled at" |
| 167 | 17 | "discreet" not "discrete" |

Renee v. Bischoff [signature] ____________ 8/7/2024 ____________

Signature Date

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202)232-0646

ERRATA SHEET

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: Renee Bischoff

Deposition Date: June 24, 2024

| Page No. | Line No. | Change |
|---|---|---|
| 191 | 16 | "I happened" not "I happed" |
| 196 | 6 | "who would be teaching" not "who would be teach" |
| 269 | 3-4 | "she would be very unhappy" not "she would very unhappy" |
| 319 | 15 | "started a" not "start a" |
| 340 | 3 | "more" not "less" |

Renee V. Bischoff 8/7/2024

Signature Date