# Exhibit 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. STELLA SAFO, GERALDINE LLAMES, AMANDA MISITI and EMILE BRUZELIUS, Plaintiffs, | CASE NO. 1:19-cv-03779-VSB-JW |
| -against- | |
| DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA and ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI, Defendants. | |

*** CONFIDENTIAL ***
CONTAINS ATTORNEYS' EYES ONLY PORTIONS
VIDEO-RECORDED DEPOSITION OF
DENNIS S. CHARNEY, MD
Glenn, Agre, Bergman & Fuentes, LLP
1185 Avenue of the Americas
22nd Floor
New York, New York 10036

06/12/2024
9:48 a.m. (EDT)

REPORTED BY: MONIQUE CABRERA

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

about gender discrimination.
Q. So when did you first learn of the complaint of gender discrimination?
A. I don't have the exact day. But going back, on a Monday, Dr. David Muller told me that a number of women were unhappy with Dr. Singh and -- and the way he was treating people.
Q. Was that shortly before there was an investigation conducted by -- by Mount Sinai concerning Dr. Singh?
A. He told me on a Monday; and I initiated, essentially, immediately the investigation the same day.
Q. How did you do that?
A. My memory is a -- is a little unclear on the specifics; but I believe I contacted that day, that very day, our head of HR for the school, Caryn Tiger, and --
(Reporter clarification.)
THE WITNESS: Caryn Tiger.
MS. LOWY: C-A-R-Y-N.

Q. There are certain restrictions on the money and how it was -- and how the institute was supposed to be focused, right, in this document?
A. I've read it.
Q. So you're aware that there are certain restrictions, right?
A. Described in that document, yes.
Q. And you were aware of that at the time, right?
A. Yes.
Q. Do you recall that Dr. Anadaraja was involved in raising this 12 and a half million dollars for the institute?
A. No.
Q. You're not aware that she had a role in having discussions with the Arnhold Foundation?
A. I'm not aware.
Q. Is that -- do you think that --
A. My current memory is that I'm not aware.

claims or gender discrimination claims that relate to the ATLAS project?
A. I haven't.
Q. And you're unaware that women raised issues about Dr. Singh's conduct in connection with ATLAS that went unaddressed?
A. I have no memory of that.
Q. Are you aware that women working on the project claimed they were underpaid compared to the men?
A. I am not aware of that.
Q. Have you done anything to look into whether or not that is, in fact, the case?
A. You're talking about me personally?
Q. Yes.
A. No, I haven't.
Q. Are you aware of anyone else at the school that looked into it?
A. I believe but I'm not positive, that that -- that may have been a focus of the investigation.
Q. Okay. So we have marked as a

Q. All right. So I have a lot of questions about that. We're going to come back to it.

A. Okay.

Q. But, I mean, one of things you learned in that meeting was there was an allegation, if not a concern, about gender discrimination, right?

A. I don't remember exactly what Dr. Muller told me on that Monday other than what I just said and I was concerned.

Q. But the fact that it was a group of women stands out in your mind, right?

A. That would be correct.

Q. That's a noteworthy fact, right?

MR. BAUMGARTEN: Object to the form.

BY MR. BOWEN:

Q. I mean, noteworthy to you?

A. It was noteworthy to me that a group of women had been meeting and they were upset; and I wanted to get to the bottom of it immediately, same day.

Q. In your mind, you made the connection between what that group of women were saying to Dr. Muller may have some connection with what Dr. Singh was hearing from Ann Olivarius?

A. I didn't know.

Q. Did you do anything to find out whether the comments from Ann Olivarius were along the same lines of what that group of women were saying or not?

A. I didn't. I immediately said to the group that, you know, we put together, you investigate this and find out what's happening.

Q. So you never contacted Ann Olivarius, right?

A. I didn't.

Q. And you didn't have any follow-up conversations with Dr. Singh to find out more about what Ann Olivarius supposedly told him?

A. Not to my memory. I want -- the key was to start the investigation.

Q. And by starting the investigation,

MR. BAUMGARTEN: You can answer that.

THE WITNESS: Okay.

A. My memory, essentially, is what I told you. I found this out from Dr. Muller. I was concerned. I immediately called the people that I just mentioned and said investigate.

BY MR. BOWEN:

Q. There -- there's something called a development office at Mount Sinai; is that right?

A. Yes.

Q. They do the outreach to potential donors?

A. Yes. They're our fundraising group.

Q. Do you know Jonathan Taylor at that -- with that group?

A. That's a name I'm not currently familiar with.

Q. How about -- I think it's Kostegan.

MR. BOWEN: Is it Paul?

