# Exhibit 9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. STELLA SAFO, GERALDINE LLAMES, AMANDA MISITI and EMILE BRUZELIUS, Plaintiffs, - against - DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA and ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI, Defendants. | CASE NO. 1:19-cv-03779-VSB-JW |

* C O N F I D E N T I A L *
VIDEO-CONFERENCE DEPOSITION
OF
ROSALIND FINK
NEW YORK, NEW YORK
TUESDAY, FEBRUARY 25, 2025

Reported Stenographically by:
ANNETTE ARLEQUIN, CCR/CSR, RPR, CRR, RSA

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

But I want to ask you about Prabhjot Singh, who I understand you represented as his legal counsel starting sometime in 2018; is that correct?

A. Yes.

Q. Now did you ever have a professional relationship that's public where it involved you doing legal work for Mount Sinai?

MS. GUERRASIO: Objection to form.

You can answer if you understand it.

A. No.

Q. Has Mount Sinai referred clients to you in the past?

MS. GUERRASIO: Objection to form.

A. Individuals at Mount Sinai have given my name to people, who reached out to me.

Q. And I understand you had a close relationship with Betsy Plevan; is that correct?

MS. GUERRASIO: Objection to form.

You can answer.

A. I don't know that I would say "close." I knew her from the time I was at

Proskauer, which is going back to the '70s.
Q. That's how you met her?
A. Yes.
Q. So from time to time over the years, you would represent people who had been referred to you by others who were working for Mount Sinai; is that correct?
MS. GUERRASIO: Objection to form.
A. Yes.
Q. And other times, it was Betsy Plevan that referred people to you as potential clients?
MS. GUERRASIO: Objection.
A. Yes.
Q. To your knowledge and to the extent that you didn't learn this from Dr. Singh, was Dr. Singh referred to you by somebody at Mount Sinai?
A. No.
Q. Was he referred to you by somebody at Proskauer, the law firm?
A. No.
Q. Do you know -- and, again, only if

you can answer this without revealing a communication with Dr. Singh -- how it was that Dr. Singh first contacted you?

A. He was given my name by a fellow NELA members, National Employment Lawyers Association.

Q. Who was that person at NELA?

MS. GUERRASIO: You can --

A. Well, let me go in the hall and talk to my counsel.

MR. BOWEN: Sure.

MS. GUERRASIO: That's fine.

MR. BOWEN: Just pause the record. We'll go off.

THE VIDEOGRAPHER: The time right now is 10:15 a.m. We are off the record.

(Witness conferring with counsel.)

THE VIDEOGRAPHER: The time right now is 10:17 a.m. We're back on the record.

A. You want to repeat the question?

Q. Can you give me the name of the person who was a fellow NELA member who referred

Dr. Singh to you?

A. Darnley Stewart.

Q. Darlene.

A. Darnley Stewart, D-a-r-n-l-e-y S-t-e-w-a-r-t.

Q. Was this referral made through NELA?

A. No.

Q. I see.

And that was sometime in 2008 -- 2018, correct?

A. Yes.

Q. Prior to that, you didn't know Dr. Singh at all?

A. Correct.

Q. Now when you -- prior to you beginning your representation of Dr. Singh, I presume you had some kind of initial consult with the understanding that he was a potential client and that that conversation was protected by attorney-client privilege; is that correct?

MS. GUERRASIO: Objection to form.

You can answer. You can answer

Q. Leaving Dr. Singh aside for the moment, had you been in other interviews that were being -- that had been conducted by Ms. Lowy in the past?

MS. GUERRASIO: Objection to form.

Are we talking about for this investigation or just in general?

MR. BOWEN: In general. Having nothing to do with this investigation.

A. I don't think so.

Q. Had you ever asked to attend an interview by Ms. Lowy in the past?

A. I don't think so.

Q. Were you asked by Mount Sinai to sign any kind of document, like a nondisclosure agreement or anything like that, before you attended the interview?

