# Exhibit 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. STELLA SAFO, GERALDINE LLAMES, AMANDA MISITI and EMILE BRUZELIUS, Plaintiffs, | CASE NO. 1:19-cv-03779-VSB-JW |
| -against- | |
| DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA and ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI, Defendants. | |

VIDEOTAPED DEPOSITION OF DR. PHILIP LANDRIGAN
APPEARING REMOTELY
September 12, 2024
9:29 a.m.

Reported by: Eileen Mulvenna, CSR/RMR/CRR/RDR

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Q. So those were two of some of the most senior officials within the Mount Sinai system at the time; is that fair?

A. That's correct.

Q. Is it your understanding that they were involved in these negotiations?

A. From this, I gather that they must have been, but I don't have any recollection of what might have happened at the time.

Q. Dean Charney was your direct supervisor at the time; right?

A. That's correct.

Q. Both in your capacity as department chair and the dean of global health; is that right?

A. Yes.

Q. Did you have regular meetings with him?

A. Yes, almost every week.

Q. Were those one-on-one meetings?

A. It varied. Some were one on one. Some were group meetings with all of my sister and brother chairpersons of departments.

instructed us on what he wanted us to do. And then we developed advertisements which we placed in medical journals, New York Times, other outlets. There's a whole procedure for that to ensure fairness and inclusion in the search process.

The ad specified the duties, the responsibilities, invited applicants. Applications came in. The search committee screened the applications. We selected a certain number of applicants to actually come to Mount Sinai for interviews. And then we did interviews and ranked the candidates.

Q. You mentioned that Dr. Charney charged the committee. What did he actually say to you or other members of the committee? What did the charge constitute of?

A. After ten years, I can't remember specifically.

Q. Do you remember generally?

A. Telling us to pick a good chairman, but beyond that, I can't remember.

Q. Did you have a view as to what a good

planned step down?
A. Yeah, I had actually been planning it for a couple three years. I had been chairman since 1990. That was long enough.
Q. And I believe I recall this correctly, that you testified that after you stepped down from the position, your sole administrative title at the institution was that of dean of global health, and that you continued -- that you increased your involvement in the global health activities afterwards; is that right?
A. That's correct.
Q. Did you consider yourself to be a suitable candidate for the director of the Arnhold Institute in 2014?
A. I did not put my hat in the ring. I thought it should go to a younger person.
Q. Why?
A. Because I was already, let's see 2015, well into my 70s and thought that it should go to a younger person. I certainly had the credentials, but I chose not to apply for the position.

We'll enter it as Exhibit PL 4.
Are we on 4?
THE VIDEOGRAPHER: That's correct, 4.
MR. CERVENKA: Thank you.
It's a document Bates stamped ISMMS_007411.
(Exhibit 4, Bates No. ISMMS_007411, Job Advertisement, Director Institute for Global Health Icahn School of Medicine at Mount Sinai, received and marked.)
BY MR. CERVENKA:
Q. Have you seen this document before, Dr. Landrigan?
A. Yes, this is the -- this is the advertisement that we placed in various journals.
Q. And who wrote the advertisement?
A. It was written by the committee, and as chairman, I led that effort.
Q. Did Dr. Charney approve the text that we -- that is in Exhibit PL 4?
A. Yes, it would have been -- I don't recall specifically, but it would have been standard

A. Yes.
Q. Which ones?
A. Well, one was Dr. Christopher Plowe from Johns Hopkins. Another was Dr. Steffanie Strathdee from University of California San Diego.
Q. Any other candidates that you recall discussing with Dean Charney?
A. I know there were others, but I don't recall any more who they might have been.
Q. Dr. Strathdee -- that's spelled S-T-R-A-T-H-D-E-E -- she eventually became a front runner; is that right?
MR. McLEOD: Objection to form.
THE WITNESS: She eventually became a front runner, yes.
BY MR. CERVENKA:
Q. What made her stand out from the rest of the candidates?
A. She was very accomplished. She had a very vibrant program at UCSG, which involved a lot of combination of research, education, and training around the issue of prevention of HIV AIDS in

