# Exhibit 13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DR. STELLA SAFO, GERALDINE LLAMES, AMANDA MISITI and EMILIE BRUZELIUS, Plaintiffs, -against- DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA and ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI, Defendants. | CASE NO. 1:19-cv-03779-VSB-JW |

*** CONFIDENTIAL ***
INCLUDES ATTORNEYS' EYES ONLY PORTIONS
VIDEO-RECORDED DEPOSITION OF
KIRSTEN KNAUP
Glenn, Agre, Bergman & Fuentes, LLP
1185 Avenue of the Americas
22nd Floor
New York, New York 10036

11/26/2024
9:37 a.m. (EDT)

REPORTED BY: MONIQUE CABRERA

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

exit interviews?
A. No. I think if one of my direct reports left under unknown circumstances, I would have conducted one, but one didn't leave and the other one transferred within Sinai.
Q. Do you know who was responsible for conducting exit interviews?
MS. GUERRASIO: Objection to form.
You can answer.
A. No.
BY MR. CERVENKA:
Q. Did you have an exit interview when you left?
A. No.
Q. Do you recall referring to yourself as an exit champion --
A. No.
Q. -- in an e-mail to Dr. Safo?
A. What is that?
Q. I'll show you.
MR. CERVENKA: Mark this as KK 1.
(Whereupon, Exhibit KK 1, E-mail,

was that of an exit champion, right?

MS. GUERRASIO: Objection to form.

A. No. It's -- it's referring to the article and that whatever I read in the article used that term "exit champion." And I said, oh, okay.

I mean, I wouldn't use the term "exit champion" in November of 2015. We had barely started.

BY MR. CERVENKA:

Q. Is it true that you always considered the worst case scenario?

A. Yes.

Q. And it's your testimony today -- today that you never conducted an exit interview with a member of staff, right, by AIGH?

MS. GUERRASIO: Objection to form.

You can answer.

A. Yes.

BY MR. CERVENKA:

Q. What do you mean at the top of e-mail when you wrote, quote, you don't want

MS. GUERRASIO: Objection to form.
A. Me personally?
BY MR. CERVENKA:
Q. Yes.
A. No.
MR. CERVENKA: All right. Let's take a break.
THE VIDEOGRAPHER: Time right now is 10:59 a.m. We are off the record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: The time right now is 11:02 a.m. We are back on the record.
BY MR. CERVENKA:
Q. Ms. Knaup, do you know what the allegations in this lawsuit are?
A. No.
Q. Are you --
A. Well, if I can clarify, once the -- what is it -- the claim was filed, I did read it at the time so I got an idea.
Q. Did you read the complaint in the

He was involved at the institute, wasn't he?
MS. GUERRASIO: Objection to form.
You can answer.
A. I can't say at what degree he was involved because I did not have a lot of interaction with him in terms of what to do on a daily basis.
BY MR. CERVENKA:
Q. Did you talk to Dr. Singh about the conversation that Dr. Anandaraja relayed to you with Dr. El-Sayed? Let me rephrase that.
The -- when Dr. Anandaraja told you of her conversation with Dr. El-Sayed in which he said that he was not going to work with anyone over the age of 40, did you discuss that conversation with Dr. Singh afterwards?
A. No.
Q. Why not?
A. I didn't see the point. Again, you know, he said it, but there was no evidence that they followed through with it.
Q. What do you mean, there was no

evidence that he would follow through with it?

A. Well, I was one of the early hires of the institute and I was older. I was beyond 40.

Q. And you -- and you didn't consider it important for Dr. Singh to know that Dr. El-Sayed is having these types of conversations with AIGH staff?

MS. GUERRASIO: Objection to form.

A. I didn't find that that was my job to do. If this was an issue, then Anu should have brought it up to Dr. Singh.

BY MR. CERVENKA:

Q. You didn't think it was your responsibility as chief operating officer to report concerns you learned about discrimination to your supervisor?

