# Exhibit 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------x

DR. STELLA SAFO, GERALDINE LLAMES, AMANDA MISITI and EMILIE BRUZELIUS,

Plaintiffs,

-against-

DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA and ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI,

Defendants.

Civil Action No. 1:19-cv-03779 VSB-JW

----------------------------------------x

VIDEOTAPED STENOGRAPHIC DEPOSITION OF:
MARINA O. LOWY
Wednesday, December 11, 2024
New York, New York
9:48 a.m. - 4:46 p.m.
***HYBRID DEPOSITION***

Reported stenographically by:
Richard Germosen, FAPR, CA CSR No. 14391
RDR, CRR, CCR, CRCR, CSR-CA, NYACR, NYRCR
NCRA/NJ/NY/CA Certified Realtime Reporter
NCRA Realtime Systems Administrator

---

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

your declaration, does that refresh your recollection as to the date that the complainants approached Mount Sinai to complain about Dr. Singh?

A. Yes.

Q. And so what's the date?

A. April 27.

Q. Does it also help refresh your recollection as to the date that you were asked by Dean Charney to conduct an investigation into Prabhjot Singh?

ATTORNEY LUPION: Object to the form.

A. No.

Q. In Paragraph 6 of your declaration, you wrote, quote: Shortly thereafter, I was made aware that one day prior, on April 26, 2018, Dr. Singh had met with Dr. Ann Olivarius, Esquire, a lawyer known for representing women in gender discrimination matters, end of quote.

Do you see that?

A. Yeah.

Q. When were you made aware of the fact that Dr. Singh and Dr. Olivarius met on April 26, 2018?
A. Very close to the April 27 date.
Q. What do you mean by "very close"?
A. It could have been within a matter of a day or two. Maybe even same day. I don't recall.
Q. Did you become aware of Dr. Singh's meeting with Dr. Olivarius in the same discussion in which Dr. Charney asked you to initiate the investigation?
ATTORNEY LUPION: Object to the form.
Don't reveal -- if you can answer that question without revealing the substance of any privileged communication with Dean Charney, you can answer.
A. I don't recall.
Q. Did Dean Charney tell you of the meeting between Dr. Singh and Dr. Olivarius?
ATTORNEY LUPION: The same objection. The same instruction.

Q. But to the best of your recollection, the source of your knowledge of the facts contained in Paragraphs 7 and 8 of your declaration was Dr. Singh?

A. I just don't remember.

Q. Was the timing of Dr. Olivarius' meeting with Dr. Singh -- I'll start over.

I'm looking at Paragraph 9 now, if you want to turn your page over.

You wrote, quote: Given the timing of Dr. Olivarius' meeting with Dr. Singh and the unexpected message, I surmised that Dr. Olivarius was advising Drs. Atkinson and Anadaraja behind the scenes.

\- - -

(Clarification requested by the stenographer.)

\- - -

ATTORNEY CERVENKA: Anadaraja, A-N-A-D-A-R-A-J-A.

Q. Did you surmise this based on any other factors than the ones that you described

We're back on the record at 11 a.m.
This will begin Media Unit 2.
BY ATTORNEY CERVENKA:
Q. Ms. Lowy, I believe you were in the process of answering my question.
A. Could you repeat the question?
Q. Yes.
ATTORNEY CERVENKA: Could we have a read back?
CERTIFIED STENOGRAPHER: (Complies.)
(Whereupon, the requested portion is read back by the certified stenographer as follows:
"QUESTION: You do understand that it was a Mount Sinai employee who put Dr. Olivarius in touch with Dr. Singh?
"ATTORNEY LUPION: Object to the form.
"QUESTION: Don't you?")
A. Yes.
BY ATTORNEY CERVENKA:
Q. What's your basis for this understanding?

A. The conversation I had with a Mount Sinai employee, a privileged conversation.

Q. And what's the name of the employee?

A. Jonathan Taylor.

Q. So in that circumstance where Jonathan Taylor introduced Dr. Olivarius to Dr. Singh, is that one of the circumstances in which it is proper for an attorney to be communicating with an employee of a corporation?

