# Exhibit 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DR. STELLA SAFO, )
GERALDINE LLAMES, )
AMANDA MISITI and )
EMILE BRUZELIUS, ) CASE NO.
) 19-cv-03779-VSB-JW
Plaintiffs, )
-against- )
DR. PRABHJOT SINGH, )
DR. DENNIS S. CHARNEY, )
BRUNO SILVA and )
ICAHN SCHOOL OF MEDICINE AT )
MOUNT SINAI, )
Defendants. )
)

*** CONFIDENTIAL TRANSCRIPT ***
VIDEO-RECORDED DEPOSITION OF
DR. DAVID MULLER

Glenn, Agre, Bergman & Fuentes, LLP
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
06/14/2024
9:42 a.m. (EDT)

REPORTED BY: MONIQUE CABRERA

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

vision.

Q. And when you mentioned that you -- that he was junior and that was a negative factor, junior in what sense? Do you recall your opinion at that time?

A. Only that he had completed his residency. My recollection is that he was not someone who went straight through his training. He had other accomplishments prior to residency, during residency. So he had clearly done a great deal more than a typical resident does, but he was just completing his residency so that felt like he was junior.

Q. Were you concerned about lack of leadership experience by Dr. Singh?

A. I was concerned about lack of leadership experience in terms of what it took to run this institute that was being created, yes.

Q. So am I right to understand that you were concerned that he didn't have enough experience to run the institute -- I'm sorry -- enough leadership experience?

A. He had not to that point run a department, been chair of a department, or been single-handedly an institute director in something that was comparable to what was being designed here. So he didn't have that going for him. He had other leadership positions, at least to my recollection, so it's a little bit -- I feel like it's a little bit more nuanced than that.

Q. Did you communicate your concerns about his lack of leadership experience to Dean Charney?

A. I don't think so.

Q. Dr. Muller, I've just handed you a document marked DM 02. The Bates stamp is ISMMS_005161.

(Whereupon, Exhibit DM 2, E-mail Bates Number ISMMS_005161, was marked for identification.)

BY MR. CERVENKA:

Q. Do you recognize this document? Take your time to read it if you need to.

A. Yes.
Q. And the first paragraph reads, quote: I interviewed Prabhjot Singh this week for the global health position and liked him. There is some risk given how junior he is and how little leadership experience he's had, but he seems quite capable and might turn out to be great, end of quote.
Did you write that?
A. Yes.
Q. Was that an accurate reflection of your views of Prabhjot Singh at that time?
A. Yes.
Q. Did Dean Charney respond to this e-mail?
A. I don't recall.
Q. Did this e-mail come up in your one-on-one meetings with Dean Charney?
A. Honestly, I don't recall.
Q. Do you see that the second paragraph discusses another candidate? She's not mentioned in the paragraph. But in the header of the

Q. Have you two worked before together?
A. No, other than, you know, there may been group meetings where a bunch of people were around the table. But no, not one on one.
Q. And did she tell you why she felt she couldn't stay there anymore?
A. I mean, her -- her entire job revolved around global health education. At that stage, whatever stage it was, it was very clear that it was not going to be supported.
And, again, you know, the way in which it was being handled from a leadership or administrative perspective was very unsettling for people. Not knowing, not having access to information, not knowing what they were going to be told next week, not being at the table when decisions were being made or the person she reported to -- again, it may have been Renee, it might have been Anu -- not even they having a handle on that. And it was just very unsettling.
Q. Did Dr. Atkinson ever approach you with about her concerns about Dr. Singh's

leadership?
A. Yes.
Q. Do you recall when?
A. Other than the general similar time frame and the concerns were similar. Human rights was clearly not going to be a -- a priority. And, you know, again, it was a similar kind of gradual process and eventually realizing that was going to be the case.
Q. So would that have been in stages 2 or 3 that she would come to you? Do you have any recollection?
A. I mean, yes. If we are going to say stages 2 or 3, then yes, it's somewhere in that time frame.
Q. Do you have any more specific recollection of the concerns that she relayed to you than you have already said?
A. No.
Q. Did she report to you feeling marginalized?
A. She did. But I -- I think that was

A. On the nonmedical student side. And then a handful of reports over the course of the years that students had brought for one reason or another.

