# Exhibit 20

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Case No. 1:19-CV-03779-VSB-JW
----------------------------------------x
DR. STELLA SAFO, GERALDINE LLAMES, AMANDA MISITI, and EMILIE BRUZELIUS,

Plaintiffs,

- against -

DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA, and ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI,

Defendants.

----------------------------------------x

April 24, 2024
9:44 a.m.

EXAMINATION BEFORE TRIAL of a Defendant, DR. PRABHJOT SINGH, pursuant to Notice, held at Glenn Agre Bergman & Fuentes, 1185 Avenue of the Americas, New York, New York 10036 before Mandy Fein, a Notary Public of the State of New York.

SINGH

Q So, by the time you met with Dean Charney, you had already made up your mind to resign?

A I believe so.

Q You were just letting him know or were you asking him for advice about how to go about it, for example?

A Both.

Q What did Dean Charney say?

A I recall him being supportive and also wanting to understand what it is that I would be doing.

Q Is that it?

A Yeah.

Q Did he express any kind of disappointment?

A I don't recall.

Q Did he ask you how you're doing?

A He did.

Q Did you tell him?

A I did.

Q Something to the effect that you felt like emotionally you were imploding?

A I communicated that I was distressed.

SINGH

Q Was it $900,000; is that right?
A No.
Q You don't remember the magnitude of it?
A No, but not --
Q Not that big?
A Not even close to that.
Q What was the salary for you as the director?
A I believe it was around 300,000.
Q What was the sign-on bonus that you got when you started that position, ballpark?
A I don't recall that component.
Q You did get a bonus amount, right?
A I'm not sure.
Q You don't remember?
A No.
Q Did you have an understanding of what the period would be for you as the director of the institute?
MS. GUERRASIO: Objection.
Q Was there an agreed upon term?
A I believe the contracts for directors are five year terms.

SINGH

Q You started in 2015, right?
A Yes.
Q And it had been renewed in 2020?
MS. GUERRASIO: Objection.
Q I am sorry, it was scheduled to terminate in 2020; is that right?
A It would have been up for renewal or not in 2020.
Q Did that factor into your thinking about resigning, the fact that the five year term was a year or so away?
A I don't recall thinking too hard about that.
Q When did you first realize that there were allegations against you of unlawful discrimination in your role at the institute?
MS. GUERRASIO: Objection to form.
You can answer.
A After the internal investigation was concluded end of summer 2018, I was told that there were complaints about age and gender discrimination.
Q Who told you that?
A I believe Rosalind Fink communicated

SINGH

will change the question. I think dramatically it sounds weird.

When did you first -- what was your response when you first learned that there were allegations that you had engaged in unlawful discrimination?

MS. GUERRASIO: Objection to form.

A I think this refers to discussions I had with Roz.

Q Okay, so you already had a lawyer by the time you understood that there were allegations of unlawful discrimination being perpetrated by you, right?

MS. GUERRASIO: Objection to form.

A I had a lawyer by the end of 2000 -- the summer of 2018, that time we were discussing, I had a lawyer at that time.

Q You said it was sometime after the internal investigation that you learned for the first time that someone or some number of people were making allegations you had engaged in unlawful discrimination, right?

MS. GUERRASIO: Objection to form.

You can answer.

SINGH

A I certainly was aware that there was an internal investigation. The details of were not clear to me until I received recommendations and I was told --

MS. GUERRASIO: Prabhjot, don't communicate about your communications with Roz.

Q So, the recommendations came from whom?

MS. GUERRASIO: Can you --

Q From your lawyer?

A My lawyer communicated them to me.

Q You never had communication from anyone with Mount Sinai about the internal investigation that did not involve your lawyer?

A I did not communicate about the investigation with anybody at Mount Sinai.

Q Were you interviewed as part of that investigation?

A Yes.

Q Who did that?

A Marina Lowy, someone else, I can't recall and my lawyer was present.

Q What do you know about Ms. Fink, let

SINGH

Q Well, he didn't have an official role at Mount Sinai, right?

A No.

Q How did you get the job of Director of the Arnhold Institute For Global Health?

A I eventually applied for it.

Q Who asked you to apply?

