# Exhibit 23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DR. STELLA SAFO, GERALDINE LLAMES, AMANDA MISITI and EMILIE BRUZELIUS,
Plaintiffs,
-against-
DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA and ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI,
Defendants.

CASE NO. 1:19-cv-03779-VSB-JW

*** CONFIDENTIAL ***
INCLUDES ATTORNEYS' EYES ONLY PORTIONS
VIDEO-RECORDED DEPOSITION OF
CARYN TIGER
Glenn, Agre, Bergman & Fuentes LLP
1185 Avenue of the Americas
22nd Floor
New York, New York 10036

08/08/2024
9:45 a.m. (EDT)

REPORTED BY: MONIQUE CABRERA

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Q. Were you involved as an investigator or overseeing it?
A. An investigator.
Q. How long ago was it?
A. A long time. I don't recall the date.
Q. In that situation, was there a finding of discriminatory conduct?
A. No.
Q. So there was a finding that no unlawful discrimination had occurred; is that right?
A. There was no finding of discrimination.
Q. Was there any finding of retaliatory conduct?
A. Any finding of it? No.
Q. Yes. Any determination that she had been unlawfully retaliated against?
A. Not that I recall.
Q. During the -- the last 18 years you've been in your various positions with Mount

Sinai, to your knowledge, has the human resources department ever determined that a claim of unlawful discrimination was substantiated?
MS. GUERRASIO: Objection to form.
You can answer if you are able to.
A. Yes.
BY MR. BOWEN:
Q. How many times?
A. I don't know off the top of my head.
Q. More than just one or two?
A. I don't want to speculate. I don't know.
Q. What -- what actions did the university take -- I'm sorry -- the school, Mount Sinai take when there was a finding of unlawful discrimination?
MS. GUERRASIO: Objection.
If you know, Caryn, you can testify to what you know.
A. Can you repeat the question? Because you didn't say "unlawful discrimination."
BY MR. BOWEN:

Q. You mean the prior question?
A. Yes, the prior question.
Q. Okay. So my first question is: During the 18 years you've been there, the last 18 years in your various positions, are you aware of any instance where the school made a determination that unlawful discrimination had occurred?
A. So yes, in the lines of sexual harassment, which I would also deem as unlawful. And -- yes. And one case was a final warning notice based on the findings we had. And one was -- I -- again, I wasn't involved -- I was involved in this one. I was not involved in the one many years ago.
It was a -- an allegation of sexual harassment, creating a hostile environment, but it was a relationship between a supervisor and a subordinate that ended badly. And we ended up removing the supervisor.
Q. Fired?
A. Separated.

Q. Through some kind of mutual agreement?

A. Yes.

Q. So those are two separate matters that you have a memory of that you recall over the last 18 years, right?

A. Yes.

Q. And both involve sexual harassment?

A. The two that I recall, yes.

Q. They both involve physical touching?

A. No. The first one did not.

Q. The second one did?

A. Yes.

Q. What kind of harassment was involved in the first one?

A. Verbal.

Q. Was it demeaning, derogatory terms --

A. No.

Q. -- based on sexuality or gender? No?

A. No, it wasn't demeaning.

Q. Do you know if those records were searched as part of this responding to this lawsuit?

A. No, I don't.

Q. Are they all kept in a -- in like a central electronic file or a paper file somewhere in human resources?

A. Not in human resources, in compliance.

Q. Well, what I want to -- what I want to differentiate is, I assume some of subset of calls that -- that are placed to that hotline get transcribed and sent to human resources.

Are you saying that everything that goes through that hotline gets transcribed and sent to human resources?

A. No, not everything gets sent to human resources.

Q. Is there a system in human resources that would track anonymous calls --

A. No.

Q. -- that are sent -- that are

referred by compliance to human resources?

A. No.

Q. Is there a way for somebody at Mount Sinai to search for transcriptions of anonymous calls that were referred by compliance to human resources?

A. Compliance would keep those records of any calls that came into compliance.

Q. And you're not aware of any searches made of those records in relation to this lawsuit; is that right?

A. I don't --

MS. GUERRASIO: Objection to form.

You can answer.

A. I don't know.

BY MR. BOWEN:

Q. During the 18 years you've -- you've been with human resources, have you learned about or been involved in a case where there were multiple employees making a discrimination claim about a single person?

