# Exhibit 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| DR. STELLA SAFO, GERALDINE LLAMES, AMANDA MISITI and EMILIE BRUZELIUS, Plaintiffs, | ) | CASE NO. 1:19-cv-03779-VSB-JW |
| -against- | ) | |
| DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA and ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI, Defendants. | ) | |

*** CONFIDENTIAL TRANSCRIPT ***
INCLUDES ATTORNEYS' EYES ONLY PORTIONS
VIDEO-RECORDED DEPOSITION OF
JEB WEISMAN, Ph.D.
Glenn, Agre, Bergman & Fuentes, LLP
1185 Avenue of the Americas
22nd Floor
New York, New York 10036
06/21/2024
9:42 a.m. (EDT)

REPORTED BY: MONIQUE CABRERA

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

large the staff was, about the skill sets of the staff, about any deadlines or timelines associated with it, and about the long -- perceived longevity or the anticipated longevity of the project because I didn't want to leave my existing job if I wasn't going to have a job in six months.

Q. And what did Dr. Singh tell you about the staff working on the project?

A. He told me -- I had -- I had met them earlier in the day. It was large group of people. I met many of them. There was sort of a group demonstration of ATLAS.

He said that they were -- it was a very smart group of people that -- that I would have the opportunity to evaluate and hire new positions if that was necessary. That was the bulk of the discussion.

Q. Did you discuss your predecessor in the role with Dr. Singh?

A. No. In fact, that was always a murky sort of topic. I knew he had left. But it

had been a very different role, so there was no real parallel.

Q. How was it different?

A. I think his title was chief technology officer, which is a very broad-based position in the technology world, whereas this was director of a very focused project.

Q. You understood, though, didn't you, that part of Dr. Faghmous's role was to oversee the same project that you were being interviewed for hire, correct?

A. I understood it was within his portfolio, yes.

Q. So no matter what else he did, you were taking over from him in terms of leadership of the ATLAS project, right?

A. Of ATLAS specifically, yes.

Q. What did you understand about the project's status when you were interviewing?

A. That a great deal work had been done on it, that the -- my goals were to -- would be to complete the software project, have the team

any discussion about that?
A. No.
Q. Was it Dr. Singh who offered you the title of director for ATLAS?
A. Director of ATLAS, yes.
Q. Were there any other terms that had to be worked out between you and the school regarding your employment?
A. Nope, just the start date.
Q. And that was in April of 2018, right?
A. Correct, correct.
Q. Did you have the sense that Dr. Faghmous had already left by the time you began your interviews in October of 2017?
A. Yes, I did.
Q. Do you know when he left?
A. Someone -- one of the staff members told me it was in September, I think.
Q. Did you go through a formal onboarding process?
A. Yes, I did.

made my living at it. I do not code now.

Q. And when you were coding, what coding languages were you proficient in?

A. I learned -- I began in machine language, basics Steam stuff, working early in the '70s in that. My principal language was C. C, as in the letter. C, which was particularly efficacious because I was Unix systems administrator for many, many years.

I worked in Oracle programming. I worked in -- the last of my sort formal official make money at it programming was when Java came out. Though Java's an independent language, it is derived from C.

I can still read code. But by that point, I had become senior administration, so it was my job to support my coders and not to do the coding anymore, though I did help with problem solving and co-developed a number of, I would like to think, innovative solutions.

Q. And the ATLAS project, at the time at least of your hire, had a software component

to it, correct?
A. Correct.
Q. Had any code been written by the time you joined?
A. Yes, quite a bit. It had actually been demonstrated to me. Components of it had been demonstrated to me.
Q. Was there like a beta release of it ready?
MR. MCLEOD: Objection. This is part of the of protective order, the actual functionality and details of ATLAS.
MR. CERVENKA: I'm not asking about a functionality of it. I'm just asking for the status of it when he joined.
Are you instructing him not to answer?
MR. MCLEOD: I'm instructing him not to answer.
(Whereupon, a request for Instruction not to answer was made.)
MR. CERVENKA: On the basis of the

protective order?

MR. MCLEOD: Yes. Topic 7. You're asking for specifics about a beta release.

MR. CERVENKA: Can we mark this question?

THE REPORTER: Sure.

MR. CERVENKA: Thank you.

