# Exhibit 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DR. STELLA SAFO, GERALDINE )
LLAMES, AMANDA MISITI and )
EMILIE BRUZELIUS, )
)
Plaintiffs, ) Case No.
) 1:19-cv-03779-VSB-JW
vs. )
)
DR. PRABHJOT SINGH, )
DR. DENNIS S. CHARNEY, BRUNO )
SILVA and ICAHN SCHOOL OF )
MEDICINE AT MOUNT SINAI, )
)
Defendants. )
------------------------------)

VIDEOTAPED DEPOSITION OF RACHEL VREEMAN
ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI 30(b)(6)
New York, New York
Wednesday, January 14, 2026

Stenographically Reported by:
KRISTIN KOCH, RPR, RMR, CRR

Bruno Silva, and here today representing the witness, Dr. Rachel Vreeman, and with me I have two of my colleagues, who I will have introduce themselves.

MS. KARAMOUZIS: Delia Karamouzis for the defendants.

MR. McLEOD: Austin McLeod, Proskauer Rose, for the defendants.

THE VIDEOGRAPHER: The court reporter will now swear in the witness.

R A C H E L V R E E M A N,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY

MR. CERVENKA:

Q. Good morning, Dr. Vreeman.

A. Good morning.

Q. Thank you for coming in today.

Dr. Vreeman, do you understand that you are testifying today on behalf of the Icahn School of Medicine at Mount Sinai?

A. Yes.

Q. Do you understand that your testimony is binding on that organization?

A. Yes.

Q. I know that Mount Sinai in general is a relatively complicated system, but if it's all right with you, I will use the term "Mount Sinai" to refer to the Icahn School of Medicine. If I need to make a distinction or if you need to make a distinction at some point, let's do that, but otherwise why don't we use the term "Mount Sinai" instead of the mouthful Icahn School of Medicine at Mount Sinai.

A. Okay. I will do the same.

Q. All right. Great. Thank you.

(MS Exhibit 1, Notice of Deposition of Rule 30(b)(6) Corporate Representative for Icahn School of Medicine at Mount Sinai (Amended), marked for identification.)

Q. Dr. Vreeman, I will mark a document as Exhibit MS 01, MS for Mount Sinai. If you can review it. I will from time to time mark documents as exhibits and they will be placed in front of you, but at the end, please leave them behind for the court reporter to collect them.

A. Okay.

MR. CERVENKA: The witness has been sworn in, right?

Resources or Labor Relations.
A. Yes.
Q. Do you see that?
A. I do.
Q. All right. So I am asking about the sub-sentence (c), right, an ISMMS employee with an obligation to report a complaint.
A. Uh-huh.
Q. Was a complaint made against Dr. Charney to an employee with an obligation to report that complaint in the relevant time period?
A. Not to my knowledge.
Q. Moving on from complaints about Dr. Charney to now complaints against Mr. Silva, in the time period were there any complaints made against Mr. Silva to Mount Sinai's Human Resources?
A. To my knowledge, in what was -- again, in my preparation for this, there were not any complaints made related to Mr. Silva to Human Resources.
Q. What about Labor Relations?
A. The same is true for Labor Relations, there were not complaints made to Mr. Silva to Labor Relations.

Q. Complaints made about Mr. Silva to Labor Relations; correct?
A. I'm sorry, yes. Yes, I'm sorry, yes, about Mr. Silva.
Q. No problem.
And were there any complaints made against Mr. Silva to an ISMMS employee with an obligation to report that complaint?
A. As far as I'm aware, there were no complaints made about Mr. Silva to this third category, an ISMMS employee with an obligation to report a complaint.
Q. And you have taken the time to gather Mount Sinai's knowledge about this topic in preparation for the deposition; correct?
A. Yes, I have.
Q. Complaints against Mr. Berman, were any of those raised to Human Resources?
A. To my knowledge, there were not complaints about Mr. Berman raised to Human Resources.
Q. And when you say "to my knowledge," are you distinguishing your personal knowledge from the knowledge you acquired during the preparation process --

this deposition?

A. That is correct.

Q. And you found out about it through conversations where counsel was present?

A. Yes.

Q. Does Mount Sinai have any records relating to this complaint against Mr. Berman?

A. No. Not -- not that -- no, there are not.

Q. It was never reduced to writing, as far as ISMMS knows?

MS. GUERRASIO: Objection to form.

You can answer.

A. As far as I know, it was never written down.

Q. Who was the complainant in this instance?

A. By that do you mean who raised the complaint?

Q. Yes. If I understand your testimony --

A. Or to whom? I didn't --

Q. If I understand your testimony correctly --

A. Okay.

Q. -- who spoke to Dr. Weisman --

A. Okay.
Q. -- with concerns about Mr. Berman?
A. My understanding is that the concern was raised by Geraldine Llames to Dr. Weisman.
Q. What was the substance of her concerns?
A. What was reported to me about the concerns, again, it's not in writing, to the best of my knowledge, was that --
MS. GUERRASIO: Objection. Hold on. Don't reveal -- your testimony cannot talk about privileged conversations. You can testify as to the information you gathered, that's perfectly fine --
THE WITNESS: Okay.
MS. GUERRASIO: -- but I don't want you to answer "what was reported to me" or "what was told to me." Okay?
THE WITNESS: Okay.
MS. GUERRASIO: You are testifying on behalf of the school. The knowledge you have is what they are looking for. So just say "what I am aware of is" --
THE WITNESS: Okay.
A. So what I am aware of is that a concern was raised that Mr. Berman had yelled at

Ms. Llames and Dr. Baum, another employee. That's what I'm aware of that was reported to Dr. Weisman.

Q. What did Dr. Weisman do afterwards?

A. Dr. Weisman did not further report that. I don't know what precisely he did afterwards. I know that there was not a subsequent -- well, to my -- to my awareness, there was not a subsequent report made after that.

