# Exhibit 26

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------- x
DR. STELLA SAFO, GERALDINE LLAMES,
AMANDA MISITI, and EMILIE BRUZELIUS,
Plaintiffs,
-versus-
DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY,
BRUNO SILVA, and ICAHN SCHOOL OF MEDICINE
AT MOUNT SINAI,
Defendants.
Civil Action No. 1:19-cv-03779-VSB-JW
------------------------------------------ x

**Attorneys' Eyes Only**

June 6, 2024
9:40 a.m.

VIDEOTAPED DEPOSITION of CLARISSA JONES-WINTER, taken pursuant to Notice, held at the offices of GLENN AGRE BERGMAN & FUENTES LLP, 1185 Avenue of the Americas, New York, New York, before Fran Insley, a Notary Public of the States of New York and New Jersey.

JONES-WINTER ATTYS'EYES ONLY

A. Yes, it was like just note taking. Sometimes I did hand. Sometimes I typed.

Q. Do you have handwritten notes about this meeting?

A. No, because I typed them.

Q. So, you wouldn't take a handwritten note and then translate it later into a typed written one?

A. No, no. As an addendum, I will just said sometimes if I had a meeting outside of my office, I took hand notes, right, in the conference room. If I am at my desk, I would type on my computer and so that's why these are typewritten notes.

Q. Is this contemporaneously with the discussion with Ms. Rahona, or did you do it after she left?

A. It was contemporaneous.

Q. So, in this document you record that Ms. Rahona was, quote/unquote, "Looking for advice regarding her position in global health and some recent developments with the program and leadership," correct?

A. Yes.

JONES-WINTER ATTYS'EYES ONLY

Q. You also noted what she reported was an announcement by Dr. Singh that he is bringing in, quote, "New people all in their 20s and 30s but she is 40 and known to be a lesbian"?

A. Yes.

Q. Were you making an annotation of that because of the potential for discriminatory conduct and what she was relaying to you?

A. No, she -- I was contemporaneously writing what she said. So, this phrase, I am 40 and, you know, I am out I think is what she said. I wrote, known to be a lesbian but those were her words. I'm not -- you know, those were her words.

Q. She wrote down -- you wrote down everything she said?

A. Yes, I'm just take -- I mean, I'm not the best note taking. I'm not a quick typist but this would be a summary while she is sitting in front of me.

Q. So, you refer in a sentence in about the middle of that paragraph that says, "This

JONES-WINTER ATTYS'EYES ONLY

new director already indicated to her that she would receive certain information from someone other than ER, which makes her feel she is being made obsolete." Do you see that sentence?

A. I do.

Q. What was -- what is the reference to "ER"?

A. I think -- so, ER is Elena Rahona and the sentence means, I believe, the person, who is also a woman, I believe, said to Elena something like, you know, I was told that I would be receiving -- she would receive certain information from someone other than Elena. So, Elena is thinking this person should be coming to her to ask questions, to get advisement, and that person indicated to her that she would actually be going to someone else and that's why Elena is saying she felt that she might be being made obsolete if she is no longer going to be the person that this person is coming to speak to about, you know, work matters. Essentially, this person has been assigned to someone else.

Q. So, towards the end of that paragraph you record that -- again, starting all the way on the right-hand side, four lines up from the bottom of the first paragraph with the word "this." Quote, "This worries her that he may be building a case to set her up for termination or a demotion, though she has no disciplinary history. There is no one else she can go to to learn about what's happening in the department, what's planned, and she feels he does not involve her in any management planning," closed quote.

A. Yes.

Q. Was that being recorded -- or let me ask it this way. Did you view that as potentially discriminatory conduct?

A. No, no. Given the context of what she just told me of a new consultant coming in, an outside consulting group walking the floors trying to decide what the structure would be, a new director coming in with his own people, you know, having hired, this is pretty typical of what happens when new management comes into places, I think, everywhere. I did not see

this as her talking about discrimination. I think it was her feeling like what's my place going to be in this new structure.

