# DECLARATION OF JAMES H. FAGHMOUS

I, Dr. James H. Faghmous, the undersigned, do hereby declare as follows:

1. I am over the age of 18, of sound mind and otherwise competent to make this Affidavit. The evidence set out here is based on my personal knowledge.

2. I received my Ph.D. from the University of Minnesota in computer science. My research focused on applying artificial intelligence methods to better understand global climate change. I completed my Ph.D. under the supervision of Professor Vipin Kumar, a pioneer in data mining and the recipient of the 2017 ACM KDD Award, which is the equivalent of the Nobel Prize in Data Mining, amongst other achievements. The University of Minnesota is ranked top-10 globally in data mining and I received the University's "Best Ph.D. Dissertation Award in Science and Engineering."

3. I am an accomplished computer science researcher and received nationally recognized awards such as a National Science Foundation graduate research fellowship. I have started two successful companies.

4. From September 2015 to July 2019, I was a Visiting Assistant Professor at Stanford University in machine learning and artificial intelligence for population health.

5. From July 2015 to September 2017, I was a faculty member and Chief Technology Officer ("CTO") of the Arnhold Institute for Global Health ("AIGH") at Icahn School of Medicine at Mount Sinai, a part of the Mount Sinai Health System ("Mount Sinai").

6. I resigned from my position at AIGH in September 2017 after it became clear to me that Dr. Prabhjot Singh, Director of AIGH, had no qualifications in doing serious global health work, pathologically undermined employees who were qualified, treated people horribly and lacked basic ethical and leadership skills to guide AIGH. It also became clear that Mount Sinai enabled him and there was no hope for the situation to improve as they weren't going to remove him.

7. The remainder of this declaration describes my experiences at AIGH in detail.

## A. Joining AIGH

8. In the fall 2014, I entered the academic job market while working as a research scientist at the University of Minnesota. By then, I had already published a dozen peer-reviewed articles (mostly as first author), and secured three major academic grants (one as principal investigator ("PI"), one as co-principal investigator ("Co-PI"), and one as senior personnel). I also had seven letters of recommendation from world class leaders in computer science, statistics and climate science.

9. During my job search, I was invited to interview for at least a dozen tenure-track professorships in computer science. In February 2015, I received my first tenure-track offer from a large public university system and over the next three months received at least six tenure-track offers from major universities in the United States.

10. Around the same time, Dr. Abdulrahman El-Sayed, with whom I had collaborated in the past, asked me if I would consider joining him at AIGH at Mount Sinai, where he had just accepted an Associate Director position. I told him I was potentially interested in joining AIGH, but I was

exploring many universities and had just been offered my first tenure-track position from a large public university system. Dr. El-Sayed asked me to consider not accepting that offer until he could get me to interview at Mount Sinai.

11. Dr. El-Sayed sold AIGH to me heavily: he told me that it was a new, innovative organization focused on created "more efficient, effective, and equitable healthcare." I have always strived to use my computer science skills to make the world better through my work in climate science, cognitive neuroscience and medicine from when I worked at the Mayo Clinic, and this opportunity seemed to fit the bill. After interviewing at AIGH, I decided to accept their offer to join as founding CTO. I turned down future interview requests at my initial preferred destination because I was committed to this project, ready to help build AIGH from the ground up.

12. A few months after I accepted my offer but before I started, Dr. El-Sayed informed me that he would not be joining Mount Sinai and instead was going to be the health commissioner of the city of Detroit. I was disappointed as I accepted my offer primarily to partner with him. That day, Dr. Singh called me and promised me that things will be even better than if Dr. El-Sayed had joined. He promised that my success would be his top priority.

13. I decided to maintain my commitment to AIGH. After all, I had just decided to move my family to New York, and we had found a place to live and a school for our children.

**B. My first experiences at AIGH and with Dr. Singh**

14. By this point, I had interacted with Dr. Singh on only a couple of occasions. We spoke on the phone back in January 2015, and I met him in person on the day of my interview. Even then, Dr. Singh seemed garbled and unclear when he spoke about healthcare. I attributed this initial confusion to me being new to the field.

