**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DR. HOLLY ATKINSON, DR. NATASHA ANUSHRI ANANDARAJA, DR. STELLA SAFO, MARY CALIENDO, HUMALE KHAN, GERALDINE LLAMES, AMANDA MISITI, and EMILIE BRUZELIUS,

Plaintiffs,

v.

DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA, DAVID BERMAN, and ICAHN SCHOOL of MEDICINE at MOUNT SINAI,

Defendants.

**ORAL ARGUMENT REQUESTED**

No. 19-cv-3779 (VSB) (JW)

**DEFENDANTS DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA, AND ICAHN SCHOOL OF MEDICINE AT MOUNT SINAI'S REPLY MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT....1

I. SAFO FAILED TO RAISE A TRIABLE ISSUE ON HER DISCRIMINATION CLAIMS....3

A. Safo's Hostile Work Environment Claims Should Be Dismissed....3

B. Safo's Disparate Treatment Claims Should Be Dismissed....5

II. LLAMES FAILED TO RAISE A TRIABLE ISSUE ON HER DISCRIMINATION CLAIMS....8

A. Llames' Hostile Work Environment Claims Should Be Dismissed....8

B. Llames' Disparate Treatment Claims Must Be Dismissed....11

III. NEITHER SAFO NOR LLAMES RAISED A TRIABLE ISSUE ON THEIR CONSTRUCTIVE DISCHARGE CLAIMS....11

IV. AMANDA MISITI FAILED TO RAISE A TRIABLE ISSUE ON HER DISCRIMINATION CLAIMS....14

A. Misiti's Hostile Work Environment Claims Should Be Dismissed....14

B. Misiti's Disparate Treatment Claims Should Be Dismissed....15

V. BRUZELIUS FAILED TO RAISE A TRIABLE ISSUE ON HER DISCRIMINATION CLAIMS....16

A. Bruzelius' Hostile Work Environment Claims Should Be Dismissed....16

B. Bruzelius' Disparate Treatment Claims Should Be Dismissed....18

C. Bruzelius' Equal Pay Act Claims Should Be Dismissed....18

D. Bruzelius' Retaliation Claims Should Be Dismissed....21

VI. PLAINTIFFS' NEW YORK STATE AND CITY LAW CLAIMS AGAINST CHARNEY MUST BE DISMISSED....23

CONCLUSION....24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Agosto v. N.Y.C. Dep't of Educ.*,
982 F.3d 86 (2d Cir. 2020)....4

*Ananiadis v. Mediterranean Gyros Products, Inc.*,
151 A.D.3d 915 (2d Dep't 2017). (Opp. 45.) ....23

*Atkinson v. Singh*,
2022 WL 137634 (S.D.N.Y. Jan. 14, 2022) ....8

*Back v. Hastings on Hudson Union Free School District*,
365 F.3d 107 (2d Cir. 2004)....17

*Bautista v. PR Gramercy Square Condo.*,
642 F. Supp. 3d 411 (S.D.N.Y. 2022)....4

*Benzinger v. Lukoil Pan Ams., LLC*,
447 F. Supp. 3d 99 (S.D.N.Y. 2020)....9

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006)....21

*Carter-Marks v. Alstom Transp. USA Inc.*,
800 F. Supp. 3d 423 (E.D.N.Y. 2025) ....4

*Casalino v. N.Y. State Cath. Health Plan, Inc.*,
2012 WL 1079943 (S.D.N.Y. Mar. 30, 2012) ....9

*Chiaramonte v. Animal Med. Ctr.*,
677 F. App'x 689 (2d Cir. 2017) ....20

*Chislett v. N.Y.C. Dep't of Educ.*,
157 F.4th 172 (2d Cir. 2025) ....13

*Douglas v. Victor Cap. Grp.*,
21 F. Supp. 2d 379 (S.D.N.Y. 1998)....8

*Dowrich-Weeks v. Cooper Square Realty, Inc.*,
535 F. App'x 9 (2d Cir. 2013) ....13

*Dyke v. McCleave*,
79 F. Supp. 2d 98 (N.D.N.Y. 2000)....4

*EEOC v. Bloomberg L.P.*,
967 F. Supp. 2d 816 (S.D.N.Y. 2013).....22, 24

*Estevez v. Berkeley Coll.*,
2021 WL 3115452 (S.D.N.Y. July 19, 2021), *aff'd*, 2022 WL 16843460 (2d Cir. Nov. 10, 2022) .....15

*Figueroa v. City of N.Y.*,
2002 WL 31163880 (S.D.N.Y. Sept. 27, 2002), *aff'd*, 118 F. App'x 524 (2d Cir. 2004) .....4, 14

*Fincher v. Depository Tr. & Clearing Corp.*,
604 F.3d 712 (2d Cir. 2010).....24

*Garcia v. Barclays Cap., Inc.*,
281 F. Supp. 3d 365 (S.D.N.Y. 2017) (Broderick, J.) .....5, 19

*Garrison v. Am. Sugar Refining, Inc.*,
789 F. Supp. 3d 291 (S.D.N.Y. 2025), *appeal dismissed*, 2025 WL 4065857 (2d Cir. Dec. 17, 2025) .....6

*Goldstein v. City Univ. of N.Y.*,
2026 WL 2532245 (S.D.N.Y. Aug. 27, 2026).....24

*Hayes v. N.Y.C. Dep't of Corr.*,
84 F.3d 614 (2d Cir. 1996).....10

*Holtz v. Rockefeller & Co.*,
258 F.3d 62 (2d Cir. 2001).....7

*Husser v. N.Y.C. Dep't of Educ.*,
137 F. Supp. 3d 253 (E.D.N.Y. 2015) .....10

*Interpublic Grp. of Cos. v. Lesser*,
775 F. Supp. 697 (S.D.N.Y. 1991).....12

*Johnson v. Potter*,
2009 WL 2180354 (W.D.N.Y. July 22, 2009), *aff'd*, 398 F. App'x 644 (2d Cir. 2010) .....12

*Liburd v. Bronx Lebanon Hosp. Ctr.*,
2009 WL 900739 (S.D.N.Y. Apr. 3, 2009), *aff'd*, 372 F. App'x 137 (2d Cir. 2010) .....5

*Livingston v. City of New York*,
563 F. Supp. 3d 201 (S.D.N.Y. 2021).....5

*Maron v. Legal Aid Soc'y*,
605 F. Supp. 3d 547 (S.D.N.Y. 2022)....4

*Mazzone-Trani v. Donohue Cecere Funeral Home*,
2010 WL 3282616 (E.D.N.Y. Aug. 13, 2010)....14

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*,
715 F.3d 102 (2d Cir. 2013)....5

*Milord-Francois v. N.Y. State Off. of Medicaid Inspector Gen.*,
635 F. Supp. 3d 308 (S.D.N.Y. 2022)....5

*Muldrow v. City of St. Louis*,
601 U.S. 346 (2024)....2, 6, 13

*Neale v. Dillon*,
534 F. Supp. 1381 (E.D.N.Y. 1982), *aff'd*, 714 F.2d 116 (2d Cir. 1982)....12

