**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DR. HOLLY ATKINSON, DR. NATASHA ANUSHRI ANANDARAJA, DR. STELLA SAFO, MARY CALIENDO, HUMALE KHAN, DR. GERALDINE LLAMES, AMANDA MISITI, and EMILIE BRUZELIUS,

Plaintiffs,

v.

DR. PRABHJOT SINGH, DR. DENNIS S. CHARNEY, BRUNO SILVA, DAVID BERMAN, and ICAHN SCHOOL of MEDICINE at MOUNT SINAI,

Defendants.

No. 19-cv-3779 (VSB) (JW)

**DEFENDANTS' REPLY TO PLAINTIFFS' CORRECTED RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1 AND DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS**

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, Defendants Dr. Prabhjot Singh ("Singh"), Dr. Dennis S. Charney ("Charney"), Bruno Silva ("Silva"), and the Icahn School of Medicine at Mount Sinai's ("ISMMS" or "Mount Sinai") (collectively referred to as "Defendants") respond to Plaintiffs' "Corrected Response to Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 and Plaintiffs' Statement of Additional Undisputed Material Facts" as follows:

## I. DEFENDANTS

1. ISMMS is the medical school and academic partner to The Mount Sinai Hospital, which, along with other member hospitals, comprises the Mount Sinai Health System. ISMMS maintains a network of clinical, research, and educational partners that contribute to the furtherance of the school's mission. (Lupion Decl. Ex. 19 (ISMMS 3268-69).)

**PLAINTIFFS' RESPONSE:** Admitted.

2. Charney became the Dean of ISMMS in 2007 and remained in that position during all times relevant to this litigation. (Lupion Decl. Ex. 1 (Charney Tr. 9).)

**PLAINTIFFS' RESPONSE:** Admitted.

3. Singh was named the Director of the Arnold Institute for Global Health ("AIGH") at ISMMS on February 24, 2015. He remained in that role until he stepped down on July 3, 2019. (Roben Decl. Ex. 1 (ISMMS 5516-17); Lupion Decl. Ex. 2 (Singh Tr. 7-8).)

**PLAINTIFFS' RESPONSE:** Admitted.

4. Silva was hired to work at AIGH in January 2016 as a Designer and Senior Management Analyst. (Lupion Decl. Ex. 3 (Silva Tr. 28, 67, 287).) In this role, Silva was responsible for the design aspect of the Health System Design team and reported to Singh. (Lupion Decl. Ex. 3 (Silva Tr. 74-75, 116-17).) Silva resigned from AIGH in October 2019. (Lupion Decl. Ex. 3 (Silva Tr. 9).)

**PLAINTIFFS' RESPONSE:** Admitted.

## II. PLAINTIFFS

5. Dr. Stella Safo ("Safo") joined ISMMS in September 2015 as an Assistant Professor in the Department of Medicine. She reported to Dr. Michael Mullen for her HIV clinical work and to Singh for her research and population health work at AIGH. In February 2018, Safo transferred from AIGH to Mount Sinai Health Partners as Senior Medical Director, Clinical Transformation. She resigned from her full-time position in the spring of 2019. (Lupion Decl. Ex. 4 (Safo Tr. 16, 20, 35-36, 68, 85, 239); Lupion Decl. Ex. 20 (ISMMS 165).)

**PLAINTIFFS' RESPONSE:** Admitted.

6. Geraldine Llames ("Llames") started at ISMMS on January 23, 2017 as a Project Manager in AIGH. She initially reported to Dr. Sandeep Kishore ("Kishore"), Associate Director, then to Singh beginning in November 2017, and to Dr. Jeb Weisman ("Weisman"),

Director of ATLAS[1], beginning in April 2018. Llames left Mount Sinai on August 9, 2018. (Lupion Decl. Ex. 5 (Llames Tr. 31, 58, 65, 122, 168, 204); Lupion Decl. Ex. 2 (Singh Tr. 247-48); Singh Decl. Ex. 3 (WEISMAN 49); Roben Decl. Ex. 3 (ISMMS 265-66).)

**PLAINTIFFS' RESPONSE:** Admitted.

7. Amanda Misiti ("Misiti") joined AIGH on May 1, 2017 as a Program and Policy Research Manager. She reported to Singh. Misiti resigned from Mount Sinai in September 2023 to take a position at Premier, Inc. (Lupion Decl. Ex. 6 (Misiti Tr. 40-42, 52, 61).)

**PLAINTIFFS' RESPONSE:** Admitted.

8. Emilie Bruzelius ("Bruzelius") joined AIGH on April 4, 2016 as a Data Analyst II. She initially reported to Dr. James Faghmous ("Faghmous") on the Data Science team, then directly to Singh following Faghmous's departure in fall 2017, and then to Weisman beginning in June 2018. Bruzelius resigned effective March 4, 2019. (Lupion Decl. Ex. 7 (Bruzelius Tr. 18, 51, 55-56, 125, 169, 234); Roben Decl. Ex. 4 (ISMMS 208-09); Lupion Decl. Ex. 21 (WEISMAN 33-34).)

**PLAINTIFFS' RESPONSE:** Admitted.

9. On April 26, 2019, Plaintiffs and four then-plaintiffs filed an original complaint in the United States District Court for the Southern District of New York as well as an Equal Opportunity Commission charge. (Dkt. 1; Dkt. 30 ¶29.) Plaintiffs amended their complaint on August 6, 2019, in a 190-page, 889-paragraph filing. (Dkt. 30) ("Amended Complaint").

**PLAINTIFFS' RESPONSE:** Admitted.

---

[1] ATLAS was a project within AIGH that sought "to develop methods for using satellite imagery and other data sources," including "community health worker data," "to address public health and epidemiologic issues in global health." (Lupion Decl. Ex. 7 (Bruzelius Tr. 37-38, 43); Lupion Decl. Ex. 3 (Silva Tr. 105).)

## III. CREATION OF AIGH AND SINGH'S TENURE

### A. AIGH

10. In or around 2006, a group of physicians who were employed at ISMMS and/or had hospital privileges to work at Mount Sinai Hospital began "discussing plans" to create a global health program at ISMMS. (Lupion Decl. Ex. 8 (Landrigan Tr. 16-17); Lupion Decl. Ex. 22 (ISMMS 5098).)

**PLAINTIFFS' RESPONSE:** Admitted.

11. From 2006 to 2015, that group, comprised primarily of Dr. Philip Landrigan ("Landrigan"), the then-Chair of Preventative Medicine and Dean of Global Health at ISMMS; Dr. Jagat Narula, Associate Dean for Global Health and Director of Research; Dr. Ramon Murphy ("Ramon Murphy"), Director of Patient Care and Professor of Clinical Pediatrics; Dr. Natasha Anandaraja, Director of Training and Assistant Professor of Pediatrics and Medical Education; Dr. Holly Atkinson, Director, Human Rights Program, and Assistant Professor of Preventive Medicine and Medicine; and Associate Directors Drs. Sigrid Hahn, Nils Hennig, Jonathan Ripp, and Annie Sparrow, began to create "the skeleton" of "Mount Sinai Global Health" (MSGH), a program focused on global health education at ISMMS, direct delivery of care overseas, and research. (Lupion Decl. Ex. 8 (Landrigan Tr. 35, 31, 38-39); Lupion Decl. Ex. 22 (ISMMS 5098, 5112).)

**PLAINTIFFS' RESPONSE:** Admitted.

12. In 2014, benefactors John and Jody Arnhold donated a $12.5 million grant to ISMMS to establish the "Arnhold Global Health Institute" (later renamed AIGH). (Lupion Decl. Ex. 1 (Charney Tr. 71-72); Lupion Decl. Ex. 8 (Landrigan Tr. 51).)

**PLAINTIFFS' RESPONSE:** Admitted.

13. The Arnholds wanted to create "a multi-disciplinary institute dedicated to addressing the gap in global health." (Lupion Decl. Ex. 1 (Charney Tr. 80).) The Arnhold gift was an "enormous increase in resources" for the global health program at ISMMS, and provided a chance to "substantially grow the program and lift it up to a new level." (Lupion Decl. Ex. 8 (Landrigan Tr. 233).)

**PLAINTIFFS' RESPONSE:** Admitted except the full quote provides "Donor's gift will establish the Arnhold Global Health Institute, a multi-disciplinary institute dedicated to addressing the gap in global health, <u>and will be used for the institute's training and education mission</u>." (emphasis added). (Lupion Decl. Ex. 1 (Charney Tr. 80); McAllister Decl. Ex. 71 (ISMMS_000142).)

**DEFENDANTS' REPLY:** Plaintiffs admit ¶13. The additional information is not material and does not controvert the contents of ¶13, and therefore should be disregarded by the Court. *See* Local Civ. R. 56.1(c).

14. One condition of the gift was that ISMMS had to create an "institute" with a director. (Lupion Decl. Ex. 1 (Charney Tr. 70-72).)

**PLAINTIFFS' RESPONSE:** Disputed. The cited portion of the Charney deposition transcript does not support the assertion. The gift agreement does not create this condition. The gift agreement does however contain a relevant condition: the gift's intended use was restricted for the purpose of "the institute's training and education mission." (McAllister Decl. Ex. 7 (Charney Tr. 71-73); McAllister Decl. Ex. 71(ISMMS_000142).)

**DEFENDANTS' REPLY:** Paragraph 14 does not assert that the gift agreement itself contained the condition to hire a director. The gift agreement refers to "the Director and other Institution leadership. . . ." (Dkt. 223.71

(ISMMS_000142-43).) Landrigan testified that the global health group discussed "the need to appoint a director" because "whenever a big grant comes into an academic institution, there has to be a point person . . . typically termed the principal investigator or the director . . . So we knew that if there were to big a grant from the Arnhold family, there would need to be such a person." (Reply Lupion Decl. Ex. 67 (Landrigan Tr. 61-62)). Paragraph 14 should be deemed admitted in its entirety.

15. In early 2014, a search committee was formed to vet potential candidates and make a recommendation to Charney for the inaugural AIGH director. Landrigan was the chairman of the search committee, which was tasked with finding someone with a vision who could "put their imprint on the program" and build something "different than the other institutes and departments in New York City." (Lupion Decl. Ex. 8 (Landrigan Tr. 15-16, 80, 233, 243); Lupion Decl. Ex. 9 (Gelijns Tr. 13-14).) The search committee did not have hiring authority. Its role was to interview candidates, make a recommendation and "express appropriate caveats as necessary." (Lupion Decl. Ex. 8 (Landrigan Tr. 243).)

**PLAINTIFFS' RESPONSE:** Disputed as to the committee's "task." Dr. Landrigan testified the "imprint" language was an expectation, not a charge: "we all know that when a new director comes in, the new director is going to put their imprint on the program. So it's to be expected." (Landrigan Tr. 233:19-22.) The charge he recalled was only "[t]elling us to pick a good chairman, but beyond that, I can't remember." (Landrigan Tr. 83:20-21.) The committee wrote the public advertisement:

> The Icahn School of Medicine at Mount Sinai seeks an experienced MD, PhD, DrPH, or person with equivalent training to lead a newly endowed Institute for Global Health. Our ideal candidate is a person with well-

> recognized leadership skills, a scholarly portfolio that includes current grant funding and a strong publication record, and an approach to global health which fosters interdisciplinary collaboration, partnership and innovation. We are looking for an inspirational team leader with field experience in low and middle income countries, a grounding in public health and health education, and a demonstrated commitment to serving under-resourced and neglected populations.

(McAllister Decl. Ex. 12 (Landrigan Tr. 89); McAllister Decl. Ex. 29 (ISMMS_007411).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶15, which should be deemed admitted in its entirety. Landrigan's testimony that "when a new director comes in, the new director is going to put their imprint on the program" (Dkt. 212.8 (Landrigan Tr. 233)) was made in the context of discussing the search committee's recommendation. Further, Gelijns testified that "[t]he criteria for the search was to have someone with a vision on how to build Global Health at Mount Sinai in an institute . . . to really have a vision, to build something that, perhaps was slightly different than the other institutes and departments in New York City." (Dkt. 212.9 (Gelijns Tr. 13-14).) Landrigan's inability, "[a]fter ten years," to recall the specifics of Charney's charge (Dkt. 223.12 (Landrigan Tr. 83)) does not create a material dispute about the criteria the committee applied.

16. In November 2014, Dr. Barbara Murphy ("Barbara Murphy"), Chair of the Department of Medicine at ISMMS, recommended Singh for consideration for the AIGH Director role. (Lupion Decl. Ex. 8 (Landrigan Tr. 173); Lupion Decl. Ex. 22 (ISMMS 5065-66).)

**PLAINTIFFS' RESPONSE:** Disputed. Landrigan's testimony is hearsay. Singh testified that "[b]oth Barbara Murphy and Dennis Charney suggested I

apply." (McAllister Decl. Ex. 20 (Singh Tr. 111), as corrected by his signed errata; Lupion Decl. Ex. 22 (ISMMS 5065-66).) Singh's testimony is undermined by his own prior writing: In December 2013, he wrote Starr, representative of the Arnhold family, to demand Singh's hire as a condition of the grant:

> I think it would be useful for me to have some sort of role for the institute- and you'd have someone paying attention. My sense is that if you told the chair of the medicine dept - Dr Barbara Murphy + Ramon - that it was a condition of the grant, she would be very supportive.

(McAllister Decl. Ex. 35 (SINGHT_004117).) Singh only disclosed this document after his deposition because a third party, Starr, produced his version, and Plaintiffs filed a Motion to Compel.

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶16, which should be deemed admitted in its entirety. The quoted testimony from Singh corroborates and does not refute ¶16. Landrigan's testimony is corroborated by Charney, who testified that "Barbara Murphy did bring [Singh] to my attention" and that "Barbara Murphy strongly recommended him . . . for the position." (Reply Lupion Decl. Ex. 62 (Charney Tr. 55-57); Dkt. 223.7 (Charney Tr. 185)). Gelijns testified that Murphy was a "strong supporter in the committee of Dr. Singh." (Dkt. 212.9 (Gelijns Tr. 37).) Singh's December 19, 2013 email to Kevin Starr (Dkt. 223.35 (SINGH 4116-17)) says nothing about whether or when Barbara Murphy recommended Singh and did not "demand Singh's hire"; it suggested "some sort of role for the institute." Plaintiffs' statements regarding hearsay and the contents of Dkt. 223.35 are irrelevant and do not controvert ¶16.

17. Singh went through the search committee's evaluation process. (Lupion Decl. Ex. 8 (Landrigan Tr. 199, 207-10).)

**PLAINTIFFS' RESPONSE:** Admitted.

18. Search committee members noted both the strengths and weaknesses of Singh's candidacy. On January 4, 2015, Dr. David Muller ("Muller"), Dean for Medical Education, wrote that he thought Singh was "quite capable and might turn out to be great," but noted his inexperience in leadership. (Lupion Decl. Ex. 23 (ISMMS 5161).) Dr. Annetine Gelijns, Chair of the Department of Population Health, Science, and Policy, noted that "Singh had a very interesting background," was an "out of the box thinker," and had a strong commitment to "community health workers[] and health equity" in New York City and internationally, but lacked an extensive portfolio of funding or "long term management experience." (Lupion Decl. Ex. 9 (Gelijns Tr. 6, 37-39, 42).) Landrigan similarly considered Singh's CV "very impressive" but noted he was young and inexperienced as a leader. (Lupion Decl. Ex. 8 (Landrigan Tr. 210, 290); Lupion Decl. Ex. 23 (ISMMS 5161).)

**PLAINTIFFS' RESPONSE:** Admitted that Dr. Muller sent the quoted email, except Defendants omit its first half: "there is some risk given how junior [Singh] is and how little leadership experience he's had, but he seems quite capable and might turn out to be great." (Lupion Decl. Ex. 23 (ISMMS 5161).) In the same email, Dr. Muller forwarded the CV of another candidate, — a woman "in NYC" with "a significant track record in grantsmanship and mentorship" — and asked to bring her in for a first-round interview. (*Id.*) Admitted that Dr. Landrigan ranked Dr. Singh relatively low. Gelijns also noted as a weakness that Singh did not have "an extensive, NIH portfolio of funding." (Lupion Decl. Ex. 9 (Gelijns Tr. 6, 37-39, 42).) Dr. Ann Marie Beddoe, Assistant Professor in the Department of Obstetrics, Gynecology and Reproductive Science and Director of Gynecologic Oncology Chemotherapy Infusion Service, who was another member of the search

committee, ranked Singh "zero across the board." (McAllister Decl. Ex. 12 (Landrigan Tr. 201-203).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶18, which should be deemed admitted in its entirety. Plaintiffs' statement that "Dr. Landrigan ranked Dr. Singh relatively low" is unsupported by any citation to evidence and should be disregarded. *See* Local Civ. R. 56.1(d). Plaintiffs' statements about the CV of another candidate are immaterial.

19. On January 4, 2015, Landrigan informed Charney in writing of the search committee's "qualified endorsement" of Singh for the AIGH director role, noting that it was a "bit of a high-risk/high-reward situation," but concluding that "[w]ith proper guidance, we feel that Prabhjot is ready to lead the Institute." (Lupion Decl. Ex. 8 (Landrigan Tr. 220-21); Roben Decl. Ex. 5 (ISMMS 5147).)

**PLAINTIFFS' RESPONSE:** Admitted that Dr. Landrigan conveyed the committee's qualified endorsement in writing, except the letter states is more stark than the cited testimony: "The overall opinion of the Search Committee on Prabhjot Singh is that he is potentially very high reward, but definitely high risk," quoting Dr. Ramon Murphy's summary that Dr. Singh was "young and risk, but could be terrific." (McAllister Decl. Ex. 30(ISMMS_026259).).

**DEFENDANTS' REPLY:** Plaintiffs' Response admits, and the additional statements contained therein do not controvert, ¶19, which should be deemed admitted in its entirety.

20. Charney selected Singh as the inaugural director of AIGH. Singh's hire was announced on February 24, 2015, though he did not officially start until September 1, 2015. (Roben Ex. 1 (ISMMS 5516-17); Lupion Decl. Ex. 8 (Landrigan Tr. 247-48).)

**PLAINTIFFS' RESPONSE:** Admitted.

**B. AIGH Under Singh.**

**1. AIGH Personnel and Institute Titles.**

21. Singh's understanding of his role as AIGH Director "would be an opportunity to build something from the ground up." Singh wanted to execute on his vision of creating a global health institute that combined domestic community health initiatives with global health initiatives. (Lupion Decl. Ex. 2 (Singh Tr. 113-15).)

**PLAINTIFFS' RESPONSE:** Admitted.

22. Singh recruited the following individuals to AIGH: Safo, Dr. Madeleine Ballard, Dr. Aaron Baum ("Baum"), David Berman ("Berman"), Faghmous, Dr. David Heller ("Heller"), Kishore, Kirsten Knaup ("Knaup"), Dr. Duncan Maru ("Duncan Maru"), Dr. Sheila Maru ("Sheila Maru"), Dr. Natalie Privett ("Privett"), Silva, and Dr. Rachel Vreeman ("Vreeman"). (Lupion Decl. Ex. 2 (Singh Tr. 124-27).)

**PLAINTIFFS' RESPONSE:** Admitted except noted Defendants omitted a citation to Dr. Singh's signed errata covering the cited pages.

**DEFENDANTS' REPLY:** Paragraph 22 is admitted. The addition of Singh's signed errata corrects only the transcription of misspelled names. (Dkt. 223.20 (Singh Errata).)

23. In addition, Singh interviewed and approved the hiring of Misiti, Bruzelius, and Llames. (Singh Decl. ¶11; Lupion Decl. Ex. 2 (Singh Tr. 146, 182-83).)

**PLAINTIFFS' RESPONSE:** Disputed as to Dr. Bruzelius. On the very page Defendants cited, Dr. Singh testified that Dr. Bruzelius was hired by Dr. Faghmous: "She was hired relatively earlier on, I believe, by James"; "I think it

was his decision, but I supported it." (Singh Tr. 182:19-183:4.) Ms. Llames does not appear on any cited page. Admitted as to Ms. Misiti.

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶23, which should be deemed admitted in its entirety. Paragraph 23 says Singh "approved" the hire of Bruzelius, which is consistent with Singh's testimony. (Dkt. 212.2 (Singh Tr. 182-83).) Paragraph 23 cites Singh's declaration, which expressly identifies Llames as one of the individuals he approved for hiring. (Dkt. 211 ¶11.) Paragraph 23 should be deemed admitted in its entirety.

24. During the relevant time period, each AIGH employee held a Mount Sinai "institutional title" that was created and assigned by ISMMS's Compensation and Position Control review process based on the job description, duties, necessary expertise and credentials. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 75, 84-86).) Neither Singh nor any other AIGH employee played a role in the decision-making process concerning an employee's institutional title. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 84-86).)

**PLAINTIFFS' RESPONSE:** Admitted

25. Employees at AIGH also held "functional titles," which were outward facing titles that describe the specific role or work that a person performed within AIGH. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 84).) Functional titles had no significance with regard to compensation, promotions, or other terms and conditions of employment. ISMMS did not maintain any policies regarding functional titles and a change in a functional title alone did not equate to a change in compensation. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 107, 96).) Functional titles could vary from institutional titles and were typically created in dialogue between the individual and their supervisor, with ultimate approval from the AIGH Director. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 87-89, 92).) There was no written procedure or

protocol associated with the creation of functional titles. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 93; 105-06, 108).)

**PLAINTIFFS' RESPONSE:** Disputed that functional titles were only outward facing. Disputed that functional titles had no significance with regard to compensation. The cited page says "[n]ot necessarily. It would really depend on the ... change" (ISMMS 30(b)(6) Tr. 96:4-9), and that compensation "could potentially get approval…for the duties that went along with that functional title change to be tied to something like a supplement" (ISMMS 30(b)(6) Tr. 96:20-23). As to Dr. Safo, the functional-title change to Chief Medical Officer was intended to carry a salary change (ISMMS 30(b)(6) Tr. 111:1-12).

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶25, which should be deemed admitted in its entirety. Paragraph 25 does not assert that the functional titles were "only" outward facing. Knaup testified that her functional title of chief operating officer "was outward facing." (Dkt. 212.12 (Knaup Tr. 30).) Further, Plaintiffs' Response quotes a fragment of the deponent's answer and omits the remainder, which supports ¶25. Asked whether "a change in functional title mean[s] a change in compensation," the deponent answered "[n]ot necessarily." She explained that "changes in compensation need to be ultimately passed through other levels of approval," because salary bands are tied to institutional titles, and that compensation could be tied to "the duties that went along with that functional title change" only through separate approval "by compensation." (Dkt. 212.10 (ISMMS 30(b)(6) Tr. 96).) As to Safo, testimony that the CMO title "was intended" to come with a salary change does not controvert ¶25. Record evidence shows that the increased compensation for Safo was for the

additional responsibilities of the CMO role and required separate approval and a contract amendment. (Dkt. 211.12 (ISMMS 9843-44) ("this additional admin supplement requires a contract amendment, involving adjusting your time and effort allocations").)

**2. Policies and Procedures.**

26. AIGH's policies, procedures, and practices largely matched those of ISMMS and/or the Mount Sinai Health System, including policies with respect to recruitment, hiring, compensation, promotions, anti-discrimination and anti-harassment. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 72).)

**PLAINTIFFS' RESPONSE:** Admitted as to policies, disputed as to procedures and practices and disputed as to any being consistently followed at AIGH.

**DEFENDANTS' REPLY**: Plaintiffs' Response does not controvert ¶26, which should be deemed admitted in its entirety. Plaintiffs' dispute as to "procedures and practices" and as to "any being consistently followed" is unsupported by any citation to evidence and should be disregarded. *See* Local Civ. R. 56.1(d).

27. AIGH was subject to ISMMS's anti-discrimination, anti-harassment, and retaliation policies, which provided, among other things, that harassment, discrimination, intimidation and retaliation would not be tolerated. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 25, 75-76, 220-21).)

**PLAINTIFFS' RESPONSE:** Admitted. Plaintiffs add that ISMMS's designee testified that every employee has a duty to report such conduct, that

breach of the duty is a disciplinary matter, and that no one has ever been found in breach of it. (ISMMS 30(b)(6) Tr. 220:13-225:10.).

**DEFENDANTS' REPLY:** Plaintiffs admit ¶27. Plaintiffs' additional assertions about employees' duty to report do not controvert ¶27.

28. Decisions affecting faculty compensation, including base salary, administrative supplements, clinical supplements, and bonuses, had to be approved by the Dean's Office. (Lupion Decl. Ex. 19 (ISMMS 3297).) Department chairs and institute directors were not authorized to adjust the compensation of current faculty members without the approval of the Dean's Office. (*Id.* at ISMMS 3296.)

**PLAINTIFFS' RESPONSE:** Admitted.

29. Position Control was responsible for decisions that concerned compensation for non-faculty staff, including new positions, replacement positions, salary adjustments, and year-end bonuses. (Lupion Decl. Ex. 11 (Tiger-Paillex Tr. 11-13, 182-83; Errata of Tiger-Paillex at 311:9); Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 96).) Position Control reviewed the job description of each role to make sure the title was consistent with the titles of those performing the same roles in other departments and to ensure the compensation was appropriate given the job responsibilities. (Lupion Decl. Ex. 11 (Tiger-Paillex Tr. 185-89).)

**PLAINTIFFS' RESPONSE:** Admitted, save that it is the Compensation department, not Position Control, that reviews the job description (Lupion Decl. Ex. 11 (Tiger-Paillex Tr. 186)), and that the witness did not know whether the process included any comparison by sex: "Q. But there's no comparison done to other employees who are female who are in the exact same position as Mr. Le? A. I don't know." (*Id.* at 189.)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶29, which should be deemed admitted in its entirety. Tiger-Paillex testified that requests are reviewed through a coordinated process between Position Control and the Compensation department. (Dkt. 212.11 (Tiger-Paillex Tr. 185-87).) The testimony Plaintiffs quote from page 189 does not concern the review process generally, but rather a single question about Singh's November 2017 proposal to promote Matthew Le.

30. ISMMS's promotion policy applied to institutional titles. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 250).) Faculty promotions went through the Committee on Faculty Appointments, Promotions, and Tenure. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 249); Lupion Decl. Ex. 19 (ISMMS 3287-88).) For non-faculty promotions, the individual needed to be out of their probationary period, which typically lasted six months, but by position, could be extended, and would restart when an employee changed roles. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 249).)

**PLAINTIFFS' RESPONSE:** Admitted as to the policy but not its implementation at AIGH. The cited page also specifies that ISMMS had no policies regarding functional titles. (Lupion Decl. Ex. 10 (ISMMS 30(b)ISMMS 30(b)(6) Tr. 250).)

**DEFENDANTS' REPLY:** Plaintiffs admit paragraph 30. Their further response does not controvert ¶30 and they cite no evidence to support their assertion regarding policy implementation at AIGH. *See* Local Civ. R. 56.1(d). The designee's testimony that ISMMS had no policies regarding functional titles (Dkt. 212.10 (ISMMS 30(b)(6) Tr. 250)) is consistent with ¶30, which states that

ISMMS's promotion policy applied to institutional titles. Paragraph 30 should be deemed admitted in its entirety.

31. Prior to 2019, there was no formal policy on remote work at AIGH, nor was there an ISMMS remote work policy applicable to staff. The practice was specific to each supervisor. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 64-66); Lupion Decl. Ex. 12 (Knaup Tr. 238).) Safo allowed her staff to work remotely on Wednesday, which was her clinic day. (Lupion Decl. Ex. 3 (Silva Tr. 182).) Singh, on the other hand, considered remote work an "exception" to the expectation that work was performed in the office and required pre-approval for planned remote work based on what he deemed to be a "compelling reason" and submission of a job plan that specified the tasks that would be completed while working remotely. In or around May 2019, AIGH memorialized the practice of requiring a written plan to request approval to work remotely. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 64-65); Lupion Decl. Ex. 55 (ISMMS 20090-91); Lupion Decl. Ex. 31 (ISMMS 22303).)

**PLAINTIFFS' RESPONSE:** Admitted that there was no written remote-work policy and that practice was supervisor-specific. Disputed that a "compelling reason" standard existed: that phrase appears nowhere in the cited deposition testimony. The "exception to the rule" language on which defendants rely is the designee's description of the general Mount Sinai norm (ISMMS 30(b)(6) Tr. 65:914), not of any standard Dr. Singh applied. Mr. Escosia reported to ISMMS's investigators that "[w]ork from home policies were inconsistent throughout the entire Institute, where some were allowed and some weren't (i.e., male vs. female)." (Lupion Decl. Ex. 25 (SAFO 6940).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶31, which should be deemed admitted in its entirety. The "compelling

reason" standard is noted in Singh's contemporaneous email where he wrote to Llames "I can't approve this work from home unless there is a compelling reason. . . ." (Dkt. 212.31 (ISMMS 22303).) Plaintiffs' assertion that the "exception to the rule" testimony describes only a general Mount Sinai norm and not the practice at AIGH, is false. (*See* Dkt. 212.10 (ISMMS 30(b)(6) Tr. 64-65) (ISMMS's designee was addressing remote work "particularly in the context of global health," and testified that, "particularly for working from home, it had been considered very much the exception to the rule").) Further, at Escosia's deposition he testified that he "only reported to Dr. Safo, so I'm not quite sure how [everyone's]. . . "work from home" requests were handled." (Reply Lupion Decl. Ex. 63 (Escosia Tr. 105-07).)

## IV. PLAINTIFF STELLA SAFO

### A. Safo's Recruitment and Hiring.

32. Safo joined ISMMS in September 2015 as an Assistant Professor in the Department of Medicine. (Lupion Decl. Ex. 4 (Safo Tr. 16); Lupion Decl. Ex. 20 (ISMMS 161).)

**PLAINTIFFS' RESPONSE:** Admitted.

33. Safo's hire at ISMMS was negotiated in conjunction with Singh's AIGH director package. (Lupion Decl. Ex. 2 (Singh Tr. 129-31); Lupion Decl. Ex. 4 (Safo Tr. 38, 195); Singh Decl. ¶¶3-5.) Specifically, Singh, who was family friends with Safo, advocated for Safo to be offered a faculty contract at ISMMS and a position at AIGH. (Lupion Decl. Ex. 2 (Singh Tr. 12930); Lupion Decl. Ex. 4 (Safo Tr. 38, 195); Singh Decl. Ex. 2 (SINGH 1658); Singh Decl. ¶4.)

**PLAINTIFFS' RESPONSE:** Admitted that Dr. Singh advocated for Dr. Safo's faculty title and supplement and that they were family friends. (Safo Tr. 38:9-16.) Disputed that her hire was "negotiated in conjunction with Singh's AIGH director package": the cited testimony places the discussions before Dr. Singh joined and before the Institute title was resolved — "[t]he institute hadn't yet started and these discussions took place prior to myself even joining," and recruitment was "more focused on the faculty rank." (Lupion Decl. Ex. 2 (Singh Tr. 129-30) The contemporaneous March 2015 chain shows Dr. Singh himself driving the salary commitment: "Question will be how to get the salary we discussed committed. . . . What is your estimated start date? Need that ASAP," and, to Dr. Murphy, "get her something in writing as soon as possible." (McAllister Decl. Ex. 31 (SINGH_001639, SINGH_001643).) Safo Tr. 195 addresses later events and supports nothing in this paragraph.

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶33, which asserts that Safo's hire was "negotiated in conjunction with," *i.e.*, at the same time as, Singh's hire. Plaintiffs' quotation that the discussions occurred before the institute had "started" confirms this. Further, Dkt. 212.4 (Safo Tr. 195) is cited for the fact that Singh and Safo were family friends. Paragraph 33 should be deemed admitted in its entirety.

34. Even though Safo was only a fellow at Montefiore and had no program experience managing people, Singh felt her academic background, clinical competency, and interest in domestic and global health work would make meaningful contributions to the Institute. He vouched for her hire and had her role as a "junior faculty" expressly referenced in his contract

with ISMMS. (Lupion Decl. Ex. 2 (Singh Tr. 131-32); Lupion Decl. Ex. 4 (Safo Tr. 64); Singh Decl. ¶¶4-5.)

**PLAINTIFFS' RESPONSE:** Disputed that Safo lacked any qualifications or experience for her role. Admitted that Singh considered Safo would make meaningful contributions to the Institute. program experience managing people was but materially incomplete. On the same page Dr. Singh gave a further reason for his hire of Safo: "and I thought it would also be helpful in terms of female, and minority recruitment." (Lupion Decl. Ex. 2 (Singh Tr. 131-32.)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶34, which should be deemed admitted in its entirety. Defendants did not assert that Safo "lacked any qualifications or experience" and Plaintiffs' "dispute" is unsupported by any citation and should be disregarded. *See* Local Civ. R. 56.1(d). Singh's testimony that he "thought it would be helpful in terms of female, and minority recruitment" confirms that Singh actively supported Safo's recruitment. (Dkt. 212.2 (Singh Tr. 131).)

35. Singh advocated for Safo to come to ISMMS as an Assistant Professor as opposed to Instructor, a lesser title and the position traditionally offered to candidates who are only one year post fellowship, which Safo was at the time. (Lupion Decl. Ex. 2 (Singh Tr. 130, 264); Lupion Decl. Ex. 4 (Safo Tr. 64).)

**PLAINTIFFS' RESPONSE:** Admitted.

36. ISMMS offered Safo a full-time faculty position in the Department of Medicine. (Lupion Decl. Ex. 4 (Safo Tr. 32-33, 51-52); Lupion Decl. Ex. 20 (ISMMS 161-68).) Safo

would receive a salary supplement for her work at AIGH. (Lupion Decl. Ex. 2 (Singh Tr. 261-62).)

**PLAINTIFFS' RESPONSE:** Admitted as to the contract terms. Materially incomplete: the cited pages are Dr. Safo's testimony that she was told not to negotiate. "I offered to negotiate directly with Mount Sinai ... That's when he conveyed to me, yes, that it would not be appropriate." (Lupion Decl. Ex. 4 (Safo Tr. 52); "I didn't get to negotiate this rate in the way that I hoped to ... on advice of Prabhjot." (Lupion Decl. Ex. 4 (Safo Tr. 32.)

**DEFENDANTS' REPLY:** Plaintiffs admit and do not controvert ¶36, which should be deemed admitted in its entirety. Safo's testimony about whether she negotiated the terms of her contract is immaterial to ¶36, which addresses only the position ISMMS offered and the salary supplement for Safo's AIGH work.

37. Since Safo's primary appointment would be in the Department of Medicine, Singh suggested that Safo contact Barbara Murphy directly to discuss the terms of her contract. (Lupion Decl. Ex. 2 (Singh Tr. 260); Singh Decl. Ex. 4 (SINGH 1547).) The two women discussed Safo's contract on multiple occasions. (Singh Decl. Ex. 4 (SINGH 1612); Lupion Decl. Ex. 4 (Safo Tr. 44).)

**PLAINTIFFS' RESPONSE:** Admitted that Singh suggested Safo contact Dr. Barbara Murphy directly to work out the terms of her contract. Disputed that Safo and Dr. Murphy discussed the contract "on multiple occasions"; the cited testimony refers to one planned meeting. (Lupion Decl. Ex. 4 (Safo Tr. 44) ("Seeing Dr. Murphy in person Wednesday the 18th. Waiting to talk to Mullen.").) Defendants' cite to Singh Decl. Ex. 4 (SINGH 1612) points to a document with no such bates stamp; by Singh's own declaration, Exhibit 4 bears Bates number

SINGH 1547 only. The document that does bear SINGH_001612 bates number is Singh Decl. Ex. 6, in which Dr. Murphy answered Dr. Safo once about clinical sessions. Sing instructed Safo "don't respond to this yet."

**DEFENDANTS' REPLY:** Defendants' statement that Safo and Murphy discussed the contract "on multiple occasions" refers to their discussions in person and by email and is supported by Safo's testimony ("Seeing Dr. Murphy in person Wednesday the 18th [of February]") (Reply Lupion Decl. Ex. 73 (Safo Tr. 43-44)[2]) and an email Safo sent Murphy on March 2, 2015 stating she "would love to begin to work out the terms of my contract." (Dkt. 211.4 (SINGH 1547).) Furthermore, on March 4, 2015, Safo told Singh that her "[l]atest communication w Barbara was on Monday." (*Id.*) Paragraph 37 cited this document as "Singh Decl. Ex. 4," but inadvertently listed the Bates number as SINGH 1612 rather than SINGH 1547. SINGH 1612, which Plaintiffs identify in their response, contains the same email from Safo to Murphy, but includes Murphy's response. (Dkt. 212.6 (SINGH 1612).) Paragraph 37 should be deemed admitted in its entirety.

38. On April 30, 2015, Safo executed a contract with ISMMS that reflected the following terms of employment: (1) institutional job title of Assistant Professor; work allocation of forty percent clinical (HIV) and sixty percent population health research; (2) compensation of $175,000, which was comprised of a $152,000 base salary and clinical supplement from the Department of Medicine, and a $23,000 research supplement from AIGH. (Lupion Decl. Ex. 20 (ISMMS 161-67).)

**PLAINTIFFS' RESPONSE:** Admitted.

[2] Safo Tr. 44, cited in ¶ 37 as part of Dkt. 212.4, was inadvertently omitted from that exhibit. It is in the record as Dkt. 223.19, on which Plaintiffs also rely.

### B. Safo's Title, Job Responsibilities and Promotion Opportunities

39. Safo's functional title within AIGH was Program Manager, which she testified was beneath her because another colleague, Anna Stapleton, who she noted was only a college-level graduate, was offered the same functional title. (Lupion Decl. Ex. 4 (Safo. Tr. 72).)

> **PLAINTIFFS' RESPONSE:** Admitted that Dr. Safo was given the Program Manager functional title, the same title as a colleague with a college degree. Disputed as to "beneath her": Dr. Safo did not use that word, and her stated objections were the fit with her role and the manner of its assignment --- Dr. Singh "just kind of yelling it across the room." (Lupion Decl. Ex. 4 (Safo. Tr. 72).)
>
> **DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶39, which should be deemed admitted in its entirety. Paragraph 39 does not place the phrase "beneath her" in quotation marks but accurately characters Safo's sentiment that she believed the Program Manager title, which was also held by Stapleton, did not fit her role. (Dkt. 212.4 (Safo. Tr. 72).)

40. On June 10, 2015, prior to starting at AIGH, Safo wrote to Singh that she believed titles such as "clinical director," "clinical supervisor," or "researcher in global health" would be appropriate for her functional title. (Singh Decl. Ex. 7 (Safo 6824).) Safo admitted that when she started at AIGH, she and Singh spoke a lot about her future career trajectory, including what her title could be as the work and team materialized. (Lupion Decl. Ex. 4 (Safo Tr. 74, 90).)

> **PLAINTIFFS' RESPONSE:** Admitted.

41. Safo also admitted that at the time Singh identified her functional title as Program Manager, she did not suggest a different title for her role, nor did she have one in mind that

she believed would be more fitting to her responsibilities. (Lupion Decl. Ex. 4 (Safo Tr. 73-74).)

**PLAINTIFFS' RESPONSE:** Disputed. The cited pages do not support the characterization. Safo testified that she did not suggest a title because she could not: "I didn't, and the conversation didn't seem like he would allow me to"; "there wasn't space or room for that." (Lupion Decl. Ex. 4 (Safo Tr. 73-74).) She did not testify that she had no title in mind; she testified "I don't recall, at the time, if I did." (*Id.*)

**DEFENDANTS' REPLY:** Plaintiffs admit that Safo did not suggest a different title for her role. Safo's testimony that she did not recall whether she had a title in mind further confirms she did not identify one. (Dkt. 212.4 (Safo Tr. 73-74).) Safo's testimony as to why she believed she could not suggest a title does not controvert ¶41 and is immaterial. Paragraph 41 should be deemed admitted in its entirety.

42. Within AIGH, Safo led the Health System Design team. (Lupion Decl. Ex. 4 (Safo Tr. 77-79); Lupion Decl. Ex. 2 (Singh Tr. 128-29).) Mike Escosia, Project Manager, reported to her, and she also supervised Privett and Silva. (Lupion Decl. Ex. 4 (Safo Tr. 78-79, 82); Lupion Decl. Ex. 13 (Escosia Tr. 26-28); Lupion Decl. Ex. 3 (Silva Tr. 74).)

**PLAINTIFFS' RESPONSE:** Disputed. Silva testified he did not report to Safo (Lupion Decl. Ex. 3 (Silva Tr. 75)), consistent with Safo's own distinction between supervising and reporting. (Lupion Decl. Ex. 4 (Safo Tr. 78-79).) Admitted that Safo led the Health System Design team and that Mr. Escosia reported to her.

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶42. Paragraph 42 states that Safo "supervised" Privett and Silva, not that they reported to her, which is the same distinction Safo drew. She testified: "Direct reporting was Mike Escosia, and then I supervised Natalie Privett and Bruno Silva," and "all of their work products related to health system design had to be overseen and approved by me." (Dkt. 212.4 (Safo Tr. 78-79).) Silva's testimony that he did not report to Safo is consistent with ¶42, and he confirmed that Safo was "the lead for the overarching program." (Dkt. 212.3 (Silva Tr. 75).) Paragraph 42 should be deemed admitted in its entirety.

43. At the time of Safo's hire, Singh did not believe she possessed the skills or experience commensurate with a "chief" titled role, such as Chief Medical Officer. Within the first year of her employment, Singh asked Safo about her goals with respect to her professional rank and title and she indicated she wanted to work towards a Chief Medical Officer role. (Singh Decl. ¶¶ 6-7.)

**PLAINTIFFS' RESPONSE:** Disputed. The paragraph rests solely on Singh's declaration, and the declaration is contradicted by his own PRIOR sworn testimony. When Singh was asked about Safo's title at the time of recruitment, he testified: "I think at the time of recruitment, we were more focused on the faculty rank," and "[t]he focus was on her title at the school. I'm not sure if we had resolved the title at the institute at that time." (Lupion Decl. Ex. 2 (Singh Tr. 129:7-12).) Dr. James Faghmous, AIGH's Chief Technology Officer, states that Safo "was also given a title that was beneath her responsibilities. She was effectively performing the role of Chief Medical Officer (indeed, she was handling more responsibility than that)." (Faghmous Decl. ¶ 52.)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶43. Singh's testimony was that at the time of recruitment, "we were more focused on the faculty rank" and the Institute title may not yet have been "resolved" (Dkt. 212.2 (Singh Tr. 129)), which does not contradict his sincerely held belief that Safo did not have the skills or experience for the "chief role" or his assertion that within the first year of Safo's employment, he and Safo discussed her goals and she indicated she wanted to work toward a CMO role. (Dkt. 211 ¶¶6-7.) Safo testified that "when I started, he and I talked a lot about my future career trajectory. And one of the things that was suggested was chief medical officer." (Dkt. 212.4 (Safo Tr. 90).) Faghmous's opinions regarding Safo's title and responsibilities do not contradict Singh's sincerely held belief and are immaterial. Paragraph 43 should be deemed admitted in its entirety.

44. As team lead, Safo attended senior management meetings, and supervised and organized the Health System Design team's work. (Lupion Decl. Ex. 4 (Safo Tr. 77, 79); Lupion Decl. Ex. 2 (Singh Tr. 258).)

**PLAINTIFFS' RESPONSE:** Admitted.

45. Over time, Safo's AIGH workload expanded to include work with the Mount Sinai Health Partners ("MSHP") team, as well as providing clinical input into the work of other AIGH teams. (Lupion Decl. Ex. 4 (Safo Tr. 78-79).) By 2017, Safo felt her job responsibilities had increased to the point where she should be considered for a more elevated functional title, such as Chief Medical Officer. (Lupion Decl. Ex. 4 (Safo Tr. 80, 82-84).) She had not been a Chief Medical Officer prior to working at ISMMS. (Roben Decl. Ex. 6 (ISMMS 141).)

**PLAINTIFFS' RESPONSE:** Admitted that Safo's workload expanded. Materially incomplete as to her reason for seeking the title: "especially given the

environment of other individuals getting these titles and promotions and not necessarily doing what I felt like was quite as much work." (Lupion Decl. Ex. 4 (Safo Tr. 84:10-16).)

**DEFENDANTS' REPLY:** Safo's explanation about what "other individuals" were doing does not controvert ¶45. Plaintiffs' Response admits ¶45, which should be deemed admitted in its entirety.

46. In early 2017, Singh suggested to Safo that she consider the Chief Medical Officer role, but she declined because she felt she was not ready. Safo testified that she did not recall this conversation. (Lupion Decl. Ex. 4 (Safo Tr. 84, 90-91); Singh Decl. ¶8.)

**PLAINTIFFS' RESPONSE:** Disputed. Safo testified that Singh suggested the Chief Medical Officer title when she started working at AIGH, i.e., in 2015 and not 2017. (Lupion Decl. Ex. 4 (Safo Tr. 90).) Admitted that Safo did not recall declining because she felt she was not ready.

**DEFENDANTS' REPLY:** Plaintiffs mischaracterize Safo's testimony, which does not controvert ¶46. Safo did not testify that Singh suggested the CMO title for her in 2015—she testified that "when I started, [Singh] and I talked a lot about my **future** career trajectory. And one of the things that was suggested was chief medical officer." (Dkt. 212.4 (Safo Tr. 90) (emphasis added).) Safo testified that she did not recall, "one way or the other," her conversation with Singh about declining the CMO position because she was not ready. (Dkt. 212-4 (Safo Tr. 90-91).) Safo did not deny that the conversation happened. (*Id.*) Paragraph 46 should be deemed admitted in its entirety.

47. Both male and female employees received functional "chief" titles within AIGH. Berman applied for and received the "Chief of Staff" role, and Kirsten Knaup was hired as

Chief Operating Officer, although she did not ask for a chief-level title. Prior to joining AIGH, Knaup had worked in for-profit and non-profit start-up organizations and spent over twenty years setting up new or recently created organizations. (Lupion Decl. Ex. 14 (Berman Tr. 97-101); Lupion Decl. Ex. 12 (Knaup Tr. 12, 30-31, 50-51).) At the time of his hire, Berman had been in a Chief of Staff-type role for four years. (Lupion Decl. Ex. 14 (Berman Tr. 77).) At the time of his hire, Faghmous had been a Chief Technology Officer since 2012. (Singh Decl. Ex. 8 (SINGH 86); Singh Decl. Ex. 9 (SINGH 156-57); Singh Decl. Ex. 10 (SINGH 309).)

**PLAINTIFFS' RESPONSE:** Disputed that Knaup did not ask for a chief-level title. Knaup testified that her role was "administrative director and COO [Chief Operating Officer];" she was asked "how did you apply for the positions?" and responded "A friend of mine referred me to Abdul El-Sayed," suggesting that she was referred for both positions and therefore applied to both. (Lupion Decl. Ex. 12 (Knaup Tr. 12).) Disputed that Berman "applied for" the Chief of Staff role. On the cited page he was referred by Knaup, who arranged the meeting: "She told me, you know, what she could. ... She set up the meeting." (Lupion Decl. Ex. 14 (Berman Tr. 98:11-15). Faghmous' prior experience as Chief Technology Officer was not in an academic context. (Singh Decl. Ex. 8 (SINGH 86).) These titles these "aren't kind of classic titles in academia, but seemed like they were permissioned and allowed at the institute." (Lupion Decl. Ex. 4 (Safo Tr. 75:19-25).) Disputed that AIGH

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶47, which should be deemed admitted in its entirety. Knaup testified that she did not ask for the title: "Q. Did you ask to have the title of chief operating officer? A. No . . ." (Dkt. 212.12 (Knaup Tr. 31).) Plaintiffs do not dispute that Berman

interviewed for an open position that carried the Chief of Staff title. (*See* Dkt. 212.14 (Berman Tr. 100-01).) Plaintiffs do not dispute that both Faghmous and Berman had chief roles before AIGH. The context of Faghmous's prior Chief Technology Officer experience is immaterial and does not controvert ¶47. Safo's testimony regarding "classic titles in academia" is immaterial. The statement "Disputed that AIGH" appears to be a typographical error that does not warrant a reply. Paragraph 47 should be deemed admitted in its entirety.

48. Safo testified that she saw male colleagues receive promotions that she believed were not necessarily tied to the amount of work they were doing but because they "ask[ed] for it." (Lupion Decl. Ex. 4 (Safo Tr. 81).) When asked if she knew Faghmous's or Berman's qualifications to be Chief Technology Officer and Chief of Staff, respectively, Safo responded "no." (Lupion Decl. Ex. 4 (Safo Tr. 75-76).)

**PLAINTIFFS' RESPONSE:** Admitted as to the first sentence. Disputed as to second. Safo was asked why Faghmous and Berman were given their titles, not whether she knew their qualifications, and she answered as to Faghmous's background. (Lupion Decl. Ex. 4 (Safo Tr. 76:6-15).) Safo further testified that these "aren't kind of classic titles in academia, but seemed like they were permissioned and allowed at the institute." (Lupion Decl. Ex. 4 (Safo Tr. 75:19-25).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶48, which should be deemed admitted in its entirety. At her deposition Safo was asked about Faghmous's background and why Faghmous and Berman were given their titles. (Dkt. 212.4 (Safo Tr. 76).) The framing of "qualifications" vs.

"background" is immaterial as Safo admitted she had no knowledge of the basis for either title. (*Id.*)

49. On August 11, 2017, Safo submitted a formal request to Singh for promotion to Chief Medical Officer. (Singh Decl. Ex. 11 (BERMAN at 6.) Singh approved the request and Safo was promoted effective October 1, 2017, with a $20,000 increase to her annual supplement. (Lupion Decl. Ex. 4 (Safo Tr. 85, 90-91, 153); Singh Decl. Ex. 13 (ISMMS 18926).)

**PLAINTIFFS' RESPONSE:** Admitted that Safo requested the promotion and that it was approved. Disputed as to August 11, 2017 or October 1, 2017 as the appropriate start dates for that position given Dr. Safo's experience and workload. Defendants' own documents show ISMMS did not pay Safo the $20,000 supplement associated with the Chief Medical Officer title at AIGH until November 25, 2018, more than a year late. (Singh Decl. Ex. 13 (ISMMS 18923); Roben Decl. Ex. 7 (ISMMS 19386).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶49, which should be deemed admitted in its entirety. Plaintiffs' view that other dates would have been "appropriate" is unsupported by a record citation and should be disregarded. *See* Local Civ. R. 56.1(d). The timing of when the supplement was paid does not contradict the October 1, 2017 effective date. Paragraph 49 should be deemed admitted in its entirety

50. For administrative reasons within ISMMS, rather than AIGH, there was a delay in effectuating Safo's salary increase. The pay increase required approval by the Department of Medicine and because Safo later transferred to MSHP, the change required her contract to be amended. (Lupion Decl. Ex. 4 (Safo Tr. 191-92); Lupion Decl. Ex. 12 (Knaup Tr. 225-26);

Singh Decl. Ex. 12 (ISMMS 9843); Singh Decl. Ex. 13 (ISMMS 18923-27).) Safo ultimately received backpay to account for her increase in pay. (Lupion Decl. Ex. 4 (Safo Tr. 191-92); Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 110-12); Roben Decl. Ex. 7 (ISMMS 19386).)

**PLAINTIFFS' RESPONSE:** Disputed. The cited pages do not support the assertion that the delay was administrative and unconnected to AIGH. Safo testified the explanation "wasn't ever really made clear to me," and that the message from Singh was that "I should be patient with the process." (Lupion Decl. Ex. 4 (Safo Tr. 192:3-15).) She also testified that the increase "was consistently delayed because of Arnhold leadership with Prabhjot [Singh] and Kirsten [Knaup]," and that it was resolved only when Clarissa Jones-Winter, member of ISMMS's labor relations department, intervened. (Lupion Decl. Ex. 4 (Safo Tr. 33:15-21); Roben Decl. Ex. 7 (ISMMS 19386).)

**DEFENDANTS' REPLY:** Plaintiffs' Response ignores the relevant record evidence that supports ¶50. Safo's CMO supplement required a contract amendment because her faculty appointment sat administratively with the Department of Medicine. (Dkt. 211.12 (ISMMS 9843-44).) In January 2018, Singh told Safo that "despite multiple inquiries on a regular basis, [the Department of] Medicine has been sitting on this particular file," and that he "remain[ed] confident that it will come through, and that the back date to October 1st will be honored." (*Id.)* When the amendment was ready, Safo "was in talks about a new role in the MSHS, and did not execute our contract amendment." (Dkt. 211.13 (ISMMS 18923–24).) After her March 1, 2018 transfer to MSHP, payment had to be made through her MSHP contract because ISMMS "cannot make any payments to Dr. Safo outside of her contract." (Singh Decl. Ex. 13 (ISMMS 18923-25).)

Safo's belief that the pay increase was delayed "because of Arnhold leadership" (Dkt. 212.4 (Safo Tr. 33)) is speculative and does not create a material dispute. Paragraph 50 should be deemed admitted in its entirety.

**C. Administrative Tasks Were Distributed Among Male and Female Employees.**

51. In her role as Program Manager, Safo's responsibilities included developing a population health learning and dissemination platform, developing evidence-based standards for clinical and social service partner accountability, and conducting research on care delivery approaches. (Lupion Decl. Ex. 20 (ISMMS 165).)

**PLAINTIFFS' RESPONSE:** Admitted.

52. Safo testified that she was also asked to do "a lot of the organizing" and set the structure of one retreat, as well as certain senior meetings. (Lupion Decl. Ex. 4 (Safo Tr. 72, 20708).) She felt that these tasks were beneath her position at AIGH. (*Id.*)

**PLAINTIFFS' RESPONSE:** Admitted that Safo organized a retreat and senior meetings and considered the work inappropriate to her position. However, Defendants' assertion is materially incomplete as Safo testified that there was structural gender component to how such work was assigned: "the administrative structuring of it would often fall to me and other women." (Lupion Decl. Ex. 4 (Safo Tr. 207-208)[3].)

**DEFENDANTS' REPLY:** Plaintiffs' Response, including the additional testimony from Safo, admits and does not controvert ¶52, which should be deemed admitted in its entirety.

---

[3] Paragraph 52, and Plaintiffs' response to it, cite pages 207-08 of Safo's deposition transcript to Lupion Decl. Ex. 4. Those pages were inadvertently omitted from that exhibit. They appear in the record at McAllister Decl. Ex. 19 (Dkt. 223-19) (Safo Tr. 207-08).

53. Male employees performed similar administrative-type tasks. Singh described the early AIGH environment as "akin to a start-up organization," where administrative aspects of the work had to be handled by the available team member, regardless of seniority. (Singh Decl. ¶10.)

**PLAINTIFFS' RESPONSE:** Disputed. The paragraph rests solely on Singh's declaration and is contradicted by the record, which establishes that administrative work was assigned to the women. Khan attests that he "was assigned virtually no administrative tasks, not even sending out meeting notes," and that the same was true of other men, including Aaron Baum, Mathew Le, Patrick Doupe and Mihir Mongia. (Khan Decl. ¶ 19.) Khan further attests that on one occasion he walked into a room where only women AIGH employees were stuffing envelopes; "I had not been asked to help with that task and only learned of it by walking into the room; I helped the women with this menial task." (*Id.*) ISMMS disputes Singh's declaration: "the reality is they're not a startup." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 17).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶53, which should be deemed admitted in its entirety. The assertion of one individual, Khan (a former plaintiff in this case) who did not observe men performing administrative tasks does not contradict Singh's testimony. Moreover, Khan did not begin working at AIGH until August 31, 2017, nearly two years after its founding. (Dkt. 224 ¶3.) The statements in Khan's declaration that he was not assigned administrative tasks, and that on one occasion he saw women stuffing envelopes, does not controvert Singh's description of AIGH's start-up

environment or that men also performed administrative tasks, which is confirmed by Plaintiffs' Response to ¶54 below. (*Id*. ¶19).

54. Kishore, a member of the leadership team, organized topics for AIGH employees to present in all-hands meetings. (Lupion Decl. Ex. 15 (Kishore Tr. 24-25, 30).) Berman worked on trip agendas, coordinated logistics, prepared briefcases of folders, and on at least one trip, handled logistics and managed drivers at Singh's direction. (Lupion Decl. Ex. 14 (Berman Tr. 372-73); Lupion Decl. Ex. 2 (Singh Tr. 176-77).)

**PLAINTIFFS' RESPONSE:** Admitted that Kishore organized presentation topics and that Berman worked on trip agendas and logistics. Materially incomplete: Singh's cited testimony is that handling logistics and managing drivers "depends on the trip. I think on one trip David Berman handled it and I think on another trip, I may have asked [Misiti] to help on that basis." (Lupion Decl. Ex. 2 (Singh Tr. 176-177; Errata of Singh at 177.)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶54, which should be deemed admitted in its entirety. The additional testimony regarding Misiti is not inconsistent with ¶54 and confirms that such tasks were assigned to both men and women.

### D. Singh's Interactions with Safo and other AIGH Staff Members.

55. Safo testified that Singh would stare at her "without blinking" to "intimidate" her. (Lupion Decl. Ex. 4 (Safo Tr. 261).)

**PLAINTIFFS' RESPONSE:** Admitted.

56. Safo testified that Singh had a "constant desire" "to control," a "lack of clarity," and would cause "multiple changes to the direction of the work," which Safo described as a "continuous shifting of the ground underneath us." (Lupion Decl. Ex. 4 (Safo Tr. 159-60).)

**PLAINTIFFS' RESPONSE:** Admitted.

57. Safo testified that she was "put off" by Singh's e-mail communications, which she described as "degrading" and "diminishing," including his "constant telling [her] of what [she] need[ed] to be focused on." (Lupion Decl. Ex. 4 (Safo Tr. 160, 199).)

**PLAINTIFFS' RESPONSE:** Admitted as to the quotes but materially incomplete. On the same page Safo attributed Singh's conduct to her sex: "the way that he was communicating with me felt degrading or diminishing and ... like it was happening because I was a woman and ... I didn't see him communicating that way to other individuals." (Lupion Decl. Ex. 4 (Safo Tr. 199).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert paragraph ¶57. The additional quotation in Plaintiffs' Response does not controvert ¶57, and notably omits the portion of Safo's testimony where she said it "felt like" Singh's communications were happening because she was a woman. (Dkt. 212.4 (Safo Tr. 199).) Safo's subjective belief is immaterial. Paragraph 57 should be deemed admitted in its entirety.

58. Safo testified Singh referred to her as a "mother hen" regarding how she ran a meeting. (Lupion Decl. Ex. 4 (Safo Tr. 199).)

**PLAINTIFFS' RESPONSE:** Admitted as to the quote but materially incomplete. Dr. Safo's testimony continued "and I can't imagine he would have done the same for a male colleague." (Lupion Decl. Ex. 4 (Safo Tr. 199:23-200:2).) Safo was testifying as to interactions that made her uncomfortable as a woman. (*Id.*)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶58, which should be deemed admitted in its entirety. Safo's additional

testimony that she "can't imagine he would have done the same for a male colleague" is speculation and immaterial.

59. Safo testified she was "more or less directed not to speak" in calls with funders and in meetings with MSHP leadership. (Lupion Decl. Ex. 4 (Safo Tr. 210, 286).) During one such call, on October 4, 2016, Singh emailed Safo with the subject line "you are talking to[o] much." (Singh Decl. Ex. 5 (SINGH 4063).)

**PLAINTIFFS' RESPONSE:** Admitted.

60. Safo testified that she believed Singh's "desire to control" her "professional relationships" "felt gendered" or she "didn't feel like [the experiences] w[ere] happening for other colleagues." (Lupion Decl. Ex. 4 (Safo Tr. 209).)

**PLAINTIFFS' RESPONSE:** Admitted but the fuller quote from Safo's testimony reads: "I experienced Prabhjot's desire to control my professional relationships as being something that felt gendered and didn't feel like that was happening for other colleagues, especially male colleagues in the institute." (Lupion Decl. Ex. 4 (Safo Tr. 209).) Safo added: I didn't see him do that with male colleagues, like individuals like Bruno [Silva] and James [Faghmous]." (Lupion Decl. Ex. 4 (Safo Tr. 210).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶60, which should be deemed admitted in its entirety.

61. Singh testified: "I think if anybody was -- if we were running a program or we had a meeting, and we weren't getting through material, I would certainly communicate that to the person that was taking too long, if I could." (Lupion Decl. Ex. 2 (Singh Tr. 279).)

**PLAINTIFFS' RESPONSE:** Admitted.

62. Singh also testified that he similarly told a male employee—either Baum or Heller—that his presentation was "going too long about their research." (Lupion Decl. Ex. 2 (Singh Tr. 279-80).)

> **PLAINTIFFS' RESPONSE:** Admitted that Singh testified he had told men their presentations ran long. However, on the same page, he disclaimed any specific memory of telling anyone other than Safo that she was talking too much --- "Q. You don't have a specific memory of that? A. No." (Lupion Decl. Ex. 2 (Singh Tr. 280:18-23).)
>
> **DEFENDANTS' REPLY:** Plaintiffs' Response admits ¶62. The additional testimony cited mischaracterizes the record. When Singh was asked whether he had "a specific memory" of "mov[ing] the mic[rophone] with anyone other than Safo, Singh answered that he recalled "a faculty meeting where I had asked for folks to kind of hurry or finish up, or wrap up, at some point at Dr. Baum and at some point to Dr. Heller," because their presentations "were going too long" and "somebody wouldn't have been able to present during that time period." (Dkt. 212.2 (Singh Tr. 279-80).) Singh's testimony that he did not know whether he told anyone other than Safo that "he or she was talking too much" (*id*. at 280:18-23) does not controvert ¶62.

63. Safo testified that people "told [her] about things [Singh] had said" about her that she characterized as "disparaging." When asked to identify the meetings where this occurred, Safo testified that during a meeting with the Peterson Institute, Singh "had me there kind of in a titular fashion but essentially didn't really allow me to speak or engage with them." Safo claimed that Baum was "brought in to work with" Peterson and "was engaging with them freely." However, Safo admitted she did not actually know whether Baum was engaging with

Peterson or with MSHP, an internal group. (Lupion Decl. Ex. 4 (Safo Tr. 285-86).) According to Singh, Safo and Baum interacted with the Peterson Institute under his guidance and they were subject to the same communication limitations. (Singh Decl. ¶9.)

**PLAINTIFFS' RESPONSE:** Admitted as to Safo's testimony except "told [her] about things [Singh] had said" does not appear on the cited transcript pages. Disputed as to Singh's testimony is disputed. During his deposition, Singh was asked "Did you try and manage Dr. Safo's interactions with others outside of the Institute?" and answered: "Quite the contrary. I introduced her to a lot of people." (Lupion Decl. Ex. 2 (Singh Tr. 269).) Singh now advances a contrarian narrative in his declaration by claiming he set boundaries with respect to Safo. (Singh Decl. ¶ 9.) Further, the difference of freedom between Safo and Dr. Baum to communicate with the Peterson Institute is in dispute. Safo testified "other male colleagues were not being introduced and certainly not having their work spoken about by him" (Lupion Decl. Ex. 4 (Safo Tr. 285:11-15)); and "[Baum] was kind of able to engage more freely than I felt like I could." (Lupion Decl. Ex. 4 (Safo Tr. 286).).

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶63, which should be deemed admitted in its entirety. The phrase "told [her] about things that [Singh] had said" appears on page 284 of Safo's transcript.[4] Singh's declaration does not contradict his testimony, in which he confirmed that he "introduced [Safo] to a lot of people," (Dkt. 212.2 (Singh Tr. 269)), and is fully consistent with Singh leading the relationship with one external funder, the

[4] The citation to page 284 was inadvertently excluded from ¶ 63, but the page is included in Lupion Decl. Ex. 4.

Peterson Institute, and setting boundaries on both Safo's and Baum's relevant communications with respect to that funder. (Dkt. 211 ¶9.) Safo's view that Baum "was kind of able to engage more freely than [she] felt like [she] could" is subjective and Safo admitted she did not know whether Baum was "engaging with [Peterson] or Mount Sinai Health Partners." (Dkt. 212.4 (Safo Tr. 285-86).)

64. In March 2015, Singh emailed Safo not to respond to Barbara Murphy about the number of Safo's clinical sessions because, as the Director of the Institute and her supervisor, he first wanted to discuss Safo's allocation of time with Barbara Murphy. (Lupion Decl. Ex. 2 (Singh Tr. 269-70).)

**PLAINTIFFS' RESPONSE:** Admitted.

65. On October 24, 2017, when Singh learned Safo was meeting with someone from Cityblock Health, Singh requested that she keep him in the loop since he had a longstanding relationship and had personally advised the organization. (Lupion Decl. Ex. 24 (Safo 2307-08).)

**PLAINTIFFS' RESPONSE:** Admitted.

66. With regard to Safo's allegation that she was passed-over in meetings, neither Safo nor Singh was able to identify a specific meeting or instance when this happened. (Lupion Decl. Ex. 4 (Safo Tr. 285-86); Lupion Decl. Ex. 2 (Singh Tr. 238-40).)

**PLAINTIFFS' RESPONSE:** Disputed. The very pages Defendants cite contradict their position. Safo identified multiple meetings: "[T]here were some meetings with Mount Sinai Health System colleagues ... one meeting with Peterson or two meetings with Peterson ... The institute meetings were another example ... most calls or maybe all the calls that I was on with funders, potential funders. And then in much of the meetings with Mount Sinai Health Partners

leadership or system leadership, I was more or less directed not to speak at all." (Lupion Decl. Ex. 4 (Safo Tr. 285:18-286:20).)

**DEFENDANTS' REPLY:** The portion of ¶66 that refers to a meeting where Safo was "passed-over" was intended to refer to meetings in which Safo believed she should have presented or introduced her work instead of allowing Singh to introduce her. (Dkt. 212.4 (Safo Tr. 285).) Safo's testimony confirms that Singh's reasoning for taking the lead in meetings was initially "to kind of get the lay of the land" and because "he had a contract with [Peterson] directly, and so he wanted to be really – yes, he wanted to be really direct about the work" and manage the relationship. (Reply Lupion Decl. Ex. 73 (Safo Tr. 286-89).) Safo's comparison to male colleagues on the point regarding introductions did not identify a specific meeting ("other male colleagues were not being introduced and certainly not having their work spoken about by [Singh]." (Dkt. 212.4 (Safo Tr. 285:9-286:20).)

67. Singh noted that "there were meetings in which either men or women felt like they didn't get a chance to speak up," including himself. Singh explained that he "often felt like [he] had something left to say and there just wasn't time for it." (Lupion Decl. Ex. 2 (Singh Tr. 238-40).)

**PLAINTIFFS' RESPONSE:** Admitted that this was Singh's testimony.

68. Safo admitted the Health System Design Team, as a whole, received directed critiques from Singh and that he was critical of male employees at AIGH, including Faghmous and Charney. (Lupion Decl. Ex. 4 (Safo Tr. 203; 237; 271).)

**PLAINTIFFS' RESPONSE:** Admitted in part. Safo testified to "a lot of directed critiques towards the health system design team and towards me as their leader." (Lupion Decl. Ex. 4 (Safo Tr. 237:4-7).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶68 which should be deemed admitted in its entirety. The additional testimony cited by Plaintiffs confirms that Singh's critique of Safo was in her capacity as "leader" of the health system design team. (Dkt. 212.4 (Safo Tr. 237:4-7).)

69. Male employees described the same behavior with regard to Singh's management style. Escosia testified he did not like Singh's management "style," stating Singh was not "able to manage properly" and Singh's "constant shifting of priorities" and "saying one thing and not the other" caused Escosia to question his own abilities. (Lupion Decl. Ex. 13 (Escosia Tr. 244); Lupion Decl. Ex. 25 (Safo 6942).)

**PLAINTIFFS' RESPONSE:** Admitted.

70. Escosia left AIGH in April 2018 because he "found it impossible to work under the conditions of uncertainty." (Lupion Decl. Ex. 13 (Escosia Tr. 35); Lupion Decl. Ex. 25 (Safo 6942).)

**PLAINTIFFS' RESPONSE:** Disputed. The quoted phrase "found it impossible to work under the conditions of uncertainty" appears nowhere in Escosia's deposition transcript. It appears in Safo 6942, but that is not a sworn document. Notably, Escosia did not write he left because of hostile work environment based on his sex. (Lupion Decl. Ex. 25 (Safo 6942).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶70, which should be deemed admitted in its entirety. The quoted language comes from a document Escosia authored. (Dkt. 212.25 (Safo 6942).) In his deposition,

Escosia confirmed the document was a "statement that I had written" and that he wrote it on his own. (Reply Lupion Decl. Ex. 63 (Escosia Tr. 187-88, 194).) Escosia's deposition testimony is consistent with the statement. He testified that because of "changing directives," AIGH employees were "constantly second guessing" themselves, and that "directives would change so often" that work "was no longer valid. It happened many times." (Dkt. 212.13 (Escosia Tr. 69-71).) He testified that the directives came "every other month from Dr. Singh," that the wasted work was frustrating, and that he second-guessed himself. (*Id.* at 71.) He further testified that his frustration with AIGH's leadership, "[m]ostly Dr. Singh," based on "an accumulation of many interactions," led him to consider resigning. (Reply Lupion Decl. Ex. 63 (Escosia Tr. 66-67).) Asked why he ultimately left, Escosia answered: "I didn't like the direction we were going, I didn't like the environment we were in and also I found a better opportunity at a different organization." (Reply Lupion Decl. Ex. 63 (Escosia Tr. 175).)

71. Berman testified that Singh "struggled" to determine AIGH's "operating model" and that he had management challenges in aligning resources to support and grow that model. (Lupion Decl. Ex. 14 (Berman Tr. 50-51).)

**PLAINTIFFS' RESPONSE:** Admitted as to Berman's testimony. Disputed that these "struggles" resulted in his departure from AIGH; Berman resigned in the wake of ISMMS's requesting his removal from AIGH as a result of its investigation into discrimination at AIGH. (McAllister Decl. Ex. 4 (Berman Tr. 211); McAllister Decl. Ex. 54 (ISMMS_021486).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶71, which should be deemed admitted in its entirety. The statements about the reasons why Berman departed from AIGH are unresponsive to ¶71 and immaterial. .

72. Muller also testified that he experienced Singh's shifting priorities. According to Muller, Singh initially was very supportive and enthusiastic about work being done by Muller, Ramon Murphy, and Landrigan, but then shifted his position and made clear that the work "was not among his highest priorities for the institute." (Lupion Decl. Ex. 16 (Muller Tr. 119-21).)

**PLAINTIFFS' RESPONSE:** Admitted.

73. Muller also testified that once, Singh was initially very supportive of a project he was working on with Google, but then "completely torpedoed it" in a group meeting, speaking about it "in...almost disparaging terms." (Lupion Decl. Ex. 16 (Muller Tr. 150-51).)

**PLAINTIFFS' RESPONSE:** Disputed. Defendants' material omission of the rest of Muller's testimony undermines their assertion. Muller testified, just a few lines below Defendants' quotes: "again, it didn't 'torpedo' --- I apologize for using that word. It didn't torpedo the program because we pushed forward with it and [Singh] wanted no part of it, which was fine." (Lupion Decl. Ex. 16 (Muller Tr. 151).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶73, which should be deemed admitted in its entirety. Muller's testimony that Singh "torpedoed" the project in a meeting." (Dkt. 212.16 (Muller Tr. 151)) was his candid characterization during the deposition, which he sought to clarify to show that the project didn't end. Muller testified that after Singh's reaction he "worked very hard to sustain it. But he went from someone who was privately very

enthusiastic about this, on board, let's do this, to really speaking about it in . . . disparaging terms in a group of people." (*Id.*) Muller's clarification that Singh did not ultimately "torpedo" the entire program because "we pushed forward with it" does not contradict Muller's testimony about Singh's reversal and disparaging comments. (*Id.*; *see* Reply Lupion Decl. Ex. 71 (Muller Tr. 246-47) (Muller described Singh's work demeanor as: "it was impossible to pin him down in a way that allowed me to work with him the way I've been able to work with scores of other people. That he behaved towards a dear friend of mine, Ramon Murphy, in a way that I thought was cruel and insensitive.").)

74. Silva testified that Singh "yelled" at him when Silva changed a flight without informing Singh. (Lupion Decl. Ex. 3 (Silva Tr. 322-23).)

**PLAINTIFFS' RESPONSE:** Admitted.

75. Berman testified that Singh was critical of his work and at times pushed Berman to do better. (Lupion Decl. Ex. 14 (Berman Tr. 133-34).)

**PLAINTIFFS' RESPONSE:** Disputed. Berman testified as to the opposite: "criticism's not a word that I would use ... he was generally pretty satisfied with my work ... normal boss stuff." (Lupion Decl. Ex. 14 (Berman Tr. 133-134).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶75. Berman's testimony confirms that Singh was critical of his work. When asked whether Singh criticized his work, Berman answered "Sure." He then testified that although "criticism's not a word that [Berman] would use," Singh expressed "whether, like, you know the work met the quality or the expectations or hit the mark," and he "certainly had moments where, yeah, you can do better than that,

like, or, like, come on, is this your best work? You know . . . normal boss stuff." (Dkt. 212.14 (Berman Tr. 133-34).) Berman also testified that Singh told him, "You are not doing a good job . . . this sucks." (*Id.* at 348.) Paragraph 75 should be deemed admitted in its entirety.

76. On one occasion, when Misiti and Berman pushed back with Singh on the timing of writing a report, Singh "became enraged" at both employees. (Lupion Decl. Ex. 26 (Safo 5372).)

**PLAINTIFFS' RESPONSE:** Admitted that the document says what Defendants claim. This is an unsworn document that Misiti shared with ISMMS investigators as part of the 2018 Investigation. (Misiti Decl. ¶7.) Defendants' reliance on this document is in direct contradiction to their previous representations to this Court that they "do not intend to rely upon the investigation as part of their defense." (Dkt. No. 133-2.)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶76, which should be deemed admitted in its entirety. The quoted language is from a statement Misiti produced in this litigation, and she declared, under the penalty of perjury, that she is "the author of that document." (Dkt. 226 ¶7.) Defendants' citation to a statement Plaintiffs produced in discovery does not contradict their position that they are not relying on the privileged 2018 investigation as part of their defense.

77. Safo testified that Singh never threatened her or acted in a way she found menacing. (Lupion Decl. Ex. 4 (Safo Tr. 261-263).)

**PLAINTIFFS' RESPONSE:** Disputed, and contradicted by the very pages Defendants cite. Safo testified: "Q. ... were you ever in fear that Dr. Singh

would strike you? A. I was." She described "long pauses after you spoke and just kind of staring at you for that time to convey anger" and that "[h]e sometimes had a tendency to kind of walk at you fast and close." (Lupion Decl. Ex. 4 (Safo Tr. 261263).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶77, which should be deemed admitted in its entirety. Plaintiffs' selective quotations mischaracterize Safo's testimony. Safo answered "I was" when asked whether she was ever "in fear that Dr. Singh would strike [her]" (Dkt. 212.4 (Safo Tr. 261)), but *later* testified in response to specific questions that she did not recall Singh ever saying anything she "construed as a threat [of] physical violence" (*id.* at 262), he never raised his hand to her (*id*. at 262-63) and that, although he "sometimes had a tendency to kind of walk at you fast and close," she "can't say that at that time [she] experienced something that stood out in [her] mind as . . . feeling physically menacing." (*Id*. at 263.) Safo's subjective fear does not contradict ¶77, which concerns only whether Singh threatened her or acted in a way she found menacing, which she testified he did not. Paragraph 77 should be deemed admitted in its entirety.

**E. Safo's Interactions with David Berman.**

78. Safo testified that Berman was "not collegiate *[sic]*" "openly hostile and verbally abusive towards staff." According to Safo, Berman "had a manner of disregarding those he didn't think were important." (Lupion Decl. Ex. 4 (Safo Tr. 94-95, 108-09).) Safo testified that Berman would make comments such as "this person isn't capable or this person isn't that good." (Lupion Decl. Ex. 4 (Safo Tr. 101).)

**PLAINTIFFS' RESPONSE:** Disputed. Safo testified as to the quoted words but Defendants' quotes are so selective they twist the meaning of Safo's testimony. In the same answer, Safo testified that "Berman was particularly harsh towards women staff . . . Prabhjot was aware of Berman's what I would call workplace, like, verbal violence and didn't do anything about it." (Lupion Decl. Ex. 4 (Safo Tr. 94-95).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶78, which should be deemed admitted in its entirety. In this part of Safo's deposition she testified about a time Berman "spoke very harshly to [Kishore] about one of the grants that was coming in." (Dkt. 212.4 (Safo Tr. 104).) Further, in response to an interrogatory asking her to identify each person she personally witnessed Berman act in a hostile manner toward, Safo only identified Kishore. (Reply Lupion Decl. Ex. 73 (Safo Tr. 274).)

79. Safo identified two women whom Berman yelled at (Mary Caliendo and Renee Bischoff) but admitted that she did not witness either interaction. (Lupion Decl. Ex. 4 (Safo Tr. 96-101).)

**PLAINTIFFS' RESPONSE:** Disputed. Safo also identified Sasha Walek as a woman that Berman often spoke to in disparaging manner. (Lupion Decl. Ex. 4 (Safo Tr. 98).) Admitted that Safo did not witness Berman yelling at Caliendo or Bischoff.

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶79, which refers only to Safo's identification of the women Berman "yelled" at. Paragraph 79 should be deemed admitted in its entirety.

80. Safo testified that Berman made statements that called into question her "professionalism and seemed to suggest a lack of competence." (Lupion Decl. Ex. 4 (Safo Tr. 106-10).) She said that after a meeting was rescheduled, Berman told her, "if you could do your job, you would be able to organize your meetings." Safo testified that Berman would disregard people who were not important. (Lupion Decl. Ex. 4 (Safo Tr. 107, 109).)

**PLAINTIFFS' RESPONSE:** Admitted.

81. While Safo believed that these types of comments "didn't seem to happen nearly as much [to] James[] [Faghmous's] work, or Aaron[] [Baum's] work" (Lupion Decl. Ex. 4 (Safo Tr. 106-10)), Berman made similarly critical comments of men. For example, Berman chastised Faghmous for not finding time to take senior management calls while out of the office, telling him "[g]reat senior managers don't find reasons not to attend senior level meetings, they find ways to[]." (*See* Roben Decl. Ex. 2 (ISMMS 8193-95 at 94).) Berman once made Baum cry. (Lupion Decl. Ex. 17 (Weisman Tr. 83).)

**PLAINTIFFS' RESPONSE:** Disputed that Weisman testified Berman made Baum cry; he testified that Llames reported it, in the same sentence in which she reported that Berman had yelled at her. (Lupion Decl. Ex. 17 (Weisman Tr. 83:14-19).) Berman testified the Baum episode was "[a] couple of conversations" between equals, mutual and reciprocal, and Baum did <u>not</u> cry afterwards. (Lupion Decl. Ex. 14 (Berman Tr. 350-51).)

**DEFENDANTS' REPLY:** Weisman testified that Llames told him that Berman had "yelled at her and made another faculty member, Dr. Baum, cry." (Dkt. 212.17 (Weisman Tr. 83).) When asked whether Safo heard David Berman had reduced Aaron Baum to tears, she answered, "I think I might have, yes." (Dkt. 212.4 (Safo Tr. 104).) Whether Baum actually cried is immaterial. The testimony

confirms that Berman was harsh with, and raised his voice at, men as well as women. Berman agreed that he had "heated exchange[s]" with Baum, in which both men's voices were raised. (Dkt. 212.14 (Berman Tr. 350-51).) Berman also sharply criticized Faghmous in writing, which Plaintiffs do not dispute. (*See* Dkt. 210.2 (ISMMS 8194).) Paragraph 81 should be deemed admitted in its entirety.

82. On September 19, 2017, Berman and Safo got into a heated email exchange over Safo's failure to invite everyone in the Institute to a birthday celebration she planned in the office. (Lupion Decl. Ex. 14 (Berman Tr. 351-54); Lupion Decl. Ex. 27 (ISMMS 93-96).)

**PLAINTIFFS' RESPONSE:** Admitted.

83. Berman, who was previously aware of complaints that Safo was not inclusive of others in the Institute, raised his concern directly with Safo. (Lupion Decl. Ex. 14 (Berman Tr. 351-53); Lupion Decl. Ex. 27 (ISMMS 95-96).) He also spoke with Safo about what he perceived as her pettiness. (Lupion Decl. Ex. 14 (Berman Tr. 58).)

**PLAINTIFFS' RESPONSE:** Disputed that Safo was not inclusive of others in the Institute. Safo wrote Berman "I'm not one to not be inclusive ... I care about everyone in this institute feeling valued and contributing to our shared vision." Lupion Decl. Ex. 27 (ISMMS 95).)

**DEFENDANTS' REPLY:** Plaintiffs' statements and disagreement with Berman's characterizations are immaterial and do not controvert ¶83, which states that Berman was aware of complaints and raised his concern with Safo. Paragraph 83 should be deemed admitted in its entirety.

84. In the email exchange, Berman informed Safo that her "celebration effort is selective" and that her "tone and replies" were "combative," reflecting "non-inclusion and a

lack of respect for basic administration protocols." (Lupion Decl. Ex. 14 (Berman Tr. 353-54); Lupion Decl. Ex. 27 (ISMMS 93-95).)

**PLAINTIFFS' RESPONSE:** Admitted as to the accuracy of the quotes but disputed as to their substance. Safo wrote Berman "I'm not one to not be inclusive ... I care about everyone in this institute feeling valued and contributing to our shared vision." Lupion Decl. Ex. 27 (ISMMS 95).)

**DEFENDANTS' REPLY:** Plaintiffs' statements and disagreement with Berman's characterizations are immaterial and do not controvert ¶84, which states that Berman informed Safo that her effort was selective and her tone was combative, reflecting non-inclusion and a lack of respect. Paragraph 84 should be deemed admitted in its entirety.

85. Safo responded to Berman, stating, "[a]s feedback to you, I'd say you should find ways to encourage staff to celebrate each other. I could read this email, and other efforts to contribute or help institute culture which have been rejected/cautioned against, as an indication to do less." (Lupion Decl. Ex. 27 (ISMMS 95).) Safo admitted that her email responding to Berman was written in an intentionally angry tone and separately forwarded her response to Privett stating, "Girl he is bothered!" and adding "I can't wait to be a thorn in the side of these mofos for the next year I'm here. Muahahahaha." (Lupion Decl Ex. 56 (ISMMS at 26691).)

**PLAINTIFFS' RESPONSE:** Admitted that the documents say what they say. Safo's testimony about them is at Lupion Decl. Ex. 4 (Safo Tr. 123)-25 and is addressed at ¶97 below.

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶85, which should be deemed admitted in its entirety.

86. At that point, Singh directed both to take the conversation "offline," communicating that "the exchange was getting heated and extended, and everybody should cool it." (Lupion Decl. Ex. 14 (Berman Tr. 355); Lupion Decl. Ex. 2 (Singh Tr. 283).)

**PLAINTIFFS' RESPONSE:** Admitted.

**F. Safo's Interactions with Silva.**

87. Prior to the lawsuit, Silva considered Safo a friend. (Lupion Decl. Ex. 3 (Silva Tr. 226, 232-33).) While working at AIGH, Safo and Silva took a personal vacation together to Mexico City. (Lupion Decl. Ex. 3 (Silva Tr. 186-88).)

**PLAINTIFFS' RESPONSE:** Admitted.

88. Safo and Silva worked together on the Health System Design team. While Silva believed Safo was a qualified physician, he did not "think that she was experienced enough" from a management perspective to lead the design team. (Lupion Decl. Ex. 3 (Silva Tr. 227-28).)

**PLAINTIFFS' RESPONSE:** Disputed. The cited pages contain no mention of Safo's managerial experience. Defendants did not quote or even include in their filing the remainder of Silva's answer on page 229. Silva testified that we were all, to a level, inexperienced to that subject" and that Safo is "a fantastic, brilliant doctor, with so much empathy as a physician." (Lupion Decl. Ex. 3 (Silva Tr. 227-28); McAllister Decl. Ex. 21 (Silva Tr. 229).)

**DEFENDANTS' REPLY:** Paragraph 88 inadvertently omitted a citation to pages 121-22 of Silva's transcript, which includes the quoted language. (Reply Lupion Decl. Ex. 74 (Silva Tr. 121-22).) Silva testified that "in [his] personal opinion . . . as a physician, she was clearly outstanding. However, from a change managing – management perspective, which was the work that we were supposed

to – we were doing as health system design, I don't think that she was experienced enough." (*Id.*) Silva further clarified that he "never said she was incompetent" but "said that she didn't have the experience to be doing the change management level work that we were trying to do," and that although "[w]e were all learning [on] the spot . . . Stella was the one who led the team." (*Id.* at 231.) The testimony cited in Plaintiffs' Response does not controvert ¶88, which should be deemed admitted in its entirety.

89. Safo testified that, at one point, Silva was not "following through on some of the health system design work" because "he was upset" with her or "something that the team had done." (Lupion Decl. Ex. 4 (Safo Tr. 276).) Safo admitted, however, that Silva's actions were not motivated by gender. (Lupion Decl. Ex. 4 (Safo Tr. 242-44, 250-51).)

**PLAINTIFFS' RESPONSE:** Disputed as to the second sentence. Safo testified Silva's actions were motivated by gender: "[W]hat felt like gendered treatment from Bruno is that he would preferentially decide whose work he would complete versus not complete ... and that definitely felt like that was gendered" (Lupion Decl. Ex. 4 (Safo Tr. 249)); "those were male colleagues versus my work and me" (Lupion Decl. Ex. 4 (Safo Tr. 250)); and "given how close he was to Prabhjot, given how favored he was by Kirsten, that did make me feel less confident as a woman in the institute that I would be protected." (Lupion Decl. Ex. 4 (Safo Tr. 251).)

**DEFENDANTS' REPLY:** The cited transcript pages reflect Safo's view that Silva's colloquial language, including phrases like "Hey, girl" and use of the word "bitch" did not offend her. (Dkt. 212.4 (Safo Tr. 242-44).) While Safo testified that Silva's preferential treatment "felt like gendered," she admitted that

her statement was based on a speculative view that his work with male colleagues "took precedence, or it seemed to me like that work took precedence." (*Id*. at 249-50.) The second sentence of ¶89 mistakenly refers to Silva's "actions" as opposed to his language, which Safo testified was not gendered. (Dkt. 212.4 (Safo Tr. 250) ("… he would use very strong terms for people that he didn't like, or people who [sic] wanted to disparage").) The remainder of ¶89 should be deemed admitted.

90. On one occasion, Silva complained to Llames (with whom he had a personal friendship) that Safo was rude and described her as "being a bitch." (Lupion Decl. Ex. 3 (Silva Tr. 228, 298).) Llames testified that in a conversation she had with Silva, Silva called Safo a "cunt," but could not recall any other details and did not report it to anyone. (Lupion Decl. Ex. 5 (Llames Tr. 147-48).) Safo testified that she did not hear Silva say these things while she was at AIGH. (Lupion Decl. Ex. 4 (Safo Tr. 245).)

**PLAINTIFFS' RESPONSE:** Admitted. Silva denied using the word "cunt." (McAllister Decl. Ex. 21 (Silva Tr. 144.)

**DEFENDANTS' REPLY:** Plaintiffs' addition does not controvert ¶90, which should be deemed admitted in its entirety.

91. Safo testified that the only times she heard Silva use the term "bitch," was in a "very clearly friendly" context. (Lupion Decl. Ex. 4 (Safo Tr. 249-51).)

**PLAINTIFFS' RESPONSE:** Disputed. Safo testified Silva used the term with acrimony: "As time went on ... it felt more like there was actually acrimony behind it when he would say some of these things like 'bitch'" (Lupion Decl. Ex. 4 (Safo Tr. 244:17-23)); "he would use very strong terms for people that he didn't like ... His tendency to do that made me wonder what else he was saying about me and others behind our backs." (Lupion Decl. Ex. 4 (Safo Tr. 251).)

**DEFENDANTS' REPLY:** Safo testified that she did not "remember him calling me a bitch to my face in a way that was not like very clearly friendly." (Dkt. 212.4 (Safo Tr. 249-51).) The "acrimony" testimony Plaintiffs quote is immaterial because it refers to Silva's speech about "*people* that he didn't like, or *people* who [sic] wanted to disparage," not women specifically or Safo. (Dkt. 212.4 (Safo Tr. 249-51) (emphasis added).) Paragraph 91 should be deemed admitted in its entirety.

92. Silva testified that Safo used the term bitch or "B" "multiple times" to refer to him. (Lupion Decl. Ex. 3 (Silva Tr. 236-37).) Silva, who reported to Safo, is a gay man. (Lupion Decl. Ex. 3 (Silva Tr. 294).)

**PLAINTIFFS' RESPONSE:** Disputed as to Silva's reporting relationship to Safo. Defendants' position here is contrary to ¶4, where they asserted "Silva was responsible for the design aspect of the Health System Design team and reported to Singh. (Lupion Decl. Ex. 3 (Silva Tr. 74-75, 116-17).)" Silva testified he did not report to Safo (Lupion Decl. Ex. 3 (Silva Tr. 75)), consistent with Safo's own distinction between supervising and reporting. (Lupion Decl. Ex. 4 (Safo Tr. 7879).)

**DEFENDANTS' REPLY:** Safo led the Health System Design team, and by her own account, supervised Silva's work related to Health Systems Design. (Dkt. 212.4 (Safo Tr. 78-80); *see* ¶42.) The distinction Plaintiffs attempt to make between "supervising" and "reporting" does not controvert Paragraph 92, which should be deemed admitted.

93. Safo did not inform Singh, or any other supervisor, of Silva's comments at the time they were made. (Lupion Decl. Ex. 4 (Safo Tr. 241-42); *see also* Lupion Decl. Ex. 2 (Singh Tr. 141-43).)

**PLAINTIFFS' RESPONSE:** Disputed. Safo testified she had raised Silva's conduct with Singh: "Bruno Silva really contributed to a culture of . . . talking behind people's backs . . . I also conveyed that to Prabhjot, and that felt like there wasn't much that was done about that." (Lupion Decl. Ex. 4 (Safo Tr. 95:815).) The pages Defendants cite show Safo testifying that "something may have happened with Bruno and others that made me specifically mention to Prabhjot that I was kind of worried about a culture of gossiping" (Lupion Decl. Ex. 4 (Safo Tr. 242:2-7)) and that "I tried to convey to Prabhjot that I thought the culture was suffering from some -- some of the gossiping" (Lupion Decl. Ex. 4 (Safo Tr. 242:14-16)). Singh acknowledged "discussions with people about management questions or issues with Bruno's team." (Lupion Decl. Ex. 2 (Singh Tr. 143:9-11).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶93. The testimony Plaintiffs cite shows that what Safo raised with Singh was a general concern about "gossiping" and talking behind people's back. (Dkt. 212.4 (Safo Tr. 95, 242).) It was not a report of Silva's use of the word "bitch" or any comments about women. Singh confirmed that his discussions about Silva's team concerned management issues, "not . . . comments that were derogatory in nature." (Dkt. 212.2 (Singh Tr. 143).) Singh further testified, "[l]eaving aside questions about work related conduct, whether something was being administered properly or not, did you, while you were the director, did you hear any comments from anyone that

Mr. Silva was acting inappropriate or behaving inappropriately," Singh responded, "No." (*Id.*) Paragraph 93 should be deemed admitted in its entirety.

94. Silva also was not offended by Safo's use of the term bitch or "B" because he interpreted their conversations as amongst friends. (Lupion Decl. Ex. 3 (Silva Tr. 236-37).)

**PLAINTIFFS' RESPONSE:** Admitted.

95. Safo testified that she "could imagine" using curse words, including "bitch" in a friendly way. (Lupion Decl. Ex. 4 (Safo Tr. 102-03).) She used the word "bitch" in communications with coworkers, including Misiti and Llames. (Lupion Decl. Ex. 28 (Safo 10772); Lupion Decl. Ex. 29 (Safo 18530); Lupion Decl. Ex. 30 (Safo 20654).)

**PLAINTIFFS' RESPONSE:** Admitted, with a clarification. Safo testified: "I don't tend to speak that way, but I can see a situation like that." (Lupion Decl. Ex. 4 (Safo Tr. 103:7-12).) Neither Misiti nor Llames was offended by Safo's messages. (Misiti. Decl. ¶¶7-8; Llames Decl. ¶10.)

**DEFENDANTS' REPLY**: Plaintiffs' Response admits ¶95, which should be deemed admitted in its entirety. Plaintiffs' statement that Misiti and Llames were not offended by Safo's messages supports ¶¶91-92, 84 and that the word "bitch" was used colloquially amongst colleagues at AIGH.

96. In communications with other AIGH employees, including Singh, Safo made statements such as: "[t]hese mofos can kiss my ass," "haters can suck a million dicks," and "millennials suck huge balls." (Singh Decl. Ex. 14 (SINGH 3508); Singh Decl. Ex. 15 (SINGH 1071); Lupion Decl. Ex. 56 (ISMMS 26691).)

**PLAINTIFFS' RESPONSE:** Admitted that the documents say what they say.

97. In an email to Privett, on September 19, 2017, Safo referred to Singh, Knaup, and Berman as "mofos," which she testified meant, "motherfucker[s]." (Lupion Decl. Ex. 4 (Safo Tr. 123-25).)

**PLAINTIFFS' RESPONSE:** Disputed. Safo testified that "mofos" likely referred to "David Berman, Kirsten [Knaup]." She did not recall if she thought of Singh as being in that group because she "still felt friendship, you know, affinity with him." (Lupion Decl. Ex. 4 (Safo Tr. 124).)

**DEFENDANTS' REPLY:** The distinction Plaintiffs attempt to make in their Response is immaterial. At her deposition, Safo admitted to writing "mofos" which meant "motherfuckers" and testified that her email, sent in reply to a chain that included Singh, Knaup and Berman, was about "the leadership of the institute" and "can definitely be read" as referring to all three individuals. (Dkt. 212.4 (Safo Tr. 124-25).) Safo's statement regarding the "friendship" and "affinity" Safo felt for Singh is immaterial. Paragraph 97 should be deemed admitted in its entirety.

**G. Safo's Transition and Departure.**

98. On or about February 28, 2018, within five months of being named Chief Medical Officer, Safo transferred from AIGH to MSHP. (Lupion Decl. Ex. 4 (Safo Tr. 20).) Safo informed Singh of her intention to join MSHP during a meeting she surreptitiously recorded. (Singh Decl. Ex. 24 (Safo 7159); Singh Decl. ¶40.)[5]

**PLAINTIFFS' RESPONSE:** Admitted that Safo transferred to MSHP in February 2018.

[5] Defendants will provide the Court with a copy of the audio file of Safo's recording.

**DEFENDANTS' REPLY:** Plaintiffs' Response admits ¶98 and does not provide any citation to controvert the facts stated therein. Paragraph 98 should be deemed admitted in its entirety.

99. Singh supported Safo's decision, and helped facilitate her transition by meeting with her future supervisor. (Singh Decl. Ex. 16 (ISMMS 9901); Singh Decl. Ex. 17 (Safo 2347); Lupion Decl. Ex. 4 (Safo Tr. 70-71).)

**PLAINTIFFS' RESPONSE:** Disputed. The only transcript page cited says nothing about Singh supporting or facilitating the transition; it is Safo's testimony that the move was, by title, a demotion: "By title, I was chief medical officer and I went to senior medical director ... it was a demotion." (Lupion Decl. Ex. 4 (Safo Tr. 70:5-9).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶99, which should be deemed admitted in its entirety. Plaintiffs cite no evidence for the proposition that Singh did not support Safo's transition, which should be disregarded by the Court. *See* Local Civ. R. 56.1(d). The documents cited confirm Singh's support. Safo's own draft announcement stated that she was "so lucky to be able to do so with the full support of my team and of Arnhold leadership under Dr Singh," and Singh arranged to speak with Andrew Snyder. (Dkt. 211.16 (ISMMS 9901).) After that conversation, Singh wrote to Safo: "I had a great conversation with Andy. He'll be in touch with you directly, and we are, of course, very supportive about the next steps." (Dkt. 211.17 (Safo 2347).) Safo testified that Snyder "would have been [her] boss" at MSHP. (Dkt. 212.4 (Safo Tr. 71).) Upon her transfer, Safo's salary remained the same and her total compensation increased. (Dkt. 211-13 (ISMMS_018925).) Plaintiffs' characterization of the

move away from AIGH as a demotion "[b]y title" is immaterial and irrelevant to ¶99.

### H. Safo's Single Interaction With Charney.

100. At the time of her transition, Safo met with Charney. It was her one and only interaction with him during her employment at AIGH. She surreptitiously recorded the interaction. (Lupion Decl. Ex. 4 (Safo Tr. 138-40); Lupion Decl. Ex. 1 (Charney Tr. 258-59); Lupion Decl. Ex. 58 (Safo 7260).)[6]

**PLAINTIFFS' RESPONSE:** Disputed. There is no cited testimony to support Defendants' assertion that this was the only interaction between Safo and Charney. Safo testified "Clarissa had made me understand that the Mount Sinai investigation ended the way it did because of Dean Charney, so he felt like someone who I should be similarly kind of wary and, again, scared of." (Lupion Decl. Ex. 4 (Safo Tr. 138).) Safo testified she recorded the meeting because

> after what I had experienced with [Singh] ... [m]y words would be twisted, and I was in a real place of, I think, having experienced some of the negative things with the gaslighting and whatnot. I was in a real place of I wanted to make sure I'm understanding and kind of tracking everything. And also I was – I was -- as I said, I was scared.

(Lupion Decl. Ex. 4 (Safo Tr. 139-40).)

**DEFENDANTS' REPLY:** Charney recalled meeting Safo "once or twice" (Reply Lupion Decl. Ex.62] (Charney Tr. 253-54)), and in the meeting with Charney that Safo recorded, Safo told Charney that she had not seen him "since I first started." (Dkt. 212.58 (Safo 7262).) Plaintiffs do not dispute that Safo met

[6] Defendants will provide the Court with a copy of the audio file of Safo's recording.

with Charney when she was moving to MSHP or that she recorded the meeting. Paragraph 100 should be deemed admitted in its entirety.

101. Safo wanted to understand her future at ISMMS since she was moving to MSHP. (Lupion Decl. Ex. 4 (Safo Tr. 138-39).)

**PLAINTIFFS' RESPONSE:** Admitted.

102. Charney did not say anything during the meeting that Safo considered offensive. (Lupion Decl. Ex. 4 (Safo Tr. 138-40).)

**PLAINTIFFS' RESPONSE:** Admitted.

103. Safo continued at MSHP for "a little over a year" before resigning from her full-time position in the spring of 2019. She testified that at the time of her deposition on April 8, 2024, she was still employed by ISMMS doing clinical work. (Lupion Decl. Ex. 4 (Safo Tr. 1318, 20).)

**PLAINTIFFS' RESPONSE:** Admitted except Defendants omit Safo's testimony as to the reason for her resignation: "I resigned in 2019, in part, because of the damages from this case. It was very difficult to work at Sinai ... I feared that I would be retaliated." (Lupion Decl. Ex. 4 (Safo Tr. 17).)

**DEFENDANTS' REPLY:** Plaintiffs admit ¶103. The supplemental testimony is immaterial and does not controvert the statements contained therein. Paragraph 103 should be deemed admitted in its entirety.

## V. <u>PLAINTIFF GERALDINE LLAMES</u>

### A. Llames's Hiring and Role at AIGH.

104. Llames started at ISMMS on January 23, 2017 as Program Manager I. (Lupion Decl. Ex. 5 (Llames Tr. 31); Roben Decl. Ex. 3 (ISMMS 265-66).)

**PLAINTIFFS' RESPONSE:** Admitted.

105. Llames' functional title within AIGH was Project Manager. (Lupion Decl. Ex. 5 (Llames Tr. 31).)

**PLAINTIFFS' RESPONSE:** Admitted.

106. At the time of her hire, Llames reported to Kishore. (Lupion Decl. Ex. 5 (Llames Tr. 122).) Over time, however, Llames's reporting structure changed. Starting in November 2017, Llames reported to Singh until approximately early 2018, at which time Llames reported to Weisman until she resigned in August 2018. (Lupion Decl. Ex. 5 (Llames Tr. 65, 122, 168); Lupion Decl. Ex. 2 (Singh Tr. 247-48); Lupion Decl. Ex. 17 (Weisman Tr. 175); Singh Decl. Ex. 3 (WEISMAN 49).)

**PLAINTIFFS' RESPONSE:** Admitted. Llames's resignation is not mentioned on any of the cited pages. The correct citation for that fact is Lupion Decl. Ex. 5 (Llames Tr. 58).

107. Llames worked with the ATLAS team and attended weekly ATLAS meetings, as well as meetings with the Robert Wood Johnson ("RWJ") Foundation. (Lupion Decl. Ex. 5 (Llames Tr. 62-63).) She prepared ATLAS workplans, coordinated meetings with external partners and global health organizations, and was involved in the preparation for a USAID meeting in Washington, D.C. (Lupion Decl. Ex. 5 (Llames Tr. 89-90); Lupion Decl. Ex. 31 (ISMMS 22303-04).)

**PLAINTIFFS' RESPONSE:** Disputed that the cited pages show Llames preparing ATLAS workplans or coordinating meetings with global health organizations; she testified of the meetings in the work plan, "Some of them I don't believe are connected." (Lupion Decl. Ex. 5 (Llames Tr. 90).)

**DEFENDANTS' REPLY:** Llames' clarification that "some of them" may not be connected to ATLAS does not controvert ¶107, which should be deemed admitted in its entirety.

108. As a Program Manager I, her role included providing "administrative, operational and programmatic oversight;" "setting an effective agenda to ensure that performance goals are met;" developing and scheduling program work plans, overseeing daily operations, coordinating program activities and administering program procedures and systems. (Roben Decl. Ex. 3 (ISMMS 265).)

**PLAINTIFFS' RESPONSE:** Admitted that the position description so states. Disputed that this was reflected in reality. Faghmous, AIGH's Chief Technology Officer, states that Llames "was expected by Dr. Singh to do actual work on the project rather than manage its processes as a project manager would." (Faghmous Decl. ¶ 54.)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶108, which should be deemed admitted in its entirety. Faghmous' belief that Llames was expected to perform additional tasks is immaterial.

109. Escosia, a male Project Manager, testified he would consider certain project manager duties to be administrative, such as organizing meetings, managing logistics, and putting together post-meeting notes. (Lupion Decl. Ex. 13 (Escosia Tr. 27-28, 31).) Escosia testified he was the only person on the Health System Design team who had to "meticulously take notes" and send them to Singh. (Lupion Decl. Ex. 13 (Escosia Tr. 78, 124).)

**PLAINTIFFS' RESPONSE:** Disputed as to the comparison drawn. Faghmous states that "Ms. Llames, who was hired as a Project Manager, was expected by Dr. Singh to do actual work on the project rather than manage its

processes as a project manager would." (Faghmous Decl. ¶ 54.) That a male project manager regarded administrative tasks as within his role does not establish that Llames was assigned the same work as her male counterpart.

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶109, which should be deemed admitted in its entirety. Plaintiffs statement regarding the "comparison drawn" is argumentative and should be disregarded. Faghmous' belief that Llames was expected to do more than manage processes is immaterial.

**B. Remote Work Requests.**

110. Llames testified that Singh discriminated against her by denying her request to work remotely. (Lupion Decl. Ex. 5 (Llames Tr. 70-71).)

**PLAINTIFFS' RESPONSE:** Disputed. Singh granted the request and then reversed it: "Dr. Singh had said I could work from home, work from Virginia like one day so I didn't have to go back to New York before going for the holiday. And then he later recounted that and declined that." (Lupion Decl. Ex. 5 (Llames Tr. 71).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶110, which should be deemed admitted in its entirety. Plaintiffs' supplemental statement about Singh granting and then denying the request is immaterial.

111. In November 2017, Llames wanted to work remotely as part of a pre-planned trip to Virginia for the Thanksgiving holiday. (Lupion Decl. Ex. 5 (Llames Tr. 82, 85-86).) There was an upcoming USAID meeting in Washington, D.C. around that same time. Llames asked Singh to work remotely from Virginia in the days leading up to the meeting. (Lupion Decl. Ex. 5 (Llames Tr. 82).)

**PLAINTIFFS' RESPONSE:** Admitted.

112. Llames and Singh had spoken about the possibility of her working remotely. However, when Singh received Llames's remote work plan ten days before the requested time, he denied the request because he believed it lacked sufficient detail to ensure that all of the work would be done in light of Faghmous's recent departure and the fact they were "preparing for a pretty intensive meeting." (Lupion Decl. Ex. 2 (Singh Tr. 247); Lupion Decl. Ex. 5 (Llames Tr. 88-89).)

**PLAINTIFFS' RESPONSE:** Disputed to the extent Defendants claim Singh's request for a "remote work plan" was AIGH policy or that it was non-discriminatory in nature. Escosia testified that Llames "was unable to work from home, whereas other people were able to work from home... I was able to work from home, Bruno [Silva] was allowed to work from home, Mr. Berman was allowed to work from home. Even her boss, Dr. Kishore, was able to work from home...and the common denominator there was that they were all male and she was the female." (McAllister Decl. Ex. 8 (Escosia Tr. 104:20–105:7).) Misiti testified "there was a general different attitude in which men were able to work remotely and have a lot more freedom than the women," naming Silva, Baum (who "moved to another state at one point and was in Nashville") and Berman ("allowed to work remotely every Friday"), and adding "I don't remember women having such freedom to come and go as they pleased." (McAllister Decl. Ex. 17 (Misiti Tr. 164-165).) Berman testified: "my discretion, like, if I had nothing that needed pressing to be in the office or I wasn't travelling, I could say to him, I'm going to work from home tomorrow." (McAllister Decl. Ex. 4 (Berman Tr. 370:19–371:6).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert the contents of ¶112, which should be deemed admitted in its entirety. Plaintiffs do

not dispute Singh's sincerely held belief that Llames's remote work plan lacked sufficient detail to ensure that all of the work would be done in light of Faghmous's recent departure and do not dispute the fact they were preparing for a pretty intensive meeting. The additional testimony Plaintiffs cite is inaccurate and incomplete. Escosia testified that he "only reported to Dr. Safo, so I'm not quite sure how [everyone's work from home requests] were being handled." (Reply Lupion Decl. Ex. 63 (Escosia Tr. 105-07).) Misiti testified that Singh approved the one remote work request she made, and that she didn't know what was approved in terms of remote work for certain men. (Dkt. 212.6 (Misiti Tr. 163-65).) Escosia testified he was aware that Safo worked remotely. (Reply Lupion Decl. Ex. 63 (Escosia Tr. 105-06).)

113. Llames admitted that she did not know the policy regarding remote work, nor did she take Singh up on his offer to "discuss in the future ways to put together a plan that would be accepted." (Lupion Decl. Ex. 5 (Llames Tr. 82-83, 95); Lupion Decl. Ex. 31 (ISMMS 22303).)

**PLAINTIFFS' RESPONSE:** Disputed that any policy regarding remote work existed. See ¶ 31 above, where Defendants admit that "[p]rior to 2019, there was no formal policy on remote work at AIGH, nor was there an ISMMS remote work policy applicable to staff." Llames resigned in August 2018. (¶106, above; Lupion Decl. Ex. 5 (Llames Tr. 58).)

"Not that was clear ... I don't know what the formal policy was." (Lupion Decl. Ex. 5 (Llames Tr. 83:4-7).) Materially incomplete: "there were people who worked from home regularly and even ad hoc and so, as far as I know, did not have

to put together work plans and so, it makes me recall that it was an exception to certain people." (Lupion Decl. Ex. 5 (Llames Tr. 94:5-9).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶113, which should be deemed admitted in its entirety. As stated in ¶31, prior to 2019, remote work policies and practices were specific to each supervisor, which Plaintiffs admit. Llames testified that she never asked "any other employees that reported to Dr. Singh whether they had to put together work plans to work from home." (Dkt. 212.5 (Llames Tr. 94).)

114. Llames also did not know whether anyone else who reported to Singh had a remote work request denied. (Lupion Decl. Ex. 5 (Llames Tr. 84-85, 100-01).)

**PLAINTIFFS' RESPONSE:** Admitted.

115. Around January 2016, Singh had rejected a request from Silva to work remotely from Mexico in order to extend his holiday break. (Lupion Decl. Ex. 2 (Singh Tr. 249); Lupion Decl. Ex. 3 (Silva Tr. 185-86).) Silva testified Singh "didn't like people working from home" and that Silva had to cancel his ticket and pay to rebook. (Lupion Decl. Ex. 3 (Silva Tr. 185).)

**PLAINTIFFS' RESPONSE:** Disputed. Silva's denied request was a request for paid time off to do unpaid outside work, not an AIGH remote-work request: "Q. So it wasn't institute work? A. It wasn't paid work, and it wasn't institute work. Q. So in order for you to go, you had to use PTO to get time off? A. I had to use PTO, yes." (Lupion Decl. Ex. 3 (Silva Tr. 186).) Silva described the plan as "use my PTOs to travel to Mexico to do that work." (Lupion Decl. Ex. 3 (Silva Tr. 185).) Singh likewise described it as Silva wanting to "extend his break" (Lupion Decl. Ex. 2 (Singh Tr. 249)) and could not date the request at all. (Lupion Decl. Ex. 2 (Singh Tr. 249).)

**DEFENDANTS' REPLY:** Singh testified that Silva "wanted to be able to work from Mexico and extend his break there," and that Singh "wanted him back in the office, and [Singh] said that he couldn't do that." (Dkt. 212.2 (Singh Tr. 249).) Silva testified that Singh "didn't like people working from home" and that he had to cancel his ticket. (Dkt. 212.3 (Silva Tr. 185-86).) Singh's inability to recall the date does not create a dispute. Plaintiffs' response does not controvert paragraph 115, which should be deemed admitted in its entirety.

**C. Llames's Concerns Regarding Singh and Berman.**

116. Llames testified Singh discriminated against her because he skipped over her in meetings, while, according to Llames, none of the men on the team—Matt Le ("Le"), Humale Khan ("Khan"), or Silva—received the same treatment. (Lupion Decl. Ex. 5 (Llames Tr. 55, 6064, 66).)

**PLAINTIFFS' RESPONSE:** Admitted. Misiti's testimony is corroborated by two colleagues: "Dr. Singh would purposefully skip over Ms. Llames's updates and move on to the next person, often causing awkward tension in the room." (Khan Decl. ¶ 16; Bruzelius Decl. ¶ 5.) Singh denied ignoring Llames and other women in meetings. (McAllister Decl. Ex. 20(Singh Tr. 245).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits ¶116, which should be deemed admitted in its entirety. Singh's denial of ignoring Llames and other women is immaterial for purposes of this Motion for Summary Judgement since Defendants have drawn all inferences in Plaintiffs' favor.

117. Llames confirmed there were no external RWJ meetings where she was skipped over and could not recall whether any other women were skipped over. (Lupion Decl. Ex. 5 (Llames Tr. 61-66).)

**PLAINTIFFS' RESPONSE:** Disputed. Llames testified that she was skipped over in RWJ meetings. (Lupion Decl. Ex. 5 (Llames Tr. 63).) Khan stated that Singh "routinely excluded Ms. Llames from meetings concerning matters for which she was responsible." (Khan Decl. ¶ 16.) Singh denied ignoring Llames and other women in meetings. (McAllister Decl. Ex. 20(Singh Tr. 245).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not differentiate between internal and external meetings, as is specifically identified in ¶117. Llames testified that she was not skipped over at any external RWJ meetings, and was skipped over at internal RWJ meetings "[o]nce or twice." (Dkt. 212.5 (Llames Tr. 65-66).) Khan's statement that Llames was "routinely excluded from meetings" is immaterial to the allegation that she was "skipped over" and provides no specific details as to the subject matter of the meetings, who excluded her, or when the meetings occurred. Singh's denial of ignoring Llames and other women in meetings is immaterial for purposes of this Motion for Summary Judgement since Defendants have drawn all inferences in Plaintiffs' favor. Paragraph 117 should be deemed admitted.

118. Singh testified he would call on Llames to speak in meetings if "that's what the agenda that was prepared called for," explaining, "if there was a project management related discussion, then she would be part of that discussion." Singh also testified that Llames was important to meetings, as she was the "backbone" and the one who decided who would speak. (Lupion Decl. Ex. 2 (Singh Tr. 242-43).)

**PLAINTIFFS' RESPONSE:** Admitted that Singh described Llames as the "backbone" of the ATLAS meetings. Disputed that she decided who would speak; two pages later Singh testified the opposite: "Q. Are you saying she ran the

meeting ... and then she would indicate who should speak next? A. No." (McAllister Decl. Ex. 20 (Singh Tr. 244).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶118, which should be deemed admitted in its entirety. Plaintiffs' selective quotation of the question posed misrepresents Singh's testimony. Singh testified that Llames "was interictal to the meeting. She often set up who would be speaking or who needed to get things done and if there was a clarification or we were off agenda, I would certainly ask her if we were getting everything done that we needed to get done." Plaintiffs' counsel then proceeded with the following question and answer: "Q: Are you saying she ran the meeting, she would start by saying here's what we need to discuss and then she would indicate who should speak next? A: No. She would be part of one of the inputs of knowing what should be the focus of that meeting." (Reply Lupion Decl. Ex. 75 (Singh Tr. 242-44).)

119. Llames put together project plans or Gantt charts. Llames alleges that it was discriminatory to receive requests for such work, only to later be told that was not what was wanted. (Lupion Decl. Ex. 5 (Llames Tr. 71-73).)

**PLAINTIFFS' RESPONSE:** Disputed. Llames offered this testimony as an instance of the hostile environment created by Singh and Berman, testifying that she was "told one thing and then another" (Lupion Decl. Ex. 5 (Llames Tr. 71:16)), similar to how Singh granted and then rescinded permission to work from Virginia (Lupion Decl. Ex. 5 (Llames Tr. 71:8-15).) Llames did not complain about receiving work assignments.

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶119, which should be deemed admitted in its entirety. Plaintiffs' Response

misrepresents Llames' testimony, which began, "[b]ecause my job was to put together project plans and see them through. . . ." Llames confirmed that the plans she was talking about were "project plans" or "Gantt chart[s]." (Dkt. 212.5 (Llames Tr. 71-73).) Plaintiffs' statement about her denied work from home request is immaterial to ¶119. Plaintiffs' statement that "Llames did not complain about receiving work assignments" is unsupported by any citation to the record and should be disregarded. *See* Local Civ. R. 56.1(d).

120. Llames could not specify who made the requests, who rejected the work, the meetings where these events occurred, any specific project plans at issue, or how many times this occurred. (Lupion Decl. Ex. 5 (Llames Tr. 70-73).)

**PLAINTIFFS' RESPONSE:** Admitted, however Llames testified "my job was to put together project plans and see them through and I remember putting them together and I remember having to turn around and redo the whole thing after sitting in meetings where I had done what was asked initially." (McAllister Dec. Ex. 14 (Llames Tr. 72:17-22).)

**DEFENDANTS' REPLY:** The additional information Plaintiffs provide does not controvert ¶120, which should be deemed admitted in its entirety.

121. Llames testified Singh originally told her she would attend a work trip in Africa, only to later tell her she was not going. (Lupion Decl. Ex. 5 (Llames Tr. 79-81).) She could not recall details about the project, Singh's reasoning for why she would no longer attend, or who actually attended. (Lupion Decl. Ex. 5 (Llames Tr. 81).)

**PLAINTIFFS' RESPONSE:** Disputed. Llames named Singh as an attendee. (Lupion Decl. Ex. 5 (Llames Tr. 81:13-15).)

**DEFENDANTS' REPLY:** Plaintiffs' Response was "Dr. Singh and some other folks. I don't recall." (Dkt. 212.5 (Llames Tr. 81).) Llames' ultimate response was, "I don't recall." The distinction is immaterial. Plaintiffs do not dispute that Llames could not recall the details about the project or Singh's reasoning for why should would no longer attend. Paragraph 121 should be deemed admitted.

122. Llames did attend a work trip to Guatemala related to the ATLAS project with Silva, Bruzelius, Berman, and members of the Data Science team. (Lupion Decl. Ex. 5 (Llames Tr. 80-81, 123-25).)

**PLAINTIFFS' RESPONSE:** Admitted.

123. On one occasion, during a meeting with Berman (and another unidentified employee), Berman [yelled at Llames] and said, "[t]his is stupid. Are you fucking stupid?" Llames testified that Berman's comment was about her work product, but could not recall any other details about the meeting. (Lupion Decl. Ex. 5 (Llames Tr. 66-67).)

**PLAINTIFFS' RESPONSE:** Disputed that Llames could recall no other details; she placed it in an office (Lupion Decl. Ex. 5 (Llames Tr. 67)) and identified the document as a slide deck on a page that Defendants intentionally omitted to cite to or include in their exhibits. (McAllister Decl. Ex. 14 (Llames Tr. 69).) Berman denied ever using the word "stupid" to refer to Llames or her work. (McAllister Decl. Ex. 4 (Berman Tr. 342-344).) He maintained: "I never yelled at anybody." (344:10.) This entire incident is a disputed material fact.

**DEFENDANTS' REPLY:** Llames testified that she could not recall who was present, what office the interaction took place in, when it occurred or what it was about other than she "had put together a document or a plan or something."

(Dkt. 212.5 (Llames Tr. 66-67).) Plaintiffs' Response does not controvert ¶123, which should be deemed admitted in its entirety.

124. Berman admitted to raising his voice with Llames, but explained that his reaction was in response to learning that Llames had missed a grant application deadline for RWJ. (Lupion Decl. Ex. 14 (Berman Tr. 162-64).) He said, she "didn't do a great job," and did not take responsibility for missing the deadline. (Lupion Decl. Ex. 14 (Berman Tr. 159-60).)

**PLAINTIFFS' RESPONSE:** Admitted that Mr. Berman so testified. Plaintiffs dispute his account for reasons stated in ¶123, above.

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶124, which should be deemed admitted in its entirety.

125. Berman raised his voice with other employees, including men. (Lupion Decl. Ex. 14 (Berman Tr. 164).) Safo was aware Berman had heated conversations with Kishore, and recalled one incident where Berman spoke to him "harshly." (Lupion Decl. Ex. 4 (Safo Tr. 104).) Berman recounted a "[c]ouple of conversations" with Baum that he characterized as "heated exchanges." (Lupion Decl. Ex. 14 (Berman Tr. 166, 196, 348-51).) Silva also testified that he witnessed Berman yell at Baum. (Lupion Decl. Ex. 3 (Silva Tr. 242-43).)

**PLAINTIFFS' RESPONSE:** Disputed throughout. Lupion Decl. Ex. 14 (Berman Tr. 164) offers no evidentiary support that Berman raised his voice at men. The transcript page discussed Berman raising his voice to two women, Bischoff and Caliendo. Safo testified "I don't recall [Berman] yelling at Sonny [Kishore] the way that he did Mary [Caliendo] or Renee [Bischoff]. (Lupion Decl. Ex. 4 (Safo Tr. 104).) Kishore testified that he never witnessed Berman yell or raise his voice in the workplace. (McAllister Decl. Ex. 11 (Kishore Tr. 61-62).) Berman testified the Baum episode was "[a] couple of conversations" between

equals, mutual and reciprocal, and Baum did not cry afterwards. (Lupion Decl. Ex. 14 (Berman Tr. 350-51).)

**DEFENDANTS' REPLY:** Safo's and Silva's testimony, as cited in ¶125, supports the statement that Berman raised his voice with men and women. Bischoff also testified that Berman yelled at Baum. (Dkt. 223.5 (Bischoff Tr. 162) ("Q. David Berman had also yelled at Dr. Baum? A. Yes").) Whether or not Baum cried (or Berman knew he cried) is immaterial. Plaintiffs' description of Berman's testimony regarding his exchange with Baum is incomplete. Berman testified: Q. Do you -- did you ever have a heated exchange with Baum, Aaron Baum? A. Couple of conversations. Aaron is a man by the way, not a woman. But yeah, a couple times. Q. Did he cry on some of those encounters? A. No, no. Q. But you never yelled at him either, right? You just -- you might have had raised voices? A. Yeah. Q. And his voice was raised talking to you? A. Yeah." (Dkt. 212.14 (Berman Tr. 166, 196, 348-51).) Plaintiffs' Response does not controvert ¶125, which should be deemed admitted in its entirety.

**D. Llames's Personal Relationship with Silva.**

126. Llames discussed aspects of her personal life with colleagues at AIGH, including Escosia, Andrew Randall, and Silva. (Lupion Decl. Ex. 5 (Llames Tr. 155-57).) The topics she discussed included her romantic relationships and dating experiences, the men she slept with, her weight struggles, and drinking alcohol. (Lupion Decl. Ex. 5 (Llames Tr. 142-43, 155-57).)

**PLAINTIFFS' RESPONSE:** Admitted. Llames testified these conversations occurred "[b]ecause we were friends." (Lupion Decl. Ex. 5 (Llames Tr. 144:4-11).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶126, which should be deemed admitted in its entirety.

127. Llames shared information with Silva about the men who appeared in her dating applications to solicit his opinion. (Lupion Decl. Ex. 5 (Llames Tr. 145-46).) Llames once sent Silva a photograph of a man in her bathroom. (Lupion Decl. Ex. 3 (Silva Tr. 293).)

**PLAINTIFFS' RESPONSE:** Admitted.

128. Both Llames and Silva characterized their relationship as a personal friendship. (Lupion Decl. Ex. 5 (Llames Tr. 143-44, 223); Lupion Decl. Ex. 3 (Silva Tr. 127-28).) Silva testified that the two spoke freely and "very openly" with one another. (Lupion Decl. Ex. 3 (Silva Tr. 293).)

**PLAINTIFFS' RESPONSE:** Admitted.

129. Silva made comments about Llames's appearance, including "you look slutty today," "do you have a date," or "you better be careful eating those snacks, you're going to get fat." Llames admitted these conversations were part of their friendly banter. (Lupion Decl. Ex. 5 (Llames Tr. 148-49).)

**PLAINTIFFS' RESPONSE:** Disputed. Llames did not testify that these conversations were "friendly banter;" that's Defendants' assertion and it is unsupported. Llames did testify, on the referenced pages of her transcript, that she told Silva to stop: "I would say sometimes, 'Bruno, stop. You can't say those things.'" (Lupion Decl. Ex. 5 (Llames Tr. 149:12-15).)

**DEFENDANTS' REPLY:** Llames testified as follows: "Q: When you and Mr. Silva would have discussions about your dating life, the way you looked, your weight, were those conversations you were having with him as part of your friendship? A. Yes." (Dkt. 212.5 (Llames Tr. 149).) That testimony immediately

*follows* Llames' statement that "sometimes" she told Bruno, "stop. You can't say those things" which was in response to statements Silva made about other people. Llames expressly testified that she was "not offended by the word bitch." (*Id*. at 140.) Plaintiffs' response does not controvert ¶129, which should be deemed admitted in its entirety.

130. Silva testified that Llames likewise made fun of him, including comments about his "belly showing" when he wore a tight, short shirt. (Lupion Decl. Ex. 3 (Silva Tr. 295-96).)

**PLAINTIFFS' RESPONSE:** Disputed. The pages Defendants cite do not support their assertion. They concern Silva calling Llames "a dyke" and telling her that Safo "is a cunt."

**DEFENDANTS' REPLY:** The correct citation for ¶130 is Silva Tr. 233-34. (Reply Lupion Decl. Ex. 74 (Silva Tr. 233-34).) Plaintiffs' Response does not dispute the substance of Paragraph 130, which should be deemed admitted.

131. At a personal gathering outside of work, Llames showed Silva a photo of herself in biker clothes and he commented, "Oh, you know, you look like a dyke," and Silva testified that they both laughed. (Lupion Decl. Ex. 3 (Silva Tr. 294-96).) Silva testified that his use of the word "dyke" had no intended "offensive connotation" and Llames never told him the comment was inappropriate. (*Id.*)

**PLAINTIFFS' RESPONSE:** Disputed. Llames did not think Silva's comment was funny; she told him that he cannot say those words because they are inappropriate. (Llames Decl. ¶8.)

**DEFENDANTS' REPLY:** At her deposition, Llames was asked to identify the "inappropriate comments" Silva made that form the basis of her claim. At no point during her deposition did she identify Silva's use of the word dyke.

(Dkt. 223.14 (Llames Tr. 135); Dkt. 212.5 (Llames Tr. 148).) Llames' declaration contradicts that testimony and her testimony that she was not offended by cursing at work and should be struck. (Dkt. 225 ¶8; Dkt. 212-5 (Llames Tr. 140).) Paragraph 131 should be deemed admitted in its entirety.

132. Silva considered Llames to be someone who was "pretty much part of the gay community." (Lupion Decl. Ex. 3 (Silva Tr. 294-96).)

**PLAINTIFFS' RESPONSE:** Admitted.

133. Llames would talk to Silva about going to gay bars in New York City. (Lupion Decl. Ex. 5 (Llames Tr. 146-47).)

**PLAINTIFFS' RESPONSE:** Admitted.

134. Llames had conversations with Silva about her menstrual cycle. (Lupion Decl. Ex. 5 (Llames Tr. 142-43, 148).) On December 18, 2017, Llames texted Silva that she was "having really bad cramps" (Lupion Decl. Ex. 32 (Safo 20939)), and Llames would "openly" "volunteer" to Silva that she was "PMS-ing." (Lupion Decl. Ex. 3 (Silva Tr. 294, 301).)

**PLAINTIFFS' RESPONSE:** Disputed. The cited pages of Llames's testimony concern Silva speaking about women being on period ("he would say ... she gave me attitude. She must be on her period.") and not Llames speaking about her menstrual cycle. (Lupion Decl. Ex. 5 (Llames Tr. 142-43, 148).)

**DEFENDANTS' REPLY:** The citations in ¶134 to Llames' text messages with Silva and Silva's testimony about the discussions he would have with Llames support the statements in ¶134. (Dkt. 212.32 (Safo 20939); Dkt. 212.3 (Silva Tr. 294, 301).) Further, when asked if Llames had "conversations at work with your colleagues about being on your period or having cramps" she said it was possible,

but she could not recall. (Dkt. 212.5 (Llames Tr. 145).) Plaintiffs' Response does not controvert ¶134, which should be deemed admitted in its entirety.

135. According to Escosia, Llames used the term "dick" in conversation with him. (Lupion Decl. Ex. 33 (Escosia 29).)

**PLAINTIFFS' RESPONSE:** Disputed. Escosia never testified on this subject. The exhibit speaks for itself but is inadmissible for Defendants' characterization.

**DEFENDANTS' REPLY:** Plaintiffs cite no legal authority or evidence to controvert Dkt. 212.33 (Escosia 29), which shows that Llames used the term "dick" in communications with Escosia and which were produced by him. To the extent Plaintiffs' dispute arises solely in connection with the prepositional phrase, "[a]ccording to Escosia," that description is immaterial to the substance of Llames' comment. The document speaks for itself and ¶135 should be deemed admitted in its entirety.

136. The term "bitch" and was used by Llames, Escosia, Safo, Misiti and others, for example: "Beach bitch!" (Lupion Decl. Ex. 32 (Safo 20935)); "I feel like I always bitch to you about boys" (Lupion Decl. Ex. 34 (Safo 7380).) Llames and Escosia would refer to Berman as "Berbitch" in G-chat communications and describe Singh as "a little bitch" stating, "and he wonders why people are leaving." (Lupion Decl. Ex. 35 (Safo 7399-401); Lupion Decl. Ex. 36 (Safo 7402-03); Lupion Decl. Ex. 5 (Llames Tr. 130-31); Lupion Decl. Ex. 13 (Escosia Tr. 12930); Lupion Decl. Ex. 37 (Safo 20880).)

**PLAINTIFFS' RESPONSE:** Admitted as to the text of the messages, disputed as to relevance and intent. Escosia testified: "I think there's a difference between a playful cursing and a cursing that's intentional to hurt someone. Our

cursing, while is cursing admittedly, was contained between myself and Ms. Llames. With other people cursing -- like I'll reference Mr. Silva again -- it was out in the open and was intentionally to hurt someone." (Lupion Decl. Ex. 13 (Escosia Tr. 130).)

**DEFENDANTS' REPLY:** Plaintiffs admit the substance of paragraph 136 and their "dispute[] as to relevance and intent" does not controvert ¶136, which should be deemed admitted in its entirety.

137. Llames could not identify specific instances of when Silva used the term "bitch" except one instance when he referred to Safo as "being a bitch," and "vague remembrances of him just calling women bitches." (Lupion Decl. Ex. 5 (Llames Tr. 141).) Llames testified she was not offended by the word "bitch" and she "couldn't take [Silva] seriously." (Lupion Decl. Ex. 5 (Llames Tr. 132, 140).)

**PLAINTIFFS' RESPONSE:** Disputed as to "not offended." Llames testified "I am not offended by the word bitch, but I do and I did say that it was inappropriate. I would say Bruno, you can't say that, stop." (Lupion Decl. Ex. 5 (Llames Tr. 140).) Defendants omitted page 138 from their brief and this is material. Llames testified as to the reason for lack of specificity: "It happened so frequently that I could not --- I wouldn't be able to give you a specific instance." (McAllister Decl. Ex. 14 (Llames Tr. 138).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶137, which should be deemed admitted in its entirety. Llames testified that the word bitch was used "very frequently amongst many individuals" at AIGH, including herself. (Dkt. 223.14 (Llames Tr. 138); *see also* Dkt. 212.5 (Llames Tr. 140).)

Llames testified that only Singh and Berman created a hostile work environment. (Reply Lupion Decl. Ex. 68 (Llames Tr. 59).)

138. Llames testified that on one occasion, Silva called Safo a cunt, but she could not provide any details about the comment except that he said the word (Lupion Decl. Ex. 5 (Llames Tr. 147).) Llames admitted that, in general, she did not find Silva's language offensive, but felt that because he was "in a position of leadership" he should not have used certain language. (Lupion Decl. Ex. 5 (Llames Tr. 139-40).) Silva was not Llames's supervisor. (Lupion Decl. Ex. 5 (Llames Tr. 137).)

**PLAINTIFFS' RESPONSE:** Admitted that Silva was not Llames's supervisor. Admitted that he was "in a position of leadership" and should not have used this language. Disputed that she did not find the language offensive; see ¶137, above.

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶138, which should be deemed admitted in its entirety. When asked whether in some context using the word bitch was not offensive, Llames testified that she was "not offended by the word bitch" or cursing. (Dkt. 212.5 (Llames Tr. 140).)

139. Llames testified Silva would make comments in the design room in front of other employees, including Escosia and David Rojas Leon, who were also friends with Llames and Silva. (Lupion Decl. Ex. 5 (Llames Tr. 137, 149); Lupion Decl. Ex. 3 (Silva Tr. 61-62).)

**PLAINTIFFS' RESPONSE:** Admitted.

140. Llames did not report Silva's comments to anyone at Mount Sinai. (Lupion Decl. Ex. 5 (Llames Tr. 139, 148).)

**PLAINTIFFS' RESPONSE:** Disputed. Llames complained to Weisman about being disrespected (Lupion Decl. Ex. 5 (Llames Tr. 168)).

**DEFENDANTS' REPLY:** Plaintiffs' Response mispresents Llames' testimony. The cited testimony refers to Llames' assertion that Weisman "knew about my experiences with Dr. Singh." (Reply Lupion Decl. Ex. 68 (Llames Tr. 167-68).) Paragraph 140 should be deemed admitted in its entirety.

141. On January 18, 2019, after Llames had left AIGH and four months before this litigation was filed, she texted Silva, "I miss you too!!! How are you??" The dialogue continued the next day. (Lupion Decl. Ex. 57 (ISMMS 7422-23).)

**PLAINTIFFS' RESPONSE:** Admitted as to the quote. Llames testified as to the reasons for her message:

> While I do agree that Bruno and I were friends and I did miss him and I did care for him, I recognize that it was part of a larger issue with a lot of other things going on at the institute and it's his comments were still inappropriate as much as I cared for him and were also part of the problem and it's more than -- it's more than, you know what, as a whole like -- it's more than what our friendship was.

(Lupion Decl. Ex. 5 (Llames Tr. 223:4-17).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert Paragraph 141, which should be deemed admitted, in its entirety. Llames' commentary confirm that the two were friends.

**E. Llames's Early Dissatisfaction and Performance Issues.**

142. Llames testified that as early as April 2017—less than three months after she started working at AIGH and prior to the period during which she reported to Singh—she was dissatisfied with her role and had discussed leaving AIGH with Escosia, asking, "how bad will it look if i leave so soon?" (Lupion Decl. Ex. 35 (Safo 7400); Lupion Decl. Ex. 5 (Llames Tr. 121-22).)

**PLAINTIFFS' RESPONSE:** Disputed. Llames testified "I had bounced the idea [of leaving AIGH] around, but it was not a serious conversation." (Lupion Decl. Ex. 5 (Llames Tr. 121).)

**DEFENDANTS' REPLY**: Plaintiffs' Response does not controvert ¶142, which should be deemed admitted in its entirety.

143. In April 2017, Llames characterized her job at AIGH as "just paying for [her] drinking habits." (Lupion Decl. Ex. 5 (Llames Tr. 118-19, 122).) In another correspondence with colleagues she wrote, "I walk in after 9:00 a.m. I can generally leave when I feel like it. ... Bet your ass I'm not staying late for SK," referring to Kishore, her boss at the time. (Lupion Decl. Ex. 35 (Safo 7399-400).) One month prior, Llames admitted to a friend that she took a "2.5 hour lunch" (Lupion Decl. Ex. 38 (Safo 7412)) and had overslept through her morning meetings. (Lupion Decl. Ex. 34 (Safo 7385).)

**PLAINTIFFS' RESPONSE:** Admitted that the quoted words appear. Llames's explanations are omitted: She testified she could come and go at the office "within reason." (Lupion Decl. Ex. 5 (Llames Tr. 119).) Llames testified as to "stupid office politics" as "conflict between ... David Berman and other women." (Lupion Decl. Ex. 5 (Llames Tr. 119).).

**DEFENDANTS' REPLY:** Plaintiffs' Response admits ¶143. The commentary cited in Plaintiffs' Response does not controvert ¶143 and is immaterial.

144. In a text exchange with Escosia, Llames described herself as "struggling with motivation" (Lupion Decl. Ex. 39 (Safo 7445).)

**PLAINTIFFS' RESPONSE:** Admitted.

**F. Llames's Departure from AIGH.**

145. Llames left Mount Sinai on August 9, 2018 to take a new job at Montefiore Medical System. (Lupion Decl. Ex. 5 (Llames Tr. 20-21).)

**PLAINTIFFS' RESPONSE:** Admitted.

**G. Llames Had No Interactions With Charney.**

146. Llames testified she did not have any direct interactions with Charney and did not witness him engage in harassing or discriminatory behavior. (Lupion Decl. Ex. 5 (Llames Tr. 22627, 229-31).) Llames testified her claims against Charney were solely due to the "larger organization and part of the environment that he fostered at AIGH." (Lupion Decl. Ex. 5 (Llames Tr. 230).)

**PLAINTIFFS' RESPONSE:** Admitted that Llames did not interact with Dean Charney directly. Materially incomplete otherwise: Llames's testimony was that "[Charney] enabled the behaviors of the folks underneath him ... bad behavior went unpunished in that he --- he fostered this environment that was --- was toxic." (Lupion Decl. Ex. 5 (Llames Tr. 231).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits ¶146, which should be deemed admitted in its entirety. Llames further admitted that she did not know whether Charney was aware of the "bad behavior" that she seeks to hold him accountable for. She testified "I had assumed [he knew]." (Dkt. 212.5 (Llames Tr. 230-31).)

**VI. <u>PLAINTIFF AMANDA MISITI</u>**

**A. Misiti's Hiring and Role at AIGH.**

147. Misiti joined AIGH on May 1, 2017 as a Program and Policy Research Manager, with an institutional job title of Program Manager II. (Lupion Decl. Ex. 6 (Misiti Tr. 52, 61, 68).)

**PLAINTIFFS' RESPONSE:** Admitted.

148. Misiti characterized herself as "midlevel staff;" her highest level of education was an executive master's degree. (Lupion Decl. Ex. 6 (Misiti Tr. 256); Lupion Decl. Ex. 40 (Safo 1054).) She was not eligible for a faculty position. (Lupion Decl. Ex. 6 (Misiti Tr. 161).)

**PLAINTIFFS' RESPONSE:** Admitted that Misiti was not eligible for a faculty role. Disputed that she described herself as "midlevel staff"; the cited passage is her explanation that a group email went "more or less to almost all of the midlevel staff." (Lupion Decl. Ex. 6 (Misiti Tr. 256).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶148, which should be deemed admitted in its entirety. At her deposition when Misiti was asked about an email in which Singh had provided positive feedback on her performance, she noted that the email was directed to almost all "midlevel staff," including herself as both a recipient and someone who was called-out for good performance. (Dkt. 212.6 (Misiti Tr. 255-56); Dkt. 212.48 (ISMMS 9887-88).)

149. Misiti interviewed with Singh, who made the decision to hire her and became her supervisor. Singh scheduled her phone interview on a weekend and then did not call her until the next day, due to being sick that weekend.[7] (Lupion Decl. Ex. 2 (Singh Tr. 146); Lupion Decl. Ex. 6 (Misiti Tr. 55-56, 68).)

**PLAINTIFFS' RESPONSE:** Admitted.

[7] In the Amended Complaint, Misiti pleads that Singh's decision to hold her job interview call on a Saturday as a forecast of his discriminatory nature. (Dkt. 30, ¶ 343.) At her deposition, Misiti admitted that her reaction, finding it objectionable that Singh scheduled an interview on a Saturday, was irrational. (Lupion Decl. Ex. 6 (Misiti Tr. 59-60).)

150. Misiti's responsibilities included helping Singh manage the RWJ grant, organizing and developing content related to the grant, contributing to the Task Force on Global Advantage Report, scheduling meetings, sitting in on and taking notes during meetings, and making presentations regarding the grant. (Lupion Decl. Ex. 6 (Misiti Tr. 68-71).)

**PLAINTIFFS' RESPONSE:** Admitted.

151. According to Escosia, he sent the notes he took for the entire Health System Design team to Singh "just to make sure we [had] everything on record." (Lupion Decl. Ex. 13 (Escosia Tr. 79, 244-45).)

**PLAINTIFFS' RESPONSE:** Admitted that Escosia used the quoted words. Escosia testified as to his reasons more fully than Defendants claim:

> "[Singh's] constant shifting of priorities and constant ... saying one thing and not the other ... I just really thought that his constant --- either intentionally or not --- lying where we had to respond by taking notes and sending him our notes just to make sure we have everything on record, that was exhausting."

(Lupion Decl. Ex. 13 (Escosia Tr. 244-245).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶151, which should be deemed admitted in its entirety.

152. On her first annual performance review, Misiti received a performance rating of "Excellent" from Singh. As a result, and at Singh's request, Knaup asked ISMMS's Compensation Department to award Misiti a salary increase, even though she had only been at AIGH for less than seven months. (Roben Decl. Ex. 8 (ISMMS 9513-14); Lupion Decl. Ex. 2 (Singh Tr. 201).)

**PLAINTIFFS' RESPONSE:** Admitted. In the same round of increases, Knaup, at Singh's request, awarded Silva a higher salary increase, 4%, that either

of the women (Bruzelius: 2%; Misiti: 3%). (Roben Decl. Ex. 8 (ISMMS 9513-14).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶152, which should be deemed admitted in its entirety. Plaintiffs' statements regarding salary increases for other individuals is immaterial to ¶152.

**B. Misiti's Salary, Title, and Requested Promotion.**

153. After Berman left AIGH in 2018, Misiti assumed some of his responsibilities, a few of which overlapped with the work she was already doing. (Lupion Decl. Ex. 6 (Misiti Tr. 110); Lupion Decl. Ex. 41 (ISMMS 267).) Misiti started managing the Panorama contract, working more with consultants, and had an expanded role in Global Sites, which included helping establish global sites in Nepal and in Queens, New York. (Lupion Decl. Ex. 6 (Misiti Tr. 88, 106, 108-10); Lupion Decl. Ex. 14 (Berman Tr. 249).) Misiti did not view her expanded responsibilities as a negative development. (Lupion Decl. Ex. 6 (Misiti Tr. 112-13).)

**PLAINTIFFS' RESPONSE:** Disputed in part. Lupion Decl. Ex. 14 (Berman Tr. 249) does not support the assertion; that page concerns Berman's own resignation, and the phrase "global sites" appears nowhere in his deposition transcript. Disputed that Misiti did not "view her expanded responsibilities as a negative development." Misiti testified she viewed the expanded responsibilities "as an opportunity that I hoped would later be compensated and acknowledged with a title change." (Lupion Decl. Ex. 6 (Misiti Tr. 113).) She further testified:

> If men took on an expanded role, so, for example, when James Faghmous left, Matt Le or Le, I'm not sure how to pronounce his last name, he, for example, was given a promotion. I took on an expanded role when Sasha Walek and David Berman left and that was never acknowledged with a title or pay increase.

(Lupion Decl. Ex. 6 (Misiti Tr. 106).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶153, which should be deemed admitted in its entirety. The testimony about Global Sites came from Misiti (as cited in ¶53) and when asked, "did you see it as a negative development that you were asked to take on expanded responsibilities when individuals left the institute" her response was, "No, I did not." (Dkt. 212.6 (Misiti Tr. 112-13).) The fact that Misiti had "hoped" for more compensation and a higher title is immaterial.

154. In light of Berman's departure, Misiti asked for an increase in pay and a new title. According to Misiti, Singh denied her request because she had not been in the role long enough to be considered for promotion. (Lupion Decl. Ex. 6 (Misiti Tr. 104-05).) Singh testified that he does not recall the conversation but that Misiti had already received a pay increase and bonus within her first year at AIGH. (Lupion Decl. Ex. 2 (Singh Tr. 268-69).) Berman's Chief of Staff role was not filled following his departure. (Lupion Decl. Ex. 6 (Misiti Tr. 109).)

**PLAINTIFFS' RESPONSE:** Admitted that Misiti asked for an increase in pay and a new title in light of Berman's departure. Admitted that Singh denied the request because she had not been in the role long enough to be considered a promotion. Singh is not competent to testify as to the conversation because he did not recall it. Mount Sinai's designee testified that there is no policy that an employee who seeks a promotion must demonstrate an ability to perform the associated duties for a year prior to actually getting the promotion. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 251).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶154, which should be deemed admitted in its entirety. For the purposes of this Motion for Summary Judgement, Defendants draw all inferences in

Plaintiffs' favor regarding Defendants' alleged discriminatory acts, including Misiti's testimony that Singh told her, "you had to have been there for a certain amount of time and you actually had to have done that role for a year or so before you were put into that role" (Dkt. 212.6 (Misiti Tr. 103-04)) even though "that is not specified as a policy." (Dkt. 223.25 (ISMMS 30(b)(6) Tr. 251).)

155. Misiti testified that men, such as Faghmous, Baum, Heller, Silva, and Berman were offered "higher pay and higher titles" than her. However, she acknowledged she had a "different role" than them and did not have the same credentials. She testified, "[i]t's not to say that I was more qualified than most of those men." (Lupion Decl. Ex. 6 (Misiti Tr. 156-63).)

**PLAINTIFFS' RESPONSE:** Disputed. Defendants cherry pick isolated words across many pages of Misiti's testimony to manufacture a self-serving point. Misiti testified that her role "included a -- an ever-growing range or tasks that I did not see the men carrying similar burdens and many of those men had higher pay and higher titles." (Lupion Decl. Ex. 6 (Misiti Tr. 156).) She further testified "It's not to say that I was more qualified than most of those men. It's to say that I had a much larger portfolio of work than many of them"; "for less money and less title I had more immediate responsibilities." (Lupion Decl. Ex. 6 (Misiti Tr. 159).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶155, which should be deemed admitted in its entirety. The entirety of Misiti's testimony, which is cited in ¶155 shows that she did not consider herself a comparator of the men she identified therein. (*See* Dkt. 212.6 (Misiti Tr. 156-63).)

156. Faghmous was a faculty member with a Ph.D. who was in charge of ATLAS; Misiti admitted she was not qualified for his role. (Lupion Decl. Ex. 6 (Misiti Tr. 156-58, 161, 256).)

**PLAINTIFFS' RESPONSE:** Admitted.

157. Heller was a faculty member with a M.D. and a Master of Public Health degree; Misiti did not know his responsibilities or role at AIGH. (Lupion Decl. Ex. 6 (Misiti Tr. 158-60).)

**PLAINTIFFS' RESPONSE:** Admitted as to Heller's background. Disputed that Misiti's recall of Heller's responsibilities at her deposition is of any legal significance. Further, Misiti did testify that Heller's role was "something related to research." (Lupion Decl. Ex. 6 (Misiti Tr. 158).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶157, which should be deemed admitted in its entirety. Plaintiffs' commentary regarding the legal significance of Misiti's knowledge should be stricken by the Court.

158. Baum was a faculty member and Health Economist; Misiti did not know his responsibilities or salary and had only a "sense" his salary was higher. (Lupion Decl. Ex. 6 (Misiti Tr. 160-61).)

**PLAINTIFFS' RESPONSE:** Admitted as to Baum's background. Disputed that Misiti's recall of Baum's responsibilities or salary at her deposition is of any legal significance. Misiti did testify that Baum "he had some funding. He was working on something related to Fonkoze, but there didn't seem to be an immediate set of items that he had to deliver on." (Lupion Decl. Ex. 6 (Misiti Tr. 161).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶158, which should be deemed admitted in its entirety. Plaintiffs' commentary regarding the legal significance of Misiti's knowledge should be stricken by the Court.

159. Silva was on the design team and worked on ATLAS; Misiti acknowledged she did not have a design background and was not qualified for a design role. (Lupion Decl. Ex. 6 (Misiti Tr. 163).)

**PLAINTIFFS' RESPONSE:** Admitted.

160. Misiti admitted she did not apply for the Chief of Staff position. (Lupion Decl. Ex. 6 (Misiti Tr. 166-67).)

**PLAINTIFFS' RESPONSE:** Admitted, save for the fact that Berman (AIGH's Chief of Staff) was already in post when she was hired, and that ISMMS did not to replace Berman after he resigned, effectively stripping Misiti of the opportunity to apply for his role even though she assumed some of Berman's responsibilities. (¶¶47, 153, 154, above.) The transcript page Defendants cite includes Misiti's testimony that her "responsibilities were fairly similar to David Berman although he was senior to me." (Lupion Decl. Ex. 6 (Misiti Tr. 167).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶160, which should be deemed admitted in its entirety. Misiti alleges that Defendants' failure to increase her title or pay after she assumed some of Berman's responsibilities was discriminatory. (Dkt. 212.6 (Misiti Tr. 106); Plaintiffs' Response to ¶160.) However, she admits that she never applied for the position. (Dkt. 212.6 (Misiti Tr. 166-67).)

161. Misiti identified Le as a male who she believes received a promotion following the departure of his supervisor, Faghmous. (Lupion Decl. Ex. 6 (Misiti Tr. 106).) Misiti testified that she does not know if Le's job title or responsibilities changed, or whether he received increased compensation. (Lupion Decl. Ex. 6 (Misiti Tr. 106-08).)

> **PLAINTIFFS' RESPONSE:** Admitted as to Misiti's testimony, disputed as to her knowledge on this subject being dispositive. The record shows that after Faghmous left, Singh awarded salary increases following Faghmous's departure to men only: Le and Silva. (Singh Decl. Ex. 18 (ISMMS 9517).)

> **DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶161, which should be deemed admitted in its entirety. As Singh testified, there were distinct pools from which bonuses or salary raises could be granted based on the justification, including for retention and/or Faghmous's departure. (Dkt. 212.2 (Singh Tr. 205-07).)

162. After Faghmous left, Singh tried to retain Le with an offer of a retention bonus and promotion, but Le left for a higher-paying job. (Lupion Decl. Ex. 2 (Singh Tr. 205); Lupion Decl. Ex. 12 (Knaup Tr. 232).) Singh explained that Le "had a machine learning background, which was pretty distinctive from anybody else on the team" and was "being recruited for roles that paid multiples of what [AIGH] could pay him." There was a concern that if Le left AIGH, the work he was doing would not continue. (Lupion Decl. Ex. 2 (Singh Tr. 205).)

> **PLAINTIFFS' RESPONSE:** Admitted that Le received a retention offer. Disputed that a promotion was offered; neither cited page mentions one.

> **DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶162, which should be deemed admitted in its entirety. (*See* Dkt.

211.18 (ISMMS 9517) (which is cited by Plaintiffs in the preceding paragraph, for Singh's discussion of the promotion offer for Le).)

163. During this same time period, Singh also requested a retention bonus of $10,000 for Knaup for providing "inexhaustible resources to manage the continued growth of the Department and Institute." (Singh Decl. Ex. 18 (ISMMS 9518).)

**PLAINTIFFS' RESPONSE:** Disputed. The cited document includes no mention of the bonus being for "retention;" that is purely Defendants' characterization that is unsupported by the record.

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶163, which should be deemed admitted in its entirety. See Singh's deposition testimony where he confirms it was an "issue related to retention." (Dkt. 212.2 (Singh Tr. 205-06).)

**C. Director of Global Sites Role.**

164. Singh wanted to create a new role at AIGH: Director of Global Sites. This role would be responsible for AIGH's efforts to manage and build-out additional global sites for the Institute's work. (Lupion Decl. Ex. 2 (Singh Tr. 151-54).)

**PLAINTIFFS' RESPONSE:** Admitted however Singh testified that at the relevant time there was no definition to what the role would include "the actual description of that role, and what it would entail only became more clear and crystallized later on. And so, at that juncture, it was not a concrete role." (Lupion Decl. Ex. 2 (Singh Tr. 153).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶164, which should be deemed admitted in its entirety.

165. Misiti alleges that Singh told her she would be "great" for the Director of Global Sites role, but then "shortly" thereafter reversed course and "told me all the reasons why I would most likely not be a good fit." Misiti testified Singh told her that she "should fight for it." (Lupion Decl. Ex. 6 (Misiti Tr. 103, 115-17).)

> **PLAINTIFFS' RESPONSE:** Admitted as to Misiti's testimony. However, Singh's testimony on this topic creates a disputed material fact. Singh testified that the Director of Global Sites role "was a fruitful direction for [Misiti's] to work on global sites" and "a good place for her to go in her work." (Lupion Decl. Ex. 2 (Singh Tr. 151-152).) Singh denies later telling Misiti that she would not be a good fit or telling her she could have that position "if she was willing to fight for it." (Lupion Decl. Ex. 2 (Singh Tr. 154-156).)
>
> **DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶165, which should be deemed admitted in its entirety. For purposes of this Motion for Summary Judgement, Defendants draw all inferences in Plaintiffs' favor regarding Defendants' alleged discriminatory acts.

166. Misiti said that Singh's suggestion that she fight for the role "represented a general attitude that he shared about a gender perspective that you should be very aggressive and then when I was aggressive that was often not well-received." (Lupion Decl. Ex. 6 (Misiti Tr. 117).) When asked if she had examples of times she was "aggressive and it wasn't well-received" Misiti could not identify any. (Lupion Decl. Ex. 6 (Misiti Tr. 117-18).)

> **PLAINTIFFS' RESPONSE:** Admitted as to Misiti's testimony but it is incomplete; she testified "there were instances in which he encouraged me to give more feedback and pushback, and then when I did, that was actually ultimately not well-received." (Lupion Decl. Ex. 6 (Misiti Tr. 117).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶166, which should be deemed admitted in its entirety. At her deposition Misiti was asked if she could provide an example, either specific or general, of a time that she was aggressive and it was not well-received, and in response to both questions said "no." (Dkt. 212.6 (Misiti Tr. 117-18).)

167. Misiti admitted she did not know whether Singh made similar suggestions to men in conversations about promotion. (Lupion Decl. Ex. 6 (Misiti Tr. 102-03).)

**PLAINTIFFS' RESPONSE:** Admitted.

168. Singh hired Vreeman as the Director of Global Sites at AIGH. She held an M.D. Misiti did not have a doctorate degree. (Singh Decl. ¶12; Lupion Decl. Ex. 40 (Safo 1054).)

**PLAINTIFFS' RESPONSE:** Admitted that Vreeman received the Director of Global Sites title: "There was no position for the director role until Rachel [Vreeman] came in and filled it." (Lupion Decl. Ex. 2 (Singh Tr. 152:22-24), as corrected by Singh Errata (June 10, 2024).). Admitted that Vreeman holds an M.D. and that Misiti does not hold a doctoral degree. Disputed that Vreeman's M.D. was the reason for the selection. That rationale appears only in Singh Decl. ¶ 12 and is contradicted by his prior testimony, <u>which Defendants' omitted from their brief</u>. Singh's testimony made it clear that this was only one of the titles that Vreeman held and that Director of Global Sites; the reason she was awarded that title was that it fit well with her other roles: "Eventually we found that Rachel's background made it a good fit for her to take on both the vice chair of research position and also direct the global sites given her background, but it hadn't been an extensive set of discussions prior to that realizing that Rachel might be just right for that role." (McAllister Decl. Ex. 20(Singh Tr. 156:24-157:6).) The directorship

was one of several titles she held. (Id. at 157:2-3.) Singh's declaration only adds to the disputed nature of this material fact.

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶168, which should be deemed admitted in its entirety. Plaintiffs' statement that Vreeman's professional degree was not relevant to her selection for the role is contradicted by both Singh's sworn testimony and his declaration. (*See* Dkt. 223.20 (Singh Tr. 156-57) ("Rachel's background made it a good fit for her to take on both the vice chair of research position and also direct the global sites given her background. . ."); Dkt. 211 ¶12.)

**D. Singh's Communication Style.**

169. Misiti alleges that during arguments or debates, Singh "would employ obfuscating language to fluster" her, use "esoteric terms" during discussions, create a different narrative than what occurred in person, engage in "staring contests," and make her feel as though she could not leave a meeting until she adopted his opinion. (Lupion Decl. Ex. 26 (Safo 5370); Lupion Decl. Ex. 6 (Misiti Tr. 91, 93, 101, 150-52, 203-04, 279).)

**PLAINTIFFS' RESPONSE:** Admitted.

170. Misiti testified that Singh once commented that she looked "stressed," suggested she act more like Craig Helfgott ("Helfgott"), another AIGH employee, and "not have emotional reactions." Misiti acknowledged that she was stressed and Singh's observation that she appeared stressed was a "fair assessment." (Lupion Decl. Ex. 6 (Misiti Tr. 94).)

**PLAINTIFFS' RESPONSE:** Admitted that Misiti agreed she was stressed, but Defendants omit a material aspect from Misiti's testimony: "It is a fair assessment, but the way in which he characterized that to other people, I felt was meant to undermine my competency." (Lupion Decl. Ex. 6 (Misiti Tr. 94).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶170, which should be deemed admitted in its entirety. How Misiti "felt" about Singh's statement is immaterial.

171. According to Misiti, Singh would act positively toward her in a one-on-one meeting but then, in a meeting with Berman and others, criticize her for not producing a deliverable that he thought others would have known to create on their own. (Lupion Decl. Ex. 6 (Misiti Tr. 155).)

**PLAINTIFFS' RESPONSE:** Disputed. Misiti testified that the deliverable was one Singh "did not explicitly ask for," not one others would have known to create: "he proceeded to be then very critical and to be --- to publicly shame me for not having produced a deliverable that he did not explicitly ask for. And after this meeting David Berman described Prabhjot's behavior towards me as brutal." (Lupion Decl. Ex. 6 (Misiti Tr. 155:17-22).)

**DEFENDANTS' REPLY:** *See* Dkt. 212.26 (SAFO_005372) which is Misiti's written statement that was produced by Plaintiffs. The remainder of Plaintiffs' response does not controvert ¶171, which should be admitted in its entirety.

172. These experiences were not unique to Misiti, or to women. According to Misiti, "[m]any people" found that Singh "constantly changed his mind." (Lupion Decl. Ex. 26 (Safo 5370); Lupion Decl. Ex. 13 (Escosia Tr. 69-70, 79-80).)

**PLAINTIFFS' RESPONSE:** Disputed to the extent Defendants claim women and men were equally affected. "In general, my impression was that women at AIGH, including Dr. Safo, Dr. Anandaraja, Dr. Atkins[on], Geraldine

Llames, Ms. Stapleton and Emilie Bruzelius, were treated unfairly" (Faghmous Decl. ¶53.)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶172, which should be deemed admitted in its entirety. Faghmous's generalized "impression" about how women at AIGH were "treated" without any specific reference to Singh is immaterial to ¶172 and contained in a declaration that was improperly withheld from discovery. (*See* Defendants' Motion to Strike, filed concurrently herewith.)

173. Escosia reported being frustrated that Singh changed directives "every other month," causing Escosia to second-guess himself, and said he thought Singh was gaslighting him because Singh would "reverse track" or deny what was said after meetings. (Lupion Decl. Ex. 13 (Escosia Tr. 70-71, 79-80, 243-45).)

**PLAINTIFFS' RESPONSE:** Admitted.

174. Anandaraja described Singh as "a poor communicator across the board." (Lupion Decl. Ex. 18 (Anandaraja Tr. 34).) Muller reported to Anandaraja after a meeting with Singh, "he hadn't understood 60 percent of what Dr. Singh had said." (Lupion Decl. Ex. 18 (Anandaraja Tr. 25).) Safo testified that Silva described Singh's "way of communicating" as "word salad" and at one point, told Safo that he "didn't understand anything [Singh] said." (Lupion Decl. Ex. 4 (Safo Tr. 247).) Misiti described Singh as critical and disrespectful of men and women during team meetings. (Lupion Decl. Ex. 42 (Safo 16702); Lupion Decl. Ex. 6 (Misiti Tr. 144-46); Lupion Decl. Ex. 26 (Safo 5376).) When asked for examples, Misiti could describe it only as "a general phenomenon." (Lupion Decl. Ex. 6 (Misiti Tr. 144-46).)

**PLAINTIFFS' RESPONSE:** Disputed as to Misiti. On the pages cited she described the conduct as directed at women, and gave a specific example: "I

observed a broader pattern of this happening with women at the institute" (Lupion Decl. Ex. 6 (Misiti Tr. 145)); "Prabhjot thanked the women for their work and then asked the men what they thought ... to the point which James Faghmous commented on the fact that the women had done most of the work but weren't being asked their opinion." (Lupion Decl. Ex. 6 (Misiti Tr. 146).)

**DEFENDANTS' REPLY:** Plaintiffs' Response ignores the portion of the record citations in ¶174 that support the fact that the treatment was also directed at men. (*See* Dkt. 212.42 (Safo 16702) ("Ps and Jeb decided to shit on sunny [Kishore] in front of a whole bunch of us during 'tea'"); Dkt. 212.26 (Safo 5376) ("Berman and Prabhjot often speaking to each other especially but also to us in an argumentative manner").) Plaintiffs' Response admits and does not controvert ¶174, which should be deemed admitted in its entirety.

**E. Misiti's Trip to Liberia.**

175. Misiti testified that during a work trip to Liberia, Singh criticized her for speaking up, which she attributed to her gender because Singh did not make a similar comment to the two other men in their group. (Lupion Decl. Ex. 6 (Misiti Tr. 80-81, 85-88, 152-54).) Misiti could not recall the specifics of Singh's alleged comment. Misiti acknowledged that the two men she referenced were not AIGH employees and that at a later point, Singh referred to one man as "just a pretty face, which Misiti understood it to be dismissive of his accomplishments. (Lupion Decl. Ex. 6 (Misiti Tr. 154).) Misiti testified that Singh was critical of her note-taking skills on the trip, but admitted that she did not believe his comments were related to her gender. (Lupion Decl. Ex. 6 (Misiti Tr. 88).)

**PLAINTIFFS' RESPONSE:** Disputed in part. Misiti testified that on the Liberia trip her contributions were criticized when the two men present were not

(Lupion Decl. Ex. 6 (Misiti Tr. 85:19-86:18)), and that Singh criticized her notes (Lupion Decl. Ex. 6 (Misiti Tr. 81:2-11), 88:2-5). Disputed that Misiti "could not recall the specifics": she described the notes incident in detail and testified that she did not remember only the precise words used. (Lupion Decl. Ex. 6 (Misiti Tr. 81).) Her contemporaneous written statement records further specifics: Singh "regularly comes into my office and makes gendered criticisms of external female colleagues," including "I feel like I am about to be scolded by my mother" before an all-women call, and "she has a few screws loose." (Lupion Decl. Ex. 26 (SAFO 5381).) Disputed that the "pretty face" comment was made on the trip; the testimony places it later. (Lupion Decl. Ex. 6 (Misiti Tr. 154).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶175, which should be deemed admitted in its entirety. Misiti testified that she could not recall what Singh said to her when he criticized her notes. (Dkt. 212.6 (Misiti Tr. 80-81).) The comments cited in Plaintiffs' Response from Misiti's "contemporaneous written statement" have no relation to the Liberia trip described in ¶175 (the Liberia trip is described in Misiti's written statement four pages earlier). (*See* Dkt. 212.26 (SAFO 5378).) Also, Paragraph 175 states: ". . . **at a later point**, Singh referred to one man as 'just a pretty face.'" (emphasis added). Defendants never stated that the comment took place on the Liberia trip.

176. After the first Task Force on Global Advantage meeting, Misiti testified Singh "thanked the women for their work and then asked the men what they thought . . . to the point which Faghmous commented on the fact that the women had done most of the work but weren't being asked their opinion." Misiti could not recall what Singh said to solicit opinions and whether he sought feedback from participants as a group or individually. Misiti admitted that

she spoke during the meeting and shared her feedback. (Lupion Decl. Ex. 6 (Misiti Tr. 146-47); Lupion Decl. Ex. 26 (Safo 5372).)

**PLAINTIFFS' RESPONSE:** Admitted as to the first sentence, disputed as to the rest. Misiti wrote that she "was horrified that he did not encourage the women to share their feedback." (Lupion Decl. Ex. 26 (SAFO 5372).) The same statement names the attendees and the sequence in detail. (*Id.*)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶176, which should be deemed admitted in its entirety. The commentary regarding Misiti's reaction is immaterial.

**F. Misiti's Workplace Complaints.**

177. Misiti testified that Berman told her when she joined AIGH that it would take her a least nine months to get "up to date," that she should "not have opinions" about a grant on which they were working, and he once encouraged women not to say more than a few words during meetings. (Lupion Decl. Ex. 6 (Misiti Tr. 205-06).) Misiti admitted that Berman interviewed her and had a basis to evaluate her professional skill-level. (Lupion Decl. Ex. 6 (Misiti Tr. 207).)

**PLAINTIFFS' RESPONSE:** Admitted.

178. On October 1, 2018, Singh asked Misiti to email Drs. Duncan and Sheela Maru to request their in-person attendance at a meeting with Panorama consultants. Misiti said she was uncomfortable making an in-person attendance request of them, but that she ultimately did it because Singh asked her to. (Lupion Decl. Ex. 6 (Misiti Tr. 89-90).) Singh testified it was part of her responsibilities to send such correspondence. (Lupion Decl. Ex. 2 (Singh Tr. 161-64).)

**PLAINTIFFS' RESPONSE:** Admitted.

179. Singh replied to the email stating, "[w]e won't be doing another session like this in the future, and so I would like to take advantage of our consultants while we have them on board." (Singh Decl. Ex. 19 (Safo 4220).) Singh testified that he subsequently spoke with the Marus by phone and reiterated his request for their in-person attendance. (Lupion Decl. Ex. 2 (Singh Tr. 161-64, 166-67).)

**PLAINTIFFS' RESPONSE:** Admitted except the one page that Defendants omitted from Misiti's deposition transcript (page 165) contains important concession by Singh: it was Misiti who suggested that Singh try to accommodate the Marus in the first place. (McAllister Decl. Ex. 20(Singh Tr. 165).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits, and the testimony they cite does not controvert ¶179, which should be deemed admitted in its entirety. The purported "concession by Singh" is immaterial.

180. Misiti emailed Singh afterward, expressing concern that the Marus would perceive her as "being the bad guy" because she requested they join the meeting in person, when Singh's correspondence showed more flexibility. Singh replied, "[t]hey did not; I spoke [with] them. They appreciated your clarity in particular." (Singh Decl. Ex. 19 (Safo 4220).)

**PLAINTIFFS' RESPONSE:** Admitted that the document says what it says.

181. Misiti, on the other hand, texted AIGH colleague Erica Levine ("Levine") about the exchange, saying of Singh, "[h]e's playing with the wrong bitch." (Lupion Decl. Ex. 43 (Safo 18101-02).)

**PLAINTIFFS' RESPONSE:** Admitted that the document says what it says. Levine was not offended by this message. (Pollock Decl. ¶7.)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶181, which should be deemed admitted in its entirety. Whether Levine was offended is immaterial.

182. On October 23, 2018, Misiti texted Levine that she had lunch with Sheela Maru "to clarify with her what happened with that whole panorama scheduling thing," adding, "I feel like I always come off as this crazy angry paranoid person . . . (Because I am)." (Lupion Decl. Ex. 44 (Safo 18124).)

**PLAINTIFFS' RESPONSE:** Admitted that the document says what it says. Levine was not offended by this message. (Pollock Decl. ¶7.)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶182, which should be deemed admitted in its entirety. Whether Levine was offended is immaterial.

183. Misiti testified that Singh once drew a diagram and stated, "I'm no Georgia O'Keefe." Misiti interpreted the statement to mean the diagram looked like a vagina, but admitted no one in the room said what the drawing looked like. (Lupion Decl. Ex. 6 (Misiti Tr. 156, 168-69).)

**PLAINTIFFS' RESPONSE:** Admitted that Singh drew the diagram and made the remark. Disputed that this was Misiti's interpretation. Levine witnessed the incident and made the same interpretation. She was shocked by Singh's actions. (Pollock Decl. ¶¶4-5.)

**DEFENDANTS' REPLY:** Plaintiffs' purported dispute regarding Misiti's testimony is belied by the record. Misiti testified as follows: "Q. Did Dr. Singh say that the diagram looked like a vagina? A. No, it was implied by his statement that he was no Georgia O'Keefe. Q. So that was your interpretation of

what that statement meant? A. Yes, that was my interpretation. Q. But no one in the room said that looks like a vagina or the diagram I made looks like a vagina? A. I believe others shared the same interpretation, but yes, I don't think anyone explicitly said that." (Dkt. 212.6 (Misiti Tr. 156, 168-69).) Levine's purported interpretation is not inconsistent with ¶183 and is immaterial. Paragraph 183 should be deemed admitted in its entirety.

184. In communications with Levine, Misiti made numerous references to female genitalia, including writing to Levine, "I use that combination of punctuation for sentences like 'omg he didn't eat your pussy?!'" (Lupion Decl. Ex. 45 (Safo 18024)) and texting Levine, "[i]t's like he saw my dirty hoo ha . . . ." (Lupion Decl. Ex. 6 (Misiti Tr. 241-45); Lupion Decl. Ex. 46 (Safo 7900)) and "I just spent $9 at deli They've got me by the clit." (Lupion Decl. Ex. 47 (Safo 18067).)

**PLAINTIFFS' RESPONSE:** Admitted that the documents say what they say. Disputed that Misiti ever texted Levine "[i]t's like he saw my dirty hoo ha" (Pollock Decl. ¶8.) Levine did not find the remaining messages offensive or inappropriate. (Pollock Decl. ¶7.)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits the contents of Misiti's statements. The comment, "[i]t's like he saw my dirty hoo ha . . . ." (Dkt. 212.6 (Misiti Tr. 241-45)), was contained in a text message to Ariella Rojhani. (Dkt. 212.46 (Safo 7900).)

**G. Remote Work Approvals.**

185. Misiti testified that men in the department "seemed they could work remotely with fairly great freedom" but women could not. Misiti could recall only one instance when she asked Singh to work remotely, and could not recall the outcome of the request. She also

testified that she had no knowledge of any male AIGH employee's remote work request and/or approval experience. (Lupion Decl. Ex. 6 (Misiti Tr. 163-66).)[8]

**PLAINTIFFS' RESPONSE:** Disputed as to the final sentence, which is contradicted by the record. Misiti named three men and described their arrangements: "Aaron Baum moved to another state at one point and was in Nashville. David Berman was allowed to work remotely every Friday." (Lupion Decl. Ex. 6 (Misiti Tr. 165).) As to her own request, she testified that Singh "may have eventually relented, but he gave me a very difficult time, whereas in contrast Bruno was in other countries working remotely." (Lupion Decl. Ex. 6 (Misiti Tr. 164:2-5).) Escosia reported the same disparity to ISMMS's investigators: "Work from home policies were inconsistent throughout the entire Institute, where some were allowed and some weren't (i.e., male vs. female)." (Lupion Decl. Ex. 25 (SAFO 6940).)

**DEFENDANTS' REPLY:** Plaintiffs conflate Misiti's anecdotal recollection with actual knowledge of male remote work requests and/or approval experiences. Misiti testified that she did not know if Khan had approval for his late arrivals, or the circumstances under which Baum was allowed to work remotely once he moved to Nashville, TN. (Dkt. 212.6 (Misiti Tr. 163-66).) Plaintiffs' Response does not controvert the facts stated in ¶185, which should be deemed admitted in its entirety.

[8] Misiti testified it was "extremely difficult" for her to get PTO approved, whereas Silva "could go to Ireland or other places and be on PTO." (Lupion Decl. Ex. 6 (Misiti Tr. 156, 163-64).) However, Misiti clarified she was referring to working remotely, not PTO. (Id. at 163.)

### H. Singh's Positive Comments About Misiti and Acknowledgment of Her Contributions to AIGH.

186. Misiti received positive feedback from Singh, including public "shout-out[s]" and describing her work as "perfect." (Lupion Decl. Ex. 6 (Misiti Tr. 98-99, 261); Lupion Decl. Ex. 26 (Safo 5374).)

**PLAINTIFFS' RESPONSE:** Admitted that the documents say what they say. Disputed as to the general pattern: "There was often a pattern of lots of negativity and then, you know, adding a little bit of positivity, and there was often a pattern of one thing said verbally and the opposite documented in writing." (Lupion Decl. Ex. 6 (Misiti Tr. 261).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶186, which should be deemed admitted in its entirety.

187. On June 6, 2017, Singh wrote to Misiti regarding the task force, stating that he trusted her approach, and she responded, "I appreciate you clarifying and giving me the autonomy." (Lupion Decl. Ex. 6 (Misiti Tr. 268-69).)

**PLAINTIFFS' RESPONSE:** Admitted that the exchange occurred. Disputed as to the general environment: "I interpret this as ... creating a written record that is different than what was communicated verbally." (Lupion Decl. Ex. 6 (Misiti Tr. 269).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶187, which should be deemed admitted in its entirety.

188. On February 7, 2018, Singh emailed Misiti, Bruzelius, and others, calling them "rising leaders and talented professionals" who "play a vital role in developing, managing and

implementing key areas of programming." (Lupion Decl. Ex. 48 (ISMMS 9887-88); Lupion Decl. Ex. 6 (Misiti Tr. 254-56).)

**PLAINTIFFS' RESPONSE:** Admitted that the document says what it says. Disputed as to the general pattern: "There was often a pattern of lots of negativity and then, you know, adding a little bit of positivity, and there was often a pattern of one thing said verbally and the opposite documented in writing." (Lupion Decl. Ex. 6 (Misiti Tr. 261).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶188, which should be deemed admitted in its entirety.

189. On September 4, 2018, Singh emailed Misiti and Privett about talking points they prepared, saying, "[j]ust to reiterate prep was amazing and I thank you both." (Singh Decl. Ex. 20 (ISMMS 19184).)

**PLAINTIFFS' RESPONSE:** Admitted that the document says what it says.

190. After a Panorama site visit on October 5, 2018, Misiti emailed Singh with her reflections. Singh responded, "[t]hese are great reflections," indicating he was going to share them with senior management and asking if she was comfortable with him attributing them to her with his "strong endorsement." Singh later added, "[y]our list below is exceedingly helpful, and the SMM felt so as well." (Singh Decl. Ex. 21 (ISMMS 19236-37).)

**PLAINTIFFS' RESPONSE:** Admitted that the document says what it says.

## I. Misiti's Resignation.

191. Misiti resigned from Mount Sinai in September 2023 to take a position at Premier, Inc. (Lupion Decl. Ex. 6 (Misiti Tr. 40-42).)

**PLAINTIFFS' RESPONSE:** Admitted.

**J. Misiti's Sole Interaction With Charney Occurred After Filing the Lawsuit.**

192. Misiti never met Charney prior to filing this lawsuit. Misiti testified that she did not have any direct interaction or contact with Charney, could not identify a single act by Charney that she viewed as discriminatory, denied experiencing any instances of discrimination by Charney, and could not identify any way in which he harassed her. Misiti's interaction with Charney was limited to one meeting after this lawsuit had been filed, where he asked all meeting attendees—male and female—to introduce themselves. Misiti testified she "felt" intimidated because of the event. (Lupion Decl. Ex. 6 (Misiti Tr. 25-31).)

**PLAINTIFFS' RESPONSE:** Disputed in part. Misiti did identify a basis and recalled a gendered remark at the meeting: "I do recall [Charney] saying to an assistant dean or an associate dean, a woman that joined him, that she was a woman who came to take his notes." (Lupion Decl. Ex. 6 (Misiti Tr. 29).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶192. The interaction cited in Plaintiffs' Response occurred at the same meeting referenced in ¶192, which occurred *after* Misiti filed the complaint in this action. Paragraph 192 should be deemed admitted in its entirety.

## VII. PLAINTIFF EMILIE BRUZELIUS

**A. Bruzelius's Hiring.**

193. Bruzelius joined AIGH on April 4, 2016 as a Data Analyst II with a starting salary of $70,000. (Lupion Decl. Ex. 7 (Bruzelius Tr. 75, 121); Lupion Decl. Ex. 49 (ISMMS 3931).) Faghmous recruited and hired her; Singh interviewed her and approved her hire. (Lupion Decl. Ex. 2 (Singh Tr. 182-83); Singh Decl. ¶11.)

**PLAINTIFFS' RESPONSE:** Admitted. Singh testified that Bruzelius "was hired relatively earlier on, I believe, by James," and that the decision was Faghmous's: "I think it was his decision, but I supported it." (Lupion Decl. Ex. 2 (Singh Tr. 182-183).)

**DEFENDANTS' REPLY:** Plaintiffs Response admits and does not controvert ¶193, which should be deemed admitted in its entirety.

194. Prior to her hire, Faghmous worked with Knaup to create a position for Bruzelius within AIGH. On January 13, 2016, he informed Knaup that Bruzelius would be a "full-time data analyst" and attached a job description indicating a salary range of "$35-$50k." (Roben Decl. Ex. 9 (ISMMS 6033; ISMMS 6038).)

**PLAINTIFFS' RESPONSE:** Admitted that the document says what it says.

195. At the time of her hire, Bruzelius had a Bachelor of Arts degree in sociology, a Masters of Public Health, and was a doctoral student in epidemiology. She did not have a Ph.D. (Lupion Decl. Ex. 50 (ISMMS 57); Lupion Decl. Ex. 7 (Bruzelius Tr. 20-21, 35).) During her employment at AIGH, she was also employed as a teaching assistant at Columbia University. (Lupion Decl. Ex. 7 (Bruzelius Tr. 12).)

**PLAINTIFFS' RESPONSE:** Admitted except disputed that the record cited by Defendants mentions Bruzelius's Bachelor of Arts degree; the supporting testimony is at Lupion Decl. Ex. 7 (Bruzelius Tr. 20-21).

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶195, which should be deemed admitted in its entirety. The Bruzelius testimony cited in Plaintiffs' Response is already cited in ¶195.

**B. Bruzelius's Role and the Departure of Faghmous.**

196. When Bruzelius started at ISMMS, she reported to Faghmous, who led the Data Science team. Faghmous reported to Singh. (Lupion Decl. Ex. 7 (Bruzelius Tr. 51, 55-56).)

**PLAINTIFFS' RESPONSE:** Admitted.

197. Bruzelius's work "fundamentally concentrated on research," working primarily on grant applications, papers, and researching the epidemiologic features underlying issues related to the ATLAS project. Bruzelius's work was initially primarily with Faghmous, but as time progressed, she also worked with Le, Patrick Doupe ("Doupe"), and Baum. (Lupion Decl. Ex. 7 (Bruzelius Tr. 51-52, 62).)

**PLAINTIFFS' RESPONSE:** Admitted.

198. Singh testified Faghmous left AIGH in fall 2017 after Singh did not agree to his demands for more money and a higher title. (Lupion Decl. Ex. 2 (Singh Tr. 183-86); Lupion Decl. Ex. 7 (Bruzelius Tr. 106).)

**PLAINTIFFS' RESPONSE:** Admitted except Singh also testified that Faghmous that Faghmous "had issues with the direction of the Institute." (Lupion Decl. Ex. 2 (Singh Tr. 185).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶198, which should be deemed admitted in its entirety.

199. At that point, Bruzelius began reporting directly to Singh. (Lupion Decl. Ex. 7 (Bruzelius Tr. 125).) Singh asked Bruzelius to "lead the research side of the Data Science team," which included directing the research activities of projects that Mihir Mongia ("Mongia") and Helfgott worked on, both of whom reported to Singh. (Lupion Decl. Ex. 7 (Bruzelius Tr. 12527).)

**PLAINTIFFS' RESPONSE:** Admitted only in part, and materially incomplete. Bruzelius testified that Singh asked her to oversee the two men and

that she did: "He asked me to oversee Mahir Mongia and Craig Helfgott." (Lupion Decl. Ex. 7 (Bruzelius Tr. 125).) After Faghmous left AIGH, Bruzelius absorbed some of Faghmous's duties; she "oversaw the research for the institute or for the data science part of the institute." (Lupion Decl. Ex. 7 (Bruzelius Tr. 207).) Bruzelius testified that she and Singh

> talked about my role shifting and me taking over more of the elements of the research that James had previously been in charge of and along with that appropriate sort of title and salary changes, but to the best of my knowledge, it wasn't like a specific number. ... He told me that I would have some sort of director title, director of research, director of data science, something along those lines.

(McAllister Decl. Ex. 6 (Bruzelius Tr. 130-131).)

Bruzelius received no salary supplement or other additional compensation for these extra duties, unlike Silva and Le, both of whom are men. (Singh Decl. Ex. 18 (ISMMS 9517).) Bruzelius's June 5, 2018 report to labor relations records that Singh questioned her title, "you are listed as a senior analyst, right?" (Bruzelius Decl. Ex. 1 (Safo_000937).) Bruzelius also complained: "my job description has been a big sticking point for me. I have repeatedly brought up the job description issue to Prabhjot in my one-on-one meetings with him, consistently." (*Id.*)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶199, which should be deemed admitted in its entirety. The additional statements contained in Plaintiffs' Response are immaterial and/or beyond the scope of ¶199.

200. Bruzelius supported research and program work, and had the ability to pursue other topics she was interested in, but she did not do data science work because, according to

Singh, "she wasn't a data scientist." (Lupion Decl. Ex. 2 (Singh Tr. 187-88, 220).) For this reason, Singh believed she could not take over Faghmous's job when he left, which Singh felt required a "very technical" and "computer science background." (Lupion Decl. Ex. 2 (Singh Tr. 186-87).) Bruzelius also could not have grants assigned to her as a principal investigator because she did not have a Ph.D. (Lupion Decl. Ex. 2 (Singh Tr. 187-88, 220).) Bruzelius admitted she did not oversee the ATLAS project, and, in fact suggested to Singh that someone be hired to fill the role when Faghmous left. (Lupion Decl. Ex. 7 (Bruzelius Tr. 207).)

**PLAINTIFFS' RESPONSE:** Disputed. Singh's words were that "we couldn't assign grants to her in the same way," not that she was barred. (Lupion Decl. Ex. 2 (Singh Tr. 220:13-14).) See Plaintiffs' response to ¶199, above. Further, Bruzelius's 2018 annual evaluation lists her successfully performing the duties of a principal investigator:

> - Completed 1 sponsored project (Pl) [Principal Investigator], collaborated on 2 sponsored projects as staff.
> - Collaborated on writing the proposal for 1 successfully funded sponsored project.
> - Participated in the scoping, writing and submission of several additional sponsored projects not ultimately funded.

(McAllister Decl. Ex. 36 (ISMMS 3931 at 3933).)

Bruzelius wrote a comment in her 2018 annual evaluation form: "I do not feel that the criteria contained within the job responsibilities accurately reflect the expectations or responsibilities of the role, as indicated by Dr. Weisman's comments. Therefore it is difficult to provide a realistic appraisal or my performance or respond the that appraisal appropriately." (*Id.* at 3938.) Weisman's comment on the same document conceded "we will seek to re-define Emilie's role, focusingon 5 key areas: Methods, Data Integrity, Information & Its Context, Scholarship/Authorship, and Program Mgt." (*Id.*)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not controvert ¶200. Plaintiffs citation to comments in Bruzelius' performance evaluations does not dispute Singh's belief that she was not qualified to take over Faghmous's job, her lack of a computer science or technical background, or the limitations that existed in assigning her grants since she was not a principal investigator. Plaintiffs do not dispute that Bruzelius was not a data scientist, she did not oversee the ATLAS project, and suggested to Singh that someone be hired to replace Faghmous's role after he left. Bruzelius did not identify Faghmous as a comparator at her deposition and, when asked about him, admitted "[w]e didn't do the same job." (Reply Lupion Decl. Ex. 61 (Bruzelius Tr. 43-44, 206-07).) Paragraph 200 should be deemed admitted in its entirety.

201. In April 2018, Weisman replaced Faghmous as Director of ATLAS. By June 2018, after a transition period, Weisman became Bruzelius's supervisor. (Lupion Decl. Ex. 17 (Weisman Tr. 10); Lupion Decl. Ex. 7 (Bruzelius Tr. 60-61, 234).)

**PLAINTIFFS' RESPONSE:** Admitted that Weisman was hired in April 2018 as Director of ATLAS. Disputed as to whether Weisman replaced Faghmous: "Q. Was Dr. Weisman --- did he replace Dr. Faghmous? A. I don't think so." (Lupion Decl. Ex. 7 (Bruzelius Tr. 61).)

**DEFENDANTS' REPLY:** Plaintiffs' Response misrepresents Bruzelius's testimony that Weisman was hired to replace Faghmous as the Director of Atlas. (Dkt. 212.7 (Bruzelius Tr. 61:7-24); *see* Compl. ¶253.) Paragraph 201 should be deemed admitted in its entirety.

**C. Bruzelius's Performance Appraisals.**

202. In 2016 and 2017, Singh gave Bruzelius performance appraisal ratings of "[e]xceeds expectations" and "[m]eets expectations," respectively. In 2018, Weisman gave Bruzelius a rating of "[m]eets expectations." (Roben Decl. Ex. 4 (ISMMS 208).)

**PLAINTIFFS' RESPONSE:** Admitted that the document says what it says. Bruzelius wrote a comment in her 2018 annual evaluation form: "I do not feel that the criteria contained within the job responsibilities accurately reflect the expectations or responsibilities of the role, as indicated by Dr. Weisman's comments. Therefore it is difficult to provide a realistic appraisal or my performance or respond the that appraisal appropriately." (McAllister Decl. Ex. 36(ISMMS 3931 at 3938).) Weisman's comment on the same document conceded "we will seek to re-define Emilie's role, focusing on 5 key areas: Methods, Data Integrity, Information & Its Context, Scholarship/Authorship, and Program Mgt." (*Id.*)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶202, which should be deemed admitted in its entirety. Bruzelius's written comments on the evaluation are immaterial to the veracity of ¶202.

**D. Bruzelius's Observations of AIGH's Environment.**

203. Bruzelius testified that she "observed different sets of rules being applied differentially to female and male employees in terms of who could take vacation [and] how much notice they had to give" and "when different people had to be in the office," indicating Kishore, Silva, and "maybe" Baum had more flexibility. (Lupion Decl. Ex. 7 (Bruzelius Tr. 87, 104).)

**PLAINTIFFS' RESPONSE:** Admitted.

204. Bruzelius testified that she never had a vacation request denied and could not provide an example of a request that was denied for any man or woman at AIGH. (Lupion Decl. Ex. 7 (Bruzelius Tr. 90).)

**PLAINTIFFS' RESPONSE:** Disputed. Bruzelius testified "I don't remember. I don't think so" (Bruzelius Tr. 90:11), not that she "never" had a vacation request denied. Bruzelius did provide an example of a request that was denied for a colleague, Llames: "Q. Are you aware of anybody else who had a vacation request denied? A. Yeah, I remember Geraldine having that happen, I think." (Lupion Decl. Ex. 7 (Bruzelius Tr. 90).)

On a page which Defendants omitted from their brief, Bruzelius testified "I believe other people told me that they had vacation requests denied." (McAllister Decl. Ex. 6 (Bruzelius Tr. 92:4-7).) Page 91, which Defendants did file as part of Lupion Decl. Ex. 7, has the relevant question on line 25; the question and Bruzelius's answer, which contradicts Defendants' position, is at the top of page 92 of the transcript, and that page Defendants did not file with the Court.

**DEFENDANTS' REPLY:** Bruzelius testified "I don't think so" in response to a question regarding whether she ever had a vacation request denied, and when asked if she was aware of anyone else who did, speculated "Geraldine … I think" and clarified, "I don't remember the details of exactly who and when and all the details of that kind of thing." (Reply Lupion Decl. Ex. 61 (Bruzelius Tr. 90-92).) Paragraph 204 should be deemed admitted in its entirety.

205. Bruzelius similarly admitted that she did not know why she had the impression that Kishore and Silva had more flexibility with their schedules, and that no one at AIGH ever

told her she had to stay at work until a certain hour. (Lupion Decl. Ex. 7 (Bruzelius Tr. 104-05).)

**PLAINTIFFS' RESPONSE:** Disputed. Bruzelius testified as to the basis for her impression: "I observed female employees in the office regularly, not typically 9:00 to 5:00, but with some leeway whereas there were male employees who seemed to have more flexibility." (Lupion Decl. Ex. 7 (Bruzelius Tr. 104).)

**DEFENDANTS' REPLY:** The entirety of Bruzelius's testimony shows that while she observed "some people left [early] and some people stayed [late]" and that "[s]ome people seemed able to kind of come in and not come in according to their own schedule, but not everybody," she didn't know why some people stayed late, no one told her she had to stay until a certain hour, she did not know whether the Institute had regular business hours, and she did not know why she believed Silva and Kishore had more flexibility in their schedule. (Reply Lupion Decl. Ex. 61 (Bruzelius Tr. 101-05).) Bruzelius's testimony that "there were male employees who seemed to have more flexibility" does not dispute her testimony that she did not know why she believed Silva and Kishore had more flexibility, as stated in ¶205. Paragraph 205 should be deemed admitted in its entirety.

206. Bruzelius recounted one instance when she was told she needed to be in the office following an international trip while "other men from the trip" did not. Bruzelius could not remember who told her she had to be in the office, nor identify the "other men" on the trip. Bruzelius also did not know whether these unidentified men had the same supervisor as her. (Lupion Decl. Ex. 7 (Bruzelius Tr. 91).)

**PLAINTIFFS' RESPONSE:** Admitted as to the first sentence. Disputed as to the rest. These questions were not put to her. The relevant portion of the testimony is:

> Q. Are you aware of anybody else who had a vacation request denied?
>
> A. I remember -- I remember having to travel for work from the institute and -- international travel and I remember being, me personally being told -- I don't remember if it was Prabhjot or Kirstin or who told me or perhaps David Berman told me that I needed to be back in the office the day after a flight or the weekend after a flight or something like that at the normal time, which was fine with me and I did that, but that other people from the trip, other men from the trip, weren't there.

(Lupion Decl. Ex. 7 (Bruzelius Tr. 91).)

**DEFENDANTS' REPLY:** The testimony cited by Plaintiffs does not dispute ¶206. The testimony Plaintiffs cite confirms Bruzelius could not remember and identified three potential individuals she believed "perhaps" told her she had to be in the office. (Reply Lupion Decl. Ex. 61 (Bruzelius Tr. 91-92).) Defendants retract the last sentence of ¶206. Bruzelius was not asked if the unidentified men she cited had the same supervisor as her. The remaining statements in ¶206 should be deemed admitted.

207. Bruzelius testified she observed different rules between men and women regarding who had offices. (Lupion Decl. Ex. 7 (Bruzelius Tr. 87).) Neither Bruzelius, nor any of her team members, were assigned offices, including Khan, Helfgott, Kyle Landell, Mongia, and Le, all of whom were on the data science team and sat with Bruzelius in an "open room." (Lupion Decl. Ex. 17 (Weisman Tr. 47-48).)

**PLAINTIFFS' RESPONSE:** Admitted.

208. Bruzelius testified she observed different rules between female and male employees regarding "who had different titles that seemed commensurate with what they were doing." (Lupion Decl. Ex. 7 (Bruzelius Tr. 87, 113).)

**PLAINTIFFS' RESPONSE:** Admitted.

209. Bruzelius testified she observed different rules regarding "who received credit for their work," but had no specific (or general) examples to offer. (Lupion Decl. Ex. 7 (Bruzelius Tr. 87).) Singh testified that when a paper was proposed to be authored by Le, he suggested that Bruzelius be first author, given she had drafted the work; the paper was published with her as first author. (Lupion Decl. Ex. 2 (Singh Tr. 229-30).)

**PLAINTIFFS' RESPONSE:** Admitted as to Singh's testimony. Disputed that Bruzelius had no specific or general examples to offer. She testified:

> I observed different sets of rules being applied differentially to female and male employees in terms of who could take vacation, how much notice they had to give, who had offices, who did not have offices, who received credit for their work, who did not receive credit for their work, who had different titles that seemed commensurate with what they were cite ends at line 10 — the answer continues below doing or not, who was allowed to take time off or not, when different people had to be in the office or not, things like that.

(Lupion Decl. Ex. 7 (Bruzelius Tr. 87).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶209, which should be deemed admitted in its entirety. The paragraph included in Plaintiffs' Response does not accurately restate Bruzelius's testimony. While Bruzelius testified that she was told (either by Safo or someone else) that Singh had taken credit for Safo's work, when asked if she knew whether Singh had also worked on the project, she admitted she did not know. (Reply Lupin Decl. Ex. 61 (Bruzelius Tr. 197-98).) In addition, in reviewing her performance review,

Bruzelius did not identify any work that she wasn't given credit for. (Reply Lupion Decl. Ex. 61 (Bruzelius Tr. 172).)

210. Bruzelius testified that while at AIGH she was "getting the opinion" that Singh did not value women's contributions. However, when asked what he said or about any conversations leading her to that conclusion, she was unable to provide any specifics. (Lupion Decl. Ex. 7 (Bruzelius Tr. 148-49).)

**PLAINTIFFS' RESPONSE:** Admitted as to the first sentence. Disputed as to the rest. Bruzelius provided specifics on the same page Defendants cite: "I mean he talked about what women were wearing or what their personalities were like or things like that." (Lupion Decl. Ex. 7 (Bruzelius Tr. 148:9-11).)

**DEFENDANTS' REPLY:** Plaintiffs' Response misrepresents Bruzelius's testimony. The testimony cite in Plaintiffs' Response is what Bruzelius said when asked whether she ever heard Singh "use epitaphs." (Reply Lupion Decl. Ex. 61 (Bruzelius Tr. 147-48).) When asked what Singh said that gave her the "opinion" that Singh "didn't value the contributions of women" Bruzelius responded, "I can't remember the details of those conversations" and "I would have to think about it." (Dkt. 212.7 (Bruzelius Tr. 148-49).) Paragraph 210 should be deemed admitted in its entirety.

211. Although Bruzelius testified that there were staff meetings where women's "contributions were ignored or talked over," she could not provide any details or identify who ignored or talked over them. (Lupion Decl. Ex. 7 (Bruzelius Tr. 84-85).)

**PLAINTIFFS' RESPONSE:** Disputed that Bruzelius did not provide any details; she plainly did: "I was in a staff meeting and somebody was speaking over

--- it was either Stella or Natalie and I remember thinking that it was rude." (Lupion Decl. Ex. 7 (Bruzelius Tr. 84).)

**DEFENDANTS' REPLY:** Plaintiffs' Response does not cure the material defect in Bruzelius's testimony. Bruzelius could not identify who spoke over Safo or Privett, nor any other examples. (Dkt. 212.7 (Bruzelius Tr. 84-85).) Paragraph 211 should be deemed admitted.

**E. Bruzelius's Interactions With Singh.**

212. Bruzelius testified that Singh "would tell you one thing to your face and say something different behind your back or he would say one thing in an e-mail and then say something different when you were alone with him." (Lupion Decl. Ex. 7 (Bruzelius Tr. 142-43).) However, she admitted that Singh did not yell or "deeply criticize[]" her work. (Lupion Decl. Ex. 7 (Bruzelius Tr. 142).)

**PLAINTIFFS' RESPONSE:** Admitted as to the accuracy of the quotes however they are incomplete. The full answer clearly states that Singh made her uncomfortable: "There was no situation where he yelled at me or deeply criticized my work or something like that, but it was not a comfortable interaction, at least on my end." (Lupion Decl. Ex. 7 (Bruzelius Tr. 142:13-16).) Further, Rahona testified that Singh yelled at people. (McAllister Decl. Ex. 27(Rahona Tr. 139).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶212, which should be deemed admitted in its entirety. Bruzelius's statement that "it was not a comfortable interaction" was preceded by the following testimony: "I didn't like him, but I tried to be professional and I think he did too for the most part." (Dkt. 212.7 (Bruzelius Tr. 142).) Rahona's statement, "Singh, he did yell at people" is not specific to women, and is from May 2015,

four years before the litigation was filed. (Reply Lupion Decl. Ex.72 (Rahona Tr. 138-39).)

213. Bruzelius testified that Knaup told her Singh "did not particularly like [her]" and he thought she "cared too much about cooperation and collaboration" and was "weak." (Lupion Decl. Ex. 7 (Bruzelius Tr. 137).)

**PLAINTIFFS' RESPONSE:** Admitted.

214. On February 7, 2018, Singh publicly praised Bruzelius as a "rising leader." (Lupion Decl. Ex. 48 ISMMS 9887-88).)

**PLAINTIFFS' RESPONSE:** Admitted that the document says what it says.

215. That same day, in Singh's "Director's Email" to AIGH, Singh wrote:

> Shout Out. Huge shout out to Emilie Bruzelius for her amazing presentation at the Center for Global Development. She is a phenomenal explainer, has a sharp analytical mind, and identifies points of collaboration in real time. We'll have her present to us all at some point soon!

(Singh Decl. Ex. 22 (ISMMS 9902).)

**PLAINTIFFS' RESPONSE:** Admitted that the document says what it says.

216. On May 28, 2018, Singh forwarded Bruzelius an email indicating a manuscript she submitted for publication had been rejected. Singh included a note that read, "sorry Emilie. You did a great job." (Singh Decl. Ex. 23 (ISMMS 18517).) Singh explained that the rejection was a "normal part of the process" and should not bother her. (Lupion Decl. Ex. 2 (Singh Tr. 230); Lupion Decl. Ex. 7 (Bruzelius Tr. 178).)

**PLAINTIFFS' RESPONSE:** Admitted.

217. On November 29, 2018, Singh sent Bruzelius an email, copying Weisman, thanking her for developing a presentation he gave, stating, "[i]t was clear, compelling, and generated a good discussion. I appreciate it." (Lupion Decl. Ex. 7 (Bruzelius Tr. 177-78).)

**PLAINTIFFS' RESPONSE:** Admitted.

### F. Bruzelius Offers No Details Regarding Comments by Berman and Silva.

218. Bruzelius testified Berman "spoke rudely" to her during a disagreement regarding him wanting her to present at a time where she was supposed to be out of the office. (Lupion Decl. Ex. 7 (Bruzelius Tr. 145.) Bruzelius could not recall any details of the comment.

**PLAINTIFFS' RESPONSE:** Disputed that Bruzelius did not give details. She did: Berman "questioned me and why I wasn't able to do it and he had a manner of speaking that let you know that he disagreed with you, didn't like you," and she described him as "very aggressive." (Lupion Decl. Ex. 7 (Bruzelius Tr. 145-146).) The same pages also record that Bruzelius heard Berman scream at other women. (*Id.*)

**DEFENDANTS' REPLY:** Bruzelius was asked to "describe as precisely as you can what made [Berman's] speech rude" and in response she stated, "we got in a disagreement about – he wanted me to present something at some point in time and I was supposed to be out that day or something like that. He just questioned me and why I wasn't able to do it and he had a manner of speaking that let you know that he disagreed with you, didn't like you. He was just – what is the right word – he's very aggressive." (Reply Lupion Decl. Ex. 61 (Bruzelius Tr. 145-46).) Bruzelius provided no details of the comment Berman made, which is what ¶218 says. Paragraph 218 should be deemed admitted in its entirety.

219. Bruzelius testified Silva commented on her weight on several occasions, but she could not identify any specific comments. (Lupion Decl. Ex. 7 (Bruzelius Tr. 150-51, 200).)

**PLAINTIFFS' RESPONSE:** Admitted as to Silva commenting on Bruzelius's weight on several occasions, disputed that she did not identify any specific comments. Deposing counsel never asked Bruzelius for specific comments that Silva made about her weight. She provided other examples of commenting on women's bodies, including Safo, who

> had lost a lot of weight and was walking with a cane and he told me -- we saw her in the hallway and he said oh, Stella looks so great. She looks amazing. Her body looks so great and I said I think she lost weight because she is sick and he made some kind of joke about it.

(Lupion Decl. Ex. 7 (Bruzelius Tr. 150).)

**DEFENDANTS' REPLY:** Bruzelius testified that Bruno "commented on my weight on multiple occassions" without providing any details as to the actual comments. Bruzelius was offered the opportunity to supplement her response but failed to do so. (Dkt. 212.7 (Bruzelius Tr. 150-51).) The comments Bruno made regarding Safo losing weight are immaterial. Paragraph 219 should be deemed admitted in its entirety.

220. Bruzelius admitted that she did not complain about Silva's comments or ask Silva to stop, acknowledging "we were all friendly with him at various points." (Lupion Decl. Ex. 7 (Bruzelius Tr. 152-53).)

**PLAINTIFFS' RESPONSE:** Disputed. Bruzelius plainly testified to the contrary. She complained about Silva: "Q. Did you ever complain about the comments that Bruno made? A. Yes. Q. To who? A. To Marina [Lowy]." (Lupion Decl. Ex. 7 (Bruzelius Tr. 151:20-24).) Marina Lowy was Mount Sinai's General

Counsel. Bruzelius also told Silva to stop when he made an inappropriate remark. (Lupion Decl. Ex. 7 (Bruzelius Tr. 152).)

**DEFENDANTS' REPLY:** Bruzelius's purported complaint was raised during Mount Sinai's internal investigation, not as a stand-alone complaint made to Human Resources, Bruzelius's supervisor or any other member of AIGH's management team. Bruzelius testified that she never told Bruno to stop making comments about women. (Dkt. 212.7 (Bruzelius Tr. 152).) The only comment Bruzelius testified that she told Bruno "not to say" was that the data science room smelled like curry, which Bruzelius interpreted as a reference to Humale Khan, a male employee. (*Id.*) Plaintiffs do not dispute the statement that Bruzelius acknowledged "we were all friendly with him at various points." Paragraph 220 should be deemed admitted in its entirety.

**G. Bruzelius's Compensation.**

221. Within her first year at AIGH, Bruzelius received two salary increases. By the end of her employment at ISMMS in March 2019, her salary had increased to $82,500. (Lupion Decl. Ex. 7 (Bruzelius Tr. 121); Roben Decl. Ex. 8 (ISMMS 9513-14); Roben Decl. Ex. 4 (ISMMS 20809).)

**PLAINTIFFS' RESPONSE:** Disputed. Bruzelius joined AIGH on April 4, 2016. (¶193, above). The record shows she received a 2% increase in 2018. (Roben Decl. Ex. 8 (ISMMS 9513-14).) The record shows that she received a further adjustment to $82,500 as part of ISMMS's salary review, after the end of the 2018 Investigation, to ensure equity in pay between men and women. (McAllister Decl. Ex. 15 (Lowy Tr. 139-140); Bruzelius Decl. Ex. 2 (Safo 4560 at 4563).) Defendants cite to p. 121 of Bruzelius's transcript but not p. 122, which

explains: "The institute went through a process of evaluating salaries in the department after the investigation and I got an e-mail that I had had an adjustment." (McAllister Decl. Ex. 6 (Bruzelius Tr. 122:11-14).)

**DEFENDANTS' REPLY:** Bruzelius received two salary increases within her first two years of employment at ISMMS. (Paragraph 221 inadvertently says "within her first year.") Bruzelius testified she received an increase after she started of approximately $5,000 (Dkt. 212.7 (Bruzelius Tr. 121)) and she received a 2% increase as part of the NBU (non-bargaining unit employee) increase in January 2018. (Dkt. 210.8 (ISMMS 9514); Dkt. 238.) Bruzelius received a further adjustment in November 2018 based on the compensation review. (Dkt. 223.60 (ISMMS 19540).) Several male employees also received salary increases following the review. (*Id.*) Bruzelius testified that "[w]e were told that everyone in the institute would be going through this process of salary adjustment and that it would be a[n] evaluation of job titles, job descriptions, salaries commensurate with that." (Reply Lupion Decl. Ex. 61 (Bruzelius Tr. 123).) Tiger-Paillex described the review as ensuring "[a]ppropriate salaries for the job that they were doing." (Reply Lupion Decl. Ex. 76 (Tiger-Paillex Tr. 256-57).) When asked if it was to ensure there is no gender disparity between people doing the same job, she responded, "[t]hat's part of it, but there's others. It's not just gender. It's making sure that they get paid based on their experience, their education, their qualifications as well as the job they are doing." *(Id.)*

**H. Bruzelius's Purported Comparators.**

222. Helfgott held the title of Data Science Analyst III and was hired at a salary of $120,000. (Roben Decl. Ex 10 (ISMMS 21370-71).) Helfgott's role required an undergraduate

degree in computer science, engineering, or a related field, and four or more years of software engineering experience. (Lupion Decl. Ex. 51 (ISMMS 19303); Lupion Decl. Ex. 17 (Weisman Tr. 182).) Helfgott had a Ph.D., a Master of Science in physics, and nine years of prior experience as a software engineer, senior quantitative specialist, and quantitative analyst. (Roben Decl. Ex. 11 (ISMMS 21355).) Weisman testified that Helfgott exceeded the minimum qualifications "significantly." (Lupion Decl. Ex. 17 (Weisman Tr. 186).)

**PLAINTIFFS' RESPONSE:** Admitted in part. Disputed that Lupion Decl. Ex. 17 (Weisman Tr. 182) addresses Helfgott's minimum qualifications; it concerns which job descriptions were sent to Rachel Posner. The four-years assertion rests on "I think that's reasonable." (Lupion Decl. Ex. 17 (Weisman Tr. 186:1-7).) ISMMS's list of AIGH employees and their job titles, produced in lieu of 30(b)(6) deposition testimony, lists both Bruzelius, Doupe, Le and Mongia as having the same title: Senior Data Analyst. (Dkt. No. 193; McAllister Decl. Ex. 34(ISMMS 26976).)

**DEFENDANTS' REPLY:** Page 182 of Weisman's transcript is cited to confirm that "CH" refers to Craig Helfgott, since only initials are contained in the operative document. Weisman's testimony regarding Helfgott's qualifications is on page 186 of his deposition transcript, as cited in ¶222. Plaintiffs' statement about the job titles listed for Bruzelius, Doupe, Le and Mongia on ISMMS's list of AIGH employees,[9] is immaterial to ¶222. Paragraph 222 should be admitted in its entirety.

[9] The list of employees ISMMS produced was a document prepared for purposes of litigation as a compromise to narrow the list of topics Plaintiffs sought to depose ISMMS's corporate representative on. It was prepared as a snapshot of the individuals who worked in AIGH at any point in time between 2014 and 2019. To the extent Plaintiffs' responses herein seek to rely upon it, it is not an official business record and was not authenticated by any witness testimony.

223. Helfgott developed "innovative new algorithms and writing them into software around high resolution weather data to overlay on visualizations" and mapping, which Weisman described as "incredibly sophisticated" and "defining work." Weisman testified that Helfgott and Bruzelius were not doing similar work. Weisman stated that given the "complexity and sophistication" of Helfgott's work, his position commanded a higher salary. (Lupion Decl. Ex. 17 (Weisman Tr. 203-05).)

**PLAINTIFFS' RESPONSE:** Admitted that Weisman gave that opinion. He also testified in the same deposition that Helfgott "was not fully utilized," that "we really weren't taking great advantage of his ... skill set," and "I felt he was underutilized." (Lupion Decl. Ex. 17 (Weisman Tr. 175).) ISMMS's list of AIGH employees and their job titles, produced in lieu of 30(b)(6) deposition testimony, lists both Bruzelius, Doupe, Le and Mongia as having the same title: Senior Data Analyst. (Dkt. No. 193; McAllister Decl. Ex. 34 (ISMMS 26976).)

**DEFENDANTS' REPLY:** Weisman's testimony about Helfgott's utilization is immaterial to ¶223. Plaintiffs' statement about the job titles listed for Bruzelius, Doupe, Le and Mongia on ISMMS's list of AIGH employees is also immaterial. Paragraph 223 should be admitted in its entirety.

224. Doupe was hired as a Senior Data Analyst at a salary of approximately $85,000. (Lupion Decl. Ex. 52 (ISMMS 21363-64).) Doupe held a Ph.D. in economics and completed additional training through the Insight Data Science Program. (Lupion Decl. Ex. 7 (Bruzelius Tr. 69-71).) In his role, Doupe developed algorithms pertaining to data science and machine learning, and he worked on technical algorithm creation and software development. According to Singh, he and Doupe discussed the fact that Doupe had multiple offers of employment from non-academic organizations. (Singh Decl. ¶13.)

**PLAINTIFFS' RESPONSE:** Admitted in part. The description of Doupe's role rests solely on Singh Decl. ¶ 13, which is at odds with Bruzelius's testimony: "[Doupe] also worked on a number of the grant applications and some different papers generating . . . ." (Lupion Decl. Ex. 7 (Bruzelius Tr. 69-71).) Bruzelius also worked on grant applications. (Plaintiffs' Response to ¶200, above; McAllister Decl. Ex. 36(ISMMS 3931 at 3933).) ISMMS's list of AIGH employees and their job titles, produced in lieu of 30(b)(6) deposition testimony, lists both Bruzelius, Doupe, Le and Mongia as having the same title: Senior Data Analyst. (Dkt. No. 193; McAllister Decl. Ex. 34 (ISMMS 26976).)

**DEFENDANTS' REPLY:** Singh's description of Doupe's role is not in conflict with Bruzelius's testimony. When Bruzelius was asked, "Did he do anything else?" she responded, "He may have" and could provide no further information. (Dkt. 212.7 (Bruzelius Tr. 69-71).) Plaintiffs' citation to ISMMS's list of AIGH employees is not inconsistent with ¶224, which identifies Doupe as a Senior Data Analyst. Paragraph 224 should be deemed admitted in its entirety.

225. Mongia was hired as a Senior Data Analyst at a salary of approximately $80,000. (Roben Decl. Ex. 12 (ISMMS 21372-73).) Mongia had a Bachelor of Science in electrical engineering and a Master of Science in computational and mathematical engineering and worked as a software engineer, with experience in deep learning research, neural network modeling, and computational engineering. (Lupion Decl. Ex. 53 (ISMMS 26197-98); Roben Decl. Ex. 13 (ISMMS 21361-62).) Weisman testified that Mongia did high-level, "sophisticated" work, including developing new algorithm-based software modules. His role was also focused on technical algorithm creation and software development. (Lupion Decl. Ex. 17 (Weisman Tr. 195); Singh Decl. ¶14.)

**PLAINTIFFS' RESPONSE:** Admitted as to the content of Singh's declaration. Disputed as to Weisman's testimony. When asked if Mongia met the criteria for his role, Weisman testified "I hadn't gotten that far in my analysis of what he did." (Lupion Decl. Ex. 17 (Weisman Tr. 195:6).) ISMMS's list of AIGH employees and their job titles, produced in lieu of 30(b)(6) deposition testimony, lists both Bruzelius, Doupe, Le and Mongia as having the same title: Senior Data Analyst. (Dkt. No. 193; McAllister Decl. Ex. 34(ISMMS 26976).)

**DEFENDANTS' REPLY:** Weisman's comment that he overlapped with Mongia for only a few months and therefore could not assess whether he was appropriately classified as a Senior Data Analyst does not dispute ¶225 which describes the work Mongia was performing. Plaintiffs' citation to ISMMS's list of AIGH employees is not inconsistent with ¶225, which identifies Doupe as a Senior Data Analyst. Paragraph 225 should be deemed admitted in its entirety.

226. Le was hired as a Senior Data Analyst earning approximately $75,000 per year. (Roben Decl. Ex. 14 (ISMMS 21359-60).) Le had a Bachelor of Science and a Master of Science in computer science and "a machine learning background." Bruzelius did not have a machine-learning background. (Roben Decl. Ex. 15 (ISMMS 21401-02); Lupion Decl. Ex. 2 (Singh Tr. 205); Lupion Decl. Ex. 50 (ISMMS 57.) Le's role was focused on technical algorithm creation and software development. (Singh Decl. ¶15.) Singh believed Le was "particularly strong at machine learning." (*Id.*)

**PLAINTIFFS' RESPONSE:** Admitted.

227. Singh testified that Le "was being recruited for roles that paid multiples of what we could pay him." (Lupion Decl. Ex. 2 (Singh Tr. 205).) In November 2017, Singh recommended Le receive a year-end bonus of $8,000 and a promotion to Data Science Analyst

I with a salary of $95,000, effective January 1, 2018, "to ensure retention of this highly technically skilled employee." (Singh Decl. Ex. 18 (ISMMS 9517-18).) Singh did not have the same retention concerns about Bruzelius, who never indicated to Singh she had a competing offer of employment. (Lupion Decl. Ex. 2 (Singh Tr. 206); Singh Decl. ¶16.)

**PLAINTIFFS' RESPONSE:** Admitted as to that's what Singh testified to. Disputed as to significance: Singh testified that if he had had a retention concern for Bruzelius or Misiti, he could have included them in the recommendation he made for Le and Silva. (Lupion Decl. Ex. 2 (Singh Tr. 206:24-207:5).) Further, Singh's basis for Le's higher salary offers from other organizations is based on general market knowledge only: "It was broadly known at that time that data scientists with skills in that field were commanding salaries many multiples of what we could offer." (*Id.*) ISMMS's list of AIGH employees and their job titles, produced in lieu of 30(b)(6) deposition testimony, lists both Bruzelius, Doupe, Le and Mongia as having the same title: Senior Data Analyst. (Dkt. No. 193; McAllister Decl. Ex. 34 (ISMMS 26976).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶227, which should be deemed admitted in its entirety. The commentary contained in Plaintiffs' Response as to the "significance" of Singh's testimony is argumentative and immaterial, and should be disregarded. Plaintiffs' citation to ISMMS's list of AIGH employees is not inconsistent with ¶227, which identifies Doupe as a Senior Data Analyst.

228. Khan was a Product Manager with a salary of $95,000. (Roben Decl. Ex. 16 (ISMMS 21385-86).) Khan had a bachelor's degree in computer science and had prior product management experience. (Roben Decl. Ex. 17 (ISMMS 21393).) Khan managed the ATLAS

product lifecycle from requirements gathering to product release, and managed product strategy roadmaps, usability testing, and cross-functional team coordination, for ATLAS. (Lupion Decl. Ex. 51 (ISMMS 19308).)

**PLAINTIFFS' RESPONSE:** Admitted that the documents say what they say.

**I. Bruzelius's Retaliation Allegations.**

229. On April 27, 2018, two former AIGH employees made a complaint against Singh alleging, among other things, that female employees had been subjected to a hostile work environment based on their gender. (Dkt. 133-1 ¶¶ 3-5.)

**PLAINTIFFS' RESPONSE:** Admitted. Disputed as to the two former AIGH employees being the only complainants.

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶229, which should be deemed admitted in its entirety.

230. Bruzelius participated in the investigation of that complaint. (Lupion Decl. Ex. 7 (Bruzelius Tr. 139-40).)

**PLAINTIFFS' RESPONSE:** Admitted.

231. Singh did not know the identity of the individuals who had complained, or the identity of any individual who participated in the investigation. (Singh Decl. ¶17.)

**PLAINTIFFS' RESPONSE:** Disputed. Singh's declaration states "At no point prior to the filing of the present lawsuit [**in April 2019]** did I have knowledge of the identities of complainants or individuals who participated in that investigation." (emphasis added) (Singh Decl. ¶17.) It contradicts his prior testimony, which Defendants intentionally omitted from their brief: "After the internal investigation was concluded end of **summer 2018**, I was told that there

were complaints about age and gender discrimination." (emphasis added) (McAllister Decl. ¶ 20 (Singh Tr. 53).) Further, on other pages that Defendants did not include in their brief because they undermine Defendants' position, Singh testified he first learned of allegations of discrimination in the "summer of 2018" through "my conversations with Counsel." (McAllister Decl. ¶ 20 (Singh Tr. 55, 56, 150).) Plaintiffs were unable to learn more from Singh on this subject because his counsel instructed him to not answer on grounds of attorney-client privilege. Further, Berman emailed Singh mid-investigation with what he had told the investigators. (McAllister Decl. Ex. 56 (SINGH_004079).)

**DEFENDANTS' REPLY:** Plaintiffs' Response conflates Singh's knowledge of the existence of an investigation with knowledge of the identities of the complainants or individuals who participated in the investigation, which Singh testified that he was not aware of. That statement is not inconsistent with his declaration. (*See* Dkt. 211 ¶17; Dkt. 223.20 (Singh Tr. 53).) Plaintiffs' Response does not controvert ¶231, which should be deemed admitted in its entirety.

232. Bruzelius testified that prior to the investigation, Singh "wanted to raise my position, give me a new title, potentially all the things that go along with that," but that after her investigatory interview Singh's demeanor changed, describing him as staring her down and being curt. (Lupion Decl. Ex. 7 (Bruzelius Tr. 153-55).)

**PLAINTIFFS' RESPONSE:** Admitted. Bruzelius added: "immediately after the investigation, he was very hostile towards me." (Lupion Decl. Ex. 7 (Bruzelius Tr. 153:21-22).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶232, which should be deemed admitted in its entirety.

233. Bruzelius testified that Singh's overall tone shifted to being "cold and aggressive," and said it was "clear to me that I wasn't in the same position that I had been before." When asked for an example, Bruzelius stated that at one meeting where they were discussing her concerns about data, Singh "made fun of" her for being "obsessed" with those concerns. (Lupion Decl. Ex. 7 (Bruzelius Tr. 161, 163).)

**PLAINTIFFS' RESPONSE:** Admitted that Bruzelius so testified but materially incomplete. Jones-Winter, ISMMS's investigator, confirmed that Bruzelius raised pay disparity with her directly and that she acted on it: "[Bruzelius] approached me about what she believed was pay disparity for herself . . . [she] said

> I believe that I should be getting paid more than what I am being paid now." (McAllister Decl. Ex. 26(Jones-Winter Tr. 191).) Jones-Winter confirmed Bruzelius's salary was adjusted after the investigation. (*Id.* at 192.)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶233 which should be deemed admitted in its entirety. To the extent Plaintiffs' Response interjects testimony that is immaterial to ¶233, it should be ignored by the Court.

234. Bruzelius testified that Singh told her, "I really want to make sure that you have a future [here]," which she interpreted as him expressing concern as to whether Bruzelius would "fit in here in the future." (Lupion Decl. Ex. 7 (Bruzelius Tr. 153-55).)

**PLAINTIFFS' RESPONSE:** Admitted as to the quoted testimony but materially incomplete. Bruzelius added: "he looked at me in the face and he said no, and he shook his head indicating yes. So I took that that he was trying to get rid of me." (Lupion Decl. Ex. 7 (Bruzelius Tr. 154).)

**DEFENDANTS' REPLY:** Plaintiffs' statement regarding how Bruzelius "took" Singh's head gesture is immaterial and does not controvert the words Singh admittedly told her. Plaintiffs' Response admits and does not controvert ¶234, which should be deemed admitted in its entirety.

235. Singh testified that because AIGH was without a lead data scientist at the time (in light of Faghmous's departure), there was a question of "how" Bruzelius's work would be done, not "if" it would be done. (Lupion Decl. Ex. 2 (Singh Tr. 219-21).) His conversation with Bruzelius regarding her role was an effort to "work out with her" the work that she wanted to do, given the limitations of AIGH not having a principal investigator and Bruzelius not yet having a Ph.D., which prevented assigning grants to her. (Lupion Decl. Ex. 2 (Singh Tr. 220-21).)

**PLAINTIFFS' RESPONSE:** Admitted that Singh so testified. Disputed as to the substance. Bruzelius's 2018 annual evaluation lists her successfully performing the duties of a principal investigator:

> - Completed 1 sponsored project (Pl) [Principal Investigator], collaborated on 2 sponsored projects as staff.
> - Collaborated on writing the proposal for 1 successfully funded sponsored project.
> - Participated in the scoping, writing and submission of several additional sponsored projects not ultimately funded.

(McAllister Decl. Ex. 36 (ISMMS 3931 at 3933).)

**DEFENDANTS' REPLY:** Plaintiffs' Response admits and does not controvert ¶235, which should be deemed admitted in its entirety. The portion of Plaintiffs' Response that recites tasks listed on Bruzelius's performance review is immaterial to ¶235 and should be ignored.

236. On June 5, 2018, Bruzelius emailed Jones-Winter in ISMMS's labor relations department regarding her meeting with Singh, indicating Singh explained to her that "without

grant funding, he couldn't be sure whether there was a place for the work I was doing." (Lupion Decl. Ex. 54 (Safo 895-96); Lupion Decl. Ex. 7 (Bruzelius Tr. 154).) Bruzelius wrote in an email to Jones-Winter that she could not "help but wonder" whether some information from the investigation was attributed to her, writing "I believe" Singh would connect gender pay issues to her. (Lupion Decl. Ex. 54 (Safo 895-96).) Bruzelius admitted, however, that when asked if he was firing her, Singh said "no" and expressed hope she would remain at AIGH. (*Id.*; Lupion Decl. Ex. 7 (Bruzelius Tr. 154).)

**PLAINTIFFS' RESPONSE:** Admitted that the email was sent. Disputed as to the final sentence. Bruzelius opened the email by writing "I want to report a conversation with Prabhjot that occurred today in our one-on-one meeting where I feel that he was either directly or indirectly pressuring me to quit." (Lupion Decl. Ex. 54 (SAFO 895).) She testified: "[H]e looked at me in the face and he said no, and he shook his head indicating yes. So I took that that he was trying to get rid of me." (Lupion Decl. Ex. 7 (Bruzelius Tr. 154:14-17).) Singh testified that he did not recall that conversation, and that he did not recall shaking his head no but nodding his head yes. (McAllister Decl. Ex. 20 (Singh Tr. 224-225).)

**DEFENDANTS REPLY:** Plaintiffs' statement regarding how Bruzelius "took" Singh's head gesture does not controvert the words Singh admittedly told her, nor the contents of her email to Jones-Winter in which she explicitly stated that should could not "help but wonder." (Dkt. 212.54 (Safo 895-96).) Plaintiffs' Response admits and does not controvert ¶236, which should be deemed admitted in its entirety.

237. On June 13, 2018, Bruzelius emailed Singh and Weisman, recapping their conversation about formalizing "a plan for [Bruzelius]'s role in the Institute moving forward."

(Lupion Decl. Ex. 21 (WEISMAN 33).) The document indicated, among other things, AIGH was going through a strategy and alignment period, and that because Baum did not have "sufficient funding to cover methodological work," "Emilie should begin to focus more of her time on Atlas." (*Id.*)

**PLAINTIFFS' RESPONSE:** Admitted.

238. At this point, Weisman had been at AIGH for two months, and Singh believed "it is a good time to consolidate [Bruzelius]'s reporting directly under [Weisman]." (Lupion Decl. Ex. 21 (WEISMAN 33-34).)

**PLAINTIFFS' RESPONSE:** Admitted that the document says what the document says.

239. Bruzelius testified Singh stopped asking her to attend meetings with him and present to external donors, but did not identify any specific meeting or conference from which she was excluded. (Lupion Decl. Ex. 7 (Bruzelius Tr. 165-66).)

**PLAINTIFFS' RESPONSE:** Admitted.

240. Bruzelius admitted that she suggested to Singh that they discontinue their one-on-one meetings. Singh agreed and directed her to report to Weisman instead. (Lupion Decl. Ex. 7 (Bruzelius Tr. 169).)

**PLAINTIFFS' RESPONSE:** Admitted

241. At her deposition, Bruzelius also admitted:

- Singh never referenced the investigation in conversations with her (Lupion Decl. Ex. 7 (Bruzelius Tr. 153, 155-56));
- Singh never asked her to resign (Lupion Decl. Ex. 7 (Bruzelius Tr. 156));
- Singh never used an "aggressive word" with her and did not "come at [her] in an aggressive way" (Lupion Decl. Ex. 7 (Bruzelius Tr. 161));

- Her work was not reassigned to anyone else (Lupion Decl. Ex. 7 (Bruzelius Tr. 165-66)); and
- Her complaint about alleged retaliation to Jones-Winter "didn't make a huge difference in [her] day-to-day experience." (Lupion Decl. Ex. 7 (Bruzelius Tr. 247).)

**PLAINTIFFS' RESPONSE:**

- Admitted as to the first point.
- Disputed as to the second point: the cited testimony clearly says Singh's "implication was you should resign." (Lupion Decl. Ex. 7 (Bruzelius Tr. 156).)
  - **DEFENDANTS' REPLY:** Bruzelius's belief, based on a head gesture, does not controvert the fact that Singh never asked her to resign. The second bullet of ¶241 is not controverted and should be deemed admitted.
- Materially incomplete as to the third point: the rest of Bruzelius's answer clarifies her testimony: "but it was clear to me that I wasn't in the same position that I had been before this." (Lupion Decl. Ex. 7 (Bruzelius Tr. 161).)
  - **DEFENDANTS' REPLY:** Bruzelius's commentary does not dispute that Singh never used an "aggressive word" with her and did not "come at [her] in an aggressive way" as she testified. (Dkt. 212.7 (Bruzelius Tr. 161).) The third bullet of ¶241 is not controverted and should be deemed admitted.

- Disputed as to the fourth point. That was not Bruzelius's testimony. She testified: "Q. Was your work reassigned to anybody else? A. That's a bit of a difficult question to answer because what my work was a bit of a moving target where he again he would ask me to identify the direction for the research agenda and then not. It is not as though he was having someone else doing that, but the specific direction of my work was not clear." (Lupion Decl. Ex. 7 (Bruzelius Tr. 165-66).)
    - **DEFENDANTS' REPLY:** Plaintiffs' citation to Bruzelius's testimony confirms that Singh did not reassign her work. (Dkt. 212.7 (Bruzelius Tr. 166: 5-7).) The fourth bullet of ¶241 is not controverted and should be deemed admitted.
- Admitted, meaning ISMMS took no remedial action. (Lupion Decl. Ex. 7 (Bruzelius Tr. 247).)

**J. Departure from ISMMS.**

242. Bruzelius resigned from ISMMS, effective March 4, 2019. (Roben Decl. Ex. 4 (ISMMS 208-09).)

**PLAINTIFFS' RESPONSE:** Admitted.

243. Bruzelius became a graduate research assistant at Columbia University in the Department of Epidemiology. (Lupion Decl. Ex. 7 (Bruzelius Tr. 18-19).)

**PLAINTIFFS' RESPONSE:** Admitted.

**K. Bruzelius Had No Interactions With Charney.**

244. Bruzelius testified she never met Charney one-on-one and did not have any evidence of actions by Charney regarding harassment or discrimination against her. (Lupion Decl. Ex. 7 (Bruzelius Tr. 198).)

**PLAINTIFFS' RESPONSE:** Admitted.

## VIII. PLAINTIFFS' STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS.

Defendants provide the below responses to Plaintiffs' Statement of Additional Undisputed Material Facts ("Additional Statement"), without waiver of or prejudice to their Motion to Strike, filed concurrently herewith. As set forth therein, Plaintiffs' Additional Statement does not comply with Local Civil Rule 56.1 in numerous respects. For the avoidance of doubt, it is Defendants' position that none of the facts appearing in Plaintiffs' Additional Statement are "material facts" for purposes of Defendants' Motion for Summary Judgment under Fed. R. Civ. P. 56 or Local Civil Rule 56.1. As a result, and regardless of whether admitted or disputed, none of the "facts" cited in Plaintiffs' Additional Statement preclude summary judgment in favor of Defendants. To the extent Defendants provide substantive responses, these responses are not intended to be, and should not be considered as, a concession that any of the "facts" contained in those paragraphs are material to Defendants' Motion for Summary Judgment or are otherwise in any way relevant to its resolution.

### A. Singh's Treatment of the Staff He Inherited.

245. Asked during her hiring interview why he had restructured the Institute, Singh told Misiti that when he arrived there "had been a lot of women who worked there, a lot of people in Global Health, and he had to get rid of them." (McAllister Decl. Ex. 17 (Misiti Tr. 56).)

**DEFENDANTS' RESPONSE:** Disputed as inconsistent with Misiti's contemporaneous statement she wrote in 2018, which said: "During the phone

interview, I asked him about the organizational culture. He immediately began to criticize global health, and told me that an 'important part of the history (of Arnhold)' was that when he was hired he had to fire nearly everyone when he started. Later I asked how one does that, and he said that some he fired, and to some he made it clear that they didn't have a future there." (Dkt. 212.26 (Safo 5370).) Misiti's full deposition testimony shows that Singh was talking about "the people who had been there initially and in Global Health . . . you know, he had maybe not used the word incompetent but suggested, basically, that there was incompetence" not just women. (Reply Lupion Decl. Ex. 70 (Misiti Tr. 57)).

246. Asked whether Singh had said "women" or "people," Misiti testified: "I believe it was women." (McAllister Decl. Ex. 17 (Misiti Tr. 56).)

**DEFENDANTS' RESPONSE:** Admitted that is what Misiti testified. (Dkt. 223.17 (Misiti Tr. 56); *see also* Defendants' Response to ¶245.)

247. Singh referred to the staff he inherited as the "legacy members." Anandaraja testified that the term denoted "the female employees that he had inherited from the Mount Sinai Global Health program," toward whom he created an environment that was "incredibly hostile." (McAllister Decl. Ex. 1 (Anandaraja Tr. 236).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. Atkinson testified that the "Legacy Group" as defined by Singh, was "the employees who were then part of AIGH going forward who had been part of the Global Health Group." (Reply Lupion Decl. Ex. 60 (Atkinson Tr. 225-26).) None of the individuals in the "legacy group" are plaintiffs.

248. Atkinson testified that Singh said of the legacy group, when asked whether he had fired them all: "No, I had my ways." (McAllister Decl. Ex. 2 (Atkinson Tr. 156).)

**DEFENDANTS' RESPONSE:** Admitted that is what Atkinson testified. *See* Defendants' Response to ¶245. None of the individuals in the "legacy group" are plaintiffs and "legacy" refers to former Global Health employees, not women. (Reply Lupion Decl. Ex. 60 (Atkinson Tr. 225-26).)

249. Bischoff prepared a document recording that 13 women had left the Institute compared with five men. (McAllister Decl. Ex. 5 (Bischoff Tr. 243-44).) Anandaraja was told by Bischoff that 13 women had left because of the environment Singh created. (McAllister Decl. Ex. 1 (Anandaraja Tr. 13).) When Anandaraja told Lowy that "[t]he people that he had hired had left in droves," Lowy agreed "[t]hat is a red flag for sure." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 37).)

**DEFENDANTS' RESPONSE:** Disputed as to the characterization of the list as a comparison. Bischoff's testimony was: "Q. And even this list, what stands out to you some six years after is the fact that it listed 13 women leaving compared to five men leaving, right? . . . A. I think there were more women who were working at the Arnhold Institute, but I think part of it is -- that stood out to me, but I think part of it was just the wide range of people who were leaving, that it was not just people who had been part of the original global health team, but it was also a lot of the new people that Prabhjot had hired. I thought that's frankly what really stood out, that even the new people were miserable. Q. And that women are more miserable than men, right? . . . A. I don't know if I would agree with that. Q. No? A. In retrospect or after the fact, I've had many conversations with the men who worked there and they were just as miserable, so." (Dkt. 223.5 (Bischoff Tr. 243-44).) Admitted as to Anandaraja's testimony, which is hearsay. Admitted as to the contents of Lowy's statement.

250. Anandaraja testified that Singh brought young men into his leadership circle while demoting the women already there, producing a "very bro-ey" culture. (McAllister Decl. Ex. 1 (Anandaraja Tr. 35-36).)

**DEFENDANTS' RESPONSE:** Disputed as incomplete and not material. Anandaraja testified that there was a narrative around "we're going to build this from the ground up as a startup" and that there "was a very bro-ey feeling around it." "Like, a very -- it discriminatory in that it was, like, it's going to be this young -- this kind of young setting. Youth was valued in that setting and, you know, in the popular culture. At that time, there was this kind of narrative around tech bros." (Reply Lupin Decl. Ex. 59 (Anandaraja Tr. 34-35).) None of the Plaintiffs were demoted and Anandaraja's age discrimination claim was dismissed. (Dkt. 81, 17, 38.)

**A. Silva's Gendered Slurs and Sexualized Commentary.**

251. Silva called women "bitch" and "cunt" as "part of his normal conversation"; it was "pretty frequent." (Lupion Decl. Ex. 7 (Bruzelius Tr. 150).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Bruzelius' testimony. Llames agreed that "the term bitch was used very frequently amongst many individuals, including [herself] . . . in this group at Mount Sinai." (Dkt. 223.14 (Llames Tr. 138).)

252. Escosia heard Silva announce to a room, "oh my god, Stella's a bitch," and heard him call Safo a "cunt." (McAllister Decl. Ex. 8 (Escosia Tr. 41, 145, 150).)

**DEFENDANTS' RESPONSE:** Admitted. Escosia could not recall any details other than the "cunt" comment was made in 2017. (Dkt. 223.8 (Escosia Tr. 150).)

253. Llames heard Silva call women "bitches" and heard him call Safo a "cunt." (McAllister Decl. Ex. 14 (Llames Tr. 135, 147).)

**DEFENDANTS' RESPONSE:** Paragraph 253 should be struck as duplicative of ¶¶90, 137, 138 of Defendants' 56.1 Statement, including Plaintiffs' Response as stated therein.[10]

254. Safo heard Silva refer to women using the word "bitch." (Lupion Decl. Ex. 4 (Safo Tr. 244).)

**DEFENDANTS' RESPONSE:** Paragraph 254 should be struck as duplicative of ¶91 of Defendants' 56.1 Statement, including Plaintiffs' Response as stated therein.

255. Silva said of a female colleague, "She must be on her period." (Lupion Decl. Ex. 5 (Llames Tr. 142).)

**DEFENDANTS' RESPONSE:** Paragraph 255 should be struck as duplicative of ¶134 of Defendants' 56.1 Statement, including Plaintiffs' Response as stated therein.

256. Silva commented on Bruzelius's weight on multiple occasions. (Lupion Decl. Ex. 7 (Bruzelius Tr. 150).) Of Safo, who had lost weight due to illness and was walking with a cane, he said "her body looks so great" and joked when told she was ill. (Lupion Decl. Ex. 7 (Bruzelius Tr. 150).)

[10] For all paragraphs contained in Plaintiffs' Statement of Additional Undisputed Facts which Defendants identify as duplicative, Defendants incorporate by reference the statements and record citations contained in Defendants' prior responses.

**DEFENDANTS' RESPONSE:** Paragraph 256 should be struck as duplicative of ¶219 of Defendants' 56.1 Statement, including Plaintiffs' Response as stated therein.

257. In Senegal, Silva said a local female colleague looked "nasty," "disgusting" and "really gross" because of a water shortage. (Lupion Decl. Ex. 7 (Bruzelius Tr. 151).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Bruzelius's testimony, but immaterial because the quoted comment is not about Plaintiffs and not related to gender.

258. Silva admitted telling Llames she looked "like a dyke" and calling Safo a "control freak." (McAllister Decl. Ex. 21 (Silva Tr. 295-96, 296-97).)

**DEFENDANTS' RESPONSE:** Paragraph 258 should be struck as duplicative of ¶131 of Defendants' 56.1 Statement as to "like a dyke" comment and immaterial. Admitted that Silva said "control freak" but the comment is immaterial because it is not related to gender. Silva explained that he used the term "control freak" because Safo "tried to control me, my conversations and everything that happened around." (Reply Lupion Decl. Ex. 74 (Silva Tr. 230).)

259. After Llames sent Silva a picture of her arm with a bandage and caption "[s]o they drew blood..," Silva responded: "Oh no are you pregnant?" (Llames Decl. Ex. 1 (Safo 20930 at 20940).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Llames' declaration. Paragraph 259 should be struck for contradicting Llames's deposition testimony and immaterial. At her deposition Llames was asked: "What is the basis of your claim against [Silva]?" and she identified the various comments addressed

in Defendants' 56.1 Statement – this one was not mentioned in her testimony. (Dkt. 223.14 (Llames Tr. 135).)

260. Silva sent Llames multiple text messages with the word "bitch." (Llames Decl. Ex. 1 (Safo 20930 at 20930, 20933, 20936).)

**DEFENDANTS' RESPONSE:** Admitted. (*See* Defendants' 56.1 Statement ¶¶136 and 137.)

261. Silva admitted deleting, after learning the allegations in this action had become public, the one text message on his phone containing the word "bitch": "So I freaked out, and I went through my phone, and I erased one — one message only that had the word 'bitch' in it." (McAllister Decl. Ex. 21 (Silva Tr. 146).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Silva's testimony and immaterial because there is no dispute that Silva used the word bitch in conversations with friends at Mount Sinai, including Llames. *See* Defendants' 56.1 Statement ¶¶136 and 137; Plaintiffs' Additional Statement ¶260.)

262. Safo testified Silva withheld or slowed her work knowing Singh would not hold him to account, and that "that definitely felt like that was gendered." (Lupion Decl. Ex. 4 (Safo Tr. 249).)

**DEFENDANTS' RESPONSE:** Disputed. Safo testified, "it seemed to me like" Silva prioritized "the work that [he] was doing in other parts of the institute often were with Prabhjot and, let's say, James around ATLAS" and that "felt" gendered. (Dkt. 212.4 (Tr. 249-50).)

**B. Berman's Yelling Directed at Women.**

263. Berman testified: "I have never yelled at anybody in a workplace in my life. I have raised my voice." (Lupion Decl. Ex. 14 (Berman Tr. 164).)

**DEFENDANTS' RESPONSE:** Admitted as to Berman's testimony and immaterial. Berman's characterization as to whether he yelled or raised his voice is not a disputed issue of material fact. Defendants have accepted as true for purposes of this motion Plaintiffs' characterization that he yelled.

264. Bischoff testified Berman yelled at her in a closed office with Kishore present, his face "very red," until Aaron Baum knocked and intervened. (McAllister Decl. Ex. 5 (Bischoff Tr. 150, 180).)

**DEFENDANTS' RESPONSE:** Defendants admit for purposes of their Motion for Summary Judgment that Berman yelled at numerous Mount Sinai employees, including Bischoff. (*See* Defendants' 56.1 Statement ¶¶79, 82, 123, 125.) The quoted language does not appear on the cited transcript pages.

265. Bischoff testified no one had ever yelled at her that way before or since. (McAllister Decl. Ex. 5 (Bischoff Tr. 181-82).) She did not report it because she was "afraid of David Berman retaliating." (McAllister Decl. Ex. 5 (Bischoff Tr. 194-95).)

**DEFENDANTS' RESPONSE:** The complete testimony from Bishoff is: Q: "Had anybody yelled at you in that manner before? A: No. Q: Since? A: No. Aside from my 14-year-old daughter? Q: Is she louder than Mr. Berman? A: She might be." (Dkt. 223.5 (Bischoff Tr. 181-82).) Admitted Bischoff testified that she was concerned about retaliation but it is not a material fact. Bischoff is not a plaintiff, Berman is not a defendant and there is no retaliation claim that involves allegations against him.

266. Berman first testified "I did not raise my voice to Mary Caliendo" and "you certainly didn't yell at her? A. No," then testified one page later, "I absolutely raised my voice to her." (McAllister Decl. Ex. 4 (Berman Tr. 165, 166).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Berman's testimony but immaterial. Mary Caliendo is not a plaintiff.

267. Berman berated Llames and Stapleton over a slide deck: "What is this? This is stupid. Are you fucking stupid?" (Lupion Decl. Ex. 5 (Llames Tr. 66-67).) Berman denied using those words. (McAllister Decl. Ex. 4 (Berman Tr. 343-44).)

**DEFENDANTS' RESPONSE:** Disputed as to Stapleton, who is not identified on the cited pages. (Dkt. 212-5 (Llames Tr. 66-67).) Llames could not recall who was present. (*Id.*) The portion of ¶267 to extent applied to Llames should be struck as duplicative of ¶123 of Defendants' 56.1 Statement. The characterization that Berman "berated" Llames and Stapleton is counsel's description, not testimony from the witness.

268. Berman told Walek in meetings that her work was "stupid" and asked "what are you even thinking here." (McAllister Decl. Ex. 14 (Llames Tr. 189).) A written account records that he made a female colleague cry while berating her until a male colleague intervened. (McAllister Decl. Ex. 8 (Escosia Tr. 209).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Llames confirmed that Berman's comment "this is stupid" pertained to Walek's work product. (Reply Lupion Decl. Ex. 68 (Llames Tr. 189-90).) Walek is not a plaintiff.

269. Bruzelius saw Berman gesticulating through the glass so threateningly at Bischoff that she feared for Bischoff's wellbeing, and testified she interpreted his conduct as gender-based "[b]ecause he only yelled at women that I was aware of." (McAllister Decl. Ex. 6 (Bruzelius Tr. 146, 198-99).)

**DEFENDANTS' RESPONSE:** Disputed. The cited pages do not support the statements in ¶269 regarding Berman allegedly "gesticulating through the glass so threateningly at Bischoff."

270. Safo testified she never witnessed Berman yell at a man and did not recall him yelling at a male colleague "the way that he did Mary or Renee." (Lupion Decl. Ex. 4 (Safo Tr. 103-04).)

**DEFENDANTS' RESPONSE:** Disputed. Safo testified that she "can't remember" whether she "witnessed" or if someone "mentioned it" to her that Berman "spoke very harshly to Sonny about, I think, one of the grants that was coming in." She also testified that she might have heard "David Berman had reduced Aaron Baum to tears." (Dkt. 212.4 (Safo Tr. 103-04).)

271. Berman denied ever hearing that women were treated differently in meetings or skipped over. (McAllister Decl. Ex. 4 (Berman Tr. 334).) He testified he "didn't see gender discrimination happening at the Arnhold Institute or frankly anywhere." (McAllister Decl. Ex. 4 (Berman Tr. 241).)

**DEFENDANTS' RESPONSE:** Admitted and immaterial.

**C. Singh's Silencing, Exclusion and Appropriation of Credit.**

272. On October 4, 2016 Singh emailed Safo under the subject line "You are talking too much." Asked about it, he testified he had no memory of it and did not know the context. (Lupion Decl. Ex. 2 (Singh Tr. 276-77).)

**DEFENDANTS' RESPONSE:** Paragraph 272 should be struck as duplicative of ¶59 of Defendants' 56.1 Statement.

273. Singh directed Misiti by text to take the microphone away from Safo during a presentation. He testified he might have done so. (Lupion Decl. Ex. 6 (Misiti Tr. 147);

McAllister Decl. Ex. 20 (Singh Tr. 277-78).) He could recall no occasion of telling anyone other than Dr. Safo that she was talking too much. (Lupion Decl. Ex. 2 (Singh Tr. 280).)

**DEFENDANTS' RESPONSE:** Admitted that Singh asked Misiti to take the microphone away from Safo. Disputed as to the remainder. (*See* Defendants' 56.1 Statement ¶¶61-62.) Singh testified that at a presentation he told David Heller that he was talking too much and they had to move on. (Reply Lupion Decl. Ex. 75 (Singh Tr. 279-80).)

274. Safo testified Singh would "look at me and kind of stare at me to stop talking or shake his head or kind of communicate to make my presence smaller. I never saw him do that to male colleagues." (McAllister Decl. Ex. 19 (Safo Tr. 200).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Safo's testimony. Safo admitted that she was not in every meeting Singh had with male colleagues to know whether he acted in the same way with men. (Dkt. 212.19 (Safo Tr. 200).)

275. Safo testified Singh insisted on introducing her and presenting her work, while "other male colleagues were not being introduced and certainly not having their work spoken about by him." (Lupion Decl. Ex. 4 (Safo Tr. 285).)

**DEFENDANTS' RESPONSE:** Paragraph 275 should be struck as duplicative of Paragraphs 63 and 66 of Defendants' 56.1 Statement, including Plaintiffs' Responses thereto.

276. In meetings with Mount Sinai Health Partners and system leadership Safo was "more or less directed not to speak at all." (Lupion Decl. Ex. 4 (Safo Tr. 286).)

**DEFENDANTS' RESPONSE:** Paragraph 276 should be struck as duplicative of ¶59 of Defendants' 56.1 Statement, including Plaintiffs' Response as stated therein.

277. Singh skipped Llames when going round the table; Misiti gestured "let's go back" and he did. (McAllister Decl. Ex. 17 (Misiti Tr. 191).) Llames was skipped in "[m]ultiple" ATLAS meetings; Le, Khan and Silva were not. (Lupion Decl. Ex. 5 (Llames Tr. 61-62).)

**DEFENDANTS' RESPONSE:** Paragraph 277 should be struck as duplicative of ¶116 of Defendants' 56.1 Statement.

278. Bruzelius saw Singh "ignore Geraldine, speak over her, not introduce her in a way that made me think that he was doing it to intentionally upset her." (McAllister Decl. Ex. 6 (Bruzelius Tr. 194).)

**DEFENDANTS' RESPONSE:** Admitted as to the statement but the testimony presented is materially incomplete. Bruzelius could not recall any specific incident and testified that she believed Singh ignored Geraldine "to intentionally upset her" and testified, "I don't know kind of to what extent that means discrimination, but that was my interpretation." (Reply Lupion Decl. Ex. 61 (Bruzelius Tr. 194-95).)

279. At the May 2017 Task Force event Singh "thanked the women for their work and then asked the men what they thought ... to the point which James Faghmous commented on the fact that the women had done most of the work but weren't being asked their opinion." (Lupion Decl. Ex. 6 (Misiti Tr. 146).)

**DEFENDANTS' RESPONSE:** Paragraph 279 should be struck as duplicative of ¶176 of Defendants' 56.1 Statement.

280. Bruzelius testified Singh presented the health-system-design team's work as his own at all-staff meetings. (McAllister Decl. Ex. 6 (Bruzelius Tr. 196-97).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. Bruzelius testified that her knowledge of Singh "present[ing]" "[t]he house [sic] systems design team projects" as his own at "all staff meetings" was based on Safo telling her that Safo

had worked on the project. Bruzelius admitted that she did not know whether Singh had also worked on the project. (Reply Lupion Decl. Ex. 61 (Bruzelius Tr. 197-98).)

281. Singh denied calling on men and not women, denied ignoring women, and denied intentionally skipping Llames. (McAllister Decl. Ex. 20 (Singh Tr. 138, 241).)

**DEFENDANTS' RESPONSE:** Admitted and immaterial.

**D. Sex Stereotyping.**

282. Singh called Safo a "mother hen" for the way she ran a meeting; Safo testified she "can't imagine he would have done the same for a male colleague." (McAllister Decl. Ex. 19 (Safo Tr. 199-200).) Singh denied using the phrase. (McAllister Decl. Ex. 20 (Singh Tr. 137).)

**DEFENDANTS' RESPONSE:** Paragraph 282 should be struck as duplicative of ¶58 of Defendants' 56.1 Statement.

283. Singh told others Misiti was "stressed" and should "act more like Craig Helfgott, who's a man, ... and not have emotional reactions." (Lupion Decl. Ex. 6 (Misiti Tr. 94).)

**DEFENDANTS' RESPONSE:** Paragraph 283 should be struck as duplicative of ¶170 of Defendants' 56.1 Statement.

284. Singh encouraged "alpha-like behavior" and then told Misiti it "was often not well-received" when she supplied it. (Lupion Decl. Ex. 6 (Misiti Tr. 116-17).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. Misiti could not identify an example, specific or general, of a time when she was "alpha-like" and it was not well received by Singh. (Dkt. 212.6 (Misiti Tr. 117).)

285. Singh described Bruzelius as "weak" and as caring "too much about cooperation and collaboration." (Lupion Decl. Ex. 7 (Bruzelius Tr. 137).)

**DEFENDANTS' RESPONSE:** Paragraph 285 should be struck as duplicative of ¶213 of Defendants' 56.1 Statement.

286. Singh mocked Bruzelius as "obsessed" when she raised patient-data and IRB compliance. (Lupion Decl. Ex. 7 (Bruzelius Tr. 163).)

**DEFENDANTS' RESPONSE:** Paragraph 286 should be struck as duplicative of ¶233 of Defendants' 56.1 Statement.

287. Misiti testified Singh's conduct of "regularly criticizing" and "characterizing me specifically as being stressed and emphasizing my emotional state to others around the office" was sex-specific: "I did not hear him do that with men, I only heard him do that about women"; "I never saw him do this behavior to men." (Lupion Decl. Ex. 6 (Misiti Tr. 89, 91).)

**DEFENDANTS' RESPONSE:** Paragraph 287 should be struck as duplicative of ¶170 of Defendants' 56.1 Statement.

288. Singh denied telling Misiti he thought women were too emotional, denied criticizing her as emotional, and denied ever commenting on women employees' dress. (McAllister Decl. Ex. 20 (Singh Tr. 178, 181-82).)

**DEFENDANTS' RESPONSE:** Admitted and immaterial.

**E. Pathologizing Women Who Challenged Him.**

289. Of Dr. Ann Marie Beddoe, Singh asked Misiti "Have you ever heard of the term splitting?" which Misiti understood as attributing to Beddoe "a borderline personality trait." (McAllister Decl. Ex. 17 (Misiti Tr. 193).) Misiti understood the comment as portraying Beddoe "in a emotional and negative way." (McAllister Decl. Ex. 17 (Misiti Tr. 195).)

**DEFENDANTS' RESPONSE:** Admitted as to contents of Misiti's testimony and immaterial. What Misiti "understood" Singh to mean in his alleged comment about

"splitting" is not material, as it is not related to her gender and Beddoe is not a plaintiff in this litigation.

290. Misiti recorded in her written statement to the investigators that Singh "regularly ... makes gendered criticisms of external female colleagues," including "she has a few screws loose," and that before an all-women call he said, "I feel like I am about to be scolded by my mother." She recorded: "I don't recall negative statements like these about men." (Lupion Decl. Ex. 26 (Safo 5381).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Misiti's statement and immaterial. Singh's purported statements about "external female colleagues," such as, "she has a few screws loose" and "I feel like I am about to be scolded by my mother" did not concern Plaintiffs and are not related to gender.

291. Charney, a psychiatrist who had never met Dr. Ann Olivarius ("Olivarius"), told Singh her account was "bizarre" and that she "sounded 'borderline.'" (Singh Note, ISMMS 021261.)

**DEFENDANTS' RESPONSE:** Disputed. Hearsay and immaterial Charney's description of Olivarius and/or her "account" is not relevant to Plaintiffs' claims.

292. Charney testified he has no memory of doing so. (McAllister Decl. Ex. 7 (Charney Tr. 147).)

**DEFENDANTS' RESPONSE:** Admitted as to Charney's testimony and immaterial. (*See* Defendants' Response to ¶291.)

293. Charney testified that "borderline personality disorder is a disorder ... in psychiatry," that he would use the term only "if I felt I had enough data to make a diagnosis," and that this generally requires assessing the person. (McAllister Decl. Ex. 7 (Charney Tr. 147-48).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Charney's testimony and immaterial. Olivarius is not a plaintiff in this action and Charney's purported comments about a diagnosis are not related to gender.

**F. Sexualized Falsehoods About Women Who Left.**

294. Singh told colleagues that Dr. Holly Atkinson was "doing sex exams" at the Institute and putting it "at risk." Atkinson testified this was "a total falsehood." (McAllister Decl. Ex. 2 (Atkinson Tr. 154).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. Atkinson is not a plaintiff and she testified, "I have no idea what he means by that" in reference to the purported comment about "sex exams." (Dkt. 223.2 (Atkinson Tr. 154-55).)

295. Atkinson learned of the statement from three people to whom Singh had said it directly — Safo, Faghmous and Jonathan Taylor ("Taylor"). (McAllister Decl. Ex. 2 (Atkinson Tr. 179).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. (*See* Defendants' Response to ¶294.)

296. Taylor told Atkinson that Singh made the remark to him in 2018, two years after Atkinson had left Mount Sinai, in the telephone call following Singh's meeting with Olivarius. (McAllister Decl. Ex. 2 (Atkinson Tr. 155, 181).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. (*See* Defendants' Response to ¶294.) The purported statement was made two years after Atkinson resigned from AIGH and is irrelevant.

297. Singh told others after Anandaraja resigned that she had had "inappropriate sexual relations with people during Global Health field trips" and had misspent funds — which she testified were "grossly untrue." (McAllister Decl. Ex. 1 (Anandaraja Tr. 241-42).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. Anandaraja is not a plaintiff and the statement was allegedly made "after Anandaraja resigned" from AIGH. (Dkt. 223.1 (Anandaraja Tr. 241).)

### G. Unwanted Physical Contact and Fear of Physical Harm.

298. When Atkinson started presenting her strategic plan as requested after sending Singh a memo about it, Singh interrupted and told her in a raised voice that she was "not capable" of the work. When she deduced he had not even read the plan, she said "You didn't read what I submitted to you, did you?" He said "I don't have to read it, you're not capable of it." Atkinson, overwhelmed, burst into tears. (McAllister Decl. Ex. 2 (Atkinson Tr. 202, 203).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Atkinson's testimony and immaterial. Atkinson is not a plaintiff and Singh's purported statement that she was "not capable" of the work is not related to gender. (Dkt. 223.2 (Atkinson Tr. 202-03).)

299. Singh then "reached out and he took his left hand and he put it on my left upper thigh, and he looked at me and said, 'Let's do this with empathy.'" Atkinson got up and walked out. (McAllister Decl. Ex. 2 (Atkinson Tr. 203-04).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Atkinson's testimony and immaterial. Atkinson is not a plaintiff and resigned from AIGH more than three years prior to the filing of this litigation.

300. Atkinson sat outside the building sobbing, feeling humiliated, and resolved to leave the Institute. (McAllister Decl. Ex. 2 (Atkinson Tr. 203, 206).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Atkinson's testimony and immaterial. Atkinson is not a plaintiff. Her emotional state and resolution to leave AIGH are irrelevant to Plaintiffs' claims.

301. Asked "were you ever in fear that Dr. Singh would strike you," Safo answered: "I was." (Lupion Decl. Ex. 4 (Safo Tr. 261).)

**DEFENDANTS' RESPONSE:** Disputed. (*See* Defendants' Reply to ¶77 of Defendants' 56.1 Statement.)

302. Colleagues feared Berman would strike Bischoff: he "yelled at Renee so violently that people thought he was going to hit her." (Lupion Decl. Ex. 4 (Safo Tr. 98).)

**DEFENDANTS' RESPONSE:** Admitted as to the content of Safo's testimony but disputed as to materiality. Bischoff is not a plaintiff. The statement comes from Safo who admitted she did not witness or hear the interaction herself. (Dkt. 212.4 (Safo. Tr. 97-98).)

**H. Assignments, Facilities, Leave and Promotion.**

303. Safo testified Singh gave female staff "more menial tasks" and that work "seemed to get assigned to women more than others." (McAllister Decl. Ex. 19 (Safo Tr. 202).)

**DEFENDANTS' RESPONSE:** Disputed. Safo testified that Singh "seemed" to be giving female staff more menial work. (McAllister Decl. Ex. 19 (Safo Tr. 202); *see* Defendants' 56.1 Statement ¶¶53, 54.)

304. Atkinson, a physician, was assigned to type 1,000 email addresses into a database and to photograph new employees. (McAllister Decl. Ex. 2 (Atkinson Tr. 155, 155-56).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Atkinson's testimony and immaterial. Atkinson is not a plaintiff and the allegations pertain to conduct from 2015 and do not concern gender.

305. For a period only men had private offices while women worked in cubicles. (McAllister Decl. Ex. 5 (Bischoff Tr. 125); McAllister Decl. Ex. 2 (Atkinson Tr. 151).) Gelijns confirmed the oversight committee learned this and that it was "a gender disparity issue,

potentially." (McAllister Decl. Ex. 10 (Gelijns Tr. 115, 116).) The investigation found a discrepancy and directed Singh to fix it. (McAllister Decl. Ex. 2 (Atkinson Tr. 151).)

**DEFENDANTS' RESPONSE:** Disputed. Atkinson testified that she was unaware Singh had designated an office to Anandaraja upon AIGH's move to the New York Academy of Medicine in September 2015, when he officially took office. Anandaraja confirmed that Singh had provided her with a designated office in the new space. (Reply Lupion Decl. Ex. 59 (Anandaraja Tr. 37-39); *see also id.* Ex. 66 (Knaup Tr. 194) (Knaup description of office space).)

306. Misiti testified PTO was "extremely difficult" for her to obtain while Silva "could go to Ireland or other places ... and come and go as they pleased," and that there was "general different attitude in which men were able to work remotely and have a lot more freedom than the women." (Lupion Decl. Ex. 6 (Misiti Tr. 156, 164-65).)

**DEFENDANTS' RESPONSE:** Paragraph 306 should be struck as duplicative of ¶185 of Defendants' 56.1 Statement, including footnote 9 thereof.

307. Escosia testified Llames could not work from home while Silva, Berman and her own supervisor Kishore could, and that "the common denominator there was that they were all male and she was the female." (McAllister Decl. Ex. 8 (Escosia Tr. 104-05).)

**DEFENDANTS' RESPONSE:** Paragraph 307 should be struck as duplicative of Plaintiffs' Response to ¶112 of Defendants' 56.1 Statement.

308. Singh approved Llames's PTO and then revoked it. (McAllister Decl. Ex. 17 (Misiti Tr. 191).) He approved her remote-work request, asked for a work plan, received it, and then refused. (Lupion Decl. Ex. 5 (Llames Tr. 82).)

**DEFENDANTS' RESPONSE:** Paragraph 308 should be struck as duplicative of ¶112 of Defendants' 56.1 Statement.

309. Misiti's role expanded to absorb the duties of Walek and Berman with no title or pay increase, while Le was promoted when Faghmous left. (Lupion Decl. Ex. 6 (Misiti Tr. 106).) Singh told her a promotion required a minimum tenure, while Duncan Maru, a man, was placed in a director role without meeting it; Misiti testified "that's one example where I feel it was very gendered." (Lupion Decl. Ex. 6 (Misiti Tr. 88-89).) Misiti complained as to the lack of salary increase or bonus "despite having taken on new responsibilities over the past year" to Jones-Winter. (McAllister Decl. Ex. 68(ISMMS 19692).)

> **DEFENDANTS' RESPONSE:** Paragraph 309 should be struck to the extent it is duplicative of Plaintiffs' Response to ¶153 of Defendants' 56.1 Statement. Disputed that Duncan Maru was placed in the director role. Misiti's testimony on this subject is: "I believe [Duncan] was hired for that role and then he was later promoted." (Dkt. 212.6 (Misiti Tr. 104).) No other evidence exists in the record to corroborate Misiti's mistaken belief. Dr. Rachel Vreeman was hired as the Director of Global Sites. (*See* Defendants' 56.1 Statement ¶ 168.)

310. Anandaraja was demoted and less experienced, less qualified men were brought in above her at higher salaries and more senior titles. (McAllister Decl. Ex. 1 (Anandaraja Tr. 239).) Her education budget was cut by 60 per cent within weeks of Singh becoming Director, though the Arnhold gift was earmarked for global health education. (McAllister Decl. Ex. 1 (Anandaraja Tr. 241).)

> **DEFENDANTS' RESPONSE:** Admitted as to the contents of Anandaraja's testimony and immaterial. Anandaraja is not a plaintiff, and her testimony provides no details of the purported "less qualified men."

311. Safo was hired without a title, told they would "figure it out," and then given "program manager" by Singh yelling it across the room. (Lupion Decl. Ex. 4 (Safo Tr. 71-72,

72).) Her promised salary increase on becoming Chief Medical Officer was "consistently delayed" until an HR colleague intervened to secure it and back pay. (Lupion Decl. Ex. 4 (Safo Tr. 33).)

**DEFENDANTS' RESPONSE:** Paragraph 311 should be struck as duplicative of ¶¶39 and 50 of Defendants' 56.1 Statement, including Plaintiffs' Responses as stated therein.

**I. Compensation.**

312. Singh testified his salary as Director was "around 300,000." (McAllister Decl. Ex. 20 (Singh Tr. 52).)

**DEFENDANTS' RESPONSE:** Admitted. Disputed as to materiality.

313. Bruzelius started at $70,000 with a ceiling of $82,500. (56.1 ¶¶ 193, 221.) Le was hired at $75,000 and moved to $95,000 with an $8,000 bonus within a year "to ensure retention." (56.1 ¶¶ 226-227.) Helfgott was paid $120,000 in a role requiring an undergraduate degree. (56.1 ¶ 235.)

**DEFENDANTS' RESPONSE:** Paragraph 313 should be struck as duplicative of ¶¶193, 221, 222, 226, and 227 of Defendants' 56.1 Statement, as those paragraphs are directly cited therein (note citation to Defendants' 56.1 Statement ¶235 is incorrect). The wording of ¶313 is disputed. None of the referenced paragraphs refer to Bruzelius's salary as a "ceiling" and the testimony does not state that Le's salary "moved to $95,000." It was a retention proposal that Le did not take. (Defendants' 56.1 Statement ¶¶226-27.) Helfgott's role required an undergraduate degree and four or more years of software engineering experience. (Defendants' 56.1 Statement ¶222.)

314. Bruzelius directed the research activities of Mongia and Helfgott while being paid less than both. (Lupion Decl. Ex. 7 (Bruzelius Tr. 125, 126, 56).1 ¶¶ 199-200.) Neither Mongia nor Le held a doctorate. (56.1 ¶¶ 225-226.)

**DEFENDANTS' RESPONSE:** Paragraph 314 should be struck as duplicative of ¶199 of Defendants' 56.1 Statement, including Plaintiffs' Response as stated therein. (*See also* Defendants' 56.1 Statement ¶226.)

315. Weisman testified he did not set Bruzelius's salary, that her banding came from Mount Sinai central, and that when he asked Knaup whether it was the best available, "I think she said, 'This is the best we can do.'" (McAllister Decl. Ex. 24 (Weisman Tr. 170-1, 217-18).)

**DEFENDANTS' RESPONSE:** Admitted.

316. Weisman testified that Helfgott, whose sophistication Defendants call unrebutted, "was not fully utilized" and that "I felt he was underutilized." (Lupion Decl. Ex. 17 (Weisman Tr. 175).)

**DEFENDANTS' RESPONSE:** Paragraph 316 should be struck as duplicative of Plaintiffs' Response to ¶223 of Defendants' 56.1 Statement.

317. Singh denied that any review was conducted to check for pay disparities between men and women. (McAllister Decl. Ex. 20 (Singh Tr. 210-11).) The investigation's own action item directed a review "to ensure ... pay-parity between men and women"; Singh testified he did not recall it being about gender. (McAllister Decl. Ex. 20 (Singh Tr. 299).) On March 1, 2019, Muller wrote Dr. Annetine Gelijns his "thoughts on Prabhjot" which included "[d]istribution, and rationale, of roles, titles, parity in pay." (McAllister Decl. Ex. 69(ISMMS 19863).)

**DEFENDANTS' RESPONSE:** Paragraph 317 is disputed as incomplete, immaterial and without citation to the record. Muller's "thoughts" on Singh is immaterial. The quote "to ensure ... pay-parity between men and women" has no record citation and is not included in any of the documents or transcript cites contained in ¶317. Tiger-Paillex testified that the review was not just about pay parity between men and women, but also "making sure that they get paid based on their experience, their education, their qualifications as well as the job they are doing." (Reply Lupion Decl. Ex. 76 (Tiger-Paillex Tr. 256-57).)

318. Charney testified that he personally did nothing to look into whether women on the project were underpaid compared with men. (McAllister Decl. Ex. 7 (Charney Tr. 117).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. Charney testified that while he did not look into the concern "personally" himself, it was his understanding that it may have been a focus of the investigation. (Dkt. 223.7 (Charney Tr. 117).)

**J. What the Institution Was Told, and What It Did.**

319. Anandaraja repeatedly raised with Muller concerns "about Prabhjot Singh's behavior towards women." (McAllister Decl. Ex. 1 (Anandaraja Tr. 21).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Anandaraja's testimony and immaterial. Anandaraja is not a plaintiff.

320. Anandaraja did not report to HR while employed because she had been told Singh was "Dr. Dennis Charney's golden boy and that any complaints about him would fall on deaf ears." (McAllister Decl. Ex. 1 (Anandaraja Tr. 72).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Anandaraja's testimony and immaterial. Anandaraja is not a plaintiff and stopped working at AIGH in summer 2016. (Dkt. 223.1 (Anandaraja Tr. 20).)

321. Bruzelius complained to ISMMS General Counsel Marina Lowy about Silva's conduct. (Lupion Decl. Ex. 7 (Bruzelius Tr. 151).)

**DEFENDANTS' RESPONSE:** Paragraph 321 should be struck as duplicative of Plaintiffs' Response to ¶220 of Defendants' 56.1 Statement.

322. Bischoff reported Berman's yelling at her to Muller the following day. (McAllister Decl. Ex. 5 (Bischoff Tr. 191-94).) Within a week Berman delivered to her what she took as "a veiled warning" about staying discreet. (McAllister Decl. Ex. 5 (Bischoff Tr. 164-65).)

**DEFENDANTS' RESPONSE:** Admitted as to contents of Bischoff's testimony but disputed as immaterial. Bischoff is not a plaintiff and Berman is not a defendant.

323. Kishore acknowledged that more than one person raised with him that Singh treated women worse than men, and that "the fact that people felt something obviously is concerning." (McAllister Decl. Ex. 11 (Kishore Tr. 68).)

**DEFENDANTS' RESPONSE:** Disputed. Kishore testified, "people would come with concerns about a direction and what they are feeling. It's tough for me to articulate whether there was a complete gender component to that. . . . Q. What did you think, Dr. Kishore? Were women at the institute treated worse than men? A. I don't know how best to answer. There are colleagues like Dr. Safo, who is brilliant and kind, and -- the fact that people felt something obviously is concerning. I -- I think -- I don't know. I don't know. I'd like to think that we created

a supportive environment for -- for everybody at the institute, but it's difficult for me to answer that, Counselor." (Reply Lupion Decl. Ex. 65 (Kishore Tr. 67-68).)

324. Singh was told on April 28, 2018 — before the investigation formally began — of an "investigation" of him relating to "turnover" and "gender discrimination." (Singh Note, ISMMS 021261.)

**DEFENDANTS' RESPONSE:** Admitted that Singh had general knowledge of an investigation. Disputed as immaterial.

325. Singh admitted that after the investigation concluded and before suit was filed he was "aware that there were gender related complaints." (McAllister Decl. Ex. 20 (Singh Tr. 149).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Singh's testimony.

326. Charney learned on Monday April 30, 2018 that a group of women associated with the Institute had been meeting and were unhappy; he testified this was "noteworthy" and that he wanted to "get to the bottom of it immediately, same day." (McAllister Decl. Ex. 7 (Charney Tr. 142).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Charney's testimony.

327. Charney did nothing to establish whether Olivarius's report and the women's complaints concerned the same conduct: "Q. Did you do anything to find out ...? A. n." (McAllister Decl. Ex. 7 (Charney Tr. 143).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. The testimony, as cited in ¶327, is truncated. The full testimony is: "Q. Did you do anything to find out whether the comments from Ann Olivarius were along the same lines of what that group of women were saying or not? A. I didn't. I immediately said to the group

that, you know, we put together, you investigate this and find out what's happening." (Dkt. 223.7 (Charney Tr. 143).)

328. Charney never contacted Olivarius and had no follow-up conversation with Singh about what she had said. (McAllister Decl. Ex. 7 (Charney Tr. 143).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Charney's testimony and immaterial. Whether Charney contact Olivarius or had a follow-up conversation with Singh is irrelevant to the claims at issue in this litigation.

329. Charney never spoke to Mark Kostegan, who heads the development department that had cultivated the prospective donor, or to anyone else in development about Olivarius's exchange with Singh. (McAllister Decl. Ex. 7 (Charney Tr. 146).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Charney's testimony and immaterial. Whether Charney spoke to Kostegan or anyone else about Olivarius is irrelevant to the claims at issue in this litigation.

330. Charney could not identify Jonathan Taylor, the development officer who arranged Singh's introduction to Olivarius, attended their first meeting in England and received Olivarius's report about her meeting in New York with Singh directly after she departed: "That's a name I'm not currently familiar with." (McAllister Decl. Ex. 7 (Charney Tr. 145).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Charney's testimony and immaterial. Charney's inability to identify Taylor is irrelevant to the claims at issue in this litigation.

331. This paragraph is left intentionally blank.

332. Charney received the investigation's recommendations, accepted them, removed Berman and retained Singh with an oversight committee and a coach. (McAllister Decl. Ex. 7 (Charney Tr. 203, 247, 217).)

**DEFENDANTS' RESPONSE:** Admitted but disputed as to materiality. ISMMS's internal investigation is not relevant to Plaintiffs' claims as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

333. On May 5, 2018, during the investigation, Bischoff sent a text message to Safo, writing that Tiger-Paillex, Lowy and Jones-Winter "are taking this investigation very seriously. I think holly cried during her interview and became retraumatized about everything. Caryn [Tiger-Paillex]/Marina [Lowy] found it very compelling. They said it's becoming clear that AI is a misogynistic and sadist place (those are their words)." (McAllister Decl. Ex. 28 (Safo 20367).) A day earlier, Bischoff messaged Anandaraja with a similar message: "they definitely came away thinking that PS [Prabhjot Singh] and his two body guards are misogynistic and sadistic ( these are the words they used)!" (McAllister Decl. Ex. 65 (ISMMS 23543).) At her deposition, Bischoff distanced herself from her own text messages and said she did not recall Lowy or Jones-Winter saying the words: I just could not see either of them using these words today. So I'm confused about why I wrote this. I don't know." (McAllister Decl. Ex. 5(Bischoff Tr. 273).) Lowy denied ever referring to AIGH as a "[m]isogynistic and sadist place." (McAllister Decl. Ex. 15 (Lowy Tr. 93).) Tiger-Paillex testified she never used the terms. (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 207).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of documents and testimony cited in ¶333, and immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

334. The investigation concluded there was no gender discrimination. (McAllister Decl. Ex. 7 (Charney Tr. 219); McAllister Decl. Ex. 10 (Gelijns Tr. 70).) Its own recommendations nevertheless directed the committee to "take steps to ensure the Institute's atmosphere is

improved, particularly as relates to gender issues." (McAllister Decl. Ex. 26 (Jones-Winter Tr. 309).)

**DEFENDANTS' RESPONSE:** Admitted but disputed as to materiality. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

335. An internal email identified as a topic for discussion "[w]hat has been or will be done to get out the word that he was not found to have engaged in either gender or age discrimination." (McAllister Decl. Ex. 9 (Fink Tr. 73).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. Plaintiffs fail to identify the "internal email" and Fink's statement about what has or will be done is irrelevant to the claims at issue in this litigation.

**K. The April 2018 Approach to Olivarius.**

336. Olivarius did not solicit the Institute. Jonathan Taylor of Mount Sinai's development office reached out to her in March 2018. (McAllister Decl. Ex. 18 (Olivarius Tr. 67).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Olivarius' testimony and immaterial. Plaintiffs previously represented to Mag. Judge Willis: "Dr. Olivarius has no personal knowledge as to why the AIGH internal investigation started or the underlying discriminatory conduct at issue in this litigation. Any information she has about the discrimination is privileged since her knowledge on that topic came from her clients." (Dkt. 160 at 2.)

337. Singh's note records that Taylor said he had "landed a meeting with Ann Olivarius," and that Singh and Taylor flew to England for the sole purpose of the 10 April breakfast and "flew back immediately." (Singh Note, ISMMS 021256.)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the notes and immaterial. (*See* Defendants' Response to ¶336.)

338. This paragraph is left intentionally blank.

339. Olivarius conducted diligence before the 26 April meeting, speaking with Atkinson and Anandaraja. (McAllister Decl. Ex. 18 (Olivarius Tr. 90, 118).) She was told ATLAS was "a vaporware. It doesn't exist." (McAllister Decl. Ex. 18 (Olivarius Tr. 107).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Olivarius' testimony and immaterial. Project ATLAS is not relevant as determined by Mag. Judge Willis. (*See* Dkt. 143 at 6-7; *see also* Defendants' Response to ¶336.)

340. On April 26, 2018 Olivarius told Singh that his "behavior here is reprehensible, that you're a misogynist, that you discriminate against women"; that the ATLAS applications were "fraudulent"; and that "you have humiliated a lot of women. That's sex discrimination." (McAllister Decl. Ex. 18 (Olivarius Tr. 120).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. Olivarius's testimony is the only source of the quoted statements and contradicts Plaintiffs' representation to the Court that she had "no personal knowledge as to why the AIGH internal investigation started or the underlying discriminatory conduct at issue in this litigation" and that "[a]ny information she has about the discrimination is privileged since her knowledge on that topic came from her clients." (Dkt. 160 at 2.)

341. Singh's response: "He burst out crying, hard. He grabbed me. I just stood there. I didn't touch him. ... He said, It's true, it's true. Everything I said he confessed to." (McAllister Decl. Ex. 18 (Olivarius Tr. 120).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. (*See* Defendants' Response to ¶340.)

342. Olivarius advised him to resign, apologize, "return the money [he] may have stolen and not pitch up at Harvard." (McAllister Decl. Ex. 18 (Olivarius Tr. 121).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. (*See* Defendants' Response to ¶340.)

343. She told Taylor the substance before the meeting; he "said he would go in and sort it out." (McAllister Decl. Ex. 18 (Olivarius Tr. 117).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Olivarius' testimony and immaterial.

344. Singh telephoned Charney on April 27, 2018 and "gave him the outlines." (Singh Note, ISMMS 021261.)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the document and immaterial.

**L. Silva and the Treatment of Women.**

345. Khan heard Silva say of Safo, in the design room, that she was "unqualified for her job," "too inexperienced" and "generally incompetent," a "control freak," a "bitch" and a "cunt." (Khan Decl. ¶5.)

**DEFENDANTS' RESPONSE:** Admit that Khan's declaration recites those terms and immaterial because Safo admits she never heard them. (*See* Defendants' 56.1 Statement ¶90.)

346. Silva said in the design room, in the presence of Llames and David Rojas Leon, that he would do no work for Safo and would watch her fail. (Khan Decl. ¶6.)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the Khan declaration and immaterial.

347. Throughout 2017 and 2018 Silva implied Llames needed to wear makeup, and when she wore it, implied she was dressing for a sexual occasion. (Khan Decl. ¶9.) Silva denied recalling telling her she looked "slutty" or asking whether she had a date. (Lupion Decl. Ex. 3 (Silva Tr. 293).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the Khan declaration and Silva's testimony. Disputed as to materiality.

348. Silva made lewd comments about Llames's genitals, frequently and in the presence of David Rojas Leon; Llames was visibly upset. (Khan Decl. ¶10.) Silva testified he did not remember saying anything like that. (Lupion Decl. Ex. 3 (Silva Tr. 294).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the Khan declaration and Silva's testimony. Disputed as to materiality and inconsistent with Llames' testimony, who was asked to identify all of the comments underlying her claims.

349. Silva referred to Llames behind her back as a "lazy bitch" and as "crazy" in the design room. (Khan Decl. ¶11.)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the Khan declaration and immaterial. Llames did not testify about Silva making comments behind her back and such comments cannot support a claim of discrimination or harassment if Llames was unaware of them.

350. Silva called Llames a "dyke" frequently, beginning after she mentioned cycling to meet colleagues in Washington for the 2017 USAID presentation. (Khan Decl. ¶11.) Silva admitted making a comment of that kind. (Lupion Decl. Ex. 3 (Silva Tr. 295-96).)

**DEFENDANTS' RESPONSE:** Paragraph 350 should be struck as duplicative of ¶¶131 and 258 of Defendants' 56.1 Statement.

351. During the ATLAS team's work in Senegal with Dimagi, Silva referred to Jessica Long, a woman at a partner organization, as a "dumb crazy bitch," said she was "smelly, needs to learn how to wear deodorant," and said she "needs to wear makeup" — repeatedly, before and after video calls with the partner organization, in the presence of Llames, Kyle Landell and David Rojas Leon. (Khan Decl. ¶14.)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the Khan declaration. Disputed as to materiality because these comments do not concern Plaintiffs and were not alleged to be witnessed by them.

**M. Singh's Treatment of Llames.**

352. Llames was assigned oversight of all ATLAS partnerships in or about October 2017. After she produced a partnership checklist and principles and sent them to Singh and Berman, she was told she was not handling partnerships. (Khan Decl. ¶17.)

**DEFENDANTS' RESPONSE:** Disputed as inconsistent with Llames' testimony and immaterial. Llames testified that she prepared ATLAS workplans, and coordinated meetings with external partners and global health organizations. (Dkt. 212.5 (Llames Tr. 86, 89-90).) She did not testify that she "was assigned oversight of all ATLAS partnerships," that such a role was ever taken away from her, or cite it as an example of discriminatory conduct.

353. Llames was assigned to give ATLAS status updates. After she gave them the task was reassigned to Khan, a man. (Khan Decl. ¶17.)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the Khan declaration and immaterial. Llames did not testify about ATLAS status updates either as part of her role or as an example of discriminatory conduct.

354. Llames was asked to oversee ATLAS budgets; once she began the work she was told it was not her responsibility. (Khan Decl. ¶17.)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the Khan declaration and immaterial. Llames did not testify about overseeing ATLAS budgets or as an example of discriminatory conduct.

355. On several occasions in 2017 and 2018 Singh told Khan of his eagerness to be rid of Llames and of how incompetent he considered her. (Khan Decl. ¶18.)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the Khan declaration and immaterial. There is no indication Llames was aware of what Khan alleges Singh told him.

356. In ATLAS core meetings often Singh became exasperated whenever Llames's name or work arose and skipped the areas she oversaw. (Khan Decl. ¶16.)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the Khan declaration and immaterial. Khan's interpretation of Singh's appearance when Llames' name or work was discussed is irrelevant to the claims at issue in this litigation.

357. Singh excluded Llames from meetings concerning domains she managed, including ATLAS project status and team goals, while her responsibilities were discussed dismissively in her absence. (Khan Decl. ¶16.)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the Khan declaration. Paragraph 357 should be struck to the extent it is duplicative of Plaintiffs' Response to ¶¶ 116 and 117 and Defendants' Reply.

**N. Atkinson's Compensation, Title and Training.**

358. Atkinson was engaged on a five-year contract at a base salary of $150,000. (McAllister Decl. Ex. 2 (Atkinson Tr. 40, 75).) The first two years of that salary were funded by a one-time gift from the Gogel family. (Id. at 40-41.) Dr. Ramon Murphy told Atkinson that once the Gogel gift was spent down, her position would be covered by Mount Sinai. (Id. at 41-42.) Singh reduced Atkinson's salary by 40% to $90,000, "which I think is scandalous that I was paid that little." (McAllister Decl. Ex. 2 (Atkinson Tr. 150).)

**DEFENDANTS' RESPONSE:** Paragraph 358 should be struck as immaterial. Atkinson is not a plaintiff in this lawsuit.

359. Atkinson's title was changed from "Director, Human Rights Program" to "Program Director of Human Rights." She testified: "I had been demoted to the Program Manager of the Human Rights Program. Program Director... I had been director and he changed my title." (McAllister Decl. Ex. 2 (Atkinson Tr. 24-25).) Asked to compare the two titles, she testified that "[a] director title implies more responsibility, is a higher level on the organization, and to go from a director to a program director is essentially demotion, and it would certainly read that way on a CV." (McAllister Decl. Ex. 2 (Atkinson Tr. 248); McAllister Decl. Ex. 64(ISMMS 6878).)

**DEFENDANTS' RESPONSE:** Paragraph 359 should be struck as immaterial. Atkinson is not a plaintiff in this lawsuit.

360. Atkinson was completing a Master of Public Health with tuition paid by Mount Sinai: "I at the time was working on my MPH... My tuition was being covered." (McAllister

Decl. Ex. 2 (Atkinson Tr. 197).) Following the meeting at which her pay was reduced, that funding was withdrawn and she was unable to complete the degree. (Atkinson Decl. ¶6.)

**DEFENDANTS' RESPONSE:** Paragraph 360 should be struck as immaterial. Atkinson is not a plaintiff in this lawsuit.

361. Singh told new AIGH staff, before they had worked with her, that Atkinson was incompetent. (McAllister Decl. Ex. 2 (Atkinson Tr. 153).)

**DEFENDANTS' RESPONSE:** Paragraph 361 should be struck as immaterial. Atkinson is not a plaintiff in this lawsuit.

**O. Discriminatory Treatment of Anandaraja.**

362. Singh denounced the training initiatives Anandaraja had built as worthless, outdated and beyond repair, and at times followed such exchanges with conciliatory emails. (Anandaraja Decl. ¶5.)

**DEFENDANTS' RESPONSE:** Paragraph 362 should be struck as immaterial. Anandaraja is not a plaintiff in this lawsuit. Notably, the statements in ¶362 come from a sworn declaration not her deposition testimony wherein she was asked to identify all discriminatory treatment she experienced.

363. Singh required Anandaraja to produce organizational charts, called each version useless, described her inability to complete the task as a sign of incompetence, and declined to provide an example of what he wanted. (Anandaraja Decl. ¶6.)

**DEFENDANTS' RESPONSE:** Paragraph 363 should be struck as immaterial. Anandaraja is not a plaintiff in this lawsuit. Notably, the statements in ¶363 come from a sworn declaration not her deposition testimony wherein she was asked to identify all discriminatory treatment she experienced.

364. Anandaraja testified that she "was micromanaged and forced to give unduly detailed and tortuous details about my expenditures and my plans and that was not something that men were subjected to at AIGH," and that her "budget for education was cut by 60 percent within a few weeks of Prabhjot assuming directorship." (McAllister Decl. Ex. 1 (Anandaraja Tr. 241).)

**DEFENDANTS' RESPONSE:** Paragraph 364 should be struck as immaterial. Anandaraja is not a plaintiff in this lawsuit.

365. Singh changed Anandaraja's title from "Director of the Global Health Educational Program" to "Program Director for Global Health Education." McAllister Decl. Ex. 64 (ISMMS 6878).) She confirmed that she "went from director to program director," that her salary "did not" change and that her responsibilities "did not" change. (McAllister Decl. Ex. 1 (Anandaraja Tr. 243).) She testified: "I was demoted from my position. I was demoted. I received a demotion, as did other female members of my team." (McAllister Decl. Ex. 1 (Anandaraja Tr. 239).)

**DEFENDANTS' RESPONSE:** Paragraph 365 should be struck as immaterial. Anandaraja is not a plaintiff in this lawsuit.

366. Singh directed Anandaraja to have her work checked by newly hired staff less qualified than she was. She testified that "when I was demoted, men who were less experienced and less qualified than me became my superiors over work streams that I had much more experience and had previously owned." (McAllister Decl. Ex. 1 (Anandaraja Tr. 239).)

**DEFENDANTS' RESPONSE:** Paragraph 366 should be struck as immaterial. Anandaraja is not a plaintiff in this lawsuit and her opinion is irrelevant.

367. After Anandaraja gave notice, Singh "tried to tell me that it was my responsibility to find my replacement and train my replacement before I could leave." (McAllister Decl. Ex.

1 (Anandaraja Tr. 235).) She was then "excluded from workflows that were under my purview," while "the men in AIGH were invited into those workflows, were attending meetings about strategy and education that I was not invited to or excluded from, even though they were areas that I had the background in." (McAllister Decl. Ex. 1 (Anandaraja Tr. 240, 247).) As to the donors, "[a]s soon as he came in, he asked that I be excluded from those meetings, so cutting off my relationships within the institution and my ability to do my work through those relationships," while "men in the organization retained" theirs. (McAllister Decl. Ex. 1 (Anandaraja Tr. 242).)

**DEFENDANTS' RESPONSE:** Paragraph 367 should be struck as immaterial. Anandaraja is not a plaintiff in this lawsuit.

### P. Bruzelius's Pay and Promotion.

368. After Faghmous left, Bruzelius reported directly to Singh and absorbed an expanded role without a raise or promotion. (Lupion Decl. Ex. 7 (Bruzelius Tr. 207).)

**DEFENDANTS' RESPONSE:** Paragraph 368 should be struck as duplicative of ¶199 of Defendants' 56.1 Statement.

369. Before the investigation Singh told Bruzelius he wanted "to raise my position, give me a new title, potentially all the things that go along with that." No promotion followed. (Lupion Decl. Ex. 7 (Bruzelius Tr. 153).)

**DEFENDANTS' RESPONSE:** Paragraph 369 should be struck as duplicative of ¶232 of Defendants' 56.1 Statement.

370. Knaup told Bruzelius she would be shocked by the salaries of the men on her own team, and that she had raised the disparity with Singh, who did not address it because he did not expect Bruzelius to press it. (Bruzelius Decl. ¶7.)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. Knaup denied making any such statement. (Reply Lupion Decl. Ex 66 (Knaup Tr. 111).) Bruzelius, who was deposed for seven hours, did not testify as to any such statement during her deposition. The contents of the Bruzelius declaration cited in paragraph 370 are hearsay.

**Q. The Assignment of Administrative Work.**

371. Singh assigned administrative and secretarial work to women. (Khan Decl. ¶19.)

**DEFENDANTS' RESPONSE:** Paragraph 371 should be struck as duplicative of ¶¶53 and 54 of Defendants' 56.1 Statement, including Plaintiffs' Responses as stated therein.

372. When the Institute was short-staffed, tedious tasks such as stuffing hundreds of envelopes fell to female staff. Khan learned of one such exercise only by walking in on the women doing it, offered to help, and learned that the practice was common — evidence that the "everyone was asked" account is not accurate. (Khan Decl. ¶19.)

**DEFENDANTS' RESPONSE:** Paragraph 372 should be struck as immaterial and duplicative of ¶53, including Plaintiffs' Response as stated therein.

373. In his entire time at the Institute Khan was assigned virtually no administrative task and cannot recall a single one, "not even sending out meeting notes," and observed the same of Aaron Baum, Matt Le, Patrick Doupe, James Faghmous, Mihir Mongia and Craig Helfgott. (Khan Decl. ¶19.)

**DEFENDANTS' RESPONSE:** Paragraph 373 should be struck as immaterial and duplicative of ¶53, including Plaintiffs' Response as stated therein.

**R. Sexual Content and the Culture Among Senior Men.**

374. In a working meeting Singh drew a diagram and said he was "no Georgia O'Keefe," which Misiti understood as indicating that he had drawn a vagina. (Lupion Decl. Ex. 6 (Misiti Tr. 156).)

**DEFENDANTS' RESPONSE:** Paragraph 374 should be struck as duplicative of ¶183, including Plaintiffs' Response as stated therein.

375. Landrigan, a senior physician, was on a speakerphone in Anandaraja's office when he said that he had been in a bad mood but had "just gone to the bathroom and masturbated and now he felt better." Anandaraja was "shocked"; Dr. Ramon Murphy, seeing her reaction, took Landrigan off speaker. (McAllister Decl. Ex. 1 (Anandaraja Tr. 216).)

**DEFENDANTS' RESPONSE:** Paragraph 375 should be struck as immaterial. Landrigan is not a defendant and Anandaraja is not a plaintiff in this litigation. The purported comment is irrelevant to the claims at issue in this litigation.

376. Anandaraja heard senior colleagues refer to women as having "big ovaries," joke about women using their pay to buy handbags, and say of a woman that "she should just get laid and then she wouldn't be so uptight." (McAllister Decl. Ex. 1 (Anandaraja Tr. 214).)

**DEFENDANTS' RESPONSE:** Paragraph 376 should be struck as immaterial. Anandaraja is not a plaintiff and the individuals she cites as making the cited remarks are not defendants in this litigation.

377. After a guest speaker answered a question about rape in the military by saying "what do women expect if they come into the military. Boys will be boys," Landrigan pressed Atkinson not to send the speaker feedback. Atkinson testified: "I think it is sexist on his part. ... And I felt it was sexist and it was inappropriate pressure on me." (McAllister Decl. Ex. 2 (Atkinson Tr. 91, 94).)

**DEFENDANTS' RESPONSE:** Paragraph 377 should be struck as immaterial. Atkinson is not a plaintiff in this litigation and Landrigan is not a defendant.

378. Bruzelius defended her doctoral dissertation on June 1, 2023 and holds a doctorate; she did not hold one during her employment at the Institute, when she held an MPH. (Lupion Decl. Ex. 7 (Bruzelius Tr. 12).)

**DEFENDANTS' RESPONSE:** Admitted. When she defended her dissertation, years after leaving ISMMS, is not material.

379. Jonathan Taylor of Mount Sinai's development office had previously worked in Yale's development office and had had "access to my database at Yale"; Olivarius directed a share of her firm's litigation winnings to Yale to fund scholarships. (McAllister Decl. Ex. 18 (Olivarius Tr. 83-84).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Olivarius' testimony and immaterial. Taylor's purported access to Olivarius's contacts and where she directs her "firm's litigation winnings" is not relevant to the claims at issue in this litigation.

380. Olivarius confirmed at her deposition that the donation under discussion in April 2018 was "in the area of 80 million pounds." (McAllister Decl. Ex. 18 (Olivarius Tr. 84).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Olivarius' testimony and immaterial. The size of the donation "under discussion" is irrelevant to the claims at issue in this litigation.

**S. Singh's Own Compensation and Qualifications.**

381. Singh testified that his salary as Director was "around 300,000." (McAllister Decl. Ex. 20 (Singh Tr. 52).)

**DEFENDANTS' RESPONSE:** Paragraph 381 should be struck as duplicative of ¶312 of Plaintiffs' Additional Statement.

382. Atkinson was paid $90,000 for full-time work, which she described as "scandalous," and Singh installed above her "another layer of middle management ... that was mostly men; so David Berman, Sunny Kishore, James Faghmous" — roles she was neither told of nor given the opportunity to apply for. (McAllister Decl. Ex. 2 (Atkinson Tr. 150).)

**DEFENDANTS' RESPONSE:** Paragraph 382 should be struck as immaterial. Atkinson is not a plaintiff. Her pay and role at AIGH are not relevant to the claims at issue in this litigation.

383. Singh told a prospective donor that on arriving at the Institute "I had to fire a lot of people because they are incompetent and I had strict orders to fire them, and I have done that." (McAllister Decl. Ex. 18 (Olivarius Tr. 78).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Olivarius' testimony and immaterial. Singh's statement that he had to fire people because they were incompetent is not relevant to the claims at issue in this litigation. Olivarius' testimony is also hearsay.

384. Olivarius found Singh "totally believable" and "completely convincing" at their first meeting, testifying: "from what I learned later, I think to myself, wow, was I gullible. But I completely believed him." (McAllister Decl. Ex. 18 (Olivarius Tr. 75, 77).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Olivarius' testimony and immaterial. Olivarius's opinion of Singh is not relevant to the claims at issue in this litigation.

385. Anandaraja did not report Singh's conduct while employed because she had been told he was "Dr. Dennis Charney's golden boy and that any complaints about him would fall on deaf ears." (McAllister Decl. Ex. 1 (Anandaraja Tr. 72).)

**DEFENDANTS' RESPONSE:** Paragraph 385 should be struck as immaterial. Anandaraja is not a plaintiff and her failure to report concerns is not relevant to the claims at issue in this litigation.

**T. The Reports of Discrimination Made to Mount Sinai, in Chronological Order.**

386. At some point in 2015, before July 1, Elena Rahona raised with Caryn Tiger-Paillex her concerns about Singh's stated preference for hires in their twenties and thirties, given her own age (40) and her sexual orientation as a lesbian. (McAllister Decl. Ex. 26 (Jones-Winter Tr. 9596); Ex. JW02 (ISMMS_005841).)

**DEFENDANTS' RESPONSE:** Paragraph 386 should be struck as immaterial. Rahona is not a plaintiff and the concerns she had in 2015 are not relevant to the claims at issue in this litigation.

387. On July 1, 2015, Rahona "formally put her concerns on record" with Jones-Winter — age, orientation and gender, and her fear that a case was being built for her termination or demotion. The outcome, in Jones-Winter's words: "nothing happened on this." (McAllister Decl. Ex. 43 (ISMMS_005841); McAllister Decl. Ex. 26 (Jones-Winter Tr. 88-101).)

**DEFENDANTS' RESPONSE:** Paragraph 387 should be struck as immaterial. Rahona is not a plaintiff and the concerns she had in 2015 are not relevant to the claims at issue in this litigation. Disputed that Rahona raised concerns related to gender. The cited document discusses age and sexual orientation.

388. Between early 2015 and June 30, 2016, Anandaraja raised Singh's "behavior towards women" with Muller several times a month. Muller said he would take it to Charney, and confirmed to her that he had. (McAllister Decl. Ex. 1 (Anandaraja Tr. 19-22).)

**DEFENDANTS' RESPONSE:** Paragraph 388 should be struck as duplicative of ¶319 of Plaintiffs' Additional Statement.

389. During 2015 and 2016, Rahona and other women reported bullying, ostracism and ageism to Landrigan, Ramon Murphy and Muller. The reports were "laughed off" by "all men, none of whom took us seriously." Murphy passed the matter to Holzman and Brodman. (McAllister Decl. Ex. 27 (Rahona Tr. 144-46, 175, 212-15); McAllister Decl. Ex. 1 (Anandaraja Tr. 72).)

**DEFENDANTS' RESPONSE:** Paragraph 389 should be struck as immaterial. None of the plaintiffs reported complaints to ISMMS in 2015 and 2016. Complaints made by Rahona "and other women" of bullying, ostracism and ageism are irrelevant to the claims at issue in this litigation.

390. After Singh's appointment and before her resignation, Atkinson approached Muller about Singh's leadership and reported feeling marginalized. (McAllister Decl. Ex. 16 (Muller Tr. 160-61).)

**DEFENDANTS' RESPONSE:** Paragraph 390 should be struck as immaterial. Atkinson is not a plaintiff in this litigation and Atkinson's report of feeling marginalized is not relevant to the claims at issue in this litigation.

391. On repeated occasions, Safo reported Silva's remarks about colleagues to Singh. Singh protected Silva and told her not to antagonize him. (Lupion Decl. Ex. 4 (Safo Tr. 95, 24143).)

**DEFENDANTS' RESPONSE:** Paragraph 391 should be struck to the extent it is duplicative of ¶93 of Defendants' 56.1 Statement, including Plaintiffs' Response as stated therein. Paragraph 391 is disputed as to the number of "remarks" Safo allegedly made to Singh and the nature of them. She testified that she mentioned to Singh that she had concerns about a "culture of gossiping." Safo was not sure whether she mentioned Silva by name when she spoke to Singh. (Dkt. 212.4 (Safo Tr. 242).)

392. In February 2017, Llames reported to Weisman that Berman had yelled at her and had made Baum cry. No note was made; Weisman thought it was "not nice" but "not illegal"; it was not escalated. (McAllister Decl. Ex. 24 (Weisman Tr. 84).)

**DEFENDANTS' RESPONSE:** Disputed as to date of event, Weisman started in April 2018. (Dkt. 212-17 (Weisman Tr. 10).) Admitted that Llames told Weisman that Berman yelled at her and had made Baum cry, and that Weisman testified he thought the conduct was "not nice" but "not illegal." (*See* Reply Lupion Decl. Ex. 77 (Weisman Tr. 83-84).) Disputed as to the remainder of the statements contained in ¶392, for which there is no record citation.

393. On March 16, 2018, Bischoff emailed Tiger-Paillex: "Another talented female leaving the Arnhold Institute and Mount Sinai." (McAllister Decl. Ex. 46 (ISMMS 10063).)

**DEFENDANTS' RESPONSE:** Admitted.

394. In spring 2018, Bischoff gave Muller, and then Tiger-Paillex, the list of departed employees organized by sex, asking "can you look into this." She made some five to ten such reports to Jones-Winter and Tiger-Paillex over time. (McAllister Decl. Ex. 5 (Bischoff Tr. 23349); McAllister Decl. Ex. 16 (Muller Tr. 179-80).)

**DEFENDANTS' RESPONSE:** Disputed. Bischoff did not testify that she gave the list of departed employees to Muller, nor that she made "five to ten" reports to Tiger-Paillex. The cited deposition pages do not provide support for either statement, which should be struck.

395. In spring 2018, Muller telephoned Tiger-Paillex to relay the concern about departing women. Tiger-Paillex was "unaware" of it and offered exit interviews; none were conducted. (McAllister Decl. Ex. 16 (Muller Tr. 252-54).)

**DEFENDANTS' RESPONSE:** Disputed. Muller testified that he spoke with Tiger-Paillex about "an increasing number of people leaving the institute, many of them women" and that Tiger-Paillex proposed, as one potential next step, conducting exit interviews. (Dkt. 223.16 (Muller Tr. 252-54).) Muller did not testify as to whether those interviews were conducted and there is no other record citation provided.

396. On April 24, 2018, Ramon Murphy told Kevin Starr, the representative for the Arnholds' philanthropy, of "an investigation" into Singh — three days before the complaint was made, and at a time when, according to Mount Sinai, no investigation existed. (McAllister Decl. Ex. 22(Starr Tr. 210); McAllister Decl. Ex. 72 (S024 at S027).)

**DEFENDANTS' RESPONSE:** Paragraph 396 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

397. On April 27, 2018, Atkinson and Anandaraja made their complaint to Jones-Winter, framed from the outset around gender and age and "women over 40." Jones-Winter reported it to Tiger-Paillex that evening and to Lowy, "regardless of whether ... it was a

complaint." (McAllister Decl. Ex. 26 (Jones-Winter Tr. 120-37, 127, 129); McAllister Decl. Ex. 2 (Atkinson Tr. 258-59).)

**DEFENDANTS' RESPONSE:** Admitted and immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

398. On April 30, 2018, Muller told Charney there "may be concern about gender discrimination within the institute," and told him of Singh's trip to England to meet Dr. Olivarius. Charney called the legal department that day and the investigation began the same day. (McAllister Decl. Ex. 16 (Muller Tr. 180, 255-60); McAllister Decl. Ex. 7 (Charney Tr. 51, 149-52).)

**DEFENDANTS' RESPONSE:** Admitted. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

399. On or about April 30, 2018, Bischoff reported her interactions with Singh and his managers to Jones-Winter, off the record. (McAllister Decl. Ex. 26 (Jones-Winter Tr. 179-80).)

**DEFENDANTS' RESPONSE:** Paragraph 399 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

400. Between May and June 2018, at least 19 people came forward during the investigation, of whom 15 were women, according to Mount Sinai's contemporaneous talking points. Bruzelius, Misiti, Llames and Beddoe were among those interviewed. (McAllister Decl. Ex. 2 (Atkinson Tr. 314-15).)

**DEFENDANTS' RESPONSE:** Paragraph 400 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

401. During the investigation, Bruzelius complained to General Counsel Marina Lowy about Silva's denigrating comments. (Lupion Decl. Ex. 7 (Bruzelius Tr. 151).)

**DEFENDANTS' RESPONSE:** Paragraph 401 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

402. On June 5 and 6, 2018, Bruzelius emailed Jones-Winter reporting Singh's post-investigation threats the day after they were made, and reported them also to Lowy and Tiger-Paillex. (Lupion Decl. Ex. 7 (Bruzelius Tr. 247).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Bruzelius's testimony, otherwise ¶402 should be struck as duplicative of ¶236 of Defendants' 56.1 Statement, which is incorporated herein.

403. On June 20, 2018, Beddoe met Charney and on June 23 she sent the "Rubicon" email, warning him about the pending decision on Singh. Nobody was copied. (McAllister Decl. Ex. 3 (Beddoe Tr. 59-61, 125-26).)

**DEFENDANTS' RESPONSE:** Paragraph 403 should be struck as immaterial. Beddoe is not a plaintiff in this litigation. Her sole claim of retaliation, as presented in a separate litigation styled as *Beddoe v. Mount Sinai Health System, Inc.,* No. 22-cv-03080 (S.D.N.Y. filed Apr. 13, 2022), was dismissed at summary judgment. (*Id.*, Dkt. 91.)

404. On February 1, 2019, Humale Khan made an exit complaint to Jones-Winter concerning the falsity of ATLAS representations to funders, the USAID report, and unprotected patient health information. (Khan Decl. ¶21.)

**DEFENDANTS' RESPONSE:** Paragraph 404 should be struck as immaterial. Khan is not a plaintiff in this litigation and Project ATLAS is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 143 at 6-7.)

405. On February 12, 2019, Khan reported directly to Charney, stating "this has been reported to HR"; Weisman's "informal exit interview" email followed the same day and a call on 15 February. (Khan Decl. ¶22.)

**DEFENDANTS' RESPONSE:** Paragraph 405 should be struck as immaterial. Khan is not a plaintiff in this litigation and Project ATLAS is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 43 at 6-7.)

406. In early 2019, Khan reported Singh and ATLAS to Starr, the funder, who then questioned Weisman about ATLAS. (Khan Decl. ¶22.)

**DEFENDANTS' RESPONSE:** Paragraph 406 should be struck as immaterial. Khan is not a plaintiff in this litigation and Project ATLAS is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 143 at 6-7.)

### U. Singh's Own Account of Why He Hired Safo.

407. Singh states that he "insisted" on hiring Safo and describes her as a longtime family friend. (Singh Decl. ¶ 3.)

**DEFENDANTS' RESPONSE:** Admitted.

408. Singh testified that he knew Safo "through my wife" and conceded that Safo was a friend of his wife. (McAllister Decl. Ex. 20 (Singh Tr. 131, 285).) Safo testified that Singh was married to her childhood best friend. (McAllister Decl. Ex. 19 (Safo Tr. 38, 39).)

**DEFENDANTS' RESPONSE:** Admitted.

409. Singh testified that bringing Safo to the Institute "would also be helpful in terms of female, and minority recruitment." (Lupion Decl. Ex. 2 (Singh Tr. 131).)

**DEFENDANTS' RESPONSE:** Admitted.

410. Safo testified that the friendship left her on "uncertain footing" and that "there was always a fear that I had of fully experiencing and kind of acknowledging to myself all the ways in which I was concerned about his character." (Lupion Decl. Ex. 4 (Safo Tr. 195).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the statements.

**V. Misiti's Evidence on Singh's Truthfulness and the Environment.**

411. Misiti testified: "Prabhjot lied very frequently." Asked what about, she answered: "He would lie about the work or misrepresent the work." (McAllister Decl. Ex. 17 (Misiti Tr. 8384).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Misiti's testimony but immaterial.

412. Misiti testified: "There were a lot of techniques that he used to exert coercive control over me and I was very afraid of him. And I had nightmares." (Lupion Decl. Ex. 6 (Misiti Tr. 93).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Misiti's testimony but immaterial.

**W. Safo's Evidence on Charney and the Investigation.**

413. Safo testified that Clarissa Jones-Winter "had made me understand that the Mount Sinai investigation ended the way it did because of Dean Charney," and that Charney was accordingly someone she felt she "should be similarly kind of wary and, again, scared of." (Lupion Decl. Ex. 4 (Safo Tr. 138).)

**DEFENDANTS' RESPONSE:** Paragraph 413 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

414. Safo testified that Singh had made her understand that Charney "understood everything that he did, was very affiliated, was very close to him." (Lupion Decl. Ex. 4 (Safo Tr. 138).)

**DEFENDANTS' RESPONSE:** Paragraph 414 should be struck as immaterial. The testimony concerns the reason why Safo surreptitiously recorded her meeting with Charney. (Reply Lupion Decl. Ex. 73 (Safo Tr. 137-38).)

**X. Admissions by Mount Sinai's General Counsel, Meeting of 17 July 2018.**

415. The following are verbatim extracts from the transcript of the recorded meeting of July 17, 2018 between Marina Lowy and Clarissa Jones-Winter of Mount Sinai and Anandaraja, Atkinson and Rahona.

**DEFENDANTS' RESPONSE:** Paragraph 415 should be struck because it does not recite a fact and is not supported by any record citation.

416. Lowy told the complainants: "None of this is on you. None of this is on you." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 19).)

**DEFENDANTS' RESPONSE:** Paragraph 416 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

417. Lowy said: "I think it is a problem that people didn't know how to trigger the appropriate review process. I think it's a problem that we talked to people who had no idea who Caryn and Clarissa were. They had no idea there was an HR function." (*Id.*)

**DEFENDANTS' RESPONSE:** Paragraph 417 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate. Judge Willis. (*See* Dkt. 135, 200.)

418. Lowy said that Mount Sinai has "such robust complaint mechanisms and the fact that we were not able to communicate that down to all the way is, that is a failure." (*Id.*)

**DEFENDANTS' RESPONSE:** Paragraph 418 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

419. Lowy said: "it's unfortunate that ... it took so long to come forward, and again, this is not on you. This is, in that respect, maybe, you know, it is on us, that -- not me, but Mount Sinai, that people didn't know or didn't feel comfortable going to the right place to trigger an investigation." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 33-34).)

**DEFENDANTS' RESPONSE:** Paragraph 419 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

420. Lowy said: "we are not arguing with people's perceptions of behavior, his demeanor. You know, clearly there's something about his demeanor that rubs people the wrong way. Um, and that makes people feel that there's a gender bias issue going on and that has to be addressed ... another aspect of this was compensation issues." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 9-10).)

**DEFENDANTS' RESPONSE:** Paragraph 420 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

421. Lowy told the complainants: "the things that you guys described, very articulately, and very, very You know, you weren't outliers in your descriptions of the way he spoke to people." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 12-13).)

**DEFENDANTS' RESPONSE:** Paragraph 421 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

422. Lowy said: "you know what only women have, um, cubicles. And they don't have offices and you know what, he went and he fixed it." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 12).)

**DEFENDANTS' RESPONSE:** Paragraph 422 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

423. Lowy said, of what the Dean required of Singh: "You have to fix every aspect of all the issues that have been raised. And there were a lot of issues that were raised, including, ah, including the perception of bias." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 15).)

**DEFENDANTS' RESPONSE:** Paragraph 423 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

424. Lowy said: "the reality is they're not a startup, they're an Institute in an established academic medical center ... They have to apply the HR policies uniformly across the board. We have policies on everything and they just have to apply them and follow them. You don't get to pick and choose and you don't get to pick and choose fancy titles." She qualified herself as to recruitment: "not that they didn't follow the rule." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 17).)

**DEFENDANTS' RESPONSE:** Paragraph 424 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

425. Anandaraja said that "[t]he people that he had hired had left in droves." Lowy replied: "That is a red flag for sure." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 37).)

**DEFENDANTS' RESPONSE:** Paragraph 425 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

426. Lowy said it would have been ideal to have "some sort of trigger for HR when there's a high turnover in a place," that "we're just not there yet from an IT perspective," and that "employee flight is always a sign of something going awry." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 41).)

**DEFENDANTS' RESPONSE:** Paragraph 426 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

427. Lowy said: "people complained a lot about the power he wielded and the control he had." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 42).)

**DEFENDANTS' RESPONSE:** Paragraph 427 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

428. Jones-Winter said of Singh that he is "literally in a box that no one else has." Lowy replied: "he's very lucky, for, he's for sure." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 38).)

**DEFENDANTS' RESPONSE:** Paragraph 428 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

429. Lowy said: "people thought Prabhjot was very smart, he's very connected, had a lot of potential, it's up to him, whether he can, you know, reach that potential." Atkinson: "We had a lot of potential too." Lowy: "there's nothing I can say to, to make that better or to change what happened. I mean, um, and I can't, we can't undo those events. Um, and I'm sorry for that." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 43-44).)

**DEFENDANTS' RESPONSE:** Paragraph 429 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

430. Lowy said, of senior staff who received reports, that they "can't just be a sounding board to people, but they have to try to do something about stuff that's reported up." (McAllister Decl. Ex. 55 (Safo_004475, at Tr. 3-4).)

**DEFENDANTS' RESPONSE:** Paragraph 430 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

**Y. Atkinson's Gendered Proposals, and Their Refusal.**

431. Singh told Atkinson in July 2015 that to keep her post she had to show she was relevant to the Institute's work and could integrate human rights across its projects. (Atkinson Decl. ¶5.)

**DEFENDANTS' RESPONSE:** Paragraph 431 should be struck as immaterial. Atkinson is not a plaintiff in this litigation. Notably, the statements in ¶431 come

from a sworn declaration not her deposition testimony wherein she was asked to identify all discriminatory treatment she experienced.

432. Atkinson proposed incorporating gendered data into the Institute's big-data work to address the gender gap in health data. Singh was not interested. (Atkinson Decl. ¶ 5.)

**DEFENDANTS' RESPONSE:** Paragraph 432 should be struck as immaterial. Atkinson is not a plaintiff in this litigation. Notably, the statements in ¶432 come from a sworn declaration not her deposition testimony wherein she was asked to identify all discriminatory treatment she experienced.

433. Dr. Singh was dismissive of Atkinson, "whom he often tried to frame as being incompetent although her work and accomplishments clearly showed otherwise. (Faghmous Decl. ¶21.)

**DEFENDANTS' RESPONSE:** Paragraph 433 should be struck as immaterial. Atkinson is not a plaintiff in this litigation and Faghmous's opinion of Atkinson's accomplishments is irrelevant.

**Z. The Arnhold Gift and What Became of It.**

434. The Arnhold Foundation gave $12.5 million to establish the Institute, before Singh was hired. (Lupion Decl. Ex. 1 (Charney Tr. 71-72).)

**DEFENDANTS' RESPONSE:** Paragraph 434 should be struck as duplicative of ¶12 of Defendants' 56.1 Statement.

435. Anandaraja and Atkinson described the flagship project as "a vaporware" that "doesn't exist." (McAllister Decl. Ex. 18 (Olivarius Tr. 107, 111).)

**DEFENDANTS' RESPONSE:** Paragraph 435 should be struck as immaterial. Project ATLAS is not relevant as determined by Magistrate Judge Willis (*see* Dkt.

143 at 6-7) and Anandaraja's and Atkinson's opinion of the project, as testified to by Olivarius, is irrelevant to the claims at issue.

436. Anandaraja's education budget was cut by 60 per cent within weeks of Singh assuming the directorship, though the Arnhold gift was earmarked for global health education. (McAllister Decl. Ex. 1 (Anandaraja Tr. 241).)

**DEFENDANTS' RESPONSE:** Paragraph 436 should be struck as duplicative of ¶364. (*See* Defendants' Response to ¶364.)

**AA. Mount Sinai's Policies, and Its Admissions About the Language Used.**

437. Mount Sinai's Rule 30(b)(6) designee testified that her testimony was binding on the institution. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 8-9).)

**DEFENDANTS' RESPONSE:** Admitted and immaterial.

438. Asked whether Mount Sinai "would consider 'bitch' when directed at a woman to be an offensive remark," the designee answered "Yes"; asked "What about 'cunt'?" she answered: "That would also be considered offensive." (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 194).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony.

439. Offensive remarks are an example of "mistreatment" under Mount Sinai's policy. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 193, 194).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony.

440. The prohibition on offensive remarks related to gender was in force from 2014 to 2019, in addition to after 2019. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 195-96, 196).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony.

441. Each Plaintiff was protected by that policy. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 197).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony.

442. Mount Sinai's Code of Conduct provides that "[d]egrading or humiliating jokes, slurs, intimidation or other harassing conduct is not acceptable," and the designee confirmed such conduct, if made in the workplace, constitutes a violation of the policy. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 220, 222).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony.

443. Every Mount Sinai employee has a responsibility to report any activity that appears to violate the Code of Conduct, including degrading or humiliating jokes, slurs, intimidation or other harassing conduct. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 223).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony.

444. Failure to report is a disciplinary matter. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 224).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony.

445. Asked whether any of the individuals identified had been found in breach of the obligation to report under the Code of Conduct, the designee answered: "No." (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 225); McAllister Decl. Ex. 61(ISMMS 317).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony.

446. Mount Sinai's anti-discrimination and anti-harassment policies applied to Singh and "would apply to all of his conduct and everybody else's." (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 269).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony.

447. Mount Sinai's designee testified that gaslighting could be covered by its policies, and that any action treating individuals differently because of gender could violate them. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 211, 214, 226).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony.

448. No complaint about Silva ever reached Mount Sinai's Human Resources function, its labor relations function, or any mandatory reporter. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 30-31).)

**DEFENDANTS' RESPONSE:** Paragraph 448 should be struck as immaterial. The only complaint concerning Silva was purportedly made by Bruzelius during the privileged internal investigation which Magistrate Judge Willis determined is not relevant to the claims and defenses at issue in this litigation. (*See* Dkt. 135, 200).

449. Knaup, the Institute's Chief Operating Officer, testified that she recalled Silva using the word "bitch," that she "d[id]n't think it was a singular event," but that it "wasn't every time I saw him." (McAllister Decl. Ex. 13 (Knaup Tr. 246, 247).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony.

450. Tiger-Paillex testified that she never learned of allegations that Silva habitually used gender-specific profanity, and that calling a colleague "bitch" "would be unprofessional, so it wouldn't be acceptable" and was not tolerated. (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 216, 217).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony but disputed as immaterial.

**BB. Berman's Conduct, and How It Was Handled.**

451. Muller was asked whether Bischoff reported to him being yelled at by Berman, and answered: "If I say — I use the term 'berated' instead of 'yelled at,' then yes." Asked the distinction, he said: "I don't know. Volume." (McAllister Decl. Ex. 16 (Muller Tr. 244).)

**DEFENDANTS' RESPONSE:** Admitted.

452. Knaup was asked whether she ever heard Berman yell at staff at the Institute and answered: "He yelled at me." Asked whether he yelled at anybody else, she answered: "I didn't notice, no." (McAllister Decl. Ex. 13 (Knaup Tr. 260).)

**DEFENDANTS' RESPONSE:** Admitted.

453. Knaup recalled Bischoff returning to their shared office upset after a disagreement with Berman. (McAllister Decl. Ex. 13 (Knaup Tr. 265).)

**DEFENDANTS' RESPONSE:** Admitted.

454. Knaup did not report Bischoff's upset to Singh or to human resources, and never told Berman not to yell at people. (McAllister Decl. Ex. 13 (Knaup Tr. 267).)

**DEFENDANTS' RESPONSE:** Admitted.

455. Knaup kept no log of complaints received from Institute staff. (McAllister Decl. Ex. 13 (Knaup Tr. 266).)

**DEFENDANTS' RESPONSE:** Admitted.

456. Knaup had worked with Berman at Columbia University. She testified that "[o]ur boss once came into my office and said that there was a complaint against David, that a graduate student claimed that he had offered her a job if they went out on a date." (McAllister Decl. Ex. 13 (Knaup Tr. 134-35).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Knaup's testimony and immaterial. A complaint made against Berman at another institution and 10 years prior to working at AIGH is not relevant to the claims at issue in this litigation.

457. Columbia terminated Berman. (McAllister Decl. Ex. 13 (Knaup Tr. 135-36).)

**DEFENDANTS' RESPONSE:** Paragraph 457 should be struck as immaterial. Berman's employment at Columbia is not relevant to the claims at issue in this litigation.

458. Knaup recommended Berman to Singh. Asked whether she told Singh of the Columbia complaint, she answered: "No." (McAllister Decl. Ex. 13 (Knaup Tr. 136).)

**DEFENDANTS' RESPONSE:** Admitted and immaterial.

459. Knaup never told anyone at Mount Sinai about the Columbia complaint. (McAllister Decl. Ex. 13 (Knaup Tr. 144).)

**DEFENDANTS' RESPONSE:** Admitted and immaterial. Whether or not Knaup discussed the terms upon which Berman left his prior employer is immaterial to the claims at issue in this litigation.

460. Knaup accepted that it would not be appropriate for a leader at an institution to offer a job to a student on condition that the student go on a date. (McAllister Decl. Ex. 13 (Knaup Tr. 143).)

**DEFENDANTS' RESPONSE:** Disputed as to the characterization "Knaup accepted." Paragraph 460 should be struck as immaterial. The premise in the question posed to Knaup is not applicable to ISMMS and therefore immaterial to the claims at issue in this litigation.

461. Tiger-Paillex testified of Berman: "He was not a good manager." (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 218).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. Tiger-Paillex testified "[h]e was not a good manager" in response to being asked what she had heard about him. (Dkt. 223.23 (Tiger-Paillex Tr. 218).)

462. Mount Sinai's designee testified that a concern was raised that Berman had yelled at Llames and at Baum; that it was reported to Weisman; that "Dr. Weisman did not further report that"; and that there was no subsequent report. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 3536).)

**DEFENDANTS' RESPONSE:** Admitted.

463. Mount Sinai holds no records relating to that complaint: its designee said "[a]s far as I know, it was never written down." (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 34).)

**DEFENDANTS' RESPONSE:** Admitted.

464. Weisman explained why he did not treat Llames's report as discrimination: "Because it was both her and a male staff member, it was a report of bad behavior, but not of discrimination ... if it had been just Ms. Llames or if it had been three people with some other characteristic, I would have considered it discrimination. But because it was someone yelling at people and didn't have any specific gender or ethnic or other association, no." (McAllister Decl. Ex. 24 (Weisman Tr. 92).)

**DEFENDANTS' RESPONSE:** Admitted.

465. Weisman had been trained that "as a manager, if you had a staff person who was reporting discrimination to you, that there was a chain to follow." (McAllister Decl. Ex. 24 (Weisman Tr. 91).)

**DEFENDANTS' RESPONSE:** Admitted.

466. Asked whether he reported what Llames told him, Weisman answered "I may have. I honestly don't remember," and "I don't recall." (McAllister Decl. Ex. 24 (Weisman Tr. 86, 88).)

**DEFENDANTS' RESPONSE:** Admitted.

467. Weisman testified that use of the word "cunt" about a female colleague would be offensive and "could be, absolutely" contributory to a hostile environment. (McAllister Decl. Ex. 24 (Weisman Tr. 113, 114).)

**DEFENDANTS' RESPONSE:** The testimony does not appear on the cited pages otherwise admitted. Weisman's opinion as to the law is immaterial.

468. Singh entered the room while Berman was shouting at Caliendo and "just shut the door." (McAllister Decl. Ex. 17 (Misiti Tr. 184).)

**DEFENDANTS' RESPONSE:** Admitted.

**CC. Accounts of Charney's Manner.**

469. Dr. Philip Landrigan was Chair of the Department of Preventive Medicine and a professor of preventive medicine and of pediatrics. (Lupion Decl. Ex. 8 (Landrigan Tr. 15).)

**DEFENDANTS' RESPONSE:** Paragraph 469 should be struck to the extent it is duplicative of ¶11 of Defendants' 56.1 Statement, otherwise admitted.

470. Charney appointed Landrigan Dean for Global Health in 2010; he held the title until his employment at Mount Sinai ended in 2018. (McAllister Decl. Ex. 12 (Landrigan Tr. 16, 85).)

**DEFENDANTS' RESPONSE:** Paragraph 470 should be struck to the extent it is duplicative of ¶11 of Defendants' 56.1 Statement, otherwise admitted.

471. Charney was Landrigan's direct supervisor, and they met "almost every week." (McAllister Decl. Ex. 12 (Landrigan Tr. 64).)

**DEFENDANTS' RESPONSE:** Paragraph 471 should be struck as immaterial. Landrigan is not a defendant and the frequency with which he met with Charney is irrelevant to the claims at issue in this litigation.

472. Asked whether he recalled Charney "ever losing temper," Landrigan answered: "He lost his temper all the time. That was his operating style." He described "a big man with enormous shoulders" who "would lean forward across the table and — and be visibly angry." (McAllister Decl. Ex. 12 (Landrigan Tr. 137).)

**DEFENDANTS' RESPONSE:** Admitted but disputed as to materiality. None of the Plaintiffs testified that Charney lost his temper with them.

473. Asked what visible signs of anger Charney displayed, Landrigan answered: "Loud voice, red face," and confirmed that he banged the table. (McAllister Decl. Ex. 12 (Landrigan Tr. 137-38).)

**DEFENDANTS' RESPONSE:** Admitted but disputed as to materiality. None of the Plaintiffs testified they experienced "visible signs of anger" from Charney.

474. Landrigan witnessed Charney direct anger at people other than himself and did not intervene, because "[i]t was his style." (McAllister Decl. Ex. 12 (Landrigan Tr. 138).)

**DEFENDANTS' RESPONSE:** Disputed. Landrigan did not testify that he didn't intervene because it was Charney's style. Landrigan testified, "[t]hat that was his usual way of -- of conducting conversations when he disagreed with a person" and "[h]e got angry at me a few times and banged on the table." (Dkt. 223.12 (Landrigan Tr. 138-39).)

475. Asked how frequently Charney conducted conversations in that manner, Landrigan answered "Frequently," and, pressed, "Weekly or monthly." (McAllister Decl. Ex. 12 (Landrigan Tr. 139).)

**DEFENDANTS' RESPONSE:** Disputed as to the characterization "pressed" otherwise admitted and immaterial because no Plaintiffs testified Charney directed anger at them.

476. Landrigan testified that Charney "could be" degrading when angry. (McAllister Decl. Ex. 12 (Landrigan Tr. 140).)

**DEFENDANTS' RESPONSE:** Admitted but disputed as to materiality. None of the Plaintiffs testified that Charney was degrading toward them.

477. Asked whether he ever considered it his duty to make a formal complaint to Human Resources about Charney's angry episodes, Landrigan answered "No," because "I didn't feel that it rose to that level." (McAllister Decl. Ex. 12 (Landrigan Tr. 142).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony.

478. Asked to explain that threshold, Landrigan said: "I'd probably say it's like Justice Potter. You know it when you see it, and we didn't get there." (McAllister Decl. Ex. 12 (Landrigan Tr. 143).)

**DEFENDANTS' RESPONSE:** Admitted.

479. The one complaint Landrigan recalled receiving about Charney came from a man, Dr. David Savitz. Landrigan told him "to let it roll off his back," and Dr. Savitz "laughed. He thought it was funny." (McAllister Decl. Ex. 12 (Landrigan Tr. 141, 142).)

**DEFENDANTS' RESPONSE:** Admitted. Landrigan testified that the only person who came to him with a complaint about Charney was Dr. David Savitz and that Landrigan did not report the concern because Savitz laughed about the episode and found Charney's anger amusing. (Dkt. 223.12 (Landrigan Tr. 141-42).).

480. Rahona described a fear of Charney's "abusive tendencies." (McAllister Decl. Ex. 27 (Rahona Tr. 219).)

**DEFENDANTS' RESPONSE:** Admitted as to the content of the testimony, disputed as to materiality. Rahona, who is not a plaintiff in this litigation, stated she "heard stories" about a maintenance worker who was fired after he made a

comment to Charney. (Reply Lupion Decl. Ex. 72 (Rahona Tr. 219-20).) Rahona could not provide any other details.

481. Kishore could not recall anyone telling him that Charney yelled, or seeing him angry. (McAllister Decl. Ex. 11 (Kishore Tr. 99).)

**DEFENDANTS' RESPONSE:** Admitted.

482. Lowy testified that she had never heard Charney scream at people in meetings and that nobody had complained to her that he had; that no investigation was ever conducted into his conduct; and that no grievance-board complaints had been made against him. (McAllister Decl. Ex. 15 (Lowy Tr. 255, 256, 260, 271).)

**DEFENDANTS' RESPONSE:** Admitted.

**DD. The 2014 Director Search and the Candidacy of Dr. Steffanie Strathdee.**

483. Dr. Steffanie Strathdee ("Strathdee") of the University of California, San Diego was a candidate for the directorship of the Institute. (McAllister Decl. Ex. 12 (Landrigan Tr. 91).)

**DEFENDANTS' RESPONSE:** Paragraph 483 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

484. Landrigan, as chair of the search committee, considered Strathdee "a very strong candidate" and a suitable candidate for the job. (McAllister Decl. Ex. 12 (Landrigan Tr. 103).)

**DEFENDANTS' RESPONSE:** Paragraph 484 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

485. Ramon Murphy was "very positively impressed by her." (McAllister Decl. Ex. 12 (Landrigan Tr. 105-06).)

**DEFENDANTS' RESPONSE:** Paragraph 485 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

486. Landrigan presented Strathdee's file to Charney and informed him that he and the committee considered her a leading candidate. (McAllister Decl. Ex. 12 (Landrigan Tr. 103-04).)

**DEFENDANTS' RESPONSE:** Paragraph 486 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

487. Charney agreed that Strathdee was a leading candidate, and she was invited back for a second visit primarily to meet him. (McAllister Decl. Ex. 12 (Landrigan Tr. 107).)

**DEFENDANTS' RESPONSE:** Paragraph 487 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

488. The purpose of the second visit was for Strathdee and Charney to negotiate the terms of her appointment; Landrigan was not involved and it was "a direct negotiation between her and the dean." (McAllister Decl. Ex. 12 (Landrigan Tr. 108).)

**DEFENDANTS' RESPONSE:** Paragraph 488 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

489. Strathdee had served as principal investigator on grants totaling some $40 million over 15 years. Asked whether that was impressive, Landrigan answered: "Oh, yes, very much so," and described it as "a very impressive performance that's in the right range" for an institute director. (McAllister Decl. Ex. 12 (Landrigan Tr. 122-23).)

**DEFENDANTS' RESPONSE:** Paragraph 489 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

490. Strathdee proposed recruiting three new faculty at roughly $200,000 each, so that "the annual salaries plus my own would total 1 million." (McAllister Decl. Ex. 12 (Landrigan Tr. 121).)

**DEFENDANTS' RESPONSE:** Paragraph 490 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

491. On September 25, 2014 Landrigan wrote to Strathdee: "I think we are very close to getting to 'yes.'" (McAllister Decl. Ex. 12 (Landrigan Tr. 123-24).)

**DEFENDANTS' RESPONSE:** Paragraph 491 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

492. Charney extended a term sheet to Strathdee. A term sheet is the penultimate stage of a negotiation, preceding the formal offer letter. (McAllister Decl. Ex. 12 (Landrigan Tr. 12829).)

**DEFENDANTS' RESPONSE:** Paragraph 492 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

493. On October 14, 2014 Strathdee responded to the term sheet: "Ultimately, there are too little resources to grow stellar program without cutting beyond the bone, given the current rate of expenditures." (McAllister Decl. Ex. 12 (Landrigan Tr. 129); ISMMS_000736-737.)

**DEFENDANTS' RESPONSE:** Paragraph 493 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

494. Charney responded on October 15, 2014 that "an offer of $6 million, an endowed chair, plus the Arnhold endowment and a commitment to additional fundraising, and membership on our newly formed International Advisory Board, is a strong one." (McAllister Decl. Ex. 12 (Landrigan Tr. 130).)

**DEFENDANTS' RESPONSE:** Paragraph 494 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

495. Asked whether Strathdee's request was unreasonable, Landrigan answered: "I would not consider it unreasonable. She wanted to build a world-class institute, and she was basically asking for the resources to do that." (McAllister Decl. Ex. 12 (Landrigan Tr. 131).)

**DEFENDANTS' RESPONSE:** Paragraph 495 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

496. Landrigan did not recall trying to persuade Charney to release further resources to meet Strathdee's request. (McAllister Decl. Ex. 12 (Landrigan Tr. 131).)

**DEFENDANTS' RESPONSE:** Paragraph 496 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

497. Rahona testified: "I recall very specifically one in which Ramon came into my office very upset, and he said, I need to show you something. And he logged into his email and showed me an email from Dennis Charney to Steffanie Strathdee calling her an idiot." Asked

whether the word "idiot" was in the email, written out, she answered "Yes," and confirmed she saw it. (McAllister Decl. Ex. 27 (Rahona Tr. 107).)

**DEFENDANTS' RESPONSE:** Paragraph 497 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

498. Rahona testified that Charney "was responding in all caps red to Steffanie," and that the word "idiot" was in red font. (McAllister Decl. Ex. 27 (Rahona Tr. 109).)

**DEFENDANTS' RESPONSE:** Paragraph 498 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

499. Rahona placed the email as being sent in about October 2014 and recalled other correspondence from Charney to Strathdee in which "Charney was using red all-capped fonts...to bully her." (McAllister Decl. Ex. 27 (Rahona Tr. 108, 110).)

**DEFENDANTS' RESPONSE:** Paragraph 499 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

500. Anandaraja also knew of the email. (McAllister Decl. Ex. 27 (Rahona Tr. 108).)

**DEFENDANTS' RESPONSE:** Paragraph 500 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

501. The email has not been produced in this litigation. (McAllister Decl. Ex. 27 (Rahona Tr. 113-14).)

**DEFENDANTS' RESPONSE:** Paragraph 501 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated

Singh's hire as well as the employment of all four Plaintiffs at AIGH. Paragraph 501 should also be struck because the cited statements are from counsel, not the witness, and assumes the document exists.

502. Atkinson testified: "I was told by Elena Rahona that she had seen an e-mail that Charney had sent to Strathdee that called her an idiot ... We knew that. We knew that before these events. We knew that in late 2014." (McAllister Decl. Ex. 2 (Atkinson Tr. 217).)

**DEFENDANTS' RESPONSE:** Paragraph 502 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

503. Atkinson testified: "I think that there was gender bias in his rejection of Stephanie Strathdee. I do not believe he would have put a woman with the same thin CV that Dr. Singh had in the position of directorship." (McAllister Decl. Ex. 2 (Atkinson Tr. 219).)

**DEFENDANTS' RESPONSE:** Paragraph 503 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH. Atkinson's opinion is also immaterial.

504. Rahona testified that Singh's name began to be discussed "right after Steffanie Strathdee had withdrawn her candidacy," in about October or November 2014. (McAllister Decl. Ex. 27 (Rahona Tr. 75).)

**DEFENDANTS' RESPONSE:** Paragraph 504 should be struck as immaterial. When "Singh's name began to be discussed" is irrelevant to Plaintiffs' claims in this litigation.

505. Rahona assisted Strathdee with the budget she presented to Charney; no other candidate reached the stage of presenting a budget. (McAllister Decl. Ex. 27 (Rahona Tr. 84-85).)

**DEFENDANTS' RESPONSE:** Paragraph 505 should be struck as immaterial. Strathdee is not a plaintiff, and her application for the Director role predated Singh's hire as well as the employment of all four Plaintiffs at AIGH.

**EE. Singh's Credentials, and the Terms on Which He Was Appointed.**

506. Landrigan testified: "I gave Dennis Charney a very heavily caveated endorsement of Prabhjot Singh ... I said that he was inexperienced, young, 33 years of age, very limited leadership ability. No record of having obtained federal grants, but outside of that, very bright." (Lupion Decl. Ex. 8 (Landrigan Tr. 210).)

**DEFENDANTS' RESPONSE:** Admitted.

507. The search committee had concerns about Singh's lack of leadership experience and lack of research experience, and "did not see Dr. Singh as having a high potential to increase scholarship within our global health group." (McAllister Decl. Ex. 12 (Landrigan Tr. 223); McAllister Decl. Ex. 62 (ISMMS 746).)

**DEFENDANTS' RESPONSE:** Admitted. (*See also* Defendants' 56.1 Statement ¶¶18, 19.)

508. Landrigan testified that Singh's publication record was "a bit thin" for his appointment as associate professor and could not recall any other professor in his department appointed on a comparable publication record. (McAllister Decl. Ex. 12 (Landrigan Tr. 294-95).)

**DEFENDANTS' RESPONSE:** Admitted. Disputed as to materiality.

509. Muller wrote to Charney on January 13, 2015: "I interviewed Prabhjot Singh this week for the global health position and liked him. There is some risk given how junior he is and how little leadership experience he's had, but he seems quite capable and might turn out to be great." He confirmed writing it and that it accurately reflected his views. (McAllister Decl. Ex. 16 (Muller Tr. 67); ISMMS_005161.)

**DEFENDANTS' RESPONSE:** Admitted.

510. Muller testified: "He had not to that point run a department, been chair of a department, or been single-handedly an institute director in something that was comparable to what was being designed here. So he didn't have that going for him." (McAllister Decl. Ex. 16 (Muller Tr. 64-65).)

**DEFENDANTS' RESPONSE:** Admitted.

511. In February 2018 Muller wrote: "My interactions with Prabhjot have been nothing less than toxic. I am not an objective source of info when it comes to him, and I can't swear that someone with the right skill set wouldn't thrive in the environment he's created." He confirmed writing it. (McAllister Decl. Ex. 16 (Muller Tr. 246).)

**DEFENDANTS' RESPONSE:** Admitted.

512. Singh was paid "around $300,000" as Director. (McAllister Decl. Ex. 20 (Singh Tr. 52).)

**DEFENDANTS' RESPONSE:** Paragraph 512 should be struck as duplicative of ¶¶312 and 381 of Plaintiffs' Additional Statement.

513. Mount Sinai's designee did not know whether Singh's compensation changed during the relevant period. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 167).)

**DEFENDANTS' RESPONSE:** Admitted. Disputed as to materiality.

514. Mount Sinai's position is that Singh met the criteria for associate professor in the research track, and that Safo did not meet the same criteria and was appointed assistant professor. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 179-80).)

> **DEFENDANTS' RESPONSE:** Admitted. The full testimony confirmed that Mount Sinai's "promotion and tenure committee" determined the appropriate faculty appointment for both Singh and Safo, irrespective of what was recommended with each application. (Dkt. 223.25 (ISMMS 30(b)(6) Tr. 179-80).)

**FF. The Arnhold Gifts, and the Donors' Intervention in 2018.**

515. The Arnhold Foundation and the Mulago Foundation made an irrevocable gift of $12,500,000 to Mount Sinai to create the Institute, payable in instalments to June 30, 2017. (Arnhold Institute Gift Agreement (executed).)

> **DEFENDANTS' RESPONSE:** Paragraph 515 should be struck as duplicative of ¶12 of Defendants' 56.1 Statement and because no record cite was provided.

516. A second executed gift agreement dated December 30, 2015 provided a further $15,000,000 over three equal annual instalments to support the Institute's new strategic plan. (McAllister Decl. Ex. 63 (ISMMS_005472).)

> **DEFENDANTS' RESPONSE:** Disputed. The cited document does not support ¶ 516.

517. Starr received no annual report and no regular reporting on the Institute: "again, if this were sort of a normal grant of Mulago, I would have a team assigned to it, and there would be a regular reporting structure, but there was not for this." (McAllister Decl. Ex. 22 (Starr Tr. 5152).)

**DEFENDANTS' RESPONSE:** Paragraph 517 should be struck as immaterial. Whether or not Starr received reporting about AIGH is irrelevant to the claims at issue in this litigation.

518. Asked whether he had negative views about Singh's performance, Starr answered: "Sure. It wasn't perfect... I don't think Atlas AI worked out." (McAllister Decl. Ex. 22 (Starr Tr. 77).)

**DEFENDANTS' RESPONSE:** Paragraph 518 should be struck. Project ATLAS is not relevant as determined by Magistrate Judge Willis (*see* Dkt. 143 at 6-7) and Starr's opinion of Singh's performance is immaterial.

519. Starr testified that ATLAS "seemed like it took a lot of the bandwidth of the institute at the time," and that he "never really fully understood how the technology would work or how it would be applied." (McAllister Decl. Ex. 22 (Starr Tr. 65-66).)

**DEFENDANTS' RESPONSE:** Paragraph 519 should be struck as immaterial. Project ATLAS is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 143 at 6-7.)

520. The Mulago Foundation made no further donations to Mount Sinai after the investigation, and has not supported Singh's work since. (McAllister Decl. Ex. 22 (Starr Tr. 12425, 257).)

**DEFENDANTS' RESPONSE:** Paragraph 520 should be struck as immaterial. The Mulago Foundation's donation history is not relevant to the claims at issue in this litigation.

521. In December 2013, before the search concluded and before he held any position at Mount Sinai, Singh wrote to Starr: "My only interest here is not blowing 12.5 million ... I think it would be useful for me to have some sort of role for the institute ... My sense is that if you

told the chair of the medicine dept ... that it was a condition of the grant, she would be very supportive." (McAllister Decl. Ex. 35 (Singh 4116 at 4117).)

**DEFENDANTS' RESPONSE:** Paragraph 521 should be struck as immaterial. Communications in 2013, before AIGH was formed and before Singh was hired, are not relevant to the claims at issue in this litigation.

522. Starr wrote in December 2013: "John Arnhold is going to give them $12.5 million to create an institute. It falls to me enter a process well down the track and make it into something useful." (*Id.*)

**DEFENDANTS' RESPONSE:** Paragraph 522 should be struck as immaterial. Communications in 2013, before AIGH was formed and before Singh was hired, are not relevant to the claims at issue in this litigation.

523. Starr testified that when he saw the proposal, "especially given the amounts required, the proposal was quite vague and in the end went ahead with it." (McAllister Decl. Ex. 22 (Starr Tr. 26).)

**DEFENDANTS' RESPONSE:** Paragraph 523 should be struck as irrelevant. Proposals created and reviewed before AIGH was formed and before Singh was hired, are irrelevant to the claims in this litigation.

524. Jody Arnhold wrote to Starr: "Keep him ... And the letter is out of his file - now. Prabhjot must get a full vote of confidence and everyone has to know it and that he has our support." (McAllister Decl. Ex. 72 (S024-37 at 31-32).)

**DEFENDANTS' RESPONSE:** Paragraph 524 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate. Judge Willis. (*See* Dkt. 135, 200.) Neither Jody Arnhold nor Starr were employed by

ISMMS and Magistrate Judge Willis denied Plaintiffs' request to depose the Arnholds. (Dkt. 185, p. 3.)

525. Starr replied that "if he stays (good chance, i think) it will be in no small part because of that backing." Ms. Arnhold answered: "You are the front man Kevin. Make it happen." (McAllister Decl. Ex. 72 (S024-37 at 31-32).)

**DEFENDANTS' RESPONSE:** Paragraph 525 should be struck as immaterial. Whether or not the Arnholds supported Singh is irrelevant to Plaintiffs' claims in this litigation.

526. This paragraph is left intentionally blank.

527. On July 23, 2018 John Arnhold reported that Charney had agreed to remove the disciplinary letter from Singh's personnel file if Singh met his goals, and "asked whether a small amount of money (100-200 thousand) could be redirected to teaching program. Said it would go a long way toward smoothing the waters. I said yes." (McAllister Decl. Ex. 72 (S024-37 at 31-32).)

**DEFENDANTS' RESPONSE:** Paragraph 527 should be struck as immaterial.

528. On June 8, 2018, while the investigation was running, Singh wrote to Starr: "I would personally hold any $ discussion as highly contingent on how things proceed vis a vis my ability/institute to flourish." (McAllister Decl. Ex. 57 (Singh 4167).)

**DEFENDANTS' RESPONSE:** Paragraph 528 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate. Judge Willis. (*See* Dkt. 135, 200.) Charney also testified that the Arnholds had no impact on the investigation. (Reply Lupion Decl. Ex. 62 (Charney Tr. 232-33).)

529. Starr's knowledge of Singh was drawn from approximately half a dozen visits of about an hour each; asked what other work situations he had seen him in, he answered: "That

is the work situations I've seen him in." He never observed the Institute outside structured meetings. (McAllister Decl. Ex. 22 (Starr Tr. 183-84, 80).)

**DEFENDANTS' RESPONSE:** Paragraph 529 should be struck as immaterial. The number of times Starr observed Singh is not relevant to the claims at issue in this litigation.

530. Starr was unaware of rates of staff turnover at the Institute and could recall no departure other than Berman's. (McAllister Decl. Ex. 22 (Starr Tr. 81).)

**DEFENDANTS' RESPONSE:** Paragraph 530 should be struck as immaterial. Starr's knowledge of the rate of staff turnover is not relevant to the claims at issue in this litigation

**GG. Olivarius, and Mount Sinai's Response to Her Report.**

531. Mount Sinai prepared a written agenda headed "Ann Olivarius Visit to the Arnhold Institute for Global Health, April 26, 2018," naming Renita Ramjit ("Ramjit") as point of contact. It was circulated by Berman to Bruzelius, Weisman and Misiti, copied to Singh. (McAllister Decl. Ex. 47 (ISMMS 10118).)

**DEFENDANTS' RESPONSE:** Paragraph 531 should be struck as immaterial. Olivarius's visit to AIGH is not relevant to the claims at issue in this litigation.

532. Olivarius holds a bachelor's degree from Yale, an M.B.A. from the Yale School of Management, a J.D. from Yale Law School and a D.Phil in Economics from the University of |Oxford. (McAllister Decl. Ex. 18 (Olivarius Tr. 9-11).)

**DEFENDANTS' RESPONSE:** Paragraph 532 should be struck as immaterial. Olivarius's academic credentials are irrelevant.

533. Olivarius testified that she "ha[s] been a philanthropist over time," that she does "some philanthropy," that she advises other philanthropists on their giving practices, and that

she has donated to organizations working on women's health. (McAllister Decl. Ex. 18 (Olivarius Tr. 69-70).)

**DEFENDANTS' RESPONSE:** Paragraph 533 should be struck as immaterial. Olivarius's philanthropic background is irrelevant to the claims at issue in this litigation.

534. Singh described Olivarius to Starr as "a prominent woman lawyer masquerading as a donor." (McAllister Decl. Ex. 22 (Starr Tr. 185).)

**DEFENDANTS' RESPONSE:** Paragraph 534 should be struck as immaterial. Singh's description of Olivarius is irrelevant to the claims at issue in this litigation.

535. Lowy was made aware within a day or two that Singh had met Olivarius on April 26, 2018, and knew her as "a lawyer known for representing women in gender discrimination matters." (McAllister Decl. Ex. 15 (Lowy Tr. 43, 44).)

**DEFENDANTS' RESPONSE:** Paragraph 535 should be struck as immaterial. Lowy's description of Olivarius is irrelevant to the claims at issue in this litigation.

536. Lowy surmised that Olivarius "was advising Drs. Atkinson and Anandaraja behind the scenes." (McAllister Decl. Ex. 15 (Lowy Tr. 47).)

**DEFENDANTS' RESPONSE:** Paragraph 536 should be struck as immaterial. Lowy's belief as to Olivarius's connection to Atkinson and Anandaraja is irrelevant to the claims at issue in this litigation.

537. Lowy's understanding of the Cliveden and New York meetings came from a conversation with Mr. Jonathan Taylor in April 2018, after Charney had instructed her to investigate. (McAllister Decl. Ex. 15 (Lowy Tr. 53-54, 56, 56-57).)

**DEFENDANTS' RESPONSE:** Paragraph 537 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

538. In July 2018 Starr wrote: "A couple of months ago now, Charney promised me he would investigate that issue," the issue being "I still want to understand how this Ana Olivarius character came into the picture." (McAllister Decl. Ex. 22 (Starr Tr. 220).)

**DEFENDANTS' RESPONSE:** Paragraph 538 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

539. Asked whether he had asked Charney to investigate Olivarius's involvement, Starr answered "Apparently," and confirmed he had asked the Dean to report back. Asked whether the Dean ever did, he answered: "He never reported back." (McAllister Decl. Ex. 22 (Starr Tr. 221).)

**DEFENDANTS' RESPONSE:** Paragraph 539 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

540. Mount Sinai's Rule 30(b)(6) designee was not asked about, and gave no evidence concerning, Olivarius, the contemplated gift, or the Cliveden meeting. Tiger-Paillex testified that she had never heard anyone refer to Olivarius before this lawsuit. (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 203).)

**DEFENDANTS' RESPONSE:** Paragraph 540 should be struck as immaterial. Olivarius, the contemplated gift and the Cliveden meeting are irrelevant to the claims in this litigation.

## HH. Starr's Warning to Singh Before the Investigation Began.

541. Starr wrote to John Arnhold on June 22, 2018: "Ramon's fingerprints are all over this mess. He spoke to me of an investigation on April 24. According to Sinai, there was no investigation at that point." (McAllister Decl. Ex. 22 (Starr Tr. 210).)

**DEFENDANTS' RESPONSE:** Paragraph 541 should be struck as immaterial. Neither Starr's nor John Arnhold's opinion of the investigation is relevant to the claims in this case.

542. Starr described what Murphy told him: "there are investigations being launched about — about sexual discrimination. And he just said it in passing in such a strange way, clearly not thought out on his part: An investigation's already underway." (McAllister Decl. Ex. 22 (Starr Tr. 121).)

**DEFENDANTS' RESPONSE:** Paragraph 542 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.) Paragraph 542 is also hearsay.

543. Starr described the conversation as "hinting darkly: Things are going on. Investigations are happening. I was shocked." (McAllister Decl. Ex. 22 (Starr Tr. 120).)

**DEFENDANTS' RESPONSE:** Paragraph 543 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

544. Asked what he did with that information, Starr answered: "Mostly stewed about it. I'm sure that I talked to Prabhjot. I can't imagine that I didn't. I'm sure I did." (McAllister Decl. Ex. 22 (Starr Tr. 114).) He confirmed: "I know I talked to Prabhjot about it." (McAllister Decl. Ex. 22 (Starr Tr. 117).)

**DEFENDANTS' RESPONSE:** Paragraph 544 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

545. Starr explained his practice: "if I heard something like that about a leader of someone in our portfolio, I would let them know immediately, 'Hey, this is circulating about you. I don't know what you should do about it, but you should know.'" He described it as "just mostly a heads-up." (McAllister Decl. Ex. 22 (Starr Tr. 117).)

**DEFENDANTS' RESPONSE:** Paragraph 545 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

546. Starr placed the conversation before the investigation began. (McAllister Decl. Ex. 22 (Starr Tr. 110, 115).)

**DEFENDANTS' RESPONSE:** Paragraph 546 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

547. Singh sent Starr a timeline on or about April 30, 2018 and a "Factoids" email on May 1, 2018. (McAllister Decl. Ex. 22 (Starr Tr. 253, 253).)

**DEFENDANTS' RESPONSE:** Paragraph 547 should be struck as immaterial. Whether or not Singh sent Starr a timeline and "Factoids" email is irrelevant.

548. Singh's contemporaneous note records that on April 28, 2018 he was told of an investigation of him concerning "turnover" and "gender discrimination." (Singh Note, ISMMS 021261.)

**DEFENDANTS' RESPONSE:** Duplicative of ¶324 of Plaintiffs' Additional Statement and immaterial. Defendants' Response to ¶324 is incorporated herein.

ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

**II. What Mount Sinai Has Admitted About Notice.**

549. Asked in discovery to identify individuals who raised concerns about potential unfair treatment based on gender and/or retaliation, Defendants identified: "Dr. Emilie Bruzelius, Amanda Misiti, Dr. Holly Atkinson, Dr. Natasha Anandaraja, Elena Rahona, and Renee Bischoff." (Defs.' Resp. to Interrog. No. 24, Dkt. 186-1.)

**DEFENDANTS' RESPONSE:** Paragraph 549 should be struck as immaterial. Whether or not individuals other than Plaintiffs "raised concerns" is irrelevant to Plaintiffs' claims.

550. Asked to identify those told about the 2018 investigation, Defendants identified, among others, "Dr. Dennis Charney, Dr. Prabhjot Singh, David Berman, Kirsten Knaup, Kevin Starr, Rosalind Fink, Dr. Kenneth Davis, Susan Cullman, Bernard Nussbaum, Brad Karp and Judith Rubin." (Defs.' Resp. to Interrog. No. 19, Dkt. 186-1.) Dr. Kenneth Davis is Chief Executive of the Mount Sinai Health System. Ms. Cullman, Mr. Nussbaum, Mr. Karp and Ms. Rubin are Trustees. Fink was Singh's personal counsel. (Defs.' Resp. to Interrog. No. 19, Dkt. 186-1; McAllister Decl. Ex. 9 (Fink Tr. 11-14).)

**DEFENDANTS' RESPONSE:** Paragraph 550 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

551. Asked whether Muller raised concerns to Human Resources that the majority of those leaving the Institute under Singh were women, Mount Sinai's designee answered: "Yes, it's my understanding that Dr. Muller brought to HR concerns about women disproportionately

leaving the institute, but what — during that time period, but specifically about women leaving." (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 59-60).)

**DEFENDANTS' RESPONSE:** Admitted as to the quoted testimony. Disputed that the statement is material.

552. Mount Sinai did not treat that report as a complaint against Singh, describing it as "a report as described that went to HR related to women disproportionately leaving." (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 60, 63).)

**DEFENDANTS' RESPONSE:** Admitted as to the quoted testimony. Disputed that the statement is material.

553. Asked whether there are "magic words" that must be used before a concern becomes a complaint, Mount Sinai's designee answered: "No." (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 199, 200).)

**DEFENDANTS' RESPONSE:** Admitted as to the quoted testimony. Disputed that the statement is material.

554. Mount Sinai has no policy defining what constitutes a complaint: "There is not a policy that lays out what constitutes a complaint." (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 258).)

**DEFENDANTS' RESPONSE:** Admitted as to the quoted testimony. Disputed that the statement is material.

555. Mount Sinai did not treat Misiti's October 2018 meeting with Human Resources as a complaint against Singh, but its designee conceded that it "does amount to Ms. Misiti raising concerns to HR about Dr. Singh." (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 256, 257).)

**DEFENDANTS' RESPONSE:** Admitted as to the quoted testimony. Disputed that the statement is material.

556. Mount Sinai did not treat as a complaint Rahona's written statement that she wanted to "formally put her concerns on record." (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 259, 260).)

**DEFENDANTS' RESPONSE:** Paragraph 556 should be struck as immaterial. Rahona is not a plaintiff, the statement she made was in 2015, and whether or not Mount Sinai treated it as a complaint is irrelevant to the Plaintiffs' claims in this litigation.

557. Mount Sinai's designee testified that it is the School's position that Bischoff did not report concerns related to Singh. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 59).)

**DEFENDANTS' RESPONSE:** Admitted.

558. Muller testified that Bischoff told him "[t]hat an increasing number of people were leaving the institute, that many of them were women, and that that was a real source of concern for her." (McAllister Decl. Ex. 16 (Muller Tr. 251).)

**DEFENDANTS' RESPONSE:** Admitted.

559. Bischoff testified to writing talking points for herself in June 2018, setting out "things I was considering and wondering whether they were because of gender or not." (McAllister Decl. Ex. 5 (Bischoff Tr. 302-305).) The pertinent section read:

> <u>Gender</u>
>
> - Women's job titles were demoted "Assistant Director" to "Program Manager"
> - JF-founding CTO; SK-Associate Director; DB-chief of staff
> - Sk-left residency after 1 year, no real office or managerial experience, elevated title that
> - was way beyond his level of experience, "fail up"

- Business cards immediately printed without giving anyone time to discuss the change
- | had a private office in Med Ed and then had to sit in a cubicle and then share with
- Kirsten and then the "penalty box"
- Don't meet with people or talk to people I'd been working with for several years
- Several students noticed this behavior "taking credit for women's work"
- Expected to be "so grateful" for something | earned and | worked at for 5 years
- What is gender discrimination?
- Pass the trash

(McAllister Decl. Ex. 64 (ISMMS 6878).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the document. Disputed as to materiality. Bischoff is not a plaintiff.

560. Muller reported that concern to Human Resources — to Tiger-Paillex, by telephone, on the same day — and then to Charney within a couple of weeks. (McAllister Decl. Ex. 16 (Muller Tr. 252, 253, 180).)

**DEFENDANTS' RESPONSE:** Disputed. The concern Muller reported to Human Resources and Charney was about the number of people leaving AIGH, not the talking points referred to in paragraph 560. (*See* Defendants' Response to ¶395 of Plaintiffs' Additional Statement.)

561. Muller deliberately did not identify Bischoff as the source: "I did not deliver it as Renee Bischoff's message. I was very clear to Renee and very careful because she didn't want to be seen in any way as passing information off." (McAllister Decl. Ex. 16 (Muller Tr. 253).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Muller's testimony.

562. Tiger-Paillex "said that she was unaware of it," raised possible exit interviews, but did not commit to any action, and there was no follow-up conversation. (McAllister Decl. Ex. 16 (Muller Tr. 254, 255).)

> **DEFENDANTS' RESPONSE:** Paragraph 562 should be struck as duplicative of ¶395 of Plaintiffs' Additional Statement.

563. Tiger-Paillex testified that she did not recall Muller saying "women," and did not recall Bischoff's March 2018 email stating "Another talented female leaving the Arnhold Institute and Mount Sinai." (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 155, 169).)

> **DEFENDANTS' RESPONSE:** Paragraph 563 should be struck as duplicative of ¶393 of Plaintiffs' Additional Statement.

564. Asked whether the departures raised a concern that this might be a gender issue, Tiger-Paillex answered: "No." She did not go to Charney about it. (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 174, 178).)

> **DEFENDANTS' RESPONSE:** Admitted.

565. Muller confirmed that key staff departed, naming among others Murphy, Anandaraja, Atkinson, Bischoff and Rahona, and testified that this was "[v]ery concerning." (McAllister Decl. Ex. 16 (Muller Tr. 194).)

> **DEFENDANTS' RESPONSE:** Admitted. Disputed as to materiality and completeness. Murphy is male and Muller testified that Singh "behaved towards a dear friend of mine, Ramon Murphy, in a way that I thought was cruel and insensitive." (Reply Lupion Decl. Ex. 71 (Muller Tr. 246-47).) Muller also testified to the departures of Craig Katz, Nils Henning, and Jonathan Ripp. (Dkt. 223-16 (Muller Tr. 194).)

566. Muller understood the subject of the investigation into Singh to be "[g]ender discrimination." (McAllister Decl. Ex. 16 (Muller Tr. 265).)

**DEFENDANTS' RESPONSE:** Paragraph 566 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.) Muller's understanding of the investigation is irrelevant.

**JJ. The Absence of Any System for Recording Complaints.**

567. Tiger-Paillex testified: "Q. Are there standardized forms that are filled out? A. No, there's not a standardized form. Q. Is there any kind of computer database where people put in the date the complaint was made, the identity of the person making the complaint, things like that? A. Not in my office." (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 134).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Disputed as to materiality.

568. A record is kept only where a matter is investigated; otherwise "there would potentially be a document, but not necessarily a file." (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 139-40, 136, 138).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Disputed as to materiality.

569. There is no system in Human Resources to track anonymous calls referred by compliance, and Tiger-Paillex did not know whether there had been any search of those records made in relation to this litigation. (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 67-68).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Disputed as to materiality.

570. Tiger-Paillex did not look for or review her own records of relevant conversations in connection with this litigation, and did not review the longhand notes she took during the investigation interviews before testifying. (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 77, 79, 304).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Disputed as to materiality.

571. Knaup took no notes, established no standard processes, and made no effort to standardize them. (McAllister Decl. Ex. 13 (Knaup Tr. 122-23, 156, 67).)

**DEFENDANTS' RESPONSE:** Disputed. Knaup's testimony regarding that she took "[no] notes" (Dkt. 223.13 (Tr. 122-23)) was in response to a question about whether she took any notes when she read the court complaint.

572. Knaup testified that no one reported concerns about discrimination to her. (McAllister Decl. Ex. 13 (Knaup Tr. 108).)

**DEFENDANTS' RESPONSE:** Admitted.

573. El-Sayed told Knaup he was "not going to work with anyone over the age of 40." She did not report it to Singh: "I didn't see the point"; "I didn't find that that was my job to do"; and "I didn't feel discriminated against so I also didn't think that Anu was discriminated against because she was there." (McAllister Decl. Ex. 13 (Knaup Tr. 105-107).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. The cited pages refer to a comment that Anandaraja reported to Knaup, not a comment Knaup received herself. The testimony is irrelevant because age discrimination is not a claim in this litigation. Paragraph 573 should be struck.

574. Mount Sinai's investigators told Knaup that she "didn't have the competency" in "HR matters." (McAllister Decl. Ex. 13 (Knaup Tr. 303).)

**DEFENDANTS' RESPONSE:** Admitted as to the content of the testimony. Paragraph 574 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

575. Knaup's performance reviews before that were "all glowing," and her appraiser was Singh. (McAllister Decl. Ex. 13 (Knaup Tr. 297).)

**DEFENDANTS' RESPONSE:** Admitted.

576. Jones-Winter breached Mount Sinai's rules by exchanging private texts with Safo during the investigation and was not disciplined. (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 24041).)

**DEFENDANTS' RESPONSE:** Paragraph 576 should be struck as immaterial. Whether or not Jones-Winter was disciplined for breaching Mount Sinai policy is irrelevant to Plaintiffs' claims.

577. No one in Human Resources was disciplined in connection with Knaup's failures. Tiger-Paillex considered that fair. (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 279).)

**DEFENDANTS' RESPONSE:** Paragraph 577 should be struck as immaterial. Whether or not someone in HR was disciplined in connection with "Knaup's failures" and Tiger-Paillex's opinion on the matter are irrelevant to Plaintiffs' claims.

578. Tiger-Paillex denied that Human Resources bore any responsibility: "Not if we didn't know about it." (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 276, 277).)

**DEFENDANTS' RESPONSE:** Disputed. Tiger-Paillex's testimony on the cited pages was in response to questions about Singh's purported failure to standardize institution policies and practices.

579. Tiger-Paillex did not know whether Knaup had ever received training in Mount Sinai's anti-discrimination policies. (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 94).)

**DEFENDANTS' RESPONSE:** Disputed. While Tiger-Paillex testified that she did not know specifically whether Knaup had received training, she testified that the training "comes out annually and is required by every employee at Mount Sinai." (Reply Lupion Decl. Ex. 76 (Tiger-Paillex Tr. 93-94).)

580. Neither Knaup nor Tiger-Paillex conducted exit interviews, and neither knew who was responsible for them. (McAllister Decl. Ex. 13 (Knaup Tr. 36, 40); McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 181).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. Tiger-Paillex did not testify that she did not know who was responsible for conducting exit interviews.

581. Weisman conducted no formal exit interviews with Bruzelius, Llames or Khan. (McAllister Decl. Ex. 24 (Weisman Tr. 229, 231).)

**DEFENDANTS' RESPONSE:** Admitted.

**KK. Charney's Participation in the Outcome.**

582. Lowy sent the recommendations of the Singh investigation to Singh's counsel on June 22, 2018: "Dear Roz, the investigation led to the recommendations listed below which were made to and accepted by Dean Charney. I know that the dean discussed them in some detail with Dr. Singh." (McAllister Decl. Ex. 9 (Fink Tr. 47-48).)

**DEFENDANTS' RESPONSE:** Paragraph 582 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

583. Fink confirmed that Singh had already discussed the recommendations with Charney. (McAllister Decl. Ex. 9 (Fink Tr. 48).)

**DEFENDANTS' RESPONSE:** Paragraph 583 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

584. Lowy wrote to Fink that she did "not want to steal the dean's thunder." (McAllister Decl. Ex. 9 (Fink Tr. 49).)

**DEFENDANTS' RESPONSE:** Paragraph 584 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

585. Charney met Singh personally on June 22, 2018. (McAllister Decl. Ex. 9 (Fink Tr. 50).)

**DEFENDANTS' RESPONSE:** Paragraph 585 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Mag. Judge Willis. (*See* Dkt. 135, 200.)

586. Tiger-Paillex confirmed that the eight recommendations were made to and accepted by Charney. (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 247).)

**DEFENDANTS' RESPONSE:** Paragraph 586 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Mag. Judge Willis. (*See* Dkt. 135, 200.)

587. Asked what happened to the recommendations, Lowy answered: "They were implemented," and that "certain aspects were enhanced" — by Charney. (McAllister Decl. Ex. 15 (Lowy Tr. 75, 76).)

**DEFENDANTS' RESPONSE:** Paragraph 587 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

588. Lowy stated contemporaneously: "he's accepted all our findings and all our recommendations without exception. He's amplified some of the recommendations based on what he thought additional needed to be done ... so he's strengthened some of the recommendations, but he certainly accepted everything without debate." She confirmed that account was true. (McAllister Decl. Ex. 15 (Lowy Tr. 123-24, 126).)

**DEFENDANTS' RESPONSE:** Paragraph 588 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

589. Charney, not Lowy, first communicated the outcome to Singh. (McAllister Decl. Ex. 15 (Lowy Tr. 103, 128).)

**DEFENDANTS' RESPONSE:** Paragraph 589 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

590. Lowy testified: "The dean has had several very serious, stern, straightforward conversations with him. He knows what's expected ... he understands and he's been told that, You have to turn this around, and you have to fix it, and you have to fix everything." (McAllister Decl. Ex. 15 (Lowy Tr. 168).)

**DEFENDANTS' RESPONSE:** Paragraph 590 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

591. The oversight committee was to "report directly to Dr. Charney," with a review of progress after about six months. Lowy could not recall whether that review took place. (McAllister Decl. Ex. 15 (Lowy Tr. 130, 131).)

**DEFENDANTS' RESPONSE:** Paragraph 591 should be struck as immaterial. The work of the oversight committee is irrelevant to the claims at issue.

592. Any final warning notice to Singh would have come from Charney, not from Human Resources. (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 273).)

**DEFENDANTS' RESPONSE:** Paragraph 592 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

593. Fink's note of July 12, 2018 records: "Marina [Lowy] will ask Dennis to tell Prabhjot who he's talking to and what he's telling them about the investigation, findings and recommendations"; "Marina will ask Dennis to tell Prabhjot the bases for the oversight committee and who will be on it"; "Marina will alert Dennis to the need to talk to Prabhjot about the medical education recommendations"; and "Marina will ask Dennis to identify benchmarks." (McAllister Decl. Ex. 9 (Fink Tr. 64-65).)

**DEFENDANTS' RESPONSE:** Paragraph 593 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

594. Singh had counsel present at his investigative interview. (McAllister Decl. Ex. 9 (Fink Tr. 21-22).)

**DEFENDANTS' RESPONSE:** Paragraph 594 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

595. Fink gave input on the identity of Singh's executive coach and on the composition of the oversight committee. (McAllister Decl. Ex. 9 (Fink Tr. 55, 57, 60).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. Fink did not testify that she gave input on the oversight committee composition, just that she discussed names. When asked if there were concerns about who was on the committee she testified, "That, I don't recall." (Reply Lupion Decl. Ex. 64 (Fink Tr. 60).) Whether Fink gave input on an executive coach and the composition of the oversight committee is not relevant to Plaintiffs' claims.

596. Fink dated a joint interest arrangement between Singh and Mount Sinai to June 22, 2018, upon learning that Mount Sinai had found Singh not to have engaged in discrimination. (McAllister Decl. Ex. 9 (Fink Tr. 75, 30).)

**DEFENDANTS' RESPONSE:** Paragraph 596 should be struck as immaterial. Singh's execution of a joint interest agreement with Mount Sinai is irrelevant to the claims and defenses in this litigation.

597. Mount Sinai refused to give Fink a copy of the report and recommendations, on the ground of attorney-client privilege. (McAllister Decl. Ex. 9 (Fink Tr. 52, 53).)

**DEFENDANTS' RESPONSE:** Admitted that Mount Sinai did not share a copy of the privileged investigation report with Singh's attorney. Paragraph 597 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

598. Asked whether she had conveyed "the idea that some of the complaints about Dr. Singh's conduct was really the result of direction that he had received from Dean Charney," Fink answered: "I may have." (McAllister Decl. Ex. 9 (Fink Tr. 99).)

**DEFENDANTS' RESPONSE:** Paragraph 598 should be struck as immaterial. Whether or not Fink conveyed her opinion regarding the complaints against Singh

is irrelevant. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

599. Asked whether it would become clear to Plaintiffs "that some of what they are complaining about him was not Singh, it was somebody else directing that these actions be undertaken," Fink answered: "Generally speaking, yes." (McAllister Decl. Ex. 9 (Fink Tr. 101).)

**DEFENDANTS' RESPONSE:** Paragraph 599 should be struck as immaterial. Fink's opinion on whether something would become clear to Plaintiffs is irrelevant.

600. Fink wrote on July 3, 2018: "What has been or will be done to get out the word that he was not found to have engaged in either gender or age discrimination; weak management skills are one thing; discrimination is quite another." (McAllister Decl. Ex. 9 (Fink Tr. 73).)

**DEFENDANTS' RESPONSE:** Paragraph 600 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.) Fink's inquiry about communicating the results of the investigation also is irrelevant.

601. Mount Sinai's investigation outcome 3 required the oversight committee to "mentor Dr. Singh and take steps to ensure that the institute's atmosphere is improved, particularly as it relates to gender issues." (McAllister Decl. Ex. 9 (Fink Tr. 56-57); McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 265-66).)

**DEFENDANTS' RESPONSE:** Paragraph 601 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

602. Mount Sinai's investigation outcome 7 required a review of all institute members' "job duties, titles and compensation to ensure appropriate classification and pay parity between men and women and to ensure transparency." (McAllister Decl. Ex. 9 (Fink Tr. 62); McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 275).)

**DEFENDANTS' RESPONSE:** Paragraph 602 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

603. Asked what the gender issues were, Tiger-Paillex answered: "We didn't have finding of gender discrimination, but employees that were in the institute felt that there were ... we wanted to ensure that the atmosphere was improved so that people didn't feel that way." (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 270).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Paragraph 603 should be struck as immaterial.

604. Tiger-Paillex testified: "We reviewed all the job descriptions and the salaries ... to make sure that there was pay equity." (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 256).)

**DEFENDANTS' RESPONSE:** Disputed. The quoted testimony does not accurately represent the testimony, which was as follows: "Q. Pay equity means parity of payment between male and female, right? A. Appropriate salaries for the job that they were doing. Q. And making sure that there's no gender disparity between people doing the same job, right? A. That's part of it, but there's others. It's not just gender. It's making sure that they get paid based on their experience, their education, their qualifications as well as the job they are doing." (Reply Lupion Decl. Ex. 76 (Tiger-Paillex Tr. 256-57).)

605. Singh was never subject to a disciplinary action and was never referred to the Faculty Disciplinary Tribunal. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 175, 177).)

**DEFENDANTS' RESPONSE:** Admitted.

606. Tiger-Paillex had heard that people were angry that Singh was not dismissed. (McAllister Decl. Ex. 23 (Tiger-Paillex Tr. 294).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. The testimony is hearsay. The quoted testimony was preceded by the following exchange: "Q: Was it true that people were very angry he wasn't being terminated? A. I didn't speak directly with anybody to know that." (Dkt. 223.23 (Tiger-Paillex Tr. 294).)

**LL. Lowy's Declaration, and the Privilege Position.**

607. Lowy states in her sworn declaration: "My investigation was conducted in anticipation of litigation." (Lowy Decl. ¶ 4, Dkt. 133-1.)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the statement. The paragraph should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

608. Lowy states that a formal internal complaint was made on April 27, 2018 and that she delivered her report to Charney on June 21, 2018. (Lowy Decl. ¶¶ 5, 11, Dkt. 133-1.)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the statement. Paragraph 608 should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

609. Lowy states that the investigators interviewed over 20 current and former employees and reviewed personnel information concerning Institute employees. (Lowy Decl. ¶ 10, Dkt. 133-1.)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the statement. The paragraph should be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

610. Defendants' counsel stated on the record at the Rule 30(b)(6) deposition: "Mount Sinai is not relying on its investigation for its defense." (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 266).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the statement. The paragraph should be struck. Counsel's statements on the record are not evidence.

611. Mount Sinai's designee was instructed not to answer whether "bitch" violated the anti-harassment policy, whether men-only offices would breach policy, and how Singh's treatment of Safo compared with his treatment of Kishore and Faghmous. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 203, 123, 127, 230-32).)

**DEFENDANTS' RESPONSE:** Paragraph 611 should be struck as immaterial. Counsel's statements on the record are not evidence and the stated questions did not pertain to topics for which the corporate representative was designated to testify.

612. Lowy testified that the investigation's charge "was for legal to look at the gender bias issues," and that it "morphed into looking at leadership issues in general because it was inescapable in the course of the investigation," which were "beyond our expertise and ability to look at." (McAllister Decl. Ex. 15 (Lowy Tr. 132).)

**DEFENDANTS' RESPONSE:** Disputed as to the attribution of the testimony to Lowy and immaterial. After the testimony cited in ¶612, Lowy was asked if she recognized the voice of the unidentified speaker and she said "no." (Dkt. 223.15

(Lowy Tr. 132-33).) ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

613. Lowy testified that she did not examine the Institute's expenditure, and that the investigation "was not about" the direction the School decided to take. (McAllister Decl. Ex. 15 (Lowy Tr. 133-34, 222-23).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Disputed as to materiality. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

614. Lowy testified: "we came out of the gate expecting that our finding will be gender discrimination," and confirmed that statement was truthful when made. (McAllister Decl. Ex. 15 (Lowy Tr. 149, 152).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Disputed as to materiality. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

615. Lowy told the complainants that they "weren't outliers in your descriptions of the way he spoke to people," and confirmed she was truthful. (McAllister Decl. Ex. 15 (Lowy Tr. 16162, 164).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Disputed as to materiality. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

616. Lowy stated: "Everyone experienced him as demeaning. Everyone experienced him as dismissive." She confirmed the statement was truthful. (McAllister Decl. Ex. 15 (Lowy Tr. 19293, 193).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Disputed as to materiality. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

617. Lowy stated that "there have been women here, believe me, who've been just as big an asshole as he is who have been given second chances," and confirmed she had said Singh was "lucky." (McAllister Decl. Ex. 15 (Lowy Tr. 228).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Disputed as to materiality. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

618. Lowy stated that Singh "is going to have to deliver — deliver and be a good leader and become a leader because clearly he has not," and confirmed the statement. (McAllister Decl. Ex. 15 (Lowy Tr. 234, 236).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Disputed as to materiality. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

619. Lowy told the complainants: "we can't undo these events, and I'm sorry for that" and confirmed she had said it and that her empathy was genuine. (McAllister Decl. Ex. 15 (Lowy Tr. 241, 242, 243).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Disputed as to materiality. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.) "These events" are not cited or described in paragraph 619.

620. Lowy testified: "we know that there was a strong wish by many that he be terminated, but we just couldn't conclude that that was the fair thing to do given that there had

never been a message that, You've got to — these are the areas you have to fix or you'll be terminated." (McAllister Decl. Ex. 15 (Lowy Tr. 178-79).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Disputed as to materiality. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

621. Lowy stated at the meeting of July 2018: "that's not my job to figure out what happens academically in Global Health or programmatically, and that's something that's within the dean's purview to decide, you know, with the people who give the money for it, where that program is going to go." (McAllister Decl. Ex. 15 (Lowy Tr. 241).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Disputed as to materiality. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

622. Lowy confirmed that the results and recommendations were shared with donors, including the Arnholds. (McAllister Decl. Ex. 15 (Lowy Tr. 231, 231).)

**DEFENDANTS' RESPONSE:** Disputed. Lowy could not recall whether the results and recommendations were shared with the Arnholds. (Reply Lupion Decl. Ex. 69 (Lowy Tr. 231-32).) Paragraph 622 should also be struck as immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

623. Lowy testified that Bruzelius was among those she interviewed, and gave no evidence about any complaint by Bruzelius about Silva. (McAllister Decl. Ex. 15 (Lowy Tr. 61).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the testimony. Disputed as to materiality. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

**MM. Beddoe's Report to Charney, and His Response.**

624. Dr. Ann Marie Beddoe is a gynecologic oncologist and was an Associate Professor at the School. She is the plaintiff in *Beddoe v. Icahn School of Medicine at Mount Sinai, et al.*, Case No. 1:22-cv-03080 (JLR) (S.D.N.Y.), and was deposed in that action on March 15, 2023 by counsel for Defendants here.

**DEFENDANTS' RESPONSE:** Disputed that Beddoe "is" the plaintiff in the litigation described in paragraph 624. Beddoe's claims have been dismissed in their entirety with prejudice. Otherwise admitted and immaterial.

625. Beddoe was interviewed once by Lowy in the 2018 investigation. (McAllister Decl. Ex. 3 (Beddoe Tr. 229).)

**DEFENDANTS' RESPONSE:** Paragraph 625 should be struck on the ground that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 625 also is immaterial. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

626. Beddoe met Charney on June 20, 2018 and wrote to him on June 23, 2018. (McAllister Decl. Ex. 3 (Beddoe Tr. 108, 125, 127, 128).)

**DEFENDANTS' RESPONSE:** Paragraph 626 should be struck on the ground that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe

was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 626 also is immaterial.

627. Beddoe testified: "Well, I asked him if he was aware of the complaints that were filed with HR, which he said he did. He said he didn't know about it before they filed the complaint. He said that he wanted the women to know that he was very supportive of them because he had daughters, and he would not want anything like that to happen to them." (McAllister Decl. Ex. 3 (Beddoe Tr. 51).)

**DEFENDANTS' RESPONSE:** Paragraph 627 should be struck on the ground that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 627 also is immaterial. Beddoe was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied.

628. Beddoe testified: "Dr. Charney asked me if I thought he could be rehabilitated, and I said no. I don't think he can [be] rehabilitated. He expressed concerns that he didn't want to stifle his potential, and at my remark but what about the women who are complaining he didn't respond to that." (McAllister Decl. Ex. 3 (Beddoe Tr. 52).)

**DEFENDANTS' RESPONSE:** Paragraph 628 should be struck on the grounds that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 628 also is immaterial.

629. Beddoe testified that Singh was "a faculty member that he really put on a pedestal," and "Dr. Singh was like Dr. Charney's golden boy." (McAllister Decl. Ex. 3 (Beddoe Tr. 53).)

**DEFENDANTS' RESPONSE:** Paragraph 629 should be struck on the ground that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 629 also is immaterial.

630. Asked whether Charney responded to her email, ever responded, or ever acknowledged it, Beddoe answered "No" to each. (McAllister Decl. Ex. 3 (Beddoe Tr. 60).)

**DEFENDANTS' RESPONSE:** Paragraph 630 should be struck on the ground that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 630 also is immaterial.

631. Beddoe testified: "when I met with him and I left his office after talking to him about Dr. Singh and his — and complaints that were filed against him, he immediately called my chairman. I don't know what the conversation was, but I don't think he calls everybody's chairman." (McAllister Decl. Ex. 3 (Beddoe Tr. 78)).

**DEFENDANTS' RESPONSE:** Paragraph 631 should be struck on the ground that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 631 also is immaterial.

632. Beddoe telephoned her chairman as she crossed campus and was told "Dr. Charney already called me about the meeting." (McAllister Decl. Ex. 3 (Beddoe Tr. 65).)

**DEFENDANTS' RESPONSE:** Paragraph 632 should be struck on the ground that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 632 also is immaterial.

633. Beddoe testified that Charney raised her email again some six months later. (McAllister Decl. Ex. 3 (Beddoe Tr. 78).)

**DEFENDANTS' RESPONSE:** Paragraph 633 should be struck on the ground that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 633 also is immaterial.

634. Asked how she was aware of the complaints, Beddoe answered: "I don't know exactly. It was the best kept secret at Mount Sinai ... Everyone knew that there was — there was some complaints about harassment at the Arnhold Institute of Global Health." (McAllister Decl. Ex. 3 (Beddoe Tr. 44).)

**DEFENDANTS' RESPONSE:** Paragraph 634 should be struck on the ground that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 634 also is immaterial.

635. Beddoe testified: "It was not just confined to Marina Lowy and the dean. The entire campus knew what was going on." (McAllister Decl. Ex. 3 (Beddoe Tr. 58).)

**DEFENDANTS' RESPONSE:** Paragraph 635 should be struck on the ground that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 635 also is immaterial.

636. Beddoe's email of June 23, 2018 named the problem as the "emotional abuse and harassment of women by men in leadership positions in our medical sector." (McAllister Decl. Ex. 3 (Beddoe Tr. 74).)

**DEFENDANTS' RESPONSE:** Paragraph 636 should be struck on the ground that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 636 also is immaterial.

637. Beddoe's email of June 23, 2018, read into the record by Defendants' counsel, states: "Sadly there have been numerous rumors heralding your announcement this week that range from appoint an oversight committee to monitor the person alleged to have committed these offenses while leaving his position intact to removing him from his current role but protecting his career within the confines of our great institution." (McAllister Decl. Ex. 3 (Beddoe Tr. 57-58).)

**DEFENDANTS' RESPONSE:** Paragraph 637 should be struck on the ground that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe

was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 637 also is immaterial.

638. Beddoe testified of her investigation interview with Lowy: "She was very puzzled why the women were bringing a complaint when she had suffered the same kind of treatment during her years as a lawyer in Israel ... And she said that she was going to make a decision about, you know, the outcome of this investigation, but that most people would not be very happy with what she — you know, what decision she came to." (McAllister Decl. Ex. 3 (Beddoe Tr. 45).)

**DEFENDANTS' RESPONSE:** Paragraph 638 should be struck on the ground that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 638 also is immaterial.

639. Muller declined to raise the subject of the women's complaints against Singh with Charney when Beddoe suggested it. (McAllister Decl. Ex. 3 (Beddoe Tr. 63-64).)

**DEFENDANTS' RESPONSE:** Paragraph 639 should be struck on the ground that the evidence cited, the Beddoe deposition transcript, was not produced in this litigation. (*See* Defendants' Motion to Strike, filed concurrently herewith.) Beddoe was not a deponent in this litigation, nor unavailable and Fed. R. Civ. P. 32(a)(8) is not satisfied. Paragraph 639 also is immaterial.

### NN. Safo — Appraisals, Restrictions and Title.

640. Safo's 2016 faculty appraisal rates her 3.67 on scholarship, 4 on research and 4 on clinical work, records that she "led the renewal of a significant grant" and "played a crucial

role in building a new organizational function," and was approved by Singh on March 15, 2017. (Safo Decl. Ex. 2 (Safo 2397).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the document, disputed as to materiality.

641. Safo's 2017 faculty appraisal reduces almost every line to 3, records a final rating of "meets expectations," records promotion readiness as "No," describes the same grant as one Safo "has partially managed," and was approved by Singh on March 1, 2018. (Safo Decl. Ex. 3 (Safo 2395).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of the document, disputed as to materiality.

642. In October 2018 Mount Sinai Human Resources circulated a memorandum headed "CONFIDENTIAL Dr. Stella Safo's supplement back-pay." (McAllister Decl. Ex. 33 (ISMMS_019267-019272).)

**DEFENDANTS' RESPONSE:** Disputed as to the nature of the document, but admitted as to the title.

643. Safo testified that she "experienced Prabhjot's desire to control my professional relationships as being something that felt gendered and didn't feel like that was happening for other colleagues, especially male colleagues in the institute," and identified his "tendency to indicate to me that I shouldn't talk to individuals within Mount Sinai Health Partners without him present or cc'd," with the same as to Cityblock and the Peterson Group. (Lupion Decl. Ex. 4 (Safo Tr. 209-10).)

**DEFENDANTS' RESPONSE:** Paragraph 643 should be struck as duplicative of ¶60 of Defendants' 56.1 Statement, including Plaintiffs' Response as stated therein. Defendants' ¶60 is incorporated herein.

644. Singh forbade Anandaraja from speaking to senior leadership without him. (McAllister Decl. Ex. 1 (Anandaraja Tr. 250).)

**DEFENDANTS' RESPONSE:** Paragraph 644 should be struck as immaterial. Anandaraja is not a plaintiff.

645. Safo testified that her expanded job responsibilities and comparison to colleagues who were getting enhanced titles and promotions justified a promotion request to Chief Medical Officer: "That's why I asked for the CMO position." (Lupion Decl. Ex. 4 (Safo Tr. 84-85).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Safo's testimony. Paragraph 645 should be struck as duplicative of ¶45 of Defendants' 56.1 Statement, including Plaintiffs' Response as stated therein. Defendants' statements in ¶45 are incorporated herein.

646. Safo asked in 2015 whether she could negotiate her starting salary directly with the School. Singh told her it "wouldn't be appropriate," was "a bit short about my even asking," and the sentiment she took away was "that I somehow wasn't grateful for ... him bringing me onboard, and so I stopped pursuing it." (McAllister Decl. Ex. 19 (Safo Tr. 49).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Safo's testimony. Paragraph 646 should be struck as duplicative of ¶36 of Defendants' 56.1 Statement, including Plaintiffs' Response as stated therein. Defendants' statements in ¶36 are incorporated herein. Safo's "sentiment" is immaterial.

647. In an escalating email exchange concerning a birthday cake, Berman accused Safo of "creating exclusivity" and of being the reason for the poor culture of the Institute, copying Singh. Safo testified: "it felt aggressive. It felt like we were having a conversation as colleagues, and then suddenly he's bringing in ... the individuals who are the ultimate leaders

of the institute." Singh then told her he agreed with Berman. (McAllister Decl. Ex. 19 (Safo Tr. 111-15).)

**DEFENDANTS' RESPONSE:** Admitted. The exchange is in ¶¶82-86 of Defendants' 56.1 Statement, including Plaintiffs' Responses as stated therein. To the extent ¶647 is duplicative of those paragraphs, it should be struck.

648. Singh confirmed the birthday-cake incident, testified that the exchange was "extended and probably inappropriate after a certain point," and that he "had asked for them to both stop talking about birthday celebrations in that manner." (McAllister Decl. Ex. 20 (Singh Tr. 281-82).)

**DEFENDANTS' RESPONSE:** Admitted. See also Defendants' 56.1 ¶86 of Defendants' 56.1 Statement, which Plaintiffs admitted.

649. Safo testified that Silva "would preferentially decide whose work he would complete versus not complete," withholding or slowing the work he owed her, "and that definitely felt like that was gendered." (Lupion Decl. Ex. 4 (Safo Tr. 249).)

**DEFENDANTS' RESPONSE:** Paragraph 649 should be struck as duplicative of ¶89 of Defendants' 56.1 Statement, including Plaintiffs' Response as stated therein, and ¶262 of Plaintiffs' Additional Statement.

### OO. Misiti — False Promotion Rule, Titles and Job Description.

650. Singh told Misiti that promotion required her to have been "in a role for a certain period of time" and to "actually be doing the role for a certain period of time." (McAllister Decl. Ex. 17 (Misiti Tr. 114, 103-04).)

**DEFENDANTS' RESPONSE:** Paragraph 650 should be struck as duplicative of ¶154 in Defendants' 56.1 Statement.

651. Asked whether it is Mount Sinai's policy that a non-faculty member cannot be promoted within the first two years of employment, its Rule 30(b)(6) designee answered: "No." (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 249).)

**DEFENDANTS' RESPONSE:** Admitted.

652. Asked about a one-year requirement, the designee answered: "that is not specified as a policy." (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 251).)

**DEFENDANTS' RESPONSE:** Admitted.

653. The only requirement is completing probation, ordinarily six months. (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 249).)

**DEFENDANTS' RESPONSE:** Disputed. The witness did not testify that it was the "only requirement" or that it was "ordinarily" six months. The witness testified: "[t]he length of that probationary period could vary. It most often starts at six months, but it can be longer and restarts with moves in position" (Dkt. 212.10 (ISMMS 30(b)(6) Tr. 249).)

654. Functional titles were "largely Dr. Singh's ... decision in the end"; they are not laid out in writing; and the definition of the job duties attached to them was also within his discretion. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 88, 90, 119-20).)

**DEFENDANTS' RESPONSE:** Admitted. The full testimony is: "It was largely Dr. Singh's title -- Dr. Singh's decision in the end as to the functional title, though, again, he wouldn't have that ability over the institutional title." (Dkt. 212.10 (ISMMS 30(b)(6) Tr. 88).)

655. Asked what mechanism prevents abuse of that discretion, Mount Sinai's designee answered: "Mount Sinai does not have policies related to the functional titles." (Lupion Decl. Ex. 10 (ISMMS 30(b)(6) Tr. 107).)

**DEFENDANTS' RESPONSE:** Disputed as incomplete. The witness identified "Mount Sinai policies, as laid out in particular in the Faculty Handbook." (Dkt. 212.10 (ISMMS 30(b)(6) Tr. 107-08).)

656. Misiti testified that Singh "presented it to me as if he was advocating for me and we went through a large process of going back and forth with the job description, but it was my understanding that what was actually being shared back, he was watering down to not reflect the full depth and expansion of what my role had become." (McAllister Decl. Ex. 17 (Misiti Tr. 114).)

**DEFENDANTS' RESPONSE:** Paragraph 656 should be struck as immaterial. Misiti's "understanding" of what Singh was sharing with others (and for which she was not present) is immaterial and speculation.

657. Singh raised the Director of Global Sites position with Misiti, "said I'd be great for it and then shortly thereafter told me all of the reasons why I would most likely not be a good fit for it and that I should fight for it." (Lupion Decl. Ex. 6 (Misiti Tr. 115-16, 101).)

**DEFENDANTS' RESPONSE:** Paragraph 657 should be struck as duplicative of. ¶165 of Defendants' 56.1 Statement.

658. The Director of Global Sites role was filled by Dr. Duncan Maru, a man, who was later promoted again. (Lupion Decl. Ex. 6 (Misiti Tr. 104).)

**DEFENDANTS' RESPONSE:** Disputed. See ¶168 of Defendants' 56.1 Statement and Defendants' Response to ¶309 of Plaintiffs' Additional Statement.

659. At an Institute event Singh instructed Misiti to take the microphone away from Safo while she was speaking. (McAllister Decl. Ex. 17 (Misiti Tr. 147, 185-86, 188).)

**DEFENDANTS' RESPONSE:** Admitted. Singh testified that while he didn't recall the context of event, he would have made such a request of Misiti "[i]f we

were running over on time or if things were getting behind schedule" (Reply Lupion Decl. Ex. 75 (Singh Tr. 277-78)), and that he asked Misiti to do it, rather than himself, because he "didn't want to create a situation where [Safo] felt … like…[Singh] was coming to interrupt her." (*Id.*)

660. Over Misiti's stated objection — "I wasn't comfortable with that, I didn't think that that should come from me" — Singh required her to send an email on October 1, 2018 insisting that external partners attend a meeting in person, and then "sent this other option right afterwards demonstrating more flexibility to them directly." (McAllister Decl. Ex. 17 (Misiti Tr. 119-21).)

**DEFENDANTS' RESPONSE:** Paragraph 660 should be struck as duplicative of ¶¶178-79 of Defendants' 56.1 Statement (which Plaintiffs admitted).

661. Singh did the same to Ramjit, his executive assistant. (McAllister Decl. Ex. 17 (Misiti Tr. 198-99).)

**DEFENDANTS' RESPONSE:** Disputed. Misiti's testimony is that "what occurred with [Ramjit] was similar to a pattern that I had experienced." Paragraph 661 should also be struck as immaterial. Ramjit is not a plaintiff and Misiti admitted in her testimony that she did not know whether Singh's concern about Ramjit's email was shared by others. (Reply Lupion Decl. Ex. 70 (Misiti Tr. 199-200).)

662. Singh denied telling Misiti that he "[p]referred the modest look" when commenting on the suit she was wearing in Liberia. (McAllister Decl. Ex. 20 (Singh Tr. 178).)

**DEFENDANTS' RESPONSE:** Admitted as to Singh's testimony, but disputed as to materiality. There is no evidence in the record Singh said this; Misiti did not testify about the purported comment in her deposition when asked to identify

specific behavior that she felt was discriminatory. (Dkt. 212.6 (Misiti Tr. 101-02, 106, 116-18, 144-45, 155-56, 163-65, 203-04.)

663. The Liberia trip took place in August 2017. (McAllister Decl. Ex. 17 (Misiti Tr. 79).)

**DEFENDANTS' RESPONSE:** Misiti testified "I believe it was August of 2017, around that time period." (Dkt. 223.17 (Misiti Tr. 79).)

**PP. Bruzelius — Pay and Comparators.**

664. Mount Sinai's Compensation department analyzed the staffing of the Institute in November 2018, listing each employee's title, job class and grade, current salary and proposed new salary. Its first entry records "Craig Helfgott, Data Science Anlst III, PK10 29P, 120,000." (ISMMS_019538-ISMMS_019540.)

**DEFENDANTS' RESPONSE:** Admitted that ISMMS 19540 (Dkt. 223-60) contains the quoted entry; ISMMS 19538-39 are not part of the record. Several male employees also received salary increases following the 2018 review. (Reply Lupion Decl. Ex. 78 (ISMMS_019540).)

665. Mount Sinai's 2018 merit-increase schedule for Department 91 — Global Health lists every salary in the Institute by name, life number, job class, job title, salary grade and scheduled hours. (ISMMS_009255; ISMMS_009264; ISMMS_009279.)

**DEFENDANTS' RESPONSE:** Disputed as incomplete and inaccurate. Two of the documents cited were not included as part of Plaintiffs' summary judgment filing. (*See* Dkt. 223.58.) The cover email for the document that was included, ISMMS 9279, indicates the document is the "proposed 2018 salary increases" for the AIGH "NBU staff." (Dkt. 223.58 (ISMMS 9272, 9279).) The compensation determinations for non-faculty staff are explained at ¶¶28-29. Singh testified that

it is "a list of people who would be eligible for a merit increase" and that "I don't think it's a complete picture." (Reply Lupion Decl. 75 (Singh Tr. 194–95, 202).)

666. Offer letters in evidence include those of Mongia (Roben Decl. Ex. 12 (ISMMS 21372), Helfgott (Roben Decl. Ex. 10 (ISMMS 21370)) and Bruzelius (ISMMS_000131-000132, February 25, 2016).

**DEFENDANTS' RESPONSE:** Disputed to the extent ¶666 is intended to represent a complete list, which it does not.

667. When Faghmous left, the men who had reported to him received salary supplements. The stated justification recorded by the Institute's Chief Operating Officer was "Supplement for additional responsibilities, double slash, boss leaving." (McAllister Decl. Ex. 13 (Knaup Tr. 231).)

**DEFENDANTS' RESPONSE:** Disputed. The content of the email speaks for itself. (*But see* ¶162 of Defendants' 56.1 Statement, which confirms that while Singh tried to retain Le after Faghmous's departure, Le left for a higher paying job.)

668. Knaup confirmed that Le and Silva "got a salary increase, the justification for which was given to you by Dr. Singh, [and] was that they assumed additional responsibilities once their boss [Faghmous] left." (McAllister Decl. Ex. 13 (Knaup Tr. 233).)

**DEFENDANTS' RESPONSE:** Disputed. The quotation in ¶668 reflects Plaintiffs' counsel's question to Knaup, which she said, "I can't really speak to" regarding Le and appeared inaccurate for Silva. (Reply Lupion Decl. Ex. 66 (Knaup Tr. 232-33).)

669. Bruzelius also reported to Faghmous. (McAllister Decl. Ex. 13 (Knaup Tr. 237).)

**DEFENDANTS' RESPONSE:** Paragraph 669 should be struck as duplicative of ¶8 of Defendants' 56.1 Statement.

670. Asked whether Bruzelius received a pay increase after Faghmous left, Knaup answered: "I don't recall." (McAllister Decl. Ex. 13 (Knaup Tr. 237).)

**DEFENDANTS' RESPONSE:** Admitted as to the content of Knaup's testimony.

671. Knaup testified: "What I did say to Dr. Singh is that Emil[ie] would like a raise to which he answered, 'Well, she is a doctoral student.'" (McAllister Decl. Ex. 13 (Knaup Tr. 110).)

**DEFENDANTS' RESPONSE:** Admitted, but the testimony presented is materially incomplete. Knaup testified, "What I did say to Dr. Singh is that Emily would like a raise to which he answered, "Well, she is a doctoral student." So she hadn't completed her education compared to, for example, Patrick Doupe, D-O-U-P-E. He already had a Ph.D. at least two years. I know he did a year in Berlin. And Dr. Healthguard (phonetic) [sic] [Helfgott] had a Ph.D. from Berkeley for like 15 years already. So they were not her peers." (Dkt. 223.13 (Knaup Tr. 110).)

672. Knaup told Bruzelius she could renegotiate "once she has a doctorate," which was about two years away. (McAllister Decl. Ex. 13 (Knaup Tr. 116).)

**DEFENDANTS' RESPONSE:** Admitted as to the content of Knaup's testimony and immaterial.

673. Mount Sinai's designee testified that in 2018 "a review was undertaken of all staff members within AIGH related to their job duties, both their functional and institutional titles ... and their current level of compensation," with Bruzelius included. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 233-34).)

**DEFENDANTS' RESPONSE:** Admitted. See also Defendants Response to ¶604, which is incorporated herein.

674. At the end of the review Bruzelius's salary was increased and she was promoted to senior data analyst. (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 235, 238, 239).)

**DEFENDANTS' RESPONSE:** Disputed. Her salary was increased but she was not promoted. (*See* infra ¶677.)

675. ISMMS's list of AIGH employees and their job titles, produced in lieu of 30(b)(6) deposition testimony, lists both Bruzelius, Doupe, Le and Mongia as having the same title: Senior Data Analyst. (Dkt. No. 193; McAllister Decl. Ex. 34(ISMMS 26976).)

**DEFENDANTS' RESPONSE:** Admitted.

676. Asked whether part of the purpose of the review was to ensure Bruzelius's salary was not lower than the men's because of her sex, the designee answered: "Yes, in the sense that that's why there is a standardized process for compensation and position control review, so yes." (McAllister Decl. Ex. 25 (ISMMS 30(b)(6) Tr. 241).)

**DEFENDANTS' RESPONSE:** Disputed. The referenced page does not contain the testimony cited in ¶676.

677. Mount Sinai Human Resources wrote to Bruzelius on January 14, 2019: "The pay increase is not a promotion, it's an adjustment based on concerns we raised resulting from the investigation ... this review came about as a result of allegations of salary inequity within the Institute ... Although downward adjustments were found, we agreed we would only hold or increase salaries and amend titles." (McAllister Decl. Ex. 51(ISMMS_019688-019691).)

**DEFENDANTS' RESPONSE:** Admitted. (*See* Defendants' 56.1 Statement ¶221.)

678. Le's promotion to data science analyst 1 at $95,000 is recorded, and Tiger-Paillex said she knew of no comparison made to female employees in the same position. (Lupion Decl. Ex. 11 (Tiger-Paillex Tr. 188, 189).)

**DEFENDANTS' RESPONSE:** Disputed. (*See* Defendants' 56.1 Statement ¶62.) The document presented to Tiger-Paillex was the recommendation by Singh that never materialized because Le left AIGH.

679. Knaup said she was not aware of Singh offering Bruzelius a promotion and denied that she told Bruzelius to expect a raise of $20,000 to $30,000. (McAllister Decl. Ex. 13 (Knaup Tr. 116-17).)

**DEFENDANTS' RESPONSE:** Disputed as an inaccurate portrayal of Knaup's testimony. Knaup's testimony, as cited in ¶679, was in response to questions posed to her about the allegations in the Complaint, not documents or other evidence that could substantiate that Bruzelius was offered a promotion or that Knaup told her to expect a raise.

680. Knaup admitted telling Bruzelius that Singh "was probably not aware of her daily work." (McAllister Decl. Ex. 13 (Knaup Tr. 115).)

**DEFENDANTS' RESPONSE:** Disputed as to characterization of Knaup's testimony as an "admission," otherwise admit the contents of the testimony.

**QQ. Bruzelius — Changing her Supervisor.**

681. Weisman testified that his role was not the role Faghmous had held: Faghmous "had been a very different role, so there was no real parallel ... I think his title was chief technology officer, which is a very broad-based position in the technology world, whereas this was director of a very focused project." He took over "ATLAS specifically, yes." (McAllister Decl. Ex. 24 (Weisman Tr. 28-29).)

**DEFENDANTS' RESPONSE:** Admitted.

682. Faghmous left in about September 2017; Weisman began in April 2018. (McAllister Decl. Ex. 24 (Weisman Tr. 34).)

**DEFENDANTS' RESPONSE:** Paragraph 682 should be struck to the extent it is duplicative of ¶8 in Defendants' 56.1 Statement. Admitted that Weisman testified he began in April 2018.

683. In the intervening period Singh supervised the ATLAS team "nominally." (McAllister Decl. Ex. 24 (Weisman Tr. 150).)

**DEFENDANTS' RESPONSE:** Paragraph 683 should be struck as immaterial and a misrepresentation of Weisman's knowledge. Weisman's testimony began with, "I think" because he was not at the Institute during the "intervening period."

684. There was no handover from Faghmous to Weisman: "No. I never met him, and he didn't leave many documents behind." (McAllister Decl. Ex. 24 (Weisman Tr. 150).)

**DEFENDANTS' RESPONSE:** Disputed as to the characterization there "was no handover." Admit the contents of the testimony, which is immaterial.

685. Weisman testified: "Since there's no defined trajectory ... I don't know what Dr. Faghmous's goals would have been." (McAllister Decl. Ex. 24 (Weisman Tr. 151, 151).)

**DEFENDANTS' RESPONSE:** Admit the contents of the testimony, which is immaterial.

686. Asked why Bruzelius became one of his supervisees, Weisman answered: "Because Dr. Singh asked me to supervise her." (McAllister Decl. Ex. 24 (Weisman Tr. 125).)

**DEFENDANTS' RESPONSE:** Admitted.

687. Weisman testified: "I had no strong feeling about it one way or the other." (McAllister Decl. Ex. 24 (Weisman Tr. 138).)

**DEFENDANTS' RESPONSE:** Disputed and immaterial. The paragraph is disputed because context of the quoted testimony is misrepresented. Weisman testified "I had no strong feeling about it one way or the other" in response to counsel's question, "[d]o you think it was a good time for Dr. Bruzelius to report directly to you in June of 2019?" (corrected to 2018), not the statement contained in ¶686 above. (Reply Lupion Decl. Ex. 77 (Weisman Tr. 137-38).) Weisman's feelings are irrelevant.

688. Weisman placed the change "during the summer of 2018 ... sometime in July." (McAllister Decl. Ex. 24 (Weisman Tr. 152).)

**DEFENDANTS' RESPONSE:** Admitted that Weisman testified as such. (*But see* Defendants' 56.1 Statement ¶8 and Dkt. 223.24 (Weisman Tr. 138).)

689. Weisman wrote in Bruzelius's October 2018 evaluation: "Emilie, perhaps more than other members of the ATLAS team, has had to adapt to changes of leadership, reporting, plans and collaborations during 2018. She has accommodated these sifting sands with grace and with a relentless desire to move with the times and do the right thing." He confirmed writing it. (McAllister Decl. Ex. 24 (Weisman Tr. 155-56).)

**DEFENDANTS' RESPONSE:** Admitted.

690. Weisman explained: "To the best of my knowledge, she was the only person who transitioned from sort of having a dotted relationship to ATLAS, to being under ... a full-time leadership under ATLAS ... nobody else that I was aware of had undergone that — that number of changes." (McAllister Decl. Ex. 24 (Weisman Tr. 156).)

**DEFENDANTS' RESPONSE:** Admitted but incomplete. Weisman testified that [Bruzelius] "had had a working relationship [sic] Dr. Aaron Baum that wasn't ATLAS-based and that had changed, shifted as well. So it wasn't just leadership

in the structure sense, but also her roles were shifting. . ." (Dkt. 223.24 (Weisman Tr. 156).)

691. Weisman rated Bruzelius "a strong contributor." (McAllister Decl. Ex. 24 (Weisman Tr. 155).)

**DEFENDANTS' RESPONSE:** Admitted but incomplete. On Bruzelius's 2018 performance review, Weisman rated her as a two out of three and a strong contributor. (Reply Lupion Decl. Ex. 77 (Weisman Tr. 154-55).)

692. The job-description review Weisman conducted in the autumn of 2018 was his own initiative; nobody asked him to do it. (Dkt. 223.24 (Weisman Tr. 132-33).)

**DEFENDANTS' RESPONSE:** Admitted and immaterial. Weisman testified that he conducted the review so he could "take best advantage of people's skills and talents." (Dkt. 223.24 (Weisman Tr. 132-33).)

**RR. ATLAS**

693. Weisman testified that his predecessor was "always a murky sort of topic," that Faghmous's role "had been a very different role, so there was no real parallel," and that he took over "ATLAS specifically." (McAllister Decl. Ex. 24 (Weisman Tr. 28-29).)

**DEFENDANTS' RESPONSE:** Admitted as to the contents of Weisman's testimony.

694. Starr testified that he "never really fully understood how the technology would work or how it would be applied," and that ATLAS "seemed like it took a lot of the bandwidth of the institute at the time." (McAllister Decl. Ex. 22 (Starr Tr. 65-66).) "I don't think Atlas AI worked out." (McAllister Decl. Ex. 22 (Starr Tr. 77).)

**DEFENDANTS' RESPONSE:** Paragraph 694 should be struck as immaterial. Project ATLAS is not relevant to this litigation as determined by Magistrate Judge Willis. (*See* Dkt. 143 at 6-7.)

695. Weisman, the director of ATLAS from April 2018, testified that code had been written and demonstrated to him when he joined. (McAllister Decl. Ex. 24 (Weisman Tr. 52-53).)

**DEFENDANTS' RESPONSE:** Paragraph 695 should be struck as immaterial. Project ATLAS is not relevant to this litigation as determined by Magistrate Judge Willis. (*See* Dkt. 143 at 6-7.)

696. Weisman testified that he made presentations to donors and grant-making organizations about ATLAS's "capabilities, the potential, and the functionality," but not about its status. (McAllister Decl. Ex. 24 (Weisman Tr. 98).)

**DEFENDANTS' RESPONSE:** Paragraph 696 should be struck as immaterial. Project ATLAS is not relevant to this litigation as determined by Magistrate Judge Willis. (*See* Dkt. 143 at 6-7.)

697. ATLAS was subsequently frozen: "we basically — we didn't move forward with it." (McAllister Decl. Ex. 24 (Weisman Tr. 147).)

**DEFENDANTS' RESPONSE:** Paragraph 697 should be struck as immaterial. Information about Project ATLAS is not relevant to this litigation as determined by Magistrate Judge Willis. (*See* Dkt. 143 at 6-7.)

698. Weisman is no longer director of ATLAS. (McAllister Decl. Ex. 24 (Weisman Tr. 54).)

**DEFENDANTS' RESPONSE:** Paragraph 698 should be struck as immaterial. Information about Project ATLAS is not relevant, as determined by Magistrate Judge Willis. (*See* Dkt. 143 at 6-7).

699. Starr recalled that Khan "was unhappy with how this Atlas Project was going," and that he raised Khan's concerns with Singh. (McAllister Decl. Ex. 22 (Starr Tr. 171).)

**DEFENDANTS' RESPONSE:** Paragraph 699 should be struck as immaterial. Information about Project ATLAS is not relevant, as determined by Magistrate Judge Willis. (*See* Dkt. 143 at 6-7.)

700. At Cliveden in April 2018 Singh represented to a prospective donor that ATLAS would "start to save 10,000 women's lives across Africa." (McAllister Decl. Ex. 18 (Olivarius Tr. 77).)

**DEFENDANTS' RESPONSE:** Paragraph 700 should be struck as immaterial. Information about Project ATLAS is not relevant, as determined by Magistrate Judge Willis. (*See* Dkt. 143 at 6-7.)

701. This paragraph is left intentionally blank.

702. This paragraph is left intentionally blank.

**SS. The Distribution of Terms and Conditions by Sex.**

703. Khan, a man two years out of university, was assigned "virtually no administrative tasks" in his entire time at the Institute, and observed the same of Baum, Mr. Le, Doupe, Faghmous, Mongia and Helfgott. [Khan Decl. ¶19.]

**DEFENDANTS' RESPONSE:** Paragraph 703 should be struck as duplicative and immaterial. (*See* Plaintiffs' Response to Defendants' 56.1 Statement ¶53 and Defendants' Reply.)

704. Atkinson, a physician, was set to typing approximately a thousand email addresses into a database and to photographing new hires. (McAllister Decl. Ex. 2 (Atkinson Tr. 155, 15556).)

**DEFENDANTS' RESPONSE:** Paragraph 704 should be struck as immaterial. Atkinson is not a Plaintiff and her work at the Institute preceded the relevant time frame for purposes of this litigation.

705. Safo testified that the administrative structuring of retreats and senior meetings "would often fall to me and other women," and that such work "seemed to get assigned to women more than others." (McAllister Decl. Ex. 19 (Safo Tr. 202, 207-08).)

**DEFENDANTS' RESPONSE:** This paragraph should be struck as duplicative of ¶52 of Defendants' 56.1 Statement, including Plaintiffs' Response as stated therein. Plaintiffs' additional statement "that such work 'seemed to get assigned to women more than others'" referred to work that Safo believed "could have been shared across the board" without providing any specific details. (Dkt. 223.19 (Safo Tr. 202).)

706. Misiti testified that Llames "requested PTO and it was approved by Prabhjot and then later revoked." (McAllister Decl. Ex. 17 (Misiti Tr. 191).)

**DEFENDANTS' RESPONSE:** This paragraph should be struck as duplicative of ¶112 of Defendants' 56.1 Statement and ¶308 of Plaintiffs' Additional Statement.

707. Maru, a man, was appointed to the Director of Global Sites role Misiti was told she would most likely not be a good fit for. (Lupion Decl. Ex. 6 (Misiti Tr. 115-16, 104).)

**DEFENDANTS' RESPONSE:** This paragraph should be struck as duplicative of ¶¶165 and 168 of Defendants' 56.1 Statement and ¶¶308 and 658 of Plaintiffs' Additional Statement.

708. Safo asked for the Chief Medical Officer title: "That's why I asked for the CMO position." (Lupion Decl. Ex. 4 (Safo Tr. 84-85).)

**DEFENDANTS' RESPONSE:** This paragraph should be struck as duplicative of ¶645 of Plaintiffs' Additional Statement.

709. Singh forbade Anandaraja from speaking to Mount Sinai senior leadership without him. (McAllister Decl. Ex. 1 (Anandaraja Tr. 250).)

**DEFENDANTS' RESPONSE:** The statement contained in ¶709 is inaccurate and immaterial. The testimony concerned conversations with David Muller, not Mount Sinai Leadership. (Dkt. 223.1 (Anandaraja Tr. 250.) Anandaraja is not a Plaintiff in this litigation. Paragraph 709 should be struck.

710. Misiti testified four times that Singh's negative conduct was directed at women and not men. (Lupion Decl. Ex. 6 (Misiti Tr. 89, 91, 92, 102).)

**DEFENDANTS' RESPONSE:** Admitted as to the content of Misiti's testimony as to what she perceived.

711. Bruzelius testified that Berman "only yelled at women that I was aware of." (McAllister Decl. Ex. 6 (Bruzelius Tr. 198-99).)

**DEFENDANTS' RESPONSE:** This paragraph should be struck as duplicative of ¶269 of Plaintiffs' Additional Statement.

712. Safo never heard Berman yell at a man. (Lupion Decl. Ex. 4 (Safo Tr. 103-04).)

**DEFENDANTS' RESPONSE:** This paragraph should be struck as duplicative of ¶270 of Plaintiffs' Additional Statement.

713. Thirteen women left the Institute, compared with five men. (McAllister Decl. Ex. 5 (Bischoff Tr. 243-44).)

**DEFENDANTS' RESPONSE:** Disputed as to a "compar[ison]." The statement contained in ¶713 is the question posed by Plaintiffs' counsel, not the witness's testimony. The response from Bischoff was as follows: "I think there were more women who were working at the Arnhold Institute, but I think part of it is -- that stood out to me, but I think part of it was just the wide range of people who were leaving, that it was not just people who had been part of the original global health team, but it was also a lot of the new people that Prabhjot had hired. I thought that's frankly what really stood out, that even the new people were miserable. BY MR. CERVENKA: Q. And that women are more miserable than men, right? MS. GUERRASIO: Objection to form. A. I don't know if I would agree with that. BY MR. CERVENKA: Q. No? A. In retrospect or after the fact, I've had many conversations with the men who worked there and they were just as miserable, so." (Dkt. 223.5 (Bischoff Tr. 243-44).)

714. Misiti told the investigators: "I don't recall negative statements like these about men." (Lupion Decl. Ex. 26 (Safo 5381).)

**DEFENDANTS' RESPONSE:** Misiti's statements to investigators are irrelevant. ISMMS's internal investigation is not relevant as determined by Magistrate Judge Willis. (*See* Dkt. 135, 200.)

**BBB. Further Facts Cited in Plaintiffs' Memorandum.**

715. Llames told Silva to stop. Asked whether she ever told him she did not want him to make the comments, she testified: "I would say sometimes, 'Bruno, stop. You can't say those things.'" She testified that others were sometimes present, "Sometimes Mike. Maybe sometimes David." (McAllister Decl. Ex. 14 (Llames Tr. 149).)

**DEFENDANTS' RESPONSE:** Paragraph 715 should be struck because it is duplicative of Plaintiffs' Response to paragraph 129 of Defendants' 56.1 Statement.

716. Baum told Bruzelius that Singh wanted her gone. She testified: "I talked about this particular conversation with Aaron Baum and I said what should I do and he said yeah, he wants to get rid of you, so start thinking about where else you would want to go." (McAllister Decl. Ex. 6 (Bruzelius Tr. 157-58).)

**DEFENDANTS' RESPONSE:** The statements contained in ¶716 are immaterial, hearsay, incomplete and should be struck. Bruzelius admitted that Baum's statement was not prompted by anything Singh had told him but rather was his interpretation based on the story Bruzelius had relayed to him. (Dkt. 223-6 (Bruzelius Tr. 158).)

717. At a meeting in September 2018 Charney became "visibly agitated," spoke with "an angry tone in his voice," and said, of an email urging him to make the right decision on Singh, that "it made him very angry when people questioned that he was a champion for women." Anandaraja understood this as threatening, "because he obviously knew that I had been involved in that investigation." (McAllister Decl. Ex. 1 (Anandaraja Tr. 96-97).)

**DEFENDANTS' RESPONSE:** The statements contained in ¶717 are immaterial, speculative and should be struck. Anandaraja is not a Plaintiff.

Dated: October 21, 2026
New York, New York

PROSKAUER ROSE LLP

By: /s/ Adam M. Lupion

Adam M. Lupion
Joseph Baumgarten
Edna D. Guerrasio
Austin D. McLeod
Eleven Times Square

New York, NY 10036
T: 212-969-3000
F: 212-969-2900
alupion@proskauer.com
jbaumgarten@proskauer.com
eguerrasio@proskauer.com
amcleod@proskauer.com

*Attorneys for Defendants Dr. Prabhjot Singh, Dr. Dennis S. Charney, Bruno Silva, and Icahn School of Medicine at Mount Sinai*