MR. CERVENKA: Mark.

BY MR. BOWEN:

Q. Mark Kostegan.
A. Very aware of Mark Kostegan.
Q. He's the head of that unit; is that right?
A. Yeah. It's more than a unit, but it's a department.
Q. Okay. Did you talk to Mr. Kostegan about what you had heard in terms of the interaction between Ann Olivarius as a potential donor or -- or representative of potential donors and Dr. Singh?
A. I have no memory of doing that.
Q. Or anyone else from the development department?
A. Not that I remember.
Q. And -- and you don't remember Dr. Singh saying to you something along the lines that Ann Olivarius was making no sense to him and saying things that he couldn't understand and you responding by saying it sounds like she's -- it sounds like she's -- you know, has some kind of psychiatric condition, something along those

lines?
A. I have no memory of doing that.
Q. Does that sound like something you would say?
A. No, not if I didn't know the person.
Q. I'm just going to -- I'm looking for the exact phrase.
Borderline. Did you -- do you remember saying to Dr. Singh that what he was telling you was, quote/unquote, bizarre and that, quote, she sounds borderline?
A. I don't have a memory of doing that.
Q. Is "borderline" a term of art in your profession?
A. What do you mean by "term of art"?
Q. Well, is it a technical term?
A. It's a -- borderline personality disorder is a disorder that -- in -- in psychiatry.
Q. And is it -- is it a term you would use, you would say that this person is acting borderline or sounds borderline?

A. I don't know how to answer that question, frankly. Can you be more specific in --

Q. Do you recall ever using that phrase, not -- not in a clinical setting, but just saying off the cuff that this person is borderline?

A. I'm a psychiatrist. You know, I would use that term if I felt I had enough data to make a diagnosis.

Q. But not otherwise?

A. Not otherwise.

Q. And you wouldn't have enough data unless you were actually assessing the patient in person?

A. That's generally true.

Q. Okay. So let's go to the -- the meeting with Dr. Muller.

MR. BAUMGARTEN: We were going to break at 1:00, and it's now 1:23.

MR. BOWEN: Oh, I'm sorry. I was losing track of the time. So this is a good

place to break. Why don't we -- why don't we break here. Let's off the record.

THE VIDEOGRAPHER: Time right now is 1:22 p.m. We're off the record.

(Whereupon, a luncheon recess was taken.)

THE VIDEOGRAPHER: The time right now is 1:52 p.m. We're back on the record.

BY MR. BOWEN:

Q. So right before the break, we were turning to the meeting with Dr. Muller on that Monday morning, April 30, 2018.

Was that a standing meeting that you had with Dr. Muller every Monday?

A. I don't -- I don't think I had standing meetings with Dr. Muller very regular basis. I don't think that was one of the standing meetings.

Q. Did he call you and say I need to talk to you right away or something like that?

A. Again, I don't have a precise recollection, but I think that might have been

the case.

Q. In that meeting, was it just the two of you?

A. Yes, that's my memory.

Q. And what -- what do you remember Dr. Muller telling you? Not -- not exact words, but what was the gist of what he was saying?

A. The gist was that a number of women had been meeting to express to each other concerns about working with -- with Prabhjot and that's my memory of the gist, and that was very concerning to me.

I don't remember getting into details with him in term of why they were meeting, et cetera. But it was of great concern, and I wanted to have an investigation right away.

Q. Did -- you don't have any memory of Dr. Muller telling you who the women were by name or by title or position?

A. I don't have any memory of that.

Q. Did you have a sense of Dr. Muller's view of the -- of their concerns, the women's

concerns?
A. I don't have any memory of, you know, what he specifically -- if he told me anything -- specifics about why they were meeting. But clearly, it was of concern to me.
Q. But was it a -- did you get the sense it was a concern to Dr. Muller?
A. I did.
Q. And was it the kind of thing where Dr. Muller said to you sum and substance along the lines of this is a serious issue?
A. I believe that was the case because again, I believe it was a special meeting and that he felt I needed to know about this.
Q. And did you have the sense that this was a discrimination issue, that this was a -- this was a potential -- either somebody was making the claim of gender discrimination or some other type of discrimination or that it potentially could be unlawful discriminatory conduct?
A. The fact that it was women that were

meeting led me to be concerned about whether there could be a gender issue, but I didn't have any specifics at that point.

Q. Was that said? Did either you or Dr. Muller say this -- this could be gender discrimination or we could have a gender bias issue here?