A. I don't recall.

Q. My understanding is that you actually did attend the interview when it occurred; is that right?

A. Yes.

Q. That took place at Mount Sinai?
A. Mount Sinai.
Q. And other than Dr. Singh and Ms. Lowy, do you recall who was present?
A. There was somebody from HR. I don't recall anyone else.
Q. So there was four of you in the room?
A. I think so.
Q. Three women and one man, correct?
MS. GUERRASIO: Objection to form. Misstates her testimony.
Go ahead.
A. Yes.
Q. Do you recall that the person from HR was a woman?
A. Yes.
Q. Does the name Clarissa Jones-Winter ring a bell?
A. No.
Q. You don't know her?
A. I know there is a person named

been interviewed concerning the investigation
that Mount Sinai was conducting?
A. Yes.
Q. And what did you discuss with
Ms. Lowy about that investigation?
MS. GUERRASIO: Again, objection to
form.
Hold on a second, Roz.
To the extent that these discussions
happened before there was any joint defense
between Dr. Singh and Mount Sinai, you can
testify to those.
A. I don't think there were any
discussions prior to the point where I learned
from Ms. Lowy that Dr. Singh had not been found
to have engaged in discrimination. And at that
point, our interests were aligned vis-à-vis the
people who are now the plaintiffs.
Q. But did you enter into some kind of
joint interest agreement with Mount Sinai on
behalf of Dr. Singh?
MS. GUERRASIO: Objection to form.

not deemed responsive.

Q. Okay. But that review was not conducted by you; it was conducted by your lawyers?

A. Correct.

Q. And were any withheld as privileged, as far as you know?

A. I don't recall.

Q. Did you review the emails that are in Exhibit RF-1 in preparation for your testimony today to refresh your recollection?

A. Yes.

Q. So the email on the first page, but at the middle of the page to the bottom, states that it's an email from Marina Lowy to you dated June 22, 2018.

And the first bit of text that appears in that email reads, "Dear Roz, the investigation led to the recommendations listed below which were made to and accepted by Dean Charney.

"I know that the dean discussed them

in some detail with Dr. Singh. We asked that you and Dr. Singh keep them confidential pending our discussion and decisions on next steps."

So there were discussions that you had with Ms. Lowy after you received this email about these representations and, quote/unquote, next steps, right?

A. Yes.

MS. GUERRASIO: Let me put in an objection.

Objection to form. You can answer.

BY MR. BOWEN:

Q. Without getting into any substance of what you learned from Dr. Singh, you were aware that Dr. Singh had already discussed these, quote/unquote, recommendations with Dean Charney, right?

A. One second.

(Document review.)

A. Yes.

Q. Now before you got this email on the bottom of page 1, had you previously had

discussions with Ms. Lowy about the investigation? Not just the outcome, but how the investigation was proceeding?

A. I don't think so, but I don't recall.

Q. If you go to the Bates number Fink 006, which is the back of the page --

A. Right.

Q. -- the middle email, so counting one up --

A. "I apologize for not returning your call"?

Q. Yes.

A. Yeah.

Q. That's an email from Marina the day before you got this email concerning the recommendations. And Ms. Lowy writes, "Hi, I apologize for not returning your call. I was out of town today. I had nothing earth-shattering as I do not want to steal the dean's thunder. I just wanted to tell you that if you have questions afterwards or want to talk about the

case or findings, please feel free to call me."

Do you remember that message from Ms. Lowy the day before you found out about the findings?

A. Well, I see it here. Do I independently recollect it? No.

Q. The email below that one on the same page is from you to Ms. Lowy where you say, "I returned your call but never heard back. If you need to reach me before Prabhjot's meeting tomorrow, please call my cell after 6:15."

So you had some information that Dr. Singh was going to be meeting with Dr. Charney on June 22, right?

MS. GUERRASIO: Objection to form.

You can answer.

A. Apparently so.

Q. Did you learn that from Ms. Lowy?

A. I don't recall.

Q. I take it you didn't attend the meeting between Dr. Charney and Dr. Singh, right?

A. Correct.

report and recommendations. Could you please send those to me. Would also like to know what complainants and witnesses are being told.

"After I've met with Prabhjot when he returns from Aspen, I'll call you with reactions, questions, comments probably on July 1 or July 2."

You recall that email?

A. I see it in front of me.

Q. You don't independently remember it?

A. No.

Q. Were you ever given a copy of the report and recommendations?

A. No.

Q. Did you ask for it?

A. Yes.

Q. I mean, in a phone call apart from this email?

A. Yes.

Q. Were you -- did you ask Ms. Lowy for it or somebody else at Mount Sinai?

A. Ms. Lowy is the only person I think

I dealt with at Mount Sinai.
Q. On this issue?
A. On this issue.
Q. Okay. What did she tell you the reason was for not giving you a copy of the report and recommendations?
A. That it was attorney-client privileged.
Q. So if you go back to the first page of this exhibit, looking at the bottom email, did you call Ms. Lowy that same day on June 22 about these recommendations?
A. I don't know if I called her or she called me. I don't have an independent recollection of that.
I believe we spoke after I received these. I also don't know if we spoke on the 22nd or the 23rd. I don't recall the date of the conversation.
Q. That would have been by phone, right, not in person?
A. By phone, yes.