Q. Did you interview her one on one?
A. I'm sure I must have. I can't recall specifically.
Q. Did you consider Dr. Strathdee to be a suitable candidate for the job?
A. Yes, she was a very strong candidate.
Q. Was she a stronger candidate than Dr. Plowe?
A. She was at least as good as Dr. Plowe.
Q. And what kind of discussions did you have with -- did you have with Dean Charney about Dr. Strathdee's candidacy?
A. So we presented -- I, as chair of the committee, presented Dr. Strathdee to him --
Q. I'm sorry, Dr. Landrigan. I'm sorry to interrupt. There's some interference coming from your mic. I don't know whether that's the case --
(Cross talk.)
THE VIDEOGRAPHER: Yeah, make sure that there's nothing on top of the microphone itself.
THE WITNESS: I had my glasses beside

the mic. That was probably the problem, yeah. Okay.

So in answer to your question, I would have met with Dean Charney, presented Dr. Strathdee's file to him, and informed him that I and the committee considered her to be a leading candidate and...

BY MR. CERVENKA:

Q. And the committee would have graded her on a matrix similar to the one that we just looked at prior to you making that recommendation to Dean Charney; right?

A. I don't recall specifically, but I'm sure we did.

Q. And do you recall your grades for Dr. Strathdee?

A. I do not. They would have been high, but I don't recall specifically.

Q. Do you recall anybody else's?

A. No.

MR. CERVENKA: Henry, you can take the document down. Thank you.

MR. McLEOD: Honza, do you have a time to break for lunch coming up or --

MR. CERVENKA: So it's noon now. You're in New York; right?

MR. McLEOD: We're in Boston.

MR. CERVENKA: You're in Boston. All right. I'm happy to break for lunch whenever the witness would like to.

Dr. Landrigan, do you have a preference?

THE WITNESS: Any time in the next 10 or 15 minutes. I wouldn't want to go beyond that.

MR. CERVENKA: Sure. Sounds good. We'll break for lunch in the next 10 to 15 minutes. That works for me.

MR. McLEOD: Okay.

BY MR. CERVENKA:

Q. Was there any member of the search committee who was particularly excited about Dr. Strathdee's candidacy?

A. I know that Dr. Ramon Murphy was very

positively impressed by her.

THE VIDEOGRAPHER: One second. The microphone -- it's just something is really hitting the microphone. I don't know that it's the glasses. Maybe a piece of paper on top of the microphone.

MR. McLEOD: No, you can see the gray box right here.

THE VIDEOGRAPHER: I'm not sure, but it seems like somebody -- yeah, it just didn't sound clear. Yeah, let's see.

THE WITNESS: Is that better now?

THE REPORTER: No.

MR. CERVENKA: Why don't we go off the record and try to sort this.

THE VIDEOGRAPHER: Okay. The time is 11:56 a.m. Going off the record.

(Discussion off the record.)

THE VIDEOGRAPHER: The time is 11:58 a.m. Back on the record.

BY MR. CERVENKA:

Q. So, Dr. Landrigan, what happened with

Dr. Strathdee's candidacy after you had the meeting with Dean Charney where you presented her as a leading candidate?

A. So what typically happens at that time with the search committee is that if the dean agrees that the person is a leading candidate, and Dean Charney did agree to that, that they invite her -- they invite the candidate back for a second visit, and -- and that visit is primarily with the dean rather than with the search committee.

Q. And that visit did happen with Dr. Strathdee?

A. It did, yes.

Q. Did Dr. Plowe also reach the same stage of candidacy? Did he also come and have a return visit primarily to meet with Dean Charney?

A. I can't remember. What I do remember is that the $5 million thing was a show-stopper, and that may have been precluded a second visit, but I can't recall.

Q. What do you remember of the return visit by Dr. Strathdee?

A. She -- she mainly met with the dean, and the purpose of that meeting was for her and the dean to negotiate the terms of her appointment, if she were to take the appointment.