MS. GUERRASIO: Objection to form. It's mischaracterizing her testimony.

You can answer.

A. I didn't feel discriminated against so I also didn't think that Anu was discriminated

against because she was there.

BY MR. CERVENKA:

Q. Did it matter that you did not feel discriminated against?

A. It was a good thing.

Q. I agree. But did it matter in the question of whether or not to report this conversation to Dr. Singh?

MS. GUERRASIO: Objection to form.

A. Did it matter? Can you just --

BY MR. CERVENKA:

Q. Actually I will ask differently --

A. Okay.

Q. -- because I don't think that was very clear.

Why did it matter in your decision process as to whether to report this or not report this to Dr. Singh that you yourself did not feel discriminated?

A. When Anu said that to me, I thought it was in the past because things had happened in between that conversation that they had on the

subway so it was not an acute issue.
Q. Were there any other times that members of AIGH staff reported to you concerns about discrimination?
MS. GUERRASIO: Objection to form.
You can answer.
A. No.
BY MR. CERVENKA:
Q. When else did people report concerns about discrimination to you?
A. No, they didn't.
MS. GUERRASIO: She said no.
BY MR. CERVENKA:
Q. Oh, I misunderstood. Thank you.
This was the only time?
MS. GUERRASIO: Objection to form.
A. Again, I didn't take it as Anu was talking about discrimination.
BY MR. CERVENKA:
Q. What did you take it as?
A. An anecdote.
Q. Anecdote meaning a joke?

paragraph?

A. Yes.

Q. What is inaccurate about it?

A. I did not say that she would be shocked by how much money the men made on her team, and I did not bring this up to Dr. Singh.

What I did say to Dr. Singh is that Emily would like a raise to which he answered, "Well, she is a doctoral student." So she hadn't completed her education compared to, for example, Patrick Doupe, D-O-U-P-E. He already had a Ph.D. at least two years. I know he did a year in Berlin. And Dr. Healthguard (phonetic) had a Ph.D. from Berkeley for like 15 years already. So they were not her peers.

And -- and she was -- I mean, just to jump this to paragraph where she said she stayed late --

Q. Which paragraph is this? I am sorry.

A. That she worked extremely hard, so 251, that "she worked extremely hard and

complaint now?
THE WITNESS: Yeah.
MR. GUERRASIO: Just make clear what she told you -- okay.
THE WITNESS: Paragraph 246, she said that "from the projected budgets it appeared that." So basically she saw the budgets for any grants that she worked on with Dr. Faghmous.
BY MR. CERVENKA:
Q. And that's what she told you?
A. No, that's where I am saying if she had said that to me, I would have probably corrected her because they all different levels of expertise.
Q. When you spoke to Dr. Singh about Ms. Bruzelius's request for a pay increase, did he tell you that he did not think that she would push the request?
A. No.
Q. What did he say to you when you told him that Ms. Bruzelius would like a pay increase?

MS. GUERRASIO: Objection.
You can answer.
A. She was a doctoral student, and as such, she was actually at the high end of the salary range for graduate students, even post-doc fellows.
BY MR. CERVENKA:
Q. Did he tell you -- did Dr. Singh tell you that he thought Ms. Bruzelius weak?
A. No.
Q. That he thought her too collaborative?
A. No.
Q. Did Dr. Singh tell you that he did not like Ms. Bruzelius?
A. No.
Q. Did you tell Ms. Bruzelius that Dr. Singh made any of these three statements?
A. No, because he didn't make them to me.
Q. No, I understand. But you didn't tell Ms. Bruzelius that Dr. Singh has told you

that she was weak, too collaborative and that he did not like her, correct?
A. He didn't tell me.
Q. I appreciate. My question is slightly different. I am just trying to make sure just going off of the allegations, that regardless of whether he told you or not, you did not tell Ms. Bruzelius that Dr. Singh had made these statements, correct?
A. Me just making it up?
Q. Yes.
A. No.
Q. Did you suggest to Ms. Bruzelius that you thought Dr. Singh did not know her very well?
A. That he was probably not aware of her daily work.
Q. You told that to Ms. Bruzelius?
A. Yes.
Q. Did you also tell her that Dr. Singh might change his view in the future and that Ms. Bruzelius could push for salary parity then?