ATTORNEY LUPION: Object to the form.

A. It is proper depending on the substance of the conversation and the surrounding circumstances, but --

Q. What do you know of the substance of the conversation that Dr. Olivarius had with Dr. Singh?

A. I'm sorry, can you say the question again?

Q. Yeah. Sure.

me to disclose the substance of a conversation that is privileged.

Q. Is there a particular conversation that you're referring to?

A. Yes.

Q. Who was that conversation with?

ATTORNEY LUPION: You can answer.

A. With Mr. Taylor.

Q. When did that conversation take place?

THE WITNESS: Can I --

ATTORNEY LUPION: You can answer.

A. In April.

Q. April of 2018?

A. Yes.

Q. Was anybody else present?

A. No.

Q. Had Dean Charney asked you to conduct this investigation before your conversation with Mr. Taylor took place?

ATTORNEY LUPION: Object to the form.

You can answer.

A. Yes.
Q. Before we took a break, you testified that one of the factors that led you to surmise that Dr. Olivarius was advising Drs. Atkinson and Dr. Anadaraja behind the scenes was the climate in the country at the time. Can you elaborate on that?
A. Just the MeToo movement. That was one of the factors, and given Dr. Olivarius' reputation, I knew this was an issue that was dear to her heart on a personal and professional level.
Q. So am I correct -- am I understanding you correctly that you surmised Dr. Olivarius was advising Drs. Atkinson and Anadaraja behind the scenes because of the MeToo movement that had already been ongoing for some time?
A. Because, among other things, Dr. Olivarius, to my understanding at the time, had a reputation as being a leader in fighting gender discrimination, and I knew

A. No.
Q. Which ones do you recall being present for?
A. I recall meeting Dr. Atkinson, Dr. Anadaraja, Ms. Bruzelius. I spoke to Jonathan Taylor. Spoke to Dr. Singh, Dr. Safo, Ms. Bischoff, Ms. Stapleton, Farah Khan, Dr. Beddoe, Dr. Murphy. There were others. I don't recall.
ATTORNEY CERVENKA: Can you mark this as ML2, please.
\- - -
(Whereupon, document entitled AIGH Investigation Interviewee List, is received and marked as ML Exhibit 2 for Identification.)
\- - -
CERTIFIED STENOGRAPHER: Number 2.
BY ATTORNEY CERVENKA:
Q. Ms. Lowy, you've been handed a document marked as Exhibit ML2.
Do you recognize this document?

Q. The recommendations in the report became the outcome of the investigation; correct?

ATTORNEY LUPION: Object to the form.

A. Again, the use of the word "outcome" is a little confusing. The recommendations in the report were the recommendations.

Q. What happened to the recommendations once you submitted your report to Dr. Charney?

A. They were implemented.

Q. All of them?

A. Yes.

Q. Without change?

A. There were -- certain aspects were enhanced.

Q. What's your basis for that statement?

ATTORNEY LUPION: Object to the form.

A. Privileged conversations with my client.

Q. Your client being who?
A. Mount Sinai and Dr. Charney in his role as dean of Mount Sinai.
Q. Dr. Charney enhanced the recommendations of the report?
ATTORNEY LUPION: You can answer that question.
A. He did.
Q. Which ones?
ATTORNEY LUPION: That I'm going to instruct her not to answer to the extent it reveals the substance of her privileged communication.
ATTORNEY CERVENKA: So you allowed her to testify -- well, let me ask it differently.
Q. Which of the --
ATTORNEY CERVENKA: Just a moment, Ms. Lowy. I've got a document that I think will assist us in this process.
Can you mark this as ML3.
\- - -
(Whereupon, document ISMMS 021486,

for you to communicate the list of eight recommendations in writing?

ATTORNEY LUPION: I'm going to object. She answered that they met in person. Anything more -- this is still in anticipation of litigation. Her reasons for doing so are covered by the attorney work product doctrine.

Q. Dr. Singh was -- scratch that.

Dr. Singh was first told of the recommendations in person by Dean Charney; correct?