Q. In talking about gender discrimination concerns, do you recall when those surfaced?

A. Both of the times were related to Global Health.

Q. And when was that?

A. It was -- I don't remember the dates. Let's -- I don't want to get too hung up on the dates, but it was a meeting I had. And this is clearly after the people you named had already left.

I had met with Renee Bischoff, who at that time -- I'm not going to guess whether she was still in the institute or in the dean's office but --

(Reporter clarification.)

A. Whether she was still in the institute -- sorry -- or already in the dean's

office, but she came to me with concerns and had a list of the women who had been -- who had left the institute. That was one instance.

BY MR. CERVENKA:

Q. And you mentioned that there were two and that they were interconnected.

A. Yes.

Q. Did Renee Bischoff initiate or share both of those concerns, or was she one and then somebody else approached you with a related second one?

MS. GUERRASIO: Objection to form.

You can answer.

A. Renee Bischoff approached me in the way that I described, and I reached out to human resources after a conversation with a Renee to describe to her or reassure to her how I would go about doing that. And then a short time afterward, I had a conversation with the dean, with Dennis Charney, also expressing that there may be concern about gender discrimination within the institute.

do global health projects together. Yeah, it put all of that in jeopardy.

Q. And it, in fact, led to the departure of many key staff doing that work, correct?

A. Correct.

Q. Dr. Anandaraja?

A. Among other many others, yeah.

Q. Who were the others?

A. Craig Katz, Nils Henning, Jonathan Ripp, Ramon Murphy in a -- in a more complicated way, but as we spoke about, Ramon Murphy, Anu Anandaraja, Holly Atkinson, Renee Bischoff, Elena Rahona, and others, but.

Q. Was that concerning to you at time that they were departing, the people that you just listed?

A. Very concerning.

Q. Why?

A. It -- it left us with a gap of talent, people who were devoted to doing education-related global health work. And if we

meetings and humiliated or felt humiliated. I don't want to say that he was humiliated. Maybe that wasn't the intention. But he certainly felt like that and berated many times, both one on one and in meetings with other people present.

Q. Berated by Dr. Singh?

A. Yeah.

Q. David Berman?

A. I don't think Ramon had as much contact with David Berman, so I would say no.

Q. Was it multiple times that Dr. Singh yelled and berated Dr. Murphy?

A. If I -- if I answer the question, it would be an educated guess.

Q. Make it.

A. Yes.

Q. What about Renee Bischoff, did she report to you being yelled at by David Berman?

A. If I say -- I use the term "berated" instead of "yelled at," then yes.

Q. Well, what do you understand to be the distinction?

A. Yes.
Q. And you wrote to her in the sentence or paragraph that begins at the bottom of page ISMMS_009910, quote: My interactions with Prabhjot have been nothing less than toxic. I am not an objective source of info when it comes to him, and I can't swear that someone with the right skill set wouldn't thrive in the environment he's created, end of quote.
Is that right?
A. Yes.
Q. Does it refresh your recollection as to whether or not your interactions with Dr. Singh were toxic?
A. Sure.
Q. They were, correct?
A. Sorry?
Q. They were -- they were toxic?
A. I'm -- I'm going to have to ask for a definition of that.
Q. Well, you used the word.
A. Yeah. But it means different things

Q. What do you recall Ms. Bischoff telling you in that meeting?
A. That an increasing number of people were leaving the institute, that many of them were women, and that that was a real source of concern for her.
Q. Anything else?
A. Nope. I mean, there were other things probably we talked about in the course of the -- of the meeting.
Q. Is it unrelated to the work environment at AIGH?
A. Yes. Related to global health education, related to the transition. I'm sure we talked about --
Q. Business.
A. -- funding the business of global health education, yeah.
Q. And you mentioned that there were two reports that resulted from this. Let me -- let me walk that back.
Earlier, you testified that there

were two instances that were linked in which you reported concerns about gender discrimination to HR, correct?
A. There was one to HR.
Q. Okay.
A. That was immediately after the meeting with Renee Bischoff. And then there was one to Dennis Charney, which was within a couple of weeks after that.
Q. Within a couple of weeks?
A. It's my guess, yeah.
Q. So --
A. Soon after that.
Q. -- but same subject matter, correct?
A. Same.
Q. So you delivered Ms. Bischoff's message that there were an increasing number of people leaving the institute, many of them women, to HR and then separately, a few weeks later to Dean Charney; is that right?
A. That's right.
And again, you may not have intended

this. But I did not deliver it as Renee Bischoff's message. I was very clear to Renee and very careful because she didn't want to be seen in any way as passing information off. So I assured her that I would relay the information, not the list which I did not have, not the names of the people, which I did not have, but that someone had come forward with those concerns.