A Both Robert Murphy and Dennis Charney suggested I apply.

Q You had a relationship with Mr. Star before you applied for the position of director with the institute, correct?

A Yes. I knew him before.

Q Did you have discussions with Mr. Star about being the director of the institute before you were -- before you got that position?

A Yes.

Q Did you have an understanding that the Arnhold Family was making an additional $15 million donation to the institute?

A During what time period?

Q Before you became the director.

A No.

SINGH

you were responsible was hostile to women based on their gender.

Do you understand that?

MS. GUERRASIO: Objection to form.

A I understand that that's part of the Complaint.

Q As far as you're concerned, did you ever say to any of the women who were working at the Institute that they were too emotional?

A No.

Q Did you say to any of the women at the Institute that they didn't know how to think and you were gonna teach them how to think?

A No.

Q Do you remember saying to one of the women who worked at the Institute that she should stop acting like a "mother hen" when conducting meetings?

A No.

Q You've never used that phrase, mother hen?

A It's not part of my speech.

Q When there were group meetings, did

SINGH

you treat women differently in the sense that you called upon the men in the meeting to speak and didn't call upon the women to speak?

A No.

Q Did you ignore women when they were trying to contribute to the meeting?

A No.

Q Did you try and limit the way women employees of the Institute were interacting with donors or other outside contacts with the Institute?

MS. GUERRASIO: Objection to form.

You can answer.

A I don't know what you're referring to.

Q Did you become aware at any point in time that there were complaints about Mr. Burman?

A I did.

Q What was the nature of the complaints that you learned about concerning Mr. Burman when you were the director of the Institute?

A Early on in his -- in his tenure, I had heard second or third hand that he had a

SINGH

she's referring to.

Q Well, is it the case that -- let me ask you a general question first.

This is not about Ms. Misiti, but is it the case that it never even occurred to you before the federal lawsuit was filed that there were women who worked at the Institute who had the perception, rightly or wrongly, that you were treating women differently and poorly then men?

MS. GUERRASIO: Objection, I believe. Can you read the question back?

(The record was read back by the reporter.)

MR. BOWEN: I will restate.

Q Is it the case that before the federal lawsuit was filed, you never had the understanding that there were women at the Institute who were alleging that you treated women differently then men?

A After the investigation was completed and before the litigation was filed, I was aware that there were gender related complaints that must have been part of -- I was aware of gender related complaints.

SINGH

Q Was that the first time that you were aware of gender related complaints?

A After the investigation?

Q Yes.

A Yes.

Q That was based on a conversation that somebody had with you about the investigation?

A This relates to my conversations with Counsel.

Q But it was after the investigation had concluded, to your understanding; is that right?

A Yes.

Q So, prior to that, it never even occurred to you that someone may have the perception that you were treating women differently then men at the Institute?

MS. GUERRASIO: Objection to form. You can answer.

A No.

Q Did you have a practice of discussing or giving your appraisal of the women who worked for you -- I will start over.

Did you have a practice of saying things

SINGH

A No.

Q You don't remember that happening?

A No.

Q Well, do you recall asking her if she was upset by what you just said?

A Which was what, sorry?

Q Do you recall being in a meeting with her where you were talking about this potential position of director of global sites where you said to her, you didn't think it was an appropriate position for her, and then you asked her if she was upset?

A I don't recall that conversation.

Q Do you recall ever being in a meeting with Ms. Misiti where you asked her if she was upset?

A I would certainly check in with Amanda and see how she was doing with her work, and she how she was feeling.

Q Do you recall a meeting where she said to you that she wanted to end the meeting and you said something to her along the lines of, well, you could have had this position if you were able to fight for it, something like

SINGH

that?

A I don't recall that.

Q You don't recall ever asking her whether she's upset and her response being, I want to -- I want to just leave?

A No.

Q And you don't recall ending a meeting with her about that particular position where you said she could have had the position if she was willing to fight for it?

A No. Because there wasn't a position at that time, so it doesn't make sense to me what you're asking me.

Q Well, you were considering creating that position, no?

A We were considering how to go about building global sites and how to assign roles towards it.

Q And eventually, you hired someone specifically to set up that -- to take that position as a director of "global sites," right?