MS. GUERRASIO: Can you just repeat

A. No, Ms.
She knocked on my door and said, "Got a minute?" And said she was hearing that people were unhappy about the transition of leadership in the Arnhold Institute.
Q. Did she say anything else that stands out in your memory?
A. No.
Q. Did you take notes of the conversation?
A. I don't recall.
Q. Did you create any kind of record of it?
A. I don't recall if I did.
Q. Did you look?
A. I didn't look.
Q. In connection with the litigation?
A. I didn't look.
Q. That is something that you could look for, though, right? You would know where to look; you would know how to check your records to see if you had any record of that discussion with

relating to Dr. Singh?
MS. GUERRASIO: Objection to form.
You can answer.
A. Whatever records I had, I collected and provided to legal.
BY MR. BOWEN:
Q. You didn't review them in preparing for your testimony today?
A. No.
Q. Had you ever testified before?
A. Once before.
Q. In a deposition like this?
A. A deposition, yes.
Q. Was it in connection with Mount Sinai?
A. Yes.
Q. In your role as -- in human resources?
A. Yes.
Q. Did that testimony involve a discrimination claim?
A. I don't recall.

to have to do it. It's a communication that comes out annually and is required by every employee at Mount Sinai.

Q. But you personally didn't discuss it with her at any time; is that right?

A. I don't believe I did.

Q. And as far as you are aware, was she provided any training in the antidiscrimination policies at Mount Sinai and the antidiscrimination laws that govern?

A. I don't know.

Q. In this e-mail at bottom from Dr. Singh to you in Exhibit CT 1, the second paragraph has a heading in bold that reads, quote: Ending positions plus -- the plus sign -- competitive hiring process for new ones.

After that title, he writes, quote: I am planning to end all current administrative positions in the institute and create a competitive hiring process for two completely new positions (new titles, terms of reference and responsibilities), close quote.

Q. Did she -- Ms. Devia talk to you about Dr. Singh?
A. Not that I recall.
Q. Or the Arnhold Institute?
A. Not that I recall.
Q. Do -- does your office, HR, have a standard procedure for intake of employee complaints?
A. Yes.
Q. Are there standardized forms that are filled out?
A. No, there's not a standardized form.
Q. Is there any kind of computer database where people put in the date the complaint was made, the identity of the person making the complaint, things like that?
A. Not in my office.
Q. So any recordkeeping of complaints is done on an ad hoc basis?
A. No. They call or they send an e-mail with a complaint and we meet and we gather facts and we investigate when we need to

A. If somebody has a complaint of any nature, illegal or otherwise, we will sit down and meet -- we will meet with them. Not every meeting requires an investigation or -- I mean, there's no -- I'm not sure I understand the question, so I can't really answer it.

Q. The question is recordkeeping. Do you have standard procedures for just keeping records of any complaint that's made, whether it deserves investigation or it's determined not to deserve an investigation? Do you just keep a record, a log? Is that a standard thing or not?

A. We keep a record if there's a complaint that is made that we investigate.

Q. And where is that record kept?

A. In my office.

Q. What is it? What is the record itself? Is it a standardized form?

A. No, it's not a standardized form.

Q. Do you create, like, electronic folders on your computer and put all the information in a folder?

records need to be created and kept?

A. There's a standard way that we handle investigations, and that's standard. There's no standard form that we use.

Q. There's no standard in terms of recordkeeping?

A. Correct.

Q. What's the standard way you handle investigations?

A. We meet with an employee. If it's a complaint that is deemed to be illegal, unsafe, unhealthy, any of those examples that warrants us to have an investigation conducted, we would meet with the person that provides the complaint.

We would gather any information that they have, any witnesses to the event. And depending upon how large the number of people are, we would meet with any individual that came up. If during an intake another person is named, we may add to the list of people that we would meet with.

We gather all the information. We

review all the facts. And we -- ultimately, if there's a complaint about a specific person, we will then get their side of the story and meet with them as well.

Once we've gathered everything that we can gather, we would then make a -- a decision based on the facts that were presented and gathered.

Q. Is it standard practice that when you're meeting with all of the people, witnesses, complainant, accused, that you create a paper record of what was being said? Somebody creates a memo to the file or?

MS. GUERRASIO: Objection to form.

You can answer.

A. So if there is a complaint that would warrant an investigation, there is a paper trail. If there's somebody that comes into the office and we need to take notes so we can follow up on it, yes.