(Whereupon, a request for Mark unanswered question was made.)

BY MR. CERVENKA:

Q. Do you know who wrote the code of the ATLAS project at the time you joined?

A. Members of the ATLAS team.

Q. Jointly or were there or any specific ones?

A. I didn't know who wrote specific code for specific pieces at that point, no.

Q. Is your title still director of ATLAS?

A. No, it is not.

Q. What did you cease being director of ATLAS?

Q. Did you report this to somebody else?
A. I may have. I honestly don't remember.
Q. You may have or you don't remember?
A. I don't remember.
Q. You don't remember.
Do you remember talking to Mr. Berman about it?
A. I do not remember.
Q. Do you remember talking to Dr. Singh about it?
A. I do not remember.
Q. Do you remember talking to Ms. Llames about it again afterwards?
A. Again? No.
Q. So you weren't that concerned about the report of Mr. Berman yelling at Ms. Llames; would that be fair to say?
A. No.
Q. It wouldn't be fair to say or you weren't concerned?

anybody else -- sorry.
Have you seen Mr. Berman make somebody cry?
A. I have not.
Q. Did you report this to somebody else, the fact that you had learned from Ms. Llames that Mr. Berman had made Mr. Baum cry?
A. I don't recall.
Q. Do you recall if Ms. Llames reported these two incidents to you at the same time?
A. Yes.
Q. And was that before the investigation was concluded, as far as you know?
A. I believe so. I don't know when the investigation concluded, so I can't say for sure.
Q. Did Mr. Berman bring up allegations about his yelling as being part of the reason why he's leaving?
A. We didn't discuss that.
Q. You did discuss his leaving, though, right?
A. Correct. He told me that he was

Q. What form did that training take?
A. It was part of an overall training. It was that if you felt you were a victim of discrimination, there were a number of routes to report it. That as a manager, if you had a staff person who was reporting discrimination to you, that there was a chain to follow.
Q. Was it online training?
A. No. It was a group session.
Q. In person?
A. Yeah. It was a lecture, a talk.
Q. With a PowerPoint of some sort?
A. I don't remember a PowerPoint, but it may have been.
Q. And it was group session, so other new hires were taking the training at the same time as you?
A. Correct. It was a large diverse group.
Q. Did the training include relaying of expectations on managers around reports of discrimination that they may receive from their

staff?

A. That if we received reports of discrimination, yes.

Q. Did you receive any reports of discrimination?

A. No.

Q. Did you consider Ms. Llames's reports to be a report of discrimination?

A. Because it was both her and a male staff member, it was a report of bad behavior, but not of discrimination.

Q. So the two incidents kind of canceled each other out in your mind?

A. One, if it had been just Ms. Llames or if it had been three people with some other characteristic, I would have considered it discrimination. But because it was someone yelling at people and didn't have any specific gender or ethnic or other association, no.

Q. You didn't know if Mr. Berman yelled at Mr. Baum, right?

A. Correct.

with the ATLAS team, correct?
A. Not once I was in charge, no.
Q. Were there all-staff meetings at the institute once you started?
A. Yes, there were.
Q. How frequent would those be?
A. I couldn't honestly -- honestly answer that.
Q. Weekly?
A. I couldn't honestly answer that. I honestly don't know.
Q. Okay. And did part of your work involve any communications with donors to the institute?
A. Yes.
Q. Grant-making organizations?
A. Yes.
Q. Did you make presentations to donors about the status of the project?
A. Status, no. About the capabilities, the potential, and the functionality, yes.
Q. Would you have brought your team or

raised by a mother and a sister, on a farm with female animals. I went to a women's college. So it's just not something that's part of my life vocabulary.

Q. And is it an offensive word?

A. It could be.

Q. Would one of the instances in which it would be offensive be when it's used to refer to a female colleague?

A. It would be.

Q. Did you ever hear Mr. Silva talk about women being on their periods?

A. No.

Q. Was whether or not a woman was on her period a topic of discussion at the institute, as far as you know?

A. Never in any conversation I was involved in.

Q. Would those kinds of conversations again be inappropriate in the workplace?

A. I think in many cases it would be.

Q. Could the use of these terms

contribute to a hostile work environment for women?

MR. MCLEOD: Objection to form.

You can answer.