Q. Do you know if Dr. Weisman did anything as a result of the concerns that Ms. Llames brought to him?

A. I do not know that he -- I do not know.

Q. And again, you have taken steps to educate yourself on this subject; correct?

A. Yes.

MS. GUERRASIO: I am going to also object to the scope of these questions, if they continue, as to what happened in the aftermath of a complaint, but I'll just put that on the record. The topic is complaints, not steps taken afterwards. She has given the testimony she has and she knows. So I will just put that objection on the record if we continue down a line of questioning that

sent an email to Ms. Tiger saying that another talented female left the institute?

MS. GUERRASIO: Objection to form.

Don't answer that. It's outside the scope of the topics you have been designated for.

MR. CERVENKA: How is that outside of the scope?

MS. GUERRASIO: The phrase you just read does not pertain to any one of the individuals in which you guys have identified as having concerns or complaints raised against.

Q. Is it Mount Sinai's position that Ms. Bischoff never reported to Ms. Tiger that she had concerns that Dr. Singh was causing talented females to leave the institute?

A. Yes, it's Mount Sinai's position that Ms. Bischoff did not report concerns related to Dr. Singh.

Q. Did Dr. Muller raise concerns to HR that the majority of people leaving AIGH under Dr. Singh's directorship were women?

A. Yes, it's my understanding that Dr. Muller brought to HR concerns about women

disproportionately leaving the institute, but what -- during that time period, but specifically about women leaving.

Q. So there were two complaints raised to HR about Dr. Singh, one by Dr. Atkinson and Dr. Anandaraja, and then this one by Dr. Muller?

MS. GUERRASIO: Objection to form. Misstates her testimony.

You can answer.

A. This was not a -- I did not say and this was not considered by Mount Sinai a complaint against Dr. Singh. It was a report as described that went to HR related to women disproportionately leaving.

Q. It was a report, it was not a complaint, am I understanding your testimony on behalf of Mount Sinai correctly?

A. Mount Sinai doesn't distinguish the report and complaint in -- in that category. The -- the sort of reporting chain for which complaints also go through is what was activated in that sense in that a concern or I guess it could be a complaint, but that went to HR one directly and one via Dr. Muller, as you said, were related to women disproportionately leaving, but

You can answer.
A. I don't know what was specifically stated by Dr. Muller, but what's -- what's -- what was conveyed for the complaint was related to the phenomena of women disproportionately leaving.
Q. And in any event, Mount Sinai did not consider that to be a complaint against Dr. Singh; correct?
A. Correct.
Q. Any other complaints against Dr. Singh in the relevant time period?
A. No.
Q. Dr. Vreeman, going back to Exhibit MS 01, Topic 1, can you tell me whether policies issued by the Icahn School of Medicine at Mount Sinai applied in the relevant time period to staff and faculty working at the institute?
A. I might need you to be more specific about like which -- which domains in terms of Topic 1, particularly because there are sometimes different policies and procedures that apply to faculty versus staff and the institute had both, and for the list of topics there, there are policies for some and not for others, so I'd need more specifics.

their titles would be, as well as discussions with supervisors, if there was a supervisor involved.
Q. What do you mean by "Dr. Singh described"?
A. I mean in my preparation for this, he described that as the practice to me. Again, because any institute director or chair would have -- in Mount Sinai's system has some discretion around how any functional titles are -- are done. That's not -- it's not laid out in writing or anything else.
Q. It is not laid out in writing; correct?
A. Functional titles are not. The procedures around, again, the institutional titling or positions are handled through Human Resources and their compensation and position control teams and that's a separate process. I am speaking specifically about staff still. Again, there is a different process for faculty members.
Q. There is a different process for functional titles within AIGH or the department between staff and faculty?
A. Potentially, yes, in the sense that a large part of a faculty member's title is determined by their appointment as -- as decided

our journey through these sub-topics.
A. Okay.
Q. And, again, the overarching question is whether or not AIGH or the department had any of their own specific policies in some fashion distinct from Mount Sinai's umbrella policies. We are on 1(l). We have finished titles for now, so I am going to ask you about position descriptions.
AIGH or the department, do they have distinct policies on position descriptions?
A. No.
Q. What about job duties?
A. Only -- I mean, each department or institute would, as I had, I think, said earlier, you know, have to come up with their -- like the specifics of what is included in the duties or responsibilities for a particular job, so in that sense I guess there are, but no policy differences that AIGH had.
Q. Nothing in writing about what procedures AIGH took to determine job duties for a particular role; correct?
A. No.
Q. And would the definition of job duties related to a functional title be also within

Dr. Singh's discretion?

A. Yes.

Q. And finally, within sub-topic (l), faculty ranks, does -- did AIGH or the department in the relevant time period have its own distinct policies as to changes to faculty ranks?

A. No.

Q. All right. Moving on to then the final sub-topic, which is office seating arrangements.

A. Okay.

Q. Any AIGH or Department of Health Systems Design and Global Health specific policies about office seating arrangements?

A. No, in terms of policies or procedures. There was a practice related to how the offices got assigned, to some extent, that was -- because the space that's there, which is the space we continue to be in, is designated by the medical school and there is a limited number of closed offices with doors within that space, and the practice was that those offices that were actual offices, meaning that they had a closed door, would be allocated to -- would be shared for associate professors and lower-rank faculty and would be not shared potentially for those who had

anti-discrimination policies?
MS. GUERRASIO: Objection to form.
You can answer.
A. The -- no.
Q. There was never, as far as Mount Sinai is concerned, a time where men -- some men working at AIGH had offices but no woman working at AIGH sat in an office?
MS. GUERRASIO: Objection. I'm also going to place an objection that there is a specific scope of this topic that was included in the judge's order and you are going beyond that with this questioning, so I am actually going to direct her not to answer.
Q. I will ask the question differently.
If -- it would be a violation of anti-discrimination policies if only man -- men sat in offices and women didn't; right?
MS. GUERRASIO: Objection to form.
A. The Code of Conduct and anti-discrimination policies would, of course, always, you know, throughout Mount Sinai in any of the, you know, activities of employees continued to be applicable. The office-related practice, as

complied with in the relevant time period as it -- let me rephrase that.