Q. Why do you say that is typical of what happens when new management comes in? What are you basing that on?

A. I'm basing it on having come to Sinai at a time when the merger was happening and there were a lot of departments where Sinai hired outside consultancy, McKinsey or someone, outside companies to come in and meet with employees, walk the floors, look at departments to make determinations about how they should change the operations. So, in my experience, that was happening a lot at Sinai. I mean, I was someone who came in new, you know, as a part of that. So, this was not -- I didn't see this as an unusual type of thing.

Q. What do you mean it was happening a lot?

A. So, Sinai merged multiple -- you know, purchased multiple hospitals and there were a lot of departments that were merged together. Labor relations was merged. I think

JONES-WINTER ATTYS'EYES ONLY

the legal department was merged and we had outside consultants come in to talk about, you know, the best way the work should be done. A lot of people were laid off or eliminated, jobs were moved. That was really -- that was my experience coming in as well. So, she is describing, to me, this is how I am receiving this information, a consultant is there, making determinations about what should be going on there, you have a new director who has spoken to her about, you know, her job and she is worried about the changes and how she is going to fit in. That's how I received it. I did not see this as discrimination.

Q. But you are basing it on just the prior merger that you personally experienced between St. Luke's and Mount Sinai?

A. No, I'm -- number one, I'm basing it on what she has described to me but I -- at Mount Sinai that happened, at New York State Nurses Association, we had an entire Board change. I met with the consultant to talk about what my job was and that person determined whether or not my job had value and

JONES-WINTER ATTYS'EYES ONLY

if the title would change.

My mother used to work for, you know, NCR. They were in the '80s. I mean, new people came in, consultants are used and exist to look at organizational structure and changes. So, for me, Elena was describing a new person coming in, bringing their people or hiring new people who didn't seem to really appreciate what she was doing.

Q. I just want to ask you about what other mergers happened during the period that you were at Mount Sinai before July of 2015. So, it would have only been a year, right?

A. Yes.

Q. And you are saying there is at least the merger between Mount Sinai and St. Luke's?

A. Right, which happened in 20 -- I came 2014 as a part of that merger and work related to that, using consultants, I know went on for years. I mean, I think in some pieces we still have that.

Q. But other than the merger between St. Luke's and Mount Sinai in the year 2014 and half of 2015, that was the only other merger,

right?
A. At Mount Sinai?
Q. Yes.
A. Yes.
Q. So, when you say this stuff happens all the time and it happened a lot at Mount Sinai, you were just talking about one other merger putting yourself back in the July 2015, correct?
A. Well, if I'm putting myself back here, I'll just use more careful language. At the time that I am receiving this, I am a product of a merger. I am a person who has met with people about changes in my department. Sinai, at that time and going forward, had consultants in many departments to talk about what the work was going to look like and how to merge these, like, four hospitals. So, that's how I am receiving her information, but the only current merger I was aware of was this.
Q. Looking, again, at Exhibit Jones-Winter 2, the last paragraph or the second paragraph, which is the last one states, quote, "She spoke to Caryn Tiger about some of

this already, but wanted to formally put her concerns on record now because PS," capital P, capital S, "is increasingly dismissive, and she heard from another employee that PS's assistant director openly said that they are only keeping one employee from her group," closed quote. Did you discuss this with Ms. Tiger?