15. However, things went south almost immediately. When I accepted my offer, I told Mount Sinai that at least two of the institutions that had offered me jobs had also offered my wife a position. Dr. Singh explained that Mount Sinai would also find a position for my wife even if they couldn't do it before I accepted the offer. I took him at his word and accepted the offer.

16. Shortly after joining, however, it became clear that Dr Singh and Mount Sinai were not prepared to do anything meaningful to find a position for my wife. In fact, all they did was send a single email on behalf of the Dean of Mount Sinai. My wife has a juris doctorate and has been a successful African American entrepreneur.

17. Shortly before starting my position, the new AIGH team received an email from Dr. Singh about an "important session" with partners from the School of Visual Arts (SVA) and PopTech, Leetha Filderman and Cheryl Heller, who were supposed to help us communicate our vision and work visually. This meeting was scheduled before I was set to return from an international trip. I had already told Dr. Singh my travel dates, but nonetheless I was urged to make it to this meeting. From Dr. Singh's email, it seemed like a very important meeting and as it was my first in-person meeting with the team, I felt it was important I be there. In order to attend, I had to change my ticket on an international flight to make it in time. As it turned out, the meeting was just simple brainstorming session with no output. I initially attributed this to AIGH being in the early phases of a startup, but this trend of last-minute emails requesting attendance to an "important meeting" that just turned

out to be a time drain would become a common reoccurrence at AIGH. Turning to external sources, like SVA, to try and bring clarity to AIGH also became a common reoccurrence.

18. In a few short months, what started as a promising and inspiring new job started to look less appealing: Dr. El-Sayed left, the promise to hire my wife was broken, and we had to rush back to New York from a trip abroad for an insignificant meeting. Initially, I wanted to focus on the high-impact work AIGH had set out to do, and viewed these "inconveniences" as just the price I had to pay in order to do this work. But as the months passed, it became clear that these were not mere inconveniences associated with the start-up phase. Instead, AIGH had serious problems and was producing no high-impact work.

19. The most startling revelation upon my start was that AIGH was not an entirely new effort as I had been told by Dr. Singh; there were in fact many pre-existing team members such as Dr. Anu Anandaraja, Dr. Phil Landrigan and Dr. Holly Atkinson. It was both disorienting and deeply disappointing to join an organization believing that I had an opportunity to start something at "ground zero," only to find that it in fact already had an established team with their own ideas and agenda. Most of my ideas and plans, and my decision to join, were predicated on the assumption that I would be a part of a project that was starting from scratch. Moreover, none of the "legacy" staff, as Dr. Singh called them, meaning the original existing staff members, interviewed me when I visited Mount Sinai in March 2015, which led me to believe that Dr. El-Sayed, Dr. Singh and I would be the only AIGH team members.

20. Nor was I told about Dr. Stella Safo and her work on Health System Design, despite the fact I was required to work with her quite a bit. In fact, never once and not in my job description, did I hear about Health System Design until I met Dr. Safo in person.

21. Dr. Singh was generally dismissive of AIGH's "legacy" staff, particularly Dr. Atkinson, whom he often tried to frame as being incompetent although her work and accomplishments clearly showed otherwise. On one occasion, Dr. Singh tried to insinuate to me that Dr. Atkinson was breaking the rules by saying that she was seeing patients in her office for "sex exams," saying that this was improper and very risky for AIGH, and implying that they could get sued for what Dr. Atkinson was doing.

22. For a long time, I tried to resist the conclusion that I had been recruited under false pretenses but, as more people joined us, I noticed that the same thing happened to many of them. For example, Dr. Safo, Dr. Natalie Privett and Bruno Silva all told me they were also misled by Dr. Singh in the course of being recruited.

**C. Dr. Singh's credentials**

23. Another thing that surprised me was that Dr. Singh had virtually no experience as an academic researcher. I understood he had never won a federal research grant and had never published a peer-reviewed scientific publication as a first author, two important metrics for any academic. I was confused as to how Dr. Singh could be selected as director of an academic institute with no real federal grant or peer-reviewed publication experience, poor management skills and no experience in leadership.