*Olin v. Rochester City Sch. Dist.*,
596 F. Supp. 3d 475 (W.D.N.Y. 2022)....5

*Pacheco v. Comprehensive Pharmacy Servs.*,
2013 WL 6087382 (S.D.N.Y. Nov. 19, 2013)....23

*Palomo v. Trustees of Columbia University*,
170 F. App'x 194 (2d Cir. 2006)....10

*Paterakos v. City of Chi.*,
147 F.4th 787 (7th Cir. 2025)....6

*Payne v. JetBlue Airways Corp.*,
2024 WL 3360381 (E.D.N.Y. July 9, 2024)....11, 18

*Raskin v. Wyatt Co.*,
1996 WL 175087 (S.D.N.Y. Apr. 15, 1996), *aff'd*, 125 F.3d 55 (2d Cir. 1997)....12, 13

*Rother v. NYS Dep't of Corr. & Cmty. Supervision*,
970 F. Supp. 2d 78 (N.D.N.Y. 2013)....11

*Royall v. City of Beacon*,
2024 WL 4266546 (S.D.N.Y. Sept. 23, 2024)....15

*Saenger v. Montefiore Med. Ctr.*,
706 F. Supp. 2d 494 (S.D.N.Y. 2010)....5

*Schoenadel v. YouGov Am. Inc.*,
2025 WL 371089 (S.D.N.Y. Feb. 3, 2025)....13

*Smith v. City of N.Y.*,
2025 WL 1983047 (S.D.N.Y. June 3), *R. & R. adopted*, 2025 WL 2022534 (S.D.N.Y. July 18, 2025) ....6

*Spina v. Our Lady of Mercy Med. Ctr.*,
2003 WL 22434143 (S.D.N.Y. Oct. 23, 2003), *aff'd*, 120 F. App'x 408 (2d Cir. 2005) ....9

*Stidhum v. 161-10 Hillside Auto Ave, LLC*,
2026 WL 761394 (2d Cir. Mar. 18, 2026) ....6

*Winsor v. Hinckley Dodge, Inc.*,
79 F.3d 996 (10th Cir. 1996) ....4

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c)(3) ....7

Local Civ. R. 56.1 ....1, 7

## PRELIMINARY STATEMENT

Plaintiffs' opposition to Defendants' Motion for Summary Judgment does not identify a genuine dispute over a single fact that matters. Instead, it devotes pages to collateral events and meaningless differences in how witnesses described them, without explaining how any of those points could establish an element of Plaintiffs' claims or defeat summary judgment. Plaintiffs attempt to avoid summary judgment by introducing nearly 500 new paragraphs of so-called "additional ***undisputed*** material facts"—in plain violation of Local Rule 56.1(b)—along with a number of irrelevant declarations, which are little more than irrelevant diversions, perhaps best epitomized by Plaintiffs' odd reference to something Nelson Mandela supposedly said about Plaintiffs' counsel more than twenty years ago. Plaintiffs point to nothing that would allow a reasonable factfinder to find viable harassment, discrimination or retaliation claims under any statute.

Indeed, Plaintiffs' opposition is notable for its failure to address the undisputed record evidence and legal authority, which went largely unrebutted, compelling dismissal of their claims. Quite tellingly, Plaintiffs' opposition makes little effort to establish a hostile work environment based on the individual experiences of the four Plaintiffs. Instead, they claim that Prabhjot Singh, David Berman and Bruno Silva were hostile to women generally, and purport to rely on the experiences of women who are not plaintiffs in this case to resuscitate the lifeless claims of the women who are. Plaintiffs then pretend that the undisputed record evidence of male employees experiencing the same or similar frustrations with Singh does not exist, and completely fail to address the overwhelming authority Defendants cite granting summary judgment in analogous circumstances. And while Plaintiffs baldly claim "Berman yelled at women"—while ignoring his similar interactions with men—only one Plaintiff, Geraldine Llames, claims to have been the target of Berman's alleged temper once.

Given those obvious defects, Plaintiffs' opposition now portrays Silva as the centerpiece of their harassment claims by clinging to language he used when communicating with friends. But those soundbites do not create an unlawful environment because the undisputed record evidence confirms: (i) Plaintiffs were either unaware of Silva's conduct or did not experience offensive remarks directed at them; (ii) Plaintiffs' interactions with Silva were a product of their personal friendship with him in and outside of work; (iii) Plaintiffs used similarly vulgar language with colleagues; and (iv) Plaintiffs were not offended.

Plaintiffs' disparate treatment claims fare no better. Plaintiffs baselessly criticize Defendants for ignoring the "some harm" standard under *Muldrow v. City of St. Louis*. Leaving aside that all of Defendants' authority on this point expressly cited *Muldrow*, Plaintiffs fail to provide any authority to support their trifling inconveniences constituting "some harm." More critically, they fail to proffer evidence that creates an inference of discrimination, and they do not even address pretext. Stella Safo and Llames simply repackage their failed disparate treatment claims into the far more exacting claims of constructive discharge, relying instead on the inapplicable "some harm" standard.

Plaintiffs failed to identify a triable issue on any of their remaining claims as well. Emilie Bruzelius' equal pay claims focus on her title rather than her actual duties, and she fails to materially dispute her comparators' vastly different credentials and experience. Her retaliation claim fails because the record is devoid of evidence of a retaliatory animus beyond her own rank speculation. Lastly, all claims against Dennis Charney fail because there is not a scintilla of evidence that he participated in any discriminatory conduct or failed to act in response to a discrimination complaint.

Accordingly, for the reasons set forth below and in Defendants' opening brief, Defendants are entitled to summary judgment on all claims.

# I. SAFO FAILED TO RAISE A TRIABLE ISSUE ON HER DISCRIMINATION CLAIMS.

## A. Safo's Hostile Work Environment Claims Should Be Dismissed.

Defendants are entitled to summary judgment on Safo's hostile work environment claims because the conduct on which she relies was, at most, petty slights, experienced by both men and women alike, not connected to gender, made without her knowledge, and/or was not offensive to her. Safo's claim that she heard "a pattern in the way that [Silva] communicated about individuals he didn't like, especially women," (Opp. 20)[1], cannot salvage her claim because it contains no specifics and there is no suggestion Safo was offended by anything Silva said to her.

The undisputed record evidence is that Safo never heard derogatory terms directed at her. 56.1 ¶90. At most, she claims there was "acrimony" when Silva talked to her about others, which caused Safo to wonder whether he talked about her behind her back. *Id*. ¶91. Plaintiffs do not even attempt to distinguish the cases Defendants cited dismissing harassment claims where the plaintiff did not experience the alleged misconduct, and fail to offer any authority to the contrary.[2]

Instead, Plaintiffs suggest that Silva's denial that he uttered the word "cunt" is "itself a dispute of material fact." (Opp. 22.) Plaintiffs are wrong. Defendants' motion assumed he described Safo to someone else using that word, but because Safo admits she never heard him say it, she cannot avoid summary judgment on that basis as a matter of law. (MSJ 16-17; 56.1 ¶90.)