A. I -- I don't remember.

Q. It could be, but you just don't remember?

A. It'd be speculation because I just don't remember.

Q. Well, if it wasn't a concern about gender discrimination or some other form of discrimination, what was the -- what was the other concern? What other concern could it be? Just bad management?

MR. BAUMGARTEN: Object to the form.

You can answer.

A. I didn't know why they were meeting, and I don't remember getting into any details with Dr. Muller.

candidate for the role, that it was Mr. -- or Dr. Starr himself who -- who suggested him?

A. I don't remember it that way.

Q. He writes, quote: I urged him to take it, close quote, meaning -- meaning he urged Dr. Singh to take the position.

Were you aware of that?

A. I don't have a precise memory of the sequence of things. But, of course, I remember that Barbara Murphy strongly recommended him, you know, for the position. And -- and then Sachs was a strong supporter too, I think.

You know, then at some point, I did involve Kevin Starr. Probably -- probably sent him to a. And in reading this, it sounds like he then became an advocate.

Q. But as far as you know, Dr. Starr did not have a prior personal or business relationship with Dr. Singh?

A. That's not my memory.

Q. Okay. In the -- in the next paragraph, top of the following page, Dr. Starr

constitutes, quote/unquote, serious wrongdoing?
A. My memory is my conversations with Dr. Starr were that we did a comprehensive investigation, concerns were raised that were important, and recommendations were made and that I was going to follow the recommendations.
Q. Well, did you tell Dr. Starr that some of the allegations were gender discrimination?
A. I don't have a specific memory of that. It's possible when I talked to him about the results of the investigation, that that -- the conclusion of the committee, I may have transmitted that to him.
Q. Did he -- did you get the sense from him that he didn't regard gender discrimination as a serious wrongdoing?
A. I don't have a memory of that.
Q. Did you -- did you get any reaction from him when -- when you told him that that was one of the topics of investigation?
A. I don't remember his reaction. My

of generality; or did you have other details about what the oversight committee was going to be focused on in terms of improving, quote/unquote, atmosphere, particularly as related to gender issues?

A. I don't remember it -- any further details at that point.

Q. Did you ever learn at any point whether it was in connection with the investigation or oversight committee work or whatever that there were allegations by a number of women that they were treated poorly relative to male colleagues in settings where male colleagues were called upon to contribute to a discussion and the women were not?

MR. BAUMGARTEN: Object to form.

BY MR. BOWEN:

Q. Is that something that you heard?

MR. BAUMGARTEN: Object to the form.

A. In regard to the conclusions reached by the investigation that -- that the finding was that there was not discrimination by gender.

removal of Berman and Knaup, Knaup, K-N-A-U-P. Knaup can be offered a position in another area of Mount Sinai.

This was recommending that David Berman be fired, right?

A. It is recommended that he be removed. As I mentioned before, I don't know if the result of that recommendation was that he resigned or he was terminated.

Q. Well, does it make a difference to you if somebody is told, you have to leave, you can either resign or I'm going fire you? Is that a --

A. Generally -- sorry.

Q. -- is that a distinction that's significant to you?

A. Generally, it isn't.

Q. It is not?

A. Generally.

Q. When you say "generally," I just want to make sure it's clear. You're saying, generally, it is not significant, right?

CERTIFICATE OF SHORTHAND REPORTER NOTARY PUBLIC

I, Monique Cabrera, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of June, 2024.

MONIQUE CABRERA
Notary Public in and for the State of New York
County of Suffolk
My Commission No.
Expires: 06/12/2026

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: Dennis S. Charney, MD

Deposition Date: June 12, 2024

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):

( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

( x ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

7-25-24 [signature]

DATE WITNESS SIGNATURE

7/25/24 Michelle T. Johnson

DATE NOTARY

MICHELLE T JOHNSON
Notary Public - State of New York
NO. 01JO6221958
Qualified in New York County
My Commission Expires May 10, 2026

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202)232-0646

ERRATA SHEET

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: Dennis S. Charney, MD

Deposition Date: June 12, 2024

| Page No. | Line No. | Change |
|---|---|---|
| 30 | 16 | "and leadership" not "in leadership" |
| 31 | 3 | "to deal" not "the deal" |
| 100 | 12 | "Anandaraja" not "Anadaraja" |
| 149 | 15-16 | "I don't think I" to "I don't think. I" |
| 185 | 15 | "the CV" not "a" |
| 244 | 10 | "available" to "inaugural" |
| 258 | 18-19 | "it didn't -- it jogged" to "it didn't jog" |
| 263 | 21 | "tough times" not "times" |

[signature] 7-25-24

Signature Date