Was that an unusual proposal or recommendation in your view?

A. No.

MS. GUERRASIO: Objection to form.

A. No.

Q. You've seen executive coaches being hired --

A. Many times. Many times.

Q. For your clients?

A. For my clients, yes.

Q. Did you say to Mount Sinai, on behalf of Dr. Singh, that you wanted some input on who the executive coach would be?

A. I believe so.

Q. And did you have that input?

A. I think I gave Ms. Lowy a name from Dr. Singh, but I don't remember what the name was.

Q. Do you know if that person was selected as the executive coach?

A. I don't recall.

Q. Do you recall any discussions on

item 2 about the removal of Berman and Knaup?
A. I don't recall.
Q. Do you remember this incident where somebody at Mount Sinai had asked Dr. Singh to contact Mr. Berman and tell him not to return from his vacation?
A. From the emails that I pulled and sent to my counsel, I saw that that had happened.
Do I have an independent recollection? No.
Q. But from the emails, you recall that Dr. Singh didn't want to do that. And you asked Mount Sinai to alleviate him of that request, right?
A. Correct.
Q. Which was done, right?
A. I believe so.
Q. Item 3 on this page reads, "An oversight committee should be formed to evaluate current and monitor future institute activities, financial and academic performance and leadership. The committee should mentor

Dr. Singh and take steps to ensure that the institute's atmosphere is improved, particularly as it relates to gender issues."

I presume you remember this action item, right?

A. I do.

Q. And you had discussions with Ms. Lowy about it?

A. I remember discussions about who was going to be on the oversight committee. I don't remember much discussion about the gender issues. I assume they must have taken place, but I don't remember the substance.

MS. GUERRASIO: Testify to what you recall.

THE WITNESS: That's what I'm saying; I don't recall.

BY MR. BOWEN:

Q. Did -- am I correct that earlier in your testimony today, you -- your position is that when you got these list of recommendations, this was the first time you understood that there

Ms. Lowy.

You just don't recall what was said about it; is that right?

MS. GUERRASIO: Objection to form.

A. I recall discussing who would be on the committee.

Q. Other than that?

A. I don't recall the rest of the discussion, assuming that other topics were discussed within item 3.

Q. Were there any issues that came up about who was going to be on the committee, to your recollection?

A. We discussed names. I don't remember if there were issues. We discussed names.

Q. Well, what I mean by that is, was there a concern on your part that was expressed to Mount Sinai that certain people being considered would not be appropriate or there would be an issue?

A. That, I don't recall.

Did I discuss them with Ms. Lowy in that conversation? I don't recall.

I do recall number 8, talking about the process for that.

Q. Okay. So before we get to number 8, number 7, at the last phrase refers to ensuring, "appropriate classification and pay parity between men and women and to ensure transparency."

Do you recall discussing that with Ms. Lowy?

A. Not specifically, no.

Q. So turning to number 8, this refers to, "A communication plan explaining the changes in the institute and providing some details regarding the results of the investigation should be developed to communicate with relevant internal and external stakeholders. This will include a plan of communication to the complainants and the Arnhold family."

What do you recall about your discussions with Ms. Lowy about that item?

of you. I just need to find the page.

(Document review.)

BY MR. BOWEN:

Q. Let's go to page Fink 012. Again, it's the backside of the page.

All right. So on this page, there's an email from you to Ms. Lowy dated July 12, 2018, and the body of the email reads, "Thanks for taking the time to answer all of our questions. Here are my notes on next steps."

Bullet point: "Marina will tell us when the meetings with persons who were interviewed occurred."

Second bullet point: "Marina will ask Dennis to tell Prabhjot who he's talking to and what he's telling them about the investigation, findings and recommendations."

Next bullet point or it's an asterisk: "Marina will ask Dennis to tell Prabhjot the bases for the oversight committee and who will be on it."

Next bullet point: "Marina will

alert Dennis to the need to talk to Prabhjot about the medical education recommendations."

And then the last bullet point: "Marina will ask Dennis to identify benchmarks."

And then there is a last sentence.

Do you remember this email?