Q. Were you involved in those negotiations?

A. No, that was a direct negotiation between her and the dean.

Q. Did you advise the dean on the negotiations from the sidelines?

A. In a general way, basically expressing my opinion that I considered her to be a very strong candidate.

Q. Did you -- well, let me ask a more general question.

After you -- after the meeting where you endorsed her as the leading candidate, which then led to her being invited for a return meeting, did you subsequently discuss her candidacy with Dean Charney?

A. I can't recall specifically, but I'm sure I must have. I can't imagine I would not have.

the deposition, but not beyond -- but I don't think I ever saw it back then.
Q. If you go to the third paragraph, towards the bottom, it's the final sentence, Dr. Strathdee wrote, Under this scenario, to recruit 3 new faculty at roughly 200K per person, the annual salaries plus my own would total 1 million.
Do you see that?
A. I see that, yes.
Q. Does this refresh your recollection as to the amount of salary that Dr. Strathdee was asking for herself?
A. Yes. Yes.
Q. It appears that she wasn't asking for $4 million for herself, but rather for a total salary package for a number of people, including herself, to be --
A. Yes.
(Cross talk.)
BY MR. CERVENKA:
Q. -- and other scenarios are discussed, but she's not asking to be paid 4 million a year;

correct?
A. That is correct, yeah.
Q. She then, in the following paragraph, discusses her own ability to generate revenue and lists a number of grants that she's on that she's serving as a principal investigator on grants totaling in the tune of $40 million in the last 15 years.
Do you see that?
A. I see that.
Q. Was that an impressive number?
A. Oh, yes, very much so.
Q. During your tenure as an academic, have you served as a principal investigator yourself?
A. Yes, many times.
Q. And have you served on other search committees for institute directors in your tenure?
A. Yes, I have.
Q. Would you say that the track record of serving as principal investigator on grants totaling some $40 million in the span of 15 years was well

above average of what institute directors do?

A. I don't know if it's above average, but it's certainly a very impressive performance that's in the right range.

MR. CERVENKA: Let's put Tab 14 on the screen, please. We will enter this document as Exhibit PL 7. It's Bates stamped ISMMS_000674.

(Exhibit 7, Bates Nos. ISMMS_000674-75, E-mail Chain, received and marked.)

BY MR. CERVENKA:

Q. Do you see this e-mail, Dr. Landrigan?

A. It's now up there, yes.

Q. It's an e-mail exchange between you, Dr. Strathdee, and various other people dated September 25, 2014, so some two weeks after the e-mails that we just looked at.

A. Okay.

Q. You write to Dr. Strathdee in the e-mail at 9:46 a.m., "I think we are very close to getting to 'yes.'"

Do you see that?
A. I see that.
Q. Was it your understanding that by the middle of September, Dr. Strathdee and Dr. Charney were getting closer and closer together to a meeting point in their negotiations?
MR. McLEOD: Objection to form.
THE WITNESS: That seems to be what I'm saying, yes.
BY MR. CERVENKA:
Q. You said that because that was your understanding; correct?
A. Yes.
Q. Your e-mail was in response to Dr. Strathdee's earlier report to you and other members of the team. That's the e-mail that starts at the bottom of the first page that we're just looking at.
She writes, "Thanks again to those of you who assisted with last minute changes of the budget yesterday."
Do you recall being involved in budget

Exhibit PL 8. It's document Bates stamped ISMMS_000736.

(Exhibit 8, Bates Nos. ISMMS_000736-37, E-mail Chain, received and marked.)

BY MR. CERVENKA:

Q. Dr. Landrigan, why don't we begin from the end. So the final e-mail that really starts at the bottom of the first page, but the substance of it is on the second page of the exhibit.

Do you see that?

A. I'm looking at it, yes.

(Document review.)

BY MR. CERVENKA:

Q. Were you aware that Dean Charney extended a term sheet to Dr. Strathdee?

A. That would have been the norm, but I don't recall it.

Q. And what's your understanding of a term sheet? What does that mean?

A. A term sheet is a prelude to a formal offer letter in which the terms and conditions of

the appointment are spelled out in some detail, and then if all the parties agree verbally to that, then those terms are enshrined in a formal letter of offer.