A. Well, she could after she had her doctorate. She definitely could renegotiate for a higher salary.

Q. Did you tell her that?

A. Yes. That once she has a doctorate, but I think she was two years out to get it, so.

Q. Did you think that Ms. Bruzelius was weak?

A. No.

Q. You liked her, right?

A. Yes.

Q. You became close as work colleagues?

MS. GUERRASIO: Objection to form.

A. So we weren't colleagues in the sense that we did a lot of work together, but we did chat.

BY MR. CERVENKA:

Q. Are you aware of Dr. Singh offering a promotion to Ms. Bruzelius? I am looking at paragraph 254 now.

A. No.

Q. Did you tell Ms. Bruzelius that she

should expect to receive a pay raise between 20 and $30,000?

A. No, not at that point. She didn't have a doctorate.

Q. Moving to paragraph 257 now, the first sentence of that paragraph, is that accurate?

MS. GUERRASIO: If you need read a paragraph or two before.

A. Yes, I was just wondering who is she.

So I wasn't present when she had this conversation with Dr. Singh.

MS. GUERRASIO: I am sorry. Was there a question that was asked? Wait for a question.

BY MR. CERVENKA:

Q. My question, I'll say it again, so paragraph 257, the first sentence of the paragraph, is it accurate?

A. I wasn't present for that conversation.

Q. Was it standard for birthday cake receipts to be reimbursed by AIGH?

MS. GUERRASIO: Objection to form.

A. If it was one of the -- what's the word I am looking for -- if it was a staff event, yes.

BY MR. CERVENKA:

Q. Then moving on to paragraph 321, do you recall this conversation taking place?

MS. GUERRASIO: Objection to form.

A. What's the question?

BY MR. CERVENKA:

Q. Do you recall this conversation taking place?

A. No.

Q. Ms. Knaup, are there any other statements that were attributed to you in the complaint that you recall that are inaccurate that we haven't discussed in the past one hour or so as we were going through the complaint?

MS. GUERRASIO: Objection.

A. I would need to read. You know, I

don't recall every detail so I can't say yes or no to whether there are additional mistakes made.

BY MR. CERVENKA:

Q. Understood. But working off of the recall that you have, imperfect as it may be, do you recall any other statements that were attributed to you which you take an issue?

MS. GUERRASIO: Objection to form.

A. I know there are more in here, but I can't give you specifics right now because, as I said, I didn't memorialize this.

BY MR. CERVENKA:

Q. All right. Did you take any notes when you were reading the complaint in April of 2019?

A. No. I was reading it on the computer.

Q. Did you contact anybody to share your thoughts on the allegations in the complaint?

A. Yes, my friend.

Q. How did you discuss the allegations

A. Well, again, he was working on programs, and we would just work together on logistics. So if there was a big conference that he would work with the others, and I would do the financial end of it.

Q. Did you work well together, in your opinion?

A. Yes.

Q. Are you aware of any complaints that he faced at Columbia?

MS. GUERRASIO: Objection to form.

You can answer.

A. Yes.

BY MR. CERVENKA:

Q. Was that a yes?

A. Uh-huh.

Q. What do you know about complaints that he faced at Columbia?

MS. GUERRASIO: And same objection.

A. Our boss once came into my office and said that there was a complaint against David, that a graduate student claimed that he

had offered her a job if they went out on a date.

BY MR. CERVENKA:

Q. Do you know any further detail?

A. No.

Q. Do you recall when this took place?

A. I want to say 20 -- summer of 2007 but it could have been 2006.

Q. And was there an investigation into this complaint?

A. I don't know. My boss was involved in this and all of the details. And David already had a job at NYU, so I don't know if there was anything more official.