ATTORNEY LUPION: Objection.

A. Meaning the first person who communicated them to Dr. Singh? Yes, that was Dr. Charney.

Q. And that was an in-person meeting; is that right?

A. Yeah, sitting here today, I couldn't say for sure.

Q. You can actually refresh your recollection by looking at the email marked as Exhibit ML3 I believe. Or perhaps not.

understanding that this might actually be a formal complaint being brought forward that needs to be forward fed and -- you know, and that's something that people are going to have to sort of understand. They can't just be a sounding board to people, but they have to try to do something about stuff that's reported up.

Dennis wanted senior people here to investigate it. He didn't want -- you know, he wanted people who could talk to everybody, who wouldn't be afraid to talk to everybody, and I think you probably know -- I mean, I know there are a lot of people I spoke to that you probably don't know we spoke to them, but I know there are a lot of people that you do know who we spoke with and we made findings and we made recommendations to the dean and he's accepted all our findings and all our recommendations without exception. He's amplified some of the recommendations based on what he thought additional needed to be done.

He certainly knows, you know, academic -- academic leadership and issues of whatever better than we do, but he's -- so he's strengthened some of the recommendations, but he certainly accepted everything without debate.

- - -

(Whereupon, the audio recording was stopped.)

- - -

ATTORNEY LUPION: I'm just going to interpose an objection here.

First, we reserve our right to review the transcript, the witness reserves the right to review the transcript, and that's including, but not limited to, the transcription of the recording. Through no fault of the court reporter, just based on the situation in the room, there are a number of inaccuracies. So we just reserve our rights.

DR. OLIVARIUS: A number of inaccuracies?

he certainly accepted everything without debate. Do you recall hearing that in the recording?

ATTORNEY LUPION: Object to the form.

A. Something to that effect.

Q. Is that true, that he accepted the recommendations without debate?

A. Yes.

\- - -

(Whereupon, an audio recording was played.)

\- - -

A VOICE: You will see will be addressed through personnel changes.

Some -- I mean, you guys are not in the institute, so I don't know. There might be delay in seeing the stuff, but there will be changes that are personnel changes that are going to be apparent pretty soon.

Prabhjot is not one of those changes. We did not recommend his replacement and I will talk about that in a minute.

and monitor future institute activities, financial and academic performance, and leadership. End of sentence. The committee should mentor Dr. Singh and take steps to ensure that the institute's atmosphere is improved, particularly as relates to gender issues, end of quote.

Do you see that?

A. I do.

Q. And this was a recommendation that was communicated to Dr. Singh; correct?

ATTORNEY LUPION: Object to the form.

A. Yes, this is in my email to Ms. Fink.

Q. You also understand Dr. Charney discussed these recommendations with Dr. Singh directly prior to your email to Ms. Fink; is that right?

A. Yes.

Q. So Dr. Singh was aware that one of the tasks for the oversight committee was to ensure that the institute's atmosphere is

A. I am. At some point, I'll talk to them about it, but yes.

Yes, I'm going to follow my counsel's recommendation.

Q. Well, do you agree that your omission of this part of the recommendation was a serious one?

ATTORNEY LUPION: Object to the form.

You can answer.

A. My recollection is that it was discussed in the meeting with them. Maybe not in that sound bite.

Q. Okay. Let's continue then the recording and we'll come back to this.

- - -

(Whereupon, an audio recording was played.)

- - -

A VOICE: The oversight committee will report directly to Dr. Charney. In about probably six months after it gets started, there will be a review of progress over the

six months to see what has changed, what's improved, what are the results.

- - -

(Whereupon, the audio recording was stopped.)

- - -

BY ATTORNEY CERVENKA:

Q. I'll go back to my earlier question later, but regarding this, this excerpt, did the six-month check-in ever happen?

A. I don't recall.

Q. Do you recall any report being given to Dr. Charney about the work of the oversight committee?

A. What I know about that, I would only know from privileged communications.

Q. Privileged conversations with whom?

A. Either with Dr. Gelijns or Dr. Charney.

THE WITNESS: G-E-L-I-J-N-S, I think.