Q. Who did you tell in HR about these concerns?

A. Caryn Tiger.

Q. Was that in writing?

A. No. It was a telephone call.

Q. Was the telephone call the same day that Ms. Bischoff and you met?

A. I know that I called Caryn the very same day. Some -- I can't remember. Sometimes she's very busy. But she either got back to me that day or the following day. But it was immediately thereafter.

Q. And so either that day or the following day, you spoke to Ms. Tiger about these

issues, correct?

A. Yes.

Q. How long was that conversation?

A. Less than 15 minutes.

Q. What did she say in response?

A. She said that she was unaware of it. And to my question of whether there was any way to gather that information more formally or officially, she said that sometimes they are -- HR is able to do exit interviews either with people who are leaving the institution or sometimes even with people who have already left, asked them to come back to do exit interviews, and explore it a little bit more deeply. And that was her response.

Q. I mean, is that something that she said she would do as a result of the conversation?

A. She didn't commit to me, I am doing this. But she told me that that was definitely possible and she would look into it. But beyond that, I -- I don't know what her actual plan was.

Q. Did you consider this to be a serious issue that you were -- of serious concern that you were passing on to HR?

A. Of course.

Q. Did you get the sense that she also similarly felt that this was a serious issue?

A. Absolutely.

Q. Did you and Ms. Tiger had a -- have a follow-up conversation about this afterwards?

A. We did not.

Q. Did you seek to have a follow-up conversation with her about it?

A. I did not because within, as I said before, a couple of weeks I had a second conversation with Dennis Charney. And I know that he immediately looked into it as well.

So it -- it took on a life of its own at that point. There was no need for me to have a follow-up conversation.

Q. Did Ms. Tiger suggest that you speak to Dean Charney about it?

A. No, she did not.

Q. Was it your idea to speak to Dean Charney about it?

A. It was my idea, yes. It was my idea.

Q. Did you speak to Dean Charney about it in one of your regular meetings?

A. Nope. We bumped into each other, again, within a couple of weeks of that conversation with Caryn. We were in one of the research buildings in an elevator bank, just the two of us; and I shared with him that there were these concerns.

Q. How long was that discussion?

A. Less than ten minutes.

Q. Did you have one of your standing meetings with Dean Charney between you speaking to Ms. Tiger and bumping into him a few weeks later?

A. I have no recollection of that. We might have, but I don't recall.

Q. You would have had, presumably, at least one, maybe a few leadership meetings in

that time period, correct?

MS. GUERRASIO: Objection to form.

A. Group leadership meetings?

BY MR. CERVENKA:

Q. Yes.

A. Yes. Group leadership meetings? Yes.

Q. Because those were weekly?

A. Those were weekly, yes.

Q. And your regular meetings with Dean Charney at the time were how frequent?

A. Either weekly or every other week. It varied. And sometimes he was away, and sometimes I was away. And so, you know, I -- I can't recall if in that period of a couple of weeks whether we did have a one-on-one meeting or not.

Q. Did anything else happen regarding these concerns between -- as far as you know -- between you calling Caryn Tiger and then you bumping into Dean Charney a few weeks later?

A. I'm sorry. The question is did

anything else happen?

Q. As far as you know.

A. I became aware of information that -- it sounded strange to me in that interim period that Prabhjot was travelling to meet some potential donor and there was a little bit of excitement about it. But, again, I -- I knew this second or thirdhand. I did not meet where Prabhjot about it at all.

And then at the same time, this donor was an attorney who was involved in gender discrimination cases. There was something vague there. Again, I knew none of it firsthand but the combination of things seemed very, very strange to me. I had just learned about it.