A Eventually we found that Rachel's background made it a good fit for her to take

SINGH

on both the vice chair of research position and also direct the global sites given her background, but it hadn't been an extensive set of discussions prior to that realizing that Rachel might be just right for that role.

Q Did she stay in that role?

A I am sorry, whom?

Q Rachel.

A I'm not sure if she still holds that title. She lead the Institute and department after I stepped down at some point.

Q She left the Institute after you left?

MS. GUERRASIO: Objection.

A No.

Q What do you mean stepped down?

A She eventually became the director and department chair of the Institute and department.

Q After you?

A Yes.

Q And prior to that, she was still the director of global sites?

A It was one of her titles. She was

SINGH

Right?

A I see that.

Q Do you remember getting that email?

A I see it here now.

Q Well, it's true what she says there, correct?

A What about it?

Q Well, what she's telling you there is a truthful statement, that it was her who suggested to you that we try to accommodate -- to accommodate them by offering them a time slot on Wednesday, correct?

A Yeah.

Q And then above that you write, "They did not; I spoke w them."

I spoke with them, right?

A Uh-huh.

Q So, you then had a phone call after you jumped in on the email with the Maru's?

A I did.

Q What did you say to them?

A That I would like them to be in-person, but if it was logistically unworkable, that -- let me know.

SINGH

Q Or one of the trips, no?
A No.
Q You never said to her something to the effect of the fact that you, "Preferred the modest look," when you were commenting on the fact that she was wearing a suit in Liberia?
A No.
Q Did you ever comment on women employee's dress?
A No.
Q Did you talk to Ms. Misiti about the fact that you thought women were too emotional?
A No.
Q Did you ever tell her a story that along the lines of you had made a female subordinate at Columbia University cry on a regular basis?
A No.
Q You never said that to Ms. Misiti?
A No.
Q Is it true that you, in some position you had at Columbia University, you had a

SINGH

A I've had critical feedback about work product.

Q In giving that kind of critical feedback, would you -- would you describe the process that they used to think through the problem as being defective in some way or not optimal?

MS. GUERRASIO: Objection to form.

A I would definitely have conversations with people about if something wasn't where it should be how to get it to the better place, and so, that would be the nature of the conversations.

Q Did you do that with women?

A I would have conversations with all people that we had producing work product, which included, both men and women.

Q From your perspective, you were equally critical of work performed by men as you were of the work performed by women?

A Yes.

Q Do you remember criticizing Ms. Misiti for being overly emotional?

A No.

SINGH

could have included them in your recommendation that you did for Matt Le and Bruno Silva; is that right?

A It's possible, yeah.

Q Did you -- did you contact the institutions that had offered Matt Le a position in 2017?

A No. It was broadly known at that time that data scientists with skills in that field were commanding salaries many multiples of what we could offer.

Q So, you just assumed that when he told you he --

MR. BOWEN: Well, let me withdraw that question.

Q Did he tell you he was getting offers from other institutions?

A I believe he was getting an offer from companies, so not -- not academic institutions.

Q Private companies?

A Yeah.

Q And then, eventually, he did leave, right?

SINGH

pay between men and women at the Institute, right?

MS. GUERRASIO: Objection to form.

A The focus was to make sure that the folks had the right roles and positions. It was not referenced in relation to what you said.

Q There was no review done by either the Oversight Committee or you to review the salaries based on gender?

A No. It was a comprehensive review of every person, man and women, across the departments in all roles.

Q Was that something that the internal investigation required?

MS. GUERRASIO: Objection.

MR. BOWEN: I will withdraw the question.

Q Is that something that the Oversight Committee required?

A It was one of the actions that followed the investigation.

Q And your testimony is that you didn't think that involved any review to make sure

SINGH

that there were no pay disparities based on gender?

A Correct.

Q Did you ever discuss that topic with anyone?

A Which topic?

Q Whether there was pay discrepancies at the Institute where women were generally paid less then men?

A No.

Q You never had that discussion?

A Not that I can recall.

Q Isn't that something that -- isn't that something that Dean Charney suggested would have to happen to you?

MS. GUERRASIO: Objection.