But there are people that come into our office to get advice or have concerns and

they want to get advice for it, there would potentially be a document, but not necessarily a file.

BY MR. BOWEN:

Q. Well, I'm talking about investigations where a determination was made that the complaint needs to be investigated and you said -- you just went through --

A. Yes.

Q. -- a series of steps.

Is there a requirement that records be kept of what people are saying?

A. Yes.

Q. So somebody's taking notes?

A. Yes.

Q. Is it audio recorded?

A. No, not typically.

Q. Have you ever done -- have you ever done that, audio recorded an interview with anyone?

A. Have I ever? Yes.

Q. In the course of an investigation?

as a reason to --
A. It was concerning enough that he reached out to me to tell me that he had a concern, and I asked him if he spoke with Dr. Charney.
Q. But you didn't keep any notes of that phone conversation?
A. I don't recall if I did or didn't.
Q. Well, you haven't seen any in preparing for your testimony?
A. No.
Q. You don't remember that Dr. Muller specifically told you that the concern related to women?
MS. GUERRASIO: Objection to form. This has been asked and answered.
You can answer again.
A. I don't recall him saying women. I recall him saying that there were people that were leaving. I don't recall if it was women.
BY MR. BOWEN:
Q. At that time, you already knew that

string Bates Number ISMMS10063, was marked for identification.)

BY MR. BOWEN:

Q. So what we marked as CT 4 is a one-page e-mail string, Bates Numbers ISMMS10063. The e-mail top of the first page is to Ms. Tiger from Renee Bischoff dated March 16, 2018.

Do you remember this?

MS. GUERRASIO: I am sorry. What was the question? I didn't hear it.

THE WITNESS: Do I remember this.

BY MR. BOWEN:

Q. Do you remember this?

A. I don't recall, but I am reading it.

Q. You don't remember receiving from Renee Bischoff in March 2018 an e-mail that said, quote: Another talented female leaving the Arnhold Institute and Mount Sinai, close quote?

A. Yes.

Q. You don't remember that?

A. I don't recall.

Q. She -- the second sentence reads,

female. She did not tell me that women were leaving.

BY MR. BOWEN:

Q. So she might have told you that females were leaving?

A. No, she didn't say that.

Q. Did she say, here is a list of females who are leaving, and here is a list of other people who are leaving?

A. I don't recall who she gave me was leaving.

Q. She did give you a list, though, right?

A. I don't know. As we talked about before, I don't know whether she gave me a list or told me people that were leaving.

Q. In any event, based on what she was telling you, you didn't -- it didn't raise a concern in your mind that this might be a gender issue, right?

A. No.

Q. You didn't go to Dean Charney after

have any memory calling Ms. Bischoff after you
got this e-mail in March of 2018 --

MS. GUERRASIO: Objection.

BY MR. BOWEN:

Q. -- about the e-mail?

MS. GUERRASIO: Objection to form.

A. I don't recall.

BY MR. BOWEN:

Q. So that's true; you don't remember,
right?

A. I don't recall.

Q. But you do remember you didn't go to
Dean Charney in March of 2018 about females
leaving the institute, right?

A. I did not.

MR. BOWEN: Let's show her --
Ms. Tiger this one.

(Whereupon, Exhibit CT 5, E-Mail and
an attachment, Bates Number ISMMS18638, was
marked for identification.)

BY MR. BOWEN:

Q. So what we have marked as Exhibit CT

majority of the people who left the institute were female, as is depicted on this chart on page 3 of Exhibit CT 5?

MS. GUERRASIO: At what time are we talking about?

MR. BOWEN: At any time.

A. I don't recall.

BY MR. BOWEN:

Q. Did you do exit interviews of all those people?

A. No.

Q. Did HR?

A. I don't know.

Q. Were all of these people contacted as part of the HR investigation?

A. I don't know.

Q. Okay. We'll come back to this. You can lay it aside for a moment.

A. Okay.

Q. You did receive, back before 2018, e-mail communications about salary and bonuses at the institute, right?

MS. GUERRASIO: You can answer that question with a "yes" or "no," ever.

A. I answered that question with I don't recall.

BY MR. BOWEN:

Q. Did you ever learn from Dr. Charney that there were funding concerns for the Arnhold Institute?

A. No.

Q. Did you ever hear anyone refer to Dr. Ann Olivarius?

A. Repeat the question.

Q. Did you ever hear -- I'll say before the federal lawsuit was filed, did you ever hear anyone refer to Dr. Ann Olivarius?