A. They could be, absolutely.

BY MR. CERVENKA:

Q. Have you ever heard anything from Dr. Singh about Dr. Safo?

A. No.

Q. Did you understand her to have been a leader at the institute?

A. I did not know that.

Q. Was she a topic of discussion at all when you were working there?

A. No. I remember hearing from time to time Stella had done that, or whatever. But that's the limits of my knowledge.

MR. CERVENKA: Let's enter -- I'll enter this exhibit JWE 1.

(Whereupon, Exhibit JWE 1, Plaintiffs' first amended complaint and demand for jury trial, was marked for

Q. What about Ms. Misiti?
A. No.
Q. When you were hired, you did not supervise Dr. Bruzelius, correct?
A. That is correct.
Q. Did you later come to supervise her?
A. Yes.
Q. Do you know who supervised her before you began supervising her?
A. In part, Dr. Singh.
Q. Who covered the other part?
A. I think she was in another department at the hospital and she was also doing graduate work elsewhere.
Q. But as far as her work at the institute was concerned, Dr. Singh was her supervisor prior to you becoming her supervisor?
A. Best of my understanding, yes.
Q. Why did she become one of your supervisees?
A. Because Dr. Singh asked me to supervise her.

interpret the question. I was looking at all my staff's roles and job descriptions.

Q. When were you looking at their roles and job descriptions?

A. I started in the fall to make sure that they matched current tasks since our staffing levels had changed and because I'm always looking for opportunities to elevate staff.

Q. And was that fall of 2018?

A. Correct. And, in fact, my plan was in the new year to sit down and completely rewrite everybody's job description.

Q. Did you do this process at your own initiative?

A. Yes.

Q. Why in the fall of 2018?

A. Because I had been there long enough, because it was clear to me that things were changing throughout the institute. There was an oversight board and so on and so forth. So it felt like a good time to revisit and figure

out a -- where people sat, what the proper constellation would be, and how to take best advantage of people's skills and talents.

Q. And this was not part of the oversight committee's mandate, correct? This was --

A. Nobody asked me to do it.

Q. Nobody asked you to do it?

A. Correct.

Q. Whether or not the investigation happened or the oversight committee happened, you decided independently to conduct this review of all of your supervisees?

A. Correct.

Q. And that included Dr. Bruzelius, correct?

A. Correct.

Q. Dr. Weisman, we marked a document as Exhibit JWE 2.

(Whereupon, Exhibit JWE 2, E-mail chain Bates Number WEISMAN_000033, was marked for identification.)

Dr. Bruzelius to report directly to you in June of 2019?

A. I -- in June of 2018, you -- you --

Q. Yes.

A. -- said -- I thought you just said '19. That's all.

Q. '18, yes.

A. I had no strong feeling about it one way or the other.

Q. Did you want Dr. Bruzelius to report to you?

A. She was smart. She understood. She had data resources and there is always use -- we also had lost staff. It was unclear that I was going to regain staff, so smart people are always useful.

Q. And, in fact, she started working on ATLAS more than other projects of the institute at this time, correct?

A. I don't know that for sure. I -- I would -- I don't know how much she had worked on it beforehand. She talked a lot about -- she

success of the ATLAS project?

A. I am invested in every project I take on, yes.

Q. You were still its director when it was -- I think you said it was frozen earlier?

A. Yeah. We basically -- we didn't move forward with it.

Q. Was that concerning to you?

MR. MCLEOD: Objection to form.

A. Concerning, yes. But it didn't mean there wouldn't be a future for it or something similar. Also, the environment -- the software environment had changed in the world.

BY MR. CERVENKA:

Q. So you moved on to other work?

A. Yes. We developed new projects until we were either clear what the future of ATLAS would be or our mission changed.

Q. What was Dr. Bruzelius's role on the ATLAS project? What did she do?

A. I can't speak to prior to my joining. She looked principally at data. Later

Q. Did you ever observe Dr. Singh trying to make people quit?

A. I did not.

Q. Do you know who supervised the ATLAS team after Dr. Faghmous left and before you joined?

A. I think nominally Dr. Singh.

Q. What do you mean by "nominally"?

A. He had many other tasks going on.

Q. Did you have the hand over with Dr. Faghmous?

A. No. I never met him, and he didn't leave many documents behind.

Q. Did you have a hand over with Dr. Singh?

A. Yeah. We went through everything that -- that he could tell me about ATLAS and about the project.

Q. As far as you could tell, were you continuing the ATLAS project on the trajectory that was established by Dr. Faghmous; or did you take it in a new direction upon joining?