The policy that prohibits discrimination based on a person's gender or sex throughout this relevant time period was complied with as it related to office seating arrangements at the Arnhold Institute For Global Health; is that correct?

MS. GUERRASIO: Objection to form.

MR. CERVENKA: You can answer.

MS. GUERRASIO: I'm not done with my objection. As the order from the judge says, this topic shall only be testified to regarding the existence of a policy, not its application. Your -- your questions pertain to its application, so I am going to direct her not to answer.

Q. Dr. Vreeman, was Dr. Atkinson ever denied an office space because of her gender?

MS. GUERRASIO: Objection. Again, this goes beyond what the judge said you were allowed to ask about office seating arrangements. It says specifically --

MR. CERVENKA: Which page of the order are you referring to?

change with Dr. Safo and Dr. Faghmous. The others I would need to see the specific information about their salaries.

Q. You don't know if Dr. Singh's compensation changed during this relevant time period?

A. I do not.

Q. As you are testifying here on behalf of Mount Sinai, did Dr. Atkinson's compensation change during the relevant time period?

A. Again, doctor -- I know that Dr. Atkinson's -- I'm not sure how to characterize it, because some of it was outside of the department, but I know that during this time period Dr. Atkinson's one-year contract term ended and I think there was a change related to her time or effort following that.

Q. And as she was a faculty member at the time, the prior approval of the dean's office was necessary prior to the change being put in place; correct?

MS. GUERRASIO: Objection to form.

You can answer.

A. I'm not entirely sure, again, because I -- my understanding is that her primary

If you know, you can testify to it.
A. I don't know who -- that would -- I don't know for that department who had that as part of their title.
Q. If you could turn to page 3311, Dr. Vreeman.
A. Okay.
Q. It's a policy about the Faculty Disciplinary Tribunal. Do you see that?
A. I do.
Q. In section (A), who does this policy apply to?
A. Full-time faculty at the rank of instructor or higher.
Q. That would include -- that would include all of the individuals in Topic 2 that you identified as having faculty status with the exception of Dr. El-Sayed; correct?
A. Yes.
Q. Have any of those faculty members had disciplinary action imposed on them?
A. No.
Q. Did Dr. Singh have a disciplinary action imposed on him?
A. No.

MS. GUERRASIO: Objection to the form.
You can answer.
A. No.
Q. Are you aware of the -- of what the outcome of the 2018 investigation was?
A. Yes.
Q. That is not privileged information, correct, as far as you understand it?
A. As far as I understand it.
Q. Was the investigation concluded with a list of adjustments to Dr. Singh's role?
MS. GUERRASIO: Objection. What topic are we within?
MR. CERVENKA: HR complaint procedures.
MS. GUERRASIO: No. The outcome of an investigation is not an HR complaint procedure.
MR. CERVENKA: It's the outcome of an HR complaint procedure, right?
MS. GUERRASIO: The outcome of an HR complaint procedure could be an investigation, but the outcome of the investigation is not the outcome of a complaint procedure, and quite frankly, Honza, the investigation was a topic that

your office agreed to remove from this list after we told you that we would not have testimony on it.

MR. CERVENKA: Correct, that's why I am only asking about the outcome and not about the investigation itself.

MS. GUERRASIO: The outcome is not one of the topics that she has been identified to testify about.

MR. CERVENKA: She has been -- Dr. Vreeman is being identified as a representative on how Mount Sinai's policies applied to Dr. Singh.

MS. GUERRASIO: Yes.

MR. CERVENKA: All right.

Q. So was this -- was the Faculty Disciplinary Tribunal policy applied to Dr. Singh during the relevant time period?

MS. GUERRASIO: She has already answered that question.

Q. Can you repeat the answer for me, please.

A. Dr. Singh was never referred to the Faculty Disciplinary Tribunal.

Q. And he never referred himself to the

Q. The reason why I hesitated is that it appears to be perhaps listed for promotion in the investigative track, if you --
A. Oh.
Q. -- go to the page before. Am I correct in that?
A. Oh, yes, actually, you are right.
Q. All right. And so --
A. So there are different -- there are -- there are different qualifications depending on the track that you are --
Q. Thank you.
A. -- going for.
Q. And which page of this policy would have applied to Dr. Singh?
A. I believe -- I think he -- I think his initial appointment -- now I'm trying to remember -- was on the research track, which would begin on 3341, 003341, and then the associate professor/research track begins on 3343 for that track.
Q. Thank you. I appreciate that.
And it's Mount Sinai's position that Dr. Singh met the criteria listed for an associate professor in the research track; correct?

A. Yes.
Q. And it is also Mount Sinai's position that Dr. Safo did not meet the same criteria?
A. It's the determination of the appointment, promotion and tenure committee, that was their determination of where she was appointed, yes. She was appointed to the assistant professor research track.
Q. And was that because that's how the -- well, is that because that's how Dr. Singh classified the application, or is that because of how the promotions and tenure committee decided to place her?
A. The decision for rank is the decision of the promotion -- the appointment, promotion and tenure committee.
Q. It's possible for the committee to award somebody associate professor status even though the paperwork submitted by the chair or institute director is for an assistant professor?
A. Yes, or vice versa. You -- as the chair of the department, you can recommend what you think their rank would be, but it's up to the committee to decide where they fall in that, and sometimes the committee will make recommendations

and trainees, it nonetheless applied to the entire ISMMS community; correct?
MS. GUERRASIO: Objection to form.
You can answer.
A. The principles of protecting the professional learning and working environment apply to everyone. In the pages that follow this, it lays out the focus specifically for how this process works for students and trainees.
Q. In the list of bullet points, the fourth one down says that an example of mistreatment includes, quote, being -- includes -- let me rephrase that.
The mistreatment policy goes on to include examples of mistreatment and they include being, quote, "subjected to offensive remarks related to gender, sexual orientation, nationality, race or ethnicity," end of quote. Do you see that?
A. Yes.
Q. If -- a woman being called a bitch at Mount Sinai, that would fall under the mistreatment policy; correct?
MS. GUERRASIO: Objection to form. Are you asking about this 2019 policy

specifically?