A. No, I did not. I was not -- I did not even -- at this point, I didn't know Caryn, actually.

Q. What did you do with this information that you got from Ms. Rahona?

A. So, she said that she wanted to put it on record and that's a phrase that sometimes people would use to say I don't want to do anything at this time -- bless you. I don't want to do anything at this time, but this is what is going on, I want it recorded somewhere. Very often -- and Elena said, you know, just in case I have to come back later to make an argument for my job, I want this on record somewhere. She had also told me she had spoken with Caryn. She was considered to be a school employee, so it made sense that she spoke with

Caryn. So, I recorded this and that was it.
Q. So, nothing happened on this?
A. No.
Q. Based on this information?
A. No.
Q. You never spoke to Dr. Singh about it?
A. No, I wouldn't even have jurisdiction to do that. At this point, I was in the hospital. So, I was working in labor relations on the hospital side, yeah.
Q. So, why was it that she was directed to speak with you?
A. Did she say she was directed to speak with me?
Q. How did it come about? If she had already spoken with Ms. Tiger, how did you -- how did she come to speak to you?
A. She would have made an appointment with our office. I don't know what drove her to come speak to us, but, you know, Caryn worked with a lot of faculty employees. She was considered a NBU employee, sorry, a non-bargaining unit employee, so, you know,

JONES-WINTER ATTYS'EYES ONLY

eventually her position was laid off and those are processed through our office. So, maybe someone told her to come to our office, I don't know, but as a nonunion employee or a union employee, we exist for people to come and talk to us about different concerns.

Q. So, at the time when Dr. Safo was originally raising the concerns that she had with Dr. Singh, you hadn't recalled that there was a complaint by Ms. Rahona about Dr. Singh?

A. At the time, I would say initially, and I'm not sure when initially was, but I don't think I ever said -- I shouldn't say ever. Early I don't believe I said to Stella, oh, I know this guy, you know, or something like that. At some point, I knew his name but Stella talked about her boss and she talked about her work and the people she is working with, so.

Q. My question was really just, do you recall when you first learned about Dr. Singh from Dr. Safo, whether you made the connection in your own mind that you had already heard something about Dr. Singh from Ms. Rahona?

JONES-WINTER ATTYS'EYES ONLY

A. Not immediately, not immediately.

Q. Later you did?

A. Later at some point, I did.

Q. Was that because Elena Rahona had met with you in the context of the investigation?

A. I think so, it may be. I can't say for certain but maybe.

Q. When an employee tells they just want something on record in terms of how you are trained at Mount Sinai in the two positions you had there, did you understand that doesn't stop you or your department from finding out more information about what is going on, right?

A. Right, absolutely.

Q. And you know that there is, in fact, a policy at Mount Sinai that requires anyone really, any employee, any faculty person, any management person at Mount Sinai to report conduct that may violate the policies at Mount Sinai, including the anti-discrimination policies, correct?

A. Yes, correct.

Q. Are you familiar with that policy?

JONES-WINTER ATTYS'EYES ONLY

A. I am.

Q. You took the view based on what Ms. Rahona was telling you was this didn't arise to a potential violation of any policy at Mount Sinai; is that right?

A. Yes.

Q. But you didn't discuss it with anyone?

A. No, because I had the view that it did not rise to the level of being in violation, even potentially of any policies, based on what she described to me.

Q. And from what you recall, you never discussed it with Ms. Tiger either?

A. I won't say never. At some point during the investigation, it's possible that we would have spoken about this, but at that point, I did not know Caryn and I wouldn't know her for, you know, another -- over a year, so...

Q. Well, you knew who she was?

A. Yes, I knew who she was.

Q. So, I take it from you what are saying, Ms. Tiger never contacted you again

back in 2015, 2016 to talk about what Ms. Rahona had said?

A. No.

Q. Other than this record that you made that is reflected in Exhibit 2, there are no other records of what Ms. Rahona had said to you?

A. No.

Q. Do you know if there are any records of what was discussed between her and Ms. Tiger?

A. I don't know.

Q. Based on what you know about Mount Sinai, there would be an expectation that Ms. Tiger would make some kind of record of it?

A. Not necessarily.

Q. No? Why not?

A. Because people can come in and say I would like to have a confidential conversation that is not put on record and then Caryn or someone else would likely say, depends on what you tell me. And if Elena went in and said this to Caryn the way she said it to me and said, I don't want it on record, it's possible

JONES-WINTER ATTYS'EYES ONLY

discrimination, right?