24. Dr. Singh's lack of academic experience revealed itself when I started to ask for permission to apply for grants and was routinely met with resistance. I found this puzzling, since grants are how universities make money. As I was new to the field of medicine, I expected Dr. Singh would clarify his resistance, and eventually help contribute to the medical science part of our work. However, he never did. While he would always mention that his busy schedule prevented him from helping, and always promised to amend his schedule so he could focus more on the scientific work, that never happened.

25. After my departure from AIGH, I received a copy of Dr. Singh's CV (attached as **Exhibit A**). I noticed that Dr. Singh claimed credit for two grants that I had applied for and won, one from the Gates Foundation (Grand Challenge, 2017, $40,000) and one from USAID (2016-2017, $300,000). The fact that I was in fact responsible for these grants can be corroborated by Michael King of the Grants and Contracts Office ("GCO") at Mount Sinai.

**D. Dr. Singh has no interest in doing good work**

*a. Dr. Singh hires his friends to dismantle current AIGH programs*

26. It also very quickly became clear to me that Dr. Singh had no interest in doing genuinely impactful academic work. Seemingly every day he would identify a new project or partnership and simply jump from idea to idea based on whatever he thought would make him look good.

27. This was also evident from his hiring practices. Many of the people Dr. Singh hired were his friends and were hired by him personally without the use of a search committee or public job postings. He decided their titles and compensation by himself, with apparently no oversight. I believe, for example, that he hired Dr. Aaron Baum, who had previously worked with his wife; Dr. Sandeep Kishore, who had been his college roommate; Bruno Silva, who was introduced to him via people at PopTech; and Dr. Natalie Privett, who was his neighbor. As far as I know, for each of these hires, no other candidates were considered. Furthermore, I understand there were no discussions or formal reviews for any of these hires. Similarly, Dr. Singh hired his former boss, Dr. Jeffrey Sachs, for a fellowship position at AIGH.

28. When I joined, AIGH had an education program in place led by Dr. Anandaraja. She and her colleagues would teach all medical students a week-long course in global health. I thought the program was good but needed some strategy and support, because every semester the team had to redesign the course from scratch, creating a lot of work for Dr. Anandaraja and her colleagues (unlike other standard courses such as anatomy which had the same course content every year). In addition to this week-long course, Dr. Anandaraja and others were thinking about offering additional "optional" courses, however, given that medical students have a packed course schedule, these optional classes were always going to be lower priority for the students even if they are interested. However, these issues would have easy to address had serving students and improving educational programs been a genuine priority.

29. Instead, Dr. Singh insisted on using his friends he had hired to create vague and unrealistic "innovative" solutions like building a video platform or a Massive Open Online Course, for which we had no money or talent. During this time, Dr. Singh began to complain that the educational component of AIGH, led by Dr. Anandaraja, was a problem. During our weekly leadership meetings, Dr. Singh would have a consistent stream of vague ideas for education programs, but the

goals always seemed to shift – Dr. Singh's mantra was "to be innovative" but without a clear direction. He used these shifting goals to consistently undermine Dr. Anandaraja – as soon as she made progress in one way, Dr. Singh would shift the goals so that it was impossible for her to succeed. The lack of clarity and direction would also become a dominant theme in why no one at AIGH could succeed.

30. Dr. Singh was never genuinely interested in doing good work or actually building up his programs; he only wanted to speak about flashy plans that would increase his visibility. On one occasion, he told me and Mr. Berman that he was thinking of giving the educational team at AIGH $4,000,000 for them to go away, leave AIGH and do their work elsewhere.

31. Another sign that Dr. Singh had no interest in helping students was came in around 2016, when students who had interest in global health complained that they weren't getting enough meetings with Dr. Singh and that their needs weren't met. As a result, a global health student advisory group was formed to meet with Dr. Singh more regularly. I believe one student involved was Gus Ruchman.