---

[1] Citations to Defendants moving memorandum of law (Dkt. 208) are denoted herein as "MSJ." Citations to Plaintiffs' opposing memorandum of law (Dkt. 241) are denoted as "Opp."

[2] Moreover, Plaintiffs do not dispute Safo's own use of vulgar language with colleagues, including "bitch," '[t]hese mofos can kiss my ass," "haters can suck a million dicks," and "millennials suck huge balls." (56.1 ¶¶95-96.)

Plaintiffs' reliance on *Dyke v. McCleave*, 79 F. Supp. 2d 98, 105-06 (N.D.N.Y. 2000) and *Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1000 (10th Cir. 1996), is misplaced. In *Dyke*, the harasser admitted to calling the plaintiff "cunt," "slut," "whore," "lesbian," and "stupid cunt" ***to her face on a daily basis***. *Dyke*, 79 F. Supp. 2d at 105. And in *Winsor*, the plaintiff was the target of a "steady stream of vulgar and offensive epithets," received sexually explicit pictures and notes, and was subjected to escalating physical violence, including a coworker pushing her against a wall and placing his knee between her legs. *Winsor*, 79 F.3d at 998-1000. This record contains nothing remotely analogous.

Moreover, Plaintiffs' attempt to inflate Silva's stature by describing him as a member of the AIGH "Senior Leadership Team" (Opp. 22) cannot be reconciled with Safo's own testimony ***that she supervised Silva***. (56.1 ¶42; Dkt. 212-4, Safo Tr. 78-79.) Plaintiffs also rely on Silva saying he would "watch her fail." (Opp. 23.) But that statement is gender-neutral, Safo did not hear it, and merely speculates that Silva's motivation for supposedly slowing her work "felt like that was gendered." (Opp. 23.) Safo's conjecture as to Silva's motivation is no substitute for a material factual dispute. *See Figueroa v. City of N.Y.*, 2002 WL 31163880, at *3 (S.D.N.Y. Sept. 27, 2002), *aff'd*, 118 F. App'x 524 (2d Cir. 2004).

None of the remaining conduct underlying Safo's claims—that Singh called her a "mother hen," passed over her in meetings, stared at her and told her she talks too much—is gender-based harassment for the reasons set forth in Defendants' opening brief. (MSJ 15-19.) Plaintiffs completely fail to address, much less attempt to distinguish, the vast body of caselaw holding the same, similar and far worse conduct to be insufficient to survive summary judgment.[3] The best

[3] *See, e.g.*, *Bautista v. PR Gramercy Square Condo.*, 642 F. Supp. 3d 411, 426-27 (S.D.N.Y. 2022); *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 102-04 (2d Cir. 2020); *Carter-Marks v. Alstom Transp. USA Inc.*, 800 F. Supp. 3d 423, 463 (E.D.N.Y. 2025); *Maron v. Legal Aid Soc'y*, 605 F.

Plaintiffs offer is cherry-picked testimony from select witnesses who claimed that Singh's alleged poor management was directed only towards women. (Opp. 29.)[4] In so doing, however, Plaintiffs totally ignore the undisputed record evidence of additional witnesses who testified unequivocally that men had the very same issues with Singh, (56.1 ¶¶69-75), including, for example, an admission from Plaintiffs that a male employee believed that Singh was "gaslighting" him, and testimony from a different employee who observed Singh treat men in a way that was "cruel and insensitive." (56.1 ¶173, 73.)[5]

The NYCHRL changes nothing because there is no evidence Safo was treated "less well" *because of* her gender; the City law is not a "general civility code." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013).

**B. Safo's Disparate Treatment Claims Should Be Dismissed.**

Safo's disparate treatment claims based on her initial title and salary in 2015 are untimely under all statutes. (MSJ 20-21.) Plaintiffs do not say otherwise, suggesting only that "[e]ven if time-barred, the 2015 conduct is admissible background." (Opp. 34.)

---

Supp. 3d 547, 565-66 (S.D.N.Y. 2022); *Milord-Francois v. N.Y. State Off. of Medicaid Inspector Gen.*, 635 F. Supp. 3d 308, 329 (S.D.N.Y. 2022); *Livingston v. City of New York*, 563 F. Supp. 3d 201, 252-53 (S.D.N.Y. 2021); *Olin v. Rochester City Sch. Dist.*, 596 F. Supp. 3d 475, 487-88 (W.D.N.Y. 2022); *Liburd v. Bronx Lebanon Hosp. Ctr.*, 2009 WL 900739, at *1, *8-9 (S.D.N.Y. Apr. 3, 2009), *aff'd*, 372 F. App'x 137 (2d Cir. 2010).

[4] That Singh denied the behavior attributed to him is not a material dispute as Plaintiffs erroneously suggest. (Opp. 27.) Even in the light most favorable to Plaintiffs, Singh's behavior does not rise to actionable gender-based harassment.

[5] Plaintiffs trumpet that "[t]hirteen women left the Institute…five men did" (Opp. 31), with no other information or why anyone left. Such raw numbers cannot defeat summary judgment. *See Garcia v. Barclays Cap., Inc.*, 281 F. Supp. 3d 365, 384 (S.D.N.Y. 2017) (Broderick, J.); *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 515-16 (S.D.N.Y. 2010).

Safo's disparate treatment claims based on the timing of her promotion to Chief Medical Officer, the brief delay in her pay raise associated with that promotion, and her claim she was assigned menial tasks all fail for lack of an adverse action. Plaintiffs claim that the foregoing constitutes "some harm" under *Muldrow v. City of St. Louis*, 601 U.S. 346, 350 (2024), which they baselessly accuse Defendants of hiding. Plaintiffs are mistaken.

Indeed, every case Defendants relied upon for the proposition that Safo did not experience an actionable adverse action was decided after, and expressly cited, *Muldrow*. (MSJ 21-22.)[6] In the face of this overwhelming authority, Plaintiffs fail to cite a single case to support their specious claim that Safo experienced "some harm." She did not.

Even if Safo experienced an adverse action, there is no evidence that permits an inference of discrimination; Safo's conclusory allegation that men received raises and promotions without asking is wholly unsupported. Plaintiffs point to Matthew Le, who they claim "received a rise [sic] and an $8,000 bonus after about a year." (Opp. 35, citing Defs.' 56.1 ¶162.) The problem for Plaintiffs is that paragraph 162 says "Singh tried to retain Le with an offer of a retention bonus and promotion, but Le left for a higher-paying job." There is no evidence that Le received an unsolicited raise.

Plaintiffs also state that James Faghmous received several salary increases, "unasked." (Opp. 35.) In support, they cite paragraph 58 of Faghmous's declaration, which states "[w]hen I first started at AIGH, ***I requested*** a $30,000 raise and was granted the raise without question or protocol. That was the same for ***most people*** if they asked for a raise" (Dkt. 236 (emphasis added).)