A. Not independently. I've read it recently.

Q. Do you remember what questions you posed to Ms. Lowy on behalf of your client?

A. No.

Q. And then in terms of these bullet points, do you -- did you learn from Ms. Lowy or from anyone else at Mount Sinai what it was that Dean Charney -- what Dean Charney said with respect to "who he's talking to and what he's telling them about the investigation, findings and recommendations"?

MS. GUERRASIO: Objection to form.

Repeat the question.

BY MR. BOWEN:

Q. Did you hear from Ms. Lowy or anyone

Q. She's at Proskauer?
A. Yes.
Q. So other than Ms. Plevan and Ms. Lowy, who else?
A. I don't think anyone else.
Q. In the fifth paragraph that we were just looking at about Dr. Singh's plans to stay at Mount Sinai, the last sentence is in parentheses. It's three lines up from the bottom of that paragraph, and then that reads, "(That's one of the major topics for our next conversation. What has been or will be done to get out the word that he was not found to have engaged in either gender or age discrimination; weak management skills are one thing; discrimination is quite another.)"
Do you see that sentence?
A. I do.
Q. Did that conversation happen?
MS. GUERRASIO: Objection to form.
You can answer.
A. Yes.

form of the question.
You can answer.
A. Yes.
Q. And if I understood your testimony earlier today, you said that that arrangement, that joint interest privilege, existed sometime after you got the report on the recommendations as a result of the investigation and before the litigation was filed; is that right?
A. I would say that as of June 22nd, which is when I have the conversation concerning next steps and the results of the investigation, to the extent they would be shared with me, that at that point with regard to your clients, there is a joint interest, yes.
Q. And that's because you learned from Mount Sinai that there was no finding of unlawful discrimination against your client, right?
A. Correct.
Q. But you're saying you anticipated that there might be litigation by the complainants against your client; is that right?

would not do that.

I recall saying to her, whatever you want him to say, you can get in a deposition, but he's not going to sort of go over to your side.

That, I recall.

Q. But do you remember you were referring to, in that conversation with Dr. Olivarius, to the fact that some women employees of the institute were terminated and that Dr. Singh would explain why that is at a deposition?

A. I don't recall that. I don't think -- I don't recall any conversation or discussion of the specifics of the complaint.

Q. Well, I'm not suggesting you use these exact words, but did you convey the idea that some of the complaints about Dr. Singh's conduct was really the result of direction that he had received from Dean Charney?

MS. GUERRASIO: Objection to form.

A. I may have.

Q. But wasn't it part of what you were

plaintiffs would have a much clearer idea of who was doing what at Mount Sinai?

MS. GUERRASIO: Objection to form.

A. I don't know about "much clearer" -- "much clearer" what was your phrase?

Q. That it would become clear to the plaintiffs that some of what they are complaining about him was not him, it was somebody else directing that these actions be undertaken?

MS. GUERRASIO: Objection to form.

A. Generally speaking, yes. But I don't recall it as I'm trying to -- I wasn't trying to plead his innocence to Ms. Olivarius. I wanted to get her away from that and either talk about what I had wanted to talk about. And then eventually one or the other of us got to settlement because it was clear I was not going to do what she wanted me to do.

Q. Do you remember how that conversation was left?

A. Yeah. I had said that I would reach out to Mount Sinai to see if there was any

C E R T I F I C A T E

STATE OF NEW YORK )
: ss.
COUNTY OF NEW YORK )

I, ANNETTE ARLEQUIN, a Notary Public within and for the State of New York, do hereby certify:

That ROSALIND FINK, whose deposition is hereinbefore set forth, was duly sworn by me, and that the transcript of such depositions is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 6th day of March 2025.

ANNETTE ARLEQUIN, CCR #30XI00145000

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202)232-0646

ERRATA SHEET

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: Rosalind Fink

Deposition Date: February 25, 2025

| Page No. | Line No. | Change |
|---|---|---|
| 13 | 5 | "members" to "member"-Transcription error |
| 17 | 6 - 7 | "Dresden & Kalf" to "Dretzin & Kauff" - Transcription error |

3-22-25

Signature Date

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: Rosalind Fink

Deposition Date: February 25, 2025

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):

( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

( x ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

3.22.25 [signature]

DATE WITNESS SIGNATURE

3/22/25 [signature]

DATE NOTARY

RICHARD H. DOLAN
Notary Public, State of New York
Registration No. 02DO4683174
Qualified in Kings County
Commission Expires January 31, 2027