Q. It's a signal of the very final stages of a negotiation; correct?

A. Yeah, well, the penultimate stage, with the letter being the final stage.

Q. Then on the middle of the first page on October 14, Dr. Strathdee responds to the term sheet that Dr. Charney sends to her, and she responds that, "Ultimately, there are too little resources to grow stellar program without cutting beyond the bone, given the current rate of expenditures."

Do you see that?

A. I see that, yes.

Q. Were you surprised when Dr. Strathdee turned the term sheet down and walked away from the negotiations?

A. I was disappointed.

Q. Why were you disappointed?

A. Well, I would have liked to have had her at Mount Sinai.
Q. Were you nonetheless surprised?
A. I can't recall at this point whether I was surprised or not. I was disappointed.
Q. You see an e-mail from Dr. Charney in response to Dr. Strathdee. This is at 10 a.m. on October 15, 2014?
A. I see it, yes.
Q. And he writes that his view is that, quote, an offer of $6 million, an endowed chair, plus the Arnhold endowment and a commitment to additional fundraising, and membership on our newly formed International Advisory Board, is a strong one, end of quote?
A. Yes.
Q. Did you share that view?
A. I'm not sure I saw this memo at that time. As you can -- I guess I was copied on it, but I would consider that a pretty strong offer, yes, but not as much as she wanted, yes.
Q. Do you think that she was unreasonable

in her ask?
A. I would not consider it unreasonable. She wanted to build a world-class institute, and she was basically asking for the resources to do that.
Q. And you too wanted to create a world-class institute; right?
A. I did, yes.
Q. Did you try to persuade Dean Charney to release further resources and match Dr. Strathdee's ask so that the deal can come through?
A. If I did, I don't recall it at this point.
Q. Well, did you discuss the failed negotiations with Dean Charney at around October 14, 2014?
A. I don't recall.
Q. Was the search a significant part of your role and duties at Mount Sinai at that time?
A. Yes, it -- it occupied many hours of my waking day.
Q. It was one of those periods where you

Q. Do you recall Dr. Murphy sharing his opinion with you on the progress of the negotiations at any point?
A. I remember that he had opinions, yes.
Q. What opinions of his do you recall?
A. Well, he was strongly in support of Dr. Strathdee's candidacy.
Q. Do you recall Dean Charney ever losing his temper during the negotiations with Dr. Strathdee?
A. I don't recall that, no.
Q. Do you recall Dean Charney ever losing temper?
A. He lost his temper all the time. That was his operating style.
Q. What does it look like when he loses his temper?
A. He was a big man with enormous shoulders, and he would lean forward across the table and -- and be visibly angry.
Q. What kind of visible signs of his anger did he display?

A. Loud voice, red face.
Q. Did you see him bang on the table when he loses his temper?
A. Yes.
Q. Have you ever felt intimidated by this display of anger?
A. He got angry at me a few times and banged on the table. I'm not easily intimidated.
Q. Did others express to you that they found Dr. Charney to be intimidating when he behaves this way?
A. They may have. I can't recall.
Q. Were you ever present in meetings with Dean Charney and other people when he was getting angry and was directing that anger to somebody other than yourself?
A. Yes.
Q. Did you intervene?
A. No.
Q. Did you think it appropriate for Dean Charney to behave in this way?
A. It was his style.

Q. What does that mean?
A. That that was his usual way of -- of conducting conversations when he disagreed with a person.
Q. Did he conduct conversations like this on a regular basis?
A. Frequently.
Q. How frequently? Every day? Every week, that you would have witnessed, of course?
A. Frequently.
Q. Yeah, can you add some color to that, so I can have an understanding of what you mean by "frequently"?
A. Weekly or monthly.
Q. Did you consider that appropriate?
A. As I said before, it was his style.
Q. Did you consider that style to be appropriate for the workplace?
MR. McLEOD: Objection.
THE WITNESS: I really never formed an opinion. It was just -- it was like the weather. I dealt with it.