Q. And what was the name of your boss?

A. Irwin Redlener.

Q. Can you spell the last name?

A. R-E-D-L-E-N-E-R.

Q. Did you and Mr. Redlener only have the one discussion about this complaint?

A. Dr. Redlener.

Q. Doctor.

A. He came in once, and then afterwards

he came in maybe the next day and said that David was terminated.

Q. That Columbia terminated his employment?

A. Yes.

Q. You were never interviewed as part of an investigation into this complaint; is that right?

A. Correct.

Q. Did you discuss the complaint with Mr. Berman?

A. No.

Q. Did you subsequently recommend that Mr. Berman be hired to work at AIGH?

A. Yes.

Q. Who did you make this recommendation to?

A. To Doctor -- well, I suggested to Dr. Singh that they meet.

Q. Did you tell Dr. Singh that Mr. Berman had faced this complaint at Columbia?

A. No.

Q. Was there a reason why you didn't tell him?

A. Well, our boss, Dr. Redlener, we hired him about two years afterwards to work for his foundation, and so we shared the space with his foundation, the Children's Health Fund.

Q. And I just wasn't -- wasn't clear. So you said that you -- well, who hired Dr. Redlener for this foundation?

A. No. Dr. Redlener was a cofounder, and he also was the director at Columbia University. So Dr. Redlener, we hired David to work with him as a special assistant at the foundation. But he had a dual role, Dr. Redlener.

Q. So if I understand you correctly, after this complaint was made against Mr. Berman, Dr. Redlener -- scratch that.

So 2007, 2008, a complaint was made against Mr. Berman, right?

A. 26 or 2007.

Q. '6 or '7?

A. Yes.
Q. Was Dr. Redlener Mr. Berman's boss at the time?
A. Yes.
Q. Okay. Subsequent to the complaint being made against Mr. Berman, Mr. Berman's employment with Columbia is terminated, correct?
A. Yes.
Q. And subsequent to that, Mr. Redlener hired Mr. Berman back; is that what you're saying?
A. Yeah, yeah, after two years at NYU, he hired him back.
Q. And you mentioned this in response to my question about why you didn't tell Dr. Singh about the complaint about Mr. Berman. And I guess I am just trying to understand. What's the relationship between Dr. Redlener rehiring Mr. Berman and your decision to not disclose the complaint to Dr. Singh? Can you explain that?
A. First, I just suggested that they

meet, and I didn't think it was relevant. I didn't have firsthand knowledge of the details so I am not sure what I should have told Dr. Singh.

Q. Well, could you have told him what you did know, and that is that you understood that a graduate student had previously made a complaint against Mr. Berman that Mr. Berman had offered her a job if she went on a date with him?

A. But I don't know if that was substantiated.

Q. Did you tell Dr. Singh that Mr. Berman was fired by Columbia?

A. No.

Q. Do you think that relevant?

MS. GUERRASIO: Objection to form.

You can answer.

A. I don't know if he was fired. He terminated and then went to NYU, so I am not sure of any sequence of events.

BY MR. CERVENKA:

Q. Well, you testified that Columbia terminated Mr. Berman's employment, right?

A. Yes.

Q. So perhaps there's a distinction between terminated and fired. So let me ask it differently.

Did you tell Dr. Singh that previously in Mr. Berman's employment, his employer terminated his position following a complaint?

A. No.

Q. Did you not think it substantiation enough of the complaint that Columbia subsequently fired Mr. Berman?

MS. GUERRASIO: Objection to form.

A. He had already handed in his resignation to work for NYU so I really don't know the details of what was talked about.

BY MR. CERVENKA:

Q. Do you know of any other complaints that were filed against Mr. Berman?

A. No.

Q. Did you face any complaints prior to joining AIGH?

What do you know of Mr. Berman's actions that led to the complaint being filed against him? Do you consider his actions to be appropriate?