- - -

(Whereupon, an audio recording was

played.)

- - -

A VOICE: So he sort of has ideas of some things he's going to do. He probably will want some external review to come in also, which realistically won't happen until September only because of summer vacation and such, but he wants some additional input to -- our charge was for legal to look at the gender bias issues. It's morphed into looking at leadership issues in general because it was inescapable in the course of the investigation, but so the issues were really beyond our expertise and ability to look at and for that he needs some additional -- additional -- additional review.

One of the recommendations we made --

A VOICE: Did you have a question?

A VOICE: It's a probationary period or not?

- - -

(Whereupon, the audio recording was stopped.)

- - -

BY ATTORNEY CERVENKA:

Q. Do you know who those two voices were, Ms. Lowy?

A. No.

- - -

(Whereupon, an audio recording was played.)

- - -

A VOICE: So if things haven't been fully reviewed yet, then are they pending further review?

A VOICE: So what will be reviewed will be reviewed until it's reviewed. I'm not sure --

A VOICE: You just said that some of the things were beyond your scope.

A VOICE: Yeah, like, for example, people were talking about, you know, you know, they spend too much money on this or they

spend too much money on that. I don't have the ability to look at that.

So Steve Harvey will be on the oversight committee, that's his job, to figure out (inaudible). So in that respect, it's going to be looked at and, you know, there were some issues raised about, you know, relationship with MED-ED vis-a-vis MED-ED, and someone's got to look at that, who knows what it's supposed to be, and, you know, make a decision about how that's been managed.

A VOICE: Uh-huh.

A VOICE: In terms of -- in terms of specific findings -- so, as I said, when we met, the first sort of the overarching issues that we thought we'd be looking at were gender bias and age discrimination, and we did not find either in the department -- in the department or institute.

\- - -

(Whereupon, the audio recording was stopped.)

(Whereupon, the requested portion is read back by the certified stenographer as follows:

"QUESTION: So let's turn back to Exhibit ML3 and this time look at recommendation Number 7. What did you mean when you wrote pay parity in that paragraph?")

A. So what I meant in this paragraph is that while the investigation did not find gender, age bias, there were a number of people within the institute and the department who perceived that there was a bias, and this recommendation was part of an effort to correct that perception and to ensure transparency, and that's why -- that's what I meant here.

Q. What did you mean by the term "pay parity"?

A. I meant here that there would be an open review to ensure that men and women were paid -- that there was no -- not to ensure, but what we did as part of the investigation

was what we did, but this was part of an effort to correct the perception. So to share with people that this -- this effort will be taken in the open to ensure that there is -- so that people were comfortable that there was no issues of equity in pay between men and women.

Q. And it's your testimony that people were uncomfortable about the fact that there are pay parity issues between men and women in the department?

ATTORNEY LUPION: Object to the form.

A. I can't answer that without revealing privileged information.

Q. Did you inform the complainants of the fact that a process was put in place to ensure pay parity between men and women in the Arnhold Institute?

ATTORNEY LUPION: Are we going to finish the recording?

ATTORNEY CERVENKA: Are you going to allow her to answer my question?

you know, that the feeling that people had isn't real and doesn't need to be addressed.

So what Dr. Charney realizes is, you know, whether or not we found gender animus and we did not find gender -- and, by the way, on age, we did not find gender animus either. In fact, his recruits are -- span a lot of -- you know, sort of span an age range that's pretty broad. There is some reasons in recruiting, why in some job categories you'll end up with younger folks. It's just data analysis tends to be younger people who come and want to do it certainly at the price that Sinai pays, it compensates people. It's very hard for us to compete with industry.

If you're more senior, a lot of times you can get a better job at Google or it's like than you can -- you know, why would you want to be here? But those are just some examples, but we really -- I mean, we came out of the gate expecting that our finding will be gender discrimination.

came out of the gate expecting our finding will be gender discrimination, were you being truthful?