And either that day or the day after, I bumped into Dennis Charney in this elevator bank and conveyed to him this concern that there was this mystery donor, but that there's always -- that there was also this concern about lots of women leaving the institute, and that I had reported it to Caryn

and I wanted to make sure that he was at least aware of it.

Q. Did Dean Charney express whether what you were telling him was news to him?

A. It was news to him.

Q. It was news to him --

A. Yes.

Q. -- when you bumped into him?

A. Yes.

Q. Both aspects of it, the -- well, let's take it one at time.

The -- the -- the increased number of people leaving, many of them women, that was news to him?

MS. GUERRASIO: Objection to form.

A. Yeah. You know, I am going to -- I'm going to go back one step.

BY MR. CERVENKA:

Q. Okay.

A. He -- he seemed surprised to hear it and told me that he was going to his -- he was headed to his office and was going to call Marina

Lowy in legal to look into it.

But I -- I realize now that may be an interpretation. In other words, he might not have heard of it at all or he might have heard about it in a regular meeting with Caryn and this triggered -- so I don't want to say that -- that he was completely unaware of it. Sort of an interpretation on my part.

But he did express immediate concern and said that day he was going to ask legal to get involved and look into it.

Q. All right. And what about the strange information about this donor? Was that bit of what you were relaying to him news to him as far as you could tell?

A. I don't --

MS. GUERRASIO: Objection to form.

THE WITNESS: Sorry.

(Reporter clarification.)

A. I don't know.

BY MR. CERVENKA:

Q. Okay. What was different about what

BY MR. CERVENKA:
Q. Did you discuss the issues that Ms. Bischoff raised with you with her subsequently?
MS. GUERRASIO: Who is "with her"? With Ms. Bischoff?
BY MR. CERVENKA:
Q. With Ms. Bischoff.
A. No.
Q. What about Dr. Anandaraja?
A. No.
Q. What about Dr. Murphy?
A. I -- I don't think so. Go back again and tell me the question. Did --
MS. GUERRASIO: I think I've lost the question too. I'm sorry.
A. Sorry. Did I discuss?
BY MR. CERVENKA:
Q. Let's actually walk that back a step. What did you understand was the subject of the investigation into Dr. Prabhjot Singh?
A. Gender discrimination.

CERTIFICATE OF SHORTHAND REPORTER NOTARY PUBLIC

I, Monique Cabrera, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 14th day of June, 2024.

MONIQUE CABRERA
Notary Public in and for the State of New York
County of Suffolk
My Commission No.
Expires: 06/12/2026

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE
Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.
Witness Name: Dr. David Muller
Deposition Date: June 14, 2024

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):
(  ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.
( x ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

7/21/24
DATE                WITNESS SIGNATURE

7/21/24
DATE                NOTARY

ADAM [illegible]
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01GU6155939
QUALIFIED IN RICHMOND COUNTY
MY COMMISSION EXPIRES NOV 20, 2026

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202)232-0646

ERRATA SHEET

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.
Witness Name: Dr. David Muller
Deposition Date: June 14, 2024

| Page No. | Line No. | Change |
|---|---|---|
| 93 | 9 | "resources" not "sources" |
| 114 | 6 | "ability" not "availability" |
| 114 | 10 | "how he saw" not "how we saw" |
| 128 | 6 | "technically" not "technical" |
| 147 | 22 | "had said" not "had" |
| 130 | 16 | delete "my" |
| 150 | 15 | "preliminary" not "primarily" |
| 176 | 22 | "That may be" not "I may be" |
| 178 | 17 | "directly to" not "directly it to" |

[signature] 7/21/24

Signature Date

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202)232-0646

ERRATA SHEET

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.
Witness Name: Dr. David Muller
Deposition Date: June 14, 2024

| Page No. | Line No. | Change |
|---|---|---|
| 196 | 5 | "any other" not "other" |
| 205 | 22 | delete "not" |
| 208 | 12 | "was not concerned" not "was concerned" |
| 216 | 18 | "Prabhjot's" not "the project's" |
| 248 | 14 | "someone should or" not "someone or" |

7/21/24

Signature Date