A I -- what are you asking that he suggested?

Q That he said to you the first thing we need to do is look to see if there are pay discrepancies based on gender?

A No.

Q After the internal investigation started -- by the way, did you know when it

SINGH

want to do that was aligned in where the Institute was going and that was the nature of the conversation, and it took time to figure that out.

Q Ms. Bruzelius is a scientist, right?

A At that time, she was a scientist in training.

Q What does that mean?

A She didn't have her PHD yet, but I think it depends how you want to use the word scientist, yeah.

Q Well, how do you use it?

A I usually think about it as somebody that has a formal background and degree in that training, but I understand that people without that background use it, and I think that's fine.

Q Did you know that Ms. Bruzelius considered herself a scientist?

A I think that's -- I don't know how she considered herself, but I think it is completely fine if she did.

Q Did you ever ask her?

A If she considered herself a

SINGH

scientist?

Q Yes.

A No.

Q Did you -- do you remember having a conversation with her where you were shaking your head no but nodding your head to indicate yes in response to a question where she was asking whether there may not be a job for her at the Institute?

A As I said before, I don't recall what you're referring to here, but I do recall being clear and assuring on multiple occasions that despite James leaving and not having a data scientist to lead the program, that there would be work that we would figure out together.

Q Is that something you've done before where somebody asks you a yes or no question and you answer no as you are nodding your head yes?

A Not that I know of, no.

Q That's not something you have ever consciously done?

A Not consciously.

SINGH

A It was focused on moving forward the work that was under his purview.
Q Ms. Llames attended those meetings?
A She did.
Q Did you intentionally skip over Ms. Llames in going around the room asking people to give a status report?
A No. Usually, Ms. Llames had actually prepared the agenda or what needed to get done, and so, she was an interictal part of those meetings.
Q Were there meetings, such status meetings, where she wasn't invited?
A Not that I know of. It was a lot of people.
Q So, one of the allegations in this federal lawsuit by Ms. Llames about you is that you treated her differently then men in the status meetings because you would skip over her and ignore her during the meeting.
Are you aware of that, that that's the allegation that she's made against you?
A I'm aware that's the allegation.
Q And your testimony is that that

SINGH

not, but it was her role to make sure that we, at least, knew what needed to get done in those meetings. So, how that was communicated in writing or verbally, I am not 100 percent sure.

Q Are you saying she ran the meeting, she would start by saying here's what we need to discuss and then she would indicate who should speak next?

A No. She would be part of one of the inputs of knowing what should be the focus of that meeting.

Q Who would decide what the focus of the meeting was going to be?

A Depending on what needed to get done. If we were going to be talking about the research paper that needed to get out of the door, that would have been Emilie. If it was about, you know, design related issues, Bruno would have talked more. It just depended upon what the priority was. I believe that Mateo Donatello also played a important role in making sure that we were on track technically because no one else had that expertise.

SINGH

Q You ran those meetings when you attended them?

A I was present for them and I asked -- I participated in them, but again, it depended upon what the priority was for them. I tried to mage sure I was engaged and give them shape.

Q Well, what you are saying is that the allegation by Ms. Llames that you had a practice of ignoring her during those meetings and other women, you are saying that's not accurate, correct?

A That's not accurate.

Q And you don't have any idea why she would say that if it's not true?

A No.

Q Do you recall having interactions with Ms. Llames about her request to work from home?

A Briefly, at some point.

Q Do you remember that you told her that she needs to have a detailed "work plan" when she makes a request for the privilege of working from home?

SINGH

Q Do you see starting at the bottom of the chain, Dr. Sachs reached out to Dr. Safo saying, Stella -- "Stella have you and Prabhjot had a chance to deliberate how we could work on this together?" It goes on from there. And then Dr. Safo responds by writing to Dr. Sachs saying -- oh, I am sorry, she is writing this to you saying -- and she says to you, "What I was going to say to her," and then she writes, Sonia, It's so nice to hear from you, eccetera, and then you respond at the top of the email chain saying, "Thanks. She'll want me to respond. I'll manage this interaction until it goes somewhere."

Do you see that?

A I do.

Q Now, you were copied on Dr. Sachs original email, but it was addressed to Dr. Safo, right?