A. Before the investigation?

Q. Before the lawsuit.

A. I mean before the lawsuit? No.

Q. Okay. So during the investigation, did you meet with Ms. Bischoff about the investigation?

MS. GUERRASIO: Objection.

MS. GUERRASIO: Well, A, I will assert a privilege objection.
MR. BOWEN: To just answering "yes" or "no," you're asserting privilege?
MS. GUERRASIO: You can answer that "yes" or "no."
A. No.
BY MR. BOWEN:
Q. Do you know why Bruno Silva was not interviewed?
MS. GUERRASIO: Again, you can answer "yes" or "no" to that.
A. I don't recall him being part of an investigation.
BY MR. BOWEN:
Q. Well, at any time, leaving the investigation out of it, did you learn that there were allegations that Bruno Silva habitually used the word "bitch" and other types of profanity that was gender specific?
A. No.
Q. You never heard that?

A. No.
Q. In your experience at Mount Sinai, it's not acceptable for people to call other workers bitch, right?
A. Right.
Q. And that would not acceptable at the institute either, correct?
A. It would be unprofessional, so it wouldn't be acceptable.
Q. It's not tolerated, correct?
A. No.
Q. Were you present when -- when Holly Atkinson was being interviewed?
A. I don't recall.
Q. Did you know her while she was working at Mount Sinai?
A. No.
Q. You never interacted with her?
A. No.
Q. So you don't have an opinion one way or another about her veracity and truthfulness?
A. No.

Q. How about Dr. Anandaraja, did you know her?

A. She was -- I didn't interact with her, but she was in the dean's office at some point.

Q. Did you have a personal opinion about her honesty and truthfulness?

A. No.

Q. How about Mr. Berman, David Berman, do you know him or have an opinion of him?

A. I knew of him when he was in the institute.

Q. What had you heard about him?

A. He was not a good manager.

Q. He tended to be demeaning towards women?

A. I don't recall that.

Q. Did you hear that he would berate women and make them cry?

MS. GUERRASIO: Caryn, I'm just going to direct whatever your testimony is going to be is conversations outside of

Q. You learned about it in connection with the lawsuit?

A. Yes.

Q. But before the lawsuit, you had never heard that?

A. No.

MR. BOWEN: Oh, yeah. We can -- we can put that exhibit away and go off of attorneys' eyes only.

(Whereupon, a request for End of attorneys' eyes only designation was made.)

BY MR. BOWEN:

Q. Well, when you -- when you found out about that, did you have a discussion with Jones-Winter about why she was texting Dr. Safo concerning the investigation?

A. No.

Q. As far as you were aware, was Dr. -- was Ms. Jones-Winter, was she disciplined at all for having done that?

A. No.

Q. Did she break any rules by having

these private texts with Ms. Safo or Dr. Safo?

A. Yes.

Q. But she wasn't called to account for violating those rules?

A. No.

MS. GUERRASIO: Objection to form.

BY MR. BOWEN:

Q. Do you know why she wasn't?

A. I had discussions with our attorneys.

Q. Well, leaving the discussions with attorneys aside, was there anyone -- anyone else involved in that decision of whether or not she should be disciplined for having had these text messages with Dr. Safo about the investigation while it was going on?

A. No.

Q. Was it your decision not to discipline her?

MS. GUERRASIO: Objection.

I'm going to instruct the witness not to answer this question to the extent it

on the first page is ISMMS021486. The top e-mail states it's from Roslyn Fink to Marina Lowy. It's dated June 22, 2018.

A. Okay.

Q. Have you ever seen this document before?

A. No. I don't recall.

Q. Looking at the bottom e-mail, starts about the middle of the page on page 1 and it goes on to page 2, there are numbered paragraphs 1 through 8.

This is an e-mail that Ms. Lowy sent to Ms. Fink and the intro paragraph reads, quote: The investigation led to the recommendations listed below which were made to and accepted by Dean Charney, closed quote.

Are these numbered paragraphs 1 through 8, are those the actual recommendations that resulted from the investigation and that were made to and accepted by Dean Charney?

A. I believe so.

Q. Is this word for word what was said

figure out whether he is improving or not?