A. I'm not clear what Dr. Faghmous's trajectory was. As I said, he didn't leave behind much documentation. I would say I focused the traject- -- the trajectory.
Q. That you focused it?
A. Correct.
Q. Was it unfocused or just less focused when you joined?
A. Less focused.
Q. Less focused.
And the trajectory of it when you joined would have been communicated to you by Dr. Singh, correct?
A. The goals were communicated by Dr. Singh.
Q. Are you making a distinction between any of the goals being communicated as opposed to the trajectory?
A. Yeah. Since there's no defined trajectory, I would say that the -- and since I don't know what Dr. Faghmous's goals would have been.

Q. When did you consider yourself Dr. Bruzelius's supervisor?
A. My memory is sketchy on that. It was during the summer of 2018. I thought later in the summer, but this would suggest it might have been earlier.
Q. Is it your recollection that some time soon after, you exchanged the e-mails in Exhibit JWE 2, you became her formal supervisor?
A. Yeah. I would assume it was sometime in July.
Q. Did you conduct Dr. Bruzelius's annual performance evaluation --
A. I did.
Q. -- in 2018?
A. I did.
Q. What did you think of her performance?
A. I thought it was above average. I think the challenges had been that -- that the position was being redefined, that she had been part-time prior to that. But I thought she was a

A. Yes.

Q. And your overall rating for Dr. Bruzelius was that she's a strong contributor, correct?

A. Correct.

Q. And you gave her an overall rating that was rounded to two out of three, correct?

A. Correct.

Q. If you turn to page that's Bates stamped 3935, there's a category called "Resilience" towards the bottom of the page.

Do you see that?

A. Yes.

Q. And in the second column for comments, it says, quote: Emilie, perhaps more than other members of the ATLAS team, has had to adapt to changes of leadership, reporting, plans and collaborations during 2018. She has accommodated these sifting sands with grace and with a relentless desire to move with the times and do the right thing, end of quote.

Did you write that?

A. I did.
Q. What did mean when you wrote that she had to adapt to changes of leadership, perhaps more than other members of the ATLAS team?
A. To the best of my knowledge, she was the only person who transitioned from sort of having a dotted relationship to ATLAS, to being under, you know, a full-time leadership under ATLAS.
She had had a working relationship Dr. Aaron Baum that wasn't ATLAS-based and that had changed, shifted as well. So it wasn't just leadership in the structure sense, but also her roles were shifting and nobody else that I was aware of had undergone that -- that number of changes.
Q. And this review took place in October 2018, correct?
A. That's correct. I don't think she signed off on it until sometime in November.
Q. Yes. I see on the first page, the

Q. And halfway through the page, it includes a job description and the document reads: Job description for PZ 51, senior data analyst, end of quote.
Do you see that?
A. Yes, I do.
Q. Does this refresh your recollection that Mr. Mongia was a senior data analyst?
A. Truth be told, he left soon after I -- I started. So I don't really have a recollection of what his job tile was.
Q. Do you have a reason to disbelieve this document?
A. No. I -- I believe it.
Q. Is it your understanding that he was a senior data analyst?
A. It is, based on this document.
Q. And so that would be the position that you promoted Dr. Bruzelius to, correct?
A. That would be correct.
Q. Did Mr. Mongia -- let me restart that.

Q. And it appears to be split in two parts along the vertical axis, current state on the left and supported by compensation on a light blue background on the right.
Do you see that?
A. I do.
Q. Do you see the fifth person down is Emilie Bruzelius?
A. I do.
Q. And her title is data analyst 2, correct?
A. Correct.
Q. And current salary is 76,055.
Do you see that?
A. Yes.
Q. That's in the current state. And in the supported by compensation, the second half of the spreadsheet, her job title changes to senior data analyst.
Do you see that?
A. I do.
Q. And two columns further to the

headway in advancing everybody. I was looking forward to the next year and what I could do then. I was particularly excited that if we were redefining people's jobs, that we could refine -- redefine them in a way that not only advance their professional goals, but then also could help anticipate compensation opportunities.