MR. CERVENKA: Yes, I am.

MS. GUERRASIO: You can answer.

A. As described in the policy, examples of mistreatment would include offensive remarks and I -- I think generally that would be considered an offensive remark.

Q. Mount Sinai would consider "bitch" when directed at a woman to be an offensive remark; correct?

MS. GUERRASIO: Objection to form.

You can answer.

A. Yes.

Q. What about "cunt"?

A. That would also be considered offensive.

Q. What about a woman being called a mother hen, given how she runs meetings, would that be an offensive remark related to her gender?

MS. GUERRASIO: Objection. Can I ask what policy or topic, excuse me, we are talking about at this point?

MR. CERVENKA: Sure.

Anti-discrimination as it applied to Stella Safo.

MS. GUERRASIO: In a 2019 policy on misconduct that applies to students and trainees when Dr. Safo was no longer at AIGH?

MR. CERVENKA: I don't think -- I asked the question that I asked. Are you instructing her not to answer?

MS. GUERRASIO: I am trying to understand where your question actually pertains to the topics she has been identified for.

Q. Dr. Vreeman, prior to April 2019, did Mount Sinai allow employees to make offensive remarks related to gender, sexual orientation, nationality, race or ethnicity?

MS. GUERRASIO: Objection to form. Objection -- hold on a second, Dr. Vreeman.

She is not here to testify on what Mount Sinai allowed or didn't allow. She is here to testify what their policies were.

MR. CERVENKA: I agree. Let me rephrase.

Q. Dr. Vreeman, from 2014 to 2019, was it a policy of Mount Sinai that employees may not make offensive remarks related to gender, sexual orientation, nationality, race or ethnicity?

A. Yes.

Q. That was Mount Sinai's policy even before this mistreatment policy was posted; correct?

A. Yes.

Q. This did not change in April 2019; correct?

MS. GUERRASIO: Objection to form.

You can answer if you understand it.

A. What are you asking changed or didn't change? You just said this changed.

Q. It was against Mount Sinai policy to make offensive remarks related to gender prior to 2019; is that correct?

A. Yes. Yes.

Q. So if a woman is called mother hen, given how she runs meetings or performs her duties in the workplace, is that an offensive remark related to that woman's gender?

MS. GUERRASIO: Objection. You are asking her to make a personal decision as to whether something would fall as a violation of policy or not. That's not her role here, Honza. She is here to testify about what the policy is.

MR. CERVENKA: I will ask it differently.

Q. Dr. Safo was protected from having made offensive remarks made to her gender during the course of her employment -- well, during the relevant time period while she was employed by virtue of Mount Sinai's policies; is that correct?

MS. GUERRASIO: Objection to form.

A. Dr. Safo was protected, yes.

Q. Ms. Misiti was protected; correct?

MS. GUERRASIO: Same objection to form.

You can answer.

A. Yes.

Q. In fact, all women -- in fact, everybody at Mount Sinai, man, woman, non-binary, transgender, everybody at Mount Sinai is protected from having offensive remarks made about them because of their gender, is that true, is that how Mount Sinai interprets its policies?

MS. GUERRASIO: Objection to form.

You can answer.

A. Yes.

Q. Thank you.

What is under Mount Sinai's policies the procedure for reporting the use of "bitch" to

A. No.

Q. Okay. Are there magic words that need to be used in order for a concern that's being raised to become a complaint?

MS. GUERRASIO: Objection. Form.

You can answer.

A. No.

Q. Ms. Knaup during the relevant time period, if she wanted to report Mr. Silva's use of the word "bitch" to refer to Dr. Safo and have it be treated as a complaint, in her communication to HR or any of the other avenues that you mentioned, she wouldn't have to state the word "complaint" in order for Mount Sinai to treat it as a complaint; correct?

MS. GUERRASIO: Objection to form, and objection to the scope of that question. Ms. Knaup is not one of the individuals that she is identified to testify about. If you want to ask the question generally, she can answer, but not as particular to certain facts.

MR. CERVENKA: Sure. Perhaps that's not useful. I was trying to be helpful.

Q. Speaking generally, employee A wants to

make a complaint about employee's -- employee B's use of the word "bitch" to refer to a woman and employee A does not want this to be just classed as venting, to be classed as something less than a complaint. Employee A wants this concern to be classed as a complaint. What does Mount Sinai through its policies require employee A to do in that situation?

MS. GUERRASIO: Objection to the question.

You can answer, if you understand it.

A. There is no specific requirement for the language to be used to describe the concern. There are multiple venues and pathways by which the concerns can be raised and then they would be addressed.

MR. CERVENKA: Should we take a quick break? How long has it been? I am happy to keep on going. Dr. Vreeman, would you like a break?

THE WITNESS: I could use a quick bathroom break.

MR. CERVENKA: Yeah, all right.

THE VIDEOGRAPHER: The time right now is 4:24 p.m. We are off the record.

prohibited. I don't know the dates of this specific policy and, as we said, the specific part, but broadly, yes, it has been, as is described other places, like the Code of Conduct.

Q. And a few lines up there is a section on sexual harassment. Do you see that as defined in this policy, sexual harassment includes derogatory comments relating to gender or sexual orientation?

A. Yes.

Q. And so going back to some of the examples that we discussed before the break, a woman being called a bitch at Mount Sinai, that would -- that statement would be contrary to the anti-harassment policy; correct?

MS. GUERRASIO: Objection to form, and also she is not being represented as an expert in HR or as a person who would be interpreting these policies. She is here to testify as to what the policy is, which she has done. So I am actually going to direct her not to answer that.

MR. CERVENKA: You are directing this witness to not answer whether the use of the word "bitch" to refer to a woman is a

you tell me where you are in your list of topics?

MR. CERVENKA: I'm in -- I'm getting to a policy. You know what, I'll rephrase it, save everybody time.

Q. Dr. Vreeman, does Mount Sinai have a policy that forbids gaslighting of its staff? If you don't understand the term, we can go through what that means.