A. Yes.

Q. Okay. Now, you had a meeting with Holly Atkinson and Natasha, sometimes she uses Anu as a nickname or as part of her middle name, last name Anandaraja. Do you remember meeting with those two women in April of 2018 at a coffee shop?

A. I do.

Q. How did that meeting come about?

A. Anu sent me an e-mail requesting a meeting.

Q. Had you known Anu before then?

A. No.

Q. You never met her before?

A. I don't believe I met her. I believe I -- in her e-mail she mentioned, I saw you on the street with Stella. So, Stella was that connection.

Q. Present at that meeting was just the three of you, correct?

A. Myself, Holly, and Anu. I believe so. I believe so, yeah.

Q. Do you recall what was discussed at

that meeting?
A. Generally, yes.
Q. By the way, before we get to that, going back to the first investigation that you were involved in that also involved the legal department concerning some kind of hostile work environment, did that investigation involve Charney?
A. No.
Q. It had nothing to do with any personnel at The Arnhold Institute of global health, correct?
A. Correct.
Q. So, at the time that you met with Ms. Anandaraja and Ms. Atkinson in the coffee shop in April 2018, did you have an understanding of what they wanted to talk about, why they were asking for a meeting?
A. I had a preliminary understanding.
Q. What was that?
A. That based on -- Stella told me she knew some people who were having concerns in their department, I don't know what exactly she said, but some sort of work concern and she

JONES-WINTER ATTYS'EYES ONLY

asked can I refer them to you, so I knew it was a work concern.

Q. So, you weren't surprised when Ms. Anandaraja contacted you, right?

A. I was not surprised, no.

Q. You understood it had something to do with Dr. Singh?

A. At that point, no.

Q. But you knew that these two women were -- had some connection with The Arnhold Institute for Global Health, right?

A. I don't even know if Stella had said it was from Arnhold. She may have. I knew they were school employees.

Q. So, what did you learn at that meeting?

A. Generally, I learned that they -- Holly and Anu had concerns about the work environment under Dr. Singh.

Q. Did they describe the basis for their concerns?

A. They did.

Q. What did you understand the basis to be?

JONES-WINTER ATTYS'EYES ONLY

A. They described the basis of -- they described an environment in which they felt you have a new person in described as Prabhjot, who had not, upon coming in to the institute, had not met with him in a way, substantive way to understand their work. They felt he was not valuing their work, had brought in his own people and was giving more credence to those people and they felt that he behaved in a disrespectful manner, condescending manner and they relayed to me that there were other people in the institute who felt the same way.

Q. Did they identify the other people?

A. Not at that time, no.

Q. Did they say they were all women?

A. No, in fact, they -- I mean, they were two women meeting with me, but they said -- they referred to the institute, others at the institute and they didn't identify whether or not the institute was all female or not, so they just said others.

Q. Your testimony earlier about new management coming in with consultants and generating feelings by the current employees

that they were being replaced or not being listened to was not uncommon, right?

A. My testimony that a new manager coming in and people not being listened to is not uncommon? No, I think what was not uncommon -- I think that's what I said before was new managers coming in and bringing their own people and consultants coming in and making decisions about the workplace. I don't believe I said, you know, employees not being listened to is common.