*b. Dr. Singh and his team of friends block others' work*

32. I estimate that during my two and a half years at AIGH, the entire institute applied for 12 grants, the majority of which originated from my team. Because federal grants are extremely competitive, a single PI would submit on average 10 grants a year and hope to win 1 or 2. Since faculty at medical schools need to pay for their salaries with grants, applying for a large number of grants is the norm; it is in fact necessary for a department to be financially viable. At AIGH, however, 5-6 faculty applied for about 12 grants over 2.5 years (custom would have them apply to about 150). Given that all AIGH faculty were assistant professors, the fact that they didn't even apply (much less win) major grants was a huge detriment to their careers; without grants, they couldn't remain employed. Dr. Singh knowingly jeopardized their careers by discouraging them from applying and using Kirsten Knaup and David Berman to prevent faculty from applying to grant.

33. During my tenure at AIGH, Dr. Singh and Kirsten Knaup, the Chief Operating Officer of AIGH and the person responsible for the institute's grant submissions, exhibited a serious lack of understanding regarding grants and the process for submitting competitive proposals. For example, Ms. Knaup always insisted on being part of the grant and the proposal, which was highly atypical for an administrator (administrators typically submit these proposals but are not involved in writing of the proposals). Often, faculty members were denied the opportunity to apply for grants because Ms. Knaup was "stretched thin" and could not shepherd the grant process through.

34. In August 2016, I applied on behalf of AIGH for a NIH Director's New Innovator Award – a prestigious $2,000,000 grant. I worked with Ms. Knaup to let her know that my team and I had been preparing for the proposal for weeks and would be applying. However, two or three days before the grant's deadline, Ms. Knaup informed my team while I was traveling internationally that she would not be submitting the award, giving no explanation as to why.

35. I was not going to let Ms. Knaup sabotage our efforts and demoralize my team who had worked on the project for weeks. I first emailed Ms. Knaup, asking her to submit the grant regardless, and she still refused. I then reached out to another department administrator, Milerva Santos from the

Department of Population Health Science and Policy, and asked her at the last minute to submit the grant through her department, which she did.

36. Upon learning this, Dr. Singh panicked and asked Ms. Knaup to submit the grant, since, if our team won, the Department of Population Health Science and Policy would receive about 60% of the $2,000,000 award and not AIGH. Ms. Knaup agreed, and submitted the grant, but wasted three days that we could have been working (because she refused to submit the grant which is her job in the first place). Furthermore, Dr. Singh did not do anything to address this issue after the fact and the grants applications of many faculty members and teams continued to be unnecessarily undermined.

c. *Dr. Singh uses AIGH as a platform to promote himself and not our work*

37. Dr. Singh not only had no interest in doing good work and blocking others from doing work; he also clearly had a personal agenda: promoting himself.

38. For example, Dr. Singh decided to hire a Director of Communications for AIGH, Sasha Walek. It seemed entirely unnecessary to me to have a communications director for an institute as small as AIGH, but it quickly became clear to me that the real objective in hiring Ms. Walek was to promote Dr. Singh. In general, Ms. Walek's work revolved mostly around Dr. Singh and not the department or its faculty. One time, I remember Ms. Walek running all over the department working with Prabhjot's secretary trying to find him to coordinate this interview.

39. In a similar vein, Dr. Singh hired four graphic designers (by contrast, we had only a single programmer on the data science team). The graphic design team was critical to Dr. Singh because they designed aesthetically pleasing presentations and brochures that created the impression that serious work was being done at AIGH. This in turn provided Dr. Singh with promotional material that he could use to make himself look good.

40. The starkest example of Dr. Singh having no interest in doing global health work except to promote himself was a trip he took to attend a conference in Ghana in the summer of 2016.

41. Dr. Singh asked approximately six to eight members of AIGH to attend with him, which was beyond excessive. Indeed, at this point, it had become routine for Dr. Singh to bring large numbers of people to meetings where one or two would have sufficed, which to me demonstrated that he did not value his team's time.

42. Worse, because the trip was planned at the last minute, our flights were incredibly expensive. I recall that my economy ticket alone cost over $3,000. With six to eight of us were attending the conference, I estimate our flights alone cost us in excess of $20,000.

43. Once we got to Accra, we traveled from one meeting to the next with seemingly with no agenda and no purpose, other than giving Dr. Singh an opportunity to meet with people of influence, such as the US Ambassador to Ghana. To my knowledge, our meetings did not lead to us forming any relationships that were helpful to AIGH.