---

[6] *See*, *e.g*., *Garrison v. Am. Sugar Refining, Inc.*, 789 F. Supp. 3d 291, 306 (S.D.N.Y. 2025), *appeal dismissed*, 2025 WL 4065857 (2d Cir. Dec. 17, 2025); *Smith v. City of N.Y.*, 2025 WL 1983047, at *9 (S.D.N.Y. June 3), *R. & R. adopted*, 2025 WL 2022534 (S.D.N.Y. July 18, 2025); *see also Stidhum v. 161-10 Hillside Auto Ave, LLC*, 2026 WL 761394, at *3 (2d Cir. Mar. 18, 2026) (summary order); *Paterakos v. City of Chi.,* 147 F.4th 787, 796-97 (7th Cir. 2025).

The Court should ignore this "evidence" for several reasons. First, the entire Faghmous declaration should be struck for the reasons set forth in Defendants' Motion to Strike, filed concurrently herewith. Second, the assertion attributed to Faghmous is not in Plaintiffs' 56.1 Statement, which precludes Plaintiffs from relying on it in their brief. *See* Local Civ. R. 56.1(d); Fed. R. Civ. P. 56(c)(3); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001).[7] Third, it does not even support the proposition for which Plaintiffs cite it, because the raise was "requested," not "unasked" as Plaintiffs falsely claim, and Faghmous said "most people" got raises once requested—not most men.

Even if the Court were inclined to consider this "evidence," it does not create an inference of discrimination because Plaintiffs completely fail to address how Faghmous or Le are similarly situated to Safo. The undisputed record evidence is that Faghmous was the Chief Technology Officer, (56.1 ¶47), and Le had "a machine learning background, which was pretty distinctive from anybody else on the team" and was a flight-risk who was "being recruited for roles that paid multiples of what [AIGH] could pay him." (56.1 ¶162.) Indeed, Safo admitted she knew nothing of Faghmous's qualifications and offered no testimony regarding Le's. (56.1 ¶48; Dkt. 212- 4, Safo Tr. 75-76.)

Plaintiffs also mischaracterize Defendants' reason for the timing of Safo's promotion, claiming it was "because she had held no chief-level role before." (Opp. 35, citing 56.1 ¶45.) While paragraph 45 does say she had not been a Chief Medical Officer prior to working at ISMMS, that has nothing to do with her promotion. The record evidence is that: (i) Singh testified Safo declined a promotion in early 2017—a conversation Safo admits she does not recall but does not deny (56.1

[7] Likewise, the documents Plaintiffs cite, ISMMS_009447-77 (Opp. 35), are not in the summary judgment record and should not be considered.

¶46); and (ii) Singh promoted her after she requested it. *Id*. ¶49. Plaintiffs also claim that neither Berman nor Faghmous had chief roles prior to ISMMS. (Opp. 35.) That is categorically false, as Plaintiffs do not dispute that both held chief-level roles for years before AIGH. (56.1 ¶47.)

Lastly, Plaintiffs offer no response to Defendants' legitimate business reasons for any adverse action Safo claims to have sustained. (MSJ 23-25.) Plaintiffs do not even attempt to show pretext, abandoning any such argument. *See Douglas v. Victor Cap. Grp*., 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998). This failure alone compels dismissal of Safo's disparate treatment claims.

## II. LLAMES FAILED TO RAISE A TRIABLE ISSUE ON HER DISCRIMINATION CLAIMS.

### A. Llames' Hostile Work Environment Claims Should Be Dismissed.

Defendants are entitled to summary judgment on Llames' claims because none of the complained-of conduct was related to her gender. For example, the fact that Berman yelled at her once and called her stupid is not unlawful. Indeed, this Court dismissed Llames' NYSHRL and NYCHRL claims against Berman because allegations that Berman had a "short temper with female subordinates" and yelled at Llames (and others) did not show that "gender factored into Berman's alleged unpleasantness towards her" or that he treated similarly situated male employees better. *Atkinson v. Singh*, 2022 WL 137634, at *15-16 (S.D.N.Y. Jan. 14, 2022). That remains true now.

Plaintiffs claim that Berman yelled at "[f]ive women"—Llames, Renee Bischoff, Mary Caliendo, Sasha Walek and Anna Stapleton—as evidence of discriminatory treatment. (Opp. 24.) Only Llames is a Plaintiff, and Plaintiffs concede that Berman yelled at her only once. *Id*. Plaintiffs fail to explain how such an isolated incident, completely unrelated to Llames' gender, is actionable

under any statute. Not only do Plaintiffs fail to distinguish Defendants' authority on this point,[8] they do not provide any legal support of their own.

Instead, Plaintiffs claim generally "Berman yelled at women." (Opp. 23.) But the record confirms he also yelled at Aaron Baum, and Safo testified she was aware of "heated conversations" between Berman and Sandeep Kishore, including once where Berman spoke to him "harshly." (56.1 ¶¶78, 81, 125.) Indeed, the uncontroverted evidence is that Berman yelled at Baum. (56.1 ¶¶ 81, 125.) They dispute only whether Baum cried as a result—a meaningless distinction. *Id*.[9]

Plaintiffs try to manufacture a factual dispute by claiming Berman said he "never yelled at anybody in a workplace" and insisted instead that he "raised [his] voice." (Opp. 24.) This meaningless distinction is not a material dispute, and, in any case, Defendants assumed Berman had yelled for purposes of their motion.

Llames cannot establish a hostile work environment claim based on Singh's management style and being passed-over in meetings because it is undisputed that both men and women experienced Singh's changing directives and were unable to speak at times during meetings. *See supra* at 4-5. Moreover, this is precisely the type of insubstantial conduct that does not alter conditions of employment. *See supra* at n.3. As noted above, Plaintiffs fail to distinguish the

---

[8] *See*, *e.g.*, *Casalino v. N.Y. State Cath. Health Plan, Inc.*, 2012 WL 1079943, at *7 (S.D.N.Y. Mar. 30, 2012); *Spina v. Our Lady of Mercy Med. Ctr.*, 2003 WL 22434143, at *3–4 (S.D.N.Y. Oct. 23, 2003), *aff'd*, 120 F. App'x 408 (2d Cir. 2005); *see also Benzinger v. Lukoil Pan Ams., LLC*, 447 F. Supp. 3d 99, 123 & n.16 (S.D.N.Y. 2020).

[9] The fact Safo claims she never heard Berman treat men the way he did Caliendo or Bischoff and that he never yelled at Mike Escosia (Opp. 24), does not negate the undisputed record evidence of other witnesses who observed Berman yelling or speaking harshly at men. (56.1 ¶125.) Safo's testimony is also completely irrelevant insofar as it does not involve Berman yelling at Plaintiffs, much less because of their gender.

extensive authority on this point holding analogous and far worse conduct to be insufficient to survive summary judgment, and do not offer any authority to the contrary.

Llames' reliance on Silva's conduct fares no better. Her exchanges with Silva about personal appearance, dating habits, sex life and menstrual cycles were a function of their personal friendship in which they sought advice from each other about sexual partners and work, among other things. Indeed, Llames admitted that conversations on these types of subjects occurred "[b]ecause we were friends." (56.1 ¶¶126-28, 133.) Her testimony confirms this:

> Q. When you and Mr. Silva would have discussions about your dating life, the way you looked, your weight, were those conversations you were having with him as part of your friendship?
>
> A. Yes.