BY MR. CERVENKA:
Q. Was Dr. Charney degrading when he was angry?
A. He could be.
Q. For ease of our discussion here, I'm going to refer to each time he got angry, you said loud voice, red face, maybe banged the table, call it an episode. I'm not -- just as a mutual word, I hope.
But how long on average did these episodes last?
A. No more than a few minutes.
Q. Was there anybody else at Mount Sinai who behaved similarly?
A. Ken Davis could occasionally get visibly angry in a conversation.
Q. But less frequently than Dean Charney?
A. I didn't see him as often. So it's hard to measure.
Q. Did you ever get angry like this in the workplace?
A. No, not my style.

Q. Why is it not your style?
A. It just isn't. I believe in exerting command through -- through other means than visible anger.
Q. Are you aware of anybody complaining of -- about Dean Charney's conduct?
A. I heard complaints, yes.
Q. Who did you hear complaints from?
A. I heard a complaint one time from my colleague, Dr. David Savitz.
Q. And can you spell the last name?
A. Yes. S-A-V, as in victory, I-T-Z, as in Zed.
Q. And what did Dr. Savitz tell you of his complaint?
A. He told me that Dr. Charney got visibly angry with him about some aspect of his academic performance.
Q. Was Dr. Savitz a professor in your department?
A. Yes.
Q. Did you do anything as a result of

receiving that complaint from Dr. Savitz?

A. No, I just told Dr. Savitz to let it roll off his back.

Q. What did he say to that?

A. He laughed. He thought it was funny.

Q. That you saying that it would roll off your back was funny?

A. No, Charney's anger.

Q. He found it amusing?

A. Dr. Savitz found it amusing, yes.

Q. Did anybody else complain to you about Dr. Charney?

A. That's the only one I can recall.

Q. Did you ever consider it to be your duty to initiate a formal complaint with Mount Sinai's HR department about Dr. Charney's angry episodes?

A. No.

Q. Is there a particular reason why you didn't feel the need to report this?

A. I didn't feel that it rose to that level.

Q. What level?
A. A level necessary to report.
Q. And can you describe to me the level -- sort of where's the threshold in terms of conduct? I don't want to put words in your mouth, but I'm trying to understand where that level was for you.
A. I'm not sure, but we didn't get there.
Q. Well, you didn't get there because you don't know where "there" was; right?
MR. McLEOD: Objection.
THE WITNESS: I don't understand your question.
BY MR. CERVENKA:
Q. Yeah, I'm trying to better understand your testimony, but if you don't know where the threshold is, you don't know when the threshold is reached or surpassed; right?
A. I'd probably say it's like Justice Potter. You know it when you see it, and we didn't get there.
Q. What kind of behavior would cross that

Q. Would it be fair to say that you rated Dr. Plowe and Dr. Strathdee -- it was on a scale of 1 to 10, 10 being the highest.
Would it be fair to say that you graded them 8, 9, 10, thereabouts?
A. I -- certainly I would have graded them above him.
Q. Was there any candidate that you invited for an interview during this search process that received similar grades to Dr. Singh, from you?
A. I don't think so, no.
Q. Are you aware of the other search committee members' grades of Dr. Singh?
A. The one I remember specifically is Dr. Ann Marie Beddoe, who ranked him zero across the board.
Q. Did any member of the search committee rank any other candidates with all zeros across the board?
A. I can't remember.
Q. But you remember that Dr. Beddoe scored Dr. Singh all zeros; correct?

A. Yes. Yes, I just said that.
Q. Is there a reason why that stands out in your mind?
A. It was -- it stands out because it was a striking finding.
Q. Well, striking because it hadn't happened before; right?
A. I didn't say that. It struck me as a strong opinion.
Q. Did anybody else give him a ranking of a zero in one category -- not necessarily across the board like Dr. Beddoe, but in one category, rank him zero?
A. I don't remember.
Q. Did you discuss this grading that Dr. Beddoe gave Dr. Singh?
A. Probably, but I don't recall the conversation.
Q. Were you concerned about the grading from Dr. Beddoe?
A. No, it was a fact.
Q. I'm sorry, say that again. I didn't

hear?

A. It was a fact. That was her opinion.

Q. But was it concerning to you that a member of your search committee and a member of the MSGH team, somebody who was doing global health work under the broad umbrella of global health at Mount Sinai, rendered this verdict of Dr. Singh?