MS. GUERRASIO: Objection to form.

A. Which claim?

BY MR. CERVENKA:

Q. Do you think it's appropriate for a leader at an institution to offer a job to a student if that student goes on a date with them?

A. No.

MS. GUERRASIO: Objection to form.

You can answer.

A. Sorry.

MS. GUERRASIO: It's okay.

BY MR. CERVENKA:

Q. Did you make introductions to anybody else with the view of them possibly be hired into the institute?

MS. GUERRASIO: Objection.

A. No.

BY MR. CERVENKA:

Q. What about Mr. Randall, did you make the introduction?

A. No. It was a job posting, and he applied. He was already at Sinai. The same with Carroll Hayek, H-A-Y-E-K.

Q. Did you disclose the -- your knowledge of the complaint against Mr. Berman to Dr. Singh subsequently to Mr. Berman's hiring?

A. No.

Q. Did you disclose it to anybody at Mount Sinai subsequently to Mr. Berman --

A. No.

Q. -- being hired?

A. No.

Q. What kind of training did you receive at Mount Sinai when you started, Ms. Knaup?

A. The first time?

Q. When you joined AIGH.

A. Other than regular onboarding training which is a whole day with new hirees and they just introduce different central

standard processes for the institute after you were hired?

MS. GUERRASIO: Objection to form.

A. No.

BY MR. CERVENKA:

Q. Was there a process in the -- at the institute for people to follow if they wanted to raise a complaint against another member of staff?

A. Yes.

Q. What was the process?

A. It would have been introduced to them at the orientation. So they're given the names and numbers for points of contact regarding whatever their concerns are.

Q. And who organized the orientation?

A. Mount Sinai.

Q. The Icahn School of Medicine?

A. It was a combination. So some people were clinical departments, and some were strictly nonclinical.

Q. So it was a combination of Mount

Q. Does that refresh your recollection at all about Dr. Singh forwarding you the -- what you called the bulk of the e-mail in December 2017?

A. It was so long ago. It really doesn't.

Q. All right. Let's focus on the portion of the e-mail that you do recognize.

Do you see that under Matt Le and Bruno Silva, there's a dash that's identical and it reads, quote, Supplement for additional responsibilities, double slash, boss leaving, end of quote.

Do you see that?

A. Yes.

Q. Who was the boss that left around that time? Do you know?

MS. GUERRASIO: Objection to form.

You can answer.

A. Dr. Faghmous.

BY MR. CERVENKA:

Q. So does this e-mail refresh your

were Dr. Faghmous'.

BY MR. CERVENKA:

Q. Okay. I'll ask a different question. They got a salary increase, the justification for which was given to you by Dr. Singh, was that they assumed additional responsibilities once their boss left; is that right?

MS. GUERRASIO: Objection to form.

A. That's what it states here.

BY MR. CERVENKA:

Q. And so that's what you understood the salary increases to be for; isn't that right?

MS. GUERRASIO: Objection to form.

A. Again, I can't really speak to Matt, but I focused more on the additional responsibilities, not what caused them. And for Bruno Silva, I do know he developed his own team, and so I also don't recall that he was reporting to Dr. Faghmous. I was under the impression he was reporting to Dr. Singh. After he had left the health system design, at that point, he

A. With the expansion of the institute and the department, the volume of new hires, more financial transaction, the volume just increased. So as the institute and department grew, so did my workload.

BY MR. CERVENKA:

Q. Did Ms. Bruzelius get a pay increase after Dr. Faghmous left?

A. I don't recall.

Q. She reported to Dr. Faghmous, right?

A. She had a dual relationship, reporting relationship.

Q. Was one of the dual parts Dr. Faghmous?

A. Yes.

Q. Who was the other?

A. Dr. Singh.

Q. So she did report to Dr. Faghmous, right?

A. While he was there, yeah.

Q. And you don't know one way or another whether she assumed some of Dr. Faghmous'

would say. And then the other time was more if I had to go to his office because maybe I needed signatures or more information from any of his direct reports or it was just watercooler encounters.