A. Yes.

Q. Do you, as you sit here now, not consider it truthful?

A. I've answered your question. I was being truthful and it was a truthful statement when it was made. I don't understand your question.

Q. Well, perhaps I don't understand your testimony. You -- I'll continue with the recording.

\- - -

(Whereupon, an audio recording was played.)

\- - -

ATTORNEY CERVENKA: I'll rewind a little bit so that the jumps are easier to navigate.

\- - -

(Whereupon, an audio recording was

played.)

- - -

A VOICE: But those are just some examples, but really, I mean, we came out of the gate expecting that we -- our finding will be gender discrimination.

That being said, you know, his behaviors are what they are. You know, we're not arguing with people's perceptions of behavior, his demeanor. You know, clearly there is something about his demeanor that rubs people the wrong way and that makes people feel that there is a gender bias issue going on and that has to be addressed, and I've been reading a lot about this. I think there can be different reasons for perception of gender bias under these circumstances, and we're going to have -- part of the oversight committee's job is going to be to address those and try to deal with it.

- - -

(Whereupon, the audio recording was

legal counsel.

- - -

(Whereupon, an audio recording was played.)

- - -

A VOICE: Why would you have a recollection of keeping them?

A VOICE: Because no one ever told him what he was doing was wrong. No one ever had the opportunity. No, that's not fair. I mean, we're really -- from what we saw, no one told Dennis, no one told -- there were people who told him, by the way, You know what? Only women have cubicles and they don't have offices, and do you know what? He went and he fixed it. He did fix it, and by across the board people said that part he did fix, but the whole idea of, you know, you're -- you talk to people in this way, you demean people. You make -- the things that you guys described very articulately and very -- very, you know -- you weren't outliers in your

descriptions of the way he spoke to people, but no one ever gave him the opportunity to correct it, and no one ever said to him, You have to fix this. You have to do the right thing here or you'll be fired.

- - -

(Whereupon, the audio recording was stopped.)

- - -

BY ATTORNEY CERVENKA:

Q. Is it true that no one ever told Dr. Singh that there were issues with his leadership style prior to the investigation taking place?

ATTORNEY LUPION: I'm going to object. I'll allow you to ask if the statement that she made to the complainants was a truthful statement.

ATTORNEY CERVENKA: But you're instructing her not to answer the question that I asked?

ATTORNEY LUPION: I'd ask you to

modifying?

ATTORNEY CERVENKA: The statement to Dr. Singh that there are issues that he needs to fix.

ATTORNEY LUPION: Well, I'm going to stand by my objection. I think -- I think there is a way for you to rephrase the question.

ATTORNEY CERVENKA: You're instructing her not to answer that question?

ATTORNEY LUPION: Yeah.

BY ATTORNEY CERVENKA:

Q. Ms. Lowy, when you told the complainants that no one ever told Dr. Singh that what he was doing was wrong, that was truthful?

A. I was truthful.

Q. And it was also truthful when you said that nobody told Dr. Charney that there were issues in the department?

A. I was truthful in this meeting. I don't recall the exact wording, but I was

sitting on top of him.

The dean has had several very serious, stern, straightforward conversations with him. He knows what's expected or will know in short order once this committee is put together. And I think everyone understands what it means with you've got to turn this around or else.

I mean, I don't think even -- when you're that senior, no one has to tell you "or else." Everyone understands what that means, but he understands and he's been told that, You have to turn this around, and you have to fix it, and you have to fix everything. You have to fix every aspect of all the issues that had been raised, and there were a lot of issues that were raised, including -- including the perception of bias.

\- - -

(Whereupon, the audio recording was stopped.)

\- - -

privileged communications, then I'll instruct you not to answer.

A. Either a yes or a no would reveal privileged information.

BY ATTORNEY CERVENKA:

Q. So are you unable to answer the question while also following your counsel's instruction?

A. I'm unable to answer without revealing privileged information.

Q. Well, you told Dr. Atkinson and Dr. Anadaraja that the institute cannot get to pick and choose titles for people; correct?

A. I said what's on that tape.

\- - -

(Whereupon, an audio recording was played.)