A I see that.

Q Why did you say she would want you to respond?

A Sonia was -- Dr. Sachs was asking about really if we would commit resources from

SINGH

If we were running over on time or if things were getting behind schedule, I might have done that.

Q But why ask Ms. Misiti to do it, why not just do it yourself?

A Depending on the context which would be less rude.

Q You said it would depend on the context which would be less rude?

A Yeah. I didn't want to create a situation where she felt where it seemed like it was -- I was coming to interrupt her, but I probably wanted to make sure that we were finishing up or wrapping up, and, you know, maybe asking someone to move the mic as one might do at the end of a set of presentations where you come to the stage and say okay, you know, can you hand me the mic, or you just move in that direction. It is a softer way to do that.

Q Had you asked Ms. Misiti to do that in the past?

A I don't recall the circumstances in which I would.

SINGH

speaking too much during meetings?

A I don't recall.

Q There was some incident between Mr. Burman and Dr. Safo that actually involved a birthday cake or some kind of celebration involving a cake at the office.

Do you remember that?

A I do.

Q And there was some heated exchange between Mr. Burman and Dr. Safo?

A I don't know if I would call it heated, but it was extended and probably inappropriate after a certain point.

Q Who was acting inappropriate in that exchange?

A I thought the first set of communications that I had -- I was looped in much later. It seemed like the initial communications were fine and then, I think, it just kept on going, and so, I had asked for them to both stop talking about birthday celebrations in that manner.

Q Mr. Burman was your chief of staff at the time?

SINGH

A He was.

Q Did you talk to him about why he was having that kind of -- having that kind of exchange with Dr. Safo?

A I -- I did speak to him. I told him that it was inappropriate, it shouldn't continue, I didn't know why it was happening. It seemed like an issue that didn't merit such a long conversation or a heated one.

Q But you also rebuked Dr. Safo about that, right?

A I recall saying the same thing to Dr. Safo, that I didn't see the reason to have such a heated or extended exchange about a birthday celebration.

Q Did you have that discussion with Dr. Safo directly in-person where you were saying that to her?

A I spoke with both Dr. Burman -- I mean, Mr. Burman and Dr. Safo directly and briefly in-person.

Q On the same day that this email exchange had occurred?

A I believe so.

SINGH

the reason culture at Arnhold is divisive?

MS. GUERRASIO: Objection to form.

You can answer.

A I don't recall saying so and it doesn't make sense.

Q Did you tell her that she had been undermining your leadership at the Institute?

A I don't recall that conversation.

Q Did you ever get the sense that you were saying sometimes conciliatory things to Dr. Safo, but in larger meetings, you were treating her with -- with harsh criticism?

A That's not how I felt.

Q And you never felt that you were undermining Dr. Safo?

A Definitely not. I felt like I was supporting her work.

Q Well, Dr. Safo was a friend of your wife, right?

A She was.

Q They knew each other since school; is that correct?

A For a long time.

Q Years?

SINGH

that you find problems with your leadership style?

A Definitely. I thought there were areas that I could improve and areas that could benefit from improvement.

Q If you look at Item 7 on the second page, there is a statement that reads, "The School's Human Resources Compensation Department should conduct a thorough review of all Institute members' job duties, titles, and compensation, to ensure appropriate classification and pay-parity between men and women to and to ensure transparency."

Did you discuss that with Dr. Charney or Dean Charney?

A I knew that HR would be doing a comprehensive review across all of the Institute.

Q And, specifically, looking at pay-parity?

A That's not what I recall. I recall it was a focus on everybody and every position, and it was comprehensive.

Q But you don't recall discussing with

SINGH

You can answer.

A I don't recall that conversation.

Q Was Dean Charney angry with you?

MS. GUERRASIO: Objection to form.

A I don't recall having an angry conversation with the Dean.

Q And you don't recall any conversation where either you or your attorney talked about having a "trump card"?

A No.

Q Did you have claims of any sort that you were making against Mount Sinai?

A No.

Q Had you ever made claims against Mount Sinai?

A No.

Q In any context, have you ever made claims based on any kind of discrimination against you against anyone else?

A No.