A. I don't know.

Q. Was he told what the consequences would be if he didn't improve?

A. I don't know.

Q. Number 2 in this document reads, quote: The institute should be reorganized, including removal of Berman and Knaup. Knaup can be offered a position in another area of Mount Sinai, closed quote.

That happened, right?

A. Yes.

Q. Other than the removal of Berman and Knaup, what other, quote/unquote, reorganization occurred at the institute?

A. We put an administrator -- two administrators to help oversee the administration. We reviewed all the job descriptions and the salaries with the job discriminations to make sure that there was pay equity.

Q. Pay equity means parity of payment

turning on one another?

A. No, I don't recall that.

Q. Did -- did Ms. Jones-Winter tell you that her view was that Dr. Singh and Mr. Berman were, quote/unquote, completely turning on one another, it's wild?

Did she ever tell you that?

A. Not that I recall.

Q. You would -- you would remember that if she said that, no?

A. I don't recall.

MR. BOWEN: Okay. Let's go off the record.

THE VIDEOGRAPHER: The time right now is 3:59 p.m. We are off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: The time right now is 4:14 p.m. We're back on the record.

BY MR. BOWEN:

Q. Going back to Exhibit CT 10, number 3 reads, quote: An oversight committee

should be formed to evaluate current and monitor future institute activities, financial and academic performance and leadership. The committee should mentor Dr. Singh and take steps to ensure that the institute's atmosphere has improved, particularly as it relates to gender issues, closed quote.

Do you know who came up with that recommendation?

MS. GUERRASIO: Objection to form and objection beyond -- hold on a second.

You can testify as to whether it came from the investigation, but don't testify to anything as to the -- as to more than that.

A. It was a recommendation based on the investigation.

BY MR. BOWEN:

Q. But who -- who came up with that idea? Was that Dean Charney's idea?

A. I don't know.

Q. You don't know?

atmosphere is improved, particularly as it relates to gender issues.

Q. What were the gender issues?

A. We didn't have finding of gender discrimination, but employees that were in the institute felt that there were.

Q. That there was a gender discrimination?

A. Well, that's the claim. We did not find that, but we wanted to ensure that the atmosphere was improved so that people didn't feel that way.

Q. And how -- how was the oversight committee going to go about doing that?

A. I don't know.

Q. Did that happen before Dr. Singh left? Did the atmosphere improve as to gender issues?

A. I can't speak for the whole institute.

Q. As far as you know, as far as what you were able to observe, did it improve?

stated to him. I know that he had to make changes and it had to be remediated. We were giving him a chance to do that.

Q. But did anybody communicate to him what would happen if he didn't?

A. I don't know.

Q. Was he given a final notice warning -- excuse me -- a final warning notice? Was he given a final warning notice?

A. I don't know.

Q. But that would come from HR, no?

A. No.

Q. It would come from Dean Charney?

A. Yes.

Q. That wasn't part of the recommendation in the report, right?

A. No. Right.

Q. And you don't know whether he was given a final notice -- a final warning notice?

A. Not that I'm aware of, but I don't know.

Q. You never discussed that with Dean

quote.
That also involved HR?
A. Yes.
Q. And number 7 is, quote: The school's human resources compensation department should conduct a thorough review of all institute members' job duties, titles and compensation to ensure appropriate classification and pay parity between men and women and to ensure transparency, closed quote.
That also involved HR?
A. Yes.
Q. It involved you directly?
A. Yes.
Q. And this is, again, referring to pay parity between gender, right?
A. Yes.
Q. On those items 5, 6 and 7, those were areas where Kirsten Knaup fell short, right?
MS. GUERRASIO: Objection to form.
I am going to also object to the extent that your answer would reveal anything

that was determined in the investigation
that's outside of what is listed here.
A. It was recommendations based on our
investigation and our findings.
BY MR. BOWEN:
Q. But the fact that that hadn't
already happened was part of the reason why
Ms. Knaup was asked to leave the institute,
correct?
MS. GUERRASIO: Objection to form.
A. I don't recall.
BY MR. BOWEN:
Q. Isn't that also a failing of HR,
that HR failed to exercise the extent of
oversight it should have of the institute before
the investigation?
A. No.
Q. No?
A. No.
Q. You don't take any responsibility
for how Dr. Singh didn't, quote/unquote, closely
standardize institute policies and practices

regarding promotions and hiring or follow recruiting policies, including posting of positions?