BY MR. CERVENKA:

Q. Did you push back against any of those numbers?

A. No, I didn't -- I mean, I said is that the best we could do, and I was told, yes, but.

Q. How do you know if that's the best you can do?

A. Because I was told that's the best we could do.

Q. Who told you that?

A. Broader institutional budget requirements, the fact I had no grants at that point particularly supporting this work, and I think it might have been through Kirsten.

Q. So Kirsten told you, this is the best we can do?
A. When I asked, "Is this the best we can do," I think she said, "This is the best we can do."
Q. What about Dr. Singh? Did you discuss this with him?
A. Not that I remember.
MR. CERVENKA: Actually, why don't we take a five-minute break? I think I am getting towards the end. I just want to look at a few more exhibits. Why don't we take a quick break and come back.
THE VIDEOGRAPHER: The time right now 3:19 p.m., and we are off the record.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: The time right now is 3:31 p.m. We're back on record.
BY MR. CERVENKA:
Q. Dr. Weisman, I have a few more questions for you, and we will start with

Q. Do you know if Kirsten Knaup conducted an exit interview with Mr. Mongia?
A. I don't know.
Q. Do you know if she conducted an exit interview with Dr. Bruzelius?
A. I don't know.
Q. You didn't conduct an exit interview with her, correct?
A. We met, but we did not have an -- it wouldn't be an exit interview.
Q. What about Ms. Llames? Did you conduct an exit interview with her?
A. We met and we'd been talking, but I don't remember having a formal exit interview with her.
Q. And do you know if Ms. Knaup conducted an exit interview?
A. I do not know.
Q. Same for Mr. Humale Khan?
A. Humale Khan, I think Kirsten had left by then and so -- and Humale --
MR. MCLEOD: Actually, I object to

nonetheless, allowed questioning for protective topics to the extent that they referred to discrimination.

That was the case with the ATLAS topic 7, for example. And frankly, that's all I'm doing. I had asked him about whether he did an exit interview with three women. I'm asking him whether he did an exit interview with a man. It's a yes-or-no answer.

MR. MCLEOD: Okay. We're going to limit the questions to whether the interviews occurred.

MR. CERVENKA: Okay.

MR. MCLEOD: I'll allow those questions.

MR. CERVENKA: All right.

A. I did not.

BY MR. CERVENKA:

Q. And do you know if Ms. Knaup conducted an exit interview?

A. I think she was gone by then; but at

CERTIFICATE OF SHORTHAND REPORTER

NOTARY PUBLIC

I, Monique Cabrera, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of June, 2024.

MONIQUE CABRERA
Notary Public in and for the State of New York
County of Suffolk
My Commission No. Expires: 06/12/2026

Digital Evidence Group, L.L.C.
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

SIGNATURE PAGE

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: Jeb Weisman, Ph.D.

Deposition Date: June 21, 2024

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that:

(Check appropriate box):

( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

(x ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

8/6/2024 [signature]

DATE WITNESS SIGNATURE

8/6/2024 [signature]

DATE NOTARY

Frank Marchesano
Notary Public State of New York
Registration No. 01MA6356802
Qualified in Westchester
Commission Expires April 3, 2025

Digital Evidence Group, LLC
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202)232-0646

ERRATA SHEET

Case: Dr. Stella Safo, et al. v. Dr. Prabhjot Singh, et al.

Witness Name: Jeb Weisman, Ph.D.

Deposition Date: June 21, 2024

| Page No. | Line No. | Change |
|---|---|---|
| 39 | 17 | "Craig" not "Greg" |
| 42 | 5 | "resumes" not "r sum s" |
| 56 | 6 | "than" not "then" |
| 58 | 2 | "focus" not "focused" |
| 102 | 2 | "Uretsky" not "Gurski" |
| 140 | 1 | "working on" not "work or" |
| 143 | 8 | "speak" not "speaking" |
| 155 | 19 | "shifting" not "sifting" |
| 203 | 18 | "real-time" not "realtime" |
| 204 | 2 | "heady" not "heavy" |
| 228 | 22 | "Ky-Shana Urie" not "Kishan Nihari (phonetic)" |

8/6/2024

Signature Date