MS. GUERRASIO: I am going to object. If there is a policy you want her to look at, I would -- I'm not gonna tell you how to do your deposition. I object to the form of the question.

MR. CERVENKA: You can answer, Dr. Vreeman.

A. I don't recall if the specific term "gaslighting" is in one of the policies that I have seen.

Q. That doesn't mean, though, that Mount Sinai's policies don't cover gaslighting; correct?

MS. GUERRASIO: Objection to form.

You can answer.

A. Yeah, but the -- Mount Sinai's policies could cover gaslighting, yes.

A. The specific actions are not -- you know, there is not an exhaustive list of actions in the policy. Any hypothetical action that was treating individuals differently because of race, color, gender, as described in this, could be considered in violation.

Q. Dr. Vreeman, if you turn to page 422, there is a section on the Grievance Committee within the anti-harassment policy. Do you see that?

A. Yes.

Q. Is that a distinct grievance committee from grievance committees mentioned in other policies that we looked at, or is it a reference to one of the previous grievance committees that we have discussed?

A. I mean, we have discussed this committee previously and it is also distinct from some of the other such bodies discussed. I'm not sure which -- I'm not sure if you are referring back to the -- which one previously.

Q. There is a Grievance Committee under the Faculty Handbook; right?

A. Yes. I -- I can't remember what it's called specifically, but yes.

Handbook, though, I believe.
Q. And Mount Sinai interprets this policy as encompassing jokes that are degrading or humiliating; correct?
MS. GUERRASIO: Objection to the form of the question.
You can answer.
A. Mount Sinai does not tolerate behavior broadly that is considered I believe your words were degrading or humiliating.
Q. And saying it was a joke doesn't make the conduct in question outside of the scope of this policy, correct, this policy specifically includes jokes that are degrading or humiliating?
MS. GUERRASIO: Objection. I am objecting to the question to the extent it's asking for a qualitative assessment of this.
If you -- you can testify as to what falls under the policy, that's fine.
A. I mean, as the Code of Conduct states, degrading or humiliating jokes, among the other things described there, are not acceptable.
Q. And if made in the workplace, constitute a violation of this policy; correct?
A. Yes.

Q. On page 000328, there is a section called Obligation to Report. Do you see that?

A. Just a moment. Yes, I see.

Q. What obligation does somebody employed by Mount Sinai have under this Code of Conduct to report humiliating or degrading conduct?

A. They have the responsibility to report any activity that appears to violate the Code of Conduct.

Q. Which includes degrading or humiliating jokes, slurs, intimidation or other harassing conduct; correct?

A. Yes.

MS. GUERRASIO: Objection to form.

A. Yes.

Q. Who are Mount Sinai employees required to report any such activity to?

MS. GUERRASIO: Objection to form.

You can answer.

A. There is a chain of command as described here as well in this, but there is also the other -- there are other options for reporting that are not all laid out in this Code of Conduct, as we reviewed in some of the other things: The hotline, the Grievance Committee, the other

entities as well.

Q. I appreciate that. Within the scope of this Code of Conduct, who do individuals report their concerns to?

A. It -- it's laid out that there are quite a number of options for that. They are -- there is the indication that staff should first make a report, if possible, to their supervisor or department manager, but that there is also the option to make a report directly to any of the list of departments at the end of the book, which again includes Human Resources, legal affairs, the corporate compliance office, and there are some -- there is a list. There is the compliance number is listed there, as well as that set of -- legal affairs, finance, corporate compliance, development, Human Resources, government affairs, marketing, press, et cetera.

Q. And failure to make an appropriate report under the Code of Conduct may result in disciplinary action; correct?

A. Yes.

Q. Have any of the individuals listed in Topic B been found to have failed to make an appropriate report under this Code of Conduct?

MS. GUERRASIO: In Topic B?
Q. Sorry. In Topic 2. Thank you.
Should I -- should I repeat the question?
A. Yes.
Q. Individuals (a) through (k), with the exception of (i), which is Dr. El-Sayed, have any of these individuals been found in breach of their obligation to report under the Code of Conduct?
A. No.
Q. Who ensures that the Code of Conduct is being complied with?
MS. GUERRASIO: Objection to form.
You can answer.
A. It's an extremely broad set of people, since it applies to everyone and everyone has the ability to report breaches of the Code of Conduct. So in that sense, everybody ensures that it's complied with. I mean, everybody involved with the Mount Sinai health system, including the School of Medicine.
Q. Dr. Vreeman, does Mount Sinai allow employees to negotiate the terms of their contract before they are finalized and they end up getting hired?

A. Yes.

MS. GUERRASIO: Objection to form.

You can answer.

A. Yes.

Q. Women, as well as men, are allowed to negotiate the terms of their contract?

A. Everyone is allowed to negotiate the terms of their contract.

Q. An institute director's refusal to allow a woman to negotiate the terms of their contract while allowing men to negotiate their contracts, would that be a violation of Mount Sinai's anti-discrimination policies?

MS. GUERRASIO: Objection to form.

Also, calls for a hypothetical.

You can answer.

A. There are several layers of hypothetical there in part because an institute director wouldn't necessarily be the one with whom the contract would need to be negotiated and there are somewhat different processes for staff and faculty, however, if differential treatment was happening on the basis of gender, then that would be considered discrimination, as we described before in terms of how the policy is applied

general then, not to talk to other people at AIGH. Please identify for me what -- what topic that falls under. I mean, there is a whole lot of context that could come with that question that you are not giving to tell if it falls even under any of this.

Q. Did Dr. Singh treat Dr. Safo differently from Dr. Kishore because of her gender?

MS. GUERRASIO: Objection to form. Objection to the -- it's outside the scope of what Dr. Vreeman is here to testify to.

MR. CERVENKA: Are you instructing her not to answer?

MS. GUERRASIO: I don't even understand the question and how she could be expected to answer that type of a question.

MR. CERVENKA: And are you allowing her to answer, or are you instructing her not to answer?

MS. GUERRASIO: Can you read the question back to me.