Q. Well, is it?

A. Is it in this case in general?

Q. In general, when new management comes in -- I'm just trying to lead you back to what you said earlier today, and if I'm misstating it, you can correct me, but I had understood you to say, is it true, that from your perspective, when new management comes in at Mount Sinai or really anywhere else, it's not uncommon for the current employees, subject to the new management, to report that they're disgruntled or they are feeling they are not being listened to or they are concerned about

being replaced, things of that nature?
MR. BAUMGARTEN: I will object to the form of the question.
A. I mean, the context in which we discussed that was Elena coming in, describing a very specific fact pattern about her personal experience and me saying based on what you are saying, I'm aware that that sort of thing happens, consultants coming in, new manager being hired, bringing their own people and making decisions about what the work is going to look like. That's what I said earlier.
In my experience, is it common that managers don't listen to employees when they come in, that's not common, but I don't know if people are reporting that.
Q. So, what was -- what was your impression -- going back to the April 2018 meeting --
A. Sure.
Q. -- what was your impression of what Ms. Anandaraja and Ms. Atkinson, I should be saying doctor, right, it's Dr. Atkinson and Dr. Anandaraja were saying?

JONES-WINTER ATTYS'EYES ONLY

A. My impression was that they were complaining about or raising concerns, I should say, about this particular person who was brought in to direct the institute. They were very explicit about the fact of his age, the fact that they believed that he did not have proper experience to be doing what he was doing, that he, in fact, did not seem to know very much about what he was doing, and for them personally, they are only telling me about their two accounts, right, that they had felt personally, you know, disrespected by him in their interactions with him thus far because he did not seem interested in their roles and their previous work and they were upset about that because they felt they had a lot of senior experience that was valuable to the institute.

Q. Was your reaction to what you were hearing in that meeting the same reaction that you had when Ms. Rahona told you her concerns about Dr. Singh?

A. Well, my reaction was the same in that I listened, you know, to what they had to say.

JONES-WINTER ATTYS'EYES ONLY

Q. But you didn't have an understanding that there was a potential claim that Dr. Singh was being discriminatory; is that right?

A. I didn't understand with Elena or with Anu and Holly, sorry?

Q. With the Anu and Holly meeting?

A. So, the difference with Anu and Holly is that they did, in that first meeting, say that, you know, they described themselves as women over 40 and they thought that he was condescending in general, but they felt that there was a propensity with him to be that way with women. They did raise, you know, gender and they identified their ages as well. So, there is no difference for me.

Q. That distinguishes what Dr. Atkinson and what Dr. Anandaraja were saying from what you understood Ms. Rahona to have been saying a few years before, right?

A. Yes.

Q. So, you handled the complaint differently or the information differently?

A. They came explicitly saying, we have this concern and we want to share it with

JONES-WINTER ATTYS'EYES ONLY

someone and we think it should be looked into, so I did handle it differently.

Q. What did you do?

A. I spoke to Caryn Tiger, my boss.

Q. The same day?

A. The same day, later that evening, I suppose.

Q. Did you take notes of that meeting?

A. I did not take notes.

Q. Why not?

A. They asked me for a confidential meeting offsite and they explicitly asked that I not take notes and that I do not record.

Q. When you say "they asked," you mean doctors Atkinson and Anandaraja?

A. Sorry. Yes, Holly and Anu.

Q. Was that unusual, in your experience, that somebody was asking you not to take notes?

A. No, it's not unusual.

Q. Did they explain why they wanted you to not take notes?

A. Yes, they said, you know, we just want to share this information, get feedback

JONES-WINTER ATTYS'EYES ONLY

about what an investigation looked like if we wanted to take this forward.

Q. So, did you understand that they were not making it a formal grievance or a formal complaint?

A. At the time, they said they wanted to share this information and see what the result would be, but I understood, following our conversation, that regardless of whether or not they were making any complaint, it was a complaint.

Q. You understood what they were asking for was information about how the institution, meaning Mount Sinai, would use that information or follow-up on that information?

A. Yes.

Q. What did you tell them?

A. I told them -- they gave me the information. They said what would an investigation potentially look like, we spoke about that.

Q. Did they raise investigation or did you?

A. Well, they did. I mean, there was a

reason that they were sharing the information, right. They said they had a concern and they wanted to know what it would look like for us to -- us meaning the institute, you know, the hospital to look into the complaint.