44. Some of the organizers of the conference did subsequently arrange a meeting with us at our offices in New York City, including Nathaniel "Chief" Nsarko, who lead the Millennium Village project

and could potentially have been a valuable partner of AIGH. However, things quickly went sour after Mr. Berman accused our guests of arriving late and cancelled the meeting. I found this shocking. They had traveled thousands of miles to New York City to meet us and yet were summarily dismissed. Dr. Singh said nothing. In similar vein, at a working group in Ghana, Mr. Berman went on a profanity-laced rant attended mostly by Ghanaian stakeholder and Dr. Singh said nothing.

45. This type of burning bridges was common during my time at AIGH. It was common for Dr. Singh to aggressively woo potentially partners, only to later drop them without adequate explanation. These included: Deb Roy at MIT, Mona Al-Sadr at Columbia, Jonathan Jackson at Dimagi, and countless Mount Sinai faculty. For example, Mona Al-Sadr, a world-renowned medical leader, was a partner on a large grant with the Gates Foundation. We were told that we were too small to apply for the grant and the Gates Foundation connected us with Mona's team suggesting we collaborate. While initially, Dr. Singh mentioned that he was thrilled to work with Mona, he then started speaking poorly of them when she was not very involved (she is very senior and had a more junior team member handle the grant which is common). When we were rejected for the grant (also very common that you don't win at your first application), he wrote an email to the entire institute framing Mona's team poorly and insinuating that the reason why we lost the grant was because of them. This was unnecessary since we didn't even need to let the institute know we applied for the grant given the very low likelihood of winning. Furthermore, if Dr. Singh was genuine about doing good work, he would have kept the relationship going and focused on re-applying to the grant thus increasing our chances of winning. But instead he yet again burned those bridges.

46. What made it all the more frustrating is that AIGH had real potential. We were very capable when it came to preparing proofs of concept, authoring publications, and winning small grants. This was a solid foundation on which to build and achieve great things. But Dr. Singh was not really interested in doing meaningful work.

**E. Hostile work environment for women**

47. Dr. Singh repeatedly exhibited complete disregard for people that worked for him. Indeed, it became increasingly apparent to me that Dr. Singh did not care about anyone but himself.

48. For example, Anna Stapleton, a young policy researcher at AIGH, was smart, worked hard and was committed to the organization's mission. In fact, my first grant application on the healthcare side was written with her support. However, she was soon assigned responsibility for helping Dr. Singh write his book. Whenever I saw her after that, she was working on his book. In my view, she should have been listed as co-author of the book, but she was not. Ms. Stapleton had been hired to do policy work, but I believe she in fact did very little, which no doubt inhibited her growth. She eventually left AIGH for law school.

49. Dr. Singh then hired Amanda Misiti to replace Ms. Stapleton. On a number of occasions when both Ms. Misti and I were present, I heard Mr. Berman refer to Ms. Misiti as "the other Anna [Stapleton]," rather than using her name.

50. The only people at AIGH who had their own offices were Dr. Singh, Dr. Kishore, Mr. Berman, Dr. Anandaraja (before she left) and me. Notably, Dr. Safo, who was far more instrumental to AIGH

and had been working at for AIGH longer than Dr. Kishore or Mr. Berman, had to share her office with three other people.

51. I also observed that Dr. Singh set unclear, unrealistic and unattainable goals for Dr. Safo. For example, I recall that Dr. Safo was expected to roll out certain services to over 30 clinics in a single year. This was physically impossible given the size of her team.

52. Dr. Safo was also given a title that was beneath her responsibilities. She was effectively performing the role of Chief Medical Officer (indeed, she was handling more responsibility than that title suggested), but was hired as a Program Manager. Dr. Singh would often speak poorly of Dr. Safo behind her back, specifically how he needed to "teach her" how to do her work and how he could not trust because he thought she was "inexperienced."

53. In general, my impression was that women at AIGH, including Dr. Safo, Dr. Anandaraja, Dr. Atkinskon, Geraldine Llames, Ms. Stapleton and Emilie Bruzelius, were treated unfairly.