(Dkt. 212-5, Llames Tr. 149.)[10]

Although Plaintiffs claim Llames told Silva to "stop. You can't say those things," (Opp. 22), Llames admitted she told him to stop because she felt he should not talk about others that way—***not because she was offended***. (Dkt. 212-5, Llames Tr. 140). Indeed, she expressly admitted she was not offended by his cursing. *Id*. The fact that ***she*** was not offended is fatal to her claim.[11] *See Husser v. N.Y.C. Dep't of Educ.*, 137 F. Supp. 3d 253, 276-77 (E.D.N.Y. 2015).

---

[10] In her declaration, Llames refers to Silva commenting on "women 'being wet.'" (Dkt. 225 ¶ 5.) When asked at her deposition about Silva's allegedly inappropriate remarks, she did not mention this, and therefore cannot rely on it here. *See Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).

[11] Plaintiffs claim that *Palomo v. Trustees of Columbia University*, 170 F. App'x 194, 196-97 (2d Cir. 2006) is the "opposite case" because "that plaintiff never told the harasser his comments made her uncomfortable." (Opp. at 21-22.) But Llames admitted she never told Silva his cursing made ***her*** uncomfortable. (56.1 ¶¶129, 137-38; Dkt. 212-5 (Llames Tr. 139-40, 142); Dkt. 223-14 (Llames Tr. 138).) And there is no record evidence that she ever attempted to disabuse the perception of her friendship with Silva.

### B. Llames' Disparate Treatment Claims Must Be Dismissed.

As set forth in Defendants' brief, Llames failed to raise a triable issue on her disparate treatment claims. (MSJ 28-29). Plaintiffs do not even attempt to argue that Llames was the victim of disparate treatment, abandoning the claim. *See Payne v. JetBlue Airways Corp.*, 2024 WL 3360381, at *8–9 (E.D.N.Y. July 9, 2024).

## III. NEITHER SAFO NOR LLAMES RAISED A TRIABLE ISSUE ON THEIR CONSTRUCTIVE DISCHARGE CLAIMS.

Both Safo and Llames failed to raise a triable issue of working conditions so intolerable that a reasonable person would have felt compelled to resign. The standard for constructive discharge is higher than that for hostile work environment, so their failure to establish the latter dooms the former. And neither Llames nor Safo suffered a humiliating reduction of responsibilities, reduction in pay or adverse action that would have compelled them to resign.

Plaintiffs' opposition fails to address Safo's working conditions that supposedly prompted her resignation and instead focuses on whether her transfer within ISMMS was a resignation. They merely say, in conclusory fashion, that "the record substantiates [her] constructive discharge claim" and that "[i]t is a question of degree, and questions of degree belong to juries." (Opp. 36.) Whatever that means, Plaintiffs' opposition fails to address the exacting standard to survive summary judgment on constructive discharge. They do not even attempt to argue that Safo suffered a humiliating reduction of responsibilities, reduction in pay or other adverse action that would have compelled her to resign. *See Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 93 (N.D.N.Y. 2013) ("The constructive-discharge inquiry focuses on the working conditions preceding the employee's resignation.") She has, therefore, waived the argument and her claim should be dismissed.

Even if there were a triable issue as to whether Safo's working conditions at AIGH were so intolerable—and clearly, there is not—her post-resignation circumstances also fail to raise a material factual dispute. While she characterizes the transfer as a demotion because of a supposedly lesser title (Opp. 36), her salary remained the same and her total compensation increased. (56.1 ¶99; Dkt. 211-13 (ISMMS _018925).) That is not constructive discharge. *See Interpublic Grp. of Cos. v. Lesser*, 775 F. Supp. 697, 698-99 (S.D.N.Y. 1991) (noting that courts are particularly hard-pressed under New York law to "find a constructive discharge when there is no evidence of reduction in salary or benefits, and the employee is asked to remain with his employer"); *see also Neale v. Dillon*, 534 F. Supp. 1381, 1390 (E.D.N.Y. 1982) (transfer to a non-supervisory position, at no loss of pay, not constructive discharge; plaintiff's perception that the transfer was damaging to her prestige insufficient), *aff'd*, 714 F.2d 116 (2d Cir. 1982).

Safo next claims she resigned her post-transfer position in 2019—***one year*** after she left AIGH for another position at ISMMS—"because of the damages from this case. It was very difficult to work at Sinai" and she "feared that [she] would be retaliated [sic]." (Opp. 37.)[12] Mere fear of retaliation is legally insufficient. *See Johnson v. Potter*, 2009 WL 2180354, at *17 (W.D.N.Y. July 22, 2009) (where a constructive discharge claim rests on retaliation, the acts complained of "must actually constitute retaliation."), *aff'd*, 398 F. App'x 644 (2d Cir. 2010). Nor can conduct at AIGH one year earlier, with no "carry-over effect" on her new position, support the claim. *Id*. Speculative fear of a future adverse action "hardly rises to the level of 'intolerable' working conditions envisioned by the Second Circuit's standard for constructive discharge." *Raskin v. Wyatt Co.*, 1996 WL 175087, at *6 (S.D.N.Y. Apr. 15, 1996), *aff'd*, 125 F.3d 55 (2d Cir.

[12] In fact, after her 2019 resignation, Safo was still doing clinical work at ISMMS ***as recently as 2024***. (56.1 ¶¶98, 103.)

1997). Even an "abusive and unpleasant" workplace does not suffice. *Chislett v. N.Y.C. Dep't of Educ*., 157 F.4th 172, 193 (2d Cir. 2025).

In a desperate attempt to salvage her constructive discharge claim, Plaintiffs claim that Safo suffered "some harm" under *Muldrow*. (Opp. 37.) But "some harm" is the standard for an adverse action under Title VII—not constructive discharge. Notably, Plaintiffs fail to cite any authority applying *Muldrow* to a constructive discharge claim. That is because the authority is to the contrary. *See*, *e.g*., *Schoenadel v. YouGov Am. Inc*., 2025 WL 371089, at *6 (S.D.N.Y. Feb. 3, 2025) (courts "have not interpreted *Muldrow* to lessen the standard for showing constructive discharge" (citation omitted)).

Llames' claim is equally deficient. As support for her claim that she had her duties stripped, she relies on an email from Berman and a recently-submitted declaration from Humale Khan. (Opp. 37.) The Berman email (Dkt. 223-45, ISMMS_008659) is not cited in Plaintiffs' 56.1 Statement and therefore should be disregarded. *See supra* at p. 7. And neither that document nor the trivial reassignments and criticisms that Khan recites rises to anything so intolerable. Plaintiffs claim only "some harm" under *Muldrow* (Opp. 37), which, as discussed above, does not apply to constructive discharge.

Llames then claims that, on one occasion, her request to work from home was denied when a previously approved leave was revoked. (Opp. 37-38.) That, too, is insufficient. *See Dowrich-Weeks v. Cooper Square Realty, Inc*., 535 F. App'x 9, 12–13 (2d Cir. 2013) (affirming dismissal of constructive discharge claim where alleged adverse actions, including denial of alternative work schedule permitting periodic work from home, do not rise to constructive discharge "when considered either individually or cumulatively").