MR. McLEOD: Objection to form.

THE WITNESS: It was clearly a vote of no confidence that she expressed.

BY MR. CERVENKA:

Q. And were you concerned about that?

A. It was one vote among eight or ten on the committee, and it was something that had to be taken into consideration.

Q. How many search committees have you served as chair during your employment at Mount Sinai?

A. Prior to this search committee, I chaired two search committees eight or ten years apart, each of which successfully recruited a chair of geriatrics. And I believe I served -- I was not

A. I stated it as a matter of fact in this e-mail.

Q. And you highlight a number of other concerns, such as his lack of leadership experience, his lack of experience in research.

Do you see that?

A. I see that, yes.

Q. Do you think the role of the search committee's view is that he does not have a, quote, high potential to increase scholarship within our global health group --

(The reporter seeks clarification.)

BY MR. CERVENKA:

Q. You wrote that the search committee did not see Dr. Singh as having a high potential to increase scholarship within our global health group, end of quote; is that right?

A. Yes.

Q. And your third concern was that you did not think that Dr. Singh could serve both as the director of the Arnhold Global Health Institute and be a vice chair in medicine.

Do you recall declining to sign any documents related to the function of the institute in February and September of 2015?

A. I don't recall any other documents, let alone whether or not I signed or did not sign them.

Q. Are you aware that Dr. Jeffrey Sachs was offered a paid fellowship at Mount Sinai?

A. I heard that later. That did not occur on my watch, as best as I can recall.

Q. Who did you hear that from?

A. I'm sorry?

Q. Who did you hear that from?

A. I don't know. I'm not sure.

Q. When did you hear that?

A. Subsequently.

Q. Do you know approximately when?

A. Maybe a year later, two years later. I don't know.

Q. What was your view of Dr. Sachs being offered a paid fellowship at Mount Sinai?

A. He's a distinguished scientist.

Q. Yes.
It's also a CV that's lacking for somebody who were in the process of obtaining the position of associate professor at Mount Sinai; is that right?
MR. McLEOD: Objection to form.
THE WITNESS: Yes, it's thin. Yes.
BY MR. CERVENKA:
Q. Yeah, it's got ten publications, when I believe we discussed earlier that 20 would be around the amount that's expected for somebody at the stage of their career where promotion for an associate professor would be appropriate; is that right?
A. That's correct.
Q. Were you surprised when Dr. Singh became associate professor at the time of his hire?
A. He had -- offsetting the porosity of publications is the extensive field experience he had in the -- and work with Jeffrey Sachs. But all that said, this is a bit thin.
Q. Are you aware of anybody else -- any

other professor in your department while you were the chair of it who became an associate professor with ten publications in their record?

MR. McLEOD: Objection to form.

THE WITNESS: I can't recall any at the present time.

MR. CERVENKA: Why don't we take a quick break, if you don't mind. I need to use the bathroom. Thank you.

THE VIDEOGRAPHER: Okay. The time is 5:57 p.m. Off the record.

(Recess from the record.)

THE VIDEOGRAPHER: The time is 6:02 p.m. Back on the record.

BY MR. CERVENKA:

Q. Dr. Landrigan --

MR. McLEOD: I'm sorry if you asked before, but can we get a time check?

THE VIDEOGRAPHER: So we're at 6 hours, 38 minutes.

BY MR. CERVENKA:

Q. Dr. Landrigan, do you know who David

THE WITNESS: You're asking me that question?

BY MR. CERVENKA:

Q. Yes.

A. That's a ridiculous question. The answer is no, but it's a ridiculous and stupid question.

Q. Did you ever tell Dr. Ramon Murphy that you masturbated at work?

MR. McLEOD: Objection to form.

THE WITNESS: Where are you --

MR. McLEOD: No, you're not -- no, I'm instructing the client not to answer.

MR. CERVENKA: On what basis, Counsel?

MR. McLEOD: This is harassment. This is highly -- I'm -- doesn't have any relevance as to this, any foundation basis, and there's nothing that's been introduced that suggests there's any foundation for that.