Q. Did he share an office with somebody?

A. No. I am sorry. I stand corrected. So initially he was in the same room with Dr. Safo -- Dr. Safo, Dr. Privett, Mike Escosia. I think at the time it was at least a small dino (phonetic), so they actually crammed five people in there. And then Bruno transitioned out into his own UX/UI design team after we got the additional space.

Q. Have you ever heard Mr. Silva use the word "bitch" to describe women?

A. I don't know if he said it specifically to describe women, but I do recall that he might have used that word, yes.

Q. What do you recall about the context in which he used that word?

A. I would say it was a venting of sorts.

Q. Vent about what?

A. I don't recall details. It was very spontaneous and ad hoc.

Q. Was it just the one time that you heard him use the word "bitch," or was it multiple times?

A. I really couldn't say for sure. I would say I remember it so I don't think it was a singular event, but it also wasn't every time I saw him.

Q. Did he ever use it, in your view, maliciously?

A. No.

Q. Did he ever use it in a degrading matter -- manner? My apologies.

A. No.

Q. It was a playful thing?

A. Not playful but just a colloquialism, you know. Like some people say that SOB so that's how I perceived it.

faculty appointment would be, there would be a range of salary that would fall into that.

Q. Did you ever hear Mr. Berman yell at staff at AIGH?

A. He yelled at me.

Q. Anybody else?

A. I didn't notice, no.

Q. Why did he yell at you?

A. I don't even remember the details, but we had a conversation with a disagreement. And he just got very animated and passionate. I eventually said we will talk about it later.

Q. Did he get angry?

A. I wouldn't call it angry, no.

Q. And you don't remember what the disagreement was about?

A. No.

Q. You said that he got animated; is that -- is that right?

A. Uh-huh.

Q. How did he get animated?

A. I mean, he will just move more. You

never heard Mr. Berman yell at anybody else in the workplace? Am I understanding you correctly?

A. No. I never witnessed him yelling at anyone.

Q. And nobody discussed other incidents of him yelling at the staff, with you?

A. I remember a time when Renee came back into the office that we shared and she was upset, and I asked her what the matter was. And she did say that she had a disagreement with David Berman.

Q. Did she tell you more about that?

A. No. Just that they had a disagreement.

Q. Did she tell you that he yelled at her?

A. I don't recall.

Q. Are you aware that -- that Mr. Berman yelled at Mary Caliendo?

MS. GUERRASIO: Objection to form.

A. No. And I would have been too far away.

BY MR. CERVENKA:
Q. Did you keep a log of complaints that you received from members of staff?
A. No.
MS. GUERRASIO: Objection to form.
BY MR. CERVENKA:
Q. Are you aware that Mr. Berman testified that he reported to you that he yelled at Mary Caliendo after it happened?
A. I don't recall.
Q. And Dr. Singh -- I just want to be clear. Your testimony also is that Dr. Singh did not discuss with you Mr. Berman yelling at people at AIGH, correct?
A. Yes. I don't recall.
Q. Did Mr. Berman yell at -- scratch that.
Did Ms. Bischoff come to you to say that she had a disagreement with Mr. Berman after Mr. Berman yelled at you or before Mr. Berman yelled at you?
MS. GUERRASIO: Objection to form.

You can answer.
A. So she didn't come to me. She returned to her desk where we shared the office and I noticed that she was upset. And I would say it happened after I had my discussion with Mr. Berman.
BY MR. CERVENKA:
Q. Did you report Ms. Bischoff's upset with the interaction she had with Ms. Berman -- or Mr. Berman to Dr. Singh?
A. No.
Q. To anybody at Icahn HR?
A. No.
Q. Why not?
A. I talked to her, and she calmed down. It was -- I told her not to take it personally.
Q. Did you tell Mr. Berman to not yell at people?
A. No.
Can I have a bathroom break?
Q. Absolutely.