\- - -

A VOICE: So, you know, we know that there was a strong wish by many that he be terminated, but we just couldn't conclude that that was the fair thing to do given that there

had never been a message that, You've got to -- these are the areas you have to fix or you'll be terminated.

A VOICE: You don't think that's a failure of the institution at large?

A VOICE: I think -- I mean, you asked -- you know, it's a very loaded way to ask a question. I think it's unfortunate that people didn't feel comfortable coming forward sooner, that this festered for years and the dean had no idea, and I think that's something we have to work on, and he understands that. People have -- you know, we ask people. I asked you guys, Why didn't you come forward sooner, because I was -- it was upsetting that people work --

A VOICE: And, by the way, we did. That's the point, we did.

A VOICE: But, you know, we talk --

A VOICE: People above us knew.

A VOICE: But that's not -- that --that was not --

Going off the record at 2:55.

- - -

(Whereupon, a short recess was taken.)

- - -

THE VIDEOGRAPHER: Stand by, please.

We're back on the record at 3:07.

This will begin Media Unit 4?

ATTORNEY CERVENKA: We'll continue the recording.

- - -

(Whereupon, an audio recording was played.)

- - -

A VOICE: Just nongender. Some of the things that you described did have that tone, but then when we talked to people, sort of everyone experienced them in the same way. Everyone experienced him as demeaning. Everyone experienced him as dismissive. Everyone thought that he didn't -- his work, that he discouraged them from publishing. He

discouraged them from getting grants.

- - -

(Whereupon, the audio recording was stopped.)

- - -

BY ATTORNEY CERVENKA:

Q. Ms. Lowy, were you being truthful in this excerpt?

A. Yes.

Q. Everyone experienced Dr. Singh as demeaning?

A. What I said in that excerpt is truthful.

Q. And when you say "everyone," you were referring to the individuals that you interviewed as part of the investigation?

ATTORNEY LUPION: I'm going to object. You're trying to mislead the witness. There is a subsequent clarification in the recording. So if you want to play the whole recording --

ATTORNEY CERVENKA: I'll withdraw this

A VOICE: Sorry. Continue.

A VOICE: No. I'm sorry. Or that there were persons in place that it wouldn't have to be women coming forward under fear of retaliation to report something, it would actually be an institutional process that would be triggered by the fact that many people had resigned over time, or -- and/or.

I'm just saying there could be other things that this system puts in place rather than relying on women who do not -- who are already being --

A VOICE: But it's -- but it's complicated.

A VOICE: No, I understand it's complicated. I'm just saying it's not --

A VOICE: (Inaudible) change here, so it wasn't immediately -- it was clearly -- and one thing -- and I know a lot of the correspondence relates to, you know, what's happening to Global Health. This investigation was not about that. It's not

for us to judge, you know, the direction the school decides --

A VOICE: Yes.

A VOICE: -- to take --

A VOICE: (Inaudible).

A VOICE: But it wouldn't necessarily be obvious in a time when there is, look, a new general counsel took over our department after the merger and a bunch of people left because they didn't want to be part of the health system, new general counsel, new approaches, new rules, people who had been here 20 years didn't like it. They often left. Different scenario, but it wouldn't necessarily be a trigger. Like to us working there, we're like, Wow, they're leaving and they're leaving, and we know why people are leaving, so we're very attuned to it, but on an institutional level, it's not necessarily obvious that people are leaving because there is an issue.

So if there is a programmatic change

BY ATTORNEY CERVENKA:

Q. And, again, in this statement, was it you, Ms. Lowy, who said, We think this is a very -- that he is a very lucky person?

ATTORNEY LUPION: Object to the form.

A. I don't think I said exactly like that, but I said -- I said he's lucky.

Q. You thought him -- you thought Dr. Singh to be lucky at the time of this meeting?

A. I made that statement.

\- - -

(Whereupon, an audio recording was played.)

\- - -

A VOICE: No, no, I don't think that's fair. I mean, I -- I don't think that's fair. I think you're -- there have been women here, believe me, who've been just as big an asshole as he is who have been given second chances. That -- that really --

A VOICE: And it's not really to prop

very transparent; right?