Q Did you have some feeling that Dean Charney was going to support you no matter what?

A No.

C E R T I F I C A T I O N

I, Mandy Fein, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose testimony as herein set forth, was duly sworn by me; and that the within transcript is a true record of the testimony given by said witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of May, 2024.

MANDY FEIN

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Safo, Stella, Dr., Et Al. v. Singh, Prabhjot, Dr., Et Al.
DATE OF DEPOSITION: 4/24/2024
WITNESSES NAME: Dr. Prabhjot Singh

| PAGE | LINE (S) | CHANGE | REASON |
| --- | --- | --- | --- |
| 29 | 15 | Privett | Not "Privith" |
| 76 | 14 | Kostegan | Not "Costigan" |
| 76 | 19 | Starr | Not "Star" |
| 111 | 9 | Barbara | Not "Robert" |
| 113 | 14 | Landrigan | Not "Andergan" |
| 123 | 14 | Privett | Not "Privith" |
| 124 | 13 | Vreeman | Not "Breeman" |
| 124 | 14 | Aaron | Not "Erin" |
| 124 | 14 | Privett | Not "Privith" |
| 124 | 15 | Sandeep | Not "Sunde" |
| 124 | 18 | Sandeep | Not "Sunde" |
| 126 | 23 | Vreeman | Not "Breeman" |
| 127 | 17 | Landrigan | Not "Andergan" |
| 132 | 3 | Privett | Not "Privith" |
| 139 | 5 | Aaron | Not "Erin" |

[signature]
Dr. Prabhjot Singh

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 10 DAY OF June, 2024.

[signature]
(NOTARY PUBLIC)

09/15/2031
MY COMMISSION EXPIRES:

PAUL H SLOAN, III
Notary Public - Seal
Boone County - State of Indiana
Commission Number NP0672999
My Commission Expires Sep 15, 2031

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Safo, Stella, Dr., Et Al. v. Singh, Prabhjot, Dr., Et Al.
DATE OF DEPOSITION: 4/24/2024
WITNESSES NAME: Dr. Prabhjot Singh

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| 141 | 25 | bidirectional | Not "by directional" |
| 152 | 23 | Vreeman | Not "Breeman" |
| 177 | 5 | Berman | Not "Burman" |
| 187 | 7 | Danieletto | Not "Donatello" |
| 187 | 16 | Weisman | Not "Wiseman" |
| 233 | 17 | Weisman | Not "Wiseman" |
| 233 | 24 | Weisman | Not "Wiseman" |
| 241 | 11 | integral | Not "interictal" |
| 242 | 4 | integral | Not "interictal" |
| 244 | 23 | Danieletto | Not "Donatello" |
| 259 | 9 | Privett | Not "Privith" |
| 268 | 11 | Vreeman | Not "Breeman" |
| 279 | 22 | Aaron | Not "Erin" |
| 282 | 20 | Berman | Not "Burman" |
| 282 | 21 | Berman | Not "Burman" |

Dr. Prabhjot Singh

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 10th DAY OF June, 2024.

(NOTARY PUBLIC)

MY COMMISSION EXPIRES: 09/15/2031

PAUL H SLOAN, III
Notary Public - Seal
Boone County - State of Indiana
Commission Number NP0672999
My Commission Expires Sep 15, 2031

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Safo, Stella, Dr., Et Al. v. Singh, Prabhjot, Dr., Et Al.
DATE OF DEPOSITION: 4/24/2024
WITNESSES NAME: Dr. Prabhjot Singh

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| 283 | 17 | Berman | Not "Burman" |
| 284 | 2 | overwrought | Not "over rot" |
| 303 | 2 | Berman | Not "Burman" |
| 303 | 4 | Starr | Not "Star" |
| 268 | 24 | I don't think it makes sense | missing "don't" |

Dr. Prabhjot Singh

SUBSCRIBED AND SWORN TO BEFORE ME
THIS 10th DAY OF June, 2024.

(NOTARY PUBLIC)

09/15/2031
MY COMMISSION EXPIRES:

PAUL H SLOAN, III
Notary Public - Seal
Boone County - State of Indiana
Commission Number NP0672999
My Commission Expires Sep 15, 2031