A. We believe he did.

Q. You thought that he did?

A. Yes.

Q. But it turned out he didn't?

A. Based on our investigation.

Q. And that's not a failure of your department, HR?

A. Not if we didn't know about it.

Q. Who was supposed to tell you? Kirsten Knaup?

A. Or Dr. Singh, yes.

Q. And you don't have responsibility to review what they're doing to make sure it's in compliance with what the -- with what Mount Sinai requires?

MS. GUERRASIO: Objection to form.

A. We do have responsibility if we are aware.

Q. It would just be either you or Clarissa Jones-Winter?

A. No. There are other people in my department that handle HR operations.

Q. But Ms. Knaup lost her position with the institute, right?

A. Based on the investigation.

Q. Nobody else in HR was disciplined in any way for Ms. Knaup's failures?

A. No.

Q. And you think that's fair?

A. Yes.

Q. Number 8 says, quote: A communication plan explaining the changes in the institute and providing some details regarding the results of the investigation should be developed to communicate with relevant internal and external stakeholders. This will include a plan of communication with the complainants and the Arnhold family, closed quote.

Whose idea was that?

MS. GUERRASIO: Same objection as

Was it true that people were very angry he wasn't being terminated?

A. I didn't speak directly with anybody to know that.

Q. Had you heard that people were angry that Dr. Singh was not being fired?

A. I had heard that.

Q. Does this refresh your recollection that you, along with Dean Charney, were speaking with Dr. Singh on July 2nd?

A. No, because this doesn't make sense. I mean, the dean and I -- it says the dean and I were speaking with Prabhjot. If we did speak with him, I don't recall speaking with him about this. But I certainly -- none of this makes sense where we would reach out to 20-plus complainants. This does not make sense to me.

Q. Well, is it the case that you were with Dean Charney when he said to Dr. Singh, how did people learn about the recommendations in the report?

A. I don't recall him asking Prabhjot

Q. Did you take notes while people were being interviewed as part of the investigation?
A. Yes.
Q. And hand -- long hand like these?
A. Yes.
Q. Did you keep them?
A. Yes.
Q. Did you review them before you came in here to testify?
A. No.
Q. And you know that -- you -- you eventually got another report about Dr. Singh from Mr. Khan, right? That's K-H-A-N. After the investigation was over.
Do you remember that?
A. I received it?
Q. Yeah.
A. I don't recall.
Q. You don't recall Mr. Khan coming to talk to you about his concerns about Dr. Singh?
A. No.
Q. At all?

CERTIFICATE OF SHORTHAND REPORTER

NOTARY PUBLIC

I, Monique Cabrera, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 8th day of August, 2024.

MONIQUE CABRERA
Notary Public in and for the State of New York
County of Suffolk
My Commission No.
Expires: 06/12/2026

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE
Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.
Witness Name: Caryn Tiger
Deposition Date: August 8, 2024

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):
( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.
( x ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

9/23/24 Caryn Tiger Paillex
DATE WITNESS SIGNATURE

9/23/24 Michelle T. John
DATE NOTARY

MICHELLE T JOHNSON
Notary Public - State of New York
NO. 01JO6221958
Qualified in New York County
My Commission Expires May 10, 2026

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202)232-0646

ERRATA SHEET

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al. Witness Name: Caryn Tiger

Deposition Date: August 8, 2024

| Page No. | Line No. | Change |
|---|---|---|
| 11 | 19 | "NBU" not "MB" - Transcription error |
| 12 | 17 | "kinds" not "kind" - Transcription error |
| 12 | 17 | "on" should be " " - Transcription error |
| 18 | 4 | "labor" not "laborer" - Transcription error |
| 30 | 12 | "Silberstein" not "Silverstein" - Last name spelled incorrectly |
| 31 | 1 | "Silberstein" not "Silverstein" - Last name spelled incorrectly |
| 89 | 2 | "role" not "position" - Clarity |
| 105 | 10 | "in the department" not "in the" - Clarity |
| 182 | 12 | "specific" not "specifics" - Transcription/Grammar |
| 256 | 20 | "descriptions" not "discriminations" - Transcription error |
| 271 | 17 | "Yoori" not "Yuri" - First name spelled incorrectly |
| 291 | 12 | "advisor" not "advise" - Grammar |

Caryn Tiger Paillex          9/23/24

Signature          Date