(Record read.)

MS. GUERRASIO: With respect to what? Compensation, bonus, hiring? I mean, you

have to actually give some framework for her to answer.

MR. CERVENKA: Sure. That's fine. As regards to compensation.

MS. GUERRASIO: You are giving her questions that are not fair to the witness. I mean, you are -- you are creating a situation where this could apply to a hundred different things. How could you expect her to answer that question and all of the questions you are posing about a specific factual scenario that may exist in your mind but which she does not have any obligation to know about.

MR. CERVENKA: I disagree with just about everything that you said, but I can focus it.

Q. As regards to -- as regards to compensation, did Dr. Singh treat Dr. Safo differently from Dr. James Faghmous because of her gender?

MS. GUERRASIO: Objection. If you want to ask Dr. Vreeman whether the policies and procedures that she has talked about about compensation were applied to Dr. Stella Safo,

I have no problem with that, but if you want her to testify about a qualitative assessment of how someone applied different policies to different people, that's not what she is here to testify about. I am going to instruct her not to answer.

MR. CERVENKA: Okay. You can instruct her not to answer when you feel that my question is improper.

Q. Dr. Vreeman, did doctor -- did Mount Sinai's anti-discrimination policies apply to Dr. Safo?

A. Mount Sinai's anti-discrimination policies apply to all faculty members, including Dr. Safo.

Q. That entitled her to protection from discrimination; correct?

A. Yes.

MR. CERVENKA: Why don't we take a quick break.

THE VIDEOGRAPHER: The time right now is 5:40 p.m. We are off the record.

(Recess was taken from 5:40 to 6:04.)

THE VIDEOGRAPHER: The time right now is 6:04 p.m. We are back on the record.

MS. GUERRASIO: Honza, I just want to, before I forget, reserve the witness' right to review the transcript after the deposition, and I don't know if I need to put this on the record, but the policy that you had asked me about at one point, the end -- the renewal date was not until 2020, so it was in existence the entirety from 1/2018 through the end of the relevant period.

MR. CERVENKA: Okay. So 1st of January 2018 to the end of the relevant time period?

MS. GUERRASIO: Yes.

MR. CERVENKA: Okay. I will refer to that policy in just a moment. Thank you for clarifying that.

BY MR. CERVENKA:

Q. Dr. Vreeman, what knowledge does Mount Sinai have of the review it conducted into Dr. Bruzelius' job duties, titles and compensation to ensure appropriate classification and pay parity? This is Topic 4 on the list of topics today.

A. In -- I am trying to remember the exact dates. In 2018, a review was undertaken of all staff members within AIGH related to their job

duties, both their functional and institutional titles, as we talked about before with those two, and their current level of compensation. As part of that review of all of the staff members, Dr. Bruzelius' job duties, titles and compensation were also reviewed at that time.

Q. Was -- did Mount Sinai compare Dr. Bruzelius' job duties, titles and compensations to other Mount Sinai employees to ensure appropriate classification and pay parity?

MS. GUERRASIO: Objection to form.

You can answer.

THE WITNESS: Okay.

A. The review for Dr. Bruzelius and all of the staff went through the central compensation and position control reviews, which essentially do benchmark that to, again, the -- the overall classifications for those positions and then the pay bands for those, so that would be yes.

Q. Okay. Thank you.

Who were the individuals that Dr. -- Mount Sinai compared Dr. Bruzelius' job duties, titles and compensation with?

A. It's not a comparison to specific individuals. It's a comparison done centrally for

the individual, in this case Dr. Bruzelius' job duties, expertise, titles, compensation, to the standards for those positions. So position control and finance don't include a list of individuals. They have those as overall positions and compensation bands.

Q. Did they use the functional titles or the institutional titles for this review?

A. They used the institutional titles.

Q. Did the Mount Sinai institution employ other people with the same institutional title as Dr. Bruzelius at that time?

A. Yes.

Q. Do you know how many?

A. No.

Q. Was Dr. Bruzelius' salary -- let me rephrase that.

Did Mount Sinai at the end of this process conclude that Dr. Bruzelius' compensation was appropriate?

MS. GUERRASIO: Objection to form.

You can answer.

A. At the end of the review, Dr. Bruzelius' salary was increased.

Q. Why was it increased?

A. Based on -- it was increased based on her current duties and -- I'm trying to remember honestly if her degree was finalized at that point or not. I know she was in process. There was a spreadsheet that included the reviews and the -- and the details that were included for -- for each of the -- the staff, so we can refer to that if -- if you want, but it was increased at that time.

Q. Was Dr. Bruzelius the only person with her institutional title whose salary was adjusted as a result of this process?

MS. GUERRASIO: Objection.

A. There are a few different parts of that. She was not the only person whose salary was increased at that time.

Q. I understand.

Were there people with the same institutional title whose salaries were also adjusted?

MS. GUERRASIO: Objection. This goes beyond the scope of Topic 4 as it's written.

If you know the answer, you can answer, Dr. Vreeman.

A. I -- I don't remember. I don't think there was anyone else with her institutional title

in that review, but I'd have to look at the list of who was reviewed to confirm whether anyone else in the department also had the same institutional title as Dr. Bruzelius.

Q. To clarify, the review wasn't done just against other people with the same institutional title in the same department; correct?

A. Correct. It was done against the school's entire set of -- of people for -- for that position and the salary band established by the school, not for the department.

Q. So a person with the same institutional title regardless of what institute, department, school, whatever corner of the Mount Sinai universe they worked in, if they had the same institutional title as Dr. Bruzelius at the time of this review, Dr. Bruzelius' compensation was compared with theirs; correct?

MS. GUERRASIO: Objection to form.

You can answer.