Q. What did you tell them about how that would look or what that would involve?

A. Sure. I told them, you know, at the -- and that was sort of a preliminary question even before they shared the information, and I said we could take -- it could be an anonymous complaint, meaning their names would not be used. It could be a complaint in which their names were used. We can do something like a climate check. You know, that would be the range, but it was really around your names being involved in this or not.

Q. The understanding in terms of -- well, so you are saying you had that discussion about process before you even understood the nature of the concerns; is that right?

A. Yeah.

Q. After you heard the nature of the

concerns that they were raising, including gender based concerns, did you tell them something different about the process, that the process would be different because it involved gender claims, gender discrimination claims?

A. No. Well, what I said to them was, you know, I didn't -- you know, these are people coming with a complaint. I'm not expecting them to be experts and what that would look like. What I said was I would like to bring this information back, you know, to my boss and have a discussion, and at that point based on some of the things she raised, yeah, I wanted to do that. And I said, I asked them to give me an opportunity to do that and then I would follow-up with them.

Q. Did you talk to Dr. Safo right before this meeting or right after concerning the meeting?

A. I don't know if I did. I don't know.

Q. When you talked to Caryn Tiger, her last name is actually hyphenated, right?

A. Yes, it's Tiger-Paillex but she goes

JONES-WINTER ATTYS'EYES ONLY

by Tiger.

Q. Okay. It's easier.

A. It is.

Q. When you had the conversation with Dr. Tiger, you think it was the same day?

A. I believe it was, yes.

Q. Because the meeting at the coffee shop was in the morning; is that right?

A. I don't recall the time but it could have been at 8:00 p.m. You know, I would have followed up with her.

Q. Immediately after the meeting?

A. Immediately. I believe so, yeah.

Q. Because it was an important significant claim that was being made?

A. I thought the issues they were raising were significant, yeah.

Q. And important?

A. Yes.

Q. What do you recall discussing with Ms. Tiger about it, about that meeting?

A. I recall describing Holly and Anu to Caryn as being two, you know, senior level employees who were in an institute in the

school who are raising complaints about, I believe, at the time I described it as a sort of hostile work environment, a person who was there who is behaving in an unprofessional manner and I know I would have raised that they are -- there was another piece that they raised about, like, the employees who had been there a long time versus employees who hadn't been there a long time and they made the age distinction sort of between those two groups and I would have said that to Caryn as well, and that they are, you know, potentially alleging age and gender discrimination.

Q. You say you would have said that. Do you recall that you actually did tell her that?

A. I am saying would have because I don't have, you know, a quote in front of me but, yeah.

Q. That is consistent with what you remember discussing with her?

A. Yes, it's consistent with what I would have said given what I remember them saying to me.

Q. Just being clear for purposes of being a witness.
A. Sure.
Q. What I'm asking you is, is it accurate to say that, to the best of your memory, that is what you did say to her, not would have said to her, but that you did say that to her?
A. Yes, yes.
Q. Did you also say to -- is it Dr. Tiger or Ms. Tiger?
A. Ms. Tiger.
Q. Did you also say to Ms. Tiger that you had information from another woman who also had concerns about Dr. Singh?
A. No.
Q. You didn't mention Dr. Safo at all?
A. At that time, no.
Q. You didn't indicate that you had heard -- maybe without mentioning her name, but you had heard from other women or another woman similar concerns or concerns in the same vein?
A. I don't recall mentioning that. The other person would have been Elena, and I don't

recall -- I mean, from two years before, so I don't recall.