54. Ms. Llames, who was hired as a Project Manager, was expected by Dr. Singh to do actual work on the project rather than manage its processes as a project manager would. Ms. Llames was also regularly asked to take notes and do other administrative duties unrelated to her role.

55. Ms. Bruzelius and Ms. Llames, who worked with me directly, were often denied opportunities for career development such as traveling to conferences. For example, for one trip to Guatemala, I requested that Ms. Llames join the team since we were under-staffed and needed help organizing a workshop. Ms. Llames spoke Spanish and was familiar with our project, and was thus the natural choice. However, Dr. Kishore texted Mr. Silva telling him that Ms. Llames could not join the trip because of "Zika risks." I regarded Dr. Kishore's remark as sexist, particularly because I thought I was more at risk from Zika at that time (my wife was pregnant).

56. Women also routinely experienced verbal abuse by Mr. Berman. I was told that Mr. Berman yelled at Renee Bischoff, Ms. Llames, Ms. Stapleton, Ms. Walek and Mary Caliendo. I did not personally witness the outbursts but heard about them shortly after they occurred.

57. In view of this behavior, I made a point not to work with Mr. Berman, and confronted Dr. Singh about it. However, he took no action. Dr. Singh did come into my office and asked me whether I didn't like Berman to which I replied that I didn't have a problem with Berman but with the way he treats people. Dr. Singh merely asked me to try to work with Mr. Berman anyway.

**F. Financial mismanagement at AIGH**

58. When I first started at AIGH, I requested a $30,000 raise and was granted the raise without question or protocol. That was the same for most people if they asked for a raise: no oversight, no protocols, and no external review.

59. During my first year, I was informed that AIGH was on financial probation and under investigation for potential misuse of finances. We were never told what had triggered the investigation, but I understand it had to do with reckless corporate credit card use.

60. While I do not know the details of what happened with the investigation, I routinely saw Mr. Berman submitting receipts for taxi and coffees that did not appear to me to relate to work.

61. I am also aware of instances in which Dr. Singh put people on the payroll who didn't do any relevant work. For example, he got some funding from the Mount Sinai Health System and would assign people's salaries from that fund even if they did not do any work relating to Mount Sinai Health System. I believe that even a small percentage of my salary was from that fund, even though I never did any work related to Mount Sinai Health System.

62. I also heard Ms. Knaup mention that she had massaged the figures in an annual presentation to the Arnhold family to give the impression that most of AIGH's operating budget came from sources other than the Arnhold family's $12.5 million gift, which was a blatant lie. In truth, AIGH had no other sources of income besides small grants and the money given by the healthcare system.

63. I am also aware of instances in which consultants were retained to do work in exchange for fees that I regarded as grossly disproportionate and unnecessary. For example, Mr. Berman hired his friends to make a few slides for Dean Charney for over $20,000. Similarly, Dr. Singh hired an external designer to design our annual report for $20,000 despite the fact he was barely a year into his tenure and had a design team in-house.

**G. Dr. Singh constantly oversells and otherwise misrepresents the ATLAS project**

64. Dr. Singh also routinely mischaracterized AIGH's work to existing and potential funders, by exaggerating what we had achieved. This both deflated our team, by giving us the impression that what we had achieved wasn't satisfactory.

65. In or around October 2015, Dr. Singh attended a United Nations ("UN") event on behalf of AIGH. The event brought together approximately 30 people from various tech companies across the country to discuss ideas for solving a persistent problem in global health: namely that community health organizations in rural areas of developing countries often have problems prioritizing care and resources. The meeting was convened by Mark Grabowsky of the UN's Special Envoy's Office.

66. Resource allocation is a well-established problem in global health so the above problem isn't novel. During the first meeting on September 27, 2015, nearly two dozen groups attended the meeting (initial meeting agenda attached as **Exhibit B**). However, after several calls attendance started to dwindle and interest waned (mainly because there was no clear leadership and no funding). I am also attaching a list of initial participants in an Excel sheet as **Exhibit C**. You can see that many are listed as donor, yet not a single one donated to this effort to the best of my knowledge. The effort was named "Africa Health Equity Atlas". This was later renamed ATLAS after AIGH became the sole driver.