Lastly, Plaintiffs claim that Singh told Khan "he wanted to be rid of Ms. Llames and thought her incompetent." (Opp. 38.) There is no allegation—much less evidence—that Singh said this to Llames, that Khan relayed it to Llames or that she otherwise knew about it at the time.

## IV. AMANDA MISITI FAILED TO RAISE A TRIABLE ISSUE ON HER DISCRIMINATION CLAIMS.

### A. Misiti's Hostile Work Environment Claims Should Be Dismissed.

Misiti's claims should be dismissed because they are based on a handful of episodic interactions that have no nexus to gender, and there is no evidence, much less a triable issue of fact, that Misiti was treated less well than men because of her gender. Misiti's claims that Singh stared at her, ignored her in meetings and used language intended to confuse her fail for the reasons discussed above.

Plaintiffs' opposition focuses principally on: (i) Singh telling Misiti she looked "stressed" (Opp. 25); and (ii) Singh remarking "I'm no Georgia O'Keefe" after drawing a diagram that Misiti interpreted to resemble a vagina. (Opp. 13.)

First, Plaintiffs fail to explain how a single comment unrelated to gender is unlawful, fail to address Defendants' authority on this point,[13] and do not cite a single case where a claim based on one gender-neutral remark survived summary judgment. Moreover, Misiti admitted she was, in fact, stressed at the time. (56.1 ¶170.)

Second, other than a passing statement in their opposition that "Misiti and other women present ***believed*** that [Singh] intended [the drawing] to be a vagina" (Opp. 13, emphasis added), Plaintiffs fail to connect that belief to a hostile work environment. Indeed, as Defendants pointed out, the record is devoid of evidence that Singh intended to portray a vagina or that Misiti was

[13] *Figueroa*, 2002 WL 31163880, at *3; *Mazzone-Trani v. Donohue Cecere Funeral Home*, 2010 WL 3282616, at *5 (E.D.N.Y. Aug. 13, 2010).

offended. (MSJ 32.) But even if that was Singh's intent and Misiti took offense, that would still be insufficient to survive summary judgment. *See Royall v. City of Beacon*, 2024 WL 4266546, at *20 (S.D.N.Y. Sept. 23, 2024); *Estevez v. Berkeley Coll.*, 2021 WL 3115452, at *16 (S.D.N.Y. July 19, 2021), *aff'd*, 2022 WL 16843460 (2d Cir. Nov. 10, 2022). Once again, Plaintiffs fail to address this authority or provide any of their own. Moreover, Plaintiffs admit Misiti had conversations with colleagues about female genitalia—including her writing "omg he didn't eat your pussy?!" and "[t]hey've got me by the clit," 56.1 ¶184—undermining any suggestion that she was offended.

**B. Misiti's Disparate Treatment Claims Should Be Dismissed.**

Misiti's disparate treatment claims fail because (as Plaintiffs largely admit): (i) the Chief of Staff role to which she aspired to be promoted—but for which she never applied—was eliminated following Berman's departure; (ii) a different position, Director of Global Sites, was filled by a woman (and one with far superior qualifications than Misiti); (iii) her conclusory allegation that men were placed in higher paying positions with higher titles is wholly unsupported because the supposed comparators she identified are indisputably not similarly situated; and (iv) there is no inference of discrimination because Singh hired her one year before he allegedly failed to promote her. (MSJ 32-34.)

Plaintiffs again completely fail to address these deficiencies and simply repackage the same conclusory allegations that Singh allegedly watered down her job description, "publicly shamed" and stared at her, kept her in the same position and salary after Berman's departure and supposedly changed his mind regarding her qualifications for the Global Sites role. (Opp. 39.) In so doing, Plaintiffs do not even pay lip service to the applicable legal standard to establish a prima facie case or pretext, and their opposition completely fails to point to any record evidence linking any employment decision to her gender.

Indeed, Plaintiffs admit that Berman's position was not filled following his departure, 56.1 ¶¶154, 160, and that Singh filled the Global Sites role with a female. (56.1 ¶168.) Plaintiffs' opposition fails to address how Misiti was similarly situated to any of her supposed male comparators because she largely admits she was not. (56.1 at ¶¶147-48; 150; 156-59.) Plaintiffs further admit that Singh denied Misiti's request for a promotion because she had not been in her role long enough. (56.1 ¶154.) And they point to nothing that suggests Singh's sincerely held belief was false or that discrimination was the real reason.[14]

## V. BRUZELIUS FAILED TO RAISE A TRIABLE ISSUE ON HER DISCRIMINATION CLAIMS.

### A. Bruzelius' Hostile Work Environment Claims Should Be Dismissed.

Bruzelius's claims are limited to Berman once speaking "rudely" to her, Silva commenting after she lost weight, and Knaup telling her Singh called her "weak" and that she "cared too much about" collaboration. These allegations echo the same petty slights and trivial inconveniences of the other Plaintiffs—none of which concern Bruzelius's gender and therefore cannot establish a hostile work environment.

Plaintiffs appear to have abandoned Bruzelius' hostile work environment claims because they make little, if any, effort to respond to its defects. For example, Plaintiffs' opposition makes

---

[14] Misiti's vague testimony that Singh supposedly said during her interview that "he had to get rid of" the women who had worked at AIGH does not evidence gender animus. (Opp. 7.) Misiti testified that she merely "believe[d]" Singh said "women" rather than "people," (56.1 ¶246), and did not identify which women or Singh's motivation for getting rid of anyone. In fact, Misiti clarified that Singh was referring to "***the people*** who had been there initially and in Global Health," whom he "suggested, basically," were incompetent. (56.1 ¶245 (emphasis added).) Regardless, any claim that Singh wanted to terminate all women is belied by the fact that Singh hired Misiti following her interview, 56.1 ¶149, recruited Safo (and several other women) and approved the hiring of Bruzelius and Llames. (56.1 ¶¶22-23.)

no reference to her interaction with Berman, much less explains how his speaking rudely to her once would be actionable. With regard to Silva, her declaration—which is not cited in Plaintiffs' brief—simply says that she "lost some weight in the summer of 2018. Mr. Silva made multiple references about [her] body at that time." (Dkt. 233, ¶6.) She provides no evidence of what he said, offers no specifics, and does not even claim to have been offended. Her claim that Knaup told her Singh thought she was weak and cared too much about collaboration is hearsay; she does not allege to have heard the remark, but even if she did, it was an isolated comment not related to her gender. *See supra* at n.3.

Plaintiffs baldly suggest "[c]ollaboration, normally a virtue, became a weakness because it was read as a female trait," (Opp. 25), citing *Back v. Hastings on Hudson Union Free School District*, 365 F.3d 107, 113 (2d Cir. 2004). *Back* is inapposite. First, the claim at issue there was disparate treatment—not hostile work environment—where the plaintiff was denied tenure based on gender-related stereotypes. There is no claim here that Bruzelius suffered any adverse action because she was allegedly perceived as collaborative. In any event, the stereotyping in *Back* included inquiries about how plaintiff was "planning on spacing [her] offspring," a request to "[p]lease do not get pregnant until I retire," a suggestion that she "wait until [her son] was in kindergarten to have another child," and a remark that "maybe . . . reconsider whether [Back] could be a mother and do this job." 365 F.3d at 115. The absence of any gender-based comments here—or anything beyond mere collaboration—renders *Back* completely irrelevant.