MR. CERVENKA: There's nothing we introduced yet, that's right.

THE WITNESS: I also notice that we're at time, or will be in about one minute.

BY MR. CERVENKA:

Q. I repeat my question.

Did you tell Dr. Ramon Murphy over the phone that you masturbated in the office?

THE WITNESS: Answer it?

MR. McLEOD: No.

Objection. I -- this is harassment.

MR. CERVENKA: What's harassing about it, Austin? It's a yes-or-no question.

MR. McLEOD: This is completely irrelevant, not relevant to this case. He's not a party to this case.

MR. CERVENKA: He's a leader at Mount Sinai. Are you instructing him not to answer that question?

MR. McLEOD: He's not a current leader at Mount Sinai. I'm instructing him not to answer. I'm maintaining that. And you can call the magistrate if you need to.

MR. CERVENKA: Let's go off the record

for a second.
THE VIDEOGRAPHER: Okay. The time is 6:20 p.m. Off the record.
(Discussion off the record.)
THE VIDEOGRAPHER: Okay. The time is 6:37 p.m. Back on the record.
BY MR. CERVENKA:
Q. Dr. Landrigan, did you tell Ramon Murphy over the phone that you masturbated in the office?
A. I did not.
Q. Thank you, Dr. Landrigan.
MR. CERVENKA: I have no further questions.
MR. McLEOD: I have no questions for this witness.
MR. CERVENKA: All right. Thank you.
THE VIDEOGRAPHER: All right. I'm going to get us off the record.
This marks the end of today's deposition. The time is 6:38 p.m.
(Off the record at 6:38 p.m.)

STATE OF NEW YORK )
ss:
COUNTY OF WESTCHESTER )

I, EILEEN MULVENNA, CSR/RMR/CRR, a Certified Court Reporter, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public in and for the State of New York, do hereby certify:

That I reported the taking of the deposition of the witness, DR. PHILIP LANDRIGAN, commencing on the 12th day of September, 2024, at the hour of 9:29 a.m.

That prior to being examined, the witness was duly sworn by me to testify to the truth, the whole truth, and nothing but the truth.

That I thereafter transcribed my said shorthand notes into typewriting and that the typewritten transcript of said deposition is a complete, true and accurate transcription of my said shorthand notes taken down at said time, and that a request has been made to review the transcript.

I further certify that I am not a relative or employee of an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel involved in said action, nor a person financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my signature this 25th day of September, 2024.

Eileen Mulvenna ____________

EILEEN MULVENNA, CSR/RMR/CRR/RDR

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: Dr. Philip Landrigan

Deposition Date: September 12, 2024

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):

( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

(X ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

10/28/2024 ______________________

DATE WITNESS SIGNATURE

28 OCT 2024 ______________________

DATE NOTARY

The Commonwealth of Massachusetts

On this 28th day of OCT, 2024, before me, the undersigned notary public, personally appeared Philip Landrigan, proved to me through satisfactory evidence of identification, which were known to me, to be the person who signed the preceding or attached document in my presence and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his/her knowledge and belief.

Bryan C. Fleming, Notary Public
My Commission Expires 30 June 2028

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202)232-0646

ERRATA SHEET

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.
Witness Name: Dr. Philip Landrigan
Deposition Date: September 12, 2024

| Page No. | Line No. | Change |
|---|---|---|
| 192 | 18 | "she" not "he" – Transcription error |
| 207 | 13 | "votes" not "rows" – Transcription error |
| 270 | 9 | "competent" not "confident" – Transcription error |
| 303 | 16-18 | "He had just gotten…I wrote this note to him." - Sentence to be marked "Attorneys' Eyes Only" |

The Commonwealth of Massachusetts
On this 28th day of OCT, 2024 before me, the undersigned notary public, Philip Landrigan personally appeared, proved to me through satisfactory evidence of identification, which were known to me, to be the person who signed the preceding or attached document in my presence and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his/her knowledge and belief.
Bryan C. Fleming, Notary Public
My Commission Expires 30 June 2028

Signature                                        Date: 10/28/2024