A. Yes.
Q. Had you received performance evaluations before then?
A. Yes.
Q. Were they all glowing?
A. Yes.
Q. Who was your appraiser?
A. Dr. Singh.
Q. Did you ask Ms. Tiger and Ms. Jones-Winter why they were eliminating your position?
A. Yes.
Q. What did they say?
A. That I had lost the confidence of my colleagues.
Q. Did they say anything else?
A. That they were going to restructure and my position was going to be eliminated.
Q. Did they tell you anything more specific?
A. I was to work with Rachel Posner for the transition.

titles with the view adjusting them, if
necessary?
A. No.
Q. Did they communicate to you that one
of the issues was that there wasn't a proper
complaints procedure at AIGH?
A. No.
Q. Did they tell you that they came to
the conclusion that many of AIGH employees
considered you to be the sole HR employee and
that you were not performing well in that
function?
MS. GUERRASIO: Objection to form.
You can answer.
A. I was told that I didn't have the
competency, yes.
BY MR. CERVENKA:
Q. That you didn't have the competency
in general or regarding HR matters?
A. HR matters.
Q. Is that something that you
considered to be part of your role prior to your

CERTIFICATE OF SHORTHAND REPORTER NOTARY PUBLIC

I, Monique Cabrera, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of November, 2024.

Monique Cabrera

MONIQUE CABRERA
Notary Public in and for the State of New York
County of Suffolk
My Commission No. 01CA6043156
Expires: 06/12/2026

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: Kirsten Knaup

Deposition Date: November 26, 2024

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):

( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

( X ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

12/31/2024 Kirsten Knaup

DATE WITNESS SIGNATURE

12/31/2024 Shirley Harrison

DATE NOTARY

SHIRLEY HARRISON
STATE OF NEW YORK
NOTARY PUBLIC
Qualified in New York County
01HA631165
202-232-0646
MY COMMISSION EXPIRES 06/27/2026

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202)232-0646

ERRATA SHEET

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: Kirsten Knaup

Deposition Date: November 26, 2024

| Page No. | Line No. | Change |
|---|---|---|
| 7 | 17 | "1380" not "1308" - Transcription error |
| 7 | 19 | "10033" not "100033" – Transcription error |
| 12 | 19 | "Mary Ann Kral" not "Maryann Crowell (phonetic)" – misspelling of name |
| 31 | 10 | "labeled as" not "legal that adds" – Transcription error |
| 42 | 8 | "and" not "in" – Transcription error |
| 47 | 7 | "to terminate" not "determining" – Transcription error |
| 51 | 16 | "InCHOIR" not "Inquire" – Transcription error |
| 61 | 18 | "of value" not "enough value" – Transcription error |
| 91 | 14 | "and" not "in" – Transcription error |
| 100 | 1 | "Renee" not "Farah" – witness misspoke |

Kirsten Knaup 12/31/2024

Signature Date

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202)232-0646

ERRATA SHEET

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: Kirsten Knaup

Deposition Date: November 26, 2024

| Page No. | Line No. | Change |
|---|---|---|
| 110 | 13 | "Helfgott" not "Healthguard (phonetic) – Transcription error |
| 124 | 2 | "Mary Ann" not "Maryann" – misspelling of name |
| 133 | 13 | "Disaster" not "Diaster" – Transcription error |
| 137 | 3-4 and 12 | "Rehired" not "we hired" – Transcription error |
| 137 | 21 | " '06 to '07" not "26 or 2007" – Clarity |
| 164 | 14 | "Mary Ann" not "Maryann" – misspelling of name |
| 192 | 18 | "in" not "on" – Transcription error |
| 246 | 11-12 | "Alyssa Smaldino" not "at least a small dino (phonetic)" – Transcription error |
| 323 | 21 | "September" not "December" – clarification |

[signature] 12/31/2024

Signature Date