ATTORNEY LUPION: Object to the form.

A. I don't -- whatever I said in that, I was truthful in that meeting.

Q. It's true that the outcome of the investigation has been laid out for donors?

A. The results and recommendation were shared to -- to donor or donors. I don't recall, but yes.

Q. You know at least one donor to whom the results and the recommendations of the investigations were communicated?

A. Sitting here today, I don't recall with certainty, but I know what I meant at the time.

Q. What did you mean at the time?

THE WITNESS: I can answer?

ATTORNEY LUPION: You can answer that. The question is: What did you mean at the time?

A. That the outcome would be shared with the Arnholds.

(Whereupon, an audio recording was played.)

- - -

A VOICE: I think in that respect he understands that this is very, very serious and that all eyes are on him and that he's going to have to deliver -- deliver and be a good leader and become a leader because clearly he has not.

In terms of the, you know, red flag on turnover, yeah, we have to figure out -- you know, I don't think the HR systems -- you know, we're -- we're seven separate hospitals. There is separate corporations. They're not even a single corporation. We don't even share necessarily all the same IT platforms, but that would have been ideal to have not just here, but really to have some sort of trigger for HR when there is a high turnover in place.

That's one of the things we said, like we're just not there yet for the 19 percent.

BY ATTORNEY CERVENKA:
Q. Again, Ms. Lowy, everything that you said in that excerpt was truthful and accurate; correct?
A. Yes.
Q. Did you make a recommendation that Mount Sinai's IT systems be improved vis- -vis the HR function?
A. That Mount Sinai -- I don't understand the question.
Q. Yeah.
Do you recall in this excerpt that I just played that you discussed how there was a need for some sort of a new IT solution to tracking how employees are leaving their jobs?
A. I don't think that's what I said on the recording.
Q. What did you understand your statements on this topic to have been in that meeting?
A. I would want to hear again what I said.

looked at.

It's not -- that's not my job to figure out what happens academically in Global Health or programmatically, and that's something that's within the dean's purview to decide, you know, with the people who give the money for it, where that program is going to go. And one thing that was sort of universal, people thought Prabhjot was very smart, very connected, had a lot of potential. It's up to him whether he can, you know, reach that potential.

A VOICE: We have a lot of potential too.

A VOICE: Yeah.

A VOICE: Yeah.

A VOICE: Go on.

A VOICE: Yeah. I mean, there is not -- there is nothing I can say to make that better or to change what happened. I mean, I can't -- we can't undo those events, and I'm sorry for that. But it's different. You

know, disagreement about a program or its value or the what's going on there, that's just --

- - -

(Whereupon, the audio recording was stopped.)

- - -

BY ATTORNEY CERVENKA:

Q. Ms. Lowy, was that you who said that you can't undo the events and that you're sorry for that?

A. Yes, that was me.

Q. And that was a truthful statement?

A. Yes.

Q. You felt sorry for what complainants went through?

ATTORNEY LUPION: Object to the form.

A. No, I wouldn't say it exactly like that.

Q. How would you say it?

A. I was reacting to their behavior and frustration in the meeting. They were

disappointed and to the way in which they experienced their time at the institute.

Q. So you're sympathizing with them?

ATTORNEY LUPION: Object to the form.

A. I was expressing empathy.

Q. Was that empathy genuine?

A. Yes.

- - -

(Whereupon, an audio recording was played.)

- - -

A VOICE: So in terms of --

A VOICE: (Inaudible).

A VOICE: And it was an issue in -- in terms of communicating with physician back to the (inaudible) I remember you saying in the conversation that it wouldn't -- it would be contacting every woman, how did that information get communicated back to the --

A VOICE: So --

A VOICE: -- people (inaudible) wanted to know, maybe people were just like, Here,

not to answer.
(Direction not to answer the question.)
Q. Did Dr. Anadaraja outside of the investigation tell you that it was widely known that Dean Charney screamed at people in meetings?
A. Outside? I only spoke to her as it related to the investigation.
Q. Have you ever heard Dean Charney scream at people in meetings?
A. No.
Q. You attended a number of depositions in this case as a representative of the Icahn School of Medicine in Mount Sinai; correct?
A. Yes.
Q. Were you present during the deposition of Philip Landrigan, L-A-N-D-R-I-G-A-N?
A. No.
Q. Are you aware that he testified

that Dean Charney regularly raised his voice at people in meetings?