A. It would have been compared with -- well, the review was both to determine if based on her titles -- her job duties and expertise that was still the positional title that fit, and that is compared to the school's standard for that

positional title.
Q. Did the school determine that the institutional title was appropriate for Dr. Bruzelius?
A. Again, I'd like to refer to the spreadsheet. I think hers did change at that time.
Q. Was that a promotion or a demotion?
A. A promotion.
Q. Was Dr. Bruzelius' compensation prior to this review in violation of the school's discrimination -- anti-discrimination policies?
MS. GUERRASIO: Objection to form.
You can answer.
A. The -- I mean, it --
MS. GUERRASIO: Testify based on your knowledge.
THE WITNESS: Okay.
MS. GUERRASIO: If you don't know, just say you don't know.
A. I don't know. Compensation -- there would be a lot of context for that determination to be made as to whether or not it was related to discrimination. What I know is that it was reviewed in comparison with the position control

and compensation centrally at that point, and then she -- I believe the institutional title was changed to a senior data analyst, but again, I wouldn't mind referring to the spreadsheet to get the term right for the positional title.

Q. The purpose of the review was to ensure pay parity based on gender; correct?

MS. GUERRASIO: Objection. Mis- -- hold on. Objection. That has not been the testimony, so I'm not sure where that characterization comes from.

You can answer the question.

A. The purpose of the review was to ensure that job duties, positional titles and compensation were appropriate for all staff members of the institute.

Q. And that there is pay parity in terms of compensation for staff at the institute; isn't that right?

MS. GUERRASIO: Objection. Objection to also the form, the use of that term.

You can answer if you understand it.

A. I'm not sure I understand. I mean, they were -- they were trying to make sure that every individual had an appropriate title and

(Record read.)
MS. GUERRASIO: You can answer it, and note my objection to the form of the question.
A. Yes, in the sense that that's why there is a standardized process for compensation and position control review, so yes.
MR. CERVENKA: Dr. Vreeman, I am going to mark a document as Exhibit MS 7.
(MS Exhibit 7, Mount Sinai Employee Handbook, Bates stamped ISMMS_026960 through ISMMS_026975, marked for identification.)
Q. It's a document Bates stamped ISMMS_026960. It's titled Mount Sinai Employee Handbook. Do you see that?
A. Yes.
Q. Are you able to confirm whether this is the policy that your counsel at the beginning of this session after the break confirmed that was in effect from 2018 until the end of the relevant period?
A. Yes.
Q. Who does this policy apply to?
A. This policy applies to employment of the Mount Sinai health system, which includes

Is it Mount Sinai's policy that an employee who seeks a promotion of the institutional title must demonstrate an ability to perform the duties associated with the sought promotion for a year prior to actually getting the promotion?

MS. GUERRASIO: I'm sorry. Salt promotion?

MR. CERVENKA: Sought, S-O --

MS. GUERRASIO: Oh, sought.

MR. CERVENKA: Yeah.

MS. GUERRASIO: I'm sorry.

Objection, but if you understand it, that's fine, you can answer.

A. That -- that is not specified as a policy.

Q. Thank you.

Does Mount Sinai allow supervisors to comment to the clothing of their supervisees?

MS. GUERRASIO: Objection. Are you asking about a policy? If so, can you identify for me what topic this falls under?

MR. CERVENKA: Yes. We are talking about a policy, and I believe it falls under 1(g), and if it's helpful, it refers to

this document says, quote: "Amanda is worried he may use the incident against her in some way in the future, it reminded her of prior incidents from the past were he emotionally manipulated the staff and she wants to take care that she's not getting caught in that again," end of quote. Do you see that?

A. I do.

Q. Do you see that in sentences above the one that I just read out, there are multiple references to PS?

A. Yes.

Q. Are those the initials of Dr. Singh?

A. Those are the initials of Dr. Singh.

Q. It's Mount Sinai's position that this was not a complaint by Ms. Misiti to HR about Dr. Singh; correct?

A. Yes.

Q. This was not a complaint?

A. This was --

Q. I'm not sure if this was another one of those double-negatives.

A. This -- this was not a complaint -- this was not seen by Mount Sinai as a complaint in the -- in this -- I don't know if this falls into

the -- into the time frame of the ongoing investigation, because I, again, didn't have the context of what was happening during that period, but this was not among the -- the list of complaints that were -- that Mount Sinai had as a complaint in that sense.

Q. I think your counsel would probably have claimed privilege over it if it had.

A. Okay.

Q. I can't put words in your mouth, but while not being treated by Mount Sinai as a complaint against Dr. Singh, this does amount to Ms. Misiti raising concerns to HR about Dr. Singh; correct?

MS. GUERRASIO: Objection to form.

You can answer.

A. Yes.

Q. What's missing from the way how Ms. Misiti's concerns are relayed here from a classification of this meeting as one of Ms. Misiti raising a complaint against Dr. Singh?

MS. GUERRASIO: Objection. Again, she has already testified about the fact that -- how the policy is applied and what's required under the policy. You are asking her about a

fact-specific question, not how the policy is applied or not applied to these individuals.

Q. Is there -- is there a policy that determined whether these concerns amount to a complaint or not?

MS. GUERRASIO: I don't understand that question, so I am going to object.

If you understand it, you can answer.

A. There is not a policy that lays out what constitutes a complaint. There -- in the policies as we described, there are -- there is -- you know, there are some specific examples and so on, but in terms of, you know, what is missing from words or definitions in -- in a given scenario, that is not in a policy.

(MS Exhibit 9, message dated 7-1-2015, Bates stamped ISMMS_005841, marked for identification.)

Q. Dr. Vreeman, you have been handed a document marked as Exhibit MS 9. Do you see that it's -- have you seen this document before?

A. Yes.

Q. You have?

A. Uh-huh.

Q. In preparation for this deposition?

A. Yes.

MS. GUERRASIO: Review the whole email --

THE WITNESS: Okay.

MS. GUERRASIO: -- or whatever is, the whole document.

Q. Do you see at the final paragraph there is a line, quote: "She spoke to Caryn Tiger about some of this already, but wanted to formally put her concerns on record now because PS is increasingly dismissive." I will end the quote there. It continues. Do you see that?

A. Yes.

Q. Is it Mount Sinai's position that this too -- that -- let me rephrase.

Did this amount to a complaint against Dr. Singh?