Q. Why not mention -- was there a reason why you didn't mention Dr. Safo, did you intentionally leave that out?

A. No, Stella had never come to me with age or gender complaint. She spoke to me about her friend who hired her who turned out to be a big dud. You know, and very explicit -- I mean, that's what we talked about. This is Holly and Anu coming and saying we are senior people who are a part of a group that -- remember Stella is the new group, basically, that they are talking about who is receiving all these great benefits. They are not a part of that group. Their claims were very, very different from anything that I had spoken about with Stella other than them describing condescending behavior from the same person. So, when I spoke to Caryn about what I saw as a potential, you know, hostile work environment with two people raising age and gender discrimination, I did not have any cause to talk about Stella at the same time who was a

personal friend of mine.
Q. Did Dr. Tiger ask you any questions?
A. I'm sure she did.
Q. Do you remember what they were?
A. You know what, I'll say no, I don't remember. I don't remember explicitly what she asked.
Q. Do you remember any -- the gist of her response when you provided her this report?
A. I do remember her saying, how long have they been there and what exactly is the institute, you know, and that's it.
Q. Was there some note or record made of the conversation you were having with Dr. Tiger?
A. No, I don't believe so.
Q. You certainly didn't make one?
A. No.
Q. So, did something -- was their some course of conduct or action taken by the department employee relations department based on that meeting you had with Dr. Tiger?
A. I know that Caryn reached out to legal and spoke with Marina.

JONES-WINTER ATTYS'EYES ONLY

Q. Were you part of that conversation?
A. I don't believe I was.
Q. You learned about it from Ms. Tiger?
A. Yes.
Q. What happened after that?
MR. BAUMGARTEN: In answering your question, don't disclose any communications that you or anybody else had with legal.
THE WITNESS: Sure.
A. I believe Marina would have -- Caryn and Marina and I met to -- Marina get more information about, you know, my conversation with Holly and Anu and we all agreed that we would meet with them together.
Q. Did you gather any information about The Arnhold Institute or Dr. Singh as part of this stage?
A. Following that immediate conversation?
Q. Following the meeting with Dr. Atkinson and Anandaraja?
A. I know I Googled him after. I mean, I personally did that just to understand who

and I'm not sure what grievance committee would be there so I -- you know, as I'm sitting here, I don't really know how to interpret that.

Q. Well, what is a grievance committee?

A. So, I mean, a grievance committee for faculty, I think when a faculty appeals -- I'm saying I think. How I understand it to be is if a faculty member has been issued a discipline for something or has been cited for something, there is a grievance committee that could investigate that if their chair says I'm writing you up for this and they disagree with that they can take the issue to the grievance committee. It's just a procedural thing.

Q. Did you discuss that with Dr. Atkinson at any time that there might be a grievance committee type of procedure related to Dr. Singh?

A. I will say no.

Q. The next paragraph, the second sentence, actually the third sentence says, "Had a discussion yesterday, with one person in office here who had transferred out of the Institute, and off the record with her

(Clarissa is referring to Renee), people in development too had problems with PS." Did you -- had you talked to Renee Bischoff by that time?

A. So, I didn't really know Renee so much before that but I do recall Renee at some point, you know, Renee was friends with Stella, I guess Renee knew that Holly and Anu and I had met and Renee independently came to me and again, asked for to be off the record and said that, I mean, people in development I think should would have mentioned that. And she also -- she just would have gave me some gossip about the place she had been there and left there. I didn't know her background before then. So, this I think would be accurate. I do remember Renee approaching me very early.

Q. What did she say?

A. I don't recall what she said, but maybe it's -- maybe some of that is here. I mean, she described herself as a person who left the institute and she described, you know, her interactions with Prabhjot and other managerial people in the institute.

JONES-WINTER ATTYS'EYES ONLY

women of all ages. And so, that was one of the operational things that we decided needed to be looked at within the institute and that's what we did and that came later but we did that.

Q. When you say it came later, you mean after the investigation?

A. Yes.

Q. But during the investigation, were you looking for payment information and looking at pay disparity?

A. We did that in reference or I personally did that in reference to one of the employees. Her name was Emily, she'd approached me about what she believed was pay disparity for herself and I did that for her. And, yeah Stella asked about her pay at one point. She wasn't claiming disparity, she was claiming she hadn't received it, but Emily said I believe that I should be getting paid more than what I am being paid now.