67. Despite no clear funding or project (and the fact that we were only 2 months into our work), Dr. Singh voiced his intense desire to be involved in ATLAS. Since there was very little funding at this point, AIGH was one of a few organizations that had expressed such interest.

68. At the time, this puzzled me. However, I soon realized that Dr. Singh's interest was driven by his desire to be involved in a UN endorsed project – the lack of direction and funds did not matter to

him as long as AIGH was associated in some way with the prestige and reputation of the UN. This was evident from his failure to assemble an AIGH team dedicated to ATLAS, or to take any concrete steps to move it forward, beyond arranging couple of unproductive calls and meetings with Twitter and Massachusetts Institute of Technology, two other organizations interested in ATLAS.

69. As a result, I decided early on to keep my distance from the ATLAS project, and instead focused my energies on developing the infrastructure of AIGH – hiring new staff and interns, and develop more concrete projects such as integrating social and economic data with health data for better health outcomes.

70. However, in June 2016, Dr. Singh requested that I fly to Seattle with him and Mr. Berman to pitch ATLAS to Dr. Trevor Mundel, president of the Global Health Program at the Gates Foundation in Seattle, a potential source of funding for ATLAS. The team included myself, Dr. Singh, Dr. Deb Roy from MIT, James Kondo from Twitter, and Gus Ruchman from the UN's Special Envoy's office (who got use the meeting). I note that Mr. Ruchman was also an incoming medical student at Mount Sinai.

71. The meeting went terribly, and I witnessed Dr. Singh's lack of experience and incompetence firsthand. He grossly oversold ATLAS, passing it off as an already existing product when in fact it was still merely an idea. He told the Gates Foundation we had active users; in fact we had none. Dr. Singh couldn't answer the most basic questions, and Mr. Kondo and Dr. Roy simply spoke about their own work rather than the proposed joint project. Furthermore, there was a verbal disagreement between Mr. Kondo, Dr. Singh and Saara Romu, a program officer at the Gates Foundation, after she kept asking numerous questions. Dr. Singh made it seem like we had a prototype when we did not; in fact, we didn't even have staff working on ATLAS at the time.

72. We left the meeting without securing any funding, and I left Seattle feeling embarrassed. After the meeting, Dr. Singh parted ways with Dr. Roy and Mr. Kondo; he asked me if I could be more involved in ATLAS and I accepted as in its current format the project was damaging AIGH's reputation.

73. My first decision as the lead of ATLAS was to hire more staff. Dr. Singh told me that he will use the Arnhold funds and greenlighted my hiring of several very accomplished individuals, including Matt Le and later Humale Khan.

74. The project was very slow to make progress because we had no partners in the health organizations space that would provide us with data. Bringing community health organizations as partners was Dr. Singh's role but he never secured a single partnership while I was working with him. This was strange because his wife ran a community health organization but they wouldn't even formally meet with us to explore a project. This was especially frustrating and caused us to spin our wheels since we need the insight from community health organization to build useful software.

75. A few months later, in the fall of 2016, I delivered a presentation about ATLAS at a USAID innovation competition in Washington DC. The competition was essentially an opportunity for organizations to pitch ideas and projects for seed funding. We were one of the more promising pitches and we were partnered up with Dimagi, a mobile data collection software company, for a

$900,000, one-year pilot program ($300,000 of which was given to AIGH) to develop a proof-of-concept in Guatemala.

76. For the duration of our partnership with Dimagi, Dr. Singh continued to oversell ATLAS to various organizations and donors, including USAID. In particular, he continued to claim that ATLAS had active users, when in fact it had none.

77. When I left Mount Sinai and AIGH in August 2017, ATLAS was still very much in its infancy and essentially useless. This was common for early-stage products and there was nothing to be ashamed of. However, Dr. Singh constantly misrepresented the status of the project. In my estimation, given the pace it was progressing at, ATLAS would require an additional 3 years of work for to reach a position where it can be used effectively. (In a normally functioning organization with proper focus it would take a year).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 16, 2021.

Dr. James H. Faghmous