And although Bruzelius testified that Silva's cursing was "part of his normal conversation" and "pretty frequent," (Opp. 20), there is no evidence that any such language was directed at Bruzelius or that she was offended. To the contrary, she admitted they were friends. 56.1 ¶220. Plaintiffs' 56.1 response asserts that Bruzelius told Silva to stop when he made an inappropriate

remark, but the undisputed record evidence is that she did so in connection with a comment Silva made about a male employee—not about her. (56.1 ¶220; Dkt. 212-7, Bruzelius Tr. 152.) Bruzelius also claims that she complained about Silva to Marina Lowy, but that was part of the internal investigation, (56.1 ¶401), which is not at issue in this case.

### B. Bruzelius' Disparate Treatment Claims Should Be Dismissed.

Bruzelius' disparate treatment claims fail for the reasons set forth in Defendants' motion. (MSJ 35.) Plaintiffs have abandoned that claim because they failed to respond. *See Payne*, 2024 WL 3360381, at *8-9. Instead, their opposition focuses exclusively on her equal pay claims, which also fail for the reasons discussed below.

### C. Bruzelius' Equal Pay Act Claims Should Be Dismissed.

Bruzelius cannot meet her *prima facie* burden because the male comparators she identified—Le, Patrick Doupe, Mihir Mongia, Craig Helfgott, and Khan—indisputably did not perform equal work in jobs requiring equal skill, effort, and responsibility. (MSJ 35-38.)

In response, Plaintiffs claim that Defendants' argument "rests on disputed characterizations of job duties, which are for a jury." (Opp. 40.) But Plaintiffs fail to identify a single disputed job duty. On the contrary, Plaintiffs largely admit the descriptions and qualifications of Bruzelius' alleged comparators, all of whom either had a Ph.D. or backgrounds in computer science or engineering—Bruzelius did not. (56.1 ¶¶222-28.)

Plaintiffs then claim Defendants "use a narrower comparator set than the record supports" (Opp. 40), but Plaintiffs identify only one additional comparator—Faghmous. *Id*. Not only did Bruzelius fail to identify Faghmous as a potential comparator during her deposition, when asked about him she expressly admitted "[w]e didn't do the same job." (56.1 ¶200; Dkt. 212-7, Bruzelius Tr. 207). Plaintiffs also admit that Bruzelius reported to Faghmous. (56.1 ¶8.) As this Court

explained, "[i]t is self-evident that a manager does not hold substantially the same position as the individuals she manages." *Garcia*, 281 F. Supp. 3d at 387. Tellingly, Plaintiffs fail to offer any evidence that Bruzelius and Faghmous performed equal work on jobs requiring equal skill, effort and responsibility.

Plaintiffs' suggestion that Mongia and Le are appropriate comparators because they did not have doctorate degrees ignores the undisputed record evidence that they had computer science and engineering backgrounds that Bruzelius lacked, and that their work focused on technical algorithm creation and software development that Bruzelius indisputably did not perform. (56.1 ¶¶225-27.) With respect to the comparators who had doctorate degrees, Plaintiffs' opposition fails to address that Bruzelius could not be assigned research grants in the same way as a principal investigator with a Ph.D.; the fact that she may have performed some duties of a principal investigator does not change that and is immaterial. (56.1 ¶200.)

Plaintiffs also cite the fact that Bruzelius directed Mongia's and Le's research activities as evidence of unequal pay. (Opp. 41.) The fact she directed the research activities of projects of Mongia and Helfgott—not Le—was a function of her role leading the *research* side of the Data Science team because she was not a data scientist, which Plaintiffs do not dispute. (56.1 ¶¶199-200.) Plaintiffs' assertion that she "supervised" Mongia and Le (Opp. 41), is also wildly inaccurate: Bruzelius testified that the employees whose research she directed—Mongia and Helfgott—did not report to her. (Dkt. 212-7, Bruzelius Tr. 126-27.)

Plaintiffs' reliance on her shared "senior data analyst" title with Le and Doupe is also misplaced. (Opp. 40.) It is well-settled that a plaintiff must establish equal work and that mere "overlap in titles or classifications" is insufficient; "broad generalizations drawn from job titles,

classifications, or divisions, and conclusory assertions of sex discrimination, cannot suffice." *Chiaramonte v. Animal Med. Ctr.*, 677 F. App'x 689, 691 (2d Cir. 2017) (citation omitted).

In an attempt to revive Helfgott as an appropriate comparator, Plaintiffs seek to discard Jeb Weisman's testimony regarding Helfgott's and Bruzelius' work and qualifications as "opinion evidence." (Opp. 41.) But Plaintiffs fail to offer any record evidence to rebut Weisman's view. That Weisman also said Helfgott—a Ph.D. with a Master of Science in physics and nine years of prior experience as a software engineer, senior quantitative specialist, and quantitative analyst, 56.1 ¶222—was underutilized at AIGH in no way undermines his belief that Helfgott's work was "incredibly sophisticated" and that he and Bruzelius (who was a graduate student) were not doing similar work. (56.1 ¶¶195, 223, 243.)

Plaintiffs' reliance on Bruzelius' salary increase following the 2018 internal review is not evidence of a gender-based pay disparity. As Plaintiffs admit, positions were reviewed for "duties, title and compensation" (Opp. 42)—not simply for gender-based disparities. Bruzelius likewise testified that "[w]e were told that everyone in the institute would be going through this process of salary adjustment and that it would be a[n] evaluation of job titles, job descriptions, salaries commensurate with that, the position control or some entity within HR would be working with the institute." (56.1 ¶221; See also ¶221.) Moreover, Plaintiffs' bald claim that "[a]n employer that reviews for pay equity and raises the woman's salary has not disproved a disparity but confirmed one" (Opp. 42), completely ignores the fact that several men also received salary increases following the review. (56.1 ¶221.)

Lastly, Plaintiffs failed to point to any evidence that suggests her comparators' vastly different credentials, skills, experience, and market demand were not the real reasons for any salary

differential, and that gender discrimination was. Plaintiffs' complete failure to address pretext entitles Defendants to summary judgment.

**D. Bruzelius' Retaliation Claims Should Be Dismissed.**

Bruzelius cannot establish a *prima facie* case that Singh retaliated against her for participating in ISMMS's internal investigation because there is no record evidence that Singh knew who participated. Singh's unrebutted testimony that he had no knowledge of the complainants or participants is fatal to her claim. (56.1 ¶231.)