ATTORNEY LUPION: Object to the form.

A. I don't know what Dr. Landrigan testified to.

Q. Have you been present in meetings between -- scratch that.

Have you been present in meetings where both Dr. Charney and Dr. Landrigan were present?

A. I don't remember.

Q. Has anybody ever complained to you that Dean Charney screamed at them?

ATTORNEY LUPION: Objection.

I'm going to allow you to answer this yes or no.

A. No.

Q. Not even during some of the informal conversations that you had with members of staff at the Icahn School of Medicine at Mount Sinai?

A. Correct.

Q. Was there an investigation into any interactions between Dean Charney and Mr. Goldstein?

ATTORNEY LUPION: You can answer yes or no.

A. No.

Q. Are you aware of any investigation into Dr. Charney's conduct during the time that your tenures at Mount Sinai have overlapped?

A. No.

Q. Was there a pay and promotions review that took place after the investigation concluded?

ATTORNEY LUPION: Object to the form.

A. I know the oversight committee took certain actions, but I don't -- I know the oversight committee took certain actions in that regard.

Q. Were you involved in their work in this regard?

A. No.

can trigger with a complaint of mistreatment of some sort.

Q. Are you aware of any complaints being filed against Dr. Singh under this policy?

A. No.

Q. What about complaints against Dr. Charney under this policy?

A. Sorry.

THE WITNESS: Can I answer?

ATTORNEY LUPION: You can answer.

A. No.

Q. Are you aware of any complaints being filed under this policy against anybody at the Arnhold Institute?

ATTORNEY LUPION: I'm going to object.

If you can answer based on knowledge independent of the investigation, you can answer.

A. There are no complaints.

Q. Are you aware of Ms. Knaup complaining to the Icahn School of Medicine

C E R T I F I C A T E

I, RICHARD GERMOSEN, Fellow of the Academy of Professional Reporters, stenographic New Jersey Certified Court Reporter, New Jersey Certified Realtime Court Reporter, California Certified Shorthand Reporter, California Certified Realtime Reporter, NCRA Registered Diplomate Reporter, and NCRA Certified Realtime Reporter, do hereby certify:

That MARINA O. LOWY, the witness whose deposition is hereinbefore set forth, having been duly sworn, and that such deposition is a true record of the testimony of said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of December 2024.

________________________________

RICHARD GERMOSEN,
FAPR, RDR, CRR, CCR-NJ, CRCR, CSR-CA, CCRR-CA,
NYACR, NYRCR
LICENSE NO. 30XI00184700
LICENSE NO. 30XR00016800

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE
Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.
Witness Name: Marina O. Lowy
Deposition Date: December 11, 2024

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):

( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

( x ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

1/23/25 Marina Lowy

DATE WITNESS SIGNATURE

1/23/25 Michelle T. Johnson

DATE NOTARY

MICHELLE T JOHNSON
Notary Public - State of New York
NO. 01JO6221958
Qualified in New York County
My Commission Expires May 10, 2026

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202)232-0646

ERRATA SHEET

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: Marina O. Lewy

Deposition Date: December 11, 2024

Page No. Line No. Change

| Page | Line(s) | Change |
|---|---|---|
| 61 | 5 | "Anandaraja" not "Anadaraja" |
| 92 | 5 | "Anandaraja" not "Anadaraja" |
| 96 | 9 | "once" not "ones" |
| 107 | 20 | "Anandaraja" not "Anadaraja" |
| 150 | 11 | "Anandaraja" not "Anadaraja" |
| 258 | 19 | "expectations" not "exceptions" |

Marina Lowy 1/23/25

Signature Date