A. No.

MS. GUERRASIO: I am going to object again to you are asking this witness to make -- to testify about assessments that were made by HR individuals in the moment at that time. She has already testified that there were no other complaints against Prabhjot other than the one that led to the

investigation. You are asking her to assess what an HR individual determined in that moment. Mount Sinai has given you its position.

MR. CERVENKA: And I'm not going to debate you on that, but I note what you said.

Q. Mount Sinai did not treat this as a complaint, despite it stating that Ms. Rahona wanted to, quote, "formally put her concerns on record," end of quote; is that right?

A. Mount Sinai did not treat this as a complaint, correct.

MR. CERVENKA: Let's take a quick break. I have a few questions, but not many. Thank you.

THE VIDEOGRAPHER: The time right now is 6:47 p.m. We are off the record.

(Recess was taken from 6:47 to 7:02.)

THE VIDEOGRAPHER: The time right now is 7:02 p.m. We are back on the record.

(MS Exhibit 10, email dated 2-27-2015, Bates stamped ISMMS_009288 and ISMMS_009289, marked for identification.)

BY MR. CERVENKA:

Q. Dr. Vreeman, you have been handed a

A. Yes.
Q. And the rest of the page appears blank?
A. Yes.
Q. Does Mount Sinai -- do Mount Sinai's anti-discrimination policies apply to Dr. Singh multiple times restricting Dr. Safo's ability to speak publicly?
MS. GUERRASIO: Objection. I am going to reiterate my prior objection. I am going to direct her not to answer. Prabhjot, you are -- I apologize. Honza, you are asking Dr. Vreeman fact-specific questions, quite frankly, some of which may or may not have part of an investigation that was a privileged investigation in which Mount Sinai made a determination as to whether there was a violation of policy. You are asking her on behalf of Mount Sinai to now testify about some of what could have been the very same allegations that were in the investigation which the court has already deemed privileged. You want her as Mount Sinai to reveal what its assessment was that was part of a privileged investigation. She is not going to testify in that manner. That's what

all of these questions are directed toward.

MR. CERVENKA: I want to make sure that I understand your position correctly, Edna. Is it your position that it's improper for me to ask questions about allegations that were investigated by Mount Sinai in the course of its investigation that the court has declared privileged?

MS. GUERRASIO: It is improper for you to ask about a Mount Sinai determination which has been deemed privileged in the allegations, whether they were part of the investigation or not, as to whether that would be a violation of Mount Sinai policy. I assume that's what your question is.

MR. CERVENKA: I think that's the wrong assumption. I am not asking Dr. Vreeman to testify as to what conclusion Mount Sinai reached in the course of its investigation about this topic.

MS. GUERRASIO: That's -- you are asking her to testify as Mount Sinai as to whether this would be a violation of its policy, which is exactly what the investigation was, which has been deemed

privileged.

MR. CERVENKA: So Mount Sinai is not going to take a position on the record as to whether its policies were breached in the context of the allegations in this case?

MS. GUERRASIO: Are you asking me or are you making a statement?

MR. CERVENKA: I'm asking you. I want to make sure I understand.

MS. GUERRASIO: Mount Sinai is not relying on its investigation for its defense. We are all aware of that. That representation has been made to the court, it has been made to you on numerous times.

MR. CERVENKA: And that's why I am not asking about the word "investigation." I'm not even sure -- it's been a long time since the word "investigation" was mentioned. If there is -- if there is part of Mount Sinai's knowledge that is privileged and, therefore, not appropriate for Mount Sinai's corporate representative to disclose in a deposition, that's -- that's, of course, fine, but you said at the onset of this deposition that Dr. Vreeman, in fact, knows nothing of the

investigation. Fair enough. Not a problem for me, because I am not asking her questions about the investigation. I didn't ask did Mount Sinai consider this as part of its investigation.

MS. GUERRASIO: You are asking her as the Mount Sinai representative to opine as an opinion as to whether a certain statement conduct would violate policy, which is undermining the privilege that has already been asserted by the court over that investigation in which the very same determinations were made. You are essentially trying to undermine the privilege that has already been asserted over the investigation by picking it apart with Mount Sinai in terms of each individual decision and course of conduct that could have been considered. That's not allowed. It's not appropriate.

MR. CERVENKA: I understand your position. I believe it to be phenomenally misplaced. I am aware that Mount Sinai -- that Dr. Vreeman has child care responsibilities and I don't want to drag

this out. This was, in fact, my last question in this deposition. I think it would be unfortunate for Dr. Vreeman to have to be recalled once a judge rules on this issue to provide the testimony, but if it is your instruction to Mount Sinai's corporate representative to not answer the question that I asked, then I think that concludes today and we reserve all rights to bring the manner in which you objected to my questions in this deposition to the judge's attention for a ruling, perhaps for a recall of Dr. Vreeman. That's unfortunate, but it's also okay. So to save us from wasting everybody's time, are you instructing Dr. Vreeman to not answer my question?

MS. GUERRASIO: What is your question?

MR. CERVENKA: Could you read it back, please. Thank you.

(Record read.)

MS. GUERRASIO: A, I object to the question, also because it mischaracterizes the document which it appears to be based on, but do the policies apply to Dr. Singh? You can answer that question.

A. Mount Sinai's anti-discrimination and anti-harassment policies apply to Dr. Singh.

Q. And they apply to all of his conduct at Mount Sinai; correct?

A. They would apply to all of his conduct and everybody else's, yes.

MR. CERVENKA: Thank you very much, Dr. Vreeman. I don't have any further questions.

MS. GUERRASIO: I don't have any questions for the witness.

THE VIDEOGRAPHER: The time right now is 7:14 p.m. We are off the record.

(Time noted: 7:14 p.m.)

C E R T I F I C A T E

STATE OF NEW YORK )
) ss.:
COUNTY OF NASSAU )

I, KRISTIN KOCH, a Notary Public within and for the State of New York, do hereby certify:

That RACHEL VREEMAN, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 26th day of January, 2026.

Kristin Koch
-------------------------

KRISTIN KOCH, RPR, RMR, CRR