Q. Is that Emily Bruzelius?

A. Bruzelius, yes. Bruzelius.

Q. That was looked into as part of the investigation?

JONES-WINTER ATTYS'EYES ONLY

you would not have said that, correct?

A. Yes.

Q. Did you say either at this meeting in June, the one you don't remember, or some other in-person meeting with Dr. Atkinson and Dr. Anandaraja that Dr. Singh either had or felt like he had a trump card?

A. No.

Q. He never made a gesture like laying cards on the table?

A. I don't even play cards. I play Go Fish. So, no, I just wouldn't do that.

Q. This isn't something that you have ever done and said, this is trump, trump card?

A. No, and no. Thank you. And no.

Q. I want to go now back to Exhibit 1.

A. Okay. Can you turn to page Bates number 591. There are two text messages on this page, one that purports to be from Dr. Stella and one that purports to be from you. The date is May 10th, 2018, so it's after the investigation started.

Dr. Safo writes to you, quote, "I'm feeling bad about how much work you have to do.

Knaup. Knaup can be offered a position in another area of Mount Sinai," as you mentioned earlier, right?
A. Yes.
Q. Three is the oversight committee, correct?
A. Yes.
Q. And that -- what is included in that paragraph says, quote, "The committee should mento Dr. Singh and take steps to ensure the Institute's atmosphere is improved, particularly as relates to gender issues." Do you see that?
A. Hmm-hmm.
Q. And then it goes on. You can look at the rest of them, but these are the accurate conclusions and recommendations that came out of the investigation, right?
A. Yes.
Q. And these are the types of conclusions that were discussed with Doctors Atkinson and Anandaraja, as well as Elena Rahona, right?
A. I don't know if we gave them this

C E R T I F I C A T E

I, FRAN INSLEY, hereby certify that the Deposition of CLARISSA JONES-WINTER was held before me on the 69th day of June, 2024; that said witness was duly sworn before the commencement of testimony; that the testimony was taken stenographically by myself and then transcribed by myself; that the party was represented by counsel as appears herein;

That the within transcript is a true record of the Deposition of said witness;

That I am not connected by blood or marriage with any of the parties; that I am not interested directly or indirectly in the outcome of this matter; that I am not in the employ of any of the counsel.

IN WITNESS WHEREOF, I have hereunto set my hand this 21st day of June, 2024.

FRAN INSLEY

ATTORNEYS' EYES ONLY



VERITEXT LEGAL SOLUTIONS

NAME OF CASE: DR. STELLA SAFO, GERALDINE LLAMES, AMANDA MISITI, and EMILIE BRUZELIUS v. DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA, and ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI

DATE OF DEPOSITION: June 6, 2024

NAME OF DEPONENT: CLARISSA JONES-WINTER,

| PAGE | LINE(S) | CHANGE | REASON |
|---|---|---|---|
| 123 | 6 | them | not "him" |
| 180 | 11 | for it to | not "for to" |
| 211 | 7 | Sikhs | not "seeks" |
| 230 | 7 | new | not "knew" |
| 247 | 23 | is their thing | not "is thing" |
| 249 | 11 | A. | not "MR. BAUMGARTEN" |
| 303 | 4 | threw | not "through" |
| 315 | 22 | Humale | not "Humalely" |
| 334 | 25 | read | not "heard" |
| 346 | 3 | different | not "difference" |
| | | | |
| | | | |
| | | | |
| | | | |

[signature]

SUBSCRIBED AND SWORN TO BEFORE ME

THIS 22 DAY OF July, 2024.

MICHELLE T JOHNSON
Notary Public - State of New York
NO. 01JO6221958
Qualified in New York County
My Commission Expires May 10, 2026

(NOTARY PUBLIC) MY COMMISSION EXPIRES:

Michelle T. Johnson