Plaintiffs speculate Singh had "ample basis" to know Bruzelius participated because he supposedly knew she was a "stickler" based on her complaining about unrelated things in the past and that he had general knowledge of an investigation because Berman and Starr had mentioned it. (Opp 43.) Plaintiffs' mere guesswork is woefully insufficient to undermine Singh's unequivocal and unrebutted testimony that he did not know the identity of the complainants or participants, even if he did know there was an investigation. (56.1 ¶231.) Thousands of pages of emails, conversations of secretly recorded meetings, and text messages have been produced in this case and not a single one suggests Singh knew Bruzelius participated. Thus, Plaintiffs' suggestion that Singh's degree of knowledge "is contested" (Opp. 43), rests entirely on Bruzelius' speculation that she could not "help but wonder" whether Singh received information from the investigator. (56.1 ¶236.) Her conjecture does not create a disputed issue of material fact.

Even if Bruzelius could overcome that fundamental defect, she fails to identify an adverse employment action, claiming only that Singh had her report to Weisman instead of him. (Opp. at 44.)[15] But a change in reporting alone is not an actionable adverse action under anti-retaliation

[15] Singh's alleged head-shake and Baum's hearsay that Singh wanted to "get rid" of her (Opp. at 43) are not adverse actions. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

laws. Plaintiffs' reliance on *EEOC v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 856 (S.D.N.Y. 2013), does not help them. In that case, the reassignment was to plaintiff's former peer, which the court held could support a *prima facie* case. Here, there is no claim that Bruzelius was assigned to a former peer but rather to the new lead of the ATLAS team. (56.1 ¶201.) In fact, in *Bloomberg*, the court granted summary judgment because the plaintiff failed to show defendant's justification for the reporting change was pretextual. 967 F. Supp. 2d at 856.

The same result obtains here. Even if Bruzelius could establish a *prima facie* case, Defendants have articulated legitimate reasons for her reporting change. After Faghmous left AIGH, there was a leadership void on the ATLAS team that Singh temporarily filled until Weisman transitioned into the ATLAS Director role. (56.1 ¶¶8, 199-201.) Plaintiffs suggest that was not the real reason Singh changed her reporting line to Weisman because, they claim, Weisman did not replace Faghmous. (Opp. 44.) The testimony on which they rely, however, completely undermines this theory. Indeed, Weisman confirmed that although he did not have as broad a mandate as Faghmous, who had been the Chief Technology Officer, he was hired to oversee "ATLAS specifically," just as Faghmous had done. (56.1 ¶¶156, 681.) Thus, Plaintiffs cannot point to a single disputed issue of fact regarding pretext. Indeed, Plaintiffs admit that, after Weisman had been at AIGH for two months, Singh believed "it is a good time to consolidate [Bruzelius]'s reporting directly under [Weisman]," (56.1 ¶238)—after Bruzelius suggested to Singh that they discontinue their one-on-one meetings. (*Id.* ¶240.) Plaintiffs have not pointed to any evidence that suggests Singh's belief was not the real reason for the change and that a retaliatory animus was. Accordingly, Defendants are entitled to summary judgment on Bruzelius' retaliation claims.

## VI. PLAINTIFFS' NEW YORK STATE AND CITY LAW CLAIMS AGAINST CHARNEY MUST BE DISMISSED.

Plaintiffs' New York State and City law claims against Charney also fail because there is no evidence he "actually participate[d] in the conduct giving rise to the discrimination." *Pacheco v. Comprehensive Pharmacy Servs.*, 2013 WL 6087382, at *17 (S.D.N.Y. Nov. 19, 2013) (citation omitted). Plaintiffs do not point to any evidence that Charney participated in any conduct giving rise to their claims and instead seek to hold him liable on an aiding and abetting theory based on the outcome of the internal investigation in 2018, citing *Ananiadis v. Mediterranean Gyros Products, Inc.*, 151 A.D.3d 915, 917-18 (2d Dep't 2017). (Opp. 45.)

*Ananiadis* is inapposite. The individual defendants in that case failed to respond to plaintiffs' complaints. There is no such allegation here. To the contrary, the undisputed record evidence is that Charney commenced an investigation immediately following the receipt of discrimination and harassment complaints. (Dkt. 223-7 (Charney Tr. 51, 142; 56.1 ¶¶326, 398.)) Unlike in *Ananiadis*, there is no admissible record evidence that any Plaintiff complained to Charney about discrimination or harassment and that he failed to act. (56.1 ¶¶101-02, 146, 192, 244).[16]

Rather, Plaintiffs' gripe appears to be with the conduct and outcome of the investigation Charney commenced once he became aware of such complaints. But the investigation and its outcome are immaterial to Plaintiffs' claims. Indeed, as Judge Willis concluded, "[t]he Court does not find the 2018 Investigation relevant to the causes of action in the instant case, as the

---

[16] Plaintiffs claim David Muller told Natasha Anandaraja, a former plaintiff, that he had taken "her concerns" to Charney in 2015. (Opp. 45.) Not only is that hearsay, Plaintiffs fail to identify what those concerns were, much less that they were complaints of discrimination. Moreover, Charney's alleged interactions with Ann Olivarius took place immediately prior to the investigation Charney commenced, and his conversation with Ann Marie Beddoe took place after. (Opp. 45-46.)

investigation happened years after the alleged claims occurred"; "[a]s discussed ad nauseum, the Court does not find the 2018 Investigation relevant to the claims of the case." (Dkt. 200 at 3, 8; *see also id*. at 7.)

To the extent Plaintiffs claim Charney oversaw a flawed investigation, it is well-settled that a deficient investigation is not actionable discrimination. *See Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010); *Goldstein v. City Univ. of N.Y.*, 2026 WL 2532245, at *11-12 (S.D.N.Y. Aug. 27, 2026); *Bloomberg*, 967 F. Supp. 2d at 875.

## CONCLUSION

For the foregoing reasons, as well as those set forth in Defendants' opening brief, Defendants respectfully request that the Court grant Defendants' motion for summary judgment and dismiss this action with prejudice.

Dated: October 21, 2026
New York, New York

PROSKAUER ROSE LLP

By: */s/ Adam M. Lupion*

Adam M. Lupion
Joseph Baumgarten
Edna D. Guerrasio
Austin D. McLeod
Eleven Times Square
New York, NY 10036
T: 212-969-3000
F: 212-969-2900
alupion@proskauer.com
jbaumgarten@proskauer.com
eguerrasio@proskauer.com
amcleod@proskauer.com

*Attorneys for Defendants Dr. Prabhjot Singh, Dr. Dennis S. Charney, Bruno Silva, and ISMMS*

## CERTIFICATE OF COMPLIANCE

On October 15, 2026, this Court ordered that Defendants are permitted to submit a Rely Brief in Further Support of their Motion for Summary Judgment of up to 7,500 total words. (ECF No. 250.)

The undersigned hereby certifies, pursuant to Local Civil Rule 7.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, and this Court's October 15, 2026 Order (ECF No. 250) that the foregoing brief contains no more than 7,500 words.

Specifically, the Microsoft Word "Word Count" tool indicates that the brief contains 7,499 words. That word count excludes the "caption, any index, table of contents, table of authorities, signature blocks, or any required certificates," but does include "material contained in footnotes or endnotes." Loc. Civ. R. 7.1.

Dated: October 21, 2026
New York, New York

*/s/ Adam M. Lupion*
Adam M. Lupion